## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GINA SPEARMAN,

     Plaintiff,

v.

BROKER SOLUTIONS, INC., d/b/a
NEW AMERICAN FUNDING,

     Defendant.

Case No. 1:20-cv-04981-CAP

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff, Gina Spearman, files the following claims for damages and respectfully shows the Court as follows:

**1.**     **Parties and Jurisdiction**

1.     Plaintiff is a Georgia resident.

2.     Defendant, Broker Solutions, Inc., d/b/a New American Funding ("NAF"), is a California corporation with its principal place of business located in Tustin, California. NAF may be served with process through its registered agent, Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3.     Plaintiff originally filed her complaint in the State Court of Fulton County on November 9, 2020.

4.      NAF removed the action to this court on December 9, 2020.

5.      NAF filed a Motion to Dismiss on December 16, 2020.

6.      The parties jointly agreed to extend the time for Plaintiff to amend her Complaint through January 12, 2021 or oppose NAF's Motion to Dismiss by January 13, 2021.

7.      Plaintiff, within the time permitted by law, files her amended complaint against NAF.

8.      NAF is subject to personal jurisdiction of this Court because NAF transacts business in this County and is registered to conduct business in Georgia and has consented to jurisdiction in this court via filing its removal.

9.      This Court has subject matter jurisdiction over the claims asserted herein.

10.     Venue properly lies in Fulton County.

**2.      <u>NAF hires Ms. Spearman</u>**

11.     NAF originates residential mortgage loans throughout the continental United States.

12.     Before hiring Ms. Spearman, NAF had no presence in the Southeastern region.

13.     NAF approached Ms. Spearman and her partner, Kelly Morrison, to hire them for the purpose of establishing NAF's presence in the Southeast.

14.     NAF hired Ms. Spearman as a Senior Vice-President and Regional Manager for NAF's newly created Southeast Division.

15.     NAF hired Ms. Spearman due to her experience and expertise as a mortgage broker and acknowledged that Ms. Spearman's "knowledge, skills and expertise will be among our most valuable assets." *See* Exhibit 1, Letter Offer Contract, p. 1.

16.     NAF sought to leverage Ms. Spearman's expertise to create and develop NAF's presence in the Southeast.

17.     During her employment, Ms. Spearman was instrumental in opening offices on behalf of NAF in the Southeastern region, staffing those offices with well-qualified loan officers, directing them and developing NAF's Southeastern Division.

**3.    NAF's contract with Ms. Spearman**

18.     On or about November 6, 2016, NAF made an Offer of Employment to Ms. Spearman ("Letter Offer Contract").

19.     The Letter Offer Contract consisted of eight (8) pages and is signed by Ms. Spearman on November 6, 2016 at 11:53 am.  *See* Exhibit 1, p. 7.

20.     The Letter Offer Contract is also signed by NAF.  *See* Exhibit 1, p. 7.

21.     The Letter Offer contains six (6) numbered paragraphs plus two (2) pages of terms and conditions.

22.     The numbered paragraphs are as follows: "1. At Will Employment; 2. Compensation; 3. Manager Agreements; 4. Non-Solicit Agreement; 5. Stipulations and Minimum Production Requirements; 6. Production."

23.     Paragraph "**1. At Will Employment**" discusses the terms of the at will employment.  It provides:

> All employees are hired for an unspecified duration of time and our employment relationship is not for any specified length.  Employment is at mutual consent of the employee and the company.  Accordingly, you r employment will be 'at will'. This means that you may end your employment with the Company at any time.  It also means that the Company may end your employment at any time, with or without cause or prior notice.  The company may change the terms and conditions of your employment, including your positions duties, compensation, benefits, location and/or work schedule.  Your status as an 'at will' employee cannot be changed except through a written agreement signed by the CEO, (presently Rick Arvielo) or COO (presently Christy Bunce).

24.     Paragraph "**2. Compensation**" outlines Ms. Spearman's compensation and provides for a salary and a guarantee.

25.     Paragraph "**3. Manager Agreements**" states that "Gina is eligible to receive a Regional Manager Override. (Outlined in Schedule 1 – Regional Manager Agreement)". It goes on to state:

> Kelly and Gina are eligible to receive compensation differential of up to 140 bps maximum compensation on all self-generated loans and house accounts as well as 75 bps maximum compensation on brokered loans compensation on all their direct reports.  Kelly and Gina will split the compensation differential with 70% to Kelly and 30% to Gina. Kelly Morrison will be responsible for notifying accounting of the 70/30 split each pay period.

26.     Following the six numbered paragraphs, there is a mis-numbered paragraph number 4 titled Benefits at p. 3.

27.     Following the numbered paragraphs described above are two (2) pages of terms and conditions beginning at p. 4. The last paragraph of the Letter Offer contains the following terms at Page 5:

> This letter contains the entire agreement with respect to your employment.   It supersedes any and all other representations or statements that may have been made, either verbally or in writing, with respect to the terms and conditions begin [sic] offered by the Company. When signed by you, this offer letter will be considered a written agreement with respect to the subject matter contained in this letter.  By your signature below, you acknowledge and agree that no other offers, representations, inducements or promises have been made by the Company that are not included in this letter, and that you understand that no other offer, representations, inducements or promises not included in this letter are valid or binding.  ***The material terms of your employment as set out in this letter may not be modified or amended by verbal agreement or course of conduct, but only by a written agreement presented by Human Resources, COO (presently Christy Bunce) or CEO (presently Rick Arvielo).*** [Emphasis supplied].

28.     NAF and Ms. Spearman executed the Letter Offer Contract on November 6, 2016.

29.     Attached to the Letter Offer Contract, and referenced in Paragraph 3 of the Letter Offer Contract, is the Regional Manager Agreement and Schedule 1.

30.     NAF's Regional Manager Agreement ("RMA") and Schedule 1 were executed by Ms. Spearman on November 6, 2016 at 11:53 am, simultaneously with her execution of the Letter Offer Contract.

5

31.    NAF did not execute the Regional Manager Agreement or Schedule 1.

32.    The Regional Manager Agreement contains twelve (12) Articles and three (3) attached Schedules.

33.    Article 1 of the Regional Manager Agreement attached to the Letter Offer Contract contains an At-Will provision much like Paragraph 1 of the Letter Offer Contract to which it was attached and states:

> No one other than the President or COO of the Company has the authority to alter this arrangement, to enter into an agreement for the employment for a specified period of time, or to make any agreement contrary to Company's policy of at-will employment.   Any such agreement must be in writing, must be signed by the President or COO of Company and by Manager, and must express a clear and unambiguous intent to alter the at-will nature of Manager's employment relationship.

34.    Article 5 of the Regional Manager Agreement discusses Compensation. It contains the following general provision that conflicts with the specific terms and conditions of the Letter Offer Contract:

> 5.2 <u>Commissions/Override Bonus</u> Manager will be eligible for Commissions and /or a monthly bonus payment based on Branch Overrides ("Override Bonus") as set forth on Schedule 1 to the Regional Manager Agreement and/or the Outside Loan Originator Agreement Exhibit A- Commission Schedule.   Schedule 1 to the Regional Manager Agreement and/or the Outside Loan Originator Agreement Exhibit A – Commission Schedule may be adjusted up or down or otherwise amended by Company from time to time, in its sole discretion.
>
> Compensation received in accordance with the provisions of Schedule 1 of the Regional Manager Agreement and/or the Outside Loan Originator Agreement Exhibit A – Commission Schedule hereto, and

this Agreement, shall be paid to Manager through Company's regular payroll practices.   Manager's intentional violation of Company's compensation policies shall be cause for discipline, up to and including immediate termination of Manager's employment.   ***In the event any term of this Agreement conflicts with either Schedule 1 to the Regional Manager Agreement or the Outside Loan Originator Agreement Exhibit A – Commission Schedule or any addendums to either of these agreements, then the Schedule 1 to the Regional Manager Agreement and/or the Outside Loan Originator Agreement Exhibit A – Commission Schedule whichever is applicable, or the effective addendum to either of these agreements will control.*** [Emphasis supplied].

35.     Article 12 of the Regional Manager Agreement which is not signed by NAF discusses Miscellaneous Provisions that apply to Ms. Spearman's employment. It also contains the following provision that speaks specifically to "performance of loan origination *services* on behalf of the Company" similar to the one found in the Letter Offer Contract executed simultaneously by Ms. Spearman:

Article 12.2 <u>Integration</u>.  This Agreement supersedes any and all other agreements, either oral or in writing, between the Company and Manager with respect to Manager's performance of loan origination services on behalf of Company, and contains all the covenants and agreements between the Parties with respect to such services in any manner whatsoever.

36.     Schedule 1, Regional Manager Compensation Details, executed solely by Ms. Spearman on November 6, 2016 at 11:53 am, contains paragraph 1.3 Override Bonus and provides:

Regional Manager is eligible for a monthly bonus payment based on their direct reports production of funded loans in a calendar month ("Override Bonus".) Override Bonus is earned on the last calendar of a month.  Regional Manager must be employed and assigned as the

Regional Manager of the direct reports on both the first and last day of the month to be eligible to earn Override Bonus for that branch for that month.

Override Bonus shall be paid on the 10th day of the month following the production month unless that day is a weekend or holiday, in which case Override Bonus will be paid on the following business day….The Override Bonus formula is identified below:

[(applicable number of basis points (bps) earned in a calendar month as set forth in 1.4 and 1.4A below and subject to the limitations of 1.4B **MULTIPLIED BY** total volume originated by branch) **MINUS** Items listed in 1.4C **PLUS** any applicable Override Bonus Add-On described in in [sic] 1.4D below]

37.     Calculation of the Override Bonus is provided for in paragraph 1.4

Override Bonus Calculation Table:

Override Bonus payable to Regional Manager shall be calculated per the Override Bonus Calculation Table below.  Loan Volume and Units funded by managed territory branches during a calendar month will receive the BPS shown in the Override Bonus Calculation Table unless specified otherwise as follows:

- Loan scenarios listed in 1.4A will earn the bps indicated in 1.4A
- No Override Bonus is paid on the loan scenarios listed in 1.4B
- Override Bonus to Regional Manager will be reduced by the amounts shown in 1.4C
- The Override Bonus to Regional Manager will also include the Override Bonus Add-on shown in 1.4D, if indicated by 1.4D

The following summary table is provided:

| Override Bonus Calculation Table (South East Region) | |
| --- | --- |
| **Loan Volume and Units Originated by Territory to be split 70% to Kelly and 30% to Gina Spearman:** (see 1.4.B for loans excluded from override payout) Excluding Piggyback, Jumbo, Junior Lien Loans and Secondary Market Issue Loan | **25 BPS** |
| **Loan Volume and Units Originated by Branch to be split 70% to Kelly Morrison and 30% to Gina Spearman:** Excluding Branch Manager loans, Piggyback Junior Lien Loans and Secondary Market Issue Loans | **30 BPS** |
| Please Review Schedule 7 For Allocations to Authorized Personnel | |

| Compensation Differential |
| --- |
| Kelly and Gina are eligible to receive compensation differential not to exceed 140 BPS in total compensation on self-generated loans and house accounts as well as 75 bps maximum compensation on brokered loans compensation on all their direct reports.  Kelly and Gina will split the compensation differential with 70% to Kelly and 30% to Gina.  Kelly Morrison will be responsible for notifying accounting of the 70/30 split each pay period. |

38.     Notably, Paragraph 1.4A modifies the Override Bonus BPS shown in the above table and provides for the following BPS:

> The following loan scenarios will not receive the Override Bonus BPS shown in the above table but will instead will [sic] receive the BPS as shown below:
> - Branch Jumbo Funded Loans (Excluding Kelly Morrison): Max 20bps (70% to Kelly Morrison and 30% to Gina Spearman, see Schedule 7 for bonus allocations)
> - Loans funded by loan officer recruits placed by recruiting firm or internal Recruiting Department during the first 18 months of employment of such loan officer recruits: these loans will receive the BPS from Override Bonus Calculation Table above minus 5 bps.

39.     Adding additional clarification to the calculation of bps and Override Bonuses, Paragraph 1.4B provides as follows:

**1.4.B**  No Override Bonus will be paid on the following loans:
- Regional Manager Personal Loan Production
- Brokered Loans
- Down Payment Assistance Loans / Bond Loans
- Secondary Market Issue Loans (loans fund funded to refinance a bad unsalable loan)
- Loans where the Regional Manager elects in writing to waive all override compensation on such loan.
- Piggyback Junior Lien Loans (2nd Mortgages) and Closed-end Second Lien Loans
- Loans that have a GFE/LE Application date which precedes the effective date of this Schedule 1.
- Loan Applications taken during Monetary Guaranty Period.  This refers to loan applications taken by loan consultants that have been hired with a monetary guaranty of $5000 per month or greater. If the GFE/LE application is taken during the Monetary Guaranty Period, then these loans are not eligible for an Override Bonus unless the loan consultant's commissions for any month exceed the amount of the Guaranty. Regional Manager shall

notify Secondary Marketing regarding any loan that qualifies for Override Bonus as described in this paragraph. See attached Schedule 4.

_____  YES[1], see attached Schedule 4 – No Override During Guarantee Period

_X_   NO, not applicable to this Area Manager Schedule 1

Footnote 1 states: "Check "YES" if this schedule is applicable for this Regional Manager Agreement.  Otherwise check "NO.""

40.     Generally, this Section would prohibit a Regional Manager from being paid Override Bonuses for the loans set forth in Section 1.4.B of Schedule 1. However, for Ms. Spearman, this section is clearly marked as not applicable, as Section 1.4.B is checked "NO, not applicable to this Area Manager Schedule 1." Thus, Override Bonuses were to be paid on these type loans.

41. Eric Fellows, a NAF branch manager with an employment agreement containing provision 1.4B, testified that he was, indeed, paid Override Bonuses for the loans defined in Section 1.4B of Schedule 1. (Doc. 51-2).

42.     Directly contradicting Mr. Fellows, Kelly Allison, a NAF executive and Ms. Spearman's Co-Regional Manager, later testified that it was the Company's policy to *never* pay Override Bonuses for the loans defined in Section 1.4B. (Doc. 53-1 at Pgs. 94-97).

43.     The remainder of Paragraph 1.4 contains the following subparagraphs regarding compensation:

**1.4.C** The following items will be deducted from the Override Bonus calculation:

- Any portion of Regional Manager's bi-weekly salary if not already deducted from Regional Manager's Commissions as shown in Section 1.2 above.
- ASA / Desk Rental Allocation (defined as an amount representing 50% of any ASA or Desk Rental Fee. See attached Schedule 5.

    ____ YES[1], see attached Schedule 5 – Additional Manager Allocations

     _X_  NO, not applicable to this Regional Manager Schedule 1

- Regional Manager will be reduced 5 BPS on candidates sourced by internal and external recruiters.

    ____ YES[1], see attached Schedule 6 – Recruiting Allocation Form

     _X_  NO, not applicable to this Regional Manager Schedule 1

- Overrides to Authorized Personnel that are identified on the Overrides to Authorized Personnel Addendum if indicated below:

    ____ YES[1], see attached Schedule 7 - Overrides to Authorized Personnel Addendum

     _X_  NO, not applicable to this Regional Manager Schedule 1

**1.4.D** Where applicable, Regional Manager will be paid an Override Bonus Add-On as shown on the Compensation Differential Schedule(s) if indicated below:

    ____ YES[2], see attached Schedule 8 - Compensation Differential Schedule(s)

     _X_  NO, not applicable to this Regional Manager Schedule 1

**1.4.E** Regional Manager Overrides shall be paid out on the Direct Reports of the Regional Manager as indicated below:

_____ YES[1], see attached Schedule 9 – Direct Reports Schedule

_X_ NO, not applicable to this Regional Manager Schedule 1

Footnote 1 states: "Check "YES" if this schedule is applicable for this Regional Manager Agreement.  Otherwise check "NO"."

44.   The items in Paragraphs 1.4C, 1.4D, and 1.4E do not apply to Ms. Spearman's Override Bonus per Schedule 1.

45.   Paragraph 4 of Schedule 1 that is not signed by NAF states:

**Modification of Compensation**.   Regional Manager's Compensation including but not limited to: Commissions, and Override Bonus may be restructured and/or adjusted up or down by Company, in its sole discretion. Regional Manager shall be provided notice of any adjustments as required by law.

46.   On March 1, 2020, NAF amended in writing the Schedule 1 to Regional Manager Agreement Compensation referenced in Ms. Spearman's Letter Offer Contract as required by the terms and conditions of Ms. Spearman's contract.  *See* Exhibit 2, March 1, 2020, Schedule 1.

47.   The March 1, 2020, Schedule 1 altered Ms. Spearman's compensation as originally set out in the November 6, 2016 contract at Paragraph 3.

48.   The March 1, 2020, Schedule 1 eliminated Override Bonuses.

49.     The March 1, 2020, Schedule 1 changed the terms of Ms. Spearman's compensation and provided for a Region Production Bonus and a Performance Bonus.

50.     The March 1, 2020, Amendment provided specific terms for Calculation of Region's Production Bonus and Performance Bonus.

51.     The March 1, 2020, Schedule contained a Paragraph 4 that required NAF to provide Ms. Spearman with at least thirty (30) days' notice of a restructure to her compensation  by providing her with a hard or electronic copy of the new or amended schedule at which time the then-current Schedule would automatically expire on the effective date of the new Schedule and Ms. Spearman's acceptance of compensation after the effective date of a new or amended schedule would constitute acceptance of the terms and conditions. Paragraph 4 states:

> **4. Changes to Compensation.** As provided for in Section 5.2 of the Agreement, SVP's Compensation may be restructured and/or adjusted up or down by NAF, in its sole discretion, upon providing SVP with at least thirty (30) days' notice.  NAF will promptly notify SVP of any changes to Schedule 1 by providing a hard or electronic copy of the new or amended Schedule to SVP.  The then-current Schedule shall automatically expire on the effective date of the new Schedule.   SVP'S ACCEPTANCE OF COMPENSATION AFTER THE EFFECTIVE DATE OF A NEW OR AMENDED SCHEDULE CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET FORTH THEREIN.

52.     On March 1, 2020, NAF executed the March 1, 2020, Schedule 1 to Regional Manager Agreement ("Amendment") and presented it to Ms. Spearman.

53.     Ms. Spearman resigned effective April 13, 2020.

**4.      NAF breaches the contract by reducing Ms. Spearman's compensation and did not place such changes in writing.**

54.     By its express terms, the contract may not be modified or amended by verbal agreement, or course of conduct, but only by a written agreement presented by Human Resources, COO (Christy Bunce) or CEO (Rick Arvielo). NAF's own documents require any change to compensation be made by a written agreement presented by HR, the COO or CEO.

55.     Schedule 1, unsigned by NAF, requires that "Regional Manager shall be provided notice of any adjustment as required by law."

56.     However, the fully executed Letter Offer Contract provides more specific terms that prohibit the contract from being modified by verbal agreement or course of conduct and require changes to the contract be made by written agreement presented by Human Resources, the COO or CEO.

57.     Under the Letter Offer Contract, NAF promised to compensate Ms. Spearman in a variety of ways, including commissions and a monthly Override Bonus as set forth in the contract in paragraph 3 at page 2:

> **3.     Manager Agreements**: Gina is eligible to receive a Regional Manager Override. (Outlined in Schedule 1 – Regional Manager Agreement)
>
> Kelly and Gina are eligible to receive compensation differential of up to 140 bps maximum compensation on all self-generated loans and house accounts as well as 75 bps maximum compensation on brokered loans compensation on all their direct reports.   Kelly and Gina will split the compensation differential with 70% to Kelly and 30% to Gina.  Kelly Morrison will be responsible for notifying accounting of the 70/30 split each pay period.

58.     Paragraphs 1.3 and 1.4 of Schedule 1 that is not signed by NAF, adds details regarding the calculation of Ms. Spearman's Override Bonus identified in paragraph 3 of the Letter Offer Contract.

59.     NAF failed to pay Ms. Spearman her Override Bonuses from the inception date of the contract through her resignation date.

60.     Ms. Spearman notified several company executives of NAF's failure to comply with this provision.  Specifically, Ms. Spearman notified NAF's officers, Christy Bunce, Jon Reed, and Jan Preslo, that she was not being compensated in accordance with contract.

61.     NAF's officers did not respond to Ms. Spearman.

62.     In an August 2018 email, Christy Bunce reaffirmed the value of NAF's partnership with Ms. Spearman and admitted then that NAF did not discuss or change any of the terms of Ms. Spearman's compensation.

63. In November 2018, Ms. Spearman advised NAF about concerns she had with NAF's new policy decision to reduce Loan Officer compensation on DPA/Bond loans which might disincentivize a Loan Officer from offering a Down Payment Assistance loan to a client in violation of the Dodd-Frank Act.

64.     In January and February of 2019, Ms. Spearman again voiced her concern over NAF's introduction of two (2) new source codes that might incentivize a Loan Officer to charge higher rates to customers in order to earn higher bps.

65.    In February 2019 at a Leadership Meeting, NAF verbally informed Ms. Spearman for the first time that her compensation was being reduced for a period of ninety (90) days to assist the Company during a period of financial difficulty stemming from the Company's misallocation of thirty million dollars ($30,000,000.00).

66.    It was not until this February 2019 Leadership Meeting that NAF verbally informed Ms. Spearman for the first time that it was reducing her compensation.

67.    NAF never modified Ms. Spearman's Agreement in writing to reflect these purported changes in compensation until March 1, 2020, when NAF presented a written agreement signed by Human Resources eliminating the Override Bonus from her compensation.

68.    Before NAF presented the signed March 1, 2020, Schedule 1, Ms. Spearman expressed her disagreement with NAF's new payment practices that deviated from the terms of her written signed contract with NAF to NAF officers, and Ms. Spearman told NAF that she did not consent to them.

69.    Ms. Spearman expressed her concerns with the March 1, 2020 Schedule, NAF's technology for tracking the P&L, and associated transparency; however, NAF advised Ms. Spearman that under the contract, NAF was only

required to notify her of the change in writing and that her acceptance was not necessary.

70.    NAF breached the contract by failing to pay Ms. Spearman the Override Bonuses from November 2016 when she was hired through March 1, 2020, when NAF amended Ms. Spearman's compensation in writing as required by the contract.

71.    As a result of NAF's conduct, Ms. Spearman has suffered damages in the amount of $544,383.00 in unpaid Override Bonuses.

**5.    NAF improperly forced Ms. Spearman to pay for Pricing Exceptions and absorb Marketing Costs.**

**i.    Pricing Exceptions**

72.     Mortgage companies set the company's interest rates offered daily by taking the raw price in the secondary market and adding a margin of their choosing. A rate sheet is published daily with higher rates paying back a premium and lower rates showing a cost to obtain that rate (known as discount points).  Loan Officers (salespeople) use this rate sheet to offer borrowers a rate for their new mortgage. The goal is for Loan Officers to quote the "par rate" or closest to par which means it is at an even 100.00 price, neither paying back a premium nor costing discount points.  If the Loan Officer offers a rate that is paying back a premium, then that premium is given to the customer in the form of a lender credit towards closing costs.

73.    When a Loan Officer is in a competitive situation in which another lender is offering a lower rate than the loan officer's company par rate, then it is

customary for the Loan Officer to request a "Pricing Exception" from their manager to match the competition.

74.     For Example, Loan Officer's company par rate is 3.25% and competitor is offering 3.0% rate.  3.25% is at par (no cost) and 3.0 is a cost of 1 point (1% of the loan amount).  In order to match the competitor, the loan officer would request a Pricing Exception of 1.0 which would waive the 1.0 cost to the customer to offer the borrower the 3.0% rate at no cost like the competition.

75.     NAF has a profit margin ranging from 4%-6% on the raw price so making a Pricing Exception on a certain percentage of business is expected and customary.

76.     When NAF hired Ms. Spearman through February 2019, her compensation was not reduced for Pricing Exceptions and the Letter Offer Contract did not provide for same.

77.     After the February 2019 Leadership Meeting, NAF reduced Ms. Spearman's compensation for any loan that the Pricing Exception exceeded a certain tolerance.  Ms. Spearman was forced to absorb Pricing Exceptions.

78.     NAF told Ms. Spearman and other Regional Managers at the February 2019 Leadership Meeting that this practice of absorbing Pricing Exceptions was "short term" because the company was experiencing a financial hardship.

### ii.     Marketing Costs

79.     Marketing Costs include items such as TV commercials, magazine ads, billboards, lead generation contracts, special events, and promotional items.

80.     When NAF hired Ms. Spearman, NAF gave Ms. Spearman and her partner a Marketing Budget of 7.5 basis points which is .075% of their production.

81.     For example, $100,000,000 in closed production in a month equals a marketing budget of $75,000 per month.

82.     At the February 2019 Leadership Meeting, NAF verbally informed Ms. Spearman and her partner that they had no longer had a marketing budget and all marketing expenses would be deducted from their compensation.

83.     In June 2019, NAF provided Ms. Spearman and her partner a $10,000 marketing budget.  Ms. Spearman and her partner covered the remainder of the marketing budget which ranged from $50,000 to $75,000 per month.

84.     NAF advised Ms. Spearman and other Regional Managers this change was due to company financial hardship.

85.     From the inception of Ms. Spearman's employment through February 2019, NAF paid Pricing Exceptions and Marketing Costs associated with mortgages placed in the Southeastern Region.

86.     In February 2019, at NAF's Leadership Meeting, NAF verbally informed Ms. Spearman that she and other Senior Vice-Presidents would have to pay for Pricing Exceptions beyond a certain tolerance and would have to absorb all

Marketing Costs associated with mortgages being made in the Southeastern Region under Ms. Spearman's direction.

87.    As a result of NAF's improper conduct, NAF has been unjustly enriched and is due to be disgorged in the amount of $466,046.00 for certain Pricing Exceptions and Marketing Costs that NAF improperly deducted from Ms. Spearman's pay.

**6.    NAF shrinks Ms. Spearman's territory.**

88.    In November 2019, NAF further reduced Ms. Spearman's compensation by unilaterally removing the Tennessee and Virginia territories from her market area.

89.    Ms. Spearman spent three (3) years investing her expertise, time, and funds to create the branches in these territories.

90.    Just as these branches were to turn a profit for which Ms. Spearman would recoup her investment, NAF removed these territories from her domain.

91.    NAF, believing Ms. Spearman was planning to leave NAF, removed these two states from her territory and assigned these two states to junior officers before she could recoup the costs of her personal investment in developing NAF's presence in these states.

92.    Ms. Spearman was not consulted by NAF in making this decision.

93.     As a result of NAF shrinking Ms. Spearman's territory, NAF has been unjustly enriched and is due to be disgorged and not retain the benefit it derived from Ms. Spearman developing the Tennessee and Virginia territories.

94.     NAF is unjustly enriched by unilaterally withdrawing territories from Ms. Spearman's Region which she had developed and incurred personal expense in doing so and for which NAF should have paid bonuses.

**7.     Ms. Spearman issued a demand letter to NAF.**

95.     On July 27, 2020, Ms. Spearman sent a letter demanding NAF to pay her the amounts that she is owed in an attempt to resolve this matter.  NAF refused and has left Spearman with no choice but to file this action in order to protect her legal rights.

**COUNT I**
**BREACH OF CONTRACT**

96.     Ms. Spearman incorporates by reference paragraphs 1 through 95 above as if fully set forth herein verbatim.

97.     NAF had a duty to perform all material provisions of the contract, and specifically, was required by the Letter Offer Contract to notify Ms. Spearman of any material changes to her contract via written notice provided by Human Resources, the COO, or CEO.[1]

---

[1] The Letter Offer is the Contract governing the terms of Ms. Spearman's employment and compensation as it was signed by both parties. The Regional

98.    Ms. Spearman continued performing work for NAF in consideration of the compensation terms that were provided to her in the Letter Offer Contract.

99.    NAF breached the contract for reasons including, but not limited to, failing to compensate Ms. Spearman for Override Bonuses in accordance with the terms of the contract.

100.   Ms. Spearman has suffered damages in the amount of $544,383.00 in unpaid Override Bonuses.

101.   As a result of NAF's breaches of the contract, Ms. Spearman has sustained and is entitled to recover damages in an amount to be determined at trial.

102.   Ms. Spearman is entitled to recover interest on the amounts NAF owes from the date the amounts were due at the legal rate.

103.   Ms. Spearman is entitled to recover attorneys' fees and other costs and expenses related to NAF's defaults.

104.   NAF has acted in bad faith, has been stubbornly litigious, and has caused Ms. Spearman unnecessary trouble and expense, which also entitles her to

---

Manager Agreement and Schedule 1 attached to the Letter Offer Contract was never executed by NAF. The fully executed Letter Offer Contract controls.  Although Ms. Spearman does not concede that the RMA and Schedule 1 are incorporated into the Letter Offer Contract, in the event the Court were to determine that they were, the specific language of the Letter Offer Contract regarding the modification of material terms prevails over the general language of the Regional Manager Agreement. Under controlling law, ambiguities must be construed against NAF as drafter.

recover her costs, expenses, and reasonable attorneys' fees for which NAF is legally responsible pursuant to O.C.G.A. § 13-6-11.

**COUNT II**
**UNJUST ENRICHMENT:**
**PRICING EXCEPTIONS AND MARKETING COSTS**

105.   Ms. Spearman incorporates by reference paragraphs 1 through 95 above as if fully set forth herein verbatim.

106.   Prior to the February 2019 Leadership Meeting, NAF absorbed the Pricing Exceptions and Marketing Costs related to mortgage loans made by NAF in the Southeastern Region.

107.   From her hire date through February 2019, Ms. Spearman was compensated for these expenditures.

108.   In February 2019, NAF's leadership explained that it was experiencing a period of financial difficulty due to its misallocation of thirty million dollars ($30,000,000.00).

109.   As a result, NAF required Ms. Spearman and other Regional Managers to personally absorb the Pricing Exceptions and Marketing Cost associated with mortgage loans they made, effectively reducing Ms. Spearman's compensation.

110.   Ms. Spearman provided a benefit to NAF by paying, at her own expense, for Pricing Exceptions and Marketing Costs, with no obligation to do so, after the February 2019 Leadership Meeting.

111.   By engaging in this wrongful conduct, NAF has been unjustly enriched by refusing to reimburse Ms. Spearman's Pricing Exceptions and Marketing Costs, and as such, it would be inequitable and unjust for NAF to retain such benefits.

112.   As a result of NAF's conduct, Ms. Spearman has suffered damages in the amount of $466,046.00 for certain Pricing Exceptions and Marketing Costs that NAF improperly deducted from Ms. Spearman's pay.

113.   NAF has acted in bad faith, has been stubbornly litigious, and has caused Ms. Spearman unnecessary trouble and expense, which also entitles her to recover her costs, expenses, and reasonable attorneys' fees for which NAF is legally responsible pursuant to O.C.G.A. § 13-6-11.

## COUNT III
## UNJUST ENRICHMENT:
## REDUCTION IN TERRITORY

114.   Ms. Spearman incorporates by reference paragraphs 1 through 95 above as if fully set forth herein verbatim.

115.   Ms. Spearman was hired by NAF to develop its presence in the Southeastern Region.  This included the states of Tennessee and Virginia in which to develop NAF's presence. Plaintiff invested time, talent, and her own money in growing NAF's footprint in these two states.

116.   NAF benefited from Ms. Spearman's actions, while Ms. Spearman's detriment flowed from NAF's wrongful conduct.

117.   By engaging in this wrongful conduct, NAF has benefited from Ms. Spearman's actions while not reimbursing her for her investment into the company, and as such, it would be inequitable and unjust for NAF to retain such benefits.

118.   Thus, NAF has been unjustly enriched by unilaterally removing states from Ms. Spearman's territory without proper compensation.

119.   As a result of NAF's improper conduct, Ms. Spearman has sustained and is entitled to recover damages in an amount to be determined at trial.

120.   NAF has acted in bad faith, has been stubbornly litigious, and has caused Ms. Spearman unnecessary trouble and expense, which also entitles her to recover her costs, expenses, and reasonable attorneys' fees for which NAF is legally responsible pursuant to O.C.G.A. § 13-6-11.

## COUNT IV[2]
## FRAUD—PRICING EXCEPTIONS AND MARKETING EXPENSES

121.   Ms. Spearman incorporates by references paragraphs 1 through 95 above as if fully set forth herein verbatim.

122.   NAF made the fraudulent representation that the company misallocated thirty million dollars.  As a result thereof, NAF indicated that it would no longer be paying marketing expenses and certain pricing exceptions for a period of ninety (90)

---

[2] "Georgia law (like the Federal Rules) expressly permits plaintiffs to plead claims in the alternative." *Onion man Co., LLC v. Nationwide Agribusiness Ins. Co.*, No. 2:21-CV-048, 2021 WL 4282582, at *5 (S.D. Ga. Sept. 21, 2021) (citing O.C.G.A. § 9-11-8(e)(2); Fed. R. Civ. P. 8(d)(2)).

days.  Based upon the representation of financial hardship on the part of NAF as a result of this purported "misallocation", Ms. Spearman expended personal funds on marketing expenses and pricing exceptions which she would not have expended but for the false representation by NAF of a fictional "misallocation". NAF falsely stated that this was to be a temporary change and was necessary to save the company during a period of financial hardship.

123.   Ms. Spearman reasonably and detrimentally relied upon such representation by expending personal funds on marketing expenses and pricing exceptions all while believing she would ultimately be reimbursed for these expenditures.

124.   NAF benefited from the fraud from the loan production of Plaintiff and the profit derived therefrom.

125.   Because of the fraudulent conduct of NAF, Ms. Spearman has suffered damages in amount to be proved at trial.

## COUNT V
## PUNITIVE DAMAGES PURSUANT TO O.C.G.A. § 51-12-5.1

126.   Ms. Spearman incorporates by reference paragraphs 1 through 125 above as if fully set forth herein verbatim.

127.   The intentional and fraudulent acts referred to herein establish by clear and convincing evidence that these acts were carried out by NAF willfully,

maliciously, and fraudulently such that an award of punitive damages against Defendant is appropriate.

### COUNT VI
### COSTS, EXPENSES AND ATTORNEY FEES PURSUANT TO
### O.C.G.A. § 13-6-11

128.   Ms. Spearman incorporates by reference paragraphs 1 through 127 above as if fully set forth herein verbatim.

129.    NAF has acted in bad faith, has been stubbornly litigious, and has caused Ms. Spearman unnecessary trouble and expense, which also entitles her to recover her costs, expenses, and reasonable attorneys' fees for which NAF is legally responsible pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE,** Ms. Spearman requests the Court:

a) Enter judgment for all damages, including compensatory and punitive damages under Georgia law, to which she is entitled to recover in an amount to be determined by the enlightened conscience of the jury;

b) Award Ms. Spearman her costs, expenses, and reasonable attorneys' fees related to enforcing her rights pursuant to O.C.G.A. § 13-6-11;

c) Have a trial by jury; and

d) Award such other and further relief as this Court deems just and proper.

Respectfully submitted, this 17th day of February, 2022.

/s/MaryBeth V. Gibson
MARYBETH V. GIBSON
mgibson@thefinleyfirm.com

27

Georgia Bar No. 725843
TRAVIS C. HARGROVE
thargrove@thefinleyfirm.com
Georgia Bar No. 141374
N. NICKOLAS JACKSON
njackson@thefinleyfirm.com
Georgia Bar No. 841433

**THE FINLEY FIRM, P.C.**
3535 Piedmont Road
Building 14, Suite 230
Atlanta, GA 30305
Telephone: (404) 320-9979
Facsimile: (404) 320-9978
*Counsel for Plaintiff*

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: February 17, 2022

/s/ *MaryBeth V. Gibson*
MARYBETH V. GIBSON

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, I served a copy of the foregoing document via the CM/ECF system, which will automatically provide email notification and service of such filing to counsel of record for all parties registered with the Court for electronic filing, as follows:

Henry M. Perlowski
Henry.Perlowski@agg.com
T. Chase Ogletree
Chase.Ogletree@agg.com
**ARNALL GOLDEN GREGORY LLP**
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363
Telephone (404) 873-8684
Facsimile: (404) 873-8685

/s/ *MaryBeth V. Gibson*
MARYBETH V. GIBSON