

Deposition of:

## Gina Spearman

*November 8, 2021*

In the Matter of:

## Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3     ---------------------------x
      GINA SPEARMAN,                )
4                                   ) Case No.
             Plaintiff,             )   1:20-cv-04981-CAP
5                                   )
      v.                            )
6                                   )
      BROKER SOLUTIONS, INC.,       )
7     d/b/a NEW AMERICAN FUNDING, )
                                    )
8              Defendant.           )
      ---------------------------x
9
                      -o0o-
10
11          The videotaped deposition of GINA SPEARMAN,
12    taken on behalf of the Defendant, taken pursuant to
13    the stipulations contained herein; the reading and
14    signing of the deposition being reserved; taken
15    before Karen D. Fuhs, Certified Court Reporter,
16    commencing at 10:01 a.m., on the 8th day of November,
17    2021, at 3535 Piedmont Road, Building 14, Suite 230,
18    Atlanta, Georgia.
19
20
21
22
23
24
25

```
                                                        Page  2

 1     APPEARANCES OF COUNSEL:
 2     For the Plaintiff:
 3         MARYBETH V. GIBSON, Esq.
           TRAVIS HARGROVE, Esq.
 4         NICK JACKSON, Esq. (Videoconference)
           The Finley Firm, P.C.
 5         Building 14
           3535 Piedmont Road, NE
 6         Suite 230
           Atlanta, Georgia 30305
 7         (404) 320-9979
           mbgibson@thefinleyfirm.com
 8         thargrove@thefinleyfirm.com
 9     For the Defendant:
10         HENRY M. PERLOWSKI, Esq.
           T. CHASE OGLETREE, Esq.
11         Arnall Golden Gregory, LLP
           171 17th Street, N.W.
12         Suite 2100
           Atlanta, Georgia 30363
13         (404) 873-8684
           Henry.Perlowski@agg.com
14         Chase.Ogletree@agg.com
15     Also Present by Zoom Videoconference:
16      Andrew Westle-New American Funding, In-house Counsel
        Ken Block-New American Funding, In-house Counsel
17
        David Ramirez-Videographer (Present-In person)
18
19
20
21
22
23
24
25
```

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 3

1                     C O N T E N T S
2                   E X A M I N A T I O N
3
4                                        Page
5
6       Cross-Examination by Mr. Perlowski.......5
7       Direct Examination by Ms. Gibson.......264
8       Recross-Examination by Mr. Perlowski...268
9
10                    E X H I B I T S
11      Defendant's                              First
        Exhibit No.    Description       Marked   Identified
12
        Exhibit 1    Offer of Employment        53  53
13      Exhibit 2    Regional Manager Agreement 58  58
        Exhibit 3    Email-4/13/20-Resignation  86  86
14      Exhibit 4    First Interrogatories      114 114
        Exhibit 5    Email-3/29/19-Southeast PEs 121 121
15      Exhibit 6    Email-11/5/19-Excluded Loans 132 132
        Exhibit 7    Regional Mgr Comp. Details 137 137
16      Exhibit 8    Amendment Schedule 1       138 138
        Exhibit 9    Email-1/18/18-Regional Agrmt. 138 139
17      Exhibit 10   Reg. Mgr. Comp. Details/Schd 1 142 142
        Exhibit 11   Email-4/5/18-Amended Agrmts/Orl 142 145
18      Exhibit 12   Schedule 4-No Override LO  148 148
        Exhibit 13   Recruiting Allocation Form 155 155
19      Exhibit 14   Overrides to Authorized Persnnl 160 161
        Exhibit 15   Schedule 8-Team Loan Officer 166 166
20      Exhibit 16   Gina Portion Notes         167 167
        Exhibit 17   Additional Manager Allocations 171 171
21      Exhibit 18   Recruit Deduction          175 175
        Exhibit 19   Bonus to Personnel         177 177
22      Exhibit 20   TN Real Estate Partners Deduct 178 178
        Exhibit 21   Email-8/7/17-BM/AM Recap-July 186 186
23      Exhibit 22   Email-12/7/17-BM/AM-November 186 189
        Exhibit 23   Southeast Division Recap   196 197
24
25

Page 4

1              P R O C E E D I N G S

2         THE VIDEOGRAPHER:  We are on the record and

3    the time is approximately 10:01 a.m.  This is the

4    beginning of the videotaped deposition for Gina

5    Spearman.

6              Would counsel present please identify

7    themselves and who they represent for the record?

8         MS. GIBSON:  This is MaryBeth Gibson at the

9    Finley Firm and I represent Gina Spearman, the

10    Plaintiff.

11        MR. HARGROVE:  Travis Hargrove also of the

12    Finley Firm, also for the Plaintiff.

13        MR. PERLOWSKI:  Henry Perlowski --

14        MR. JACKSON:  This is Nick Jackson at the

15    Finley Firm, I'm attending via Zoom, and I also

16    represent the Plaintiff.

17        MR. PERLOWSKI:  Sorry about that, Nick.

18             Henry Perlowski here for New American

19    Funding.

20        MR. OGLETREE:  And Chase Ogletree for New

21    American Funding as well.

22        THE VIDEOGRAPHER:  Thank you, Counsel.

23             Will the court reporter please swear in

24    the witness.

25                       GINA SPEARMAN,

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 5

1    after first having been duly sworn, testified as

2    follows:

3                        CROSS-EXAMINATION

4    BY MR. PERLOWSKI:

5        Q    Good morning, Ms. Spearman.  My name's Henry

6    Perlowski.  We met a few minutes ago.  Nice to meet

7    you.

8        A    Nice to meet you as well.

9        Q    Have you ever been deposed before?

10       A    I have not.

11       Q    Okay.

12            I know you, at least, participated remotely

13   in the deposition of Mr. Fellows, but let me just go

14   ahead and start with a couple of ground rules, if I

15   could.

16       A    Sure.

17       Q    We're going to be talking a lot today.  I'm

18   going to do my very best to let you finish your

19   answer.  I would also ask if you could let me finish

20   my question, because the court reporter has to take

21   our conversation down, okay?

22       A    Sure.

23       Q    And if at any point in time -- look, it's

24   going to be human nature where you're anticipating

25   the answer to my question and you may jump in.  I may

Page 6

1    ask you to let me finish my question.  I'm not trying

2    to be rude.  I just want to make sure the testimony

3    reads clearly, okay?

4         A    Okay.

5         Q    And if at any time you do not understand my

6    question, I would ask you to please let me know,

7    okay?

8         A    Okay.

9         Q    But if you don't let me know, I'm going to

10   assume that you did understand my question; is that

11   fair?

12        A    Yes.

13        Q    Okay.

14             Also, this is not an endurance contest.

15   We'll be taking breaks periodically, but if at any

16   time you feel you need to take a break, just let me

17   know, I'm happy to accommodate it, as long as there's

18   not a question sitting out there, okay?

19        A    Yes.

20        Q    So you said you have not been deposed

21   before.

22             Have you ever given testimony in a court

23   proceeding before?

24        A    No.

25        Q    By court, have you ever given testimony in

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 7

1    an arbitration proceeding, which is a little

2    different than a court proceeding, in that it's more

3    likely to be around a conference room table than in

4    an actual courtroom; have you ever given testimony in

5    an arbitration proceeding before?

6         A    No.

7         Q    Other than this lawsuit and discounting,

8    like, a minor traffic offense, have you ever been a

9    party to any kind of legal proceeding before?

10        A    No.

11        Q    Ms. Spearman, are you on any medications

12   that might impair your ability to give testimony?

13        A    No.

14        Q    So another ground rule, I should have

15   mentioned a second ago, unless I specifically ask --

16   and I don't anticipate doing that -- at no time today

17   am I asking you to reveal conversations that you may

18   have had with your lawyers, okay?

19        A    (Nods head.)

20        Q    So subject to that, what did you do to

21   prepare for your deposition today?

22        A    I met with my attorneys.

23        Q    When?

24        A    Friday.

25        Q    For how long?

Page 8

1        A    A few hours.

2        Q    Was anyone else present besides yourself and

3    your lawyers at that meeting?

4        A    No.

5        Q    Did you review any documents in preparation

6    for the deposition?

7        A    Yes.

8        Q    Do you recall which ones?

9        A    Various.  Various documents.

10       Q    Do you recall which kinds of various

11   documents, even just categories of documents that

12   you --

13       A    Employment agreements.

14       Q    Yours?

15       A    Yes.

16       Q    With New American Funding?

17       A    Yes.

18       Q    And I may refer to New American Funding

19   throughout the deposition as N-A-F; is that okay?

20       A    Yes.  Most people would say NAF.

21       Q    NAF.  Okay.  NAF it is.

22            Other than your employment agreements with

23   NAF, do you recall reviewing any other kinds of

24   documents in preparation for the deposition today?

25       A    No.

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                              Page 9

 1          MS. GIBSON:  And if I may say, you have to
 2      give your responses verbally --
 3          THE WITNESS:  Okay.
 4          MS. GIBSON: -- although he is recording
 5      it --
 6          THE WITNESS:  Okay.
 7          MS. GIBSON: -- yes, nos, head nods don't
 8      work.
 9          THE WITNESS:  Got it.
10          MS. GIBSON:  Okay.
11  BY MR. PERLOWSKI:
12      Q   Ya.  I was actually just going to say that.
13  And again, that's human nature.  I mean, you know --
14      A   Yes.
15      Q   -- you and I are talking, we're looking at
16  each other, you're nodding, but I may -- as MaryBeth
17  just did -- ask you to give audible answers, so the
18  court reporter can take it down.
19      A   Sure.
20      Q   When was the last time you spoke with Kelly
21  Allison?
22      A   Not sure I can give you a specific date, but
23  a few weeks ago.  Possibly a month.
24      Q   Who initiated that conversation?
25      A   Well, we met for -- we met for dinner.  So,

Page 10

1    I believe she initiated requesting or asking if I

2    wanted to get together.

3         Q    Okay.

4              Where did you meet for dinner?

5         A    The Mill Kitchen and Bar in Roswell.

6         Q    So as I understand what you just said, she

7    asked you if you wanted to get together for dinner?

8         A    Yes.

9         Q    Okay.

10        A    To the best of my recollection, yes.

11        Q    Did she say why she wanted to get together

12   for dinner?

13        A    We're friends.

14        Q    Prior to getting together at the Mill

15   Kitchen and Bar, when was the last time that you had

16   physically seen Ms. Allison in person?  I don't mean

17   like through Zoom or --

18        A    Uh-huh.

19        Q    Ya.

20             -- Skype or anything like that.

21        A    I see her once every couple of months.

22        Q    You see her once every couple of months.  Is

23   that part of -- just periodic social get together or

24   is there, say, a function that the two of you

25   typically attend that happens to meet every couple of

Page 11

1    months?

2        A    Social.

3        Q    Okay.

4             During your dinner with Ms. Allison at the

5    Mill Kitchen and Bar, did the topic of your dispute

6    with NAF come up?

7        A    The existence, I guess, of the lawsuit and

8    the fact that it was public knowledge.  That's all

9    that I recall.

10       Q    So the conversation about the existence of

11   the lawsuit and the fact that it was public

12   knowledge, how did that topic come up, to the best of

13   your recollection, from your meeting with

14   Ms. Allison?

15       A    I believe she just asked me, do you know

16   that it's public knowledge.

17       Q    Do you recall the context in which she asked

18   you that question?  I mean, did it come out of the

19   blue or was it in the context of something else being

20   discussed?

21       A    I don't remember anything else about it

22   other than that question.

23       Q    Was there any discussion that the -- that

24   your dispute with NAF was being used against NAF in

25   the marketplace?

Page 12

 1          MS. GIBSON:  Objection.  Foundation.

 2               You can answer.

 3          THE WITNESS:  I can't answer that with any

 4      certainty.  I do remember, you know, her -- her

 5      saying that -- that someone at New American had

 6      brought it to her attention.

 7  BY MR. PERLOWSKI:

 8      Q    She -- so, she said that someone at New

 9  American had brought what to her attention?

10      A    The lawsuit.

11      Q    So she said that someone at NAF brought the

12  lawsuit to her attention?

13      A    Uh-huh.  Yes.  I didn't mean to say uh-huh.

14      Q    Did she give you any context for how the

15  lawsuit was brought to her attention, again, what

16  circumstance?

17      A    I don't recall.

18      Q    Was there any discussion during your dinner

19  meeting that one or more competitors of NAF were

20  using the lawsuit against NAF in the marketplace?

21          MS. GIBSON:  Objection.  Foundation.

22          THE WITNESS:  No.  I don't recall that.

23  BY MR. PERLOWSKI:

24      Q    Did the topic of depositions come up during

25  your dinner meeting with Ms. Allison?

Page 13

```
 1        A    No.

 2        Q    How long did you work with Ms. Allison?

 3        A    Not -- not consistently, but for over

 4   20 years.

 5        Q    Other than the dinner meeting at Mill

 6   Kitchen, had you discussed your lawsuit with

 7   Ms. Allison at any time since you left NAF?

 8        A    I have not discussed the details of the

 9   lawsuit with her, no.

10        Q    That wasn't quite my question.

11        A    Okay.

12        Q    Have you discussed the lawsuit with

13   Ms. Allison at any time since you left NAF other than

14   the discussion at the Mill Kitchen?

15        A    No.  Other than what I've described.

16        Q    Which companies did you and Ms. Allison work

17   together?

18        A    Home Bank Mortgage Corporation.  Home Star,

19   which became Optimum Financial.  Countrywide Home

20   Loans.  Academy Mortgage, which was acquired by

21   Caliber Home Loans.  And New American Funding.

22        Q    Was that in chronological order, to the best

23   of your recollection?

24        A    (Nods head.)

25        Q    Yes?
```

Page 14

 1      A    Yes.

 2      Q    Okay.

 3           Other than getting together with Ms. Allison

 4   every couple of months socially, do you do anything

 5   else socially with her?

 6      A    No.

 7      Q    Since you left NAF, have you had any

 8   discussions with Sarah Laprade about the lawsuit?

 9      A    No.

10      Q    Since you left NAF, have you had any

11   discussions with anyone else in NAF's Sandy Springs

12   office regarding the lawsuit?

13      A    No.

14      Q    Have you had any discussions with Jon Reed

15   about the lawsuit?

16      A    No.

17      Q    How about Scott Frommert?

18      A    No.

19      Q    Other than Ms. Allison, just talked about,

20   have you had any discussions about the lawsuit with

21   any other former or present NAF employees since you

22   left NAF?

23      A    No.

24      Q    At any point in time in connection with your

25   relationship with NAF -- so broader than just this

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 15

1    lawsuit -- have you ever engaged Lee Parks to assist

2    you?

3         A    No.

4         Q    Do you know who Mr. Parks is?

5         A    I don't know him, but I -- yes.  I've heard

6    the name.

7         Q    Have you ever engaged Lex Watson to assist

8    you in any aspect of your relationship with NAF?

9         A    Yes.

10        Q    When?

11             And again, I don't -- I'm not asking for

12   substance of your conversations with him, just asking

13   for time.

14        A    It would have been late '19, 2019.  I can't

15   say with certainty.  I would say maybe September,

16   October.

17        Q    Did he attend a meeting, Mr. Watson, with

18   yourself, Jon Reed, and Scott Frommert in NAF's Sandy

19   Springs offices in around the fall of '19?

20        A    Yes.

21        Q    Ms. Allison was also present at that

22   meeting?

23        A    Yes.

24        Q    Do you recall anyone else being present at

25   the meeting other than Mr. Watson, yourself,

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 17 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 16

1   Ms. Allison, Mr. Reed, and Mr. Frommert?

2        A    There was a CPA that Kelly works with that

3   she requested be there.

4        Q    So the CPA that was present, not someone who

5   was employed by NAF, correct?

6        A    That's correct.

7        Q    Okay.

8             Do you recall the name of the CPA or the

9   firm?

10       A    I don't.

11       Q    Okay.

12            Again, I'm not asking about any private

13  conversations that you may have had with Mr. Watson

14  in connection with this meeting, but tell me what was

15  the purpose of the meeting, to the best of your

16  understanding.

17       A    New American Funding was proposing to change

18  our original agreement, which the agreement would

19  have been from November of 2016, they were looking to

20  change that agreement.  And it was going to be based

21  off of a profit and loss would be the basis -- would

22  be part of the basis of the compensation.  And they

23  were going to be drafting a new agreement.

24            And so, we were discussing that that P and L

25  model, and how it would be structured, and how the

Page 17

1   agreement might be structured.  Because it was going
2   to replace our November 2016 agreement.
3        Q    So, as you understand it, the new agreement
4   that was being discussed was just going to be sort of
5   a wholesale replacement of what was in place at the
6   time?
7             MS. GIBSON:  Objection.  Foundation.
8             THE WITNESS:  It wasn't going to replace the
9        entire agreement.  It was going to replace the
10       override bonus component to something else.
11  BY MR. PERLOWSKI:
12       Q    What was being discussed in terms of what
13  would replace the override bonus component of your
14  compensation?
15       A    A profit and loss-based compensation.
16       Q    Do you recall any specifics of what was
17  being discussed in terms of how you and Ms. Allison
18  might be compensated under the profit and loss-based
19  compensation model?
20            MS. GIBSON:  Objection.  Form.
21            THE WITNESS:  Do I answer?
22            MS. GIBSON:  You can answer.
23  BY MR. PERLOWSKI:
24       Q    Ya.
25            When Ms. Gibson objects, I have an

Page 18

1    opportunity, if I choose to, to rephrase my question.

2    I don't have to, that's my choice, but unless you're

3    instructed not to answer it, you are to answer the

4    question.

5          So, the question was:  Do you recall any

6    specifics of what was being discussed in terms of how

7    you would be compensated under the profit and loss

8    model?

9          MS. GIBSON:  Same objection.

10          THE WITNESS:  I don't remember specifically.

11       If you have a specific question, I'm happy --

12    BY MR. PERLOWSKI:

13       Q   Well, that was my specific question.

14          Do you remember what was being proposed in

15    terms of how you would be compensated under the

16    proposed profit and loss model?

17       A   What was being discussed was that whatever

18    the profit of our region was, we would -- our

19    compensation would be based on a percentage of that.

20    That would be one component.

21       Q   Do you recall what other components were

22    being discussed in terms of your compensation in

23    addition to something based on the profit of your

24    region?

25          MS. GIBSON:  Objection.  Foundation.

Case 1:20-cv-04981-CAP  Document 88  Filed 04/27/22  Page 20 of 327
Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 19

1              THE WITNESS:  There was discussion back and

2          forth on if it would still re -- if the new

3          agreement would still retain a portion of a

4          production override in addition to the

5          profitability.  I don't remember the exact

6          terminology they were using, but it was those two

7          components.

8    BY MR. PERLOWSKI:

9          Q    When that meeting concluded, to your

10   understanding, where were things left about what was

11   going to happen next with respect to your contract?

12             MS. GIBSON:  Objection.  Form.

13             THE WITNESS:  NAF had hired Scott Frommert

14         as CFO.  And so, he was working on -- he was

15         going to continue to work on the P and L, its

16         transparency, and that sort of thing, to -- since

17         that would be the basis for the compensation.

18   BY MR. PERLOWSKI:

19         Q    Do you recall when NAF hired Mr. Frommert;

20   if you know?

21         A    It was a few months after the 2019

22   leadership meeting -- which I believe was in

23   February, I can't be certain, but I'm pretty sure it

24   was February -- in which NAF informed us there was a

25   misallocation of $30 million.  And they were hiring a

Page 20

1    CFO, because they did not have one at that time.

2            So, they were hiring a CFO to right the

3    ship, I believe is kind of the terminology that was

4    used.  And he would also be working on a P and L

5    platform for SVPs, regional managers.  He was --

6    shortly thereafter.

7        Q    Okay.

8            In the discussions about the P and L model,

9    you mentioned that Mr. Frommert was hired to achieve

10   transparency with respect to the P and L model; is

11   that correct?

12       A    That was what was discussed after the

13   meeting in Atlanta with Mr. Frommert, was that we did

14   not have a high level of trust in the P and L, given

15   the misallocation and the other financial issues.

16       Q    You said you didn't have a high level of

17   trust in the P and L, what -- what issues did you not

18   trust?

19       A    Certain line items of the P and L.  There

20   was no way to see the invoices or what -- what made

21   up that line item, so that we could, you know, check

22   that on a regular basis to ensure the accuracy.

23       Q    Do you recall which line items that you had

24   concerns about?

25       A    Almost all of them.  All of the

Page 21

1    expense-related ones.

2        Q    Were you questioning whether the expenses

3    were incurred, or how they were allocated, or both?

4        A    Both.

5        Q    Do you recall any specific expense that you

6    questioned whether it was incurred or not?

7        A    No, I don't recall.

8        Q    Do you recall any specific expense that you

9    questioned how it was being allocated?

10       A    I don't recall.

11       Q    During your employment with NAF, what

12   personal email addresses did you maintain?

13       A    Personal email addresses?  That's the

14   question?

15       Q    Yes.

16       A    You want the actual email address?

17       Q    Yes.

18       A    Gina S at spearmania dot com.

19       Q    Spearmania would be Spearman with an I-A at

20   the end?

21       A    Correct.

22       Q    Okay.

23            Any others?

24       A    That's it.

25       Q    During your employment at NAF, what -- at a

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 22

1   high level, what computers did you use to conduct

2   business?

3        A    The NAF-issued computer.

4        Q    The one that you returned?

5        A    Correct.

6        Q    Did you also use a personal laptop during

7   your employment with NAF?

8        A    No.

9        Q    During your employment -- employment with

10  NAF -- I'm just using as context -- if I'm -- I'm

11  traveling later in the week.  So, if I'm in a hotel,

12  I'll connect with our work system through a

13  virtual -- a VPN.  If you were outside of NAF's

14  offices, would you connect to a NAF system, like

15  through a virtual private network?

16       A    No.

17            MS. GIBSON:  Objection.  Form.

18            THE WITNESS:  No.  Not to my knowledge.

19  BY MR. PERLOWSKI:

20       Q    No.  Okay.

21            If you were working from home or remotely --

22  or otherwise remotely, how would you connect onto

23  NAF's systems?

24       A    With a WiFi connection, I could access, you

25  know, email.  And really -- everything was web-based,

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 23

1    to the best of my knowledge.

2         Q    Okay.

3              If you were working on documents during your

4    employment with NAF, not necessarily an email, like

5    say a Word document or an Excel spreadsheet or

6    something like -- or PowerPoint, something like that,

7    would you typically store those on NAF's systems?

8         A    I would save that on my computer, like my

9    docs.

10        Q    And that was a folder on your computer?

11        A    Yes.

12        Q    Is Spearman your maiden name or your -- or

13   married name?

14        A    Married.

15        Q    What is your maiden name?

16        A    White.

17        Q    Have you gone -- ever gone by any names

18   other than Gina White or Gina Spearman?

19        A    No.

20        Q    Are you married?

21        A    I am.

22        Q    For how long?

23        A    26 years.

24        Q    That was not a trick question.

25             What's your husband's name?

Page 24

1      A   He goes by Marty, M-a-r-t-y.

2      Q   Spearman?

3      A   Yes.

4      Q   Do you have any children?

5      A   Yes.

6      Q   How many?

7      A   Two.

8      Q   Ages?

9      A   24 and 22.

10     Q   And do they both have the last name

11  Spearman?

12     A   Yes.

13     Q   Where are you from?

14     A   Georgia.

15     Q   Where in Georgia?

16     A   I was born in Waycross, Georgia.  And we

17  moved to the Atlanta area when I was six or

18  seven years old.

19     Q   Where did you go to high school?

20     A   I went to two high schools because we moved.

21  I went to Campbell High School and Riverwood High

22  School.

23     Q   And where did you go to college?

24     A   Georgia.

25     Q   Do you have a degree from Georgia?

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                    Page 25

 1         A    Yes.

 2         Q    Tell me when you graduated and your degree.

 3         A    I graduated in '92 and my degree is in

 4    political science.

 5         Q    Do you have any postgraduate studies of any

 6    kind?

 7         A    No.

 8         Q    Do you have any relatives in metro Atlanta

 9    with the last name other than Spearman?

10         A    Yes.

11         Q    Can you tell me last names other than

12    Spearman --

13         A    White.

14         Q    -- in terms of your relatives in metro

15    Atlanta?

16              So White?

17         A    (Nods head.)

18         Q    Any others besides Spearman and White?

19         A    Not that I can think of.  No.

20              I have a step-niece and nephew.

21         Q    Okay.

22         A    That would count.

23         Q    Do you recall what their last -- their last

24    names?

25         A    Speaks.

Page 26

1        Q    S-p-e-a-k-s?

2        A    Correct.

3        Q    Do you regularly attend a church,

4    Ms. Spearman?

5        A    Regularly, no.

6        Q    If you periodically attend a church, which

7    one might it be?

8        A    Holy Innocence, Episcopal.

9        Q    Do you belong to any social organizations?

10        A    Is a country club a social organization?

11        Q    Sure.  Sure.

12        A    Yes.

13        Q    Which one?

14        A    Cherokee County Country Club.

15        Q    Do you belong to any professional

16    organizations?

17        A    Mortgage Bankers Association.  Atlanta Home

18    Builders Association.  Councils within those.

19        Q    Sorry.  You said councils within those?

20        A    Ya.  Like a member of, like, Professional

21    Women in Building, which is a division of Atlanta

22    Home Builders Association.

23        Q    Do you remember the -- so you said

24    Professional Women in Building.  Do you remember the

25    names of any of the other councils that you might

Page 27

1   belong to that are affiliated with either the

2   Mortgage Bankers Association or the Atlanta Home

3   Builders Association?

4        A    No.

5        Q    Just the Professional Women in Building?

6        A    Yes.

7        Q    Okay.

8             If you could -- and you may have already

9   done this in part earlier in the deposition, but if

10  you could just give me an outline of your employment

11  history since you left Georgia.  I know you gave me a

12  number -- names of companies in the --

13       A    Uh-huh.

14       Q    -- mortgage space, but let's go ahead and

15  start with -- and you can either do it in reverse

16  order or you can do it in -- you know, bringing it

17  forward, whichever's easiest for you.

18       A    After Georgia, I worked for Venture Homes as

19  an onsite sales agent.  Then got into the mortgage

20  business at a company called Peachstate Funding.

21       Q    Okay.

22       A    And then, picking up on the other companies

23  I listed Home Bank.  After Home Bank, Wells Fargo.

24  Home Star slash Optimum.  Countrywide.  Academy.

25  Caliber.  New American Funding.

Page 28

1      Q    When did you -- when did you work for

2    Peachtree -- sorry -- Peachstate Funding?  Excuse me.

3      A    Peachstate Funding from '93 to roughly

4    2000.

5      Q    Fair to say that you've been continuously in

6    the mortgage business since '93?

7      A    Correct.

8      Q    What was your position with Caliber?

9      A    I had a couple of titles there.

10     Q    The most recent one, the last one.

11     A    Builder manager.

12     Q    What were your responsibilities as business

13   manager -- builder manager for Caliber?  Excuse me.

14     A    Business development, recruiting, management

15   of the production.

16     Q    Did you work for Ms. Allison at Caliber?

17     A    Yes.

18     Q    She was your boss?

19     A    From an HR reporting standpoint, yes.

20     Q    And what was Ms. Allison's position at

21   Caliber for the last --

22     A    To my recollection, she was an area manager.

23     Q    And was your position as builder manager,

24   was it -- were your responsibilities within the area

25   that Ms. Allison managed?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 29

1        A    Yes.

2        Q    And what was that area?

3        A    Georgia and South Carolina.

4        Q    Any other state besides Georgia and South

5    Carolina?

6        A    Not that I can recall.

7        Q    So when you left Caliber, to the best of

8    your recollection, your territory was Georgia and

9    South Carolina for Caliber?

10       A    Yes.

11       Q    And how are you -- to the best of your

12   recollection, how were you compensated at Caliber?

13   And I'm going to talk about it -- this will be at the

14   end of your employment with Caliber.

15       A    I originated loans or I had an origination

16   team, so I received commissions on originations as

17   well as an override on production.

18       Q    Were the commissions based on loans that you

19   yourself produced or was it -- or is the commissions

20   based on loans that others within the team produced?

21       A    Combination.

22       Q    And when you were at Caliber, explain to me

23   on which -- on what did you receive an override?

24            And again, talking about this will be the

25   end of your employment with Caliber, which I'm only

 1    interested in what it was at the time you left.
 2            MS. GIBSON:  Objection.  Form.
 3    BY MR. PERLOWSKI:
 4        Q    So I want you to --
 5        A    It's been a little time, so --
 6        Q    Sure.  I understand.
 7            And look, we're going to be talking about
 8    things today that happened, you know, some meaningful
 9    time before November 8th of 2021.
10            So, I'm just asking what your best
11    recollection is of how you were compensated on an
12    override basis at the end of your employment with
13    Caliber.
14        A    To the best of my recollection, I was paid
15    in override on the majority of the production of the
16    area.
17        Q    Did you split that override with
18    Ms. Allison?
19        A    No.
20        Q    Do you recall what your override percentage
21    was?
22        A    I do not.
23        Q    You said you received an override on a
24    majority of the production in the area.
25            Do you recall any particular kinds of loans

Gina Spearman                                     November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 31

 1    where you would not receive an override at the end of
 2    your employment with Caliber?

 3        A    I do not.

 4        Q    Do you recall when you were at Caliber
 5    whether you received an override on loans made during
 6    a loan officer's guarantee period?

 7        A    To the best of my knowledge, I did.

 8        Q    Did you receive an override on your personal
 9    production while you were at Caliber?

10        A    I do not recall.

11        Q    Did you receive an override on brokered
12    loans with Caliber?

13        A    To the best of my recollection, yes.

14        Q    In your own words, can you describe to me
15    what a brokered loan is?

16        A    A brokered loan is a loan in which the
17    company does not retain that loan after closing and
18    service it.

19        Q    So you -- so the company, basically,
20    originates the loan and then flips it right away?

21        A    Generally speaking, the company originates
22    the loan and sends it to another lender to
23    underwrite, fund, and service.

24        Q    Okay.

25            When you were at Caliber, do you recall

Page 32

```
 1    receiving an override bonus on down payment

 2    assistance loans?

 3         A    To the best of my memory, I did.

 4         Q    If you could just tell me in your own words

 5    what is a down payment assistance loan.

 6         A    It's a loan in which the borrower is

 7    receiving some sort of assistance from a third party

 8    for the down payment.

 9         Q    Did you receive an override bonus on

10    secondary market issue loans at Caliber?

11         A    To the best of my knowledge, yes.

12         Q    What is a secondary market issue loan?

13         A    I'm not 100 percent sure, but I can tell you

14    what I think.

15         Q    Sure.

16              And your -- how you would describe it.

17         A    It would be a loan in which the company had

18    little to no profit on the secondary market with that

19    loan.

20         Q    When you were at Caliber, did you receive an

21    override bonus on Piggyback Junior Lien Loans?

22         A    I'm not sure.

23         Q    In your own words, what is a Piggyback

24    Junior Lien Loan?

25         A    It's a loan in which the loan amount, that
```

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 34 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 33

1    the borrower is seeking, is divided into two loans; a
2    first mortgage and a second mortgage that describes
3    the lien position.
4        Q   And when you were at Caliber, did you
5    receive an override bonus on closed and second lien
6    loans?
7        A   I don't remember.
8        Q   Can you describe to me what a closed and
9    second lien loan is, based on your understanding?
10       A   Very similar to the previous category to
11   just a closed in loan as opposed to an equity line.
12       Q   Do you recall what you earned from Caliber
13   in 2015?
14       A   I do not.
15       Q   Do you have an approximation?
16       A   In 2015?
17       Q   Yes.
18       A   That would have been the year before.  Okay
19   to estimate?  I really don't remember.
20       Q   Ya.  I asked for your estimation.
21       A   Okay.
22           500,000.
23       Q   Do you recall what you earned from Caliber
24   in 2016 up to the time you left?
25       A   I would think it's similar.

```
 1        Q    Similar gross or prorated?

 2        A    Prorated.

 3             MS. GIBSON:  Objection.  Form.

 4   BY MR. PERLOWSKI:

 5        Q    Okay.  Let me -- let me clean that up.

 6             So, you worked for Caliber throughout 2015?

 7        A    Yes.

 8        Q    So you earned -- your best -- your

 9   estimation was 500,000 in 2015, which would be over

10   12 months, right?

11        A    Yes.

12        Q    You left Caliber in November of '16; is that

13   right?

14        A    October, November.

15        Q    October, November.

16             So you worked for Caliber for approximately

17   10 months or so?

18        A    Yes.

19        Q    In 2016?

20        A    Correct.

21        Q    So, did you -- do you think you earned

22   500,000 in that ten months or did you earn ten

23   twelfths of 500,000?

24        A    I don't remember.

25             MS. GIBSON:  Objection.  Form.
```

Page 35

1          THE WITNESS:  I don't remember.

2     BY MR. PERLOWSKI:

3          Q    Okay.

4               Do you still have your last contract with

5     Caliber?

6          A    I do not.

7          Q    How did you first come into contact with

8     NAF?

9          A    A recruiter for New American Funding called

10    me.

11         Q    Who was that?

12         A    Paul Pritchard.

13         Q    Pritcher or Pritchard?

14         A    With a D on the end.

15         Q    Okay.

16         A    Pritchard.

17         Q    Did Mr. Pritchard call you or did he call

18    you and Ms. Allison?

19              MS. GIBSON:  Objection.  Form.

20              THE WITNESS:  To the best of my memory, he

21         called me.

22    BY MR. PERLOWSKI:

23         Q    Okay.

24              Tell me about that conversation.

25         A    He wanted to know if we had an interest in

Page 36

1    hearing about New American Funding and coming to work

2    there.

3         Q   How long had you been at Caliber as of

4    October '16?

5         A   Approximately, I was there a total of

6    18 months.

7         Q   So, started at Caliber early '15, does that

8    sound right?

9         A   I would have to look back at my records to

10   give you an accurate answer on that.

11        Q   When did you start with NAF?

12        A   November of '16.

13        Q   Do you recall which day?

14        A   I do not.

15        Q   Were you looking to leave Caliber when you

16   got the recruiter call or was it just one of those

17   out-of-the-blue calls?

18        A   To the best of my knowledge, we were not

19   actively looking to leave.

20        Q   While you were not actively looking to leave

21   Caliber, were you willing to take calls and listen?

22             MS. GIBSON:  Objection.  Form.

23   BY MR. PERLOWSKI:

24        Q   Were you willing to take calls from other

25   mortgage companies and listen about the possibility

Page 37

1   of leaving Caliber?

2        A    Was I willing, is that your question?

3        Q    Yes.

4        A    Apparently.  Because I took Paul's call.

5        Q    You said that Mr. Pritchard asked if you

6   wanted to know if you had an interest in NAF?

7        A    Uh-huh.

8        Q    What did you say?

9        A    I said that I would talk to my business

10  partner and let him know.

11       Q    And when you said, you would talk to your

12  business partner, who are you referring to?

13       A    Kelly Allison.

14       Q    Did you consider Ms. Allison to be -- and

15  I'm not using this term in a legal sense, but your

16  business partner?

17       A    Yes.

18       Q    So, as of the fall of '16, would it be fair

19  to say that if you were going to consider leaving

20  somewhere, it would have been with Ms. Allison as

21  opposed to by yourself?

22            MS. GIBSON:  Objection.  Form.

23            THE WITNESS:  Can you repeat the question?

24  BY MR. PERLOWSKI:

25       Q    Sure.

Page 38

1         So, in the fall of '16, is it fair to say

2    that if you were going to leave Caliber, you were

3    going to leave with Ms. Allison as opposed to off on

4    your own?

5         MS. GIBSON:  Same objection.

6         THE WITNESS:  Yes.

7    BY MR. PERLOWSKI:

8      Q   So, did you, then, talk to Ms. Allison about

9    the possibility -- about the call you received from

10   NAF?  Excuse me.

11     A   Yes, I did.

12     Q   Tell me about that conversation.

13        MS. GIBSON:  Objection.  Form.

14        THE WITNESS:  I don't remember the details.

15   BY MR. PERLOWSKI:

16     Q   Okay.

17        Why don't you describe to me how your -- how

18   either your discussions or -- to your knowledge,

19   Ms. Allison's discussions progressed with NAF.

20     A   Because the company was based in California,

21   Southern California, Kelly was going to be at a

22   meeting in Southern California for Caliber.  And we

23   decided to meet with New American Funding.  So I flew

24   out after her meetings.

25     Q   So, both you and Ms. Allison attended

Page 39

1    meetings with NAF in Southern California?

2        A    Yes.

3        Q    Okay.

4             Prior to going out to visit NAF in Southern

5    California, had you spoken to any NAF representatives

6    aside from Mr. Pritchard?

7        A    Not to my knowledge.

8        Q    And I don't mean, you know, like, the

9    occasional -- I'm not talking about an email where

10   you're setting up the logistics of, you know --

11       A    Okay.

12       Q    -- the meeting in California.  I'm talking

13   about an actual conversation with someone at NAF

14   about the opportunity, a substantive conversation.

15            MS. GIBSON:  Objection.  Asked and answered.

16            THE WITNESS:  We spoke with Jon Reed.  I

17        cannot recall if that was before or after the

18        meeting.

19   BY MR. PERLOWSKI:

20       Q    Okay.

21            Who did you meet with when you were out in

22   Southern California?  This is the first meeting that

23   you had with NAF in Southern California with

24   Ms. Allison.

25       A    Jon Reed, Christy Bunce, Jan Preslo, Rick

Page 40

1    Arvielo, Patty Arvielo.

2         Q    How long was your meeting with NAF?

3         A    It was over a two-day period of time.

4         Q    Were both of those, the two -- the meetings

5    on both days, were they at NAF's offices?

6         A    Yes.

7         Q    When you -- when you left California to come

8    back, did you have an offer at the time?

9         A    Not that I recall.

10        Q    What was the opportunity that was described

11   to you during the two day meetings at NAF?

12             MS. GIBSON:   Objection.   Form.

13   BY MR. PERLOWSKI:

14        Q    Let me rephrase the question.

15             During the two day meetings at NAF, you and

16   Ms. Allison discussed the possibility of joining NAF,

17   correct?

18        A    Yes.

19        Q    Based on your understanding, what was being

20   presented to you as the opportunity for you and

21   Ms. Allison to join NAF?

22             MS. GIBSON:   Objection.   Form.

23             THE WITNESS:   They did not have a presence

24        in the Southeastern United States and they were

25        looking to open that market.   So they were

Page 41

1          looking for us to open offices for New American

2          Funding in the Southeast.

3     BY MR. PERLOWSKI:

4          Q    When you were told that NAF didn't have a

5     presence in the Southeast, were you -- did you have

6     any understanding about like where NAF had a presence

7     that was the closest to the Southeast?

8          A    I would -- from my recollection, we were

9     probably told where their existing branches were

10    located.

11         Q    And at the time, you were -- at the time

12    that you were building manager for Caliber, it had

13    branches in Georgia and South Carolina that you were

14    responsible for?

15         A    They had other branches than that, but

16    those -- those were where our branches were located,

17    to my memory.

18         Q    Okay.

19              The branches that were under Ms. Allison's

20    oversight for Caliber were in Georgia and South

21    Carolina?

22         A    Yes.

23         Q    Okay.

24              So when NAF -- when you and Ms. Allison were

25    discussing the possibility of looking at opening

Gina Spearman                        November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 42

1    offices in the Southeast, during these initial

2    meetings, was there a discussion about where in the

3    Southeast that you would be looking to open offices

4    for NAF?

5        A    Yes.

6        Q    Where?

7        A    I believe there were seven to eight states

8    being discussed, but I cannot remember exactly.

9        Q    Did either you or Ms. Allison, for Caliber,

10   have a presence outside of Georgia or South Carolina?

11            MS. GIBSON:  Objection.  Form.

12            THE WITNESS:  I cannot be sure.  You know,

13        we had a desire to grow beyond those two states.

14        And I cannot recall if we had opened anything

15        outside of Georgia or South Carolina while we

16        were still at Caliber.  I cannot recall.

17   BY MR. PERLOWSKI:

18        Q    And so, what I'm getting at is -- okay.

19            So my understanding, from your testimony, is

20   that you and Ms. Allison, either predominantly or

21   exclusively, worked in Georgia and South Carolina?

22        A    Uh-huh.

23        Q    That was your presence for Caliber?

24        A    Uh-huh.

25        Q    NAF's talking about opening up -- you know,

Page 43

1    looking to open in seven or eight states.

2            Was there a discussion of how you and

3    Ms. Allison could effectively expand your footprint

4    from the one that you had for Caliber to seven or

5    eight states?

6            MS. GIBSON:  Objection.  Form.

7            THE WITNESS:  Ya.  We discussed opening in

8        more states than Georgia and South Carolina.

9    BY MR. PERLOWSKI:

10       Q    Okay.

11            Do you recall which states you discussed

12   opening in with NAF, outside of Georgia and South

13   Carolina, during these initial meetings?

14       A    I can't, with certainty, say what we

15   discussed at that stage.

16       Q    Do you recall whether you discussed the

17   possibility of opening locations in Tennessee during

18   the initial meetings with NAF?

19       A    I can't say for sure.

20       Q    What about Virginia?

21       A    I can't say for sure if we discussed it.

22       Q    What about Florida?

23       A    At that stage, I cannot say for sure.

24       Q    During your two-day meeting with NAF, was

25   the topic of how you and/or Ms. Allison would be

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 45 of 327
Gina Spearman                         November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 44

1  compensated come up?

2       A    Yes.

3       Q    Tell me what you can recall about any

4  compensation-related discussions during the two-day

5  meeting at NAF.

6       A    They discussed an override model

7  compensation.

8       Q    Do you recall what they discussed about the

9  override model of compensation?

10      A    That there would be, in their terms, several

11 different buckets of override.

12      Q    Do you recall what buckets of overrides were

13 discussed during your two-day meeting at NAF?

14      A    To the best of my knowledge, we discussed an

15 area manager, a branch manager, and a compensation

16 differential.

17      Q    So the area manager override, was that being

18 discussed with respect to Ms. Allison's compensation?

19      A    It was for both of us.

20      Q    Okay.

21           Tell me what was -- what you can recall

22 being discussed about the area manager override at

23 the meetings at NAF.

24           So, for the purpose of these questions, I'm

25 referring to the two-day meeting.

Page 45

1        A    I don't really remember anything other than

2    the fact that there were the different levels of

3    buckets.

4        Q    Okay.

5             Do you recall anything more specific being

6    discussed about the branch manager override?

7        A    No.

8        Q    Okay.

9             You said compensation differential?

10       A    Yes.

11       Q    Explain to me what was your understanding of

12   what that meant.

13       A    That there was compensation and basis points

14   that we would share in a portion of that.

15       Q    Was there any discussion of how you would

16   share in the basis points compensation?

17       A    Not that I recall.

18       Q    In terms of describing the buckets of

19   overrides that you just mentioned, who was leading

20   those discussions on NAF's part; to your

21   recollection?

22       A    Jon Reed.

23       Q    What was your understanding of Mr. Reed's

24   position at the time?

25       A    He was EVP of production for the company.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 46

1          Q    Before you joined NAF, did you go out to

2     NAF's offices at any other time after the initial

3     two-day meeting?

4          A    I believe I did, but I can't be sure.

5          Q    So you -- you believe you went out to

6     California at least one other time before you joined

7     NAF?

8          A    I can't remember.

9          Q    Do you recall anything specific about any

10    meeting that you may have had in California before

11    you joined NAF, there was a meeting other than the

12    two-day meeting we just discussed?

13              MS. GIBSON:  Objection.  Form.

14    BY MR. PERLOWSKI:

15         Q    So -- just to clean that up.

16              So, I'm talking about -- and I recognize,

17    Ms. Spearman, you said you think -- you believe you

18    went out another time, but you're not sure.  So what

19    I'm trying to get at is, we've talked about the

20    two-day meeting --

21         A    Uh-huh.

22         Q    -- put that one aside --

23         A    Uh-huh.

24         Q    -- for the purpose of this question.

25              Do you recall anything specific that was

1    discussed between you and NAF about -- that was in

2    another meeting that was held in California before

3    you joined NAF?

4         A    I do not recall anything about any other

5    meetings.

6         Q    Okay.

7              Did any NAF representatives come out to

8    Georgia to meet with you and/or Ms. Allison before

9    you joined NAF?

10        A    Not that I recall.

11        Q    Okay.

12             In terms of negotiations with NAF about

13   joining, between you and Ms. Allison, who took the

14   lead in those discussions, if anyone?

15             MS. GIBSON:   Objection.   Form.

16             THE WITNESS:   It was joined.

17   BY MR. PERLOWSKI:

18        Q    We're going to -- and we're going to get to

19   your -- with your offer letter and your Regional

20   Manager Agreement in a moment, but I just -- before

21   any offer letter or Regional Manager Agreement was

22   presented to you, do you recall anything more

23   specific in terms of your discussions with NAF about

24   override bonuses other than what you've already

25   described today?

Page 48

```
1            MS. GIBSON:  Objection.  Form.
2            THE WITNESS:  I don't recall anything more
3        specific.
4    BY MR. PERLOWSKI:
5        Q    Okay.
6            So -- just so the record's clear, what I'm
7    trying to get at -- we had a conversation where you
8    believe Mr. Reed was leading a discussion about the
9    buckets of overrides --
10       A    Yes.
11       Q    -- right?  Area manager, branch manager,
12   comp differential.
13           Do you recall any verbal discussions with
14   NAF, where there was any more specificity about your
15   override bonus compensation before you joined NAF?
16       A    I don't remember anything specific.  No.
17       Q    Okay.
18           Do you recall having any conversation with
19   any representative of NAF before you joined NAF about
20   how pricing exceptions would be handled?
21           MS. GIBSON:  Objection.  Form.
22           THE WITNESS:  I do not recall.
23   BY MR. PERLOWSKI:
24       Q    Okay.
25           Do you recall any discussions with any
```

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 49

1    representative of NAF before you joined NAF about

2    what kind of marketing budget you and Ms. Allison

3    might have?

4         A    I recall that the marketing budget was put

5    into Kelly's agreement; seven-and-a-half basis points

6    per loan.

7         Q    Do you recall any discussions about the

8    marketing budget with any representative of NAF

9    before you joined NAF?

10             And I understand you said that you recall

11   there might be something in Ms. Allison's agreement

12   about a marketing budget.  I'm talking about any

13   discussions that you may have had with a

14   representative of NAF about the marketing budget

15   before you joined.

16        A    I remember discussing that we did a lot of

17   marketing.  And that we had, for example, a TV

18   contract.

19        Q    You discussed having a TV contract with

20   representatives of NAF?

21        A    From my recollection, yes.

22        Q    What was the TV contract?

23        A    It was for a TV show that is called

24   Atlanta's Best New Homes.

25        Q    Was it a commercial placement during that TV

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 51 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 50

1     show?

2          A   It was a two-minute segment in which myself

3     or someone else would give mortgage information on

4     the show.

5          Q   So it was an actual segment within the show

6     as opposed to a commercial --

7          A   That's correct.

8          Q   -- during a break in the show?  Okay.

9              Atlanta's Best New Homes, what station was

10    that on; do you recall?  And I'm --

11         A   I'm going to take a guess and say it was

12    WSB, but I'm not 100 percent.

13         Q   Okay.

14             Do you recall what day and time the show

15    aired?  I've never seen it, so I'm just -- I'm just

16    asking.

17         A   Okay.

18             Saturday -- my recollection is Saturday at

19    ten a.m.

20             MS. GIBSON:  Henry, can you just let us know

21        a good time for a break?

22             MR. PERLOWSKI:  This is fine.

23             MR. GIBSON:  Okay.

24             MR. PERLOWSKI:  Absolutely.

25             THE VIDEOGRAPHER:  The time is 11:07 a.m.,

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 52 of 327
Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 51

 1          we are off video record.

 2                (Whereupon, a short break was taken.)

 3                THE VIDEOGRAPHER:  The time is 11:15 a.m.,

 4          we are back on video record.

 5     BY MR. PERLOWSKI:

 6          Q    Ms. Spearman, when we broke, we were talking

 7     about any discussions that you may have had with NAF

 8     about a potential marketing budget if you and

 9     Ms. Allison joined NAF.  You mentioned that you

10     believe that you recall that there was a marketing

11     budget in Ms. Allison's agreement.

12                Aside from what may be in Ms. Allison's

13     agreement, do you recall any specific discussions

14     with any NAF representatives about what marketing

15     budget you and she may have?

16          A    Nothing specific, other than the fact that

17     we did a lot of marketing.

18                We were bringing over, you know, a group of

19     almost 100 employees, very large builder and realtor,

20     you know, referral partnerships.  So, I know we

21     discussed the fact that there would be substantial

22     marketing.

23          Q    So the discussion that you -- that you and

24     Ms. Allison and NAF were having was about bringing

25     over an entire team of people, you said around 100?

Page 52

1        A    Correct.

2        Q    And those 100 or so people, where were they

3    based for Caliber?

4        A    Georgia and South Carolina.

5        Q    So did Caliber have various branch locations

6    throughout Georgia and South Carolina?

7        A    Yes.  Most of which we probably opened.

8        Q    Did Caliber have a presence in Georgia and

9    South Carolina aside from yourself, Ms. Allison, and

10   your team?

11       A    Yes.

12       Q    When you and Ms. Allison and others left

13   Caliber to join NAF, did Caliber continue to have any

14   presence in Georgia and South Carolina?

15       A    Yes.

16       Q    Do you recall --

17       A    Can I clarify something there?

18       Q    Of course -- oh.  Yes.  Absolutely.  Go

19   ahead.

20       A    I can't be certain about if they retained

21   anything in South Carolina.

22       Q    Okay.

23       A    I know they did in the Atlanta area.

24       Q    Okay.  And thank you for mentioning that.

25            Another ground rule throughout -- I should

1    have mentioned at the start of the deposition.  At

2    any point in time today you want to clarify or

3    correct any testimony that you've previously given,

4    you are free to do so --

5         A    Okay.

6         Q    -- okay?

7              Do you recall when you first received an

8    offer from NAF?

9         A    I don't recall the exact date.

10             (Whereupon, Defendant's Exhibit Number One

11        was marked for identification.)

12   BY MR. PERLOWSKI:

13        Q    Ms. Spearman, I'm going to show you what's

14   been marked as Exhibit One, which is an Offer of

15   Employment from NAF dated Friday, November 4th.  It

16   was attached to the lawsuit that you filed.

17             My first question to you is:  Do you

18   recognize this offer letter?

19        A    Yes.

20        Q    Do you recall receiving a prior version of

21   an offer letter from NAF?

22        A    No.

23        Q    Do you recall receiving an Offer of

24   Employment from NAF before November 4th of 2016?

25        A    I'm sorry.  How is that different from the

Page 54

1     last question?

2          Q    Do you recall receiving any Offer of

3     Employment from NAF before November 4th of 2016?

4          A    No.

5          Q    Okay.

6               This offer letter, if you look, it's about

7     halfway down the page, it says your proposed start

8     date was Tuesday, November 1st, 2016; do you recall

9     when you started with NAF?

10         A    I don't recall, but I would assume it was

11    November 1st.

12         Q    Do you recall starting with NAF before you

13    received an offer letter?

14         A    I don't recall.

15         Q    Do you recall how you received this offer

16    letter?

17         A    Electronically --

18         Q    By email --

19         A    -- is what I recall.

20         Q    By email to your spearmania email address?

21         A    To the best of my recollection, yes.

22         Q    Okay.

23              After you received this offer letter from

24    NAF, did you discuss it with anyone at NAF?

25         A    I don't recall.

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 56 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 55

1      Q    Ms. Spearman, go to the second to last page,
2   you see there's a signature for yourself, Gina W.
3   Spearman?
4      A    Page 7 of 29?
5      Q    Yes.
6           Page 7 of 8 of the offer letter, yes, Page 7
7   of 29 of the document that was filed with the court.
8      A    Yes.
9      Q    Did you -- is that a DocuSign signature
10  above your name?
11     A    Yes.  I believe so.
12     Q    Okay.
13          Now the initials, you see there's initials
14  on each page?
15     A    Yes.
16     Q    And GWS, those are your initials?
17     A    Yes.
18     Q    Are those DocuSigned initials?
19     A    To the best of my knowledge, yes.
20     Q    Okay.
21          So, before you accept the offer
22  electronically, did you -- do you recall negotiating
23  any of these specific terms in the offer letter with
24  anyone at NAF?
25     A    We would have had verbal conversations

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 57 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 56

1    probably about some of these components, yes; but I

2    don't remember specifically the details of that.

3         Q   Okay.

4              So let's start with who would the verbal

5    conversations have been with about the terms of your

6    offer letter?

7         A   Jon Reed and Christy Bunce.

8         Q   These conversations have been not in person?

9         A   I believe they would have been over the

10   phone.

11        Q   Do you recall any specific terms that you

12   may have negotiated with either Mr. Reed or Ms. Bunce

13   over the phone?

14        A   I remember discussing the non-solicit

15   portion of the agreement.

16        Q   Do you remember discussing any other terms

17   of the offer letter with either Mr. Reed or Ms. Bunce

18   other than the non-solicit?

19        A   I remember some discussions about COBRA,

20   them covering insurance.  I was trying to find that

21   in here.

22        Q   Covering your medical insurance continuation

23   from your leaving Caliber?

24        A   Correct.

25        Q   Okay.

Page 57

1          Anything other than in terms of other terms

2    that you remember discussing with either Mr. Reed,

3    Ms. Bunce, or anyone else at NAF aside from the

4    non-solicit or the COBRA?

5          A    Not that I can recall.

6          Q    It looks like you -- on Page 2 of the offer

7    letter, see it says additional bonus.  It appears

8    that were offered a one-time additional bonus to

9    cover COBRA verifiable -- verifiable COBRA expenses;

10   do you see that?

11         A    Yes.

12         Q    Does that reflect your discussions that you

13   had with NAF before you joined?

14              MS. GIBSON:  Objection.  Form.

15              THE WITNESS:  Yes.

16   BY MR. PERLOWSKI:

17         Q    Okay.

18              Did you engage legal counsel in connection

19   with your review of this Offer of Employment?  I'm

20   just asking yes or no.

21         A    No.

22         Q    Do you know whether Ms. Allison did?

23         A    I can't confirm if she did or didn't.  I

24   believe she verbally told me that she was seeking

25   counsel.

Page 58

1      Q   Do you recall ever having any conversation

2   with any legal counsel that Ms. Allison may have

3   engaged?  I'm not asking for any specifics.  I'm

4   just -- that's a yes or no.

5      A   No, I did not.

6      Q   So the offer letter refers to you having a

7   position as regional manager in our OLA division.

8          What was your understanding of what the OLA

9   division was?

10     A   It stands for Outside Loan Agent, which is

11  the retail division.

12     Q   Uh-huh.

13         At the time you received this offer letter,

14  Ms. Spearman, did you also receive the Regional

15  Manager Agreement?

16     A   Yes.

17         (Whereupon, Defendant's Exhibit Number Two

18         was marked for identification.)

19  BY MR. PERLOWSKI:

20     Q   Ms. Spearman, before we actually look at the

21  Regional Manager Agreement, was it -- to your

22  recollection, was it within the same email in which

23  you received the offer letter?

24     A   Yes.

25     Q   Did you also DocuSign the Regional Manager

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 60 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 59

1    Agreement?  And feel free to take a look at

2    Exhibit Two.  At any time I'm asking you about an

3    exhibit, feel free to look -- take whatever time you

4    need to look at it.

5        A    Yes.  To my recollection, it was digitally

6    signed.

7        Q    Do you recall signing the offer letter or

8    the Regional Manager Agreement around the same time?

9        A    Yes.

10       Q    Do you know which one you signed first?

11       A    I do not.

12       Q    Okay.

13            So, Ms. Spearman, if you look at

14   Exhibit Two, the Regional Manager Agreement, it

15   appears to be dated November 6th, do you see that?

16       A    Yes.

17            MS. GIBSON:  What page are you referring to?

18            MR. PERLOWSKI:  It's the very first page.

19            MS. GIBSON:  Okay.

20   BY MR. PERLOWSKI:

21       Q    I'm sorry.  Did you --

22       A    Yes.

23       Q    Okay.

24            Had you ever received a prior version of a

25   Regional Manager Agreement from N-A-F?

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 60

```
 1        A    Not that I recall.
 2        Q    Do you recall discussing any of the terms of
 3   the Regional Manager Agreement with anyone at N-A-F
 4   before you signed it?
 5        A    No.  I don't recall.
 6        Q    Do you recall discussing any of the terms of
 7   the Regional Manager Agreement with Mr. Reed before
 8   you signed it?
 9        A    No.  I don't recall.
10        Q    Do you recall discussing the Regional
11   Manager Agreement with Ms. Bunce before you signed
12   it?
13        A    No.
14        Q    Do you recall discussing the Regional
15   Manager Agreement with Ms. Preslo before you signed
16   it?
17        A    No.
18        Q    Do you recall discussing the Regional
19   Manager Agreement with Mr. Arvielo before you signed
20   it?
21        A    No.
22        Q    Do you recall discussing the Regional
23   Manager Agreement with Ms. Arvielo before you signed
24   it?
25        A    No.
```

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 61

1        Q   So, in the offer letter, Ms. Spearman,

2    there's a discussion about the compensation being

3    differential, being split 70 percent to Ms. Allison

4    and 30 percent to you.  And that's at the bottom of

5    Page 2.  Was that something that you negotiated with

6    Ms. Allison or with NAF?

7             MS. GIBSON:  Objection.  Form.

8    BY MR. PERLOWSKI:

9        Q   Okay.

10            Let me ask a different question:  70/30

11   split, how did that come to be, based on your

12   understanding?

13       A   That was something Kelly and I decided.

14       Q   To your knowledge, did NAF have any input in

15   deciding that split?

16       A   Not to my knowledge.

17       Q   I'm sorry?

18       A   Not to my knowledge.

19       Q   Okay.

20            So sticking with that provision of the offer

21   letter, it's paragraph three, and it's the bottom of

22   Page 2, very last paragraph on Page 2; are you there?

23       A   Yes.

24       Q   Okay.

25            It says Kelly and Gina are eligible to

Page 62

1    receive compensation differential.  What does -- what

2    was your understanding of what that meant,

3    compensation differential?

4         A    That what we paid the loan officers in our

5    territory, if they were paid less than 140 basis

6    points, we would make that differential.

7         Q    And Ms. Spearman, this may be a very basic

8    question to you; but understanding that, you know,

9    there are going to be people considering this dispute

10   who know nothing about the industry.  Let me just ask

11   a very basic question.

12            Can you explain to me what -- what does BPS

13   mean?

14        A    Basis points.

15        Q    And basis points means what within the

16   industry?  So it's 140 -- up to 140 basis points

17   for -- right?  And --

18        A    Uh-huh.

19        Q    -- what does that mean?  Translate that to a

20   lay person, if you could.

21        A    Ya.  It's a percentage.  So it's a decimal

22   point percentage calculation to determine how much

23   commission that's generally based off the loan

24   amount.

25        Q    Okay.

Page 63

1           So the basis points is a -- it's a

2    percentage calculation based off of loan amounts?

3           A    Yes.

4           Q    Okay.

5                So, what was your understanding if someone

6    says when up to 140 basis points --

7           A    Uh-huh.

8           Q    -- is that up to 140 basis points on all

9    loans generated by loan officers?

10          A    Yes.

11          Q    Okay.

12               So whatever that number was, you would minus

13    the loan officer's compensation to determine the

14    compensation differential?

15               MS. GIBSON:   Objection.   Form.

16               THE WITNESS:   Yes.

17    BY MR. PERLOWSKI:

18          Q    Okay.   Okay.

19               So, in the offer letter, in paragraph three,

20    it says, up to 140 BPS maximum; do you see that?

21          A    Uh-huh.   Yes.

22          Q    And it says, on all self-generated loans and

23    house accounts.   What is your understanding of what a

24    self-generated loan was?

25          A    A self-generated loan would be a loan in

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 65 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 64

1    which the loan officer generated the lead or the

2    client.

3         Q    Okay.

4              And what was -- what was your understanding

5    of what a house account was?

6         A    A house account would be an account in which

7    management obtained the referral source; example,

8    builder account or a realtor account.  And the loan

9    officer was given the opportunity to work the lead

10   from that account.

11        Q    And then, so it talks about up to 140 --

12   up -- a differential of up to 140 basis points

13   maximum on self-generated loans and house accounts.

14             It also talks about, as well as 75 basis

15   points maximum on brokered loans compensation.  What

16   was your understanding of what brokered loans

17   compensation meant?

18        A    Brokered loans, as we discussed earlier, is

19   a loan in which the loan is being sent to a

20   third-party lender, in most cases for underwriting,

21   closing, funding, and servicing of the loan.

22        Q    Generally speaking, is a brokered loan a

23   less attractive loan versus a non-brokered loan to a

24   company like NAF?

25        A    Is less profitable.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 65

1        Q    That's -- okay.

2             Before you signed your offer letter and

3    Regional Manager Agreement, did you ever see

4    Ms. Allison's agreement?

5        A    To my knowledge, prior to me signing my

6    agreement -- prior to me signing my agreement, I do

7    not recall seeing her agreement.

8        Q    Do you recall discussing it with her?

9        A    We certainly had conversations regarding

10   aspects of the compensation terms.  I don't recall

11   specifically talking to her about the agreement.

12       Q    Okay.

13            Tell me what you can recall before you

14   signed your offer letter and Regional Manager

15   Agreement.  What conversations did you have with

16   Ms. Allison about compensation terms?

17       A    What our split would be.

18       Q    The 70/30 split?

19       A    Yes.

20       Q    What other compensation terms do you recall

21   discussing with Ms. Allison aside from the split

22   before you signed your offer letter and Regional

23   Manager Agreement?

24       A    I remember, you know, discussing the

25   different buckets and how that would work.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 66

1       Q    Tell me what you can recall discussing with

2    Ms. Allison about the different buckets and how they

3    would work?

4       A    We ran, you know, rough calculations on our

5    production and what that compensation might look

6    like.

7       Q    Do you recall anything else that you

8    discussed with Ms. Allison about the buckets of

9    potential override bonuses other than the

10   calculations that you were running?

11      A    I don't recall anything else.

12      Q    What's your understanding of your

13   responsibilities as -- what were you hired to do?

14      A    We were hired to open offices and grow

15   production in the Southeast for New American Funding.

16      Q    At the time that you and Ms. Allison joined

17   NAF, what was the Southeast region when you joined?

18      A    Their production was zero.

19      Q    And then you brought teams of people who are

20   based in Georgia and South Carolina?

21      A    Correct.

22      Q    So initially, when you and she joined, the

23   Southeast region at NAF went from zero to Georgia and

24   South Carolina?

25      A    Yes.

Page 67

1      Q   Were you -- were you given any parameters in

2   terms of growing the region, in terms of, for

3   example, where?

4      A   There were seven -- six to eight states

5   discussed.  The states of Georgia, South Carolina,

6   North Carolina, Alabama, Tennessee, Florida.  And I

7   do believe Virginia was in that -- in the discussion.

8      Q   Georgia, South Carolina and North Carolina,

9   Alabama, Tennessee, Florida, Virginia; does that

10  sound right?

11     A   Yes.

12     Q   To your knowledge, did NAF have a presence

13  in any of those states when you and Ms. Allison

14  joined?

15     A   They had one individual in North Carolina.

16  And they had a branch in Orlando, Florida.

17     Q   Were you given any direction in terms of

18  profitability expectations around the time you

19  joined?

20     A   No.

21     Q   Did you have an understanding that you were

22  being asked to run the regions profitably?

23     A   Can you ask the question again?

24     Q   Did you have an understanding that you were

25  being asked to run the region proper -- excuse me --

Page 68

1    profitably?

2         A    I don't remember them ever asking that.  I

3    know, as a business person, that that is generally an

4    expectation.

5         Q    So as regional manager, to whom did you --

6    you reported to Jon Reed directly?

7         A    Yes.

8         Q    What was your understanding of to whom

9    Ms. Allison reported?

10        A    It was my understanding that she also

11   reported to Jon Reed.

12        Q    And to who -- who reported to you when you

13   started?  Just positions, not people.

14        A    Branch managers, loan officers; but, you

15   know, loan officers technically reported to the

16   branch managers who, then, reported to us.  We also

17   had marketing manager, production manager, training

18   manager that reported to us.

19        Q    So the branch manager would be the person,

20   for example, if you have -- like you mentioned there

21   was a branch in Orlando, Florida.  The branch manager

22   would be the lead person at that location?

23        A    Yes.

24        Q    And that person would report to you?

25        A    Yes.

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 69

1        Q    Okay.

2             And there are other positions like

3    marketing, production, that -- sounds like those

4    positions, marketing manager, production manager,

5    they're not location-specific, they're just

6    throughout the --

7        A    That's correct.

8        Q    -- their responsible -- their responsibility

9    is the entire region, right?

10       A    That's correct.

11       Q    Okay.

12            And those positions would report to you?

13       A    Yes.

14       Q    Okay.

15            How did the Southeast regions territory

16   change over time?

17            MS. GIBSON:   Objection.   Form.

18   BY MR. PERLOWSKI:

19       Q    So, when you said when NAF started -- when

20   you started at NAF, you and Ms. Allison brought

21   Georgia and South Carolina to the proverbial table?

22       A    Uh-huh.

23       Q    You said there was one person, an individual

24   in North Carolina and a branch in Florida --

25       A    Uh-huh.

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 70

1          Q    -- right?

2          A    Uh-huh.  Yes.

3          Q    Okay.

4               So, to your recollection, around the time

5     you started, do you recall any other locations within

6     NAF's Southeast region footprint other than what we

7     just discussed?

8          A    Those are the only people that I recall

9     being in those states prior to us joining.

10         Q    Okay.

11              When you left NAF in April of 2020 --

12         A    Uh-huh.

13         Q    -- where did NAF have a presence in the

14    Southeast region, state -- state -- let's just start

15    with states.  I'm not getting more --

16         A    Okay.

17              You want me to name the states?

18         Q    Sure.  Ya.

19         A    Georgia, South Carolina, North Carolina,

20    Alabama, Florida, Tennessee.  I cannot be certain if

21    there was anyone in Virginia when I left.  There was

22    someone in Virginia during my tenure there.

23         Q    Who was that person who was in Virginia at

24    some point during your tenure?

25         A    I'm trying to think of his name.  Daniel.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 71

1    And I'm trying to think of his last name.  I'll have

2    to come back to you on the last name.

3         Q    If you remember --

4         A    Okay.

5         Q    -- as I said earlier, if you want to go

6    ahead and clarify, expand your testimony at any point

7    in time, please feel free to do so.

8         A    Okay.

9         Q    When, to your best of your recollection, was

10   Alabama -- when did NAF expand into Alabama?

11        A    I'm trying to remember the date.  We hired a

12   branch manager in Huntsville, that was our first

13   location in Alabama.  If I had to guess, I would say

14   it was in 2018.

15        Q    Did NAF expand in North Carolina besides

16   that one individual that you mentioned earlier?

17        A    Yes.

18        Q    Opened other branches in North Carolina?

19        A    We did, yes.

20        Q    Okay.

21             Do you recall when NAF expanded into

22   Tennessee?

23        A    We hired a branch manager in Chattanooga in

24   2018.

25        Q    Who was that?

Page 72

 1      A    Janet Hillis.

 2      Q    Do you recall when NAF expanded into

 3  Virginia?

 4      A    It was after Tennessee, but I cannot

 5  remember the date.

 6      Q    Just as a -- just as a general view, if you

 7  could just describe to me.  Okay.  So you mentioned

 8  you expanded into Alabama by hiring a branch manager

 9  in Tennessee.

10           What was the process to engage or recruit

11  for a branch manager in a location you were

12  interested in in expanding into?  Just talk me out.

13  How did it work?

14      A    Combination of ways; recruiter, in-house

15  recruiter, external -- external recruiters.  Just

16  knowledge of people in the industry.  Could be

17  current employees, former employees.  Could be

18  business partners.

19      Q    So, if an opportunity came up or either

20  through someone that works for you, you just hear it

21  on the street, or a recruiter contacts you, okay,

22  maybe an opportunity to expand into Birmingham,

23  Alabama.  What, if at all, how would the Southeast

24  region work with corporate to look at that

25  opportunity?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 73

1          A    We would -- we would talk to the individual.

2     It was our responsibility -- excuse me -- to recruit

3     and business develop.  So, we would speak to that

4     person and determine if they are a fit for our

5     organization.  And then we would -- if we felt that

6     they were, then we would request an offer from HR.

7          Q    So typically speaking, in terms of the

8     expansion into other territories -- when I say

9     corporate, I'm referring to N-A-F in Tustin,

10    California --

11         A    Yes.

12         Q    -- okay?

13              So corporate would typically get involved

14    when you wanted to make an offer?

15         A    Yes.

16         Q    In terms of sort of evaluating, you know,

17    whether that opportunity seemed to make good business

18    sense or not, you know, whether the person had a, you

19    know, sufficient book of business or potentially

20    might lead to a sufficient book of business, who is

21    doing that analysis, if anyone?

22         A    At some point in my tenure, I don't recall

23    it being at the very beginning, and I don't recall at

24    what date it was implemented, but there was a

25    questionnaire that Kelly and I, along with the

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 75 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 74

1    internal recruiter, would complete some questions

2    regarding opening a branch in that location.

3         Q    And that questionnaire would then go to

4    corporate?

5         A    Yes.

6         Q    Do you know to whom in corporate?

7         A    The internal recruiter would handle a lot of

8    that, so I'm not exactly sure.

9         Q    In terms -- you said you would request an

10   offer from HR.  Did corporate have to formally

11   approve the issuance of the offer; to your

12   understanding?

13        A    Yes.

14        Q    Did either -- did NAF engage recruiters to

15   assist it in expansion efforts?

16        A    We had an internal recruiter.

17        Q    And was that internal recruiter based within

18   the Southeast region or was that internal recruiter

19   based in -- at corporate?

20        A    He was based in California.

21        Q    Did the Southeast region use any other --

22   use any external recruiting services in terms of

23   potential expansion opportunities?

24        A    It was permissible to do so.  I can't, at

25   the moment, remember a time in which we used one.

Page 75

```
1        Q    Okay.
2             So, in the -- in the process of adding a
3     branch, what I'm trying to ascertain is, what level
4     of involvement corporate had versus the region.
5             So it sounds like corporate may have been
6     involved in terms of the -- if the internal recruiter
7     was involved at all in the opportunity.
8             So corporate may have been involved if the
9     internal recruiter was involved in identifying an
10    opportunity, right?
11            MS. GIBSON:  Objection.  Form.
12    BY MR. PERLOWSKI:
13       Q    You can answer.
14       A    Corporate was involved in bringing on an
15    employee or a branch.
16       Q    Okay.
17            How so -- how so?
18       A    I would say they were approving it from a
19    financial standpoint.
20       Q    Was that true throughout your tenure at NAF?
21       A    Yes.
22       Q    Okay.
23            Corporate would issue the offer, correct?
24       A    Yes.
25            THE VIDEOGRAPHER:  Excuse me.
```

Page 76

```
 1              Can we go off for one moment?

 2         MR. PERLOWSKI:  Sure.

 3         MS. GIBSON:  Ya.

 4         THE VIDEOGRAPHER:  The time is 11:56 a.m.,

 5    we are off video record.

 6         (Whereupon, a short break was taken.)

 7         (Whereupon, a lunch break was taken.)

 8         THE VIDEOGRAPHER:  The time is 12:41 p.m.,

 9    we are back on video record.

10   BY MR. PERLOWSKI:

11     Q   Good afternoon, Ms. Spearman.

12     A   Hello.

13     Q   Let's just go back.  Exhibit One is your

14   offer letter, Ms. Spearman.  And I believe -- and

15   again, your testimony from before this morning will

16   speak for itself.  I believe you said you didn't have

17   legal counsel assist you with this offer letter.

18         Did you read the entire offer letter before

19   you signed it?

20     A   Yes.

21     Q   And with respect to the Regional Manager

22   Agreement, which is Exhibit Two, did you read the

23   entire Regional Manager Agreement before you signed

24   it?

25     A   To the best of my recollection, yes.
```

1        Q    Okay.

2             Between the time that you received the

3    Regional Manager Agreement and the time that you

4    signed it, did you speak to anyone at N-A-F about any

5    of its terms?

6        A    No.

7        Q    Same question with respect to the offer

8    letter.  Between the time you received it and the

9    time you signed it, did you speak with anyone at

10   N-A-F regarding its terms?

11       A    I think I mentioned the non-solicit and the

12   COBRA --

13       Q    Right.

14       A    -- were the ones that I recall --

15       Q    Okay.

16       A    -- discussing with them.

17       Q    Right.

18            You don't recall anything else other than

19   the non-solicit and the COBRA?

20       A    I do not.

21       Q    Okay.

22            And I apologize if I asked you this question

23   this morning, I just don't remember the answer.

24            Do you remember who at N-A-F you spoke to

25   about the non-solicit and the COBRA?

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 78

1        A    I believe on the non-solicit, I spoke to

2    Christy Bunce.

3        Q    Okay.

4        A    And that was jointly, Kelly and I, probably

5    both speaking to her about that.

6        Q    Were the discussions about the non-solicit

7    just concerns about what you could and couldn't do?

8        A    We were bringing 100 people.

9        Q    Yes.

10       A    So, our question was ensuring that those

11   people were not subject to the non-solicit, since we

12   had brought them.

13       Q    Okay.

14            Do you remember who -- with whom you

15   discussed the COBRA issue?

16       A    Someone in HR.  I cannot recall who.

17       Q    It looks like the offer letter on N-A-F's

18   part is a Katie Traviglia?  I'm probably botching the

19   pronunciation of the last name.

20       A    Uh-huh.

21       Q    T-r-a-v-i-g-l-i-a.

22       A    Uh-huh.

23       Q    Does that ring a bell in terms of who you

24   may have spoken with about the COBRA issue?

25       A    I do not remember.

Page 79

```
 1        Q    Okay.

 2             When did you start with Movement Mortgage?

 3        A    September 30th, 2020.

 4        Q    Okay.

 5        A    It's either September 30th or October 1st.

 6        Q    Okay.

 7             When did you receive an offer from Movement

 8   Mortgage?

 9        A    In the weeks prior to that.  I don't

10   remember the specific date.

11        Q    Did you have any form of employment between

12   the time that you left NAF and joined Movement

13   Mortgage?

14        A    No.

15        Q    Had you spoken to any other companies about

16   the possibility of leaving NAF before you resigned?

17             MS. GIBSON:  Objection.  Form.

18             THE WITNESS:  Can you repeat the question?

19   BY MR. PERLOWSKI:

20        Q    Sure.

21             Before you left NAF, did you interview with

22   any other companies in the industry about joining

23   them -- about the possibility of joining them?

24        A    Yes.

25        Q    Which ones?
```

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 81 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 80

1      A    I don't know that I would consider it

2   interviewing, but I did talk to other companies, just

3   to see what, you know, what was available in the

4   marketplace.

5      Q    Which companies do you recall talking to

6   about seeing what was available in the marketplace?

7      A    A company called Cardinal.

8      Q    Okay.

9           Any others?  And this is before you left

10  NAF.

11     A    We did -- I did talk to Movement.

12     Q    Before I ask some follow-up questions, any

13  others besides Cardinal and Movement that you spoke

14  to before you left NAF about the possibility seeing

15  what else was available in the industry?

16     A    No.

17     Q    Do you recall when you had a conversation

18  with Cardinal?

19     A    I don't.  It was after the leadership

20  meeting in 2019 in which it was disclosed to us of

21  the misallocation of $30 million.  And that they

22  would be looking to change our compensation, change

23  our original 2016 agreement.

24     Q    Okay.

25     A    I can't remember the month.

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 82 of 327
Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 81

1      Q    Sure.

2           So, leadership meeting, I think we -- I

3      think you mentioned -- although, I think you also

4      qualified that you're not exactly sure -- February

5      of '19 or so?

6      A    Yes.

7      Q    So you resigned on -- in April of '20?

8      A    Yes.

9      Q    So, roughly, 13, 14 months between the

10     leadership meeting and when you resigned?

11     A    (Nods head.)

12     Q    Do you recall when you talked to Cardinal

13     relative to that 13, 14-month time difference between

14     the leadership meeting and your resignation?

15     A    It was some time in 2019.  Mid to late 2019.

16     Q    Did you interview with Cardinal?

17     A    I would not consider it to be an interview.

18     Q    How many -- did you have more than one

19     conversation with Cardinal?

20     A    I only had one conversation.

21     Q    With whom?

22     A    I do not recall his name.  Something I could

23     easily obtain.

24     Q    Do you recall his position?  You can't

25     recall the name.  Do you recall the position of the

Page 82

1    person you talked to?

2         A    I believe he was the COO.

3         Q    The conversation that you had with the

4    individual at Cardinal, was this an in-person or

5    telephone?

6         A    In-person.

7         Q    Where was it?

8         A    I believe -- they have -- I believe it was

9    in Charlotte.

10        Q    Is that where Cardinal's headquarters is

11   based?

12        A    I think they have more than one, but they

13   have an office there.

14        Q    Who attended that meeting?

15        A    Myself and Kelly.

16        Q    Anyone else on NAF's side besides yourself

17   and Kelly?

18        A    Not to my knowledge.

19        Q    And just for the purpose of the record, when

20   you're talking about Kelly, you're referring to Kelly

21   Allison?

22        A    Yes.

23        Q    Okay.

24        A    Ya.

25        Q    And that's fine.  We can refer to her as

Page 83

1    Kelly, Ms. Allison, whatever works for you.  I just

2    want to make sure, months down the road, when someone

3    else is reading it, that it's clear.

4         A    Understood.

5         Q    Did you receive an offer from Cardinal?

6         A    No.

7         Q    Other than the in-person meeting with the

8    individual that you mentioned, who you think is the

9    CEO -- the COO, did you have any other discussions

10   with Cardinal about the prospect of joining Cardinal?

11        A    We were curious about companies that paid

12   based on a profit and loss model.  So, that was

13   really our primary -- or my primary motivation in

14   speaking to them, to understand a little bit more

15   about that compensation model.

16        Q    And did you understand that Cardinal paid on

17   a P and L model?

18        A    Yes.

19        Q    How -- what was the source of that

20   understanding?

21        A    Recruiters and people from other companies

22   routinely reach out to top producers in the industry,

23   like Kelly and myself.  So, I don't remember

24   originally how I would come to know that information.

25   I just knew.

Case 1:20-cv-04981-CAP  Document 88  Filed 04/27/22  Page 85 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 84

1      Q    Okay.

2           Did anyone attend the meeting for Cardinal

3    aside from the individual that you were referring to,

4    the male who you think may have been the COO?

5      A    They did have some other teammates in and

6    out of the meeting, just showing their platform.

7      Q    Was the meeting with Cardinal on your

8    calendar?

9      A    I don't recall.

10     Q    And by, on your calendar, just as a frame,

11   my -- the only calendar I personally keep is what's

12   on my phone, my Outlook.  My calendar is what's on my

13   Outlook --

14     A    Right.

15     Q    -- I don't keep a paper calendar.  I'm using

16   the term calendar to refer to both electronic or a

17   paper calendar.  Do you recall if that meeting might

18   have been on a calender --

19     A    I don't recall.

20     Q    -- so we can place it in time?

21     A    I don't recall if I placed it on a calendar.

22     Q    Okay.

23          And you said you also talked to Movement

24   before you left NAF?

25     A    Yes.

Page 85

```
 1        Q    Do you recall when you first talked to
 2   Movement about the possibility of -- or about options
 3   with Movement?
 4        A    January or February of '20.
 5        Q    Were those discussions with Movement in
 6   person or by telephone?
 7        A    There was an in-person meeting.
 8        Q    Where was that?
 9        A    Charlotte.
10        Q    And who attended that in-person meeting at
11   Charlotte?
12        A    Several people from Movement.
13        Q    How about, was it just yourself or did
14   Ms. Allison attend as well?
15        A    Kelly attended as well.
16        Q    Do you recall with whom you met at Movement?
17        A    Several members of their management team.
18        Q    Did -- so this meeting was in January,
19   February?
20        A    Uh-huh.
21        Q    Did you have any other meetings or
22   discussions with Movement before you left NAF,
23   understanding that you joined Movement in the fall
24   of '20?
25        A    Right.  I did not have any other
```

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 87 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 86

1    communications with Movement prior to leaving NAF.

2           (Whereupon, Defendant's Exhibit Number Three

3        was marked for identification.)

4    BY MR. PERLOWSKI:

5        Q    Ms. Spearman, I'm going to show you what's

6    been marked as Exhibit Three.  I will represent to

7    you that Exhibit Three might -- can you hand me that

8    back, please?

9        A    (Document tendered.)

10       Q    There might be an extra page on there.  Let

11   me see.  Ya.  It looks like the last page was printed

12   twice.  Yep.  Just going to take the last page off,

13   because it appears to have been printed twice.

14          Ms. Spearman, I'm showing you what's been

15   marked as Exhibit Three, which is an email of April

16   13th of 2020 from yourself; do you recognize that

17   email?

18       A    Yes.

19       Q    Okay.

20          Ms. Spearman, I'll also represent to you

21   that the spreadsheet on the last page, the

22   spreadsheet that is attached to the email; do you

23   recognize this spreadsheet?

24       A    Yes.

25       Q    Okay.

Page 87

1              Prior to April 13th of 2020, Ms. Spearman,

2      did you tell anyone at NAF that you were resigning?

3          A    My husband.

4          Q    Another -- throughout the deposition today,

5      if I -- and I recognize I asked an open-ended

6      question, did you tell anybody.  I'm not going to ask

7      you about any conversation that you may have had with

8      your husband.  Those are typically private

9      conversations between spouses are typically protected

10     from the marital privilege.

11         A    Uh-huh.

12         Q    So I'm not going to go and ask about any

13     conversations that you had with your husband, okay?

14         A    (Nods head.)

15         Q    So, other than your husband, did you -- let

16     me ask a better question:  Did you tell anyone at NAF

17     that you were considering resigning?

18         A    I told Kelly.

19         Q    When?

20         A    I discussed it with her the day before.

21         Q    Did you tell her that you were resigning or

22     that you were considering resigning?

23         A    I told her I was strongly considering

24     resigning.

25         Q    Did you tell her why?

Page 88

1       A    Yes.

2       Q    What'd you tell her?

3       A    I told her that based on the fact that we

4   had not been paid as agreed since our 2016 agreement,

5   along with the changes to how they paid us in 2019,

6   and moving to the new compensation that we signed in

7   March of 2020, that I was not comfortable with the

8   stability of the company nor the transparency of the

9   P and L platform that would be used to calculate our

10  income.

11      Q    So if I understand what you just said

12  correctly, and please correct me if I'm wrong, the

13  March of 2020 contract amendment was a change to go

14  to the P and L model?

15      A    Yes.

16      Q    And you signed that March of 2020 amendment?

17      A    Yes.

18      Q    And you had legal counsel assist you with

19  that March of 2020 amendment, Mr. Watson?

20      A    Yes.  He reviewed the draft of the

21  agreement, the new agreement.  He reviewed our 2016

22  agreement and the March 2020 agreement.

23      Q    Did you engage an accountant at all to help

24  you understand the P and L model?

25      A    I did not engage a CPA.

Gina Spearman                        November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 89

1      Q    Ms. Allison --

2      A    Yes.

3      Q    -- engage a CPA?

4      A    Yes.

5      Q    Okay.

6           Did -- do you recall the name of that CPA?

7      A    I do not.

8      Q    Do you recall the company the CPA was with?

9      A    I do not.

10     Q    Okay.

11          Did you participate in any discussions

12    with -- sorry -- CPA, male or female?

13     A    Female.

14     Q    Okay.

15          Do you recall being in any discussions with

16    the CPA and Ms. Allison about the P and Ls?

17     A    Other than what was discussed at the

18    meeting, where the CPA was present, I had no other

19    conversations with that CPA.

20     Q    And the meeting that you're referring to is

21    the meeting in the fall of '19 with Mr. Frommert,

22    Mr. Reed, and Mr. Watson?

23     A    That is correct.

24     Q    Okay.

25          Was your last day with NAF April 13th of

Page 90

1    2020?

2        A    Yes.

3        Q    Why did you resign immediately?

4        A    I don't understand the question.

5        Q    Did you consider giving notice?

6        A    I think I have referenced here.  Can I take

7    a moment to read this?

8        Q    Of course.

9             And feel free to read the entire email.  I'm

10   just referencing the first sentence where it says

11   you've elected to resign.  And then at the end it

12   says, effective immediately.  So that's where I'm

13   going with this.

14           MS. GIBSON:  Go ahead and read the entire

15       thing.

16           THE WITNESS:  Yes.

17               I state in my resignation I am willing

18       to assist with any transition needs that are in

19       the best interest of the NAF Southeast team,

20       customers, and referral partners.  Please provide

21       guidance as how you would like to address the

22       logistics.

23               It is customary in our industry, when

24       you are tied to production, that there is no

25       notice.  Typically, even if you provide notice,

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 92 of 327
Gina Spearman                        November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 91

1       you're terminated immediately.

2   BY MR. PERLOWSKI:

3       Q   To cut off the continuing compensation

4   associated with production?

5       A   I guess that could be part of it.  I think

6   it's probably the communication and connection to the

7   employees and referral partners.

8       Q   Sure.

9           Did you ever prepare any projections as to

10  what you thought you would make under the P and L

11  model in 2020?

12      A   No.

13      Q   Did you have any understanding, one way or

14  the other, about whether the change in the P and L

15  model was likely to result in an increase or decrease

16  in your compensation?

17      A   Did I have any understanding of that?

18      Q   Uh-huh.

19      A   The only understanding I had was from what

20  Scott Frommert would have indicated.  He may have

21  even prepared something that showed, you know, a low,

22  high -- a low, mid, high type of compensation.  So,

23  the only thing I knew was what he would have

24  prepared.

25      Q   Do you recall how much you made in

1    compensation from NAF in 2019, approximately?

2         A    Approximately, a million dollars.

3         Q    How about in '18?

4         A    About the same.

5         Q    How about in '17?

6         A    I do not recall.

7         Q    Is it fair to say your compensation in '18

8    and '19 were fairly similar?

9              MS. GIBSON:  Objection.  Form.

10                  But you can answer.

11             THE WITNESS:  I don't recall what I made in

12         '18.

13   BY MR. PERLOWSKI:

14        Q    I think you said, approximately, a million.

15        A    I'm sorry.  I don't remember -- what was

16   your question?

17        Q    Sorry.

18             Your '18, '19 comp -- from your prior

19   testimony --

20        A    Yes.  Yes.

21        Q    -- it sounds like they were around the same;

22   so, relatively stable?

23        A    Yes.

24        Q    Okay.

25        A    However, we did much more production in '19

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 93

1    than '18.

2         Q    Okay.

3              The region did more production?

4         A    Yes.

5         Q    So, on April 13th of 2020, did you have any

6    understanding about whether you thought your

7    compensation would be more than a million in '20,

8    less than a million?

9         A    Because it was based off of profitability

10   that we -- I did not have transparency to how that P

11   and L was calculated or formulated, I didn't believe

12   I had any indication of what I would make.

13        Q    Were there specific aspects of the P and L,

14   as of April of 2020, that you believe you didn't have

15   transparency into?

16        A    All of it.

17        Q    Did you receive -- did you regularly receive

18   financial statements for your region?

19        A    Not on a regular basis.  It was provided --

20   there was a form of a P and L or financial provided

21   to us from time to time.

22        Q    By whom?

23        A    Jon Reed.

24        Q    When did Mr. Reed leave NAF; if you know?

25        A    He left shortly after the February '19

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 94

```
1    leadership meeting, in which all the SVP regionals'
2    compensation was reduced.
3         Q    Who -- and who replaced Mr. Reed?
4         A    They did not replace him, to my knowledge.
5         Q    To whom did you report after Mr. Reed left?
6         A    Jan Preslo.
7         Q    Did you report to Ms. Preslo up through your
8    resignation or did that ever change?
9         A    I believe I continued to report to her.
10        Q    Did Ms. Allison also report to Ms. Preslo?
11        A    Yes.
12        Q    Did you ever ask NAF, anyone at NAF for
13   additional information regarding the P and Ls that
14   you did not receive?
15        A    Can you ask that again?
16        Q    Sure.
17             Did you ever ask anyone at NAF for
18   additional information regarding the P and Ls that
19   you, then, did not receive?
20        A    So your question is if I didn't receive a
21   financial, did I ask anyone for one?
22        Q    No.
23             My question is:  Did you ever ask for
24   information about the P and Ls from NAF that you,
25   then, did not receive?
```

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 95

1        A    I see.

2        Q    So, did you ask for X and then you didn't

3    get X?

4        A    I did not ask for --

5        Q    Who did?

6        A    I'm just saying I did not ask.

7        Q    Okay.

8             So you don't recall asking anyone at NAF for

9    any additional information regarding the P and Ls?

10       A    We were not paid based off of a P and L.

11   So, I was told by Jon Reed and Christy Bunce, on

12   many, many occasions, that our region was very

13   profitable and they were very happy with our

14   performance.  I don't recall asking any other

15   questions.

16       Q    Okay.

17            So I understand, again, Mr. Reed left in --

18   shortly after the leadership meeting?

19       A    Uh-huh.

20       Q    And you were talking about going to a P and

21   L model --

22       A    Uh-huh.

23       Q    -- which apparently was, at least, reflected

24   in the March 2020 amendment?

25       A    Yes.

Case 1:20-cv-04981-CAP  Document 88  Filed 04/27/22  Page 97 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 96

1       Q   So, during the time that there were
2    discussions about moving to a P and L model --
3       A   Uh-huh.
4       Q   -- up to and including the entry into the
5    March of the 2020 amendment --
6       A   Uh-huh.
7       Q   -- did you ever ask for any additional
8    information regarding the P and Ls?
9       A   We asked for information as it related to
10   what the -- you know, the draft of the March 2020
11   agreement and the supporting draft P and L; meaning,
12   it wasn't current active information -- live
13   information.  It was proposed.
14          So, we did ask clarification questions about
15   how the P and L would work and those sorts of things.
16      Q   Okay.
17          You used the word, we, in your last answer;
18   are you referring to yourself and Ms. Allison?
19      A   Yes.
20      Q   Okay.
21          So, did you personally ever ask for any
22   additional P and L-related information from NAF in
23   connection with this move to a P and L compensation
24   model?
25      A   (No response.)

1      Q    You, personally.

2      A    I can't point to a specific example or date

3   or anything, but we had questions.

4          So my assumption would be at some point, I

5   probably asked a question about the new compensation

6   model.

7      Q    To whom?

8      A    There were -- you know, fairly routine calls

9   with Jan, Jon, before he left, and Scott Frommert

10  about the new compensation plan.  So, the questions

11  would have most likely gone to one of those three or

12  all three.

13     Q    Do you recall any specific questions that

14  you may have asked about the new compensation plan to

15  either Ms. Preslo, Mr. Reed, or Mr. Frommert?

16     A    I remember asking about detail -- details of

17  how we would see invoices for expense line items.

18     Q    What were you told?

19     A    We were told that because the P and L was in

20  its infancy stage, that they didn't have the

21  technology to be able to, you know, look at the line

22  item, click on it, and the supporting documentation

23  reveal itself.  We would have to ask accounting for

24  any proof and they would have to manually send us

25  documents.

Case 1:20-cv-04981-CAP  Document 88  Filed 04/27/22  Page 99 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 98

1      Q    Okay.

2           If you can, look at the spreadsheet.  And I

3      want to be careful, Ms. Spearman, again, I want to

4      remind you, I'm not asking you to reveal any

5      attorney/client privilege communications in

6      connection with this line of questioning, okay?

7      A    Okay.

8      Q    Did you personally compile the spreadsheet,

9      the information on this spreadsheet?

10     A    I personally compiled the information on

11     this spreadsheet.

12     Q    Did anyone assist you?

13     A    No.

14     Q    How did you compile -- how did you go about

15     compiling the information on the spreadsheet, just

16     the process, how did you do it?

17     A    So each month, the overrides were calculated

18     on a spreadsheet by corporate to arrive at our

19     compensation.  And so, I took the excluded volume

20     from each month's spreadsheet and added it to this

21     compilation.

22     Q    Are you -- were you referring to the monthly

23     recaps in your prior answer?

24     A    Yes.

25     Q    So you took information off of the monthly

 1   recaps from the -- from excluded portions on the

 2   monthly recaps and created the spreadsheet using that

 3   data?

 4        A   Yes.

 5        Q   Okay.

 6            And you were trying to be accurate when you

 7   put the spreadsheet together?

 8        A   Yes.

 9            MS. GIBSON:  Objection.  Form.

10            THE WITNESS:  Definitely.  Yes.

11   BY MR. PERLOWSKI:

12        Q   And you were trying to capture what you

13   contended you were owed by N-A-F as of April of 2020,

14   when you were preparing this spreadsheet?

15        A   Yes.

16        Q   So, just walking through the columns.  So,

17   excluded volume, does that mean loan volume that was

18   excluded from your compensation?

19        A   Yes.

20        Q   Is that from the override bonus portion of

21   your compensation?

22        A   Yes.

23        Q   Okay.

24            And the excluded dollars in the next column,

25   that's just a formula off of excluded volume?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 100

1        A    Yes.

2        Q    Okay.

3             So let's look at the marketing deduct

4    column.  Tell me what that reflects.

5        A    After the February 2019 meeting, we were

6    informed because of the $30 million misallocation by

7    NAF, that they would no longer pay for marketing

8    costs that they had paid prior.  That we would be

9    responsible for all marketing costs, because the

10   company was struggling financially.

11            So, they began to have a line item on that

12   monthly recap of the marketing expenses that they had

13   paid on behalf of our region.  So I took the number

14   off of the monthly recap that was deducted from our,

15   mine and Kelly Allison's, compensation.

16       Q    Okay.

17            So after the February '19 leadership

18   meeting, the Southeast region would continue to

19   receive invoices from vendors for marketing expenses,

20   right?

21       A    Yes.

22       Q    What would happen to those invoices?

23       A    Some of them went directly to corporate and

24   some were submitted to corporate for payment.

25       Q    Okay.

Gina Spearman                                            November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                          Page 101

 1              So corporate would pay the expenses to the

 2       vendor?

 3              A    Yes.

 4              Q    And then, whatever was paid to the vendor

 5       would come off the top from the region?

 6              A    So, it was a deduction from our override

 7       bonuses, essentially, or our compensation.  So, yes,

 8       they lumped it all together and put it on the

 9       spreadsheet as a marketing -- I'm so sorry.  Are we

10       talking about PEs or marketing?

11              Q    Marketing.

12              A    Okay.

13              They would list it as a marketing deduction

14       on the -- over on the monthly recap.

15              Q    Okay.

16              A    A lump sum.

17              Q    Lump sum?

18              A    Uh-huh.

19              Q    And to your understanding, the policy change

20       around the time of the leadership meeting, that was

21       companywide?

22              A    Yes.

23              Q    In other words, it wasn't specific to the

24       Southeast region?

25              A    I was told it was to all the other regions

Page 102

1   as well.

2        Q    Okay.

3             And so -- just so I'm clear, so the

4   marketing deduct reflects for each month from

5   March '19 through February of '20, that reflects the

6   number shown on the monthly recap?

7        A    Yes.

8        Q    Okay.

9             So then you total it and then you multiple

10  that by .3, which is your share of the split with

11  Ms. Allison?

12       A    That's correct.

13       Q    Okay.

14            So the PE deduct column, let's go to that

15  one.  Let -- let me just ask the base -- the basic

16  question again.  In dreaded lay person's terms, what

17  is a pricing exception?

18       A    A pricing exception is -- becomes necessary

19  in a situation in which a loan is being locked in at

20  an interest rate that is a cost to the company to

21  secure that rate.

22       Q    When you say, a rate that is a cost to the

23  company, does that mean a rate that renders the loan

24  unprofitable?

25       A    Not necessarily.  Because there could be a

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 103

1    pricing exception on a loan in which the company is

2    having to pay something for that interest rate and

3    the loan could still be profitable.

4        Q    Okay.  So -- sorry.  This just may be a lack

5    of industry understanding on my part.

6            But -- so you said the loan is locked in at

7    a rate that is a cost to the company, what do you

8    mean, by a cost to the company?

9        A    There's a rate sheet that is published daily

10   that gives the interest rates and their corresponding

11   cost.  So, the lower rates are going to have a cost

12   associated with obtaining that rate in the secondary

13   market.  There'll be a rate close to par, meaning no

14   cost, no -- no payback.  And then there will be

15   higher interest rates that would actually pay the

16   lender back something in the secondary market.

17       Q    Okay.

18            So, the lower the rate, the more likely

19   there would be a cost to the company?

20       A    Yes.

21       Q    Okay.

22            So, prior to the February '19 leadership

23   meeting, did loan officers have to get any kind of

24   approval to -- to sell a loan that had a pricing

25   exception associated with it?

Page 104

1      A    Yes.

2      Q    What was that process?

3      A    The loan officer would send the pricing

4  exception request to Kelly Allison and she would

5  approve or deny.  And the company would cover that

6  cost in the vast majority of cases.

7      Q    So if she approved, you said the company

8  would, then, cover the cost in the vast majority of

9  cases?

10      A    Correct.

11      Q    What do you mean by the company would cover

12  the cost?

13      A    Meaning our compensation overrides were not

14  impacted.

15      Q    You said in the vast majority of cases, but

16  were there instances where the company did not cover

17  the cost?

18      A    There were very, very few instances in which

19  they would not cover the cost because of the large

20  amount.  And managers could agree to waive their

21  override for those unusual circumstances.

22      Q    And why would a manager agree to waive their

23  override?  Just typically.

24      A    Could be just, obviously, market

25  competition.  Could be for --

Page 105

1        Q    I'm sorry.  I got distracted because the

2     microphone was about to fall off my tie.

3        A    Got it.

4             Are we good?

5             MR. PERLOWSKI:  Could you read that answer

6        back for me?

7             (Whereupon, the court reporter read back the

8        answer "Could be just, obviously, market

9        competition.  Could be for --")

10    BY MR. PERLOWSKI:

11       Q    Okay.

12            So, if there is going to be a pricing

13    exception before the leadership meeting, where there

14    was a -- going to be a cost to N-A-F, the loan

15    officer had to get approval to make that loan?

16       A    Yes.

17       Q    Okay.

18            And that approval would typically go in the

19    Southeast region and would go to Kelly Allison?

20       A    That's right.

21       Q    Did it ever go to you?

22       A    I may have been copied at times.

23       Q    How about in terms of making, up or down,

24    decision on the loan, did you ever have to do that?

25    This is before the leadership meeting.

Page 106

1          A    Right.  Rarely.  Only if Kelly was going to

2     be out for an extended amount of time.

3          Q    But obviously, if there's -- if Ms. Allison

4     were to choose to deny the request, then the loan's

5     not made, right?

6          A    That's correct.

7          Q    And there's no compensation for anyone on

8     that loan?

9          A    That's right.

10         Q    Because it's not made, right?

11         A    That's correct.

12         Q    Okay.

13              So, after February of '19, did the process

14    with respect to pricing exceptions change?

15              I'm not talking about the compensation

16    impact.  I'm talking about, did the process of

17    dealing with the pricing exception change?

18         A    Not to the loan officer.  For the loan

19    officer, it was the same.

20         Q    So after the leadership meeting and the

21    change was announced that NAF was not going to cover

22    the cost of pricing exceptions, did the loan officer

23    still have to seek approval for the pricing exception

24    request?

25         A    Yes.

Page 107

1    Q    And that -- within the Southeast region, did

2    that approval still go to Kelly Allison?

3    A    Yes.

4    Q    Typically, was Kelly Allison the person who

5    would either approve or deny the pricing exception

6    request?

7    A    Yes.

8    Q    After -- so, Ms. Allison was approving the

9    pricing exception request after February of '19.  Is

10   it fair to say that she did so knowing that that cost

11   was going to come off -- come out of the region's

12   reconciliation?

13   A    She knew that they had implemented this new

14   policy.  And that their expectation was that we

15   would -- they were expecting us to participate in the

16   pricing exception.  They did state, at that meeting

17   in February of 2019, that this was temporary.  And

18   they believed it would be for a period of 90 days,

19   that they needed some help in solving their financial

20   challenges, due to the $30 million in misallocated

21   funds.

22   Q    Okay.

23        So, just -- I'm just going to give it --

24   just give an example using a round number,

25   recognizing the example may not make real whole

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 108

1    sense, but just bear with me.

2            So let's just say that in April of '19,

3    Ms. Allison is presented with a pricing exception

4    request from a loan officer, right?

5        A   Yes.

6        Q   So, whatever that cost -- so then that cost

7    to N-A-F, whatever that number is, let's just say the

8    cost is $10,000, just for the sake of easy math.

9    That cost was going to come out of or be absorbed by

10   the region and impact both yours and hers

11   compensation, right?

12       A   Yes.

13       Q   So, given that Ms. Allison was being asked,

14   if she was going to be asked to approve a pricing

15   exception?

16       A   Yes.

17       Q   And again, I'm talking about April of '19,

18   after the change is announced --

19       A   Uh-huh.

20       Q   -- did she ever confer with you about

21   whether to approve the pricing exception, because if

22   she did, she was impacting your bottom line?

23       A   Obviously, the change to our compensation

24   for marketing and pricing exceptions was a shock to

25   us.  Because obviously, it's very different from what

Page 109

1    had happened prior to the meeting.

2         We were very much not in agreement with the

3    policy, but we had 200 loan officers at that point,

4    that had trusted us to come to New American Funding

5    and conduct business.  So, I believe that she felt

6    that we didn't have a choice but to continue to

7    approve pricing exceptions that we had prior to the

8    meeting for the fear of loss of business, partners,

9    and loan officers.

10        Q    And I very much appreciate that.  That

11   wasn't my exact question.

12        My question was:  Did she ever confer with

13   you about whether to make a pricing -- to whether to

14   approve a pricing exception or not, because if she --

15   by doing so, by approving, she was, in effect, taking

16   money out of your pocket?

17        MS. GIBSON:  Objection.  Form.

18   BY MR. PERLOWSKI:

19        Q    Did she ever confer with you about whether

20   to grant a pricing exception or not after the policy

21   change?

22        A    I didn't view it as her taking money out of

23   my pocket.  I viewed it as NAF making a unilateral

24   decision.  So, you know, she didn't confer with me on

25   specific exception by exception, when they were

Page 110

1    submitted; but I do believe she and I were in

2    alignment that we didn't have a choice, the policy,

3    you know, was put upon us.  We were told that our

4    agreements were going to be amended accordingly and

5    they were not.

6           So, I believe that she probably thought that

7    I would support her decision in that, you know, given

8    that it was protecting our overall book of business;

9    but she did not confer with me on each individual

10   pricing exception.

11      Q   Did she confer with you on a macrolevel, not

12   a microlevel, on a per loan level, but did she confer

13   with you on a big picture level as to whether to

14   continue approving pricing exceptions as you

15   historically had--  or as she historically had?

16   Excuse me.

17      A   On a macrolevel, yes, I would say she did

18   confer with me.  And that we were in agreement with

19   this -- this was for a period of 90 days.  We were

20   continuing to have discussions with corporate, that

21   we were not okay with this policy.

22           So, I would say on a macrolevel, yes, she

23   conferred with me, that we didn't have a choice, but

24   to continue doing business as we had prior.

25      Q   Okay.

Page 111

```
1              Did you and Ms. Allison ever discuss the
2      possibility that you just were going not -- that the
3      region was just not going to approve pricing
4      exceptions, just say no to all of them?
5          A    That would have been -- no.  That would have
6      been absolutely catastrophic and detrimental to our
7      business.
8          Q    Because the loan officers would not have
9      been able to make a sufficient number of loans?
10         A    Because -- yes.  Correct.
11         Q    Just -- just ballpark, what percentage of
12     loans fell within the pricing exception category?
13             MS. GIBSON:  Objection.  Foundation.
14     BY MR. PERLOWSKI:
15         Q    Ballpark.
16             Like a total number of loans, what
17     percentage of loans were approved with a pricing
18     exception?  Ballpark.
19         A    I don't have that data.
20         Q    Do you have an estimate?
21             MS. GIBSON:  Asked and answered.
22     BY MR. PERLOWSKI:
23         Q    I recognize you don't have the data, but do
24     you have an estimate?
25         A    I don't have an estimate without --
```

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 112

1        Q    Okay.

2        A    -- looking at documentation.

3        Q    Okay.

4             You said that you were told that the policy

5    was going to be -- tell me -- tell me what you were

6    told about the 90 days.  I want it as specific as you

7    can remember it.

8        A    Uh-huh.

9             We were told that -- Kelly and I were told

10   that we -- they were going to have to make some

11   significant cuts due to their financial problems and

12   the misallocation of the $30 million.  And that they

13   were going to need our help for a 90-day period to

14   right the ship.

15       Q    Who told you that?

16       A    In the meeting was Christy Bunce, Jon Reed,

17   and I'm pretty certain Jan Preslo was in the meeting;

18   but that evening, at dinner, and in the coming weeks

19   after that, Patty Arvielo, on multiple occasions,

20   told us, don't worry, this is just for 90 days.

21       Q    Who told you that in the meeting?  You said

22   that we needed to make significant -- that there

23   was -- they needed help for 90 days to right the

24   ship; who said that?

25       A    I believe they all said it.  All three of

Page 113

1    them.

2         Q    Meaning Ms. Bunce, Mr. Reed, and Ms. Preslo?

3         A    Yes.

4         Q    Okay.

5              Did you ever see the 90 days, like the

6    change in the policy with respect to pricing

7    exceptions, did you ever see that 90 days in writing

8    anywhere?

9         A    No, because they didn't really put out a

10   policy change.

11        Q    After 90 days had passed, did you ever

12   contact anyone and said, is this going to be changed

13   back?

14        A    Yes.  There was much conversation verbally;

15   conference calls, in person.  Rick and Patty actually

16   came to Atlanta to meet with us, to assure us this

17   was temporary.  And every time we asked, we were told

18   that they were hiring a CFO to satisfy, you know, and

19   clear up their financial issues.  And that we were

20   working on a new comp plan that would rectify and

21   address everything.

22        Q    And that was the comp plan that was put into

23   effect in March of '20?

24        A    Right.  A year -- little over a year later,

25   yes.

Page 114

1        Q    Okay.

2             (Whereupon, Defendant's Exhibit Number Four

3        was marked for identification.)

4   BY MR. PERLOWSKI:

5        Q    Ms. Spearman, I'm going to show you what's

6   been marked as Exhibit --

7        A    Can we -- can we just -- I want to take my

8   jacket off, too.

9        Q    Oh, please.  Of course.

10            Ms. Spearman, I represent to you

11  Exhibit Four is your interrogatory responses that you

12  served on July 12th.  And I just want to jump to

13  Page 6.  And the -- interrogatory is the --

14  apparently, lawyers need a fancier word for

15  question --

16       A    Right.

17       Q    -- question, right, so that's what

18  interrogatory is.

19            Interrogatory number five talks about

20  pricing exceptions.  And I want to ask you something

21  about your answer, just so I -- just so I make sure I

22  understand it.

23       A    Okay.

24       Q    So, in your answer, it's about halfway down

25  the page, it says, Plaintiff explains that initially

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 115

1    upon hire, she received compensation for the pricing

2    exceptions granted on loans made by loan officers

3    that were within N-A-F's stated tolerance; do you see

4    that?

5         A    Yes.

6         Q    Okay.

7              So, first of all, tell me, you said you

8    received compensation for the pricing exceptions,

9    what do you mean by that?

10        A    Meaning pricing exceptions were not deducted

11   from our compensation as long as they fell within a

12   certain tolerance.

13        Q    Okay.

14             So it's not like you received additional

15   compensation for pricing exception, you just didn't

16   receive it, you didn't just have to absorb the cost

17   of that pricing exception?

18        A    Correct.

19        Q    Okay.

20             And you said within a stated tolerance.

21        A    Uh-huh.

22        Q    Do you recall what the stated tolerance was?

23        A    I believe it was up to 300 basis points.

24        Q    And that was the stated tolerance around the

25   time of your hire?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 116

1        A    Yes.

2        Q    Do you recall whether that stated tolerance

3    changed at any time before the leadership meeting

4    from up to 300 basis points?

5        A    Not to my knowledge.

6        Q    Do you recall whether that stated tolerance

7    was in any kind of like written policy or document of

8    any kind?

9        A    There was a policy on, you know, the process

10   for approving pricing exceptions; but as far as the

11   tolerance, I can't say that I've ever seen a policy

12   document.

13           There may have been an email, in which they

14   told Kelly what the tolerances were; but that's

15   definitely what was verbally discussed and that's

16   what took place until February of 2019.

17       Q    As a product of the discussions at the

18   February leadership meeting, was it your

19   understanding that the change with respect to pricing

20   exceptions, was your understanding that that applied

21   companywide?

22       A    They had a private meeting with each

23   regional manager, so I can't speak to what actually

24   happened with the other regions, but they did tell us

25   that it was applicable to all the regions.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                              Page 117

1        Q    Who told you that it was applicable to all

2   regions?

3        A    Christy, Jan, and Jon.

4             And then we all went to dinner that night.

5   So, pretty much every regional was upset, so I think

6   it probably applied to everybody.

7        Q    So the discussion wasn't you need to just --

8   you and Ms. Allison, the discussion about absorbing

9   pricing exceptions was -- that was being had in front

10  of other regions as well?

11       A    I believe so.

12       Q    And the dinner that you're referring to was

13  a dinner that members from other regions attended as

14  well?

15       A    Yes.

16       Q    Okay.

17            Where was that dinner, if you remember?

18       A    I cannot recall.  It was in -- it was near

19  Tustin, the Tustin office.

20       Q    On the next page, Page 7, and this is,

21  again, about halfway down the page, it says, while

22  the tolerance was cut in half by Defendant; what do

23  you mean by that?

24            MS. GIBSON:  Feel free to read as much of

25       the paragraph as you want.

Page 118

1          THE WITNESS:  Okay.

2          MR. PERLOWSKI:  Absolutely.

3          THE WITNESS:  This is in response to the

4     same number five?

5          MR. PERLOWSKI:  Yes.

6          THE WITNESS:  Okay.

7              So, the prior toler -- prior to 2000 --

8     February 2019, the tolerance was 300 basis

9     points.  They reduced it to 100 basis points.  So

10    it was cut by more than half what they were

11    expecting us to absorb.

12  BY MR. PERLOWSKI:

13    Q    Okay.

14         So, explain the difference to me.  So you

15  said it was -- the tolerance was changed from up

16  to -- okay.  So, let me make sure I understand that.

17         So previously, the tolerance was up to 300

18  basis points?

19    A    (Nods head.)

20    Q    So, if it was over 300 basis points, you

21  don't make the loan?

22    A    It would have to go to someone else for

23  approval.

24    Q    Okay.

25         So, Kelly couldn't approve it?

Page 119

1        A    (Nods head.)

2        Q    It had to go up the food chain, so to speak?

3        A    Yes.

4        Q    So now the tolerance to approve a pricing

5    exception was lowered to 100 basis points?

6        A    Yes.

7        Q    So if it was over 100 basis points, then

8    Ms. Allison could no longer approve it, it had to go

9    to somebody else?

10       A    It just couldn't be done.

11       Q    Couldn't be done at all?

12       A    Right.   Unless we were absorbing it.

13       Q    Okay.

14            So let's say a loan was below the 100 basis

15   points number.   Would -- could a loan have a pricing

16   exception that was below the 100 basis points

17   tolerance?

18       A    Yes.

19       Q    Okay.

20            And that loan could be approved by

21   Ms. Allison, right, if it was below the 100 basis

22   points?

23       A    Yes.

24       Q    And if it was approved, the region still

25   absorbed that pricing exception?

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 120

1      A   Or below a 100?

2      Q   Ya.  Because it's a pricing exception.

3      A   Our -- it wasn't absorbed by our

4    compensation.  If it was under -- I believe it was

5    87-and-a-half basis points for a conventional loan

6    and a 100 for government loans.  And if it was below

7    those tolerances, then NAF corporate would be

8    absorbing the pricing exception as it related to our

9    override.

10     Q   Okay.

11     A   The pricing exception cost of it, I'm sure

12   still hit the region's P and L.

13     Q   Okay.

14         So, if it was below 100, corporate absorbed

15   the cost, not the region?

16     A   That's correct.

17     Q   Okay.

18         Was there a number after the February '19

19   region where Ms. Allison still had to -- she could no

20   longer approve the pricing exception, it had to go to

21   somebody else for approval?

22     A   There was no escalation policy any longer,

23   because they basically said, if it's over this

24   amount, you either absorb it or you don't do it.

25     Q   Okay.

Page 121

1           So, the second lay -- the additional layer

2     of potential approval for a -- more of an outlier

3     loan that was no longer in place?

4           A    That's correct.

5           Q    Okay.

6                (Whereupon, Defendant's Exhibit Number Five

7           was marked for identification.)

8     BY MR. PERLOWSKI:

9           Q    Show you what's been marked as Exhibit Five,

10    Ms. Spearman.  And just let me know when you've had a

11    chance to familiarize yourself with it.  And the

12    questions that I'm going to ask you are about your

13    email on -- of March 29th of 2019; but again, take

14    your time.

15          A    Okay.

16          Q    Ms. Spearman, your email of March 29th of

17    2019 to Mr. Arvielo, Kelly Allison, Ms. Arvielo,

18    Ms. Bunce, Mr. Reed, was that your attempt to explain

19    your understanding of the changes with respect to

20    pricing exceptions?

21               MS. GIBSON:  Objection.  Form.

22    BY MR. PERLOWSKI:

23          Q    And again, I'm referring to your email of

24    11:41 a.m. on March 29th, 2019.

25          A    I think my email was in an attempt to

Page 122

1    explain the chronology of what had happened.  And the

2    back and forth of how they were going to be handled.

3        Q    Okay.

4             And your -- the third bullet point, that I

5    think the entry is March 19th, that reflects what you

6    were talking about earlier where there were

7    thresholds of 187.5 (sic); is that right?

8        A    Yes.

9        Q    And you say, therefore, we sent an email

10   with a revised proposal of comp back to 140 and PE

11   thresholds of 100 slash 87.5; do you see that?

12       A    Uh-huh.

13       Q    So that was a proposal that was sent by you

14   and Ms. Allison?

15       A    There was back and forth over that period of

16   time, from February 12th to March 29th, in which,

17   again, they were asking for our help --

18       Q    Right.

19       A    -- for a period of 90 days.

20       Q    Right.

21       A    And we were still in shock that there was a

22   profitability issue with the company, much less our

23   region, given, you know, we had been told up until

24   November or December of '18, that we were highly

25   profitable, the company was doing well.

Page 123

1          So, when they asked if we could help for a

2    period of 90 days, yes, we were attempting to come up

3    with something that might work.

4          Q    Okay.

5               So the rev -- you say, we sent an email with

6    a revised proposal; do you see that?

7          A    Uh-huh.

8          Q    The we is who?

9          A    Kelly and I.

10         Q    Okay.

11              So, explain to me in the proposal that you

12   and Ms. Allison sent, you said there were going to be

13   PE thresholds of 187.5 (sic) --

14         A    That was what --

15         Q    -- right?

16         A    Ya.  Because I think that was what was

17   originally given to us in the -- at the February

18   meeting.

19         Q    Okay.

20              So as part of your proposal, if a -- if a

21   loan exceeded those thresholds, what was going to

22   happen?

23              MS. GIBSON:  Objection.  Asked and answered.

24   BY MR. PERLOWSKI:

25         Q    Please answer.

Gina Spearman                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 124

1       A    You're going to have to give me the question

2   again.

3       Q    Under the proposal that you had sent, if a

4   loan exceeded the threshold of say 100, what was

5   going to happen?

6            MS. GIBSON:  Objection.  Mischaracterizes

7       the document also.

8   BY MR. PERLOWSKI:

9       Q    Please -- please answer the question.

10      A    For -- ya.  In the pro -- in the proposal,

11  for a period of 90 days, we would be forced to absorb

12  over that tolerance.

13      Q    You would agree with me, Ms. Spearman, that

14  90 days doesn't appear anywhere in your email of

15  March 29th of 2019 at 11:41 a.m.?

16      A    No.

17      Q    Okay.

18           And the thresholds that were ult -- the

19  revised thresholds you said went from 300 -- up to

20  300 basis points, the revised thresholds were the 100

21  slash 87.5?

22      A    You mean is that what they ended up doing?

23      Q   Yes.

24      A   Yes.

25      Q    Ms. Spearman, the issue of source codes has

Gina Spearman                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 125

1    come up in this litigation.  And I just want to, once

2    again, start with the basics.

3              What is a source code?

4         A    It is a categorizing of where the borrower,

5    also known as a lead, where that was derived.

6         Q    Did -- when you joined N-A-F, do you

7    remember what source codes, what lead codes were in

8    place?

9              MS. GIBSON:  Objection.  Foundation.

10             MR. PERLOWSKI:  Let me strike that.

11   BY MR. PERLOWSKI:

12        Q    So, it sounds like, from your answer to the

13   prior question, that what a source code is, it's just

14   trying to categorize, basically, what the source of

15   the business was?

16        A    Correct.

17        Q    In simplest terms?

18        A    Yes.

19        Q    Who made the determination of -- who made

20   the categorization determination?

21             So, NAF sells a loan to Henry Perlowski.

22   Who is making the determination as to what source

23   code is used with respect to that loan?

24        A    The loan officer selects that, unless it is

25   a corporate-referred lead from a specific entity,

Page 126

1    like an online entity, when that loan is referred to

2    the loan officer in the loan origination system, that

3    referral source would already be listed there.  For

4    example, Zillow.

5         Q    Okay.

6              So, if it was a corporate-referred lead,

7    effectively, the source code would already be

8    prepopulated?

9         A    Yes.

10        Q    Okay.

11             So it -- so what is a -- heard the term real

12   estate lead, what does that mean or what did that

13   mean?

14        A    Meaning it was referred to the loan officer

15   by a real estate agent, usually.

16        Q    Is a corp gen source, is that the same thing

17   as the corporate-referred lead that you were just

18   talking about?

19        A    No.

20        Q    What is that?  What's a corp gen lead?

21        A    It's just a lead source that they have

22   available in the system to select.

23        Q    And what -- what did it -- what did corp gen

24   reflect in terms of the origin of the business?

25   Like, I mean, real estate lead, you said by an agent,

Page 127

1    that makes intuitive sense to me --

2         A    Yes.

3         Q    -- right?

4              So corp gen, what does that mean with

5    respect to the source of the business?

6         A    I don't know.  They created it.

7         Q    You said they created it?

8         A    New American Funding created the source

9    code.

10        Q    Do you know who?

11        A    I do not.

12        Q    Do you know when?

13        A    I do not.

14        Q    Have you ever heard the term connect in

15   terms of a source code?

16        A    Yes.

17        Q    What does connect refer -- refer to in terms

18   of the source of the business?

19        A    If memory serves, it was a special

20   program -- a special type of corporate-generated lead

21   that was a partnership with Zillow, in which leads

22   that came in through Zillow were referred to a local

23   loan officer, and they called it the connect program.

24        Q    Okay.

25             Do you know -- do you know when the connect

Page 128

1    source code came into effect?

2        A    I do not remember specifically when.

3        Q    Did the use of a particular source code

4    impact a loan officer's compensation in any way?

5        A    Yes.

6        Q    How?

7        A    For a corporate-generated lead or connect

8    lead, the loan officer was paid a lower commission

9    than from a realtor lead or LO generated.

10       Q    What is LO generated?

11       A    It could be from other sources other than

12   realtor, but it was generated by the loan officer.

13       Q    So, loan officer him or herself actually

14   originated --

15       A    Former client.

16       Q    Sure.

17       A    Builder, realtor.

18       Q    Okay.

19            And how did -- with respect to the -- a loan

20   on a realtor lead or a loan officer-generated lead,

21   would that be the same commission to the loan

22   officer?

23       A    Say that again.

24       Q    For a realtor lead and a loan

25   officer-generated lead, would that be the same

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 129

1     commission for the loan officer?

2          A    Yes.

3          Q    For connect and corp gen, would it be the

4     same commission?

5          A    They were two different compensations.

6          Q    Okay.

7               Both were lower --

8          A    Yes.

9          Q    -- then -- then the real estate and loan

10    officer, but they were different?

11         A    Yes.

12         Q    Okay.

13              And how did the -- how did the origin of a

14    loan impact your compensation, if at all?

15         A    Managers were paid a lower override on the

16    connect and corporate-generated leads.

17         Q    How so?

18         A    I would have to reference documentation, but

19    from memory, I would say it was like ten basis point

20    override for a corporate generated lead versus much

21    more than that on a noncorporate generated.

22         Q    And you said the manager was paid a lower

23    override, what manager are you -- what position are

24    you referring to?

25         A    Branch manager, area manager, regional

Page 130

1    manager.

2         Q    And was that -- was that the case throughout

3    your employment at N-A-F -- at NAF?  Excuse me.

4         A    (No response.)

5         Q    That there was a differential in the

6    override bonuses between the lease --

7         A    It was a case whenever they introduced them,

8    which I don't believe connect, in the best of my

9    recollection, was in existence when we first started;

10   but I couldn't be sure.

11        Q    Was corp gen in effect when you started?

12        A    It wasn't something that was used, because

13   we didn't really receive corporate-generated leads;

14   but I do not know if it was a part of possibly loan

15   officers agreements that it was listed there as a

16   different comp.  It just wasn't used.

17        Q    Did you ever raise a concern to anyone about

18   loan officers using one source code versus another?

19        A    Yes.

20        Q    Tell me about that.

21        A    Kelly and I together raised the concern to

22   Jon Reed and Jan Preslo that we felt there could be a

23   concern with Dodd-Frank LO compensation rules.

24        Q    Did you ever raise that concern to anyone

25   within NAF's legal department?

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 131

1       A    No.  Because they -- Jon and Jan and Christy

2    told us that they had sought legal counsel for that

3    decision.

4       Q    Okay.

5            Did they tell you what legal counsel opined

6    on?

7       A    No.

8       Q    I mean, they didn't tell you what legal

9    actually said with respect to that issue?

10      A    My memory is that they said it may be in the

11   gray area, but we feel it's pretty low risk, is my

12   memory.

13      Q    When was this conversation with Ms. Preslo

14   and Mr. Reed?

15      A    Some time after the leadership meeting in

16   February of '19.

17      Q    What caused you to bring the concern to

18   Mr. Reed and Ms. Preslo about whether there was an

19   issue with the Dodd-Frank loan officer compensation

20   rules after the leadership meeting, what prompted you

21   to raise that issue?

22      A    It was recommended by Christy, Jon, and Jan

23   that those source codes existed, the corporate gen

24   and connect.  And that those could be used by loan

25   officers to help with pricing exceptions.

Page 132

1       Q   What did they say in terms of how the source

2   codes could be used to help with the pricing

3   exceptions?

4       A   If you source something, connect or

5   corporate generated, and the loan officer is making a

6   lower compensation, that creates a differential of

7   revenue that's not being paid to the loan officer

8   that could go to help absorb the pricing exception.

9       Q   To offset the pricing exception?

10      A   Yes.

11          MR. PERLOWSKI:  Quick break?

12          MS. GIBSON:  Ya.  Great.

13          THE VIDEOGRAPHER:  The time is 2:04 p.m., we

14      are off video record.

15          (Whereupon, a short break was taken.)

16          THE VIDEOGRAPHER:  The time is 2:17 p.m., we

17      are back on video record.

18          (Whereupon, Defendant's Exhibit Number Six

19      was marked for identification.)

20  BY MR. PERLOWSKI:

21      Q   Ms. Spearman, I'm going to show you what's

22  been marked as Exhibit 6, which is an email chain.

23  And I have a couple of questions for you.

24          Yours -- there's an email from you that

25  appears on the third -- starts on the bottom of the

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 133

1    third page and that's where I'm going to start; but

2    of course, as always, take your time to familiarize

3    yourself with the document.

4         A    Okay.

5              I've read the first couple of pages, so we

6    can see if I can answer based on that.

7         Q    Okay.

8              So, I'm looking at your email of

9    November 5th, 2019 at 2:44 p.m. --

10        A    Uh-huh.

11        Q    -- at the bottom of the third page.  Just

12   help me out here.  So, who is Shannon Johnston?

13        A    She works in secondary marketing, which

14   would be, like, pricing for NAF.

15        Q    In the corporate office or in the Southeast?

16        A    Corporate.

17        Q    Who's Kristin Ankeny?

18        A    She also works in secondary.  VP, I think,

19   in secondary pricing and corporate.

20        Q    Okay.

21             And in your email you were saying, we pay

22   for PEs dollar for dollar over our threshold; what

23   did you mean by that?

24        A    So I think what was happening here is loan

25   officers were being deducted for some of the PEs --

Page 134

1    I'm sorry.  Branch managers were being deducted.

2    Their compensation was being deducted for some of our

3    PEs.  And -- because the thresholds and the -- you

4    know, PE policy was being changed, we didn't want

5    that to impact our downline branch managers or loan

6    officers.

7         Q    Okay.

8              So, at some point, whether intentionally or

9    by virtue of an error, branch managers were also

10   being impacted by the pricing exception absorptions?

11        A    Yes.

12        Q    Do you know how you learned of that fact?

13        A    Let me read on back to the original.

14        Q    Ya.

15             Whether that's within the context of the

16   email or otherwise; I just --

17        A    Okay.

18        Q    -- my question was, just generally, how did

19   you learn of that fact?

20        A    It would've -- we are copied on our

21   branch -- our branch managers also get a monthly

22   recap.

23        Q    Uh-huh.

24        A    So, we must have discovered it on one of the

25   branch managers' recaps.

Page 135

1      Q    And once you discovered it, was your

2    intention to try to correct it?

3      A    We, basically, didn't want our branch

4    managers to have to deal with the change that we were

5    experiencing.

6      Q    Okay.

7           So, in Ms. -- and I recognize, you're not

8    copied on this email; but in the very first -- the

9    email on the first page, the last one, Ms. Preslo

10   states, Kelly and Gina have been very clear they want

11   to absorb all the hits unless it is a complete LO

12   screwup; is that -- is that fair, in terms of what

13   your -- what you and Ms. Allison were stating at the

14   time?

15     A    If they were going to take the PEs from

16   somebody, we wanted it to be us, not our branch

17   managers or loan officers.  We were trying to protect

18   them from this change.

19     Q    Do you know whether branch managers and

20   other regions were also being potentially impacted by

21   the change in terms of the pricing exception policy?

22     A    I don't -- I don't know.

23     Q    During your employment with NAF, did you

24   periodically receive a proposed amendment to

25   schedules of your Regional Manager Agreement, some

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 136

1    new schedules?

2        A    I believe there were a few occasions in

3    which they would ask me to sign a new schedule so

4    that we could hire someone.

5        Q    Okay.

6             How would you typically receive those new

7    schedules?

8        A    Email.

9        Q    From whom, typically?

10       A    Someone in HR.

11       Q    And you said you would be asked to sign

12   those amended schedules?

13       A    Do you have an example of one?

14       Q    I do.  And I'll get to that in a second.

15       A    Okay.

16            I mean, I need to see what -- you know,

17   which one you're referencing.

18       Q    Just in terms of a process, would you

19   typically return any signed schedules by DocuSign or

20   would you actually, you know, put your physical

21   signature on a schedule?

22            MS. GIBSON:  Objection.  Foundation.

23            THE WITNESS:  To the best of my

24        recollection, if I signed one, it would have most

25        likely been electronic.

Page 137

1    BY MR. PERLOWSKI:

2         Q    Did N-A-F -- did NAF typically use

3    electronic signatures as a company practice?

4         A    Yes.

5              (Whereupon, Defendant's Exhibit Number Seven

6         was marked for identification.)

7    BY MR. PERLOWSKI:

8         Q    Ms. Allison -- sorry, Ms. Spearman.  I

9    apologize about that.  I knew I was going to do that

10   at some point today.

11        A    Uh-huh.

12        Q    My apologies.

13             Ms. Spearman, I'm showing you what's been

14   marked as Exhibit Seven.  And I guess my question to

15   you:  Understanding this is unsigned, do you recall

16   ever receiving this schedule one that was -- has a

17   date of March 1st, 2017 on the front page and then

18   appears to have been signed in April of '17 by

19   Ms. Preslo?

20        A    I do not recall ever seeing this.

21        Q    When you say, you don't recall ever seeing

22   it, meaning you may have, but you just don't

23   remember?

24        A    To my knowledge, the only regional manager

25   agreements I have are the one I signed in November

Page 138

1    of 2016 and then the one in March of 2020.  So, I

2    don't believe --

3         Q    Okay.  We'll get to that.

4              (Whereupon, Defendant's Exhibit

5         Numbers Eight and Nine were marked for

6         identification.)

7    BY MR. PERLOWSKI:

8         Q    I'm showing you what's been marked as

9    Exhibit Eight, Ms. Spearman, which is an amendment to

10   schedule one regional manager compensation that has

11   a -- at least a date on the first page of January 1st

12   of 2018 and ask if you recall receiving this

13   amendment to schedule one?

14        A    Is your -- is -- unsigned?

15        Q    Yes.

16        A    I don't recall seeing this.

17        Q    Understanding you don't recall seeing it,

18   could you flip over to the second page, please.  In

19   the second page it talks about CM1 loss calculation;

20   do you see that?

21        A    Yes.

22        Q    At some point in time, was a CM1 loss

23   calculation introduced into your compensation

24   formula?

25        A    I do remember Jon Reed reviewing with us at

Page 139

1    one of our meetings that they wanted to start

2    recapturing lost revenue on new branches.  And that

3    if you had a branch that was opened for a period of

4    time and it was not profitable, per their

5    calculations, that they would want to call back some

6    of the override.  I remember them introducing that

7    concept verbally.

8        Q    Okay.

9             Do you remember it ever being introduced in

10   practice as opposed to just being discussed verbally?

11       A    Because we didn't have branches that weren't

12   profitable by the time period, I do not remember it

13   ever going into practice.  I vaguely remember one

14   branch in North Carolina, I can't say for certain,

15   but if it was, it was definitely not on any large

16   scale, because I would recall it.

17       Q    Do you remember -- with respect to the

18   branch in North Carolina, do you remember any effort

19   to recapture any override bonus compensation due to

20   the fact that that branch wasn't profitable?

21       A    I remember some conversation about it.  I

22   cannot recall if they recaptured anything.

23       Q    Ms. Spearman, I'm showing you what's been

24   marked as Exhibit Nine, which is an email chain.  The

25   latest in time is on January 18th of 2018 from you to

Page 140

1    Ms. Preslo copying a number of others.  Just take a

2    moment to look through it.  Just let me know when

3    you're ready.

4         A    Okay.

5         Q    See on the third page of the document, the

6    number on the bottom right-hand corner is NAF135?

7         A    Yes.

8         Q    Amber Braun in HR is saying, good evening,

9    Gina, attached, please find the Regional Manager

10   Agreement that Jan and Jon had discussed with you.

11   And that's dated -- the most -- January 9th of 2018;

12   do you see that?

13        A    Yes.

14        Q    And then Ms. Braun, in the next email, is

15   asking if she would like for you to send this to you

16   for signature in Adobe Sign; do you see that?

17        A    Uh-huh.

18        Q    And then you say in response, a few days

19   later, I'd like to discuss this change to my comp

20   plan in further detail with Jon and Jan when we visit

21   California for the regional meetings; do you see

22   that?

23        A    Uh-huh.

24        Q    Is that -- does this email trail at all

25   refresh your recollection as to whether you may have

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 141

1   received this amendment to schedule one that was

2   shown as Exhibit Eight?

3        A    Does this indicate what attachment they're

4   referring to?

5        Q    Ms. Braun, in her email, says, attached

6   please find the Regional Manager Agreement that Jan

7   and Jon have discussed with you, as this has been

8   effective as of January 1st of 2018; do you see that?

9        A    Uh-huh.  Right.  But --

10        Q    And this Exhibit Eight is an amendment to

11   schedule one entered into as of the first day of

12   January 2018; so, at least the dates match up.

13             MS. GIBSON:  You can finish your -- if you

14        had a response.  You were interrupted.

15             MR. PERLOWSKI:  She asked me if it -- if --

16        she asked a question.  She wasn't answering the

17        question.  She asked a question.

18             MS. GIBSON:  And I think she was going on,

19        but go ahead.

20                  If there's a question out there, you can

21        continue, Henry.

22   BY MR. PERLOWSKI:

23        Q    So, does these (sic) email chain refresh

24   your recollection as to your receipt to -- of the

25   amendment to schedule one that's been marked as

Page 142

1   Exhibit Eight, which was to be entered into as of

2   January 1st of 2018?

3        A   No.

4        Q   No?

5            So, Ms. Braun's email says that Jan and Jon

6   have discussed a Regional Manager Agreement --

7        A   Uh-huh.

8        Q   -- with you; do you recall anything about

9   those discussions, sitting here today?

10       A   I do not.

11           (Whereupon, Defendant's Exhibit Numbers 10

12       and 11 were marked for identification.)

13  BY MR. PERLOWSKI:

14       Q   I'm going to show you what's been marked as

15  Exhibit 10, Ms. Spearman, and ask if you recall ever

16  receiving this schedule one, the date, at least on

17  the first page, of March 1st of 2018?

18       A   I don't necessarily recall receiving this

19  agreement, but I do notice that it references

20  Orlando.

21       Q   Yep.  It does talk -- see, if you look at

22  the third page of the agreement -- of the schedule,

23  sorry --

24       A   Uh-huh.

25       Q   -- see there's an override bonus calculation

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 143

 1   table?

 2        A    Uh-huh.

 3        Q    And then, there is a specific row to

 4   loans -- loan volume and units originated, and it

 5   says Kissimmee, Orlando, Orlando Waterford Lakes, and

 6   Tampa; do you see that?

 7        A    Uh-huh.  I do.

 8        Q    Okay.

 9             And it -- so it looks like, with respect to

10   those loans, the override bonus calculation was

11   different than it was with respect to other loans

12   originated by the branch --

13        A    Yes.

14        Q    -- right?

15             Do you recall the circumstances in which

16   that came to be?

17        A    Yes.  We were -- NAF was adding those

18   branches to our territory.

19        Q    So that was part of the expansion that we

20   were discussing earlier today?

21             MS. GIBSON:  Objection.  Foundation.

22             THE WITNESS:  Yes.  I mean, it was part

23        of -- yes.

24   BY MR. PERLOWSKI:

25        Q    Okay.  Sorry.

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 144

1          You said, NAF was adding those branches.

2     Are these branches that you and Ms. Allison

3     facilitated the opening of or were these just

4     branches that were added to your region?

5          A    These were branches that were added to our

6     region.

7          Q    Okay.

8               Which you were not involved in the

9     facilitation of the opening, correct?

10         A    We were not.  The manager there requested to

11    be a part of our region.

12         Q    Do you recall the discussions in terms of

13    what kind of override bonus you would receive with

14    respect to those locations, because they were being

15    added to your region at the manager's request?

16         A    Just that they would be at a lower

17    compensation than branches that we generated and

18    opened on our own.

19         Q    Before -- prior to March of '18, had you

20    been receiving any override bonuses with respect to

21    loans originated from Kissimmee?

22         A    I can't say for sure, but I don't believe

23    so.

24         Q    Okay.

25               What about loans originated from either

Page 145

1    Orlando or Orlando Waterford Lakes?

2         A    I don't remember the exact dates when they

3    were added or when we started receiving compensation.

4         Q    Same for Tampa?

5         A    Correct.

6         Q    Did you -- did you have a concern that you

7    were going to be receiving override bonuses at a

8    lower compensation formula for these four branches?

9         A    No.

10        Q    And I'm referring to the four branches in

11   the --

12        A    Right.

13        Q    -- in the third row, in the override bonus

14   calculation table.

15        A    Uh-huh.

16             And your question is?

17        Q    Did you have a concern that you were

18   receiving a lower override bonus with respect to

19   those four branches?

20        A    I did not have a concern.

21        Q    Ms. Spearman, I'm going to show you what's

22   been marked as Exhibit 11, which is an email

23   exchange.  And on April 5th of 2018, Ms. Spearman,

24   you say to Ms. Bunce, hey -- hi Christy, we got our

25   new agreements and I believe they are still

Page 146

1    incorrect; do you see that?

2         A   Yes.

3         Q   Does this at all in your -- you then say

4    that NAF is only supposed to pay Kelly and I

5    ten basis points on Miguel's branches.

6              Is Miguel the manager that you were

7    referring to in the prior -- in our prior discussion

8    a minute ago?

9         A   Yes.

10        Q   And the branches that are referred to are

11   Kissimmee, Orlando, Orlando Waterford Lakes, and

12   Tampa; do you see that?

13        A   Yes.

14        Q   So it looks like the draft agreement that

15   you received had 15 basis points instead of ten?

16        A   Right.

17             So I was -- I remember this (indicating) --

18   this block.  I don't remember signing a new Regional

19   Manager Agreement.

20        Q   Okay.

21             Do you remember receiving a new Regional

22   Manager Agreement, irrespective of whether you signed

23   it or not?

24        A   I do not.

25             I remember this calculation table.  And I

Page 147

1    remember that it was -- they were giving us too much;

2    so yes, I corrected her.

3          Q    Right.

4               And when you say, this calculation table,

5    again, Ms. Spearman, I'm only trying to make sure

6    that the record's clear for down the road.

7          A    Uh-huh.

8          Q    I think you were pointing to the calculation

9    table that's on the top of Page 2 of the exhibit, the

10   Bates number is NAF130; am I correct?  No.  Sorry.

11   Your --

12              MS. GIBSON:  The email.

13   BY MR. PERLOWSKI:

14         Q    Stick with -- stick with Exhibit 11.

15              MS. GIBSON:  Exhibit 11.

16              THE WITNESS:  Oh, okay.

17   BY MR. PERLOWSKI:

18         Q    When you say, this compensation table, were

19   you referring to the compensation table that's on the

20   top of Page 2 of the exhibit, and the number on the

21   bottom right-hand corner is NAF130?

22         A    Yes.  That's what I'm pointing to.  Correct.

23         Q    Okay.  Okay.

24              MR. PERLOWSKI:  Can we go off the record for

25         a moment?

Page 148

 1              THE WITNESS:  Yes.

 2              MS. GIBSON:  Sure.

 3              THE VIDEOGRAPHER:  The time is approximately

 4         2:44 p.m., we are off the video record.

 5              (Whereupon, a short break was taken.)

 6              THE VIDEOGRAPHER:  The time is 2:49 p.m., we

 7         are back on video record.

 8              (Whereupon, Defendant's Exhibit Number 12

 9         was marked for identification.)

10    BY MR. PERLOWSKI:

11         Q    So, Ms. Spearman, what I'm showing you with

12    Exhibit 12 -- and again, feel free to take a look at

13    the entire document -- is a series of schedule fours,

14    that are hopefully in chronological order, that have

15    your signature on them.  So why don't you just -- and

16    this is a composite of multiple schedule fours in

17    chronological order that have your signature on them.

18    So, just let me know when you're ready.

19         A    Okay.

20         Q    Okay.

21              So generally speaking -- and just feel free,

22    again, refer to the exhibit or not -- do you remember

23    receiving schedule four updates from N-A-F addressing

24    overrides during the loan officer guarantee period

25    periodically during your employment with NAF?

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 149

1        A    Yes.

2        Q    How would you typically receive the schedule

3   fours?

4        A    Electronically.

5        Q    From human resources?

6        A    Human resources, yes, would send them

7   occasionally.  And the recruiter, Paul Pritchard,

8   would frantically call me that I needed to sign

9   whatever had been sent to me, because this person

10  would not be able -- their offer wouldn't be able to

11  go out or they wouldn't be able to be hired, so I

12  would need to sign it.

13       Q    Okay.

14            And when Mr. Pritchard was calling

15  frantically, trying to get you to sign something so

16  that an offer would come out --

17       A    Yes.

18       Q    -- was he specifically referring to the

19  schedule that refers to no overrides during the loan

20  officer guarantee period or was he referring to a

21  different kind of schedule?

22       A    He wouldn't specify.  I don't think he knew.

23  He just knew that HR needed something signed in order

24  for things to move forward.  One -- this clause in

25  1.4B of my 2016 agreement stated not applicable; but

Page 150

1    I was told I did need to sign these in order for them

2    to receive their offers or start -- the loan officer

3    that was being referenced.

4        Q    So you -- I think -- and the exhibit will

5    obviously speak for itself -- you e-signed a series

6    of these schedule fours at periods of time during

7    your employment with NAF, correct?

8        A    Yes.

9        Q    Did you ever ask anyone at NAF any questions

10   about what the schedule fours, that you were signing,

11   meant?

12       A    No.

13       Q    Did you understand in entering into schedule

14   four that there would be deductions taken with

15   respect to -- I'm sorry -- not deductions, but during

16   a loan officer's guarantee period that you would not

17   be paid override bonuses with respect to that loan

18   officer?

19       A    I thought that I would be paid during the

20   guarantee period.

21       Q    So let's -- let me ask you, start with a

22   different question.

23            Were you ever paid override bonuses during a

24   loan officer's guarantee period?

25       A    I believe that there were occasions in which

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 151

1    I was, yes.

2         Q    So, a guarantee period, just -- again, just

3    going back to just, again, a lay person's

4    understanding, I mean, is it that a loan officer was

5    guaranteed a certain amount of compensation during a

6    certain number of months?

7         A    Yes.

8         Q    So irrespective of production?

9         A    Yes.

10        Q    The guarantee set a floor, but not a

11   ceiling?

12        A    That's correct.

13        Q    Okay.

14             Would the loan -- so, if a loan officer did

15   not achieve production in the amount of the

16   guarantee, the loan officer would not receive any

17   production-based compensation on those loans, right?

18        A    They were guaranteed X number of dollars per

19   month regardless of how much they closed.  If they

20   closed enough production that their commission would

21   have exceeded that guarantee, they would get the

22   higher amount.

23        Q    Right.

24             But if so -- so, here, let's just look --

25   and understand, there have been names at cc, it says

Page 152

1    redacted in the --

2         A    Uh-huh.

3         Q    -- in the -- the names have been redacted.

4         A    Uh-huh.

5         Q    So with -- for whoever the person that was

6    reflected, you see the very first amount of guarantee

7    is 150,000 month one.  So if that person achieved

8    $140,000 of commission-based compensation, they would

9    just be paid the 150, right?

10        A    If they closed enough production that the

11   commission would have equaled 140, they would have

12   received 150.

13        Q    Right.

14             When you e-signed -- so the first schedule

15   four has an effective date of July 30th of 2018 and

16   it appears to have been e-signed on July 12th of

17   2018; do you see that?

18        A    Yes.

19        Q    Did you understand that you were not going

20   to receive an override during the loan officer

21   guarantee period for the loan officers who are

22   identified on the schedule?

23        A    I did not.

24        Q    Did you ask anybody about what this schedule

25   four meant?

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 153

1        A    No.  Because I thought 1.4B schedule one

2    stated not applicable.

3        Q    So, at any point in time, with respect to

4    the various schedule fours that you e-signed, did you

5    ever ask anyone at NAF what that schedule meant?

6        A    I asked Paul Pritchard, the recruiter,

7    because he would say I need -- I had to sign it in

8    order for the person's offer to go out.

9        Q    Okay.

10       A    So I thought that was the purpose.

11       Q    At some point during your tenure, did you

12   stop receiving overrides during the loan officer

13   guarantee period for certain loan officers?

14       A    Yes.

15       Q    Did you, then, talk to anyone about that?

16       A    Yes.

17       Q    Whom -- who?  Sorry.

18       A    Christy, Jan, Jon.

19       Q    Tell me what you can recall about your

20   discussions with Christy about that topic, that

21   override bonuses weren't being paid during the loan

22   officer guarantee period.

23       A    She would say she's going to look into it.

24   She'll talk to HR.  She'll take a look at the

25   agreement.  Those sorts of things.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 154

1       Q    Okay.

2            How about Ms. Preslo, what do you recall her

3    saying about the issue of the fact that you were not

4    receiving override bonuses during certain loan

5    officer guarantee periods?

6       A    Similar comments; either ignore or delay or

7    we'll look into it.

8       Q    What about with respect to Mr. Reed, what

9    did he say about the topic of you not receiving

10   override bonuses during certain loan officers

11   guarantee periods?

12      A    He would generally defer to Jan and Christy

13   on those types of matters.

14      Q    So nothing specific that you can recall him

15   saying?

16      A    No.

17      Q    Did you talk to anyone other than Ms. Bunce,

18   Ms. Preslo, and Mr. Reed about the topic of you not

19   receiving override bonuses during certain loan

20   officer guarantee periods?

21      A    I remember talking to Christy about it on

22   several occasions, but one in particular is when Eric

23   Fellows and Michele Hoefle joined us as regional

24   sales managers.  And they questioned the deduction on

25   their compensation.  So, we brought it to Christy

Page 155

1    Bunce's attention, that they were being deducted and

2    their agreement said not applicable.  And we made the

3    comment that our agreement was the same, that it

4    stated not applicable as well and that we were being

5    deducted.

6            And my recollection is that Christy said

7    that we would need to pay Eric because his agreement

8    said not applicable.

9        Q    Had you actually seen Mr. Fellows'

10   agreement?

11       A    I believe he sent it to us when he was

12   questioning the deduction.  And it was corrected and

13   he was paid, according to him.

14       Q    Do you have any -- what's the source of your

15   knowledge that he was paid?

16       A    Just that he told me they corrected it.

17       Q    Okay.

18            (Whereupon, Defendant's Exhibit Number 13

19       was marked for identification.)

20   BY MR. PERLOWSKI:

21       Q    Ms. Spearman, I'm going to show you what's

22   been marked as Exhibit 13.  And I understand it's

23   the -- in the same vein as Exhibit 12.  Exhibit 13

24   reflects a series of schedule six recruiting

25   allocation forms that are e-signed by you.  And I

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 157 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 156

1    made every effort to put these in chronological

2    order.   So, for example, you'll see the first one,

3    the first one within the exhibit is a grand total of

4    six pages and you'll see your e-sign on the sixth

5    page, which is NAF470.

6         A    Uh-huh.

7         Q    So, do you -- is it -- recognizing -- feel

8    free to take your time to look through the exhibit,

9    but do you recall receiving these recruiting

10   allocation forms schedule sixes periodic during your

11   employment with NAF?

12        A    Yes.

13        Q    You mentioned earlier, when we were talking

14   about Exhibit 12, which were the schedule fours, that

15   Mr. Pritchett (sic) was frantically asking you to

16   sign certain schedules so that he could, in effect,

17   make offers to people?

18        A    Yes.

19        Q    On -- schedule sixes are recruiting

20   allocation forms.

21             Do you recall whether Mr. Pritchard was

22   frantically asking you to sign the schedule sixes,

23   the schedule fours, or both?

24             MS. GIBSON:  Objection.  Form.

25             THE WITNESS:  Again, I'm not sure that he

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 157

```
 1        knew what I needed to sign.  He would simply say,

 2        HR is telling me that there is something pending

 3        your signature in order for us to move forward.

 4   BY MR. PERLOWSKI:

 5        Q    Okay.

 6             So let's look at the schedule sixes.  I

 7   think you're in a different document --

 8        A    I am.  I'm just checking my agreement.

 9        Q    Okay.

10             Well -- I want to ask you some questions

11   about schedule six.

12        A    Okay.

13             MS. GIBSON:  If she needs to look at another

14        document to help her with this --

15             MR. PERLOWSKI:  I haven't even asked a

16        question yet.  I'm just trying to focus --

17             MS. GIBSON:  Well, she can refresh her

18        memory.

19                  Go ahead and look at whatever you need

20        to look at.

21             MR. PERLOWSKI:  Okay.

22                  Just be here a lot longer, but that's

23        fine.

24             MS. GIBSON:  Well --

25             THE WITNESS:  I wanted to see what it
```

Page 158

1      corresponded to.  Okay.

2    BY MR. PERLOWSKI:

3       Q    So, looking at the schedule -- do you have

4    the schedule six form in front of you?

5       A    Yes.

6       Q    Okay.

7            So, the first -- the first -- the first of

8    the schedule sixes within Exhibit 13 you e-signed on

9    May 30th of 2018.

10      A    Uh-huh.

11      Q    What was your understanding of what this

12   recruiting allocation form represented?

13      A    That we would pay the recruiter five basis

14   points.

15      Q    The recruiter?

16      A    Yes.

17      Q    Okay.

18           So, explain what that -- practically, what

19   would happen.  So, employee -- or a person's

20   recruited and then the recruiter is paid five basis

21   points as a result of the successful recruiting of a

22   candidate?

23      A    Yes.

24      Q    Okay.

25           And when you say, we would pay the recruiter

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 159

1    five basis points, who's the we that you're referring

2    to?

3          A    They would -- Kelly and I.  They would

4    deduct it from our compensation.

5          Q    Okay.

6               Was it always five basis points?

7          A    I believe so.

8          Q    And to your knowledge, every time that a

9    recruiter successfully recruited somebody and

10   five basis points were going to be taken from yours

11   and Ms. Allison's bucket and put into the recruiter's

12   bucket, were you asked to sign a recruiting

13   allocation form?

14         A    I'm not sure if it happened every single

15   time, but it definitely happened.

16         Q    So when you were signing this form, you were

17   on -- you understood that, in effect, a small piece

18   of compensation would be taken out of your bucket and

19   placed into the recruiter's bucket?

20              MS. GIBSON:  Objection.  Form.

21              THE WITNESS:  Can you state the question

22         again?

23   BY MR. PERLOWSKI:

24         Q    Sure.

25              You understood that certain amounts were

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 160

1    being taken from yours and Ms. Allison's override to

2    fund the five basis points that was being allocated

3    to the recruiter when you signed this form?

4         A    I don't know if I believe that by signing

5    this form that's what I was agreeing to; but --

6              MS. GIBSON:  You can finish.

7              THE WITNESS:  -- but it was my general

8         understanding that we were to pay for the

9         recruiter.

10   BY MR. PERLOWSKI:

11        Q    And you wanted the recruiter to find more

12   loan officers because that increased your potential

13   compensation --

14        A    Yes.

15        Q    -- down the road?

16             MS. GIBSON:  Objection.  Foundation.

17   BY MR. PERLOWSKI:

18        Q    You said yes?

19        A    Yes.

20        Q    More loan officers typically meant more

21   money?

22        A    Yes.

23             (Whereupon, Defendant's Exhibit Number 14

24        was marked for identification.)

25   BY MR. PERLOWSKI:

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 161

1      Q   Ms. Spearman, with Exhibit 14, I'm showing
2   you is a composite of signed schedule sevens
3   overrides to authorized personnel that you signed
4   during your employment with N-A-F.  So, again, feel
5   free to take the opportunity to look at Exhibit Seven
6   (sic).  Just let me know when you're ready.
7      A   Okay.
8      Q   With respect to schedule -- I know I asked
9   you with respect to schedule four how you typically
10   receive them.
11          With respect to schedule six, schedule
12   seven, did you receive those in the same manner via
13   email from human resources?
14      A   Yes.
15      Q   And you would typically be asked to e-sign
16   them?
17      A   Yes.
18      Q   Okay.
19          And you would typically return them to human
20   resources?
21      A   Typically, the signature would automatically
22   send the document back to them, so I didn't have to
23   send it.
24      Q   Oh, right.  That's the beauty of e-sign.
25          When you -- when you -- so the first

Page 162

1    schedule seven is a three-page document, appears with

2    your signature's on May 15th of 2018.  What was your

3    understanding of what this schedule seven reflected?

4         A    That an override or bonus was being paid to

5    one of our downline managers.

6         Q    You're saying downline manager, are you

7    referring to a particular position within the

8    company?

9         A    No.

10        Q    So just branch -- branch managers would be a

11   downline manager?

12        A    Yes.

13        Q    Any other -- what were the other positions

14   that you would consider to be downline managers in

15   addition to branch managers?

16        A    Production manager, builder manager,

17   business development manager.

18        Q    Okay.

19             Just take a look at the first page of

20   Exhibit 14, please.  So, do you see in the column,

21   payment details, there appears to be a series of

22   requests that are captured?

23        A    Uh-huh.

24        Q    Yes?

25        A    Yes.

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 163

1      Q    Sorry.  I had trouble hearing.

2      A    Yes.

3      Q    Too many concerts at a young age.

4           And at least just from reading this, again,

5      as a lay person, they appear to be different kinds of

6      requests; for example, in the first -- in the first

7      row, it says, Kelly and Gina have requested to

8      allocate 15 basis points branch manager override to

9      any branch managers in the region.

10          And then, you know, the third row, for

11     example, says, Kelly and Gina have requested to

12     allocate $5 per funded loan in the Southeast region.

13          So I guess my question is:  Would these --

14     would this -- would -- in terms of process, would you

15     and Ms. Allison initiate the request in effect to

16     allocate either basis points or dollars to other

17     employees?

18     A    Initiate.  It was usually what was required

19     to hire that person.

20     Q    So, would the -- would the arrangements,

21     whatever the deal was with respect to that specific

22     person, was that typically something that was entered

23     into at the time of hire?

24     A    Yes.

25     Q    Would it ever typically change, like, for

Page 164

1    example, you know, two years in, somebody gets a

2    different deal than they had before?

3         A    It's possible.

4         Q    Okay.

5              So there's a new hire.  How would the

6    discussion -- how would it work in terms of deciding

7    what was going to be given to that new hire?

8              Like here, again, for example, the first row

9    says, Kelly and Gina have requested to allocate

10   15 basis points branch manager override to any branch

11   managers in the region.

12        A    Uh-huh.

13        Q    How does -- how does that get decided?

14        A    It's usually market driven, whatever the

15   company -- you know, market rate for that position.

16        Q    With respect to these requests -- so is this

17   something that you and Ms. Allison would discuss

18   together that you're willing to grant, you know, this

19   amount to this position?

20        A    Yes.

21        Q    And then, would you typically, then, inform

22   corporate or would corporate also be involved in the

23   discussions at the outset about what to grant?

24        A    We would usually work with the recruiter to

25   write up the offer details.  And so, I guess it would

Page 165

1   be a collaboration.  Because we would inevitably talk

2   to corporate or they would approve or deny.

3        Q    And the recruiter, I think you testified

4   earlier, was in corporate?

5        A    Yes.

6        Q    Okay.

7             Would you be talking to anyone else at

8   corporate besides the recruiter about what deal to

9   cut for the new hire?

10       A    Yes.  We often talked to Jan and Christy

11  about offers.

12       Q    Okay.

13            So, typically speaking, understanding there

14  could be exceptions, the deals that were cut to

15  authorize personnel were cut at the time of hire or

16  at the time of the offer?

17       A    Yes.

18       Q    Okay.

19            And I'm just asking, because it says, you

20  know, authorized personnel is used throughout this

21  document.

22       A    Uh-huh.

23       Q    Authorized personnel, to your understanding,

24  did that just mean persons who were authorized to

25  receive compensation pursuant to these deals?

Page 166

1       A    I guess so.  I've never really thought about

2    that definition.

3       Q    Ya.

4            I was going to say, did you ever see

5    anything where you could only authorize to give

6    comp -- you know, to give either basis points or

7    dollars to only a certain bucket of people?

8       A    No.

9            (Whereupon, Defendant's Exhibit Number 15

10           was marked for identification.)

11   BY MR. PERLOWSKI:

12      Q    I'm going to show you what's been marked as

13   Exhibit 15, Ms. Spearman, which is a schedule eight,

14   it appears that you e-signed on April 8th of 2019; do

15   you recall doing that?

16      A    I don't recall doing it, but --

17      Q    Okay.

18           Would Exhibit -- Exhibit Eight (sic) also

19   would have been presented to you by human resources

20   by email?

21      A    Yes.

22      Q    And you would e-sign it and return it back

23   to human resources?

24      A    Yes.

25      Q    What was your understanding of what schedule

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 167

1    eight reflected?

2         A    There was a gross amount basis points being

3    paid to the region.  And if we paid the loan officers

4    less than that, then the differential would go to the

5    regional manager.

6         Q    So, this exhibit reflects differentials that

7    in turn would resolve an additional compensation

8    being paid to you?

9         A    Yes.

10             (Whereupon, Defendant's Exhibit Number 16

11             was marked for identification.)

12   BY MR. PERLOWSKI:

13        Q    Ms. Spearman, I'm going to show you

14   Exhibit 16, which is a document that we received

15   within the last ten days or so from your counsel.

16   And I just want to ask you to -- and again, I'm going

17   to caution you on the attorney/client privilege

18   communications, I'm not asking you to reveal any of

19   those -- if you could tell me what Exhibit 16

20   reflects?

21        A    It reflects the amounts deducted on monthly

22   recaps for ASA and desk rentals.

23        Q    So these are amounts in addition to amounts

24   that are included in your original spreadsheet that

25   you provided on April 30th of 2020, correct?

Page 168

1        A    Yes.

2        Q    So, you said ASA and desk rentals.  Tell me

3    what -- what do you mean by ASA?

4        A    ASA stands for Advertising Services

5    Agreement.  So, it's generally an advertising

6    agreement or a desk rental with a real estate office,

7    is the most commonly way that is used, in which we

8    are subletting an office and/or paying for

9    advertising -- joint advertising services with a real

10    estate company.

11        Q    Okay.

12            So you have an arrangement with a real

13    estate company to either do joint advertising or

14    sublet space to them?

15        A    From them.

16        Q    From them.  Okay.

17            So you'd be subletting space, for example,

18    for a branch?

19        A    Ya.

20            So, an office within a real estate company's

21    building in which a loan officer would work there out

22    of the real estate company's office.

23        Q    So, in either case, whether it be a joint

24    advertising agreement or a sublet of space, these are

25    expenses that are being incurred by NAF?

Page 169

1      A    Yes.

2      Q    And NAF would typically pay those expenses

3  directly?

4      A    They would pay those expenses and then

5  deduct all or a portion of them from our override.

6      Q    Okay.

7           Let me -- before I ask you more questions

8  about Exhibit 16, I wanted to go back and ask you

9  some more general.

10          With respect to a series of the exhibits

11 that we just discussed, you know, what I'm going to

12 call them the schedule composite exhibits, did you

13 ever see schedules that were being presented to

14 Ms. Allison by NAF?

15     A    No.

16     Q    Did you and Ms. Allison ever discuss any

17 schedules that may have been presented to her?

18     A    No.

19     Q    Do you recall any instance, to your

20 knowledge, whether through discussions with

21 Ms. Allison or otherwise, where a deduction was taken

22 from you, but not her?

23     A    No.

24     Q    Do you -- vice versa, do you recall any

25 situations where a discussion where a deduction was

Page 170

1    taken from her but not you?

2         A    Have you seen the monthly recaps?

3         Q    I have a couple.  I have a few that I'm

4    going to show you in a minute.

5         A    Oh, okay.  Ya.  It's -- you can see on

6    there; if it's taken from her, it's taken from me.

7         Q    Got it.  Okay.

8              Do you recall ever being concerned, for

9    example, that maybe Ms. Allison was entering into a

10   schedule that might result in deductions being taken

11   from the region that might impact your comp

12   negatively?

13        A    No.

14        Q    Did you ever have that conversation with her

15   about how maybe what she was agreeing to might impact

16   your compensation as well?

17        A    No.

18        Q    Okay.

19             So just going back to Exhibit 16, just so

20   I'm sure I'm capturing my understanding of it.

21             An ASA would be an advertising services

22   agreement, so that would be something where you were

23   doing joint advertising with a real estate group?

24        A    Yes.

25        Q    And desk rental would be the situation that

Page 171

1    you were referring to earlier where you're

2    effectively renting space?

3         A    Yes.

4         Q    Okay.

5              (Whereupon, Defendant's Exhibit Number 17

6         was marked for identification.)

7    BY MR. PERLOWSKI:

8         Q    Ms. Spearman, I'm showing you what's been

9    marked as Exhibit 17, which is a schedule five you

10   appear to have e-signed on March 15th of 2018; do you

11   see that?

12        A    Yes.

13        Q    Do you recall agreeing that an -- that

14   your -- overrides would be reduced by $713 a month

15   for payment of the Drake Realty's ASA?

16        A    I don't remember the actual activity of

17   signing this, but yes.

18        Q    Do you remember the -- the Drake Realty ASA

19   costs were being -- override bonuses were being

20   reduced by those costs?

21        A    Yes.

22        Q    Did you have any -- what other ASAs did you

23   have besides Drake Realty that you can recall?

24        A    Real Estate Partners.

25        Q    Any others?

Page 172

1        A    That's the only other one I can recall.

2        Q    Do you know when the ASA with Real Estate

3    Partners originated?

4        A    Early 2018, I believe.

5        Q    What was the business relationship between

6    NAF and Real Estate Partners, in your words?

7        A    We had an advertising services agreement

8    with them.  And we had several -- I can't remember

9    how many desk rentals.  They had multiple offices.

10   So we had desk rentals in each of their locations in

11   their office.

12       Q    What -- just describe Real Estate Partners'

13   business to me, as you understood it.  What do they

14   do?

15       A    Real estate brokerage; list and sell homes.

16       Q    So, if you were a consumer, you could

17   literally go in, identify a home you wanted to

18   purchase --

19            THE VIDEOGRAPHER:  The time is 3:29 p.m., we

20       are off video record.

21            (Whereupon, a short break was taken.)

22            THE VIDEOGRAPHER:  The time is 3:35 p.m., we

23       are back on video record.

24   BY MR. PERLOWSKI:

25       Q    So I think when we broke briefly, before, I

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 173

1    was asking you, so with respect to the Real Estate

2    Partners relationship, a consumer could literally go

3    in, identify a home they wanted to purchase, and

4    literally have NAF in the building to potentially

5    service a mortgage need associated with that

6    transaction?

7         A    Yes.

8         Q    Okay.

9              And did the Real Estate Partners ASA

10   continue in effect throughout your tenure with NAF

11   after it was entered into, I think you said in

12   early '18?

13        A    Yes.  Although it was part of the Tennessee

14   market; so, that territory, therefore, that

15   relationship was removed from our region.

16        Q    When was that -- when was the Real Estate

17   Partners relationship removed from your region and

18   moved to Tennessee?

19        A    I believe that was September, October

20   of '19.

21        Q    Who, to your knowledge, originated the Real

22   Estate Partners relationship?

23        A    Myself and Kelly Allison, along with Janet

24   Hillis, the branch manager in Chattanooga.

25        Q    Did Ms. Hillis have a relative who was

Page 174

1    associated with Real Estate Partners?

2         A    She did.

3         Q    Who was that?

4         A    Her sister was the founding starter of the

5    company.  And the day-to-day was run by her nephew,

6    Ms. Hillis's nephew.

7         Q    So those familia connections that caused you

8    to first learn about the Real Estate Partners

9    opportunity?

10        A    Yes.  That is what allowed us to obtain the

11   meeting when they were looking for a preferred

12   partner; but most of the meetings, to secure the

13   relationship, the agreement -- the ASA agreement and

14   the desk rentals were all done by Kelly and I.

15   Because the nephew did not want the familia

16   relationship to be the reason that he selected NAF.

17        Q    Do you know whether Real Estate Partners was

18   looking at any other mortgage providers other than

19   NAF?

20        A    They said that they did.

21        Q    And is it desk rental just literally, like,

22   the cost of leasing the space?

23        A    Yes.

24        Q    Renting, leasing, whatever you want to call

25   it.

Page 175

1        A    (Nods head.)

2             (Whereupon, Defendant's Exhibit Number 18

3        was marked for identification.)

4   BY MR. PERLOWSKI:

5        Q    Show you what's been marked as Exhibit 18,

6   Ms. Spearman, and this also is a document that we

7   received from your counsel within the last ten days

8   or so.  And again, without asking you to reveal any

9   privileged communications, can you please identify

10  what Exhibit 18 reflects?

11       A    The recruit deductions that were on each

12  monthly recap that were deducted from our -- mine and

13  Kelly Allison's override.

14       Q    When you say, the recruit deductions, what

15  are you referring to?

16       A    The five basis points that was paid to the

17  internal recruiter.

18       Q    Okay.

19            When you were preparing Exhibit 18 -- sorry.

20  Let me ask this:  Did you prepare Exhibit 18?

21       A    I did.

22       Q    And did you do that just by lifting numbers

23  from the monthly recaps?

24       A    Yes.

25       Q    Okay.

Page 176

```
 1            When you were preparing Exhibit 18, did you
 2      make any effort to factor how the schedule sixes,
 3      that you had signed, factored into that --
 4            A    No.
 5            Q    -- recruiting deduction?
 6            A    No.
 7            Q    So the sums on Exhibit 18 could indeed
 8      reflect recruiting deductions that you specifically
 9      agreed to during your employment with NAF?
10            MS. GIBSON:  Objection.  Form.  Misstates
11            testimony.
12      BY MR. PERLOWSKI:
13            Q    Please answer the question as asked.
14            A    The numbers reflected on the spreadsheet do
15      not take into consideration anything to do with those
16      schedules.
17            Q    So the numbers on the spreadsheet could, in
18      fact, include recruiting deductions that you
19      expressly agreed to during your employment with NAF,
20      correct?
21            MS. GIBSON:  Same objection.  Misstates
22            testimony.
23            THE WITNESS:  I don't consider the schedule
24            sixes expressly agreeing to anything.  So, no.  I
25            would say no to that.
```

Page 177

1    BY MR. PERLOWSKI:

2         Q    Okay.

3              With the schedule sixes that you signed,

4    there's language that says, this recruiting deduction

5    will be split 50/50 with Kelly Morrison Allison.  Are

6    you saying that you did not agree to the recruiting

7    deduction to be split with you and Ms. Allison when

8    you signed the recruiting allocation form?

9              MS. GIBSON:  Objection.  Form.  And asked

10        and answered.

11                  You can answer.

12             THE WITNESS:  Referring back to the original

13        agreement, that clause is not applicable.

14             (Whereupon, Defendant's Exhibit Number 19

15        was marked for identification.)

16   BY MR. PERLOWSKI:

17        Q    I show you what's been marked as Exhibit 19,

18   Ms. Spearman, which also is a document we received

19   within the last ten days from your counsel and I want

20   to ask you what it reflects.

21        A    I took the -- to create this spreadsheet, I

22   took the deductions for bonuses to managers, our

23   downline managers, off of the monthly recap each

24   month and transferred it to this spreadsheet.

25        Q    So, do the sums on exhibit -- sorry -- the

Page 178

1    second column is total bonuses deducted; do you see

2    that?

3         A    Uh-huh.  Yes.

4         Q    Do those amounts reflect the total bonuses

5    paid to downline managers within a given month?

6         A    Yes.

7         Q    So that's the -- so, for example, in

8    September of '17, $42,970 were paid as bonuses to

9    downline managers?

10        A    Yes.

11        Q    Okay.

12             When you were preparing Exhibit 19, the

13   spreadsheet, section seven bonus to authorized

14   personnel, did you make any effort to examine the

15   schedule seven overrides authorized personnel that

16   you signed during your employment with NAF?

17        A    No.

18             (Whereupon, Defendant's Exhibit Number 20

19        was marked for identification.)

20   BY MR. PERLOWSKI:

21        Q    Let me show you what's been marked as

22   Exhibit 20, Ms. Spearman, which is another

23   spreadsheet that we received within the last ten days

24   with counsel and I want to ask you what it reflects.

25        A    It reflects the ASA and desk rental cost for

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 179

1    the Real Estate Partners relationship that -- the

2    deductions that were taken from our override, mine

3    and Kelly's override on those given months.

4         Q    So, if you -- is Exhibit 20 duplicative of

5    Exhibit 16?  And I'm just asking because the

6    ultimate -- the totals are exactly the same --

7         A    Yes.

8         Q    -- $33,310?

9         A    Yes.

10        Q    Okay.

11             So, in effect, Exhibit 16 also reflects the

12   ASA and desk rentals allocated to Real Estate

13   Partners?

14        A    Yes.

15        Q    Okay.

16             We've talked about the monthly recap reports

17   at points during the deposition today, Ms. Spearman.

18   You're familiar with those reports, generally, right?

19        A    Yes.

20        Q    What was the -- your understanding, what was

21   the purpose of those monthly recap reports?

22        A    They were used to calculate commissions for

23   loan officers overrides for branch managers and

24   overrides for regional managers.

25        Q    Who typically, to your understanding,

Page 180

1   prepared the monthly recaps?

2        A    New American Funding corporate, they had

3   compensation analysts that prepared them.

4        Q    Compensation analysts who prepared them, do

5   you understand to whom they reported?

6        A    I do not.  And I use that term loosely.  I

7   don't know if that was their exact title.

8        Q    How did you receive the monthly recaps?

9        A    Via email.

10        Q    From whom?

11        A    There may have been multiple people over the

12   time I was there.  The one person that I can recall

13   the name was Dani or Danielle, I believe, Abril or

14   Abrillio (ph).  I don't remember her name

15   specifically.

16        Q    Danielle Abril?

17        A    Yes.

18        Q    A-b-r-i-l?

19        A    Yes.

20        Q    Maybe she went by Dani?

21        A    Yes.

22        Q    Okay.

23        A    I believe she reported to Jan Preslo, but

24   I'm not certain.

25        Q    To your understanding, monthly recap reports

Gina Spearman                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 181

1    went to all regions?

2         A    Yes.

3         Q    Who within the Southeast region was

4    typically responsible for reviewing those monthly

5    recap reports?

6         A    Kelly's assistant, Sarah, reviewed them

7    commonly.

8         Q    Was Sarah also your assistant?

9         A    She -- her title was, you know, assistant to

10   Kelly Allison, and that was her primary

11   responsibility, but there was some crossover.

12        Q    Did you have an assistant yourself?

13        A    I did not.

14        Q    So Sarah would occasionally pitch in and

15   help you out?

16        A    That's right.

17        Q    Okay.

18             So was Sarah typically tasked with the first

19   pass review of the monthly recaps?

20        A    Yes.

21        Q    Did anyone conduct a second pass review of

22   the monthly recaps?

23        A    She would bring things to our attention

24   that, in most cases, would cause us to take a look at

25   those items in question.

Page 182

1      Q    Do you -- excuse me.

2           Did you recall generally reviewing each of

3      the monthly recap reports?

4      A    Not in detail.

5      Q    So, that would be my answer if someone asked

6      me if I reviewed the monthly partnership reports that

7      we get.  I would say, you know, yes, but not in a

8      whole lot of detail.

9           But, you know, that -- I'm just talking for

10     me, I would typically open them up, I'd look at,

11     like, four or five different specific things, and

12     then I shut it down, that's the extent of my review

13     each month.

14          I'm just using that to understand, did

15     you -- understanding you may not have reviewed them

16     in detail, did you typically review the monthly recap

17     reports --

18          MS. GIBSON:  Objection.  Form.

19     BY MR. PERLOWSKI:

20     Q    -- even if it was in -- even if it was in --

21     even in passing?

22          MS. GIBSON:  Objection.  Form.

23              You can answer.

24          THE WITNESS:  Yes.

25     BY MR. PERLOWSKI:

Page 183

1      Q   And you had the opportunity to review each

2    of the monthly recap reports, right?

3      A   Yes.

4      Q   Did the region -- was the region asked to

5    approve each of the monthly recap reports?

6      A   No.

7          Let me clarify that.

8      Q   Please.

9      A   Are you asking if I was required to complete

10   some sort of approval process?

11     Q   No.  I was asking if the region was

12   generally asked to approve the monthly recap reports,

13   could be as simple as, looks good, approve,

14   doesn't -- I'm not talking about any formal process.

15   I'm just asking, did the region typically have to --

16   was the region typically asked to approve the monthly

17   recap reports for accuracy?

18     A   I would say reviewed them for accuracy, yes.

19     Q   If -- if -- how do you pronounce Sarah's

20   last name?  I just want to make sure I'm pronouncing

21   it correctly.

22     A   Laprade.

23     Q   Laprade?  Okay.

24         Absent Sarah Laprade bringing things to

25   either yours or Kelly's attention, would you

Page 184

1      typically raise concerns that you had regarding the

2      content of the monthly recap reports to anyone?

3          A   We did.

4          Q   You say, we did?

5          A   Kelly and I both did on many occasions on

6      conference calls and in meetings face-to-face in

7      California.

8          Q   Okay.

9              What concerns do you recall that either you

10     and/or Ms. Allison raised during these conference

11     calls and meetings regarding the monthly recap

12     reports?

13         A   We expressed that we were not being paid per

14     our agreement.

15         Q   Do you recall anything specific that you

16     and/or Ms. Allison said as to how you weren't being

17     paid per your agreement?

18         A   We mentioned to them that there were loans

19     being excluded from our override that our agreement

20     indicated a deduction for those items was not

21     applicable to our agreement.

22         Q   Which kinds of loans?

23         A   Bond loans.  Second mortgages.  As we

24     discussed earlier, loans during the guarantee period.

25         Q   Any other kinds of loans that were excluded

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 185

1    from your override that you thought was inconsistent

2    with your agreement?

3         A    There were probably several others.  Those

4    were the primary.

5         Q    Earlier today, we -- and again, the record

6    will reflect what you and I specifically discussed,

7    but you talked about that there were concerns that

8    you would raise, I think, to Ms. Preslo, Mr. Reed,

9    Ms. Bunce, and they -- and I'm paraphrasing, but

10   Mr. Reed would refer to Preslo and Bunce.  I think

11   maybe Ms. Bunce, you think you said she said she was

12   going to look into it, are these the same

13   conversations that you're referring to now?

14        A    Yes.

15        Q    Okay.

16             Do you recall anything more specific about

17   concerns that you raised to NAF about the monthly

18   recaps other than what we've previously discussed

19   during your deposition?

20        A    No.  Other than the multiple times that we

21   brought it up to them, multiple people, multiple

22   times.

23        Q    And the multiple people, anyone else besides

24   Ms. Bunce, Ms. Preslo, and Mr. Reed?

25        A    I know there was more discussion about it

Page 186

1    after the 2019 leadership meeting, when there was,

2    you know, additional changes to the way we were being

3    paid.  I believe we expressed our frustration with --

4    to -- to Patty Arvielo, possibly to Rick and Patty,

5    during those conversations that we felt we had not

6    been paid as agreed since we started.  And that we

7    were yet now not being paid as agreed again.  So, I

8    believe that was when -- at the time in which we

9    brought it up to the Arvielos.

10        Q    Okay.

11             And I'll get to those conversations in a

12   moment.

13        A    Okay.

14        Q    Anything else that you can recall with

15   either Ms. Bunce, Ms. Preslo, or Mr. Reed that we

16   haven't discussed already today?

17        A    Not at this time.

18        Q    Okay.

19             (Whereupon, Defendant's Exhibit Numbers 21

20        and 22 were marked for identification.)

21   BY MR. PERLOWSKI:

22        Q    Ms. Spearman, I'm going to show you what's

23   been marked as Exhibits 21 and 22.  And I will

24   represent to you that these are, you know, email

25   exchanges with monthly report information attached.

Page 187

1    And take a moment to familiarize yourself with them.

2         A    Okay.

3         Q    Looking at Exhibit 21, it appears to be --

4    there's some emails with Ms. Laprade on -- with

5    Ms. Laprade on August 7th after Ms. Abril forwards --

6         A    Can I just ask a question?

7         Q    Sure.

8         A    So, you gave me an Exhibit 12 (sic) and 21;

9    is that correct?

10        Q    21 and 22.

11             MS. GIBSON:  He should remark it.  I think

12        he meant to mark it 21.

13             THE WITNESS:  Just make sure I --

14             MR. PERLOWSKI:  21 and 22.

15             THE WITNESS: -- I just didn't want there to

16        be confusion.

17             MS. GIBSON:  Let me see that one.

18             THE WITNESS:  This one says 21.  That one

19        looks like 12 to me, but --

20             MS. GIBSON:  I think it's supposed to be 22.

21             MR. PERLOWSKI:  Let's just make it more

22        clear.  That's a handwriting issue on my end.

23             THE WITNESS:  No worries.  I just want to

24        make sure --

25             MR. PERLOWSKI:  Thank you.

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                              Page 188

1             THE WITNESS:  Uh-huh.  Thank you.  Okay.

2        21.

3   BY MR. PERLOWSKI:

4        Q    21 appears to be emails involving

5   Ms. Laprade on August 7th after Ms. Abril forwards

6   the July 2017 branch manager, area manager recap; do

7   you see that?

8        A    Yes.

9        Q    Okay.

10            So -- and then there's a spreadsheet

11   attached to the exhibit.  Does that look like one of

12   the monthly recaps that you would have typically

13   received in 2017?

14        A    A portion of it.

15        Q    A portion of it?  Okay.  We'll get to that

16   in a second.

17            So if you look at the emails, Ms. Spearman,

18   it looks like Ms. Abril forwards the information on

19   Thursday, August 3rd.  And then, Ms. Laprade responds

20   on August 7th asking some questions; do you see that?

21        A    Yes.

22        Q    Then it appears that Ms. Abril sends a

23   revision, which Ms. Laprade forwards, right --

24        A    Uh-huh.

25        Q    -- saying, Kelly and Gina, Dani has made the

Page 189

1    revisions I requested.  Will you please review and

2    approve the attached July AM/BM recap for payroll.

3    And then you say, I approve all but my guarantee

4    deduction; do you see that?

5         A    Yes.

6         Q    Okay.

7              Would Ms. Laprade typically ask you and

8    Ms. Allison to approve the monthly recap for payroll?

9         A    I don't recall her sending that every single

10   time that we needed to approve it.

11        Q    Okay.

12             And if you can look at Exhibit 22.

13        A    Okay.

14        Q    So again, I'm only asking you about the

15   emails.

16        A    Yes.

17        Q    There's a series of emails, but what I'm

18   most specifically interested in asking about is it

19   says -- on the first page, it says, December 7th,

20   good afternoon, everyone.  I've reviewed and the

21   attached looks correct to me.  Thank you, Dani.

22   Gina, do you approve?  This is from Ms. Laprade to

23   you and then you say, I approve --

24        A    Yes.

25        Q    -- thank you, Sarah and Dani.

Page 190

1      A    Yes.

2      Q    So, at least, we've looked at two

3  exemplars --

4      A    Yes.

5      Q    -- where Ms. Laprade has asked you -- one

6  time she asks both Ms. Allison and you, the second

7  time she asks just you to approve.

8           So, I think from what your testimony

9  earlier, but I want to make sure I understand it, you

10 said that that did not happen every month?

11     A    No.  This was early in the employment.  We

12 were on -- Kelly and I were both on a guarantee in

13 the beginning of our employment.  So it wasn't until

14 April to May.  So we began in November of '16.  And

15 April to May of '17 was when we first started to

16 receive the recaps.

17     Q    Was that because you were going above your

18 guarantee?

19     A    Yes.

20     Q    Okay.

21     A    Because we had a one-year guarantee; but in

22 April or May, I want to say it was the first time we

23 saw the document that would calculate our income.

24           And in those first couple of months is when

25 we were expressing, you know, why are these loans

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 191

1    being excluded, the ones we mentioned other -- you

2    know, earlier.

3        Q    Uh-huh.  Uh-huh.

4        A    And that is when they were -- we're going to

5    look into it, we'll get back to you.  That sort of

6    thing.

7             So, Sarah wasn't reviewing the recap for

8    that specifically.  She was reviewing it -- you know,

9    there's every single loan that we closed in our

10   region, you know, on the recap.  So, she was checking

11   for, you know, other -- other things.

12            In order for our downline managers to be

13   paid their bonus, we had to review and give

14   acknowledgement, you know, for -- in order for -- for

15   payroll to process.

16       Q    Okay.

17            So let me make sure I understand that.

18       A    Okay.

19       Q    So, you said so -- the downline managers,

20   you're referring to the branch managers, production

21   managers, same group of people we talked about

22   earlier --

23       A    Yes.

24       Q    -- right?

25            So, before they received -- before payroll

Page 192

1    was approved as to them, who had to approve -- who

2    had to approve it within the Southeast region?

3          A    I don't think they had a specified person.

4          Q    Okay.

5                Was it either you or Ms. Allison who had to

6    approve it?

7          A    They never specified, you know, that both of

8    you must, one of you must, Sarah can do it.  It was

9    an exchange of information, you know, each month.

10   And in the -- in the first couple of months, in which

11   we received them, that is when we expressed our

12   concern over loans being excluded.  And, of course --

13         Q    I'm trying to get back to -- okay.  It

14   sounds like --

15               MS. GIBSON:  You can finish your answer,

16         though --

17               MR. PERLOWSKI:  Ya.

18               THE WITNESS:  Okay.

19   BY MR. PERLOWSKI:

20         Q    I thought you -- was finished.  I didn't

21   mean to interrupt you.  If you were not, please

22   continue.  I thought you paused, so --

23         A    I was going to say that when it became

24   apparent in those first couple of recaps, which would

25   have been around April or May --

Page 193

1       Q    Uh-huh.

2       A    -- it became apparent that they were going

3   to continue to deduct or exclude certain loans.  So,

4   our choices were leave, because they're not paying as

5   agreed, which would have caused pretty serious

6   reputational damage, because we brought 100 people;

7   business partners, builders, realtors.

8           The other option would have been to cause a

9   very, very big stink and create turmoil within, you

10  know, our relationship with corporate.  And I

11  believed that if we did our job and grew the market,

12  that they would eventually pay as agreed.

13      Q    Okay.

14          You could have also said, for example, on

15  Exhibit 22, right, instead of, I approve, you could

16  have said, I approve with the exception of these

17  issues as to me, right?

18          MS. GIBSON:  Objection.  Form.

19          THE WITNESS:  In hind --

20  BY MR. PERLOWSKI:

21      Q    You could have --

22      A    -- in hindsight --

23      Q    -- right?

24      A    Sure.

25      Q    Okay.

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 194

1            But you didn't, right?

2            MS. GIBSON:  Objection.  Form and

3        foundation.

4    BY MR. PERLOWSKI:

5        Q    Please answer.

6        A    I could have --

7            MS. GIBSON:  Objection.  Form.

8            THE WITNESS:  I could have done that.  I

9        could have done a lot of things.

10   BY MR. PERLOWSKI:

11       Q    Okay.

12            For example, in Exhibit 21, you did say, I

13   approve all but my guarantee deduction, right?

14       A    (Nods head.)

15       Q    So you did raise an issue in Exhibit 21

16   about -- that you approve with a qualifier, correct?

17       A    Yes.

18       Q    But you didn't do that in Exhibit 22,

19   correct?

20       A    Correct.

21       Q    Okay.

22            So let's go back -- I want to go back to

23   just the approval process.

24            Understanding -- I understand the questions

25   that you have and that you discussed with others.  I

Page 195

1    want to get back to the conversations in connection

2    with the leadership meeting and thereafter in a

3    moment; but in just in terms of the process --

4        A    Yes.

5        Q    -- somebody had to sign off on -- in effect

6    for payroll to be run and for the downline managers

7    to be paid, right?

8        A    Yes.

9        Q    Okay.

10            So, do you know who had to -- who was able

11   to do that, the sign-off within the region?

12       A    They didn't specify, but Sarah often did it.

13       Q    Okay.

14       A    I don't know if she used the words, we

15   approve, but she gave the okay for payroll.

16       Q    Okay.

17            To whom would Sarah typically discuss

18   whether to give the okay?

19       A    Dani.

20       Q    Okay.

21            Would Sarah typically ask for your

22   permission to say we approve?

23       A    To my recollection, she did not ask that

24   every month.

25       Q    Sometimes she did, sometimes she didn't?

Gina Spearman                          November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 196

1       A    Yes.

2       Q    Do you know whether she would typically ask

3    Ms. Allison, who she was, you know, an executive

4    assistant to?

5       A    Right.

6       Q    Do you know whether she would typically ask

7    Ms. Allison for her approval before saying we

8    approve?

9       A    I can't speak to that unless I was on the

10   same email.

11      Q    Ya.  No.  I'm just asking for your general

12   awareness.  I'm not asking about a specific document

13   or a specific instance.  I'm just asking about your

14   -- if you had any general awareness as to whether

15   Sarah would --

16      A    I don't think she would --

17      Q    -- typically ask Kelly?

18      A    -- I don't think she would do it completely

19   on her own.

20      Q    Did you and Kelly ever discuss whether to

21   approve or not?

22      A    No.

23           (Whereupon, Defendant's Exhibit Number 23

24      was marked for identification.)

25   BY MR. PERLOWSKI:

Page 197

1          Q    Ms. Spearman, showing you what's been marked

2     as Exhibit 23 and I actually want to -- if you could

3     just look at the spreadsheet that's attached.  And I

4     apologize for the size of the print.

5          A    I don't need to look at the email?

6          Q    No.  If you could just look at the

7     spreadsheet that's attached.

8               Did -- does this spreadsheet look like a --

9     the monthly recap format that you would typically

10    receive?

11         A    One of them, yes.  It changed several times

12    over time.

13         Q    The format would change --

14         A    Yes.

15         Q    -- several times -- okay.

16              And I'm not asking you about any of the

17    specific, you know, loan data within --

18         A    Okay.

19         Q    -- but typically speaking, the monthly recap

20    would contain the kinds of information that's

21    included on Exhibit 23?

22         A    Yes.

23         Q    Do you know how the Southeast region

24    performed financially in 2018?

25         A    I only know from what we were told.

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 198

1      Q    Was 2018 generally a good or a bad year for

2   the industry; if you know?

3      A    It was a good year for production.

4      Q    Was it a bad year for something other than

5   production?

6      A    There was margin compression the fourth

7   quarter of 2018.

8      Q    Is margin compression typically something

9   caused by just competition?

10     A    It's more market conditions.

11     Q    Is margin compression just because -- I

12  think -- this is just based on my vague

13  recollection -- interest rates were really low at the

14  time, does that have something to do with it?

15     A    Yes.

16     Q    Did you have any -- so -- okay.

17         You said -- when I asked you the question,

18  do you know how the Southeast region performed

19  financially, you just said, no, other than what you

20  were told.

21     A    Right.

22     Q    What were you told?

23     A    When we attended a meeting roughly November

24  of '18, so, close to the end of the year, we were

25  given what I would consider to be rave reviews as it

Page 199

1    related to all of our scorecard criteria, which was

2    growth, retention, loan quality, customer service,

3    and profitability.

4        Q    So profitability, you remember it being one

5    of the criteria in the scorecard?

6        A    Definitely.

7        Q    Okay.

8             The November '18 meeting, who attended that

9    meeting, to the best of your recollection?

10       A    Christy and Jon for sure.  Possibly Jan,

11   along with myself and Kelly.

12       Q    Where was the meeting?

13       A    Tustin.

14       Q    Do you recall what was said about the

15   profitability of the region during the meeting?

16       A    That we were the highest profitability of

17   all the regions.  We won that year, the chairman's

18   award, which was a competition throughout the year

19   for all the regionals.  And it was based off some of

20   the criteria I mentioned before; loan quality,

21   growth, profitability.

22       Q    Do you recall anything being said during the

23   November '18 meeting about how the company was doing

24   as a whole?

25       A    It was all positive, that the company was

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 200

1    doing well.

2         Q    Any specifics shared other than the

3    company's doing well?

4         A    Not that I recall, other than that they

5    were -- the company was profitable.  The retail

6    division, specifically, was performing --

7    outperforming their expectations.  And they may have

8    even shared a P and L for just our region at that

9    meeting.  I don't recall the specifics of it because

10   we were exceeding their expectations.  So, there was

11   not -- not a lot of cause for review.

12        Q    Had you ever seen a regional P and L before,

13   November of '18?

14        A    It's possible that we were shown a P and L,

15   again, to show that we were above their target for

16   profitability.

17        Q    Do you know what the profitability target

18   for the region was in '18?

19        A    It seemed to change.  It was never a

20   criteria they gave us that we were required to meet.

21        Q    Uh-huh.

22        A    Simply you're at X, which is great, you

23   know, you've met our threshold of X; but it did seem

24   to change.

25        Q    Do you recall any of the profitability

Page 201

1     expect -- any of the profitability targets that you

2     were given?

3          A    I do not.

4          Q    So, like, for example, at the beginning of a

5     year, you know, we'll do the financial scrubbing from

6     the year before.  A managing partner usually, in a

7     January meeting, will say something like, you know,

8     this is the expectation for -- like, we'll get that

9     conversation in January of '22 based on how '21 shook

10    out.  We'll just be given a this is what -- this is

11    what we're looking ahead for this year; do you

12    remember anything like that being given to you?

13             MS. GIBSON:  Objection.  Form.  Asked and

14         answered.

15             THE WITNESS:  I don't recall any.

16    BY MR. PERLOWSKI:

17         Q    Any profitability targets that were given to

18    you, do you recall how they were expressed, like, was

19    it in terms of we expect the profit of X percent or

20    we expect a profit of X dollars?

21         A    I was never given targets, but -- we were

22    never given targets; but on the few occasions I saw a

23    P and L, the main conversation was around basis

24    points.  So, net basis points as far as

25    profitability.  It wasn't a dollar amount.

Page 202

1       Q    Do you recall what net basis points numbers

2   were being discussed in terms of a profitability

3   target?

4       A    They were -- they ranged.

5       Q    From what to what?

6       A    I can't say for certain; but I would say

7   anything from 30 to 50 basis points net profit.

8       Q    Was there any discussion in the November '18

9   meeting about possibly moving to a profit and

10  loss-based compensation model?

11      A    Not to my knowledge.

12      Q    Had you attended a leadership meeting before

13  the one in February of '19?

14      A    Yes.

15      Q    Did you attend one in '18?

16      A    They would have two to maybe three a year.

17  So, I attended several.

18      Q    And I know that we -- I think you testified

19  earlier that you do not -- you don't remember whether

20  the leadership meeting in '19 was in February or

21  March.  I'm just going to call it the February '19

22  leadership meeting; is that okay?

23      A    Yes.  I'm almost positive it was in

24  February.

25      Q    Okay.

Page 203

1            So you had attended leadership meetings

2    before?

3        A   Yes.

4        Q   Did you ask to attend that meeting or were

5    you -- did you ask to attend that meeting or were you

6    asked to attend the February '19 meeting?

7        A   We were asked to attend.

8        Q   But would that have been typical?

9        A   (Nods head.)

10       Q   Yes?

11       A   Yes.

12       Q   Okay.

13       A   Sorry.  Yes.

14       Q   No.  It's fine.

15       A   When they held a regional leadership

16   meeting, you were expected to attend.

17       Q   Somebody from the region was expected to

18   attend?

19           MS. GIBSON:  Objection.  Form.

20               You can answer.

21           THE WITNESS:  I can't speak for NAF's

22       expectations, but my thought is that they

23       expected the regional managers to be at the

24       regional manager leadership meeting.

25   BY MR. PERLOWSKI:

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 204

1        Q    Okay.

2             Were all -- would typically other regional

3    managers also present at the leadership meeting in

4    addition to yourself?

5        A    Yes.

6        Q    How -- where did the '19 -- February of '19

7    leadership meeting take place?

8        A    Tustin.

9        Q    At NAF's corporate headquarters?

10       A    Yes.

11       Q    How long was the meeting?

12       A    My memory is that normally, we -- in the

13   past, we had a joint meeting with all the regionals.

14            That particular meeting, that particular

15   visit, they did separate meetings with each regional

16   throughout the day.  It may have even been over

17   two days.  And then, we all joined for a dinner when

18   all the meetings were over; but I would say that the

19   meeting lasted a couple of hours.  Our specific

20   one-on-one meeting with Jan, Jon, and Christy.

21       Q    Okay.

22            That was a meeting specific to the Southeast

23   region?

24       A    Yes.

25       Q    So, you mentioned a number of times the

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 206 of 327
Gina Spearman                        November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 205

1    topic of a $30 million shortfall had come up.  Was it
2    in the two-hour meeting you just mentioned --
3         A    Yes.
4         Q    -- that the topic came up?
5         A    Yes.
6         Q    Okay.
7              So, in that -- so -- I just want to confirm,
8    the attendees in the two-hour meeting were whom?
9         A    Kelly Allison, myself, Jon Reed, Jan Preslo,
10   and Christy Bunce.
11        Q    Sorry.
12             So you, Kelly, Jon Reed, Jan Preslo, Christy
13   Bunce; did I miss anyone?
14        A    I think that's it.
15        Q    Okay.
16             So tell me what you recall hearing about a
17   $30 million shortfall?
18        A    They -- Christy was very concerned about the
19   stability of the company.  She said we -- our P and
20   Ls have been redone.  And although, we thought at the
21   end of last year, everything looked great, our P and
22   Ls have been revised, and we have a problem.  And we
23   are going to have to take drastic measures, because
24   there has been a misallocation of $30 million.
25        Q    And this is Ms. Bunce speaking?

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 206

1       A    Yes.  She and Jon did most of the talking,

2    as I recall.

3       Q    But as to this specific issue, it was

4    Ms. Bunce?

5       A    I believe they both said the misallocation

6    part, but they both spoke.

7       Q    Did they explain the misallocation or the

8    alleged misallocation to you?

9       A    No.  We asked many questions about it.

10      Q    Okay.

11           So -- and granted, this may be parsing

12   words, but bear with me.

13      A    Okay.

14      Q    So shortfall, to me, I can note that that

15   means you have less than what you thought --

16      A    Right.

17      Q    -- right?  That you're short of something.

18           Misallocation to me means instead of in

19   bucket A, you might put something in bucket B?

20      A    Right.

21      Q    You with me so far?

22      A    Yes.

23      Q    Okay.

24           They said it was a $30 million

25   misallocation?

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                    Page 207

1        A    They did.

2        Q    Okay.

3             Did they explain at all the nature of the

4    misallocation of the funds?

5        A    They used some terminology regarding CM1 and

6    CM2.

7        Q    Okay.

8             Did you -- did that mean anything to you?

9        A    On the few occasions I had seen a P and L in

10   the past, it always referenced CM1, which, when we

11   asked them what that meant, it was corporate margin

12   one.

13       Q    Okay.

14       A    And the first time I had ever heard of CM2

15   was in that leadership meeting when they were

16   discussing the misallocation.

17       Q    To your understanding, did CM2 mean

18   corporate margin two?

19       A    I would assume.

20       Q    Okay.

21            Did anyone explain what the practical

22   meaning was of the misallocation from either CM1 to

23   CM2 or CM2 to CM1?

24            MS. GIBSON:  Objection.  Form.

25                 You can answer.

Page 208

```
 1          THE WITNESS:  It was just discussions about
 2      expenses and just misallocation of -- of items
 3      that was causing them major concern about the P
 4      and L.
 5  BY MR. PERLOWSKI:
 6      Q   Was the concern about like just the
 7  integrity of the P and L or was the concern about the
 8  financial position as a result of the
 9  misallocation --
10      A   Ask that again --
11      Q   -- as you understood it?
12      A   Ask that again, please.
13      Q   Sure.
14          So going back to what we were talking about
15  earlier, misallocation just generally means that
16  instead of in one bucket, it's put in a different
17  bucket, right?  And maybe, it should have been -- it
18  was inappropriately put in a certain bucket?
19      A   Right.
20      Q   So -- and look, that's -- that's not ideal,
21  but it doesn't necessarily mean that the company's
22  lost money as a result of the misallocation --
23      A   Uh-huh.
24      Q   -- do you know what I mean?
25      A   Right.
```

Page 209

1      Q    Did anybody ever explain to you that NAF had
2   lost money because of the misallocation?
3           MS. GIBSON:  Objection.  Form.
4           THE WITNESS:  They did not specifically --
5           they did not specifically say that.  They did
6           state that they took responsibility in some ways
7           in saying they felt like the financials have not
8           been properly managed, because they don't have a
9           CFO.
10  BY MR. PERLOWSKI:
11          Q    Okay.
12               Had NAF had a CFO at some point in time, to
13  your knowledge?
14          A    Not to my knowledge.
15          Q    Okay.
16          A    I believe Jason Obradovich handled -- who
17  was the head of the secondary marketing -- handled
18  most of the financial P and L.
19          Q    In this misallocation, to your
20  understanding, was this companywide or was it
21  specific to a particular region?
22          A    It was companywide.
23          Q    And just -- sorry -- I didn't mean to
24  interrupt.
25          A    I was just going to say, because they said

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 210

1    it was, and also the other regionals, in speaking to

2    the other regionals, they were communicated the same

3    information.

4         Q    Did you have a conversation with any other

5    regional about the misallocation of $30 million?

6         A    Yes.  We -- Kelly and I both spoke to most

7    of the other regionals.

8         Q    Did anyone indicate to you that it was --

9    that the issue was something other than just a

10   misallocation of funds as opposed to a shortfall of

11   funds?

12        A    No one really spoke to that.  They spoke to

13   the fact that the other regionals thought that

14   corporate believed that the regionals made too much

15   money and that this was a method to reduce our

16   compensation.

17        Q    During the leadership meeting, were you ever

18   given any numbers as to how NAF performed as a whole

19   in 2018; in other words, for example, how much profit

20   NAF made in 2018?

21        A    No.

22        Q    Did you ask, like, how NAF performed in

23   2018?

24        A    No.

25        Q    Did anyone tell you that the regions made

Page 211

1   too much money at the leadership meeting?

2        A   You mean, Jon, Christy, or Jan?

3        Q   I said anyone.

4            MS. GIBSON:  Objection.  Form.

5   BY MR. PERLOWSKI:

6        Q   So, did anyone tell you at the leadership

7   meeting -- did anyone tell you at the leadership

8   meeting that the regions made too much money?

9        A   Other than the other regionals, no one else

10  told me that directly.

11       Q   Okay.

12           So, neither Christy, Jon, nor Jan told you

13  that the regions made too much money?

14       A   No.

15           There was another meeting.

16       Q   Go ahead.

17           You said there was another meeting; when?

18       A   About this topic.

19       Q   When?

20       A   So, each region was met with individually.

21  Then we all went to dinner with Rick and Patty and

22  the regionals, Jon, Jan, Christy, the leadership

23  team, the executive team.  And it was a, we're going

24  to get through this, you know, just stick with us

25  kind of thing, kind of dinner.

Page 212

1          And at that point, I think each regional was

2      communicating with Jon, Jan, and Christy about, you

3      know, their marketing budget being eliminated, how

4      they're going to handle their PEs.  And all those

5      things.

6          So, the regionals started talking amongst

7      each other, after they left the meeting, over the

8      next week or two.  And it was decided that there may

9      be a better way to resolve this problem that NAF is

10     having.

11         So, the regionals decided to ask Rick and

12     Patty, because they weren't a part of the individual

13     meetings that we had.  Someone spearheaded -- I can't

14     remember which regional, it wasn't Kelly and I, but

15     they spearheaded, hey, let's fly out to corporate on

16     our own dime, to California, in an effort of good

17     faith, to show them that we want to be part of the

18     solution, but that maybe there's a better way to do

19     this.  Maybe -- we just need to understand more about

20     what the real problem is.

21     Q   So the second meeting that you were just

22     referencing is this follow-up meeting where you flew

23     out to California?

24     A   Yes.  We all --

25     Q   Some weeks after the leadership meeting?

Page 213

1        A    Yes.

2        Q    Okay.

3             I'll get to that in a second.

4        A    Okay.

5        Q    So, with respect to the -- going back to the

6    leadership meeting, did you learn of NAF's changes

7    with respect to marketing expenses during the

8    two-hour meeting that you mentioned earlier?

9        A    Yes.

10       Q    And did you learn about NAF's changes with

11   respect to the absorption of pricing expenses in the

12   two-hour meeting?

13       A    Yes.

14       Q    So, with respect to the change as to pricing

15   exceptions, who was communicating that change?

16       A    Jon and Christy did it jointly.  Primarily

17   Christy.

18       Q    And the change that was announced to you

19   would be that the regions would have to absorb any

20   exceptions above the new tolerance level?

21       A    I do not recall if the tolerance level --

22   that specific tolerance level was discussed in that

23   meeting, but that pricing exceptions were going to

24   have to change drastically and no more marketing

25   budget.

Page 214

 1      Q    Okay.

 2           With respect to the pricing exception --

 3      A    Yes.

 4      Q    -- you remember it's that they -- that

 5  Mr. Reed and Ms. Bunce, primarily Ms. Bunce, did the

 6  talking and said that pricing exceptions would have

 7  to change dramatically.  What did she specifically --

 8  what do you recall her saying?

 9      A    We're not going to be able to approve all

10  these marketing exceptions.  And you guys are going

11  to have to absorb them if you want to do them.

12      Q    You said marketing exceptions?

13      A    I'm sorry.

14      Q    You mean pricing exceptions?

15      A    Pricing exceptions.

16      Q    So she said you guys are going to have to

17  absorb them if you want to do them?

18      A    (Nods head.)

19      Q    Was there any recommendation one way or the

20  other about whether that -- whether the regions

21  should still continue to make loans that require

22  pricing exceptions?

23      A    I think everyone at that meeting is

24  experienced enough to know there was no realistic way

25  to publish all pricing exceptions.

Gina Spearman                                     November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 215

1      Q    Was there a realistic way to significantly

2    reduce them but not abolish them?

3      A    Not in my opinion.

4      Q    Okay.

5           Why not?

6      A    Because the level of pricing exceptions that

7    we had been approving were necessary to compete in

8    our marketplace to be competitive with like lenders.

9      Q    Did you ever have -- did you ever conduct

10   any kind of -- or have conducted any kind of analysis

11   as to what other lenders were doing with respect to

12   pricing exceptions?

13     A    We often did market analysis just on

14   checking where other lenders were with their rate

15   offering, so that we knew where we stood; but not

16   about how they -- each company handled pricing

17   exceptions.

18     Q    Did you -- is -- I would assume that that

19   information, with respect to what a specific company

20   does with respect to pricing exceptions, is typically

21   kept confidential?

22     A    I would say yes.

23     Q    So, like, company A doesn't want company B

24   to know what it does with respect to pricing

25   exceptions?

Page 216

1          A    Right.

2               MS. GIBSON:  Objection.  Form.

3      BY MR. PERLOWSKI:

4          Q    Okay.

5          A    Yes.  You could easily, generally, find out

6      from other loan officers at other companies what rate

7      they're offering, what rate they're able to offer,

8      but not the back end of how they're arriving at that.

9          Q    Okay.

10              When you left the leadership meeting, had

11     the new tolerance level been communicated?

12         A    It was still in discussion.

13         Q    Okay.

14              When did the change with respect to pricing

15     exceptions go into effect?

16         A    I believe it was March 1.

17         Q    So it was prospective from the leadership

18     meeting?

19         A    It was on or about March 1.

20         Q    After the leadership meeting?

21         A    Correct.

22         Q    To your understanding, was -- were regions

23     treated differently at all with respect to the change

24     in the pricing exception policy, like in any way,

25     like, for example, did a certain region have a

Page 217

1    different tolerance level than others or was a

2    certain region asked to absorb only certain costs but

3    not others?

4         A    I don't know.

5         Q    Okay.

6              To your knowledge, every region was treated

7    the same?

8         A    I don't know either way.

9              MS. GIBSON:  Asked and answered.

10   BY MR. PERLOWSKI:

11        Q    Okay.

12             What was said to you about the change with

13   respect to marketing expenses going forward at the

14   leadership meeting?

15        A    That all marketing expenses would be the

16   responsibility of the regionals.  There would be no

17   marketing expenses paid by corporate.

18        Q    Did corporate typically provide marketing

19   support for the regions?

20        A    Yes.

21        Q    So I'm trying to make a distinction between

22   an expense -- a marketing expense, for example, that

23   the region decided to spend, like you mentioned the

24   TV -- the TV --

25        A    Yes.

Page 218

1        Q    -- program, right?

2             That's being done at the regional level that

3    you and/or Ms. Allison decide, you know, we want to

4    -- we think this is a good way to drum up business,

5    so we want to spend this money?

6        A    Right.

7        Q    Were there typically marketing expenses that

8    corporate covered, for example, like or -- strike

9    that.

10            Were there typically kinds of marketing

11   support that corporate provided the Southeast region

12   independent from expenses that the region decided to

13   spend -- to incur?

14       A    I can't think of any other than just maybe

15   maintaining a company website.  I can't think of any

16   other marketing expenses.

17       Q    With respect to the policy going forward,

18   for the marketing expenses that the region would have

19   to absorb, were those only marketing expenses that

20   the region decided to spend as opposed to -- or was

21   it even, for example, it costs us X dollars to

22   maintain a website, so we're going to allocate a

23   percentage of those costs to the region?

24            MS. GIBSON:  Objection.  Form.

25            THE WITNESS:  What they abolished was

Page 219

1          region-specific marketing.

2     BY MR. PERLOWSKI:

3          Q    Okay.

4               So they didn't -- no.  You used the word

5     abolished regions specific marketing.

6               They didn't abolish it, right?

7               MS. GIBSON:  Objection.  Form.

8     BY MR. PERLOWSKI:

9          Q    They didn't say you couldn't spend the

10    money, right?

11              MS. GIBSON:  Objection.  Form.

12              THE WITNESS:  Correct.

13    BY MR. PERLOWSKI:

14         Q    They just said, if you decided to spend it,

15    you're going to have to absorb it?

16         A    Correct.

17         Q    Okay.

18              And that policy change was prospective as

19    well, right?

20         A    Yes.

21         Q    When did that go into effect?

22         A    I believe at the same time.

23         Q    Were there any exceptions for your region

24    that were granted?

25         A    Not to my knowledge.  We asked them to make

Page 220

1    the exception for Atlanta's Best New Homes TV show,

2    just because it was a large expense that they knew

3    about before we joined.  And given the fact we had

4    the seven-and-a-half basis points marketing budget in

5    Kelly's agreement.

6         Q    Ms. Allison had a 7.5 percent basis points

7    in her agreement?

8         A    Correct.

9         Q    That was not in yours, correct?

10        A    It wasn't; however, the way -- as you see

11   the recaps, the way they're calculated, the marketing

12   is deducted from the total override before the split

13   is applied.  So, if she has a marketing budget, then

14   I benefit from that.

15        Q    Okay.

16             But there was no marketing budget in your

17   agreement, correct?

18             MS. GIBSON:  Objection.  Asked and answered.

19             THE WITNESS:  That is correct.

20   BY MR. PERLOWSKI:

21        Q    And there was no marketing budget in your

22   offer letter, correct?

23        A    Correct.

24        Q    So, what was the response, the request for

25   an exception regarding Atlanta Best Homes?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 221

1        A    No.

2        Q    Who said that?

3        A    Christy.

4        Q    After the policy change, did you and

5    Ms. Allison discuss whether you were going to

6    continue making regional spend knowing that that was

7    going to be absorbed out of your --

8        A    Yes.

9        Q    You did.

10            And what did you and she decide?

11       A    That we couldn't change our commitment to

12   our loan officers, branch managers, builders and

13   realtors.  So even though it was being changed for

14   us, in order to maintain our business and grow at the

15   same rate, we would have to continue the marketing

16   expenses.

17       Q    What kinds of marketing expenses did you

18   and -- and/or Ms. Allison decide to continue to incur

19   after the change in policy and announce at the

20   leadership meeting?

21       A    The biggest one being Atlanta's Best New

22   Homes.  I'm sure you could get a list of all the

23   invoices from NAF to give you a detailed account of

24   all the marketing.  There's lots of different things.

25       Q    So, what, typically, would occur is that the

Page 222

1    region would incur the expense, send it to corporate

2    for payment, and then it would be offset against

3    your --

4         A    It would be subtracted from our override.

5         Q    Subtracted from the override at the -- okay.

6              Who -- who made the decision within the

7    Southeast region as to what marketing expenses to

8    incur?

9         A    Kelly and I.

10        Q    Did -- did you both typically have -- agree

11   on a marketing expense or did you each have the

12   discretion to decide what to spend on your own?

13        A    We were pretty much in sync.  We were

14   partners, so we talked on a daily basis, and most

15   things were discussed and agreed upon.

16        Q    Did you ever -- now, I'm not referring to --

17   for the purpose of my next question, I'm not

18   referring to expenses that were submitted for payment

19   to corporate and that were then deducted from yours

20   and Kelly's compensation.  I'm not referring to

21   expenses that went through that process.

22             Did you ever personally pay out of pocket

23   any expenses for the Southeast region; like, you

24   know, did you actually cut the check or credit card

25   or what have you --

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 223

1        A    Uh-huh.

2        Q    -- you cut the payment yourself?

3        A    Uh-huh.  Yes.

4            It was customary that primarily for air

5    fare, hotel, certain lunches or dinners, if those

6    costs exceeded NAF's policy and procedure manual

7    amount, they had set amount that you could spend for

8    a hotel room and for a flight and for dinner, lunch,

9    breakfast, if the amount exceeded what they would

10   reimburse us for, then we'd pay that overage.

11       Q    So, when you would say -- say you're

12   traveling and the hotel limit is 200 bucks a night

13   and you decide, you know what, I'm going to treat

14   myself and I'm staying at the Four Seasons tonight;

15   typically, a Four Seasons higher than a $200 a night,

16   would you just submit a reimbursement for $200 then

17   and eat the rest?

18       A    That's correct.

19            MS. GIBSON:  Objection.  Form.

20   BY MR. PERLOWSKI:

21       Q    Okay.

22       A    I'm not agreeing to the fact that we stayed

23   at the Four Seasons --

24       Q    No.  I'm just -- I'm just -- I just used it

25   as an example --

Page 224

1      A    Yes.  We paid the -- we only submitted the

2    amount allowed.

3      Q    Okay.

4           I was just using the Four Seasons as an

5    example --

6      A    Let me be clear.

7           MS. GIBSON:  That's where lawyers and I'll

8      go on Gregory's --

9    BY MR. PERLOWSKI:

10     Q    -- that would typically have a higher

11   expense.

12     A    Understood.

13     Q    Could have used others, but that's the --

14     A    Uh-huh.

15     Q    -- first one that popped into my head.

16     A    It's a nice hotel.

17     Q    Did you ever do any kind of return on

18   investment analysis of the Atlanta Best Homes TV

19   show?

20     A    No.

21     Q    So you don't know one way or the other about

22   whether the Atlanta Best Homes appearances on

23   television ever specifically brought business to NAF?

24     A    Because we were heavily involved in builder

25   business and the growth of our region with builders,

Page 225

1    national and regional builders, we attribute part of

2    that to the branding of that show.  Because all

3    builders pay attention to that show and watch that

4    show.  So, that would be my --

5         Q    So the show, the Atlanta Best Homes, had a

6    branding value, but you can't put a dollar value

7    associated with that, correct?

8         A    Well --

9         Q    A return on investment dollar value

10   associated with that?

11        A    We did have a source code for it.  And we

12   were able to track actually loans generated from

13   people that called into New American Funding, because

14   we had designated loan officers.  So, we did have

15   reporting to show that people called in for a loan

16   from watching the show.

17        Q    Okay.

18             What was that -- do you remember what that

19   source code was?

20        A    I don't, but it had -- it was obvious that

21   it was Atlanta's Best New Homes, it may have been

22   abbreviated.

23        Q    For any of the other marketing expenses that

24   the Southeast region incurred after a change in

25   policy announced in the leadership meeting, did you

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 226

1    ever do any kind of return on investment analysis to

2    determine whether a specific expense actually

3    resulted in specific business?

4         A    Other than the fact that we went from $0 to

5    about two billion a year in production, no.  No other

6    specific analysis.

7         Q    You said you went from zero to two billion

8    in production.  From zero would be in 2016 when you

9    started?

10        A    Correct.

11        Q    And two billion was when?

12        A    Definitely in 2020, we were close to that.

13   In 2019, maybe one and a -- 1.7 billion in 2019.

14        Q    So 1.7 billion in production in '19?

15        A    Yes.

16        Q    So through the end of '19 you were at

17   1.7 billion in production?

18        A    Close to that.  I cannot remember the exact

19   amount.

20        Q    Do you recall what you were in production

21   for the first quarter of '20?

22        A    I do not.  I know they did over two billion

23   in '20.

24        Q    In '20 as a whole?

25        A    Correct.

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 227

```
 1          Q    When did NAF expand into Tennessee?

 2          A    It was when we hired Janet Hillis.

 3          Q    Okay.

 4          A    And I'd -- would have to check with NAF on

 5     her hire date --

 6          Q    So whatever that hire date --

 7          A    Yes.

 8          Q    -- that would correspond to when --

 9          A    I want to say it was, like, late '18.  I'm

10     sorry.  No.  It would have been -- it would have been

11     early '18; but please check that date.

12          Q    Sure.  Will do.

13               Ms. Hillis was in Chattanooga --

14          A    Yes.

15          Q    -- is that right?

16               So Chattanooga was the first NAF branch in

17     Tennessee?

18          A    Yes.

19          Q    Did you expand to any other Tennessee

20     locations after Ms. Hillis joined, whenever that was?

21          A    Yes.  We expanded into Nashville.

22          Q    Anything else besides Nashville and

23     Chattanooga?

24          A    Franklin.

25          Q    Franklin's a suburb of Nashville?
```

Page 228

1      A   It is; but we opened a separate office

2   there.

3      Q   Was the opening in Nashville, did that

4   coincide with the hiring of Eric Fellows and Michele

5   Hoefle?

6      A   Yes.

7      Q   Were they in Franklin as well?

8      A   Yes.

9      Q   When did NAF expand into Virginia?

10     A   That was after Michele and Eric as well.

11  They recruited Daniel.

12     Q   So whenever Daniel was hired?

13     A   Yes.

14     Q   Were you involved in the recruitment of

15  Daniel?

16     A   I was involved in a couple of the meetings

17  with Daniel in Atlanta, but it was primarily Eric and

18  Michele.

19     Q   And you were involved in the meetings to

20  recruit Daniel in Atlanta as part of your job duties

21  as regional manager?

22     A   Yes.

23     Q   And you were paid a base salary as well,

24  right?

25     A   I was not.

Page 229

1    Q    You were not paid a base salary?

2    A    I was not.

3         We were paid a draw.

4    Q    Okay.

5         Explain how the draw worked.

6    A    It's a nominal amount of money.  It's based

7    on an hourly rate, I believe.  And it's in the

8    agreement, but then it is deducted from the override.

9    Q    Got it.

10    A    Draw against the override.

11    Q    So -- and I'm referring back to Exhibit Two.

12    In article 5.1 it says, salary, manager will be paid

13    a salary of $1,760 biweekly?

14    A    Uh-huh.

15    Q    Is that what you're referring to as a draw?

16    A    Yes.

17    Q    Okay.

18    A    It's deducted.

19    Q    Did NAF expand into any other locations in

20    Virginia aside from the branch that Daniel was

21    involved with?

22    A    No.

23    Q    No?

24    A    No.

25    Q    Okay.

Page 230

1        A    He may have opened another satellite, there

2    may have been two locations, but they were both under

3    Daniel.

4        Q    And you said Michele and Eric were

5    principally involved in bringing Daniel onto NAF?

6        A    Yes.

7        Q    Did you invest any personal funds in any --

8    any associated with bringing Daniel onto NAF?

9        A    Personal funds?

10       Q    Yes.

11       A    No.

12       Q    And did you receive override bonuses on

13   loans that were originated out of Virginia?

14       A    Yes.

15       Q    Okay.

16       A    But I believe Daniel's override outweighed

17   the -- the loans override, therefore, it was probably

18   a net zero or negative; but yes.

19       Q    Were you involved in bringing Eric Fellows

20   to NAF?

21       A    Yes.

22       Q    Was -- who else was involved in bringing

23   Eric Fellows to NAF, if anyone, besides yourself?

24       A    Kelly and I.

25       Q    Kelly -- Kelly and yourself?

Page 231

1      A    Yes.

2      Q    Was Janet Hillis involved in bringing Eric

3  Fellows onto NAF?

4      A    Janet referred Eric to talk to us.  She was

5  not involved in his recruitment.

6      Q    So the initial contact with Eric was through

7  Janet?

8      A    Yes.

9           Eric had been recruiting Janet at his former

10 company, when she was considering NAF.  So she,

11 basically, was considering NAF or Eric Fellows former

12 company and she chose NAF.  So when Eric then chose

13 to make a move, he called Janet and asked her how she

14 liked NAF.

15     Q    Who was involved in bringing Michele Hoefle

16 onto NAF?

17     A    Eric and Michele were together.  So --

18     Q    At the other company?

19     A    Yes.

20     Q    So they were a package deal, in effect?

21     A    Yes.

22     Q    Did you supervise Mr. Fellows?

23     A    (No response.)

24     Q    Sorry.

25          Did he report to you?

Page 232

1       A    Yes.  He reported to Kelly and I.

2       Q    Did Mr. Hof -- did Ms. Hoefle report to

3   Kelly and you or to Mr. Fellows?

4       A    To Kelly and I.  They were -- they were

5   partners.

6       Q    Did either yourself or Ms. Allison ask Eric

7   and/or Michele to absorb any costs associated with

8   the Real Estate Partners relationship after the

9   February leadership meeting?

10      A    We did not ask them to absorb the desk

11  rental and AA, the actual costs; but the compensation

12  to the loan officer on that account was a reduced

13  compensation, which was common for a real estate

14  alliance or a house account, a captured builder, that

15  you reduce the loan officer compensation.  And they

16  did not like that.

17      Q    How was the loan officer compensation

18  reduced?

19      A    It was 90 basis points.  It was considered a

20  house account because of the expense of the account.

21      Q    Did the compensation -- did the loan officer

22  compensation with respect to Real Estate Partners,

23  did that change after the February leadership

24  meeting?

25      A    No.

Gina Spearman                                      November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 233

1        Q    Okay.

2             So, with respect to the loan officer reduced

3    compensation, what, to your -- basically, your

4    understanding, what did Eric and Michele not like,

5    what was the -- what was the issue that they had,

6    your understanding?

7        A    Their marketing budget was reduced.

8        Q    Their marketing budget was reduced?

9        A    Yes.

10       Q    By whom?

11       A    When ours was done away with, Kelly and I

12   reduced their marketing budget.

13       Q    Did you just tell them that they had less

14   dollars to spend?

15       A    Yes.

16       Q    Did you tell them that if they spent dollars

17   over -- over whatever the reduced budget was, that

18   they were going to have to absorb those costs?

19       A    I don't remember having that specific

20   conversation.

21       Q    What was their marketing budget reduced,

22   like from what to what, if you recall?

23       A    I don't remember the numbers.

24       Q    Do you remember the amount of the reduction,

25   either in dollars or a percentage?

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 234

1       A    I do not, but that's easy to obtain.

2       Q    Okay.

3            Do you know when that deduction went into

4    effect for Eric and Michele?

5       A    I don't remember the exact date.

6       Q    Was it around the same time the change in

7    marketing expense policy went into effect for the

8    Southeast region?

9       A    I think it was later.  Because I believe we

10   were trying to give the 90 days to see if indeed NAF

11   would -- we didn't want anyone to have to be

12   subjected to the change.  So I believe we waited the

13   90 days.

14      Q    So --

15      A    And -- ya.

16      Q    Sorry.  Go ahead.  Please --

17      A    And when we saw that, even after asking,

18   that NAF was not going to change, I believe that was

19   when -- so it was probably several months after ours

20   went into effect.

21      Q    So is it fair to say, based on what you just

22   said, for the first 90 days or so, you did not change

23   anything with respect to Eric and Michele's marketing

24   budget and it was only after --

25      A    That's my recollection.

Page 235

1      Q    Okay.

2           Did you -- do you recall attending a meeting

3      in Chattanooga with Eric and Michele where they

4      expressed their displeasure about the change in their

5      marketing budget?

6      A    Yes.

7      Q    When did -- do you recall, roughly, when

8      that meeting took place?

9      A    I don't.  I would say late summer.

10     Q    Of '19?

11     A    Yes.

12     Q    Who attended that meeting?

13     A    Kelly and I were there in Chattanooga for a

14     Real Estate Partners special event.  So, we were

15     already there for something.  And Eric and Michele

16     were there from Nashville in Chattanooga for the same

17     event.  And we met with them to review some things

18     before the event.  So it was the four of us.

19     Q    And no one else present other than the four

20     of you?

21     A    That's correct.

22     Q    During that discussion, was there any -- did

23     the topic of them potentially reporting to corporate

24     come up?

25     A    Yes.

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 236

1        Q    Tell me about that.

2        A    They were dissatisfied with the reduction in

3    their marketing budget and continued -- had been for,

4    at least, a few weeks prior to the meeting.  And then

5    at the meeting, were expressing their frustration

6    over things being changed.  And we repeatedly -- they

7    were asking us questions we couldn't answer; why is

8    this happening?  How did, you know, NAF misallocate

9    money?  You know, questions that we had the same

10   questions and we couldn't get answers to.

11            So we just, after several times of telling

12   them, you're welcome to call corporate yourself and

13   ask them these questions -- at one point, Kelly said

14   to them, if you guys just want to report to

15   corporate, you can do that.

16       Q    Meaning report to corporate directly as

17   their own region?

18       A    Correct.

19            But she said, if you do that, Chattanooga is

20   our market.  We started it.  We grew it.  And we gave

21   it to you when you came on board.

22       Q    So when Ms. Allison was suggesting that Eric

23   and Michele could report directly to corporate and,

24   you know, outside of the Southeast region, what was

25   your understanding of what area she was offering them

Page 237

1    to split off with?

2        A    Whatever they brought.  Whatever they

3    brought and whatever they recruited and grew --

4        Q    Okay.

5        A    -- which was Nashville.

6        Q    So Nashville and Virginia?

7        A    At this point, Daniel was no longer with us.

8        Q    Okay.

9        A    So there was no Virginia.

10       Q    Okay.

11       A    At that moment.

12       Q    Did -- was there a Virginia --

13       A    Let me clarify that.

14            There may have still been one or two loan

15   officers in Virginia left, but Daniel was not there.

16       Q    Okay.

17            Was there any contemplation that Virginia

18   would go with them instead of staying within the

19   Southeast region, because Eric and/or Michele were

20   responsible principally for recruiting Daniel?

21       A    In my opinion, anything that was under their

22   management, in her comment, I felt like was free to

23   go with them other than Chattanooga.

24       Q    Was Virginia under their management?

25       A    Yes.

Page 238

1          Q    Okay.

2               So, in terms of the dividing things up, in

3     your mind, Chattanooga stayed, but the rest -- but

4     anything else left?

5          A    I don't know that I took it seriously, that

6     they were going to do that.

7          Q    Okay.

8          A    I think it was a -- they were frustrated.

9     Honestly, it was almost like they're frustrated with

10    the same thing we're frustrated about, right?  We're

11    all frustrated that our comp's being cut when we'd

12    done nothing but do what we said we would do.

13              So, I thought it was a frustration.  Kelly

14    gave them the out.  And I didn't necessarily think

15    that was going to come to fruition.

16         Q    Okay.

17              Did you -- did you -- do you recall saying

18    anything -- understanding that you didn't think that

19    this was going to come to fruition, do you recall

20    saying anything to them about whether you were okay

21    with them splitting off?

22         A    I do not believe I commented on it.

23         Q    Okay.

24              Do you recall having a conversation with

25    anyone at NAF about the possibility of them splitting

Page 239

1    off after the meeting in Chattanooga?

2         A    I do not.  I remember giving -- I believe

3    Jan Preslo, we updated her, during that time period,

4    about their frustration with the cutting of marketing

5    expenses, but I don't remember discussing the

6    break-off at any time.

7         Q    Okay.

8              Do you recall ever hearing from anyone at

9    NAF that Eric and Michele were dissatisfied about the

10   fact that their marketing budget was being reduced by

11   a decision made by either you or Ms. Allison?

12        A    No.

13        Q    Other than -- after the -- other than the

14   discussion in Chattanooga about the possibility that

15   they -- that Eric and Michele split off, do you

16   recall, I think, another conversation with them about

17   the possibility of them splitting off?

18        A    With Eric and Michele?

19        Q    Yes.

20        A    No.

21        Q    Do you recall having any follow-up

22   conversations with Kelly Allison about the

23   possibility of Eric and Michele splitting off?

24        A    I don't recall having any other

25   conversations about that until we received the phone

Page 240

1    call from Christy stating that they had made the

2    decision -- that NAF had made the decision to do

3    that.

4          Q    Okay.

5               Do you recall when that conversation with

6    Christy occurred?

7          A    September, October of '19.

8          Q    Okay.  What did -- what did -- sorry.

9               September or October of '19, so within a

10   month or two of the Chattanooga meeting?

11         A    I would say so.

12         Q    Okay.

13              Do you recall what Christy told you?

14         A    She said, we are removing Tennessee and

15   Virginia from the Southeast.  Eric and Michele want

16   to report directly to corporate.  And we have agreed.

17         Q    Do you recall saying anything in response to

18   that news?

19         A    We said, that's fine, but we -- we're

20   keeping Chattanooga.

21         Q    You said we said.  So Ms. Allison was on

22   this call as well?

23         A    Correct.

24         Q    So, I just want to just log -- just lockdown

25   the participants.

Page 241

1          So, Ms. Bunce was on the call, you were on

2     the call, Ms. Allison was on the call; anyone else?

3          A    Jan Preslo.

4          Q    Jan Preslo.

5               Do you recall anyone else being on the call?

6          A    I think Jon might have been on there, Jon

7     Reed.

8          Q    Okay.

9               And just -- was this a phone call or was it

10    a -- like -- look, I know, recently, NAF uses

11    Microsoft Teams.  And so, you know, we're fine

12    communicating with them oftentimes through a Teams

13    meeting; do you recall, was it a phone call, was it

14    a --

15         A    Phone call.

16         Q    -- video conference of any kind?

17         A    It was not a video conference.

18         Q    Okay.

19              That may be the product of COVID and life

20    going forward from COVID.

21         A    Yes.

22         Q    Who -- who said about we're keeping

23    Chattanooga?

24         A    I don't remember; but one of us.

25         Q    Either yourself or Ms. Allison, but you

Page 242

1    don't remember?

2         A    Yes.

3         Q    Who was the branch manager in Chattanooga?

4         A    Janet Hillis.

5         Q    Okay.

6              When you said, we wanted -- we want to keep

7    Chattanooga, what was said in response?

8         A    We've made the decision to also allow

9    Chattanooga to go with Tennessee, with Eric and

10   Michele.

11        Q    But did you -- what did either you or

12   Ms. Allison say in response to that, that you recall?

13        A    We strongly disagree with this decision, can

14   you please tell us why you made that decision, given

15   we recruited it, nurtured it, invested in it.

16        Q    What were you told in response to your

17   expressing -- and I say, your, I'm referring to you

18   and/or Ms. Allison -- when you expressed your

19   disagreement with -- and Chattanooga was going to be

20   going with Eric and Michele, what were you told, if

21   anything?

22        A    We were told that there were some HR-related

23   issues that they couldn't disclose.  And that they

24   spoke to Janet and asked her if she wanted to go with

25   them, with Eric and Michele.  And that Janet had

Page 243

1    said, yes, she wanted to go with Eric and Michele.

2    And so, we asked -- Kelly and I asked Jan (sic) and

3    Christy did most of the talking, Christy did, why

4    weren't -- we said, were Eric and Michele given the

5    opportunity to talk to Janet and ask her to go with

6    them?  And they said, yes, they were.  And we said,

7    why weren't we given an opportunity to talk to Janet?

8    And they said, because that's the way we decided to

9    do it.

10        Q    Okay.

11             You said that they mentioned you were told

12   there were HR-related issues.  Were you given any

13   specificity about what those HR-related issues were?

14        A    I can't remember if it was in that same

15   conversation or a later conversation, that they did

16   mention that Eric and Michele told them, told

17   corporate that we were leaving, that Kelly and I were

18   leaving NAF.  So I don't know if that was the

19   HR-related issue or not.

20        Q    When did you learn that Eric and Michele had

21   told corporate that you and Kelly were leaving NAF?

22        A    It was that week some time.  I can't

23   remember if it was that phone call or if there was a

24   subsequent call.

25        Q    So around reasonably proximate to when you

Gina Spearman                            November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 244

1    found out that Eric and Michele were splitting off?

2        A    Yes.

3        Q    So some time in the September or October

4    timeframe?

5        A    Yes.

6        Q    Were you given any specificity as to what

7    Eric and/or Michele had told corporate about the --

8    about the prospect of your and Kelly leaving NAF?

9        A    No.  No proof.  No documentation.  No --

10       Q    Did you ever speak to Janet Hillis after

11   learning that she wanted to stay with Eric and

12   Michele about whether she, in fact, didn't want to

13   stay with them or was possibly interested in

14   remaining within the Southeast region?

15       A    I did speak to Janet.

16       Q    What'd she say?

17       A    She said that she felt like she was in the

18   middle.  And that Eric and Michele had promised her

19   dedicated -- more dedicated operation support and

20   that they would be in her market every week, because

21   they lived in Nashville, and that they were going to

22   be able to support her better.

23       Q    Okay.

24            Do you know how long -- if you know -- do

25   you know how long Janet Hillis had known Eric

Page 245

1    Fellows?

2         A    Prior to coming to NAF?  I think they only

3    met one time during -- when he tried to recruit her,

4    because I don't think they knew each other very long.

5         Q    Do you know if Michele Hoefle knew Janet

6    Hillis?

7         A    Not to my knowledge.

8         Q    Okay.

9              Do you know -- do you recall when the split

10   actually occurred?

11        A    I don't remember the exact date.  September,

12   October.

13        Q    You mentioned earlier that -- you know, that

14   you said that you disagreed about Chattanooga because

15   you recruited, nurtured, and invested in Chattanooga;

16   how did you invest in Chattanooga?

17        A    We paid the Real Estate Partners AA and desk

18   rental since inception, which was probably

19   year-and-a-half, almost two years prior to that, at a

20   time in which it wasn't generating any business, so

21   it was a true expense.

22             And at the time the market was taken from

23   us, it had begun to produce enough business to

24   actually start to turn a profit or produce enough

25   volume to cover the expenses.

Gina Spearman                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 246

1       Q    So the investment that you're referring to

2    is the payment of the Real Estate Partners desk

3    rentals and ASA?

4       A    Part of it, yes.

5       Q    Anything else?

6       A    Other than time and energy, traveling to

7    Chattanooga for two years --

8       Q    Right.

9       A    -- I'm sure there were other expenses that

10   could probably be obtained from my expense reports

11   for dinners, lodging, those sorts of things.

12      Q    Any expenses that you can recall that were

13   not reimbursed by NAF, associated with your

14   investment in Chattanooga?

15      A    I don't have anything specific.

16           MS. GIBSON:  Henry, is now a good time to

17      take a break?

18           MR. PERLOWSKI:  Ya.

19           THE VIDEOGRAPHER:  The time is 5:18 p.m., we

20      are off video record.

21           (Whereupon, a short break was taken.)

22           THE VIDEOGRAPHER:  The time is 5:26 p.m., we

23      are back on video record.

24           MR. PERLOWSKI:  Thank you.

25   BY MR. PERLOWSKI:

Page 247

1        Q   Ms. Spearman, from the testimony throughout

2   the day, at various points in time, additional

3   territory -- additional states were added to the

4   Southeast region from the original locations of

5   Georgia and South Carolina, correct?

6        A   Yes.

7        Q   Do you recall at any point in time when

8   states were added to the Southeast region, was

9   your -- do you recall your agreement ever being

10  amended to reflect the addition of those new states?

11       A   I believe all the states were in the

12  original agreement.

13       Q   Okay.

14           By the original agreement, what are you

15  referring to?

16       A   2016.

17       Q   Okay.

18           So we have Exhibits One and Two in front of

19  us.  We've marked Exhibits One and Two, which are the

20  offer letter and the Regional Manager Agreement.

21  Let's maybe do this sequentially.

22           Do you recall an offer letter to being any

23  reference to the specific states within your --

24  within the Southeast region?

25       A   Okay.  I understand what you're asking.  I

Page 248

1    do not recall my agreement ever being amended to add

2    a state.

3         Q    Okay.

4              Do you recall either -- do you recall your

5    offer letter stating which states would be in your

6    territory?

7         A    Could be getting it confused with Kelly's,

8    but I think mine -- let me read it.  It may just

9    specify Southeast.  Okay.  Mine says Southeast.

10        Q    Where?

11        A    On page one of six, schedule one.

12        Q    So you're referring to Exhibit Two?

13        A    Yes.

14        Q    Schedule one.

15             Which page are you referring to within the

16   document?

17        A    22 of 29 on the document filing.

18        Q    Thank you.  Okay.

19             It says, Southeast; do you see that?

20        A    Yes.

21        Q    And you agree the territories would be

22   subject to change at any time by the discretion of

23   executive management?

24             MS. GIBSON:  Objection to foundation.

25             THE WITNESS:  Yes.

Page 249

1    BY MR. PERLOWSKI:

2        Q    So when you -- when you entered into the

3    regional manager management agreement, you understood

4    that N-A-F could expand or subtract from your

5    territory, right?

6        A    Right.

7             I didn't know that they would take away from

8    my territory for unjust reasons --

9        Q    All right.

10       A    -- to make things more profitable for

11   themselves.

12       Q    But instead, you understood that a

13   discretion of executive management could be exercised

14   to change your territory?

15            MS. GIBSON:  Objection.  Asked and answered.

16       Form.

17            THE WITNESS:  Yes.

18   BY MR. PERLOWSKI:

19       Q    Aside from what may be in Ms. Allison's

20   agreement, did you ever receive any agreement from

21   N-A-F to pay a specific amount of marketing expenses

22   within the Southeast region?

23       A    Other than the monthly recap for the

24   two years prior, where they paid it.

25       Q    So for two years prior, N-A-F paid

Page 250

1   7.5 percent -- 7.5 basis points?

2        A    Two-and-a-half years, yes.

3        Q    Did N-A-F pay -- let me ask the question

4   differently -- did N-A-F, to your knowledge, not

5   reimburse the Southeast region for any marketing

6   expenses that it incurred prior to the February '19

7   leadership meeting?

8             MS. GIBSON:  Objection.  Form.

9             THE WITNESS:  I have to ask --

10  BY MR. PERLOWSKI:

11       Q    Did it refuse a marketing -- did it -- did

12  N-A-F refuse to reimburse a marketing expense within

13  the Southeast region other than those specific

14  expenses that you referred to where you might have

15  exceeded a hotel budget or a dining budget?

16       A    I don't believe they did, because we stayed

17  within the budget.

18       Q    So, to your knowledge, any expense that was

19  submitted was approved and paid by N-A-F -- NAF?

20       A    Any compliance-approved item, yes.

21       Q    Okay.

22            Did you ever have a marketing expense

23  rejected due to it not being in compliance with NAF

24  policies, to your recollection?

25       A    No.

Page 251

1      Q   When you entered your offer letter as

2  Exhibit One, Ms. Spearman, looking at paragraph one

3  of your offer letter, Ms. Spearman, you understood

4  when you signed the offer letter, that NAF could

5  change the terms and conditions of your employment,

6  including your position, duties, compensation -- and

7  compensation?

8          MS. GIBSON:   Objection.   Form and

9          foundation.

10          THE WITNESS:   My understanding was that any

11          change to compensation would need to be in

12          writing and signed by all parties.

13  BY MR. PERLOWSKI:

14      Q   Where's -- what's the basis for that

15  understanding, Ms. Spearman?

16      A   Other than the basic definition of an

17  agreement, it is in -- there's the clause on number

18  one, on Page 1, that states, your status cannot be

19  changed except through a written agreement signed by

20  the CEO or COO.

21      Q   It says your status as an at-will employee

22  cannot be changed except for a written agreement

23  signed by the CEO or COO, right?

24      A   Yes.

25      Q   Do you know what an at-will employee is?

Gina Spearman                            November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 252

1        A    Yes.

2             MS. GIBSON:   Objection.   Form.

3    BY MR. PERLOWSKI:

4        Q    Tell me what your understanding of what an

5    at-will employment -- employee is.

6        A    That you can be terminated at any time or

7    you can resign at any time.

8        Q    And your status as an at-will employee of

9    NAF was never changed, correct?

10       A    That is correct.

11       Q    Anything else that supports your belief that

12   NAF could only change your compensation by virtue of

13   a written agreement?

14       A    Yes.

15       Q    What?

16       A    Page 5 of that document.

17       Q    Okay.

18            Tell me where you are.

19       A    I guess it would be the last sentence on

20   that page.

21       Q    Go ahead.

22       A    The material terms of your employment as set

23   out in this letter may not be modified or amended by

24   verbal agreement or course of contact -- course of

25   conduct, but only by a written agreement.

Page 253

1          Q     Presented by human resources, COO, or CEO?

2          A     Correct.

3          Q     Okay.

4                You would agree that this letter,

5     Exhibit One, says nothing about your marketing

6     budget?

7          A     Correct.

8          Q     And you would agree that this exhibit,

9     Exhibit One, says nothing about how pricing

10    exceptions would be handled?

11         A     Correct.

12         Q     You would agree that this exhibit,

13    Exhibit One, says nothing about how pricing

14    exceptions may have to be absorbed by the region?

15         A     Correct.

16               My position that the agreement must be in

17    writing and signed by all parties was further

18    supported by the fact that when a loan officer's

19    compensation was changed, it was required that they

20    be sent a new agreement and sign it, as well as when

21    they formally finally changed our compensation in

22    March of 2020, both parties were required to sign it,

23    as was the 2016 agreement.

24         Q     When you say, as was the 2016 agreement,

25    what do you mean?

Gina Spearman                              November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 254

1        A    It was signed.

2        Q    Oh, you mean -- you're meaning Exhibit Two

3   was signed?

4        A    Yes.

5        Q    Do you recall -- okay.

6        A    Exhibit One and Two were signed.

7        Q    You would agree that the sentence that

8   you're referring to on Page 5 doesn't say anything

9   about the written agreement having to be signed, it

10   just says it has to be presented by human resources,

11   COO, or CEO?

12       A    Ya.  I'm --

13            MS. GIBSON:  Objection.  Form.  Foundation.

14       To the extent it calls for a legal conclusion.

15              Go ahead.

16            THE WITNESS:  Yes.  I'm not an attorney, but

17       I just -- in my experience, agreements, by their

18       true definition, have to be acknowledged by both

19       parties.  And the way you acknowledge that is by

20       signature.

21   BY MR. PERLOWSKI:

22       Q    Such as your signature to the various

23   schedules that we looked at earlier today?

24            MS. GIBSON:  Objection.  Form.

25            THE WITNESS:  Is that a question?

Page 255

1    BY MR. PERLOWSKI:

2        Q    Ya.

3             Put a question mark at the end of it.

4             MS. GIBSON:  It's hard to tell.

5             THE WITNESS:  Ya.

6                  If you can ask it again, please?

7    BY MR. PERLOWSKI:

8        Q    Such as your agreement by -- evidencing by

9    your signature to all the schedules that we looked at

10   today, schedule four, six, and seven, eight, that you

11   signed, that would reflect your agreement?

12       A    Yes.  That further supports my understanding

13   of an agreement that it must be signed.

14       Q    You would agree that the word presented,

15   means something different than the word signed?

16            MS. GIBSON:  Objection.  Form.

17            MR. PERLOWSKI:  Plain English.

18            MS. GIBSON:  Objection.  Form.  And to the

19       extent it calls for a legal conclusion.

20   BY MR. PERLOWSKI:

21       Q    You would agree that the word presented

22   means something different than the word signed, in

23   plain English?

24            MS. GIBSON:  Objection.  Same objection.

25            MR. PERLOWSKI:  I'd like her to answer the

Page 256

1          question.  You can object all you want.

2               MS. GIBSON:  I know.  Let me finish my

3          objection on the record, Henry.

4               MR. PERLOWSKI:  You've already objected to

5          the same question on the record.

6               MS. GIBSON:  Well, and you keep repeating

7          the questions, so I need to --

8               MR. PERLOWSKI:  Because I'm not getting an

9          answer.

10              MS. GIBSON:  Well, give her a minute.

11                   Same objection.  Form.  To the extent it

12         calls for a legal conclusion.

13                   And you can answer his question, if you

14         can.

15              THE WITNESS:  Okay.

16                   Yes.  I don't have a legal background.

17         So --

18    BY MR. PERLOWSKI:

19         Q   But, yes, in terms of plain English,

20    presented means something different than signed,

21    correct?

22              MS. GIBSON:  Same objections.

23                   If you agree or if you don't.

24              THE WITNESS:  The words -- the words have

25         different definitions, yes.

Page 257

1    BY MR. PERLOWSKI:

2         Q    Okay.

3              So with respect to override bonuses, looking

4    at your offer letter, Exhibit One, and I'm

5    specifically looking at the bottom of Page 2 of

6    Exhibit One; but obviously, feel free to refer to any

7    other provisions as well.  It says, Gina is eligible

8    to receive a regional manager override; do you see

9    that?

10        A    Yes.

11        Q    Okay.

12             And then I think we've talked about earlier

13   that compensation differential, up to 140 basis

14   points, that was the -- compensation differential is

15   if you were paying loan officers less than a certain

16   amount?

17             MS. GIBSON:  Objection.  Form.

18             MR. PERLOWSKI:  Ya.  I may have botched that

19        question.  All right.  Let's --

20   BY MR. PERLOWSKI:

21        Q    Your testimony will speak for itself on

22   that.  Okay.

23             So it says up to 140 basis points were

24   you -- maximum.  Was it your understanding that you

25   could receive a compensation differential anything

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 258

1    from zero to 140 basis points on self-generated loans

2    and house accounts?

3         A    Yes.

4         Q    And you could receive anything from zero to

5    75 basis points on brokered loans?

6         A    Yes.

7         Q    Turning to your Exhibit Two, your Regional

8    Manager Agreement.  Let's go to section 5.2,

9    Ms. Spearman.  Just let me know when you're there.

10        A    5.2, I'm there.

11        Q    Okay.

12             So section 5.2 says, manager -- that's you,

13   right?

14        A    Yes.

15        Q    -- will be eligible for commissions and/or a

16   monthly bonus payment based on branch overrides --

17   and that's then defined as override bonus -- as set

18   forth on schedule one; do you see that?

19        A    Yes.

20        Q    Okay.  If you continue forward.

21             The next sentence says, schedule one to the

22   Regional Manager Agreement and/or the outside loan

23   originator agreement, Exhibit A, commission schedule,

24   may be adjusted up or down or otherwise amended by

25   company from time to time in its sole discretion; do

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 259

1   you see that?

2        A    Yes.

3        Q    So you understood that schedule one could be

4   amended by NAF from time to time in NAF's sole

5   discretion?

6             MS. GIBSON:  Objection, to the extent it

7        calls for a legal conclusion.

8             THE WITNESS:  I thought any change to my

9        compensation would need to be in writing and

10       signed.

11  BY MR. PERLOWSKI:

12       Q    So when you read -- you said you read the

13  Regional Manager Agreement before you signed it.  Did

14  you have any concern that the language said that NAF

15  could amend schedule one from time to time in its

16  sole discretion?

17       A    I did not, because I thought that it had to

18  be amended in writing.

19       Q    And you would agree that sole discretion

20  means just NAF's discretion, not yours?

21       A    Sole means one, yes.

22       Q    Okay.

23            If you look at -- go to schedule one,

24  Ms. Spearman, I'm on Page 23 of 29 if you look at the

25  top of the document.  Section 1.3 of schedule one

Page 260

1    which is page --

2         A    Are you on Exhibit One?

3         Q    I'm sorry.  No.  My apologies.  I'm on

4    Exhibit Two.  Done with Exhibit One for now.  I'm on

5    Exhibit Two, which is your Regional Manager

6    Agreement, and I'm within schedule one.  Schedule one

7    begins on Page 22 of 29.

8         A    Page 22?

9         Q    It starts on Page 22.

10            My first question is going to be on Page 23.

11   Just let me know when you're ready.

12        A    I'm ready.

13        Q    Okay.

14            So within section 1.3 there -- there's an

15   override bonus formula, do you see that, and that's

16   the language in italics in the -- within the

17   brackets?

18        A    Yes.

19        Q    Okay.

20            Did you understand that your override bonus

21   formula was subject to the limitations of 1.4B?

22            MS. GIBSON:  Objection.  Form.

23            THE WITNESS:  I believed that 1.4B was not

24        applicable.

25   BY MR. PERLOWSKI:

Page 261

1      Q   Okay.

2          You believe that all of 1.4B was not

3    applicable?

4      A   Yes.

5      Q   Okay.

6          So let's look and see the -- let's go to the

7    Page 25 of 29.

8          Do you see there's a box for yes and a box

9    for no?

10     A   Yes.

11     Q   So yes says see attached schedule four, no

12   override during guarantee period; what does that

13   mean, no override during guarantee period?

14     A   No override while an LO is on a guarantee.

15     Q   Okay.

16         And that -- and so, the -- no override with

17   respect to an LO during the guarantee period, is

18   that -- is that what's referred to in the last bullet

19   point on Page 24 of 29, within section 1.4B, loan

20   applications taken during monetary guaranty (sic)

21   period?

22     A   You're referencing back to Page 24 where?

23     Q   Ya.

24         So, the no override during guarantee period

25   is where there's -- you don't get paid an override

Page 262

1    for a loan officer's production during the guarantee

2    period, that's the topic, right?

3              MS. GIBSON:  Where are you referring to?

4              MR. PERLOWSKI:  I'm just asking a question.

5    BY MR. PERLOWSKI:

6         Q    So, no -- the no override during guarantee

7    period refers to loan officers -- loans made by loan

8    officers during their guarantee period, right?

9         A    No override during guarantee period means

10   exactly what it says.  There's no override during a

11   guarantee period.

12        Q    So, schedule four was Exhibit 12, right?  So

13   if you pull out Exhibit 12, schedule four talks about

14   no override during loan officer guarantee period,

15   right?

16        A    Right.

17        Q    So that's where the schedule listed for

18   these specific loan officers, there would be no

19   override bonuses for loans made during these loan

20   officers' guarantee periods, right?

21        A    Except for it says it's not applicable.

22        Q    Okay.  Right.

23             So, it says, yes, see attached schedule

24   four.  That's referring to the loan officer override

25   during the guarantee period, right?

Gina Spearman                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                        Page 263

1            MS. GIBSON:  Objection.  Form.

2            THE WITNESS:  Well, the box, yes, see

3       attached schedule is not checked.

4    BY MR. PERLOWSKI:

5        Q    Right.

6        A    So --

7        Q    So if it was yes, you would refer to

8    schedule four, right?

9        A    If it was checked, yes.

10       Q    Okay.

11            So the yes is specific to schedule four,

12   correct?

13       A    Yes.  The yes is specific.

14       Q    Okay.

15            Go to section four on schedule one, which is

16   on Page 26 of 29.  Let me know when you're there.

17   Section four is titled modification of compensation

18   in bold.

19       A    Yes.

20       Q    You understood, when signing the Regional

21   Manager Agreement, that your compensation, including

22   but not limited to commissions and override bonus may

23   be restructured and/or adjusted up or down by company

24   in its sole discretion?

25       A    I believe --

Page 264

1          MS. GIBSON:  Objection.  Form.  Document

2      speaks for itself.

3              You can answer.

4          THE WITNESS:  I believed that any changes

5      had to be in writing.

6   BY MR. PERLOWSKI:

7      Q   Did you believe that on November 6th of

8   2016?

9      A   Yes.

10         MR. PERLOWSKI:  We can go off the record for

11     a moment?

12         THE VIDEOGRAPHER:  The time is 5:51 p.m., we

13     are off video record.

14         (Whereupon, a short break was taken.)

15         THE VIDEOGRAPHER:  The time is 5:56 p.m., we

16     are back on video record.

17   BY MR. PERLOWSKI:

18     Q   Ms. Spearman, thank you very much for your

19   cooperation today.  I do not have any further

20   questions.

21     A   Thank you.

22         MS. GIBSON:  I have a few questions.

23                 DIRECT EXAMINATION

24   BY MS. GIBSON:

25     Q   Ms. Spearman, if you can pull out

Gina Spearman                           November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 265

1    Exhibit 12, Counsel showed you what he represented is

2    a composite of -- composite exhibit of schedule

3    fours.  And I represented to you that I counted these

4    and there are six schedules in this composite

5    exhibit.

6            And the first one is dated July 12th, 2018.

7    To your knowledge, did you ever receive any schedule

8    fours before this date?

9        A    No.

10       Q    All right.

11           I'm going to ask you to look at Exhibit 13,

12   which is another composite exhibit that Counsel

13   showed you.

14       A    Uh-huh.

15       Q    And I'm going to represent to you that there

16   are ten here.  And the first one is dated May 30th,

17   with your e-signature; do you see that?

18       A    Yes.

19       Q    To your knowledge, did you ever receive a

20   schedule six before May 30th of 2018?

21       A    No.

22       Q    And I want you to look at Exhibit 14, which

23   is what Counsel represented as a composite exhibit of

24   schedule sevens.  I've counted these and represent

25   there are four here.  And the first one is dated,

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 266

1    DocuSignature, May 15th; do you see that?

2        A    Almost there.

3        Q    Sorry.

4        A    Yes.

5        Q    And you testified that all of these

6    schedules in these three exhibits are DocuSigned; is

7    that correct?

8        A    Yes.

9        Q    And is it NAF's practice to have you

10   DocuSign agreements?

11       A    Yes.

12       Q    Prior to these exhibits dated May and July

13   of 2018, did NAF ever present you with an amendment

14   to -- an amended schedule one to your Regional

15   Manager Agreement?

16            MR. PERLOWSKI:   Object to the form.

17            THE WITNESS:   No.

18   BY MS. GIBSON:

19       Q    Did you ever DocuSign an amended schedule

20   one to the Regional Manager Agreement after November

21   2016, but before March 1, 2020?

22       A    No.

23       Q    After -- in this time period of May,

24   July 2018, did Ms. Bunce every reassure you that your

25   original agreement with NAF had never changed?

Page 267

1        A    Yes, she did.

2        Q    And what did she tell you?

3        A    She, I believe, sent at least one, if not

4    multiple emails, about their satisfaction with our

5    performance and that they had no intentions of ever

6    changing our deal or our compensation.

7        Q    Okay.

8             I would like you to look at Exhibits 21 and

9    22 that Counsel showed you; 21 is dated 8/7/2017 and

10   22 is the 12/7/2017 email.

11       A    I got 22.  I don't have 21.  Oh, here it is.

12   Okay.

13       Q    And you testified about these earlier.

14       A    Okay.

15       Q    What was the purpose -- your purpose in

16   saying, I approve, in these emails?

17       A    So that payroll could move forward primarily

18   so that our downline managers would be paid timely.

19       Q    Did you saying, I approve, have anything to

20   do with your approval of NAF refusing to pay you

21   loans identified in your Regional Manager Agreement?

22            MR. PERLOWSKI:  Object to the form.

23            THE WITNESS:  It did not.

24   BY MS. GIBSON:

25       Q    At the February 2019 leadership meeting, did

Page 268

1    NAF specifically give the reason, misallocation of

2    $30 million, as the reason for changing the policy

3    regarding PEs and marketing costs?

4         A    Yes.

5         Q    All right.

6              And if you can go back to your Exhibit One

7    and Two.  And the last thing Counsel was asking you

8    about, before we broke, was Exhibit Two, Page 26.

9    And he read the first sentence of paragraph four at

10   the bottom there.

11        A    (Nods head.)

12        Q    And can you read the second sentence?

13        A    Regional manager shall be provided notice of

14   any adjustments as required by law.

15        Q    And what did you understand that to mean if

16   NAF wanted to make a change to your compensation?

17        A    I believed that any change to my

18   compensation would need to be in writing, signed by

19   all parties.

20        Q    And -- okay.  Was that -- okay.

21             MS. GIBSON:  I have no further questions.

22                      RECROSS-EXAMINATION

23   BY MR. PERLOWSKI:

24        Q    Ms. Spearman, it says regional manager shall

25   be provided notice of any adjustments as required by

Page 269

1    law.

2            Is providing notice the same thing as a

3    signed agreement?  Plain English.

4            MS. GIBSON:  Object to the form.

5            THE WITNESS:  Required by law.

6    BY MR. PERLOWSKI:

7        Q    Right.

8            Do you have any legal training --

9        A    My understanding of the agreement was that

10   any change to my agreement needed to be in writing

11   and signed.

12       Q    Okay.

13           It says, regional manager shall be provided

14   notice --

15           MS. GIBSON:  Of any adjustments as required

16       by law.

17           MR. PERLOWSKI:  This is not your deposition.

18       I wasn't finished with my question.  Please stop

19       interrupting me.

20   BY MR. PERLOWSKI:

21       Q    Regional manager shall be provided notice of

22   any adjustments as required by law.

23           Notice, doesn't say written notice, correct?

24           MS. GIBSON:  Objection.  Form.  Misstates

25       the document.

Page 270

1    BY MR. PERLOWSKI:

2         Q    Correct?

3         A    I am not an attorney.  I believed that

4    changes to my compensation and the word, agreement,

5    in and of itself, needed to be agreed to by both

6    parties.

7         Q    Notwithstanding it says in multiple places

8    that your compensation could be changed by NAF in its

9    sole discretion; adjusted up or down --

10        A    It also --

11        Q    -- in its sole discretion --

12             MS. GIBSON:  Objection.  Form.

13   BY MR. PERLOWSKI:

14        Q    -- right?

15        A    It also states in several places that any

16   changes need to be made in writing.

17        Q    You said, it says any changes need to be

18   made in writing; what are you referring to?

19        A    We referenced, I believe, a paragraph in the

20   offer letter as well as --

21        Q    Right.

22             The paragraph in the offer letter says that

23   the material terms of your employment as set out in

24   this letter may not be modified or amended by verbal

25   agreement or course of conduct, but only by a written

Page 271

1   agreement presented by human resources, COO, or CEO;

2   that's what you're referring to?

3        A    Yes.  I signed these documents on the same

4   date, so they're both my agreement.

5        Q    You said that Ms. -- when Ms. Gibson asked

6   you a question about your discussions with Ms. Bunce,

7   you said Ms. Bunce said that NAF had no intent to

8   change your deal or your compensation?

9        A    Correct.

10       Q    Did she say anything else with respect to

11  any change in your deal or compensation?

12            I know she said that they were satisfied

13  with your performance.  I'm referring to,

14  specifically, any discussion about an intent to

15  change your deal or compensation.

16       A    So your question is?

17       Q    Did she say anything else other than NAF had

18  no intent to change your deal or compensation?

19       A    Not that I recall.

20       Q    And when were these assurances provided?

21       A    We have email -- I believe discovery that we

22  provided.  I can --

23       Q    Okay.  No.  The discovery -- right.  I can

24  look for those emails just as easily as Ms. Gibson

25  can.

Case 1:20-cv-04981-CAP  Document 88  Filed 04/27/22  Page 273 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 272

1        A    Okay.

2        Q    Do you recall -- do you recall when

3   Ms. Bunce may have had any conversation with you that

4   may not be reflected in an email?

5        A    You're asking me about verbal?

6        Q    Ya.  Yep.

7        A    Oh, gosh.  Many occasions.  At the

8   November 2018 meeting would be one example.

9        Q    And what did she say at the November '18

10  meeting?

11       A    That we were exceeding all scorecard.

12       Q    Did she say anything about any potential

13  change to your compensation at the November '18

14  meeting?

15       A    I don't remember, specifically, on that.

16       Q    Okay.

17            Do you recall any other -- any verbal

18  assurances that Ms. Bunce may have given you

19  regarding that there would be no changes to your

20  compensation, aside from anything that may be in an

21  email?

22       A    I can't give you specific dates, but there

23  were -- there were multiple occasions in which she

24  assured of her satisfaction and that there was no

25  intention to change anything.

Gina Spearman                                     November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

Page 273

1          Q    Okay.

2               Do you recall Ms. Preslo ever saying

3      anything about NAF having an intent or not to change

4      your compensation?

5          A    No.

6          Q    What about Mr. Reed?

7          A    No.

8               MR. PERLOWSKI:  Nothing further.

9               MS. GIBSON:  I have nothing further.

10               This ends the deposition.  Thank you.

11               THE VIDEOGRAPHER:  The time is 6:07 p.m.,

12          this concludes today's videotaped deposition for

13          Gina Spearman.  We are off video record.

14               (Whereupon, the deposition was concluded

15          6:07 p.m.)

16

17

18

19

20

21

22

23

24

25

Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

                                                    Page 274

1              D I S C L O S U R E
2    STATE OF GEORGIA
3    COUNTY OF COBB
4    DEPOSITION OF GINA SPEARMAN
5            Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
6    Judicial Council of Georgia, I make the following
     disclosure:
7
             I am a Georgia Certified Court Reporter.  I
8    am here as a representative of American Court
     Reporting Co., Inc.
9
             I am not disqualified for a relationship of
10   interest under provisions of O.C.G.A. 9-11-28(c).
11           American Court Reporting Co., Inc., was
     contacted by the offices of Veritext to provide court
12   reporting services for this deposition.
13           American Court Reporting Co., Inc., will not
     be taking this deposition under any contract that is
14   prohibited by O.C.G.A. 15-14-37 (a) and (b).
15           American Court Reporting Co., Inc., has no
     exclusive contract to provide reporting services with
16   any party to the case, any counsel in the case, or
     any reporter or reporting agency from whom a referral
17   might have been made to cover this deposition.
18           American Court Reporting Co., Inc., will
     charge its usual and customary rates to all parties
19   in the case, and a financial discount will not be
     given to any party to this litigation.
20
21           This, the 23rd day of November, 2021.
22
23
             _____
24
             KAREN D. FUHS, RPR, CCR-2832
25

Page 275

1                   C E R T I F I C A T E

2    G E O R G I A :

3    COUNTY OF COBB:

4                   I hereby certify that the foregoing

5    transcript was taken down as stated in the caption

6    and the proceedings were reduced to typewriting under

7    my direction and control.

8                   I further certify that the transcript

9    is a true and correct record of the evidence given at

10   the said proceedings.

11                  I further certify that I am neither a

12   relative or employee or attorney or counsel to any of

13   the parties nor financially or otherwise interested

14   in this matter.

15                  This, the 23rd day of November, 2021.

16

17

18

                        _____

19

20                      Karen D. Fuhs, RPR, CCR-2832

21

22

23

24

25

Page 276

1                    E R R A T A   S H E E T

2    IN RE:   GINA SPEARMAN V BROKER SOLUTIONS, INC.

3             d/b/a NEW AMERICAN FUNDING

4    CASE NO.:  1:20-cv--40981-CAP

5    DEPOSITION TAKEN ON:  November 8, 2021

6    DEPOSITION OF:  GINA SPEARMAN

7              I have read the transcript of my

8    deposition and find that no changes are necessary

9    _____.

10             Having read the transcript of my

11   deposition, I wish to make the following changes:

12   (Please state reason.)

13             Page _____, Line _____:

14             Page _____, Line _____:

15             Page _____, Line _____:

16

17

18

           _____, GINA SPEARMAN,

19

20             Sworn to and subscribed before me, this the

21   _____ day of _____, 2021;

22   _____, County, Georgia.

23             _____, Notary Public

24

25

**0**

**0**  226:4
**04981**  1:4

**1**

**1**  3:12,16,17
  216:16,19 251:18
  266:21
**1,760**  229:13
**1.3**  259:25 260:14
**1.4b**  149:25 153:1
  260:21,23 261:2
  261:19
**1.7**  226:13,14,17
**1/18/18**  3:16
**10**  3:17 34:17
  142:11,15
**10,000**  108:8
**100**  32:13 50:12
  51:19,25 52:2
  78:8 118:9 119:5
  119:7,14,16,21
  120:1,6,14 122:11
  124:4,20 193:6
**10:01**  1:16 4:3
**11**  3:17 142:12
  145:22 147:14,15
**11/5/19**  3:15
**114**  3:14,14
**11:07**  50:25
**11:15**  51:3
**11:41**  121:24
  124:15
**11:56**  76:4
**12**  3:18 34:10
  148:8,12 155:23
  156:14 187:8,19
  262:12,13 265:1
**12/7/17**  3:23
**12/7/2017**  267:10

**121**  3:14,14
**12:41**  76:8
**12th**  114:12
  122:16 152:16
  265:6
**13**  3:18 81:9,13
  155:18,22,23
  158:8 265:11
**13048**  274:23
  275:18
**132**  3:15,15
**137**  3:15,15
**138**  3:16,16,16
**139**  3:16
**13th**  86:16 87:1
  89:25 93:5
**14**  1:17 2:5 3:19
  81:9,13 160:23
  161:1 162:20
  265:22
**140**  62:5,16,16
  63:6,8,20 64:11,12
  122:10 152:11
  257:13,23 258:1
**140,000**  152:8
**142**  3:17,17,17
**145**  3:17
**148**  3:18,18
**15**  3:19 36:7
  146:15 163:8
  164:10 166:9,13
**15-14-37**  274:14
**150**  152:9,12
**150,000**  152:7
**155**  3:18,18
**15th**  162:2 171:10
  266:1
**16**  3:20 34:12 36:4
  36:12 37:18 38:1
  167:10,14,19
  169:8 170:19

**179:5,11 190:14**
**160**  3:19
**161**  3:19
**166**  3:19,19
**167**  3:20,20
**17**  3:20 92:5
  137:18 171:5,9
  178:8 190:15
**171**  2:11 3:20,20
**175**  3:21,21
**177**  3:21,21
**178**  3:22,22
**17th**  2:11
**18**  3:21 36:6 92:3
  92:7,12,18 93:1
  122:24 144:19
  173:12 175:2,5,10
  175:19,20 176:1,7
  198:24 199:8,23
  200:13,18 202:8
  202:15 227:9,11
  272:9,13
**186**  3:22,22,23
**187.5**  122:7 123:13
**189**  3:23
**18th**  139:25
**19**  3:21 15:14,19
  81:5 89:21 92:8
  92:18,25 93:25
  100:17 102:5
  103:22 106:13
  107:9 108:2,17
  120:18 131:16
  173:20 177:14,17
  178:12 202:13,20
  202:21 203:6
  204:6,6 226:14,16
  235:10 240:7,9
  250:6
**196**  3:23

**197**  3:23
**19th**  122:5
**1:20**  1:4 276:4
**1st**  54:8,11 79:5
  137:17 138:11
  141:8 142:2,17

**2**

**2**  3:13 57:6 61:5
  61:22,22 147:9,20
  257:5
**20**  3:22 13:4 81:7
  85:4,24 93:7
  102:5 113:23
  178:18,22 179:4
  226:21,23,24
**200**  109:3 223:12
  223:15,16
**2000**  28:4 118:7
**2015**  33:13,16 34:6
  34:9
**2016**  16:19 17:2
  33:24 34:19 53:24
  54:3,8 80:23 88:4
  88:21 138:1
  149:25 226:8
  247:16 253:23,24
  264:8 266:21
**2017**  137:17 188:6
  188:13
**2018**  71:14,24
  138:12 139:25
  140:11 141:8,12
  142:2,17 145:23
  152:15,17 158:9
  162:2 171:10
  172:4 197:24
  198:1,7 210:19,20
  210:23 265:6,20
  266:13,24 272:8
**2019**  15:14 19:21
  80:20 81:15,15

88:5 92:1 100:5
107:17 116:16
118:8 121:13,17
121:24 124:15
133:9 166:14
186:1 226:13,13
267:25
**2020**  70:11 79:3
86:16 87:1 88:7
88:13,16,19,22
90:1 91:11 93:5
93:14 95:24 96:5
96:10 99:13 138:1
167:25 226:12
253:22 266:21
**2021**  1:17 30:9
274:21 275:15
276:5,21
**21**  3:22 186:19,23
187:3,8,10,12,14
187:18 188:2,4
194:12,15 201:9
267:8,9,11
**2100**  2:12
**22**  3:23 24:9
186:20,23 187:10
187:14,20 189:12
193:15 194:18
201:9 248:17
260:7,8,9 267:9,10
267:11
**23**  3:23 196:23
197:2,21 259:24
260:10
**230**  1:17 2:6
**23rd**  274:21
275:15
**24**  24:9 261:19,22
**25**  261:7
**26**  23:23 263:16
268:8

**264**  3:7
**268**  3:8
**2832**  274:24
275:20
**29**  55:4,7 248:17
259:24 260:7
261:7,19 263:16
**29th**  121:13,16,24
122:16 124:15
**2:04**  132:13
**2:17**  132:16
**2:44**  133:9 148:4
**2:49**  148:6

**3**

**3**  3:13 102:10
**3/29/19**  3:14
**30**  19:25 61:4
80:21 100:6
107:20 112:12
202:7 205:1,17,24
206:24 210:5
268:2
**300**  115:23 116:4
118:8,17,20
124:19,20
**30305**  2:6
**30363**  2:12
**30th**  79:3,5 152:15
158:9 167:25
265:16,20
**320-9979**  2:7
**33,310**  179:8
**3535**  1:17 2:5
**3:29**  172:19
**3:35**  172:22
**3rd**  188:19

**4**

**4**  3:14,18
**4/13/20**  3:13

**4/5/18**  3:17
**404**  2:7,13
**40981**  276:4
**42,970**  178:8
**4th**  53:15,24 54:3

**5**

**5**  3:6,14 163:12
252:16 254:8
**5.1**  229:12
**5.2**  258:8,10,12
**50**  202:7
**50/50**  177:5
**500,000**  33:22 34:9
34:22,23
**53**  3:12,12
**58**  3:13,13
**5:18**  246:19
**5:26**  246:22
**5:51**  264:12
**5:56**  264:15
**5th**  133:9 145:23

**6**

**6**  3:15 114:13
132:22
**6:07**  273:11,15
**6th**  59:15 264:7

**7**

**7**  3:15 55:4,6,6
117:20
**7.5**  220:6 250:1,1
**70**  61:3
**70/30**  61:10 65:18
**713**  171:14
**75**  64:14 258:5
**7th**  187:5 188:5,20
189:19

**8**

**8**  3:16,19 55:6
276:5

**8.b.**  274:5
**8/7/17**  3:22
**8/7/2017**  267:9
**86**  3:13,13
**87**  120:5
**87.5**  122:11 124:21
**873-8684**  2:13
**8th**  1:16 30:9
166:14

**9**

**9**  3:16
**9-11-28**  274:10
**90**  107:18 110:19
112:6,13,20,23
113:5,7,11 122:19
123:2 124:11,14
232:19 234:10,13
234:22
**92**  25:3
**93**  28:3,6
**9th**  140:11

**a**

**a.m.**  1:16 4:3
50:19,25 51:3
76:4 121:24
124:15
**aa**  232:11 245:17
**abbreviated**
225:22
**ability**  7:12
**able**  97:21 111:9
149:10,10,11
195:10 214:9
216:7 225:12
244:22
**abolish**  215:2
219:6
**abolished**  218:25
219:5

abril  180:13,16
  187:5 188:5,18,22
abrillio  180:14
absent  183:24
absolutely  50:24
  52:18 111:6 118:2
absorb  115:16
  118:11 120:24
  124:11 132:8
  135:11 213:19
  214:11,17 217:2
  218:19 219:15
  232:7,10 233:18
absorbed  108:9
  119:25 120:3,14
  221:7 253:14
absorbing  117:8
  119:12 120:8
absorption  213:11
absorptions
  134:10
academy  13:20
  27:24
accept  55:21
access  22:24
accommodate
  6:17
account  64:5,6,6,8
  64:8,10 221:23
  232:12,14,20,20
accountant  88:23
accounting  97:23
accounts  63:23
  64:13 258:2
accuracy  20:22
  183:17,18
accurate  36:10
  99:6
achieve  20:9
  151:15

achieved  152:7
acknowledge
  254:19
acknowledged
  254:18
acknowledgement
  191:14
acquired  13:20
active  96:12
actively  36:19,20
activity  171:16
actual  7:4 21:16
  39:13 50:5 171:16
  232:11
add  248:1
added  98:20 144:4
  144:5,15 145:3
  247:3,8
adding  75:2
  143:17 144:1
addition  18:23
  19:4 162:15
  167:23 204:4
  247:10
additional  3:20
  57:7,8 94:13,18
  95:9 96:7,22
  115:14 121:1
  167:7 186:2 247:2
  247:3
address  21:16
  54:20 90:21
  113:21
addresses  21:12
  21:13
addressing  148:23
adjusted  258:24
  263:23 270:9
adjustments
  268:14,25 269:15
  269:22

adobe  140:16
advertising  168:4
  168:5,9,9,13,24
  170:21,23 172:7
affiliated  27:1
afternoon  76:11
  189:20
age  163:3
agency  274:16
agent  27:19 58:10
  126:15,25
ages  24:8
agg.com  2:13,14
ago  5:6 7:15 9:23
  146:8
agree  104:20,22
  124:13 177:6
  222:10 248:21
  253:4,8,12 254:7
  255:14,21 256:23
  259:19
agreed  88:4 176:9
  176:19 186:6,7
  193:5,12 222:15
  240:16 270:5
agreeing  160:5
  170:15 171:13
  176:24 223:22
agreement  3:13
  16:18,18,20,23
  17:1,2,3,9 19:3
  47:20,21 49:5,11
  51:11,13 56:15
  58:15,21 59:1,8,14
  59:25 60:3,7,11,15
  60:19,23 65:3,4,6
  65:6,7,11,15,23
  76:22,23 77:3
  80:23 88:4,21,21
  88:22,22 96:11
  109:2 110:18

135:25 140:10
  141:6 142:6,19,22
  146:14,19,22
  149:25 153:25
  155:2,3,7,10 157:8
  168:5,6,24 170:22
  172:7 174:13,13
  177:13 184:14,17
  184:19,21 185:2
  220:5,7,17 229:8
  247:9,12,14,20
  248:1 249:3,20,20
  251:17,19,22
  252:13,24,25
  253:16,20,23,24
  254:9 255:8,11,13
  258:8,22,23
  259:13 260:6
  263:21 266:15,20
  266:25 267:21
  270:3,9,10 270:4
  270:25 271:1,4
agreements  8:13
  8:22 110:4 130:15
  137:25 145:25
  254:17 266:10
agrmt  3:16
agrmts  3:17
ahead  5:14 27:14
  52:19 71:6 90:14
  141:19 157:19
  201:11 211:16
  234:16 252:21
  254:15
air  223:4
aired  50:15
alabama  67:6,9
  70:20 71:10,10,13
  72:8,23
alignment  110:2

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 281 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[alleged - approval]                              Page 4

**alleged** 206:8
**alliance** 232:14
**allison** 9:21 10:16
11:4,14 12:25
13:2,7,13,16 14:3
14:19 15:21 16:1
17:17 28:16,25
30:18 35:18 37:13
37:14,20 38:3,8,25
39:24 40:16,21
41:24 42:9,20
43:3,25 47:8,13
49:2 51:9,24 52:9
52:12 57:22 58:2
61:3,6 65:16,21
66:2,8,16 67:13
68:9 69:20 82:21
83:1 85:14 89:1
89:16 94:10 96:18
102:11 104:4
105:19 106:3
107:2,4,8 108:3,13
111:1 117:8 119:8
119:21 120:19
121:17 122:14
123:12 135:13
137:8 144:2
163:15 164:17
169:14,16,21
170:9 173:23
177:5,7 181:10
184:10,16 189:8
190:6 192:5 196:3
196:7 205:9 218:3
220:6 221:5,18
232:6 236:22
239:11,22 240:21
241:2,25 242:12
242:18
**allison's** 28:20
38:19 41:19 44:18

49:11 51:11,12
65:4 100:15
159:11 160:1
175:13 249:19
**allocate** 163:8,12
163:16 164:9
218:22
**allocated** 21:3,9
160:2 179:12
**allocation** 3:18
155:25 156:10,20
158:12 159:13
177:8
**allocations** 3:20
**allow** 242:8
**allowed** 174:10
224:2
**amber** 140:8
**amend** 259:15
**amended** 3:17
110:4 136:12
247:10 248:1
252:23 258:24
259:4,18 266:14
266:19 270:24
**amendment** 3:16
88:13,16,19 95:24
96:5 135:24 138:9
138:13 141:1,10
141:25 266:13
**american** 1:7 2:16
2:16 4:18,21 8:16
8:18 12:5,9 13:21
16:17 27:25 35:9
36:1 38:23 41:1
66:15 109:4 127:8
180:2 225:13
274:8,11,13,15,18
276:3
**amount** 32:25
62:24 104:20

106:2 120:24
151:5,15,22 152:6
164:19 167:2
201:25 223:7,7,9
224:2 226:19
229:6 233:24
249:21 257:16
**amounts** 63:2
159:25 167:21,23
167:23 178:4
**analysis** 73:21
215:10,13 224:18
226:1,6
**analysts** 180:3,4
**andrew** 2:16
**ankeny** 133:17
**announce** 221:19
**announced** 106:21
108:18 213:18
225:25
**answer** 5:19,25
12:2,3 17:21,22
18:3,3 36:10
75:13 77:23 92:10
96:17 98:23 105:5
105:8 114:21,24
123:25 124:9
125:12 133:6
176:13 177:11
182:5,23 192:15
194:5 203:20
207:25 236:7
255:25 256:9,13
264:3
**answered** 39:15
111:21 123:23
177:10 201:14
217:9 220:18
249:15
**answering** 141:16

**answers** 9:17
236:10
**anticipate** 7:16
**anticipating** 5:24
**anybody** 87:6
152:24 209:1
**apologies** 137:12
260:3
**apologize** 77:22
137:9 197:4
**apparent** 192:24
193:2
**apparently** 37:4
95:23 114:14
**appear** 124:14
163:5 171:10
**appearances** 2:1
224:22
**appears** 57:7
59:15 86:13
132:25 137:18
152:16 162:1,21
166:14 187:3
188:4,22
**applicable** 116:25
117:1 149:25
153:2 155:2,4,8
177:13 184:21
260:24 261:3
262:21
**applications**
261:20
**applied** 116:20
117:6 220:13
**appreciate** 109:10
**approval** 103:24
105:15,18 106:23
107:2 118:23
120:21 121:2
183:10 194:23
196:7 267:20

**approve** 74:11
104:5 107:5
108:14,21 109:7
109:14 111:3
118:25 119:4,8
120:20 165:2
183:5,12,13,16
189:2,3,8,10,22,23
190:7 192:1,2,6
193:15,16 194:13
194:16 195:15,22
196:8,21 214:9
267:16,19
**approved** 104:7
111:17 119:20,24
192:1 250:19,20
**approving** 75:18
107:8 109:15
110:14 116:10
215:7
**approximately** 4:3
34:16 36:5 92:1,2
92:14 148:3
**approximation**
33:15
**april** 70:11 81:7
86:15 87:1 89:25
93:5,14 99:13
108:2,17 137:18
145:23 166:14
167:25 190:14,15
190:22 192:25
**arbitration** 7:1,5
**area** 24:17 28:22
28:24 29:2 30:16
30:24 44:15,17,22
48:11 52:23
129:25 131:11
188:6 236:25
**arnall** 2:11

**arrangement**
168:12
**arrangements**
163:20
**arrive** 98:18
**arriving** 216:8
**article** 229:12
274:5
**arvielo** 40:1,1
60:19,23 112:19
121:17,17 186:4
**arvielos** 186:9
**asa** 167:22 168:2,3
168:4 170:21
171:15,18 172:2
173:9 174:13
178:25 179:12
246:3
**asas** 171:22
**ascertain** 75:3
**aside** 39:6 46:22
51:12 52:9 57:3
65:21 84:3 229:20
249:19 272:20
**asked** 10:7 11:15
11:17 33:20 37:5
39:15 67:22,25
77:22 87:5 96:9
97:5,14 108:13,14
111:21 113:17
123:1,23 136:11
141:15,16,17
153:6 157:15
159:12 161:8,15
176:13 177:9
182:5 183:4,12,16
190:5 198:17
201:13 203:6,7
206:9 207:11
217:2,9 219:25
220:18 231:13

242:24 243:2,2
249:15 271:5
**asking** 7:17 10:1
15:11,12 16:12
30:10 50:16 57:20
58:3 59:2 68:2
95:8,14 97:16
98:4 122:17
140:15 156:15,22
165:19 167:18
173:1 175:8 179:5
183:9,11,15
188:20 189:14,18
196:11,12,13
197:16 234:17
236:7 247:25
262:4 268:7 272:5
**asks** 190:6,7
**aspect** 15:8
**aspects** 65:10
93:13
**assist** 15:1,7 74:15
76:17 88:18 90:18
98:12
**assistance** 32:2,5,7
**assistant** 181:6,8,9
181:12 196:4
**associated** 91:4
103:12,25 173:5
174:1 225:7,10
230:8 232:7
246:13
**association** 26:17
26:18,22 27:2,3
**assume** 6:10 54:10
207:19 215:18
**assumption** 97:4
**assurances** 271:20
272:18
**assure** 113:16

**assured** 272:24
**atlanta** 1:2,18 2:6
2:12 20:13 24:17
25:8,15 26:17,21
27:2 52:23 113:16
220:25 224:18,22
225:5 228:17,20
**atlanta's** 49:24
50:9 220:1 221:21
225:21
**attached** 53:16
86:22 140:9 141:5
186:25 188:11
189:2,21 197:3,7
261:11 262:23
263:3
**attachment** 141:3
**attempt** 121:18,25
**attempting** 123:2
**attend** 10:25 15:17
26:3,6 84:2 85:14
202:15 203:4,5,6,7
203:16,18
**attended** 38:25
82:14 85:10,15
117:13 198:23
199:8 202:12,17
203:1 235:12
**attendees** 205:8
**attending** 4:15
235:2
**attention** 12:6,9
12:12,15 155:1
181:23 183:25
225:3
**attorney** 98:5
167:17 254:16
270:3 275:12
**attorneys** 7:22
**attractive** 64:23

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 283 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[attribute - blue]                                        Page 6

**attribute** 225:1
**audible** 9:17
**august** 187:5
188:5,19,20
**authorize** 165:15
166:5
**authorized** 3:19
161:3 165:20,23
165:24 178:13,15
**automatically**
161:21
**available** 80:3,6
80:15 126:22
**award** 199:18
**awareness** 196:12
196:14

**b**

**b** 1:7 3:10 180:18
206:19 215:23
274:14 276:3
**back** 19:1 36:9
40:8 51:4 71:2
76:9,13 86:8
103:16 105:6,7
113:13 122:2,10
122:15 132:17
134:13 139:5
148:7 151:3
161:22 166:22
169:8 170:19
172:23 177:12
191:5 192:13
194:22,22 195:1
208:14 213:5
216:8 229:11
246:23 261:22
264:16 268:6
**background**
256:16
**bad** 198:1,4

**ballpark** 111:11
111:15,18
**bank** 13:18 27:23
27:23
**bankers** 26:17
27:2
**bar** 10:5,15 11:5
**base** 102:15
228:23 229:1
**based** 16:20 17:15
17:18 18:19,23
22:25 29:18,20
33:9 38:20 40:19
52:3 61:11 62:23
63:2 66:20 74:17
74:19,20 82:11
83:12 88:3 93:9
95:10 133:6
151:17 152:8
198:12 199:19
201:9 202:10
229:6 234:21
258:16
**basic** 62:7,11
102:15 251:16
**basically** 31:19
120:23 125:14
135:3 231:11
233:3
**basics** 125:2
**basis** 16:21,22
19:17 20:22 30:12
45:13,16 49:5
62:5,14,15,16 63:1
63:6,8 64:12,14
93:19 115:23
116:4 118:8,9,18
118:20 119:5,7,14
119:16,21 120:5
124:20 129:19
146:5,15 158:13

158:20 159:1,6,10
160:2 163:8,16
164:10 166:6
167:2 175:16
201:23,24 202:1,7
220:4,6 222:14
232:19 250:1
251:14 257:13,23
258:1,5
**bates** 147:10
**bear** 108:1 206:12
**beauty** 161:24
**began** 100:11
190:14
**beginning** 4:4
73:23 190:13
201:4
**begins** 260:7
**begun** 245:23
**behalf** 1:12 100:13
**belief** 252:11
**believe** 10:1 11:15
19:22 20:3 42:7
46:4,5,17 48:8
51:10 55:11 56:9
57:24 67:7 76:14
76:16 78:1 82:2,8
82:8 93:11,14
94:9 109:5 110:1
110:6 112:25
115:23 117:11
120:4 130:8 136:2
138:2 144:22
145:25 150:25
155:11 159:7
160:4 172:4
173:19 180:13,23
186:3,8 206:5
209:16 216:16
219:22 229:7
230:16 234:9,12

234:18 238:22
239:2 247:11
250:16 261:2
263:25 264:7
267:3 270:19
271:21
**believed** 107:18
193:11 210:14
260:23 264:4
268:17 270:3
**bell** 78:23
**belong** 26:9,15
27:1
**benefit** 220:14
**best** 5:18 10:10
11:12 13:22 16:15
23:1 29:7,11
30:10,14 31:7,13
32:3,11 34:8
35:20 36:18 44:14
49:24 50:9 54:21
55:19 71:9 76:25
90:19 130:8
136:23 199:9
220:1,25 221:21
224:18,22 225:5
225:21
**better** 87:16 212:9
212:18 244:22
**beyond** 42:13
**big** 110:13 193:9
**biggest** 221:21
**billion** 226:5,7,11
226:13,14,17,22
**birmingham**
72:22
**bit** 83:14
**biweekly** 229:13
**block** 2:16 146:18
**blue** 11:19 36:17

**bm** 3:22,23 189:2
**board** 236:21
   274:5
**bold** 263:18
**bond** 184:23
**bonus** 3:21 17:10
   17:13 32:1,9,21
   33:5 48:15 57:7,8
   99:20 139:19
   142:25 143:10
   144:13 145:13,18
   162:4 178:13
   191:13 258:16,17
   260:15,20 263:22
**bonuses** 47:24
   66:9 101:7 130:6
   144:20 145:7
   150:17,23 153:21
   154:4,10,19
   171:19 177:22
   178:1,4,8 230:12
   257:3 262:19
**book** 73:19,20
   110:8
**born** 24:16
**borrower** 32:6
   33:1 125:4
**boss** 28:18
**botched** 257:18
**botching** 78:18
**bottom** 61:4,21
   108:22 132:25
   133:11 140:6
   147:21 257:5
   268:10
**box** 261:8,8 263:2
**bps** 62:12 63:20
**brackets** 260:17
**branch** 44:15 45:6
   48:11 52:5 67:16
   68:14,16,19,21,21

69:24 71:12,23
72:8,11 74:2 75:3
75:15 129:25
134:1,5,9,21,21,25
135:3,16,19 139:3
139:14,18,20
143:12 162:10,10
162:15 163:8,9
164:10,10 168:18
173:24 179:23
188:6 191:20
221:12 227:16
229:20 242:3
258:16
**branches** 41:9,13
   41:15,16,19 71:18
   139:2,11 143:18
   144:1,2,4,5,17
   145:8,10,19 146:5
   146:10
**branding** 225:2,6
**braun** 140:8,14
   141:5
**braun's** 142:5
**break** 6:16 50:8,21
   51:2 76:6,7
   132:11,15 148:5
   172:21 239:6
   246:17,21 264:14
**breakfast** 223:9
**breaks** 6:15
**briefly** 172:25
**bring** 131:17
   181:23
**bringing** 27:16
   51:18,24 75:14
   78:8 183:24 230:5
   230:8,19,22 231:2
   231:15
**broader** 14:25

**broke** 51:6 172:25
   268:8
**broker** 1:6 276:2
**brokerage** 172:15
**brokered** 31:11,15
   31:16 64:15,16,18
   64:22,23 258:5
**brought** 12:6,9,11
   12:15 66:19 69:20
   78:12 154:25
   185:21 186:9
   193:6 224:23
   237:2,3
**bucket** 159:11,12
   159:18,19 166:7
   206:19,19 208:16
   208:17,18
**buckets** 44:11,12
   45:3,18 48:9
   65:25 66:2,8
**bucks** 223:12
**budget** 49:2,4,8,12
   49:14 51:8,11,15
   212:3 213:25
   220:4,13,16,21
   233:7,8,12,17,21
   234:24 235:5
   236:3 239:10
   250:15,15,17
   253:6
**builder** 28:11,13
   28:23 51:19 64:8
   128:17 162:16
   224:24 232:14
**builders** 26:18,22
   27:3 193:7 221:12
   224:25 225:1,3
**building** 1:17 2:5
   26:21,24 27:5
   41:12 168:21
   173:4

**bullet** 122:4
   261:18
**bunce** 39:25 56:7
   56:12,17 57:3
   60:11 78:2 95:11
   112:16 113:2
   121:18 145:24
   154:17 185:9,10
   185:11,24 186:15
   205:10,13,25
   206:4 214:5,5
   241:1 266:24
   271:6,7 272:3,18
**bunce's** 155:1
**business** 22:2
   27:20 28:6,12,14
   37:9,12,16 68:3
   72:18 73:3,17,19
   73:20 109:5,8
   110:8,24 111:7
   125:15 126:24
   127:5,18 162:17
   172:5,13 193:7
   218:4 221:14
   224:23,25 226:3
   245:20,23

---

**c**

**c** 3:1 4:1 274:1,10
   275:1,1
**calculate** 88:9
   179:22 190:23
**calculated** 93:11
   98:17 220:11
**calculation** 62:22
   63:2 138:19,23
   142:25 143:10
   145:14 146:25
   147:4,8
**calculations** 66:4
   66:10 139:5

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[calendar - chattanooga]                                              Page 8

calendar  84:8,10
  84:11,12,15,16,17
  84:21
calender  84:18
caliber  13:21
  27:25 28:8,13,16
  28:21 29:7,9,12,14
  29:22,25 30:13
  31:2,4,9,12,25
  32:10,20 33:4,12
  33:23 34:6,12,16
  35:5 36:3,7,15,21
  37:1 38:2,22
  41:12,20 42:9,16
  42:23 43:4 52:3,5
  52:8,13,13 56:23
california  38:20
  38:21,22 39:1,5,12
  39:22,23 40:7
  46:6,10 47:2
  73:10 74:20
  140:21 184:7
  212:16,23
call  35:17,17 36:16
  37:4 38:9 139:5
  149:8 169:12
  174:24 202:21
  236:12 240:1,22
  241:1,2,2,5,9,13
  241:15 243:23,24
called  27:20 35:9
  35:21 49:23 80:7
  127:23 225:13,15
  231:13
calling  149:14
calls  36:17,21,24
  97:8 113:15 184:6
  184:11 254:14
  255:19 256:12
  259:7

campbell  24:21
candidate  158:22
cap  1:4 276:4
caption  275:5
capture  99:12
captured  162:22
  232:14
capturing  170:20
card  222:24
cardinal  80:7,13
  80:18 81:12,16,19
  82:4 83:5,10,10,16
  84:2,7
cardinal's  82:10
careful  98:3
carolina  29:3,5,9
  41:13,21 42:10,15
  42:21 43:8,13
  52:4,6,9,14,21
  66:20,24 67:5,6,8
  67:8,15 69:21,24
  70:19,19 71:15,18
  139:14,18 247:5
case  1:4 130:2,7
  168:23 274:16,16
  274:19 276:4
cases  64:20 104:6
  104:9,15 181:24
catastrophic  111:6
categories  8:11
categorization
  125:20
categorize  125:14
categorizing  125:4
category  33:10
  111:12
cause  181:24
  193:8 200:11
caused  131:17
  174:7 193:5 198:9

causing  208:3
caution  167:17
cc  151:25
ccr  274:24 275:20
ceiling  151:11
ceo  83:9 251:20,23
  253:1 254:11
  271:1
certain  19:23
  20:19 52:20 70:20
  112:17 115:12
  139:14 151:5,6
  153:13 154:4,10
  154:19 156:16
  159:25 166:7
  180:24 193:3
  202:6 208:18
  216:25 217:2,2
  223:5 257:15
certainly  65:9
certainty  12:4
  15:15 43:14
certified  1:15
  274:7
certify  275:4,8,11
cfo  19:14 20:1,2
  113:18 209:9,12
chain  119:2
  132:22 139:24
  141:23
chairman's  199:17
challenges  107:20
chance  121:11
change  16:17,20
  69:16 80:22,22
  88:13 91:14 94:8
  101:19 106:14,17
  106:21 108:18,23
  109:21 113:6,10
  116:19 135:4,18
  135:21 140:19

163:25 197:13
  200:19,24 213:14
  213:15,18,24
  214:7 216:14,23
  217:12 219:18
  221:4,11,19
  225:24 232:23
  234:6,12,18,22
  235:4 248:22
  249:14 251:5,11
  252:12 259:8
  268:16,17 269:10
  271:8,11,15,18
  272:13,25 273:3
changed  113:12
  116:3 118:15
  134:4 197:11
  221:13 236:6
  251:19,22 252:9
  253:19,21 266:25
  270:8
changes  88:5
  121:19 186:2
  213:6,10 264:4
  270:4,16,17
  272:19 276:8,11
changing  267:6
  268:2
charge  274:18
charlotte  82:9
  85:9,11
chase  2:10 4:20
chase.ogletree
  2:14
chattanooga  71:23
  173:24 227:13,16
  227:23 235:3,13
  235:16 236:19
  237:23 238:3
  239:1,14 240:10
  240:20 241:23

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 286 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[chattanooga - compensation]

Page 9

242:3,7,9,19
245:14,15,16
246:7,14
**check** 20:21
222:24 227:4,11
**checked** 263:3,9
**checking** 157:8
191:10 215:14
**cherokee** 26:14
**children** 24:4
**choice** 18:2 109:6
110:2,23
**choices** 193:4
**choose** 18:1 106:4
**chose** 231:12,12
**christy** 39:25 56:7
78:2 95:11 112:16
117:3 131:1,22
145:24 153:18,20
154:12,21,25
155:6 165:10
199:10 204:20
205:10,12,18
211:2,12,22 212:2
213:16,17 221:3
240:1,6,13 243:3,3
**chronological**
13:22 148:14,17
156:1
**chronology** 122:1
**church** 26:3,6
**circumstance**
12:16
**circumstances**
104:21 143:15
**clarification** 96:14
**clarify** 52:17 53:2
71:6 183:7 237:13
**clause** 149:24
177:13 251:17

**clean** 34:5 46:15
**clear** 48:6 83:3
102:3 113:19
135:10 147:6
187:22 224:6
**clearly** 6:3
**click** 97:22
**client** 64:2 98:5
128:15 167:17
**close** 103:13
198:24 226:12,18
**closed** 33:5,8,11
151:19,20 152:10
191:9
**closest** 41:7
**closing** 31:17
64:21
**club** 26:10,14
**cm1** 138:19,22
207:5,10,22,23
**cm2** 207:6,14,17
207:23,23
**cobb** 274:3 275:3
**cobra** 56:19 57:4,9
57:9 77:12,19,25
78:15,24
**code** 125:3,13,23
126:7 127:9,15
128:1,3 130:18
225:11,19
**codes** 124:25
125:7,7 131:23
132:2
**coincide** 228:4
**collaboration**
165:1
**college** 24:23
**column** 99:24
100:4 102:14
162:20 178:1

**columns** 99:16
**com** 21:18
**combination**
29:21 72:14
**come** 11:6,12,18
12:24 35:7 40:7
44:1 47:7 61:11
71:2 83:24 101:5
107:11,11 108:9
109:4 123:2 125:1
149:16 205:1
235:24 238:15,19
**comfortable** 88:7
**coming** 36:1
112:18 245:2
**commencing** 1:16
**comment** 155:3
237:22
**commented**
238:22
**comments** 154:6
**commercial** 49:25
50:6
**commission** 62:23
128:8,21 129:1,4
151:20 152:8,11
258:23
**commissions**
29:16,18,19
179:22 258:15
263:22
**commitment**
221:11
**common** 232:13
**commonly** 168:7
181:7
**communicated**
210:2 216:11
**communicating**
212:2 213:15
241:12

**communication**
91:6
**communications**
86:1 98:5 167:18
175:9
**comp** 3:15,17
48:12 92:18
113:20,22 122:10
130:16 140:19
166:6 170:11
**comp's** 238:11
**companies** 13:16
27:12,22 36:25
79:15,22 80:2,5
83:11,21 216:6
**company** 27:20
31:17,19,21 32:17
38:20 45:25 64:24
80:7 88:8 89:8
100:10 102:20,23
103:1,7,8,19 104:5
104:7,11,16
122:22,25 137:3
162:8 164:15
168:10,13 174:5
199:23,25 200:5
205:19 215:16,19
215:23,23 218:15
231:10,12,18
258:25 263:23
**company's** 168:20
168:22 200:3
208:21
**companywide**
101:21 116:21
209:20,22
**compensated**
17:18 18:7,15
29:12 30:11 44:1
**compensation**
16:22 17:14,15,19

18:19,22 19:17
44:4,7,9,15,18
45:9,13,16 48:15
61:2 62:1,3 63:13
63:14 64:15,17
65:10,16,20 66:5
80:22 83:15 88:6
91:3,16,22 92:1,7
93:7 94:2 96:23
97:5,10,14 98:19
99:18,21 100:15
101:7 104:13
106:7,15 108:11
108:23 115:1,8,11
115:15 120:4
128:4 129:14
130:23 131:19
132:6 134:2
138:10,23 139:19
144:17 145:3,8
147:18,19 151:5
151:17 152:8
154:25 159:4,18
160:13 165:25
167:7 170:16
180:3,4 202:10
210:16 222:20
232:11,13,15,17
232:21,22 233:3
251:6,7,11 252:12
253:19,21 257:13
257:14,25 259:9
263:17,21 267:6
268:16,18 270:4,8
271:8,11,15,18
272:13,20 273:4
**compensations**
129:5
**compete** 215:7
**competition**
104:25 105:9

198:9 199:18
**competitive** 215:8
**competitors** 12:19
**compilation** 98:21
**compile** 98:8,14
**compiled** 98:10
**compiling** 98:15
**complete** 74:1
135:11 183:9
**completely** 196:18
**compliance**
250:20,23
**component** 17:10
17:13 18:20
**components** 18:21
19:7 56:1
**composite** 148:16
161:2 169:12
265:2,2,4,12,23
**compression**
198:6,8,11
**computer** 22:3
23:8,10
**computers** 22:1
**concept** 139:7
**concern** 130:17,21
130:23,24 131:17
145:6,17,20
192:12 208:3,6,7
259:14
**concerned** 170:8
205:18
**concerns** 20:24
78:7 184:1,9
185:7,17
**concerts** 163:3
**concluded** 19:9
273:14
**concludes** 273:12
**conclusion** 254:14
255:19 256:12

259:7
**conditions** 198:10
251:5
**conduct** 22:1
109:5 181:21
215:9 252:25
270:25
**conducted** 215:10
**confer** 108:20
109:12,19,24
110:9,11,12,18
**conference** 7:3
113:15 184:6,10
241:16,17
**conferred** 110:23
**confidential**
215:21
**confirm** 57:23
205:7
**confused** 248:7
**confusion** 187:16
**connect** 22:12,14
22:22 127:14,17
127:23,25 128:7
129:3,16 130:8
131:24 132:4
**connection** 14:24
16:14 22:24 57:18
91:6 96:23 98:6
195:1
**connections** 174:7
**consider** 37:14,19
80:1 81:17 90:5
162:14 176:23
198:25
**consideration**
176:15
**considered** 232:19
**considering** 62:9
87:17,22,23
231:10,11

**consistently** 13:3
**consumer** 172:16
173:2
**contact** 35:7
113:12 231:6
252:24
**contacted** 274:11
**contacts** 72:21
**contain** 197:20
**contained** 1:13
**contemplation**
237:17
**contended** 99:13
**content** 184:2
**contest** 6:14
**context** 11:17,19
12:14 22:10
134:15
**continuation**
56:22
**continue** 19:15
52:13 100:18
109:6 110:14,24
141:21 173:10
192:22 193:3
214:21 221:6,15
221:18 258:20
**continued** 94:9
236:3
**continuing** 91:3
110:20
**continuously** 28:5
**contract** 19:11
35:4 49:18,19,22
88:13 274:13,15
**control** 275:7
**conventional**
120:5
**conversation** 5:21
9:24 11:10 35:24
38:12 39:13,14

**[conversation - customers]**                                      Page 11

48:7,18 58:1
80:17 81:19,20
82:3 87:7 113:14
131:13 139:21
170:14 201:9,23
210:4 233:20
238:24 239:16
240:5 243:15,15
272:3
**conversations**
7:17 15:12 16:13
55:25 56:5,8 65:9
65:15 87:9,13
89:19 185:13
186:5,11 195:1
239:22,25
**coo** 82:2 83:9 84:4
251:20,23 253:1
254:11 271:1
**cooperation**
264:19
**copied** 105:22
134:20 135:8
**copying** 140:1
**corner** 140:6
147:21
**corp** 126:16,20,23
127:4 129:3
130:11
**corporate** 72:24
73:9,13 74:4,6,10
74:19 75:4,5,8,14
75:23 98:18
100:23,24 101:1
110:20 120:7,14
125:25 126:6,17
127:20 128:7
129:16,20 130:13
131:23 132:5
133:15,16,19
164:22,22 165:2,4

165:8 180:2
193:10 204:9
207:11,18 210:14
212:15 217:17,18
218:8,11 222:1,19
235:23 236:12,15
236:16,23 240:16
243:17,21 244:7
**corporation** 13:18
**correct** 16:5,6
20:11 21:21 22:5
26:2 28:7 34:20
40:17 50:7 52:1
53:3 56:24 66:21
69:7,10 75:23
88:12 89:23
102:12 104:10
106:6,11 111:10
115:18 120:16
121:4 125:16
135:2 144:9 145:5
147:10,22 150:7
151:12 167:25
176:20 187:9
189:21 194:16,19
194:20 216:21
219:12,16 220:8,9
220:17,19,22,23
223:18 225:7
226:10,25 235:21
236:18 240:23
247:5 252:9,10
253:2,7,11,15
256:21 263:12
266:7 269:23
270:2 271:9 275:9
**corrected** 147:2
155:12,16
**correctly** 88:12
183:21

**correspond** 227:8
**corresponded**
158:1
**corresponding**
103:10
**cost** 102:20,22
103:7,8,11,11,14
103:19 104:6,8,12
104:17,19 105:14
106:22 107:10
108:6,6,8,9 115:16
120:11,15 174:22
178:25
**costs** 100:8,9
171:19,20 217:2
218:21,23 223:6
232:7,11 233:18
268:3
**council** 274:6
**councils** 26:18,19
26:25
**counsel** 2:1,16,16
4:6,22 57:18,25
58:2 76:17 88:18
131:2,5 167:15
175:7 177:19
178:24 265:1,12
265:23 267:9
268:7 274:16
275:12
**count** 25:22
**counted** 265:3,24
**country** 26:10,14
**countrywide**
13:19 27:24
**county** 26:14
274:3 275:3
276:22
**couple** 5:14 10:21
10:22,25 14:4
28:9 132:23 133:5

170:3 190:24
192:10,24 204:19
228:16
**course** 52:18 90:8
114:9 133:2
192:12 252:24,24
270:25
**court** 1:1,15 4:23
5:20 6:22,25 7:2
9:18 55:7 105:7
274:5,7,8,11,11,13
274:15,18
**courtroom** 7:4
**cover** 57:9 104:5,8
104:11,16,19
106:21 245:25
274:17
**covered** 218:8
**covering** 56:20,22
**covid** 241:19,20
**cpa** 16:2,4,8 88:25
89:3,6,8,12,16,18
89:19
**create** 177:21
193:9
**created** 99:2 127:6
127:7,8
**creates** 132:6
**credit** 222:24
**criteria** 199:1,5,20
200:20
**cross** 3:6 5:3
**crossover** 181:11
**curious** 83:11
**current** 72:17
96:12
**customary** 90:23
223:4 274:18
**customer** 199:2
**customers** 90:20

Gina Spearman                                      November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[cut - detail]**                                                        Page 12

**cut** 91:3 117:22
  118:10 165:9,14
  165:15 222:24
  223:2 238:11
**cuts** 112:11
**cutting** 239:4
**cv** 1:4 276:4

**d**

**d** 1:7,15 4:1 35:14
  274:1,24 275:20
  276:3
**daily** 103:9 222:14
**damage** 193:6
**dani** 180:13,20
  188:25 189:21,25
  195:19
**daniel** 70:25
  228:11,12,15,17
  228:20 229:20
  230:3,5,8 237:7,15
  237:20
**daniel's** 230:16
**danielle** 180:13,16
**data** 99:3 111:19
  111:23 197:17
**date** 9:22 53:9
  54:8 71:11 72:5
  73:24 79:10 97:2
  137:17 138:11
  142:16 152:15
  227:5,6,11 234:5
  245:11 265:8
  271:4
**dated** 53:15 59:15
  140:11 265:6,16
  265:25 266:12
  267:9
**dates** 141:12 145:2
  272:22
**david** 2:17

**day** 1:16 36:13
  40:3,11,15 43:24
  44:4,13,25 46:3,12
  46:20 50:14 87:20
  89:25 112:13
  141:11 174:5,5
  204:16 247:2
  274:21 275:15
  276:21
**days** 40:5 107:18
  110:19 112:6,20
  112:23 113:5,7,11
  122:19 123:2
  124:11,14 140:18
  167:15 175:7
  177:19 178:23
  204:17 234:10,13
  234:22
**deal** 135:4 163:21
  164:2 165:8
  231:20 267:6
  271:8,11,15,18
**dealing** 106:17
**deals** 165:14,25
**december** 122:24
  189:19
**decide** 218:3
  221:10,18 222:12
  223:13
**decided** 38:23
  61:13 164:13
  212:8,11 217:23
  218:12,20 219:14
  243:8
**deciding** 61:15
  164:6
**decimal** 62:21
**decision** 105:24
  109:24 110:7
  131:3 222:6
  239:11 240:2,2

242:8,13,14
**decrease** 91:15
**dedicated** 244:19
  244:19
**deduct** 3:22 100:3
  102:4,14 159:4
  169:5 193:3
**deducted** 100:14
  115:10 133:25
  134:1,2 155:1,5
  167:21 175:12
  178:1 220:12
  222:19 229:8,18
**deduction** 3:21
  101:6,13 154:24
  155:12 169:21,25
  176:5 177:4,7
  184:20 189:4
  194:13 234:3
**deductions** 150:14
  150:15 170:10
  175:11,14 176:8
  176:18 177:22
  179:2
**defendant** 1:8,12
  2:9 117:22
**defendant's** 3:11
  53:10 58:17 86:2
  114:2 121:6
  132:18 137:5
  138:4 142:11
  148:8 155:18
  160:23 166:9
  167:10 171:5
  175:2 177:14
  178:18 186:19
  196:23
**defer** 154:12
**defined** 258:17
**definitely** 99:10
  116:15 139:15

159:15 199:6
  226:12
**definition** 166:2
  251:16 254:18
**definitions** 256:25
**degree** 24:25 25:2
  25:3
**delay** 154:6
**deny** 104:5 106:4
  107:5 165:2
**department**
  130:25
**deposed** 5:9 6:20
**deposition** 1:11,14
  4:4 5:13 7:21 8:6
  8:19,24 27:9 53:1
  87:4 179:17
  185:19 269:17
  273:10,12,14
  274:4,12,13,17
  276:5,6,8,11
**depositions** 12:24
**derived** 125:5
**describe** 31:14
  32:16 33:8 38:17
  72:7 172:12
**described** 13:15
  40:10 47:25
**describes** 33:2
**describing** 45:18
**description** 3:11
**designated** 225:14
**desire** 42:13
**desk** 167:22 168:2
  168:6 170:25
  172:9,10 174:14
  174:21 178:25
  179:12 232:10
  245:17 246:2
**detail** 97:16
  140:20 182:4,8,16

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 290 of 327
Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[detailed - docusigned]                                          Page 13

**detailed** 221:23
**details** 3:15,17
  13:8 38:14 56:2
  97:16 162:21
  164:25
**determination**
  125:19,20,22
**determine** 62:22
  63:13 73:4 226:2
**detrimental** 111:6
**develop** 73:3
**development**
  28:14 162:17
**difference** 81:13
  118:14
**different** 7:2 44:11
  45:2 53:25 61:10
  65:25 66:2 108:25
  129:5,10 130:16
  143:11 149:21
  150:22 157:7
  163:5 164:2
  182:11 208:16
  217:1 221:24
  255:15,22 256:20
  256:25
**differential** 44:16
  45:9 48:12 61:3
  62:1,3,6 63:14
  64:12 130:5 132:6
  167:4 257:13,14
  257:25
**differentials** 167:6
**differently** 216:23
  250:4
**digitally** 59:5
**dime** 212:16
**dining** 250:15
**dinner** 9:25 10:4,7
  10:12 11:4 12:18
  12:25 13:5 112:18

117:4,12,13,17
  204:17 211:21,25
  223:8
**dinners** 223:5
  246:11
**direct** 3:7 264:23
**direction** 67:17
  275:7
**directly** 68:6
  100:23 169:3
  211:10 236:16,23
  240:16
**disagree** 242:13
**disagreed** 245:14
**disagreement**
  242:19
**disclose** 242:23
**disclosed** 80:20
**disclosure** 274:6
**discount** 274:19
**discounting** 7:7
**discovered** 134:24
  135:1
**discovery** 271:21
  271:23
**discretion** 222:12
  248:22 249:13
  258:25 259:5,16
  259:19,20 263:24
  270:9,11
**discuss** 54:24
  111:1 140:19
  164:17 169:16
  195:17 196:20
  221:5
**discussed** 11:20
  13:6,8,12 17:4,12
  17:17 18:6,17,22
  20:12 40:16 42:8
  43:7,11,15,16,21
  44:6,8,13,14,18,22

45:6 46:12 47:1
  49:19 51:21 64:18
  66:8 67:5 70:7
  78:15 87:20 89:17
  116:15 139:10
  140:10 141:7
  142:6 169:11
  184:24 185:6,18
  186:16 194:25
  202:2 213:22
  222:15
**discussing** 16:24
  41:25 49:16 56:14
  56:16 57:2 60:2,6
  60:10,14,18,22
  65:8,21,24 66:1
  77:16 143:20
  207:16 239:5
**discussion** 11:23
  12:18 13:14 19:1
  42:2 43:2 45:15
  48:8 51:23 61:2
  67:7 117:7,8
  146:7 164:6
  169:25 185:25
  202:8 216:12
  235:22 239:14
  271:14
**discussions** 14:8
  14:11,14,20 20:8
  38:18,19 44:4
  45:20 47:14,23
  48:13,25 49:7,13
  51:7,13 56:19
  57:12 78:6 83:9
  85:5,22 89:11,15
  96:2 110:20
  116:17 142:9
  144:12 153:20
  164:23 169:20
  208:1 271:6

**displeasure** 235:4
**dispute** 11:5,24
  62:9
**disqualified** 274:9
**dissatisfied** 236:2
  239:9
**distinction** 217:21
**distracted** 105:1
**district** 1:1,1
**divided** 33:1
**dividing** 238:2
**division** 1:2 3:23
  26:21 58:7,9,11
  200:6
**docs** 23:9
**document** 23:5
  55:7 86:9 116:7
  116:12 124:7
  133:3 140:5
  148:13 157:7,14
  161:22 162:1
  165:21 167:14
  175:6 177:18
  190:23 196:12
  248:16,17 252:16
  259:25 264:1
  269:25
**documentation**
  97:22 112:2
  129:18 244:9
**documents** 8:5,9
  8:11,11,24 23:3
  97:25 271:3
**docusign** 55:9
  58:25 136:19
  266:10,19
**docusignature**
  266:1
**docusigned** 55:18
  266:6

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[dodd - engage]** Page 14

**dodd** 130:23
  131:19
**doing** 7:16 73:21
  109:15 110:24
  122:25 124:22
  166:15,16 170:23
  199:23 200:1,3
  215:11
**dollar** 133:22,22
  201:25 225:6,9
**dollars** 92:2 99:24
  151:18 163:16
  166:7 201:20
  218:21 233:14,16
  233:25
**dot** 21:18
**downline** 134:5
  162:5,6,11,14
  177:23 178:5,9
  191:12,19 195:6
  267:18
**draft** 88:20 96:10
  96:11 146:14
**drafting** 16:23
**drake** 171:15,18
  171:23
**dramatically**
  214:7
**drastic** 205:23
**drastically** 213:24
**draw** 229:3,5,10
  229:15
**dreaded** 102:16
**driven** 164:14
**drum** 218:4
**due** 107:20 112:11
  139:19 250:23
**duly** 5:1
**duplicative** 179:4
**duties** 228:20
  251:6

**e**

**e** 3:1,2,10 4:1,1
  26:1 150:5 152:14
  152:16 153:4
  155:25 156:4
  158:8 161:15,24
  166:14,22 171:10
  265:17 274:1
  275:1,1,2 276:1,1
  276:1
**earlier** 27:9 64:18
  71:5,16 122:6
  143:20 156:13
  165:4 171:1
  184:24 185:5
  190:9 191:2,22
  202:19 208:15
  213:8 245:13
  254:23 257:12
  267:13
**early** 36:7 172:4
  173:12 190:11
  227:11
**earn** 34:22
**earned** 33:12,23
  34:8,21
**easiest** 27:17
**easily** 81:23 216:5
  271:24
**easy** 108:8 234:1
**eat** 223:17
**effect** 109:15
  113:23 128:1
  130:11 156:16
  159:17 163:15
  173:10 179:11
  195:5 216:15
  219:21 231:20
  234:4,7,20
**effective** 90:12
  141:8 152:15

**effectively** 43:3
  126:7 171:2
**effort** 139:18
  156:1 176:2
  178:14 212:16
**efforts** 74:15
**eight** 42:7 43:1,5
  67:4 138:5,9
  141:2,10 142:1
  166:13,18 167:1
  255:10
**either** 27:1,15
  38:18 42:9,20
  56:12,17 57:2
  72:19 74:14 79:5
  97:15 107:5
  120:24 144:25
  154:6 163:16
  166:6 168:13,23
  183:25 184:9
  186:15 192:5
  207:22 217:8
  232:6 233:25
  239:11 241:25
  242:11 248:4
**elected** 90:11
**electronic** 84:16
  136:25 137:3
**electronically**
  54:17 55:22 149:4
**eligible** 61:25
  257:7 258:15
**eliminated** 212:3
**email** 3:13,14,15
  3:16,17,22,23
  21:12,13,16 22:25
  23:4 39:9 54:18
  54:20,20 58:22
  86:15,17,22 90:9
  116:13 121:13,16
  121:23,25 122:9

  123:5 124:14
  132:22,24 133:8
  133:21 134:16
  135:8,9 136:8
  139:24 140:14,24
  141:5,23 142:5
  145:22 147:12
  161:13 166:20
  180:9 186:24
  196:10 197:5
  267:10 271:21
  272:4,21
**emails** 187:4 188:4
  188:17 189:15,17
  267:4,16 271:24
**employed** 16:5
**employee** 75:15
  158:19 251:21,25
  252:5,8 275:12
**employees** 14:21
  51:19 72:17,17
  91:7 163:17
**employment** 3:12
  8:13,22 21:11,25
  22:7,9,9 23:4
  27:10 29:14,25
  30:12 31:2 53:15
  53:24 54:3 57:19
  79:11 130:3
  135:23 148:25
  150:7 156:11
  161:4 176:9,19
  178:16 190:11,13
  251:5 252:5,22
  270:23
**ended** 87:5 124:22
**ends** 273:10
**endurance** 6:14
**energy** 246:6
**engage** 57:18
  72:10 74:14 88:23

[engage - exhibit]                                                    Page 15

88:25 89:3
**engaged** 15:1,7
58:3
**english** 255:17,23
256:19 269:3
**ensure** 20:22
**ensuring** 78:10
**entered** 141:11
142:1 163:22
173:11 249:2
251:1
**entering** 150:13
170:9
**entire** 17:9 51:25
69:9 76:18,23
90:9,14 148:13
**entity** 125:25
126:1
**entry** 96:4 122:5
**episcopal** 26:8
**equaled** 152:11
**equity** 33:11
**eric** 154:22 155:7
228:4,10,17 230:4
230:19,23 231:2,4
231:6,9,11,12,17
232:6 233:4 234:4
234:23 235:3,15
236:22 237:19
239:9,15,18,23
240:15 242:9,20
242:25 243:1,4,16
243:20 244:1,7,11
244:18,25
**error** 134:9
**escalation** 120:22
**esq** 2:3,3,4,10,10
**essentially** 101:7
**estate** 3:22 126:12
126:15,25 129:9
168:6,10,13,20,22

170:23 171:24
172:2,6,12,15
173:1,9,16,22
174:1,8,17 179:1
179:12 232:8,13
232:22 235:14
245:17 246:2
**estimate** 33:19
111:20,24,25
**estimation** 33:20
34:9
**evaluating** 73:16
**evening** 112:18
140:8
**event** 235:14,17,18
**eventually** 193:12
**everybody** 117:6
**evidence** 275:9
**evidencing** 255:8
**evp** 45:25
**exact** 19:5 53:9
109:11 145:2
180:7 226:18
234:5 245:11
**exactly** 42:8 74:8
81:4 179:6 262:10
**examination** 3:6,7
3:8 5:3 264:23
268:22
**examine** 178:14
**example** 49:17
64:7 67:3 68:20
97:2 107:24,25
126:4 136:13
156:2 163:6,11
164:1,8 168:17
170:9 178:7
193:14 194:12
201:4 210:19
216:25 217:22
218:8,21 223:25

224:5 272:8
**exceeded** 123:21
124:4 151:21
223:6,9 250:15
**exceeding** 200:10
272:11
**excel** 23:5
**exception** 102:17
102:18 103:1,25
104:4 105:13
106:17,23 107:5,9
107:16 108:3,15
108:21 109:14,20
109:25,25 110:10
111:12,18 115:15
115:17 119:5,16
119:25 120:2,8,11
120:20 132:8,9
134:10 135:21
193:16 214:2
216:24 220:1,25
**exceptions** 48:20
106:14,22 108:24
109:7 110:14
111:4 113:7
114:20 115:2,8,10
116:10,20 117:9
121:20 131:25
132:3 165:14
213:15,20,23
214:6,10,12,14,15
214:22,25 215:6
215:12,17,20,25
216:15 219:23
253:10,14
**exchange** 145:23
192:9
**exchanges** 186:25
**exclude** 193:3
**excluded** 3:15
98:19 99:1,17,18

99:24,25 184:19
184:25 191:1
192:12
**exclusive** 274:15
**exclusively** 42:21
**excuse** 28:2,13
38:10 67:25 73:2
75:25 110:16
130:3 182:1
**executive** 196:3
211:23 248:23
249:13
**exemplars** 190:3
**exercised** 249:13
**exhibit** 3:11,12,13
3:13,14,14,15,15
3:16,16,17,17,18
3:18,19,19,20,20
3:21,21,22,22,23
3:23 53:10,14
58:17 59:2,3,14
76:13,22 86:2,6,7
86:15 114:2,6,11
121:6,9 132:18,22
137:5,14 138:4,9
139:24 141:2,10
142:1,11,15
145:22 147:9,14
147:15,20 148:8
148:12,22 150:4
155:18,22,23,23
156:3,8,14 158:8
160:23 161:1,5
162:20 166:9,13
166:18,18 167:6
167:10,14,19
169:8 170:19
171:5,9 175:2,5,10
175:19,20 176:1,7
177:14,17,25
178:12,18,22

**[exhibit - financial]**                                                    Page 16

179:4,5,11 186:19
187:3,8 188:11
189:12 193:15
194:12,15,18
196:23 197:2,21
229:11 248:12
251:2 253:5,8,9,12
253:13 254:2,6
257:4,6 258:7,23
260:2,4,4,5 262:12
262:13 265:1,2,5
265:11,12,22,23
268:6,8
**exhibits**  169:10,12
186:23 247:18,19
266:6,12 267:8
**existed**  131:23
**existence**  11:7,10
130:9
**existing**  41:9
**expand**  43:3 71:6
71:10,15 72:22
227:1,19 228:9
229:19 249:4
**expanded**  71:21
72:2,8 227:21
**expanding**  72:12
**expansion**  73:8
74:15,23 143:19
**expect**  201:1,19,20
**expectation**  68:4
107:14 201:8
**expectations**
67:18 200:7,10
203:22
**expected**  203:16
203:17,23
**expecting**  107:15
118:11
**expense**  21:1,5,8
97:17 217:22,22

220:2 222:1,11
224:11 226:2
232:20 234:7
245:21 246:10
250:12,18,22
**expenses**  21:2 57:9
100:12,19 101:1
168:25 169:2,4
208:2 213:7,11
217:13,15,17
218:7,12,16,18,19
221:16,17 222:7
222:18,21,23
225:23 239:5
245:25 246:9,12
249:21 250:6,14
**experience**  254:17
**experienced**
214:24
**experiencing**
135:5
**explain**  29:22
45:11 62:12
118:14 121:18
122:1 123:11
158:18 206:7
207:3,21 209:1
229:5
**explains**  114:25
**expressed**  184:13
186:3 192:11
201:18 235:4
242:18
**expressing**  190:25
236:5 242:17
**expressly**  176:19
176:24
**extended**  106:2
**extent**  182:12
254:14 255:19
256:11 259:6

**external**  72:15,15
74:22
**extra**  86:10

**f**

**f**  8:19 59:25 60:3
73:9 77:4,10,24
99:13 105:14
108:7 125:6 130:3
137:2 148:23
161:4 249:4,21,25
250:3,4,12,19
275:1
**f's**  78:17 115:3
**face**  184:6,6
**facilitated**  144:3
**facilitation**  144:9
**fact**  11:8,11 45:2
51:16,21 88:3
134:12,19 139:20
154:3 176:18
210:13 220:3
223:22 226:4
239:10 244:12
253:18
**factor**  176:2
**factored**  176:3
**fair**  6:11 28:5
37:18 38:1 92:7
107:10 135:12
234:21
**fairly**  92:8 97:8
**faith**  212:17
**fall**  15:19 37:18
38:1 85:23 89:21
105:2
**familia**  174:7,15
**familiar**  179:18
**familiarize**  121:11
133:2 187:1
**fancier**  114:14

**far**  116:10 201:24
206:21
**fare**  223:5
**fargo**  27:23
**fear**  109:8
**february**  19:23,24
81:4 85:4,19
93:25 100:5,17
102:5 103:22
106:13 107:9,17
116:16,18 118:8
120:18 122:16
123:17 131:16
202:13,20,21,24
203:6 204:6 232:9
232:23 250:6
267:25
**feel**  6:16 59:1,3
71:7 90:9 117:24
131:11 148:12,21
156:7 161:4 257:6
**fell**  111:12 115:11
**fellows**  5:13
154:23 155:9
228:4 230:19,23
231:3,11,22 232:3
245:1
**felt**  73:5 109:5
130:22 186:5
209:7 237:22
244:17
**female**  89:12,13
**filed**  53:16 55:7
**filing**  248:17
**finally**  253:21
**financial**  13:19
20:15 75:19 93:18
93:20 94:21
107:19 112:11
113:19 201:5
208:8 209:18

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 294 of 327
Gina Spearman                        November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[financial - fruition]                                        Page 17

274:19
**financially** 100:10
  197:24 198:19
  275:13
**financials** 209:7
**find** 56:20 140:9
  141:6 160:11
  216:5 276:8
**fine** 50:22 82:25
  157:23 203:14
  240:19 241:11
**finish** 5:18,19 6:1
  141:13 160:6
  192:15 256:2
**finished** 192:20
  269:18
**finley** 2:4 4:9,12
  4:15
**firm** 2:4 4:9,12,15
  16:9
**first** 3:11,14 5:1
  33:2 35:7 39:22
  53:7,17 59:10,18
  71:12 85:1 90:10
  115:7 130:9 133:5
  135:8,9 138:11
  141:11 142:17
  152:6,14 156:2,3
  158:7,7,7 161:25
  162:19 163:6,6
  164:8 174:8
  181:18 189:19
  190:15,22,24
  192:10,24 207:14
  224:15 226:21
  227:16 234:22
  260:10 265:6,16
  265:25 268:9
**fit** 73:4
**five** 114:19 118:4
  121:6,9 158:13,20

159:1,6,10 160:2
  171:9 175:16
  182:11
**flew** 38:23 212:22
**flight** 223:8
**flip** 138:18
**flips** 31:20
**floor** 151:10
**florida** 43:22 67:6
  67:9,16 68:21
  69:24 70:20
**fly** 212:15
**focus** 157:16
**folder** 23:10
**follow** 80:12
  212:22 239:21
**following** 274:6
  276:11
**follows** 5:2
**food** 119:2
**footprint** 43:3
  70:6
**forced** 124:11
**foregoing** 275:4
**form** 3:18 17:20
  19:12 22:17 30:2
  34:3,25 35:19
  36:22 37:22 38:13
  40:12,22 42:11
  43:6 46:13 47:15
  48:1,21 57:14
  61:7 63:15 69:17
  75:11 79:11,17
  92:9 93:20 99:9
  109:17 121:21
  156:24 158:4,12
  159:13,16,20
  160:3,5 176:10
  177:8,9 182:18,22
  193:18 194:2,7
  201:13 203:19

207:24 209:3
  211:4 216:2
  218:24 219:7,11
  223:19 249:16
  250:8 251:8 252:2
  254:13,24 255:16
  255:18 256:11
  257:17 260:22
  263:1 264:1
  266:16 267:22
  269:4,24 270:12
**formal** 183:14
**formally** 74:10
  253:21
**format** 197:9,13
**former** 14:21
  72:17 128:15
  231:9,11
**forms** 155:25
  156:10,20
**formula** 99:25
  138:24 145:8
  260:15,21
**formulated** 93:11
**forth** 19:2 122:2
  122:15 258:18
**forward** 27:17
  149:24 157:3
  217:13 218:17
  241:20 258:20
  267:17
**forwards** 187:5
  188:5,18,23
**found** 244:1
**foundation** 12:1
  12:21 17:7 18:25
  111:13 125:9
  136:22 143:21
  160:16 194:3
  248:24 251:9
  254:13

**founding** 174:4
**four** 114:2,11
  145:8,10,19
  148:23 150:14
  152:15,25 161:9
  182:11 223:14,15
  223:23 224:4
  235:18,19 255:10
  261:11 262:12,13
  262:24 263:8,11
  263:15,17 265:25
  268:9
**fours** 148:13,16
  149:3 150:6,10
  153:4 156:14,23
  265:3,8
**fourth** 198:6
**frame** 84:10
**frank** 130:23
  131:19
**franklin** 227:24
  228:7
**franklin's** 227:25
**frantically** 149:8
  149:15 156:15,22
**free** 53:4 59:1,3
  71:7 90:9 117:24
  148:12,21 156:8
  161:5 237:22
  257:6
**friday** 7:24 53:15
**friends** 10:13
**frommert** 14:17
  15:18 16:1 19:13
  19:19 20:9,13
  89:21 91:20 97:9
  97:15
**front** 117:9 137:17
  158:4 247:18
**fruition** 238:15,19

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[frustrated - go]**

Page 18

**frustrated** 238:8,9
238:10,11
**frustration** 186:3
236:5 238:13
239:4
**fuhs** 1:15 274:24
275:20
**function** 10:24
**fund** 31:23 160:2
**funded** 163:12
**funding** 1:7 2:16
2:16 4:19,21 8:16
8:18 13:21 16:17
27:20,25 28:2,3
35:9 36:1 38:23
41:2 64:21 66:15
109:4 127:8 180:2
225:13 276:3
**funds** 107:21
207:4 210:10,11
230:7,9
**further** 140:20
253:17 255:12
264:19 268:21
273:8,9 275:8,11

**g**

**g** 4:1 78:21 275:2
275:2
**gen** 126:16,20,23
127:4 129:3
130:11 131:23
**general** 72:6 160:7
169:9 196:11,14
**generally** 31:21
62:23 64:22 68:3
134:18 148:21
154:12 168:5
179:18 182:2
183:12 198:1
208:15 216:5

**generated** 63:9,22
63:24,25 64:1,13
127:20 128:7,9,10
128:12,20,25
129:16,20,21
130:13 132:5
144:17 225:12
258:1
**generating** 245:20
**georgia** 1:1,18 2:6
2:12 24:14,15,16
24:24,25 27:11,18
29:3,4,8 41:13,20
42:10,15,21 43:8
43:12 47:8 52:4,6
52:8,14 66:20,23
67:5,8 69:21
70:19 247:5 274:2
274:6,7 276:22
**getting** 10:14 14:3
42:18 70:15 248:7
256:8
**gibson** 2:3 3:7 4:8
4:8 9:1,4,7,10
12:1,21 17:7,20,22
17:25 18:9,25
19:12 22:17 30:2
34:3,25 35:19
36:22 37:22 38:5
38:13 39:15 40:12
40:22 42:11 43:6
46:13 47:15 48:1
48:21 50:20,23
57:14 59:17,19
61:7 63:15 69:17
75:11 76:3 79:17
90:14 92:9 99:9
109:17 111:13,21
117:24 121:21
123:23 124:6
125:9 132:12

136:22 141:13,18
143:21 147:12,15
148:2 156:24
157:13,17,24
159:20 160:6,16
176:10,21 177:9
182:18,22 187:11
187:17,20 192:15
193:18 194:2,7
201:13 203:19
207:24 209:3
211:4 216:2 217:9
218:24 219:7,11
220:18 223:19
224:7 246:16
248:24 249:15
250:8 251:8 252:2
254:13,24 255:4
255:16,18,24
256:2,6,10,22
257:17 259:6
260:22 262:3
263:1 264:1,22,24
266:18 267:24
268:21 269:4,15
269:24 270:12
271:5,24 273:9
**gina** 1:3,11 3:20
4:4,9,25 21:18
23:18,18 55:2
61:25 135:10
140:9 163:7,11
164:9 188:25
189:22 257:7
273:13 274:4
276:2,6,18
**give** 7:12 9:2,17,22
12:14 27:10 36:10
50:3 107:23,24
124:1 166:5,6
191:13 195:18

221:23 234:10
256:10 268:1
272:22
**given** 6:22,25 7:4
20:14 53:3 64:9
67:1,17 108:13
110:7 122:23
123:17 164:7
178:5 179:3
198:25 201:2,10
201:12,17,21,22
210:18 220:3
242:14 243:4,7,12
244:6 272:18
274:19 275:9
**gives** 103:10
**giving** 90:5 147:1
239:2
**go** 5:13 24:19,23
27:14 46:1 52:18
55:1 71:5 74:3
76:1,13 87:12
88:13 90:14 98:14
102:14 105:18,19
105:21 107:2
118:22 119:2,8
120:20 132:8
141:19 147:24
149:11 153:8
157:19 167:4
169:8 172:17
173:2 194:22,22
211:16 216:15
219:21 224:8
234:16 237:18,23
242:9,24 243:1,5
252:21 254:15
258:8 259:23
261:6 263:15
264:10 268:6

**[goes - high]**                                                        Page 19

**goes**  24:1
**going**  5:17,18,24
  6:9 9:12 16:20,23
  17:1,4,8,9 19:11
  19:15 29:13 30:7
  37:19 38:2,3,21
  39:4 47:18,18
  50:11 53:13 62:9
  86:5,12 87:6,12
  90:13 95:20
  103:11 105:12,14
  106:1,21 107:11
  107:23 108:9,14
  110:4 111:2,3
  112:5,10,13
  113:12 114:5
  121:12 122:2
  123:12,21 124:1,5
  132:21 133:1
  135:15 137:9
  139:13 141:18
  142:14 145:7,21
  151:3 152:19
  153:23 155:21
  159:10 164:7
  166:4,12 167:13
  167:16 169:11
  170:4,19 185:12
  186:22 190:17
  191:4 192:23
  193:2 202:21
  205:23 208:14
  209:25 211:23
  212:4 213:5,23
  214:9,10,16
  217:13 218:17,22
  219:15 221:5,7
  223:13 233:18
  234:18 238:6,15
  238:19 241:20
  242:19,20 244:21

**260:10 265:11,15**
**golden**  2:11
**good**  5:5 50:21
  73:17 76:11 105:4
  140:8 183:13
  189:20 198:1,3
  212:16 218:4
  246:16
**gosh**  272:7
**government**  120:6
**graduated**  25:2,3
**grand**  156:3
**grant**  109:20
  164:18,23
**granted**  115:2
  206:11 219:24
**gray**  131:11
**great**  132:12
  200:22 205:21
**gregory**  2:11
**gregory's**  224:8
**grew**  193:11
  236:20 237:3
**gross**  34:1 167:2
**ground**  5:14 7:14
  52:25
**group**  51:18
  170:23 191:21
**grow**  42:13 66:14
  221:14
**growing**  67:2
**growth**  199:2,21
  224:25
**guarantee**  31:6
  148:24 149:20
  150:16,20,24
  151:2,10,16,21
  152:6,21 153:13
  153:22 154:5,11
  154:20 184:24
  189:3 190:12,18

**190:21 194:13**
  261:12,13,14,17
  261:24 262:1,6,8,9
  262:11,14,20,25
**guaranteed**  151:5
  151:18
**guaranty**  261:20
**guess**  11:7 50:11
  71:13 91:5 137:14
  163:13 164:25
  166:1 252:19
**guidance**  90:21
**guys**  214:10,16
  236:14
**gws**  55:16

**h**

**h**  3:10 276:1
**half**  49:5 117:22
  118:10 120:5
  220:4 245:19
  250:2
**halfway**  54:7
  114:24 117:21
**hand**  86:7 140:6
  147:21
**handle**  74:7 212:4
**handled**  48:20
  122:2 209:16,17
  215:16 253:10
**handwriting**
  187:22
**happen**  19:11
  100:22 123:22
  124:5 158:19
  190:10
**happened**  30:8
  109:1 116:24
  122:1 159:14,15
**happening**  133:24
  236:8

**happens**  10:25
**happy**  6:17 18:11
  95:13
**hard**  255:4
**hargrove**  2:3 4:11
  4:11
**head**  7:19 9:7
  13:24 25:17 81:11
  87:14 118:19
  119:1 175:1
  194:14 203:9
  209:17 214:18
  224:15 268:11
**headquarters**
  82:10 204:9
**hear**  72:20
**heard**  15:5 126:11
  127:14 207:14
**hearing**  36:1
  163:1 205:16
  239:8
**heavily**  224:24
**held**  47:2 203:15
**hello**  76:12
**help**  88:23 107:19
  112:13,23 122:17
  123:1 131:25
  132:2,8 133:12
  157:14 181:15
**henry**  2:10 4:13
  4:18 5:5 50:20
  125:21 141:21
  246:16 256:3
**henry.perlowski**
  2:13
**hey**  145:24 212:15
**hi**  145:24
**high**  20:14,16 22:1
  24:19,20,21,21
  91:22,22

**[higher - industry]**                                                    Page 20

**higher** 103:15
151:22 223:15
224:10
**highest** 199:16
**highly** 122:24
**hillis** 72:1 173:24
173:25 227:2,13
227:20 231:2
242:4 244:10,25
245:6
**hillis's** 174:6
**hind** 193:19
**hindsight** 193:22
**hire** 115:1,25
136:4 163:19,23
164:5,7 165:9,15
227:5,6
**hired** 19:13,19
20:9 66:13,14
71:11,23 149:11
227:2 228:12
**hiring** 19:25 20:2
72:8 113:18 228:4
**historically**
110:15,15
**history** 27:11
**hit** 120:12
**hits** 135:11
**hoefle** 154:23
228:5 231:15
232:2 245:5
**hof** 232:2
**holy** 26:8
**home** 13:18,18,19
13:21 22:21 26:17
26:22 27:2,23,23
27:24 172:17
173:3
**homes** 27:18 49:24
50:9 172:15 220:1
220:25 221:22

224:18,22 225:5
225:21
**honestly** 238:9
**hopefully** 148:14
**hotel** 22:11 223:5
223:8,12 224:16
250:15
**hour** 205:2,8
213:8,12
**hourly** 229:7
**hours** 8:1 204:19
**house** 2:16,16
63:23 64:5,6,13
72:14 232:14,20
258:2
**hr** 28:19 73:6
74:10 78:16
136:10 140:8
149:23 153:24
157:2 242:22
243:12,13,19
**huh** 10:18 12:13
12:13 27:13 37:7
42:22,24 46:21,23
58:12 62:18 63:7
63:21 69:22,25
70:2,12 78:20,22
85:20 87:11 91:18
95:19,22 96:3,6
101:18 108:19
112:8 115:21
122:12 123:7
133:10 134:23
137:11 140:17,23
141:9 142:7,24
143:2,7 145:15
147:7 152:2,4
156:6 158:10
162:23 164:12
165:22 178:3
188:1,24 191:3,3

193:1 200:21
208:23 223:1,3
224:14 229:14
265:14
**human** 5:24 9:13
149:5,6 161:13,19
166:19,23 253:1
254:10 271:1
**huntsville** 71:12
**husband** 87:3,8,13
87:15
**husband's** 23:25

**i**

**ideal** 208:20
**identification**
53:11 58:18 86:3
114:3 121:7
132:19 137:6
138:6 142:12
148:9 155:19
160:24 166:10
167:11 171:6
175:3 177:15
178:19 186:20
196:24
**identified** 3:11
152:22 267:21
**identify** 4:6
172:17 173:3
175:9
**identifying** 75:9
**ignore** 154:6
**immediately** 90:3
90:12 91:1
**impact** 106:16
108:10 128:4
129:14 134:5
170:11,15
**impacted** 104:14
134:10 135:20

**impacting** 108:22
**impair** 7:12
**implemented**
73:24 107:13
**inappropriately**
208:18
**inception** 245:18
**include** 176:18
**included** 167:24
197:21
**including** 96:4
251:6 263:21
**income** 88:10
190:23
**inconsistent** 185:1
**incorrect** 146:1
**increase** 91:15
**increased** 160:12
**incur** 218:13
221:18 222:1,8
**incurred** 21:3,6
168:25 225:24
250:6
**independent**
218:12
**indicate** 141:3
210:8
**indicated** 91:20
184:20
**indicating** 146:17
**indication** 93:12
**individual** 67:15
69:23 71:16 73:1
82:4 83:8 84:3
110:9 212:12
**individually**
211:20
**industry** 62:10,16
72:16 79:22 80:15
83:22 90:23 103:5
198:2

Gina Spearman                         November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[inevitably - july]**                                           Page 21

**inevitably** 165:1
**infancy** 97:20
**inform** 164:21
**information** 50:3
  83:24 94:13,18,24
  95:9 96:8,9,12,13
  96:22 98:9,10,15
  98:25 186:25
  188:18 192:9
  197:20 210:3
  215:19
**informed** 19:24
  100:6
**initial** 42:1 43:13
  43:18 46:2 231:6
**initially** 66:22
  114:25
**initials** 55:13,13
  55:16,18
**initiate** 163:15,18
**initiated** 9:24 10:1
**innocence** 26:8
**input** 61:14
**instance** 169:19
  196:13
**instances** 104:16
  104:18
**instructed** 18:3
**insurance** 56:20
  56:22
**integrity** 208:7
**intent** 271:7,14,18
  273:3
**intention** 135:2
  272:25
**intentionally**
  134:8
**intentions** 267:5
**interest** 35:25 37:6
  90:19 102:20
  103:2,10,15

198:13 274:10
**interested** 30:1
  72:12 189:18
  244:13 275:13
**internal** 74:1,7,16
  74:17,18 75:6,9
  175:17
**interrogatories**
  3:14
**interrogatory**
  114:11,13,18,19
**interrupt** 192:21
  209:24
**interrupted**
  141:14
**interrupting**
  269:19
**interview** 79:21
  81:16,17
**interviewing** 80:2
**introduced** 130:7
  138:23 139:9
**introducing** 139:6
**intuitive** 127:1
**invest** 230:7
  245:16
**invested** 242:15
  245:15
**investment** 224:18
  225:9 226:1 246:1
  246:14
**invoices** 20:20
  97:17 100:19,22
  221:23
**involved** 73:13
  75:6,7,8,9,14
  144:8 164:22
  224:24 228:14,16
  228:19 229:21
  230:5,19,22 231:2
  231:5,15

**involvement** 75:4
**involving** 188:4
**irrespective**
  146:22 151:8
**issuance** 74:11
**issue** 32:10,12
  75:23 78:15,24
  122:22 124:25
  131:9,19,21 154:3
  187:22 194:15
  206:3 210:9 233:5
  243:19
**issued** 22:3
**issues** 20:15,17
  113:19 193:17
  242:23 243:12,13
**italics** 260:16
**item** 20:21 97:22
  100:11 250:20
**items** 20:19,23
  97:17 181:25
  184:20 208:2

**j**

**jacket** 114:8
**jackson** 2:4 4:14
  4:14
**jan** 39:25 94:6
  97:9 112:17 117:3
  130:22 131:1,22
  140:10,20 141:6
  142:5 153:18
  154:12 165:10
  180:23 199:10
  204:20 205:9,12
  211:2,12,22 212:2
  239:3 241:3,4
  243:2
**janet** 72:1 173:23
  227:2 231:2,4,7,9
  231:13 242:4,24
  242:25 243:5,7

244:10,15,25
  245:5
**january** 85:4,18
  138:11 139:25
  140:11 141:8,12
  142:2 201:7,9
**jason** 209:16
**job** 193:11 228:20
**johnston** 133:12
**join** 40:21 52:13
**joined** 46:1,6,11
  47:3,9,16 48:15,19
  49:1,9,15 51:9
  57:13 66:16,17,22
  67:14,19 79:12
  85:23 125:6
  154:23 204:17
  220:3 227:20
**joining** 40:16
  47:13 70:9 79:22
  79:23 83:10
**joint** 168:9,13,23
  170:23 204:13
**jointly** 78:4
  213:16
**jon** 14:14 15:18
  39:16,25 45:22
  56:7 68:6,11
  93:23 95:11 97:9
  112:16 117:3
  130:22 131:1,22
  138:25 140:10,20
  141:7 142:5
  153:18 199:10
  204:20 205:9,12
  206:1 211:2,12,22
  212:2 213:16
  241:6,6
**judicial** 274:6
**july** 3:22 114:12
  152:15,16 188:6

189:2 265:6
266:12,24
**jump** 5:25 114:12
**junior** 32:21,24

**k**

**k** 26:1
**karen** 1:15 274:24
275:20
**katie** 78:18
**keep** 84:11,15
242:6 256:6
**keeping** 240:20
241:22
**kelly** 9:20 16:2
37:13 38:21 61:13
61:25 73:25 78:4
82:15,17,20,20
83:1,23 85:15
87:18 100:15
104:4 105:19
106:1 107:2,4
112:9 116:14
118:25 121:17
123:9 130:21
135:10 146:4
159:3 163:7,11
164:9 173:23
174:14 175:13
177:5 181:10
184:5 188:25
190:12 196:17,20
199:11 205:9,12
210:6 212:14
222:9 230:24,25
230:25 232:1,3,4
233:11 235:13
236:13 238:13
239:22 243:2,17
243:21 244:8
**kelly's** 49:5 179:3
181:6 183:25

220:5 222:20
248:7
**ken** 2:16
**kept** 215:21
**kind** 7:9 20:3 25:6
49:2 103:23 116:7
116:8 144:13
149:21 211:25,25
215:10,10 224:17
226:1 241:16
**kinds** 8:10,23
30:25 163:5
184:22,25 197:20
218:10 221:17
**kissimmee** 143:5
144:21 146:11
**kitchen** 10:5,15
11:5 13:6,14
**knew** 83:25 91:23
107:13 137:9
149:22,23 157:1
215:15 220:2
245:4,5
**know** 5:12 6:6,9
6:17 9:13 11:15
12:4 15:4,5 19:20
20:21 22:25 27:11
27:16 30:8 35:25
37:6,10 39:8,10
42:12,25 50:20
51:18,20,20 52:23
57:22 59:10 62:8
62:10 65:24 66:4
68:3,15 73:16,18
73:19 74:6 80:1,3
83:24 91:21 93:24
96:10 97:8,21
109:24 110:3,7
113:18 116:9
121:10 122:23
127:6,10,12,25,25

130:14 134:4,12
135:19,22 136:16
136:20 140:2
148:18 160:4
161:6,8 163:10
164:1,15,18
165:20 166:6
169:11 172:2
174:17 180:7
181:9 182:7,9
185:25 186:2,24
190:25 191:2,8,10
191:11,14 192:7,9
193:10 195:10,14
196:2,3,6 197:17
197:23,25 198:2
198:18 200:17,23
201:5,7 202:18
208:24 211:24
212:3 214:24
215:24 217:4,8
218:3 222:24
223:13 224:21
226:22 234:3
236:8,9,24 238:5
241:10,11 243:18
244:24,24,25
245:5,9,13 249:7
251:25 256:2
258:9 260:11
263:16 271:12
**knowing** 107:10
221:6
**knowledge** 11:8
11:12,16 22:18
23:1 31:7 32:11
36:18 38:18 39:7
44:14 55:19 61:14
61:16,18 65:5
67:12 72:16 82:18
94:4 116:5 137:24

155:15 159:8
169:20 173:21
202:11 209:13,14
217:6 219:25
245:7 250:4,18
265:7,19
**known** 125:5
244:25
**kristin** 133:17

**l**

**l** 16:24 19:15 20:4
20:8,10,14,17,19
78:21 83:17 88:9
88:14,24 91:10,14
93:11,13,20 95:10
95:21 96:2,11,15
96:22,23 97:19
120:12 180:18
200:8,12,14
201:23 207:9
208:4,7 209:18
274:1
**lack** 103:4
**lakes** 143:5 145:1
146:11
**language** 177:4
259:14 260:16
**laprade** 14:8
183:22,23,24
187:4,5 188:5,19
188:23 189:7,22
190:5
**laptop** 22:6
**large** 51:19 104:19
139:15 220:2
**lasted** 204:19
**late** 15:14 81:15
227:9 235:9
**latest** 139:25
**law** 268:14 269:1
269:5,16,22

Gina Spearman                                                November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[lawsuit - loan]**                                                      Page 23

**lawsuit** 7:7 11:7
  11:11 12:10,12,15
  12:20 13:6,9,12
  14:8,12,15,20 15:1
  53:16
**lawyers** 7:18 8:3
  114:14 224:7
**lay** 62:20 102:16
  121:1 151:3 163:5
**layer** 121:1
**lead** 47:14 64:1,9
  68:22 73:20 125:5
  125:7,25 126:6,12
  126:17,20,21,25
  127:20 128:7,8,9
  128:20,20,24,25
  129:20
**leadership** 19:22
  80:19 81:2,10,14
  94:1 95:18 100:17
  101:20 103:22
  105:13,25 106:20
  116:3,18 131:15
  131:20 186:1
  195:2 202:12,20
  202:22 203:1,15
  203:24 204:3,7
  207:15 210:17
  211:1,6,7,22
  212:25 213:6
  216:10,17,20
  217:14 221:20
  225:25 232:9,23
  250:7 267:25
**leading** 45:19 48:8
**leads** 127:21
  129:16 130:13
**learn** 134:19 174:8
  213:6,10 243:20
**learned** 134:12

**learning** 244:11
**lease** 130:6
**leasing** 174:22,24
**leave** 36:15,19,20
  38:2,3 93:24
  193:4
**leaving** 37:1,19
  56:23 79:16 86:1
  243:17,18,21
  244:8
**lee** 15:1
**left** 13:7,13 14:7
  14:10,22 19:10
  27:11 29:7 30:1
  33:24 34:12 40:7
  52:12 70:11,21
  79:12,21 80:9,14
  84:24 85:22 93:25
  94:5 95:17 97:9
  212:7 216:10
  237:15 238:4
**legal** 7:9 37:15
  57:18 58:2 76:17
  88:18 130:25
  131:2,5,8 254:14
  255:19 256:12,16
  259:7 269:8
**lender** 31:22 64:20
  103:16
**lenders** 215:8,11
  215:14
**letter** 47:19,21
  53:18,21 54:6,13
  54:16,23 55:6,23
  56:6,17 57:7 58:6
  58:13,23 59:7
  61:1,21 63:19
  65:2,14,22 76:14
  76:17,18 77:8
  78:17 220:22
  247:20,22 248:5

251:1,3,4 252:23
  253:4 257:4
  270:20,22,24
**level** 20:14,16 22:1
  75:3 110:12,13
  213:20,21,22
  215:6 216:11
  217:1 218:2
**levels** 45:2
**lex** 15:7
**lien** 32:21,24 33:3
  33:5,9
**life** 241:19
**lifting** 175:22
**liked** 231:14
**limit** 223:12
**limitations** 260:21
**limited** 263:22
**line** 20:19,21,23
  33:11 97:17,21
  98:6 100:11
  108:22 276:13,14
  276:15
**list** 101:13 172:15
  221:22
**listed** 27:23 126:3
  130:15 262:17
**listen** 36:21,25
**literally** 172:17
  173:2,4 174:21
**litigation** 125:1
  274:19
**little** 7:1 30:5
  32:18 83:14
  113:24
**live** 96:12
**lived** 244:21
**llp** 2:11
**lo** 3:18 128:9,10
  130:23 135:11
  261:14,17

**loan** 3:19 31:6,15
  31:16,16,17,20,22
  32:5,6,12,17,19,24
  32:25,25 33:9,11
  49:6 58:10 62:4
  62:23 63:2,9,13,24
  63:25,25 64:1,8,19
  64:19,21,22,23,23
  68:14,15 99:17
  102:19,23 103:1,3
  103:6,23,24 104:3
  105:14,15,24
  106:8,18,18,22
  108:4 109:3,9
  110:12 111:8
  115:2 118:21
  119:14,15,20
  120:5 121:3
  123:21 124:4
  125:21,23,24
  126:1,2,2,14
  127:23 128:4,8,12
  128:13,19,20,21
  128:24 129:1,9,14
  130:14,18 131:19
  131:24 132:5,7
  133:24 134:5
  135:17 143:4
  148:24 149:19
  150:2,16,17,24
  151:4,14,14,16
  152:20,21 153:12
  153:13,21 154:4
  154:10,19 160:12
  160:20 163:12
  167:3 168:21
  179:23 191:9
  197:17 199:2,20
  216:6 221:12
  225:14,15 232:12
  232:15,17,21

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[loan - managers]                                                              Page 24

233:2 237:14
253:18 257:15
258:22 261:19
262:1,7,7,14,18,19
262:24
**loan's** 106:4
**loans** 3:15 13:20
13:21 29:15,18,20
30:25 31:5,12
32:2,10,21 33:1,6
63:9,22 64:13,15
64:16,18 111:9,12
111:16,17 115:2
120:6 143:4,10,11
144:21,25 151:17
184:18,22,23,24
184:25 190:25
192:12 193:3
214:21 225:12
230:13,17 258:1,5
262:7,19 267:21
**local** 127:22
**located** 41:10,16
**location** 68:22
69:5 71:13 72:11
74:2
**locations** 43:17
52:5 70:5 144:14
172:10 227:20
229:19 230:2
247:4
**lockdown** 240:24
**locked** 102:19
103:6
**lodging** 246:11
**log** 240:24
**logistics** 39:10
90:22
**long** 6:17 7:25
13:2 23:22 36:3
40:2 115:11

204:11 244:24,25
245:4
**longer** 100:7 119:8
120:20,22 121:3
157:22 237:7
**look** 5:23 30:7
36:9 54:6 58:20
59:1,3,4,13 66:5
72:24 97:21 98:2
100:3 140:2
142:21 148:12
151:24 153:23,24
154:7 156:8 157:6
157:13,19,20
161:5 162:19
181:24 182:10
185:12 188:11,17
189:12 191:5
197:3,5,6,8 208:20
241:10 259:23,24
261:6 265:11,22
267:8 271:24
**looked** 190:2
205:21 254:23
255:9
**looking** 9:15 16:19
36:15,19,20 40:25
41:1,25 42:3 43:1
80:22 112:2 133:8
158:3 174:11,18
187:3 201:11
251:2 257:3,5
**looks** 57:6 78:17
86:11 143:9
146:14 183:13
187:19 188:18
189:21
**loosely** 180:6
**loss** 16:21 17:15
17:18 18:7,16
83:12 109:8

138:19,22 202:10
**lost** 139:2 208:22
209:2
**lot** 5:17 49:16
51:17 74:7 157:22
182:8 194:9
200:11
**lots** 221:24
**low** 91:21,22
131:11 198:13
**lower** 103:11,18
128:8 129:7,15,22
132:6 144:16
145:8,18
**lowered** 119:5
**ls** 89:16 94:13,18
94:24 95:9 96:8
205:20,22
**lump** 101:16,17
**lumped** 101:8
**lunch** 76:7 223:8
**lunches** 223:5

**m**

**m** 2:10 3:2 24:1
**macrolevel** 110:11
110:17,22
**maiden** 23:12,15
**main** 201:23
**maintain** 21:12
218:22 221:14
**maintaining**
218:15
**major** 208:3
**majority** 30:15,24
104:6,8,15
**making** 105:23
109:23 125:22
132:5 221:6
**male** 84:4 89:12
**managed** 28:25
209:8

**management**
28:14 64:7 85:17
237:22,24 248:23
249:3,13
**manager** 3:13,20
28:11,13,13,22,23
41:12 44:15,15,17
44:22 45:6 47:20
47:21 48:11,11
58:7,15,21,25 59:8
59:14,25 60:3,7,11
60:15,19,23 65:3
65:14,23 68:5,17
68:17,18,19,21
69:4,4 71:12,23
72:8,11 76:21,23
77:3 104:22
116:23 129:22,23
129:25,25 130:1
135:25 137:24
138:10 140:9
141:6 142:6
144:10 146:6,19
146:22 162:6,11
162:16,16,17
163:8 164:10
167:5 173:24
188:6,6 203:24
228:21 229:12
242:3 247:20
249:3 257:8 258:8
258:12,22 259:13
260:5 263:21
266:15,20 267:21
268:13,24 269:13
269:21
**manager's** 144:15
**managers** 20:5
68:14,16 104:20
129:15 134:1,5,9
134:21,25 135:4

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 302 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[managers - meeting]                                                                 Page 25

135:17,19 154:24
162:5,10,14,15
163:9 164:11
177:22,23 178:5,9
179:23,24 191:12
191:19,20,21
195:6 203:23
204:3 221:12
267:18
**managing**  201:6
**manner**  161:12
**manual**  223:6
**manually**  97:24
**march**  88:7,13,16
88:19,22 95:24
96:5,10 102:5
113:23 121:13,16
121:24 122:5,16
124:15 137:17
138:1 142:17
144:19 171:10
202:21 216:16,19
253:22 266:21
**margin**  198:6,8,11
207:11,18
**marital**  87:10
**mark**  187:12
255:3
**marked**  3:11
53:11,14 58:18
86:3,6,15 114:3,6
121:7,9 132:19,22
137:6,14 138:5,8
139:24 141:25
142:12,14 145:22
148:9 155:19,22
160:24 166:10,12
167:11 171:6,9
175:3,5 177:15,17
178:19,21 186:20
186:23 196:24

197:1 247:19
**market**  32:10,12
32:18 40:25
103:13,16 104:24
105:8 164:14,15
173:14 193:11
198:10 215:13
236:20 244:20
245:22
**marketing**  49:2,4
49:8,12,14,17 51:8
51:10,14,17,22
68:17 69:3,4
100:3,7,9,12,19
101:9,10,11,13
102:4 108:24
133:13 209:17
212:3 213:7,24
214:10,12 217:13
217:15,17,18,22
218:7,10,16,18,19
219:1,5 220:4,11
220:13,16,21
221:15,17,24
222:7,11 225:23
233:7,8,12,21
234:7,23 235:5
236:3 239:4,10
249:21 250:5,11
250:12,22 253:5
268:3
**marketplace**
11:25 12:20 80:4
80:6 215:8
**married**  23:13,14
23:20
**marty**  24:1
**marybeth**  2:3 4:8
9:16
**match**  141:12

**material**  252:22
270:23
**math**  108:8
**matter**  275:14
**matters**  154:13
**maximum**  63:20
64:13,15 257:24
**mbgibson**  2:7
**mean**  9:13 10:16
11:18 12:13 39:8
62:13,19 99:17
102:23 103:8
104:11 115:9
117:23 124:22
126:12,13,25
127:4 131:8
133:23 136:16
143:22 151:4
165:24 168:3
192:21 207:8,17
208:21,24 209:23
211:2 214:14
253:25 254:2
261:13 268:15
**meaning**  96:11
103:13 104:13
113:2 115:10
126:14 137:22
207:22 236:16
254:2
**meaningful**  30:8
**means**  62:15
206:15,18 208:15
255:15,22 256:20
259:20,21 262:9
**meant**  45:12 62:2
64:17 150:11
152:25 153:5
160:20 187:12
207:11

**measures**  205:23
**medical**  56:22
**medications**  7:11
**meet**  5:6,8 10:4,25
38:23 39:21 47:8
113:16 200:20
**meeting**  8:3 11:13
12:19,25 13:5
15:17,22,25 16:14
16:15 19:9,22
20:13 38:22 39:12
39:18,22 40:2
43:24 44:5,13,25
46:3,10,11,12,20
47:2 80:20 81:2
81:10,14 82:14
83:7 84:2,6,7,17
85:7,10,18 89:18
89:20,21 94:1
95:18 100:5,18
101:20 103:23
105:13,25 106:20
107:16 109:1,8
112:16,17,21
116:3,18,22
123:18 131:15,20
174:11 186:1
195:2 198:23
199:8,9,12,15,23
200:9 201:7 202:9
202:12,20,22
203:4,5,6,16,24
204:3,7,11,13,14
204:19,20,22
205:2,8 207:15
210:17 211:1,7,8
211:15,17 212:7
212:21,22,25
213:6,8,12,23
214:23 216:10,18
216:20 217:14

221:20 225:25
232:9,24 235:2,8
235:12 236:4,5
239:1 240:10
241:13 250:7
267:25 272:8,10
272:14
**meetings** 38:24
39:1 40:4,11,15
42:2 43:13,18
44:23 47:5 85:21
139:1 140:21
174:12 184:6,11
203:1 204:15,18
212:13 228:16,19
**member** 26:20
**members** 85:17
117:13
**memory** 32:3
35:20 41:17
127:19 129:19
131:10,12 157:18
204:12
**mention** 243:16
**mentioned** 7:15
20:9 45:19 51:9
53:1 68:20 71:16
72:7 77:11 81:3
83:8 156:13
184:18 191:1
199:20 204:25
205:2 213:8
217:23 243:11
245:13
**mentioning** 52:24
**met** 5:6 7:22 9:25
9:25 85:16 200:23
211:20 235:17
245:3
**method** 210:15

**metro** 25:8,14
**mgr** 3:15,17
**michele** 154:23
228:4,10,18 230:4
231:15,17 232:7
233:4 234:4 235:3
235:15 236:23
237:19 239:9,15
239:18,23 240:15
242:10,20,25
243:1,4,16,20
244:1,7,12,18
245:5
**michele's** 234:23
**microlevel** 110:12
**microphone** 105:2
**microsoft** 241:11
**mid** 81:15 91:22
**middle** 244:18
**miguel** 146:6
**miguel's** 146:5
**mill** 10:5,14 11:5
13:5,14
**million** 19:25
80:21 92:2,14
93:7,8 100:6
107:20 112:12
205:1,17,24
206:24 210:5
268:2
**mind** 238:3
**mine** 100:15
175:12 179:2
248:8,9
**minor** 7:8
**minus** 63:12
**minute** 50:2 146:8
170:4 256:10
**minutes** 5:6
**misallocate** 236:8

**misallocated**
107:20
**misallocation**
19:25 20:15 80:21
100:6 112:12
205:24 206:5,7,8
206:18,25 207:4
207:16,22 208:2,9
208:15,22 209:2
209:19 210:5,10
268:1
**mischaracterizes**
124:6
**misstates** 176:10
176:21 269:24
**model** 16:25 17:19
18:8,16 20:8,10
44:6,9 83:12,15,17
88:14,24 91:11,15
95:21 96:2,24
97:6 202:10
**modification**
263:17
**modified** 252:23
270:24
**moment** 47:20
74:25 76:1 90:7
140:2 147:25
186:12 187:1
195:3 237:11
264:11
**monetary** 261:20
**money** 109:16,22
160:21 208:22
209:2 210:15
211:1,8,13 218:5
219:10 229:6
236:9
**month** 9:23 80:25
81:13 98:17 102:4
151:19 152:7

171:14 177:24
178:5 182:13
190:10 192:9
195:24 240:10
**month's** 98:20
**monthly** 98:22,25
99:2 100:12,14
101:14 102:6
134:21 167:21
170:2 175:12,23
177:23 179:16,21
180:1,8,25 181:4
181:19,22 182:3,6
182:16 183:2,5,12
183:16 184:2,11
185:17 186:25
188:12 189:8
197:9,19 249:23
258:16
**months** 10:21,22
11:1 14:4 19:21
34:10,17,22 36:6
81:9 83:2 151:6
179:3 190:24
192:10 234:19
**morning** 5:5 76:15
77:23
**morrison** 177:5
**mortgage** 13:18
13:20 26:17 27:2
27:14,19 28:6
33:2,2 36:25 50:3
79:2,8,13 173:5
174:18
**mortgages** 184:23
**motivation** 83:13
**move** 96:23
149:24 157:3
231:13 267:17
**moved** 24:17,20
173:18

**movement** 79:2,7
79:12 80:11,13
84:23 85:2,3,5,12
85:16,22,23 86:1
**moving** 88:6 96:2
202:9
**multiple** 102:9
112:19 148:16
172:9 180:11
185:20,21,21,23
267:4 270:7
272:23

**n**

**n** 3:1,1,2,2 4:1
8:19 59:25 60:3
73:9 77:4,10,24
78:17 99:13
105:14 108:7
115:3 125:6 130:3
137:2 148:23
161:4 249:4,21,25
250:3,4,12,19
**n.w.** 2:11
**naf** 8:20,21,21,23
11:6,24,24 12:11
12:19,20 13:7,13
14:7,10,21,22,25
15:8 16:5 19:13
19:19,24 21:11,25
22:3,7,10,14 23:4
35:8 36:11 37:6
38:10,19 39:1,4,5
39:13,23 40:2,11
40:15,16,21 41:4,6
41:24 42:4 43:12
43:18,24 44:5,13
44:23 46:1,7,11
47:1,3,7,9,12,23
48:14,15,19,19
49:1,1,8,9,14,20
51:7,9,14,24 52:13

53:8,15,21,24 54:3
54:9,12,24,24
55:24 57:3,13
61:6,14 64:24
66:17,23 67:12
69:19,20 70:11,13
71:10,15,21 72:2
74:14 75:20 79:12
79:16,21 80:10,14
84:24 85:22 86:1
87:2,16 89:25
90:19 92:1 93:24
94:12,12,17,24
95:8 96:22 100:7
106:21 109:23
120:7 125:21
130:3 133:14
135:23 137:2
143:17 144:1
146:4 148:25
150:7,9 153:5
156:11 168:25
169:2,14 172:6
173:4,10 174:16
174:19 176:9,19
178:16 185:17
209:1,12 210:18
210:20,22 212:9
221:23 224:23
227:1,4,16 228:9
229:19 230:5,8,20
230:23 231:3,10
231:11,12,14,16
234:10,18 236:8
238:25 239:9
240:2 241:10
243:18,21 244:8
245:2 246:13
250:19,23 251:4
252:9,12 259:4,14
266:13,25 267:20

268:1,16 270:8
271:7,17 273:3
**naf's** 14:11 15:18
22:13,23 23:7
40:5 42:25 45:20
46:2 70:6 82:16
130:25 203:21
204:9 213:6,10
223:6 259:4,20
266:9
**naf130** 147:10,21
**naf135** 140:6
**naf470** 156:5
**name** 15:6 16:8
23:12,13,15,25
24:10 25:9 55:10
70:17,25 71:1,2
78:19 81:22,25
89:6 180:13,14
183:20
**name's** 5:5
**names** 23:17 25:11
25:24 26:25 27:12
151:25 152:3
**nashville** 227:21
227:22,25 228:3
235:16 237:5,6
244:21
**national** 225:1
**nature** 5:24 9:13
207:3
**ne** 2:5
**near** 117:18
**necessarily** 23:4
102:25 142:18
208:21 238:14
**necessary** 102:18
215:7 276:8
**need** 6:16 59:4
112:13 114:14
117:7 136:16

149:12 150:1
153:7 155:7
157:19 173:5
197:5 212:19
251:11 256:7
259:9 268:18
270:16,17
**needed** 107:19
112:22,23 149:8
149:23 157:1
189:10 269:10
270:5
**needs** 90:18
157:13
**negative** 230:18
**negatively** 170:12
**negotiated** 56:12
61:5
**negotiating** 55:22
**negotiations** 47:12
**neither** 211:12
275:11
**nephew** 25:20
174:5,6,15
**net** 201:24 202:1,7
230:18
**network** 22:15
**never** 50:15 166:1
192:7 200:19
201:21,22 252:9
266:25
**new** 1:7 2:16,16
4:18,20 8:16,18
12:5,8 13:21
16:17,23 17:3
19:2 27:25 35:9
36:1 38:23 41:1
49:24 50:9 66:15
88:6,21 97:5,10,14
107:13 109:4
113:20 127:8

136:1,3,6 139:2
145:25 146:18,21
164:5,7 165:9
180:2 213:20
216:11 220:1
221:21 225:13,21
247:10 253:20
276:3
**news** 240:18
**nice** 5:6,8 224:16
**nick** 2:4 4:14,17
**niece** 25:20
**night** 117:4 223:12
223:15
**nine** 138:5 139:24
**nodding** 9:16
**nods** 7:19 9:7
13:24 25:17 81:11
87:14 118:19
119:1 175:1
194:14 203:9
214:18 268:11
**nominal** 229:6
**non** 56:14,18 57:4
64:23 77:11,19,25
78:1,6,11
**noncorporate**
129:21
**normally** 204:12
**north** 67:6,8,15
69:24 70:19 71:15
71:18 139:14,18
**northern** 1:1
**nos** 9:7
**notary** 276:23
**note** 206:14
**notes** 3:20
**notice** 90:5,25,25
142:19 268:13,25
269:2,14,21,23,23

**notwithstanding**
270:7
**november** 1:16
3:23 16:19 17:2
30:9 34:12,14,15
36:12 53:15,24
54:3,8,11 59:15
122:24 133:9
137:25 190:14
198:23 199:8,23
200:13 202:8
264:7 266:20
272:8,9,13 274:21
275:15 276:5
**number** 27:12
53:10 58:17 63:12
86:2 100:13 102:6
107:24 108:7
111:9,16 114:2,19
118:4 119:15
120:18 121:6
132:18 137:5
140:1,6 147:10,20
148:8 151:6,18
155:18 160:23
166:9 167:10
171:5 175:2
177:14 178:18
196:23 204:25
251:17
**numbers** 138:5
142:11 175:22
176:14,17 186:19
202:1 210:18
233:23
**nurtured** 242:15
245:15

**o**

**o** 3:1,2 4:1 274:1
275:2

**o.c.g.a.** 274:10,14
**o0o** 1:9
**object** 256:1
266:16 267:22
269:4
**objected** 256:4
**objection** 12:1,21
17:7,20 18:9,25
19:12 22:17 30:2
34:3,25 35:19
36:22 37:22 38:5
38:13 39:15 40:12
40:22 42:11 43:6
46:13 47:15 48:1
48:21 57:14 61:7
63:15 69:17 75:11
79:17 92:9 99:9
109:17 111:13
121:21 123:23
124:6 125:9
136:22 143:21
156:24 159:20
160:16 176:10,21
177:9 182:18,22
193:18 194:2,7
201:13 203:19
207:24 209:3
211:4 216:2
218:24 219:7,11
220:18 223:19
248:24 249:15
250:8 251:8 252:2
254:13,24 255:16
255:18,24,24
256:3,11 257:17
259:6 260:22
263:1 264:1
269:24 270:12
**objections** 256:22
**objects** 17:25

**obradovich**
209:16
**obtain** 81:23
174:10 234:1
**obtained** 64:7
246:10
**obtaining** 103:12
**obvious** 225:20
**obviously** 104:24
105:8 106:3
108:23,25 150:5
257:6
**occasional** 39:9
**occasionally** 149:7
181:14
**occasions** 95:12
112:19 136:2
150:25 154:22
184:5 201:22
207:9 272:7,23
**occur** 221:25
**occurred** 240:6
245:10
**october** 15:16
34:14,15 36:4
79:5 173:19 240:7
240:9 244:3
245:12
**offense** 7:8
**offer** 3:12 40:8
47:19,21 53:8,14
53:18,21,23 54:2,6
54:13,15,23 55:6
55:21,23 56:6,17
57:6,19 58:6,13,23
59:7 61:1,20
63:19 65:2,14,22
73:6,14 74:10,11
75:23 76:14,17,18
77:7 78:17 79:7
83:5 149:10,16

Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[offer - okay]**                                           Page 29

153:8 164:25
165:16 216:7
220:22 247:20,22
248:5 251:1,3,4
257:4 270:20,22
**offered**   57:8
**offering**   215:15
216:7 236:25
**offers**   150:2
156:17 165:11
**office**   14:12 82:13
117:19 133:15
168:6,8,20,22
172:11 228:1
**officer**   3:19 64:1,9
104:3 105:15
106:18,19,22
108:4 125:24
126:2,14 127:23
128:8,12,13,20,22
128:25 129:1,10
131:19 132:5,7
148:24 149:20
150:2,18 151:4,14
151:16 152:20
153:12,22 154:5
154:20 168:21
232:12,15,17,21
233:2 262:14,24
**officer's**   31:6
63:13 128:4
150:16,24 253:18
262:1
**officers**   62:4 63:9
68:14,15 103:23
109:3,9 111:8
115:2 130:15,18
131:25 133:25
134:6 135:17
152:21 153:13
154:10 160:12,20

167:3 179:23
216:6 221:12
225:14 237:15
257:15 262:7,8,18
262:20
**offices**   15:19 22:14
40:5 41:1 42:1,3
46:2 66:14 172:9
274:11
**offset**   132:9 222:2
**oftentimes**   241:12
**ogletree**   2:10 4:20
4:20
**oh**   52:18 114:9
147:16 161:24
170:5 254:2
267:11 272:7
**okay**   5:11,21 6:3,4
6:7,8,13,18 7:18
8:19,21 9:3,6,10
10:3,9 11:3 13:11
14:2 16:7,11 20:7
21:22 22:20 23:2
25:21 27:7,21
31:24 33:18,21
34:5 35:3,15,23
38:16 39:3,11,20
41:18,23 42:18
43:10 44:20 45:4
45:8 47:6,11 48:5
48:17,24 50:8,13
50:17,23 52:22,24
53:5,6 54:5,22
55:12,20 56:3,25
57:17 59:12,19,23
61:9,19,24 62:25
63:4,11,18,18 64:3
65:1,12 69:1,11,14
70:3,10,16 71:4,8
71:20 72:7,21
73:12 75:1,16,22

77:1,15,21 78:3,13
79:1,4,6 80:8,24
82:23 84:1,22
86:19,25 87:13
89:5,10,14,24
92:24 93:2 95:7
95:16 96:16,20
98:1,6,7 99:5,23
100:2,16,25
101:12,15 102:2,8
102:13 103:4,17
103:21 105:11,17
106:12 107:22
110:21,25 112:1,3
113:4 114:1,23
115:6,13,19
117:16 118:1,6,13
118:16,24 119:13
119:19 120:10,13
120:17,25 121:5
121:15 122:3
123:4,10,19
124:17 126:5,10
127:24 128:18
129:6,12 131:4
133:4,7,20 134:7
134:17 135:6
136:5,15 138:3
139:8 140:4 143:8
143:25 144:7,24
146:20 147:16,23
147:23 148:19,20
149:13 151:13
153:9 154:1
155:17 157:5,9,12
157:21 158:1,6,17
158:24 159:5
161:7,18 162:18
164:4 165:6,12,18
166:17 168:11,16
169:6 170:5,7,18

171:4 173:8
175:18,25 177:2
178:11 179:10,15
180:22 181:17
183:23 184:8
185:15 186:10,13
186:18 187:2
188:1,9,15 189:6
189:11,13 190:20
191:16,18 192:4
192:13,18 193:13
193:25 194:11,21
195:9,13,15,16,18
195:20 197:15,18
198:16 199:7
202:22,25 203:12
204:1,21 205:6,15
206:10,13,23
207:2,7,13,20
209:11,15 211:11
213:2,4 214:1
215:4 216:4,9,13
217:5,11 219:3,17
220:15 222:5
223:21 224:3
225:17 227:3
229:4,17,25
230:15 233:1
234:2 235:1 237:4
237:8,10,16 238:1
238:7,16,20,23
239:7 240:4,8,12
241:8,18 242:5
243:10 244:23
245:8 247:13,17
247:25 248:3,9,18
250:21 252:17
253:3 254:5
256:15 257:2,11
257:22 258:11,20
259:22 260:13,19

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 307 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[okay - page]                                              Page 30

261:1,5,15 262:22
263:10,14 267:7
267:12,14 268:20
268:20 269:12
271:23 272:1,16
273:1
**ola** 58:7,8
**old** 24:18
**once** 10:21,22
125:1 135:1
**ones** 8:8 21:1
77:14 79:25 191:1
**online** 126:1
**onsite** 27:19
**open** 40:25 41:1
42:3 43:1 66:14
87:5 182:10
**opened** 42:14 52:7
71:18 139:3
144:18 228:1
230:1
**opening** 41:25
42:25 43:7,12,17
74:2 144:3,9
228:3
**operation** 244:19
**opined** 131:5
**opinion** 215:3
237:21
**opportunities**
74:23
**opportunity** 18:1
39:14 40:10,20
64:9 72:19,22,25
73:17 75:7,10
161:5 174:9 183:1
243:5,7
**opposed** 33:11
37:21 38:3 50:6
139:10 210:10
218:20

**optimum** 13:19
27:24
**option** 193:8
**options** 85:2
**order** 13:22 27:16
148:14,17 149:23
150:1 153:8 156:2
157:3 191:12,14
221:14
**organization**
26:10 73:5
**organizations** 26:9
26:16
**origin** 126:24
129:13
**original** 16:18
80:23 134:13
167:24 177:12
247:4,12,14
266:25
**originally** 83:24
123:17
**originated** 29:15
128:14 143:4,12
144:21,25 172:3
173:21 230:13
**originates** 31:20
31:21
**origination** 29:15
126:2
**originations** 29:16
**originator** 258:23
**orl** 3:17
**orlando** 67:16
68:21 142:20
143:5,5 145:1,1
146:11,11
**outlier** 121:2
**outline** 27:10
**outlook** 84:12,13

**outperforming**
200:7
**outset** 164:23
**outside** 22:13
42:10,15 43:12
58:10 236:24
258:22
**outweighed**
230:16
**overage** 223:10
**overall** 110:8
**override** 3:18
17:10,13 19:4
29:17,23 30:12,15
30:17,20,23 31:1,5
31:8,11 32:1,9,21
33:5 44:6,9,11,17
44:22 45:6 47:24
48:15 66:9 99:20
101:6 104:21,23
120:9 129:15,20
129:23 130:6
139:6,19 142:25
143:10 144:13,20
145:7,13,18
150:17,23 152:20
153:21 154:4,10
154:19 160:1
162:4 163:8
164:10 169:5
171:19 175:13
179:2,3 184:19
185:1 220:12
222:4,5 229:8,10
230:12,16,17
257:3,8 258:17
260:15,20 261:12
261:13,14,16,24
261:25 262:6,9,10
262:14,19,24
263:22

**overrides** 3:19
44:12 45:19 48:9
98:17 104:13
148:24 149:19
153:12 161:3
171:14 178:15
179:23,24 258:16
**oversight** 41:20
**owed** 99:13

**p**

**p** 4:1 16:24 19:15
20:4,8,10,14,17,19
26:1 83:17 88:9
88:14,24 89:16
91:10,14 93:10,13
93:20 94:13,18,24
95:9,10,20 96:2,8
96:11,15,22,23
97:19 120:12
200:8,12,14
201:23 205:19,21
207:9 208:3,7
209:18
**p.c.** 2:4
**p.m.** 76:8 132:13
132:16 133:9
148:4,6 172:19,22
246:19,22 264:12
264:15 273:11,15
**package** 231:20
**page** 3:4 54:7 55:1
55:4,6,6,14 57:6
59:17,18 61:5,22
61:22 86:10,11,12
86:21 114:13,25
117:20,20,21
133:1,11 135:9
137:17 138:11,18
138:19 140:5
142:17,22 147:9
147:20 156:5

162:1,19 189:19
248:11,15 251:18
252:16,20 254:8
257:5 259:24
260:1,7,8,9,10
261:7,19,22
263:16 268:8
276:13,14,15
**pages** 133:5 156:4
**paid** 30:14 62:4,5
83:11,16 88:4,5
95:10 100:8,13
101:4 128:8
129:15,22 132:7
150:17,19,23
152:9 153:21
155:13,15 158:20
162:4 167:3,3,8
175:16 178:5,8
184:13,17 186:3,6
186:7 191:13
195:7 217:17
224:1 228:23
229:1,3,12 245:17
249:24,25 250:19
261:25 267:18
**paper** 84:15,17
**par** 103:13
**paragraph** 61:21
61:22 63:19
117:25 251:2
268:9 270:19,22
**parameters** 67:1
**paraphrasing**
185:9
**parks** 15:1,4
**parsing** 206:11
**part** 10:23 16:22
27:9 45:20 78:18
91:5 103:5 123:20
130:14 143:19,22

144:11 173:13
206:6 212:12,17
225:1 228:20
246:4
**participants**
240:25
**participate** 89:11
107:15
**participated** 5:12
**particular** 30:25
128:3 154:22
162:7 204:14,14
209:21
**parties** 251:12
253:17,22 254:19
268:19 270:6
274:18 275:13
**partner** 37:10,12
37:16 174:12
201:6
**partners** 3:22
72:18 90:20 91:7
109:8 171:24
172:3,6,12 173:2,9
173:17,22 174:1,8
174:17 179:1,13
193:7 222:14
232:5,8,22 235:14
245:17 246:2
**partnership**
127:21 182:6
**partnerships**
51:20
**party** 7:9 32:7
64:20 274:16,19
**pass** 181:19,21
**passed** 113:11
**passing** 182:21
**patty** 40:1 112:19
113:15 186:4,4
211:21 212:12

**paul** 35:12 149:7
153:6
**paul's** 37:4
**paused** 192:22
**pay** 100:7 101:1
103:2,15 133:21
146:4 155:7
158:13,25 160:8
169:2,4 193:12
222:22 223:10
225:3 249:21
250:3 267:20
**payback** 103:14
**paying** 168:8
193:4 257:15
**payment** 32:1,5,8
100:24 162:21
171:15 222:2,18
223:2 246:2
258:16
**payroll** 189:2,8
191:15,25 195:6
195:15 267:17
**pe** 102:14 122:10
123:13 134:4
**peachstate** 27:20
28:2,3
**peachtree** 28:2
**pending** 157:2
**people** 8:20 51:25
52:2 62:9 66:19
68:13 70:8 72:16
78:8,11 83:21
85:12 156:17
166:7 180:11
185:21,23 191:21
193:6 225:13,15
**percent** 32:13
50:12 61:3,4
201:19 220:6
250:1

**percentage** 18:19
30:20 62:21,22
63:2 111:11,17
218:23 233:25
**performance**
95:14 267:5
271:13
**performed** 197:24
198:18 210:18,22
**performing** 200:6
**period** 31:6 40:3
107:18 110:19
112:13 122:15,19
123:2 124:11
139:3,12 148:24
149:20 150:16,20
150:24 151:2
152:21 153:13,22
184:24 239:3
261:12,13,17,21
261:24 262:2,7,8,9
262:11,14,25
266:23
**periodic** 10:23
156:10
**periodically** 6:15
26:6 135:24
148:25
**periods** 150:6
154:5,11,20
262:20
**perlowski** 2:10 3:6
3:8 4:13,13,17,18
5:4,6 9:11 12:7,23
17:11,23 18:12
19:8,18 22:19
30:3 34:4 35:2,22
36:23 37:24 38:7
38:15 39:19 40:13
41:3 42:17 43:9
46:14 47:17 48:4

48:23 50:22,24
51:5 53:12 57:16
58:19 59:18,20
61:8 63:17 69:18
75:12 76:2,10
79:19 86:4 91:2
92:13 99:11 105:5
105:10 109:18
111:14,22 114:4
118:2,5,12 121:8
121:22 123:24
124:8 125:10,11
125:21 132:11,20
137:1,7 138:7
141:15,22 142:13
143:24 147:13,17
147:24 148:10
155:20 157:4,15
157:21 158:2
159:23 160:10,17
160:25 166:11
167:12 171:7
172:24 175:4
176:12 177:1,16
178:20 182:19,25
186:21 187:14,21
187:25 188:3
192:17,19 193:20
194:4,10 196:25
201:16 203:25
208:5 209:10
211:5 216:3
217:10 219:2,8,13
220:20 223:20
224:9 246:18,24
246:25 249:1,18
250:10 251:13
252:3 254:21
255:1,7,17,20,25
256:4,8,18 257:1
257:18,20 259:11

260:25 262:4,5
263:4 264:6,10,17
266:16 267:22
268:23 269:6,17
269:20 270:1,13
273:8
**permissible** 74:24
**permission** 195:22
**persnnl** 3:19
**person** 2:17 10:16
56:8 62:20 68:3
68:19,22,24 69:23
70:23 73:4,18
82:1,4,6 83:7 85:6
85:7,10 107:4
113:15 149:9
152:5,7 163:5,19
163:22 180:12
192:3
**person's** 102:16
151:3 153:8
158:19
**personal** 21:12,13
22:6 31:8 230:7,9
**personally** 84:11
96:21 97:1 98:8
98:10 222:22
**personnel** 3:21
161:3 165:15,20
165:23 178:14,15
**persons** 165:24
**pes** 3:14 101:10
133:22,25 134:3
135:15 212:4
268:3
**ph** 180:14
**phone** 56:10,13
84:12 239:25
241:9,13,15
243:23

**physical** 136:20
**physically** 10:16
**picking** 27:22
**picture** 110:13
**piece** 159:17
**piedmont** 1:17 2:5
**piggyback** 32:21
32:23
**pitch** 181:14
**place** 17:5 84:20
116:16 121:3
125:8 204:7 235:8
**placed** 84:21
159:19
**placement** 49:25
**places** 270:7,15
**plain** 255:17,23
256:19 269:3
**plaintiff** 1:4 2:2
4:10,12,16 114:25
**plan** 97:10,14
113:20,22 140:20
**platform** 20:5
84:6 88:9
**please** 4:6,23 6:6
71:7 86:8 88:12
90:20 114:9
123:25 124:9,9
138:18 140:9
141:6 162:20
175:9 176:13
183:8 189:1
192:21 194:5
208:12 227:11
234:16 242:14
255:6 269:18
276:12
**pocket** 109:16,23
222:22
**point** 5:23 14:24
53:2 62:22 70:24

71:6 73:22 97:2,4
109:3 122:4
129:19 134:8
137:10 138:22
153:3,11 209:12
212:1 236:13
237:7 247:7
261:19
**pointing** 147:8,22
**points** 45:13,16
49:5 62:6,14,15,16
63:1,6,8 64:12,15
115:23 116:4
118:9,18,20
119:5,7,15,16,22
120:5 124:20
146:5,15 158:14
158:21 159:1,6,10
160:2 163:8,16
164:10 166:6
167:2 175:16
179:17 201:24,24
202:1,7 220:4,6
232:19 247:2
250:1 257:14,23
258:1,5
**policies** 250:24
**policy** 101:19
107:14 109:3,20
110:2,21 112:4
113:6,10 116:7,9
116:11 120:22
134:4 135:21
216:24 218:17
219:18 221:4,19
223:6 225:25
234:7 268:2
**political** 25:4
**popped** 224:15
**portion** 3:20 19:3
45:14 56:15 99:20

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 310 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[portion - produced]                                                    Page 33

169:5 188:14,15
**portions** 99:1
**position** 28:8,20
28:23 33:3 45:24
58:7 81:24,25
129:23 162:7
164:15,19 208:8
251:6 253:16
**positions** 68:13
69:2,4,12 162:13
**positive** 199:25
202:23
**possibility** 36:25
38:9 40:16 41:25
43:17 79:16,23
80:14 85:2 111:2
238:25 239:14,17
239:23
**possible** 164:3
200:14
**possibly** 9:23
130:14 186:4
199:10 202:9
244:13
**postgraduate** 25:5
**potential** 51:8
66:9 74:23 121:2
160:12 272:12
**potentially** 73:19
135:20 173:4
235:23
**powerpoint** 23:6
**practical** 207:21
**practically** 158:18
**practice** 137:3
139:10,13 266:9
**predominantly**
42:20
**preferred** 174:11
**preparation** 8:5
8:24

**prepare** 7:21 91:9
175:20
**prepared** 91:21,24
180:1,3,4
**preparing** 99:14
175:19 176:1
178:12
**prepopulated**
126:8
**presence** 40:23
41:5,6 42:10,23
52:8,14 67:12
70:13
**present** 2:15,17
4:6 8:2 14:21
15:21,24 16:4
89:18 204:3
235:19 266:13
**presented** 40:20
47:22 108:3
166:19 169:13,17
253:1 254:10
255:14,21 256:20
271:1
**preslo** 39:25 60:15
94:6,7,10 97:15
112:17 113:2
130:22 131:13,18
135:9 137:19
140:1 154:2,18
180:23 185:8,10
185:24 186:15
205:9,12 239:3
241:3,4 273:2
**pretty** 19:23
112:17 117:5
131:11 193:5
222:13
**previous** 33:10
**previously** 53:3
118:17 185:18

**pricing** 48:20
102:17,18 103:1
103:24 104:3
105:12 106:14,17
106:22,23 107:5,9
107:16 108:3,14
108:21,24 109:7
109:13,14,20
110:10,14 111:3
111:12,17 113:6
114:20 115:1,8,10
115:15,17 116:10
116:19 117:9
119:4,15,25 120:2
120:8,11,20
121:20 131:25
132:2,8,9 133:14
133:19 134:10
135:21 213:11,14
213:23 214:2,6,14
214:15,22,25
215:6,12,16,20,24
216:14,24 253:9
253:13
**primarily** 213:16
214:5 223:4
228:17 267:17
**primary** 83:13,13
181:10 185:4
**principally** 230:5
237:20
**print** 197:4
**printed** 86:11,13
**prior** 10:14 39:4
53:20 59:24 65:5
65:6 70:9 79:9
86:1 87:1 92:18
98:23 100:8
103:22 109:1,7
110:24 118:7,7
125:13 144:19

146:7,7 236:4
245:2,19 249:24
249:25 250:6
266:12
**pritchard** 35:12
35:13,16,17 37:5
39:6 149:7,14
153:6 156:21
**pritcher** 35:13
**pritchett** 156:15
**private** 16:12
22:15 87:8 116:22
**privilege** 87:10
98:5 167:17
**privileged** 175:9
**pro** 124:10
**probably** 41:9
52:7 56:1 78:4,18
91:6 97:5 110:6
117:6 185:3
230:17 234:19
245:18 246:10
**problem** 205:22
212:9,20
**problems** 112:11
**procedure** 223:6
**proceeding** 6:23
7:1,2,5,9
**proceedings** 275:6
275:10
**process** 72:10 75:2
98:16 104:2
106:13,16 116:9
136:18 163:14
183:10,14 191:15
194:23 195:3
222:21
**produce** 245:23,24
**produced** 29:19
29:20

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 311 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[producers - rate]                                                          Page 34

**producers** 83:22
**product** 116:17
  241:19
**production** 19:4
  28:15 29:17 30:15
  30:24 31:9 45:25
  66:5,15,18 68:17
  69:3,4 90:24 91:4
  92:25 93:3 151:8
  151:15,17,20
  152:10 162:16
  191:20 198:3,5
  226:5,8,14,17,20
  262:1
**professional** 26:15
  26:20,24 27:5
**profit** 16:21 17:15
  17:18 18:7,16,18
  18:23 32:18 83:12
  201:19,20 202:7,9
  210:19 245:24
**profitability** 19:5
  67:18 93:9 122:22
  199:3,4,15,16,21
  200:16,17,25
  201:1,17,25 202:2
**profitable** 64:25
  95:13 103:3
  122:25 139:4,12
  139:20 200:5
  249:10
**profitably** 67:22
  68:1
**program** 127:20
  127:23 218:1
**progressed** 38:19
**prohibited** 274:14
**projections** 91:9
**promised** 244:18
**prompted** 131:20

**pronounce** 183:19
**pronouncing**
  183:20
**pronunciation**
  78:19
**proof** 97:24 244:9
**proper** 67:25
**properly** 209:8
**proposal** 122:10
  122:13 123:6,11
  123:20 124:3,10
**proposed** 18:14,16
  54:7 96:13 135:24
**proposing** 16:17
**prorated** 34:1,2
**prospect** 83:10
  244:8
**prospective**
  216:17 219:18
**protect** 135:17
**protected** 87:9
**protecting** 110:8
**proverbial** 69:21
**provide** 90:20,25
  217:18 274:11,15
**provided** 93:19,20
  167:25 218:11
  268:13,25 269:13
  269:21 271:20,22
**providers** 174:18
**providing** 269:2
**provision** 61:20
**provisions** 257:7
  274:10
**proximate** 243:25
**public** 11:8,11,16
  276:23
**publish** 214:25
**published** 103:9
**pull** 262:13 264:25

**purchase** 172:18
  173:3
**purpose** 16:15
  44:24 46:24 82:19
  153:10 179:21
  222:17 267:15,15
**pursuant** 1:12
  165:25 274:5
**put** 46:22 49:4
  99:7 101:8 110:3
  113:9,22 136:20
  156:1 159:11
  206:19 208:16,18
  225:6 255:3

**q**

**qualified** 81:4
**qualifier** 194:16
**quality** 199:2,20
**quarter** 198:7
  226:21
**question** 5:20,25
  6:1,6,10,18 11:18
  11:22 13:10 18:1
  18:4,5,11,13 21:14
  23:24 37:2,23
  40:14 46:24 53:17
  54:1 61:10 62:8
  62:11 67:23 77:7
  77:22 78:10 79:18
  87:6,16 90:4
  92:16 94:20,23
  97:5 102:16
  109:11,12 114:15
  114:17 124:1,9
  125:13 134:18
  137:14 141:16,17
  141:17,20 145:16
  150:22 157:16
  159:21 163:13
  176:13 181:25
  187:6 198:17

222:17 250:3
254:25 255:3
256:1,5,13 257:19
260:10 262:4
269:18 271:6,16
**questioned** 21:6,9
  154:24
**questioning** 21:2
  98:6 155:12
**questionnaire**
  73:25 74:3
**questions** 44:24
  74:1 80:12 95:15
  96:14 97:3,10,13
  121:12 132:23
  150:9 157:10
  169:7 188:20
  194:24 206:9
  236:7,9,10,13
  256:7 264:20,22
  268:21
**quick** 132:11
**quite** 13:10

**r**

**r** 4:1 24:1 78:21
  180:18 274:1
  275:1,2 276:1,1
**raise** 130:17,24
  131:21 184:1
  185:8 194:15
**raised** 130:21
  184:10 185:17
**ramirez** 2:17
**ran** 66:4
**ranged** 202:4
**rarely** 106:1
**rate** 102:20,21,22
  102:23 103:2,7,9
  103:12,13,18
  164:15 215:14
  216:6,7 221:15

Gina Spearman                                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[rate - recognize]**                                                    Page 35

229:7
**rates**   103:10,11,15
198:13 274:18
**rave**   198:25
**reach**   83:22
**read**   76:18,22 90:7
90:9,14 105:5,7
117:24 133:5
134:13 248:8
259:12,12 268:9
268:12 276:7,10
**reading**   1:13 83:3
163:4
**reads**   6:3
**ready**   140:3
148:18 161:6
260:11,12
**real**   3:22 107:25
126:11,15,25
129:9 168:6,9,12
168:20,22 170:23
171:24 172:2,6,12
172:15 173:1,9,16
173:21 174:1,8,17
179:1,12 212:20
232:8,13,22
235:14 245:17
246:2
**realistic**   214:24
215:1
**really**   22:25 33:19
45:1 83:13 113:9
130:13 166:1
198:13 210:12
**realtor**   51:19 64:8
128:9,12,17,20,24
**realtors**   193:7
221:13
**realty**   171:18,23
**realty's**   171:15

**reason**   174:16
268:1,2 276:12
**reasonably**   243:25
**reasons**   249:8
**reassure**   266:24
**recall**   8:8,10,23
11:9,17 12:17,22
15:24 16:8 17:16
18:5,21 19:19
20:23 21:5,7,8,10
25:23 29:6 30:20
30:25 31:4,10,25
33:12,23 36:13
39:17 40:9 42:14
42:16 43:11,16
44:3,8,12,21 45:5
45:17 46:9,25
47:4,10,22 48:2,13
48:18,22,25 49:4,7
49:10 50:10,14
51:10,13 52:16
53:7,9,20,23 54:2
54:8,10,12,14,15
54:19,25 55:22
56:11 57:5 58:1
59:7 60:1,2,5,6,9
60:10,14,18,22
65:7,8,10,13,20
66:1,7,11 70:5,8
71:21 72:2 73:22
73:23 77:14,18
78:16 80:5,17
81:12,22,24,25,25
84:9,17,19,21 85:1
85:16 89:6,8,15
91:25 92:6,11
95:8,14 97:13
115:22 116:2,6
117:18 137:15,20
137:21 138:12,16
138:17 139:16,22

142:8,15,18
143:15 144:12
153:19 154:2,14
156:9,21 166:15
166:16 169:19,24
170:8 171:13,23
172:1 180:12
182:2 184:9,15
185:16 186:14
189:9 199:14,22
200:4,9,25 201:15
201:18 202:1
205:16 206:2
213:21 214:8
226:20 233:22
235:2,7 238:17,19
238:24 239:8,16
239:21,24 240:5
240:13,17 241:5
241:13 242:12
245:9 246:12
247:7,9,22 248:1,4
248:4 254:5
271:19 272:2,2,17
273:2
**recap**   3:22,23
100:12,14 101:14
102:6 134:22
175:12 177:23
179:16,21 180:25
181:5 182:3,16
183:2,5,12,17
184:2,11 188:6
189:2,8 191:7,10
197:9,19 249:23
**recaps**   98:23 99:1
99:2 134:25
167:22 170:2
175:23 180:1,8
181:19,22 185:18
188:12 190:16

192:24 220:11
**recapture**   139:19
**recaptured**   139:22
**recapturing**   139:2
**receipt**   141:24
**receive**   29:23 31:1
31:8,11 32:9,20
33:5 58:14 62:1
79:7 83:5 93:17
93:17 94:14,19,20
94:25 100:19
115:16 130:13
135:24 136:6
144:13 149:2
150:2 151:16
152:20 161:10,12
165:25 180:8
190:16 197:10
230:12 249:20
257:8,25 258:4
265:7,19
**received**   29:16
30:23 31:5 38:9
53:7 54:13,15,23
58:13,23 59:24
77:2,8 115:1,8,14
141:1 146:15
152:12 167:14
175:7 177:18
178:23 188:13
191:25 192:11
239:25
**receiving**   32:1,7
53:20,23 54:2
137:16 138:12
142:16,18 144:20
145:3,7,18 146:21
148:23 153:12
154:4,9,19 156:9
**recognize**   46:16
53:18 86:16,23

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 313 of 327
Gina Spearman                    November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[recognize - region]                                   Page 36

87:5 111:23 135:7
**recognizing**
107:25 156:7
**recollection** 10:10
11:13 13:23 28:22
29:8,12 30:11,14
31:13 41:8 45:21
49:21 50:18 54:21
58:22 59:5 70:4
71:9 76:25 130:9
136:24 140:25
141:24 155:6
195:23 198:13
199:9 234:25
250:24
**recommendation**
214:19
**recommended**
131:22
**reconciliation**
107:12
**record** 4:2,7 51:1
51:4 76:5,9 82:19
132:14,17 147:24
148:4,7 172:20,23
185:5 246:20,23
256:3,5 264:10,13
264:16 273:13
275:9
**record's** 48:6
147:6
**recording** 9:4
**records** 36:9
**recross** 3:8 268:22
**recruit** 3:21 72:10
73:2 175:11,14
228:20 245:3
**recruited** 158:20
159:9 228:11
237:3 242:15
245:15

**recruiter** 35:9
36:16 72:14,15,21
74:1,7,16,17,18
75:6,9 149:7
153:6 158:13,15
158:20,25 159:9
160:3,9,11 164:24
165:3,8 175:17
**recruiter's** 159:11
159:19
**recruiters** 72:15
74:14 83:21
**recruiting** 3:18
28:14 74:22
155:24 156:9,19
158:12,21 159:12
176:5,8,18 177:4,6
177:8 231:9
237:20
**recruitment**
228:14 231:5
**rectify** 113:20
**redacted** 152:1,3
**redone** 205:20
**reduce** 210:15
215:2 232:15
**reduced** 94:2
118:9 171:14,20
232:12,18 233:2,7
233:8,12,17,21
239:10 275:6
**reduction** 233:24
236:2
**reed** 14:14 15:18
16:1 39:16,25
45:22 48:8 56:7
56:12,17 57:2
60:7 68:6,11
89:22 93:23,24
94:3,5 95:11,17
97:15 112:16

113:2 121:18
130:22 131:14,18
138:25 154:8,18
185:8,10,24
186:15 205:9,12
214:5 241:7 273:6
**reed's** 45:23
**refer** 8:18 82:25
84:16 127:17,17
148:22 185:10
257:6 263:7
**reference** 129:18
247:23
**referenced** 90:6
150:3 207:10
270:19
**references** 142:19
**referencing** 90:10
136:17 212:22
261:22
**referral** 51:20
64:7 90:20 91:7
126:3 274:16
**referred** 125:25
126:1,6,14,17
127:22 146:10
231:4 250:14
261:18
**referring** 37:12
44:25 59:17 73:9
82:20 84:3 89:20
96:18 98:22
117:12 121:23
129:24 141:4
145:10 146:7
147:19 149:18,20
159:1 162:7 171:1
175:15 177:12
185:13 191:20
222:16,18,20
229:11,15 242:17

246:1 247:15
248:12,15 254:8
262:3,24 270:18
271:2,13
**refers** 58:6 149:19
262:7
**reflect** 57:12
126:24 176:8
178:4 185:6
247:10 255:11
**reflected** 95:23
152:6 162:3 167:1
176:14 272:4
**reflects** 100:4
102:4,5 122:5
155:24 167:6,20
167:21 175:10
177:20 178:24,25
179:11
**refresh** 140:25
141:23 157:17
**refuse** 250:11,12
**refusing** 267:20
**reg** 3:17
**regarding** 14:12
65:9 74:2 77:10
94:13,18 95:9
96:8 184:1,11
207:5 220:25
268:3 272:19
**regardless** 151:19
**region** 18:18,24
66:17,23 67:2,25
69:9 70:6,14
72:24 74:18,21
75:4 93:3,18
95:12 100:13,18
101:5,24 105:19
107:1 108:10
111:3 119:24
120:15,19 122:23

**[region - reports]**                                                        Page 37

144:4,6,11,15
163:9,12 164:11
167:3 170:11
173:15,17 181:3
183:4,4,11,15,16
191:10 192:2
195:11 197:23
198:18 199:15
200:8,18 203:17
204:23 209:21
211:20 216:25
217:2,6,23 218:11
218:12,18,20,23
219:1,23 222:1,7
222:23 224:25
225:24 234:8
236:17,24 237:19
244:14 247:4,8,24
249:22 250:5,13
253:14
**region's** 107:11
120:12
**regional** 3:13,15
3:16 20:5 47:19
47:21 58:7,14,21
58:25 59:8,14,25
60:3,7,10,14,18,22
65:3,14,22 68:5
76:21,23 77:3
116:23 117:5
129:25 135:25
137:24 138:10
140:9,21 141:6
142:6 146:18,21
154:23 167:5
179:24 200:12
203:15,23,24
204:2,15 210:5
212:1,14 218:2
221:6 225:1
228:21 247:20

249:3 257:8 258:7
258:22 259:13
260:5 263:20
266:14,20 267:21
268:13,24 269:13
269:21
**regionals** 94:1
199:19 204:13
210:1,2,7,13,14
211:9,22 212:6,11
217:16
**regions** 67:22
69:15 101:25
116:24,25 117:2
117:10,13 135:20
181:1 199:17
210:25 211:8,13
213:19 214:20
216:22 217:19
219:5
**regular** 20:22
93:19
**regularly** 26:3,5
93:17
**regulations** 274:5
**reimburse** 223:10
250:5,12
**reimbursed**
246:13
**reimbursement**
223:16
**rejected** 250:23
**related** 21:1 44:4
96:9,22 120:8
199:1 242:22
243:12,13,19
**relationship** 14:25
15:8 172:5 173:2
173:15,17,22
174:13,16 179:1
193:10 232:8

274:9
**relative** 81:13
173:25 275:12
**relatively** 92:22
**relatives** 25:8,14
**remaining** 244:14
**remark** 187:11
**remember** 11:21
12:4 18:10,14
19:5 26:23,24
33:7,19 34:24
35:1 38:14 42:8
45:1 46:8 48:16
49:16 56:2,14,16
56:19 57:2 65:24
68:2 71:3,11 72:5
74:25 77:23,24
78:14,25 79:10
80:25 83:23 92:15
97:16 112:7
117:17 125:7
128:2 137:23
138:25 139:6,9,12
139:13,17,18,21
145:2 146:17,18
146:21,25 147:1
148:22 154:21
171:16,18 172:8
180:14 199:4
201:12 202:19
212:14 214:4
225:18 226:18
233:19,23,24
234:5 239:2,5
241:24 242:1
243:14,23 245:11
272:15
**remind** 98:4
**remotely** 5:12
22:21,22

**removed** 173:15
173:17
**removing** 240:14
**renders** 102:23
**rental** 168:6
170:25 174:21
178:25 232:11
245:18
**rentals** 167:22
168:2 172:9,10
174:14 179:12
246:3
**renting** 171:2
174:24
**repeat** 37:23 79:18
**repeatedly** 236:6
**repeating** 256:6
**rephrase** 18:1
40:14
**replace** 17:2,8,9
17:13 94:4
**replaced** 94:3
**replacement** 17:5
**report** 68:24 69:12
94:5,7,9,10 186:25
231:25 232:2
236:14,16,23
240:16
**reported** 68:6,9,11
68:12,15,16,18
180:5,23 232:1
**reporter** 1:15 4:23
5:20 9:18 105:7
274:7,16
**reporting** 28:19
225:15 235:23
274:5,8,11,12,13
274:15,15,16,18
**reports** 179:16,18
179:21 180:25
181:5 182:3,6,17

183:2,5,12,17
184:2,12 246:10
**represent** 4:7,9,16
86:6,20 114:10
186:24 265:15,24
**representative**
48:19 49:1,8,14
274:8
**representatives**
39:5 47:7 49:20
51:14
**represented**
158:12 265:1,3,23
**reputational** 193:6
**request** 73:6 74:9
104:4 106:4,24
107:6,9 108:4
144:15 163:15
220:24
**requested** 16:3
144:10 163:7,11
164:9 189:1
**requesting** 10:1
**requests** 162:22
163:6 164:16
**require** 214:21
**required** 163:18
183:9 200:20
253:19,22 268:14
268:25 269:5,15
269:22
**reserved** 1:14
**resign** 90:3,11
252:7
**resignation** 3:13
81:14 90:17 94:8
**resigned** 79:16
81:7,10
**resigning** 87:2,17
87:21,22,24

**resolve** 167:7
212:9
**resources** 149:5,6
161:13,20 166:19
166:23 253:1
254:10 271:1
**respect** 9:11
20:10 44:18 76:21
77:7 106:14 113:6
116:19 121:19
125:23 127:5
128:19 131:9
139:17 143:9,11
144:14,20 145:18
150:15,17 153:3
154:8 161:8,9,11
163:21 164:16
169:10 173:1
213:5,7,11,14
214:2 215:11,19
215:20,24 216:14
216:23 217:13
218:17 232:22
233:2 234:23
257:3 261:17
271:10
**responds** 188:19
**response** 96:25
118:3 130:4
140:18 141:14
220:24 231:23
240:17 242:7,12
242:16
**responses** 9:2
114:11
**responsibilities**
28:12,24 66:13
**responsibility**
69:8 73:2 181:11
209:6 217:16

**responsible** 41:14
69:8 100:9 181:4
237:20
**rest** 223:17 238:3
**restructured**
263:23
**result** 91:15
158:21 170:10
208:8,22
**resulted** 226:3
**retail** 58:11 200:5
**retain** 19:3 31:17
**retained** 52:20
**retention** 199:2
**return** 136:19
161:19 166:22
224:17 225:9
226:1
**returned** 22:4
**rev** 123:5
**reveal** 7:17 97:23
98:4 167:18 175:8
**revenue** 132:7
139:2
**reverse** 27:15
**review** 8:5 57:19
181:19,21 182:12
182:16 183:1
189:1 191:13
200:11 235:17
**reviewed** 88:20,21
181:6 182:6,15
183:18 189:20
**reviewing** 8:23
138:25 181:4
182:2 191:7,8
**reviews** 198:25
**revised** 122:10
123:6 124:19,20
205:22

**revision** 188:23
**revisions** 189:1
**rick** 39:25 113:15
186:4 211:21
212:11
**right** 20:2 31:20
34:10,13 36:8
48:11 62:17 67:10
69:9 70:1 75:10
77:13,17 84:14
85:25 100:20
105:20 106:1,5,9
106:10 108:4,11
112:14,23 113:24
114:16,17 119:12
119:21 122:7,18
122:20 123:15
127:3 140:6 141:9
143:14 145:12
146:16 147:3,21
151:17,23 152:9
152:13 161:24
179:18 181:16
183:2 188:23
191:24 193:15,17
193:23 194:1,13
195:7 196:5
198:21 206:16,17
206:20 208:17,19
208:25 216:1
218:1,6 219:6,10
219:19 227:15
228:24 238:10
246:8 249:5,6,9
251:23 257:19
258:13 262:2,8,12
262:15,16,20,22
262:25 263:5,8
265:10 268:5
269:7 270:14,21
271:23

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[ring - seen]**

Page 39

ring  78:23
risk  131:11
riverwood  24:21
road  1:17 2:5 83:2
  147:6 160:15
room  7:3 223:8
roswell  10:5
rough  66:4
roughly  28:3 81:9
  198:23 235:7
round  107:24
routine  97:8
routinely  83:22
row  143:3 145:13
  163:7,10 164:8
rpr  274:24 275:20
rude  6:2
rule  7:14 52:25
rules  5:14 130:23
  131:20 274:5
run  67:22,25
  174:5 195:6
running  66:10

**s**

s  3:1,10 4:1 21:18
  26:1,1 274:1,1
  276:1
sake  108:8
salary  228:23
  229:1,12,13
sales  27:19 154:24
sandy  14:11 15:18
sarah  14:8 181:6,8
  181:14,18 183:24
  189:25 191:7
  192:8 195:12,17
  195:21 196:15
sarah's  183:19
satellite  230:1
satisfaction  267:4
  272:24

satisfied  271:12
satisfy  113:18
saturday  50:18,18
save  23:8
saw  190:23 201:22
  234:17
saying  12:5 95:6
  133:21 140:8
  154:3,15 162:6
  177:6 188:25
  196:7 209:7 214:8
  238:17,20 240:17
  267:16,19 273:2
says  54:7 57:7
  61:25 63:6,20,22
  90:10,12 114:25
  117:21 141:5
  142:5 143:5
  151:25 163:7,11
  164:9 165:19
  177:4 187:18
  189:19,19 229:12
  248:9,19 251:21
  253:5,9,13 254:10
  257:7,23 258:12
  258:21 261:11
  262:10,21,23
  268:24 269:13
  270:7,17,22
scale  139:16
schd  3:17
schedule  3:16,18
  3:19 136:3,21
  137:16 138:10,13
  141:1,11,25
  142:16,22 148:13
  148:16,23 149:2
  149:19,21 150:6
  150:10,13 152:14
  152:22,24 153:1,4
  153:5 155:24

156:10,14,19,22
156:23 157:6,11
158:3,4,8 161:2,8
161:9,11,11 162:1
162:3 166:13,25
169:12 170:10
171:9 176:2,23
177:3 178:15
248:11,14 255:10
258:18,21,23
259:3,15,23,25
260:6,6 261:11
262:12,13,17,23
263:3,8,11,15
265:2,7,20,24
266:14,19
schedules  135:25
  136:1,7,12,19
  156:16 169:13,17
  176:16 254:23
  255:9 265:4 266:6
school  24:19,21,22
schools  24:20
science  25:4
scorecard  199:1,5
  272:11
scott  14:17 15:18
  19:13 91:20 97:9
screwup  135:12
scrubbing  201:5
seasons  223:14,15
  223:23 224:4
second  7:15 33:2,5
  33:9 55:1 121:1
  136:14 138:18,19
  178:1 181:21
  184:23 188:16
  190:6 212:21
  213:3 268:12
secondary  32:10
  32:12,18 103:12

103:16 133:13,18
133:19 209:17
section  178:13
  258:8,12 259:25
  260:14 261:19
  263:15,17
secure  102:21
  174:12
see  10:21,22 20:20
  55:2,13 57:7,10
  59:15 63:20 65:3
  80:3 86:11 95:1
  97:17 113:5,7
  115:3 122:11
  123:6 133:6
  136:16 138:20
  140:5,12,16,21
  141:8 142:21,25
  143:6 146:1,12
  152:6,17 156:2,4
  157:25 162:20
  166:4 169:13
  170:5 171:11
  178:1 187:17
  188:7,20 189:4
  220:10 234:10
  248:19 257:8
  258:18 259:1
  260:15 261:6,8,11
  262:23 263:2
  265:17 266:1
seeing  65:7 80:6
  80:14 137:20,21
  138:16,17
seek  106:23
seeking  33:1 57:24
seen  10:16 50:15
  116:11 155:9
  170:2 200:12
  207:9

**segment** 50:2,5
**select** 126:22
**selected** 174:16
**selects** 125:24
**self** 63:22,24,25
64:13 258:1
**sell** 103:24 172:15
**sells** 125:21
**send** 97:24 104:3
140:15 149:6
161:22,23 222:1
**sending** 189:9
**sends** 31:22
188:22
**sense** 37:15 73:18
108:1 127:1
**sent** 64:19 122:9
122:13 123:5,12
124:3 149:9
155:11 253:20
267:3
**sentence** 90:10
252:19 254:7
258:21 268:9,12
**separate** 204:15
228:1
**september** 15:15
79:3,5 173:19
178:8 240:7,9
244:3 245:11
**sequentially**
247:21
**series** 148:13
150:5 155:24
162:21 169:10
189:17
**serious** 193:5
**seriously** 238:5
**served** 114:12
**serves** 127:19

**service** 31:18,23
173:5 199:2
**services** 74:22
168:4,9 170:21
172:7 274:12,15
**servicing** 64:21
**set** 151:10 223:7
252:22 258:17
270:23
**setting** 39:10
**seven** 24:18 42:7
43:1,4 49:5 67:4
137:5,14 161:5,12
162:1,3 178:13,15
220:4 255:10
**sevens** 161:2
265:24
**shannon** 133:12
**share** 45:14,16
102:10
**shared** 200:2,8
**she'll** 153:24,24
**sheet** 103:9
**ship** 20:3 112:14
112:24
**shock** 108:24
122:21
**shook** 201:9
**short** 51:2 76:6
132:15 148:5
172:21 206:17
246:21 264:14
**shortfall** 205:1,17
206:14 210:10
**shortly** 20:6 93:25
95:18
**show** 49:23 50:1,4
50:5,8,14 53:13
86:5 114:5 121:9
132:21 142:14
145:21 155:21

166:12 167:13
170:4 175:5
177:17 178:21
186:22 200:15
212:17 220:1
224:19 225:2,3,4,5
225:15,16
**showed** 91:21
265:1,13 267:9
**showing** 84:6
86:14 137:13
138:8 139:23
148:11 161:1
171:8 197:1
**shown** 102:6 141:2
200:14
**shut** 182:12
**sic** 122:7 123:13
141:23 156:15
161:6 166:18
187:8 243:2
261:20
**side** 82:16
**sign** 136:3,11
140:16 149:8,12
149:15 150:1
153:7 156:4,16,22
157:1 159:12
161:15,24 166:22
195:5,11 253:20
253:22
**signature** 55:2,9
136:21 140:16
148:15,17 157:3
161:21 254:20,22
255:9 265:17
274:23 275:18
**signature's** 162:2
**signatures** 137:3
**signed** 59:6,10
60:4,8,11,15,19,23

65:2,14,22 76:19
76:23 77:4,9 88:6
88:16 136:19,24
137:18,25 146:22
149:23 150:5
152:14,16 153:4
155:25 158:8
160:3 161:2,3
166:14 171:10
176:3 177:3,8
178:16 251:4,12
251:19,23 253:17
254:1,3,6,9 255:11
255:13,15,22
256:20 259:10,13
268:18 269:3,11
271:3
**significant** 112:11
112:22
**significantly** 215:1
**signing** 1:14 59:7
65:5,6 146:18
150:10 159:16
160:4 171:17
263:20
**similar** 33:10,25
34:1 92:8 154:6
**simple** 183:13
**simplest** 125:17
**simply** 157:1
200:22
**single** 159:14
189:9 191:9
**sister** 174:4
**sitting** 6:18 142:9
**situation** 102:19
170:25
**situations** 169:25
**six** 24:17 67:4
132:18 155:24
156:4 157:11

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 318 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[six - specifically]                                                   Page 41

158:4 161:11
248:11 255:10
265:4,20
**sixes** 156:10,19,22
157:6 158:8 176:2
176:24 177:3
**sixth** 156:4
**size** 197:4
**skype** 10:20
**slash** 27:24 122:11
124:21
**small** 159:17
**social** 10:23 11:2
26:9,10
**socially** 14:4,5
**sole** 258:25 259:4
259:16,19,21
263:24 270:9,11
**solicit** 56:14,18
57:4 77:11,19,25
78:1,6,11
**solution** 212:18
**solutions** 1:6
276:2
**solving** 107:19
**somebody** 119:9
120:21 135:16
159:9 164:1 195:5
203:17
**sorry** 4:17 26:19
28:2 53:25 59:21
61:17 89:12 92:15
92:17 101:9 103:4
105:1 134:1 137:8
142:23 143:25
147:10 150:15
153:17 163:1
175:19 177:25
203:13 205:11
209:23 214:13
227:10 231:24

234:16 240:8
260:3 266:3
**sort** 17:4 19:16
32:7 73:16 183:10
191:5
**sorts** 96:15 153:25
246:11
**sought** 131:2
**sound** 36:8 67:10
**sounds** 69:3 75:5
92:21 125:12
192:14
**source** 64:7 83:19
124:25 125:3,7,13
125:14,22 126:3,7
126:16,21 127:5,8
127:15,18 128:1,3
130:18 131:23
132:1,4 155:14
225:11,19
**sources** 128:11
**south** 29:3,4,9
41:13,20 42:10,15
42:21 43:8,12
52:4,6,9,14,21
66:20,24 67:5,8
69:21 70:19 247:5
**southeast** 3:14,23
41:2,5,7 42:1,3
66:15,17,23 69:15
70:6,14 72:23
74:18,21 90:19
100:18 101:24
105:19 107:1
133:15 163:12
181:3 192:2
197:23 198:18
204:22 218:11
222:7,23 225:24
234:8 236:24
237:19 240:15

244:14 247:4,8,24
248:9,9,19 249:22
250:5,13
**southeastern**
40:24
**southern** 38:21,22
39:1,4,22,23
**space** 27:14
168:14,17,24
171:2 174:22
**speak** 73:3 76:16
77:4,9 116:23
119:2 150:5 196:9
203:21 244:10,15
257:21
**speaking** 31:21
64:22 73:7 78:5
83:14 148:21
165:13 197:19
205:25 210:1
**speaks** 25:25
264:2
**spearheaded**
212:13,15
**spearman** 1:3,11
4:5,9,25 5:5 7:11
21:19 23:12,18
24:2,11 25:9,12,18
26:4 46:17 51:6
53:13 55:1,3
58:14,20 59:13
61:1 62:7 76:11
76:14 86:5,14,20
87:1 98:3 114:5
114:10 121:10,16
124:13,25 132:21
137:8,13 138:9
139:23 142:15
145:21,23 147:5
148:11 155:21
161:1 166:13

167:13 171:8
175:6 177:18
178:22 179:17
186:22 188:17
197:1 247:1 251:2
251:3,15 258:9
259:24 264:18,25
268:24 273:13
274:4 276:2,6,18
**spearmania** 21:18
21:19 54:20
**special** 127:19,20
235:14
**specific** 9:22 18:11
18:13 21:5,8 45:5
46:9,25 47:23
48:3,16 51:13,16
55:23 56:11 69:5
79:10 93:13 97:2
97:13 101:23
109:25 112:6
125:25 143:3
154:14 163:21
182:11 184:15
185:16 196:12,13
197:17 204:19,22
206:3 209:21
213:22 215:19
219:1,5 226:2,3,6
233:19 246:15
247:23 249:21
250:13 262:18
263:11,13 272:22
**specifically** 7:15
18:10 56:2 65:11
128:2 149:18
176:8 180:15
185:6 189:18
191:8 200:6 209:4
209:5 214:7
224:23 257:5

268:1 271:14 272:15
**specificity** 48:14 243:13 244:6
**specifics** 17:16 18:6 58:3 200:2,9
**specified** 192:3,7
**specify** 149:22 195:12 248:9
**spend** 217:23 218:5,13,20 219:9 219:14 221:6 222:12 223:7 233:14
**spent** 233:16
**split** 30:17 61:3,11 61:15 65:17,18,21 102:10 177:5,7 220:12 237:1 239:15 245:9
**splitting** 238:21,25 239:17,23 244:1
**spoke** 9:20 39:16 77:24 78:1 80:13 206:6 210:6,12,12 242:24
**spoken** 39:5 78:24 79:15
**spouses** 87:9
**spreadsheet** 23:5 86:21,22,23 98:2,8 98:9,11,15,18,20 99:2,7,14 101:9 167:24 176:14,17 177:21,24 178:13 178:23 188:10 197:3,7,8
**springs** 14:11 15:19
**stability** 88:8 205:19

**stable** 92:22
**stage** 43:15,23 97:20
**standpoint** 28:19 75:19
**stands** 58:10 168:4
**star** 13:18 27:24
**start** 5:14 27:15 36:11 53:1 54:7 56:4 70:14 79:2 125:2 133:1 139:1 150:2,21 245:24
**started** 36:7 54:9 68:13 69:19,20 70:5 130:9,11 145:3 186:6 190:15 212:6 226:9 236:20
**starter** 174:4
**starting** 54:12
**starts** 132:25 260:9
**state** 29:4 70:14,14 90:17 107:16 159:21 209:6 248:2 274:2 276:12
**stated** 115:3,20,22 115:24 116:2,6 149:25 153:2 155:4 275:5
**statements** 93:18
**states** 1:1 40:24 42:7,13 43:1,5,8 43:11 67:4,5,13 70:9,15,17 135:10 247:3,8,10,11,23 248:5 251:18 270:15
**stating** 135:13 240:1 248:5

**station** 50:9
**status** 251:18,21 252:8
**stay** 244:11,13
**stayed** 223:22 238:3 250:16
**staying** 223:14 237:18
**step** 25:20
**stick** 147:14,14 211:24
**sticking** 61:20
**stink** 193:9
**stipulations** 1:13
**stood** 215:15
**stop** 153:12 269:18
**store** 23:7
**street** 2:11 72:21
**strike** 125:10 218:8
**strongly** 87:23 242:13
**structured** 16:25 17:1
**struggling** 100:10
**studies** 25:5
**subject** 7:20 78:11 248:22 260:21
**subjected** 234:12
**sublet** 168:14,24
**subletting** 168:8 168:17
**submit** 223:16
**submitted** 100:24 110:1 222:18 224:1 250:19
**subscribed** 276:20
**subsequent** 243:24
**substance** 15:12

**substantial** 51:21
**substantive** 39:14
**subtract** 249:4
**subtracted** 222:4 222:5
**suburb** 227:25
**successful** 158:21
**successfully** 159:9
**sufficient** 73:19,20 111:9
**suggesting** 236:22
**suite** 1:17 2:6,12
**sum** 101:16,17
**summer** 235:9
**sums** 176:7 177:25
**supervise** 231:22
**support** 110:7 217:19 218:11 244:19,22
**supported** 253:18
**supporting** 96:11 97:22
**supports** 252:11 255:12
**supposed** 146:4 187:20
**sure** 5:16,22 6:2 9:19,22 19:23 26:11,11 30:6 32:13,15,22 37:25 42:12 43:19,21,23 46:4,18 70:18 74:8 76:2 79:20 81:1,4 83:2 91:8 94:16 114:21 118:16 120:11 128:16 130:10 144:22 147:5 148:2 156:25 159:14,24 170:20 183:20 187:7,13

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 320 of 327
Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[sure - testimony]
Page 43

187:24 190:9
191:17 193:24
199:10 208:13
221:22 227:12
246:9
**svp** 94:1
**svps** 20:5
**swear** 4:23
**sworn** 5:1 276:20
**sync** 222:13
**system** 22:12,14
126:2,22
**systems** 22:23
23:7

**t**

**t** 2:10 3:1,1,2,10
24:1 78:21 275:1
275:1 276:1,1
**table** 7:3 69:21
143:1 145:14
146:25 147:4,9,18
147:19
**take** 5:20 6:16
9:18 36:21,24
50:11 59:1,3
86:12 90:6 114:7
121:13 133:2
135:15 140:1
148:12 153:24
156:8 161:5
162:19 176:15
181:24 187:1
204:7 205:23
246:17 249:7
**taken** 1:12,12,14
51:2 76:6,7
132:15 148:5
150:14 159:10,18
160:1 169:21
170:1,6,6,10
172:21 179:2

245:22 246:21
261:20 264:14
275:5 276:5
**talk** 29:13 37:9,11
38:8 72:12 73:1
80:2,11 142:21
153:15,24 154:17
165:1 231:4 243:5
243:7
**talked** 14:19 46:19
81:12 82:1 84:23
85:1 165:10
179:16 185:7
191:21 222:14
257:12
**talking** 5:17 9:15
29:24 30:7 39:9
39:12 42:25 46:16
49:12 51:6 65:11
80:5 82:20 95:20
101:10 106:15,16
108:17 122:6
126:18 154:21
156:13 165:7
182:9 183:14
206:1 208:14
212:6 214:6 243:3
**talks** 64:11,14
114:19 138:19
262:13
**tampa** 143:6 145:4
146:12
**target** 200:15,17
202:3
**targets** 201:1,17
201:21,22
**tasked** 181:18
**team** 3:19 29:16
29:20 51:25 52:10
85:17 90:19
211:23,23

**teammates** 84:5
**teams** 66:19
241:11,12
**technically** 68:15
**technology** 97:21
**telephone** 82:5
85:6
**television** 224:23
**tell** 16:14 25:2,11
32:4,13 35:24
38:12 44:3,21
65:13 66:1 87:2,6
87:16,21,25 88:2
100:4 112:5,5
115:7 116:24
130:20 131:5,8
153:19 167:19
168:2 205:16
210:25 211:6,7
233:13,16 236:1
242:14 252:4,18
255:4 267:2
**telling** 157:2
236:11
**temporary** 107:17
113:17
**ten** 34:22,22 50:19
129:19 146:5,15
167:15 175:7
177:19 178:23
265:16
**tendered** 86:9
**tennessee** 43:17
67:6,9 70:20
71:22 72:4,9
173:13,18 227:1
227:17,19 240:14
242:9
**tenure** 70:22,24
73:22 75:20
153:11 173:10

**term** 37:15 84:16
126:11 127:14
180:6
**terminated** 91:1
252:6
**terminology** 19:6
20:3 207:5
**terms** 17:12,17
18:6,15,22 25:14
44:10 45:18 47:12
47:23 55:23 56:5
56:11,16 57:1,1
60:2,6 65:10,16,20
67:2,2,17 73:7,16
74:9,22 75:6 77:5
77:10 78:23
102:16 105:23
125:17 126:24
127:15,17 132:1
135:12,21 136:18
144:12 163:14
164:6 195:3
201:19 202:2
238:2 251:5
252:22 256:19
270:23
**territories** 73:8
248:21
**territory** 29:8 62:5
69:15 143:18
173:14 247:3
248:6 249:5,8,14
**testified** 5:1 165:3
202:18 266:5
267:13
**testimony** 6:2,22
6:25 7:4,12 42:19
53:3 71:6 76:15
92:19 176:11,22
190:8 247:1
257:21

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[thank - total]**                                                                 Page 44

**thank**   4:22 52:24
187:25 188:1
189:21,25 246:24
248:18 264:18,21
273:10
**thargrove**   2:8
**thefinleyfirm.com**
2:7,8
**thing**   19:16 90:15
91:23 126:16
191:6 211:25
238:10 268:7
269:2
**things**   19:10 30:8
96:15 149:24
153:25 181:23
182:11 183:24
191:11 194:9
212:5 221:24
222:15 235:17
236:6 238:2
246:11 249:10
**think**   25:19 32:14
33:25 34:21 46:17
70:25 71:1 77:11
81:2,3,3 82:12
83:8 84:4 90:6
91:5 92:14 117:5
121:25 122:5
123:16 133:18,24
141:18 147:8
149:22 150:4
157:7 165:3
172:25 173:11
185:8,10,11
187:11,20 190:8
192:3 196:16,18
198:12 202:18
205:14 212:1
214:23 218:4,14
218:15 234:9

238:8,14,18
239:16 241:6
245:2,4 248:8
257:12
**third**   32:7 64:20
122:4 132:25
133:1,11 140:5
142:22 145:13
163:10
**thought**   91:10
93:6 110:6 150:19
153:1,10 166:1
185:1 192:20,22
203:22 205:20
206:15 210:13
238:13 259:8,17
**three**   61:21 63:19
86:2,6,7,15 97:11
97:12 112:25
162:1 202:16
266:6
**threshold**   124:4
133:22 200:23
**thresholds**   122:7
122:11 123:13,21
124:18,19,20
134:3
**thursday**   188:19
**tie**   105:2
**tied**   90:24
**time**   4:3 5:23 6:5
6:16 7:16 9:20
10:15 13:7,13
14:24 15:13 17:6
20:1 30:1,5,9
33:24 40:3,8
41:11,11 45:24
46:2,6,18 50:14,21
50:25 51:3 53:2
57:8 58:13 59:2,3
59:8 66:16 67:18

69:16 70:4 71:7
74:25 76:4,8 77:2
77:3,8,9 79:12
81:13,15 84:20
93:21,21 96:1
101:20 106:2
113:17 115:25
116:3 121:14
122:16 131:15
132:13,16 133:2
135:14 138:22
139:4,12,25 148:3
148:6 150:6 153:3
156:8 159:8,15
163:23 165:15,16
172:19,22 180:12
186:8,17 189:10
190:6,7,22 197:12
198:14 207:14
209:12 219:22
234:6 239:3,6
243:22 244:3
245:3,20,22 246:6
246:16,19,22
247:2,7 248:22
252:6,7 258:25,25
259:4,4,15,15
264:12,15 266:23
273:11
**timeframe**   244:4
**timely**   267:18
**times**   105:22
185:20,22 197:11
197:15 204:25
236:11
**title**   180:7 181:9
**titled**   263:17
**titles**   28:9
**tn**   3:22
**today**   5:17 7:16,21
8:24 30:8 47:25

53:2 87:4 137:10
142:9 143:20
179:17 185:5
186:16 254:23
255:10 264:19
**today's**   273:12
**told**   41:4,9 57:24
87:18,23 88:3
95:11 97:18,19
101:25 110:3
112:4,6,9,9,15,20
112:21 113:17
116:14 117:1
122:23 131:2
150:1 155:16
197:25 198:20,22
211:10,12 240:13
242:16,20,22
243:11,16,16,21
244:7
**toler**   118:7
**tolerance**   115:3,12
115:20,22,24
116:2,6,11 117:22
118:8,15,17 119:4
119:17 124:12
213:20,21,22
216:11 217:1
**tolerances**   116:14
120:7
**tonight**   223:14
**top**   83:22 101:5
147:9,20 259:25
**topic**   11:5,12
12:24 43:25
153:20 154:9,18
205:1,4 211:18
235:23 262:2
**total**   36:5 102:9
111:16 156:3
178:1,4 220:12

Veritext Legal Solutions

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

**[totals - understood]**                                           Page 45

| | | | |
|---|---|---|---|
| **totals** 179:6 | **turmoil** 193:9 | 163:22,25 164:21 | **ultimate** 179:6 |
| **track** 225:12 | **turn** 167:7 245:24 | 165:13 169:2 | **understand** 6:5,10 |
| **traffic** 7:8 | **turning** 258:7 | 179:25 181:4,18 | 10:6 17:3 30:6 |
| **trail** 140:24 | **tustin** 73:9 117:19 | 182:10,16 183:15 | 49:10 83:14,16 |
| **training** 68:17 | 117:19 199:13 | 183:16 184:1 | 88:11,24 90:4 |
| 269:8 | 204:8 | 188:12 189:7 | 95:17 114:22 |
| **transaction** 173:6 | **tv** 49:17,19,22,23 | 195:17,21 196:2,6 | 118:16 150:13 |
| **transcript** 275:5,8 | 49:25 217:24,24 | 196:17 197:9,19 | 151:25 152:19 |
| 276:7,10 | 220:1 224:18 | 198:8 204:2 | 155:22 180:5 |
| **transferred** | **twelfths** 34:23 | 215:20 217:18 | 182:14 190:9 |
| 177:24 | **twice** 86:12,13 | 218:7,10 221:25 | 191:17 194:24 |
| **transition** 90:18 | **two** 10:24 19:6 | 222:10 223:15 | 212:19 247:25 |
| **translate** 62:19 | 24:7,20 33:1 40:3 | 224:10 | 260:20 268:15 |
| **transparency** | 40:4,11,15 42:13 | | **understanding** |
| 19:16 20:10 88:8 | 43:24 44:4,13,25 | **u** | 16:16 19:10 33:9 |
| 93:10,15 | 46:3,12,20 50:2 | | 40:19 41:6 42:19 |
| **traveling** 22:11 | 58:17 59:2,14 | **u** 274:1 | 45:11,23 58:8 |
| 223:12 246:6 | 76:22 129:5 164:1 | **uh** 10:18 12:13,13 | 61:12 62:2,8 63:5 |
| **traviglia** 78:18 | 190:2 202:16 | 27:13 37:7 42:22 | 63:23 64:4,16 |
| **travis** 2:3 4:11 | 204:17 205:2,8 | 42:24 46:21,23 | 66:12 67:21,24 |
| **treat** 223:13 | 207:18 212:8 | 58:12 62:18 63:7 | 68:8,10 74:12 |
| **treated** 216:23 | 213:8,12 226:5,7 | 63:21 69:22,25 | 83:20 85:23 91:13 |
| 217:6 | 226:11,22 229:11 | 70:2,12 78:20,22 | 91:17,19 93:6 |
| **trick** 23:24 | 230:2 237:14 | 85:20 87:11 91:18 | 101:19 103:5 |
| **tried** 245:3 | 240:10 245:19 | 95:19,22 96:3,6 | 116:19,20 121:19 |
| **trouble** 163:1 | 246:7 247:18,19 | 101:18 108:19 | 137:15 138:17 |
| **true** 75:20 245:21 | 248:12 249:24,25 | 112:8 115:21 | 151:4 158:11 |
| 254:18 275:9 | 250:2 254:2,6 | 122:12 123:7 | 160:8 162:3 |
| **trust** 20:14,17,18 | 258:7 260:4,5 | 133:10 134:23 | 165:13,23 166:25 |
| **trusted** 109:4 | 268:7,8 | 137:11 140:17,23 | 170:20 179:20,25 |
| **try** 135:2 | **type** 91:22 127:20 | 141:9 142:7,24 | 180:25 182:15 |
| **trying** 6:1 46:19 | **types** 154:13 | 143:2,7 145:15 | 194:24 207:17 |
| 48:7 56:20 70:25 | **typewriting** 275:6 | 147:7 152:2,4 | 209:20 216:22 |
| 71:1,11 75:3 99:6 | **typical** 203:8 | 156:6 158:10 | 233:4,6 236:25 |
| 99:12 125:14 | **typically** 10:25 | 162:23 164:12 | 238:18 251:10,15 |
| 135:17 147:5 | 23:7 73:7,13 87:8 | 165:22 178:3 | 252:4 255:12 |
| 149:15 157:16 | 87:9 90:25 104:23 | 188:1,24 191:3,3 | 257:24 269:9 |
| 192:13 217:21 | 105:18 107:4 | 193:1 200:21 | **understood** 83:4 |
| 234:10 | 136:6,9,19 137:2 | 208:23 223:1,3 | 159:17,25 172:13 |
| **tuesday** 54:8 | 149:2 160:20 | 224:14 229:14 | 208:11 224:12 |
| | 161:9,15,19,21 | 265:14 | 249:3,12 251:3 |
| | | **ult** 124:18 | |

Case 1:20-cv-04981-CAP   Document 88   Filed 04/27/22   Page 323 of 327

Gina Spearman
November 8, 2021
Spearman, Gina Vs. Broker Solutions, Inc. D/B/A New American Funding

[understood - wifi]
Page 46

259:3 263:20
**underwrite** 31:23
**underwriting**
64:20
**unilateral** 109:23
**united** 1:1 40:24
**units** 143:4
**unjust** 249:8
**unprofitable**
102:24
**unsigned** 137:15
138:14
**unusual** 104:21
**updated** 239:3
**updates** 148:23
**upset** 117:5
**use** 22:1,6 74:21
74:22 128:3 137:2
180:6
**uses** 241:10
**usual** 274:18
**usually** 126:15
163:18 164:14,24
201:6

**v**

**v** 1:5 2:3 78:21
276:2
**vague** 198:12
**vaguely** 139:13
**value** 225:6,6,9
**various** 8:9,9,10
52:5 153:4 247:2
254:22
**vast** 104:6,8,15
**vein** 155:23
**vendor** 101:2,4
**vendors** 100:19
**venture** 27:18
**verbal** 48:13 55:25
56:4 252:24
270:24 272:5,17

**verbally** 9:2 57:24
113:14 116:15
139:7,10
**verifiable** 57:9,9
**veritext** 274:11
**versa** 169:24
**version** 53:20
59:24
**versus** 64:23 75:4
129:20 130:18
**vice** 169:24
**video** 51:1,4 76:5
76:9 132:14,17
148:4,7 172:20,23
241:16,17 246:20
246:23 264:13,16
273:13
**videoconference**
2:4,15
**videographer** 2:17
4:2,22 50:25 51:3
75:25 76:4,8
132:13,16 148:3,6
172:19,22 246:19
246:22 264:12,15
273:11
**videotaped** 1:11
4:4 273:12
**view** 72:6 109:22
**viewed** 109:23
**virginia** 43:20
67:7,9 70:21,22,23
72:3 228:9 229:20
230:13 237:6,9,12
237:15,17,24
240:15
**virtual** 22:13,15
**virtue** 134:9
252:12
**visit** 39:4 140:20
204:15

**volume** 98:19
99:17,17,25 143:4
245:25
**vp** 133:18
**vpn** 22:13

**w**

**w** 55:2
**waited** 234:12
**waive** 104:20,22
**walking** 99:16
**want** 6:2 21:16
30:4 53:2 70:17
71:5 83:2 98:3,3
112:6 114:7,12,20
117:25 125:1
134:4 135:3,10
139:5 157:10
167:16 174:15,24
177:19 178:24
183:20 187:15,23
190:9,22 194:22
195:1 197:2 205:7
212:17 214:11,17
215:23 218:3,5
227:9 234:11
236:14 240:15,24
242:6 244:12
256:1 265:22
**wanted** 10:2,7,11
35:25 37:6 73:14
135:16 139:1
157:25 160:11
169:8 172:17
173:3 242:6,24
243:1 244:11
268:16
**watch** 225:3
**watching** 225:16
**waterford** 143:5
145:1 146:11

**watson** 15:7,17,25
16:13 88:19 89:22
**way** 20:20 91:13
128:4 168:7 186:2
212:9,18 214:19
214:24 215:1
216:24 217:8
218:4 220:10,11
224:21 243:8
254:19
**waycross** 24:16
**ways** 72:14 209:6
**we've** 46:19
179:16 185:18
190:2 242:8
247:19 257:12
**web** 22:25
**website** 218:15,22
**week** 22:11 212:8
243:22 244:20
**weeks** 9:23 79:9
112:18 212:25
236:4
**welcome** 236:12
**wells** 27:23
**went** 24:20,21
46:5,18 66:23
100:23 117:4
124:19 180:20
181:1 211:21
222:21 226:4,7
234:3,7,20
**westle** 2:16
**what'd** 88:2
244:16
**whichever's** 27:17
**white** 23:16,18
25:13,16,18
**wholesale** 17:5
**wifi** 22:24

**willing** 36:21,24
37:2 90:17 164:18
**wish** 276:11
**witness** 4:24 9:3,6
9:9 12:3,22 17:8
17:21 18:10 19:1
19:13 22:18 35:1
35:20 37:23 38:6
38:14 39:16 40:23
42:12 43:7 47:16
48:2,22 57:15
63:16 79:18 90:16
92:11 99:10 118:1
118:3,6 136:23
143:22 147:16
148:1 156:25
157:25 159:21
160:7 176:23
177:12 182:24
187:13,15,18,23
188:1 192:18
193:19 194:8
201:15 203:21
208:1 209:4
218:25 219:12
220:19 248:25
249:17 250:9
251:10 254:16,25
255:5 256:15,24
259:8 260:23
263:2 264:4
266:17 267:23
269:5
**women** 26:21,24
27:5
**won** 199:17
**word** 23:5 96:17
114:14 219:4
255:14,15,21,22
270:4

**words** 31:14 32:4
32:23 101:23
172:6 195:14
206:12 210:19
256:24,24
**work** 9:8 13:2,16
19:15 22:12 28:1
28:16 36:1 64:9
65:25 66:3 72:13
72:24 96:15 123:3
164:6,24 168:21
**worked** 27:18 34:6
34:16 42:21 229:5
**working** 19:14
20:4 22:21 23:3
113:20
**works** 16:2 72:20
83:1 133:13,18
**worries** 187:23
**worry** 112:20
**would've** 134:20
**write** 164:25
**writing** 113:7
251:12 253:17
259:9,18 264:5
268:18 269:10
270:16,18
**written** 116:7
251:19,22 252:13
252:25 254:9
269:23 270:25
**wrong** 88:12
**wsb** 50:12

**x**

**x** 1:3,8 3:2,10 95:2
95:3 151:18
200:22,23 201:19
201:20 218:21

**y**

**y** 24:1
**ya** 9:12 10:19
17:24 26:20 33:20
43:7 62:21 70:18
76:3 82:24 86:11
120:2 123:16
124:10 132:12
134:14 166:3
168:19 170:5
192:17 196:11
234:15 246:18
254:12 255:2,5
257:18 261:23
272:6
**year** 33:18 113:24
113:24 190:21
198:1,3,4,24
199:17,18 201:5,6
201:11 202:16
205:21 226:5
245:19
**years** 13:4 23:23
24:18 164:1
245:19 246:7
249:24,25 250:2
**yep** 86:12 142:21
272:6
**young** 163:3

**z**

**zero** 66:18,23
226:7,8 230:18
258:1,4
**zillow** 126:4
127:21,22
**zoom** 2:15 4:15
10:17

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.