Page 277

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4    GINA SPEARMAN,
5          Plaintiff,
                                    CIVIL ACTION FILE
6          vs.
                                    NO. 1:20-cv-04981-CAP
7    BROKER SOLUTIONS, INC. d/b/a
     NEW AMERICAN FUNDING,
8
           Defendant.
9

10

11                    VOLUME 2
12               VIDEO DEPOSITION OF
13                  GINA SPEARMAN
14                March 21, 2022
15                   1:04 p.m.
16             The Finley Firm, P.C.
17             Building 14, Suite 230
18              3535 Piedmont Road
19               Atlanta, Georgia
20     Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
21

22

23

24

25

Page 278

1   EXHIBIT              DESCRIPTION                PAGE

2   Exhibit 24      E-mails, 2/13/19, NAF_0000149    323

3   Exhibit 25      E-mails, 3/20/19                 328

4

5

6

7                 INDEX TO EXAMINATION             PAGE

8   By Mr. Perlowski                               281

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 279

1   APPEARANCES OF COUNSEL:

2   On behalf of the Plaintiff:

3           MARYBETH V. GIBSON, ESQ.

4           TRAVIS C. HARGROVE, ESQ. (via Zoom)

5           N. NICKOLAS JACKSON, ESQ. (via Zoom)

6           The Finley Firm, P.C.

7           3535 Piedmont Road

8           Building 14, Suite 230

9           Atlanta, Georgia  30305

10

11  On behalf of the Defendant:

12          HENRY M. PERLOWSKI, ESQ.

13          CHASE OGLETREE, ESQ. (via Zoom)

14          Arnall Golden Gregory LLP

15          171 17th Street, N.W.

16          Suite 2100

17          Atlanta, Georgia  30363

18

19  Also Present:

20          Andrew Westle, Esq. (via Zoom)

21          Bryan Robinson, videographer

22

23

24

25

Page 280

1            THE VIDEOGRAPHER:  We are on the record.

2   The time is 1:04 p.m. on March 21st, 2022, and this

3   is the continuation of the video deposition for Gina

4   Spearman.

5            Would counsel present please identify

6   themselves for the record.

7            MS. GIBSON:  Yes.  This is MaryBeth Gibson

8   at The Finley Firm, and I represent Ms. Spearman.

9            MR. PERLOWSKI:  Henry Perlowski, Arnall,

10  Golden & Gregory, and I represent New American

11  Funding.

12           MR. HARGROVE:  Travis Hargrove attending

13  remotely on behalf of Ms. Spearman.

14           MR. JACKSON:  And Nick Jackson attending

15  remotely on behalf of Ms. Spearman.

16           MR. OGLETREE:  And Chase Ogletree

17  attending remotely on behalf of NAF.

18           THE VIDEOGRAPHER:  Thank you, Counsel.

19           Will the court reporter please swear in

20  the witness.

21                    GINA SPEARMAN,

22  having been first duly sworn, was examined and

23  testified as follows:

24                    EXAMINATION

25  BY MR. PERLOWSKI:

Page 281

```
 1      Q    Good afternoon, Ms. Spearman.  How are

 2   you?

 3      A    I'm good.  Thank you.

 4      Q    Good.

 5           Same rules as last time.  If you have

 6   any -- if for any reason you don't understand my

 7   questions, please let me know.  I'll be happy to

 8   rephrase it until you do.  Okay?

 9      A    Sure.

10           MR. PERLOWSKI:  Same stipulations?

11           MS. GIBSON:  Same stipulation.

12           MR. PERLOWSKI:  Okay.  Great.

13   BY MR. PERLOWSKI:

14      Q    Ms. Spearman, do you understand, sitting

15   here today, that you've now brought a fraud claim

16   against NAF with respect to your second amended

17   complaint?

18      A    Yes.

19      Q    Do you agree that fraud is a serious

20   accusation?

21      A    What do you mean by "serious"?

22      Q    I mean serious how -- the common

23   understanding of the word.  Not casual, serious.

24           MS. GIBSON:  Objection, form, foundation.

25      A    It is not casual, no.
```

Page 282

1    BY MR. PERLOWSKI:

2         Q    How do you contend that you were

3    defrauded, Ms. Spearman?

4              MS. GIBSON:   Objection, form.

5         A    I was led to -- do you mean in regards to

6    the marketing expenses and pricing exceptions?

7    BY MR. PERLOWSKI:

8         Q    I'm asking how you contend you were

9    defrauded, Ms. Spearman.  You brought a fraud claim;

10   I'm asking how you contend you were defrauded.

11             MS. GIBSON:   Objection, form.

12        A    Because my compensation was reduced, and

13   expenses were taken out of my compensation for what

14   I believe to be a false reason, and I was assured it

15   would be for a very short period of time, which it

16   was not.

17   BY MR. PERLOWSKI:

18        Q    When you say expenses were taken out of

19   your compensation, what are you referring to?

20        A    Marketing expenses and pricing exceptions.

21        Q    And marketing expenses that the Southeast

22   region chose to incur were reduced from the

23   Southeast region's profit as of March 1st?

24             MS. GIBSON:   Objection, form and

25   foundation.

Page 283

1    BY MR. PERLOWSKI:

2         Q    Let me rephrase the question.  Marketing

3    expenses, if they were incurred by the Southeast

4    region, were charged against the region as of

5    March 1st of 2019?

6         A    No, beginning in February of 2019,

7    marketing expenses that were discussed prior to us

8    joining New American Funding was the reason and the

9    basis by us incorporating a marketing budget into

10   the agreement so that we -- that NAF agreed to the

11   marketing expenses that would be done on behalf of

12   the Southeast region.  But, no, it was actually

13   deducted from our compensation on the monthly

14   recaps.

15        Q    Did that begin as of March 1st of 2019?

16        A    It was in February or March.  I cannot

17   remember the exact date.

18        Q    You said that expenses were taken out of

19   comp for a false reason.  What was that false

20   reason?

21        A    We were informed at the leadership meeting

22   in February that NAF had misallocated $30 million,

23   and that they were under financial hardship because

24   of this, that the retail divisions, including the

25   Southeast, although we had thought they all made

Page 284

1   money, it was discovered because of this

2   misallocation that they were not profitable, and as

3   a result, they would need to reduce our

4   compensation.

5        Q    Who told you that?

6        A    Rick Arvielo, Patty Arvielo, Christy

7   Bunce, Jan Preslo, and Jon Reed.

8        Q    And this was all at the leadership meeting

9   in February of 2019?

10       A    Yes.

11       Q    Okay.  What were you told was

12  misallocated?

13       A    We --

14            MS. GIBSON:  Objection, form and

15  foundation.

16            Go ahead.

17       A    We weren't given a lot of specifics other

18  than there were expenses that the corporation

19  incurred that were not allocated to the regions and

20  that the number $30 million was reiterated several

21  times, that --

22  BY MR. PERLOWSKI:

23       Q    Okay.

24       A    -- it was significant.

25       Q    So as you understood it, expenses were

Page 285

1    incurred by NAF, but those expenses were not

2    allocated against the regional finances -- the

3    finances for the regions?

4         A    It wasn't clear, you know, whose expenses

5    they were, if they were from other divisions, other

6    companies, other channels.  It was just simply there

7    were expenses not allocated properly that caused a

8    huge swing in the bottom line P&Ls for the retail

9    division and, of course, more specifically that we

10   were concerned about, the Southeast division.

11        Q    Did you ever learn subsequent to the

12   leadership meeting -- either at the leadership

13   meeting or subsequent to it whether those

14   expenses -- the expenses that were misallocated,

15   whether they were actually incurred?

16        A    I was never given any information that

17   they were incurred.

18        Q    Were you ever given any information that

19   the expenses that were said to be misallocated were

20   not incurred?

21        A    I was never given any further information

22   after the leadership meeting.

23        Q    One way or the other; is that correct?

24   I'm just trying to understand whether --

25        A    Sure.

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 286

```
 1        Q     So you hear at the leadership meeting that
 2   expenses were misallocated.   Okay?
 3        A     Uh-huh.
 4        Q     So would you agree with me that
 5   misallocation, just in a common understanding of
 6   what that means, is that something's put in the
 7   wrong place?
 8              MS. GIBSON:   Objection, form.
 9   BY MR. PERLOWSKI:
10        Q     Would you agree with me that mis- -- if
11   you misallocate something, it generally means that
12   it's in the wrong place?
13        A     It's in a different place.
14        Q     Okay.   Did you learn either at the
15   leadership meeting or thereafter, whatever expenses
16   were misallocated, did you ever learn what place
17   they were in?
18        A     No.
19        Q     Ms. Spearman, at the time of the
20   leadership meeting -- and you were deposed for quite
21   a while when we did this the last time, and I know
22   you -- I recall you testifying generally, and your
23   testimony will speak for itself, that occasionally
24   Mr. Reed would share some financial information with
25   you and Ms. Allison.
```

Page 287

1           What I'm trying to understand is what you

2    in your position with NAF as of February of '19,

3    what you had access to.

4           So from a financial reporting perspective

5    as of February 2019, what did you have access to?

6       A    We had access to a platform called Kevlar

7    that was primarily for -- you know, we could check

8    pricing exceptions and things like that.  We were

9    provided, I would say, an occasional P&L that was

10   more -- because we weren't paid based off of a P&L,

11   it was almost more of an FYI at maybe a biannual,

12   you know, leadership meeting or something going over

13   the Southeast division.  It was generally presented

14   for the purpose of saying what a great job we're

15   doing, look how profitable you are.

16          But I was generally given those -- we were

17   given those in person, you know, when we were at a

18   meeting or something.

19      Q    So the P&Ls that you mentioned were

20   occasionally given to you, who do you recall

21   typically would give those to you?

22      A    To my recollection, Jon Reed.

23      Q    The P&Ls that were -- and I'll get to the

24   Kevlar in a moment.  I'm not asking about Kevlar for

25   right now.

Page 288

1          The P&Ls that were occasionally given to

2     you -- let's assume that they were given to you by

3     Mr. Reed -- were they regional -- were they

4     Southeast region P&Ls?  Were they company-wide P&Ls?

5     Were they outside retail P&Ls?

6          A     Southeast.

7          Q     Let's go to -- you mentioned earlier that

8     you had access to Kevlar.  This may be some

9     terminology, but I want to ask you if you recall

10    whether you had -- did you have access to CM1 in

11    Kevlar?

12              MR. PERLOWSKI:  That's C-M-1.

13              MS. GIBSON:  Objection, foundation.

14              Go ahead.

15    BY MR. PERLOWSKI:

16         Q     Sure.

17         A     I don't remember what we had access to in

18    Kevlar as it relates to P&Ls.  I really just

19    remember Kevlar being more so for the purpose of

20    checking pricing.  But the P&Ls that I recall

21    seeing, I do remember the bottom line -- what I

22    would consider to be the bottom line number was

23    referenced as CM1.

24         Q     So you may have just answered my

25    question -- my next question, but let me make sure I

Page 289

1    understand it.

2              Do you believe that when you had access to

3    Kevlar that you had access to P&Ls?

4        A    I do not recall ever viewing or retrieving

5    a P&L from Kevlar.

6        Q    In your answer a couple questions ago, I

7    think you did mention CM1 in your answer.  The

8    record obviously will speak for itself.

9              But do you recall whether you had access

10   to CM1 in Kevlar?

11       A    I do not recall.

12       Q    Do you recall whether you had access to

13   CM2 in Kevlar?

14             MS. GIBSON:  Objection, foundation.

15       A    I don't recall.

16   BY MR. PERLOWSKI:

17       Q    Okay.  Do you recall whether you had

18   access to CM3 in Kevlar?

19       A    I don't recall that.

20       Q    Okay.  You mentioned that Mr. Reed would

21   typically give you the Southeast region P&Ls when

22   you were given a physical document.

23             Do you recall ever receiving, prior to the

24   leadership meeting, company-wide P&Ls that would

25   show, for example, how profitable NAF was as a whole

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 290

1    at a given time or in a given year?

2        A    No.

3        Q    So I'm going to use 2018 as an example

4    because you know the leadership meeting was in

5    February '19.

6              So as of the end of 2018, were you given

7    any information that demonstrated how profitable NAF

8    was as a whole?

9        A    No.

10       Q    Did you have any knowledge prior to the

11   leadership meeting as to what NAF's profitability

12   was shown in CM1 as of the end of 2018?

13       A    No.  My recollection late in 2018,

14   possibly November, we were there for regional

15   meetings, and I just remember the general consensus

16   was positive, that the entire retail division was

17   doing very well, everyone was very pleased, and the

18   Southeast was -- by far led the company in

19   profitability, but that all the regions were doing

20   well.

21       Q    Get to that in a second.

22              MR. PERLOWSKI:  Could you please read back

23   my last question?

24              (The record was read by the reporter as

25   follows:

Page 291

```
 1          "Q    Did you have any knowledge prior to

 2      the leadership meeting --")

 3          MR. PERLOWSKI:  Okay.

 4  BY MR. PERLOWSKI:

 5      Q    Did you have any knowledge prior to the

 6  leadership meeting as to what NAF's profitability

 7  for 2018 was showing in CM2?

 8      A    No.

 9      Q    Did you have any knowledge prior to the

10  leadership meeting as to what NAF's profitability

11  was showing in CM3 for 2018?

12      A    No.

13      Q    So when it was, as you testified, it was

14  explained to you that certain expenses were incurred

15  but weren't allocated to the regions, were you told

16  what kind of expenses were incurred by NAF but

17  weren't being allocated to the regions?

18      A    No.  And the P&Ls that we did see had all

19  your usual and customary expenses.

20      Q    When you said the P&Ls that you did see,

21  what are you referring to?

22      A    When I mentioned earlier from time to time

23  Jon Reed or Christy Bunce would share a P&L with us,

24  I had seen P&Ls throughout my career, so the

25  expenses that were on the P&L were the usual and
```

Page 292

1   customary expenses.  So it wasn't as if anything

2   were missing, so that's why it was pretty much

3   alarming to all of us at the meeting that there

4   would be expenses that had not been allocated to our

5   regions.

6        Q    When you say the P&Ls that you were shown

7   had all of the customary expenses, you mean in terms

8   of the categories of expenses that are listed on the

9   P&L?

10            MS. GIBSON:  Objection, form.

11       A    Categories, and I would say the actual

12  amounts were industry -- pretty industry norms.

13  BY MR. PERLOWSKI:

14       Q    Did you ever -- did you ever have any --

15  were you ever given any detail behind the amounts

16  that were shown in the P&Ls that were given to you?

17            So, in other words, if you were given a

18  P&L by Mr. Reed --

19       A    Uh-huh.

20       Q    -- P&L has various numbers allocated to

21  accounts, were you given any detail behind those

22  numbers to show what they represented?

23       A    Only if we asked.

24       Q    Okay.  And did you ask?

25       A    I can't remember any specific times, but I

Page 293

1    do know that on occasion, we asked for backup on

2    certain line items, but I could not remember

3    specifics.

4              I remember there being discussion about

5    the fact that there wasn't a system to allow us to

6    easily look at the backup, that it had to be

7    manually -- had to be asked for and manually

8    provided.

9        Q    Okay.  Did you ask for backup at the

10   February '19 leadership meeting for the expenses

11   that were incurred but were not allocated to the

12   regions?

13       A    We did not.

14       Q    So to your knowledge at the leadership

15   meeting, you didn't have any understanding as to

16   whether NAF's profitability was shown as being

17   different in CM1 versus CM2 versus CM3.

18              You didn't have any knowledge one way or

19   the other, correct?

20              MS. GIBSON:  Objection, form and

21   foundation.

22       A    No.

23   BY MR. PERLOWSKI:

24       Q    At the leadership meeting in terms of

25   NAF's actual financial position company-wide, what

Page 294

1    were you told?

2          At 2018's financial position company-wide,

3    what were you told?

4      A    At the meeting?

5      Q    Yes.

6      A    That the financials that had been provided

7    to date did not have all -- the misallocation of

8    $30 million that had not been allocated to the

9    regions.  That NAF was in -- on financial hard times

10   and that they were asking -- they were telling the

11   regionals that they would have to reduce their

12   compensation for the marketing expenses and pricing

13   exceptions.  And that they were asking for our

14   cooperation in this and that it would only be for a

15   short period of time because they were going to hire

16   a CFO because to date at that point they did not

17   have a CFO.  And they felt as if some of the

18   financial issues with this misallocation and other

19   things were the result of not having someone in that

20   role, and that they were going to hire one to

21   rightsize the company, and that things would go back

22   to normal as soon as they were able to do this.

23     Q    Okay.  Let me go back.

24          Were you ever given, for example, a

25   number, like, as of the end of 2018, NAF's profit or

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 295

1  loss is X dollars?

2         Were you ever given a number at the

3  leadership meeting?

4      A    No.

5      Q    Did you have an understanding at the

6  leadership meeting as to whether NAF was profitable

7  or not in 2018?

8         Not -- I understand what you testified

9  about financial hard times, but I'm just trying to

10  understand.  Did you have an understanding whether

11  NAF made money or lost money in 2018?

12      A    They were representing that although in

13  December when they closed out the books they were

14  profitable that they were now not profitable was

15  what they represented.  In February they represented

16  that they were not profitable, whereas they thought

17  they had been.

18      Q    Do you have any reason to believe whether

19  that understanding that NAF -- was incorrect?

20         The understanding that NAF was not

21  profitable in 2018, in February of '19, do you have

22  any understanding as to whether that was not true?

23         MS. GIBSON:  Objection, form.

24         Go ahead.

25      A    It was very hard to believe.

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 296

1   BY MR. PERLOWSKI:

2        Q    Okay.

3        A    It was hard to believe for all of the

4   regionals given the fact that the COO, the EVPs,

5   everyone was shocked by this information.  So it

6   made it hard to believe that they weren't

7   profitable.

8        Q    You said that you were told that the

9   regions were being asked -- and this is all regions,

10  right, were being asked for their cooperation?

11       A    Yes.

12       Q    You were told that they were asking for

13  cooperation for a period of -- a short period of

14  time until NAF hired a CFO?

15       A    Correct.

16       Q    Were you told anything in the leadership

17  meeting as to what the status of that CFO search

18  was?

19       A    That it was their top priority, they had

20  several candidates, and that, you know, they were

21  going to do it as quickly as possible.

22       Q    Were you given a -- so as of the

23  leadership meeting, you understood that the CFO

24  search had already begun?

25       A    I believe so.

Gina Spearman , Vol 2                          March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 297

1     Q    At the leadership meeting, did you have an
2  understanding that NAF had already identified
3  candidates for the CFO position?
4     A    I can't recall if it was at the meeting or
5  shortly thereafter that it was communicated to us
6  that they had candidates, and they quickly hired
7  someone, so I can't say for sure --
8     Q    You mean --
9     A    -- if they mentioned it at the meeting or
10  not.
11     Q    Sorry to interrupt.
12          You mean quickly hired someone after the
13  leadership meeting?
14     A    Uh-huh.
15     Q    Mr. Frommert?
16     A    Correct.
17     Q    Okay.
18     A    There was obviously a lot of concern by
19  all the regionals and the executives about what was
20  happening, you know, was this even accurate since
21  they didn't have a CFO, was it possible that, you
22  know, this -- this loss that they believe they now
23  had that was resulting in them needing to, you know,
24  reduce all of our compensation, you know, was it
25  accurate given -- you know, maybe there's just an

Page 298

 1    error in the accounting.

 2        Q    Right.

 3             Did you ever learn prior to your

 4    resignation from NAF whether there was an error in

 5    the accounting that -- we'll just leave it at that.

 6        A    I was never given any proof

 7    documentation-wise.  There was lots of conversation

 8    amongst regionals, amongst -- once Scott came on and

 9    started working on the new comp plan, there was much

10    conversation about that things were not done

11    correctly and should be done differently, those

12    sorts of things.

13        Q    Were you ever given any information after

14    the leadership meeting that led you to believe that

15    NAF's statements that it was not as profitable as it

16    thought it was was incorrect?

17             MS. GIBSON:  Objection, form.

18        A    Can you give -- can you say the question

19    again?

20    BY MR. PERLOWSKI:

21        Q    Sure.

22             So you testified at the February

23    leadership meeting you were told that NAF was not as

24    profitable as NAF thought it was --

25        A    Right.

Gina Spearman , Vol 2                              March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 299

1      Q      -- right?

2             After the leadership meeting, were you

3    ever given any indication -- were you ever given any

4    information that led you to believe that NAF's

5    statements that it wasn't as profitable as it

6    thought it was were false when they were made?

7             MS. GIBSON:  Objection, form.

8             Go ahead.

9      A      NAF did not provide me with any

10   information.  Again, applying common sense, general

11   industry norms, can't speak for the company at

12   large, what I can speak to is that the Southeast

13   region, based on our book of business, the volume of

14   business, should have been highly profitable.

15   BY MR. PERLOWSKI:

16     Q      Okay.  But that wasn't my question.

17            My question was specific:  Were you given

18   any information from NAF after the February

19   leadership meeting that led you to believe that

20   NAF's statement that it was not as profitable as it

21   thought it was was false when that statement was

22   made?

23            MS. GIBSON:  Objection, form, asked and

24   answered.

25     A      And when you say from NAF --

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 300

1    BY MR. PERLOWSKI:

2         Q    Yes.

3         A    -- who do you mean?

4         Q    Anyone.

5         A    There was much conversation around -- from

6    regionals that -- no facts.  I mean, it was just

7    simply that the expenses that maybe were now trying

8    to be allocated to the regions weren't really retail

9    expenses, they were other businesses or other

10   channels, and that they didn't -- they weren't

11   incurred by the regions.

12        Q    When you're referring to other businesses,

13   are you referring to other businesses within NAF

14   aside from retail?

15        A    Yes.

16        Q    Okay.  When you say other channels, are

17   you also referring to other channels within NAF

18   that's not retail?

19        A    Correct.

20        Q    Okay.  So is it fair to say then that the

21   conversation or the speculation was that expenses

22   that were being incurred outside of retail were

23   being allocated to retail?

24             MS. GIBSON:  Objection, form and misstates

25   testimony.

Page 301

 1          Go ahead.
 2          MR. PERLOWSKI:  Please repeat the
 3  question.
 4          (The record was read by the reporter as
 5  follows:
 6          "Q   So is it fair to say then that the
 7       conversation or the speculation was that
 8       expenses that were being incurred outside of
 9       retail were being allocated to retail?")
10          MS. GIBSON:  Same objection.
11      A   There was that speculation amongst many
12  regionals.
13  BY MR. PERLOWSKI:
14      Q   Did you ever receive any specific
15  information that confirmed whether that speculation
16  was, in fact, true with respect to any specific
17  expense?
18      A   We were never given any detail -- of the
19  $30 million that was misallocated, we were never
20  given any detail of those expenses.
21      Q   You mentioned the cooperation was going to
22  be for a short period of time, that NAF was going to
23  hire a CFO, was going to sort of rightsize the
24  company.
25          When were you told when that sort of --

Page 302

1   the cooperation for the short period of time, when

2   were you told it was going to end or the request for

3   cooperation was going to end?

4        A    Most of the conversation around the short

5   time frame came from Rick and Patty Arvielo but

6   primarily Patty.  It was discussed a lot on the trip

7   that Rick and Patty made to Atlanta to visit with

8   Kelly and I after the leadership meeting to reassure

9   us that they were going to get their

10  accounting/financial issues resolved, and that --

11  that's when the 90 days was mentioned several times,

12  that they believed it would be for a period of 90

13  days that we would absorb the pricing exceptions and

14  marketing costs.

15       Q    Okay.  So the conversations that you just

16  referenced, Ms. Spearman, these were in the meetings

17  in Atlanta that followed the leadership meeting?

18       A    Yes.

19       Q    Okay.  So let me just sort of stick to the

20  leadership meeting discussions first.

21       A    Sure.

22       Q    So I just want to compartmentalize when

23  certain conversations occurred.

24            So at the leadership meeting itself, the

25  February '19 leadership meeting, were you -- at that

Gina Spearman , Vol 2                    March 21, 2022

Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 303

1    meeting, you were told that the cooperation was

2    being requested for a short period of time?

3         A    Correct.

4         Q    Okay.  At that meeting, were you given any

5    indication as to how long that period of time might

6    be at the leadership meeting?

7         A    I cannot recall if I was given a specific

8    date then.

9         Q    Okay.  Okay.  Refresh my recollection,

10   Ms. Spearman, as to how the meetings in Atlanta --

11   when did those occur relative to the leadership

12   meeting, like, just in terms of time frame?

13        A    I am not certain.  I believe it's in the

14   e-mails that we've shared in discovery, but it was

15   in the March to April time frame.

16        Q    Okay.

17        A    I would say within 60 days or so of the

18   leadership meeting.

19        Q    So you mentioned in your prior answer in

20   the trip in Atlanta, whenever that occurred,

21   March-April of '19, that Rick Arvielo and/or Patty

22   Arvielo referenced 90 days.

23             What did they say?

24        A    Yes.  Sorry, I was nodding instead of

25   saying "yes."

Page 304

```
 1      Q    Sorry.  I -- I saw that and didn't even

 2   think twice of it.

 3      A    Sorry.  My answer is "yes" to that.

 4      Q    Yes.

 5      A    And we were very concerned, "we" being

 6   Kelly and I.

 7      Q    Right.

 8      A    All the regionals were concerned, but

 9   obviously I know a lot more about mine and Kelly's

10   experience.  And we were very concerned about, you

11   know, the stability of the company, A, and, B, you

12   know, the fact that if our book of business wasn't

13   profitable here, that was a big concern.

14           But we wanted to be part of the solution

15   if it was for a temporary period of time.  You know,

16   we wanted to make things work.  We had a lot

17   invested, time and money.  We had brought so many

18   people over, over a hundred people.  We were up to

19   over 200 employees at this point, referral partners,

20   everything.  So we were very vested in making it

21   work.

22           So when they came into town, they were

23   there, I believe, to reassure us that they were

24   working very quickly to get it resolved and that

25   things would go back to normal.  And I interpreted
```

Page 305

1   that to mean we would go back to normal on our

2   normal comp plan whereby we had our marketing budget

3   and they were absorbing the marketing -- the pricing

4   exceptions as they had up to that point.

5          MR. PERLOWSKI:  Could you please read my

6   question back?

7          (The record was read by the reporter as

8   follows:

9          "Q    So you mentioned in your prior answer

10         the trip in Atlanta, whenever that occurred,

11         March-April of '19, that Rick Arvielo and/or

12         Patty Arvielo referenced 90 days.  What did

13         they say?")

14  BY MR. PERLOWSKI:

15     Q    Okay.  So you told me a lot about what

16  your understanding was, but I want to understand --

17     A    What they said?

18     Q    -- what they said.

19     A    They said, hang in there with us, we're

20  going to get this resolved, and this is only going

21  to last for 90 days with you having to absorb these

22  costs.

23     Q    So was it your understanding that it was

24  90 days from the day of your conversation with them?

25     A    I don't know what date they meant.

Page 306

1    Q    Okay.  So when they said it'll be 90 days

2   that you'll have to absorb these costs, your

3   understanding was that for at least for 90 days

4   going forward, the Southeast region was going to

5   have to continue to absorb the marketing expenses

6   and pricing exceptions?

7    A    I don't know how to answer that.  I don't

8   know -- I can't speak to what they --

9    Q    No, I'm trying to understand what you --

10   what you understood.

11        So whenever that conversation occurred,

12   was it your understanding that for the next 90 days,

13   you were going to have to incur the marketing

14   expense and pricing exception costs?

15   A    The conversations were this is going to be

16   temporary, and the 90 days was used as a frame of

17   reference for temporary.  But there was never, like,

18   an end date discussed or a start date, for that

19   matter.

20   Q    Was it your understanding that during the

21   temporary period of time that the Southeast region

22   was going to have to absorb the marketing expense

23   and pricing exception costs?

24   A    Was it my understanding that we were going

25   to have to absorb them?

Page 307

1        Q     During the temporary period of time.

2        A     Yes.

3        Q     Okay.  Now, when Mr. -- when the meeting

4    with the Arvielos happened in Atlanta, was a CFO

5    hired at that time yet, if you know?

6        A     I don't recall.

7        Q     Okay.  When the -- you mentioned that

8    the -- and, again, your testimony will speak for

9    itself, but you said that the 90 days was kind of a

10   frame of reference for the temporary period of time.

11   I think that's essentially what you said.

12            Was there any discussion at the time as

13   to, like, what things needed to happen, you know,

14   over the next weeks and months to sort of convert --

15   you know, actually end the period of time where the

16   regions were going to be absorbing these costs?

17       A     It wasn't really clear, just that they

18   needed help rightsizing the company, and they felt

19   like that was going to be an adequate amount of time

20   for them to do so.

21       Q     They were projecting what they thought was

22   going to be an adequate amount of time to do that,

23   to rightsize the company, is that what you

24   understood?

25       A     You'd have to ask them.

Page 308

1      Q     Okay.  Did you ever have a conversation

2   with the Arvielos about whether the costs that the

3   regions were going to have to be absorbed would ever

4   be paid back to the regions?

5      A     No.

6      Q     Was there any discussion at the leadership

7   meeting in February of '19 as to whether any of the

8   costs that the region were going to absorb would

9   ever be paid back to the regions?

10     A     No.

11     Q     Did you ever approach anyone at NAF, let's

12  say 90 days after your meeting with the Arvielos,

13  whenever that occurred?  So if the meeting was in

14  March, it would be sometime in June; if the meeting

15  was in April, it would be sometime in July.

16          After 90 days from that meeting, did you

17  ever approach anyone at NAF about why the policy

18  change with respect to marketing expenses and

19  pricing exceptions was still in place?

20     A     Yeah, there's various e-mails on the

21  subject.

22     Q     And what you were you told?

23     A     Once Mr. Frommert was hired, it was --

24  much of the conversation was about moving to the

25  different compensation model, that it would still

Page 309

```
 1   have an override component and that it would have a
 2   profit component.  And the conversations were around
 3   we're getting that together as quickly as possible,
 4   and your marketing budget and pricing exceptions
 5   would be reinstated with that new compensation
 6   structure.
 7        Q    At the February '19 leadership meeting,
 8   was there any discussion about moving to a profit
 9   and loss compensation model?  This is at the
10   February '19 leadership meeting.
11        A    I believe there were regionals maybe --
12   best of my recollection -- I can't be sure -- I
13   believe there were regionals that maybe discussed
14   that type of model, but that wasn't the purpose of
15   the meeting.  The meeting -- purpose of the meeting
16   was to discuss the misallocation and to cut our
17   compensation.
18        Q    So at -- understanding that there were
19   discussions, you know, that there were regional
20   discussions -- and I'm sure people were talking to
21   each other.  I mean, human nature, big changes are
22   made, people are going to talk to each other.
23             But from NAF announcing changes to the
24   regions, did NAF announce at the February leadership
25   meeting that it was going to be changing the
```

Page 310

1   compensation model going forward to include a profit

2   and loss component?

3        A    I don't recall.

4        Q    So you mentioned that after Mr. Frommert

5   was hired, the discussion sort of veered into --

6   "veered" is my word, not yours, but veered into

7   moving to a different compensation model.

8             At that time when that was being

9   discussed, did you ever say, okay, but it's been --

10  you know, it's been more than 90 days that our

11  marketing expenses, pricing exceptions, that we're

12  absorbing those, are you going to, you know,

13  reinstate the prior policy while you're looking at

14  this new compensation model?

15            MS. GIBSON:  Objection, form.

16  BY MR. PERLOWSKI:

17       Q    Did you ever say anything like that?

18       A    Many times.

19       Q    And what were you told?

20       A    We're working on it.  We'll get back to

21  you.

22       Q    After the February leadership meeting, did

23  anyone ever tell you that NAF was going to pay the

24  regions' marketing expenses as it had done before

25  the leadership meeting?

Page 311

1        A    Yes.

2        Q    Who?

3        A    Christy, Jan, Jon, Rick and Patty.

4        Q    Tell me -- tell me what they said.

5        A    What I've already stated, that we are

6    working on clearing up and cleaning up our

7    accounting.  We just need your help for a temporary

8    period of time, and things will go back to normal.

9        Q    Okay.  Other than saying things would go

10   back to normal, did anyone ever tell you after the

11   February '19 leadership meeting that NAF was, in

12   effect, reinstating its prior policy with respect to

13   marketing expenses?

14            MS. GIBSON:  Objection, asked and

15   answered.

16       A    They stated on many occasions that they

17   would go back to the prior policy.

18   BY MR. PERLOWSKI:

19       Q    When?  As of when?

20       A    When did they say it, or when did they say

21   it was going back into effect?

22       Q    The latter.

23       A    They never gave a date.

24       Q    Okay.  As of March 1st of 2020, how did

25   NAF handle regional marketing expenses?

Gina Spearman , Vol 2                          March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 312

1      A     I'm sorry, can you repeat the question?

2      Q     Yeah.

3            So we know that in March -- on March 1st

4    of 2020, shortly before you resigned, a new

5    compensation model was put into effect.

6      A     Uh-huh.

7      Q     Under that new model, how were regional

8    marketing expenses handled?

9      A     From my memory, to the best of my

10   recollection there was a budget given for marketing

11   expenses, and anything exceeding that budget was

12   then a part of the split of profitability, which, in

13   our case was, like, a 50-50 split.

14     Q     And as of March 1st of 2020, how were

15   pricing exceptions handled?

16     A     To the best of my memory, again, a budget

17   or a tolerance was put into place, and anything that

18   exceeded that would then be a shared expense between

19   NAF and Kelly and myself, which was 50-50.

20     Q     With respect to marketing expenses, it was

21   also going to be a shared expense if there was an

22   overage of the budget?

23     A     Yes.

24     Q     And the shared expense would be between

25   NAF and the region?

Page 313

```
 1        A     Yes.  I think you have a copy of the
 2   agreement.  I think it's spelled out.
 3        Q     So after the leadership meeting in
 4   February of 2019, did you and Ms. Allison ever
 5   discuss whether you were going to continue to incur
 6   marketing expenses on behalf of the region?
 7        A     We discussed that we had to.  It was
 8   commitments that had been made to loan officers and
 9   referral partners, so there really was no choice.
10        Q     Did you discuss whether you were going to
11   reduce any of those commitments?
12        A     Not that I recall.
13        Q     Did you discuss whether you were going to
14   reduce any -- when I say "discretionary marketing
15   expense," I don't mean, like, okay, you've made a
16   contractual commitment that you're going to spend,
17   you know, $30,000 on a specific date.  That's a --
18   I'm not talking about a contractual commitment.
19              Discretionary expense, I mean, like, if I
20   go to the mall after we leave this deposition today,
21   I can decide whether I want to buy something or not,
22   right?
23              Did you ever have any discussion with
24   Ms. Allison about whether you were going to reduce
25   any discretionary marketing expenses after the
```

Page 314

1   leadership meeting?

2          MS. GIBSON:  Objection, form and

3   foundation.

4      A    To my recollection, most of our marketing

5   expenses were either contractual or commitments,

6   meaning they were either contracts, like our TV show

7   that had a one-year contract, or they were

8   association memberships that had contracts, or they

9   were loan officer marketing expenses that were

10   either in the loan officer's contract with NAF, or,

11   at a minimum, verbal commitments on our part.  So I

12   didn't feel like much of it was discretionary if we

13   were going to honor our word.

14   BY MR. PERLOWSKI:

15      Q    Do you recall ever having any

16   conversations with anyone at NAF about that your

17   region had certain contractual commitments that it

18   had to make and how those contractual marketing

19   commitments were going to be addressed under the new

20   policy?

21      A    I remember discussing Atlanta's Best New

22   Homes.  There were even e-mail exchanges in the

23   discovery in which we asked would they pay for that

24   since it was a contractual agreement that NAF had

25   made to the TV show, and we were told no, that

Page 315

1    either -- that we would have to pay that.  There was

2    no "either."  We would have to pay it.

3        Q    With respect to pricing exceptions, did

4    you ever have any discussions with Ms. Allison about

5    not improving -- not approving pricing exceptions

6    after the leadership meeting or even approving fewer

7    pricing exceptions?

8        A    From what I recall, we discussed what our

9    options were on many -- you know, many levels,

10   obviously, given the difficult situation we were in.

11   And I think the conclusion that we came to was we

12   would lose business and/or lose loan officers if we

13   did not continue to approve the pricing concessions

14   as we had been.

15       Q    I just want to make sure I understand

16   something.

17            So if a pricing exception loan was made,

18   would you still receive a bonus on that loan?

19       A    We would receive our override bonuses,

20   some of them, but then a deduction would be made to

21   our compensation for that.  So it was almost like

22   you get it and then subtract from it.

23            Does that make sense?

24       Q    Sure.  And I may have been just trying to

25   understand, would the deduction typically mirror the

Gina Spearman , Vol 2                        March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 316

1    amount of the override bonus, or would -- in other

2    words, how did the deduction and the bonus relate to

3    each other?

4         A    Have you seen any of the monthly recaps?

5         Q    Yeah.  Yeah.

6         A    So it's spelled out on there.

7         Q    Okay.

8         A    I'm happy to try to explain it --

9         Q    What's your understanding?  I can look at

10   a recap.  What's your understanding in terms of --

11   so pricing -- you decide, say, April of '19 we're

12   going to go ahead and make a loan that's, you know,

13   above the tolerance, you receive -- would the

14   deduction effectively mirror the bonus that you

15   would have received on the loan?

16            MS. GIBSON:  Objection, form.

17        A    No.

18   BY MR. PERLOWSKI:

19        Q    Okay.

20        A    It could be less than or more than.

21        Q    Okay.

22        A    It's specific to the, you know, exact

23   amount of the concession on that loan.

24        Q    Right.

25            So is it your understanding that NAF's

Page 317

1   policy change that it announced at the leadership

2   meeting with respect to marketing expenses, is it

3   your understanding that that policy change remained

4   in effect until March 1st of 2020?

5        A    Are you asking did the change that they

6   made in February of '19 stay in effect until March

7   of 2020?

8        Q    Yes.

9        A    The deductions stayed in place, yes.

10        Q    Until March 1st of 2020?

11        A    Yes.

12        Q    And then the new compensation model went

13   into effect on March 1st of 2020?

14        A    Yes.

15        Q    So the policy change was in place for

16   about a year?

17        A    It wasn't a policy change in writing.  It

18   was just a deduction that they took from our pay

19   during that time period for both of those items.

20        Q    The announcement that regional marketing

21   expenses would be deducted against the region, that

22   was in place for about a year?

23        A    From February of '19 to March of '20, yes,

24   what, a year and a month.

25        Q    Leadership meeting was, like, the

Page 318

1    11th-12th of February?

2         A    Can't say for sure.  Sounds about right.

3         Q    I believe in your prior testimony, which,

4    again, will speak for itself, I thought you

5    testified that the changes that were announced were

6    pro- -- were announced effective as of March 1st.

7              Does that ring a bell?

8         A    I don't remember the exact effective date.

9         Q    Okay.

10        A    But it's in the e-mails and all the

11   documentation.

12        Q    Yeah.  Right.

13             And the change in the pricing exceptions

14   tolerance, that lasted -- that was in effect for

15   about a year?

16        A    Yes.

17        Q    Under -- before the leadership meeting,

18   NAF still had pricing exception tolerances in place,

19   right?

20        A    There wasn't -- there wasn't many pricing

21   exceptions that -- other than, like, they had

22   something where basically no one would get paid.

23   Like, the loan officer wouldn't get paid, the

24   manager wouldn't get paid.  They had -- and I can't

25   remember what that was called.  Those were the only

Page 319

1   times in which we had to participate in a pricing

2   exception prior to February of 2019.

3        Q    So tell me the circumstances in which you

4   had to participate in a pricing exception before the

5   leadership meeting.

6        A    Basically, when you submitted or approved

7   a pricing concession that was what at the time the

8   lock desk believed to be higher than they wanted to

9   do, then they would just say, hey, we can do this

10  one, but manager's not going to get paid, loan

11  officer's not going to get paid.

12       Q    Okay.  And you would then approve that

13  knowing that you wouldn't effectively be paid on

14  that loan?

15       A    I'm trying to remember how it would

16  happen.  Yeah, there would just be an e-mail

17  exchange of, you know, this is -- this is what's

18  going to happen on this loan.

19       Q    So --

20       A    There were a handful probably over --

21       Q    So for those occasions, so either you

22  could either decide not to make the loan or approve

23  it understanding that you would not be paid on that

24  loan, meaning the -- "you" being the regional

25  manager?

Page 320

```
 1        A      Yeah, it would be for something like -- it
 2   wouldn't be for a competitive situation.  It would
 3   be for loan officer error, someone made a mistake.
 4   You know, it was just, like, a very big
 5   exception-type situation.  There was probably a
 6   handful of times it happened between November of '16
 7   and February of '19.
 8        Q      And in the handful of times it happened,
 9   you could decide to approve it knowing you wouldn't
10   get paid on it?
11        A      It was never a situation in those
12   situations of -- that we weren't going to do it.
13        Q      Okay.  But when you did do it, you
14   understood you weren't going to get paid on that
15   loan, correct?
16        A      It was usually a situation where the loan
17   officer had either made a mistake or there was a
18   severe customer service issue, so the loan officer
19   would agree that they weren't getting paid, yes.  I
20   don't recall us ever having to, like, approve that.
21   I remember the loan officer did.
22        Q      Okay.  So when the loan officer would
23   approve the pricing exception but you -- on the
24   regional manager side, would you be paid still --
25   would you still be paid on that loan?
```

Page 321

```
 1        A    I don't think anybody would get paid --

 2        Q    Okay.

 3        A    -- on those rare instances.

 4        Q    Okay.  Did anyone give you a specific time

 5   frame as to how long NAF expected it was going to

 6   take to hire a CFO?

 7        A    Just that it was a top priority and within

 8   90 days, I guess.

 9        Q    You said it was a top priority.

10             When you said "within 90 days," who told

11   you that NAF was going to hire a CFO within 90 days?

12        A    Rick and Patty Arvielo, Christy Bunce.

13        Q    When did Rick or Patty Arvielo tell you

14   that NAF was going to hire a CFO within 90 days?

15             MS. GIBSON:  Objection, asked and

16   answered.

17        A    After the February -- we had a dinner

18   during the February leadership meeting.  I remember

19   it being discussed by Rick and Patty to all of us at

20   the dinner, and then Rick and Patty also said it

21   when they came to Atlanta.

22   BY MR. PERLOWSKI:

23        Q    So at the dinner during the leadership

24   meeting, did either Rick or Patty Arvielo say that

25   NAF was going to hire a CFO within 90 days?
```

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 322

1        A     I believe so.

2        Q     What specific words do you recall them

3    using?

4        A     I don't remember specific words.

5        Q     Did they say, we hope to hire a CFO within

6    90 days, we are going to hire a CFO within 90 days,

7    we're going to hire a CFO as soon as possible, it's

8    a top priority?

9        A     All those.

10       Q     And then in the Atlanta meeting, what did

11   they say with respect to the hiring of a CFO?

12       A     That they felt the solution to this

13   financial problem was to get the CFO hired, they had

14   people already interviewing, they were already

15   talking to people, and that they believed they were

16   going to be able to hire someone very, very soon.

17       Q     And they did -- and they did hire -- NAF

18   did hire a CFO within 90 days of the leadership

19   meeting?

20            MS. GIBSON:  Objection, foundation.

21       A     I don't have his hire date.

22   BY MR. PERLOWSKI:

23       Q     Okay.  Sounds about right, generally?

24            MS. GIBSON:  Same objection, speculation.

25       A     I don't -- yeah, speculation.  I don't

Page 323

```
 1   know for sure the date, but --
 2   BY MR. PERLOWSKI:
 3        Q    Do you recall when Mr. Frommert joined
 4   NAF?
 5        A    I do not.
 6        Q    Did anyone tell you about how long it
 7   would take NAF to develop a P&L model of
 8   compensation?
 9        A    No.
10        Q    Did you understand that NAF was going to
11   attempt to develop a P&L model of compensation after
12   it hired a CFO?
13             MS. GIBSON:  Objection, speculation.
14   BY MR. PERLOWSKI:
15        Q    I'm asking for your understanding.
16        A    My recollection was the P&L plan --
17   compensation model discussion came about after Scott
18   was hired.
19        Q    Do you recall any discussion of the P&L
20   model of compensation being something that NAF
21   wanted to implement before Mr. Frommert was hired?
22        A    I can't say for sure.
23        Q    Okay.
24             (Defendant's Exhibit 24 was marked for
25   identification.)
```

Page 324

1   BY MR. PERLOWSKI:

2        Q    Ms. Spearman, I'm going to show you what's

3   been marked as Exhibit 24 to your deposition, and

4   this is an e-mail exchange in February of 2019, and

5   I want to call your attention to the second page.

6   Just let me know when you're there.

7        A    You want me to read it?

8        Q    I'm going to ask you a couple questions

9   about your e-mail on February 13th of 2019 --

10       A    Okay.

11       Q    -- to Ms. Bunce, Mr. Reed, and Ms. Preslo,

12   and a copy to Ms. Allison.

13       A    Okay.

14       Q    Obviously take your time to read it as

15   need be, but I want to -- my question to you, it

16   says, "Follow-up to our meeting."

17            That's a follow-up to the leadership

18   meeting?

19       A    I believe so.

20       Q    Okay.  And it said if you look at --

21            MS. GIBSON:  Go ahead and take your time

22   to read the e-mail.

23   BY MR. PERLOWSKI:

24       Q    Please, as I said, take your time.

25            My question is going to be:  It starts

Page 325

1    with -- at the end of the first line, it says, "We

2    have spent several hours yesterday and today

3    reviewing all the information you provided in our

4    meeting along with the P&L info in Kevlar."

5           I'm going to ask you about that.

6    A      Okay.

7    Q      So what P&L --

8           MS. GIBSON:  Can she have just a minute to

9    finish reading it?  She's still reading.

10          MR. PERLOWSKI:  I'm asking her a question

11   about that one sentence.

12          MS. GIBSON:  That's fine, but she wants to

13   read it for the context.

14          MR. PERLOWSKI:  That's fine.

15          MS. GIBSON:  Thank you.

16   A      Okay.

17   BY MR. PERLOWSKI:

18   Q      What P&L info in Kevlar did you review

19   prior to authoring this e-mail?

20   A      From my memory, it would have been

21   something Jon provided from Kevlar.

22   Q      Do you know what Jon provided in Kevlar?

23          MS. GIBSON:  Objection, asked and

24   answered.

25   A      I would, again, be guessing, but I think

Page 326

```
1    probably either two thousand eight- -- it would have

2    been Southeast P&Ls.  So I don't remember the time

3    period.

4              MS. GIBSON:  I'll just instruct you not to

5    guess.

6              THE WITNESS:  Okay.

7    BY MR. PERLOWSKI:

8         Q    Okay.  Well, we talked earlier, generally

9    speaking, about what you recall Mr. Reed giving you

10   at various points in time.

11        A    Uh-huh.

12        Q    We also talked generally about what you

13   may -- what you might have had access to in Kevlar.

14             What I'm trying to understand is on

15   February 13th of 2019, you're saying to Ms. Bunce,

16   Mr. Reed, and Ms. Preslo that we have spent several

17   hours yesterday and today reviewing all the

18   information you provided in our meeting, along with

19   the P&L info in Kevlar.

20             So you're saying that you reviewed P&L

21   info in Kevlar.  I want to try and understand what

22   P&L info in Kevlar you reviewed.

23             Did you go into Kevlar itself and review

24   P&L information either on February 12th or

25   February 13th of 2019?
```

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 327

1        A     (Sotto voce reading.)

2              I would just be guessing.  I know that Jon

3    provided us P&Ls.  I cannot remember if it was like,

4    you know, PDF P&Ls that were provided or going into

5    Kevlar to view a P&L.  I do not recall.

6        Q     Did Mr. --

7        A     But we definitely reviewed P&Ls.

8        Q     Did Mr. Reed provide you with P&L

9    information at the leadership meeting?

10             MS. GIBSON:  Objection, asked and

11   answered.

12       A     I don't recall if he gave us P&Ls at the

13   meeting or after the meeting.  But this says we

14   reviewed them, so he gave them to us either -- you

15   know, it was a two-day meeting, so --

16   BY MR. PERLOWSKI:

17       Q     Right.

18       A     -- I don't remember which day.

19       Q     Okay.  So Mr. Reed did give you something

20   at the leadership meeting.

21             Do you recall going into Kevlar and

22   reviewing information in Kevlar as opposed to

23   reviewing information that Mr. Reed may have given

24   you?

25             MS. GIBSON:  Objection, asked and

```
 1   answered.

 2        A    I do not recall going into Kevlar.

 3   BY MR. PERLOWSKI:

 4        Q    Okay.

 5             MS. GIBSON:  Henry, we've been going a

 6   little over an hour.  You want to take a quick

 7   break?

 8             MR. PERLOWSKI:  Yeah, I don't have -- I

 9   don't have much -- I don't have that much longer,

10   but let's take five.

11             MS. GIBSON:  Yeah, that was my next

12   question.

13             MR. PERLOWSKI:  That's fine.  No.  I don't

14   have that much.

15             MS. GIBSON:  There's probably not that

16   much really left of the deposition time.  Okay.

17             THE VIDEOGRAPHER:  Off record at 2:10.

18             (Recess 2:10-2:17 p.m.)

19             THE VIDEOGRAPHER:  Back on the record at

20   2:17.

21             (Defendant's Exhibit 25 was marked for

22   identification.)

23             MR. PERLOWSKI:  This is going to be

24   Exhibit 25.  This was Exhibit 15 to Ms. Bunce's

25   deposition, which is why it has that.
```

Gina Spearman , Vol 2                           March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 329

1    BY MR. PERLOWSKI:

2         Q    Ms. Spearman, I'm showing you what's been

3    marked as Exhibit 25 to your deposition.  And,

4    Ms. Spearman, I'm again going to call your attention

5    to the second page of the exhibit, which is actually

6    an e-mail from Ms. Allison on March 19th of 2019 to

7    Ms. Bunce, Ms. Preslo, and Mr. Reed, and it copies

8    you and the Arvielos.

9              And understand, take your time to take a

10   look at it, as your counsel has instructed you to.

11             My question for you is going to be:  Did

12   you and Ms. Allison develop this e-mail together, or

13   did she just draft it?

14        A    I don't remember.

15        Q    And, I mean, obviously, feel free to take

16   your time and look at the e-mail, but it talks

17   about, you know, the changes that were announced at

18   the leadership meeting, and Ms. Allison reflects

19   some sentiments, right, in response to those changes

20   that were being announced.

21             And if you look towards the bottom of her

22   e-mail, see there's numbers 1, 2, 3, and 4 above the

23   "sincerely"?

24        A    Yes.

25        Q    You see that?

Page 330

 1           And then right before that, it says,

 2    "Please approve the following so we can advance,"

 3    and then it says 1, 2, 3, and 4.

 4           Do you know whether -- asking maybe a more

 5    specific question:  Do you remember developing these

 6    requests for approval of these four items with

 7    Ms. Allison, or is that something she did on her

 8    own?

 9       A    We would have had discussions about it.

10    We were partners.  I don't remember if I was

11    involved in the drafting of the e-mail.

12       Q    And so is item number 1, is it just asking

13    for a different tolerance level on certain kinds of

14    loans?

15       A    Yes.

16       Q    Same thing with number 2, asking for a

17    different tolerance level on certain kinds of loans?

18       A    Yes.

19       Q    And the proposal in items 1 and 2 was

20    asking for different tolerance levels but with an

21    understanding that anything above those tolerance

22    levels, the region would cover out of its

23    compensation?

24       A    Are you asking me if that's --

25       Q    Yeah.

Page 331

1       A     -- what it says here?

2       Q     Yes.

3             Was that the proposal to NAF, to change

4       the tolerance levels, but anything above the

5       tolerance levels that you and she would cover out of

6       your comp buckets?

7             MS. GIBSON:   Objection, foundation,

8       misstates testimony.

9       A     I didn't draft the e-mail, but that's what

10      it says there.

11      BY MR. PERLOWSKI:

12      Q     Okay.  Did you -- did you approve of these

13      proposals that Ms. Allison submitted to Ms. Bunce,

14      Ms. Preslo, and Mr. Reed?

15      A     Did I approve of them; what do you mean?

16      Q     You mentioned that you and she were

17      partners and that you would have discussed them.

18      A     Yes.

19      Q     Did you agree with them?

20      A     I didn't agree with any of it.

21      Q     Okay.

22      A     I didn't agree with them not paying since

23      my initial contract, I didn't agree with them

24      cutting our pay when we were a profitable region,

25      but I believed them that they were going to get it

Page 332

1   right eventually.  And so I didn't agree with any of

2   this.

3        Q    Did you --

4        A    But we were trying to be part of the

5   solution.

6        Q    Did you -- did you authorize Ms. Allison

7   to send her -- the e-mail that she sent on

8   March 19th of 2019?

9        A    She did not need my authorization to send

10  this e-mail.

11       Q    Did you ever express any disagreement with

12  Ms. Allison's proposals as -- in her e-mail of

13  March 13th?

14            MS. GIBSON:  Objection, form, asked and

15  answered.

16       A    We were -- as a lot of our communication

17  states, we were trying to help be part of the

18  solution.  So we didn't want this, we didn't agree

19  to it, but we were -- if it was temporary, we were

20  trying to come up with a better alternative than

21  what they had suggested -- what NAF had suggested.

22  BY MR. PERLOWSKI:

23       Q    But you -- okay.  Fair enough.

24       A    For a temporary, yeah.

25       Q    Okay.  So from whenever the marketing --

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 333

1    the change in marketing expenses, whenever that was

2    adopted, whether it was in February of '19 or

3    March 1st of '19, through March 1st of 2020 --

4         A    Yes.

5         Q    -- you understood that if the region made

6    a marketing expense, it was going to come out of the

7    region's budget?

8              MS. GIBSON:  Objection, form.

9         A    Yes, that's what they told us, yes.

10   BY MR. PERLOWSKI:

11        Q    Okay.  And you understood that during that

12   entire year or so period of time before March 1st of

13   2020?

14        A    I was expecting it to end every day --

15        Q    Okay.

16        A    -- because that was what they had

17   promised.

18        Q    Did anyone ever tell you that it was

19   ending as of a certain day before March 1st of 2020?

20             MS. GIBSON:  Objection, form.

21        A    They just told us daily that they were

22   close to a solution.

23   BY MR. PERLOWSKI:

24        Q    Were you ever told that you were going to

25   be reimbursed for any of the marketing expenses that

Page 334

1   the region chose to incur?

2          MS. GIBSON:  Objection, form, misstates

3   testimony.

4      A    Was I --

5   BY MR. PERLOWSKI:

6      Q    Okay.

7      A    -- ever informed that I would be

8   reimbursed, that's your question?

9      Q    Were you ever told that you were going to

10  be reimbursed for any marketing expenses the

11  Southeast region chose to incur after the change was

12  announced?

13     A    No.  I was just expecting it to be over --

14     Q    Okay.

15     A    -- and not deducted anymore.

16     Q    Okay.  Again, from whenever the change was

17  announced, whether it was in February of '19 or

18  whether it was adopted as of March 1st of '19, that

19  next year or so period of time, you understood that

20  if a pricing exception loan was approved outside of

21  tolerances that the region was going to take a hit

22  on that loan, correct?

23         MS. GIBSON:  Objection, form.

24     A    Did I understand if Kelly approved a

25  concession, that it was going to come out of our

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 335

1    pay?

2    BY MR. PERLOWSKI:

3        Q    Yes.

4        A    I guess I understood that, yeah.  I didn't

5    agree to it.

6        Q    Right, but you understood it from

7    whenever -- February of '19 or March 1st of '19

8    until March 1st of 2020; you understood that,

9    correct?

10       A    I understood it was a temporary change

11   that just never ended even though they promised it

12   would.

13       Q    Did anyone ever tell you that it was

14   ending on a date certain before March 1st of 2020

15   with respect to pricing exceptions?

16       A    90 days.

17       Q    So after the 90 days, did you go to

18   somebody and say, hey, where's the old policy?

19            MS. GIBSON:  Objection, form.

20       A    Weekly.

21   BY MR. PERLOWSKI:

22       Q    And what were you told?

23       A    We're working on a new plan that will be

24   better than that.

25       Q    Okay.  And no one told you in response to

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 336

1   your weekly question that the policy was reverting

2   back to what it was before the leadership meeting,

3   correct?

4            MS. GIBSON:  What's the question?  I'm

5   sorry, I didn't hear one in that.

6            MR. PERLOWSKI:  Please read it back.

7            (The record was read by the reporter as

8   follows:

9            "Q    Okay.  And no one told you in

10           response to your weekly question that the

11           policy was reverting back to what it was before

12           the leadership meeting, correct?")

13           MS. GIBSON:  No one told you what, is my

14   question.  I don't --

15   BY MR. PERLOWSKI:

16       Q    Did anyone tell you that the policy was

17   going back to what it was --

18           MS. GIBSON:  Objection, asked and

19   answered.

20   BY MR. PERLOWSKI:

21       Q    -- before the leadership meeting?

22       A    There were many occasions in which they

23   said, we will go back to your contractual marketing

24   budget, yes.

25       Q    As of when?

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 337

1            MS. GIBSON:  Objection, asked and

2    answered.

3    BY MR. PERLOWSKI:

4        Q    You said "marketing budget."  I was

5    talking about pricing exceptions.

6        A    Okay.  Same with that, that after the

7    90 days, it would go back to that.

8        Q    Okay.  And so when the 90 days expired --

9        A    Uh-huh.

10       Q    -- did you then go to someone and say, why

11   are pricing exceptions being deducted from our

12   compensation?

13           MS. GIBSON:  Objection, asked and

14   answered.

15       A    They said because they were working on the

16   new comp plan, that that would all be taken care of

17   in the new comp plan.

18   BY MR. PERLOWSKI:

19       Q    Okay.  So your understanding was that the

20   change with respect to pricing exceptions was going

21   to still be in effect after the 90 days expired?

22           MS. GIBSON:  Objection, misstates

23   testimony.

24       A    No.

25   BY MR. PERLOWSKI:

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 338

1        Q     Okay.  So you think that there's a 90-day
2   window that this policy with respect to pricing
3   exceptions is going to be in effect.
4        A     Right.
5        Q     On the 91st day, you go -- you ask
6   someone, why is the policy change still in effect
7   or -- right?
8              You with me so far?
9              MS. GIBSON:  Objection, misstates
10  testimony and slightly badgering --
11             MR. PERLOWSKI:  I haven't even talked
12  about testimony yet.  I'm trying to get an answer to
13  a question.
14             MS. GIBSON:  Well, you're saying on the
15  91st day, and I think her testimony, if you want her
16  to read it back, is that --
17             MR. PERLOWSKI:  Please stop speaking for
18  the witness.  You can object.  Stop speaking for the
19  witness.  You're instructing the witness.
20             MS. GIBSON:  I am not instructing her.
21             MR. PERLOWSKI:  It's a speaking objection.
22  Stop.
23             MS. GIBSON:  Hey, Henry, don't tell me to
24  stop.
25  BY MR. PERLOWSKI:

Page 339

1        Q    Okay.  We are going to do this.  You're
2    going to answer my question.
3             So the 90 days expires --
4             MS. GIBSON:  Give me an opportunity to
5    object.
6             Go ahead.
7    BY MR. PERLOWSKI:
8        Q    So the 90 days expires.  The policy change
9    with respect to pricing exceptions is still in
10   effect after 90 days, correct?
11            MS. GIBSON:  Objection, asked and
12   answered.
13   BY MR. PERLOWSKI:
14       Q    Correct?
15       A    They continued to make the deductions.
16       Q    Okay.  When you -- you asked somebody --
17   did you ask somebody why they were continuing to
18   make the deductions after 90 days had expired?
19            MS. GIBSON:  Objection, asked and
20   answered.
21       A    Yes.  We had weekly calls with --
22   BY MR. PERLOWSKI:
23       Q    Okay.
24       A    Uh-huh.  Yes.
25       Q    And you were told they were working on it?

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 340

 1       A    Yes.

 2       Q    That it was going to be addressed in what?

 3       A    They were working towards a P&L-based

 4   compensation, and the budget would be reinstated

 5   with that plan.

 6       Q    So the budget -- so the pricing

 7   exceptions, tolerances would be reinstated when the

 8   new P&L model was in effect?

 9       A    Yes.

10       Q    Okay.  So you understood after the 90 days

11   expired that the pricing exceptions change would

12   remain in effect until the P&L model was

13   developed --

14            MS. GIBSON:  Objection, form.

15   BY MR. PERLOWSKI:

16       Q    -- and implemented?

17            MS. GIBSON:  Objection, form, asked and

18   answered.

19       A    No, it was one -- it was a situation,

20   Henry, where every week it was, we're working on it;

21   we're going to reinstate it.  And then it was, let's

22   work on this P&L and get it implemented as soon as

23   possible.

24            So it was just an always, oh, we're just a

25   few weeks away from -- from reinstating it.

Page 341

 1   BY MR. PERLOWSKI:

 2       Q    Okay.  So they're telling you you're a few

 3   weeks away from reinstating it, and they would

 4   reinstate it as of when?

 5       A    I don't know.

 6            MS. GIBSON:  Objection, asked and

 7   answered.

 8       A    I don't know.  I mean --

 9   BY MR. PERLOWSKI:

10       Q    Okay.

11       A    -- you'd have to ask them what -- when

12   they were going to do it.

13       Q    I'm asking what your understanding was.

14       A    And I told you.

15            MS. GIBSON:  I think she's testified.  Her

16   understanding may not be what you like, but she has

17   given you her understanding.

18            And you have about 17 or less minutes.

19   You actually expired the time, but you said --

20            MR. PERLOWSKI:  If you want to take that

21   up with the Court, you're more than happy to do

22   that.

23            MS. GIBSON:  Yeah, I will.

24            MR. PERLOWSKI:  I'm sure you will.

25   BY MR. PERLOWSKI:

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

                                              Page 342

1        Q    And you were never told you were going to

2    be reimbursed for any pricing exception reductions

3    in your compensation, correct?

4             MS. GIBSON:  Objection, asked and

5    answered.

6        A    I don't recall discussing reimbursement.

7    Just, again, when it started out, it was a very

8    short period of time we thought it was going to

9    happen, so reimbursement wasn't discussed.

10   BY MR. PERLOWSKI:

11       Q    So why does paragraph 123 of your second

12   amended complaint say, "all while believing she

13   would ultimately reimbursed for these expenditures"?

14            MS. GIBSON:  What's the question?

15   BY MR. PERLOWSKI:

16       Q    So why does paragraph 123 of your second

17   amended complaint say that you believed you would

18   ultimately be reimbursed for these expenditures?

19            MS. GIBSON:  I think the document speaks

20   for itself.  I think there's --

21            MR. PERLOWSKI:  I didn't ask -- you're not

22   testifying, Ms. Gibson.

23            MS. GIBSON:  Objection.

24            MR. PERLOWSKI:  I'm asking Ms. Spearman

25   why her second amended complaint says, contrary to

Page 343

1    her testimony today, while -- "all while believing

2    she would ultimately be reimbursed for these

3    expenditures."

4    BY MR. PERLOWSKI:

5         Q    Why does it say that?

6              MS. GIBSON:  Objection, misstates

7    testimony, asking her questions about a legal

8    document about which she does not -- has not -- does

9    not have the legal expertise to respond to.  And

10   you've asked and answered that question over and

11   over.

12        A    Yeah, I just believed that -- I believed

13   them, and I believed that we were going to get to a

14   resolution quickly --

15   BY MR. PERLOWSKI:

16        Q    Right.

17        A    -- and that just didn't happen.

18        Q    But no one ever told you that you were

19   ultimately going to be reimbursed for any marketing

20   expense and pricing exception expenditure?

21        A    I didn't think that it would go on long

22   enough.

23        Q    That wasn't my question.

24             MS. GIBSON:  Objection, form, misstates

25   testimony.

Page 344

```
 1   BY MR. PERLOWSKI:

 2       Q    Paragraph 123, Ms. Spearman, says that you

 3   expended personal funds on marketing expenses and

 4   pricing exceptions, "all while believing she would

 5   ultimately be reimbursed for those expenditures."

 6            What supports that belief that you were

 7   ultimately going to be reimbursed for these

 8   expenditures?

 9            MS. GIBSON:  Objection, asked and

10   answered.

11       A    I believed that they weren't going to

12   deduct them anymore.

13   BY MR. PERLOWSKI:

14       Q    Okay.  Pro- -- as of a certain point, the

15   deductions would stop, that's what you believed,

16   right?

17            MS. GIBSON:  Objection, asked and

18   answered.

19   BY MR. PERLOWSKI:

20       Q    Did you answer the question, Ms. Spearman?

21       A    When it started in February, I believed

22   that it was for a period of 90 days and that we

23   would go back to having our marketing budget of

24   7 and a half bps.  I believed them when they told me

25   that.
```

                                                     Page 345

1            MR. PERLOWSKI:  Just give me five minutes.

2            THE VIDEOGRAPHER:  Off the record at 2:33.

3            (Recess 2:33-2:36 p.m.)

4            THE VIDEOGRAPHER:  Back on the record at

5       2:36.

6       BY MR. PERLOWSKI:

7            Q    Ms. Spearman, this document was already

8       marked as an exhibit to your deposition as

9       Exhibit 5.  And I want to go ahead and ask you --

10      this is -- the questions I'm going to ask you,

11      Ms. Spearman, are about your e-mail of March 19th of

12      2019, which is the first page of the document.  Feel

13      free to take your time --

14           A    Okay.

15           Q    -- to skim through it.

16           Ms. Spearman, I'm going to ask you my

17      first question, but again, feel free --

18           A    Okay.

19           Q    -- to take your time to look through it.

20           My first question is going to be:  If you

21      look at the second-to-last sentence of your e-mail

22      that says, "It now appears we have a solid

23      go-forward plan, and we're looking forward to

24      getting back to work on growing the Southeast," my

25      question is going to be about that, about what the

Gina Spearman , Vol 2                                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 346

1   solid go-forward plan was.

2            Again, take your time.  For the record, my

3   question is:  I want to -- if you could please

4   explain what the solid go-forward plan was, to your

5   understanding.

6        A    Okay.  I'm trying to determine which

7   go-forward, quote/unquote, plan it was.  All of

8   these discussions back and forth in the e-mails were

9   about what would be the go-forward plan for the next

10  90 days as we help to rightsize the company.  So I

11  don't know exactly which e-mail I'm referring to

12  there.

13           I'm just trying to see if it was...

14       Q    And, again, take your time.

15       A    I can't be certain what we were --

16  which -- if you're going to ask me specifics, I

17  can't be certain.

18           What I know that to mean is that we were

19  trying to be part of the solution, and so the

20  directive that we had been given, we decided to say,

21  okay, for 90 days, if that's what you need to

22  rightsize the company, I guess that's the go-forward

23  that was being referred to.

24       Q    You would agree with me 90 days isn't

25  referenced in your e-mail, right?

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 347

1      A     It's not referenced in that sentence.

2      Q     What is -- what is WA PE?

3      A     Where do you see that?

4      Q     It's in a number of places in your e-mail,

5   talking -- appears to be a recap in the bullet

6   points.  So there's a bullet points recap --

7      A     Uh-huh.

8      Q     -- and it talks about you manage to a WA

9   PE of 22 bps with a PE tolerance of 200 bps.  And

10  then --

11     A     Yes, weighted average.

12     Q     Okay.  So is it fair to say that by virtue

13  of this -- the e-mails -- this e-mail that we're

14  looking at, that you and Ms. Allison had proposed a

15  different interim solution but that that interim

16  solution that was proposed was rejected?

17     A     There were several interim solutions that

18  were discussed back and forth.

19     Q     And were any of the interim solutions

20  accepted by NAF?

21     A     I'm not sure what you mean by "accepted."

22     Q     Were any of the changes that you and/or

23  Ms. Allison had proposed, were any of them adopted

24  by NAF after the leadership meeting?

25     A     There was never an amendment or change to

Page 348

1  our agreement, so I don't know that either side

2  really ever approved anything.

3       Q    What I'm saying, Ms. -- changes were

4  announced by NAF with respect to pricing exceptions

5  and marketing expenses.  You and Ms. Allison --

6  and/or Ms. Allison may have proposed different

7  changes, like, okay, instead of doing it this way,

8  we propose doing it a different way.

9       A    Yes.

10      Q    Did any of the proposals that you and she

11 made, did any of those take --

12           MS. GIBSON:  Objection, form, asked and

13 answered -- sorry.

14 BY MR. PERLOWSKI:

15      Q    -- where they were adopted by NAF after

16 you made the alternative proposal?

17           MS. GIBSON:  Objection, form, asked and

18 answered.

19      A    It was pretty convoluted, so I don't know

20 that one set proposal was ever adopted or accepted.

21 BY MR. PERLOWSKI:

22      Q    Okay.  I don't think I have any other

23 questions, Ms. Spearman.

24           MS. GIBSON:  That concludes the

25 deposition.

Page 349

1          THE VIDEOGRAPHER:  We're off the record at

2    2:43.

3               (Deposition concluded at 2:43 p.m.)

4               (Signature reserved.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 350

```
 1        The following reporter and firm disclosures
      were presented by me at this proceeding for review
 2    by counsel:
 3                    REPORTER DISCLOSURES
 4           The following representations and
      disclosures are made in compliance with Georgia Law,
 5    more specifically:
 6            Article 10 (B) of the Rules and
      Regulations of the Board of Court Reporting
      (disclosure forms)
 7            OCGA Section 9-11-28 (c) (disqualification
      of reporter for financial interest)
 8            OCGA Sections 15-14-37 (a) and (b)
      (prohibitions against contracts except on a
 9    case-by-case basis).
10    - I am a certified court reporter in the State of
      Georgia.
11    - I am a subcontractor for Veritext.
      - I have been assigned to make a complete and
12    accurate record of these proceedings.
      - I have no relationship of interest in the matter
13    on which I am about to report which would disqualify
      me from making a verbatim record or maintaining my
14    obligation of impartiality in compliance with the
      Code of Professional Ethics.
15    - I have no direct contract with any party in this
      action, and my compensation is determined solely by
16    the terms of my subcontractor agreement.
17
18                     FIRM DISCLOSURES
19    - Veritext was contacted to provide reporting
      services by the noticing or taking attorney in this
20    matter.
      - There is no agreement in place that is prohibited
21    by OCGA 15-14-37 (a) and (b).  Any case-specific
      discounts are automatically applied to all parties,
22    at such time as any party receives a discount.
      - Transcripts:  The transcript of this proceeding as
23    produced will be a true, correct, and complete
      record of the colloquies, questions, and answers as
24    submitted by the certified court reporter.
      - Exhibits:  No changes will be made to the exhibits
25    as submitted by the reporter, attorneys, or
      witnesses.
```

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 351

1    - Password-Protected Access:  Transcripts and
     exhibits relating to this proceeding will be
2    uploaded to a password-protected repository, to
     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gina Spearman , Vol 2          March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

Page 352

1                    CERTIFICATE
2     STATE OF GEORGIA:
      COUNTY OF FULTON:
3
4            I hereby certify that the foregoing
      transcript was taken down, as stated in the caption,
5     and the colloquies, questions and answers were
      reduced to typewriting under my direction; that the
6     transcript is a true and correct record of the
      evidence given upon said proceeding.
7            I further certify that I am not a relative
      or employee or attorney of any party, nor am I
8     financially interested in the outcome of this
      action.
9            I have no relationship of interest in this
      matter which would disqualify me from maintaining my
10    obligation of impartiality in compliance with the
      Code of Professional Ethics.
11           I have no direct contract with any party
      in this action and my compensation is based solely
12    on the terms of my subcontractor agreement.
             Nothing in the arrangements made for this
13    proceeding impacts my absolute commitment to serve
      all parties as an impartial officer of the court.
14
15                                        )22.
16
17
18           _____
19           ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

Page 353

1   To:  MaryBeth Gibson, Esq.

2   Re: Signature of Deponent Gina Spearman

3   Date Errata due back at our offices: 30 days

4

5   Greetings:

6   This deposition has been requested for read and sign
    by the deponent.  It is the deponent's

7   responsibility to review the transcript, noting any
    changes or corrections on the attached PDF Errata.

8   The deponent may fill out the Errata electronically
    or print and fill out manually.

9

    Once the Errata is signed by the deponent and

10  notarized, please mail it to the offices of Veritext
    (below).

11

    When the signed Errata is returned to us, we will

12  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies

13  of the Errata to all ordering parties.

14  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the

15  court without the signature of the deponent.

16

17  Please send completed Errata to:

18  Veritext Production Facility

19  20 Mansell Court, Suite 300

20  Roswell, GA 30076

21  (770) 343-9696

22

23

24

25

Page 354

1    ERRATA for ASSIGNMENT #
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6
     Pursuant to Rule 30(7)(e) of the Federal Rules of
7    Civil Procedure and/or OCGA 9-11-30(e), any changes
     in form or substance which you desire to make to
8    your testimony shall be entered upon the deposition
     with a statement of the reasons given for making
9    them.  To assist you in making any such corrections,
     please use the form below.  If additional pages are
10   necessary, please furnish same and attach.
11   Page No._____Line No._____Change to_____
12   _____
13   Reason for change_____
14   Page No._____Line No._____Change to_____
15   _____
16   Reason for change_____
17   Page No._____Line No._____Change to_____
18   _____
19   Reason for change_____
20   Page No._____Line No._____Change to_____
21   _____
22   Reason for change_____
23   Page No._____Line No._____Change to_____
24   _____
25   Reason for change_____

Page 355

1    Page No._____Line No._____Change to_____

2    _____

3    Reason for change_____

4    Page No._____Line No._____Change to_____

5    _____

6    Reason for change_____

7    Page No._____Line No._____Change to_____

8    _____

9    Reason for change_____

10   Page No._____Line No._____Change to_____

11   _____

12   Reason for change_____

13   Page No._____Line No._____Change to_____

14   _____

15   Reason for change_____

16   Page No._____Line No._____Change to_____

17   _____

18   Reason for change_____

19

              _____

20                 DEPONENT'S SIGNATURE

21   Sworn to and subscribed before me this_____day of
     _____, 20__.

22

23   _____

     NOTARY PUBLIC

24

25   My Commission Expires:_____

**[& - adopted]**                                                    Page 1

**&**

**&**   280:10

**0**

**0000149**   278:2
**04981**   277:6

**1**

**1**   288:12 329:22
330:3,12,19
**10**   350:5
**11th**   318:1
**123**   342:11,16
344:2
**12th**   318:1 326:24
**13609**   352:17
**13th**   324:9 326:15
326:25 332:13
**14**   277:17 279:8
**15**   328:24
**15-14-37**   350:8,21
**16**   320:6
**17**   341:18
**171**   279:15
**17th**   279:15
**19**   287:2 290:5
293:10 295:21
302:25 303:21
305:11 308:7
309:7,10 311:11
316:11 317:6,23
320:7 333:2,3
334:17,18 335:7,7
**19th**   329:6 332:8
345:11
**1:04**   277:15 280:2
**1:20**   277:6
**1st**   282:23 283:5
283:15 311:24
312:3,14 317:4,10
317:13 318:6
333:3,3,12,19

334:18 335:7,8,14

**2**

**2**   277:11 329:22
330:3,16,19
**2/13/19**   278:2
**20**   317:23 353:19
355:21
**200**   304:19 347:9
**2018**   290:3,6,12,13
291:7,11 294:25
295:7,11,21
**2018's**   294:2
**2019**   283:5,6,15
284:9 287:5 313:4
319:2 324:4,9
326:15,25 329:6
332:8 345:12
**2020**   311:24 312:4
312:14 317:4,7,10
317:13 333:3,13
333:19 335:8,14
**2022**   277:14 280:2
352:15
**21**   277:14
**2100**   279:16
**2138**   277:20
352:19
**21st**   280:2
**22**   347:9
**230**   277:17 279:8
**24**   278:2 323:24
324:3
**25**   278:3 328:21,24
329:3
**281**   278:8
**2:10**   328:17
**2:10-2:17**   328:18
**2:17**   328:20
**2:33**   345:2
**2:33-2:36**   345:3

**2:36**   345:5
**2:43**   349:2,3

**3**

**3**   329:22 330:3
**3/20/19**   278:3
**30**   283:22 284:20
294:8 301:19
353:3 354:6
**30,000**   313:17
**300**   353:19
**30076**   353:20
**30305**   279:9
**30363**   279:17
**323**   278:2
**328**   278:3
**343-9696**   353:21
**3535**   277:18 279:7

**4**

**4**   329:22 330:3
**4th**   352:15

**5**

**5**   345:9
**50-50**   312:13,19

**6**

**60**   303:17

**7**

**7**   344:24 354:6
**770**   353:21

**9**

**9-11-28**   350:7
**9-11-30**   354:7
**90**   302:11,12
303:22 305:12,21
305:24 306:1,3,12
306:16 307:9
308:12,16 310:10
321:8,10,11,14,25
322:6,6,18 335:16
335:17 337:7,8,21

338:1 339:3,8,10
339:18 340:10
344:22 346:10,21
346:24
**91st**   338:5,15

**a**

**able**   294:22
322:16
**absolute**   352:13
**absorb**   302:13
305:21 306:2,5,22
306:25 308:8
**absorbed**   308:3
**absorbing**   305:3
307:16 310:12
**accepted**   347:20
347:21 348:20
**access**   287:3,5,6
288:8,10,17 289:2
289:3,9,12,18
326:13 351:1,2
**accounting**   298:1
298:5 302:10
311:7
**accounts**   292:21
**accurate**   297:20
297:25 350:12
**accusation**   281:20
**action**   277:5
350:15 352:8,11
**actual**   292:11
293:25
**additional**   354:9
**addressed**   314:19
340:2
**adequate**   307:19
307:22
**adopted**   333:2
334:18 347:23
348:15,20

**[advance - back]**                                                    Page 2

advance  330:2
afternoon  281:1
ago  289:6
agree  281:19
  286:4,10 320:19
  331:19,20,22,23
  332:1,18 335:5
  346:24
agreed  283:10
agreement  283:10
  313:2 314:24
  348:1 350:16,20
  352:12
ahead  284:16
  288:14 295:24
  299:8 301:1
  316:12 324:21
  339:6 345:9
alarming  292:3
allison  286:25
  313:4,24 315:4
  324:12 329:6,12
  329:18 330:7
  331:13 332:6
  347:14,23 348:5,6
allison's  332:12
allocated  284:19
  285:2,7 291:15,17
  292:4,20 293:11
  294:8 300:8,23
  301:9
allow  293:5
alternative  332:20
  348:16
amended  281:16
  342:12,17,25
amendment
  347:25
american  277:7
  280:10 283:8

amount  307:19,22
  316:1,23
amounts  292:12
  292:15
andrew  279:20
announce  309:24
announced  317:1
  318:5,6 329:17,20
  334:12,17 348:4
announcement
  317:20
announcing
  309:23
answer  289:6,7
  303:19 304:3
  305:9 306:7
  338:12 339:2
  344:20
answered  288:24
  299:24 311:15
  321:16 325:24
  327:11 328:1
  332:15 336:19
  337:2,14 339:12
  339:20 340:18
  341:7 342:5
  343:10 344:10,18
  348:13,18
answers  350:23
  352:5
anybody  321:1
anymore  334:15
  344:12
appearances
  279:1
appears  345:22
  347:5
applied  350:21
applying  299:10
approach  308:11
  308:17

approval  330:6
approve  315:13
  319:12,22 320:9
  320:20,23 330:2
  331:12,15
approved  319:6
  334:20,24 348:2
approving  315:5,6
april  303:15,21
  305:11 308:15
  316:11 352:15
arnall  279:14
  280:9
arrangements
  352:12
article  350:5
arvielo  284:6,6
  302:5 303:21,22
  305:11,12 321:12
  321:13,24
arvielos  307:4
  308:2,12 329:8
aside  300:14
asked  292:23
  293:1,7 296:9,10
  299:23 311:14
  314:23 321:15
  325:23 327:10,25
  332:14 336:18
  337:1,13 339:11
  339:16,19 340:17
  341:6 342:4
  343:10 344:9,17
  348:12,17
asking  282:8,10
  287:24 294:10,13
  296:12 317:5
  323:15 325:10
  330:4,12,16,20,24
  341:13 342:24
  343:7

assigned  350:11
assignment  354:1
assist  354:9
association  314:8
assume  288:2
assured  282:14
atlanta  277:2,19
  279:9,17 302:7,17
  303:10,20 305:10
  307:4 321:21
  322:10
atlanta's  314:21
attach  354:10
attached  353:7
attempt  323:11
attending  280:12
  280:14,17
attention  324:5
  329:4
attorney  350:19
  352:7 353:12
attorneys  350:25
authoring  325:19
authorization
  332:9
authorize  332:6
automatically
  350:21
average  347:11

**b**

b  277:7,20 304:11
  350:5,8,21 352:19
back  290:22
  294:21,23 304:25
  305:1,6 308:4,9
  310:20 311:8,10
  311:17,21 328:19
  336:2,6,11,17,23
  337:7 338:16
  344:23 345:4,24
  346:8 347:18

Case 1:20-cv-04981-CAP   Document 89   Filed 04/27/22   Page 82 of 98
Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

[back - code]                                                        Page 3

353:3
**backup** 293:1,6,9
**badgering** 338:10
**based** 287:10
299:13 340:3
352:11
**basically** 318:22
319:6
**basis** 283:9 350:9
**beginning** 283:6
**begun** 296:24
**behalf** 279:2,11
280:13,15,17
283:11 313:6
**belief** 344:6
**believe** 282:14
289:2 295:18,25
296:3,6,25 297:22
298:14 299:4,19
303:13 304:23
309:11,13 318:3
322:1 324:19
**believed** 302:12
319:8 322:15
331:25 342:17
343:12,12,13
344:11,15,21,24
**believing** 342:12
343:1 344:4
**bell** 318:7
**best** 309:12 312:9
312:16 314:21
**better** 332:20
335:24
**biannual** 287:11
**big** 304:13 309:21
320:4
**board** 350:6
**bonus** 315:18
316:1,2,14

**bonuses** 315:19
**book** 299:13
304:12
**books** 295:13
**bosworth** 277:20
352:19
**bottom** 285:8
288:21,22 329:21
**bps** 344:24 347:9,9
**break** 328:7
**broker** 277:7
**brought** 281:15
282:9 304:17
**bryan** 279:21
**buckets** 331:6
**budget** 283:9
305:2 309:4
312:10,11,16,22
333:7 336:24
337:4 340:4,6
344:23
**building** 277:17
279:8
**bullet** 347:5,6
**bunce** 284:7
291:23 321:12
324:11 326:15
329:7 331:13
**bunce's** 328:24
**business** 299:13
299:14 304:12
315:12
**businesses** 300:9
300:12,13
**buy** 313:21

**c**

**c** 279:4 288:12
350:7
**call** 324:5 329:4
**called** 287:6
318:25

**calls** 339:21
**candidates** 296:20
297:3,6
**cap** 277:6
**caption** 352:4
**care** 337:16
**career** 291:24
**case** 312:13 350:9
350:9,21
**casual** 281:23,25
**categories** 292:8
292:11
**caused** 285:7
**ccr** 277:20 352:19
**certain** 291:14
293:2 302:23
303:13 314:17
330:13,17 333:19
335:14 344:14
346:15,17
**certificate** 352:1
**certified** 350:10
350:24
**certify** 352:4,7
354:2
**cfo** 294:16,17
296:14,17,23
297:3,21 301:23
307:4 321:6,11,14
321:25 322:5,6,7
322:11,13,18
323:12
**change** 308:18
317:1,3,5,15,17
318:13 331:3
333:1 334:11,16
335:10 337:20
338:6 339:8
340:11 347:25
354:11,13,14,16
354:17,19,20,22

354:23,25 355:1,3
355:4,6,7,9,10,12
355:13,15,16,18
**changes** 309:21,23
318:5 329:17,19
347:22 348:3,7
350:24 353:7
354:4,5,7
**changing** 309:25
**channels** 285:6
300:10,16,17
**charged** 283:4
**chase** 279:13
280:16
**check** 287:7
**checking** 288:20
**choice** 313:9
**chose** 282:22
334:1,11
**christy** 284:6
291:23 311:3
321:12
**circumstances**
319:3
**civil** 277:5 354:7
**claim** 281:15
282:9
**cleaning** 311:6
**clear** 285:4 307:17
**clearing** 311:6
**close** 333:22
**closed** 295:13
**cm1** 288:10,23
289:7,10 290:12
293:17
**cm2** 289:13 291:7
293:17
**cm3** 289:18
291:11 293:17
**code** 350:14
352:10

Gina Spearman , Vol 2                              March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

**[colloquies - days]**                                                Page 4

**colloquies**   350:23
  352:5
**come**   332:20 333:6
  334:25
**commission**
  355:25
**commitment**
  313:16,18 352:13
**commitments**
  313:8,11 314:5,11
  314:17,19
**common**   281:22
  286:5 299:10
**communicated**
  297:5
**communication**
  332:16
**comp**   283:19
  298:9 305:2 331:6
  337:16,17
**companies**   285:6
**company**   288:4
  289:24 290:18
  293:25 294:2,21
  299:11 301:24
  304:11 307:18,23
  346:10,22
**compartmentalize**
  302:22
**compensation**
  282:12,13,19
  283:13 284:4
  294:12 297:24
  308:25 309:5,9,17
  310:1,7,14 312:5
  315:21 317:12
  323:8,11,17,20
  330:23 337:12
  340:4 342:3
  350:15 352:11

**competitive**   320:2
**complaint**   281:17
  342:12,17,25
**complete**   350:11
  350:23
**completed**   353:17
**compliance**   350:4
  350:14 352:10
**component**   309:1
  309:2 310:2
**concern**   297:18
  304:13
**concerned**   285:10
  304:5,8,10
**concession**   316:23
  319:7 334:25
**concessions**
  315:13
**concluded**   349:3
**concludes**   348:24
**conclusion**   315:11
**confirmed**   301:15
**consensus**   290:15
**consider**   288:22
**contacted**   350:19
**contend**   282:2,8
  282:10
**context**   325:13
**continuation**
  280:3
**continue**   306:5
  313:5 315:13
**continued**   339:15
**continuing**   339:17
**contract**   314:7,10
  331:23 350:15
  352:11
**contracts**   314:6,8
  350:8
**contractual**
  313:16,18 314:5

314:17,18,24
  336:23
**contrary**   342:25
**conversation**
  298:7,10 300:5,21
  301:7 302:4
  305:24 306:11
  308:1,24
**conversations**
  302:15,23 306:15
  309:2 314:16
**convert**   307:14
**convoluted**   348:19
**coo**   296:4
**cooperation**
  294:14 296:10,13
  301:21 302:1,3
  303:1
**copies**   329:7
  353:12
**copy**   313:1 324:12
**corporation**
  284:18
**correct**   285:23
  293:19 296:15
  297:16 300:19
  303:3 320:15
  334:22 335:9
  336:3,12 339:10
  339:14 342:3
  350:23 352:6
**corrections**   353:7
  354:9
**correctly**   298:11
**costs**   302:14
  305:22 306:2,14
  306:23 307:16
  308:2,8
**counsel**   279:1
  280:5,18 329:10
  350:2

**county**   352:2
**couple**   289:6
  324:8
**course**   285:9
**court**   277:1
  280:19 341:21
  350:6,10,24
  352:13 353:15,19
**cover**   330:22
  331:5
**crc**   277:20 352:19
**crr**   277:20 352:19
**customary**   291:19
  292:1,7
**customer**   320:18
**cut**   309:16
**cutting**   331:24
**cv**   277:6

**d**

**d**   277:7
**daily**   333:21
**date**   283:17 294:7
  294:16 303:8
  305:25 306:18,18
  311:23 313:17
  318:8 322:21
  323:1 335:14
  353:3
**day**   305:24 327:15
  327:18 333:14,19
  338:1,5,15 352:15
  355:21
**days**   302:11,13
  303:17,22 305:12
  305:21,24 306:1,3
  306:12,16 307:9
  308:12,16 310:10
  321:8,10,11,14,25
  322:6,6,18 335:16
  335:17 337:7,8,21
  339:3,8,10,18

Case 1:20-cv-04981-CAP   Document 89   Filed 04/27/22   Page 84 of 98
Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

[days - eventually]                                                    Page 5

340:10 344:22
346:10,21,24
353:3
**december** 295:13
**decide** 313:21
316:11 319:22
320:9
**decided** 346:20
**deduct** 344:12
**deducted** 283:13
317:21 334:15
337:11
**deduction** 315:20
315:25 316:2,14
317:18
**deductions** 317:9
339:15,18 344:15
**defendant** 277:8
279:11
**defendant's**
323:24 328:21
**definitely** 327:7
**defrauded** 282:3,9
282:10
**demonstrated**
290:7
**deponent** 353:2,6
353:8,9,15
**deponent's** 353:6
355:20
**deposed** 286:20
**deposition** 277:12
280:3 313:20
324:3 328:16,25
329:3 345:8
348:25 349:3
353:6 354:8
**description** 278:1
**desire** 354:7
**desk** 319:8

**detail** 292:15,21
301:18,20
**determine** 346:6
**determined**
350:15
**develop** 323:7,11
329:12
**developed** 340:13
**developing** 330:5
**different** 286:13
293:17 308:25
310:7 330:13,17
330:20 347:15
348:6,8
**differently** 298:11
**difficult** 315:10
**dinner** 321:17,20
321:23
**direct** 350:15
352:11
**direction** 352:5
**directive** 346:20
**disagreement**
332:11
**disclosure** 350:6
**disclosures** 350:1
350:3,4,18
**discount** 350:22
**discounts** 350:21
**discovered** 284:1
**discovery** 303:14
314:23
**discretionary**
313:14,19,25
314:12
**discuss** 309:16
313:5,10,13
**discussed** 283:7
302:6 306:18
309:13 310:9
313:7 315:8

321:19 331:17
342:9 347:18
**discussing** 314:21
342:6
**discussion** 293:4
307:12 308:6
309:8 310:5
313:23 323:17,19
**discussions** 302:20
309:19,20 315:4
330:9 346:8
**disqualification**
350:7
**disqualify** 350:13
352:9
**district** 277:1,1
**division** 277:2
285:9,10 287:13
290:16
**divisions** 283:24
285:5
**document** 289:22
342:19 343:8
345:7,12
**documentation**
298:7 318:11
**doing** 287:15
290:17,19 348:7,8
**dollars** 295:1
**draft** 329:13 331:9
**drafting** 330:11
**due** 353:3
**duly** 280:22

**e**

**e** 278:2,3 303:14
308:20 314:22
318:10 319:16
324:4,9,22 325:19
329:6,12,16,22
330:11 331:9
332:7,10,12

345:11,21 346:8
346:11,25 347:4
347:13,13 354:6,7
**earlier** 288:7
291:22 326:8
**easily** 293:6
**effect** 311:12,21
312:5 317:4,6,13
318:14 337:21
338:3,6 339:10
340:8,12
**effective** 318:6,8
**effectively** 316:14
319:13
**eight** 326:1
**either** 285:12
286:14 314:5,6,10
315:1,2 319:21,22
320:17 321:24
326:1,24 327:14
348:1
**electronically**
353:8
**employee** 352:7
**employees** 304:19
**ended** 335:11
**entered** 354:8
**entire** 290:16
333:12
**errata** 353:3,7,8,9
353:11,13,14,17
354:1
**error** 298:1,4
320:3
**esq** 279:3,4,5,12
279:13,20 353:1
**essentially** 307:11
**ethics** 350:14
352:10
**eventually** 332:1

Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

**[evidence - foundation]**

evidence  352:6
evps  296:4
exact  283:17
 316:22 318:8
exactly  346:11
examination  278:7
 280:24
examined  280:22
example  289:25
 290:3 294:24
exceeded  312:18
exceeding  312:11
exception  306:14
 306:23 315:17
 318:18 319:2,4
 320:5,23 334:20
 342:2 343:20
exceptions  282:6
 282:20 287:8
 294:13 302:13
 305:4 306:6
 308:19 309:4
 310:11 312:15
 315:3,5,7 318:13
 318:21 335:15
 337:5,11,20 338:3
 339:9 340:7,11
 344:4 348:4
exchange  319:17
 324:4
exchanges  314:22
executives  297:19
exhibit  278:1,2,3
 323:24 324:3
 328:21,24,24
 329:3,5 345:8,9
exhibits  350:24,24
 351:1
expected  321:5
expecting  333:14
 334:13

expended  344:3
expenditure
 343:20
expenditures
 342:13,18 343:3
 344:5,8
expense  301:17
 306:14,22 312:18
 312:21,24 313:15
 313:19 333:6
 343:20
expenses  282:6,13
 282:18,20,21
 283:3,7,11,18
 284:18,25 285:1,4
 285:7,14,14,19
 286:2,15 291:14
 291:16,19,25
 292:1,4,7,8 293:10
 294:12 300:7,9,21
 301:8,20 306:5
 308:18 310:11,24
 311:13,25 312:8
 312:11,20 313:6
 313:25 314:5,9
 317:2,21 333:1,25
 334:10 344:3
 348:5
experience  304:10
expertise  343:9
expired  337:8,21
 339:18 340:11
 341:19
expires  339:3,8
 355:25
explain  316:8
 346:4
explained  291:14
express  332:11

**f**

facility  353:18
fact  293:5 296:4
 301:16 304:12
facts  300:6
fair  300:20 301:6
 332:23 347:12
false  282:14
 283:19,19 299:6
 299:21
far  290:18 338:8
february  283:6,16
 283:22 284:9
 287:2,5 290:5
 293:10 295:15,21
 298:22 299:18
 302:25 308:7
 309:7,10,24
 310:22 311:11
 313:4 317:6,23
 318:1 319:2 320:7
 321:17,18 324:4,9
 326:15,24,25
 333:2 334:17
 335:7 344:21
federal  354:6
feel  314:12 329:15
 345:12,17
felt  294:17 307:18
 322:12
fewer  315:6
file  277:5 353:12
filed  353:14
fill  353:8,8
finances  285:2,3
financial  283:23
 286:24 287:4
 293:25 294:2,9,18
 295:9 302:10
 322:13 350:7

financially  352:8
financials  294:6
fine  325:12,14
 328:13
finish  325:9
finley  277:16
 279:6 280:8
firm  277:16 279:6
 280:8 350:1,18
first  280:22
 302:20 325:1
 345:12,17,20
five  328:10 345:1
follow  324:16,17
followed  302:17
following  330:2
 350:1,4 354:5
follows  280:23
 290:25 301:5
 305:8 336:8
foregoing  352:4
form  281:24 282:4
 282:11,24 284:14
 286:8 292:10
 293:20 295:23
 298:17 299:7,23
 300:24 310:15
 314:2 316:16
 332:14 333:8,20
 334:2,23 335:19
 340:14,17 343:24
 348:12,17 354:7,9
forms  350:6
forth  346:8 347:18
forward  306:4
 310:1 345:23,23
 346:1,4,7,9,22
 353:12
foundation  281:24
 282:25 284:15
 288:13 289:14

293:21 314:3
322:20 331:7
**four** 330:6
**frame** 302:5
303:12,15 306:16
307:10 321:5
**fraud** 281:15,19
282:9
**free** 329:15 345:13
345:17
**frommert** 297:15
308:23 310:4
323:3,21
**fulton** 352:2
**funding** 277:7
280:11 283:8
**funds** 344:3
**furnish** 354:10
**further** 285:21
352:7
**fyi** 287:11

**g**

**ga** 353:20
**general** 290:15
299:10
**generally** 286:11
286:22 287:13,16
322:23 326:8,12
**georgia** 277:1,19
279:9,17 350:4,10
352:2
**getting** 309:3
320:19 345:24
**gibson** 279:3
280:7,7 281:11,24
282:4,11,24
284:14 286:8
288:13 289:14
292:10 293:20
295:23 298:17
299:7,23 300:24

301:10 310:15
311:14 314:2
316:16 321:15
322:20,24 323:13
324:21 325:8,12
325:15,23 326:4
327:10,25 328:5
328:11,15 331:7
332:14 333:8,20
334:2,23 335:19
336:4,13,18 337:1
337:13,22 338:9
338:14,20,23
339:4,11,19
340:14,17 341:6
341:15,23 342:4
342:14,19,22,23
343:6,24 344:9,17
348:12,17,24
353:1
**gina** 277:4,13
280:3,21 353:2
**give** 287:21 289:21
298:18 321:4
327:19 339:4
345:1
**given** 284:17
285:16,18,21
287:16,17,20
288:1,2 289:22
290:1,1,6 292:15
292:16,17,21
294:24 295:2
296:4,22 297:25
298:6,13 299:3,3
299:17 301:18,20
303:4,7 312:10
315:10 327:23
341:17 346:20
352:6 354:8

**giving** 326:9
**go** 284:16 288:7,14
294:21,23 295:24
299:8 301:1
304:25 305:1
311:8,9,17 313:20
316:12 324:21
326:23 335:17
336:23 337:7,10
338:5 339:6
343:21 344:23
345:9,23 346:1,4,7
346:9,22
**going** 287:12
290:3 294:15,20
296:21 301:21,22
301:23 302:2,3,9
305:20,20 306:4,4
306:13,15,22,24
307:16,19,22
308:3,8 309:22,25
310:1,12,23
311:21 312:21
313:5,10,13,16,24
314:13,19 316:12
319:10,11,18
320:12,14 321:5
321:11,14,25
322:6,7,16 323:10
324:2,8,25 325:5
327:4,21 328:2,5
328:23 329:4,11
331:25 333:6,24
334:9,21,25
336:17 337:20
338:3 339:1,2
340:2,21 341:12
342:1,8 343:13,19
344:7,11 345:10
345:16,20,25
346:16

**golden** 279:14
280:10
**good** 281:1,3,4
**great** 281:12
287:14
**greetings** 353:5
**gregory** 279:14
280:10
**growing** 345:24
**guess** 321:8 326:5
335:4 346:22
**guessing** 325:25
327:2

**h**

**half** 344:24
**handful** 319:20
320:6,8
**handle** 311:25
**handled** 312:8,15
**hang** 305:19
**happen** 307:13
319:16,18 342:9
343:17
**happened** 307:4
320:6,8
**happening** 297:20
**happy** 281:7 316:8
341:21
**hard** 294:9 295:9
295:25 296:3,6
**hardship** 283:23
**hargrove** 279:4
280:12,12
**hear** 286:1 336:5
**help** 307:18 311:7
332:17 346:10
**henry** 279:12
280:9 328:5
338:23 340:20
**hey** 319:9 335:18
338:23

[higher - leadership]                                                    Page 8

**higher** 319:8
**highly** 299:14
**hire** 294:15,20
  301:23 321:6,11
  321:14,25 322:5,6
  322:7,16,17,18,21
**hired** 296:14
  297:6,12 307:5
  308:23 310:5
  322:13 323:12,18
  323:21
**hiring** 322:11
**hit** 334:21
**homes** 314:22
**honor** 314:13
**hope** 322:5
**hour** 328:6
**hours** 325:2
  326:17
**huge** 285:8
**huh** 286:3 292:19
  297:14 312:6
  326:11 337:9
  339:24 347:7
**human** 309:21
**hundred** 304:18

**i**

**identification**
  323:25 328:22
**identified** 297:2
**identify** 280:5
**impacts** 352:13
**impartial** 352:13
**impartiality**
  350:14 352:10
**implement** 323:21
**implemented**
  340:16,22
**improving** 315:5
**include** 310:1

**including** 283:24
**incorporating**
  283:9
**incorrect** 295:19
  298:16
**incur** 282:22
  306:13 313:5
  334:1,11
**incurred** 283:3
  284:19 285:1,15
  285:17,20 291:14
  291:16 293:11
  300:11,22 301:8
**index** 278:7
**indication** 299:3
  303:5
**industry** 292:12
  292:12 299:11
**info** 325:4,18
  326:19,21,22
**information**
  285:16,18,21
  286:24 290:7
  296:5 298:13
  299:4,10,18
  301:15 325:3
  326:18,24 327:9
  327:22,23
**informed** 283:21
  334:7
**initial** 331:23
**instances** 321:3
**instruct** 326:4
**instructed** 329:10
**instructing** 338:19
  338:20
**interest** 350:7,12
  352:9
**interested** 352:8
**interim** 347:15,15
  347:17,19

**interpreted**
  304:25
**interrupt** 297:11
**interviewing**
  322:14
**invested** 304:17
**involved** 330:11
**issue** 320:18
**issues** 294:18
  302:10
**it'll** 306:1
**item** 330:12
**items** 293:2
  317:19 330:6,19

**j**

**jackson** 279:5
  280:14,14
**jan** 284:7 311:3
**job** 287:14
**joined** 323:3
**joining** 283:8
**jon** 284:7 287:22
  291:23 311:3
  325:21,22 327:2
**july** 308:15
**june** 308:14

**k**

**kelly** 302:8 304:6
  312:19 334:24
**kelly's** 304:9
**kevlar** 287:6,24,24
  288:8,11,18,19
  289:3,5,10,13,18
  325:4,18,21,22
  326:13,19,21,22
  326:23 327:5,21
  327:22 328:2
**kind** 291:16 307:9
**kinds** 330:13,17

**know** 281:7 285:4
  286:21 287:7,12
  287:17 290:4
  293:1 296:20
  297:20,22,23,24
  297:25 304:9,11
  304:12,15 305:25
  306:7,8 307:5,13
  307:15 309:19
  310:10,12 312:3
  313:17 315:9
  316:12,22 319:17
  320:4 323:1 324:6
  325:22 327:2,4,15
  329:17 330:4
  341:5,8 346:11,18
  348:1,19
**knowing** 319:13
  320:9
**knowledge** 290:10
  291:1,5,9 293:14
  293:18

**l**

**large** 299:12
**lasted** 318:14
**late** 290:13
**law** 350:4
**leadership** 283:21
  284:8 285:12,12
  285:22 286:1,15
  286:20 287:12
  289:24 290:4,11
  291:2,6,10 293:10
  293:14,24 295:3,6
  296:16,23 297:1
  297:13 298:14,23
  299:2,19 302:8,17
  302:20,24,25
  303:6,11,18 308:6
  309:7,10,24
  310:22,25 311:11

**[leadership - mentioned]**

313:3 314:1 315:6
317:1,25 318:17
319:5 321:18,23
322:18 324:17
327:9,20 329:18
336:2,12,21
347:24
**learn** 285:11
286:14,16 298:3
**leave** 298:5 313:20
**led** 282:5 290:18
298:14 299:4,19
**left** 328:16
**legal** 343:7,9
**level** 330:13,17
**levels** 315:9
330:20,22 331:4,5
**line** 285:8 288:21
288:22 293:2
325:1 354:11,14
354:17,20,23
355:1,4,7,10,13,16
**listed** 292:8
**little** 328:6
**llp** 279:14
**loan** 313:8 314:9
314:10 315:12,17
315:18 316:12,15
316:23 318:23
319:10,14,18,22
319:24 320:3,15
320:16,18,21,22
320:25 334:20,22
**loans** 330:14,17
**lock** 319:8
**long** 303:5 321:5
323:6 343:21
**longer** 328:9
**look** 287:15 293:6
316:9 324:20
329:10,16,21

345:19,21
**looking** 310:13
345:23 347:14
**lose** 315:12,12
**loss** 295:1 297:22
309:9 310:2
**lost** 295:11
**lot** 284:17 297:18
302:6 304:9,16
305:15 332:16
**lots** 298:7

## m

**m** 279:12 288:12
**mail** 314:22
319:16 324:4,9,22
325:19 329:6,12
329:16,22 330:11
331:9 332:7,10,12
345:11,21 346:11
346:25 347:4,13
353:10
**mails** 278:2,3
303:14 308:20
318:10 346:8
347:13
**maintaining**
350:13 352:9
**making** 304:20
350:13 354:8,9
**mall** 313:20
**manage** 347:8
**manager** 318:24
319:25 320:24
**manager's** 319:10
**mansell** 353:19
**manually** 293:7,7
353:8
**march** 277:14
280:2 282:23
283:5,15,16
303:15,21 305:11

308:14 311:24
312:3,3,14 317:4,6
317:10,13,23
318:6 329:6 332:8
332:13 333:3,3,12
333:19 334:18
335:7,8,14 345:11
**marked** 323:24
324:3 328:21
329:3 345:8
**marketing** 282:6
282:20,21 283:2,7
283:9,11 294:12
302:14 305:2,3
306:5,13,22
308:18 309:4
310:11,24 311:13
311:25 312:8,10
312:20 313:6,14
313:25 314:4,9,18
317:2,20 332:25
333:1,6,25 334:10
336:23 337:4
343:19 344:3,23
348:5
**marybeth** 279:3
280:7 353:1
**matter** 306:19
350:12,20 352:9
**mean** 281:21,22
282:5 292:7 297:8
297:12 300:3,6
305:1 309:21
313:15,19 329:15
331:15 341:8
346:18 347:21
**meaning** 314:6
319:24
**means** 286:6,11
**meant** 305:25

**meeting** 283:21
284:8 285:12,13
285:22 286:1,15
286:20 287:12,18
289:24 290:4,11
291:2,6,10 292:3
293:10,15,24
294:4 295:3,6
296:17,23 297:1,4
297:9,13 298:14
298:23 299:2,19
302:8,17,20,24,25
303:1,4,6,12,18
307:3 308:7,12,13
308:14,16 309:7
309:10,15,15,15
309:25 310:22,25
311:11 313:3
314:1 315:6 317:2
317:25 318:17
319:5 321:18,24
322:10,19 324:16
324:18 325:4
326:18 327:9,13
327:13,15,20
329:18 336:2,12
336:21 347:24
**meetings** 290:15
302:16 303:10
**memberships**
314:8
**memory** 312:9,16
325:20
**mention** 289:7
**mentioned** 287:19
288:7 289:20
291:22 297:9
301:21 302:11
303:19 305:9
307:7 310:4
331:16

**million** 283:22
284:20 294:8
301:19
**mine** 304:9
**minimum** 314:11
**minute** 325:8
**minutes** 341:18
345:1
**mirror** 315:25
316:14
**mis** 286:10
**misallocate** 286:11
**misallocated**
283:22 284:12
285:14,19 286:2
286:16 301:19
**misallocation**
284:2 286:5 294:7
294:18 309:16
**missing** 292:2
**misstates** 300:24
331:8 334:2
337:22 338:9
343:6,24
**mistake** 320:3,17
**model** 308:25
309:9,14 310:1,7
310:14 312:5,7
317:12 323:7,11
323:17,20 340:8
340:12
**moment** 287:24
**money** 284:1
295:11,11 304:17
**month** 317:24
**monthly** 283:13
316:4
**months** 307:14
**moving** 308:24
309:8 310:7

**n**

**n** 279:5
**n.w.** 279:15
**naf** 278:2 280:17
281:16 283:10,22
285:1 287:2
289:25 290:7
291:16 294:9
295:6,11,19,20
296:14 297:2
298:4,23,24 299:9
299:18,25 300:13
300:17 301:22
308:11,17 309:23
309:24 310:23
311:11,25 312:19
312:25 314:10,16
314:24 318:18
321:5,11,14,25
322:17 323:4,7,10
323:20 331:3
332:21 347:20,24
348:4,15
**naf's** 290:11 291:6
291:10 293:16,25
294:25 298:15
299:4,20 316:25
**nature** 309:21
**necessary** 354:10
**need** 284:3 311:7
324:15 332:9
346:21
**needed** 307:13,18
**needing** 297:23
**never** 285:16,21
298:6 301:18,19
306:17 311:23
320:11 335:11
342:1 347:25
**new** 277:7 280:10
283:8 298:9 309:5

310:14 312:4,7
314:19,21 317:12
335:23 337:16,17
340:8
**nick** 280:14
**nickolas** 279:5
**nodding** 303:24
**normal** 294:22
304:25 305:1,2
311:8,10
**norms** 292:12
299:11
**northern** 277:1
**notarized** 353:10
**notary** 355:23
**noted** 354:4,5
**noticing** 350:19
**noting** 353:7
**november** 290:14
320:6
**number** 284:20
288:22 294:25
295:2 330:12,16
347:4
**numbers** 292:20
292:22 329:22

**o**

**object** 338:18
339:5
**objection** 281:24
282:4,11,24
284:14 286:8
288:13 289:14
292:10 293:20
295:23 298:17
299:7,23 300:24
301:10 310:15
311:14 314:2
316:16 321:15
322:20,24 323:13
325:23 327:10,25

331:7 332:14
333:8,20 334:2,23
335:19 336:18
337:1,13,22 338:9
338:21 339:11,19
340:14,17 341:6
342:4,23 343:6,24
344:9,17 348:12
348:17
**obligation** 350:14
352:10
**obviously** 289:8
297:18 304:9
315:10 324:14
329:15
**occasion** 293:1
**occasional** 287:9
**occasionally**
286:23 287:20
288:1
**occasions** 311:16
319:21 336:22
**occur** 303:11
**occurred** 302:23
303:20 305:10
306:11 308:13
**ocga** 350:7,8,21
354:7
**officer** 314:9
318:23 320:3,17
320:18,21,22
352:13
**officer's** 314:10
319:11
**officers** 313:8
315:12
**offices** 353:3,10
**ogletree** 279:13
280:16,16
**oh** 340:24

**[okay - plan]**          Page 11

**okay** 281:8,12
284:11,23 286:2
286:14 289:17,20
291:3 292:24
293:9 294:23
296:2 297:17
299:16 300:16,20
302:15,19 303:4,9
303:9,16 305:15
306:1 307:3,7
308:1 310:9 311:9
311:24 313:15
316:7,19,21 318:9
319:12 320:13,22
321:2,4 322:23
323:23 324:10,13
324:20 325:6,16
326:6,8 327:19
328:4,16 331:12
331:21 332:23,25
333:11,15 334:6
334:14,16 335:25
336:9 337:6,8,19
338:1 339:1,16,23
340:10 341:2,10
344:14 345:14,18
346:6,21 347:12
348:7,22
**old** 335:18
**once** 298:8 308:23
353:9
**opportunity** 339:4
**opposed** 327:22
**options** 315:9
**ordering** 351:2
353:13
**original** 353:12,14
**outcome** 352:8
**outside** 288:5
300:22 301:8
334:20

**overage** 312:22
**override** 309:1
315:19 316:1

**p**

**p&l** 287:9,10
289:5 291:23,25
292:9,18,20 323:7
323:11,16,19
325:4,7,18 326:19
326:20,22,24
327:5,8 340:3,8,12
340:22
**p&ls** 285:8 287:19
287:23 288:1,4,4,5
288:18,20 289:3
289:21,24 291:18
291:20,24 292:6
292:16 326:2
327:3,4,7,12
**p.c.** 277:16 279:6
**p.m.** 277:15 280:2
328:18 345:3
349:3
**page** 278:1,7 324:5
329:5 345:12
354:11,14,17,20
354:23 355:1,4,7
355:10,13,16
**pages** 354:9
**paid** 287:10 308:4
308:9 318:22,23
318:24 319:10,11
319:13,23 320:10
320:14,19,24,25
321:1
**paragraph** 342:11
342:16 344:2
**part** 304:14
312:12 314:11
332:4,17 346:19

**participate** 319:1
319:4
**parties** 350:21
351:2 352:13
353:13
**partners** 304:19
313:9 330:10
331:17
**party** 350:15,22
352:7,11
**password** 351:1,2
**patty** 284:6 302:5
302:6,7 303:21
305:12 311:3
321:12,13,19,20
321:24
**pay** 310:23 314:23
315:1,2 317:18
331:24 335:1
**paying** 331:22
**pdf** 327:4 353:7
**pe** 347:2,9,9
**people** 304:18,18
309:20,22 322:14
322:15
**period** 282:15
294:15 296:13,13
301:22 302:1,12
303:2,5 304:15
306:21 307:1,10
307:15 311:8
317:19 326:3
333:12 334:19
342:8 344:22
**perlowski** 278:8
279:12 280:9,9,25
281:10,12,13
282:1,7,17 283:1
284:22 286:9
288:12,15 289:16
290:22 291:3,4

292:13 293:23
296:1 298:20
299:15 300:1
301:2,13 305:5,14
310:16 311:18
314:14 316:18
321:22 322:22
323:2,14 324:1,23
325:10,14,17
326:7 327:16
328:3,8,13,23
329:1 331:11
332:22 333:10,23
334:5 335:2,21
336:6,15,20 337:3
337:18,25 338:11
338:17,21,25
339:7,13,22
340:15 341:1,9,20
341:24,25 342:10
342:15,21,24
343:4,15 344:1,13
344:19 345:1,6
348:14,21
**person** 287:17
**personal** 344:3
**perspective** 287:4
**physical** 289:22
**piedmont** 277:18
279:7
**place** 286:7,12,13
286:16 308:19
312:17 317:9,15
317:22 318:18
350:20
**places** 347:4
**plaintiff** 277:5
279:2
**plan** 298:9 305:2
323:16 335:23
337:16,17 340:5

345:23 346:1,4,7,9
**platform** 287:6
**please** 280:5,19
281:7 290:22
301:2 305:5
324:24 330:2
336:6 338:17
346:3 353:10,17
354:9,10
**pleased** 290:17
**point** 294:16
304:19 305:4
344:14
**points** 326:10
347:6,6
**policy** 308:17
310:13 311:12,17
314:20 317:1,3,15
317:17 335:18
336:1,11,16 338:2
338:6 339:8
**position** 287:2
293:25 294:2
297:3
**positive** 290:16
**possible** 296:21
297:21 309:3
322:7 340:23
**possibly** 290:14
**present** 279:19
280:5
**presented** 287:13
350:1
**preslo** 284:7
324:11 326:16
329:7 331:14
**pretty** 292:2,12
348:19
**pricing** 282:6,20
287:8 288:20
294:12 302:13

305:3 306:6,14,23
308:19 309:4
310:11 312:15
315:3,5,7,13,17
316:11 318:13,18
318:20 319:1,4,7
320:23 334:20
335:15 337:5,11
337:20 338:2
339:9 340:6,11
342:2 343:20
344:4 348:4
**primarily** 287:7
302:6
**print** 353:8
**prior** 283:7 289:23
290:10 291:1,5,9
298:3 303:19
305:9 310:13
311:12,17 318:3
319:2 325:19
**priority** 296:19
321:7,9 322:8
**pro** 318:6 344:14
**probably** 319:20
320:5 326:1
328:15
**problem** 322:13
**procedure** 354:7
**proceeding** 350:1
350:22 351:1
352:6,13
**proceedings**
350:12
**produced** 350:23
**production** 353:18
**professional**
350:14 352:10
**profit** 282:23
294:25 309:2,8
310:1

**profitability**
290:11,19 291:6
291:10 293:16
312:12
**profitable** 284:2
287:15 289:25
290:7 295:6,14,14
295:16,21 296:7
298:15,24 299:5
299:14,20 304:13
331:24
**prohibited** 350:20
**prohibitions** 350:8
**projecting** 307:21
**promised** 333:17
335:11
**proof** 298:6
**properly** 285:7
**proposal** 330:19
331:3 348:16,20
**proposals** 331:13
332:12 348:10
**propose** 348:8
**proposed** 347:14
347:16,23 348:6
**protected** 351:1,2
**provide** 299:9
327:8 350:19
**provided** 287:9
293:8 294:6 325:3
325:21,22 326:18
327:3,4
**public** 355:23
**purpose** 287:14
288:19 309:14,15
**pursuant** 354:6
**put** 286:6 312:5,17

**q**

**question** 283:2
288:25,25 290:23
298:18 299:16,17

**profitability**
**q**
**r**

301:3 305:6 312:1
324:15,25 325:10
328:12 329:11
330:5 334:8 336:1
336:4,10,14
338:13 339:2
342:14 343:10,23
344:20 345:17,20
345:25 346:3
**questions** 281:7
289:6 324:8 343:7
345:10 348:23
350:23 352:5
**quick** 328:6
**quickly** 296:21
297:6,12 304:24
309:3 343:14
**quite** 286:20
**quote** 346:7

**r**

**rare** 321:3
**read** 290:22,24
301:4 305:5,7
324:7,14,22
325:13 336:6,7
338:16 353:6
354:2
**reading** 325:9,9
327:1
**really** 288:18
300:8 307:17
313:9 328:16
348:2
**reason** 281:6
282:14 283:8,19
283:20 295:18
354:13,16,19,22
354:25 355:3,6,9
355:12,15,18
**reasons** 354:8

Case 1:20-cv-04981-CAP   Document 89   Filed 04/27/22   Page 92 of 98
Gina Spearman , Vol 2                    March 21, 2022
Spearman, Gina v. Broker Solutions, Inc. D/B/A New American Funding

[reassure - respond]                                              Page 13

reassure 302:8
304:23
recall 286:22
287:20 288:9,20
289:4,9,11,12,15
289:17,19,23
297:4 303:7 307:6
310:3 313:12
314:15 315:8
320:20 322:2
323:3,19 326:9
327:5,12,21 328:2
342:6
recap 316:10
347:5,6
recaps 283:14
316:4
receive 301:14
315:18,19 316:13
received 316:15
receives 350:22
receiving 289:23
recess 328:18
345:3
recollection
287:22 290:13
303:9 309:12
312:10 314:4
323:16
record 280:1,6
289:8 290:24
301:4 305:7
328:17,19 336:7
345:2,4 346:2
349:1 350:12,13
350:23 352:6
reduce 284:3
294:11 297:24
313:11,14,24
reduced 282:12,22
352:5

reductions 342:2
reed 284:7 286:24
287:22 288:3
289:20 291:23
292:18 324:11
326:9,16 327:8,19
327:23 329:7
331:14
reference 306:17
307:10
referenced 288:23
302:16 303:22
305:12 346:25
347:1
referral 304:19
313:9
referred 346:23
referring 282:19
291:21 300:12,13
300:17 346:11
reflects 329:18
refresh 303:9
regards 282:5
region 282:22
283:4,4,12 288:4
289:21 299:13
306:4,21 308:8
312:25 313:6
314:17 317:21
330:22 331:24
333:5 334:1,11,21
region's 282:23
333:7
regional 285:2
288:3 290:14
309:19 311:25
312:7 317:20
319:24 320:24
regionals 294:11
296:4 297:19
298:8 300:6

301:12 304:8
309:11,13
regions 284:19
285:3 290:19
291:15,17 292:5
293:12 294:9
296:9,9 300:8,11
307:16 308:3,4,9
309:24 310:24
regulations 350:6
reimbursed
333:25 334:8,10
342:2,13,18 343:2
343:19 344:5,7
reimbursement
342:6,9
reinstate 310:13
340:21 341:4
reinstated 309:5
340:4,7
reinstating 311:12
340:25 341:3
reiterated 284:20
rejected 347:16
relate 316:2
relates 288:18
relating 351:1
relationship
350:12 352:9
relative 303:11
352:7
remain 340:12
remained 317:3
remember 283:17
288:17,19,21
290:15 292:25
293:2,4 314:21
318:8,25 319:15
320:21 321:18
322:4 326:2 327:3
327:18 329:14

330:5,10
remotely 280:13
280:15,17
repeat 301:2 312:1
rephrase 281:8
283:2
report 350:13
reporter 280:19
290:24 301:4
305:7 336:7 350:1
350:3,7,10,24,25
reporting 287:4
350:6,19
repository 351:2
represent 280:8
280:10
representations
350:4
represented
292:22 295:15,15
representing
295:12
request 302:2
requested 303:2
353:6
requests 330:6
reserved 349:4
resignation 298:4
resigned 312:4
resolution 343:14
resolved 302:10
304:24 305:20
respect 281:16
301:16 308:18
311:12 312:20
315:3 317:2
322:11 335:15
337:20 338:2
339:9 348:4
respond 343:9

[response - southeast]                                                    Page 14

**response**  329:19
335:25 336:10
**responsibility**
353:7
**result**  284:3
294:19
**resulting**  297:23
**retail**  283:24
285:8 288:5
290:16 300:8,14
300:18,22,23
301:9,9
**retrieving**  289:4
**returned**  353:11
353:14
**reverting**  336:1,11
**review**  325:18
326:23 350:1
353:7
**reviewed**  326:20
326:22 327:7,14
**reviewing**  325:3
326:17 327:22,23
**rick**  284:6 302:5,7
303:21 305:11
311:3 321:12,13
321:19,20,24
**right**  287:25
296:10 298:2,25
299:1 304:7
313:22 316:24
318:2,12,19
322:23 327:17
329:19 330:1
332:1 335:6 338:4
338:7 343:16
344:16 346:25
**rightsize**  294:21
301:23 307:23
346:10,22

**rightsizing**  307:18
**ring**  318:7
**road**  277:18 279:7
**robinson**  279:21
**robyn**  277:20
352:19
**role**  294:20
**roswell**  353:20
**rpr**  277:20 352:19
**rule**  354:6
**rules**  281:5 350:5
354:6

**s**

**saw**  304:1
**saying**  287:14
303:25 311:9
326:15,20 338:14
348:3
**says**  324:16 325:1
327:13 330:1,3
331:1,10 342:25
344:2 345:22
**scott**  298:8 323:17
**seal**  353:12
**search**  296:17,24
**second**  281:16
290:21 324:5
329:5 342:11,16
342:25 345:21
**section**  350:7
**sections**  350:8
**see**  291:18,20
329:22,25 346:13
347:3
**seeing**  288:21
**seen**  291:24 316:4
**send**  332:7,9
353:12,17
**sense**  299:10
315:23

**sent**  332:7
**sentence**  325:11
345:21 347:1
**sentiments**  329:19
**serious**  281:19,21
281:22,23
**serve**  352:13
**service**  320:18
**services**  350:19
**set**  348:20
**severe**  320:18
**share**  286:24
291:23
**shared**  303:14
312:18,21,24
**shocked**  296:5
**short**  282:15
294:15 296:13
301:22 302:1,4
303:2 342:8
**shortly**  297:5
312:4
**show**  289:25
292:22 314:6,25
324:2
**showing**  291:7,11
329:2
**shown**  290:12
292:6,16 293:16
**side**  320:24 348:1
**sign**  353:6
**signature**  349:4
352:17 353:2,15
355:20
**signed**  353:9,11,14
**significant**  284:24
**simply**  285:6
300:7
**sincerely**  329:23
**sitting**  281:14

**situation**  315:10
320:2,5,11,16
340:19
**situations**  320:12
**skim**  345:15
**slightly**  338:10
**solely**  350:15
352:11
**solid**  345:22 346:1
346:4
**solution**  304:14
322:12 332:5,18
333:22 346:19
347:15,16
**solutions**  277:7
347:17,19
**somebody**  335:18
339:16,17
**something's**  286:6
**soon**  294:22 322:7
322:16 340:22
**sorry**  297:11
303:24 304:1,3
312:1 336:5
348:13
**sort**  301:23,25
302:19 307:14
310:5
**sorts**  298:12
**sotto**  327:1
**sounds**  318:2
322:23
**southeast**  282:21
282:23 283:3,12
283:25 285:10
287:13 288:4,6
289:21 290:18
299:12 306:4,21
326:2 334:11
345:24

**[speak - time]**                                                    Page 15

**speak** 286:23
289:8 299:11,12
306:8 307:8 318:4
**speaking** 326:9
338:17,18,21
**speaks** 342:19
**spearman** 277:4
277:13 280:4,8,13
280:15,21 281:1
281:14 282:3,9
286:19 302:16
303:10 324:2
329:2,4 342:24
344:2,20 345:7,11
345:16 348:23
353:2
**specific** 292:25
299:17 301:14,16
303:7 313:17
316:22 321:4
322:2,4 330:5
350:21
**specifically** 285:9
350:5
**specifics** 284:17
293:3 346:16
**speculation**
300:21 301:7,11
301:15 322:24,25
323:13
**spelled** 313:2
316:6
**spend** 313:16
**spent** 325:2
326:16
**split** 312:12,13
**stability** 304:11
**start** 306:18
**started** 298:9
342:7 344:21

**starts** 324:25
**state** 350:10 352:2
**stated** 311:5,16
352:4
**statement** 299:20
299:21 354:8
**statements** 298:15
299:5
**states** 277:1
332:17
**status** 296:17
**stay** 317:6
**stayed** 317:9
**stick** 302:19
**stipulation** 281:11
**stipulations**
281:10
**stop** 338:17,18,22
338:24 344:15
**street** 279:15
**structure** 309:6
**subcontractor**
350:11,16 352:12
**subject** 308:21
**submitted** 319:6
331:13 350:24,25
**subscribed** 355:21
**subsequent** 285:11
285:13
**substance** 354:7
**subtract** 315:22
**suggested** 332:21
332:21
**suite** 277:17 279:8
279:16 353:19
**supports** 344:6
**sure** 281:9 285:25
288:16,25 297:7
298:21 302:21
309:12,20 315:15
315:24 318:2

323:1,22 341:24
347:21
**swear** 280:19
**swing** 285:8
**sworn** 280:22
355:21
**system** 293:5

**t**

**take** 321:6 323:7
324:14,21,24
328:6,10 329:9,9
329:15 334:21
341:20 345:13,19
346:2,14 348:11
**taken** 282:13,18
283:18 337:16
352:4
**talk** 309:22
**talked** 326:8,12
338:11
**talking** 309:20
313:18 322:15
337:5 347:5
**talks** 329:16 347:8
**tell** 310:23 311:4,4
311:10 319:3
321:13 323:6
333:18 335:13
336:16 338:23
**telling** 294:10
341:2
**temporary** 304:15
306:16,17,21
307:1,10 311:7
332:19,24 335:10
**terminology** 288:9
**terms** 292:7
293:24 303:12
316:10 350:16
352:12

**testified** 280:23
291:13 295:8
298:22 318:5
341:15
**testifying** 286:22
342:22
**testimony** 286:23
300:25 307:8
318:3 331:8 334:3
337:23 338:10,12
338:15 343:1,7,25
354:2,8
**thank** 280:18
281:3 325:15
**thing** 330:16
**things** 287:8
294:19,21 298:10
298:12 304:16,25
307:13 311:8,9
**think** 289:7 304:2
307:11 313:1,2
315:11 321:1
325:25 338:1,15
341:15 342:19,20
343:21 348:22
**thought** 283:25
295:16 298:16,24
299:6,21 307:21
318:4 342:8
**thousand** 326:1
**time** 280:2 281:5
282:15 286:19,21
290:1 291:22,22
294:15 296:14
301:22 302:1,5
303:2,5,12,15
304:15,17 306:21
307:1,5,10,12,15
307:19,22 310:8
311:8 317:19
319:7 321:4

**[time - witnesses]**                                    Page 16

324:14,21,24
326:2,10 328:16
329:9,16 333:12
334:19 341:19
342:8 345:13,19
346:2,14 350:22
353:14
**times** 284:21
292:25 294:9
295:9 302:11
310:18 319:1
320:6,8
**today** 281:15
313:20 325:2
326:17 343:1
**told** 284:5,11
291:15 294:1,3
296:8,12,16
298:23 301:25
302:2 303:1
305:15 308:22
310:19 314:25
321:10 333:9,21
333:24 334:9
335:22,25 336:9
336:13 339:25
341:14 342:1
343:18 344:24
**tolerance** 312:17
316:13 318:14
330:13,17,20,21
331:4,5 347:9
**tolerances** 318:18
334:21 340:7
**top** 296:19 321:7,9
322:8
**town** 304:22
**transcript** 350:22
352:4,6 353:7,12
353:14 354:2

**transcripts** 350:22
351:1
**travis** 279:4
280:12
**trip** 302:6 303:20
305:10
**true** 295:22
301:16 350:23
352:6
**try** 316:8 326:21
**trying** 285:24
287:1 295:9 300:7
306:9 315:24
319:15 326:14
332:4,17,20
338:12 346:6,13
346:19
**tv** 314:6,25
**twice** 304:2
**two** 326:1 327:15
**type** 309:14 320:5
**typewriting** 352:5
**typically** 287:21
289:21 315:25

**u**

**uh** 286:3 292:19
297:14 312:6
326:11 337:9
339:24 347:7
**ultimately** 342:13
342:18 343:2,19
344:5,7
**undersigned** 354:2
**understand** 281:6
281:14 285:24
287:1 289:1 295:8
295:10 305:16
306:9 315:15,25
323:10 326:14,21
329:9 334:24

**understanding**
281:23 286:5
293:15 295:5,10
295:19,20,22
297:2 305:16,23
306:3,12,20,24
309:18 316:9,10
316:25 317:3
319:23 323:15
330:21 337:19
341:13,16,17
346:5
**understood**
284:25 296:23
306:10 307:24
320:14 333:5,11
334:19 335:4,6,8
335:10 340:10
**united** 277:1
**unquote** 346:7
**uploaded** 351:2
**use** 290:3 354:9
**usual** 291:19,25
**usually** 320:16

**v**

**v** 279:3
**various** 292:20
308:20 326:10
**veered** 310:5,6,6
**verbal** 314:11
**verbatim** 350:13
**veritext** 350:11,19
353:10,18
**versus** 293:17,17
**vested** 304:20
**video** 277:12
280:3
**videographer**
279:21 280:1,18
328:17,19 345:2,4
349:1

**view** 327:5
**viewing** 289:4
**virtue** 347:12
**visit** 302:7
**voce** 327:1
**volume** 277:11
299:13
**vs** 277:6

**w**

**wa** 347:2,8
**want** 288:9 302:22
305:16 313:21
315:15 324:5,7,15
326:21 328:6
332:18 338:15
341:20 345:9
346:3
**wanted** 304:14,16
319:8 323:21
**wants** 325:12
**way** 285:23 293:18
348:7,8
**we've** 303:14
328:5
**week** 340:20
**weekly** 335:20
336:1,10 339:21
**weeks** 307:14
340:25 341:3
**weighted** 347:11
**went** 317:12
**westle** 279:20
**wide** 288:4 289:24
293:25 294:2
**window** 338:2
**wise** 298:7
**witness** 280:20
326:6 338:18,19
338:19
**witnesses** 350:25

**[word - zoom]**                                                    Page 17

| |
|---|
| **word**   281:23 310:6 314:13 |
| **words**   292:17 316:2 322:2,4 |
| **work**   304:16,21 340:22 345:24 |
| **working**   298:9 304:24 310:20 311:6 335:23 337:15 339:25 340:3,20 |
| **writing**   317:17 |
| **wrong**   286:7,12 |

| x |
|---|
| **x**   295:1 |

| y |
|---|
| **yeah**   308:20 312:2 316:5,5 318:12 319:16 320:1 322:25 328:8,11 330:25 332:24 335:4 341:23 343:12 |
| **year**   290:1 314:7 317:16,22,24 318:15 333:12 334:19 |
| **yesterday**   325:2 326:17 |

| z |
|---|
| **zoom**   279:4,5,13 279:20 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.