Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4    GINA SPEARMAN,

5            Plaintiff,

6     vs.                          Case No. 1:20-cv-04981-CAP

7

     BROKER SOLUTIONS, INC.,
8    d/b/a NEW AMERICAN FUNDING,

9            Defendant.

10

11

12

             REMOTE VIDEOCONFERENCE DEPOSITION

13

                            of

14

                    SCOTT FROMMERT

15

                 January 28, 2022

16

                   12:00 p.m.

17

             Lucy C. Rateau, RPR, CCR

18

19

20

21

22

23

24

25

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 2

1                        INDEX OF EXHIBITS

2        Exhibit              Description                Page

3
                        (No exhibits marked)
4

5

6

7

                      INDEX TO EXAMINATIONS            PAGE
8

9    By Mr. Hargrove                                      5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 3

1       APPEARANCES OF COUNSEL (via Zoom videoconference):

2

3       On behalf of the Plaintiff:

4               TRAVIS C. HARGROVE, ESQ.

5               MARYBETH GIBSON, ESQ.

6               The Finley Firm, PC

7               3535 Piedmont Road, NE

8               Suite 230

9               Atlanta, GA  30305

10              thargrove@thefinleyfirm.com

11              mgibson@thefinleyfirm.com

12

13      On behalf of the Defendant:

14              HENRY M. PERLOWSKI, ESQ.

15              T. CHASE OGLETREE, ESQ.

16              Arnall Golden Gregory, LLP

17              171 17th Street, NW, Suite 2100

18              Atlanta, GA  30363

19              404.873.8500

20              henry.perlowski@ogg.com

21              chase.ogletree@ogg.com

22

23      Also Present Remotely:

24              Andrew Westle, Esq.

25              Gina Spearman

Page 4

1           (All counsel stipulated to the remote

2      swearing in of the witness due to the COVID-19

3      pandemic.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scott Frommert                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                      Page 5

1                         SCOTT D. FROMMERT

2        having been first duly sworn, was examined and

3        testified as follows:

4                              EXAMINATION

5        BY MR. HARGROVE:

6            Q.  Mr. Frommert, I'm Travis Hargrove.  I

7        represent Gina Spearman in a case that she has filed

8        against New American Funding.  We appreciate you

9        appearing pursuant to a subpoena via Zoom today for

10       your deposition.

11               You have the right to read and sign your

12       deposition or you can waive that right.

13               Before we go much further, are you

14       represented by counsel in this deposition today?

15           A.  I mean Henry and I talked about he would

16       object on my behalf, because I do have, you know,

17       some concerns on that; but other than that I guess

18       that would be representation.

19           Q.  So is he your lawyer today?

20                   MR. PERLOWSKI:  We will be representing

21            Mr. Frommert for purposes of the deposition

22            today.

23       BY MR. HARGROVE:

24           Q.  So you can get with your lawyer and then

25       advise the court reporter whether you want to read

Page 6

1    and sign or waive that right.

2                    MR. PERLOWSKI:  We'll reserve that

3         right, Travis.

4                    MS. GIBSON:  Okay.  The usual

5         stipulations good with everybody?

6                    MR. PERLOWSKI:  Yes.

7    BY MR. HARGROVE:

8         Q.  Mr. Frommert, have you ever had your

9    deposition taken before?

10        A.  Yes, I have.

11        Q.  And what kind of a case was that in?

12        A.  Probably a couple of very, you know, all

13   along the lines of my role related to financial

14   knowledge on either litigation for employment

15   reasons, non-compete, non-solicitations, things of

16   this nature.

17        Q.  Any of those depositions you gave, were

18   they in your capacity as an employee of New American

19   Funding?

20        A.  No.

21        Q.  And if I call New American Funding NAF, is

22   that fair, will you know what I'm talking about?

23        A.  Yes.

24        Q.  Have you ever sued anyone personally or

25   been sued?

Page 7

1        A.   No.

2        Q.   So none of the depositions you gave -- all

3    the depositions you gave were in your capacity as an

4    employee for some entity, correct?

5        A.   That is correct.

6        Q.   Just to go through a couple of background

7    or ground rules today, everything that anyone says

8    is going to be taken down by the court reporter, so

9    it's important that we make sure we give verbal

10   responses to any questions; that way she can take it

11   down.  If I tell you I need a verbal response

12   because you said uh-huh or giving a head nod or

13   something like that, I'm not trying to be rude; I

14   just want to make sure the answers are clear on the

15   record.  Fair enough?

16       A.   Understood.

17       Q.   If you need a break today -- I don't think

18   we're going to be here too terribly long, but if you

19   need a break today at anytime for any reason, no

20   problem with that.  Just let me know.  I would

21   appreciate though if you would go ahead and answer

22   whatever question is on the table before we take a

23   break.  Fair enough?

24       A.   Understood.

25       Q.   The questions I ask you today, I'm not

Page 8

1     trying to ask you trick questions.  I'm not trying

2     to trip you up or anything like that.  I'm trying to

3     ask clear questions so that I can find out what you

4     may know or what you may not know about this case

5     that we're here taking your deposition in.  So if I

6     ask a question that you do not understand, please

7     let me know that and I'll ask it until I ask it in a

8     way that you do understand it.  Fair enough?

9          A.  Understood.

10         Q.  All right.  And to the extent you don't

11    understand a question but answer anyway, your lack

12    of understanding is not going to be reflected on the

13    record.  Fair enough?

14         A.  Understood.

15         Q.  Do you understand all those ground rules I

16    went over?

17         A.  Yes.  I'm very comfortable.

18         Q.  And you're fine abiding by it?

19         A.  I'm fine what?

20         Q.  You're fine abiding by those ground rules

21    today?

22         A.  Yes, sir.

23         Q.  Are you under the influence of any

24    medication or anything else, legal or illegal, that

25    would affect your ability to fully and truthfully

Page 9

```
 1    testify today?

 2         A.  No, sir.

 3         Q.  Have you ever been diagnosed with any sort

 4    of a memory issue?

 5         A.  No, sir.

 6         Q.  I should have done this at the beginning,

 7    but could you state your full name for the record?

 8         A.  Scott David Frommert.

 9         Q.  And, Mr. Frommert, where do you currently

10    live?

11         A.  Laguna Beach, Laguna Niguel, California.

12         Q.  Have you ever lived in Georgia?

13         A.  No, sir.

14         Q.  Do you have any family members who reside

15    in Georgia?

16         A.  No, sir.

17         Q.  Have you ever been in Georgia?

18         A.  Several times.

19         Q.  Was that in your capacity for NAF?

20         A.  Yes, that was one of the times, correct.

21         Q.  On that time you came to Georgia for NAF,

22    what was the purpose for that visit?

23         A.  Rolling out compensation plans and

24    discussing compensation plan changes.

25         Q.  And whose compensation plans did those
```

Scott Frommert                         January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1    meetings address or did that meeting address?
2         A.   That specific meeting addressed Gina and
3    Kelly -- Gina Spearman and Kelly Allison, the
4    regional managers for the Georgia area for New
5    American Funding, to discuss and review compensation
6    that would align to the P and Ls, branch regional
7    P and Ls that were created.
8         Q.   And we'll come back to that meeting.  The
9    other times that you've been to Georgia, were those
10   all work related as well?
11        A.   Prior employers, but yes.
12        Q.   Prior employers.  Can you walk me briefly
13   through your employment history?
14        A.   I don't know how far back you want me to go
15   but I can go super fast.
16        Q.   Start with college.  I don't care about
17   cutting the grass when you were in high school or
18   anything like that, but in your professional career.
19        A.    Immediately out of school I worked at
20   Vanguard Brokerage Investment Company for a brief
21   period of time, call it one year; left, went to a
22   small regional mortgage lender that did wholesale
23   retail out of North Scottsdale, two-ish years.  They
24   did a lot of subprime.  They went out of business.
25   I left, I went to CVS Caremark, which is a benefits

Page 11

1    provider nationally, for four-ish years.  At the

2    time, after getting a master's I transferred over

3    and spent four and a half, five years at Chase

4    running retail mortgage there, retail mortgage, home

5    equity lines of credit, at which time I left.  I

6    spent, give or take, four years, five years at ONCU

7    Financial as CFO.  From there I went to New American

8    Funding as CFO.

9         Q.  Are you presently at New American Funding?

10        A.  I am not.

11        Q.  Are you employed presently?

12        A.  I am.

13        Q.  And where are you employed now?

14        A.  Sun West Mortgage, a national mortgage

15   lender.

16        Q.  And is that the only job you've held since

17   now?

18        A.  That is correct.

19        Q.  And what's your position, your current

20   role?

21        A.  Chief Financial Officer.

22        Q.  Could you walk me briefly through your

23   educational background?

24        A.  Undergraduate, I have a business degree

25   with an emphasis in finance from Arizona State

Page 12

1      University Barrett Honors College as well as going

2      to -- I guess between there I did several Series

3      licenses for investment, Series 6, 66, things of

4      this nature.  Back to getting a master's in

5      financial engineering from Arizona State W.P. Carey

6      School of Business.

7           Q.  What year did you get that master's in

8      financial engineering?

9           A.  I would have to look.  2009, '8, '9.

10          Q.  What year did you originally graduate from

11     college?

12          A.  2003.

13          Q.  And for a layperson can you describe what a

14     masters in financial engineering, what that sort of

15     entails?

16          A.  Exclusively finance classes.  There are no

17     classes but financial and advanced mathematics

18     classes.  So you learn how to price bonds, build

19     bonds.  You learn how to structure financial

20     agreements through -- there's a class in law,

21     there's a class in Excel modeling, there's a class

22     in DBA and SQL coding, along with multiple advanced

23     mathematics classes, database classes, things of

24     this nature.  And effectively it's all engineering,

25     so no linear differential equations, just building

Page 13

1    nerdy stuff that probably nobody cares about.

2         Q.  I may have to link you up with my daughter

3    who's 12 and says she wants to be an engineer.

4    Sounds like it would do better for her to ask you

5    for help with her homework than me.  Good deal.

6              As far as the companies that you've worked

7    for in the past, any of them have a presence in the

8    Atlanta area?

9         A.  ONCU Financial had a fairly large presence

10   in the Atlanta, Savannah type areas, correct.

11        Q.  And is that the one that was into the

12   subprime and they're no more?

13        A.  No, it was afterwards.  That was probably

14   2005, '6; so ONCU was 2010 through '14, give or

15   take.

16        Q.  And ONCU, you said they had; do you know if

17   they still have much of a presence?

18        A.  They do not any longer have a very large

19   presence.  They may have a couple of originators.

20        Q.  Are you a member of any civic

21   organizations, anything like that?

22        A.  No organizational --

23        Q.  Are you a member of any professional

24   organizations?

25        A.  I'm not.

Page 14

1          Q.   Have you ever served in the military?

2          A.   No, sir.

3          Q.   Have you ever filed for bankruptcy?

4          A.   No.

5          Q.   What did you do to prepare for this

6     deposition?

7          A.   Really nothing.  Got a cup of coffee.  That

8     was about it.

9          Q.   All right.  Didn't look at any documents?

10         A.   I don't have any documents.  I didn't

11    retain any documents after my employment.

12         Q.   Your meeting -- your phone call with Mr.

13    Perlowski, how long of a phone call was that?

14         A.   Five minutes.  I don't know.  Pretty brief.

15         Q.   Prior to you speaking with Mr. Perlowski

16    for five minutes the other day, since you departed

17    from NAF have you had any conversations in person or

18    by phone with anyone from NAF?

19         A.   Just one ex-employee that I'm friends with,

20    on a friendship basis, but nobody involved with this

21    case.

22         Q.   Okay.  Who is that employee, just so I make

23    sure it's not someone involved in this case?

24         A.   Jim Muth.

25         Q.   And did your discussions with Jim Muth have

1    anything at all to do with Ms. Spearman?

2         A.  Nothing.  Just friendship, dogs, family,

3    wives.

4         Q.  Any discussions with anyone other than Mr.

5    Muth from NAF from the time of your departure up

6    until the present?

7         A.  Yeah.  I guess -- Jon Reed and I are

8    friends to some degree.  But we've talked three

9    times maybe; how are you, where are you going.  When

10   I first left I called him because he left around the

11   same time.  What's your plans, where are you going,

12   that type of stuff, personal.

13        Q.  None of the discussions with Jon Reed

14   pertained in any way to Ms. Spearman?

15        A.  No.  More curiosity, where he was going to

16   plant his flag.

17        Q.  Have you ever read any of the pleadings in

18   this case that Ms. Spearman has filed?

19        A.  No, sir.

20        Q.  Have you done any independent internet

21   research as to what the case may be about?

22        A.  No, none.

23        Q.  And you've said upon your departure from

24   NAF you took no documents with you, correct?

25        A.  Correct.

Page 16

1        Q.  Did you have, at the time you departed --

2   and I'm getting a little out of kilter because we'll

3   walk through that later when we go over some

4   documents.  Did you have a computer that NAF issued

5   you?

6        A.  Yes.  I returned it the day of my final day

7   of employment.

8        Q.  And on that computer were any documents

9   that you had saved on that computer and left on that

10  computer with NAF upon your departure?

11       A.  No.  I think I would regularly use the most

12  -- certain things would be saved onto my hard drive

13  versus the share drives.

14       Q.  So there was a share drive at NAF and your

15  hard drive, and you would have saved documents in

16  one of those two places?

17       A.  Correct.

18       Q.  When you had the computer at NAF, when you

19  turned it in did you remove anything from that

20  computer before you turned it in?

21       A.  No.

22       Q.  If you could walk me through -- and you've

23  given me your history, but how did you come to be

24  employed by NAF?  And I want you to kind of start

25  with how you were recruited or learned about the job

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1      and walk me up to your hire.

2            A.   A really rapid process.  They actually

3      posted a confidential posting in a blog that's a

4      pretty well-known mortgage blog called the Chrisman

5      Blog to which I replied, you know, just hi, I have

6      an interest, let's talk.  I think within a day I got

7      a phone call from Christy Bunce or Jason O'Bradovich

8      -- I don't recall because it was a long time ago --

9      a brief phone call, two or three minutes, what is

10     your background, what is your interest, do you want

11     to get on a more formal call.  I think that call

12     happened like the next day.  So it was really,

13     really rapid.  That was more like an hour with

14     four-ish people, what is your background, what is

15     your skill set, to which they booked a flight and

16     flew me out I think within three days.  So I got on

17     a plane, went out there, spent a half a day with

18     Rick, Patty, Christy, the whole group, probably just

19     walking through what I had built, what my background

20     was and kind of walking through what their goals

21     were for this role and just figuring out if that

22     made a fit.  Like most roles, you leave and -- it

23     felt good, but I didn't know if it was going to be a

24     fit, so you get a call a couple of days later with

25     an offer.  I think two weeks later I sold my house

Scott Frommert                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1    and moved out there.  It was really, really rapid.

2         Q.  I'm going to kind of break it down a little

3    bit.  You said that first call was with Christy

4    Bunce and perhaps Mr. O'Bradovich?

5         A.  Yeah.  I don't recall exactly, but I

6    believe -- I'm pretty confident it was with Christy.

7    I'm not sure if Jason was on the line or not.

8         Q.  You were responding to a posting on a

9    mortgage industry blog, correct?

10        A.  Correct.

11        Q.  Do you remember what the contents of that

12   posting were?

13        A.  No.  I wish I did.  I don't have that good

14   of a memory.  Something like looking for a strategic

15   CFO to join large national mortgage lender.  It was

16   pretty brief.

17        Q.  Had you --

18        A.  The blog limits you to 50 characters or

19   something.  A pretty brief blog.

20        Q.  Got you.  You had been a CFO with prior

21   employers, correct?

22        A.  Correct.

23        Q.  How long had you been a CFO before you

24   became a CFO with them?

25        A.  Approximately five years at ONCU Financial.

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 19

1        Q.  And that first initial call with Ms. Bunce

2     and perhaps Mr. O'Bradovich, you said that was about

3     a two to three-minute call, just --

4        A.  Yeah, just -- not to get into the process

5     too much, but when you respond to the blog it's hi,

6     I'm Scott, I'm interested, but I have a job, I don't

7     want to put my name out there and get slaughtered by

8     my current employer.

9        Q.  Right.

10       A.  So here's my name, can this be

11    confidential.  I got a call and said, you know, we

12    don't know much about you.  Can you just give us the

13    basics.  Because I didn't want to send my resumé to

14    a complete stranger.

15       Q.  Sure.

16       A.  So it was just like here it is and, okay,

17    can you send over your official resumé.  Here's our

18    email address.  And sent it over and then -- I can't

19    remember, some admin basically scheduled a more

20    official one-hour type call.

21       Q.  So the posting is kind of a blind posting,

22    and you wanted to make sure you don't send your

23    resumé to your own employer who didn't know you were

24    looking, correct?

25       A.  There you go.

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                            Page 20

1          Q.  So after that initial call, this hour-long

2     approximately call, you said there were multiple

3     people on that call.  Can you tell me who you recall

4     being on that call?

5          A.  To the best of my recollection both of the

6     Arvielos, Rick and Patty, Christy Bunce and Jason

7     O'Bradovich.

8          Q.  And on that hour-long call approximately

9     were you told what NAF was looking for?

10         A.  I mean the vast majority started with what

11    I did and what my skill set was, what my strengths

12    and weaknesses were.  I think there was -- I would

13    ask the normal things.  I'm not an accountant, and I

14    make that very clear with everybody I talk to.  I

15    don't do accounting.  I can't close the books.  So

16    my focus is building math models and value models,

17    which peaked their interest, and how do you do that

18    and how is that done and what would that look like.

19    So a lot of the call went that direction.  And there

20    was certainly more interest on that topic.  And they

21    said that would add a lot of value to the company.

22    So I don't think it was specifically stated, but

23    that was a focal point.

24         Q.  Was it described what the math or value

25    models, why those might be useful to NAF?

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 21

1          A.   No.   It was just a very brief call, that
2     initial call.
3          Q.   So you were giving information to them.
4     Did they give much information to you about why they
5     were looking for a CFO?
6          A.   Not on that hour-long call, no.
7          Q.   How about what the duties of the position
8     would be, did they give you any information on that
9     hour-long call?
10          A.   They had sent like a job description with
11     some duties and bullets.  At some point I had sent
12     the resumé over and they sent back a scheduled
13     interview with that official posting, if you will,
14     and the job responsibilities.
15          Q.   Do you recall what those job
16     responsibilities were listed as?
17          A.   No.
18          Q.   You don't?
19          A.   No.  That was probably three years ago.
20     I'm sorry --
21          Q.   That's fine --
22          A.   -- four years ago.
23          Q.   If you don't know, you don't know.
24          A.   I don't recall.
25               MR. PERLOWSKI:  Travis, you guys are

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

1         starting to talk over each other.  Could you

2         please let him finish his answer?

3                  MR. HARGROVE:  Sure.  No problem.

4    BY MR. HARGROVE:

5         Q.  So after you had this hour-long call you

6    said within about three days you were flown out to

7    NAF's offices to interview in person?

8         A.  That is correct.

9         Q.  And where -- were you flown to Tustin, to

10   that office?

11        A.  Yeah.  I lived in Phoenix, Arizona, so I

12   flew out to John Wayne Airport, which is in Orange

13   County.  I stayed in that general vicinity, and had

14   scheduled, to the best of my recollection, like an

15   early morning, like 9 a.m. meeting.  So I flew out

16   the night before, stayed the night, got up and did

17   -- call it a two or three-hour meeting.  It was on a

18   Friday I specifically remember because I stayed the

19   weekend to get familiar with the town and the area.

20   Should it work out I wanted to know where I might be

21   moving.

22        Q.  And in that two to three-hour meeting can

23   you tell me who was present for that?

24        A.  I can tell you who I know was there.  There

25   might have been more people, but I don't recall.

Page 23

1    There was a meeting in Rick Arvielo's office with

2    Rick, Patty and Christy.  And there was an

3    additional break-away meeting with just me and Jason

4    O'Bradovich.  I don't recall if he was in the room

5    or not, but I know I did a separate break-away with

6    him also.

7         Q.  What was discussed in that first meeting at

8    Rick's office with Patty, Christy and possibly

9    others?

10        A.  It was a very standard interview.  So there

11   were cookie cutter interview questions, what would

12   you do in this situation, that situation, can you

13   tell me about your background.  There was -- you

14   know, if you took an interview -- I don't remember

15   the exact time, two and a half hours, 80 percent is

16   them asking that.  At the end when you've satisfied

17   their interest, they say this sounds good, and you

18   start to ask them questions, what do you have for

19   us, what does the job look like, I don't do this

20   accounting.  And they basically said the modeling we

21   do, the things you build are exactly what we don't

22   feel some of these things we have.  Those could be

23   staff rank reporting, leakage reporting, different

24   types of metrics that I have skill sets building

25   that they didn't necessarily have in place, special

Page 24

1        techniques for saving money, restructuring warehouse

2        agreements and things of this nature.  So I

3        basically talked about how I would want to do it and

4        if that worked for them or not.  Because that's

5        effectively how I do things.  Does this work for

6        you, does this not work for you.  And it started,

7        yes, that's exactly what we need.

8                So that evolved into call it multiple silos

9        of conversations, one of which would be reporting,

10       one of which would be warehouse banks, one of which

11       would be expense reduction.  So we went through all

12       of those buckets.

13           Q.  As far as reporting, was that like

14       reporting of financial performance?

15           A.  Broken into call it three buckets.  There

16       would be one for cash management reporting and how

17       you use and leverage that to create wealth, number

18       one.  Number two would be performance reporting,

19       which would be broken into regional branch

20       profitability modeling as well as individual staff

21       rank reporting.  And then the third bucket would be

22       product level profitability.

23           Q.  Was there any discussion about whether you

24       would be involved in the financial statements of

25       NAF?

Scott Frommert                                        January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 25

```
 1              MR. PERLOWSKI:  Object to the form.  You
 2         can answer.
 3         A.  What I would say is I was very clear I do
 4    not close the books.  I do not make journal entries.
 5    And they have a chief accounting officer, Jim Cross,
 6    that worked for the organization.  And if Jim were
 7    to not be there, I could not close the books.  But I
 8    would review the month close financials.  I would
 9    sign off on them.  They had a roughly 30-day close
10    process, and I committed to them to get to an
11    eight-day close process through process automation.
12    So it was more process -- project management
13    oriented versus functional daily accounting.
14         Q.  Anything else that was discussed in that
15    meeting in Mr. Arvielo's office?
16         A.  Compensation, timelines, the fact I owned a
17    home and had to sell it, things -- just structural
18    deals.
19         Q.  The second meeting you had with Mr.
20    O'Bradovich, can you tell me about what was
21    discussed in that meeting?
22         A.  An interesting meeting.  It was just really
23    him saying the culture here is really this, do you
24    think you can fit, meaning you're going to be on an
25    island, that they go off and do their own thing and
```

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 26 of 97
Scott Frommert                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 26

1    kind of like -- I don't know how to put it other

2    than, hey, I'm your buddy, how this is going to

3    work.  I don't really know a better way to describe

4    that.

5         Q.  So no real information about the job, just

6    information about the culture of the company?

7         A.  Correct.

8         Q.  Any discussion with Mr. O'Bradovich about

9    NAF's financial statements or the way those were

10   done?

11        A.  None at all.

12        Q.  In the first meeting was there any

13   discussion about NAF's financial statements and the

14   way they were done, the earlier meeting in Mr.

15   Arvielo's office?

16             MR. PERLOWSKI:  Object to the form.  You

17        can answer.

18        A.  I guess I want to go on record and say when

19   I'm answering these it's to the best of my

20   recollection.  I can't remember everything from four

21   years ago.  I don't recall exactly, but I don't

22   believe so.

23        Q.  Fair enough.

24             So after this meeting in Tustin you spent

25   the weekend, checked the place out, and then was

Page 27

```
 1      your next conversation with anyone at NAF where you
 2      were made an offer for the job?
 3           A.  It was into the next week that I was made
 4      an offer.  I think I got a call from Christy Bunce,
 5      and she said I'm excited to get you onto the team
 6      and let's talk timelines and structure.
 7           Q.  And at that point did you accept the job
 8      with NAF?
 9           A.  Accepted the job, yes.
10           Q.  And how long after you accepted the job did
11      you move from Phoenix to Tustin and start the job?
12           A.  Two to three weeks.
13           Q.  Wow.  Must have been during a hot market to
14      sell a house.
15           A.  I sold the house like three months later.
16      But sometimes you've just got to do what you've got
17      to do.
18           Q.  I'm with you.
19               Once you became employed by NAF did you
20      have any sort of employment contract?
21           A.  I don't know if you would define it as a
22      contract.  It's a standard employment agreement that
23      all employees sign that has terms and conditions,
24      you know, smoke policy, break policy, all those
25      things that are included.  It's, give or take, 10,
```

Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 28

1     15 pages, plus a compensation section and -- you

2     know, I don't think anything unique, no.

3         Q.  During the time that you were employed --

4     let me just make sure -- step back a little bit.  Do

5     you remember when your first day at NAF was?

6         A.  I do not remember my -- what my first day

7     was, no.

8         Q.  Do you remember the month?

9         A.  I would say, if I'm going off of my best

10    memory, middle of April, late April, give or take.

11    I would have to go back and look.

12        Q.  Would that be 2019?

13        A.  Yes.  I mean I literally would just have to

14    go back to my LinkedIn to look, which is probably

15    the best way, which is the only way to track it.

16    That's probably the most accurate.

17        Q.  Are you pulling up the LinkedIn right now?

18        A.  Yes.  My LinkedIn is more accurate than my

19    brain, because I mark it as I go.

20            It was April '19 through May of 2020.  I do

21    know it has the last day of May.  I believe it was

22    the middle of April.

23        Q.  And when you signed off on the documents

24    that you referred to earlier, you said that set

25    forth the terms of your employment in the pages of

Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 29

1    those documents?

2        A.  Yes.

3        Q.  At any point between April of '19 and May

4    of '20 did the terms of your employment change?

5        A.  Yeah.  At some point I think that there was

6    a compensation increase.

7        Q.  All right.  Do you remember approximately

8    when that compensation increase took place?

9        A.  Four or five months into it.

10       Q.  And when that compensation increase

11   happened, how were you notified of the increase?

12       A.  Rick called me into his office and

13   discussed it with me.

14       Q.  Were there any documents related to the

15   compensation increase?

16              MR. PERLOWSKI:  Object to the form.  You

17        can answer.

18       A.  I do not recall.  I'm assuming I had to

19   sign just something to acknowledge it went from X

20   to Y.

21   BY MR. HARGROVE:

22       Q.  But you don't specifically recall whether

23   you signed a document or not?

24       A.  I do not.  Actually, I don't think I did.

25   I think I might have gotten an email from HR.

Scott Frommert                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 30

1          Q.  And that would have been sent to your NAF

2     email account, correct?

3          A.  Correct.

4          Q.  Did you ever do any work -- did you ever

5     have any work-related emails sent to or received --

6     let me go back and ask a better question.

7               Did you ever send any work-related emails

8     while you were at NAF from any account other than

9     your NAF email account?

10         A.  Not to my knowledge.  Sometimes on your

11    iPhone when you start one it might go into the wrong

12    account.  But that's one in a thousand, on accident.

13         Q.  How about as far as receiving emails, did

14    you ever receive any emails that were NAF work

15    related to any account other than your NAF email

16    account?

17         A.  No.

18         Q.  When you first went to NAF in April of

19    2019, what were you told to start doing on day one

20    when you got there?

21         A.  I guess I would say I don't know that they

22    ever had -- they did not have a CFO prior to me.  I

23    don't know that they knew what a CFO did.  I think I

24    paved the path more on my own than them telling me

25    what to do.  So I self directed.  I think a good

1    majority of my time, if I broke it into a pie chart,

2    30 percent spent with the accounting team going

3    through their process, making sure I had clear

4    expectations on automation and improvement.

5    Probably 40 percent of my time was spent auditing

6    and extracting data so that I could assure the

7    confidence of the data that I was going to be using

8    to build these reports.  And the remaining

9    percentage, 30-ish percent of my time was spent

10   reducing costs, calling vendors and warehouse banks.

11        Q.  Did you have any discussions with anyone at

12   NAF about why, when they had not had a CFO in the

13   past, they hired you to be CFO?

14        A.  Yeah.  I think probably one of my first

15   questions before I joined was why have you not had

16   one, and I think they basically said we had a chief

17   accounting officer, Jim, that always closed the

18   books; and we had clean audited financials, and so

19   we felt confident with those.  So the external

20   audited financials had consistently done well and

21   they didn't feel they needed one.  I think they

22   wanted to focus more of the energy on these internal

23   reports and efficiency modeling, if you will.  When

24   you make the distinction between finance and

25   accounting, I think they had very, very strong

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 32

1    accounting and they night not have had as strong of

2    analytics, so that's where the gap was that I was

3    focusing on.

4         Q.  Were there any problems with the internal

5    reports that you were told about?

6              MR. PERLOWSKI:  Object to the form.

7         A.  I think that there was -- the way I would

8    characterize it is there was five different people

9    doing reports, different types of reports.  I don't

10   know if you want to be specific on a report.  But

11   all of those I think had opportunity for

12   improvement.

13             There had been, within the Call Center

14   there was conversion metrics reporting that had been

15   inaccurate that needed remodeling.  The mathematics

16   was improper.  The automation of the SQL coding for

17   the extraction of the data was coming from a CSB

18   file versus a refreshed SQL file.  These things were

19   causing delays, lags and improper results.  So I

20   think that had been -- call it five different

21   meetings on the five different reports on what they

22   saw and what I felt could be done to improve that.

23   Does that answer the question?

24        Q.  Yes, it does.  A lot of technical terms in

25   there; but, yes.

Scott Frommert                                  January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

1        A.   I'm trying not to do that.   I will do

2    better.

3        Q.   No worries there.

4             So the time you spent meeting with the

5    accounting team, the 30 percent of the time

6    approximately that you spent looking at processes,

7    what processes were you analyzing?

8        A.   You have a bunch of clerks making data

9    entry on payables and loans, right, and they're

10   physically keying them in, when you can get files

11   that automatically batch and upload, and that saves

12   time, versus a stack of papers.   You can

13   automatically do it through computer coding, and you

14   can save multiple days and reduce errors.   So

15   physically, literally sitting in the office and

16   watching the process and them coming up with ways to

17   automate and improve that process.

18       Q.   So 40 percent of the time you spent did you

19   say auditing and extrapolating data, or was it

20   auditing and -- something that starts with an "e"

21   data.

22       A.   So when you think about it, you enter it.

23   Now it's in the system.   You have to pull it back

24   out for reporting.   And so the different reports

25   that were already being created, if you have a whole

Page 34

```
 1    pie that you pull out and you put it into the report
 2    and you only have a half of a pie, you'll never get
 3    a proper picture.  So you have to take the report
 4    and look at the raw data and literally compare them
 5    to see if two is on one and two is on the other, so
 6    that they're equal.
 7         Q.  And when you were looking at this data did
 8    you notice any discrepancies or issues with any
 9    reports that had been issued in the past?
10              MR. PERLOWSKI:  Object to the form;
11         foundation.  You can answer.
12         A.  Yes.  I always find that.  I did find that.
13    I think there's degrees of finding it, right, if
14    that makes sense.  So it's a very precise art.  So,
15    yes, I did find things.
16         Q.  Can you tell me some of the things you
17    recall you found?
18         A.  Expenses that weren't being pushed over,
19    expenses that weren't allocated properly, and entire
20    expenses that would hit one bucket should have got
21    cascaded to three buckets.  Maybe a revenue that had
22    ten components had only trickled in nine of the
23    components.  One of components was not brought in
24    because it was considered -- you know, when you book
25    in revenue, you book it under buckets, and so it's
```

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 35 of 97
Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1    contra revenue.  It's not as simple as just revenue

2    was missed; it was a contra revenue.  And so they

3    didn't look in that contra revenue, things of this

4    nature.

5        Q.  Did any of these issues that you found

6    relate to the 2018 financial statements of NAF?

7        A.  Not to the corporate financial statements,

8    no.

9        Q.  Just some other financial statements than

10   the corporate financial statements?

11       A.  Well, you really only have two:  Corporate

12   financial statements, outward facing corporate

13   financial statements that are audited by third

14   parties, and you have internal reporting, right.

15   Anything that's not going external would not be

16   considered a financial statement; it would be an

17   internal report if you will; where if any of the

18   errors happened on internal reports, the cumulative

19   data from an external facing perspective was

20   accurate.

21       Q.  So just to make sure I understand it, there

22   were audited financial statements that were

23   externally done, and there were no problems with

24   those, correct?

25       A.  Correct.

Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 36

1      Q.  There were some problems with internal

2   reports, however, that were -- I think you used the

3   word inward facing rather than outward facing,

4   correct?

5      A.  Correct.

6      Q.  Which internal reports had issues as far as

7   their correctness from your analysis?

8                MR. PERLOWSKI:  Object to the form;

9         foundation; mischaracterizes his testimony.

10        You can answer.

11      A.  Again, I would say -- I don't know how to

12   answer the question.  I'm a very particular person.

13   All of them to varying degrees.  I would say that

14   conversion reporting from the Call Center, the cash

15   reporting that wasn't leveraging and curtailing -- I

16   could go through very technical things.  I would say

17   all of them to a degree.

18           When you look at -- I'll give you the most

19   simple example that can happen.  If you have a

20   processor that gets paid $100,000 and they do loans

21   for two branches, if you take $50,000 to each branch

22   or does $100,000 hit all one branch.  And those

23   allocations were not being done in a way that I

24   agreed with.  I guess you could find other people

25   doing what I did and they would all slice it

Page 37

1    different.  I think their best practice and worst

2    practice is somewhere in between.  I would say some

3    of these were done somewhere in between, and I think

4    there was room for improvement.

5         Q.  Did you review the 2018 internal reports

6    once you became CFO?

7         A.  I did.  They were published through the

8    intranet website if you will.

9         Q.  When you reviewed those 2018 internal

10   reports, did you find any errors on those 2018

11   internal reports?

12              MR. PERLOWSKI:  Object to the form.  You

13        can answer.

14        A.  I feel the methodology was incorrect.

15   BY MR. HARGROVE:

16        Q.  Can you tell me what you felt was incorrect

17   about the methodology with respect to the 2018

18   internal reports?

19        A.  It's hard without getting technical.  I

20   don't know how technical you want me to get.  What I

21   would say is there is a waterfall from the top of

22   the regional on expenses all the way down to the

23   branch, the loan officer for the loan.  The

24   allocation of costs from the top down had been a

25   little bit imbalanced.  The way you call -- when you

Page 38

1    layer in costs you could look at regional profit

2    level one, profit level two, profit level three, and

3    the choice to look at one versus three will change

4    how you visually view the results.  And I think that

5    they had been looking at what they would call

6    regional level one or corporate level one versus

7    corporate level three or regional level three to

8    have more inclusions in it.  So, yes, that's -- I

9    think that is a technical term, but I think some of

10   that data was there but the view in front of you

11   would be with less allocations, and when you

12   allocate down more it gives you a more holistic

13   view.

14        Q.  And your understanding as far as these

15   allocations of the different types of expenses you

16   talked about with respect to the 2018 internal

17   reports, had that caused the company to believe that

18   there had been funds misallocated in 2018?

19              MR. PERLOWSKI:  Object to the form;

20        foundation.  You can answer.

21        A.  That was before my time.

22   BY MR. HARGROVE:

23        Q.  Mr. Frommert, did you have any discussions

24   with anyone at NAF about a purported misallocation

25   of funds -- let me start over.

Scott Frommert                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 39

1          Did you have any discussions with anyone at

2     NAF about a purported misallocation with regard to

3     the 2018 financials at NAF?

4               MR. PERLOWSKI:  Object to the form and

5          foundation.  You can answer.

6          A.  Yeah, it had come up that there had been a

7     problem with some of the reports.  Again, before my

8     time.  I don't know the details of that.  I think

9     that was months before my time.

10         Q.  From whom did you learn there had been a

11    problem with reports?

12              MR. PERLOWSKI:  Object to the form;

13         foundation.  You can answer.

14         A.  I think Jason O'Bradovich, Kristin Ankeny

15    would be the two people that had mentioned it.

16    BY MR. HARGROVE:

17         Q.  Jason O'Bradovich and who was the second

18    one?

19         A.  Kristin Ankeny.  She worked for him.

20         Q.  What did they tell you about the prior

21    reports and the purported problems?

22         A.  I think it basically goes back to what I

23    was talking about before, levels of profitability.

24    They call it corporate margins, CM; CM1, CM2, CM3.

25    And I think effectively the discussions that I

Page 40

1    understood were that the focus was on CM1, and CM3

2    was there but nobody talked about it, but it was

3    visible.  That was the talk that I recall, having --

4    that there was multiple levels of corporate margin

5    and that the final level, CM3, had all of the

6    allocations and CM1 did not.  And that's the extent

7    of my knowledge.

8        Q.  So the internal report for 2018 before you

9    got there did not contain all of the expenses; is

10   that correct?

11              MR. PERLOWSKI:  Object to the form;

12        foundation; mischaracterizes his testimony.

13        You can answer.

14       A.  Can you repeat the question?

15   BY MR. HARGROVE:

16       Q.  Sure.  In 2018 there were internal reports

17   that you ultimately reviewed, correct?

18       A.  Correct.

19       Q.  And you told me you had discussions with

20   Mr. O'Bradovich and a young lady who worked for him

21   about those reports, correct?

22       A.  Correct.

23       Q.  And there was discussion about the

24   different types of corporate margins, CM1, CM2, and

25   CM3, correct?

Scott Frommert                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1        A.   Yes.

2        Q.   And in those reports CM3 would have been a

3    more encompassing category of expenses; is that fair

4    to say?

5        A.   Yes.

6        Q.   Was CM3 included on the internal reports

7    for 2018?

8        A.   No.  So let's go back.  There's an internal

9    intranet site known as Keblar that these were

10   published, and you can look at the results and you

11   can look at the bottom line.  But what publishes out

12   there and sits there doesn't have all those layers I

13   don't believe, to my best recollection, but I cannot

14   recall.  That was four years ago.  I think there's

15   simply one CM number.

16             I believe there was calls.  We all had

17   calls.  I had calls on my models, and you go through

18   more details on versus what's visible there.  So I

19   can't recall if there was CM2, CM3 on there.

20             My goal in reviewing those was really

21   unrelated.  I'm building what I'm building, and it's

22   my way of doing it that I feel is the future.  And I

23   would have to look at this and see where there's a

24   disconnect, and that's where those conversations

25   happened.

Page 42

1      Q.  Did you have any discussions with anyone

2   else at NAF about CM1, CM2 and CM3 and the 2018

3   internal reports?

4      A.  Just a very brief -- Rick Arvielo was my

5   boss, the president and CEO, whatever his role is

6   there, exact title I don't recall.  Just my

7   progress, my goals and what I was building, what it

8   looked like and what they use to have, quick

9   characters -- you know, you have a 30-minute

10  once-a-week meeting and you have 20 things to go

11  through.  You give him a five-minute digest on this

12  piece of it.  It's pretty brief.  Here's what I'm

13  building, here's what it looks like, here's how it's

14  different than what you used to have.

15     Q.  Did you tell Mr. Arvielo or anyone else

16  that the 2018 internal reports had problems with

17  them with respect to the way expenses were

18  allocated?

19     A.  I would not say I put it in those words,

20  but I talked about it in a way that I felt was

21  appropriate.

22     Q.  Tell me about --

23     A.  You're not going to go into an owner's

24  office and say -- you're a new hire.  You're a new

25  CFO.  You're not there to rip down everything else.

Page 43

1      And I don't really characterize it as terrible or

2      good.  It's, look, here's how you had built it, and

3      you have, you know, five ladder rungs and you should

4      have had six in my opinion, and here's the value of

5      six.  Look at your five, look at my six.  This is

6      what I'm building.  Do you agree.  Are you okay with

7      this.  And so it becomes those types of talk tracks

8      with an owner.  Again, be it him or anybody else,

9      they don't want to get that level of technicality.

10     But I would say -- so you go in and say this is my

11     experience, this is what I want to build, this is

12     why it looks this way, this is what was built,

13     here's the differential between them, here's how

14     this is going to impact the future, so he understood

15     what that may look like.  I don't think I would have

16     characterized it the way you're looking at it.  Does

17     that make sense?  It's very technical.

18          Q.  Did you tell Mr. Arvielo or anyone else at

19     NAF that the way the 2018 reports were prepared was

20     wrong?

21          A.  I would say I didn't agree with them.

22          Q.  And you told Mr. Arvielo you didn't agree

23     with them?

24          A.  I think we would probably dovetail into 100

25     little conversations about examples; if you looked

Page 44

1    at expenses, how you could cascade those expenses.

2    An example, if you take credit cards and you run

3    credit card billing at the corporate level, that's

4    an expense.  If that credit card usage is, you know,

5    assuming all volume was equal, but the credit card

6    usage was 70 percent east coast and 30 percent west

7    coast, you do not want to allocate your expenses

8    50/50.  It wouldn't be appropriate.  It should be

9    based on usage.  So examples where mathematically if

10   you took 50/50, you're over-allocating to one and

11   under-allocating to another.  It would be more

12   mathematically appropriate to do the 70/30 based on

13   utilization.  And those little differentials over 50

14   buckets can create a more precise art.

15        Q.  Did you have an understanding as to who was

16   responsible for the preparation of the 2018 internal

17   reports?

18        A.  To the best of my knowledge there was a

19   team of several people, Kristin, Jason, that team of

20   people.

21        Q.  Did you provide criticism to Mr. Arvielo or

22   anyone else at NAF about that team or Mr.

23   O'Bradovich or Kristin's work on those internal

24   reports?

25        A.  In a delicate way.

Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45

1          Q.  Tell me how you did that in a delicate way.

2          A.  You know, it's corporate politics.  You

3     don't want to go out and say -- I think you did a

4     really good job based on what they have.  But if you

5     look at -- specifically it's called activity-based

6     costing.  Activity-based costing methodologies,

7     there's several specific techniques that you're

8     going to want to use that I don't believe, when

9     you're picking between cost per unit, you know,

10    basis points, how you're going to derive an

11    allocation, I would pick this based on this

12    reasoning, and this is what was used before, and I

13    think that that created disproportionality, if you

14    will.

15         Q.  And I recognize you informed him in a

16    delicate way.  But as we sit here today, without the

17    need to be delicate, can you tell me what the

18    criticisms were of the 2018 internal reports?

19         A.  I don't know if I'm being compelled to, but

20    I would really rather not get into how I feel about

21    that.  Is that a mandatory requirement here today?

22         Q.  You're under subpoena, so...

23         A.  At the end of the day I think Jason was ill

24    prepared to create these.  I think his -- he did a

25    decent job, probably better than most mortgage

Page 46

1    banks, probably better than many people do.  I think

2    that when you looked at -- when you build this --

3    I'm just going by education and background.  I built

4    this for JP Morgan Chase.  It's a different level of

5    discipline and precision.  I don't think most people

6    have that, so I'm going to be more critical.  I

7    don't think that what he had was poor, but I

8    wouldn't rank it above a C if you're giving it a

9    grade.  Maybe a C plus.  That doesn't mean it's a D

10   or an F.

11        Q.  Did you express criticisms of Mr.

12   O'Bradovich, other than what you've told me, the

13   delicate statements you made earlier?

14             MR. PERLOWSKI:  Object to the form.  You

15        can answer.

16        A.  There was an ongoing dialogue with Rick

17   about my concern.

18        Q.  And was Mr. Arvielo receptive to your

19   concerns about the work that Mr. O'Bradovich had

20   done?

21        A.  Yeah, I think he -- he wanted to understand

22   it.  He wanted to know how to improve his business.

23   I think he takes pride in his business.  He's a guy

24   that wants to constantly improve his business.  He's

25   not out -- yes, I think he listened.  I don't think

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 47 of 97
Scott Frommert                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 47

1    he would want to get into the personal Jason versus

2    Scott or any of that stuff.  He just wants the end

3    result, right.  He's a business owner.

4         Q.  Did you get along with Mr. O'Bradovich

5    during the time you all were both employed at NAF?

6         A.  No.

7         Q.  No.  Okay.  Tell me what was the source of

8    the friction?

9         A.  He built a model that effectively I was

10   coming to rebuild, and I don't think that sits well

11   with anybody.  It creates a little bit of tension

12   out of the gate.

13        Q.  And did you have discussions at all with

14   Mr. Arvielo about this tension between you and Mr.

15   O'Bradovich?

16        A.  Yes.

17        Q.  Tell me about those discussions.

18        A.  I don't know that I can.  Can I talk about

19   that?  I have an NDA in place about this topic.

20             MR. PERLOWSKI:  Do not reveal testimony

21        that you believe would give you concerns on

22        your NDA, Mr. Frommert.

23             MR. HARGROVE:  Do we have a copy of the

24        NDA?  Because most of them say that if you're

25        subpoenaed, that's an exception to the NDA.  Do

Page 48

1         you have a copy of the NDA?  And we have a

2         protective order in this case.

3        A.  What I would say is I'm not comfortable

4   talking about it.  I believe that this breaches my

5   NDA.

6              MR. HARGROVE:  Henry, do you have a copy

7         of the NDA?

8              MR. PERLOWSKI:  I do not.

9              MR. HARGROVE:  Let's take a brief

10        five-minute break and then we'll come back.

11             (Recess 1:00 p.m. - 1:08 p.m.)

12   BY MR. HARGROVE:

13        Q.  Thanks for indulging me on the break, Mr.

14   Frommert.

15             You said you have a copy of that NDA; is

16   that correct?

17        A.  Somewhere.  Literally probably in a box in

18   my garage.

19        Q.  Would you be willing to provide a copy of

20   that to counsel for the Plaintiff?

21        A.  Not a quick notice, but I could probably

22   dig it up.  Literally, it's probably packed in a

23   box.  I don't even know which box.  It would be a

24   process.

25        Q.  Okay.  Well, we would ask that you do that.

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 49

1     And we're going to ask you some other questions

2     today, but we're going to, at the end, adjourn your

3     deposition but not conclude it in case we visit with

4     the Court whether certain questions that you don't

5     want to answer due to the NDA, whether you could be

6     compelled to answer those or not.  So if you could

7     provide that document to us -- we can subpoena it,

8     but if you'll voluntarily provide it to us, that

9     would be easier since you've agreed to do --

10                    MR. PERLOWSKI:  First of all, let me say

11            no subpoena was served -- no document request

12            was served with the subpoena, correct?

13                    MR. HARGROVE:  Correct.

14                    MS. GIBSON:  We didn't ask for it.  We

15            can serve a subpoena for the NDA.  We weren't

16            aware that there was one.  So we can serve a

17            subpoena asking for --

18                    MR. PERLOWSKI:  I believe there was

19            prior deposition testimony confirming that

20            there was an agreement in place.  But

21            irrespective, I cannot give Mr. Frommert advice

22            on this issue because his agreement would be

23            with NAF.  So we're going to reserve our

24            position regarding that issue.

25                    MR. HARGROVE:  Okay.  Fair enough.

Scott Frommert                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 50

1                      MR. PERLOWSKI:  I just want to put that

2          on the record.

3                      MR. HARGROVE:  Fair enough.

4     BY MR. HARGROVE:

5          Q.  Mr. Frommert, just to confirm, you said you

6     would look for that document and provide it to us,

7     correct?

8          A.  Yes, to the best of my recollection -- I

9     will look for it.  I'm not 100 percent -- it's like

10    with a bunch of tax documents and everything else.

11    I'm not the best record-keeper of my own personal

12    stuff.  I will do my best to find it.

13         Q.  Thank you.

14             Were there any discussions around NAF about

15    a misallocation of funds that had purportedly

16    occurred with respect to 2018?

17                      MR. PERLOWSKI:  Object to the form;

18             foundation.  You can answer.

19              By the way, Mr. Frommert, I should have

20             cautioned you, because Mr. Hargrove did not

21             mention this at the outset.  I'm not saying

22             that this is true with respect to this

23             question, but if you had conversations with

24             NAF's legal counsel regarding an issue, I would

25             ask that you not disclose those.  But subject

Page 51

1            to that, you can answer.

2            A.   Well, 2018 was a complicated year.  It's

3      twofold.  One is the business -- the mortgage

4      business as a whole industry shifted.  There was a

5      compression of margins, so I think there was a lot

6      of discussions around that, right.  A time like that

7      is a great time to hire a CFO, part of which I think

8      encouraged them to bring me on board.  So that was a

9      catalyst, so I think it's worth stating.

10           I think misallocation of funds goes back to

11     my characterization of CM1 versus CM3.  Again,

12     before my time.  My understanding was they had

13     looked at CM1 and discussed the CM1, but CM3 was

14     there.  That's how I understood it.  I wasn't there

15     for that.  I don't know that I was there to say

16     whether there was a misallocation of funds.  I

17     simply believe that there was a view of CM1 versus

18     CM3.

19           Q.   So that wasn't exactly my question.  My

20     question was were there discussions between you and

21     others at NAF about -- and using the words

22     specifically misallocation of funds for 2018?

23           A.   Not that I recall.

24                MR. PERLOWSKI:  Object to the form;

25          foundation; asked and answered.  You can answer

Page 52

1              again, Mr. Frommert.

2         A.   Not that I recall.

3    BY MR. HARGROVE:

4         Q.   So no one at NAF, in discussions with you,

5    referred to a misallocation of funds related to

6    2018?

7              MR. PERLOWSKI:   Objection; asked and

8         answered; foundation.   You can answer again,

9         Mr. Frommert.

10        A.   Not that I recall.

11   BY MR. HARGROVE:

12        Q.   Do you have any knowledge about a

13   leadership meeting that took place in February 2019

14   prior to your coming on board at NAF?

15        A.   Yes, I'm aware that there was, I believe,

16   an on-site leadership meeting prior to me joining.

17        Q.   And do you have any awareness as to whether

18   misallocation of funds was discussed in that

19   meeting?

20             MR. PERLOWSKI:   Object to the form;

21        asked and answered; foundation.   You can go

22        ahead and answer.

23        A.   Again, before my time.   I wasn't there.   I

24   don't recall them specifically talking about

25   misallocation of funds per that meeting or that that

Scott Frommert                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 53

1    was a topic in that meeting specifically.

2         Q.  How about any incorrectness on the 2018

3    either -- let me go back.

4         Did you have discussions with anyone at NAF

5    about, at that leadership meeting, it being conveyed

6    that the internal financial reports were not

7    accurate?

8              MR. PERLOWSKI:  Object to the form;

9         foundation.  You can answer.

10        A.  No, that was not -- that's not what my

11   understanding is.  My understanding of the meeting

12   was the mortgage market shifted, one; two, we

13   thought we were making money, and we were not.  As

14   to why -- I think you're talking -- I don't know

15   that part.  There was no misallocation or

16   inaccuracies.  We thought we were making money.  We

17   were not.  That's my understanding.  That's what I

18   know about that meeting.

19        Q.  And was it ever conveyed to you why NAF

20   thought it was making money but it was not, for the

21   2018 year?

22        A.  I don't know I'm clear on why that exactly

23   happened.  I think I probably couldn't be specific

24   enough to say why.

25        Q.  Who was it who told you about NAF thinking

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 54

1     it made money but in fact it did not for 2018?

2            A.   It was mentioned by both Jason and Rick.

3            Q.   Jason and Rick.  And in your review of the

4     2018 financial documents did NAF in fact make money

5     or did it not?

6            A.   Let me answer -- the outside division, this

7     group, this segment of the business had lost money.

8     There are other segments of the business, there are

9     other revenue streams as a whole that may make

10    money.  So there are other pieces when you look at

11    an internal report and you look at a pie.  This is a

12    piece of that pie.  So I think we need to be very

13    clear when we're talking, are we talking about this

14    piece of the pie or are we talking about the whole

15    pie, because there are different results.

16           Q.   I'm talking about the piece right now, the

17    branch that Ms. Spearman was a part of.  That's OLA,

18    correct?

19           A.   Correct.

20           Q.   So OLA was not profitable for 2018,

21    correct?

22           A.   Correct.

23           Q.   Did you review the documents for -- well,

24    let me go back.  Did you see any documents for 2018

25    that would have indicated otherwise in your review

Scott Frommert                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 55

1    of the 2018 documents?

2               MR. PERLOWSKI:  Object to the form.  I'm

3        sorry.  Could you please repeat that question?

4    BY MR. HARGROVE:

5        Q.  In your review of the 2018 documents, the

6    internal financial documents, did you review any

7    documents which would have contradicted the fact

8    that OLA did not make a profit?

9        A.  I'll try to be specific here.  Keblar had

10   the financial records for the division, which I

11   exported those into Excel, and they had the bottom

12   line that showed CM1, 2, and 3, from which I could

13   see all the components of this from the model and

14   see that there was no profit made at the CM3.

15       Q.  Are there documents that you reviewed in

16   2018 that would have shown a profit for that

17   division?

18       A.  Not --

19              MR. PERLOWSKI:  Object to the form.

20   BY MR. HARGROVE:

21       Q.  There were not any?

22       A.  Not that I recall.

23       Q.  Do you have any idea then how Mr.

24   O'Bradovich or others within NAF would have believed

25   that NAF made money in 2018 when in fact it didn't?

Case 1:20-cv-04981-CAP  Document 90  Filed 04/27/22  Page 56 of 97
Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 56

1            MR. PERLOWSKI:  Object to the form;

2        speculation; foundation.  You can answer if you

3        can.

4        A.  I would be speculating.  I don't know how

5    they came to that conclusion.

6        Q.  But you never saw any documents in your

7    review of all the 2018 internal reports that

8    indicated that NAF had a profitable 2018?

9        A.  OLA, I'll be specific, the ones I saw

10    showed that they did not.

11        Q.  And do you know whether those have been

12    altered or changed in any form?

13        A.  I do not.  It is not a report.  As it's

14    being conveyed, it is an online tool that is

15    uploaded through a server.

16        Q.  How about the southeast region, did you do

17    any reviews to find out whether the southeast region

18    of the OLA was profitable?

19        A.  Based on the current numbers that were

20    being provided in Keblar, absolutely.

21        Q.  And was it profitable in 2018?

22        A.  I can't say I recall if any one region --

23    because my goal was not -- there was -- I would have

24    to say that when I joined in 2019 I was looking at

25    more recently the last six months, which include

1    some of 2018 but not early 2018 or mid 2018, if that

2    makes any sense.

3         Q.  Did you have --

4         A.  You had a market that dipped and you lost

5    money and it picked back up again.  So I'm looking

6    at now we're having this run rate, and I'm talking

7    to people about how they're going to get compensated

8    based off of now, not off of history.  So I didn't

9    have a heavy focus on history as much as more

10   recently.

11        Q.  When you came on board did it have anything

12   to do with the fact that there were errors in the

13   internal financial documents for 2018 prior to you

14   coming on board?

15             MR. PERLOWSKI:  Object to the form;

16        foundation; speculation.  You can answer if you

17        can.

18        A.  My understanding is that I was to spend a

19   great deal of my time building a branch

20   profitability model.

21        Q.  Did anyone from NAF tell you that there

22   were errors, mistakes or omissions of any sort in

23   the 2018 internal financial documents at some point

24   before you came on board?

25        A.  Just the previously disclosed where I

Page 58

1    talked to Jason and Rick, brief conversations

2    between them on, you know, going back to the

3    meeting, we thought we were making money, we weren't

4    making money.  We had a meeting.  We talked about

5    the new market, the new market conditions.  And I

6    don't know if that answers your question

7    specifically.

8        Q.  In that meeting was there a discussion

9    about why the company thought it was making money

10   but in fact wasn't making money?

11            MR. PERLOWSKI:  Object to the form;

12        foundation.

13       A.  CM1, CM3 was -- the way I would say this,

14   Rick said -- I think he was looking at the CM1 and I

15   think Jason was looking -- I'm speculating.  Rick

16   and Jason told me slightly different stories of how

17   they ended up there.  I think there was some maybe

18   rapid market movement -- let's just be very clear,

19   rapid market movement happened where businesses

20   started taking a loss.  And I think when you look at

21   one versus the other, there's very little

22   differentiation, and it becomes more important to

23   look at both routinely.

24       Q.  I want to change gears a little bit.  Were

25   you involved in creating a profit and loss model for

Page 59

1     the regional managers at NAF?  Was that part of your

2     duties?

3          A.   Yes.

4          Q.   How did you go about creating that model?

5          A.   Pretty simple.  You create a P and L for

6     the region based on best practices.  And I'll give

7     you the simplest example I can.  Let's just say that

8     Gina inside that model is paid one dollar, and let's

9     say the business profits one dollar.  You remove her

10    one dollar of salary, you put it as if she never got

11    paid, and now the business makes two dollars.  And

12    you create a split of 50/50, and everybody still

13    gets one dollar and one dollar.  That way going

14    forward everybody is on the same page.  So step one,

15    just create a branch profitability model.  Step two,

16    extract her income, and then come up with a math

17    equation that effectively gives her an equal

18    percentage as if you split the bottom line, be it 30

19    percent, 50 percent, whatever that number is.

20         Q.   And in creating that profit model,

21    profit/loss model do you have to go back and look at

22    any of NAF's prior financial documents?

23         A.   I extracted historical accounting data.

24         Q.   Did you have everything that you needed to

25    prepare that profit and loss model for NAF?

Scott Frommert                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 60

```
 1          A.  As good as any company probably has.  I
 2    mean there's steps you've got to close more gaps on,
 3    but yes.
 4          Q.  As the CFO were you provided with all of
 5    the financial information about NAF that you asked
 6    the company for?
 7          A.  I'm going to defer to my NDA.
 8          Q.  You're going to defer to your NDA?
 9          A.  I'm uncomfortable, because, look, I don't
10    want to be in a position with NAF, right, so what I
11    would say is I asked Jason for detailed revenue
12    data.  I wasn't always given it.  We butted heads a
13    little bit, and there's tension there.  And so it
14    gets into a gray area I'm not comfortable talking
15    about.
16          Q.  So just so we're clear on the record, you
17    were asked whether you were given all the
18    information and the response to the question is
19    you're not going to answer the question because of
20    your NDA, correct?
21               MR. PERLOWSKI:  Object to the form;
22          mischaracterizes what Mr. Frommert said.  He
23          asked for detailed revenue data.  He didn't
24          always get it.  It's a gray area.  He's not
25          comfortable talking about it.
```

Page 61

1      BY MR. HARGROVE:

2          Q.  So that's the extent -- that you're not

3      willing to give any details based on your NDA about

4      that; is that correct?

5          A.  That's correct.

6          Q.  Let's go back to this P and L model.  When

7      you prepared this P and L model was it across the

8      board or was there one specific to, say, Ms.

9      Spearman that was prepared?

10         A.  The same methodology was used in all

11     regions for all regional managers.  There was a

12     slight difference between her region and other

13     regions where she and Kelly split the region.  That

14     was the only differential.

15         Q.  And in your preparation of that model you

16     ultimately were involved in the meeting where that

17     was presented to Ms. Spearman and Ms. Allison,

18     correct?

19         A.  Correct.

20         Q.  Did you prepare any materials in advance of

21     that meeting that were to be used in the meeting?

22         A.  A one-page picture of exactly what we

23     talked about before, the P and L with her money

24     inside of it, the P and L with her money extracted,

25     and then the split to show that it was equal.

Page 62

1        Q.  So how was that presented to Ms. Spearman?

2        A.  A computer.  Plugged it in and put a Power

3   Point type screen up, something to that effect.  I

4   mean four years ago, I don't exactly recall.

5        Q.  And you said a Power Point, so was there a

6   Power Point slide show that was --

7        A.  A single page to my best recollection.

8   But, yes.

9        Q.  And it was put into Power Point, correct?

10            MR. PERLOWSKI:  Object to the form.

11       A.  To my best recollection.

12   BY MR. HARGROVE:

13       Q.  Do you know what has happened to that Power

14   Point?

15       A.  No.

16       Q.  Do you have a copy of it?

17       A.  I would not.

18       Q.  Is it something you would have emailed to

19   anyone within the company?

20       A.  I generally did not email these before I

21   went; so, no, probably not.

22       Q.  When you say you didn't email, you mean to

23   Ms. Spearman and Ms. Allison or do you mean to

24   anyone within NAF?

25       A.  I mean certainly to Ms. Spearman or

Scott Frommert                               January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 63

1    Allison.  I don't recall emailing it to anyone

2    though.

3          Q.  Did you save that document on your laptop

4    computer?

5          A.  Most likely, but I do not recall

6    specifically.

7          Q.  Did you ever delete that document from your

8    laptop computer?

9          A.  I don't recall.

10          Q.  You don't know?

11          A.  No.  I hate to say, but you do a thousand

12    documents a year.  It's just really hard to track

13    what you did four years ago in one document.

14          Q.  Sure.  So tell me what you recall about

15    this meeting that you had in person with Ms.

16    Spearman and others where this Power Point was

17    shown.

18          A.  It was lively --

19                MR. PERLOWSKI:  Object to the form;

20           foundation.  You can answer.

21          A.  You know, you fly into a city you haven't

22    been in a while to meet people you're hoping to

23    build a relationship with, and you have a belief

24    that you're putting something in front of them

25    that's going to benefit them.  And they had an

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 64 of 97
Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 64

1    attorney and a CPA in the room, and it was almost

2    immediately somewhat confrontational, the best I can

3    recall.  And I think what they were trying to

4    understand is was this a fair deal, was this an

5    equal deal, was this a better deal.  I think they

6    brought in people to help them feel that that was or

7    was not true, right.  Maybe not the experts on that.

8    I don't recall the exact length, but if I had to

9    guess, an hour and a half.  It wasn't too long, too

10   short.  It was myself, and Jon Reed flew in.  I

11   think we flew in the night before, if I recall, and

12   in the morning had a presentation of this one page,

13   but basically said, look, the market shifted, the

14   company started to lose money.  Companies thrive

15   better when the regionals are aligned and marching

16   in the same direction.  This is how we do this and

17   this is the new compensation plan that we're putting

18   in front of you.  That was the gist of the meeting.

19          There was a lot of back-and-forth questions

20   between the CPA and the attorney of how could it be

21   mathematically accurate, all those types of things.

22   And that's probably the best characterization I can

23   give.

24       Q.  Did NAF take either outside or internal

25   legal counsel to this meeting?

Scott Frommert                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 65

1       A.  Not that I recall.  I think it was just me

2    and Jon.

3       Q.  Did you have any discussions with either

4    outside or internal NAF counsel prior to the

5    meeting?

6       A.  Not that I recall.

7       Q.  When you prepared this document were you

8    contemplating there might be litigation about this

9    document?

10      A.  That didn't cross my mind at the time at

11   all.

12      Q.  Did you have any discussions with anyone

13   from NAF who went to this meeting about

14   contemplation of litigation?

15      A.  I mean the only person in the meeting was

16   me and Jon.  No.  I was more thinking that they were

17   going to quit.

18      Q.  Was there transparency of the numbers to

19   support the new profit and loss model you presented?

20              MR. PERLOWSKI:  Object to the form.

21      A.  I believe so.  I mean I made it, so I guess

22   I'm biased, but I think so.

23      Q.  Were there any comments about that from Ms.

24   Spearman or Ms. Allison?

25      A.  Yeah, I think -- I've been doing this a

Page 66

1    long time and there's always those comments; one,

2    that there's a disbelief, how can you know, how can

3    they audit it, how can they trust when you're giving

4    them a dollar that it was only maybe costing you 89

5    cents.  Yeah, I think those questions came up.

6         Q.  And do you believe that they were given

7    satisfactory explanations?

8         A.  Again, I'm biassed, right.  I did my best

9    to give that information.  Do I feel like they were

10   satisfied?  That's probably a different question.  I

11   don't know that I satisfied them, because they were

12   frustrated at that moment.  I felt towards the end

13   it got better, but maybe that's my perception.

14        Q.  So earlier you testified that you had an

15   issue with Mr. O'Bradovich about getting all the

16   information you asked for, correct?

17        A.  Correct.

18        Q.  Was any of that information something that

19   was needed for this P and L model for Ms. Spearman?

20             MR. PERLOWSKI:  Object to the form;

21        foundation.

22        A.  There's two components, just keeping it as

23   simple as possible, revenue and expense.  Revenue is

24   when you're selling the loans, all the aspects of

25   that.  But when I talk about the four, nine, ten

Page 67

1    units, did you get comp'd for all ten or just nine

2    and all aspects of that, I felt confident enough

3    that it was -- in what we do.  When you talk about a

4    400 million dollar company, is it accurate if

5    there's one penny off of 400 million.  I felt it was

6    -- everything I did mathematically showed that it

7    was in range.

8        Q.  And how were you able to reach that

9    conclusion when you weren't provided everything you

10   had asked Mr. O'Bradovich for?

11           MR. PERLOWSKI:  Object to the form.  You

12         can answer.

13       A.  Industry averages, normal numbers.  I've

14   been doing this 10 years.  If you see 370 in a block

15   that's always been 370 or you see 367, 373, you know

16   you're at least close.  I think from what I do I try

17   to get as close as possible and as many things.  And

18   nothing is ever absolute.  There's just not an

19   absolute in this.

20           Would I say I felt 100 percent, no, but I

21   felt pretty good or I wouldn't have published it.

22   There's degrees of pretty good to perfection.  I

23   would love to be perfect, and I push towards and

24   strive towards that.  But, you know, I think I had

25   good data.  I think more importantly -- for what

Page 68

1    it's worth, this is a very important fact, whether

2    -- even if it was significantly off, if I give her

3    50 percent of something that's significantly wrong,

4    and the significantly wrong stays consistent, then

5    the income still stays consistent, if that makes any

6    sense at all.

7              So from an income perspective I felt good

8    about the model, the consistency of the model

9    delivering very consistent results as long as the

10   baseline stayed the same.

11        Q.  Did you ever hear anyone at NAF say the

12   girls make too much money?

13        A.  Not that I recall.  A lot of them make good

14   money.  I don't recall hearing the girls make good

15   money, no.

16        Q.  How about anyone in NAF, whether using

17   those exact words or not, but expressing that they

18   felt Ms. Spearman and Ms. Allison made too much

19   money?

20        A.  Not too much money, no.  I think that in

21   statements people say they make good money.  I don't

22   think I have heard anybody say they make too much

23   money.  And I think that distinction changes the

24   statement significantly.

25        Q.  At some point you departed from NAF,

1     correct?

2          A.   Correct.

3          Q.   Can you tell me what the circumstances

4     behind your departure were?

5          A.   I cannot.

6          Q.   And why not?

7          A.   Based on my NDA.

8          Q.   Did it have anything to do with Mr.

9     O'Bradovich and you not being provided the

10    information that you felt you needed?

11         A.   I don't feel it's appropriate to answer

12    what it could or couldn't be and narrow it down to

13    what it could be then, because I still am on that

14    gray area of what the NDA is covering.  And not

15    being personally represented, I don't want to put

16    myself at risk, unless somebody's either going to

17    waive or rescind that.

18         Q.   Were you given any sort of termination --

19    well, were you terminated or did you leave?

20         A.   I'm not a lawyer, guys.  I don't know if my

21    NDA covers that or not.  I feel like we're playing

22    on that edge, and it's making me uncomfortable.  So

23    unless somebody wants to advise me on that or go on

24    the record, I am not comfortable with proceeding.

25         Q.   Just so we're clear again, on the record,

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 70 of 97
Scott Frommert                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 70

1    you're not going to answer that question because of

2    the NDA, correct?

3         A.   That is correct.

4         Q.   And so you said you're not personally

5    represented.  Isn't Mr. Perlowski representing you

6    in this deposition?

7              MR. PERLOWSKI:  As I said, Travis, I

8         cannot represent him with respect to these

9         specific issues because NAF is the other

10         signatory to the NDA, so I cannot give him

11         guidance regarding whether to waive a

12         confidentiality restriction or not.  NAF has

13         agreed to provide counsel for Mr. Frommert for

14         the purpose of the deposition generally, not

15         knowing what topics you were going to get into

16         or not.

17              MR. HARGROVE:  Well, then what capacity

18         (audio interference) because he's not an

19         employee, so what material --

20              MR. PERLOWSKI:  He's the former CFO of a

21         company, Travis.  He's a former C level

22         executive of a company.  Companies routinely

23         provide counsel for their former executives

24         when they're drug into matters.

25              MR. HARGROVE:  And NAF drafted the NDA,

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 71

1              correct?

2                      MR. PERLOWSKI:  I have no idea.

3                      MR. HARGROVE:  So your position is you

4              represent him in his -- except for in his

5              capacity of the NDA?  I just want to make

6              sure --

7                      MR. PERLOWSKI:  I have clearly stated

8              our representation of Mr. Frommert and what we

9              cannot advise him on, period.

10                     MR. HARGROVE:  Is NAF willing to waive

11             any argument regarding the NDA so he can

12             testify then?

13                     MR. PERLOWSKI:  I haven't spoken with my

14             client about whether it's willing to waive a

15             confidentiality obligation or not.  I told you

16             I don't have the NDA.  I'm not going to give

17             advice to my client and make a spot decision

18             because you decided to spring it in a

19             deposition.  I'm not going to do that.

20                     You didn't subpoena the NDA.  You

21             haven't even requested it in a document request

22             from us.

23                     MR. HARGROVE:  Mr. Frommert told us

24             about the NDA in the deposition today.  So if

25             you represent him in the deposition, in any

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 72 of 97
Scott Frommert                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 72

1         event --

2                MR. PERLOWSKI:  We can suspend the

3         deposition given that we can't represent him as

4         to this issue.  Fine, we can do that.

5                MR. HARGROVE:  Let's finish what doesn't

6         deal with the NDA and we'll suspend it

7         otherwise, and then we can cross that bridge.

8         Because there's no reason not to finish what we

9         have.

10               MR. PERLOWSKI:  I have no problem with

11        that.  But if Mr. Frommert says he's not

12        comfortable answering a question because of the

13        NDA, that's the answer.  I can't give him

14        guidance on it.

15               MR. HARGROVE:  I understand:

16        A.  I just want to ask a quick question.  If

17    you can give me one minute.

18               MR. PERLOWSKI:  Yes.  Let's take a

19        break.

20               (Recess 1:38 p.m. - 1:47 p.m.)

21        A.  I guess I would just say after talking to

22    him -- like I say, I'm good at math.  Math people

23    are really nerdy in one way, but we don't know

24    anything about the law.  And so what I'll say is I

25    do want to honor an agreement I've made.  And I feel

Page 73

1      like some of these questions could hover in that

2      area.  And based on that I'm going to honor the NDA.

3      I'm going to continue to stay on that topic, that

4      there is a confidentiality agreement in place and I

5      don't feel comfortable discussing some of those

6      topics.

7                    MR. HARGROVE:  I think at this point

8            we'll go ahead and suspend the deposition

9            subject to --

10                   MR. PERLOWSKI:  That's fine.  I'm happy

11           to address that in good faith once I actually

12           have the NDA or talk to NAF about it.  And

13           we'll address it promptly.  I'm not trying to

14           throw a monkey wrench into having this

15           completed or even -- it may well be that we say

16           we're okay with anything -- we have a

17           protective order in this litigation.  I just

18           haven't seen it, so I don't want to do that on

19           the spot.  But let me chase that down with NAF

20           internally and we can confer on how to best

21           proceed in that regard.  And I don't care, with

22           respect -- I'll put this on the record, too, I

23           recognize we have a discovery cutoff subject to

24           other -- there's obviously pending motions that

25           could conceivably impact that, but we can

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 74

1          address that, knowing you're suspending, very

2          logically, in doing so.

3                  MR. HARGROVE:  All right, well, that's

4          all the questions that we have today, Mr.

5          Frommert.  I don't know if Mr. Perlowski has

6          any questions for you.

7                  MR. PERLOWSKI:  I don't.

8                  (Signature reserved.)

9                  (Deposition concluded at 1:50 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 75

1                           CERTIFICATE

2        STATE OF GEORGIA:

3        COUNTY OF FULTON:

4            I hereby certify that the foregoing

5        transcript was taken down, as stated in the caption,

6        and the colloquies, questions and answers were

7        reduced to typewriting under my direction; that the

8        transcript is a true and correct record of the

9        evidence given upon said proceeding.

10           I further certify that I am not a relative or

11       employee or attorney of any party, nor am I

12       financially interested in the outcome of this action.

13           I have no relationship of interest in this

14       matter which would disqualify me from maintaining my

15       obligation of impartiality in compliance with the

16       Code of Professional Ethics.

17           I have no direct contract with any party in

18       this action and my compensation is based solely on

19       the terms of my subcontractor agreement.

20           Nothing in the arrangements made for this

21       proceeding impacts my absolute commitment to serve

22       all parties as an impartial officer of the court.

23       Th:                                        .

24

       _____

25

              Lucy C. Rateau, RPR, CCR 2766

Scott Frommert                     January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 76

1     To:   Henry M. Perlowski, Esq.

2     Re:   Signature of Deponent Scott D. Frommert

3     Date Errata due back at our offices: 30 days

4

5     Greetings:

6     This deposition has been requested for read and sign

7     by the deponent.  It is the deponent's responsibility

8     to review the transcript, noting any changes or

9     corrections on the attached PDF Errata.

10    The deponent may fill out the Errata electronically

11    or print and fill out manually.  Once the Errata is

12    signed by the deponent and notarized, please mail it

13    to the offices of Veritext (below).

14    When the signed Errata is returned to us, we will

15    seal and forward to the taking attorney to file with

16    the original transcript.  We will also send copies

17    of the Errata to all ordering parties.

18    If the signed Errata is not returned within the time

19    above, the original transcript may be filed with the

20    court without the signature of the deponent.

21    Please send completed Errata to:

22    Veritext Production Facility

23    20 Mansell Court, Suite 300

24    Roswell, GA  30076

25    (770) 343-9696

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                            Page 77

1                    ERRATA for ASSIGNMENT #

2

3       I, the undersigned, do hereby certify that I have

4       read the transcript of my testimony, and that

5       ___ There are no changes noted.

6       ___ The following changes are noted:

7

8       Pursuant to Rule 30(7)(e) of the Federal Rules of

9       Civil Procedure and/or OCGA 9-11-30(e), any changes

10      in form or substance which you desire to make to

11      your testimony shall be entered upon the deposition

12      with a statement of the reasons given for making

13      them.  To assist you in making any such corrections,

14      please use the form below.  If additional pages are

15      necessary, please furnish same and attach.

16

17      Page _____ Line _____ Change _____

18      _____

19      Reason for change _____

20      Page _____ Line _____ Change _____

21      _____

22      Reason for change _____

23      Page _____ Line _____ Change _____

24      _____

25      Reason for change _____

Scott Frommert                                   January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 78

1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Reason for change _____

7    Page _____ Line _____ Change _____

8    _____

9    Reason for change _____

10   Page _____ Line _____ Change _____

11   _____

12   Reason for change _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16

17                          _____

18                          DEPONENT'S SIGNATURE

19   Sworn to and subscribed before me this ___ day of

20   _____, ____.

21

22   _____

23   NOTARY PUBLIC

24   My Commission Expires: _____

25

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[04981 - allocation]                                        Page 1

| 0 |
| --- |

**04981**  1:6

| 1 |
| --- |

**10**  27:25 67:14
**100**  43:24 50:9
  67:20
**100,000**  36:20,22
**12**  13:3
**12:00**  1:16
**14**  13:14
**14th**  75:23
**15**  28:1
**171**  3:17
**17th**  3:17
**19**  4:2 28:20 29:3
**19546**  75:24
**1:00**  48:11
**1:08**  48:11
**1:20**  1:6
**1:38**  72:20
**1:47**  72:20
**1:50**  74:9

| 2 |
| --- |

**2**  55:12
**20**  29:4 42:10
  76:23
**2003**  12:12
**2005**  13:14
**2009**  12:9
**2010**  13:14
**2018**  35:6 37:5,9
  37:10,17 38:16,18
  39:3 40:8,16 41:7
  42:2,16 43:19
  44:16 45:18 50:16
  51:2,22 52:6 53:2
  53:21 54:1,4,20,24
  55:1,5,16,25 56:7
  56:8,21 57:1,1,1
  57:13,23

**2019**  28:12 30:19
  52:13 56:24
**2020**  28:20
**2022**  1:15 75:23
**2100**  3:17
**230**  3:8
**2766**  75:25
**28**  1:15

| 3 |
| --- |

**3**  55:12
**30**  25:9 31:2,9
  33:5 42:9 44:6
  59:18 76:3 77:8
**300**  76:23
**30076**  76:24
**30305**  3:9
**30363**  3:18
**343-9696**  76:25
**3535**  3:7
**367**  67:15
**370**  67:14,15
**373**  67:15

| 4 |
| --- |

**40**  31:5 33:18
**400**  67:4,5
**404.873.8500**  3:19

| 5 |
| --- |

**5**  2:9
**50**  18:18 44:13
  59:19 68:3
**50,000**  36:21
**50/50**  44:8,10
  59:12

| 6 |
| --- |

**6**  12:3 13:14
**66**  12:3

| 7 |
| --- |

**7**  77:8
**70**  44:6
**70/30**  44:12
**770**  76:25

| 8 |
| --- |

**8**  12:9
**80**  23:15
**89**  66:4

| 9 |
| --- |

**9**  12:9 22:15
**9-11-30**  77:9

| a |
| --- |

**a.m.**  22:15
**abiding**  8:18,20
**ability**  8:25
**able**  67:8
**absolute**  67:18,19
  75:21
**absolutely**  56:20
**accept**  27:7
**accepted**  27:9,10
**accident**  30:12
**account**  30:2,8,9
  30:12,15,16
**accountant**  20:13
**accounting**  20:15
  23:20 25:5,13
  31:2,17,25 32:1
  33:5 59:23
**accurate**  28:16,18
  35:20 53:7 64:21
  67:4
**acknowledge**
  29:19
**action**  75:12,18
**activity**  45:5,6
**add**  20:21
**additional**  23:3
  77:14

**address**  10:1,1
  19:18 73:11,13
  74:1
**addressed**  10:2
**adjourn**  49:2
**admin**  19:19
**advance**  61:20
**advanced**  12:17
  12:22
**advice**  49:21 71:17
**advise**  5:25 69:23
  71:9
**affect**  8:25
**ago**  17:8 21:19,22
  26:21 41:14 62:4
  63:13
**agree**  43:6,21,22
**agreed**  36:24 49:9
  70:13
**agreement**  27:22
  49:20,22 72:25
  73:4 75:19
**agreements**  12:20
  24:2
**ahead**  7:21 52:22
  73:8
**airport**  22:12
**align**  10:6
**aligned**  64:15
**allison**  10:3 61:17
  62:23 63:1 65:24
  68:18
**allocate**  38:12
  44:7
**allocated**  34:19
  42:18
**allocating**  44:10
  44:11
**allocation**  37:24
  45:11

Scott Frommert

January 28, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[allocations - brain]

Page 2

**allocations** 36:23
38:11,15 40:6
**altered** 56:12
**american** 1:8 5:8
6:18,21 10:5 11:7
11:9
**analysis** 36:7
**analytics** 32:2
**analyzing** 33:7
**andrew** 3:24
**ankeny** 39:14,19
**answer** 7:21 8:11
22:2 25:2 26:17
29:17 32:23 34:11
36:10,12 37:13
38:20 39:5,13
40:13 46:15 49:5
49:6 50:18 51:1
51:25 52:8,22
53:9 54:6 56:2
57:16 60:19 63:20
67:12 69:11 70:1
72:13
**answered** 51:25
52:8,21
**answering** 26:19
72:12
**answers** 7:14 58:6
75:6
**anybody** 43:8
47:11 68:22
**anytime** 7:19
**anyway** 8:11
**appearances** 3:1
**appearing** 5:9
**appreciate** 5:8
7:21
**appropriate** 42:21
44:8,12 69:11
**approximately**
18:25 20:2,8 29:7

33:6
**april** 28:10,10,20
28:22 29:3 30:18
**area** 10:4 13:8
22:19 60:14,24
69:14 73:2
**areas** 13:10
**argument** 71:11
**arizona** 11:25 12:5
22:11
**arnall** 3:16
**arrangements**
75:20
**art** 34:14 44:14
**arvielo** 42:4,15
43:18,22 44:21
46:18 47:14
**arvielo's** 23:1
25:15 26:15
**arvielos** 20:6
**asked** 51:25 52:7
52:21 60:5,11,17
60:23 66:16 67:10
**asking** 23:16
49:17
**aspects** 66:24 67:2
**assignment** 77:1
**assist** 77:13
**assuming** 29:18
44:5
**assure** 31:6
**atlanta** 1:2 3:9,18
13:8,10
**attach** 77:15
**attached** 76:9
**attorney** 64:1,20
75:11 76:15
**audio** 70:18
**audit** 66:3
**audited** 31:18,20
35:13,22

**auditing** 31:5
33:19,20
**automate** 33:17
**automatically**
33:11,13
**automation** 25:11
31:4 32:16
**averages** 67:13
**aware** 49:16 52:15
**awareness** 52:17

**b**

**b** 1:8
**back** 10:8,14 12:4
21:12 28:4,11,14
30:6 33:23 39:22
41:8 48:10 51:10
53:3 54:24 57:5
58:2 59:21 61:6
64:19 76:3
**background** 7:6
11:23 17:10,14,19
23:13 46:3
**bankruptcy** 14:3
**banks** 24:10 31:10
46:1
**barrett** 12:1
**based** 44:9,12 45:4
45:5,6,11 56:19
57:8 59:6 61:3
69:7 73:2 75:18
**baseline** 68:10
**basically** 19:19
23:20 24:3 31:16
39:22 64:13
**basics** 19:13
**basis** 14:20 45:10
**batch** 33:11
**beach** 9:11
**beginning** 9:6
**behalf** 3:3,13 5:16

**belief** 63:23
**believe** 18:6 26:22
28:21 38:17 41:13
41:16 45:8 47:21
48:4 49:18 51:17
52:15 65:21 66:6
**believed** 55:24
**benefit** 63:25
**benefits** 10:25
**best** 20:5 22:14
26:19 28:9,15
37:1 41:13 44:18
50:8,11,12 59:6
62:7,11 64:2,22
66:8 73:20
**better** 13:4 26:3
30:6 33:2 45:25
46:1 64:5,15
66:13
**biased** 65:22
**biassed** 66:8
**billing** 44:3
**bit** 18:3 28:4 37:25
47:11 58:24 60:13
**blind** 19:21
**block** 67:14
**blog** 17:3,4,5 18:9
18:18,19 19:5
**board** 51:8 52:14
57:11,14,24 61:8
**bonds** 12:18,19
**book** 34:24,25
**booked** 17:15
**books** 20:15 25:4,7
31:18
**boss** 42:5
**bottom** 41:11
55:11 59:18
**box** 48:17,23,23
**brain** 28:19

Scott Frommert

January 28, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[branch - cm3]**

Page 3

**branch** 10:6 24:19
36:21,22 37:23
54:17 57:19 59:15
**branches** 36:21
**breaches** 48:4
**break** 7:17,19,23
18:2 23:3,5 27:24
48:10,13 72:19
**bridge** 72:7
**brief** 10:20 14:14
17:9 18:16,19
21:1 42:4,12 48:9
58:1
**briefly** 10:12
11:22
**bring** 51:8
**broke** 31:1
**broken** 24:15,19
**broker** 1:7
**brokerage** 10:20
**brought** 34:23
64:6
**bucket** 24:21
34:20
**buckets** 24:12,15
34:21,25 44:14
**buddy** 26:2
**build** 12:18 23:21
31:8 43:11 46:2
63:23
**building** 12:25
20:16 23:24 41:21
41:21 42:7,13
43:6 57:19
**built** 17:19 43:2,12
46:3 47:9
**bullets** 21:11
**bunce** 17:7 18:4
19:1 20:6 27:4
**bunch** 33:8 50:10

**business** 10:24
11:24 12:6 46:22
46:23,24 47:3
51:3,4 54:7,8 59:9
59:11
**businesses** 58:19
**butted** 60:12

**c**

**c** 1:17 3:4 46:8,9
70:21 75:25
**california** 9:11
**call** 6:21 10:21
14:12,13 17:7,9,11
17:11,24 18:3
19:1,3,11,20 20:1
20:2,3,4,8,19 21:1
21:2,6,9 22:5,17
24:8,15 27:4
32:13,20 36:14
37:25 38:5 39:24
**called** 15:10 17:4
29:12 45:5
**calling** 31:10
**calls** 41:16,17,17
**cap** 1:6
**capacity** 6:18 7:3
9:19 70:17 71:5
**caption** 75:5
**card** 44:3,4,5
**cards** 44:2
**care** 10:16 73:21
**career** 10:18
**caremark** 10:25
**cares** 13:1
**carey** 12:5
**cascade** 44:1
**cascaded** 34:21
**case** 1:6 5:7 6:11
8:4 14:21,23
15:18,21 48:2
49:3

**cash** 24:16 36:14
**catalyst** 51:9
**category** 41:3
**caused** 38:17
**causing** 32:19
**cautioned** 50:20
**ccr** 1:17 75:25
**center** 32:13 36:14
**cents** 66:5
**ceo** 42:5
**certain** 16:12 49:4
**certainly** 20:20
62:25
**certificate** 75:1
**certify** 75:4,10
77:3
**cfo** 11:7,8 18:15
18:20,23,24 21:5
30:22,23 31:12,13
37:6 42:25 51:7
60:4 70:20
**change** 29:4 38:3
58:24 77:17,19,20
77:22,23,25 78:1,3
78:4,6,7,9,10,12
78:13,15
**changed** 56:12
**changes** 9:24
68:23 76:8 77:5,6
77:9
**characterization**
51:11 64:22
**characterize** 32:8
43:1
**characterized**
43:16
**characters** 18:18
42:9
**chart** 31:1
**chase** 3:15 11:3
46:4 73:19

**chase.ogletree**
3:21
**checked** 26:25
**chief** 11:21 25:5
31:16
**choice** 38:3
**chrisman** 17:4
**christy** 17:7,18
18:3,6 20:6 23:2,8
27:4
**circumstances**
69:3
**city** 63:21
**civic** 13:20
**civil** 77:9
**class** 12:20,21,21
**classes** 12:16,17
12:18,23,23
**clean** 31:18
**clear** 7:14 8:3
20:14 25:3 31:3
53:22 54:13 58:18
60:16 69:25
**clearly** 71:7
**clerks** 33:8
**client** 71:14,17
**close** 20:15 25:4,7
25:8,9,11 60:2
67:16,17
**closed** 31:17
**cm** 39:24 41:15
**cm1** 39:24 40:1,6
40:24 42:2 51:11
51:13,13,17 55:12
58:13,14
**cm2** 39:24 40:24
41:19 42:2
**cm3** 39:24 40:1,5
40:25 41:2,6,19
42:2 51:11,13,18
55:14 58:13

Scott Frommert                                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[coast - cup]                                                            Page 4

coast  44:6,7
code  75:16
coding  12:22
  32:16 33:13
coffee  14:7
college  10:16 12:1
  12:11
colloquies  75:6
come  10:8 16:23
  39:6 48:10 59:16
comfortable  8:17
  48:3 60:14,25
  69:24 72:12 73:5
coming  32:17
  33:16 47:10 52:14
  57:14
comments  65:23
  66:1
commission  78:24
commitment
  75:21
committed  25:10
comp'd  67:1
companies  13:6
  64:14 70:22
company  10:20
  20:21 26:6 38:17
  58:9 60:1,6 62:19
  64:14 67:4 70:21
  70:22
compare  34:4
compelled  45:19
  49:6
compensated  57:7
compensation
  9:23,24,25 10:5
  25:16 28:1 29:6,8
  29:10,15 64:17
  75:18
compete  6:15

complete  19:14
completed  73:15
  76:21
compliance  75:15
complicated  51:2
components  34:22
  34:23,23 55:13
  66:22
compression  51:5
computer  16:4,8,9
  16:10,18,20 33:13
  62:2 63:4,8
conceivably  73:25
concern  46:17
concerns  5:17
  46:19 47:21
conclude  49:3
concluded  74:9
conclusion  56:5
  67:9
conditions  27:23
  58:5
confer  73:20
confidence  31:7
confident  18:6
  31:19 67:2
confidential  17:3
  19:11
confidentiality
  70:12 71:15 73:4
confirm  50:5
confirming  49:19
confrontational
  64:2
considered  34:24
  35:16
consistency  68:8
consistent  68:4,5,9
consistently  31:20
constantly  46:24

contain  40:9
contemplating
  65:8
contemplation
  65:14
contents  18:11
continue  73:3
contra  35:1,2,3
contract  27:20,22
  75:17
contradicted  55:7
conversation  27:1
conversations
  14:17 24:9 41:24
  43:25 50:23 58:1
conversion  32:14
  36:14
conveyed  53:5,19
  56:14
cookie  23:11
copies  76:16
copy  47:23 48:1,6
  48:15,19 62:16
corporate  35:7,10
  35:11,12 38:6,7
  39:24 40:4,24
  44:3 45:2
correct  7:4,5 9:20
  11:18 13:10 15:24
  15:25 16:17 18:9
  18:10,21,22 19:24
  22:8 26:7 30:2,3
  35:24,25 36:4,5
  40:10,17,18,21,22
  40:25 48:16 49:12
  49:13 50:7 54:18
  54:19,21,22 60:20
  61:4,5,18,19 62:9
  66:16,17 69:1,2
  70:2,3 71:1 75:8

corrections  76:9
  77:13
correctness  36:7
cost  45:9
costing  45:6,6 66:4
costs  31:10 37:24
  38:1
counsel  3:1 4:1
  5:14 48:20 50:24
  64:25 65:4 70:13
  70:23
county  22:13 75:3
couple  6:12 7:6
  13:19 17:24
court  1:1 5:25 7:8
  49:4 75:22 76:20
  76:23
covering  69:14
covers  69:21
covid  4:2
cpa  64:1,20
create  24:17 44:14
  45:24 59:5,12,15
created  10:7 33:25
  45:13
creates  47:11
creating  58:25
  59:4,20
credit  11:5 44:2,3
  44:4,5
critical  46:6
criticism  44:21
criticisms  45:18
  46:11
cross  25:5 65:10
  72:7
csb  32:17
culture  25:23 26:6
cumulative  35:18
cup  14:7

Case 1:20-cv-04981-CAP Document 90 Filed 04/27/22 Page 83 of 97
Scott Frommert January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[curiosity - edge] Page 5

**curiosity** 15:15
**current** 11:19 19:8
  56:19
**currently** 9:9
**curtailing** 36:15
**cutoff** 73:23
**cutter** 23:11
**cutting** 10:17
**cv** 1:6
**cvs** 10:25

**d**

**d** 1:8 5:1 46:9 76:2
**daily** 25:13
**data** 31:6,7 32:17
  33:8,19,21 34:4,7
  35:19 38:10 59:23
  60:12,23 67:25
**database** 12:23
**date** 76:3
**daughter** 13:2
**david** 9:8
**day** 14:16 16:6,6
  17:6,12,17 25:9,11
  28:5,6,21 30:19
  45:23 75:23 78:19
**days** 17:16,24 22:6
  33:14 76:3
**dba** 12:22
**deal** 13:5 57:19
  64:4,5,5 72:6
**deals** 25:18
**decent** 45:25
**decided** 71:18
**decision** 71:17
**defendant** 1:9
  3:13
**defer** 60:7,8
**define** 27:21
**degree** 11:24 15:8
  36:17

**degrees** 34:13
  36:13 67:22
**delays** 32:19
**delete** 63:7
**delicate** 44:25
  45:1,16,17 46:13
**delivering** 68:9
**departed** 14:16
  16:1 68:25
**departure** 15:5,23
  16:10 69:4
**deponent** 76:2,7
  76:10,12,20
**deponent's** 76:7
  78:18
**deposition** 1:12
  5:10,12,14,21 6:9
  8:5 14:6 49:3,19
  70:6,14 71:19,24
  71:25 72:3 73:8
  74:9 76:6 77:11
**depositions** 6:17
  7:2,3
**derive** 45:10
**describe** 12:13
  26:3
**described** 20:24
**description** 2:2
  21:10
**desire** 77:10
**detailed** 60:11,23
**details** 39:8 41:18
  61:3
**diagnosed** 9:3
**dialogue** 46:16
**difference** 61:12
**different** 23:23
  32:8,9,20,21 33:24
  37:1 38:15 40:24
  42:14 46:4 54:15
  58:16 66:10

**differential** 12:25
  43:13 61:14
**differentials** 44:13
**differentiation**
  58:22
**dig** 48:22
**digest** 42:11
**dipped** 57:4
**direct** 75:17
**directed** 30:25
**direction** 20:19
  64:16 75:7
**disbelief** 66:2
**discipline** 46:5
**disclose** 50:25
**disclosed** 57:25
**disconnect** 41:24
**discovery** 73:23
**discrepancies** 34:8
**discuss** 10:5
**discussed** 23:7
  25:14,21 29:13
  51:13 52:18
**discussing** 9:24
  73:5
**discussion** 24:23
  26:8,13 40:23
  58:8
**discussions** 14:25
  15:4,13 31:11
  38:23 39:1,25
  40:19 42:1 47:13
  47:17 50:14 51:6
  51:20 52:4 53:4
  65:3,12
**disproportionality**
  45:13
**disqualify** 75:14
**distinction** 31:24
  68:23

**district** 1:1,1
**division** 1:2 54:6
  55:10,17
**document** 29:23
  49:7,11 50:6 63:3
  63:7,13 65:7,9
  71:21
**documents** 14:9
  14:10,11 15:24
  16:4,8,15 28:23
  29:1,14 50:10
  54:4,23,24 55:1,5
  55:6,7,15 56:6
  57:13,23 59:22
  63:12
**dogs** 15:2
**doing** 30:19 32:9
  36:25 41:22 65:25
  67:14 74:2
**dollar** 59:8,9,10
  59:13,13 66:4
  67:4
**dollars** 59:11
**dovetail** 43:24
**drafted** 70:25
**drive** 16:12,14,15
**drives** 16:13
**drug** 70:24
**due** 4:2 49:5 76:3
**duly** 5:2
**duties** 21:7,11
  59:2

**e**

**e** 33:20 77:8,9
**earlier** 26:14
  28:24 46:13 66:14
**early** 22:15 57:1
**easier** 49:9
**east** 44:6
**edge** 69:22

Scott Frommert                                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[education - financial]                                                    Page 6

education 46:3
educational 11:23
effect 62:3
effectively 12:24
  24:5 39:25 47:9
  59:17
efficiency 31:23
eight 25:11
either 6:14 53:3
  64:24 65:3 69:16
electronically
  76:10
email 19:18 29:25
  30:2,9,15 62:20,22
emailed 62:18
emailing 63:1
emails 30:5,7,13
  30:14
emphasis 11:25
employed 11:11
  11:13 16:24 27:19
  28:3 47:5
employee 6:18 7:4
  14:19,22 70:19
  75:11
employees 27:23
employer 19:8,23
employers 10:11
  10:12 18:21
employment 6:14
  10:13 14:11 16:7
  27:20,22 28:25
  29:4
encompassing
  41:3
encouraged 51:8
ended 58:17
energy 31:22
engineer 13:3
engineering 12:5,8
  12:14,24

entails 12:15
enter 33:22
entered 77:11
entire 34:19
entity 7:4
entries 25:4
entry 33:9
equal 34:6 44:5
  59:17 61:25 64:5
equation 59:17
equations 12:25
equity 11:5
errata 76:3,9,10
  76:11,14,17,18,21
  77:1
errors 33:14 35:18
  37:10 57:12,22
esq 3:4,5,14,15,24
  76:1
ethics 75:16
event 72:1
everybody 6:5
  20:14 59:12,14
evidence 75:9
evolved 24:8
ex 14:19
exact 23:15 42:6
  64:8 68:17
exactly 18:5 23:21
  24:7 26:21 51:19
  53:22 61:22 62:4
examination 5:4
examinations 2:7
examined 5:2
example 36:19
  44:2 59:7
examples 43:25
  44:9
excel 12:21 55:11
exception 47:25

excited 27:5
exclusively 12:16
executive 70:22
executives 70:23
exhibit 2:2
exhibits 2:1,3
expectations 31:4
expense 24:11
  44:4 66:23
expenses 34:18,19
  34:20 37:22 38:15
  40:9 41:3 42:17
  44:1,1,7
experience 43:11
experts 64:7
expires 78:24
explanations 66:7
exported 55:11
express 46:11
expressing 68:17
extent 8:10 40:6
  61:2
external 31:19
  35:15,19
externally 35:23
extract 59:16
extracted 59:23
  61:24
extracting 31:6
extraction 32:17
extrapolating
  33:19

f

f 46:10
facility 76:22
facing 35:12,19
  36:3,3
fact 25:16 54:1,4
  55:7,25 57:12
  58:10 68:1

fair 6:22 7:15,23
  8:8,13 26:23 41:3
  49:25 50:3 64:4
fairly 13:9
faith 73:11
familiar 22:19
family 9:14 15:2
far 10:14 13:6
  24:13 30:13 36:6
  38:14
fast 10:15
february 52:13
  75:23
federal 77:8
feel 23:22 31:21
  37:14 41:22 45:20
  64:6 66:9 69:11
  69:21 72:25 73:5
felt 17:23 31:19
  32:22 37:16 42:20
  66:12 67:2,5,20,21
  68:7,18 69:10
figuring 17:21
file 32:18,18 76:15
filed 5:7 14:3
  15:18 76:19
files 33:10
fill 76:10,11
final 16:6 40:5
finance 11:25
  12:16 31:24
financial 6:13 11:7
  11:21 12:5,8,14,17
  12:19 13:9 18:25
  24:14,24 26:9,13
  35:6,7,9,10,12,13
  35:16,22 53:6
  54:4 55:6,10
  57:13,23 59:22
  60:5

**financially** 75:12
**financials** 25:8
  31:18,20 39:3
**find** 8:3 34:12,12
  34:15 36:24 37:10
  50:12 56:17
**finding** 34:13
**fine** 8:18,19,20
  21:21 72:4 73:10
**finish** 22:2 72:5,8
**finley** 3:6
**firm** 3:6
**first** 5:2 15:10
  18:3 19:1 23:7
  26:12 28:5,6
  30:18 31:14 49:10
**fit** 17:22,24 25:24
**five** 11:3,6 14:14
  14:16 18:25 29:9
  32:8,20,21 42:11
  43:3,5 48:10
**flag** 15:16
**flew** 17:16 22:12
  22:15 64:10,11
**flight** 17:15
**flown** 22:6,9
**fly** 63:21
**focal** 20:23
**focus** 20:16 31:22
  40:1 57:9
**focusing** 32:3
**following** 77:6
**follows** 5:3
**foregoing** 75:4
**form** 25:1 26:16
  29:16 32:6 34:10
  36:8 37:12 38:19
  39:4,12 40:11
  46:14 50:17 51:24
  52:20 53:8 55:2
  55:19 56:1,12

57:15 58:11 60:21
  62:10 63:19 65:20
  66:20 67:11 77:10
  77:14
**formal** 17:11
**former** 70:20,21
  70:23
**forth** 28:25 64:19
**forward** 59:14
  76:15
**found** 34:17 35:5
**foundation** 34:11
  36:9 38:20 39:5
  39:13 40:12 50:18
  51:25 52:8,21
  53:9 56:2 57:16
  58:12 63:20 66:21
**four** 11:1,3,6
  17:14 21:22 26:20
  29:9 41:14 62:4
  63:13 66:25
**friction** 47:8
**friday** 22:18
**friends** 14:19 15:8
**friendship** 14:20
  15:2
**frommert** 1:14 5:1
  5:6,21 6:8 9:8,9
  38:23 47:22 48:14
  49:21 50:5,19
  52:1,9 60:22
  70:13 71:8,23
  72:11 74:5 76:2
**front** 38:10 63:24
  64:18
**frustrated** 66:12
**full** 9:7
**fully** 8:25
**fulton** 75:3
**functional** 25:13

**funding** 1:8 5:8
  6:19,21 10:5 11:8
  11:9
**funds** 38:18,25
  50:15 51:10,16,22
  52:5,18,25
**furnish** 77:15
**further** 5:13 75:10
**future** 41:22 43:14

**g**

**ga** 3:9,18 76:24
**gap** 32:2
**gaps** 60:2
**garage** 48:18
**gate** 47:12
**gears** 58:24
**general** 22:13
**generally** 62:20
  70:14
**georgia** 1:1 9:12
  9:15,17,21 10:4,9
  75:2
**getting** 11:2 12:4
  16:2 37:19 66:15
**gibson** 3:5 6:4
  49:14
**gina** 1:4 3:25 5:7
  10:2,3 59:8
**girls** 68:12,14
**gist** 64:18
**give** 7:9 11:6 13:14
  19:12 21:4,8
  27:25 28:10 36:18
  42:11 47:21 49:21
  59:6 61:3 64:23
  66:9 68:2 70:10
  71:16 72:13,17
**given** 16:23 60:12
  60:17 66:6 69:18
  72:3 75:9 77:12

**gives** 38:12 59:17
**giving** 7:12 21:3
  46:8 66:3
**go** 5:13 7:6,21
  10:14,15 16:3
  19:25 25:25 26:18
  28:11,14,19 30:6
  30:11 36:16 41:8
  41:17 42:10,23
  43:10 45:3 52:21
  53:3 54:24 59:4
  59:21 61:6 69:23
  73:8
**goal** 41:20 56:23
**goals** 17:20 42:7
**goes** 39:22 51:10
**going** 7:8,18 8:12
  12:1 15:9,11,15
  17:23 18:2 25:24
  26:2 28:9 31:2,7
  35:15 42:23 43:14
  45:8,10 46:3,6
  49:1,2,23 57:7
  58:2 59:13 60:7,8
  60:19 63:25 65:17
  69:16 70:1,15
  71:16,19 73:2,3
**golden** 3:16
**good** 6:5 13:5
  17:23 18:13 23:17
  30:25 43:2 45:4
  60:1 67:21,22,25
  68:7,13,14,21
  72:22 73:11
**gotten** 29:25
**grade** 46:9
**graduate** 12:10
**grass** 10:17
**gray** 60:14,24
  69:14

Scott Frommert
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[great - jason]                                                        Page 8

**great** 51:7 57:19
**greetings** 76:5
**gregory** 3:16
**ground** 7:7 8:15
    8:20
**group** 17:18 54:7
**guess** 5:17 12:2
    15:7 26:18 30:21
    36:24 64:9 65:21
    72:21
**guidance** 70:11
    72:14
**guy** 46:23
**guys** 21:25 69:20

**h**

**half** 11:3 17:17
    23:15 34:2 64:9
**happen** 36:19
**happened** 17:12
    29:11 35:18 41:25
    53:23 58:19 62:13
**happy** 73:10
**hard** 16:12,15
    37:19 63:12
**hargrove** 2:9 3:4
    5:5,6,23 6:7 22:3
    22:4 29:21 37:15
    38:22 39:16 40:15
    47:23 48:6,9,12
    49:13,25 50:3,4,20
    52:3,11 55:4,20
    61:1 62:12 70:17
    70:25 71:3,10,23
    72:5,15 73:7 74:3
**hate** 63:11
**head** 7:12
**heads** 60:12
**hear** 68:11
**heard** 68:22
**hearing** 68:14

**heavy** 57:9
**held** 11:16
**help** 13:5 64:6
**henry** 3:14 5:15
    48:6 76:1
**henry.perlowski**
    3:20
**hey** 26:2
**hi** 17:5 19:5
**high** 10:17
**hire** 17:1 42:24
    51:7
**hired** 31:13
**historical** 59:23
**history** 10:13
    16:23 57:8,9
**hit** 34:20 36:22
**holistic** 38:12
**home** 11:4 25:17
**homework** 13:5
**honor** 72:25 73:2
**honors** 12:1
**hoping** 63:22
**hot** 27:13
**hour** 17:13 19:20
    20:1,8 21:6,9 22:5
    22:17,22 64:9
**hours** 23:15
**house** 17:25 27:14
    27:15
**hover** 73:1
**hr** 29:25
**huh** 7:12

**i**

**idea** 55:23 71:2
**illegal** 8:24
**imbalanced** 37:25
**immediately** 10:19
    64:2
**impact** 43:14
    73:25

**impacts** 75:21
**impartial** 75:22
**impartiality** 75:15
**important** 7:9
    58:22 68:1
**importantly** 67:25
**improper** 32:16
    32:19
**improve** 32:22
    33:17 46:22,24
**improvement** 31:4
    32:12 37:4
**inaccuracies** 53:16
**inaccurate** 32:15
**include** 56:25
**included** 27:25
    41:6
**inclusions** 38:8
**income** 59:16 68:5
    68:7
**incorrect** 37:14,16
**incorrectness** 53:2
**increase** 29:6,8,10
    29:11,15
**independent** 15:20
**index** 2:1,7
**indicated** 54:25
    56:8
**individual** 24:20
**indulging** 48:13
**industry** 18:9 51:4
    67:13
**influence** 8:23
**information** 21:3
    21:4,8 26:5,6 60:5
    60:18 66:9,16,18
    69:10
**informed** 45:15
**initial** 19:1 20:1
    21:2

**inside** 59:8 61:24
**interest** 17:6,10
    20:17,20 23:17
    75:13
**interested** 19:6
    75:12
**interesting** 25:22
**interference** 70:18
**internal** 31:22
    32:4 35:14,17,18
    36:1,6 37:5,9,11
    37:18 38:16 40:8
    40:16 41:6,8 42:3
    42:16 44:16,23
    45:18 53:6 54:11
    55:6 56:7 57:13
    57:23 64:24 65:4
**internally** 73:20
**internet** 15:20
**interview** 21:13
    22:7 23:10,11,14
**intranet** 37:8 41:9
**investment** 10:20
    12:3
**involved** 14:20,23
    24:24 58:25 61:16
**inward** 36:3
**iphone** 30:11
**irrespective** 49:21
**ish** 10:23 11:1
    17:14 31:9
**island** 25:25
**issue** 9:4 49:22,24
    50:24 66:15 72:4
**issued** 16:4 34:9
**issues** 34:8 35:5
    36:6 70:9

**j**

**january** 1:15
**jason** 17:7 18:7
    20:6 23:3 39:14

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[jason - making]**                                            Page 9

39:17 44:19 45:23
47:1 54:2,3 58:1
58:15,16 60:11
**jim**   14:24,25 25:5
25:6 31:17
**job**   11:16 16:25
19:6 21:10,14,15
23:19 26:5 27:2,7
27:9,10,11 45:4,25
**john**   22:12
**join**   18:15
**joined**   31:15 56:24
**joining**   52:16
**jon**   15:7,13 64:10
65:2,16
**journal**   25:4
**jp**   46:4

**k**

**keblar**   41:9 55:9
56:20
**keeper**   50:11
**keeping**   66:22
**kelly**   10:3,3 61:13
**keying**   33:10
**kilter**   16:2
**kind**   6:11 16:24
17:20 18:2 19:21
26:1
**knew**   30:23
**know**   5:16 6:12,22
7:20 8:4,4,7 10:14
13:16 14:14 17:5
17:23 19:11,12,23
21:23,23 22:20,24
23:5,14 26:1,3
27:21,24 28:2,21
30:21,23 32:10
34:24 36:11 37:20
39:8 42:9 43:3
44:4 45:2,9,19
46:22 47:18 48:23

51:15 53:14,18,22
56:4,11 58:2,6
62:13 63:10,21
66:2,11 67:15,24
69:20 72:23 74:5
**knowing**   70:15
74:1
**knowledge**   6:14
30:10 40:7 44:18
52:12
**known**   17:4 41:9
**kristin**   39:14,19
44:19
**kristin's**   44:23

**l**

**l**   59:5 61:6,7,23,24
66:19
**lack**   8:11
**ladder**   43:3
**lady**   40:20
**lags**   32:19
**laguna**   9:11,11
**laptop**   63:3,8
**large**   13:9,18
18:15
**late**   28:10
**law**   12:20 72:24
**lawyer**   5:19,24
69:20
**layer**   38:1
**layers**   41:12
**layperson**   12:13
**leadership**   52:13
52:16 53:5
**leakage**   23:23
**learn**   12:18,19
39:10
**learned**   16:25
**leave**   17:22 69:19
**left**   10:21,25 11:5
15:10,10 16:9

**legal**   8:24 50:24
64:25
**lender**   10:22 11:15
18:15
**length**   64:8
**level**   24:22 38:2,2
38:2,6,6,7,7 40:5
43:9 44:3 46:4
70:21
**levels**   39:23 40:4
**leverage**   24:17
**leveraging**   36:15
**licenses**   12:3
**limits**   18:18
**line**   18:7 41:11
55:12 59:18 77:17
77:20,23 78:1,4,7
78:10,13
**linear**   12:25
**lines**   6:13 11:5
**link**   13:2
**linkedin**   28:14,17
28:18
**listed**   21:16
**listened**   46:25
**literally**   28:13
33:15 34:4 48:17
48:22
**litigation**   6:14
65:8,14 73:17
**little**   16:2 18:2
28:4 37:25 43:25
44:13 47:11 58:21
58:24 60:13
**live**   9:10
**lived**   9:12 22:11
**lively**   63:18
**llp**   3:16
**loan**   37:23,23
**loans**   33:9 36:20
66:24

**logically**   74:2
**long**   7:18 14:13
17:8 18:23 20:1,8
21:6,9 22:5 27:10
64:9 66:1 68:9
**longer**   13:18
**look**   12:9 14:9
20:18 23:19 28:11
28:14 34:4 35:3
36:18 38:1,3
41:10,11,23 43:2,5
43:5,15 45:5 50:6
50:9 54:10,11
58:20,23 59:21
60:9 64:13
**looked**   42:8 43:25
46:2 51:13
**looking**   18:14
19:24 20:9 21:5
33:6 34:7 38:5
43:16 56:24 57:5
58:14,15
**looks**   42:13 43:12
**lose**   64:14
**loss**   58:20,25
59:21,25 65:19
**lost**   54:7 57:4
**lot**   10:24 20:19,21
32:24 51:5 64:19
68:13
**love**   67:23
**ls**   10:6,7
**lucy**   1:17 75:25

**m**

**m**   3:14 76:1
**mail**   76:12
**maintaining**   75:14
**majority**   20:10
31:1
**making**   31:3 33:8
53:13,16,20 58:3,4

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 88 of 97
Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[making - necessary]                                         Page 10

58:9,10 69:22
77:12,13
**management**
24:16 25:12
**managers** 10:4
59:1 61:11
**mandatory** 45:21
**mansell** 76:23
**manually** 76:11
**marching** 64:15
**margin** 40:4
**margins** 39:24
40:24 51:5
**mark** 28:19
**marked** 2:3
**market** 27:13
53:12 57:4 58:5,5
58:18,19 64:13
**marybeth** 3:5
**master's** 11:2 12:4
12:7
**masters** 12:14
**material** 70:19
**materials** 61:20
**math** 20:16,24
59:16 72:22,22
**mathematically**
44:9,12 64:21
67:6
**mathematics**
12:17,23 32:15
**matter** 75:14
**matters** 70:24
**mean** 5:15 20:10
28:13 46:9 60:2
62:4,22,23,25
65:15,21
**meaning** 25:24
**medication** 8:24
**meet** 63:22

**meeting** 10:1,2,8
14:12 22:15,17,22
23:1,3,7 25:15,19
25:21,22 26:12,14
26:24 33:4 42:10
52:13,16,19,25
53:1,5,11,18 58:3
58:4,8 61:16,21,21
63:15 64:18,25
65:5,13,15
**meetings** 10:1
32:21
**member** 13:20,23
**members** 9:14
**memory** 9:4 18:14
28:10
**mention** 50:21
**mentioned** 39:15
54:2
**methodologies**
45:6
**methodology**
37:14,17 61:10
**metrics** 23:24
32:14
**mgibson** 3:11
**mid** 57:1
**middle** 28:10,22
**military** 14:1
**million** 67:4,5
**mind** 65:10
**minute** 19:3 42:9
42:11 48:10 72:17
**minutes** 14:14,16
17:9
**misallocated**
38:18
**misallocation**
38:24 39:2 50:15
51:10,16,22 52:5
52:18,25 53:15

**mischaracterizes**
36:9 40:12 60:22
**missed** 35:2
**mistakes** 57:22
**model** 47:9 55:13
57:20 58:25 59:4
59:8,15,20,21,25
61:6,7,15 65:19
66:19 68:8,8
**modeling** 12:21
23:20 24:20 31:23
**models** 20:16,16
20:25 41:17
**moment** 66:12
**money** 24:1 53:13
53:16,20 54:1,4,7
54:10 55:25 57:5
58:3,4,9,10 61:23
61:24 64:14 68:12
68:14,15,19,20,21
68:23
**monkey** 73:14
**month** 25:8 28:8
**months** 27:15 29:9
39:9 56:25
**morgan** 46:4
**morning** 22:15
64:12
**mortgage** 10:22
11:4,4,14,14 17:4
18:9,15 45:25
51:3 53:12
**motions** 73:24
**move** 27:11
**moved** 18:1
**movement** 58:18
58:19
**moving** 22:21
**multiple** 12:22
20:2 24:8 33:14
40:4

**muth** 14:24,25
15:5

**n**

**naf** 6:21 9:19,21
14:17,18 15:5,24
16:4,10,14,18,24
20:9,25 24:25
27:1,8,19 28:5
30:1,8,9,14,15,18
31:12 35:6 38:24
39:2,3 42:2 43:19
44:22 47:5 49:23
50:14 51:21 52:4
52:14 53:4,19,25
54:4 55:24,25
56:8 57:21 59:1
59:25 60:5,10
62:24 64:24 65:4
65:13 68:11,16,25
70:9,12,25 71:10
73:12,19
**naf's** 22:7 26:9,13
50:24 59:22
**name** 9:7 19:7,10
**narrow** 69:12
**national** 11:14
18:15
**nationally** 11:1
**nature** 6:16 12:4
12:24 24:2 35:4
**nda** 47:19,22,24
47:25 48:1,5,7,15
49:5,15 60:7,8,20
61:3 69:7,14,21
70:2,10,25 71:5,11
71:16,20,24 72:6
72:13 73:2,12
**ne** 3:7
**necessarily** 23:25
**necessary** 77:15

Scott Frommert                                                     January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[need - perlowski]**                                              Page 11

**need** 7:11,17,19
  24:7 45:17 54:12
**needed** 31:21
  32:15 59:24 66:19
  69:10
**nerdy** 13:1 72:23
**never** 34:2 56:6
  59:10
**new** 1:8 5:8 6:18
  6:21 10:4 11:7,9
  42:24,24 58:5,5
  64:17 65:19
**night** 22:16,16
  32:1 64:11
**niguel** 9:11
**nine** 34:22 66:25
  67:1
**nod** 7:12
**non** 6:15,15
**normal** 20:13
  67:13
**north** 10:23
**northern** 1:1
**notarized** 76:12
**notary** 78:23
**noted** 77:5,6
**notice** 34:8 48:21
**notified** 29:11
**noting** 76:8
**number** 24:17,18
  41:15 59:19
**numbers** 56:19
  65:18 67:13
**nw** 3:17

**o**

**o'bradovich** 17:7
  18:4 19:2 20:7
  23:4 25:20 26:8
  39:14,17 40:20
  44:23 46:12,19
  47:4,15 55:24

66:15 67:10 69:9
**object** 5:16 25:1
  26:16 29:16 32:6
  34:10 36:8 37:12
  38:19 39:4,12
  40:11 46:14 50:17
  51:24 52:20 53:8
  55:2,19 56:1
  57:15 58:11 60:21
  62:10 63:19 65:20
  66:20 67:11
**objection** 52:7
**obligation** 71:15
  75:15
**obviously** 73:24
**occurred** 50:16
**ocga** 77:9
**offer** 17:25 27:2,4
**office** 22:10 23:1,8
  25:15 26:15 29:12
  33:15 42:24
**officer** 11:21 25:5
  31:17 37:23 75:22
**offices** 22:7 76:3
  76:13
**official** 19:17,20
  21:13
**ogg.com** 3:20,21
**ogletree** 3:15
**okay** 6:4 14:22
  19:16 43:6 47:7
  48:25 49:25 73:16
**ola** 54:17,20 55:8
  56:9,18
**omissions** 57:22
**once** 27:19 37:6
  42:10 73:11 76:11
**oncu** 11:6 13:9,14
  13:16 18:25
**ones** 56:9

**ongoing** 46:16
**online** 56:14
**opinion** 43:4
**opportunity** 32:11
**orange** 22:12
**order** 48:2 73:17
**ordering** 76:17
**organization** 25:6
**organizational**
  13:22
**organizations**
  13:21,24
**oriented** 25:13
**original** 76:16,19
**originally** 12:10
**originators** 13:19
**outcome** 75:12
**outset** 50:21
**outside** 54:6 64:24
  65:4
**outward** 35:12
  36:3
**owned** 25:16
**owner** 43:8 47:3
**owner's** 42:23

**p**

**p** 10:6,7 59:5 61:6
  61:7,23,24 66:19
**p.m.** 1:16 48:11,11
  72:20,20 74:9
**packed** 48:22
**page** 2:2,7 59:14
  61:22 62:7 64:12
  77:17,20,23 78:1,4
  78:7,10,13
**pages** 28:1,25
  77:14
**paid** 36:20 59:8,11
**pandemic** 4:3
**papers** 33:12

**part** 51:7 53:15
  54:17 59:1
**particular** 36:12
**parties** 35:14
  75:22 76:17
**party** 75:11,17
**path** 30:24
**patty** 17:18 20:6
  23:2,8
**paved** 30:24
**payables** 33:9
**pc** 3:6
**pdf** 76:9
**peaked** 20:17
**pending** 73:24
**penny** 67:5
**people** 17:14 20:3
  22:25 32:8 36:24
  39:15 44:19,20
  46:1,5 57:7 63:22
  64:6 68:21 72:22
**percent** 23:15 31:2
  31:5,9 33:5,18
  44:6,6 50:9 59:19
  59:19 67:20 68:3
**percentage** 31:9
  59:18
**perception** 66:13
**perfect** 67:23
**perfection** 67:22
**performance**
  24:14,18
**period** 10:21 71:9
**perlowski** 3:14
  5:20 6:2,6 14:13
  14:15 21:25 25:1
  26:16 29:16 32:6
  34:10 36:8 37:12
  38:19 39:4,12
  40:11 46:14 47:20
  48:8 49:10,18

Scott Frommert
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

50:1,17 51:24
52:7,20 53:8 55:2
55:19 56:1 57:15
58:11 60:21 62:10
63:19 65:20 66:20
67:11 70:5,7,20
71:2,7,13 72:2,10
72:18 73:10 74:5
74:7 76:1
**person** 14:17 22:7
36:12 63:15 65:15
**personal** 15:12
47:1 50:11
**personally** 6:24
69:15 70:4
**perspective** 35:19
68:7
**pertained** 15:14
**phoenix** 22:11
27:11
**phone** 14:12,13,18
17:7,9
**physically** 33:10
33:15
**pick** 45:11
**picked** 57:5
**picking** 45:9
**picture** 34:3 61:22
**pie** 31:1 34:1,2
54:11,12,14,15
**piece** 42:12 54:12
54:14,16
**pieces** 54:10
**piedmont** 3:7
**place** 23:25 26:25
29:8 47:19 49:20
52:13 73:4
**places** 16:16
**plaintiff** 1:5 3:3
48:20

**plan** 9:24 64:17
**plane** 17:17
**plans** 9:23,25
15:11
**plant** 15:16
**playing** 69:21
**pleadings** 15:17
**please** 8:6 22:2
55:3 76:12,21
77:14,15
**plugged** 62:2
**plus** 28:1 46:9
**point** 20:23 21:11
27:7 29:3,5 57:23
62:3,5,6,9,14
63:16 68:25 73:7
**points** 45:10
**policy** 27:24,24
**politics** 45:2
**poor** 46:7
**position** 11:19
21:7 49:24 60:10
71:3
**possible** 66:23
67:17
**possibly** 23:8
**posted** 17:3
**posting** 17:3 18:8
18:12 19:21,21
21:13
**power** 62:2,5,6,9
62:13 63:16
**practice** 37:1,2
**practices** 59:6
**precise** 34:14
44:14
**precision** 46:5
**preparation** 44:16
61:15
**prepare** 14:5
59:25 61:20

**prepared** 43:19
45:24 61:7,9 65:7
**presence** 13:7,9,17
13:19
**present** 3:23 15:6
22:23
**presentation**
64:12
**presented** 61:17
62:1 65:19
**presently** 11:9,11
**president** 42:5
**pretty** 14:14 17:4
18:6,16,19 42:12
59:5 67:21,22
**previously** 57:25
**price** 12:18
**pride** 46:23
**print** 76:11
**prior** 10:11,12
14:15 18:20 30:22
39:20 49:19 52:14
52:16 57:13 59:22
65:4
**probably** 6:12
13:1,13 17:18
21:19 28:14,16
31:5,14 43:24
45:25 46:1 48:17
48:21,22 53:23
60:1 62:21 64:22
66:10
**problem** 7:20 22:3
39:7,11 72:10
**problems** 32:4
35:23 36:1 39:21
42:16
**procedure** 77:9
**proceed** 73:21
**proceeding** 69:24
75:9,21

**process** 17:2 19:4
25:10,11,11,12
31:3 33:16,17
48:24
**processes** 33:6,7
**processor** 36:20
**product** 24:22
**production** 76:22
**professional** 10:18
13:23 75:16
**profit** 38:1,2,2
55:8,14,16 58:25
59:20,21,25 65:19
**profitability** 24:20
24:22 39:23 57:20
59:15
**profitable** 54:20
56:8,18,21
**profits** 59:9
**progress** 42:7
**project** 25:12
**promptly** 73:13
**proper** 34:3
**properly** 34:19
**protective** 48:2
73:17
**provide** 44:21
48:19 49:7,8 50:6
70:13,23
**provided** 56:20
60:4 67:9 69:9
**provider** 11:1
**public** 78:23
**published** 37:7
41:10 67:21
**publishes** 41:11
**pull** 33:23 34:1
**pulling** 28:17
**purported** 38:24
39:2,21

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 91 of 97
Scott Frommert                                        January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[purportedly - responding]                              Page 13

**purportedly** 50:15
**purpose** 9:22
  70:14
**purposes** 5:21
**pursuant** 5:9 77:8
**push** 67:23
**pushed** 34:18
**put** 19:7 26:1 34:1
  42:19 50:1 59:10
  62:2,9 69:15
  73:22
**putting** 63:24
  64:17

**q**

**question** 7:22 8:6
  8:11 30:6 32:23
  36:12 40:14 50:23
  51:19,20 55:3
  58:6 60:18,19
  66:10 70:1 72:12
  72:16
**questions** 7:10,25
  8:1,3 23:11,18
  31:15 49:1,4
  64:19 66:5 73:1
  74:4,6 75:6
**quick** 42:8 48:21
  72:16
**quit** 65:17

**r**

**range** 67:7
**rank** 23:23 24:21
  46:8
**rapid** 17:2,13 18:1
  58:18,19
**rate** 57:6
**rateau** 1:17 75:25
**raw** 34:4
**reach** 67:8

**read** 5:11,25 15:17
  76:6 77:4
**real** 26:5
**really** 14:7 17:2,12
  17:13 18:1,1
  25:22,23 26:3
  35:11 41:20 43:1
  45:4,20 63:12
  72:23
**reason** 7:19 72:8
  77:19,22,25 78:3,6
  78:9,12,15
**reasoning** 45:12
**reasons** 6:15 77:12
**rebuild** 47:10
**recall** 17:8 18:5
  20:3 21:15,24
  22:25 23:4 26:21
  29:18,22 34:17
  40:3 41:14,19
  42:6 51:23 52:2
  52:10,24 55:22
  56:22 62:4 63:1,5
  63:9,14 64:3,8,11
  65:1,6 68:13,14
**receive** 30:14
**received** 30:5
**receiving** 30:13
**receptive** 46:18
**recess** 48:11 72:20
**recognize** 45:15
  73:23
**recollection** 20:5
  22:14 26:20 41:13
  50:8 62:7,11
**record** 7:15 8:13
  9:7 26:18 50:2,11
  60:16 69:24,25
  73:22 75:8
**records** 55:10

**recruited** 16:25
**reduce** 33:14
**reduced** 75:7
**reducing** 31:10
**reduction** 24:11
**reed** 15:7,13 64:10
**referred** 28:24
  52:5
**reflected** 8:12
**refreshed** 32:18
**regard** 39:2 73:21
**regarding** 49:24
  50:24 70:11 71:11
**region** 56:16,17,22
  59:6 61:12,13
**regional** 10:4,6,22
  24:19 37:22 38:1
  38:6,7 59:1 61:11
**regionals** 64:15
**regions** 61:11,13
**regularly** 16:11
**relate** 35:6
**related** 6:13 10:10
  29:14 30:5,7,15
  52:5
**relationship** 63:23
  75:13
**relative** 75:10
**remaining** 31:8
**remember** 18:11
  19:19 22:18 23:14
  26:20 28:5,6,8
  29:7
**remodeling** 32:15
**remote** 1:12 4:1
**remotely** 3:23
**remove** 16:19 59:9
**repeat** 40:14 55:3
**replied** 17:5
**report** 32:10 34:1
  34:3 35:17 40:8

  54:11 56:13
**reporter** 5:25 7:8
**reporting** 23:23
  23:23 24:9,13,14
  24:16,18,21 32:14
  33:24 35:14 36:14
  36:15
**reports** 31:8,23
  32:5,9,9,21 33:24
  34:9 35:18 36:2,6
  37:5,10,11,18
  38:17 39:7,11,21
  40:16,21 41:2,6
  42:3,16 43:19
  44:17,24 45:18
  53:6 56:7
**represent** 5:7 70:8
  71:4,25 72:3
**representation**
  5:18 71:8
**represented** 5:14
  69:15 70:5
**representing** 5:20
  70:5
**request** 49:11
  71:21
**requested** 71:21
  76:6
**requirement**
  45:21
**rescind** 69:17
**research** 15:21
**reserve** 6:2 49:23
**reserved** 74:8
**reside** 9:14
**respect** 37:17
  38:16 42:17 50:16
  50:22 70:8 73:22
**respond** 19:5
**responding** 18:8

[response - sorry]                                                    Page 14

**response** 7:11
  60:18
**responses** 7:10
**responsibilities**
  21:14,16
**responsibility**
  76:7
**responsible** 44:16
**restriction** 70:12
**restructuring** 24:1
**result** 47:3
**results** 32:19 38:4
  41:10 54:15 68:9
**resumé** 19:13,17
  19:23 21:12
**retail** 10:23 11:4,4
**retain** 14:11
**returned** 16:6
  76:14,18
**reveal** 47:20
**revenue** 34:21,25
  35:1,1,2,3 54:9
  60:11,23 66:23,23
**review** 10:5 25:8
  37:5 54:3,23,25
  55:5,6 56:7 76:8
**reviewed** 37:9
  40:17 55:15
**reviewing** 41:20
**reviews** 56:17
**rick** 17:18 20:6
  23:1,2 29:12 42:4
  46:16 54:2,3 58:1
  58:14,15
**rick's** 23:8
**right** 5:11,12 6:1,3
  8:10 14:9 19:9
  28:17 29:7 33:9
  34:13 35:14 47:3
  51:6 54:16 60:10
  64:7 66:8 74:3

**rip** 42:25
**risk** 69:16
**road** 3:7
**role** 6:13 11:20
  17:21 42:5
**roles** 17:22
**rolling** 9:23
**room** 23:4 37:4
  64:1
**roswell** 76:24
**roughly** 25:9
**routinely** 58:23
  70:22
**rpr** 1:17 75:25
**rude** 7:13
**rule** 77:8
**rules** 7:7 8:15,20
  77:8
**run** 44:2 57:6
**rungs** 43:3
**running** 11:4

**s**

**salary** 59:10
**satisfactory** 66:7
**satisfied** 23:16
  66:10,11
**savannah** 13:10
**save** 33:14 63:3
**saved** 16:9,12,15
**saves** 33:11
**saving** 24:1
**saw** 32:22 56:6,9
**saying** 25:23 50:21
**says** 7:7 13:3
  72:11
**scheduled** 19:19
  21:12 22:14
**school** 10:17,19
  12:6
**scott** 1:14 5:1 9:8
  19:6 47:2 76:2

**scottsdale** 10:23
**screen** 62:3
**seal** 76:15
**second** 25:19
  39:17
**section** 28:1
**see** 34:5 41:23
  54:24 55:13,14
  67:14,15
**seen** 73:18
**segment** 54:7
**segments** 54:8
**self** 30:25
**sell** 25:17 27:14
**selling** 66:24
**send** 19:13,17,22
  30:7 76:16,21
**sense** 34:14 43:17
  57:2 68:6
**sent** 19:18 21:10
  21:11,12 30:1,5
**separate** 23:5
**series** 12:2,3
**serve** 49:15,16
  75:21
**served** 14:1 49:11
  49:12
**server** 56:15
**set** 17:15 20:11
  28:24
**sets** 23:24
**share** 16:13,14
**shifted** 51:4 53:12
  64:13
**short** 64:10
**show** 61:25 62:6
**showed** 55:12
  56:10 67:6
**shown** 55:16 63:17
**sign** 5:11 6:1 25:9
  27:23 29:19 76:6

**signatory** 70:10
**signature** 74:8
  75:24 76:2,20
  78:18
**signed** 28:23 29:23
  76:12,14,18
**significantly** 68:2
  68:3,4,24
**silos** 24:8
**simple** 35:1 36:19
  59:5 66:23
**simplest** 59:7
**simply** 41:15
  51:17
**single** 62:7
**sir** 8:22 9:2,5,13
  9:16 14:2 15:19
**sit** 45:16
**site** 41:9 52:16
**sits** 41:12 47:10
**sitting** 33:15
**situation** 23:12,12
**six** 43:4,5,5 56:25
**skill** 17:15 20:11
  23:24
**slaughtered** 19:7
**slice** 36:25
**slide** 62:6
**slight** 61:12
**slightly** 58:16
**small** 10:22
**smoke** 27:24
**sold** 17:25 27:15
**solely** 75:18
**solicitations** 6:15
**solutions** 1:7
**somebody** 69:23
**somebody's** 69:16
**somewhat** 64:2
**sorry** 21:20 55:3

Case 1:20-cv-04981-CAP   Document 90   Filed 04/27/22   Page 93 of 97
Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[sort - thanks]                                                    Page 15

sort 9:3 12:14 27:20 57:22 69:18
sounds 13:4 23:17
source 47:7
southeast 56:16,17
speaking 14:15
spearman 1:4 3:25 5:7 10:3 15:1,14 15:18 54:17 61:9 61:17 62:1,23,25 63:16 65:24 66:19 68:18
special 23:25
specific 10:2 32:10 45:7 53:23 55:9 56:9 61:8 70:9
specifically 20:22 22:18 29:22 45:5 51:22 52:24 53:1 58:7 63:6
speculating 56:4 58:15
speculation 56:2 57:16
spend 57:18
spent 11:3,6 17:17 26:24 31:2,5,9 33:4,6,18
split 59:12,18 61:13,25
spoken 71:13
spot 71:17 73:19
spring 71:18
sql 12:22 32:16,18
stack 33:12
staff 23:23 24:20
standard 23:10 27:22
start 10:16 16:24 23:18 27:11 30:11 30:19 38:25

started 20:10 24:6 58:20 64:14
starting 22:1
starts 33:20
state 9:7 11:25 12:5 75:2
stated 20:22 71:7 75:5
statement 35:16 68:24 77:12
statements 24:24 26:9,13 35:6,7,9 35:10,12,13,22 46:13 68:21
states 1:1
stating 51:9
stay 73:3
stayed 22:13,16,18 68:10
stays 68:4,5
step 28:4 59:14,15
steps 60:2
stipulated 4:1
stipulations 6:5
stories 58:16
stranger 19:14
strategic 18:14
streams 54:9
street 3:17
strengths 20:11
strive 67:24
strong 31:25 32:1
structural 25:17
structure 12:19 27:6
stuff 13:1 15:12 47:2 50:12
subcontractor 75:19
subject 50:25 73:9 73:23

subpoena 5:9 45:22 49:7,11,12 49:15,17 71:20
subpoenaed 47:25
subprime 10:24 13:12
subscribed 78:19
substance 77:10
sued 6:24,25
suite 3:8,17 76:23
sun 11:14
super 10:15
support 65:19
sure 7:9,14 14:23 18:7 19:15,22 22:3 28:4 31:3 35:21 40:16 63:14 71:6
suspend 72:2,6 73:8
suspending 74:1
swearing 4:2
sworn 5:2 78:19
system 33:23

**t**

t 3:15
table 7:22
take 7:10,22 11:6 13:15 27:25 28:10 34:3 36:21 44:2 48:9 64:24 72:18
taken 6:9 7:8 75:5
takes 46:23
talk 17:6 20:14 22:1 27:6 40:3 43:7 47:18 66:25 67:3 73:12
talked 5:15 15:8 24:3 38:16 40:2 42:20 58:1,4 61:23

talking 6:22 39:23 48:4 52:24 53:14 54:13,13,14,16 57:6 60:14,25 72:21
tax 50:10
team 27:5 31:2 33:5 44:19,19,22
technical 32:24 36:16 37:19,20 38:9 43:17
technicality 43:9
techniques 24:1 45:7
tell 7:11 20:3 22:23,24 23:13 25:20 34:16 37:16 39:20 42:15,22 43:18 45:1,17 47:7,17 57:21 63:14 69:3
telling 30:24
ten 34:22 66:25 67:1
tension 47:11,14 60:13
term 38:9
terminated 69:19
termination 69:18
terms 27:23 28:25 29:4 32:24 75:19
terrible 43:1
terribly 7:18
testified 5:3 66:14
testify 9:1 71:12
testimony 36:9 40:12 47:20 49:19 77:4,11
thank 50:13
thanks 48:13

Scott Frommert
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[thargrove - visually]**                                      Page 16

thargrove 3:10
thefinleyfirm.com
 3:10,11
thing 25:25
things 6:15 12:3
 12:23 16:12 20:13
 23:21,22 24:2,5
 25:17 27:25 32:18
 34:15,16 35:3
 36:16 42:10 64:21
 67:17
think 7:17 16:11
 17:6,11,16,25
 20:12,22 25:24
 27:4 28:2 29:5,24
 29:25 30:23,25
 31:14,16,21,25
 32:7,11,20 33:22
 34:13 36:2 37:1,3
 38:4,9,9 39:8,14
 39:22,25 41:14
 43:15,24 45:3,13
 45:23,24 46:1,5,7
 46:21,23,25,25
 47:10 51:5,7,9,10
 53:14,23 54:12
 58:14,15,17,20
 64:3,5,11 65:1,22
 65:25 66:5 67:16
 67:24,25 68:20,22
 68:23 73:7
thinking 53:25
 65:16
third 24:21 35:13
thought 53:13,16
 53:20 58:3,9
thousand 30:12
 63:11
three 15:8 17:9,16
 19:3 21:19 22:6
 22:17,22 24:15

27:12,15 34:21
 38:2,3,7,7
thrive 64:14
throw 73:14
time 9:21 10:21
 11:2,5 15:5,11
 16:1 17:8 23:15
 28:3 31:1,5,9 33:4
 33:5,12,18 38:21
 39:8,9 47:5 51:6,7
 51:12 52:23 57:19
 65:10 66:1 76:18
timelines 25:16
 27:6
times 9:18,20 10:9
 15:9
title 42:6
today 5:9,14,19,22
 7:7,17,19,25 8:21
 9:1 45:16,21 49:2
 71:24 74:4
told 20:9 30:19
 32:5 40:19 43:22
 46:12 53:25 58:16
 71:15,23
tool 56:14
top 37:21,24
topic 20:20 47:19
 53:1 73:3
topics 70:15 73:6
town 22:19
track 28:15 63:12
tracks 43:7
transcript 75:5,8
 76:8,16,19 77:4
transferred 11:2
transparency
 65:18
travis 3:4 5:6 6:3
 21:25 70:7,21

trick 8:1
trickled 34:22
trip 8:2
true 50:22 64:7
 75:8
trust 66:3
truthfully 8:25
try 55:9 67:16
trying 7:13 8:1,1,2
 33:1 64:3 73:13
turned 16:19,20
tustin 22:9 26:24
 27:11
two 10:23 16:16
 17:9,25 19:3
 22:17,22 23:15
 24:18 27:12 34:5
 34:5 35:11 36:21
 38:2 39:15 53:12
 59:11,15 66:22
twofold 51:3
type 13:10 15:12
 19:20 62:3
types 23:24 32:9
 38:15 40:24 43:7
 64:21
typewriting 75:7

**u**

uh 7:12
ultimately 40:17
 61:16
uncomfortable
 60:9 69:22
undergraduate
 11:24
undersigned 77:3
understand 8:6,8
 8:11,15 35:21
 46:21 64:4 72:15
understanding
 8:12 38:14 44:15

51:12 53:11,11,17
 57:18
understood 7:16
 7:24 8:9,14 40:1
 43:14 51:14
unique 28:2
unit 45:9
united 1:1
units 67:1
university 12:1
unrelated 41:21
upload 33:11
uploaded 56:15
usage 44:4,6,9
use 16:11 24:17
 42:8 45:8 77:14
useful 20:25
usual 6:4
utilization 44:13

**v**

value 20:16,21,24
 43:4
vanguard 10:20
varying 36:13
vast 20:10
vendors 31:10
verbal 7:9,11
veritext 76:13,22
versus 16:13 25:13
 32:18 33:12 38:3
 38:6 41:18 47:1
 51:11,17 58:21
vicinity 22:13
videoconference
 1:12 3:1
view 38:4,10,13
 51:17
visible 40:3 41:18
visit 9:22 49:3
visually 38:4

Scott Frommert                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[volume - zoom]**                                              Page 17

**volume**  44:5
**voluntarily**  49:8
**vs**  1:6

**w**

**w.p.**  12:5
**waive**  5:12 6:1
  69:17 70:11 71:10
  71:14
**walk**  10:12 11:22
  16:3,22 17:1
**walking**  17:19,20
**want**  5:25 7:14
  10:14 16:24 17:10
  19:7,13 24:3
  26:18 32:10 37:20
  43:9,11 44:7 45:3
  45:8 47:1 49:5
  50:1 58:24 60:10
  69:15 71:5 72:16
  72:25 73:18
**wanted**  19:22
  22:20 31:22 46:21
  46:22
**wants**  13:3 46:24
  47:2 69:23
**warehouse**  24:1
  24:10 31:10
**watching**  33:16
**waterfall**  37:21
**way**  7:10 8:8
  15:14 26:3,9,14
  28:15,15 32:7
  36:23 37:22,25
  41:22 42:17,20
  43:12,16,19 44:25
  45:1,16 50:19
  58:13 59:13 72:23
**wayne**  22:12
**ways**  33:16
**we've**  15:8

**weaknesses**  20:12
**wealth**  24:17
**website**  37:8
**week**  27:3 42:10
**weekend**  22:19
  26:25
**weeks**  17:25 27:12
**went**  8:16 10:21
  10:24,25 11:7
  17:17 20:19 24:11
  29:19 30:18 62:21
  65:13
**west**  11:14 44:6
**westle**  3:24
**wholesale**  10:22
**willing**  48:19 61:3
  71:10,14
**wish**  18:13
**witness**  4:2
**wives**  15:3
**word**  36:3
**words**  42:19 51:21
  68:17
**work**  10:10 22:20
  24:5,6 26:3 30:4,5
  30:7,14 44:23
  46:19
**worked**  10:19 13:6
  24:4 25:6 39:19
  40:20
**worries**  33:3
**worst**  37:1
**worth**  51:9 68:1
**wow**  27:13
**wrench**  73:14
**wrong**  30:11 43:20
  68:3,4

**x**

**x**  29:19

**y**

**y**  29:20
**yeah**  15:7 18:5
  19:4 22:11 29:5
  31:14 39:6 46:21
  65:25 66:5
**year**  10:21 12:7,10
  51:2 53:21 63:12
**years**  10:23 11:1,3
  11:6,6 18:25
  21:19,22 26:21
  41:14 62:4 63:13
  67:14
**young**  40:20

**z**

**zoom**  3:1 5:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.