Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4   GINA SPEARMAN,                        )
                                          )
5        Plaintiff,                       )
                                          )  Case No.
6   vs.                                   )
                                          )  1:20-cv-04981-CAP
7   BROKER SOLUTIONS, INC., d/b/a         )
    NEW AMERICAN FUNDING,                 )
8                                         )
         Defendant.                       )
9

10

11          CONTINUED VIRTUAL DEPOSITION OF
12                  SCOTT FROMMERT
13                    VOLUME II
14            Wednesday, February 16, 2022
15                    11:37 a.m.
16

17        Robin K. Ferrill, CCR-B-1936, RPR
18

19

20

21

22

23

24

25

Page 2

```
 1              APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiff
     TRAVIS C. HARGROVE, Esquire
 3   MARYBETH V. GIBSON, Esquire
           The Finley Firm, P.C.
 4         3535 Piedmont Road, N.E.
           Building 14, Suite 230
 5         Atlanta, Georgia  30305-1518
           404.320.9979
 6         thargrove@thefinleyfirm.com
           mgibson@thefinleyfirm.com
 7
 8
 9   On behalf of the Defendant
     HENRY M. PERLOWSKI, Esquire
10         Arnall Golden Gregory LLP
           171 17th Street, N.W., Suite 2100
11         Atlanta, Georgia  30363-1031
           404.873.8684
12         henry.perlowski@agg.com
13
14
15   ALSO PRESENT:
16         Ken Block, General Counsel, New American Funding
17
18
19
20
21
22
23
24
25
```

Page 3

1                          INDEX

2              CONTINUED VIRTUAL DEPOSITION OF

3                     SCOTT FROMMERT

4              Wednesday, February 16, 2022

5    EXAMINATION BY                              PAGE

6    Mr. Hargrove                               4, 47

7    By Mr. Perlowski                             40

8

9              DESCRIPTION OF EXHIBITS

10   EXHIBIT              IDENTIFICATION          PAGE

11   Exhibit 1   E-mail string Bates labeled       6

12              SPEARMAN 1412 - SPEARMAN 1413

13

14

15

16       (Original exhibits attached to the Original

17    transcript.)

18

19

20

21

22

23

24

25

Page 4

1              CONTINUED VIRTUAL DEPOSITION OF

2                      SCOTT FROMMERT

3                        VOLUME II

4               Wednesday, February 16, 2022

5          MR. HARGROVE:  Let's go on the record.

6    SCOTT FROMMERT,

7              called as a witness, having been previously

8    duly sworn by a Notary Public, was examined and

9    testified as follows:

10   EXAMINATION

11   BY MR. HARGROVE:

12        Q.   Mr. Frommert, this is -- we previously

13   suspended your deposition that was taken on the 28th

14   and now we're back for resumption.  So you're still

15   under the same oath that you were before.

16          MR. HARGROVE:  And, Henry, same

17       stipulations as before?

18          MR. PERLOWSKI:  Yes, Travis.

19        Q.   (By Mr. Hargrove) All right.  And since

20   your deposition, we've reviewed the agreement you

21   have with New American Funding upon your departure.

22   And at this point we --

23          MR. HARGROVE:  Henry, do you want to go

24       ahead and put your statement on the record with

25       regard to that issue?

Page 5

1              MR. PERLOWSKI:  Sure.

2              So, Mr. Frommert, understanding that, you

3         know, you raised concerns about compliance with

4         that agreement during your prior deposition, and

5         we've taken a look at it.  And I believe it's

6         Section 5 of your agreement has obligations with

7         respect to confidential information, trade

8         secrets and proprietary data of NAF.

9              We can designate any of the portions of the

10        transcript as confidential pursuant to the

11        parties' Protective Order.  So to the extent

12        that you have any concerns in that regard,

13        unless we specifically raise them, you can go

14        ahead and answer questions today because we can

15        designate portions of the transcript as

16        confidential.

17             THE WITNESS:  Okay.

18             MR. PERLOWSKI:  Is that -- and if you have

19        any questions as they come up, feel free to

20        raise them.

21        Q.   (By Mr. Hargrove) Okay.

22             All right.  Well, Mr. Frommert, we're going

23   to touch on a couple of areas today.

24        A.   Can I just take one minute before we get

25   started to just turn off the fan and blow my nose and

Page 6

1    then we can get started?  That way I'm not so super

2    nasally when I'm answering.  Just --

3              MS. GIBSON:  Of course.

4         Q.   (By Mr. Hargrove) Absolutely.  And --

5         A.   I'll be, like, 60 seconds.  Just give me a

6    moment.

7         Q.   Yeah.  Take all the time you need.

8              (WHEREUPON, there was a discussion off the

9         record.)

10             MR. HARGROVE:  Let's go back on the record.

11        Q.   (By Mr. Hargrove) So, Mr. Frommert, I

12   wanted to ask you a couple of questions.

13             MR. HARGROVE:  And, Nick, could you upload

14        Spearman 1412?

15             MS. GIBSON:  Yes.

16             MR. HARGROVE:  Oh, MaryBeth is doing it.

17        Okay.  Good.

18             MS. GIBSON:  Scott, if you refresh your

19        screen you should get an exhibit.

20             THE WITNESS:  All right.  I'm in the

21        folders now.

22             (Plaintiff's Exhibit 1, E-mail string Bates

23        labeled SPEARMAN 1412 - SPEARMAN 1413, marked

24        for identification.)

25        Q.   (By Mr. Hargrove) Let me know when you have

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 7

1    it up.

2          A.    Looks like an e-mail.

3          Q.    Okay.  And if you'll go down two-thirds of

4    the way from the top of the front page, looks like an

5    e-mail to you, Kelly, Gina, Jan Preslo and Jon Reed,

6    "Please see below for our call," correct?

7          A.    That's correct.

8          Q.    All right.  And what I want to find out

9    from you, you had testified earlier that there was a

10   meeting on or about September 19th of 2019 in Atlanta

11   with Gina and Kelly to present the P&L model.

12         Do you recall that?

13         A.    I do.

14         Q.    All right.  And in that meeting you said

15   there was a PowerPoint that was displayed for Gina

16   and Kelly to review.  And what I want to find out

17   from you and just verify, this is not that PowerPoint

18   what's in this e-mail, correct?

19         MR. PERLOWSKI:  Object to the form of the

20         question.

21         A.    To the best of my recollection, I had

22   included this in there.  This was part of what I

23   would have presented.  Maybe not in whole.

24         Q.    (By Mr. Hargrove) Okay.  So just so I

25   verify, you testified about a PowerPoint presentation

Page 8

1    at that in-person meeting, correct?

2          A.    Yes.

3          Q.    And it's your testimony that this, what's

4    contained in Exhibit 1, this table was part of that

5    presentation but it's not the complete presentation,

6    correct?

7                MR. PERLOWSKI:  Object to the form.

8          A.    That's correct, to the best of my

9    recollection.

10         Q.    (By Mr. Hargrove) Okay.

11               MR. PERLOWSKI:  Can the court reporter let

12         Mr. Block in?  I just got a note that he hasn't

13         been admitted.

14               THE COURT REPORTER:  There you go.

15               MR. PERLOWSKI:  Thanks.

16               MR. HARGROVE:  I'll wait until he's

17         connected to ask my next question.

18               Okay.  Looks like he's connected.

19         Q.    (By Mr. Hargrove) Mr. Frommert, we talked

20   about and got up to the point of talking about

21   whether you had any criticisms of the 2018

22   financials.  And in light of your agreement, I didn't

23   get as deep into that as I wanted to.  But I want to

24   sort of revisit that area.

25               These issues with the 2018 financials and

Page 9

1   whether they reflected the true profit and loss

2   amount for NAF for 2018, are you -- do you have any

3   role, as CFO, did you have criticisms of the way

4   those 2018 financials were compiled?

5        A.   Yes.  First I would -- yes.  What I would

6   say is I wanted to clarify that it's the internal

7   branch profitability model.  So when I hear

8   financials, I hear external.

9        Q.   Okay.

10       A.   So it's the external branch profitability

11  modeling I guess my answer would be yes, part of what

12  I'm --

13       Q.   All right.

14       A.   -- you know, tasked to do.

15       Q.   All right.  And what are those criticisms

16  of the internal financial documents?

17            MR. PERLOWSKI:  Object to the form.

18       A.   I guess the highest level would just be

19  super -- you know, I could probably talk really

20  technical for a long time.  The short version is at

21  the bottom of the P&L they used three different

22  layers of what they called corporate margin

23  profitability as they layered in pieces of allocation

24  from the corporation.  And the way that that was

25  displayed didn't allow visibility to all of those at

Scott Frommert                                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1    all times.

2          Q.    (By Mr. Hargrove) Okay.  And do you have an

3    understanding of who at NAF was responsible for that

4    layout with those three different layers?

5          A.    I mean, it was built before I was there.

6    But to the best of my understanding it was Kristin

7    Ankeny and Jason O'Bradovich.

8          Q.    Did you have any discussions with either

9    Ms. Ankeny or Mr. O'Bradovich about those three

10   layers of corporate margin?

11         A.    I mean, in building the new model, yes, it

12   was talked about why they did that, what their goal

13   was.  How I looked at it, how we can move from what

14   it was to what we were building.

15         Q.    Okay.  And what did they tell you about why

16   they did that and what their goal was?

17               MR. PERLOWSKI:  Object to the form.

18         Foundation.

19               You can answer.

20         A.    I think they wanted to be able to look at

21   it with -- you know, at different levels.  Like, if

22   you included one thing versus two things versus three

23   things, what would that look like so that they can

24   have -- I don't really know why they did it.  But I

25   know that they had different levels of input.

Scott Frommert                           February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 11

1        Q.    (By Mr. Hargrove) So it was never explained

2    to you why there were three different levels of

3    input?

4        A.    Not in specifics that I recall exactly.

5        Q.    Did you ever come to any understanding of

6    why were there were three different levels of

7    corporate margin?

8        A.    When you look at something like legal

9    expenses, they would want to say where the branch is

10   profitable with or without this included.  Right?

11   Operating profit versus fully inclusive profit.  So

12   that's my understanding of why they had those layers.

13       Q.    All right.

14             Did you have any discussions with anyone at

15   NAF about -- well, let me strike that.

16             Did you have any discussions with Rick

17   Arvielo about the corporate margin and the way that

18   it was laid out?

19       A.    Yes.

20       Q.    All right.  Tell me about those

21   discussions.

22       A.    I mean, I was tasked to rebuild the P&L

23   model for the branches.  And talking through that,

24   what I built, a mock-up of what it would look like.

25   And having that next to what was in place and why we

Page 12

1    would go from this to this and how I believed it was

2    better.  I mean, that's kind of the overall theme of

3    the conversations.

4         Q.   When you had the discussions with

5    Mr. Arvielo, were you critical of Mr. O'Bradovich or

6    anyone else on his team from the way that they had

7    done it in the past?

8         A.   I guess it would --

9              MR. PERLOWSKI:  Object to the form.

10        A.   I wouldn't really say "critical" as much as

11   I'd say "I want to build it this way."  I could

12   just -- a better way to build it.  I don't know if

13   you would call that critical.

14        Q.   (By Mr. Hargrove) Okay.

15             During the time you were at NAF, did you

16   have any negative interactions or arguments with

17   Mr. O'Bradovich about the way the internal finances

18   had been reported?

19        A.   I'm trying to think of how to answer that

20   because it's really not about we had negative

21   interactions about the changes and the goal to move

22   from A to B and his view versus my view.

23        Q.   Okay.

24             What was explained to you what his view

25   versus your view was?

Page 13

1       A.   What I was trying to build was a branch

2    profitability model.  So you'd, you know, want to

3    look at the final result of kind of how I laid it out

4    versus he laid it out, you know, and saying this is

5    how I wanted to do it and he had it the other way.

6    And, you know, effectively just disagreeing that

7    that's how it should be built.  I'm not sure how to

8    answer the question differently.

9       Q.   Did the disagreement at all involve the

10   different buckets that would, I guess, reflect

11   different profit and loss amounts depending on what

12   was counted?

13            MR. PERLOWSKI:  Object to the form.

14            THE WITNESS:  Sorry, Henry.

15            MR. PERLOWSKI:  No, that's okay, Scott.

16      A.   I wouldn't -- I didn't build it with

17   buckets.  I had just one profitability number.  No

18   buckets.

19      Q.   (By Mr. Hargrove) All right.

20            Did Mr. O'Bradovich believe that there

21   should still be buckets?

22      A.   I mean, not that he said to me.  I don't

23   think he communicated that specifically to me, no.

24      Q.   Okay.  Well, what exactly did he disagree

25   with about the way that you were going to have the

Scott Frommert                              February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 14

1    internal reporting?

2        A.    I guess the way I would characterize it is

3    if -- it's really hard to explain.  But if you have

4    just, say, the numbers 1, 2 and 3 on a sheet of paper

5    and I want to go 1 point a, you know, 2 point a, I

6    would ask for that.  I wouldn't get a response for a

7    while.  And then he would say "I don't, you know,

8    agree with that."  And effectively would be a lot of

9    conversations to give it across the finish line.

10       Q.    Okay.

11             So when you wouldn't get a response, were

12   you not getting the information that you needed in

13   order to build the way that you wanted the reporting

14   to take place?

15       A.    Not related to the question, I mean, that

16   you're asking right now, no.  I think when you're

17   talking through building it the right way, the system

18   was owned by Kristin.  It was -- you know, it's

19   called Keblar.  It's a database.  Changing the

20   structure and layout has to go through the

21   developers.  The developers reported to her.

22             So if I said "Here's change one.  I want to

23   move one and rename it A," I would have to put that

24   request through her.  So I didn't have direct access

25   because those people did not work for me.  I don't

Case 1:20-cv-04981-CAP   Document 91   Filed 04/27/22   Page 15 of 66
Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

1   know if that answers your question.

2        Q.   Okay.  So when you wanted to change

3   something, you weren't able to just change it.  You

4   had to reach out to somebody who would then make a

5   change within the financial internal reporting

6   software; is that correct?

7        A.   Correct.

8        Q.   Okay.

9             All right.  And was what you asked to be

10  changed always changed?

11       A.   I would say some of the things that were

12  more debated would get routed to a round table with

13  maybe the whole group, Christy Bunce and Rick and the

14  whole team.  I would say most of them.  I don't know

15  what percentage got changed.  It might have just been

16  more difficult to get done than, you know, maybe I

17  would have wanted.

18       Q.   When you were making these changes, were

19  you given all the information from NAF that you

20  needed to do your job?

21            MR. PERLOWSKI:  Object to the form.

22            You can answer.

23       A.   I did not.  I had direct access to expense

24  data through A & B.  I did not have direct access to

25  revenue data, as that's derived from secondary

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 16

1    marketing.

2         Q.    (By Mr. Hargrove) Did you need direct

3    access to revenue or expenses in order to do your

4    job?

5              MR. PERLOWSKI:  Object to the form.

6         A.    Certainly makes it easier.

7         Q.    (By Mr. Hargrove) And you have been CFO of

8    other companies, correct?

9         A.    Yes.

10        Q.    All right.  Have you ever had trouble

11   getting expense and revenue data from any of your

12   other jobs where you're CFO for the company?

13        A.    No.

14        Q.    Do you have any idea why you were unable to

15   get the expense and revenue data that you requested?

16             MR. PERLOWSKI:  Object to the form.

17        Mischaracterizes his testimony.

18             You can answer.

19        A.    I mean, I would really only be speculating

20   because it's -- I can't control what's in his head.

21        Q.    (By Mr. Hargrove) Did you have any

22   discussions about why you weren't being provided all

23   the expense and revenue information you requested?

24             MR. PERLOWSKI:  Object to the form.

25        Mischaracterizes testimony.

Scott Frommert                                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1              You can answer.

2      A.    What I guess I would say is when I would

3  ask for a change and I wouldn't get the change, I

4  would get pushback on the change, there was a point

5  where I would go to Rick and say "Hey.  Like, this is

6  what I'm trying to build.  These are the hurdles I

7  keep hitting with Jason.  How do you want me to

8  proceed," right?

9              So -- because at that point it was very

10  difficult to accomplish my goal if I had one person

11  saying "You have six months or five months to get

12  this goal accomplished" and every time I do it

13  there's two weeks delay, how am I going to hit my

14  goal?

15              So, you know, it becomes important to

16  communicate that and either get acknowledgment and

17  then a further-out date or some acknowledgment.

18      Q.    (By Mr. Hargrove) I want to shift gears a

19  tad here.  I say "a tad" but I'm jumping around a

20  little bit from the initial phase of your deposition

21  and talk about your departure from NAF.

22              Can you walk me through what led to your

23  departure at NAF?

24      A.    I can give you my perception of it.  I

25  mean, ultimately when we continued -- when I

Page 18

1   continued to ask for a change and I wouldn't get a

2   change, I would say to Rick "If I can't make these

3   changes, then I can't own this.  This isn't going to

4   work.  You know, I'm supposed to be running this."

5             And so I think, you know, there were

6   several meetings where me, him and Jason and Christy

7   would be in the room basically trying to work through

8   the tension between us.  And effectively, I think,

9   five times of me saying "It's not going to work" they

10  just said "You're right.  It's not going to work."

11       Q.   All right.  So what was the tension that

12  was going on between you, Jon and Christy that was

13  being addressed in these meetings?

14            MR. PERLOWSKI:  Object to the form.

15       Foundation.

16       A.   Jason and Christy.  I think you said Jon.

17       Q.   (By Mr. Hargrove) I'm sorry.

18       A.   I mean, it would be these changes.  It

19  would be, you know, getting access to the revenue

20  data, getting -- changing, you know, something from 1

21  to 2 or A to B, right?  And that not happening.

22  Right?  And the pushback that I would get.

23            And, you know, I just can't -- it makes it

24  very challenging to do your job when every day you're

25  dealing with that and somebody is clearly putting up

Page 19

1  blockades.

2      Q.   And who was it that was putting up the

3  blockades?

4      A.   Some version of Jason or Kristin.  You

5  know, a combination depending on the day of the week

6  or the topic.

7      Q.   Revenue data, I just want to make sure that

8  I'm clear.  You did not, as the CFO, have direct

9  access to NAF's revenue data?

10      A.   There's a difference for this report.  The

11  revenue data for the external reports flows through.

12  When you sell the loan you get a Purchase Advice.  I

13  had access to that.  Right?  I have full access to

14  that, what's booked when you lock the loan.

15          Without getting too complicated, you might

16  think you're going to sell it for two dollars.  If

17  the market moves up and down, there's a derivative

18  hedge that offsets that.  You can't look at the final

19  sale price.  I did have access to the final sale

20  price.

21          When you lock the loan, what you expect to

22  make off of it is known.  You know, effectively you

23  lock it.  If somebody looks at the market and says

24  "Okay.  It should be worth 102 at this point in

25  time," that's how you build branch profitability.

Page 20

1   It's not off of actuals.  You couldn't do it off of

2   actuals because of the derivative, so I did not have

3   access to the expected gain on sale raw data.

4       Q.   Okay.  Did you ask to have access to the

5   expected data on sale raw data that you needed?

6       A.   Yes.

7            MR. PERLOWSKI:  Object to the form.

8            THE WITNESS:  Sorry, Henry.  I'll pause.

9            MR. PERLOWSKI:  That's okay.

10      A.   Yes.

11      Q.   (By Mr. Hargrove) All right.  Who did you

12  ask?

13      A.   I mean, I think I asked Jason.  I asked --

14  I basically would ask Jason and not get it and tell

15  Rick I wasn't getting it.  He would say "Work it out

16  with Jason."  And we kind of went in a circle.

17  Discussed the issue with Christy Bunce as to not

18  being able to get it.  You know, ended up in a

19  meeting where the three of us would talk about it.

20           You know, at some point it was "Hey, give

21  him the data" and then I didn't get the data, which

22  is towards the end.  And I basically said "You need

23  to give me the data.  You agreed.  We all agreed to

24  give me the data on this day."

25           You know, I think that's when Rick

Page 21

1   basically called me and said "You know, you're not

2   going to get the data."  I don't know.  "You're not

3   getting it."  And two days later I was gone.

4        Q.   So after they agreed to give you the data,

5   Rick then said "We're not giving you the data,"

6   Mr. Frommert?

7        A.   That's correct.

8        Q.   All right.  Do you have any idea why?

9        A.   I mean, he ultimately said he didn't trust

10  me.  That's the answer he said.  I don't know.

11       Q.   Having that data, what negative could have

12  befallen NAF by you having the data you needed as CFO

13  to do your job?

14            MR. PERLOWSKI:  Object to the form.

15       Foundation.  Speculation.

16            You can answer.

17       A.   I don't think -- I will say at that point

18  it was just a very broken relationship.  I couldn't

19  tell you.  You'd have to ask Rick.

20       Q.   (By Mr. Hargrove) Okay.  Did you ever have

21  a discussion with Rick Arvielo about why you were not

22  being given this data that you had been told you

23  would be provided?

24       A.   Yes.  Several.

25       Q.   And what were you told?

Page 22

1      A.   Pretty much the same thing I just said,

2   like, "You can get it from Jason.  Ask Jason.  You

3   got to figure out how to work with Jason."

4           Then Jason wouldn't give it to me.  I'd go

5   back.  He'd say "He's sick of talking about it."

6           We'd go in a circle.  I'd say "I can't keep

7   doing this.  If you're going to keep doing that, this

8   isn't going to work."  And eventually it just kind of

9   back-and-forth and he said "Fine.  It's not going to

10  work."

11     Q.   Okay.

12          With regard to -- and we were talking about

13  those final sale prices.  I assume the expense raw

14  data was kind of part and parcel of this discussion?

15     A.   No, I expect --

16          MR. PERLOWSKI:  Object to the form.

17     Foundation.  Mischaracterizes his testimony.

18          You can answer.

19     A.   It comes from a different system of

20  records.  It is the --

21     Q.   (By Mr. Hargrove) Okay.

22     A.   Yeah.  So that's done by the Accounts

23  Payable team, which directly reported to me.  I had

24  direct access.

25     Q.   Okay.  So you did have access to all of the

Page 23

1    expense data at NAF?

2         A.    That's correct.

3         Q.    All right.  But you did not have all of the

4    revenue data, correct?

5         A.    The expected gain on sale revenue data,

6    correct.

7         Q.    All right.  And to do your job as CFO, did

8    you feel that was something that -- some information

9    that you needed?

10        A.    Yes.

11        Q.    All right.  Why did you need that

12   information?

13        A.    Just to basically tie everything up, make

14   sure it adds all up.  Right?  So there's a lot of

15   tests you do with the raw data.  It goes in, you push

16   dollar in, do you get a dollar out?  That's test one.

17   I mean, there's a variety of tests you do.

18            If you push a dollar in and expect a

19   dollar, then you test that against what you

20   collected, which we talked about won't be the same

21   because of the market and the shifts.  But you want

22   to see the difference and you want to look at the

23   derivative and you want to see if that calculated and

24   blended out effectively.

25        Q.    Right.  And did you explain all of this to

Scott Frommert                                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 24

1   Mr. Arvielo when you had discussions with him about

2   not being provided this data?

3       A.   I don't think we got to that level of

4   detail.  It was much, much higher level.  Just, you

5   know, "I need this.  This is the role."  Or, you

6   know, "Here's what I'm trying to get.  Here's the

7   roadblocks I'm hitting.  How can you help me?"

8       Q.   You testified earlier that you believed

9   that you weren't given this information because NAF

10  didn't trust you.  What's your basis for that belief?

11          MR. PERLOWSKI:  Object to the form.

12      Mischaracterizes his testimony.

13          You can answer.

14      A.   I mean, I think -- I don't remember the

15  amount of days, but one or two days before this, you

16  know, I ended up leaving New American.  I basically

17  said "You need to give me this data."  I drew a line

18  in the sand, if you will.  And Rick called in and

19  said "I'm not going to give it to you.  I don't trust

20  you."  And then a day or two later I got a call from

21  Christy that that was the end of my employment.

22      Q.   (By Mr. Hargrove) When Mr. Arvielo told you

23  "I'm not going to give it to you.  I don't trust

24  you," did you remind him that he had agreed to that

25  that data should be provided to you earlier?

Scott Frommert                           February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 25

1        A.    No.

2        Q.    Okay.  At that point did you realize it was

3   probably time for you to make an exit and figure out

4   something else to do?

5        A.    I figured within -- I figured within a day

6   or two I would get a call and the relationship would

7   be over.

8        Q.    Okay.

9              This information that you were not provided

10  about revenue, did it have any effect on NAF's tax

11  return or tax reporting?

12       A.    No.

13       Q.    All right.  Did you, in your role as CFO,

14  did you have any role in compiling the data that was

15  used for NAF's tax return?

16       A.    It would be under the accountant that

17  reported to me.  But I didn't directly get involved

18  with data.  He did his taxes outside of the company.

19       Q.    Okay.  Do you have knowledge of the tax

20  preparation?  I know that wasn't -- you said that was

21  not something directly.  Did you have indirect, an

22  indirect role as CFO with the tax preparation?

23       A.    No.

24       Q.    In your opinion, from being the CFO at NAF,

25  do you believe that NAF appropriately reported all of

Page 26

1   its tax obligations on its tax returns?

2        A.   We have corporate taxes.  You have

3   Arvielo's personal taxes.  You have a lot of

4   different tax buckets, I mean, I was not involved

5   with.  It's a pass-through, so I don't get involved

6   with anything that passes through to the best of my

7   knowledge on their actual NAF tax return, yes.

8        Q.   Okay.  Well, how about the Arvielos'

9   pass-through?  Did you come across anything that led

10  you to believe there was something improper with the

11  taxes, of the Arvielos' taxes?

12       A.   I wasn't able to see their personal taxes

13  at all.

14       Q.   Okay.  Would the information that you were

15  not -- that Mr. Arvielo said he didn't trust you

16  with, so you didn't get it, would that have any

17  effect on either the Arvielos or NAF's tax

18  obligations?

19            MR. PERLOWSKI:  Object to the form.

20       Foundation.  Speculation.

21            You can answer.

22       A.   The taxes would be based off of the actual

23  sold loan, not the expected gain on sale.  The

24  expected gain on sale was what I didn't have access

25  to.  It's when you lock the loan what you think it

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 27

1   will be worth.  You do your taxes off what it's

2   actually sold at irregardless of what you thought it

3   would be worth.

4       Q.   (By Mr. Hargrove) And I'm recycling a

5   little bit to a question before I was trying to

6   figure out.  What nefarious use could someone make of

7   this data that NAF, through Mr. Arvielo, said it

8   didn't trust you to have?

9           MR. PERLOWSKI:  Object to the form.

10      Foundation.  Speculation.

11          You can answer.

12      A.   Are you asking me to give you multiple

13  options of what it could be?

14      Q.   (By Mr. Hargrove) Yes.

15      A.   What could cause it?

16      Q.   Yes.

17      A.   You could understate the revenue, therefore

18  understate the profitability.  You could push

19  profitability up for one region, down for -- I mean,

20  effectively you can move -- it's a lever.  Right?

21  It's a lever on the machine.  So you can move

22  something in one direction or another.  That would

23  be, you know, one reason.

24          If they are -- I mean, on most of these

25  companies, is you -- when you look at revenue, it's

Page 28

1    not as simple as I sold, you know, my mouse for a

2    dollar.  It's all the pieces of the mouse inside of

3    it.  And so what you give credit to a branch for may

4    not be all the pieces of the puzzle.  So you could be

5    taking and excluding some of those things.

6              A specific example may be, like, something

7    called a spec pool.  When you take a spec pool, you

8    get an additional premium for selling these, you

9    know, CRA loans.  You generally don't give credit to

10   the branches.  That's a -- you know, it's an internal

11   report.  You would give credit to the team that did

12   that trade and structured that trade.  So there could

13   be good or bad reasons for doing it.

14             Yeah.  I don't know if that answers your

15   question.

16        Q.   So if NAF had provided you all that

17   information, then, that you asked for about revenue,

18   do you feel like you would have then been able to

19   accurately assess the internal financials?  Or would

20   you -- let me go back and start the question over.

21             Had you been provided the revenue

22   information you asked for, would you have been able

23   to more accurately report on a branch and/or

24   division-wide basis profit and loss within NAF?

25        A.   I would have been more able to accurately

Scott Frommert                                February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 29

1    validate what I was reporting was accurate.

2            Does that make sense?

3        Q.    That does, yes.  So without that

4    information, there could have been inaccuracies on

5    the internal data and you would not be able to test

6    that data to assure it was correct.  Is that an

7    accurate summation?

8            MR. PERLOWSKI:  Object to the form.

9        A.    Correct.

10       Q.    (By Mr. Hargrove) All right.  And the

11   reason you wanted to have that data was so you could

12   conduct that exact task, testing of the internal

13   financial data, correct?

14       A.    Yes, that's correct.

15       Q.    Because otherwise, you were basically just

16   taking someone's word for it without being able to

17   check on your own as CFO, correct?

18       A.    I mean, there's a little bit more.  You

19   could use some industry indicator to see if you're in

20   range.  But effectively, yes.

21       Q.    Okay.  And did you feel like those industry

22   indicators were sufficient without you having that

23   revenue data that you requested but were denied?

24       A.    I felt pretty confident.  I just obviously

25   prefer to be exact versus, you know, pretty

Page 30

```
 1   confident.  You can't say for sure.  If there's one
 2   at the highest levels, yes.  At the branch-to-branch
 3   level, maybe not or maybe within some cut.  Maybe
 4   not.  It's very hard to say.
 5          But at the highest levels, the numbers seem
 6   to generally reflect industry averages.
 7       Q.   Okay.  But without that data you needed,
 8   checking branch-wide and division-wide was -- let me
 9   go back.
10          You talked about the general numbers.  Are
11   you saying that the branch-specific -- excuse me.
12   Let me go back.
13          You talked about the overall numbers.  But
14   to get the branch and division-specific numbers, you
15   believed you needed these revenue figures to test
16   that data; is that correct?
17       A.   As you bring in more data it blends.
18   Right?  So it's harder to tell as you go higher up
19   with the blend.  As you get very, very small amounts
20   of data, under 30 units to be specific, any
21   miscalculation, any inaccuracy would be more
22   noticeable.
23       Q.   Okay.  And when you were tasked with
24   preparing this P&L model we talked about some -- and
25   if you need to take a break, let me know.  I can tell
```

Scott Frommert                                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 31

1    looking at you.

2            THE WITNESS:  Just give me one second.

3            MR. HARGROVE:  Yeah, let's take a break.

4            THE WITNESS:  Stop the video and blow my

5        nose.  I'm sorry.

6            MR. HARGROVE:  No worries.

7            THE WITNESS:  One minute.

8            (WHEREUPON, a recess was taken.)

9            MR. HARGROVE:  Let's go back on the record.

10       Q.   (By Mr. Hargrove) Mr. Frommert, did you

11   feel like Mr. O'Bradovich was hiding something as far

12   as his refusal to provide you those revenue figures?

13       A.   I don't know.  Okay.  I guess I would say I

14   thought a lot about that, I guess.  It really

15   probably -- if I'm guessing, is more of territorial,

16   you know, maybe ownership of something.  I'm just

17   speculating.  I have no idea.

18       Q.   Okay.

19           I want to take us back to something that I

20   asked earlier.  And in the initial iteration of your

21   deposition, I asked if you had discussions with Rick

22   Arvielo about the tension between you and

23   Mr. O'Bradovich.  And I can tell you it was you that

24   responded "I don't know that I can.  Can I talk about

25   that?  I have an NDA in place about this topic."

Page 32

1           So since we've dealt with the NDA issue,

2    can you expound on the discussions you had with

3    Mr. Arvielo about the tension between you and

4    Mr. O'Bradovich?

5           A.    I would say I couldn't tell how many

6    specific times.  But multiple occasions I would go to

7    him and talk to him about a variety of issues, if you

8    will, with Jason.  And the walls I was hitting and my

9    inability to, you know, be able to find a way to

10   partner with him or at least have some sort of

11   half-cordial relationship with the guy to build

12   success.

13          Q.    Okay.  And it was multiple conversations?

14          A.    Yes.  Yes, sir.

15          Q.    Was he defensive of Mr. O'Bradovich,

16   neutral or did he appear to be on your side?

17          A.    Probably would say at the very beginning it

18   was very neutral or "Let me help you get there."  And

19   over time I think that became more of -- yeah, I

20   don't know.  It's a tough topic I guess I would say.

21   He said -- I wouldn't say took his side.  I guess he

22   just made it very clear that he wasn't going to

23   support me.  He would say "Figure it out with Jason."

24   And that clearly wasn't going to happen.

25                So I would go back to him and say "I'm not

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

1   able to accomplish that goal effectively."  And, you

2   know, those turned into some heated arguments.

3        Q.   Heated arguments with you and Mr. Arvielo?

4        A.   Yes.  Heated conversations, maybe not an

5   argument.

6        Q.   Right.  What was the content of the heated

7   conversations with Mr. Arvielo?

8        A.   "Here it is.  Figure it out.  You guys can

9   figure it out.  You're adults.  You're

10  professionals."  You know, "I don't want to hear it

11  any more."  You know, it's, like, you know,

12  effectively "If you can't get it done, you go back."

13  You know, that was the topic.

14       Q.   Okay.  And ultimately it was go back to the

15  person who won't give you the data.  And he stood

16  behind Mr. O'Bradovich, not you, correct?

17       A.   It wasn't just about the data.

18            MR. PERLOWSKI:  Object to the form.

19       Mischaracterizes testimony.

20            You can answer.

21       A.   Yeah.  It wasn't just the data.  Just to be

22  clear, it was the data.  It would be the literal

23  "Look.  If I want to" -- when you look at a P&L and

24  you have six buckets, sometimes I want to collapse

25  those into one.  You hit a button and expand it and

Page 34

1    make it be six.  That takes work on the developer's

2    end.  That's, in my opinion, the better way to go.

3    But I would ask that.  It wouldn't get done.

4            And so then I would -- you know, I'm not

5    accomplishing the goal of building.  I'm relying on

6    another team.  I'm going to talk about that.  Right?

7    And so it wasn't just that data.  It would be, you

8    know, "I think this row should be gray."  I mean,

9    it's simple of things as that.

10           You know, I am used to owing something and

11   maybe that's on me.  Right?  But I'm used to owing it

12   and saying "This is what it looks like and this is

13   the result."  And when I'm not able to accomplish

14   that I don't feel empowered I'm going to have that

15   conversation.

16      Q.   (By Mr. Hargrove) Right.

17           So did you ever hear either Rick or Patty

18   Arvielo say that the regional managers made too much

19   money?

20      A.   I don't recall somebody saying they made

21   too much money.  I think people knew they made good

22   money.  There would be things, like, "You guys are

23   making a lot of money.  We did not make money" or

24   things of that nature.  But I do not recall

25   specifically somebody saying "You make too much

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1   money."

2          Q.    Okay.

3                When you were building, you were tasked to

4   build the P&L model for Gina and Kelly and the other

5   regionals, correct?

6          A.    Yes, sir.

7          Q.    The data, the revenue data that you were

8   not provided by the company, is that something that

9   would have been useful to you in creating this P&L

10  model?

11         A.    Yes, sir.

12         Q.    All right.  And you testified earlier

13  because that would give it broken down more by region

14  by way of example, correct?

15         A.    Yes.  To clarify, the data was already

16  there in the system, in the database, invisible on

17  the reporting tool, Keblar.  Right?  So I could see

18  the output.  I just simply could not see the raw

19  data.

20         Q.    Okay.  And the raw data was something that

21  would have made your job of preparing a P&L plan for

22  the regionals easier to do, correct?

23         A.    I think that's part of model building and

24  model development.  You get the raw data and you test

25  it and you analyze it.  Right?  And you look for

Page 36

1    issues.

2              So the first time in my career I didn't own

3    the data.  Right?  And own the actual people.  So I

4    was trying to be adaptive to the situation.  I think

5    that because they worked for another person, I tried

6    to work in that situation.

7              I don't think -- I think there's a variety

8    of tests you should perform.  It's harder to do those

9    tests.  Right?  So I tried -- when I talked earlier

10   about industry numbers, if I don't have raw data,

11   right, I'm going to go to industry.  I'm going to try

12   to test that way.

13        Q.   So that raw data that you did not have, did

14   you have any discussions with Kelly or Gina about the

15   fact you had not been provided everything that you

16   asked NAF for to prepare this P&L model?

17        A.   No, sir.

18        Q.   Do you have any understanding as to whether

19   Gina and Kelly felt there was a lack of transparency

20   about the P&L model?

21             MR. PERLOWSKI:  Object to the form.

22        Speculation.

23             You can answer.

24        A.   They told me several times they, you know,

25   had concerns about the data, the report, throughout a

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 37

1    couple of meetings.

2         Q.   (By Mr. Hargrove) Tell me about the

3    discussions you recall with Gina, whether Kelly was

4    present or not, about the P&L model and any concerns

5    she might have.

6         A.   I mean, I think it was a variety of things.

7    "How do I know that these expenses are mine?"  You

8    know, "How would I know that this loan didn't get

9    paid more on or less on?"  "Are you counting this

10   concession?"  I think we went through a lot of things

11   to the best of my recollection.

12            I think, you know, they mentioned in the

13   past "We thought we were making money, then we

14   weren't.  So how do we know this is true this time?

15   How is it going to be different this time?"

16            I did my best to -- you know, while I did

17   not have that data, I had spent still quite a bit of

18   time in that model.  So I did my best to give them my

19   understanding of the data, the situation, the flow of

20   what was being presented to them.

21        Q.   Okay.  Did you discuss with them the fact

22   that you, in fact, had not been provided with all the

23   data you asked for to prepare the P&L model?

24        A.   No.

25        Q.   When Gina mentioned that she felt there was

Scott Frommert
February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 38

1    a lack of transparency, did you feel that was true in

2    light of the fact that you hadn't been provided all

3    the information you had asked NAF for?

4            MR. PERLOWSKI:  Object to the form.

5        A.   Yes.  I think we specifically set a meeting

6    with Jason to cherrypick ten specific loans or

7    something along those lines to have him prove it to

8    her, something along that to the best of my

9    recollection.

10       Q.   (By Mr. Hargrove) And did the testing of

11   those ten specific loans fare out correctly?

12       A.   I don't remember exactly.  I think it was a

13   little bit rough.  But I think we generally got to

14   some comfort level, yes.

15       Q.   Didn't you have similar concerns as to the

16   transparency of NAF's financial data by the fact that

17   you weren't provided everything that you asked for?

18           MR. PERLOWSKI:  Object to the form.

19       Foundation.  Asked and answered.

20           You can answer again.

21       A.   I don't know that I would say I had similar

22   concerns.  I had maybe different concerns.  You know,

23   on building a model, I want to test the data.  I

24   think she has no insight to the whole model at all.

25   Right?  So I couldn't say that there were similar

Case 1:20-cv-04981-CAP   Document 91   Filed 04/27/22   Page 39 of 66
Scott Frommert                         February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 39

1    concerns.  I think hers are probably broader.

2        Q.   (By Mr. Hargrove) Okay.  But you had

3    concerns as to how transparent NAF was with its

4    revenue figures that it wouldn't provide you as the

5    CFO, correct?

6        MR. PERLOWSKI:  Object to the form.  Asked

7        and answered about five times.

8        You can answer a sixth time.

9        A.   Concerns?  I guess I would just try to use

10   my own words.

11       I was frustrated.  I wanted to be able to

12   go through the process I had been doing for a long

13   time.  I wasn't able to do that.

14       I don't know if I would use the word

15   "concerns."  I was aggravated if I'm using a, you

16   know, descriptor.

17       MR. HARGROVE:  Mr. Frommert, let's take a

18       break.  If I have anything else for you it won't

19       be very much.  But if we could go to a breakout

20       room and I'm thinking about five minutes and

21       hopefully we can let you get over to Urgent Care

22       soon.

23       MR. PERLOWSKI:  And, Mr. Frommert, I'm

24       probably going to have about five or ten minutes

25       of questions but that's about it.

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 40

1          THE WITNESS:  Okay.

2          MR. PERLOWSKI:  Thank you.

3          (WHEREUPON, a recess was taken.)

4          MR. HARGROVE:  I don't have any other

5      questions right now.  I know Mr. Perlowski has

6      indicated he has a few and that may cause me to

7      ask a follow-up question.  But as we sit right

8      now I'm good.

9          MR. PERLOWSKI:  Mr. Frommert, I will try to

10     be as brief as possible.  And thank you so much

11     for your time today.

12  EXAMINATION

13  BY MR. PERLOWSKI:

14     Q.   You had mentioned that the information that

15  you were trying to receive from Mr. O'Bradovich was

16  expected gain on sale revenue data.

17          Do I have that -- is that correct, how I'm

18  phrasing it?

19     A.   Yes, sir.

20     Q.   Could you, in laypersons' terms, just

21  explain to me what that is?

22     A.   When you do a loan, when you originally get

23  the loan, the borrower decides at this moment in time

24  they are going to lock in the rate at that market

25  rate.  They lock the loan.  And so you would look at

Case 1:20-cv-04981-CAP   Document 91   Filed 04/27/22   Page 41 of 66
Scott Frommert                        February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1    the board and see what Fannie, Freddie, Ginnie are

2    trading at at that point in time and what that loan

3    should be worth.  So you expect to make that amount

4    of profit at that point in time.

5          Q.   So if I was the borrower, let's say I'm

6    locking in a loan at 3.5 percent interest on a

7    30-year loan, you'd be able to -- so if that's the

8    rate lock, you would then be able to compare that

9    rate lock to certain, I think you said Fannie,

10   Freddie, information to determine what the expected

11   profit on that loan would be at a given moment in

12   time?

13         A.   The expected sale price, not the profit.

14         Q.   I'm sorry.  The expected sale price.  So in

15   other words, if NAF then wanted to sell that loan, is

16   that what you're talking about?

17         A.   If NAF then wanted to sell that loan, what

18   you would expect to make.  So just like you

19   described, that 30-year, you know, interest rate, you

20   would look on a board, like a stock market, and see

21   that that was currently trading at "X" 102, 103.  And

22   the two or the three would represent two percent,

23   three percent times the loan amount, which would give

24   you the expected gain on sale in dollars or basis

25   points or percentage, whatever way you wanted to

Scott Frommert                              February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 42

1    choose to look at it.

2        Q.   And what I -- you also, in responding to

3    Mr. Hargrove's questions, and your testimony today

4    will speak for itself, I'm just trying to understand

5    it.  You said that in Keblar data was visible but

6    that you didn't have the raw data.  So I'm just

7    trying to understand, what was visible relative to

8    what you didn't have access to?

9        A.   So what you would see is a branch.  You

10   could get to a branch and you could look at the loans

11   in the branch.  But you would not see the tape, the

12   raw tape that was uploaded to compare to what was put

13   on the board.  Meaning if I had every single time --

14   just think of today and I just do three loans and I

15   go two dollars, three dollars, four dollars, I take

16   that upload sheet with those numbers and I upload

17   them to Keblar, I can see the culmination.  I might

18   even be able to see the individual loans.

19            But me, as a CFO, I want to see that raw

20   sheet to compare to what ends up in Keblar.  Because

21   data, in a database, you might have three but only

22   two become visible.  Data has functionality that is

23   sometimes flawed.

24            Does that answer your question?

25       Q.   Sort of.  And this could very well be a

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 43

1    product of -- again, I think we talked about before,

2    I don't have, you know, an accounting/finance

3    background.

4              So the data that you weren't receiving,

5    what was your purpose in wanting to see it?  Like, in

6    other words, of what value did having that data have

7    to you as an ex-Chief Financial Officer?

8         A.   I would take the raw data.  I would look at

9    the sum of that number effectively.  And I would

10   partition out by branch or by segment or whatever way

11   I wanted to look at it, I would audit the end result

12   coming out of Keblar.

13             So I would load it into Keblar.  Is that

14   also what's coming out of Keblar?  That's

15   effectively, in the shortest version, what I would

16   use that for.

17        Q.   Okay.

18             The discussions that you mentioned that you

19   were having with Mr. Arvielo about your efforts to

20   receive the expected gain on sale revenue data, when

21   were those discussions taking place generally

22   speaking?

23        A.   I guess I'm not sure how to answer that

24   question.  From when I started to when I ended, I --

25   some interval, called every month or give or take.

Scott Frommert                     February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 44

1    Towards the end it was probably much more frequent.

2    In his office?  I'm not sure specifically how you're

3    looking for me to phrase that.

4         Q.   No, I'm just trying to get a timeframe

5    for -- and if you just could refresh our recollection

6    on when was your last day with NAF roughly?

7         A.   May of '19, if I'm recalling properly, or

8    '20.  I'd have to go look.  I can't remember what

9    years.

10        Q.   Well, you met with Ms. Spearman and

11   Mr. Reed and Ms. Allison in Atlanta in September of

12   '19.

13        A.   Yes.  So sorry, May of '20.

14        Q.   Okay.

15        A.   I believe it specifically was the last day

16   of May.

17        Q.   And NAF implemented a P&L model in the

18   spring of 2020?

19        A.   Correct.

20        Q.   So the discussions that you were having

21   with Mr. Arvielo, were they still ongoing after NAF

22   implemented a P&L model?

23        A.   About similar context, yes.

24        Q.   Okay.

25             To your knowledge, did your efforts to have

Page 45

1    access to the expected gain on sale raw revenue data

2    have anything to do with NAF's decision about how it

3    was going to compensate its regional managers?

4          A.    No.

5          Q.    To your knowledge, did your having access

6    or not to the expected gain on sale of raw revenue

7    data have anything to do with NAF's decision of

8    whether to reimburse certain marketing expenses or

9    not?

10         A.    No.

11         Q.    To your knowledge, did your having access

12   or not to the expected gain on sale of raw revenue

13   data have any impact on NAF's decisions about what

14   pricing exceptions it would approve?

15         A.    It could have if you weren't profitable.

16   Right?  So the goal would be to look at

17   profitability.

18              But ultimately that data, whether I had

19   access to it or not, wouldn't change the decision.

20   The decision would be made based on profitability.

21         Q.    Okay and you had the information available

22   to evaluate profitability?

23         A.    We had the Keblar tool at the branch level

24   to look at branch region rollups.

25         Q.    And to your knowledge, based on your

Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 46

1    experience as NAF's CFO, did NAF have to file audited

2    financial statements each year as a HUD lender?

3           A.    Yes.

4           Q.    And did NAF do that, submit audited

5    financial statements during your tenure as CFO?

6           A.    Yes.

7           Q.    Were those financial statements audited to

8    your knowledge?

9           A.    Yes.

10          Q.    Were any concerns raised regarding NAF's

11   audited financial statements that you're aware of?

12          A.    No.  I mean, there's always some level of

13   commentary that they make.  That's their job.  But no

14   material findings were written up.

15          Q.    And did NAF use outside accounting

16   professionals to assist in the preparation of its

17   audited financial statements?

18          A.    Yes.

19          Q.    Okay.  Do you recall who NAF used?

20          A.    I believe they were using KSJG.

21          Q.    Okay.

22          A.    That might have been Richey May.  I think

23   it was KSJG, though.  I'm pretty sure.  Maybe they're

24   culled with them now.  They changed their name.  They

25   merged.

Case 1:20-cv-04981-CAP   Document 91   Filed 04/27/22   Page 47 of 66
Scott Frommert                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 47

1          MR. PERLOWSKI:  Thank you, Mr. Frommert.

2          THE WITNESS:  No more questions?

3          MR. PERLOWSKI:  And again, thank you.

4          MR. HARGROVE:  I just got a brief

5      follow-up.

6   EXAMINATION

7   BY MR. HARGROVE:

8      Q.   When the decision was made in February 2019

9   to stop paying marketing expenses, were you employed

10  by NAF?

11     A.   No, sir.

12     Q.   Okay.  So you wouldn't have any knowledge

13  as to why that decision was made, then, correct?

14     A.   No.

15     Q.   And you're not privy to why NAF made its

16  decisions as to compensation for any time you weren't

17  employed there, correct?

18     A.   No, I'm not.

19     Q.   Okay.

20          MR. HARGROVE:  Give us two brief minutes.

21      I think we're finished.  Let me consult with my

22      co-counsel real briefly.  I'm going to go off

23      the camera for just a second.

24          MR. PERLOWSKI:  Sure.

25          (WHEREUPON, a recess was taken.)

Page 48

1              MR. HARGROVE:  We're ready to go back on

2       when everybody else is.

3              Mr. Frommert, we don't have any further

4       questions for you.  I thank you for your time

5       and I hope you feel better soon.

6              I don't know if Mr. Perlowski has any

7       follow-ups but we're done.

8              MR. PERLOWSKI:  I do not, Travis.  Thank

9       you.

10             And, Mr. Frommert, again, best of luck with

11      feeling better and hope everything is okay.

12      Thank you for your time today.

13             THE WITNESS:  Thanks.

14             MS. GIBSON:  Thanks, Scott.  Hope you feel

15      better.

16             (WHEREUPON, the proceedings were concluded

17      at 12:51 p.m.)

18

19

20

21

22

23

24

25

Page 49

```
 1              C E R T I F I C A T E

 2    STATE OF GEORGIA   )

 3                       ) ss.:

 4    FULTON COUNTY      )

 5

 6        I,  Robin Ferrill, Certified Court Reporter within

 7    the State of Georgia, do hereby certify:

 8             That SCOTT FROMMERT, the witness whose

 9    deposition is hereinbefore set forth, was duly sworn by me

10    and that such deposition is a true record of the testimony

11    given by such witness.

12             I further certify that I am not related to any

13    of the parties to this action by blood or marriage; and

14    that I am in no way interested in the outcome of this

15    matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17    hand this 22nd day of February, 2021.

18

19             _____

20                  ROBIN K. FERRILL, RPR

21

22

23

24

25
```

Page 50

1    To: Mr. Perlowski
     Re: Signature of Deponent SCOTT FROMMERT
2    Date Errata due back at our offices: 30 days
3    Greetings:
     This deposition has been requested for read and sign by
4    the deponent.  It is the deponent's responsibility to
     review the transcript, noting any changes or corrections
5    on the attached PDF Errata.  The deponent may fill out the
     Errata electronically or print and fill out manually.
6
     Once the Errata is signed by the deponent and notarized,
7    please mail it to the offices of Veritext (below).
8    When the signed Errata is returned to us, we will seal and
     forward to the taking attorney to file with the original
9    transcript.  We will also send copies of the Errata to all
     ordering parties.
10
     If the signed Errata is not returned within the time
11   above, the original transcript may be filed with the
     court without the signature of the deponent.
12
13   Please send completed Errata to:
14   VeritextProduction Facility
15   20 Mansell Court
16   Suite 300
17   Roswell, GA 30076
18   (770) 343-9696
19
20
21
22
23
24
25

Scott Frommert                                    February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                              Page 51

1    ERRATA for ASSIGNMENT # 5083801

2    I, the undersigned, do hereby certify that I have read the

3    transcript of my testimony, and that

4    ____ There are no changes noted.

5    ____ The following changes are noted:

6

     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

7    Procedure and/or OCGA 9-11-30(e), any changes in form or

     substance which you desire to make to your testimony shall

8    be entered upon the deposition with a

     statement of the reasons given for making them.  To assist

9    you in making any such corrections, please use

     the form below.  If additional pages are necessary, please

10   furnish same and attach.

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19   Page _____ Line _____ Change _____

20   _____

21   Page _____ Line _____ Change _____

22   _____

23   Reason for change _____

24   Page _____ Line _____ Change _____

25   _____

Scott Frommert                                February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 52

1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Page _____ Line _____ Change _____

7    _____

8    Reason for change _____

9    Page _____ Line _____ Change _____

10   _____

11   Page _____ Line _____ Change _____

12   _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16   Page _____ Line _____ Change _____

17   _____

18

19

                    _____

20                        SCOTT FROMMERT

21   Sworn to and subscribed before me this ____ day of

22   _____, _____.

23   _____

     NOTARY PUBLIC

24

25   My Commission Expires:_____

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[& - asked]**

February 16, 2022

Page 1

**&**

**&**  15:24

**0**

**04981**  1:6

**1**

**1**  3:11 6:22 8:4
  14:4,5 18:20
**102**  19:24 41:21
**103**  41:21
**11:37**  1:15
**12:51**  48:17
**13637**  49:18
**14**  2:4
**1412**  3:12 6:14,23
**1413**  3:12 6:23
**16**  1:14 3:4 4:4
**171**  2:10
**17th**  2:10
**19**  44:7,12
**1936**  1:17
**19th**  7:10
**1:20**  1:6

**2**

**2**  14:4,5 18:21
**20**  44:8,13 50:15
**2018**  8:21,25 9:2,4
**2019**  7:10 47:8
**2020**  44:18
**2021**  49:17
**2022**  1:14 3:4 4:4
**2100**  2:10
**22nd**  49:17
**230**  2:4
**28th**  4:13

**3**

**3**  14:4
**3.5**  41:6
**30**  30:20 41:7,19
  50:2 51:6

**300**  50:16
**30076**  50:17
**30305-1518**  2:5
**30363-1031**  2:11
**343-9696**  50:18
**3535**  2:4

**4**

**4**  3:6
**40**  3:7
**404.320.9979**  2:5
**404.873.8684**  2:11
**47**  3:6

**5**

**5**  5:6
**5083801**  51:1

**6**

**6**  3:11
**60**  6:5

**7**

**7**  51:6
**770**  50:18

**9**

**9-11-30**  51:7

**a**

**a.m.**  1:15
**able**  10:20 15:3
  20:18 26:12 28:18
  28:22,25 29:5,16
  32:9 33:1 34:13
  39:11,13 41:7,8
  42:18
**absolutely**  6:4
**access**  14:24 15:23
  15:24 16:3 18:19
  19:9,13,13,19 20:3
  20:4 22:24,25
  26:24 42:8 45:1,5
  45:11,19

**accomplish**  17:10
  33:1 34:13
**accomplished**
  17:12
**accomplishing**
  34:5
**accountant**  25:16
**accounting**  43:2
  46:15
**accounts**  22:22
**accurate**  29:1,7
**accurately**  28:19
  28:23,25
**acknowledgment**
  17:16,17
**action**  49:13
**actual**  26:7,22
  36:3
**actuals**  20:1,2
**adaptive**  36:4
**additional**  28:8
  51:9
**addressed**  18:13
**adds**  23:14
**admitted**  8:13
**adults**  33:9
**advice**  19:12
**agg.com**  2:12
**aggravated**  39:15
**agree**  14:8
**agreed**  20:23,23
  21:4 24:24
**agreement**  4:20
  5:4,6 8:22
**ahead**  4:24 5:14
**allison**  44:11
**allocation**  9:23
**allow**  9:25
**american**  1:7 2:16
  4:21 24:16

**amount**  9:2 24:15
  41:3,23
**amounts**  13:11
  30:19
**analyze**  35:25
**ankeny**  10:7,9
**answer**  5:14 9:11
  10:19 12:19 13:8
  15:22 16:18 17:1
  21:10,16 22:18
  24:13 26:21 27:11
  33:20 36:23 38:20
  39:8 42:24 43:23
**answered**  38:19
  39:7
**answering**  6:2
**answers**  15:1
  28:14
**appear**  32:16
**appearances**  2:1
**appropriately**
  25:25
**approve**  45:14
**area**  8:24
**areas**  5:23
**argument**  33:5
**arguments**  12:16
  33:2,3
**arnall**  2:10
**arvielo**  11:17 12:5
  21:21 24:1,22
  26:15 27:7 31:22
  32:3 33:3,7 34:18
  43:19 44:21
**arvielo's**  26:3
**arvielos**  26:8,11
  26:17
**asked**  15:9 20:13
  20:13 28:17,22
  31:20,21 36:16
  37:23 38:3,17,19

Scott Frommert

Spearman, Gina v. Broker Solutions, Inc. Et Al

[asked - comfort]

Page 2

39:6
**asking** 14:16
  27:12
**assess** 28:19
**assignment** 51:1
**assist** 46:16 51:8
**assume** 22:13
**assure** 29:6
**atlanta** 1:2 2:5,11
  7:10 44:11
**attach** 51:10
**attached** 3:16 50:5
**attorney** 50:8
**audit** 43:11
**audited** 46:1,4,7
  46:11,17
**available** 45:21
**averages** 30:6
**aware** 46:11

**b**

**b** 1:7,17 12:22
  15:24 18:21
**back** 4:14 6:10
  22:5,9 28:20 30:9
  30:12 31:9,19
  32:25 33:12,14
  48:1 50:2
**background** 43:3
**bad** 28:13
**based** 26:22 45:20
  45:25
**basically** 18:7
  20:14,22 21:1
  23:13 24:16 29:15
**basis** 24:10 28:24
  41:24
**bates** 3:11 6:22
**befallen** 21:12
**beginning** 32:17
**behalf** 2:2,9

**belief** 24:10
**believe** 5:5 13:20
  25:25 26:10 44:15
  46:20
**believed** 12:1 24:8
  30:15
**best** 7:21 8:8 10:6
  26:6 37:11,16,18
  38:8 48:10
**better** 12:2,12
  34:2 48:5,11,15
**bit** 17:20 27:5
  29:18 37:17 38:13
**blend** 30:19
**blended** 23:24
**blends** 30:17
**block** 2:16 8:12
**blockades** 19:1,3
**blood** 49:13
**blow** 5:25 31:4
**board** 41:1,20
  42:13
**booked** 19:14
**borrower** 40:23
  41:5
**bottom** 9:21
**branch** 9:7,10
  11:9 13:1 19:25
  28:3,23 30:2,2,8
  30:11,14 42:9,10
  42:11 43:10 45:23
  45:24
**branches** 11:23
  28:10
**break** 30:25 31:3
  39:18
**breakout** 39:19
**brief** 40:10 47:4
  47:20
**briefly** 47:22

**bring** 30:17
**broader** 39:1
**broken** 21:18
  35:13
**broker** 1:7
**buckets** 13:10,17
  13:18,21 26:4
  33:24
**build** 12:11,12
  13:1,16 14:13
  17:6 19:25 32:11
  35:4
**building** 2:4 10:11
  10:14 14:17 34:5
  35:3,23 38:23
**built** 10:5 11:24
  13:7
**bunce** 15:13 20:17
**button** 33:25

**c**

**c** 2:2 49:1,1
**calculated** 23:23
**call** 7:6 12:13
  24:20 25:6
**called** 4:7 9:22
  14:19 21:1 24:18
  28:7 43:25
**camera** 47:23
**cap** 1:6
**care** 39:21
**career** 36:2
**case** 1:5
**cause** 27:15 40:6
**ccr** 1:17
**certain** 41:9 45:8
**certainly** 16:6
**certified** 49:6
**certify** 49:7,12
  51:2
**cfo** 9:3 16:7,12
  19:8 21:12 23:7

25:13,22,24 29:17
  39:5 42:19 46:1,5
**challenging** 18:24
**change** 14:22 15:2
  15:3,5 17:3,3,4
  18:1,2 45:19
  51:11,13,14,16,18
  51:19,21,23,24
  52:1,3,4,6,8,9,11
  52:13,15,16
**changed** 15:10,10
  15:15 46:24
**changes** 12:21
  15:18 18:3,18
  50:4 51:4,5,7
**changing** 14:19
  18:20
**characterize** 14:2
**check** 29:17
**checking** 30:8
**cherrypick** 38:6
**chief** 43:7
**choose** 42:1
**christy** 15:13 18:6
  18:12,16 20:17
  24:21
**circle** 20:16 22:6
**civil** 51:6
**clarify** 9:6 35:15
**clear** 19:8 32:22
  33:22
**clearly** 18:25
  32:24
**collapse** 33:24
**collected** 23:20
**combination** 19:5
**come** 5:19 11:5
  26:9
**comes** 22:19
**comfort** 38:14

Scott Frommert
February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[coming - difficult]                                                                    Page 3

| | | | |
|---|---|---|---|
| **coming** 43:12,14 | **control** 16:20 | **culmination** 42:17 | **deep** 8:23 |
| **commentary** 46:13 | **conversation** 34:15 | **currently** 41:21 | **defendant** 1:8 2:9 |
| **commission** 52:25 | **conversations** 12:3 14:9 32:13 33:4,7 | **cut** 30:3 | **defensive** 32:15 |
| **communicate** 17:16 | | **cv** 1:6 | **delay** 17:13 |
| **communicated** 13:23 | **copies** 50:9 | **d** | **denied** 29:23 |
| **companies** 16:8 27:25 | **cordial** 32:11 | **d** 1:7 | **departure** 4:21 17:21,23 |
| **company** 16:12 25:18 35:8 | **corporate** 9:22 10:10 11:7,17 26:2 | **data** 5:8 15:24,25 16:11,15 18:20 19:7,9,11 20:3,5,5 20:21,21,23,24 21:2,4,5,11,12,22 22:14 23:1,4,5,15 24:2,17,25 25:14 25:18 27:7 29:5,6 29:11,13,23 30:7 30:16,17,20 33:15 33:17,21,22 34:7 35:7,7,15,19,20,24 36:3,10,13,25 37:17,19,23 38:16 38:23 40:16 42:5 42:6,21,22 43:4,6 43:8,20 45:1,7,13 45:18 | **depending** 13:11 19:5 |
| **compare** 41:8 42:12,20 | **corporation** 9:24 | | **deponent** 50:1,4,5 50:6,11 |
| **compensate** 45:3 | **correct** 7:6,7,18 8:1,6,8 15:6,7 16:8 21:7 23:2,4,6 29:6,9,13,14,17 30:16 33:16 35:5 35:14,22 39:5 40:17 44:19 47:13 47:17 | | **deponent's** 50:4 |
| **compensation** 47:16 | | | **deposition** 1:11 3:2 4:1,13,20 5:4 17:20 31:21 49:9 49:10 50:3 51:8 |
| **compiled** 9:4 | | | **derivative** 19:17 20:2 23:23 |
| **compiling** 25:14 | | | **derived** 15:25 |
| **complete** 8:5 | **corrections** 50:4 51:9 | | **described** 41:19 |
| **completed** 50:13 | **correctly** 38:11 | | **description** 3:9 |
| **compliance** 5:3 | **counsel** 2:1,16 47:22 | | **descriptor** 39:16 |
| **complicated** 19:15 | **counted** 13:12 | **database** 14:19 35:16 42:21 | **designate** 5:9,15 |
| **concerns** 5:3,12 36:25 37:4 38:15 38:22,22 39:1,3,9 39:15 46:10 | **counting** 37:9 | **date** 17:17 50:2 | **desire** 51:7 |
| | **county** 49:4 | **day** 18:24 19:5 20:24 24:20 25:5 44:6,15 49:17 52:21 | **detail** 24:4 |
| | **couple** 5:23 6:12 37:1 | | **determine** 41:10 |
| **concession** 37:10 | **course** 6:3 | | **developer's** 34:1 |
| **concluded** 48:16 | **court** 1:1 8:11,14 49:6 50:11,15 | **days** 21:3 24:15,15 50:2 | **developers** 14:21 14:21 |
| **conduct** 29:12 | | **dealing** 18:25 | **development** 35:24 |
| **confident** 29:24 30:1 | **cra** 28:9 | **dealt** 32:1 | **difference** 19:10 23:22 |
| **confidential** 5:7 5:10,16 | **creating** 35:9 | **debated** 15:12 | **different** 9:21 10:4 10:21,25 11:2,6 13:10,11 22:19 26:4 37:15 38:22 |
| **connected** 8:17,18 | **credit** 28:3,9,11 | **decides** 40:23 | |
| **consult** 47:21 | **critical** 12:5,10,13 | **decision** 45:2,7,19 45:20 47:8,13 | |
| **contained** 8:4 | **criticisms** 8:21 9:3 9:15 | **decisions** 45:13 47:16 | **differently** 13:8 |
| **content** 33:6 | | | **difficult** 15:16 17:10 |
| **context** 44:23 | **culled** 46:24 | | |
| **continued** 1:11 3:2 4:1 17:25 18:1 | | | |

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[direct - form]**

Page 4

**direct** 14:24 15:23
15:24 16:2 19:8
22:24
**direction** 27:22
**directly** 22:23
25:17,21
**disagree** 13:24
**disagreeing** 13:6
**disagreement** 13:9
**discuss** 37:21
**discussed** 20:17
**discussion** 6:8
21:21 22:14
**discussions** 10:8
11:14,16,21 12:4
16:22 24:1 31:21
32:2 36:14 37:3
43:18,21 44:20
**displayed** 7:15
9:25
**district** 1:1,1
**division** 1:2 28:24
30:8,14
**documents** 9:16
**doing** 6:16 22:7,7
28:13 39:12
**dollar** 23:16,16,18
23:19 28:2
**dollars** 19:16
41:24 42:15,15,15
**drew** 24:17
**due** 50:2
**duly** 4:8 49:9

**e**

**e** 3:11 6:22 7:2,5
7:18 49:1,1 51:6,7
**earlier** 7:9 24:8,25
31:20 35:12 36:9
**easier** 16:6 35:22
**effect** 25:10 26:17

**effectively** 13:6
14:8 18:8 19:22
23:24 27:20 29:20
33:1,12 43:9,15
**efforts** 43:19
44:25
**either** 10:8 17:16
26:17 34:17
**electronically** 50:5
**employed** 47:9,17
**employment** 24:21
**empowered** 34:14
**ended** 20:18 24:16
43:24
**ends** 42:20
**entered** 51:8
**errata** 50:2,5,5,6,8
50:9,10,13 51:1
**esquire** 2:2,3,9
**evaluate** 45:22
**eventually** 22:8
**everybody** 48:2
**ex** 43:7
**exact** 29:12,25
**exactly** 11:4 13:24
38:12
**examination** 3:5
4:10 40:12 47:6
**examined** 4:8
**example** 28:6
35:14
**exceptions** 45:14
**excluding** 28:5
**excuse** 30:11
**exhibit** 3:10,11
6:19,22 8:4
**exhibits** 3:9,16
**exit** 25:3
**expand** 33:25
**expect** 19:21 22:15
23:18 41:3,18

**expected** 20:3,5
23:5 26:23,24
40:16 41:10,13,14
41:24 43:20 45:1
45:6,12
**expense** 15:23
16:11,15,23 22:13
23:1
**expenses** 11:9 16:3
37:7 45:8 47:9
**experience** 46:1
**expires** 52:25
**explain** 14:3 23:25
40:21
**explained** 11:1
12:24
**expound** 32:2
**extent** 5:11
**external** 9:8,10
19:11

**f**

**f** 49:1
**facility** 50:14
**fact** 36:15 37:21
37:22 38:2,16
**fan** 5:25
**fannie** 41:1,9
**far** 31:11
**fare** 38:11
**february** 1:14 3:4
4:4 47:8 49:17
**federal** 51:6
**feel** 5:19 23:8
28:18 29:21 31:11
34:14 38:1 48:5
48:14
**feeling** 48:11
**felt** 29:24 36:19
37:25
**ferrill** 1:17 49:6,20

**figure** 22:3 25:3
27:6 32:23 33:8,9
**figured** 25:5,5
**figures** 30:15
31:12 39:4
**file** 46:1 50:8
**filed** 50:11
**fill** 50:5,5
**final** 13:3 19:18,19
22:13
**finance** 43:2
**finances** 12:17
**financial** 9:16 15:5
29:13 38:16 43:7
46:2,5,7,11,17
**financials** 8:22,25
9:4,8 28:19
**find** 7:8,16 32:9
**findings** 46:14
**fine** 22:9
**finish** 14:9
**finished** 47:21
**finley** 2:3
**firm** 2:3
**first** 9:5 36:2
**five** 17:11 18:9
39:7,20,24
**flawed** 42:23
**flow** 37:19
**flows** 19:11
**folders** 6:21
**follow** 40:7 47:5
48:7
**following** 51:5
**follows** 4:9
**form** 7:19 8:7 9:17
10:17 12:9 13:13
15:21 16:5,16,24
18:14 20:7 21:14
22:16 24:11 26:19
27:9 29:8 33:18

Scott Frommert
February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[form - indicator]                                                                                    Page 5

36:21 38:4,18
39:6 51:7,9
**forth**  22:9 49:9
**forward**  50:8
**foundation**  10:18
18:15 21:15 22:17
26:20 27:10 38:19
**four**  42:15
**freddie**  41:1,10
**free**  5:19
**frequent**  44:1
**frommert**  1:12 3:3
4:2,6,12 5:2,22
6:11 8:19 21:6
31:10 39:17,23
40:9 47:1 48:3,10
49:8 50:1 52:20
**front**  7:4
**frustrated**  39:11
**full**  19:13
**fully**  11:11
**fulton**  49:4
**functionality**
42:22
**funding**  1:7 2:16
4:21
**furnish**  51:10
**further**  17:17 48:3
49:12

**g**

**ga**  50:17
**gain**  20:3 23:5
26:23,24 40:16
41:24 43:20 45:1
45:6,12
**gears**  17:18
**general**  2:16 30:10
**generally**  28:9
30:6 38:13 43:21
**georgia**  1:1 2:5,11
49:2,7

**getting**  14:12
16:11 18:19,20
19:15 20:15 21:3
**gibson**  2:3 6:3,15
6:18 48:14
**gina**  1:4 7:5,11,15
35:4 36:14,19
37:3,25
**ginnie**  41:1
**give**  6:5 14:9 17:24
20:20,23,24 21:4
22:4 24:17,19,23
27:12 28:3,9,11
31:2 33:15 35:13
37:18 41:23 43:25
47:20
**given**  15:19 21:22
24:9 41:11 49:11
51:8
**giving**  21:5
**go**  4:5,23 5:13
6:10 7:3 8:14 12:1
14:5,20 17:5 22:4
22:6 28:20 30:9
30:12,18 31:9
32:6,25 33:12,14
34:2 36:11 39:12
39:19 42:15 44:8
47:22 48:1
**goal**  10:12,16
12:21 17:10,12,14
33:1 34:5 45:16
**goes**  23:15
**going**  5:22 13:25
17:13 18:3,9,10,12
19:16 21:2 22:7,8
22:9 24:19,23
32:22,24 34:6,14
36:11,11 37:15
39:24 40:24 45:3
47:22

**golden**  2:10
**good**  6:17 28:13
34:21 40:8
**gray**  34:8
**greetings**  50:3
**gregory**  2:10
**group**  15:13
**guess**  9:11,18 12:8
13:10 14:2 17:2
31:13,14 32:20,21
39:9 43:23
**guessing**  31:15
**guy**  32:11
**guys**  33:8 34:22

**h**

**half**  32:11
**hand**  49:17
**happen**  32:24
**happening**  18:21
**hard**  14:3 30:4
**harder**  30:18 36:8
**hargrove**  2:2 3:6
4:5,11,16,19,23
5:21 6:4,10,11,13
6:16,25 7:24 8:10
8:16,19 10:2 11:1
12:14 13:19 16:2
16:7,21 17:18
18:17 20:11 21:20
22:21 24:22 27:4
27:14 29:10 31:3
31:6,9,10 34:16
37:2 38:10 39:2
39:17 40:4 47:4,7
47:20 48:1
**hargrove's**  42:3
**head**  16:20
**hear**  9:7,8 33:10
34:17
**heated**  33:2,3,4,6

**hedge**  19:18
**help**  24:7 32:18
**henry**  2:9 4:16,23
13:14 20:8
**henry.perlowski**
2:12
**hereinbefore**  49:9
**hereunto**  49:16
**hey**  17:5 20:20
**hiding**  31:11
**higher**  24:4 30:18
**highest**  9:18 30:2
30:5
**hit**  17:13 33:25
**hitting**  17:7 24:7
32:8
**hope**  48:5,11,14
**hopefully**  39:21
**hud**  46:2
**hurdles**  17:6

**i**

**idea**  16:14 21:8
31:17
**identification**  3:10
6:24
**ii**  1:13 4:3
**impact**  45:13
**implemented**
44:17,22
**important**  17:15
**improper**  26:10
**inability**  32:9
**inaccuracies**  29:4
**inaccuracy**  30:21
**included**  7:22
10:22 11:10
**inclusive**  11:11
**index**  3:1
**indicated**  40:6
**indicator**  29:19

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al

February 16, 2022

[indicators - marketing]

Page 6

**indicators** 29:22
**indirect** 25:21,22
**individual** 42:18
**industry** 29:19,21
  30:6 36:10,11
**information** 5:7
  14:12 15:19 16:23
  23:8,12 24:9 25:9
  26:14 28:17,22
  29:4 38:3 40:14
  41:10 45:21
**initial** 17:20 31:20
**input** 10:25 11:3
**inside** 28:2
**insight** 38:24
**interactions** 12:16
  12:21
**interest** 41:6,19
**interested** 49:14
**internal** 9:6,16
  12:17 14:1 15:5
  28:10,19 29:5,12
**interval** 43:25
**invisible** 35:16
**involve** 13:9
**involved** 25:17
  26:4,5
**irregardless** 27:2
**issue** 4:25 20:17
  32:1
**issues** 8:25 32:7
  36:1
**iteration** 31:20

**j**

**jan** 7:5
**jason** 10:7 17:7
  18:6,16 19:4
  20:13,14,16 22:2,2
  22:3,4 32:8,23
  38:6

**job** 15:20 16:4
  18:24 21:13 23:7
  35:21 46:13
**jobs** 16:12
**jon** 7:5 18:12,16
**jumping** 17:19

**k**

**k** 1:17 49:20
**keblar** 14:19
  35:17 42:5,17,20
  43:12,13,14 45:23
**keep** 17:7 22:6,7
**kelly** 7:5,11,16
  35:4 36:14,19
  37:3
**ken** 2:16
**kind** 12:2 13:3
  20:16 22:8,14
**knew** 34:21
**know** 5:3 6:25
  9:14,19 10:21,24
  10:25 12:12 13:2
  13:4,6 14:5,7,18
  15:1,14,16 17:15
  18:4,5,19,20,23
  19:5,22 20:18,20
  20:25 21:1,2,10
  24:5,6,16 25:20
  27:23 28:1,9,10,14
  29:25 30:25 31:13
  31:16,24 32:9,20
  33:2,10,11,11,13
  34:4,8,10 36:24
  37:7,8,8,12,14,16
  38:21,22 39:14,16
  40:5 41:19 43:2
  48:6
**knowledge** 25:19
  26:7 44:25 45:5
  45:11,25 46:8
  47:12

**known** 19:22
**kristin** 10:6 14:18
  19:4
**ksjg** 46:20,23

**l**

**labeled** 3:11 6:23
**lack** 36:19 38:1
**laid** 11:18 13:3,4
**layered** 9:23
**layers** 9:22 10:4
  10:10 11:12
**layout** 10:4 14:20
**laypersons** 40:20
**leaving** 24:16
**led** 17:22 26:9
**legal** 11:8
**lender** 46:2
**level** 9:18 24:3,4
  30:3 38:14 45:23
  46:12
**levels** 10:21,25
  11:2,6 30:2,5
**lever** 27:20,21
**light** 8:22 38:2
**line** 14:9 24:17
  51:11,14,16,19,21
  51:24 52:1,4,6,9
  52:11,13,16
**lines** 38:7
**literal** 33:22
**little** 17:20 27:5
  29:18 38:13
**llp** 2:10
**load** 43:13
**loan** 19:12,14,21
  26:23,25 37:8
  40:22,23,25 41:2,6
  41:7,11,15,17,23
**loans** 28:9 38:6,11
  42:10,14,18

**lock** 19:14,21,23
  26:25 40:24,25
  41:8,9
**locking** 41:6
**long** 9:20 39:12
**look** 5:5 10:20,23
  11:8,24 13:3
  19:18 23:22 27:25
  33:23,23 35:25
  40:25 41:20 42:1
  42:10 43:8,11
  44:8 45:16,24
**looked** 10:13
**looking** 31:1 44:3
**looks** 7:2,4 8:18
  19:23 34:12
**loss** 9:1 13:11
  28:24
**lot** 14:8 23:14 26:3
  31:14 34:23 37:10
**luck** 48:10

**m**

**m** 2:9
**machine** 27:21
**mail** 3:11 6:22 7:2
  7:5,18 50:7
**making** 15:18
  34:23 37:13 51:8
  51:9
**managers** 34:18
  45:3
**mansell** 50:15
**manually** 50:5
**margin** 9:22 10:10
  11:7,17
**marked** 6:23
**market** 19:17,23
  23:21 40:24 41:20
**marketing** 16:1
  45:8 47:9

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al
February 16, 2022

[marriage - p&l]                                                                Page 7

**marriage** 49:13
**marybeth** 2:3 6:16
**material** 46:14
**matter** 49:15
**mean** 10:5,11
  11:22 12:2 13:22
  14:15 16:19 17:25
  18:18 20:13 21:9
  23:17 24:14 26:4
  27:19,24 29:18
  34:8 37:6 46:12
**meaning** 42:13
**meeting** 7:10,14
  8:1 20:19 38:5
**meetings** 18:6,13
  37:1
**mentioned** 37:12
  37:25 40:14 43:18
**merged** 46:25
**met** 44:10
**mgibson** 2:6
**mine** 37:7
**minute** 5:24 31:7
**minutes** 39:20,24
  47:20
**miscalculation**
  30:21
**mischaracterizes**
  16:17,25 22:17
  24:12 33:19
**mock** 11:24
**model** 7:11 9:7
  10:11 11:23 13:2
  30:24 35:4,10,23
  35:24 36:16,20
  37:4,18,23 38:23
  38:24 44:17,22
**modeling** 9:11
**moment** 6:6 40:23
  41:11

**money** 34:19,21
  34:22,23,23 35:1
  37:13
**month** 43:25
**months** 17:11,11
**mouse** 28:1,2
**move** 10:13 12:21
  14:23 27:20,21
**moves** 19:17
**multiple** 27:12
  32:6,13

**n**

**n.e.** 2:4
**n.w.** 2:10
**naf** 5:8 9:2 10:3
  11:15 12:15 15:19
  17:21,23 21:12
  23:1 24:9 25:24
  25:25 26:7 27:7
  28:16,24 36:16
  38:3 39:3 41:15
  41:17 44:6,17,21
  46:1,4,15,19 47:10
  47:15
**naf's** 19:9 25:10
  25:15 26:17 38:16
  45:2,7,13 46:1,10
**name** 46:24
**nasally** 6:2
**nature** 34:24
**nda** 31:25 32:1
**necessary** 51:9
**need** 6:7 16:2
  20:22 23:11 24:5
  24:17 30:25
**needed** 14:12
  15:20 20:5 21:12
  23:9 30:7,15
**nefarious** 27:6
**negative** 12:16,20
  21:11

**neutral** 32:16,18
**never** 11:1
**new** 1:7 2:16 4:21
  10:11 24:16
**nick** 6:13
**northern** 1:1
**nose** 5:25 31:5
**notarized** 50:6
**notary** 4:8 52:23
**note** 8:12
**noted** 51:4,5
**noticeable** 30:22
**noting** 50:4
**number** 13:17
  43:9
**numbers** 14:4
  30:5,10,13,14
  36:10 42:16

**o**

**o'bradovich** 10:7
  10:9 12:5,17
  13:20 31:11,23
  32:4,15 33:16
  40:15
**oath** 4:15
**object** 7:19 8:7
  9:17 10:17 12:9
  13:13 15:21 16:5
  16:16,24 18:14
  20:7 21:14 22:16
  24:11 26:19 27:9
  29:8 33:18 36:21
  38:4,18 39:6
**obligations** 5:6
  26:1,18
**obviously** 29:24
**occasions** 32:6
**ocga** 51:7
**office** 44:2
**officer** 43:7

**offices** 50:2,7
**offsets** 19:18
**oh** 6:16
**okay** 5:17,21 6:17
  7:3,24 8:10,18 9:9
  10:2,15 12:14,23
  13:15,24 14:10
  15:2,8 19:24 20:4
  20:9 21:20 22:11
  22:21,25 25:2,8,19
  26:8,14 29:21
  30:7,23 31:13,18
  32:13 33:14 35:2
  35:20 37:21 39:2
  40:1 43:17 44:14
  44:24 45:21 46:19
  46:21 47:12,19
  48:11
**once** 50:6
**ongoing** 44:21
**operating** 11:11
**opinion** 25:24 34:2
**options** 27:13
**order** 5:11 14:13
  16:3
**ordering** 50:9
**original** 3:16,16
  50:8,11
**originally** 40:22
**outcome** 49:14
**output** 35:18
**outside** 25:18
  46:15
**overall** 12:2 30:13
**owing** 34:10,11
**owned** 14:18
**ownership** 31:16

**p**

**p&l** 7:11 9:21
  11:22 30:24 33:23
  35:4,9,21 36:16,20

Case 1:20-cv-04981-CAP   Document 91   Filed 04/27/22   Page 60 of 66
Scott Frommert                         February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[p&l - ready]                                            Page 8

37:4,23 44:17,22
**p.c.**  2:3
**p.m.**  48:17
**page**  3:5,10 7:4
   51:11,14,16,19,21
   51:24 52:1,4,6,9
   52:11,13,16
**pages**  51:9
**paid**  37:9
**paper**  14:4
**parcel**  22:14
**part**  7:22 8:4 9:11
   22:14 35:23
**parties**  5:11 49:13
   50:9
**partition**  43:10
**partner**  32:10
**pass**  26:5,9
**passes**  26:6
**patty**  34:17
**pause**  20:8
**payable**  22:23
**paying**  47:9
**pdf**  50:5
**people**  14:25
   34:21 36:3
**percent**  41:6,22,23
**percentage**  15:15
   41:25
**perception**  17:24
**perform**  36:8
**perlowski**  2:9 3:7
   4:18 5:1,18 7:19
   8:7,11,15 9:17
   10:17 12:9 13:13
   13:15 15:21 16:5
   16:16,24 18:14
   20:7,9 21:14
   22:16 24:11 26:19
   27:9 29:8 33:18
   36:21 38:4,18

39:6,23 40:2,5,9
   40:13 47:1,3,24
   48:6,8 50:1
**person**  8:1 17:10
   33:15 36:5
**personal**  26:3,12
**phase**  17:20
**phrase**  44:3
**phrasing**  40:18
**pieces**  9:23 28:2,4
**piedmont**  2:4
**place**  11:25 14:14
   31:25 43:21
**plaintiff**  1:5 2:2
**plaintiff's**  6:22
**plan**  35:21
**please**  7:6 50:7,13
   51:9,9
**point**  4:22 8:20
   14:5,5 17:4,9
   19:24 20:20 21:17
   25:2 41:2,4
**points**  41:25
**pool**  28:7,7
**portions**  5:9,15
**possible**  40:10
**powerpoint**  7:15
   7:17,25
**prefer**  29:25
**premium**  28:8
**preparation**  25:20
   25:22 46:16
**prepare**  36:16
   37:23
**preparing**  30:24
   35:21
**present**  2:15 7:11
   37:4
**presentation**  7:25
   8:5,5

**presented**  7:23
   37:20
**preslo**  7:5
**pretty**  22:1 29:24
   29:25 46:23
**previously**  4:7,12
**price**  19:19,20
   41:13,14
**prices**  22:13
**pricing**  45:14
**print**  50:5
**prior**  5:4
**privy**  47:15
**probably**  9:19
   25:3 31:15 32:17
   39:1,24 44:1
**procedure**  51:7
**proceed**  17:8
**proceedings**  48:16
**process**  39:12
**product**  43:1
**professionals**
   33:10 46:16
**profit**  9:1 11:11,11
   13:11 28:24 41:4
   41:11,13
**profitability**  9:7
   9:10,23 13:2,17
   19:25 27:18,19
   45:17,20,22
**profitable**  11:10
   45:15
**properly**  44:7
**proprietary**  5:8
**protective**  5:11
**prove**  38:7
**provide**  31:12
   39:4
**provided**  16:22
   21:23 24:2,25
   25:9 28:16,21

35:8 36:15 37:22
   38:2,17
**public**  4:8 52:23
**purchase**  19:12
**purpose**  43:5
**pursuant**  5:10
   51:6
**push**  23:15,18
   27:18
**pushback**  17:4
   18:22
**put**  4:24 14:23
   42:12
**putting**  18:25 19:2
**puzzle**  28:4

**q**

**question**  7:20 8:17
   13:8 14:15 15:1
   27:5 28:15,20
   40:7 42:24 43:24
**questions**  5:14,19
   6:12 39:25 40:5
   42:3 47:2 48:4
**quite**  37:17

**r**

**r**  49:1
**raise**  5:13,20
**raised**  5:3 46:10
**range**  29:20
**rate**  40:24,25 41:8
   41:9,19
**raw**  20:3,5 22:13
   23:15 35:18,20,24
   36:10,13 42:6,12
   42:19 43:8 45:1,6
   45:12
**reach**  15:4
**read**  50:3 51:2
**ready**  48:1

Scott Frommert

February 16, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[real - september]

Page 9

| | | | |
|---|---|---|---|
| **real** 47:22 | **related** 14:15 | 18:19 19:7,9,11 | **row** 34:8 |
| **realize** 25:2 | 49:12 | 23:4,5 25:10 | **rpr** 1:17 49:20 |
| **really** 9:19 10:24 | **relationship** 21:18 | 27:17,25 28:17,21 | **rule** 51:6 |
| 12:10,20 14:3 | 25:6 32:11 | 29:23 30:15 31:12 | **rules** 51:6 |
| 16:19 31:14 | **relative** 42:7 | 35:7 39:4 40:16 | **running** 18:4 |
| **reason** 27:23 | **relying** 34:5 | 43:20 45:1,6,12 | |
| 29:11 51:13,18,23 | **remember** 24:14 | **review** 7:16 50:4 | **s** |
| 52:3,8,15 | 38:12 44:8 | **reviewed** 4:20 | **sale** 19:19,19 20:3 |
| **reasons** 28:13 51:8 | **remind** 24:24 | **revisit** 8:24 | 20:5 22:13 23:5 |
| **rebuild** 11:22 | **rename** 14:23 | **richey** 46:22 | 26:23,24 40:16 |
| **recall** 7:12 11:4 | **report** 19:10 28:11 | **rick** 11:16 15:13 | 41:13,14,24 43:20 |
| 34:20,24 37:3 | 28:23 36:25 | 17:5 18:2 20:15 | 45:1,6,12 |
| 46:19 | **reported** 12:18 | 20:25 21:5,19,21 | **sand** 24:18 |
| **recalling** 44:7 | 14:21 22:23 25:17 | 24:18 31:21 34:17 | **saying** 13:4 17:11 |
| **receive** 40:15 | 25:25 | **right** 4:19 5:22 | 18:9 30:11 34:12 |
| 43:20 | **reporter** 8:11,14 | 6:20 7:8,14 9:13 | 34:20,25 |
| **receiving** 43:4 | 49:6 | 9:15 11:10,13,20 | **says** 19:23 |
| **recess** 31:8 40:3 | **reporting** 14:1,13 | 13:19 14:16,17 | **scott** 1:12 3:3 4:2 |
| 47:25 | 15:5 25:11 29:1 | 15:9 16:10 17:8 | 4:6 6:18 13:15 |
| **recollection** 7:21 | 35:17 | 18:10,11,21,22 | 48:14 49:8 50:1 |
| 8:9 37:11 38:9 | **reports** 19:11 | 19:13 20:11 21:8 | 52:20 |
| 44:5 | **represent** 41:22 | 23:3,7,11,14,25 | **screen** 6:19 |
| **record** 4:5,24 6:9 | **request** 14:24 | 25:13 27:20 29:10 | **seal** 50:8 |
| 6:10 31:9 49:10 | **requested** 16:15 | 30:18 33:6 34:6 | **second** 31:2 47:23 |
| **records** 22:20 | 16:23 29:23 50:3 | 34:11,16 35:12,17 | **secondary** 15:25 |
| **recycling** 27:4 | **respect** 5:7 | 35:25 36:3,9,11 | **seconds** 6:5 |
| **reed** 7:5 44:11 | **responded** 31:24 | 38:25 40:5,7 | **secrets** 5:8 |
| **reflect** 13:10 30:6 | **responding** 42:2 | 45:16 | **section** 5:6 |
| **reflected** 9:1 | **response** 14:6,11 | **road** 2:4 | **see** 7:6 23:22,23 |
| **refresh** 6:18 44:5 | **responsibility** | **roadblocks** 24:7 | 26:12 29:19 35:17 |
| **refusal** 31:12 | 50:4 | **robin** 1:17 49:6,20 | 35:18 41:1,20 |
| **regard** 4:25 5:12 | **responsible** 10:3 | **role** 9:3 24:5 25:13 | 42:9,11,17,18,19 |
| 22:12 | **result** 13:3 34:13 | 25:14,22 | 43:5 |
| **regarding** 46:10 | 43:11 | **rollups** 45:24 | **segment** 43:10 |
| **region** 27:19 35:13 | **resumption** 4:14 | **room** 18:7 39:20 | **sell** 19:12,16 41:15 |
| 45:24 | **return** 25:11,15 | **roswell** 50:17 | 41:17 |
| **regional** 34:18 | 26:7 | **rough** 38:13 | **selling** 28:8 |
| 45:3 | **returned** 50:8,10 | **roughly** 44:6 | **send** 50:9,13 |
| **regionals** 35:5,22 | **returns** 26:1 | **round** 15:12 | **sense** 29:2 |
| **reimburse** 45:8 | **revenue** 15:25 | **routed** 15:12 | **september** 7:10 |
| | 16:3,11,15,23 | | 44:11 |

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al
February 16, 2022

[set - theme]

set 38:5 49:9,16
sheet 14:4 42:16
  42:20
shift 17:18
shifts 23:21
short 9:20
shortest 43:15
sick 22:5
side 32:16,21
sign 50:3
signature 49:18
  50:1,11
signed 50:6,8,10
similar 38:15,21
  38:25 44:23
simple 28:1 34:9
simply 35:18
single 42:13
sir 32:14 35:6,11
  36:17 40:19 47:11
sit 40:7
situation 36:4,6
  37:19
six 17:11 33:24
  34:1
sixth 39:8
small 30:19
software 15:6
sold 26:23 27:2
  28:1
solutions 1:7
somebody 15:4
  18:25 19:23 34:20
  34:25
someone's 29:16
soon 39:22 48:5
sorry 13:14 18:17
  20:8 31:5 41:14
  44:13
sort 8:24 32:10
  42:25

speak 42:4
speaking 43:22
spearman 1:4 3:12
  3:12 6:14,23,23
  44:10
spec 28:7,7
specific 28:6 30:11
  30:14,20 32:6
  38:6,11
specifically 5:13
  13:23 34:25 38:5
  44:2,15
specifics 11:4
speculating 16:19
  31:17
speculation 21:15
  26:20 27:10 36:22
spent 37:17
spring 44:18
ss 49:3
start 28:20
started 5:25 6:1
  43:24
state 49:2,7
statement 4:24
  51:8
statements 46:2,5
  46:7,11,17
states 1:1
stipulations 4:17
stock 41:20
stood 33:15
stop 31:4 47:9
street 2:10
strike 11:15
string 3:11 6:22
structure 14:20
structured 28:12
submit 46:4
subscribed 52:21

substance 51:7
success 32:12
sufficient 29:22
suite 2:4,10 50:16
sum 43:9
summation 29:7
super 6:1 9:19
support 32:23
supposed 18:4
sure 5:1 13:7 19:7
  23:14 30:1 43:23
  44:2 46:23 47:24
suspended 4:13
sworn 4:8 49:9
  52:21
system 14:17
  22:19 35:16

t

t 49:1,1
table 8:4 15:12
tad 17:19,19
take 5:24 6:7
  14:14 28:7 30:25
  31:3,19 39:17
  42:15 43:8,25
taken 4:13 5:5
  31:8 40:3 47:25
takes 34:1
talk 9:19 17:21
  20:19 31:24 32:7
  34:6
talked 8:19 10:12
  23:20 30:10,13,24
  36:9 43:1
talking 8:20 11:23
  14:17 22:5,12
  41:16
tape 42:11,12
task 29:12
tasked 9:14 11:22
  30:23 35:3

tax 25:10,11,15,19
  25:22 26:1,1,4,7
  26:17
taxes 25:18 26:2,3
  26:11,11,12,22
  27:1
team 12:6 15:14
  22:23 28:11 34:6
technical 9:20
tell 10:15 11:20
  20:14 21:19 30:18
  30:25 31:23 32:5
  37:2
ten 38:6,11 39:24
tension 18:8,11
  31:22 32:3
tenure 46:5
terms 40:20
territorial 31:15
test 23:16,19 29:5
  30:15 35:24 36:12
  38:23
testified 4:9 7:9,25
  24:8 35:12
testimony 8:3
  16:17,25 22:17
  24:12 33:19 42:3
  49:10 51:3,7
testing 29:12
  38:10
tests 23:15,17 36:8
  36:9
thank 40:2,10 47:1
  47:3 48:4,8,12
thanks 8:15 48:13
  48:14
thargrove 2:6
thefinleyfirm.com
  2:6,6
theme 12:2

Scott Frommert
Spearman, Gina v. Broker Solutions, Inc. Et Al

February 16, 2022

[thing - words]

Page 11

thing   10:22 22:1
things   10:22,23
  15:11 28:5 34:9
  34:22,24 37:6,10
think   10:20 12:19
  13:23 14:16 18:5
  18:8,16 19:16
  20:13,25 21:17
  24:3,14 26:25
  32:19 34:8,21
  35:23 36:4,7,7
  37:6,10,12 38:5,12
  38:13,24 39:1
  41:9 42:1,14 43:1
  46:22 47:21
thinking   39:20
thirds   7:3
thought   27:2
  31:14 37:13
three   9:21 10:4,9
  10:22 11:2,6
  20:19 41:22,23
  42:14,15,21
tie   23:13
time   6:7 9:20
  12:15 17:12 19:25
  25:3 32:19 36:2
  37:14,15,18 39:8
  39:13 40:11,23
  41:2,4,12 42:13
  47:16 48:4,12
  50:10
timeframe   44:4
times   10:1 18:9
  32:6 36:24 39:7
  41:23
today   5:14,23
  40:11 42:3,14
  48:12
told   21:22,25
  24:22 36:24

tool   35:17 45:23
top   7:4
topic   19:6 31:25
  32:20 33:13
touch   5:23
tough   32:20
trade   5:7 28:12,12
trading   41:2,21
transcript   3:17
  5:10,15 50:4,9,11
  51:3
transparency
  36:19 38:1,16
transparent   39:3
travis   2:2 4:18
  48:8
tried   36:5,9
trouble   16:10
true   9:1 37:14
  38:1 49:10
trust   21:9 24:10
  24:19,23 26:15
  27:8
try   36:11 39:9
  40:9
trying   12:19 13:1
  17:6 18:7 24:6
  27:5 36:4 40:15
  42:4,7 44:4
turn   5:25
turned   33:2
two   7:3 10:22
  17:13 19:16 21:3
  24:15,20 25:6
  41:22,22 42:15,22
  47:20

**u**

ultimately   17:25
  21:9 33:14 45:18
unable   16:14

undersigned   51:2
understand   42:4,7
understanding   5:2
  10:3,6 11:5,12
  36:18 37:19
understate   27:17
  27:18
united   1:1
units   30:20
upload   6:13 42:16
  42:16
uploaded   42:12
ups   48:7
urgent   39:21
use   27:6 29:19
  39:9,14 43:16
  46:15 51:9
useful   35:9

**v**

v   2:3
validate   29:1
value   43:6
variety   23:17 32:7
  36:7 37:6
verify   7:17,25
veritext   50:7
veritextproduction
  50:14
version   9:20 19:4
  43:15
versus   10:22,22
  11:11 12:22,25
  13:4 29:25
video   31:4
view   12:22,22,24
  12:25
virtual   1:11 3:2
  4:1
visibility   9:25
visible   42:5,7,22

volume   1:13 4:3
vs   1:6

**w**

wait   8:16
walk   17:22
walls   32:8
want   4:23 7:8,16
  8:23 11:9 12:11
  13:2 14:5,22 17:7
  17:18 19:7 23:21
  23:22,23 31:19
  33:10,23,24 38:23
  42:19
wanted   6:12 8:23
  9:6 10:20 13:5
  14:13 15:2,17
  29:11 39:11 41:15
  41:17,25 43:11
wanting   43:5
way   6:1 7:4 9:3,24
  11:17 12:6,11,12
  12:17 13:5,25
  14:2,13,17 32:9
  34:2 35:14 36:12
  41:25 43:10 49:14
we've   4:20 5:5
  32:1
wednesday   1:14
  3:4 4:4
week   19:5
weeks   17:13
went   20:16 37:10
whereof   49:16
wide   28:24 30:8,8
witness   4:7 5:17
  6:20 13:14 20:8
  31:2,4,7 40:1 47:2
  48:13 49:8,11,16
word   29:16 39:14
words   39:10 41:15
  43:6

Scott Frommert                          February 16, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

| |
|---|
| **work**   14:25 18:4,7 |
| 18:9,10 20:15 |
| 22:3,8,10 34:1 |
| 36:6 |
| **worked**   36:5 |
| **worries**   31:6 |
| **worth**   19:24 27:1 |
| 27:3 41:3 |
| **written**   46:14 |

| **x** |
|---|
| **x**   41:21 |

| **y** |
|---|
| **yeah**   6:7 22:22 |
| 28:14 31:3 32:19 |
| 33:21 |
| **year**   41:7,19 46:2 |
| **years**   44:9 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.