Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4       GINA SPEARMAN,

5              Plaintiff,          Case No:

6       vs.                        1:20-cv-04981-CAP

7       BROKER SOLUTIONS, INC.,

8       d/b/a NEW AMERICAN FUNDING,

9              Defendant.

10

11

12                     DEPOSITION OF

13                       JIM MUTH

14                    March 29, 2022

15                      1:52 p.m.

16

17          TAKEN BY REMOTE VIDEO CONFERENCE

18          LaRita J. Cormier, RPR, CCR-2578

19

20

21

22

23

24

25

Jim Muth                                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 2

1                     INDEX OF EXHIBITS

2    Exhibit No.        Description                    Page

3    Plaintiff's

4      Exhibit 1   NAF_0000739, OLA Division CM        125

5                  breakdown 2018 (bps)

6      Exhibit 2   NAF_0000781, Rolling P&L, 01/18     142

7                  to 09/18

8      Exhibit 3   Copy of NAF Metadata                156

9      Exhibit 4   NAF_0000733, Complete OLA P&L,      157

10                 Jan-Nov '18

11     Exhibit 5   NAF_0000734, Southeast              161

12     Exhibit 7   NAF_0000735, 2018 Regional          164

13                 Summary

14     Exhibit 9   NAF_0000737, 2018 Post Lock         166

15                 Concessions

16     Exhibit 10  NAF_0000738, SE Discretionary       168

17                 and Marketing Expenses

18     Exhibit 11  NAF_0000743, spreadsheet            170

19     Exhibit 12  NAF_0000774, spreadsheet            172

20     Exhibit 13  NAF_0000782, 2017                   175

21     Exhibit 14  NAF_0000783, Confidential           177

22                 spreadsheet

23     Exhibit 15  NAF_0000784 Spreadsheet             179

24

25

Page 3

1              INDEX OF EXHIBITS (Cont'd)

2     Exhibit No.        Description                   Page

3     Plaintiff's

4       Exhibit 16  NAF_0000789 Spreadsheet           179

5       Exhibit 17  NAF_0000795 Spreadsheet           179

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 4

1   APPEARANCES OF COUNSEL:

2   On behalf of the Plaintiffs:

3           TRAVIS C. HARGROVE, ESQUIRE

4           MARYBETH V. GIBSON, ESQUIRE

5           THE FINLEY FIRM, P.C.

6           3535 Piedmont Road

7           Building 14, Suite 230

8           Atlanta, Georgia  30305

9           Thargrove@thefinleyfirm.com

10          Mgibson@thefinleyfirm.com

11          Njackson@thefinleyfirm.com

12

13  On behalf of the Defendant:

14          HENRY M. PERLOWSKI, ESQUIRE

15          Arnall Golden Gregory LLP

16          171 17th Street, NW

17          Suite 2100

18          Atlanta, Georgia  30363

19          Hperlowski@agg.com

20

21  Also present:

22          Ken Block, NAF General Counsel

23          Andrew Westle, NAF Senior Counsel

24

25

```
                                                        Page 5

 1                      JIM MUTH,

 2     having been first duly sworn, was examined and

 3     testified as follows:

 4                      EXAMINATION

 5     BY MR. HARGROVE:

 6         Q.  Good afternoon over here; and good morning

 7     I guess for another hour over there, Mr. Muth.  I'm

 8     Travis Hargrove.  I represent Gina Spearman in this

 9     action that has been filed against New American

10     Funding that's pending in the United States District

11     Court for the Northern District of Georgia, and I'm

12     here to take your deposition today.

13                  MR. HARGROVE:  Henry, are you good with the

14     usual stipulation?

15                  MR. PERLOWSKI:  Yes, Travis.

16     BY MR. HARGROVE:

17         Q.  And I just want to make sure I'm

18     pronouncing your name right.  It's "Muth," not

19     "Mooth"; correct?

20         A.  Correct.

21         Q.  Okay.  Mr. Muth, you have the right to read

22     and sign this deposition, or that's something that

23     you can choose to waive.  You can speak with your

24     counsel and just let the court reporter know about

25     that.  That's just something I like to advise
```

Page 6

1   everyone of during the deposition.

2          MR. PERLOWSKI:  We'll read and sign.

3   BY MR. HARGROVE:

4      Q.  Have you ever been deposed before,

5   Mr. Muth?

6      A.  No.

7      Q.  All right.  Well, let me just walk you

8   through, and some of this may be a little

9   repetitive, but let me walk you through the process.

10  I'm going to be asking you questions.  It's a little

11  bit unique because, often, these would be in person

12  rather than on a screen.  So first off, if you don't

13  hear my question or if I freeze or something, you

14  know, raise your hand, stomp your feet, do something

15  so that I know that, and then we'll stop and fix the

16  technical difficulty.

17         But one thing that I am going to need,

18  because the court reporter is going to be taking

19  down everything that I say and everything that you

20  say and anyone else says, is that I'm going to need

21  you to give me verbal responses.  So sometimes

22  uh-huhs or huh-uhs or head nods, we'll just do that

23  in normal communication, but in deposition, we need

24  yes, no, and verbal responses.  So if I tell you I

25  need a verbal response after you've answered a

Jim Muth                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 7

1   question, I'm not trying to be rude.  I just want to

2   make sure that the record accurately reflects what

3   was stated here to me.  Fair enough?

4       A.  Yes.

5       Q.  Next, if you need a break at any time for

6   any reason today, that's fine.  This is not an

7   exercise in endurance.  I hope to get you out of

8   here as quickly as possible, but we do have a fair

9   amount of material that we need to cover.  But if

10  you need a break, I would ask that you finish any

11  question that's pending at the time before we take

12  the break.  Fair enough?

13      A.  (The witness nods.)

14      Q.  I actually didn't hear you that time.

15  You're cutting out a little bit.  Hopefully it will

16  clear up.

17          Next, if -- the questions I'm asking you

18  today, I'm not trying to ask you trick questions.

19  I'm trying to ask you direct questions so I can find

20  out what you know or what you may not know about

21  this litigation.  So to that end, if I ask you a

22  question and it's unclear or you do not understand

23  it, I need you to tell me that so that I can then

24  rephrase or ask the question in a better way so that

25  you do understand it.  Fair enough?

Jim Muth                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                         Page 8

1        A.   Yes.

2        Q.   And if I ask you a question and you don't

3   understand it but you don't tell me that, the record

4   is not going to reflect your lack of understanding

5   of the question.  Fair enough?

6        A.   Yes.

7        Q.   All right.  Do you have any questions about

8   any of those ground rules?

9        A.   No.

10       Q.   Are you fine with abiding by them?

11       A.   I'm sorry, what was that?

12       Q.   Are you okay with abiding by them today?

13       A.   I couldn't hear what you were saying.

14       Q.   Are you okay with abiding by those ground

15   rules today?

16       A.   Yes.

17       Q.   And then one other one that I always get

18   reminded of, these will get conversational.  I'm

19   going to try my best to let you finish your answer.

20   You try your best to let me finish my question.

21   Sometimes one of us may anticipate what the other is

22   going to say, but the court reporter can only take

23   down what one of us is saying at a time.  Fair

24   enough?

25       A.   Yes.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 9

1        Q.   Great.   Could you state your full name for
2    the record?
3        A.   Jim Muth.
4        Q.   All right.   And Mr. Muth, where do you
5    currently reside?
6        A.   In California.
7        Q.   All right.   In Tustin?
8        A.   In Newport Beach.
9        Q.   Newport Beach?   Okay.   Are you testifying
10   from the company offices in Tustin right now?
11       A.   No.
12       Q.   From home?
13       A.   Yes.
14       Q.   Got you.   All right.   And you live in
15   Newport Beach.   Do you have any connections to the
16   state of Georgia of any sort, relatives?
17       A.   Relatives.
18       Q.   You do?
19       A.   Yes.
20       Q.   All right.   And do those relatives live in
21   the Atlanta area?
22       A.   In Athens.
23       Q.   Okay.   All right.   If they're in Athens,
24   they would be Middle District, not Northern
25   District.   So no relatives that live -- other than

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1   some relatives who live in Athens, no relatives in

2   the state of Georgia?

3        A.   No.

4        Q.   And just in case, what are those relatives'

5   names?

6        A.   Danine and Shawn Glynn.

7        Q.   All right.  Anybody else?

8        A.   No.

9        Q.   All right.  Have you ever lived in the

10  state of Georgia?

11       A.   No.

12       Q.   Have you ever been to the state of Georgia?

13       A.   Yes.

14       Q.   All right.  And was that a work-related

15  purpose for which you came to the state of Georgia?

16       A.   No.

17       Q.   All right.  Got you.  So your job at NAF

18  has never taken you to Georgia, then; correct?

19       A.   No.

20       Q.   No, it's not correct or no, not --

21       A.   No, it's never taken me to Georgia.

22       Q.   Okay.  Got you.  All right.  Are you a

23  member of any civic organizations, national

24  organizations, anything like that?

25       A.   No.  You broke up a little there.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 11

1        Q.   I haven't said anything since asking you
2    about civic organizations.
3        A.   Oh, okay.
4        Q.   All right.  Can you walk me through your
5    educational background briefly?
6        A.   Yes.  I went to Cal State Fullerton,
7    studied business.
8        Q.   Okay.  And did you graduate?
9        A.   Yes.
10       Q.   What year did you graduate?
11       A.   2009.
12       Q.   All right.  And did you have a major at Cal
13   State Fullerton?
14       A.   Business admin.
15       Q.   All right.  And did you grow up in
16   California?
17       A.   Yes.
18       Q.   After you got your undergraduate degree in
19   business administration, did you pursue any further
20   education?
21       A.   No.
22       Q.   Have you had any postgraduate courses of
23   any sort?
24       A.   No.
25       Q.   Walk me through your work history, starting

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 12

1   with after you graduated from Cal State Fullerton in

2   2009.

3        A.   In 2009, I was working for LendingTree

4   loans.

5        Q.   What did you do for LendingTree?

6        A.   I was a junior analyst.

7        Q.   What does a junior analyst do?

8        A.   Run various reports, metrics, KPIs.

9        Q.   Did you say KPIs?

10       A.   Yes.

11       Q.   What's a KPI?

12       A.   Key performance indicator.

13       Q.   What is a key performance indicator?

14       A.   Just measures how the company is

15   performing, whether it's production, volumes, that

16   sort of thing.

17       Q.   So as an analyst for LendingTree, you

18   weren't actually generating loans, you were

19   reviewing the financials that came in and then

20   providing reports based on those figures?

21       A.   Correct.

22       Q.   I didn't hear you.  I'm sorry?

23       A.   Correct.

24       Q.   All right.  And how long did you stay at

25   LendingTree?

Jim Muth                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 13

1       A.  I was at LendingTree for five years, but

2  part of it, it was acquired by another company.

3       Q.  Okay.  From about 2009 to about 2014, you

4  were with LendingTree.  And during that time,

5  LendingTree was acquired by someone else?

6       A.  Correct.

7       Q.  Did you advance from -- you were initially

8  employed as an analyst at LendingTree.  Did you

9  advance beyond the analyst title during your five

10 years?

11      A.  Yes.

12      Q.  And can you walk me through your

13 advancement within LendingTree, and then the company

14 that later acquired it?

15      A.  So I went from an analyst to a senior

16 analyst.

17      Q.  Okay.  What was the difference between

18 being an analyst and a senior analyst?

19      A.  Not much.

20      Q.  I would assume there was a pay raise, since

21 you got a new title, hopefully?

22      A.  Correct.

23      Q.  Okay.  Did you get more duties than you had

24 as an analyst?

25      A.  Over time.

Jim Muth                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 14

1      Q.  Okay.  What -- and what additional

2   duties -- you told me what you did as an analyst.

3   What additional duties did you obtain over time?

4      A.  Forecasting.

5      Q.  And would that be forecasting future

6   performance of the company?  I didn't hear you.

7   Every now and again, it's blipping.  Go ahead.  I

8   still didn't pick you up.

9      A.  Correct.

10         (Off-the-record discussion.)

11         MR. HARGROVE:  Would you minding reading

12   the last question back to him?

13         THE REPORTER:  Sure.

14         (The reporter read the requested material.)

15   BY MR. HARGROVE:

16      Q.  Okay.  Good.  I just want to make sure,

17   since there was a little bit of a gap there.

18         So did you take the econometrics class in

19   college when you were obtaining your business

20   degree, or a forecasting class?

21      A.  No.

22      Q.  All right.  Where did you obtain the

23   expertise to perform forecasting as a senior

24   analyst?

25      A.  The job.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

1          Q.  On-the-job training?

2          A.  Yes.

3          Q.  Okay.  All right.  Any other duties that

4     you picked up, other than forecasting, when you

5     became a senior analyst for LendingTree?

6          A.  No.

7          Q.  While you were at LendingTree, what city

8     were you based out of?

9          A.  In Irvine, California.

10         Q.  Who was it that acquired -- well, before I

11    get to that, did you advance beyond senior analyst

12    at LendingTree?

13         A.  No.

14         Q.  It cut out again.  I could read your lips

15    and see what you were saying, but it needs to be on

16    the record.

17         A.  No.

18         Q.  All right.  And who acquired LendingTree?

19         A.  Discover Financial Services.

20         Q.  Discover Financial Services?

21         A.  Yes.

22         Q.  All right.  And do you remember about when

23    that occurred?

24         A.  Not off the top of my head.

25         Q.  Okay.  When Discover acquired LendingTree,

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 16

1    did you have a change in title at that point?

2         A.   No.

3         Q.   Approximately how long did you remain with

4    what was now Discover -- well, let me go back.

5              When Discover acquired it, did LendingTree

6    lose its name or just become Discover or just become

7    a division of Discover?

8         A.   Became a division of Discover.

9         Q.   All right.  And you at some point departed

10   from LendingTree.  Did that have anything to do with

11   the acquisition by Discover?

12        A.   Say that again.

13        Q.   Did your departure from LendingTree have

14   anything to do with the fact LendingTree was

15   acquired by Discover?

16        A.   I never departed LendingTree.

17        Q.   You never departed LendingTree?

18        A.   No.

19        Q.   Okay.  So you're still with LendingTree

20   today?

21        A.   No.

22        Q.   Okay.  Explain that to me, if you never

23   departed, how you're not with them today.

24        A.   They were acquired and absorbed by

25   Discover.

Case 1:20-cv-04981-CAP  Document 92  Filed 04/28/22  Page 17 of 216
Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1      Q.  Okay.  So -- and it was known as a --
2   LendingTree was a division of Discover at that
3   point, so it was still called LendingTree; correct?
4      A.  No.
5      Q.  Okay.  It's not a huge part, but I'm just
6   trying to figure out, Discover acquired LendingTree,
7   and then the sign on the wall said Discover the next
8   day and not LendingTree anymore?
9      A.  Correct.
10      Q.  Okay.  I got confused earlier, which
11   happens from time to time.  So you departed from
12   Discover at some point; correct?
13      A.  Correct.
14      Q.  All right.  While you were at Discover, as
15   opposed to LendingTree, did your title change beyond
16   senior analyst?
17      A.  No.
18      Q.  All right.  When you departed from -- well,
19   tell me about the circumstances of your departure
20   from Discover.
21      A.  I don't understand the question.
22      Q.  All right.  You don't work at Discover
23   anymore; correct?
24      A.  Correct.
25      Q.  Why don't you work for Discover anymore?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1          A.   I left Discover.

2          Q.   Okay.  And when you left Discover, what

3     were the circumstances?  Did you find another job?

4     Did you want to do something else?  What were the

5     circumstances behind you leaving Discover?

6          A.   For another job.

7          Q.   And where was that other job that you

8     found?

9               MR. PERLOWSKI:  Travis, I'm sorry.  I

10     didn't hear that last response.  I don't know

11     whether it's the connection.  I know sometimes

12     you're having difficulty with it.  Seems like you

13     heard that last one, but I didn't.

14               (Off-the-record discussion.)

15               (The reporter read the requested material.)

16     BY MR. HARGROVE:

17          Q.   Let's pick up there.  Where was that other

18     job?

19          A.   After Discover?

20          Q.   After Discover, yes.

21          A.   loanDepot.

22          Q.   And where were you physically based for

23     loanDepot?

24          A.   Foothill Ranch.

25          Q.   California?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 19

```
 1        A.   (The witness nods.)

 2        Q.   I didn't hear your answer that time.

 3        A.   Correct.

 4        Q.   Okay.  And it might be an issue that your

 5   mic's not picking it up, I don't know.  But anyway,

 6   I'll let you know if I don't hear.

 7             And what was your job title from loanDepot?

 8        A.   Senior financial analyst.

 9        Q.   All right.  And what did you do as a senior

10   financial analyst for loanDepot?

11        A.   I did financial reporting.

12        Q.   All right.  Similar financial reporting to

13   what you did with LendingTree/Discover?

14        A.   Less forecasting, more just reporting.

15        Q.   All right.  And again, you were not

16   actively involved in making the loans, you were

17   reporting on the revenue that was coming in from the

18   loans being generated; correct?

19        A.   Correct.

20        Q.   And in your role as -- you said financial

21   analyst was the title?

22        A.   Senior financial analyst.

23        Q.   All right.  Did you have people working

24   under you?

25        A.   No.
```

Jim Muth                                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 20

1        Q.  All right.  Any other duties as a senior

2    financial analyst that you haven't told me about?

3        A.  No.

4        Q.  In your duties for loanDepot, did any of

5    your analysis relate to corporate expenses as they

6    were allocated to specific branches of loanDepot?

7        A.  No.

8        Q.  Did you progress beyond being a senior

9    financial analyst for loanDepot?

10       A.  No.

11       Q.  All right.  How long did you stay at

12   loanDepot?

13       A.  About a year and a half.

14       Q.  All right.  And what were the circumstances

15   behind your departure from loanDepot?

16       A.  Went to another company.

17       Q.  All right.  To which company did you go?

18       A.  Stearns.

19       Q.  And what does Stearns do?

20       A.  Mortgage lending.

21       Q.  Okay.  And where were you based while with

22   Stearns?

23       A.  In Santa Anna, California.

24       Q.  And what was your job title with Stearns?

25       A.  Senior financial analyst.

Page 21

1      Q.  All right.  So that was the same job title
2   that you had with loanDepot; correct?
3      A.  (Inaudible.)
4      Q.  I didn't hear you.
5      A.  Correct.
6      Q.  Okay.  All right.  And did you progress
7   beyond being a senior financial analyst for Stearns?
8      A.  No.
9      Q.  All right.  How long did you stay at
10  Stearns?
11     A.  A year, year and a half.
12     Q.  In your financial analyst duties at
13  Stearns, did you address allocation of corporate
14  expenses amongst branches of Stearns?
15     A.  No.
16     Q.  And at some point you departed from
17  Stearns; correct?
18     A.  Correct.
19     Q.  And where did you go after Stearns?
20     A.  New American Funding.
21     Q.  And the front part, you said -- all I heard
22  was American Funding, but I assume you said "New"
23  and I just didn't pick it up on the mic; correct?
24     A.  Yes.  New American Funding.
25     Q.  All right.  If I refer to New American

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

1  Funding as NAF, will you know what I'm talking about
2  today?
3       A.  Yes.
4       Q.  And what year did you go to NAF?
5       A.  2017.
6       Q.  All right.  And for what position were you
7  hired at NAF?
8       A.  I was the AVP of corporate analytics.
9       Q.  AVP of corporate analytics?
10      A.  Right.
11      Q.  And what -- are you still the AVP of
12 corporate analytics, or has your job title changed
13 since 2017?
14      A.  It's changed.
15      Q.  All right.  Walk me through what you did
16 when you were the AVP of corporate analytics.
17      A.  I compiled the financial data and put
18 together the financial reporting each month.
19      Q.  All right.  And did you have a supervisor?
20      A.  Yes.
21      Q.  Who was your supervisor?
22      A.  Jason Obradovich.
23      Q.  All right.  And did you -- from where did
24 you compile the financial data?
25      A.  From our general ledger software.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 23

1      Q.   What is the general ledger software called?

2      A.   AMB.

3      Q.   All right.  Were you involved with actually

4    inputting the numbers into AMB or just extrapolating

5    them out of AMB?

6      A.   Just extrapolating them.

7      Q.   All right.  Did you do any testing or

8    anything to make sure the numbers put into AMB were

9    accurate?

10     A.   No.

11     Q.   All right.  So did you have a log-in for

12   the AMB system?

13     A.   Yes.

14     Q.   All right.  And describe for me how -- the

15   process you would use to take that AMB data up to a

16   financial statement.

17     A.   Once logging into AMB, you can run a report

18   and extract it into an Excel spreadsheet.

19     Q.   All right.  And after you extracted the

20   information into an Excel spreadsheet from AMB, what

21   happened next?

22     A.   So then we would compile the data together

23   based off the call centers.

24     Q.   Okay.  You would -- so AMB has data by cost

25   center.  And you would compile that data -- that

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 24

1    data; correct?

2          A.  Yes.

3              MR. PERLOWSKI:  Object to the form.

4    BY MR. HARGROVE:

5          Q.  I didn't hear you again.

6              MR. PERLOWSKI:  I think he said correct.  I

7    think.  That's what I heard.

8    BY MR. HARGROVE:

9          Q.  All right.  And tell me, what were the cost

10   centers from which these numbers were aggregated?

11         A.  I didn't understand your question.

12         Q.  All right.  You referenced cost centers in

13   your answer.  Do you recall that?

14         A.  Yes.

15         Q.  All right.  What are cost centers?

16         A.  They're departments.

17         Q.  All right.  So what were the different

18   departments that were utilized or that were from

19   which numbers came out of AMB?  What were those

20   departments?

21         A.  They're all the departments within the

22   company.

23         Q.  Okay.  Tell me what the departments within

24   the company are.

25         A.  I couldn't tell you that.

Jim Muth                                 March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 25

1        Q.  Do you know how many departments there are
2   within the company?
3        A.  Hundreds.
4        Q.  There's hundreds of departments?
5        A.  Yes.
6        Q.  All right.  Name some of the departments
7   that you know of.
8        A.  For example, finance would be a department.
9        Q.  Okay.
10       A.  Accounting would be a department.
11       Q.  I'm sorry, I didn't hear the first part of
12   it.
13       A.  Accounting.
14       Q.  Accounting.  All right.  IT, is that a
15   department?
16       A.  IT would be a department.
17       Q.  All right.  So -- and what I was getting
18   mixed up with -- so there's different departments in
19   the company.  I thought you were speaking about the
20   divisions of the company.  I'm sure we'll get there
21   at some point.
22            So you received into AMB financial data for
23   each department of the company; correct?
24       A.  Correct.
25       Q.  And then you went to AMB, extrapolated that

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 26

1   data into spreadsheets, correct, or into Excel

2   spreadsheets; correct?

3        A.  Correct.

4        Q.  All right.  What happened after the data

5   was extrapolated into the Excel spreadsheets?

6        A.  It would put together the branch-level

7   reporting.

8        Q.  All right.  And how would you go about

9   putting together the branch-level reporting?

10       A.  You would align the costs being booked for

11  the branches to the loans that are funded with the

12  branches.

13       Q.  All right.  You would align the costs for

14  the branches with the loans being funded by the

15  branches?  Did I hear that correct?

16       A.  Correct.

17       Q.  All right.  And how would we go from a

18  spreadsheet generated -- extrapolated from AMB to

19  branch-level cost and loan reconciliation?

20            MR. PERLOWSKI:  Object to the form.

21            You can answer.

22       A.  I'm sorry, can you repeat the question?

23  BY MR. HARGROVE:

24       Q.  Sure.  You said ultimately there was

25  branch-level reporting based on costs for the branch

Jim Muth                                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 27

1    and loans generated by the branch; correct?

2         A.   Correct.

3         Q.   All right.  Is there another step, or do

4    the spreadsheets that are extrapolated from AMB give

5    you that branch-level data that you just testified

6    about?

7         A.   The AMB does not provide that data.

8         Q.   Okay.  Does extrapolating the AMB into

9    Excel spreadsheets give you that data?

10        A.   Eventually.

11        Q.   All right.  How do we get to the eventually

12   where that happens?  What happens next?

13        A.   So the AMB gives us the branch expense, and

14   then you pull the loans that are funded by that

15   branch and apply that.

16        Q.   So the loans that are funded by branch are

17   not part of AMB?

18        A.   No, they're not in AMB.

19        Q.   So AMB deals with expenses.  Where do the

20   loans by branch come from?  Where do you get that

21   information?

22        A.   (Inaudible) -- to me.

23        Q.   The first part of the answer, I couldn't

24   hear.

25        A.   It's provided to me.

Jim Muth                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 28

1        Q.   Who provides it to you?

2        A.   Capital markets.

3        Q.   All right.  Now, what is capital markets?

4        A.   A department.

5        Q.   It's a department within the company?

6        A.   Correct.

7        Q.   All right.  What does capital markets do?

8        A.   They are in charge of pricing the margins.

9        Q.   Okay.  So are -- they're also in charge of

10   gathering the branch-level loan data, I take it?

11       A.   Correct.

12       Q.   All right.  So capital markets provides you

13   the branch-level loan data; AMB provides you

14   branch-level expenses; and then you create, for

15   whatever time period, branch-level profit and loss

16   statements?

17       A.   Correct.

18       Q.   All right.  Is there any further software,

19   such as Kevlar, that is utilized in preparing those

20   branch level reports?

21       A.   To prepare them?  No.

22       Q.   Okay.  So what else happens once you have

23   the expenses from AMB and the branch-level loan

24   figures from capital markets, what happens next?

25   How do we get from that to a financial statement?

Jim Muth                                         March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 29

1        A.   Repeat.

2        Q.   You get the expenses from AMB.  You get the

3   loan data from the capital markets department.  How

4   do we go from that to a financial statement, a

5   profit and loss statement by branch?

6        A.   When you combine the revenue from capital

7   markets and the expenses from AMB, that's your

8   profit and loss report.

9        Q.   All right.  Is there a medium that is used

10  to prepare that profit and loss report using that

11  data?

12       A.   Excel.

13       Q.   Okay.  So Excel spreadsheets are generated

14  by branch level showing the profit and loss.  And

15  are those -- what is the timing?  Are those monthly,

16  quarterly, yearly?  What's the timing of the

17  preparation of those statements?

18       A.   We do them monthly.

19       Q.   All right.  So at the beginning of your

20  tenure, when you began to be employed by NAF -- and

21  what was your title again?  I know I asked it

22  before, but you had a few of them.  What was the

23  title again?

24       A.   AVP of corporate analytics.

25       Q.   All right.  So you brought in the -- you

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 30

1    brought in all this information, you put it into an

2    Excel spreadsheet.  Did anything happen with that

3    spreadsheet after you prepared it?

4         A.  We would load it to Kevlar.

5         Q.  All right.  And what was the purpose of

6    loading the Excel spreadsheet to Kevlar?

7         A.  To view it.

8         Q.  All right.  When you say "to view it," was

9    it an easier medium to view it in than just looking

10   at an Excel spreadsheet?

11        A.  Correct.

12        Q.  All right.  And my understanding is that in

13   reviewing -- that Kevlar, you were not able to

14   change information in there, you would have to

15   change the underlying spreadsheet and then re-upload

16   it to generate something different.  Is my

17   understanding accurate?

18        A.  I don't understand -- Kevlar couldn't

19   change anything.

20        Q.  Okay.  Kevlar simply is a medium to display

21   the work you did in the Excel spreadsheet; correct?

22        A.  That's correct.

23        Q.  And for a number to change in Kevlar, one

24   would have to go back to the Excel spreadsheet and

25   change something in that, then reload it into

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 31

1    Kevlar; correct?

2         A.  (Inaudible.)

3         Q.  I read your lips, but I didn't hear it,

4    just so it's on the record.

5         A.  Correct.

6         Q.  All right.  And is -- as an AVP, that

7    was -- that was your role.  Is that a role that you

8    have kept, or did that role cease at some point?

9              MR. PERLOWSKI:  Object to the form.

10             You can answer.

11        A.  I'm sorry, can you repeat it for me?

12   BY MR. HARGROVE:

13        Q.  Sure.  In your initial hiring by the

14   company, you described for me the process that you

15   would generate branch-level financial reports,

16   profit and loss statements; correct?

17        A.  Correct.

18        Q.  Did you say correct?

19        A.  Correct.

20        Q.  All right.  Is that a duty that you have

21   maintained your whole tenure with NAF up until

22   present, or did that duty go away at some point?

23        A.  I maintained that.

24        Q.  Okay.  In preparing these branch-level

25   financial statements, it is my understanding that

1   there are also allocations in addition to the

2   branch-level expenses that are called corporate

3   margin expenses.  Is my understanding correct?

4        A.  No.

5        Q.  No, it's not?

6        A.  What you just said doesn't make sense to

7   me.

8        Q.  Okay.  Can you explain to me, then, aside

9   from the branch-level expenses, any other expenses

10  that you use in preparing the branch-level financial

11  statements?

12       A.  Corporate allocations.

13       Q.  Okay.  And what are corporate allocations?

14       A.  Corporate allocations are costs at the

15  corporate level.

16       Q.  All right.  And what is the corporate

17  level?

18       A.  For example, the accounting department.

19       Q.  Okay.  And just so that we're all on the

20  same page, at the corporate level, meaning not a

21  branch level; correct?

22       A.  Correct.

23       Q.  So you're speaking of the accounting

24  department, by way of example, in Tustin,

25  California; correct?

Page 33

1        A.   (Inaudible.)

2        Q.   It didn't pick it up.

3        A.   Correct.

4        Q.   Okay.  And some portion of the expense of

5   that accounting department is allocated to each

6   region; correct?

7        A.   Correct.

8        Q.   All right.  In your preparation of the

9   financial statements on a monthly basis for each

10  branch, explain to me how, in the process of pulling

11  AMB expense and getting information from capital

12  markets on loan generation, how those corporate

13  allocations are factored into, if at all, the

14  ultimate product being the profit and loss for the

15  branch for a month.

16       A.   The corporate costs are allocated out to

17  the business, so that would be all of the different

18  various branches.

19       Q.   All right.  How are those corporate costs

20  allocated to the various branches?

21       A.   Can you resay the question again?

22       Q.   Sure.  How are those corporate allocations

23  allocated to the various branches?

24       A.   Based off of funded units.

25       Q.   Okay.  What is a funded unit?

Jim Muth                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 34

 1        A.   A loan.

 2        Q.   All right.  Tell me how funded units are

 3   used to calculate a given branch's percentage of

 4   corporate allocations.

 5        A.   Sorry, can you say that again?

 6        Q.   Sure.  Tell me how a branch's funded units

 7   are used to calculate the amount of corporate

 8   allocations that will be attributed to a given

 9   branch.

10        A.   So it would take the total corporate costs

11   and divide it over the number of funded units to get

12   a cost per unit.

13        Q.   So a branch that has more loan volume is

14   going to pay a larger percentage of corporate

15   allocations under that system; correct?

16        A.   I don't quite understand the question.

17        Q.   All right.  You said that the -- all the

18   funded units were aggregated together, and then an

19   amount per funded unit of corporate allocations is

20   figured out; correct?

21        A.   Correct.

22        Q.   And then per branch, you multiply that

23   amount, that per-unit amount by the number of funded

24   units that branch had; correct?

25        A.   Correct.

Jim Muth                                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1      Q.  All right.  So a branch that had more

2   funded units is going to have more corporate

3   allocations placed into its column; correct?

4      A.  Total dollar, yes.

5      Q.  I didn't hear the first part of your

6   response.  I'm sorry.

7      A.  Total dollar, yes.

8      Q.  Okay.  So total dollars.  So you qualified

9   your response instead of just saying yes by saying

10  "total dollar, yes."  Is there some other way that

11  it would be figured?

12     A.  Well, you said that they were being

13  allocated more.  They're all being allocated the

14  same on a per dollar.

15     Q.  On a per dollar or per funded unit?

16     A.  Dollar per funded unit.

17     Q.  Okay.  So if the southeast has 10 funded

18  units and the northeast has one funded unit, then

19  the southeast is going to have 10 times more

20  corporate allocation attributed to it than the

21  northeast; correct?

22     A.  Correct.

23     Q.  All right.  In figuring out these corporate

24  allocations, is there any consideration other than

25  solely the number of funded units used?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 36

1      A.   No.

2      Q.   All right.  So by way of example, if there

3   was a -- something that one branch did that caused

4   corporate -- let's say a branch got sued or

5   something that one branch did caused the company to

6   get sued and the company incurred legal fees.  Those

7   fees would not be attributed just to that branch,

8   they would be attributed based on funded units

9   spread out amongst all the branches; correct?

10     A.   Correct.

11     Q.   Okay.  And are you involved at all in the

12  aggregation of the expenses that form the total of

13  the corporate allocations?

14          MR. PERLOWSKI:  Object to the form.

15     A.   What do you mean by that?

16  BY MR. HARGROVE:

17     Q.   Let me ask again because Henry objected,

18  and then I didn't pick up part of your answer.  So

19  are you involved, in your position with the company,

20  in calculating the total corporate allocation amount

21  that has been split amongst the branches?

22     A.   No.

23     Q.   Where does that information come from?

24     A.   AMB.

25     Q.   Okay.  So AMB has the branch-level expenses

Jim Muth                               March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 37

1    in it; correct?

2         A.   Yes.

3         Q.   And it has the corporate allocation

4    expenses in it; correct?

5         A.   Yes.

6         Q.   The corporate-level expenses, how are those

7    input into AMB?

8         A.   I'm not aware of it.

9         Q.   All right.  But when you go into AMB, they

10   are there; correct?

11        A.   Correct.

12        Q.   All right.  Do you do any sort of testing

13   or verification of any of the corporate allocation

14   expenses before preparing a monthly financial profit

15   and loss for a branch?

16        A.   No.

17        Q.   Okay.  When the corporate -- well, let me

18   go back.

19             Okay.  Step back to now.  We get to the

20   point where the information is put into Excel.  So

21   the AMB information put into Excel includes the

22   branch-level expenses and it includes the corporate

23   allocations; correct?

24        A.   It includes the corporate costs.

25        Q.   Okay.  It includes the corporate costs and

Jim Muth                                  March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 38

1    it includes the branch-level costs; correct?

2         A.   Correct.

3         Q.   And when I said "corporate allocations,"

4    you said "corporate costs," I want to make sure

5    we're talking about the same thing.  The corporate

6    cost is what then becomes the corporate allocation

7    to the different branches; correct?

8         A.   Correct.

9         Q.   All right.  So whatever corporate costs

10   there are are allocated to the branches and then

11   called corporate allocations; correct?

12        A.   Correct.

13        Q.   There are also, it is my understanding,

14   corporate allocations that are attributed to the

15   cost center; is that accurate?

16        A.   What do you mean by that?

17        Q.   All right.  Do you understand that there

18   are -- that there is a retail division that includes

19   the branches and includes a call center for NAF?  Do

20   you understand that?

21        A.   No.

22        Q.   All right.  What do you understand to be

23   not the departments but the divisions of NAF?

24        A.   Divisions?

25        Q.   Yes.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 39

1          A.   So, like, retail would be a division.

2          Q.   Okay.  Is retail split into any

3     subdivisions?

4          A.   Yes.

5          Q.   All right.  What are those subdivisions

6     that retail is split into?

7          A.   Regions.

8          Q.   I couldn't hear you.

9          A.   Regions.

10         Q.   Regions, okay.  All right.  Anything other

11    than regions?

12         A.   No.  I mean, regions then become branches.

13         Q.   Let's take a step back.  Do you understand

14    that there is also a call center that NAF has

15    separate and apart from the regions?

16         A.   Yes.

17         Q.   Okay.  And that call center, where would it

18    fall?  Would it fall under the retail division, or

19    is it an entirely separate division?

20         A.   Separate.

21         Q.   Okay.  So the retail division is only the

22    regions, then there's a call center that's a

23    separate division.  Are any of the corporate --

24    well, let me go back.

25              Are you involved at all in computing the

Page 40

1    financials for the call center division of NAF?

2        A.  Yes.

3        Q.  All right.  Explain to me your role in that

4    regard.

5        A.  Putting together the financials for the

6    call center.

7        Q.  Yes.  How do you put together the

8    financials for the call center?

9        A.  Same way we do for retail.

10        Q.  Okay.  So you have the AMB information that

11    is for the call center, the expenses of the call

12    center; correct?

13        A.  Correct.

14        Q.  All right.  And you said capital markets is

15    who gave you the loan volume for the branches.  Is

16    that who also gives you the loan volume for the call

17    center?

18        A.  Yes.

19        Q.  All right.  And you take those numbers and

20    extrapolate them into a spreadsheet; correct?

21        A.  Correct.

22        Q.  And in those figures, it's some portion of

23    what you referred to as the corporate expense

24    attributed to the call center?

25        A.  Yes.

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 41 of 216
Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1     Q.  All right.  How is that done for the call
2  center?
3     A.  Number of units.
4     Q.  All right.  So is the number of units an
5  aggregate of all of the units between the call
6  center and the -- and what you referred to as the
7  retail division, and then those expenses are divided
8  up, or is it separately done between the call center
9  and the retail division, as you referred to it?
10    A.  Say that again.
11    Q.  All right.  On a per-unit basis when you're
12 making these calculations, do you aggregate all of
13 the funded units together from both the retail
14 division and the call center, and then take the cost
15 and divide it up?  Or is there a separate
16 calculation for the call center per unit and a
17 separate allocation for the retail division per
18 unit?
19    A.  Separate.
20    Q.  Separate.  Okay.  How is it determined what
21 percentage of the retail division, what
22 percentage -- let me start over.
23       How is it determined the percentage of the
24 corporate costs attributed to the retail division as
25 opposed to the call center division?

Page 42

```
 1        A.   The split, is that what you're referring
 2   to?
 3        Q.   The split, yes, how is that determined?
 4        A.   Between the retail and the call center?
 5        Q.   Yes.
 6        A.   Yes.
 7        Q.   How is it determined?
 8        A.   For the call center assigned for retail?
 9        Q.   Let me see if I can clarify.  Let's say
10   that there's a hundred dollars of corporate expense.
11   I've got the retail division, I've got the call
12   center.  How do I determine who gets hit with what
13   amount of that hundred dollars?
14        A.   The units.
15        Q.   All right.  And I asked you earlier -- and
16   let me just use numbers and see if I can make it
17   clearer.  If the call center has three units and
18   retail had 10 units, do I add that up and say, okay,
19   there's 13, so I divide 100 by 13 and that's my
20   per-unit cost, or is there a separate calculation
21   that I do for the call center division and then the
22   retail division?
23        A.   Separate.  So we would determine the cost
24   for the retail, and then we would determine the cost
25   for the call center and then divide each of those
```

Jim Muth                                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 43

1    costs by the number of units for each of those two

2    divisions.

3         Q.   All right.  How do you determine how much

4    of the cost is going to be attributed to the call

5    center as opposed to the regions before that

6    calculation is made?

7         A.   Some expenses are directly related to one

8    or the other.

9         Q.   Some expenses are directly related to one

10   or the other?  Okay.  What are the expenses that are

11   attributable only to the retail division?

12        A.   I guess it's more on the call center side.

13        Q.   Okay.  So what are the ones that are

14   attributable only to the call center side?

15        A.   For example, the dialer system.

16        Q.   Okay.  So if I look at the dialer system,

17   there would not be any costs from the dialer system

18   attributed to the branches; correct?

19        A.   Correct.

20        Q.   All right.  Is there a document that breaks

21   out which costs are attributable solely to the call

22   center as opposed to the regions?

23        A.   Not that I'm aware of.

24        Q.   All right.  If I wanted to figure that

25   out -- you have to figure it out from somewhere;

Jim Muth                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 44

1   correct?

2        A.   Correct.

3        Q.   All right.  So what is the raw data that

4   you use to do that breakdown?

5        A.   AMB.

6        Q.   All right.  Does AMB break down by call

7   center or regions' expenses?

8        A.   I don't follow you.

9        Q.   All right.  You referenced the dialer

10  system as something that was only attributable to

11  the call center; correct?

12       A.   Correct.

13       Q.   All right.  Does AMB have a column or

14  something within it that aggregates the expenses for

15  corporate allocations that only come from the call

16  center?

17       A.   No.

18       Q.   All right.  How do you know or how do you

19  figure out, then, which expenses get allocated only

20  to the call center?

21       A.   I'm looking at the different vendors.

22       Q.   Looking at the vendors?

23       A.   Yes.

24       Q.   All right.  So you go into the AMB system

25  each month and you look at each line item of

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45

1    corporate expense, and then you know, based on your

2    experience, which items of corporate expense get

3    moved over to only the call center and not

4    considered as part of the regions; correct?

5         A.   Correct.

6         Q.   All right.  Is there an Excel spreadsheet

7    or where -- where is that information recorded

8    either electronically or in hard copy?

9         A.   It would be in Excel.

10        Q.   Okay.  And then that Excel is then placed

11   into Kevlar, and that's where you get your report,

12   your P&L; correct?

13        A.   Eventually, it would go to Kevlar.

14        Q.   I think you said initially it would go to

15   Kevlar?

16        A.   Eventually.

17        Q.   Okay.  And in calculating those corporate

18   expenses -- so certain items are attributable only

19   to call center, and the example you used was the

20   dialer system.  Are there a lot of other items

21   attributable just to the call center?

22        A.   No.

23        Q.   All right.  How much is the dialer system

24   on a monthly basis?

25        A.   I don't know off the top of my head.

1      Q.  So when whatever items are removed from

2   potential costs to the regions, and we'll just

3   say -- recognizing there might be more, but let's

4   say the dialer system is set aside, are the

5   corporate allocations measured, then, by taking the

6   loan units and all of the joint, the ones that

7   aren't attributable solely to the call system, so

8   let's take that out, all right?  Dialer or whatever

9   is only attributable to the call center is taken

10  out, and the call center gets hit with a hundred

11  percent of that; correct?

12      A.  Correct.

13      Q.  All right.  The remaining amount, let's say

14  there's a hundred dollars of expense and the call

15  center has two loans and retail has two loans, how

16  do we calculate who gets what of that hundred-dollar

17  cost put in their column?

18      A.  Would be allocated based off the number of

19  units.

20      Q.  All right.  So if each had two units --

21  funded units; right?  Meaning, loans?

22      A.  Correct.

23      Q.  All right.  So if each side had two funded

24  units, then each would have $50 of corporate

25  expenses allocated to it; correct?

Page 47

 1        A.  Correct.

 2        Q.  And then the call center would also have

 3   the dialer system attributed to it; correct?

 4        A.  Correct.

 5        Q.  It didn't pick up.

 6        A.  Correct.

 7        Q.  All right.  And there should be Excel

 8   documents that show the dialer, by way of example,

 9   or was computed in the call center but not

10   considered as part of the retail division; correct?

11        A.  Correct.

12        Q.  All right.  During the time that you have

13   been with NAF, has there been any change in the way

14   that the corporate expenses were allocated?

15        A.  Yes.

16        Q.  All right.  Tell me about the -- when did

17   that change occur?

18        A.  It changes almost yearly.

19        Q.  Okay.  Was there a change between 2017 and

20   2018?

21        A.  I don't know.

22        Q.  All right.  Well, why don't you do this.

23   Why don't you walk me through all the changes that

24   you know have occurred with the way that corporate

25   expenses were allocated.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 48

1          A.   Starting with how we're doing it now or...

2          Q.   If you want to -- let's work -- let's work

3     from the way it was.  I'm assuming what you told me

4     was when it started, when you started there.  That's

5     what I was understanding.  Am I accurate?

6          A.   Yes.

7          Q.   Okay.  And real quick, before we get beyond

8     that, I want to ask you one other question.  My

9     understanding is none of the corporate expenses are

10    allocated to the servicing division of NAF; is that

11    correct?

12         A.   I don't know.

13         Q.   All right.  Do you have anything to do with

14    the financials of the servicing division?

15         A.   No.

16         Q.   All right.  Is it your understanding that

17    all of the corporate expenses of the company

18    pertaining to any part are included in that figure

19    that you get for corporate expenses that gets

20    allocated between retail and then the call center?

21              MR. PERLOWSKI:  Object to the form of the

22    question.

23         A.   Can you say that again?

24    BY MR. HARGROVE:

25         Q.   Sure.  Are there any company expenses

Page 49

1    that -- are there any company expenses that are not

2    allocated to either the call center or the retail

3    department?

4         A.  At a point in time there was.

5         Q.  All right.  And what point in time was

6    that?

7         A.  I don't remember.

8         Q.  All right.  So where were those expenses

9    allocated at that prior point in time?

10        A.  To the servicing division.

11        Q.  Got you.  All right.  So prior to 2018,

12   were there costs attributed to the servicing

13   division?

14        A.  I'm not aware of that.

15        Q.  Meaning, you don't know when that change

16   occurred?

17        A.  Correct.

18        Q.  All right.  Was the change in the

19   allocation of expenses -- well, let me go back.

20             So at the time you first became employed

21   with NAF, were there expenses that were attributed

22   to the servicing division?

23        A.  Yes.

24        Q.  All right.  And you came to NAF in 2016;

25   correct?

Jim Muth                                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 50

1        A.   No.

2        Q.   2017?

3        A.   The end of 2017.

4        Q.   End of 2017.  All right.  How were expenses

5   allocated to the -- when you came in at the end of

6   2017, how were expenses allocated to the --

7   allocated to the servicing division?

8        A.   On a percentage.

9        Q.   All right.  And how was that percentage

10   calculated?

11        A.   It wasn't.

12        Q.   All right.  How was that percentage

13   determined?

14        A.   We reached out to different departments and

15   asked them how much time they spent with servicing.

16        Q.   All right.  And which departments did you

17   reach out to find out how much time they spent with

18   servicing?

19        A.   All corporate departments.

20        Q.   All right.  And you said there were

21   hundreds of corporate departments; correct?

22        A.   No.

23        Q.   All right.  You told me there were hundreds

24   of something.  It might not have been the word

25   "corporate" departments.  What are the corporate

Jim Muth                                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 51

1    departments you reached out to?  Let me simplify it.

2         A.   So the corporate departments I reached out

3    to would be for departments such as accounting,

4    finance, IT, marketing, legal.

5         Q.   Okay.  All right.  And you personally would

6    reach out to each of these departments and ask them

7    what percent of your time are you spending on

8    servicing?

9         A.   Correct.

10        Q.   Would you reach out to them by phone or

11   would you reach out to them by e-mail or some

12   electronic communication?

13        A.   Probably both forms.

14        Q.   All right.  So there would be -- there

15   would be e-mails from you to departments up until

16   some date saying, hey, I need to know how much time

17   you spent this month on servicing versus retail and

18   call center; correct?

19        A.   Correct.

20        Q.   All right.  And then they would respond to

21   you in writing saying these are the percentages?

22        A.   Correct.

23        Q.   All right.  And then you would -- how would

24   you go about aggregating that to figure out the

25   percentage to allocate to the servicing division?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 52

1        A.   The percentage that they told us that

2    they -- time spent with servicing.

3        Q.   All right.  So you would take that

4    percentage, multiply by whatever the cost for that

5    month was for that department, and that would be the

6    amount that would get allocated to servicing?

7        A.   Correct.

8        Q.   All right.  And then you would take the

9    balance, whatever wasn't absorbed by servicing,

10   that's what would go through the formula that you

11   gave us to figure out the per-funded-unit cost;

12   correct?

13       A.   Correct.

14       Q.   Okay.  And at some point after you got

15   there at the end of -- when you say end of 2017, do

16   you remember what month in 2017?

17       A.   November.

18       Q.   All right.  So you got there in November of

19   2017.  And for approximately how long did you

20   continue to reach out to the servicing department to

21   find out the percentage that would be allocated to

22   the servicing department?

23       A.   It wasn't long.  I couldn't tell you.

24       Q.   All right.  So it was a short time, it was

25   a matter of a couple of months; correct?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 53

1        A.   Correct.

2             MR. PERLOWSKI:   Object to the form.

3    BY MR. HARGROVE:

4        Q.   All right.  So after that short time, what

5    happened with respect to the servicing department

6    and corporate allocations being made to it?

7        A.   So we used the same percentage that was

8    going to servicing.  We didn't reach out to them

9    every single month.

10        Q.   Okay.  All right.  For how long did you use

11    the same percentage, then, after you reached out and

12    obtained that percentage?  Well, let me make sure I

13    understood.

14             You said at some point, servicing ceased

15    getting hit with any of it; correct?

16        A.   Correct.

17        Q.   It didn't pick up.

18        A.   Correct.

19        Q.   All right.  Got it.  Fourth time was a

20    charm.

21             All right.  And so was it a short time

22    thereafter that corporate expenses ceased being

23    allocated to the servicing division?

24        A.   I don't remember the timing.

25        Q.   You don't remember the timing?

Jim Muth                                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 54

1        A.  No.

2        Q.  So it could have been -- it could have been

3    a month, it could have been two years, you don't

4    know?

5        A.  It could have been --

6            MR. PERLOWSKI:  Objection.  Asked and

7    answered.

8    BY MR. HARGROVE:

9        Q.  You can answer.

10       A.  Yeah, I -- it wasn't in the last couple of

11   years.  I would've remember that by now.

12       Q.  Okay.  So it was more than a couple years

13   ago?

14       A.  Yes.

15       Q.  All right.  Did this happen in the middle

16   of a year, this change, or did it happen at the end

17   of a year?

18       A.  I don't know when the change occurred.

19       Q.  Okay.  Would there be any documents that

20   would show when the change occurred?

21       A.  Not that I'm aware of.

22       Q.  All right.  When you input information

23   into -- strike that.

24           When you were determining this cost amount,

25   at whatever month that ceased, you would be able to

Jim Muth                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 55

1    go back and look at the Excel spreadsheet and see
2    the point at which no allocation was given to
3    servicing; correct?
4         A.   If I can find the file.
5         Q.   Okay.  Where would you need to look to find
6    the file?
7         A.   In our -- I don't know, wherever the
8    folders are on the computer.
9         Q.   How was it communicated to you that no
10   further allocation of corporate expenses was to be
11   made to the servicing division?
12        A.   I don't remember.
13        Q.   You don't remember?
14        A.   No.
15        Q.   Okay.  The reason I repeated that is
16   because I only heard part of your response.  So you
17   don't know whether that was in writing by someone?
18        A.   I don't remember.
19        Q.   How much -- what was the percentage of the
20   corporate expenses that was being allocated to the
21   servicing division prior to the change allocating it
22   all to either retail or the call center?
23        A.   Was minimal.
24        Q.   Define "minimal."
25        A.   I don't know how to define it.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 56

1       Q.   Would minimal be more or less than 10
2   percent?
3       A.   It would be less than 10 percent.
4       Q.   More or less than 5 percent?
5       A.   Maybe around 5 percent.
6       Q.   Okay.  And we're going to get to some
7   documents later.  The corporate -- the corporate
8   expenses, can you give me a ballpark of what they
9   are a year for now?
10      A.   This year?
11      Q.   Yeah, for this year.  We're going to look
12  at 2018 in a little bit, but give me a ballpark for
13  this year.
14      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
15      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
16  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
17  ▒▒▒▒
18      A.   Not off the top of my head.
19      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
20  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
21      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
22  ▒▒▒▒
23      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
24      ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒   ▒▒▒▒▒▒▒▒
25  ballpark, 5 percent of that was being allocated to

Jim Muth                                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 57

1    the servicing division, and then that went away;

2    correct?

3        A.  At some point, correct.

4        Q.  All right.  And at that point when it went

5    away from the servicing division, the cost for

6    the -- the cost allocated to the retail division

7    went up; correct?

8        A.  I don't understand.

9        Q.  Well, when it was -- when servicing was no

10   longer bearing any of the expense, any of the

11   corporate expense, necessarily it went up for call

12   center and retail; correct?

13       A.  Yes.

14       Q.  Okay.  In the documents preparing the -- in

15   the documents, the Excel spreadsheets -- well, let

16   me just go back.

17           What document, if I wanted to ask for a

18   document that -- if I wanted to ask for a document

19   that would show when this change took place, what

20   document would I need to ask for that would show

21   that?

22       A.  Which change?

23       Q.  The change that we've been talking about

24   with regard to corporate expenses no longer being

25   allocated to -- at all to the servicing division.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 58

1        A.   I don't believe there was a document.

2        Q.   All right.  You said that, but if I want to

3    see a document that would show the month in which

4    that was part of your calculation and the month at

5    which it wasn't, if I wanted to look at all those to

6    figure it out, have an expert look at those to

7    figure it out, what would be the document I would

8    need to ask to produce to me that would show, hey,

9    here's one month where some was being allocated to

10   the servicing, and here's the following month where

11   it's not?

12       A.   I don't believe that exists.

13       Q.   So did NAF -- does NAF not keep records of

14   its allocation of expenses from past years?

15       A.   We do.

16       Q.   All right.  So necessarily, wouldn't there

17   be a month that was the last month that there was an

18   allocation of the corporate expenses to the

19   servicing division followed by a month where there

20   was no such allocation?

21       A.   I think it's because the way we exchange

22   corporate allocations periodically.

23       Q.   Okay.  Well, right now we're just talking

24   about this change in corporate allocation.  So you

25   had to know and do something to not include that

1    part that was going to the servicing division from

2    one month to the next when it changed; correct?

3          A.  It wasn't that we included it; we changed

4    the methodology.

5          Q.  You changed the methodology to eliminate

6    anything being allocated to the servicing

7    department; correct?

8          A.  Not necessarily.

9          Q.  We've been talking for the past 30 minutes

10   about, as I understood it, a change where the

11   servicing department was absorbing some of those

12   costs and then ceased absorbing any of those costs;

13   right?

14          MR. PERLOWSKI:  Object to the form.

15          You can answer.

16          A.  Can you say it again, then?

17   BY MR. HARGROVE:

18          Q.  Sure.  We even talked about -- you said it

19   was minimal, that there was an amount that was

20   allocated to the servicing division, and that

21   doesn't happen anymore; right?

22          A.  In theory, no, but in practice, yes.

23          Q.  In theory, no, the servicing division is

24   not getting -- all right.  Let's walk back.  And I'm

25   afraid we're going to be here a while because I'm

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 60 of 216
Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 60

1    not following you.

2            MR. PERLOWSKI:  Before you do this again,

3    can we take a two-minute break?

4            MR. HARGROVE:  Sure.

5            (Recess 3:10 to 3:20 p.m.)

6    BY MR. HARGROVE:

7        Q.   Mr. Muth, who puts the corporate expenses

8    into the AMB system?

9        A.   Accounting.

10       Q.   Accounting does?  Okay.  Are you involved

11   at all in that?

12       A.   No.

13       Q.   All right.  So I want to go back where we

14   were.  I understood you to testify that the call

15   center -- or that the servicing division had some

16   corporate expenses allocated to it when you

17   initially got to NAF, and that that changed at some

18   point, and then corporate expenses were no longer

19   allocated partially to the servicing division; is

20   that correct?

21       A.   Not really.

22       Q.   All right.  So are you changing your

23   testimony from what you said earlier in the

24   deposition when we spent 45 minutes talking about

25   that change?

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 61 of 216
Jim Muth                                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 61

1          A.   No.

2          Q.   Okay.  Well, then, tell me -- reconcile the

3     answer you just gave me with the past 45 minutes,

4     please.

5          A.   So for the corporate allocations for retail

6     and the call center, we reduced the corporate

7     allocations by the percentage that went to

8     servicing.  We didn't actually go and add that to

9     servicing P&L.  I don't do any servicing P&Ls.

10         Q.   So the corporate allocation for retail and

11    the call center used to be reduced by the percentage

12    attributable to the servicing division, and now it's

13    still reduced by that but you don't know where that

14    is allocated; is that accurate?

15              MR. PERLOWSKI:  Object to the form.

16              You can answer.

17         A.   Can you say that again?

18    BY MR. HARGROVE:

19         Q.   All right.  Let me give it as an example

20    because these work well for me.

21              There's a hundred dollars of corporate

22    expense.  Used to be 5 percent -- and I'm using

23    rough numbers here -- 5 percent of that was taken

24    off and allocated to the servicing department.  So

25    $95 is going to get split between the retail

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 62 of 216
Jim Muth                                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 62

1    division and the call center and calculated the way

2    we talked about; right?

3        A.   Yes.

4        Q.   Okay.  Then you testified that there was no

5    longer anything allocated on the corporate

6    expenditures to the servicing division; correct?

7        A.   Not in the same manner that we were doing

8    it.

9        Q.   Okay.  So now what you're telling me is the

10   amount that used to be attributed to the servicing

11   division is not attributed to it, but it's not

12   attributed to the retail and call center; is that

13   correct?

14       A.   Correct.

15       Q.   All right.  Where is that allocated, then?

16       A.   It's not allocated anywhere.

17       Q.   It's not allocated anywhere?  So how does

18   the company prepare a global financial statement or

19   its tax return if it's got an expense that isn't

20   allocated anywhere?

21       A.   It's an expense in the general ledger,

22   which is what's audited.

23       Q.   So it's allocated to the company in

24   general, but there are no -- there's no division to

25   which it is attributed?

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 63

1        A.   It's incurred by the company.

2        Q.   Okay.  It's incurred by the company, but in

3   the -- in the monthly reports, that is subtracted

4   off the top of the amount the corporate allocation

5   is derived from?

6        A.   (The witness nods.)

7             MR. HARGROVE:   Object to form.

8   BY MR. HARGROVE:

9        Q.   I didn't hear you.

10        A.   Correct.

11        Q.   All right.  So your role is just to prepare

12   the statements for the retail and call center

13   division; correct?

14        A.   Correct.

15        Q.   So what were you told about this change at

16   whatever point it took place?

17        A.   The change when we went from that was to go

18   to, I believe, an all basis point methodology.

19        Q.   All right.  So right now I'm just talking

20   about the shift where -- the change where corporate

21   allocation numbers aren't attributed to the call

22   center anymore.  Are you saying that's the same time

23   that a basis point change --

24        A.   I'm sorry, say that again.

25        Q.   All right.  We were talking about changes

1    in the way the corporate allocation was applied.

2    The first one you told me about was that at some

3    point any of it ceased being attributed to the call

4    center -- excuse me -- to the servicing division;

5    correct?

6         A.   Correct.

7         Q.   Couldn't hear you.

8         A.   Correct.

9         Q.   All right.  I know it may not be

10   comfortable.  If you lean forward or pull up closer,

11   I think it might work better because every time --

12        A.   Yeah, it's right here.

13        Q.   Yeah.  Well, for whatever reason, that 6

14   inches of space seems to make a difference.

15             MR. PERLOWSKI:  It definitely does.  I'm

16   noticing the same thing.

17   BY MR. HARGROVE:

18        Q.   So there was a change that I understood was

19   the first change in time to where no longer was

20   anything going to be allocated to the servicing

21   division.  And you've testified that that amount,

22   though, did not get shifted over and allocated to

23   retail and call center; correct?

24        A.   Right.  We reduced the allocation to the

25   call center and retail based off the amount that

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 65

1    would have gone to servicing.

2         Q.   All right.  And how was that change

3    communicated to you?

4         A.   To move away from that process?

5         Q.   Correct.

6         A.   That's where we switched to a basis point

7    methodology.

8         Q.   All right.  Do you know when the basis

9    point methodology switch came?

10        A.   Not exactly, no.

11        Q.   All right.  Was it a recent change?

12        A.   Years ago.

13        Q.   Okay.  So at the point at which there was a

14   change to a basis point methodology, it was

15   communicated to you that there would no longer be an

16   allocation of any of the corporate expenses to the

17   servicing division; correct?

18        A.   No.

19        Q.   No.  All right.  Tell me what was wrong

20   about that statement.  Correct me.

21        A.   The methodology change was to use basis

22   points, and we used historical basis points.  So

23   previously what was haircutted for servicing would

24   keep going forward.

25        Q.   Walk me through -- start me with the basis.

Page 66

1    Explain to me what the basis point methodology is so

2    that I can understand how the change factored in

3    where there would be no more cost attributed to the

4    servicing department.

5         A.   Well, the basis point change was to bill

6    off of the bips, which is a percentage of the loan

7    volume that was funded for that month.

8         Q.   All right.  And that was to determine the

9    amount of corporate allocation attributable to --

10        A.   Correct.

11        Q.   All right.  So we're going off bips instead

12   of going off of loan units now; right?

13        A.   Basis points is off of loan volume.

14        Q.   Okay.  And before, you referred to it as

15   funded units.  What's the difference?

16        A.   A unit is count; volume is dollar.

17        Q.   All right.  So that change in methodology

18   is made on how we're going to allocate the corporate

19   expenditure.  I understand that part.  You can't

20   tell me when that change took place; correct?

21        A.   No.

22        Q.   All right.  But at the same time that

23   change took place is when this change took place

24   that shifted away from anything being allocated

25   towards the servicing division; correct?

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 67 of 216
Jim Muth                                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 67

1           MR. PERLOWSKI:  Object to the form.

2    BY MR. HARGROVE:

3        Q.  You can answer.

4        A.  Not necessarily.

5        Q.  All right.  Why not necessarily?

6        A.  When we switched to basis points, we looked

7    at historical basis points that were being allocated

8    out.  So going with the same historical, the assumed

9    costs for servicing allocation was still there.

10       Q.  So the basis points -- all right.  I want

11   to simplify this as much as I can.  Basis point

12   calculation happens.  Were basis points attributed

13   to the servicing department?

14       A.  What do you mean?

15       Q.  All right.  I'm not an accountant.  You

16   told me that the servicing department used to pay

17   some part of the corporate expenses, and that went

18   away at some point.  And then you said, well, that

19   was still being deducted from what retail was going

20   to pay, even though it wasn't being attributed to

21   servicing.  That's -- is that accurate?

22       A.  No.

23       Q.  All right.  Correct me.  Where am I wrong?

24       A.  We reduced the allocations for retail and

25   the call center for servicing.  I don't do servicing

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 68

1    P&Ls, so I didn't put servicing allocations -- or

2    corporate allocations for servicing on the servicing

3    P&L.

4         Q.  Okay.  So recognizing you didn't do the

5    servicing P&L, I'm with you there.  You're doing the

6    retail and the call center P&L.  Part of the cost is

7    reduced by something you don't put on your balance

8    sheet, whatever percentage was allocated to

9    servicing; correct?

10        A.  I don't understand your question.

11        Q.  All right.  Well, make me understand.  I

12   want you to walk me through the process that was

13   used to calculate when you first got there.  I want

14   you to walk me through the process that was used to

15   calculate corporate allocation to the retail

16   department.

17             MR. PERLOWSKI:  Object to the form.  Asked

18   and answered.

19             You can answer again, Mr. Muth.

20        A.  What was that?

21   BY MR. HARGROVE:

22        Q.  You can answer.  Go ahead.  Walk me through

23   the process.

24        A.  So we would look at the corporate

25   allocations from AMB.  We would split the costs,

Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 69

1   whether it was between OLA, ILA, or servicing.  We

2   would exclude servicing from the OLA and -- sorry,

3   call center and retail divisions, then we would

4   allocate them on a funded-unit basis.

5        Q.  Okay.  Then there was a change.  Tell me

6   what the new process was when there was a change.

7        A.  The switch to going off of basis points.

8        Q.  Okay.  So if you were writing instructions

9   to your successor, what would you tell the successor

10  the change was that they needed to do?

11       A.  So we're going to switch and go off of

12  basis points off of funded volume.

13       Q.  Okay.  As opposed to what?

14       A.  As opposed to pulling the AMB and

15  allocating out individually.  So call center and

16  retail.

17       Q.  All right.  So I understand you're changing

18  from funded units to basis points.  Walk me through

19  the rest of the process other than that, of how you

20  figured out the corporate allocation.

21       A.  So each month when we put together the P&L,

22  we would allocate the number of basis points off of

23  the funded volume.

24       Q.  All right.  And did -- so at that point,

25  none of it -- at that point, was there or was there

Jim Muth                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 70

1    not a deduction for what was attributable to the

2    servicing department?

3        A.   There would have been because we used

4    historicals.

5        Q.   You used historical basis points?

6        A.   Correct.

7        Q.   All right.  How do basis points factor into

8    the allocation towards the servicing department?

9        A.   I don't know what you mean by that.

10       Q.   All right.  Pretend I am not an accountant

11   and have no accounting knowledge.  All right?  I

12   don't want you to tell me about what changed; I want

13   you to tell me after this change was made, start

14   from scratch.  Tell me exactly the process that was

15   followed to figure out how much corporate allocation

16   would get applied to the retail division after the

17   change.  Assume this is the way that it started;

18   okay?  And walk me through from step 1 to the end

19   how it happens.

20       A.   We looked up the historical corporate

21   allocations in the form of basis points.  We then

22   took that historical basis points and applied it for

23   the funded volume.

24       Q.   So under the historical allocation, there

25   were basis points allocated to the servicing

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 71

1    division?

2         A.   Basis points is just a corporate allocation

3    dollar divided by the funded volume.

4         Q.   All right.  So explain to me the

5    interaction between the basis points and what would

6    have been allocated to the servicing division.

7         A.   The corporate allocations, when we were

8    removing the costs that would have been allocated to

9    servicing were recorded, and then we used that

10   dollar amount to determine what the basis points

11   were.

12        Q.   Right.  So off the top when this change

13   happened, you looked at what historically had been

14   allocated to the servicing department and just

15   automatically deducted that?

16        A.   No.  We looked at what the divisions were

17   being allocated.

18        Q.   All right.

19        A.   That's after servicing was removed.

20        Q.   So there was some portion of corporate --

21   as simply as possible, explain to me how it was

22   determined what the reduction to what was attributed

23   to retail and call center was after this change for

24   what used to be attributed to the servicing

25   department.

Jim Muth                                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 72

1        A.   I don't understand what you're asking me

2    now.

3        Q.   We're going to be here a while.  You would

4    agree with me that there were part of the corporate

5    allocations attributed to the servicing department

6    and actually placed on its balance sheet at some

7    point; correct?

8        A.   No.

9        Q.   Would you agree with me that there was

10   money -- I just asked you to walk me through the

11   process, and you said there was a deduction -- this

12   is before the change -- there was a deduction to the

13   corporate allocations for the amount of time, based

14   on your conversations with them, that was spent on

15   servicing; right?

16       A.   Correct.

17       Q.   All right.  Did that keep happening, or did

18   it stop?

19       A.   We changed methodology.

20       Q.   All right.

21       A.   It's not that it didn't stop; we changed

22   methodology.

23       Q.   Okay.  How did the methodology change --

24   well, before I ask you how it changed, what effect

25   did that change in methodology have on the part of

Page 73

1    the allocation that used to go to servicing?

2         A.   There was no change.

3         Q.   Okay.  So that was still going to servicing

4    even when you changed methodology?

5         A.   Nothing went to servicing.  There was a

6    reduction in corporate allocations for retail and

7    the call center for servicing.  That's what the

8    process was.

9         Q.   All right.  So the same reduction that they

10   were getting when some of it was being attributed to

11   servicing was still being given even when it wasn't

12   being --

13        A.   Correct.

14        Q.   Okay.  And how was that amount calculated?

15        A.   We were using the historical averages.

16        Q.   All right.  Historical averages of what had

17   been attributed to servicing before the change?

18        A.   Correct.

19        Q.   And your testimony is that that change

20   didn't cause any increase in the amount of corporate

21   allocations to the retail division; correct?

22        A.   Not that I'm aware of.

23        Q.   Well, are there others that I need to speak

24   with?  You said not that you're aware of.  Are there

25   others who might have knowledge of increases beyond

Page 74

1    your knowledge?

2          MR. PERLOWSKI:  Object to the form.

3    Foundation.

4    BY MR. HARGROVE:

5       Q.  Do I need to talk to somebody else to find

6    out whether there were changes?

7       A.  What changes are you referring to?

8          MR. PERLOWSKI:  Object to the form.

9    Foundation, speculation.

10         You can answer.

11   BY MR. HARGROVE:

12      Q.  My understanding is you're the guy we're

13   going to get to, everybody says you're the guy for

14   the P&Ls and the corporate allocations.  That's --

15   I've been directed to you.  And you said not to your

16   knowledge as to whether there was any increase in

17   corporate allocation burden to the retail division.

18         And what I'm asking you is, is there

19   someone the buck stops with beyond you I need to

20   speak with to find out if there was an increase in

21   the burden of the corporate allocation to the retail

22   division?

23         MR. PERLOWSKI:  First of all, objection.

24   Foundation.  Form.  You were told that Mr. Muth was

25   the appropriate person to talk about some of the

Jim Muth                                                   March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 75

1    supplemental documents that were produced and

2    nothing else.  So let's actually -- I mean, he can

3    answer the questions you asked, but the entire

4    foundation was just wrong.

5    BY MR. HARGROVE:

6        Q.  So you're the man.  Any of these documents

7    that were produced, you're the man; correct?

8            MR. PERLOWSKI:  Not what I said.  That's

9    not what I said.  You want to show him the documents

10   that were produced and ask him about them --

11           MR. HARGROVE:  We're going to show him

12   documents in a minute.  I'm asking him questions so

13   I can get to the documents, which is going to be a

14   while.

15   BY MR. HARGROVE:

16       Q.  But is there someone other than you who you

17   believe has superior knowledge of whether the change

18   that you told me about caused an increase in

19   corporate allocation to the retail division?

20           MR. PERLOWSKI:  Objection.  Form,

21   foundation, speculation.

22           You can answer if you can, Mr. Muth.

23   BY MR. HARGROVE:

24       Q.  I can't hear you.

25       A.  I'm not aware of anything.

Page 76

1      Q.  I still can't hear you.

2      A.  I'm not aware of anything.

3      Q.  All right.  Have there been other -- you

4   told me about that change.  Have there been other

5   changes in the way that corporate allocations have

6   been computed?

7      A.  Yes.

8      Q.  All right.  Tell me about the next change.

9      A.  Dollar per unit.

10     Q.  All right.  And when did that change to

11  dollar per unit take place?

12     A.  Beginning of 2021.

13     Q.  Okay.  So some -- so other than this change

14  at the beginning of 2021, the only other change to

15  corporate allocations you've already told me about;

16  correct?

17     A.  Correct.

18     Q.  I couldn't hear you.

19     A.  Correct.

20     Q.  All right.

21         MR. PERLOWSKI:  I couldn't hear that

22  either.  Were you able to hear that last one,

23  Travis?

24         MR. HARGROVE:  I heard it.  He said

25  correct, but I don't mind him saying it again.

Page 77

1              MR. PERLOWSKI:  That's fine.  I'll take

2    your word for it.  I just didn't hear it.

3    BY MR. HARGROVE:

4         Q.  So what changed in early 2021?  How did

5    this per-unit change affect corporate allocations to

6    the retail division?

7         A.  We were allocating on a dollar per funded

8    unit.

9         Q.  Dollar per funded unit.  Explain that

10   formula of dollar per funded unit, what the inputs

11   are.

12        A.  So we estimated what our corporate

13   allocations were going to be for the full year, and

14   then what our funded volume -- or funded units was

15   going to be to determine a cost per unit.

16        Q.  Okay.  So it was a prospective projection,

17   and that was used to calculate who would -- which

18   region would bear how much of the corporate

19   allocation; is that accurate?  I didn't hear you.

20        A.  (Inaudible.)

21        Q.  I still didn't hear you.

22        A.  Correct.

23        Q.  All right.  We got a little bit out of

24   order.  I'm going to ask you a question now that

25   we're going to do a little bit more background, and

Page 78

1  then we'll come back to a lot of these issues as we

2  go through these documents.

3          And I think I know the answer to this at

4  this point, but I intended to ask it at the

5  beginning.  You're not under the influence of any

6  prescription medications or nonprescription of any

7  sort that would affect your ability to fully and

8  truthfully testify today; correct?

9      A.  No.

10     Q.  No, you're not or no -- I know you're

11 saying no, you're not, but that --

12     A.  No, I'm not.

13     Q.  Okay.  All right.  And you've never been

14 diagnosed with any sort of a memory problem;

15 correct?

16     A.  No, I haven't.

17     Q.  All right.  Have you ever been involved in

18 a lawsuit before where you either sued someone or

19 have been sued?

20     A.  No.

21     Q.  What did you do to prepare for this

22 deposition today?

23     A.  Nothing.

24     Q.  So you didn't look at any documents?

25     A.  I reviewed some documents.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 79

1          Q.  Okay.  So -- so you said "nothing."  So
2     let's go back.  What did you do to prepare for the
3     deposition today?
4          A.  I've looked over some documents.
5          Q.  All right.  What documents did you look at?
6          A.  A pie chart.
7          Q.  Okay.  Did you look at any documents other
8     than a pie chart?
9          A.  Yeah, there were a couple other.
10         Q.  Tell me what you recall about those.
11         A.  I don't really recall.  They were part of
12    meetings from a while ago.
13         Q.  All right.  Were those meetings with your
14    counsel or somebody else?
15         A.  With counselor.
16         Q.  Okay.  Now, I don't want to know what you
17    discussed, but did you speak -- did you meet with
18    your counsel prior to this deposition?
19         A.  Yes.
20         Q.  Okay.  For how long did y'all meet?
21         A.  Don't recall.
22         Q.  All right.  Was it one meeting or multiple
23    meetings?
24         A.  One.
25         Q.  All right.  When did the meeting take

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 80

1    place?

2        A.   Yesterday.

3        Q.   All right.  And how many documents did you

4    review in preparation for your deposition?

5        A.   There were a couple.

6        Q.   All right.  A couple meaning two or a

7    couple meaning not a whole lot but a few?

8        A.   A few.

9        Q.   Okay.  How long did you spend reviewing the

10   documents?

11       A.   Maybe 20 minutes, 25 minutes.

12       Q.   When you reviewed the documents that you

13   reviewed in preparation for the deposition, did

14   you -- well, let me go back.

15            Did you prepare any of the documents that

16   you reviewed in preparation for the deposition?

17       A.   Yes.

18       Q.   All right.  Were there any documents that

19   you reviewed in preparation for the deposition that

20   you didn't prepare?

21       A.   Possibly.

22       Q.   All right.  The ones you did prepare, do

23   you remember preparing those documents and the

24   circumstances attendant thereto?

25       A.   They were a long time ago.  Not

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 81 of 216
Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 81

1   necessarily.

2       Q.   All right.  Were you able to refresh your

3   recollection at all when reviewing the documents?

4       A.   A little bit.

5       Q.   All right.  Aside from a meeting with your

6   counsel and reviewing some documents for about 20

7   minutes, did you do anything else to prepare for

8   your deposition?

9       A.   No.

10      Q.   All right.  Have you talked with anyone

11  else at NAF about your deposition?

12      A.   No.

13      Q.   Have you had any discussions with

14  Mr. Obradovich about his deposition?

15      A.   No.

16      Q.   Does Mr. Obradovich know you were being

17  deposed today?

18      A.   I believe so.

19      Q.   Okay.  Did you have any conversations with

20  him about what you might be asked in the deposition?

21      A.   Yes.

22      Q.   Okay.  Tell me about those discussions.

23      A.   He mentioned background.

24      Q.   Okay.  So let's go back.  Where were you --

25  so you had one discussion with Mr. Obradovich or

Jim Muth                                 March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 82

1    multiple discussions with Mr. Obradovich about this
2    deposition?
3          A.   One.
4          Q.   All right.  When did that discussion take
5    place?
6          A.   Yesterday.
7          Q.   All right.  And was that in person or a
8    phone call discussion?
9          A.   It was a teams meeting.
10         Q.   A teams meeting.  All right.  Was your
11   counsel present on that teams meeting?
12         A.   Yes.
13         Q.   All right.  Well, then, I'm not going to
14   ask you more about that if your counsel was present.
15              Outside the presence of your counsel, did
16   you have any discussions with Mr. Obradovich about
17   the deposition?
18         A.   No.
19         Q.   Have you had any discussion with anyone
20   else at NAF, outside of the presence of your
21   counsel, about the deposition?
22         A.   No.
23         Q.   Have you had any discussions with anyone at
24   NAF, outside of the presence of your counsel, about
25   their depositions?

Page 83

```
 1        A.  No.

 2        Q.  Do you have any knowledge of what the

 3   claims in the lawsuit that you're here being deposed

 4   in are?

 5        A.  No.

 6            MR. PERLOWSKI:  I'm going to -- don't

 7   reveal any privileged communications in that regard,

 8   but you can answer.

 9   BY MR. HARGROVE:

10        Q.  You can go ahead and answer.

11        A.  No.

12        Q.  So you don't have any idea what this

13   lawsuit is about, then; correct?

14        A.  Correct.

15        Q.  Not had any discussions outside the

16   presence of your counsel with anyone at NAF about

17   the deposition?

18        A.  No.

19        Q.  How did you learn that you were going to be

20   deposed?

21        A.  E-mail.

22        Q.  Okay.  And did the e-mail come from your

23   counsel?

24        A.  Yes.

25        Q.  All right.  Have you had any discussions
```

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 84 of 216
Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 84

1    with Kelly Allison about this case?

2        A.   No.

3        Q.   Have you had any discussion with

4    Kelly Allison about this deposition?

5        A.   No.

6        Q.   Have you done any independent research of

7    any sort to try to learn about what the allegations

8    of the lawsuit are?

9        A.   No.

10       Q.   Do you know my client Ms. Spearman?

11       A.   Yes.

12       Q.   Okay.  And how do you know her?

13       A.   Worked at NAF.

14       Q.   All right.  When was the last time you

15   interacted with her?

16       A.   I don't remember.

17       Q.   Okay.  While she was still employed with

18   NAF, I would assume?

19       A.   Yes.

20       Q.   So we got started on your employment at NAF

21   and your initial position, which was -- that was --

22   what was it again?  It's been a little while.  Vice

23   president of?

24       A.   I started as the AVP of corporate

25   analytics.

1      Q.  Okay.  All right.  How did you first come

2   to be employed at NAF?

3      A.  By applying for the job.

4      Q.  All right.  And how did you know to apply

5   for the job?

6      A.  I was recruited.

7      Q.  All right.  Who recruited you?

8      A.  A recruiter.

9      Q.  All right.  What was the recruiter's name?

10      A.  I don't remember.

11      Q.  All right.  And when the recruiter reached

12   out, you obviously ended up employed at NAF.  Walk

13   me through the process by which you became employed

14   as the AVP of corporate analytics.

15      A.  I interviewed with Jason Obradovich.

16      Q.  Okay.  That's it?  You interviewed with him

17   and he said you're hired?

18      A.  It was a couple days later I got a phone

19   call that I got the position.

20      Q.  Okay.  Did you meet with anyone other than

21   Mr. Obradovich?

22      A.  Yes.

23      Q.  Okay.  Who else did you meet with?

24      A.  Kristin Ankeny.

25      Q.  Kristin Ankeny?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 86

```
 1        A.  Correct.
 2        Q.  All right.  And she is in the same
 3   department you're in; correct?
 4        A.  No.
 5        Q.  No?  Okay.  What department is she?
 6        A.  I don't know off the top of my head.
 7        Q.  What department are you in?
 8        A.  Finance.
 9        Q.  All right.  And you became the AVP of
10   corporate analytics, you said, about November of
11   2017?
12        A.  Correct.
13        Q.  All right.  Walk me through -- well, let me
14   go back.
15             You didn't know Mr. Obradovich before you
16   became employed at NAF; correct?
17        A.  Correct.
18        Q.  All right.  Did you interact with
19   Mr. Obradovich regularly in your job at NAF?
20        A.  Only weekly.
21        Q.  And do you collaborate on things together
22   or does he supervise you or what is y'all's
23   relationship?
24        A.  Every once in a while.
25        Q.  Every once in a while you collaborate?
```

Jim Muth                                              March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 87

1      A.  Correct.

2      Q.  All right.  Is he on the totem pole above

3  where you are with NAF?

4      A.  Yes.

5      Q.  All right.  Walk me through your

6  advancement at NAF up to your present position.

7      A.  I was promoted to vice president of finance

8  in November 2019.

9      Q.  Okay.  And how did your role change between

10  being AVP of corporate analytics to VP of finance?

11      A.  It was a pretty similar role.

12      Q.  Did you obtain additional responsibilities?

13      A.  No.

14      Q.  All right.  Were you supervising more

15  people than you were before?

16      A.  No.

17      Q.  So it was just a change in name only and, I

18  assume, a pay increase?

19      A.  Correct.

20      Q.  All right.  And is that your current

21  position, VP of finance?

22      A.  Yes.

23      Q.  All right.  If you were to write a job

24  description for your job, tell me what that job

25  description would be.

Case 1:20-cv-04981-CAP  Document 92  Filed 04/28/22  Page 88 of 216
Jim Muth                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 88

1          A.   Prepare various P&Ls for the company.

2          Q.   To prepare various P&Ls for the company?

3          A.   Correct.

4          Q.   All right.  What are the various P&Ls that

5     you prepare?

6          A.   Did P&Ls for the retail and the call

7     center.

8          Q.   Okay.  And you have walked me through

9     already the method and manner by which you prepare

10    those P&Ls for the retail and call center; correct?

11         A.   Correct.

12         Q.   And those are done on a monthly basis;

13    correct?

14         A.   Yes.

15         Q.   And then at the end of the year, is there

16    an aggregate for the year or are there also -- well,

17    let me just ask it this way:  Are there statements

18    prepared, P&Ls for the retail and call center other

19    than just the monthly P&Ls you've told me about?

20         A.   No.  They're prepared monthly.

21         Q.   All right.  So you are involved in

22    aggregating months together to form quarters or

23    quarters to form years?  It's all simply monthly

24    data; correct?

25         A.   We prepare them monthly; however, you can

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 89

1    combine them to make quarters or year.

2         Q.  Okay.  And is that part of your role, or do

3    you provide monthly and then someone else, to the

4    extent they want to aggregate, then aggregates them?

5         A.  No.  I would do that as well.

6         Q.  Okay.  And you do that using the

7    information that's input by others into AMB and that

8    you obtain from the branches, that goes on the Excel

9    spreadsheet, that gets input to Kevlar, and that

10   prints the reports; correct?

11        A.  Correct.

12        Q.  Okay.  And in addition to Kevlar, there are

13   also certain Excel spreadsheets that can be put

14   together to show various aspects of the company's

15   finances; correct?

16        A.  Correct.

17        Q.  And in fact, you were involved in preparing

18   many such documents related to Ms. Spearman and

19   Ms. Allison while they were employed at NAF;

20   correct?

21             MR. PERLOWSKI:  Object to the form.

22   Foundation.

23             You can answer.

24        A.  Correct.

25   BY MR. HARGROVE:

Jim Muth                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 90

1        Q.   All right.   The Kevlar system was
2   already -- the Kevlar system was already in place at
3   the point in which you became employed at NAF;
4   correct?
5        A.   No.
6        Q.   No?   Okay.   How far into your employment
7   was the Kevlar system implemented?
8        A.   It was early on.
9        Q.   All right.   Before the Kevlar system was
10  implemented, tell me how you went about preparing
11  the P&Ls that you prepared.
12       A.   Excel.
13       Q.   In Excel?   Okay.   So same exact process, it
14  would just be an Excel document as opposed to
15  uploading it into Kevlar?
16       A.   Correct.
17       Q.   Okay.   Did Kevlar change anything about the
18  way revenue costs or profits were recorded by you in
19  the Excel spreadsheets?
20       A.   No.
21       Q.   Did you think that Kevlar was beneficial to
22  the company?
23       A.   Yes.
24       Q.   All right.   Were you involved in building
25  the Kevlar program?

1     A.   No.

2     Q.   Who was involved in building the Kevlar

3  program?

4     A.   The team people.

5     Q.   Were you consulted about the Kevlar system?

6     A.   I created templates of what the P&L design

7  would look like.

8     Q.   Okay.  Who asked you to do that?

9     A.   I don't recall who asked.

10     Q.   Was Mr. Obradovich involved in preparing

11  the Kevlar system?

12     A.   Yes, he was.

13     Q.   Does the Kevlar system account for earnings

14  and expenses?

15     A.   Yes.

16     Q.   Did the method that you utilized before

17  Kevlar was in play account for earnings and

18  expenses?

19     A.   Yes.

20     Q.   All right.  On a Kevlar report, a Kevlar

21  P&L always has bottom-line profit on it; correct?

22     A.   Correct.

23     Q.   It didn't pick up.  Could you go ahead and

24  repeat?

25     A.   Yes.

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 92

1    ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕
2    ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕
3    ✕✕✕✕✕✕✕✕✕
4    ✕✕✕✕✕✕✕
5    ✕✕✕✕✕✕✕✕
6    ✕✕✕✕✕✕✕✕✕✕✕✕✕

7         Q.   Okay.  And why don't you believe so?
8         A.   2018 was a very bad year for the industry.
9         Q.   Okay.  Would it surprise you if Ms. Preslo
10   testified that the 2018 P&L showed a profit on page
11   86 of her deposition?
12             MR. PERLOWSKI:  Object to the form.
13             You can answer.
14        A.   Yes.
15   BY MR. HARGROVE:
16   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕
17   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕
18   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕
19   ✕✕✕✕✕
20        Q.   Were you involved with -- in meetings about
21   or approving the P&Ls on a monthly basis with
22   Mr. Obradovich?
23        A.   Yes.
24        Q.   All right.  Who else was involved in those
25   meetings, if anyone?

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 93

1        A.   Jon Reed.

2        Q.   Okay.  Anyone else?

3        A.   Jan Preslo.

4        Q.   Okay.  Anyone else?

5        A.   Christy.

6        Q.   Christy Bunce?  All right.  So Mr. Reed,

7   Ms. Preslo, Ms. Bunce, Mr. Obradovich, you.  Anyone

8   else?

9        A.   No.

10        Q.   All right.  Did these meetings occur on a

11   monthly basis when the P&Ls were prepared?

12        A.   Yes.

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ██████

16   █████████████████████████████████████████████

17   ███████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████████████████

21        A.   I believe so.

22        Q.   All right.  What were the contents of those

23   discussions?

24        A.   I don't remember in detail.

25        Q.   Well, tell me what you do remember even not

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 94

1    in detail.

2         A.   I don't remember details of a meeting three

3    or four years ago.

4         Q.   Do you remember anything about the meeting?

5         A.   Not specifically, no.

6         Q.   How about generally?

7         A.   Only we would have the meetings.  I

8    remember that.

9    ████████████████████████████████████████

10   ██████████████████████████████████████████████

11   ██████████████████

12   ██████████████████████████████████████████████

13   ██████

14        Q.   Okay.  Do you remember who was alarmed?

15        A.   Not specifically.

16        Q.   Okay.  But you do remember that somebody

17   was alarmed about it; correct?

18        A.   Like I said, I don't remember the meeting

19   specifically.  I imagine there would be some people

20   that would be alarmed by it.

21   ████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████

24   ████████

25        A.   Not that I'm aware of.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 95

1           MR. PERLOWSKI:  Object to the form.

2    Speculation.

3    BY MR. HARGROVE:

4        ████████████████████████████████████████

5    ███████████████████

6        ███████████

7        Q.  All right.  And in response to that alarm,

8    did you take any action?

9        A.  Not necessarily, no.

10       Q.  All right.  Were there any changes to the

11   way that corporate allocations were charged for the

12   year 2018 against the retail division that caused

13   it, on your P&Ls, to be less profitable?

14       A.  No.

15       Q.  So there was nothing done that changed the

16   corporate allocation to increase them as it pertains

17   to the retail division for 2018?

18           MR. PERLOWSKI:  Objection.  Asked and

19   answered.

20           You can answer again.

21       A.  What was that?

22   BY MR. HARGROVE:

23       Q.  You already answered.  He put an objection

24   in, but you already answered.  I'm not saying you

25   ran over the objection.  I'm just saying you already

```
 1  answered.
 2            MR. PERLOWSKI:  I didn't hear.
 3            MR. HARGROVE:  You want to read the
 4  question back so it's less confusing?
 5            MR. PERLOWSKI:  Let's do that.
 6            (The reporter read the requested material.)
 7            MR. PERLOWSKI:  Same objection.
 8            You can answer.
 9       A.  No.
10  BY MR. HARGROVE:
11       Q.  In the prior years, had the retail -- so
12  you only got there in 2000 -- end of 2017.  Did 2017
13  come out to be a profitable year?
14       A.  I don't recall.
15       ████████████████████████████████████████████
16  ████████████
17       ██████
18       Q.  Is that because you saw the P&Ls all along?
19       A.  Yes.
20       Q.  Okay.  Do you know, with regard to the P&Ls
21  off Kevlar, did you distribute those to the
22  Arvielos?
23       A.  Not directly.
24       Q.  Okay.  But you prepared them, y'all met
25  about them, went through them, then you know they
```

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 97 of 216
Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 97

1    were transmitted to the Arvielos; correct?

2         A.  I don't know that for sure.

3         Q.  Okay.  So you don't have any knowledge as

4    to whether the Arvielos ever saw the P&Ls or not?

5         A.  Not that ones I --

6              MR. PERLOWSKI:  Object.  Asked and

7    answered.  Speculation.

8              You can answer.

9    BY MR. HARGROVE:

10        Q.  I didn't hear your answer.

11        A.  I don't know if the Arvielos saw the P&Ls I

12   produced.

13        Q.  Okay.  Do you know whether they saw any

14   P&Ls for the retail division?

15        A.  I wouldn't know what they saw or didn't

16   see.

17        Q.  All right.  Let's take a couple-minute

18   break before I get in here, about to change gears.

19              (Recess 4:11 to 4:23 p.m.)

20   BY MR. HARGROVE:

21        Q.  Did you attend a 2019 leadership meeting

22   with the regional managers and the executives of

23   NAF?

24        A.  No.

25        Q.  Okay.  Are you aware of any such meeting

Jim Muth                                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 98

1    taking place?

2         A.   I've heard of the meeting.

3         Q.   All right.  Tell me what you've heard about

4    the meeting.

5         A.   Just that there was a meeting.

6         Q.   All right.  And so you've not heard

7    anything other than there was a leadership meeting

8    in February 2019?

9         A.   Correct.

10        Q.   All right.  So you don't know whether at

11   that meeting there was a discussion about 2018 not

12   being a good financial year for the retail division?

13        A.   I wasn't in the meeting.  I don't know what

14   was discussed.

15        Q.   Had you had discussions with others about

16   the meeting?

17        A.   No.

18        Q.   Okay.  How did you know the meeting even

19   took place?

20        A.   Preparing documents.

21        Q.   Because what now?

22        A.   Preparing documents.

23        Q.   All right.  What documents did you prepare

24   for the February 2019 leadership meeting?

25        A.   I don't recall specifically.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 99

1        Q.  All right.  Who asked you to prepare

2    documents for the 2019 leadership meeting?

3        A.  I don't recall specifically.

4        Q.  All right.  Well, do you recall generally?

5        A.  I'm sure it came from several different

6    individuals.

7        Q.  Okay.  Who were those individuals who

8    you're sure it could have been?

9        A.  I'm not sure.

10       Q.  All right.  Well, name the ones that -- you

11   said several individuals, so tell me the identity of

12   those people.

13       A.  They could have been Jon Reed.

14       Q.  Okay.

15       A.  Could have been Christy Bunce.

16       Q.  Okay.

17       A.  And Jason Obradovich.

18       Q.  All right.  When you were asked to prepare

19   documents, were you given a reason why you were

20   preparing the documents?

21       A.  For 2018 review.

22       Q.  For a 2018 review?

23       A.  Correct.

24       Q.  All right.  A review of what?

25       A.  Of the P&Ls for 2018.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 100

1        Q.   Okay.  Was there anything different about
2    this leadership meeting than other meetings that
3    took place while you were at NAF?
4             MR. PERLOWSKI:  Object to the form.
5    Speculation.
6             You can answer if you can.
7        A.   I haven't attended any other meeting, so I
8    wouldn't know.
9    BY MR. HARGROVE:
10       Q.   Did you say you hadn't attended any other
11   or any of the meetings?
12       A.   You asked how they compared to other
13   meetings prior.  I never attended any other
14   meetings.
15       Q.   Okay.  And were you asked to prepare
16   documents for other meetings during the time you've
17   been at NAF?
18       A.   Yes.
19       Q.   Were you asked to prepare similar documents
20   that you were asked to prepare for their February
21   2019 leadership meeting?
22       A.   Most likely, yes.
23       Q.   Did you have any discussions with anyone
24   prior to the meeting about there being a
25   misallocation of funds that caused the -- what was

Page 101

1    thought to be a profitable year to be a not

2    profitable year?

3         A.   I don't know what you mean.

4    ████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████

7    ████

8    ████████████████████████████████████████

9    ████████████████████████

10   ██████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████

13            MR. PERLOWSKI:  Object to the form.

14   Foundation.

15            You can answer.

16        A.   Yes.

17   BY MR. HARGROVE:

18        Q.   Okay.  Tell me about those conversations.

19        A.   It was regarding the corporate allocations.

20        Q.   Okay.  Who did you have those -- that

21   conversation or those conversations with?

22        A.   Various people at NAF.

23        Q.   Okay.  Tell me everything you recall

24   about -- well, first off, let me go back.

25            Who were the various people at NAF you had

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 102

1   these conversations with?

2       A.  I'm sure they were with Jon Reed, Christy

3   Bunce.

4       Q.  Okay.

5       A.  Jason Obradovich.

6       Q.  All right.  Was it conversations with

7   everyone, or were these separate conversations?

8       A.  I don't recall.

9       Q.  All right.  Tell me what was discussed in

10  these conversations.

11      A.  It was the various levels of corporate

12  allocations.

13      Q.  All right.  What was discussed about the

14  various levels of corporate allocations?

15      A.  I guess it was the difference between them.

16      Q.  All right.  Were you asked to explain the

17  difference between them?

18      A.  I don't recall specifically.

19      Q.  Okay.  So there was discussion about the

20  difference between them.  Do you know -- why were

21  y'all discussing the difference between the

22  different corporate allocations?

23      A.  Because there's the different amounts for

24  the allocation, what was applied.

25      Q.  All right.  And why did that matter?

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 103

1        A.   Well, if you don't apply all the corporate

2    allocations, you're not seeing the full P&L.

3        Q.   All right.  And did you have an

4    understanding that there was someone who didn't see

5    all the corporate allocations?

6        A.   Not to my understanding.

7    ████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████

11        MR. PERLOWSKI:  Object to form.

12   Mischaracterizes his testimony.

13        You can answer.

14        A.   Correct.

15   BY MR. HARGROVE:

16   ████████████████████████████████████████████

17   ██████████████████████████████████████

18   ██████████████████████████████████████

19   ██████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████

22   ██████████████████

23        Q.   All right.  But you can't tell me who at

24   NAF that was?

25        A.   I don't know who had the confusion.  I know

Veritext Legal Solutions

Page 104

1    there was confusion.

2         Q.  The first part of your answer was cut off,

3    so if you wouldn't mind answering again.

4         A.  I don't remember who had confusion

5    specifically.

6         Q.  Was it Mr. Arvielo?

7         A.  Not to my knowledge.

8         Q.  All right.  Was it Mr. Obradovich?

9         A.  Not to my knowledge.

10        Q.  Was it Mr. Reed?

11        A.  It could have been Reed.

12        Q.  Okay.  Why do you say it could have been

13   Reed?

14        A.  Because he was part of the corporate

15   allocation discussions.

16        Q.  Okay.  He was also involved in the monthly

17   meetings you guys had where the P&Ls were approved;

18   correct?

19        A.  Correct.

20        Q.  And those P&Ls always had the bottom-line

21   profit on them; correct?

22        A.  Correct.

23        Q.  Okay.  Did he ever express to you a lack of

24   understanding of the bottom-line profit?

25        A.  Not directly to me.

Jim Muth                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 105

1      Q.   Okay.  Did he express it to someone else,
2   that you're aware of?
3      A.   Not that I'm aware of.
4      Q.   All right.  How about Ms. Bunce?  Was
5   Ms. Bunce confused about the corporate allocations?
6      A.   Not that I'm aware of.
7      Q.   All right.  How about Ms. Preslo?
8      A.   Not that I'm aware of.
9      Q.   So the only one you're aware that it might
10  be is Mr. Reed?
11     A.   Possibly.
12     Q.   Okay.  Anybody else that it might have
13  been?
14     A.   Not to my knowledge.
15     Q.   So as we sit here, you're not certain it
16  was Mr. Reed, but you believe Mr. Reed is the one
17  who was confused about the corporate allocations?
18     A.   I believe so.
19     Q.   Okay.  And you had discussions with
20  Mr. Reed about the corporate allocations?
21          MR. PERLOWSKI:  Object to the form.  Asked
22  and answered.
23     A.   We would have discussions about corporate
24  allocations, yes.
25  BY MR. HARGROVE:

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 106

1        Q.   And when you had those discussions, did you
2    leave with the belief that he did not understand
3    bottom-line profit on the P&Ls you prepared?
4        A.   No.
5        Q.   Okay.  What leads you to believe that he is
6    the only one you think might have been the one
7    confused about the corporate allocations?
8             MR. PERLOWSKI:  Objection.  Asked and
9    answered.
10       A.   Just because I had more conversations with
11   him.  I worked closer with him than anyone else
12   during that time period.
13   BY MR. HARGROVE:
14       Q.   All right.  Do you understand that that
15   corporate allocations issue was an issue that came
16   up after February 2019 leadership meeting?
17             MR. PERLOWSKI:  Objection.  Foundation.
18   Speculation.
19             You can answer.
20       A.   I'm not aware of what came up during the
21   meeting.
22   BY MR. HARGROVE:
23       Q.   You didn't have discussions after the
24   meeting with anyone about what happened at the
25   meeting?

Jim Muth                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 107

1          A.   No, not that I recall.

2          Q.   You weren't asked to -- you weren't asked

3    to prepare any documents about -- related to

4    corporate allocation after the meeting?

5          A.   Not that I recall specifically.

6          Q.   So prior to today, have you ever heard

7    anyone say that at that meeting, a misallocation of

8    $30 million was discussed?

9          A.   I'm not aware of a misallocation.

10         Q.   Okay.  That wasn't my question.  My

11   question was if you had ever heard a discussion

12   about a 30-million-dollar misallocation?

13         A.   I'm not aware of the misallocation.

14         Q.   I'm sorry, you said what now?  I couldn't

15   hear you.

16         A.   I'm not aware of what you're referring to

17   as a misallocation.

18         Q.   Are you aware of some other accounting

19   error or mistake that was discussed at the meeting?

20         A.   Error or mistake?  No.

21         Q.   Okay.  Something, a misunderstanding?

22         A.   I'm not familiar with what occurred at the

23   meeting.

24         Q.   Okay.  My question was, have you heard from

25   anyone else at NAF about a misunderstanding of the

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 108

1   financials being discussed at that meeting?

2           MR. PERLOWSKI:  Object to the form.

3   Foundation.  Speculation.

4           You can answer.

5      A.  Yeah, can you ask that again?  Sorry.

6   BY MR. HARGROVE:

7      Q.  Sure.  Let me go back.  Have you discussed

8   what happened at that meeting, the February 2019

9   leadership meeting, with anyone at NAF?

10     A.  No, not that I'm aware of.

11     Q.  Not that you're aware of.  Okay.  Have you

12  heard from anybody at NAF about anything that

13  occurred at that meeting?

14     A.  No.

15  ▩▩▩▩▩▩▩▩▩▩▩▩▩▩  ▩▩▩▩▩▩▩▩▩▩▩▩▩

16  ▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩  ▩▩▩▩▩▩▩▩▩▩▩▩▩▩

17  ▩▩▩▩▩  ▩▩▩▩▩▩▩▩▩  ▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩▩

18  ▩▩▩▩▩  ▩▩▩▩▩▩▩

19          MR. PERLOWSKI:  Objection.  Speculation.

20          You can answer.  Foundation.

21     A.  Yes.

22  BY MR. HARGROVE:

23     Q.  Okay.  Who is that?

24     A.  I don't know specifically.

25     Q.  All right.  How do you know that there's

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 109

1    someone at NAF, which I think you eliminated down to

2    it was most likely Jon Reed, who had that

3    misunderstanding of your P&Ls?

4         A.   You were breaking up during that question.

5         Q.   Sure.  From where did you obtain that

6    understanding that someone misunderstood your P&Ls

7    who the only one you can't eliminate is Jon Reed?

8         A.   Sorry, once again, you were breaking up

9    again.

10        Q.   Okay.  Sorry about that.

11        A.   That's all right.

12        Q.   Where did you obtain the understanding that

13   someone at NAF, and you eliminated everyone but Jon

14   Reed, had a misunderstanding about the P&Ls you

15   prepared and what they showed as to profitability

16   for 2018?

17        A.   So I recall putting together a document

18   that showed the difference.

19        Q.   Okay.  That showed the difference of what?

20        A.   The various allocations.

21        Q.   All right.  Who asked you to prepare that

22   document?

23        A.   I don't recall specifically.

24        Q.   All right.  Is that document one of the

25   documents that you looked at before this deposition?

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 110

1          A.   Yes.

2          Q.   All right.  Is that a document you provided

3     to counsel to be produced in this litigation?

4          A.   You're breaking up again.

5          Q.   All right.  Is that document one of the

6     documents that you produced to your counsel in this

7     litigation?

8          A.   Yes.

9          Q.   All right.  And were you asked to prepare

10    that document before the leadership meeting or after

11    the leadership meeting?

12         A.   You cut out on the beginning of that.  I

13    just heard the leadership meeting.

14         Q.   Were you asked to prepare that document

15    before the leadership meeting or after the

16    leadership meeting?

17         A.   Before.

18         Q.   All right.  But you don't remember who

19    asked you to prepare the document?

20         A.   Not specifically, no.

21    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

22    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25         A.   No.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 111

1      Q.  All right.  Why did you think you were
2  asked to prepare that document?
3      A.  I don't know why.
4      Q.  Okay.  Have you had any discussions with
5  Rick Arvielo about the 2018 profit and loss
6  statements?
7      A.  Yes.
8      Q.  Okay.  Tell me about your conversations
9  with Rick Arvielo about the 2018 profit and loss
10  statements.
11      A.  I don't remember specifically the
12  conversation.
13      Q.  All right.  Tell me everything you do
14  remember about any conversation you've had with
15  Mr. Arvielo about the 2018 profit and loss
16  statements.
17      A.  I just recall that it was not a good year.
18      Q.  Okay.  And did this conversation -- were
19  there multiple conversations with Mr. Arvielo or
20  just one conversation?
21      A.  I don't recall.
22      Q.  All right.  Is Mr. Arvielo's office near
23  your office?
24      A.  Yes.
25      Q.  All right.  Did you have --

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 112

1        A.  In the same building.

2        Q.  In the same building?  Are you on the same

3    floor?

4        A.  No.

5        Q.  All right.  The conversation, was it in his

6    office or your office?

7        A.  His office.

8        Q.  All right.  Did he ask you to come to his

9    office?

10       A.  I don't think specifically.  I don't

11   remember if there was a meeting or what.

12       Q.  All right.  So his office isn't in such

13   proximity that you would just run into him in the

14   hall and him say step into my office; right?

15       A.  Right.

16       Q.  It was on an entire different floor of the

17   building; correct?

18       A.  Correct.

19       Q.  All right.  And so you had a discussion

20   about the 2018 P&Ls with him, which you don't recall

21   the contents of any of it?

22       A.  From 2018?  No.

23       Q.  All right.  You don't know whether the

24   corporate margin and how it was allocated was

25   discussed with Mr. Arvielo?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 113

1          A.  I don't recall.

2          Q.  How often have you had meetings in

3    Mr. Arvielo's office during your tenure with the

4    company?

5          A.  Before he went remote, pretty much monthly.

6          Q.  Okay.  So what would the monthly

7    meetings -- what would be the purpose of these

8    monthly meetings?

9          A.  To review the corporate P&L.

10         Q.  Okay.  At any meeting that you had with

11   Mr. Arvielo reviewing corporate P&Ls, was there a

12   discussion about anything other than the bottom-line

13   profit reflected on the P&L you had prepared?

14         A.  Talked about volume.

15         Q.  Okay.  Would you go over the P&L with

16   Mr. Arvielo?

17         A.  Several of us would be in the meeting

18   reviewing the P&L.

19         Q.  All right.  And when several of you were in

20   the meeting reviewing the P&L, did you have any

21   pause or concern as to whether he understood what

22   line on those P&Ls was the bottom-line profit

23   number?

24         A.  No.

25         Q.  All right.  Did anyone in any of those

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 114

1  meetings ever tell Mr. Arvielo that the -- that any

2  number was profit other than the bottom-line profit

3  number at the bottom of the P&L?

4          MR. PERLOWSKI:  Object to the form.

5      A.  No.

6  BY MR. HARGROVE:

7      Q.  Did Mr. Arvielo ever express in any of

8  those meetings out loud that he believed some line

9  on the P&L other than the final line was the actual

10 profit or loss of the retail division?

11     A.  Not --

12         MR. PERLOWSKI:  Object to the form.

13 BY MR. HARGROVE:

14     Q.  Go ahead.

15     A.  Not to my knowledge.

16     Q.  For 2018, the retail division for the

17 southeast region, was there a profitable year for

18 that region?

19     A.  I'm sorry, you broke up in the middle of

20 that.

21     Q.  2018, the southeast region retail, was it

22 not highly profitable in 2018?

23     A.  No.

24     Q.  Okay.  And how is it that you recall that

25 specifically from 2018 as opposed to other things

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 115

1    about 2018?

2            MR. PERLOWSKI:  Object to the form.

3        A.  Say the question again.

4    BY MR. HARGROVE:

5        Q.  Sure.  How is it that you recall so quickly

6    from 2018 the southeast region not being profitable

7    as opposed to all the other things I've asked you

8    about that time that you said were so remote you

9    couldn't remember it?

10       A.  From a document.

11       Q.  And what document is that?

12       A.  The document I looked at yesterday.

13       Q.  And none of those documents refreshed your

14   recollection as to who at NAF didn't understand your

15   profit and loss statements and the appropriate

16   corporate allocations?

17       A.  No.

18       Q.  Did the P&Ls for retail before the

19   leadership meeting in 2018 for the fourth quarter

20   show a 15-million-dollar profit?

21           MR. PERLOWSKI:  Object to the form.

22   Foundation.

23       A.  I don't recall what it showed.  It wouldn't

24   have shown a 15-million-dollar profit, though.

25   BY MR. HARGROVE:

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 116

1      Q.  Never, at any point?

2      A.  2018?  No.

3      Q.  Okay.  Were you involved at all in any

4  discussions about altering -- altering regional

5  managers', such as Ms. Spearman and Ms. Allison,

6  compensation as a result of misunderstandings of the

7  financial statements from 2018?

8          MR. PERLOWSKI:  Objection.  Foundation.

9          You can answer.

10     A.  No.

11 BY MR. HARGROVE:

12     Q.  Were you involved at all in discussions of

13 pricing exceptions and whether there should be any

14 changes to those for people such as Ms. Spearman and

15 other regional managers?

16     A.  I'm sorry, you were breaking up.  Can you

17 say that again?

18     Q.  Sure.  Were you involved at all in

19 discussions about whether there would be alterations

20 to pricing exceptions for individuals such as

21 Ms. Spearman?

22     A.  No.

23     Q.  Were you involved in any conversations

24 about compensation whatsoever as it pertained to

25 Ms. Spearman or her division?

Page 117

1          A.   No.

2          Q.   Did corporate costs increase substantially

3    in 2018 for NAF?

4          A.   Not that I'm aware of.

5          Q.   All right.  And you reviewed documents

6    ahead of this that refreshed your recollection about

7    the southeast region.  Did any of your -- any of the

8    documents refresh your recollection about the level

9    of corporate expense in '18 versus '19?

10         A.   I'm not familiar with corporate expense in

11   '17.

12         Q.   You were there at the end of '17; correct?

13   You prepared the year-end P&L for '17; correct?

14         A.   I prepared the December P&L.

15         Q.   All right.  I know what you said, but only

16   a little of it got on the record.  Would you remind

17   repeating it?

18         A.   I would have prepared the December P&L.

19         Q.   And in association with preparing the

20   December P&L, would you have seen the aggregate P&L

21   for 2017?

22         A.   Not that I recall.

23         Q.   Were you involved in any meetings with NAF

24   executives prior to the February 2019 leadership

25   meeting in preparation for that meeting?

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 118

1        A.   I'm sorry, you broke up in the beginning of

2   that.

3        Q.   Okay.  Were you a part of any meetings with

4   NAF leadership to prepare for the 2019 leadership

5   meeting?

6        A.   Not that I recall.

7        Q.   Did you have any discussions with Jon Reed

8   after the leadership meeting in February 2019 about

9   what occurred at the leadership meeting?

10       A.   Not that I recall.

11       Q.   Are you aware that one of the allegations

12  in this lawsuit is that a misallocation of $30

13  million was announced at the February 2019

14  leadership meeting?

15       A.   You broke up after $30 million.

16       Q.   Are you aware that one of the allegations

17  in this lawsuit is that at the leadership meeting in

18  February 2019, a 30-million-dollar misallocation of

19  funds was discussed?

20       A.   I'm not aware of the lawsuit.

21       Q.   Have you, before I just told you that, ever

22  heard from anyone, related to the lawsuit or

23  otherwise, discussion of a 30-million-dollar

24  misallocation of funds at the February 2019

25  leadership meeting?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 119

1          MR. PERLOWSKI:  I just want to just remind

2     you, this is a general rule of thumb, not to reveal

3     any attorney-client privileged communications in

4     response to any of Mr. Hargrove's questions.  I'm

5     not saying there are any; I'm just giving you that

6     reminder.  You may answer.

7          A.  Yes.

8     BY MR. HARGROVE:

9          Q.  All right.  Tell me what you're aware of.

10    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

11    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

12    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

13    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

14    ▨▨▨▨▨

15    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

16    ▨▨▨▨▨▨

17    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

18    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

20    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

21         A.  I don't --

22         MR. PERLOWSKI:  Objection.  Foundation.

23    BY MR. HARGROVE:

24         Q.  Go ahead.

25         A.  I was not aware specifically of who was

Jim Muth                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 120

1    aware.

2           ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

4    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

5    ▨▨▨▨▨▨▨▨▨▨▨▨▨

6           MR. PERLOWSKI:  Object to the form.

7    Foundation.  Speculation.

8    BY MR. HARGROVE:

9           Q.  Correct?

10          A.  Correct.

11          Q.  I couldn't hear your answer, Mr. Muth.  I

12   still can't hear you.  You've gone silent.  Still

13   didn't hear you.

14          A.  Correct.

15          ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

16   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

17   ▨▨▨▨▨▨▨

18          ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19          Q.  Okay.  And that was the pie chart that was

20   put together before -- before the leadership

21   meeting; correct?

22          A.  Correct.

23          Q.  All right.  And who did you have these

24   discussions about the pie chart with?

25          A.  I believe it was with Christy Bunce and

Page 121

1    Jason Obradovich.

2         ████████████████████████████████████

3    ██████████████████████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████████████████████

6    ██

7              MR. PERLOWSKI:  Object to the form.

8         A.  I don't recall the conversation.

9              MR. PERLOWSKI:  Object to the form.

10   Mischaracterizes testimony.

11             You can answer.

12   BY MR. HARGROVE:

13        Q.  Go ahead.

14        A.  I don't recall the specific conversation.

15        Q.  All right.  Well, tell me generally

16   everything you recall about that conversation.

17        A.  I recall that I was asked to put it

18   together.

19        Q.  Okay.  And you did the pie chart, which

20   we'll look at in a little while; correct?

21        A.  (Inaudible.)

22        Q.  You'll have to say it again.  It didn't

23   pick up.

24        A.  Correct.

25        ████████████████████████████████████

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 122

1  ████████████████████████████████████████████

2  ████████████████████████████████████████

3  ██████████

4          ██████████████

5      Q.  I saw you say correct, but all I got on the

6  record was the second syllable.

7      A.  Correct.

8      Q.  All right.  And what gave you that belief

9  was your meeting with Ms. Bunce and Mr. Obradovich;

10 right?

11     A.  When I was asked to produce the pie chart.

12 I'm not sure if that request came from Jason or

13 Christy.

14     Q.  Okay.  And you produced the pie chart.  Did

15 they express surprise to you that there was $30

16 million on the pie chart?

17         MR. PERLOWSKI:  Object to the form.

18 Foundation.

19 BY MR. HARGROVE:

20     Q.  You can answer.

21     A.  Sorry, what was the question?

22     Q.  The question is, did they express -- well,

23 let me withdraw that question.

24         Did they express surprise to you about

25 anything on the pie chart?

Page 123

1      A.   I believe I just probably e-mailed it to

2  them.

3      Q.   Uh-huh.

4      A.   I don't know if I had a response from them.

5  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

6  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7  ▨▨▨▨▨▨▨▨▨▨▨

8  ▨▨▨▨▨

9      MR. PERLOWSKI:  Object to form.

10 Foundation.  Speculation.

11 BY MR. HARGROVE:

12     Q.   You didn't believe that?

13     A.   I did not believe that they didn't know

14 about it.

15 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

16 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

17 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

18 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

20 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

21 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

22 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ XXXXXXX

1    XXXXXX ████████████████████

2        A.  I don't know.  I didn't attend the meeting.

3        Q.  All right.  Did anyone communicate to you

4    later, or did you learn after the fact, that that

5    was part of the discussion at the meeting?

6           MR. PERLOWSKI:  Objection.  Speculation.

7    Asked and answered.

8        A.  I haven't talked to anyone regarding that

9    meeting.

10   BY MR. HARGROVE:

11      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  XXX  XXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  XXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

15          MR. PERLOWSKI:  Objection.  Foundation.

16   Mischaracterizes testimony.

17          You can answer.

18      A.  Can you say the question again?

19   BY MR. HARGROVE:

20      Q.  Sure.  You prepared the profit and loss

21   statements for NAF for 2018; correct?

22      A.  Correct.

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 125

1 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2     ▨▨▨▨▨▨▨▨▨▨

3          MR. PERLOWSKI:  Objection.  Foundation.

4 BY MR. HARGROVE:

5     Q.  Do you believe that the 2018 profit and

6 loss statements that you prepared were accurate?

7     A.  (Inaudible.)

8     Q.  Your answer didn't come up.

9     A.  Correct.

10     Q.  All right.

11          MR. PERLOWSKI:  Can we read that question

12 and answer back?

13          THE REPORTER:  Yes.

14          (The reporter read the requested material.)

15          MR. PERLOWSKI:  Thank you.

16          MR. HARGROVE:  MaryBeth, can you upload

17 000739?

18          MR. PERLOWSKI:  Mr. Muth, this will be in

19 the Exhibit Share location.

20          (Off-the-record discussion.)

21          (Plaintiff's Exhibit 1 marked)

22 BY MR. HARGROVE:

23     Q.  What is Exhibit 1?

24     A.  This is the OLA, which is the retail

25 division, corporate allocation breakdown in basis

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 126

1    points from 2018.

2         Q.   Okay.   Is this the pie chart that you

3    referred to earlier in the deposition?

4         A.   Yes.

5         Q.   All right.   And you were asked to prepare

6    this document before the February leadership

7    meeting; correct?

8              MR. PERLOWSKI:   Objection.   Asked and

9    answered.

10   BY MR. HARGROVE:

11        Q.   Correct?

12        A.   Correct.

13        Q.   All right.   And you provided this document,

14   you believe, by e-mail to those who requested it?

15        A.   Yes.

16        Q.   All right.   And is this pie chart all of

17   the corporate expenses or -- let me ask it this way.

18   What portion of the global corporate expenses for

19   NAF are reflected on this pie chart, Exhibit 1?

20        A.   Corporate allocations that are allocated to

21   retail.

22   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Jim Muth                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 127

1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████

6  ████████████████████████████████

7       Q.  Okay.  All right.  And this is a document

8  that you said someone at NAF looked at, and you have

9  the belief they were -- they didn't realize that

10  these amounts were part of the calculation for 2018

11  for the retail division?

12       A.  I believe so.

13       Q.  Okay.  Did anyone ask you any questions

14  about this document after you e-mailed it to

15  everyone?

16       A.  Not that I recall.

17       Q.  When did you learn that there -- that some

18  people at NAF were -- did not know that these

19  amounts reflected on Exhibit 1 should have been part

20  of the P&L for 2018?

21            MR. PERLOWSKI:  Objection.

22  Mischaracterizes testimony.

23  BY MR. HARGROVE:

24       Q.  You can answer.

25            MR. PERLOWSKI:  And foundation.  Sorry.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 128

 1            You can answer.

 2       A.  I'm not aware specifically when.

 3  BY MR. HARGROVE:

 4       Q.  Okay.  Do you know if it was before or

 5  after the leadership meeting?

 6            MR. PERLOWSKI:  Objection.  Foundation.

 7  Mischaracterizes testimony.

 8  BY MR. HARGROVE:

 9       Q.  Go ahead, you can answer.

10       A.  I believe it would be before.

11       Q.  Okay.  Were you asked to explain this pie

12  chart to anyone before the leadership meeting?

13            MR. PERLOWSKI:  Objection.  Asked and

14  answered.

15       A.  I don't recall.

16  BY MR. HARGROVE:

17       Q.  So that -- it could have happened, you just

18  don't remember it?  You'll have to say it again.

19  I'm sorry.

20       A.  Correct.

21  ████████████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████

24  ███████

25       Q.  And how was it determined that that is the

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 129

1    amount of legal fees/lawsuits that should be

2    allocated to the retail division?

3         A.  During the period, we would look and see

4    where the legal expenses were coming from.

5         Q.  All right.  So all of these would have been

6    expenses that were incurred by or because of the

7    retail division?  Your answer didn't register.

8         A.  Not specifically these numbers.

9         Q.  Okay.  Did you do anything but just get a

10   number provided by the legal department and input it

11   into this chart?

12        A.  It would come from AMB.

13        Q.  From AMB?  Okay.  And was it just a number

14   input to AMB by the legal department that goes to

15   you?

16        A.  It would be inputted by --

17             MR. PERLOWSKI:  Objection to form.

18   Foundation.

19   BY MR. HARGROVE:

20        Q.  Included by accounting?

21        A.  Yes.

22        Q.  All right.  So all you did to put the

23   numbers into this pie chart, which numbers affected

24   the profitability of the retail division, was just

25   pull the numbers off of AMB that were input by

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 130

1    whichever department in NAF input them; correct?

2        A.  Correct.

3            MR. PERLOWSKI:  Objection.  Foundation.

4    BY MR. HARGROVE:

5        Q.  Correct?

6        A.  (The witness nods.)

7        Q.  All right.  And there wasn't any further

8    analysis of, by way of example on the legal, whether

9    the legal fees had anything to do with the retail

10   division or not; correct?

11       A.  Not to my knowledge.

12       Q.  Okay.  Was there someone other than you

13   that was involved in preparing the P&Ls?

14       A.  Accounting.

15       Q.  Accounting?

16       A.  Accounting inputs the financials.

17       Q.  All right.  And then you take the numbers

18   that they input and create the P&Ls; correct?

19       A.  Correct.

20       Q.  And you don't have any knowledge about what

21   their process is for analyzing what the appropriate

22   amount of expense to be attributed to the retail

23   division is?

24       A.  No.

25       Q.  All right.  Have you instructed them on how

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 131

1    they're supposed to do that?

2         A.   No.

3         Q.   Are you aware of anyone else instructing

4    them on how to do that?

5         A.   No.

6         Q.   All right.  So as we sit here, do you know

7    whether the amounts on this pie chart are even

8    reflective of the amount of expense caused by the

9    retail division to the corporate entity?

10        A.   This would be the allocations from

11   corporate to the retail division.

12        Q.   But you don't know what the big number is

13   of corporate expense; correct?

14        A.   Not off the top of my head, no.

15        Q.   Okay.  Well, what I'm asking, do you do any

16   calculation to make sure that this number

17   reflects -- the numbers reflected on Exhibit 1

18   reflects only the percentage attributable to the

19   retail division?

20        A.   That would have been done.  This is the

21   retail division.

22        Q.   Okay.  So you said "that would have been

23   done."  Do you do that?

24        A.   Yes.

25        Q.   All right.  So you look at the total

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 132

1    number, and then you analyze to make sure that the
2    numbers reflected on Exhibit 1 are only what's
3    attributable to the retail division?
4         A.   Correct.
5         Q.   So you go back and check against each
6    department what amount was -- what amount was input
7    into AMB, and you make sure that that's reflective
8    of the correct percentage?
9         A.   The amount in AMB would be the full amount.
10   The amount here is what we're allocating to retail.
11        Q.   All right.  So AMB doesn't allocate it
12   down.  You pull a number off AMB, and then you make
13   a calculation of what should be allocated to retail,
14   and that's what gets input on the P&L and is on
15   Exhibit 1?
16        A.   Correct.
17        Q.   All right.  Are there any documents that
18   reflect those calculations?
19        A.   Documents?  No.
20        Q.   All right.  How do you make those
21   calculations, then, out of AMB and into the P&L?
22        A.   Through Excel spreadsheets.
23        Q.   All right.  So there would be Excel
24   spreadsheets, then, that would reflect what the full
25   amount was and then what amount was attributable to

Jim Muth                                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 133

1    retail?

2         A.   Correct.

3         Q.   All right.  And are those saved by year on

4    the computer system or by month, or how are they

5    saved?

6         A.   They are saved monthly.

7         Q.   All right.  So in each of those monthly

8    Excel spreadsheets that are saved is what goes into

9    Kevlar and then gives the final product with the

10   bottom-line profit; correct?

11        A.   Correct.

12        Q.   And that bottom-line profit incorporates

13   for 2018 all these expenses reflected on Exhibit 1;

14   correct?

15        A.   I'm not aware of that.

16        Q.   You're not aware of that?

17        A.   No.

18        Q.   So you don't know whether your 2018 profit

19   and loss statements included all of the expenses

20   that are reflected on Exhibit 1?

21        A.   No.

22        Q.   All right.  You earlier testified you

23   believe that the 2018 profit and loss statements

24   that you prepared were accurate; correct?  It didn't

25   pick up your answer.

Page 134

1      A.   Correct.

2      Q.   It still didn't pick it up.

3      A.   Correct.

4      Q.   Okay.  So how is it that you believe those

5  are accurate when you're not sure if expenses on

6  Exhibit 1 were included?

7      A.   Because of the various levels of corporate

8  allocations.

9      Q.   Okay.  Would all of the -- for bottom-line

10  profit, would all of these expenses on Exhibit 1 be

11  reflected for the financial statement to be

12  accurate?

13      A.   That's correct.

14      Q.   Okay.  So bottom-line profit, that's CM3;

15  right?  Isn't that what it was called then?  It

16  didn't pick up your answer.

17      A.   Correct.

18      Q.   So the CM3 number on the 2018 P&Ls, you

19  don't know whether it includes these items on

20  Exhibit 1?

21      A.   CM3, it would be included.

22      Q.   Okay.  And that's bottom-line profit;

23  correct?

24      A.   Correct.

25      Q.   And that's reflected on all of the

Jim Muth                                            March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 135

1    documents that are -- that are prepared by Kevlar;

2    correct?

3           MR. PERLOWSKI:  Object to the form.

4    BY MR. HARGROVE:

5       Q.  Kevlar P&Ls show bottom-line CM3; right?

6       A.  No.

7       Q.  I couldn't hear your answer.

8       A.  Not always.

9       Q.  Not always?  So if Mr. Obradovich testified

10   that they always do, that would be inaccurate?

11      A.  I believe so.

12      Q.  Okay.  Well, what are the circumstances

13   that profit and loss statements prepared in Kevlar

14   by you didn't include bottom-line profit?  I

15   couldn't hear your answer.

16      A.  Say that again.

17      Q.  Sure.  Under what circumstances would

18   profit and loss statements prepared by you not

19   include bottom-line profit?

20      A.  Profit and loss prepared by me would

21   include all expenses and CM3.

22      Q.  Okay.  And that's what was discussed at

23   your meetings, correct, when you had meetings to

24   approve the P&Ls?  It didn't pick up your answer.

25      A.  Correct.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 136

1        Q.  All right.  And that's what got distributed

2    by you to the NAF executives; correct?

3        A.  Correct.

4        Q.  So if someone wanted to print a Kevlar

5    report that didn't have bottom-line profit and loss,

6    they would have had to do that independently of what

7    you provided; correct?

8        A.  Say that again.

9        Q.  If someone wanted to produce a Kevlar

10   statement, accounting P&L that didn't include CM3

11   and actual bottom-line profit, they would have had

12   to do that independently of you; correct?

13       A.  You can't exclude things from -- Kevlar

14   would only show what Kevlar shows.  So I don't

15   follow your question.

16       Q.  My question is, the only reports that you

17   distributed, the P&Ls, have the bottom-line profit

18   on them; correct?

19       A.  I believe so.

20       Q.  Okay.  If someone was looking at another

21   document, a source other than you would have had to

22   go into Kevlar and prepare that document; correct?

23           MR. PERLOWSKI:  Object to the form.

24   Foundation and speculation.

25           You can answer.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 137

1        A.  Say it again.

2    BY MR. HARGROVE:

3        Q.  In order for someone to have a profit and

4    loss document from Kevlar that didn't include CM3

5    and bottom-line profit, that person would have had

6    to have it from a source other than you, who

7    prepared what you've testified are accurate profit

8    and loss statements that include all costs; correct?

9        A.  Your question is little confusing.  So I

10   would always report through CM3.

11       Q.  Okay.

12       A.  I'm not sure if that answers your question.

13       Q.  No, that answers it.  That answers it.  Was

14   there any discussion of this pie chart with anyone

15   at NAF after the leadership meeting?

16            MR. PERLOWSKI:  Object to the form of the

17   question.  Foundation.  Asked and answered.

18   BY MR. HARGROVE:

19       Q.  I didn't hear your answer.

20       A.  Not that I'm aware of.

21       Q.  Was the first time that you saw this

22   document after you provided it to whomever asked for

23   it before that leadership meeting in preparation for

24   this deposition?

25       A.  Say that again.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 138

1          Q.   Did you see this document between the time

2     you turned it over to whoever asked for it before

3     the February 2019 leadership meeting up until the

4     point you saw it preparing for this deposition?

5          A.   Not that I'm aware of.

6          Q.   Okay.  And you don't recall discussing this

7     document with anyone up until the point of this

8     deposition; correct?

9          A.   Correct.

10              MR. HARGROVE:   MaryBeth, can you pull up

11     781?

12              (Plaintiff's Exhibit 2 marked)

13          A.   Okay.

14     BY MR. HARGROVE:

15          Q.   Do you have that up?

16          A.   I do.

17          Q.   All right.  Set that to the side because

18     before we get to that, there's something else I want

19     to ask you.

20              After the leadership meeting in 2019, were

21     there any changes made to the way that NAF -- that

22     NAF reported P&L for the retail division?

23          A.   I guess I don't understand your question.

24          Q.   Sure.  My understanding from talking with

25     Mr. Obradovich is there was CM1, CM2, and CM3 that

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 139

1    on the documents you prepare, there was always the

2    bottom-line CM3 profit.  Is that -- am I accurate --

3    was he accurate to that point?

4         A.  Correct.

5         Q.  All right.  Was anything changed about the

6    way corporate expenses were reflected on P&Ls after

7    the 2019 leadership meeting?

8         A.  Most likely, yes.

9         Q.  All right.  And what were those changes?

10        A.  We changed methodology.

11        Q.  All right.  How did the methodology change?

12        A.  We went over that earlier.

13        Q.  All right.

14        A.  Different methods on cost per loan or basis

15   points.

16        Q.  Okay.  Got you.  I'm with you.  How about

17   the way it was -- is reported by you?  Was there any

18   change in the way it was reported, the expenses are

19   reported by you on the P&Ls?

20        A.  Not by me, no.

21        Q.  Okay.  By anyone else that you are aware

22   of?

23        A.  Not that I'm aware of.

24        Q.  All right.  Do you know Scott Frommert?

25        A.  I do.

Page 140

1      Q.  Okay.  And how do you know Scott Frommert?

2      A.  He used to be my boss for a little period

3   of time.

4      Q.  All right.  Did you-all work well together

5   while he was your boss?

6      A.  Yes.

7      Q.  All right.  To your knowledge -- well, did

8   he ever ask you for any -- let me just talk with you

9   specifically.  Did he ever ask you for any

10  information while he was your boss about the

11  finances of NAF and the accounting records, et

12  cetera?

13     A.  At the time, yes.

14     Q.  All right.  Did you provide the information

15  that he asked for?

16     A.  I would have.

17     Q.  All right.  Are you aware of him asking for

18  information that you were not privy to that he was

19  not provided?

20     A.  Not that I'm aware of.

21     Q.  Did he ever have any discussions with you

22  about not being provided information that he had

23  asked Mr. Arvielo for?

24     A.  Not that I'm aware of.

25     Q.  Did he ever have any discussions with you

Jim Muth                                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 141

1    about not being provided information after being

2    directed by Mr. Arvielo and Mr. Obradovich?

3         A.  Not that I'm aware of.

4         Q.  Do you have any knowledge as to

5    Mr. Frommert being upset that he wasn't able to see

6    every -- all the information he felt he needed to do

7    his job?

8         A.  Not that I'm aware of.

9         Q.  Did Mr. Frommert discuss with you why he

10   was departing NAF?

11        A.  No.

12        Q.  How did you find out he had departed NAF?

13        A.  He -- I believe he was let go.

14        Q.  Okay.

15        A.  But I don't know for certain.

16        Q.  How did you find out he had been let go?

17        A.  Well, after he was, I don't know,

18   terminated or whatever the word used, I then went

19   back to reporting to Jason Obradovich.

20        Q.  Okay.  So you didn't have any discussion

21   with him.  He was there one day; he was gone the

22   next, and that's the last time you saw or spoke to

23   him?

24        A.  I've spoke to him since then.

25        Q.  Tell me about your conversations with him

Page 142

1    since then.

2         A.   Just normal conversations, nothing specific

3    and work-related.

4         Q.   Did you talk by phone or in person?

5         A.   By phone.

6         Q.   Okay.  Who called who?

7         A.   I believe we both called each other.

8         Q.   All right.  And do y'all -- did y'all

9    socialize outside of work?

10        A.   No.

11        Q.   All right.  What was the purpose of the

12   calls?

13        A.   I think just keeping in touch.

14        Q.   Did you have any discussions with him about

15   him being deposed in this case?

16        A.   No.

17        Q.   All right.  Did you have any discussions

18   with him about you being deposed in this case?

19        A.   No.

20        Q.   Did you have any discussions with him about

21   this case at all?

22        A.   No.

23        Q.   Let's look at Exhibit 2 now.  Let me know

24   when you've got it up.

25             (Plaintiff's Exhibit 2 marked)

Jim Muth                                 March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 143

1        A.   Is that a different one?

2   BY MR. HARGROVE:

3        Q.   No.   The one that was just uploaded.

4        A.   Okay.   I have it up.

5        Q.   Okay.   What's Exhibit 2?

6        A.   I'm looking at a Kevlar report.

7        Q.   All right.

8        A.   Looks like it's a P&L from the southeast,

9   January 2018 through September 2018.

10       Q.   Okay.   This is the way it was produced to

11  us.   Do you know why it's a January to September

12  profit and loss statement?

13       A.   I'm guessing they asked for Q1 through Q3.

14       Q.   So you don't know -- I'll represent to you

15  we didn't ask for a specific quarter.   Who was the

16  "they" that you think asked for Q1 to Q3?

17       A.   I don't know specifically who asked.

18       Q.   Did you generate this report?   Are you the

19  one who generated this for NAF to produce?

20       A.   It probably came from me.

21       Q.   All right.   And does this look like the

22  reports that you would share with the NAF executives

23  each month?

24       A.   With the regionals, yes.

25       Q.   All right.   What's -- you said "with the

Jim Muth                                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 144

1    regionals."  Is there something else that you would

2    share with others?

3        A.  Well, you said "executives."

4        Q.  Okay.  Well, who did you share -- who did

5    you send monthly P&Ls to after your prepared them?

6        A.  This is in Kevlar.  I wouldn't necessarily

7    send this out.  People have access, and they would

8    look at it themselves.

9        Q.  All right.  So each month you would prepare

10   P&Ls, there would be a meeting to approve them.  At

11   that meeting, would there be a printed off P&L that

12   you had prepared that individuals in the meeting

13   were privy to?

14       A.  Yes.

15       Q.  Okay.  All right.  So you don't know why,

16   except for speculating that you were asked just to

17   do Q1, Q2, and Q3, this only has January to

18   September of '18; correct?

19       A.  Correct.

20           MR. PERLOWSKI:  Objection.  Asked and

21   answered.

22   BY MR. HARGROVE:

23       Q.  The corporate margin at the bottom, is that

24   CM3, the allocation of all the expenses?

25       A.  I don't know.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 145

1        Q.  I couldn't hear you.  I'm sorry, it cut
2   out.
3        A.  Not specifically.
4        Q.  All right.  How would you know?
5        A.  I'd have to go and look and see what was
6   the level for corporate allocation 1, 2, or 3 and
7   see which number these are.
8        Q.  When you prepared this report, what -- were
9   you asked to pull corporate margin 1, 2, or 3 level?
10       A.  I was asked to pull a Kevlar report.
11       Q.  All right.  And so looking at this, you
12   can't tell whether it even includes all of the
13   expenses?
14       A.  I can't.
15       Q.  All right.  Is there a reason you would
16   have pulled a report that didn't include all of the
17   expenses?
18       A.  The Kevlar reports are only pulled one way.
19   You can't exclude stuff from Kevlar.
20       Q.  You can't exclude stuff from Kevlar?
21       A.  No.
22       Q.  So necessarily, then, this would have to
23   include all of the expenses; right?
24       A.  It would include what's loaded.
25       Q.  All right.  Well, if you say you can't

Jim Muth                                       March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 146

1    exclude things from Kevlar, explain to me that --
2    the difference there between can't exclude things
3    and it's only what's loaded.
4         A.   So if you pull a report from Kevlar, I
5    can't say to exclude certain items from Kevlar.
6         Q.   Okay.
7         A.   You would get the full report.  The
8    question would be what was loaded to Kevlar.
9         Q.   Okay.  So you're the one who would have
10   loaded things to Kevlar; correct?
11        A.   No.
12        Q.   All right.  Who loaded things to Kevlar?
13        A.   IT employees.
14        Q.   Okay.  The content that the IT employee
15   loaded into Kevlar, who did that come from?
16        A.   That would come from me.
17        Q.   Okay.  So the information that got uploaded
18   in Kevlar, unless the IT people altered it in some
19   way, would be the information you input into Kevlar;
20   correct?
21        A.   Correct.
22        Q.   All right.  Do you believe the IT people
23   eliminated expenses from what you submitted to them
24   so that this Kevlar report is inaccurate?
25        A.   No.

Jim Muth                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 147

1            MR. PERLOWSKI:  Object to the form.

2    Foundation.  Speculation.

3            You can answer.

4    BY MR. HARGROVE:

5        Q.  So barring that happening, this report

6    would include all the corporate expenses; correct?

7        A.  No.

8        Q.  All right.  Tell me a circumstance how this

9    report would not include all the expenses.

10       A.  It could be loaded only through corporate

11   allocation 1.

12       Q.  So IT -- all right.  Let's take a step

13   back.  You have the information that goes into

14   Excel.  Does that include all corporate allocations?

15       A.  In my Excel P&Ls, it includes all corporate

16   allocations.

17       Q.  Okay.  You give it to IT with instructions

18   to upload into Kevlar; right?

19       A.  I give IT an upload file.

20       Q.  All right.  When you give IT the upload

21   file, explain to me how we could end up with a

22   Kevlar report that does not include all of the

23   corporate allocations if they're all included on the

24   file you asked IT to upload.

25       A.  It's not included, only included for

Page 148

1    corporate allocation 1.

2         Q.   So your Excel spreadsheet only includes

3    corporate allocation 1?

4         A.   The upload.

5         Q.   So your Excel spreadsheet only -- includes

6    all of the expenses?

7         A.   The Excel P&L includes all corporate

8    allocations.

9         Q.   All right.  Kevlar doesn't include all

10   corporate allocations?

11        A.   Not in the beginning.

12        Q.   And when is the beginning?

13        A.   It was built out in 2018.

14        Q.   So in 2018 Kevlar, the reporting software

15   for the retail division, did not include anything

16   but CM1?

17        A.   To my knowledge.

18        Q.   When did that change?

19        A.   I don't recall specifically when.

20        Q.   So if Mr. Obradovich said Kevlar always

21   included a bottom-line profit on it, that would be

22   inaccurate for 2018?

23        A.   It includes a bottom-line profit, although

24   it might be the profit at CM1.

25        Q.   Okay.  And if Mr. Obradovich said that it

Page 149

1    always included a bottom-line profit, then anyone

2    who read otherwise was making a mistake by looking

3    only at top-line revenue, that wouldn't be accurate

4    for 2018?

5          MR. PERLOWSKI:  Object to the form.

6    Mischaracterizes his testimony.

7          You can answer.

8      A.  Say that again.

9    BY MR. HARGROVE:

10     Q.  Sure.  If Mr. Obradovich testified that all

11   of the Kevlar reports had the bottom-line profit,

12   and that Mr. Arvielo just misread and looked at

13   top-line revenue, that would be wrong for 2018;

14   correct?

15         MR. PERLOWSKI:  Object to the form.

16   Mischaracterizes testimony.

17         You can answer.

18     A.  I'm not familiar with what Jason and Rick

19   Arvielo --

20   BY MR. HARGROVE:

21     Q.  Well, if that's what Mr. Obradovich

22   testified to, that wouldn't be accurate because in

23   2018, Kevlar only included CM1?

24         MR. PERLOWSKI:  Object to the form.

25   Foundation.  Mischaracterizes testimony.

Page 150

1              You can answer.

2         A.  To my knowledge.

3    BY MR. HARGROVE:

4         Q.  So you were involved in inputting this

5    information, and you had meetings about the P&Ls

6    with -- with the individuals you identified, and you

7    knew that these Kevlar reports didn't include all

8    the expenses; is that correct?

9              MR. PERLOWSKI:  Object to the form.

10        A.  Yes.

11   BY MR. HARGROVE:

12        Q.  That's correct?

13        A.  (The witness nods.)

14        Q.  Yes?

15        A.  Yes.

16        Q.  Did you have discussions with these folks

17   about the fact that all of the expenses were not

18   included on the Kevlar report that you had input

19   into the spreadsheet?

20        A.  Which individuals are you referring to?

21        Q.  You said your monthly meetings on the P&Ls

22   were with Mr. Reed, Ms. Bunce, Ms. Preslo, and

23   Mr. Obradovich.

24        A.  They would include CM1, 2, and 3 in those

25   meetings.

Jim Muth                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 151

1        Q.   All right.  How would they see CM1, 2, and
2    3?
3        A.   In the Excel P&Ls.
4        Q.   All right.  So they would see in the Excel
5    P&Ls, and they understood that the Excel P&Ls were
6    the actual accurate statements, financial P&Ls;
7    correct?
8        A.   To my knowledge, yes.
9        Q.   Okay.  And then these Kevlar reports, you
10   provided the information to Kevlar.  Did you see the
11   Kevlar reports?
12       A.   Yes.
13            MR. PERLOWSKI:  Objection to form.
14   BY MR. HARGROVE:
15       Q.   All right.  So do you have -- so obviously
16   in 2019 that changed and all the corporate expenses
17   began to be included in Kevlar; correct?
18       A.   Yes.
19       Q.   Was that a direct result of after the
20   leadership meeting?
21       A.   I'm not aware of the change or why it was
22   changed.
23       Q.   Well, you would agree with me that what was
24   in Kevlar before 2019, if those allocations should
25   have been made, would not be an accurate reflection

Page 152

1    of the profitability of the retail division of NAF;

2    correct?

3         A.   Yes.

4         Q.   So when you referred to the profit and loss

5    statements that you prepared, you were not referring

6    to Kevlar, you were referring to the Excel

7    spreadsheets that you provided to IT that then got

8    uploaded into Kevlar?

9         A.   Referring to the P&Ls I created in Excel.

10        Q.   Okay.  Do you have any understanding of how

11   Kevlar excluded certain expenses from the P&Ls?

12        A.   It was loaded through CM1.

13        Q.   And is that the way that NAF, to your

14   knowledge, I know you got there in 2017, but is that

15   the way that NAF judged the profitability of its

16   retail divisions up through 2019, using CM1?

17             MR. PERLOWSKI:  Object to the form.

18   Speculation.  You can answer.  And foundation.

19             You can answer.

20        A.   Look at CM1, 2, and 3.

21   BY MR. HARGROVE:

22        Q.   All right.  But before Kevlar -- you were

23   there when Kevlar got introduced; right?

24        A.   Yes.

25        Q.   All right.  Did you express concern that

Jim Muth                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 153

1   Kevlar did not accurately depict the financial

2   statements, the profit and loss?

3        A.  No.

4        Q.  Did it concern you that Kevlar did not

5   accurately reflect the profit and loss for the

6   retail division?

7        A.  No.

8        Q.  Why did it not concern you?

9        A.  The concern is we were still looking at

10  CM1, 2, and 3.

11       Q.  And "we" was those of you who were in the

12  monthly meetings about profit and loss statements;

13  correct?

14       A.  Correct.

15       Q.  All right.  And you had no reason to

16  believe anyone didn't understand that; correct?

17       A.  Correct.

18       Q.  All right.  And so the reason you can't

19  tell me for sure whether all the expenses are

20  included on Exhibit 2 is this is a 2018 statement,

21  and if it was printed before the change in 2019, it

22  wouldn't reflect anything but CM1; correct?

23       A.  Correct.

24       Q.  All right.  Do you know when this statement

25  was printed, Exhibit No. 2?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 154

 1        A.  Not specifically.

 2        Q.  All right.  Do you know when it was

 3    created?

 4        A.  Not specifically.

 5        Q.  And if we were given a report on metadata

 6    that says it was created on June 5th, 2015, there's

 7    no way that can be accurate; correct?

 8        A.  I don't believe so.

 9            MR. PERLOWSKI:  Object to form.

10            MR. HARGROVE:  MaryBeth, can you upload the

11    metadata chart?  We'll make that Exhibit 3.

12    BY MR. HARGROVE:

13        Q.  While she's uploading that, is Kevlar the

14    only information that's given to the regionals?

15            MR. PERLOWSKI:  Object to the form.

16        A.  I'm not aware of what all regionals are

17    provided.

18    BY MR. HARGROVE:

19        Q.  Did you share -- your P&L in Excel, was

20    that password-protected?

21        A.  It may have been.

22        Q.  Well, is it now currently password-

23    protected?

24        A.  Some of our finals are password-protected,

25    some aren't.  I don't know which ones.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 155

1        Q.  So you don't know if the Excel spreadsheet

2    is password-protected or not, that you prepare each

3    month?

4        A.  No.

5        Q.  Did you send that Excel spreadsheet in 2018

6    out to any of the regional managers?

7        A.  I don't recall.

8        Q.  Okay.  It's possible you did?

9        A.  Possibly.  I don't remember.

10       Q.  All right.  Well, on a monthly basis, is

11   that something you would normally do?

12       A.  Yes, possibly.

13       Q.  All right.  So we might find e-mails where

14   you, on a monthly basis, sent your Excel spreadsheet

15   that had up to CM3 in it to regional managers in

16   2018?

17       A.  (Inaudible.)

18       Q.  I'm sorry?

19       A.  I don't know.

20       Q.  Okay.  What about Kevlar reports?  Did you

21   send those to regional managers in 2018?

22       A.  I don't know.

23       Q.  All right.  If you sent them, would they

24   have been from your work e-mail address?

25       A.  Yes.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 156

1                 (Plaintiff's Exhibit 3 marked)

2       BY MR. HARGROVE:

3           Q.  All right.  Is Exhibit 3 uploaded?

4           A.  Yes.

5           Q.  If you look at Exhibit 3, I'll represent to

6       you this was purportedly metadata for the documents

7       included in Exhibit 2, which was document 000781.

8       And it indicates a creation date of June the 5th,

9       2015.  Do you see that?

10          A.  Which row are you on?

11          Q.  Look on the second page, Row 000044 says

12      NAF 0000781, top one on the second page.

13              MS. GIBSON:  Travis, the printed version

14      looks different from the online version.

15      BY MR. HARGROVE:

16          Q.  Okay.  It's the second to last one from the

17      bottom.

18              MR. PERLOWSKI:  It would be Row 27.

19          A.  Okay.  I see it.

20      BY MR. HARGROVE:

21          Q.  All right.  And you see that has a created

22      date of June 5th, 2015?

23          A.  I see that.

24          Q.  All right.  You would agree with me that a

25      report for 2018 couldn't have been created June 5th

Page 157

1    of 2015, wouldn't you?

2         A.  I would.

3         Q.  You would agree with me; correct?  All

4    right.  And --

5              MR. PERLOWSKI:  I didn't hear an answer.

6         A.  Correct.

7    BY MR. HARGROVE:

8         Q.  All right.  And then on a modified date, it

9    says January 28, 2022.  Did you modify this document

10   on January 28, 2022, in any way?

11        A.  No.

12        Q.  All right.  Do you know what that modified

13   date would mean?

14        A.  I don't know.

15        Q.  Okay.

16             MR. HARGROVE:  MaryBeth, could you upload

17   000733.

18             (Plaintiff's Exhibit 4 marked)

19   BY MR. HARGROVE:

20        Q.  Let me know when you've got it up.

21        A.  I have it up.

22        Q.  All right.  Do you recognize this document?

23        A.  I do.

24        Q.  All right.  What is this document?

25        A.  Looks like the retail P&L from January

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 158

1    through November 2018.

2         Q.  All right.  Did you prepare this document?

3         A.  I believe I would have.

4         Q.  All right.  For what purpose did you

5    prepare this document?

6         A.  I don't recall.

7         Q.  All right.  Do you know when you prepared

8    this document?

9         A.  I don't recall.

10        Q.  Would it have been recently?

11        A.  No.

12        Q.  All right.  So you don't remember for what

13   purpose you prepared the document, and you don't

14   remember when you prepared the document; correct?

15        A.  Not specifically, no.

16        Q.  All right.  What does this document tell

17   us?

18        A.  It tells us the retail P&L from the period

19   of January through November 2018.

20        Q.  And this is for all of retail or just some

21   portion of retail?

22        A.  All of retail.

23        Q.  All right.  Does this include all of the

24   expenses of retail?

25        A.  Yes.

Jim Muth                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 159

1       Q.   All right.   And that has -- that's because

2    it's got, I see CM1, CM2, and CM3, those are all the

3    expenses?

4       A.   Correct.

5    ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

6    ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

7    ✗✗✗✗✗✗✗✗✗

8       Q.   Was this document initially prepared

9    without CM2 and CM3?

10      A.   Not to my knowledge.

11      Q.   Were CM2 and CM3 added in -- added into the

12   calculation so that the regional managers could be

13   paid less?

14      A.   Not to my knowledge.

15          MR. PERLOWSKI:   Did you say "not to my

16   knowledge"?

17      A.   Not to my knowledge.

18   BY MR. HARGROVE:

19      Q.   When Kevlar was altered to add CM2 and CM3,

20   were you involved in any of the discussions about

21   that taking place?

22      A.   No.

23      Q.   And do you have any knowledge as to why

24   that took place?

25      A.   No.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 160

1        Q.  Do you know whether Exhibit 4 was prepared
2   before the February 2019 leadership meeting?
3        A.  It might have been.
4        Q.  All right.  Were you asked to prepare
5   multiple documents before that meeting?
6        A.  I was.
7        Q.  Okay.  And this might have been one of
8   those.  You know the pie chart was one of those;
9   correct?
10        A.  Correct.
11        Q.  All right.  And this might have been -- for
12   what other purpose -- can you think of any other
13   purpose for which you would have prepared Exhibit 4?
14        A.  Not necessarily.
15             MR. HARGROVE:  MaryBeth, can you upload?
16   734.
17             MR. PERLOWSKI:  Can we take a short break?
18             MR. HARGROVE:  That's fine, yes.  Let's
19   take five.
20             (Recess 5:46 to 5:54 p.m.)
21   BY MR. HARGROVE:
22        Q.  If I go back, Mr. Muth, to Exhibit No. 3,
23   the only prepared created date that we have -- and
24   you can let me know when you have that up --
25        A.  I have it up.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 161

1        Q.  -- is October 27, 2021.  It's the second

2   row down on that.  Do you believe October 27, 2021

3   is when Exhibit No. 4 was created?  If you look at

4   the second line down, it's number 000733, October

5   27, 2021?

6             MR. PERLOWSKI:  Objection.

7        A.  No, I would not agree that it was created

8   in 2021.

9   BY MR. HARGROVE:

10       Q.  All right.

11            MR. HARGROVE:  MaryBeth, can you upload

12   734?

13            MS. GIBSON:  I'm going to delete Exhibit 6

14   and you can use Exhibit 5.

15   BY MR. HARGROVE:

16       Q.  Let me know when you've got Exhibit 5 in

17   front of you.

18            (Plaintiff's Exhibit 5 marked)

19       A.  I have it up.

20   BY MR. HARGROVE:

21       Q.  All right.  And do you recognize Exhibit 5?

22       A.  I do.

23       Q.  Okay.  What is Exhibit 5?

24       A.  I believe it's looking at the southeast P&L

25   from 2018.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 162

1        Q.  Did you prepare Exhibit 5?

2        A.  I would have.

3        Q.  All right.  Do you know when you prepared

4    it?

5        A.  Not exactly.

6        Q.  Would it have been before the leadership

7    meeting or after?

8        A.  I believe it would have been before.

9        Q.  All right.  The metadata shows a created

10   date of November 3rd, 2021.  You would agree with me

11   that's not when this document was created?  Correct?

12   Did you say correct?  We didn't pick it up.

13       A.  Correct.

14       Q.  All right.  And were you involved in

15   sharing this document, Exhibit 5, with anyone?

16       A.  I may have been.  I don't recall.

17       Q.  Did you ever have any meetings with

18   Ms. Spearman or Ms. Allison about P&Ls or

19   financials?

20       A.  I believe we had a meeting.

21       Q.  Okay.  And tell me about that meeting.

22       A.  I think it was just a meeting to go over

23   some of the data from 2018.

24       Q.  All right.  Where did that meeting take

25   place?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 163

1          A.   In Tustin, California.

2          Q.   All right.  And were they -- what did they

3     have to say about the 2018 financials?

4          A.   I don't remember specifically what they had

5     to say.

6          ▮▮ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7     ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

8     ▨▨▨▨▨

9          ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

10    ▨▨▨▨▨▨▨▨▨▨▨

11         Q.   Did they express concern about the -- about

12    the financials to you?

13         A.   I don't recall specifically.

14         Q.   Do you recall anything about the meeting?

15         A.   I was in the meeting for a short period of

16    time in the beginning, and then I had left the

17    meeting.

18         Q.   Okay.  Were they upset?

19         A.   I don't recall how they were reacting.

20         Q.   Did -- did they seem surprised that --

21    well, did you gather that they believed 2018 had

22    been a profitable year for their region?

23         A.   I don't recall.

24         Q.   Okay.  But do you know whether this was a

25    document shown to them in that meeting?

Jim Muth                                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 164

```
 1        A.  It might have been.
 2        Q.  Okay.  Can you think of any other purpose
 3   for which this document, Exhibit 5, would have been
 4   prepared?
 5        A.  Just to show the profit and loss.
 6             MR. HARGROVE:  MaryBeth, can you upload
 7   735.  That will be Exhibit 6 to your deposition.
 8             MS. GIBSON:  That would be Exhibit 7.
 9             MR. PERLOWSKI:  We'll just agree that
10   Exhibit 6 is not being introduced.
11             (Plaintiff's Exhibit 7 marked)
12   BY MR. HARGROVE:
13        Q.  All right.  So Exhibit 7.  And let me know
14   when it's up.  And my question for you is going to
15   be, do you recognize this document?
16        A.  (Inaudible.)
17        Q.  Do you recognize it?  I can't hear you.
18        A.  I have it up.
19        Q.  I didn't understand you that time.
20        A.  I have the document up.
21        Q.  Do you recognize this document?
22        A.  Vaguely.
23        Q.  All right.  What is it?
24             MR. PERLOWSKI:  And take your time to look
25   at it if you need to.
```

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 165

1        A.   Looks like a regional summary from 2018.

2   BY MR. HARGROVE:

3        Q.   Is this a document that you prepared?

4        A.   I don't recall specifically if I prepared

5   this.

6        Q.   Who other than you would have had the

7   access to the information needed to prepare this

8   document?

9        A.   Probably Kristin Ankeny.

10        Q.   Okay.  All right.  Do you know what, if

11   anything, this document was used for?

12        A.   No.

13        Q.   Do you know when the document was created?

14        A.   No.

15        Q.   Do you know why it was produced in this

16   case?

17        A.   No.

18        Q.   Okay.

19             MR. HARGROVE:  MaryBeth, if you can load

20   734.

21             MS. GIBSON:  734 is Exhibit 5 and 6.  We've

22   already looked at that.  Let's agree Exhibit 8 is a

23   duplicate.

24             MR. PERLOWSKI:  We'll just strike Exhibit 8

25   as well.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 166

1              MR. HARGROVE:  Let's load 737.

2              (Plaintiff's Exhibit 9 marked)

3    BY MR. HARGROVE:

4         Q.  Let me know when you've got Exhibit 9 in

5    front of you, Mr. Muth.

6         A.  I have it.

7         Q.  And do you recognize this document?

8         A.  Vaguely.

9         Q.  All right.  Can you tell me what it is?

10        A.  Looks like it's a post lock concession

11   report from 2018.

12        Q.  What's a post lock concession?

13        A.  A post lock concession is a price exception

14   that's given after the initial lock.

15        Q.  Okay.  And did you prepare this document?

16        A.  I don't believe so, no.

17        Q.  All right.  Do you know who prepared it?

18        A.  No, I don't.

19        Q.  Do you know when it was prepared?

20        A.  No, I don't.

21        Q.  Do you know why it was prepared?

22        A.  Not specifically.

23        Q.  Do you generally know why it was prepared?

24        A.  It looks like it's comparing the southeast

25   to the rest of the retail division.

Page 167

1          Q.   Okay.   And do you know why this was

2    produced in this case, Exhibit No. 9?

3          A.   Not specifically.

4          Q.   All right.   Do you -- do you generally know

5    why it would have been produced in this case?

6               MR. PERLOWSKI:   Objection.   Asked and

7    answered.

8          A.   I missed that, I'm sorry.

9    BY MR. HARGROVE:

10         Q.   You said "not specifically."   I said, do

11   you generally know why it was produced in this case,

12   since you don't know specifically?

13         A.   Looking at it, it's comparing all of --

14   sorry, retail versus the southeast, where the

15   southeast has much higher basis points of post lock

16   concessions.

17         Q.   Okay.   Did the southeast have more volume

18   overall than other regions?

19         A.   They do.

20         Q.   All right.   Was it one of the highest

21   volume regions for NAF for 2018?

22         A.   It would have been.

23   ████████████████████████████████████

24   ███████████████████████████████████████████

25   ████████████████████████████████████████████████

Page 168

1    ▨▨▨▨▨▨▨▨▨▨▨▨

2              ▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3        Q.  Okay.

4             MR. HARGROVE:  MaryBeth, if you can load

5    738, which will be Exhibit 10.

6             (Plaintiff's Exhibit 10 marked)

7    BY MR. HARGROVE:

8        Q.  When it's up, let me know.

9        A.  I have it up.

10       Q.  All right.  And what -- have you seen

11   Exhibit 10 before?

12       A.  I have.

13       Q.  All right.  When have you seen it?

14       A.  I created it.

15       Q.  All right.  And when did you create it?

16       A.  It would have been sometime in early 2019.

17       Q.  All right.  What was the purpose of you

18   creating this document in early 2019?

19       A.  Looks like we're just looking at

20   discretionary expenses and marketing expenses.

21       Q.  And who is "we" that were looking at

22   discretionary expenses and marketing expenses?  I

23   couldn't hear you.

24       A.  Say that again.

25       Q.  Sure.  Who is the "we"?  You said "we" were

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 169

1    looking at discretionary and marketing expenses.

2    Who's the "we" who was looking at discretionary and

3    marketing expenses?

4        A.   That would be myself, Gina, and Kelly, and

5    probably Jon Reed, Christy, and Jason.

6        Q.   Was this for a meeting that took place in

7    person?

8        A.   I believe this might have been one of the

9    documents during the meeting in Tustin.

10       Q.   Okay.

11       A.   I don't know a hundred percent sure,

12   though.

13       Q.   Were you involved in any discussions about

14   this document?

15       A.   I would have been.

16       Q.   All right.  Tell me what you recall about

17   the discussions relating to this document.

18            MR. PERLOWSKI:  Object to the form.

19   Foundation.

20            You can answer.

21       A.   It's just discussing the expenses that are

22   at the branch and the region level.  So this is

23   directly the spend coming from Gina and Kelly's

24   region in the southeast.

25   BY MR. HARGROVE:

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 170

1      Q.  Was this included in any of the corporate

2  expenses, or is this just expenses attributable to

3  the southeast region?

4      A.  It's just the expenses from the southeast

5  region.

6      Q.  Okay.  And where did you pull the

7  information that was used to create this document,

8  Exhibit 10, from?

9      A.  It would come from AMB.

10     Q.  From AMB?  Okay.

11         MR. HARGROVE:  MaryBeth, 743, please.

12         (Plaintiff's Exhibit 11 marked)

13  BY MR. HARGROVE:

14     Q.  Let me know when you've got it up.  This

15  will be Exhibit 11.

16     A.  Okay.

17     Q.  All right.  And what is Exhibit 11?

18     A.  It's a Kevlar report for the southeast from

19  October 2018 through December 2018.

20     Q.  And previously we looked at one that was

21  January to September.  And I'll ask you, do you

22  know -- now that you've seen this one as well, do

23  you know why they were separated out like this?

24     A.  No.

25     Q.  All right.  Do you know why initially the

Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 171

1   only Kevlar report that we received was this one,

2   Exhibit 11, that just showed October through

3   December of '18?

4       A.  No.

5       Q.  If you look at this, did this include all

6   of the corporate allocations or just some of the

7   corporate allocations?

8           MR. PERLOWSKI:  Object to the form.

9           You can answer.

10          I didn't hear his answer.

11      A.  I don't know.

12  BY MR. HARGROVE:

13      Q.  You don't know?  All right.  If a 2018

14  report was printed after the change in 2019, would

15  it include all of the corporate allocations?

16      A.  Which change?

17      Q.  The change to where there was -- all the

18  corporate allocations were included in Kevlar that

19  you testified about earlier, you said in 2018, it

20  was only CM1 in Kevlar?

21      A.  Correct.

22      Q.  All right.  So if this was printed in 2018,

23  then it wouldn't have it all, but if it was printed

24  after, it would; correct?

25      A.  If it was printed after the change,

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 172

1    correct.

2          Q.   Okay.  Is there a way for us to know

3    whether this was printed before or after the change?

4          A.   Not by looking at it.

5          Q.   Okay.  Are copies of the Kevlar reports

6    printed contemporaneously with when they're

7    generated and maintained?  And by that I mean, would

8    I be able to go back to June of 2018 and find a

9    contemporaneously printed then June 2018 Kevlar P&L?

10         A.   Sure.

11         Q.   All right.

12              MR. HARGROVE:  MaryBeth, can you load 774?

13   And this will be Exhibit 12.

14              (Plaintiff's Exhibit 12 marked)

15   BY MR. HARGROVE:

16         Q.   Have you got it up?

17         A.   Yes.

18         Q.   Okay.  Do you recognize Exhibit 12?

19         A.   Vaguely.

20         Q.   All right.  Can you tell me what Exhibit 12

21   is?

22         A.   It looks like a P&L by region.

23         Q.   Okay.  Is this a document you prepared?

24         A.   It might have been.  I'm not sure.

25         Q.   All right.  Do you know when it was

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 173

1    prepared?

2         A.   No.

3         Q.   Do you know why it was prepared?

4         A.   No.

5         Q.   Do you know why it was produced in this

6    case?

7         A.   No.

8         Q.   And what does this document tell us?

9         A.   It shows, by region, volume all the way

10   through CM3.

11        Q.   All right.  And CM3 would be bottom-line

12   profit; is that correct?

13        A.   Correct.

14             MR. PERLOWSKI:  I didn't hear the answer to

15   that, Travis.

16        A.   Correct.

17   BY MR. HARGROVE:

18        Q.   And you have no idea when this was

19   prepared?

20        A.   No, I don't.

21        Q.   All right.  If the metadata sheet, Exhibit

22   3, says January 7, 2022, would you have an opinion

23   as to whether that is accurate as to the date this

24   document was prepared?

25        A.   I'm not aware of it.

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                        Page 174

1        Q.  And you don't know if you prepared this
2    document or not?
3        A.  I don't believe so, no.
4        Q.  You don't believe so?
5        A.  I don't know if I created this document or
6    not.
7        Q.  Okay.  For these documents that we've been
8    looking at, if you created them, would they be
9    maintained -- do you maintain a separate file,
10   electronic or otherwise, for documents that you
11   prepare?
12       A.  Sometimes.
13       Q.  All right.  Did you search those files for
14   documents that were responsive to our production
15   requests in this case?
16       A.  Yes.
17       Q.  All right.  And did you produce documents
18   out of there that you had prepared?
19       A.  Yes.
20       Q.  Did you produce any documents out of your
21   computer and files that were not documents you had
22   prepared?
23       A.  Say that again.
24       Q.  Were there documents that you produced in
25   this case other than documents that you didn't

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 175

1    prepare?

2         A.  I don't understand the question.

3         Q.  All right.  You produced -- you said you

4    went to your files.  You maintain files of documents

5    that you prepared.  And you searched those files for

6    responsive documents in this case; correct?

7         A.  Yes.

8         Q.  And you produced some documents that you

9    prepared; correct?

10        A.  Yes.

11        Q.  Did you produce any documents, you to your

12   counsel, that were not documents that you prepared

13   for this case?

14        A.  No.

15        Q.  Okay.  So if it came from you to your

16   counsel, it's a document that you in fact prepared;

17   correct?

18        A.  If I prepared a document, then I prepared

19   the document.

20        Q.  But if you produced it to your counsel, it

21   was one of the documents you prepared, not a

22   document someone else prepared; correct?

23        A.  I would believe so, yes.

24             MR. HARGROVE:  MaryBeth, can you load 782?

25             (Plaintiff's Exhibit 13 marked)

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 176

1    BY MR. HARGROVE:

2         Q.  This will be Exhibit 13.  Let me know when

3    you've got it up.

4         A.  I've got it up.

5         Q.  Do you recognize Exhibit 13?

6         A.  Vaguely.

7         Q.  All right.  Did you prepare Exhibit 13?

8         A.  I believe so.

9         Q.  All right.  What is Exhibit 13?

10        A.  It looks like a P&L from 2017.

11        Q.  A P&L for what for 2017?

12        A.  I couldn't tell you.

13        Q.  How is it, if you don't know what it's a

14   P&L for, that you believe you prepared it?

15        A.  I didn't say I thought I prepared it.

16        Q.  I guess I misunderstood you.  So you don't

17   know who prepared it?

18        A.  (Inaudible.)

19        Q.  You'll have to say it again.  It didn't

20   register.

21        A.  I don't know who prepared it.

22        Q.  Okay.  And you don't know what it is, other

23   than it's a P&L for something for 2017?

24        A.  Correct.

25        Q.  All right.  And you don't know when it was

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 177

1    prepared; correct?

2          A.   No.

3          Q.   All right.

4               MR. HARGROVE:   MaryBeth, if you can do 783,

5    which will be Exhibit 14.

6               (Plaintiff's Exhibit 14 marked)

7    BY MR. HARGROVE:

8          Q.   Once you've got it up, Mr. Muth, my

9    question for you is, do you recognize Exhibit 14?

10         A.   I do.

11         Q.   Do you recognize 14?

12         A.   I do.

13         Q.   All right.  What is Exhibit 14?

14         A.   Looks like P&Ls from various years.

15         Q.   All right.  P&Ls for various years for

16   what?

17         A.   I believe it's from the southeast.

18         Q.   Okay.  Why is it you believe it's from the

19   southeast?

20         A.   Just based off whenever they've been put

21   together.

22         Q.   Okay.  Did you prepare Exhibit 14?

23         A.   I might have.

24         Q.   All right.  Do you know when you might have

25   prepared it?

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 178

1        A.  I'd say in the last six months, five

2    months, four months, I'm not sure.

3        Q.  And what would have caused you to prepare

4    this document, Exhibit 14, in the last few months?

5        A.  I was asked to prepare it.

6        Q.  You were asked to prepare it?

7        A.  Yes.

8        Q.  All right.  Were you asked by your counsel

9    to prepare it?

10       A.  I don't know --

11           MR. PERLOWSKI:  Please answer that with a

12   yes or no.

13       A.  I don't recall who had asked for it.  It

14   may have been counsel.

15   BY MR. HARGROVE:

16       Q.  All right.  But it might have been someone

17   other than counsel?  Can you tell me what you were

18   trying to show for this case with Exhibit 14?

19           MR. PERLOWSKI:  Again, I want to instruct

20   you not to reveal any privileged communications in

21   connection with your answer.  Subject to that, you

22   can answer.

23       A.  It just would have been a P&L for the

24   various time periods.

25   BY MR. HARGROVE:

Page 179

```
 1        Q.  Okay.

 2             MR. HARGROVE:  MaryBeth, do you mind

 3   hitting 784.  And this one's a little bigger, but

 4   hopefully it won't take too long.

 5        A.  I have it up.

 6             (Plaintiff's Exhibit 15 marked)

 7   BY MR. HARGROVE:

 8        Q.  And that will be Exhibit 15.  I'll ask if

 9   you recognize Exhibit 15.

10        A.  Do not.

11        Q.  Have you ever seen Exhibit 15 before?

12        A.  I have not.

13        Q.  All right.  Do you have any idea what

14   Exhibit 15 is?

15        A.  No.

16        Q.  You have no idea what it is?

17        A.  No.

18        Q.  All right.

19             MR. HARGROVE:  MaryBeth, do you mind

20   loading the next one, which will be 16.

21             (Plaintiff's Exhibit 16 marked)

22   BY MR. HARGROVE:

23        Q.  Did you say you had it up?

24        A.  Yes.  It looks like the one we just looked

25   at.
```

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 180

1      Q.  Okay.  And you've never seen that document

2   before?

3      A.  No.

4      Q.  Don't recognize it, don't know what it is?

5      A.  No.

6      Q.  All right.

7          MR. HARGROVE:  Well, let's load the last

8   one, then, MaryBeth, if you don't mind.

9          MS. GIBSON:  All right.

10          (Plaintiff's Exhibit 17 marked)

11   BY MR. HARGROVE:

12      Q.  Have you got it up?

13      A.  I do.

14      Q.  Do you recognize Exhibit No. 17?

15      A.  I do not.

16      Q.  Okay.  Have you ever seen Exhibit 17

17   before?

18      A.  I have not.

19      Q.  Do you have any idea what Exhibit 17 is?

20      A.  No.

21          MR. HARGROVE:  All right.  Well, let us

22   take a couple minutes.  I think we're pretty close

23   to finished.  Let me talk with my co-counsel.  Let's

24   take about five, and may have a little bit more or

25   may be finished, sir.  If you'll stand by, we'll

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 181

1    take a quick break.

2              (Recess 6:26 to 6:28 p.m.)

3              MR. HARGROVE:  Mr. Muth, that's all we have

4    for you today.  I appreciate your time.

5              MR. PERLOWSKI:  I don't have anything for

6    Mr. Muth.

7              (Deposition concluded at 6:28 p.m.)

8              (Signature reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 182

1                    VERITEXT LEGAL SOLUTIONS

2                 FIRM CERTIFICATE AND DISCLOSURE

3

4      Veritext represents that the foregoing transcript as

5      produced by our Production Coordinators, Georgia

6      Certified Notaries, is a true, correct and complete

7      transcript of the colloquies, questions and answers

8      as submitted by the certified court reporter in this

9      case.  Veritext further represents that the attached

10     exhibits, if any, are a true, correct and complete

11     copy as submitted by the certified reporter,

12     attorneys or witness in this case; and that the

13     exhibits were handled and produced exclusively

14     through our Production Coordinators, Georgia

15     Certified Notaries.  Copies of notarized production

16     certificates related to this proceeding are

17     available upon request to litsup-ga@veritext.com.

18

19     Veritext is not taking this deposition under any

20     relationship that is prohibited by OCGA 15-14-37(a)

21     and (b).  Case-specific discounts are automatically

22     applied to all parties, at such time as any party

23     receives a discount.  Ancillary services such as

24     calendar and financial reports are available to all

25     parties upon request.

Jim Muth                                                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 183

1                      CERTIFICATE
2    STATE OF GEORGIA:
     COUNTY OF FULTON:
3

4            I hereby certify that the foregoing
     transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
5    reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
6    evidence given upon said proceeding.
             I further certify that I am not a relative
7    or employee or attorney of any party, nor am I
     financially interested in the outcome of this
8    action.
             I have no relationship of interest in this
9    matter which would disqualify me from maintaining my
     obligation of impartiality in compliance with the
10   Code of Professional Ethics.
             I have no direct contract with any party in
11   this action and my compensation is based solely on
     the terms of my subcontractor agreement.
12           Nothing in the arrangements made for this
     proceeding impacts my absolute commitment to serve
13   all par—                              of the court.
14            *La Rita J. Cormier*          2022.
15
16           _____
17           LaRita J. Cormier, RPR, CCR No. 2578
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Jim Muth                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                              Page 184

1   To:  Henry M. Perlowski, Esquire
2   Re:  Signature of Deponent Jim Muth
3   Date Errata due back at our offices: 30 days
4
5   Greetings:
6   The deponent has reserved the right to read and
    sign.  Please have the deponent review the attached
7   PDF transcript, noting any changes or corrections on
    the attached PDF Errata.  The deponent may fill out
8   the Errata electronically or print and fill out
    manually.
9
10  Once the Errata is signed by the deponent and
    notarized, please mail it to the office of Veritext
11  (below).
12
    When the signed Errata is returned to us, we will
13  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies
14  of the Errata to all ordering parties.
15
    If the signed Errata is not returned within the time
16  above, the original transcript may be filed with the
    court without the signature of the deponent.
17
18
    Please send completed Errata to:
19
    Veritext Production Facility
20
    20 Mansell Court
21
    Suite 300
22
    Roswell, GA  30076
23
    (770) 343-9696
24
25

Page 185

1   ERRATA
2   I, the undersigned, do hereby certify that I have
    read the transcript of my testimony and that

3
    ____ There are no changes noted.

4
    ____ The following changes are noted:

5
6   Pursuant to Rule 30(7)(e) of the Federal Rules of
    Civil Procedure and/or OCGA 9-11-30(e), any changes
7   in form or substance which you desire to make to
    your testimony shall be entered upon the deposition
8   with a statement of the reasons given for making
    them.  To assist you in making any such corrections,
9   please use the form below.  If additional pages are
    necessary, please furnish same and attach.
10
11  Page ____ Line ____ Change _____
12  _____
13  Reason for change _____
14  Page ____ Line ____ Change _____
15  _____
16  Reason for change _____
17  Page ____ Line ____ Change _____
18  _____
19  Reason for change _____
20  Page ____ Line ____ Change _____
21  _____
22  Reason for change _____
23  Page ____ Line ____ Change _____
24  _____
25  Reason for change _____

Page 186

1    Page ____ Line ____ Change _____
2    _____
3    Reason for change _____
4    Page ____ Line ____ Change _____
5    _____
6    Reason for change _____
7    Page ____ Line ____ Change _____
8    _____
9    Reason for change _____
10   Page ____ Line ____ Change _____
11   _____
12   Reason for change _____
13   Page ____ Line ____ Change _____
14   _____
15   Reason for change _____
     Page ____ Line ____ Change _____
16
     _____
17
     Reason for change _____
18
19
                        _____
20                      DEPONENT'S SIGNATURE
21   Sworn to and subscribed before me this ____ day of
     _____, _____.
22
23   _____
     NOTARY PUBLIC
24
25   My Commission Expires: _____

Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[000044 - 300]**

Page 1

| **0** |
| --- |

000044   156:11
0000733   2:9
0000734   2:11
0000735   2:12
0000737   2:14
0000738   2:16
0000739   2:4
0000743   2:18
0000774   2:19
0000781   2:6
   156:12
0000782   2:20
0000783   2:21
0000784   2:23
0000789   3:4
0000795   3:5
000733   157:17
   161:4
000739   125:17
000781   156:7
01/18   2:6
04981   1:6
09/18   2:7

| **1** |
| --- |

1   2:4 70:18 125:21
   125:23 126:19
   127:19 131:17
   132:2,15 133:13
   133:20 134:6,10
   134:20 145:6,9
   147:11 148:1,3
10   2:16 35:17,19
   42:18 56:1,3
   168:5,6,11 170:8
100   42:19
11   2:18 170:12,15
   170:17 171:2
12   2:19 172:13,14
   172:18,20

125   2:4
12th   183:14
13   2:20 42:19,19
   175:25 176:2,5,7,9
130   56:14,15,19,21
   56:24
13621   183:15
14   2:21 4:7 177:5
   177:6,9,11,13,22
   178:4,18
142   2:6
15   2:23 115:20,24
   179:6,8,9,11,14
15-14-37   182:20
156   2:8
157   2:9
16   3:4 179:20,21
161   2:11
164   2:12
166   2:14
168   2:16
17   3:5 117:11,12
   117:13 180:10,14
   180:16,19
170   2:18
171   4:16
172   2:19
175   2:20
177   2:21
179   2:23 3:4,5
17th   4:16
18   2:10 117:9
   144:18 171:3
19   117:9
1:20   1:6
1:52   1:15

| **2** |
| --- |

2   2:6 138:12
   142:23,25 143:5
   145:6,9 150:24
   151:1 152:20

153:10,20,25
   156:7
20   80:11 81:6
   184:20
2000   96:12
2009   11:11 12:2,3
   13:3
2014   13:3
2015   154:6 156:9
   156:22 157:1
2016   49:24
2017   2:20 22:5,13
   47:19 50:2,3,4,6
   52:15,16,19 86:11
   96:12,12 117:21
   152:14 176:10,11
   176:23
2018   2:5,12,14
   47:20 49:11 56:12
   56:17,21 92:1,4,8
   92:10,16 94:11
   95:4,12,17 96:15
   98:11 99:21,22,25
   101:5,11 103:17
   103:20 108:18
   109:16 111:5,9,15
   112:20,22 114:16
   114:21,22,25
   115:1,6,19 116:2,7
   117:3 124:14,21
   125:5 126:1
   127:10,20 133:13
   133:18,23 134:18
   143:9,9 148:13,14
   148:22 149:4,13
   149:23 153:20
   155:5,16,21
   156:25 158:1,19
   159:6 161:25
   162:23 163:3,8,21
   165:1 166:11

167:21,24 170:19
   170:19 171:13,19
   171:22 172:8,9
2019   87:8 97:21
   98:8,24 99:2
   100:21 106:16
   108:8 117:24
   118:4,8,13,18,24
   123:25 138:3,20
   139:7 151:16,24
   152:16 153:21
   160:2 168:16,18
   171:14
2021   76:12,14 77:4
   161:1,2,5,8 162:10
2022   1:14 157:9,10
   173:22 183:14
2100   4:17
230   4:7
25   80:11
2578   1:18 183:17
27   156:18 161:1,2
   161:5
28   157:9,10
29   1:14

| **3** |
| --- |

3   2:8 145:6,9
   150:24 151:2
   152:20 153:10
   154:11 156:1,3,5
   160:22 173:22
30   59:9 107:8,12
   118:12,15,18,23
   119:10,12,17,20
   120:3,16 121:5
   122:2,15 123:7,17
   123:22,24 124:11
   124:23 126:22,23
   127:4 184:3 185:6
300   184:21

**[30076 - allocated]**

**30076** 184:22
**30305** 4:8
**30363** 4:18
**343-9696** 184:23
**3535** 4:6
**3:10** 60:5
**3:20** 60:5
**3rd** 162:10

**4**

**4** 2:9 157:18 160:1
 160:13 161:3
**4,097,231** 128:23
**45** 60:24 61:3
**4:11** 97:19
**4:23** 97:19

**5**

**5** 2:11 56:4,5,25
 61:22,23 161:14
 161:16,18,21,23
 162:1,15 164:3
 165:21
**50** 46:24
**5:46** 160:20
**5:54** 160:20
**5th** 154:6 156:8,22
 156:25

**6**

**6** 64:13 161:13
 164:7,10 165:21
**6:26** 181:2
**6:28** 181:2,7

**7**

**7** 2:12 164:8,11,13
 173:22 185:6
**734** 160:16 161:12
 165:20,21
**735** 164:7
**737** 166:1

**738** 168:5
**743** 170:11
**770** 184:23
**774** 172:12
**781** 138:11
**782** 175:24
**783** 177:4
**784** 179:3

**8**

**8** 165:22,24
**86** 92:11

**9**

**9** 2:14 166:2,4
 167:2
**9-11-30** 185:6
**95** 61:25

**a**

**abiding** 8:10,12,14
**ability** 78:7
**able** 30:13 54:25
 76:22 81:2 141:5
 172:8
**absolute** 183:12
**absorbed** 16:24
 52:9
**absorbing** 59:11
 59:12
**access** 144:7 165:7
**accidentally**
 108:16
**account** 91:13,17
**accountant** 67:15
 70:10
**accounting** 25:10
 25:13,14 32:18,23
 33:5 51:3 60:9,10
 70:11 107:18
 129:20 130:14,15
 130:16 136:10
 140:11

**accurate** 23:9
 30:17 38:15 48:5
 61:14 67:21 77:19
 125:6 133:24
 134:5,12 137:7
 139:2,3 149:3,22
 151:6,25 154:7
 173:23
**accurately** 7:2
 153:1,5
**acquired** 13:2,5,14
 15:10,18,25 16:5
 16:15,24 17:6
**acquisition** 16:11
**action** 5:9 95:8
 183:8,11
**actively** 19:16
**actual** 114:9
 136:11 151:6
**add** 42:18 61:8
 126:23 127:2
 159:19
**added** 159:11,11
**addition** 32:1
 89:12
**additional** 14:1,3
 87:12 185:9
**address** 21:13
 155:24
**admin** 11:14
**administration**
 11:19
**advance** 13:7,9
 15:11
**advancement**
 13:13 87:6
**advise** 5:25
**affect** 77:5 78:7
**afraid** 59:25
**afternoon** 5:6

**agg.com** 4:19
**aggregate** 41:5,12
 88:16 89:4 117:20
**aggregated** 24:10
 34:18
**aggregates** 44:14
 89:4
**aggregating** 51:24
 88:22
**aggregation** 36:12
**ago** 54:13 65:12
 79:12 80:25 94:3
**agree** 72:4,9
 151:23 156:24
 157:3 161:7
 162:10 164:9
 165:22
**agreed** 163:6,9,10
**agreement** 183:11
**ahead** 14:7 68:22
 83:10 91:23
 114:14 117:6
 119:24 121:13
 128:9
**alarm** 94:9 95:7
**alarmed** 94:14,17
 94:20 95:4
**align** 26:10,13
**allegations** 84:7
 118:11,16
**allison** 84:1,4
 89:19 116:5
 162:18
**allocate** 51:25
 66:18 69:4,22
 132:11
**allocated** 20:6
 33:5,16,20,23
 35:13,13 38:10
 44:19 46:18,25
 47:14,25 48:10,20

Case 1:20-cv-04981-CAP Document 92 Filed 04/28/22 Page 189 of 216
Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al
March 29, 2022

[allocated - approximately]

Page 3

49:2,9 50:5,6,7
52:6,21 53:23
55:20 56:25 57:6
57:25 58:9 59:6
59:20 60:16,19
61:14,24 62:5,15
62:16,17,20,23
64:20,22 66:24
67:7 68:8 70:25
71:6,8,14,17
112:24 126:20
129:2 132:13
**allocating** 55:21
69:15 77:7 132:10
**allocation** 21:13
35:20 36:20 37:3
37:13 38:6 41:17
49:19 55:2,10
58:14,18,20,24
61:10 63:4,21
64:1,24 65:16
66:9 67:9 68:15
69:20 70:8,15,24
71:2 73:1 74:17
74:21 75:19 77:19
95:16 102:24
104:15 107:4
120:4,16 124:12
125:25 144:24
145:6 147:11
148:1,3
**allocations** 32:1
32:12,13,14 33:13
33:22 34:4,8,15,19
35:3,24 36:13
37:23 38:3,11,14
44:15 46:5 53:6
58:22 61:5,7
67:24 68:1,2,25
70:21 71:7 72:5
72:13 73:6,21

74:14 76:5,15
77:5,13 95:11
101:19 102:12,14
102:22 103:2,5
105:5,17,20,24
106:7,15 109:20
115:16 119:11,13
119:16,18,20
126:20 131:10
134:8 147:14,16
147:23 148:8,10
151:24 171:6,7,15
171:18
**alterations** 116:19
**altered** 146:18
159:19
**altering** 116:4,4
**amb** 23:2,4,5,8,12
23:15,17,20,24
24:19 25:22,25
26:18 27:4,7,8,13
27:17,18,19 28:13
28:23 29:2,7
33:11 36:24,25
37:7,9,21 40:10
44:5,6,13,24 60:8
68:25 69:14 89:7
129:12,13,14,25
132:7,9,11,12,21
170:9,10
**american** 1:8 5:9
21:20,22,24,25
**amount** 7:9 34:7
34:19,23,23 36:20
42:13 46:13 52:6
54:24 59:19 62:10
63:4 64:21,25
66:9 71:10 72:13
73:14,20 129:1
130:22 131:8
132:6,6,9,9,10,25

132:25
**amounts** 102:23
127:10,19 131:7
**analysis** 20:5
130:8
**analyst** 12:6,7,17
13:8,9,15,16,18,18
13:24 14:2,24
15:5,11 17:16
19:8,10,21,22 20:2
20:9,25 21:7,12
**analytics** 22:8,9
22:12,16 29:24
84:25 85:14 86:10
87:10
**analyze** 132:1
**analyzing** 130:21
**ancillary** 182:23
**andrew** 4:23
**ankeny** 85:24,25
165:9
**anna** 20:23
**announced** 118:13
**answer** 8:19 19:2
24:13 26:21 27:23
31:10 36:18 54:9
59:15 61:3,16
67:3 68:19,22
74:10 75:3,22
78:3 83:8,10
89:23 92:13 95:20
96:8 97:8,10
100:6 101:15
103:13 104:2
106:19 108:4,20
116:9 119:6
120:11 121:11
122:20 124:17
125:8,12 127:1,24
128:1,9 129:7
133:25 134:16

135:7,15,24
136:25 137:19
147:3 149:7,17
150:1 152:18,19
157:5 169:20
171:9,10 173:14
178:11,21,22
**answered** 6:25
54:7 68:18 95:19
95:23,24 96:1
97:7 105:22 106:9
124:7 126:9
128:14 137:17
144:21 167:7
**answering** 104:3
**answers** 137:12,13
137:13 182:7
183:4
**anticipate** 8:21
**anybody** 10:7
105:12 108:12
**anymore** 17:8,23
17:25 59:21 63:22
**anyway** 19:5
**apart** 39:15
**appearances** 4:1
**applied** 64:1 70:16
70:22 102:24
182:22
**apply** 27:15 85:4
103:1
**applying** 85:3
**appreciate** 181:4
**appropriate** 74:25
115:15 130:21
**approve** 135:24
144:10
**approved** 104:17
**approving** 92:21
**approximately**
16:3 52:19 56:19

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[april - believe]

Page 4

april   183:14
area   9:21
arnall   4:15
arrangements
   183:12
arvielo   104:6
   111:5,9,15,19
   112:25 113:11,16
   114:1,7 140:23
   141:2 149:12,19
arvielo's   111:22
   113:3
arvielos   94:24
   96:22 97:1,4,11
aside   32:8 46:4
   81:5
asked   29:21 42:15
   50:15 54:6 68:17
   72:10 75:3 81:20
   91:8,9 95:18 97:6
   99:1,18 100:12,15
   100:19,20 102:16
   103:7 105:21
   106:8 107:2,2
   109:21 110:9,14
   110:19,22 111:2
   115:7 121:17
   122:11 124:7
   126:5,8 128:11,13
   137:17,22 138:2
   140:15,23 143:13
   143:16,17 144:16
   144:20 145:9,10
   147:24 160:4
   167:6 178:5,6,8,13
asking   6:10 7:17
   11:1 72:1 74:18
   75:12 131:15
   140:17
aspects   89:14

assigned   42:8
assist   185:8
association   117:19
assume   13:20
   21:22 70:17 84:18
   87:18
assumed   67:8
assuming   48:3
athens   9:22,23
   10:1
atlanta   1:3 4:8,18
   9:21
attach   185:9
attached   182:9
   184:6,7
attend   97:21 124:2
attendant   80:24
attended   100:7,10
   100:13
attorney   119:3
   183:7 184:13
attorneys   182:12
attributable   43:11
   43:14,21 44:10
   45:18,21 46:7,9
   61:12 66:9 70:1
   131:18 132:3,25
   170:2
attributed   34:8
   35:20 36:7,8
   38:14 40:24 41:24
   43:4,18 47:3
   49:12,21 62:10,11
   62:12,25 63:21
   64:3 66:3 67:12
   67:20 71:22,24
   72:5 73:10,17
   130:22
audited   62:22
automatically
   71:15 182:21

available   182:17
   182:24
averages   73:15,16
avp   22:8,9,11,16
   29:24 31:6 84:24
   85:14 86:9 87:10
aware   37:8 43:23
   49:14 54:21 73:22
   73:24 75:25 76:2
   94:25 97:25 105:2
   105:3,6,8,9 106:20
   107:9,13,16,18
   108:10,11,15
   117:4 118:11,16
   118:20 119:9,11
   119:14,19,20,25
   120:1,5,15,17
   121:5 122:2
   123:23 128:2
   131:3 133:15,16
   137:20 138:5
   139:21,23 140:17
   140:20,24 141:3,8
   151:21 154:16
   173:25

**b**

b   1:8 182:21
back   14:12 16:4
   30:24 37:18,19
   39:13,24 49:19
   55:1 56:20 57:16
   59:24 60:13 78:1
   79:2 80:14 81:24
   86:14 96:4 101:24
   108:7 125:12
   132:5 141:19
   147:13 160:22
   172:8 184:3
background   11:5
   77:25 81:23

bad   92:8
balance   52:9 68:7
   72:6
ballpark   56:8,12
   56:25
barring   147:5
based   12:20 15:8
   18:22 20:21 23:23
   26:25 33:24 36:8
   45:1 46:18 64:25
   72:13 177:20
   183:11
basis   33:9 41:11
   45:24 63:18,23
   65:6,8,14,21,22,25
   66:1,5,13 67:6,7
   67:10,11,12 69:4,7
   69:12,18,22 70:5,7
   70:21,22,25 71:2,5
   71:10 88:12 92:21
   93:11 125:25
   139:14 155:10,14
   167:15
beach   9:8,9,15
bear   77:18
bearing   57:10
began   29:20
   151:17
beginning   29:19
   76:12,14 78:5
   92:17 110:12
   118:1 148:11,12
   163:16
behalf   4:2,13
belief   101:5,11
   106:2 110:23
   122:8 123:16,18
   123:21 127:9
believe   58:1,12
   63:18 75:17 81:18
   92:6,7 93:21

Jim Muth
March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[believe - center]

Page 5

105:16,18 106:5
120:25 123:1,6,12
123:13 125:5
126:14 127:2,12
128:10 133:23
134:4 135:11
136:19 141:13
142:7 146:22
153:16 154:8
158:3 161:2,24
162:8,20 166:16
169:8 174:3,4
175:23 176:8,14
177:17,18
**believed** 110:23
114:8 163:21
**believing** 103:8
**beneficial** 90:21
**best** 8:19,20
**better** 7:24 64:11
**beyond** 13:9 15:11
17:15 20:8 21:7
48:7 73:25 74:19
**big** 131:12
**bigger** 179:3
**bill** 66:5
**bips** 66:6,11
**bit** 6:11 7:15 14:17
56:12 77:23,25
81:4 180:24
**blipping** 14:7
**block** 4:22
**booked** 26:10
**boss** 140:2,5,10
**bottom** 91:21
93:14 104:20,24
106:3 113:12,22
114:2,3 124:13
133:10,12 134:9
134:14,22 135:5
135:14,19 136:5

136:11,17 137:5
139:2 144:23
148:21,23 149:1
149:11 156:17
173:11
**bps** 2:5
**branch** 26:6,9,19
26:25,25 27:1,5,13
27:15,16,20 28:10
28:13,14,15,20,23
29:5,14 31:15,24
32:2,9,10,21 33:10
33:15 34:9,13,22
34:24 35:1 36:3,4
36:5,7,25 37:15,22
38:1 169:22
**branch's** 34:3,6
**branches** 20:6
21:14 26:11,12,14
26:15 33:18,20,23
36:9,21 38:7,10,19
39:12 40:15 43:18
89:8
**break** 7:5,10,12
44:6 60:3 97:18
160:17 181:1
**breakdown** 2:5
44:4 125:25
128:22
**breaking** 109:4,8
110:4 116:16
**breaks** 43:20
**briefly** 11:5
**broke** 10:25
114:19 118:1,15
**broker** 1:7
**brought** 29:25
30:1
**buck** 74:19
**building** 4:7 90:24
91:2 112:1,2,17

**built** 148:13
**bunce** 93:6,7
99:15 102:3 105:4
105:5 120:25
121:2 122:9
150:22
**burden** 74:17,21
**business** 11:7,14
11:19 14:19 33:17

**c**

**c** 4:3
**cal** 11:6,12 12:1
**calculate** 34:3,7
46:16 68:13,15
77:17
**calculated** 50:10
62:1 73:14
**calculating** 36:20
45:17
**calculation** 41:16
42:20 43:6 58:4
67:12 127:10
131:16 132:13
159:12
**calculations** 41:12
132:18,21
**calendar** 182:24
**california** 9:6
11:16 15:9 18:25
20:23 32:25 163:1
**call** 23:23 38:19
39:14,17,22 40:1,6
40:8,11,11,16,24
41:1,5,8,14,16,25
42:4,8,11,17,21,25
43:4,12,14,21 44:6
44:11,15,20 45:3
45:19,21 46:7,9,10
46:14 47:2,9
48:20 49:2 51:18
55:22 57:11 60:14

61:6,11 62:1,12
63:12,21 64:3,23
64:25 67:25 68:6
69:3,15 71:23
73:7 82:8 85:19
88:6,10,18
**called** 17:3 23:1
32:2 38:11 134:15
142:6,7
**calls** 142:12
**cap** 1:6
**capital** 28:2,3,7,12
28:24 29:3,6
33:11 40:14
**caption** 183:4
**case** 1:5 10:4 84:1
142:15,18,21
165:16 167:2,5,11
173:6 174:15,25
175:6,13 178:18
182:9,12,21
**cause** 73:20
124:25
**caused** 36:3,5
75:18 95:12
100:25 131:8
178:3
**ccr** 1:18 183:17
**cease** 31:8
**ceased** 53:14,22
54:25 59:12 64:3
**center** 23:25 38:15
38:19 39:14,17,22
40:1,6,8,11,12,17
40:24 41:2,6,8,14
41:16,25 42:4,8,12
42:17,21,25 43:5
43:12,14,22 44:7
44:11,16,20 45:3
45:19,21 46:9,10
46:15 47:2,9

Jim Muth

Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[center - completed]

Page 6

48:20 49:2 51:18
55:22 57:12 60:15
61:6,11 62:1,12
63:12,22 64:4,23
64:25 67:25 68:6
69:3,15 71:23
73:7 88:7,10,18
**centers** 23:23
24:10,12,15
**certain** 45:18
89:13 105:15
141:15 146:5
152:11
**certificate** 182:2
183:1
**certificates** 182:16
**certified** 182:6,8
182:11,15
**certify** 183:3,6
185:2
**cetera** 140:12
**change** 16:1 17:15
30:14,15,19,23,25
47:13,17,19 49:15
49:18 54:16,18,20
55:21 57:19,22,23
58:24 59:10 60:25
63:15,17,20,23
64:18,19 65:2,11
65:14,21 66:2,5,17
66:20,23,23 69:5,6
69:10 70:13,17
71:12,23 72:12,23
72:25 73:2,17,19
75:17 76:4,8,10,13
76:14 77:5 87:9
87:17 90:17 97:18
139:11,18 148:18
151:21 153:21
171:14,16,17,25
172:3 185:11,13

185:14,16,17,19
185:20,22,23,25
186:1,3,4,6,7,9,10
186:12,13,15,15
186:17
**changed** 22:12,14
59:2,3,5 60:17
70:12 72:19,21,24
73:4 77:4 95:15
139:5,10 151:16
151:22
**changes** 47:18,23
63:25 74:6,7 76:5
95:10 116:14
138:21 139:9
184:7 185:3,4,6
**changing** 60:22
69:17
**charge** 28:8,9
**charged** 95:11
**charm** 53:20
**chart** 79:6,8
120:18,19,24
121:3,19,25
122:11,14,16,25
123:6,16 126:2,16
126:19 128:12
129:11,23 131:7
137:14 154:11
160:8
**check** 132:5
**choose** 5:23
**christy** 93:5,6
99:15 102:2
120:25 121:2
122:13 169:5
**circumstance**
147:8
**circumstances**
17:19 18:3,5
20:14 80:24

135:12,17
**city** 15:7
**civic** 10:23 11:2
**civil** 185:6
**claims** 83:3
**clarify** 42:9
**class** 14:18,20
**clear** 7:16
**clearer** 42:17
**client** 84:10 119:3
**close** 180:22
**closer** 64:10
106:11
**cm** 2:4
**cm1** 138:25
148:16,24 149:23
150:24 151:1
152:12,16,20
153:10,22 159:2
171:20
**cm2** 138:25 159:2
159:9,11,19
**cm3** 134:14,18,21
135:5,21 136:10
137:4,10 138:25
139:2 144:24
155:15 159:2,9,11
159:19 173:10,11
**code** 183:10
**collaborate** 86:21
86:25
**college** 14:19
**colloquies** 182:7
183:4
**column** 35:3 44:13
46:17
**combine** 29:6 89:1
**come** 27:20 36:23
44:15 78:1 83:22
85:1 96:13 110:22
112:8 125:8 127:5

129:12 146:15,16
170:9
**comfortable** 64:10
**coming** 19:17
129:4 169:23
**commission**
186:25
**commitment**
183:12
**communicate**
123:21 124:3
**communicated**
55:9 65:3,15
**communication**
6:23 51:12 94:22
**communications**
83:7 119:3 167:24
178:20
**company** 9:10
12:14 13:2,13
14:6 20:16,17
24:22,24 25:2,19
25:20,23 28:5
31:14 36:5,6,19
48:17,25 49:1
62:18,23 63:1,2
88:1,2 90:22
108:17 113:4
**company's** 89:14
**compared** 100:12
**comparing** 166:24
167:13
**compensation**
116:6,24 183:11
**compile** 22:24
23:22,25
**compiled** 22:17
**complete** 2:9
182:6,10
**completed** 184:18

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 193 of 216

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[compliance - correct]

Page 7

| | | | |
|---|---|---|---|
| **compliance** 183:9 | 112:5 121:8,14,16 | 70:15,20 71:2,7,20 | 40:12,13,20,21 |
| **computed** 47:9 | **conversational** | 72:4,13 73:6,20 | 43:18,19 44:1,2,11 |
| 76:6 | 8:18 | 74:14,17,21 75:19 | 44:12 45:4,5,12 |
| **computer** 55:8 | **conversations** | 76:5,15 77:5,12,18 | 46:11,12,22,25 |
| 133:4 174:21 | 72:14 81:19 | 84:24 85:14 86:10 | 47:1,3,4,6,10,11 |
| **computing** 39:25 | 101:18,21 102:1,6 | 87:10 95:11,16 | 48:11 49:17,25 |
| **concern** 113:21 | 102:7,10 106:10 | 101:19 102:11,14 | 50:21 51:9,18,19 |
| 152:25 153:4,8,9 | 111:8,19 116:23 | 102:22 103:1,5 | 51:22 52:7,12,13 |
| 163:11 | 141:25 142:2 | 104:14 105:5,17 | 52:25 53:1,15,16 |
| **concession** 166:10 | **coordinators** | 105:20,23 106:7 | 53:18 55:3 57:2,3 |
| 166:12,13 | 182:5,14 | 106:15 107:4 | 57:7,12 59:2,7 |
| **concessions** 2:15 | **copies** 172:5 | 112:24 113:9,11 | 60:20 62:6,13,14 |
| 167:16 | 182:15 184:13 | 115:16 117:2,9,10 | 63:10,13,14 64:5,6 |
| **concluded** 181:7 | **copy** 2:8 45:8 | 119:15,18,20 | 64:8,23 65:5,17,20 |
| **conference** 1:17 | 182:11 | 120:4,16 124:11 | 66:10,20,25 67:23 |
| **confidential** 2:21 | **cormier** 1:18 | 124:23 125:25 | 68:9 70:6 72:7,16 |
| **confused** 17:10 | 183:17 | 126:17,18,20 | 73:13,18,21 75:7 |
| 105:5,17 106:7 | **corporate** 20:5 | 131:9,11,13 134:7 | 76:16,17,19,25 |
| **confusing** 96:4 | 21:13 22:8,9,12,16 | 139:6 144:23 | 77:22 78:8,15 |
| 137:9 | 29:24 32:2,12,13 | 145:6,9 147:6,10 | 83:13,14 86:1,3,12 |
| **confusion** 103:25 | 32:14,15,16,20 | 147:14,15,23 | 86:16,17 87:1,19 |
| 104:1,4 | 33:12,16,19,22 | 148:1,3,7,10 | 88:3,10,11,13,24 |
| **connection** 18:11 | 34:4,7,10,14,19 | 151:16 170:1 | 89:10,11,15,16,20 |
| 178:21 | 35:2,20,23 36:4,13 | 171:6,7,15,18 | 89:24 90:4,16 |
| **connections** 9:15 | 36:20 37:3,6,13,17 | **correct** 5:19,20 | 91:21,22 94:17 |
| **consideration** | 37:22,24,25 38:3,4 | 10:18,20 12:21,23 | 97:1 98:9 99:23 |
| 35:24 | 38:5,6,9,11,14 | 13:6,22 14:9 17:3 | 103:10,14,21,22 |
| **considered** 45:4 | 39:23 40:23 41:24 | 17:9,12,13,23,24 | 104:18,19,21,22 |
| 47:10 124:12 | 42:10 44:15 45:1 | 19:3,18,19 21:2,5 | 112:17,18 117:12 |
| **consulted** 91:5 | 45:2,17 46:5,24 | 21:17,18,23 24:1,6 | 117:13 120:5,9,10 |
| **cont'd** 3:1 | 47:14,24 48:9,17 | 25:23,24 26:1,2,3 | 120:14,21,22 |
| **contemporaneou...** | 48:19 50:19,21,25 | 26:15,16 27:1,2 | 121:20,24 122:4,5 |
| 172:6,9 | 50:25 51:2 53:6 | 28:6,11,17 30:11 | 122:7 123:17 |
| **content** 146:14 | 53:22 55:10,20 | 30:21,22 31:1,5,16 | 124:21,22 125:2,9 |
| **contents** 93:22 | 56:7,7 57:11,24 | 31:17,18,19 32:3 | 126:7,11,12 |
| 112:21 | 58:18,22,24 60:7 | 32:21,22,25 33:3,6 | 128:20 130:1,2,5 |
| **continue** 52:20 | 60:16,18 61:5,6,10 | 33:7 34:15,20,21 | 130:10,18,19 |
| **contract** 183:10 | 61:21 62:5 63:4 | 34:24,25 35:3,21 | 131:13 132:4,8,16 |
| **conversation** | 63:20 64:1 65:16 | 35:22 36:9,10 | 133:2,10,11,14,24 |
| 101:21 110:21 | 66:9,18 67:17 | 37:1,4,10,11,23 | 134:1,3,13,17,23 |
| 111:12,14,18,20 | 68:2,15,24 69:20 | 38:1,2,7,8,11,12 | 134:24 135:2,23 |

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

[correct - dialer]

Page 8

135:25 136:2,3,7
136:12,18,22
137:8 138:8,9
139:4 144:18,19
146:10,20,21
147:6 149:14
150:8,12 151:7,17
152:2 153:13,14
153:16,17,22,23
154:7 157:3,6
158:14 159:4,7
160:9,10 162:11
162:12,13 171:21
171:24 172:1
173:12,13,16
175:6,9,17,22
176:24 177:1
182:6,10 183:5
**corrections** 184:7
185:8
**cost** 23:24 24:9,12
24:15 26:19 34:12
38:6,15 41:14
42:20,23,24 43:4
46:17 52:4,11
54:24 57:5,6 66:3
68:6 77:15 139:14
**costs** 26:10,13,25
32:14 33:16,19
34:10 37:24,25
38:1,4,9 41:24
43:1,17,21 46:2
49:12 59:12,12
67:9 68:25 71:8
90:18 117:2 137:8
**counsel** 4:1,22,23
5:24 79:14,18
81:6 82:11,14,15
82:21,24 83:16,23
110:3,6 128:22
175:12,16,20

178:8,14,17
180:23
**counselor** 79:15
**count** 66:16
**county** 183:2
**couple** 52:25
54:10,12 79:9
80:5,6,7 85:18
97:17 180:22
**courses** 11:22
**court** 1:1 5:11,24
6:18 8:22 182:8
183:13 184:16,20
**cover** 7:9
**create** 28:14
130:18 168:15
170:7
**created** 91:6 152:9
154:3,6 156:21,25
160:23 161:3,7
162:9,11 165:13
168:14 174:5,8
**creating** 168:18
**creation** 156:8
**current** 87:20
**currently** 9:5
154:22
**cut** 15:14 104:2
110:12 145:1
**cutting** 7:15
**cv** 1:6

**d**

**d** 1:8
**danine** 10:6
**data** 22:17,24
23:15,22,24,25
24:1 25:22 26:1,4
27:5,7,9 28:10,13
29:3,11 44:3
88:24 162:23

**date** 51:16 156:8
156:22 157:8,13
160:23 162:10
173:23 184:3
**day** 17:8 141:21
183:14 186:21
**days** 85:18 184:3
**deals** 27:19
**december** 117:14
117:18,20 170:19
171:3
**deducted** 67:19
71:15
**deduction** 70:1
72:11,12
**defendant** 1:9
4:13
**define** 55:24,25
**definitely** 64:15
**degree** 11:18
14:20
**delete** 161:13
**departed** 16:9,16
16:17,23 17:11,18
21:16 141:12
**departing** 141:10
**department** 25:8
25:10,15,16,23
28:4,5 29:3 32:18
32:24 33:5 49:3
52:5,20,22 53:5
59:7,11 61:24
66:4 67:13,16
68:16 70:2,8
71:14,25 72:5
86:3,5,7 129:10,14
130:1 132:6
**departments**
24:16,18,20,21,23
25:1,4,6,18 38:23
50:14,16,19,21,25

51:1,2,3,6,15
**departure** 16:13
17:19 20:15
**depict** 153:1
**deponent** 184:2,6
184:6,7,10,16
**deponent's** 186:20
**deposed** 6:4 81:17
83:3,20 142:15,18
**deposition** 1:12
5:12,22 6:1,23
60:24 78:22 79:3
79:18 80:4,13,16
80:19 81:8,11,14
81:20 82:2,17,21
83:17 84:4 92:11
109:25 126:3
137:24 138:4,8
164:7 181:7
182:19 185:7
**depositions** 82:25
**derived** 63:5
**describe** 23:14
**described** 31:14
**description** 2:2
3:2 87:24,25
**design** 91:6
**desire** 185:7
**detail** 93:24 94:1
**details** 94:2
**determine** 42:12
42:23,24 43:3
66:8 71:10 77:15
**determined** 41:20
41:23 42:3,7
50:13 71:22
128:25
**determining** 54:24
**diagnosed** 78:14
**dialer** 43:15,16,17
44:9 45:20,23

Veritext Legal Solutions

800.808.4958                                    770.343.9696

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[dialer - e]

Page 9

46:4,8 47:3,8

**difference** 13:17
64:14 66:15
102:15,17,20,21
109:18,19 146:2

**different** 24:17
25:18 30:16 33:17
38:7 44:21 50:14
99:5 100:1 102:22
102:23 112:16
139:14 143:1
156:14

**difficulty** 6:16
18:12

**direct** 7:19 151:19
183:10

**directed** 74:15
141:2

**direction** 183:5

**directly** 43:7,9
96:23 104:25
169:23

**disclosure** 182:2

**discount** 182:23

**discounts** 182:21

**discover** 15:19,20
15:25 16:4,5,6,7,8
16:11,15,25 17:2,6
17:7,12,14,20,22
17:25 18:1,2,5,19
18:20 19:13

**discretionary** 2:16
168:20,22 169:1,2

**discuss** 141:9

**discussed** 79:17
98:14 102:9,13
107:8,19 108:1,7
112:25 118:19
135:22

**discussing** 102:21
138:6 169:21

**discussion** 14:10
18:14 81:25 82:4
82:8,19 84:3
98:11 101:4
102:19 107:11
112:19 113:12
118:23 121:4
123:25 124:5
125:20 137:14
141:20

**discussions** 81:13
81:22 82:1,16,23
83:15,25 93:19,23
98:15 100:23
101:8 103:8
104:15 105:19,23
106:1,23 111:4
116:4,12,19 118:7
120:24 140:21,25
142:14,17,20
150:16 159:20
169:13,17

**display** 30:20

**disqualify** 183:9

**distribute** 96:21

**distributed** 136:1
136:17

**district** 1:1,2 5:10
5:11 9:24,25

**divide** 34:11 41:15
42:19,25

**divided** 41:7 71:3

**division** 1:3 2:4
16:7,8 17:2 38:18
39:1,18,19,21,23
40:1 41:7,9,14,17
41:21,24,25 42:11
42:21,22 43:11
47:10 48:10,14
49:10,13,22 50:7
51:25 53:23 55:11

55:21 57:1,5,6,25
58:19 59:1,20,23
60:15,19 61:12
62:1,6,11,24 63:13
64:4,21 65:17
66:25 70:16 71:1
71:6 73:21 74:17
74:22 75:19 77:6
92:2 95:12,17
97:14 98:12
114:10,16 116:25
124:14 125:25
127:11 129:2,7,24
130:10,23 131:9
131:11,19,21
132:3 138:22
148:15 152:1
153:6 166:25

**divisions** 25:20
38:23,24 43:2
69:3 71:16 152:16

**document** 43:20
57:17,18,18,20
58:1,3,7 90:14
109:17,22,24
110:2,5,10,14,19
111:2 115:10,11
115:12 126:6,13
127:7,14 136:21
136:22 137:4,22
138:1,7 156:7
157:9,22,24 158:2
158:5,8,13,14,16
159:8 162:11,15
163:25 164:3,15
164:20,21 165:3,8
165:11,13 166:7
166:15 168:18
169:14,17 170:7
172:23 173:8,24
174:2,5 175:16,18

175:19,22 178:4
180:1

**documents** 47:8
54:19 56:7 57:14
57:15 75:1,6,9,12
75:13 78:2,24,25
79:4,5,7 80:3,10
80:12,15,18,23
81:3,6 89:18
98:20,22,23 99:2
99:19,20 100:16
100:19 107:3
109:25 110:6
115:13 117:5,8
132:17,19 135:1
139:1 156:6 160:5
169:9 174:7,10,14
174:17,20,21,24
174:25 175:4,6,8
175:11,12,21

**doing** 48:1 62:7
68:5

**dollar** 35:4,7,10
35:14,15,16 46:16
66:16 71:3,10
76:9,11 77:7,9,10
107:12 115:20,24
118:18,23 159:5

**dollars** 35:8 42:10
42:13 46:14 61:21

**due** 184:3

**duly** 5:2

**duplicate** 165:23

**duties** 13:23 14:2
14:3 15:3 20:1,4
21:12

**duty** 31:20,22

| e |
| --- |

**e** 51:11,15 83:21
83:22 123:1
126:14 127:14

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 196 of 216

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al
March 29, 2022

[e - explain]

Page 10

155:13,24 185:6,6
**earlier** 17:10
42:15 60:23 122:1
126:3,23 133:22
139:12 171:19
**early** 77:4 90:8
168:16,18
**earnings** 91:13,17
**easier** 30:9
**econometrics**
14:18
**education** 11:20
**educational** 11:5
**effect** 72:24
124:13
**either** 45:8 49:2
55:22 76:22 78:18
**electronic** 51:12
174:10
**electronically** 45:8
184:8
**eliminate** 59:5
109:7
**eliminated** 109:1
109:13 146:23
**employed** 13:8
29:20 49:20 84:17
85:2,12,13 86:16
89:19 90:3
**employee** 146:14
183:7
**employees** 146:13
**employment** 84:20
90:6
**ended** 85:12
**endurance** 7:7
**entered** 185:7
**entire** 75:3 112:16
**entirely** 39:19
**entity** 131:9

**errata** 184:3,7,8
184:10,12,14,15
184:18 185:1
**error** 107:19,20
**esquire** 4:3,4,14
184:1
**estimated** 77:12
**et** 140:11
**ethics** 183:10
**eventually** 27:10
27:11 45:13,16
**everybody** 74:13
**evidence** 183:6
**exact** 90:13
**exactly** 65:10
70:14 162:5
**examination** 5:4
**examined** 5:2
**example** 25:8
32:18,24 36:2
43:15 45:19 47:8
61:19 128:22
130:8
**excel** 23:18,20
26:1,5 27:9 29:12
29:13 30:2,6,10,21
30:24 37:20,21
45:6,9,10 47:7
55:1 57:15 89:8
89:13 90:12,13,14
90:19 132:22,23
133:8 147:14,15
148:2,5,7 151:3,4
151:5 152:6,9
154:19 155:1,5,14
**exception** 166:13
**exceptions** 116:13
116:20
**exchange** 58:21
**exclude** 69:2
136:13 145:19,20

146:1,2,5
**excluded** 152:11
**exclusively** 182:13
**excuse** 64:4
**executives** 97:22
101:10 117:24
136:2 143:22
144:3
**exercise** 7:7
**exhibit** 2:2,4,6,8,9
2:11,12,14,16,18
2:19,20,21,23 3:2
3:4,5 125:19,21,23
126:19 127:19
131:17 132:2,15
133:13,20 134:6
134:10,20 138:12
142:23,25 143:5
153:20,25 154:11
156:1,3,5,7 157:18
160:1,13,22 161:3
161:13,14,16,18
161:21,23 162:1
162:15 164:3,7,8
164:10,11,13
165:21,22,24
166:2,4 167:2
168:5,6,11 170:8
170:12,15,17
171:2 172:13,14
172:18,20 173:21
175:25 176:2,5,7,9
177:5,6,9,13,22
178:4,18 179:6,8,9
179:11,14,21
180:10,14,16,19
**exhibits** 2:1 3:1
182:10,13
**exists** 58:12
**expenditure** 66:19

**expenditures** 62:6
**expense** 27:13
33:4,11 40:23
42:10 45:1,2
46:14 57:10,11
61:22 62:19,21
117:9,10 124:23
130:22 131:8,13
**expenses** 2:17 20:5
21:14 27:19 28:14
28:23 29:2,7 32:2
32:3,9,9 36:12,25
37:4,6,14,22 40:11
41:7 43:7,9,10
44:7,14,19 45:18
46:25 47:14,25
48:9,17,19,25 49:1
49:8,19,21 50:4,6
53:22 55:10,20
56:8 57:24 58:14
58:18 60:7,16,18
65:16 67:17 91:14
91:18 126:17,18
129:4,6 133:13,19
134:5,10 135:21
139:6,18 144:24
145:13,17,23
146:23 147:6,9
148:6 150:8,17
151:16 152:11
153:19 158:24
159:3 168:20,20
168:22,22 169:1,3
169:21 170:2,2,4
**experience** 45:2
**expert** 58:6
**expertise** 14:23
**expires** 186:25
**explain** 16:22 32:8
33:10 40:3 66:1
71:4,21 77:9

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

102:16 128:11
146:1 147:21
**express**  94:9
104:23 105:1
114:7 122:15,22
122:24 152:25
163:11
**expressed**  94:23
**extent**  89:4
**extract**  23:18
**extracted**  23:19
**extrapolate**  40:20
**extrapolated**
25:25 26:5,18
27:4
**extrapolating**  23:4
23:6 27:8

**f**

**facility**  184:19
**fact**  16:14 89:17
93:19 94:9 101:6
101:12 103:9
110:24 124:4
150:17 175:16
**factor**  70:7
**factored**  33:13
66:2
**fair**  7:3,8,12,25
8:5,23
**fall**  39:18,18
**familiar**  107:22
117:10 149:18
**far**  90:6
**february**  98:8,24
100:20 106:16
108:8 117:24
118:8,13,18,24
120:3 124:1 126:6
138:3 160:2
**federal**  185:6

**fees**  36:6,7 129:1
130:9
**feet**  6:14
**felt**  141:6
**figure**  17:6 43:24
43:25 44:19 48:18
51:24 52:11 58:6
58:7 70:15
**figured**  34:20
35:11 69:20
**figures**  12:20
28:24 40:22
**figuring**  35:23
**file**  55:4,6 147:19
147:21,24 174:9
184:13
**filed**  5:9 184:16
**files**  174:13,21
175:4,4,5
**fill**  184:7,8
**final**  114:9 133:9
**finals**  154:24
**finance**  25:8 51:4
86:8 87:7,10,21
**finances**  89:15
140:11
**financial**  15:19,20
19:8,10,11,12,20
19:22 20:2,9,25
21:7,12 22:17,18
22:24 23:16 25:22
28:25 29:4 31:15
31:25 32:10 33:9
37:14 62:18 98:12
116:7 134:11
151:6 153:1
182:24
**financially**  183:7
**financials**  12:19
40:1,5,8 48:14
108:1 130:16

162:19 163:3,12
**find**  7:19 18:3
50:17 52:21 55:4
55:5 74:5,20
141:12,16 155:13
172:8
**fine**  7:6 8:10 77:1
160:18
**finish**  7:10 8:19,20
**finished**  180:23,25
**finley**  4:5
**firm**  4:5 182:2
**first**  5:2 6:12
25:11 27:23 35:5
49:20 64:2,19
68:13 74:23 85:1
101:24 104:2
137:21
**five**  13:1,9 159:5
160:19 178:1
180:24
**fix**  6:15
**floor**  112:3,16
**folders**  55:8
**folks**  150:16
**follow**  44:8 136:15
**followed**  58:19
70:15
**following**  58:10
60:1 185:4
**follows**  5:3
**foothill**  18:24
**forecasting**  14:4,5
14:20,23 15:4
19:14
**foregoing**  182:4
183:3
**form**  24:3 26:20
31:9 36:12,14
48:21 53:2 59:14
61:15 63:7 67:1

68:17 70:21 74:2
74:8,24 75:20
88:22,23 89:21
92:12 95:1 100:4
101:13 103:11
105:21 108:2
114:4,12 115:2,21
120:6 121:7,9
122:17 123:9
126:25 129:17
135:3 136:23
137:16 147:1
149:5,15,24 150:9
151:13 152:17
154:9,15 169:18
171:8 185:7,9
**forms**  51:13
**formula**  52:10
77:10
**forward**  64:10
65:24 184:13
**found**  18:8
**foundation**  74:3,9
74:24 75:4,21
89:22 101:14
106:17 108:3,20
115:22 116:8
119:22 120:7
122:18 123:10
124:15 125:3
127:25 128:6
129:18 130:3
136:24 137:17
147:2 149:25
152:18 169:19
**four**  94:3 178:2
**fourth**  53:19
115:19
**freeze**  6:13
**frommert**  139:24
140:1 141:5,9

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[front - hargrove]**

Page 12

**front** 21:21 161:17
166:5
**full** 9:1 77:13
103:2 132:9,24
146:7
**fullerton** 11:6,13
12:1
**fully** 78:7
**fulton** 183:2
**funded** 26:11,14
27:14,16 33:24,25
34:2,6,11,18,19,23
35:2,15,16,17,18
35:25 36:8 41:13
46:21,23 52:11
66:7,15 69:4,12,18
69:23 70:23 71:3
77:7,9,10,14,14
**funding** 1:8 5:10
21:20,22,24 22:1
**funds** 100:25
118:19,24
**furnish** 185:9
**further** 11:19
28:18 55:10 130:7
182:9 183:6
**future** 14:5

**g**

**ga** 182:17 184:22
**gap** 14:17
**gather** 163:21
**gathering** 28:10
**gears** 97:18
**general** 4:22 22:25
23:1 62:21,24
119:2
**generally** 94:6
99:4 121:15
166:23 167:4,11
**generate** 30:16
31:15 143:18

**generated** 19:18
26:18 27:1 29:13
143:19 172:7
**generating** 12:18
**generation** 33:12
**georgia** 1:2 4:8,18
5:11 9:16 10:2,10
10:12,15,18,21
182:5,14 183:2
**getting** 25:17
33:11 53:15 59:24
73:10
**gibson** 4:4 156:13
161:13 164:8
165:21 180:9
**gina** 1:4 5:8 169:4
169:23
**give** 6:21 27:4,9
56:8,12 61:19
147:17,19,20
**given** 34:3,8 55:2
73:11 99:19 154:5
154:14 166:14
183:6 185:8
**gives** 27:13 40:16
133:9
**giving** 119:5
**global** 62:18
126:18
**glynn** 10:6
**go** 14:7 16:4 20:17
21:19 22:4 26:8
26:17 29:4 30:24
31:22 37:9,18
39:24 44:24 45:13
45:14 49:19 51:24
52:10 55:1 56:20
57:16 60:13 61:8
63:17 68:22 69:11
73:1 78:2 79:2
80:14 81:24 83:10

86:14 91:23
101:24 108:7
113:15 114:14
119:24 121:13
128:9 132:5
136:22 141:13,16
145:5 160:22
162:22 172:8
**goes** 89:8 129:14
133:8 147:13
**going** 6:10,17,18
6:20 8:4,19,22
34:14 35:2,19
43:4 53:8 56:6,11
59:1,25 61:25
64:20 65:24 66:11
66:12,18 67:8,19
69:7,11 72:3 73:3
74:13 75:11,13
77:13,15,24,25
82:13 83:6,19
161:13 164:14
**golden** 4:15
**good** 5:6,6,13
14:16 98:12
111:17
**graduate** 11:8,10
**graduated** 12:1
**great** 9:1
**greetings** 184:5
**gregory** 4:15
**ground** 8:8,14
**grow** 11:15
**guess** 5:7 43:12
102:15 138:23
176:16
**guessing** 143:13
**guy** 74:12,13
**guys** 104:17

**h**

**haircutted** 65:23
**half** 20:13 21:11
**hall** 112:14
**hand** 6:14
**handled** 182:13
**happen** 30:2 54:15
54:16 59:21
**happened** 23:21
26:4 53:5 71:13
106:24 108:8
128:17
**happening** 72:17
147:5
**happens** 17:11
27:12,12 28:22,24
67:12 70:19
**hard** 45:8
**hargrove** 4:3 5:5,8
5:13,16 6:3 14:11
14:15 18:16 24:4
24:8 26:23 31:12
36:16 48:24 53:3
54:8 59:17 60:4,6
61:18 63:7,8
64:17 67:2 68:21
74:4,11 75:5,11,15
75:23 76:24 77:3
83:9 89:25 92:15
95:3,22 96:3,10
97:9,20 100:9
101:17 103:15
105:25 106:13,22
108:6,22 114:6,13
115:4,25 116:11
119:8,23 120:8
121:12 122:19
123:11 124:10,19
125:4,16,22
126:10 127:3,23
128:3,8,16 129:19

Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[hargrove - inputting]                                                    Page 13

130:4 135:4 137:2
137:18 138:10,14
143:2 144:22
147:4 149:9,20
150:3,11 151:14
152:21 154:10,12
154:18 156:2,15
156:20 157:7,16
157:19 159:18
160:15,18,21
161:9,11,15,20
164:6,12 165:2,19
166:1,3 167:9
168:4,7 169:25
170:11,13 171:12
172:12,15 173:17
175:24 176:1
177:4,7 178:15,25
179:2,7,19,22
180:7,11,21 181:3
**hargrove's** 119:4
**head** 6:22 15:24
45:25 56:18 86:6
93:17 131:14
**hear** 6:13 7:14
8:13 12:22 14:6
18:10 19:2,6 21:4
24:5 25:11 26:15
27:24 31:3 35:5
39:8 63:9 64:7
75:24 76:1,18,21
76:22 77:2,19,21
96:2 97:10 107:15
120:11,12,13
135:7,15 137:19
145:1 157:5
164:17 168:23
171:10 173:14
**heard** 18:13 21:21
24:7 55:16 76:24
98:2,3,6 107:6,11

107:24 108:12
110:13 118:22
**henry** 4:14 5:13
36:17 184:1
**hey** 51:16 58:8
**higher** 167:15
**highest** 167:20
**highly** 114:22
**hired** 22:7 85:17
**hiring** 31:13
**historical** 65:22
67:7,8 70:5,20,22
70:24 73:15,16
**historically** 71:13
**historicals** 70:4
**history** 11:25
**hit** 42:12 46:10
53:15
**hitting** 179:3
**home** 9:12
**hope** 7:7
**hopefully** 7:15
13:21 179:4
**hour** 5:7
**hperlowski** 4:19
**huge** 17:5
**huh** 6:22 92:5
123:3
**huhs** 6:22
**hundred** 42:10,13
46:10,14,16 61:21
169:11
**hundreds** 25:3,4
50:21,23

**i**

**idea** 83:12 173:18
179:13,16 180:19
**identified** 150:6
**identity** 99:11
**ila** 69:1

**imagine** 94:19
**impacts** 183:12
**impartial** 183:13
**impartiality** 183:9
**implemented** 90:7
90:10
**inaccurate** 124:25
135:10 146:24
148:22
**inaudible** 21:3
27:22 31:2 33:1
77:20 121:21
125:7 155:17
164:16 176:18
**inches** 64:14
**include** 58:25
135:14,19,21
136:10 137:4,8
145:16,23,24
147:6,9,14,22
148:9,15 150:7,24
158:23 171:5,15
**included** 48:18
59:3 124:24
129:20 133:19
134:6,21 147:23
147:25,25 148:21
149:1,23 150:18
151:17 153:20
156:7 170:1
171:18
**includes** 37:21,22
37:24,25 38:1,18
38:19 134:19
145:12 147:15
148:2,5,7,23
**incorporates**
133:12
**increase** 73:20
74:16,20 75:18
87:18 95:16 117:2

**increases** 73:25
**incurred** 36:6 63:1
63:2 129:6
**independent** 84:6
**independently**
136:6,12
**index** 2:1 3:1
**indicates** 156:8
**indicator** 12:12,13
**individually** 69:15
**individuals** 99:6,7
99:11 116:20
144:12 150:6,20
**industry** 92:8
**influence** 78:5
**information** 23:20
27:21 30:1,14
33:11 36:23 37:20
37:21 40:10 45:7
54:22 89:7 140:10
140:14,18,22
141:1,6 146:17,19
147:13 150:5
151:10 154:14
165:7 170:7
**initial** 31:13 84:21
166:14
**initially** 13:7
45:14 60:17 159:8
170:25
**input** 37:7 54:22
89:7,9 129:10,14
129:25 130:1,18
132:6,14 146:19
150:18
**inputs** 77:10
130:16
**inputted** 129:16
**inputting** 23:4
150:4

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 200 of 216

Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[instruct - lawsuit]
Page 14

**instruct** 178:19
**instructed** 130:25
**instructing** 131:3
**instructions** 69:8
  147:17
**intended** 78:4
**interact** 86:18
**interacted** 84:15
**interaction** 71:5
**interest** 183:8
**interested** 183:7
**interviewed** 85:15
  85:16
**introduced** 152:23
  164:10
**involved** 19:16
  23:3 36:11,19
  39:25 60:10 78:17
  88:21 89:17 90:24
  91:2,10 92:20,24
  104:16 116:3,12
  116:18,23 117:23
  130:13 150:4
  159:20 162:14
  167:23 169:13
**irvine** 15:9
**issue** 19:4 106:15
  106:15
**issues** 78:1
**item** 44:25
**items** 45:2,18,20
  46:1 134:19 146:5

**j**

**j** 1:18 183:17
**jan** 2:10 93:3
**january** 143:9,11
  144:17 157:9,10
  157:25 158:19
  159:6 170:21
  173:22

**jason** 22:22 85:15
  99:17 102:5 121:1
  121:3 122:12
  141:19 149:18
  169:5
**jim** 1:13 5:1 9:3
  184:2
**job** 10:17 14:25
  15:1 18:3,6,7,18
  19:7 20:24 21:1
  22:12 85:3,5
  86:19 87:23,24,24
  141:7
**joint** 46:6
**jon** 93:1 99:13
  102:2 109:2,7,13
  118:7 169:5
**judged** 152:15
**june** 154:6 156:8
  156:22,25 172:8,9
**junior** 12:6,7

**k**

**keep** 58:13 65:24
  72:17
**keeping** 142:13
**kelly** 84:1,4 169:4
**kelly's** 169:23
**ken** 4:22
**kept** 31:8
**kevlar** 28:19 30:4
  30:6,13,18,20,23
  31:1 45:11,13,15
  89:9,12 90:1,2,7,9
  90:15,17,21,25
  91:2,5,11,13,17,20
  91:20 96:21 133:9
  135:1,5,13 136:4,9
  136:13,14,22
  137:4 143:6 144:6
  145:10,18,19,20
  146:1,4,5,8,10,12

146:15,18,19,24
147:18,22 148:9
148:14,20 149:11
149:23 150:7,18
151:9,10,11,17,24
152:6,8,11,22,23
153:1,4 154:13
155:20 159:19
170:18 171:1,18
171:20 172:5,9
**key** 12:12,13
**knew** 103:19
  150:7
**know** 5:24 6:14,15
  7:20,20 18:10,11
  19:5,6 22:1 25:1,7
  29:21 44:18 45:1
  45:25 47:21,24
  48:12 49:15 51:16
  54:4,18 55:7,17,25
  58:25 61:13 64:9
  65:8 70:9 78:3,10
  79:16 81:16 84:10
  84:12 85:4 86:6
  86:15 93:16 94:21
  96:20,25 97:2,11
  97:13,15 98:10,13
  98:18 100:8 101:3
  102:20 103:18,25
  103:25 108:24,25
  111:3 112:23
  117:15 120:2
  123:4,6,13,16,19
  123:19,20,22,24
  124:2 127:6,18
  128:4 131:6,12
  133:18 134:19
  139:24 140:1
  141:15,17 142:23
  143:11,14,17
  144:15,25 145:4

152:14 153:24
154:2,25 155:1,19
155:22 157:12,14
157:20 158:7
160:1,8,24 161:16
162:3 163:6,24
164:13 165:10,13
165:15 166:4,17
166:19,21,23
167:1,4,11,12
168:8 169:11
170:14,22,23,25
171:11,13 172:2
172:25 173:3,5
174:1,5 176:2,13
176:17,21,22,25
177:24 178:10
180:4
**knowledge** 70:11
  73:25 74:1,16
  75:17 83:2 97:3
  104:7,9 105:14
  114:15 130:11,20
  140:7 141:4
  148:17 150:2
  151:8 152:14
  159:10,14,16,17
  159:23
**known** 17:1
**kpi** 12:11
**kpis** 12:8,9
**kristin** 85:24,25
  165:9

**l**

**lack** 8:4 104:23
**larger** 34:14
**larita** 1:18 183:17
**lawsuit** 78:18 83:3
  83:13 84:8 118:12
  118:17,20,22

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[lawsuits - mailed]**

Page 15

**lawsuits** 128:23
129:1
**leadership** 97:21
98:7,24 99:2
100:2,21 106:16
108:9 110:10,11
110:13,15,16
115:19 117:24
118:4,4,8,9,14,17
118:25 120:3,20
124:1 126:6 128:5
128:12 137:15,23
138:3,20 139:7
151:20 160:2
162:6
**leads** 106:5
**lean** 64:10
**learn** 83:19 84:7
124:4 127:17
**leave** 106:2
**leaving** 18:5
**ledger** 22:25 23:1
62:21
**left** 18:1,2 163:16
**legal** 36:6 51:4
128:22 129:1,4,10
129:14 130:8,9
182:1
**lending** 20:20
**lendingtree** 12:3,5
12:17,25 13:1,4,5
13:8,13 15:5,7,12
15:18,25 16:5,10
16:13,14,16,17,19
17:2,3,6,8,15
19:13
**level** 26:6,9,19,25
27:5 28:10,13,14
28:15,20,23 29:14
31:15,24 32:2,9,10
32:15,17,20,21

36:25 37:6,22
38:1 117:8 145:6
145:9 169:22
**levels** 102:11,14
119:15 134:7
**line** 44:25 91:21
93:14 104:20,24
106:3 113:12,22
113:22 114:2,8,9
124:14 133:10,12
134:9,14,22 135:5
135:14,19 136:5
136:11,17 137:5
139:2 148:21,23
149:1,3,11,13
161:4 173:11
185:11,14,17,20
185:23 186:1,4,7
186:10,13,15
**lips** 15:14 31:3
**litigation** 7:21
110:3,7
**litsup** 182:17
**little** 6:8,10 7:15
10:25 14:17 56:12
77:23,25 81:4
84:22 117:16
121:20 137:9
140:2 179:3
180:24
**live** 9:14,20,25
10:1
**lived** 10:9
**llp** 4:15
**load** 30:4 165:19
166:1 168:4
172:12 175:24
180:7
**loaded** 145:24
146:3,8,10,12,15
147:10 152:12

**loading** 30:6
179:20
**loan** 26:19 28:10
28:13,23 29:3
33:12 34:1,13
40:15,16 46:6
66:6,12,13 139:14
**loandepot** 18:21
18:23 19:7,10
20:4,6,9,12,15
21:2
**loans** 12:4,18
19:16,18 26:11,14
27:1,14,16,20
46:15,15,21
**location** 125:19
**lock** 2:14 166:10
166:12,13,14
167:15
**log** 23:11
**logging** 23:17
**long** 12:24 16:3
20:11 21:9 52:19
52:23 53:10 79:20
80:9,25 179:4
**longer** 57:10,24
60:18 62:5 64:19
65:15
**look** 43:16 44:25
55:1,5 56:11 58:5
58:6 68:24 78:24
79:5,7 91:7
121:20 128:21
129:3 131:25
142:23 143:21
144:8 145:5
152:20 156:5,11
161:3 164:24
171:5
**looked** 67:6 70:20
71:13,16 79:4

109:25 115:12
127:8 149:12
165:22 170:20
179:24
**looking** 30:9 44:21
44:22 136:20
143:6 145:11
149:2 153:9
161:24 167:13
168:19,21 169:1,2
172:4 174:8
**looks** 143:8 156:14
157:25 165:1
166:10,24 168:19
172:22 176:10
177:14 179:24
**lose** 16:6
**loss** 28:15 29:5,8
29:10,14 31:16
33:14 37:15 92:1
92:17 93:14 95:5
101:11 111:5,9,15
114:10 115:15
124:12,20,24
125:1,6 133:19,23
135:13,18,20
136:5 137:4,8
143:12 152:4
153:2,5,12 159:6
164:5
**losses** 93:19 94:10
94:23
**lot** 45:20 78:1 80:7
**loud** 114:8

**m**

**m** 4:14 184:1
**mail** 51:11 83:21
83:22 126:14
155:24 184:10
**mailed** 123:1
127:14

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[mails - month]

Page 16

**mails** 51:15
155:13
**maintain** 174:9
175:4
**maintained** 31:21
31:23 172:7 174:9
**maintaining** 183:9
**major** 11:12
**making** 19:16
41:12 149:2 185:8
185:8
**man** 75:6,7
**managers** 97:22
116:5,15 155:6,15
155:21 159:12
**manner** 62:7 88:9
**mansell** 184:20
**manually** 184:8
**march** 1:14
**margin** 32:3
112:24 144:23
145:9
**margins** 28:8
**marked** 125:21
138:12 142:25
156:1 157:18
161:18 164:11
166:2 168:6
170:12 172:14
175:25 177:6
179:6,21 180:10
**marketing** 2:17
51:4 168:20,22
169:1,3
**markets** 28:2,3,7
28:12,24 29:3,7
33:12 40:14
**marybeth** 4:4
125:16 138:10
154:10 157:16
160:15 161:11

164:6 165:19
168:4 170:11
172:12 175:24
177:4 179:2,19
180:8
**material** 7:9 14:14
18:15 96:6 125:14
**matter** 52:25
102:25 183:9
**mean** 36:15 38:16
39:12 67:14 70:9
75:2 101:3 157:13
172:7
**meaning** 32:20
46:21 49:15 80:6
80:7
**measured** 46:5
**measures** 12:14
**medications** 78:6
**medium** 29:9 30:9
30:20
**meet** 79:17,20
85:20,23
**meeting** 79:22,25
81:5 82:9,10,11
94:2,4,18 97:21,25
98:2,4,5,7,11,13
98:16,18,24 99:2
100:2,7,21,24
106:16,21,24,25
107:4,7,19,23
108:1,8,9,13
110:10,11,13,15
110:16 112:11
113:10,17,20
115:19 117:25,25
118:5,8,9,14,17,25
120:3,21 122:9
124:1,2,5,9 126:7
128:5,12 137:15
137:23 138:3,20

139:7 144:10,11
144:12 151:20
160:2,5 162:7,20
162:21,22,24
163:14,15,17,25
169:6,9
**meetings** 79:12,13
79:23 92:20,25
93:10 94:7,22
100:2,11,13,14,16
104:17 113:2,7,8
114:1,8 117:23
118:3 135:23,23
150:5,21,25
153:12 162:17
**member** 10:23
**memory** 78:14
**mentioned** 81:23
**met** 96:24
**metadata** 2:8
154:5,11 156:6
162:9 173:21
**method** 88:9 91:16
**methodology** 59:4
59:5 63:18 65:7,9
65:14,21 66:1,17
72:19,22,23,25
73:4 139:10,11
**methods** 139:14
**metrics** 12:8
**mgibson** 4:10
**mic** 21:23
**mic's** 19:5
**middle** 9:24 54:15
114:19
**million** 56:14,15
56:20,22,24 107:8
107:12 115:20,24
118:13,15,18,23
119:10,12,17,20
120:3,16 121:5

122:2,16 123:7,17
123:22,25 124:11
124:23 126:22,24
127:4 159:5
**mind** 76:25 104:3
179:2,19 180:8
**minding** 14:11
**minimal** 55:23,24
56:1 59:19
**minute** 60:3 75:12
97:17
**minutes** 59:9
60:24 61:3 80:11
80:11 81:7 180:22
**misallocation**
100:25 107:7,9,12
107:13,17 118:12
118:18,24
**mischaracterizes**
103:12 121:10
124:16 127:1,22
128:7 149:6,16,25
**misread** 149:12
**misreading** 108:15
**missed** 167:8
**mistake** 107:19,20
108:16 149:2
**misunderstanding**
101:10 103:16,20
107:21,25 109:3
109:14
**misunderstandin...**
116:6
**misunderstood**
109:6 176:16
**mixed** 25:18
**modified** 157:8,12
**modify** 157:9
**money** 72:10
**month** 22:18
33:15 44:25 51:17

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

52:5,16 53:9 54:3
54:25 58:3,4,9,10
58:17,17,19 59:2
66:7 69:21 133:4
143:23 144:9
155:3
**monthly** 29:15,18
33:9 37:14 45:24
63:3 88:12,19,20
88:23,25 89:3
92:21 93:11
104:16 113:5,6,8
133:6,7 144:5
150:21 153:12
155:10,14
**months** 52:25
88:22 93:14,16,17
93:20 94:11 178:1
178:2,2,4
**mooth** 5:19
**morning** 5:6
**mortgage** 20:20
**move** 65:4
**moved** 45:3
**multiple** 79:22
82:1 111:19 160:5
**multiply** 34:22
52:4
**muth** 1:13 5:1,7
5:18,21 6:5 9:3,4
60:7 68:19 74:24
75:22 120:11
125:18 160:22
166:5 177:8 181:3
181:6 184:2

**n**

**naf** 2:4,6,8,9,11,12
2:14,16,18,19,20
2:21,23 3:4,5 4:22
4:23 10:17 22:1,4
22:7 29:20 31:21

38:19,23 39:14
40:1 47:13 48:10
49:21,24 58:13,13
60:17 81:11 82:20
82:24 83:16 84:13
84:18,20 85:2,12
86:16,19 87:3,6
89:19 90:3 97:23
100:3,17 101:5,9
101:10,22,25
103:24 107:25
108:9,12 109:1,13
115:14 117:3,23
118:4 120:4
124:21 126:19
127:8,18 130:1
136:2 137:15
138:21,22 140:11
141:10,12 143:19
143:22 152:1,13
152:15 156:12
167:21
**name** 5:18 9:1
16:6 25:6 85:9
87:17 99:10
**names** 10:5
**national** 10:23
**near** 111:22
**necessarily** 57:11
58:16 59:8 67:4,5
81:1 95:9 144:6
145:22 160:14
**necessary** 185:9
**need** 6:17,20,23,25
7:5,9,10,23 51:16
55:5 57:20 58:8
73:23 74:5,19
164:25
**needed** 69:10
141:6 165:7

**needs** 15:15
**never** 10:18,21
16:16,17,22 78:13
100:13 116:1
180:1
**new** 1:8 5:9 13:21
21:20,22,24,25
69:6
**newport** 9:8,9,15
**njackson** 4:11
**nods** 6:22 7:13
19:1 63:6 130:6
150:13
**nonprescription**
78:6
**normal** 6:23 142:2
**normally** 155:11
**northeast** 35:18
35:21
**northern** 1:2 5:11
9:24
**notaries** 182:6,15
**notarized** 182:15
184:10
**notary** 186:23
**noted** 185:3,4
**noticing** 64:16
**noting** 184:7
**nov** 2:10
**november** 52:17
52:18 86:10 87:8
158:1,19 159:6
162:10
**number** 30:23
34:11,23 35:25
41:3,4 43:1 46:18
69:22 113:23
114:2,3 126:22,24
127:4 129:10,13
131:12,16 132:1
132:12 134:18

145:7 161:4
**numbers** 23:4,8
24:10,19 40:19
42:16 61:23 63:21
129:8,23,23,25
130:17 131:17
132:2
**nw** 4:16

**o**

**object** 24:3 26:20
31:9 36:14 48:21
53:2 59:14 61:15
63:7 67:1 68:17
74:2,8 89:21
92:12 95:1 97:6
100:4 101:13
103:11 105:21
108:2 114:4,12
115:2,21 120:6
121:7,9 122:17
123:9 126:25
135:3 136:23
137:16 147:1
149:5,15,24 150:9
152:17 154:9,15
169:18 171:8
**objected** 36:17
**objection** 54:6
74:23 75:20 95:18
95:23,25 96:7
106:8,17 108:19
116:8 119:22
124:6,15 125:3
126:8 127:21
128:6,13 129:17
130:3 144:20
151:13 161:6
167:6
**obligation** 183:9
**obradovich** 22:22
81:14,16,25 82:1

Jim Muth
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[obradovich - p.m.]**                                                    Page 18

82:16 85:15,21
86:15,19 91:10
92:22 93:7 99:17
102:5 104:8 121:1
121:3 122:9 135:9
138:25 141:2,19
148:20,25 149:10
149:21 150:23
**obtain** 14:3,22
87:12 89:8 109:5
109:12
**obtained** 53:12
**obtaining** 14:19
**obviously** 85:12
151:15
**occur** 47:17 93:10
**occurred** 15:23
47:24 49:16 54:18
54:20 107:22
108:13 118:9
**ocga** 182:20 185:6
**october** 161:1,2,4
170:19 171:2
**office** 111:22,23
112:6,6,7,9,12,14
113:3 184:10
**officer** 183:13
**offices** 9:10 184:3
**oh** 11:3
**okay** 5:21 8:12,14
9:9,23 10:22 11:3
11:8 13:3,17,23
14:1,16 15:3,25
16:19,22 17:1,5,10
18:2 19:4 20:21
21:6 23:24 24:23
25:9 27:8 28:9,22
29:13 30:20 31:24
32:8,13,19 33:4,25
35:8,17 36:11,25
37:17,19,25 39:2

39:10,17,21 40:10
41:20 42:18 43:10
43:13,16 45:10,17
47:19 48:7 51:5
52:14 53:10 54:12
54:19 55:5,15
56:6,15,19,24
57:14 58:23 60:10
61:2 62:4,9 63:2
65:13 66:14 68:4
69:5,8,13 70:18
72:23 73:3,14
76:1,3 77:16 78:13
79:1,7,16,20 80:9
81:19,22,24 83:22
84:12,17 85:1,16
85:20,23 86:5
87:9 88:8 89:2,6
89:12 90:6,13,17
91:8 92:7,9,16
93:2,4 94:14,16
96:20,24 97:3,13
97:25 98:18 99:7
99:14,16 100:1,15
101:18,20,23
102:4,19 104:12
104:16,23 105:1
105:12,19 106:5
107:10,21,24
108:11,23 109:10
109:19 111:4,8,18
113:6,10,15
114:24 116:3
118:3 120:2,15,19
121:2,19 122:14
123:5,15,20,24
124:11 126:2,22
127:4,7,13 128:4
128:11,21 129:9
129:13 130:12
131:15,22 134:4,9

134:14,22 135:12
135:22 136:20
137:11 138:6,13
139:16,21 140:1
141:14,20 142:6
143:4,5,10 144:4
144:15 146:6,9,14
146:17 147:17
148:25 151:9
152:10 155:8,20
156:16,19 157:15
160:7 161:23
162:21 163:18,24
164:2 165:10,18
166:15 167:1,17
167:23 168:3
169:10 170:6,10
170:16 172:2,5,18
172:23 174:7
175:15 176:22
177:18,22 179:1
180:1,16
**ola** 2:4,9 69:1,2
125:24
**once** 23:17 28:22
86:24,25 109:8
177:8 184:10
**one's** 179:3
**ones** 43:13 46:6
80:22 97:5 99:10
154:25
**online** 156:14
**opinion** 173:22
**opposed** 17:15
41:25 43:5,22
69:13,14 90:14
114:25 115:7
**order** 77:24 137:3
**ordering** 184:14
**organizations**
10:23,24 11:2

**original** 184:13,16
**outcome** 183:7
**outside** 82:15,20
82:24 83:15 142:9
**overall** 167:18

**p**

**p&l** 2:6,9 45:12
61:9 68:3,5,6
69:21 91:6,21
92:10 103:2 113:9
113:13,15,18,20
114:3,9 117:13,14
117:18,20,20
127:20 132:14,21
136:10 138:22
143:8 144:11
148:7 154:19
157:25 158:18
161:24 172:9,22
176:10,11,14,23
178:23
**p&ls** 61:9 68:1
74:14 88:1,2,4,6
88:10,18,19 90:11
92:21 93:11,20
94:10,23 95:4,13
96:18,20 97:4,11
97:14 99:25
104:17,20 106:3
108:16 109:3,6,14
112:20 113:11,22
115:18 130:13,18
134:18 135:5,24
136:17 139:6,19
144:5,10 147:15
150:5,21 151:3,5,5
151:6 152:9,11
162:18 177:14,15
**p.c.** 4:5
**p.m.** 1:15 60:5
97:19 160:20

181:2,7
**page** 2:2 3:2 32:20
92:10 156:11,12
185:11,14,17,20
185:23 186:1,4,7
186:10,13,15
**pages** 185:9
**paid** 159:13
**part** 13:2 17:5
21:21 25:11 27:17
27:23 35:5 36:18
45:4 47:10 48:18
55:16 58:4 59:1
66:19 67:17 68:6
72:4,25 79:11
89:2 104:2,14
118:3 119:10,13
119:18 124:5
127:10,19
**partially** 60:19
**parties** 182:22,25
183:13 184:14
**party** 182:22
183:7,10
**password** 154:20
154:22,24 155:2
**pause** 113:21
**pay** 13:20 34:14
67:16,20 87:18
**pdf** 184:7,7
**pending** 5:10 7:11
**people** 19:23
87:15 91:4 94:9
94:19 99:12
101:22,25 116:14
119:11,13,18,19
120:4,16 122:2
127:18 144:7
146:18,22
**percent** 46:11 51:7
56:2,3,4,5,25

61:22,23 169:11
**percentage** 34:3
34:14 41:21,22,23
50:8,9,12 51:25
52:1,4,21 53:7,11
53:12 55:19 61:7
61:11 66:6 68:8
131:18 132:8
**percentages** 51:21
**perform** 14:23
**performance**
12:12,13 14:6
**performing** 12:15
**period** 28:15
106:12 129:3
140:2 158:18
159:6 163:15
**periodically** 58:22
**periods** 178:24
**perlowski** 4:14
5:15 6:2 18:9 24:3
24:6 26:20 31:9
36:14 48:21 53:2
54:6 59:14 60:2
61:15 64:15 67:1
68:17 74:2,8,23
75:8,20 76:21
77:1 83:6 89:21
92:12 95:1,18
96:2,5,7 97:6
100:4 101:13
103:11 105:21
106:8,17 108:2,19
114:4,12 115:2,21
116:8 119:1,22
120:6 121:7,9
122:17 123:9
124:6,15 125:3,11
125:15,18 126:8
126:25 127:21,25
128:6,13 129:17

130:3 135:3
136:23 137:16
144:20 147:1
149:5,15,24 150:9
151:13 152:17
154:9,15 156:18
157:5 159:15
160:17 161:6
164:9,24 165:24
167:6 169:18
171:8 173:14
178:11,19 181:5
184:1
**person** 6:11 74:25
82:7 137:5 142:4
169:7
**personally** 51:5
**pertained** 116:24
**pertaining** 48:18
**pertains** 95:16
**phone** 51:10 82:8
85:18 142:4,5
**physically** 18:22
**pick** 14:8 18:17
21:23 33:2 36:18
47:5 53:17 91:23
121:23 133:25
134:2,16 135:24
162:12
**picked** 15:4
**picking** 19:5
**pie** 79:6,8 120:18
120:19,24 121:3
121:19,25 122:11
122:14,16,25
123:5,15 126:2,16
126:19 128:11
129:23 131:7
137:14 160:8
**piedmont** 4:6

**place** 57:19 63:16
66:20,23,23 76:11
80:1 82:5 90:2
98:1,19 100:3
159:21,24 162:25
169:6
**placed** 35:3 45:10
72:6
**plaintiff** 1:5
**plaintiff's** 2:3 3:3
125:21 138:12
142:25 156:1
157:18 161:18
164:11 166:2
168:6 170:12
172:14 175:25
177:6 179:6,21
180:10
**plaintiffs** 4:2
**play** 91:17
**please** 61:4 170:11
178:11 184:6,10
184:18 185:9,9
**point** 16:1,9 17:3
17:12 21:16 25:21
31:8,22 37:20
49:4,5,9 52:14
53:14 55:2 57:3,4
60:18 63:16,18,23
64:3 65:6,9,13,14
66:1,5 67:11,18
69:24,25 72:7
78:4 90:3 116:1
123:25 138:4,7
139:3
**points** 65:22,22
66:13 67:6,7,10,12
69:7,12,18,22 70:5
70:7,21,22,25 71:2
71:5,10 126:1
139:15 167:15

Jim Muth

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**pole**  87:2
**portion**  33:4 40:22
  71:20 126:18
  158:21
**position**  22:6
  36:19 84:21 85:19
  87:6,21
**possible**  7:8 71:21
  155:8
**possibly**  80:21
  105:11 155:9,12
**post**  2:14 166:10
  166:12,13 167:15
**postgraduate**
  11:22
**potential**  46:2
**practice**  59:22
**preparation**  29:17
  33:8 80:4,13,16,19
  117:25 137:23
**prepare**  28:21
  29:10 62:18 63:11
  78:21 79:2 80:15
  80:20,22 81:7
  88:1,2,5,9,25
  98:23 99:1,18
  100:15,19,20
  107:3 109:21
  110:9,14,19,22
  111:2 118:4 126:5
  136:22 139:1
  144:9 155:2 158:2
  158:5 160:4 162:1
  165:7 166:15
  174:11 175:1
  176:7 177:22
  178:3,5,6,9
**prepared**  30:3
  88:18,20 90:11
  92:2 93:11 96:24
  106:3 108:17

109:15 113:13
  117:13,14,18
  123:5,15 124:20
  125:6 133:24
  135:1,13,18,20
  137:7 144:5,12
  145:8 152:5 158:7
  158:13,14 159:8
  160:1,13,23 162:3
  164:4 165:3,4
  166:17,19,21,23
  172:23 173:1,3,19
  173:24 174:1,18
  174:22 175:5,9,12
  175:16,18,18,21
  175:22 176:14,15
  176:17,21 177:1
  177:25
**preparing**  28:19
  31:24 32:10 37:14
  57:14 80:23 89:17
  90:10 91:10 98:20
  98:22 99:20
  117:19 130:13
  138:4
**prescription**  78:6
**presence**  82:15,20
  82:24 83:16
**present**  4:21 31:22
  82:11,14 87:6
**president**  84:23
  87:7
**preslo**  92:9 93:3,7
  105:7 150:22
**pretend**  70:10
**pretty**  87:11 113:5
  180:22
**previously**  65:23
  170:20
**price**  166:13

**pricing**  28:8
  116:13,20
**print**  136:4 184:8
**printed**  144:11
  153:21,25 156:13
  171:14,22,23,25
  172:3,6,9
**prints**  89:10
**prior**  49:9,11
  55:21 79:18 96:11
  100:13,24 107:6
  117:24 120:2
**privileged**  83:7
  119:3 178:20
**privy**  140:18
  144:13
**probably**  51:13
  123:1 143:20
  165:9 169:5
**problem**  78:14
**procedure**  185:6
**proceeding**  182:16
  183:6,12
**process**  6:9 23:15
  31:14 33:10 65:4
  68:12,14,23 69:6
  69:19 70:14 72:11
  73:8 85:13 90:13
  130:21
**produce**  58:8
  122:11 136:9
  143:19 174:17,20
  175:11
**produced**  75:1,7
  75:10 97:12 110:3
  110:6 122:14
  143:10 165:15
  167:2,5,11 173:5
  174:24 175:3,8,20
  182:5,13

**product**  33:14
  133:9
**production**  12:15
  174:14 182:5,14
  182:15 184:19
**professional**
  183:10
**profit**  28:15 29:5,8
  29:10,14 31:16
  33:14 37:14 91:21
  92:1,3,10 101:10
  104:21,24 106:3
  110:24 111:5,9,15
  113:13,22 114:2,2
  114:10 115:15,20
  115:24 124:12,20
  124:24 125:1,5
  133:10,12,18,23
  134:10,14,22
  135:13,14,18,19
  135:20 136:5,11
  136:17 137:3,5,7
  139:2 143:12
  148:21,23,24
  149:1,11 152:4
  153:2,5,12 164:5
  173:12
**profitability**
  103:17,20 109:15
  129:24 152:1,15
**profitable**  95:13
  96:13,16 101:1,2,6
  101:6,12 103:9
  108:17 114:17,22
  115:6 163:7,22
  167:25
**profits**  90:18
**program**  90:25
  91:3
**progress**  20:8 21:6

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

[prohibited - reduction]                                                      Page 21

**prohibited** 182:20
**projection** 77:16
**promoted** 87:7
**pronouncing** 5:18
**prospective** 77:16
**protected** 154:20
  154:23,24 155:2
**provide** 27:7 89:3
  140:14
**provided** 27:25
  110:2 126:13
  129:10 136:7
  137:22 140:19,22
  141:1 151:10
  152:7 154:17
**provides** 28:1,12
  28:13
**providing** 12:20
**proximity** 112:13
**public** 186:23
**pull** 27:14 64:10
  129:25 132:12
  138:10 145:9,10
  146:4 170:6
**pulled** 145:16,18
**pulling** 33:10
  69:14
**purportedly** 156:6
**purpose** 10:15
  30:5 113:7 142:11
  158:4,13 160:12
  160:13 164:2
  168:17
**pursuant** 185:6
**pursue** 11:19
**put** 22:17 23:8
  26:6 30:1 37:20
  37:21 40:7 46:17
  68:1,7 69:21
  89:13 95:23
  120:18,20 121:17

129:22 177:20
**puts** 60:7
**putting** 26:9 40:5
  109:17

**q**

**q1** 143:13,16
  144:17
**q2** 144:17
**q3** 143:13,16
  144:17
**qualified** 35:8
**quarter** 115:19
  143:15
**quarterly** 29:16
**quarters** 88:22,23
  89:1
**question** 6:13 7:1
  7:11,22,24 8:2,5
  8:20 14:12 17:21
  24:11 26:22 33:21
  34:16 48:8,22
  68:10 77:24 96:4
  107:10,11,24
  109:4 115:3
  122:21,22,23
  124:18 125:11
  136:15,16 137:9
  137:12,17 138:23
  146:8 164:14
  175:2 177:9
**questions** 6:10
  7:17,18,19 8:7
  75:3,12 119:4
  127:13 182:7
  183:4
**quick** 48:7 181:1
**quickly** 7:8 115:5
**quite** 34:16

**r**

**raise** 6:14 13:20
**ran** 95:25
**ranch** 18:24
**raw** 44:3
**reach** 50:17 51:6
  51:10,11 52:20
  53:8
**reached** 50:14
  51:1,2 53:11
  85:11
**reacting** 163:19
**read** 5:21 6:2
  14:14 15:14 18:15
  31:3 96:3,6
  125:11,14 149:2
  184:6 185:2
**reading** 14:11
**real** 48:7
**realize** 127:9
**really** 60:21 79:11
**reason** 7:6 55:15
  64:13 99:19
  145:15 153:15,18
  185:13,16,19,22
  185:25 186:3,6,9
  186:12,15,17
**reasons** 185:8
**recall** 24:13 79:10
  79:11,21 91:9
  94:12 96:14 98:25
  99:3,4 101:23
  102:8,18 107:1,5
  109:17,23 111:17
  111:21 112:20
  113:1 114:24
  115:5,23 117:22
  118:6,10 121:4,8
  121:14,16,17
  127:16 128:15
  138:6 148:19

155:7 158:6,9
  162:16 163:9,13
  163:14,19,23
  165:4 168:2
  169:16 178:13
**recalled** 103:10
**received** 25:22
  171:1
**receives** 182:23
**recess** 60:5 97:19
  160:20 181:2
**recognize** 157:22
  161:21 164:15,17
  164:21 166:7
  172:18 176:5
  177:9,11 179:9
  180:4,14
**recognizing** 46:3
  68:4
**recollection** 81:3
  93:13 115:14
  117:6,8
**reconcile** 61:2
**reconciliation**
  26:19
**record** 7:2 8:3 9:2
  14:10 15:16 18:14
  31:4 117:16 122:6
  125:20 183:5
**recorded** 45:7
  71:9 90:18
**records** 58:13
  140:11
**recruited** 85:6,7
**recruiter** 85:8,11
**recruiter's** 85:9
**reduced** 61:6,11
  61:13 64:24 67:24
  68:7 183:5
**reduction** 71:22
  73:6,9

Case 1:20-cv-04981-CAP   Document 92   Filed 04/28/22   Page 208 of 216
Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[reed - retail]

Page 22

**reed** 93:1,6 99:13 102:2 104:10,11 104:13 105:10,16 105:16,20 109:2,7 109:14 118:7 150:22 169:5
**refer** 21:25
**referenced** 24:12 44:9
**referred** 40:23 41:6,9 66:14 126:3 152:4
**referring** 42:1 74:7 107:16 150:20 152:5,6,9
**reflect** 8:4 132:18 132:24 153:5,22
**reflected** 113:13 126:19 127:19 131:17 132:2 133:13,20 134:11 134:25 139:6
**reflection** 151:25
**reflective** 131:8 132:7
**reflects** 7:2 131:17 131:18
**refresh** 81:2 117:8
**refreshed** 115:13 117:6
**regard** 40:4 57:24 83:7 96:20
**regarding** 101:19 124:8
**region** 33:6 77:18 114:17,18,21 115:6 117:7 163:7 163:22 167:25 169:22,24 170:3,5 172:22 173:9

**regional** 2:12 97:22 116:4,15 155:6,15,21 159:12 165:1
**regionals** 143:24 144:1 154:14,16
**regions** 39:7,9,10 39:11,12,15,22 43:5,22 44:7 45:4 46:2 167:18,21
**register** 129:7 176:20
**regularly** 86:19
**relate** 20:5
**related** 10:14 43:7 43:9 89:18 107:3 118:22 142:3 182:16
**relating** 169:17
**relationship** 86:23 182:20 183:8
**relative** 183:6
**relatives** 9:16,17 9:20,25 10:1,1,4
**reload** 30:25
**remain** 16:3
**remaining** 46:13
**remember** 15:22 49:7 52:16 53:24 53:25 54:11 55:12 55:13,18 56:16 80:23 84:16 85:10 93:24,25 94:2,4,8 94:14,16,18 104:4 110:18 111:11,14 112:11 115:9 128:18 155:9 158:12,14 163:4
**remind** 117:16 119:1

**reminded** 8:18
**reminder** 119:6
**remote** 1:17 113:5 115:8
**removed** 46:1 71:19
**removing** 71:8
**repeat** 26:22 29:1 31:11 91:24
**repeated** 55:15
**repeating** 117:17
**repetitive** 6:9
**rephrase** 7:24
**report** 23:17 29:8 29:10 45:11 91:20 127:6 136:5 137:10 143:6,18 145:8,10,16 146:4 146:7,24 147:5,9 147:22 150:18 154:5 156:25 166:11 170:18 171:1,14
**reported** 138:22 139:17,18,19
**reporter** 5:24 6:18 8:22 14:13,14 18:15 96:6 125:13 125:14 182:8,11
**reporting** 19:11 19:12,14,17 22:18 26:7,9,25 141:19 148:14
**reports** 12:8,20 28:20 31:15 63:3 89:10 136:16 143:22 145:18 149:11 150:7 151:9,11 155:20 172:5 182:24

**represent** 5:8 143:14 156:5
**represents** 182:4,9
**request** 122:12 182:17,25
**requested** 14:14 18:15 96:6 125:14 126:14
**requests** 174:15
**resay** 33:21
**research** 84:6
**reserved** 181:8 184:6
**reside** 9:5
**respect** 53:5
**respond** 51:20
**response** 6:25 18:10 35:6,9 55:16 95:7 119:4 123:4
**responses** 6:21,24
**responsibilities** 87:12
**responsive** 174:14 175:6
**rest** 69:19 166:25
**result** 116:6 151:19
**retail** 38:18 39:1,2 39:6,18,21 40:9 41:7,9,13,17,21,24 42:4,8,11,18,22,24 43:11 46:15 47:10 48:20 49:2 51:17 55:22 57:6,12 61:5,10,25 62:12 63:12 64:23,25 67:19,24 68:6,15 69:3,16 70:16 71:23 73:6,21 74:17,21 75:19

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

**[retail - run]**

Page 23

| | | | |
|---|---|---|---|
| 77:6 88:6,10,18 | 19:12,15,23 20:1 | 81:2,5,10 82:4,7 | 148:9 151:1,4,15 |
| 92:2 95:12,17 | 20:11,14,17 21:1,6 | 82:10,13 83:25 | 152:22,23,25 |
| 96:11 97:14 98:12 | 21:9,25 22:6,10,15 | 84:14 85:1,4,7,9 | 153:15,18,24 |
| 114:10,16,21 | 22:19,23 23:3,7,11 | 85:11 86:2,9,13,18 | 154:2 155:10,13 |
| 115:18 124:14 | 23:14,19 24:9,12 | 87:2,5,14,20,23 | 155:23 156:3,21 |
| 125:24 126:21 | 24:15,17 25:6,14 | 88:4,21 90:1,9,24 | 156:24 157:4,8,12 |
| 127:11 129:2,7,24 | 25:17 26:4,8,13,17 | 91:20 92:24 93:6 | 157:22,24 158:2,4 |
| 130:9,22 131:9,11 | 27:3,11 28:3,7,12 | 93:10,13,18,22 | 158:7,12,16,23 |
| 131:19,21 132:3 | 28:18 29:9,19,25 | 95:7,10 97:17 | 159:1 160:4,11 |
| 132:10,13 133:1 | 30:5,8,12 31:6,20 | 98:3,6,10,23 99:1 | 161:10,21 162:3,9 |
| 138:22 148:15 | 32:16 33:8,19 | 99:4,10,18,24 | 162:14,24 163:2 |
| 152:1,16 153:6 | 34:2,17 35:1,23 | 101:4,8 102:6,9,13 | 164:13,23 165:10 |
| 157:25 158:18,20 | 36:2 37:9,12 38:9 | 102:16,25 103:3,7 | 166:9,17 167:4,20 |
| 158:21,22,24 | 38:17,22 39:5,10 | 103:16,19,23 | 168:10,13,15,17 |
| 166:25 167:14 | 40:3,14,19 41:1,4 | 104:8 105:4,7 | 169:16 170:17,25 |
| **return**  62:19 | 41:11 42:15 43:3 | 106:14 108:25 | 171:13,22 172:11 |
| **returned**  184:12 | 43:20,24 44:3,6,9 | 109:11,21,24 | 172:20,25 173:11 |
| 184:15 | 44:13,18,24 45:6 | 110:2,5,9,18,21 | 173:21 174:13,17 |
| **reveal**  83:7 119:2 | 45:23 46:8,13,20 | 111:1,13,22,25 | 175:3 176:7,9,25 |
| 178:20 | 46:21,23 47:7,12 | 112:5,8,12,14,15 | 177:3,13,15,24 |
| **revenue**  19:17 | 47:16,22 48:13,16 | 112:19,23 113:19 | 178:8,16 179:13 |
| 29:6 90:18 149:3 | 49:5,8,11,18,24 | 113:25 117:5,15 | 179:18 180:6,9,21 |
| 149:13 | 50:4,9,12,16,20,23 | 119:9,12,17 | 184:6 |
| **review**  80:4 99:21 | 51:5,14,20,23 52:3 | 120:23 121:15 | **road**  4:6 |
| 99:22,24 113:9 | 52:8,18,24 53:4,10 | 122:3,8,10 124:3 | **role**  19:20 31:7,7,8 |
| 184:6 | 53:19,21 54:15,22 | 125:10 126:5,13 | 40:3 63:11 87:9 |
| **reviewed**  78:25 | 57:4 58:2,16,23 | 126:16 127:7 | 87:11 89:2 |
| 80:12,13,16,19 | 59:13,21,24 60:13 | 129:5,22 130:7,17 | **rolling**  2:6 |
| 117:5 | 60:22 61:19 62:2 | 130:25 131:6,25 | **roswell**  184:22 |
| **reviewing**  12:19 | 62:15 63:11,19,19 | 132:11,17,20,23 | **rough**  61:23 |
| 30:13 80:9 81:3,6 | 63:25 64:9,12,24 | 133:3,7,22 134:15 | **roughly**  56:24 |
| 113:11,18,20 | 65:2,8,11,19 66:8 | 135:5 136:1 | 126:23 |
| **rick**  111:5,9 | 66:11,12,17,22 | 138:17 139:5,9,11 | **row**  156:10,11,18 |
| 149:18 | 67:5,10,15,23 | 139:13,24 140:4,7 | 161:2 |
| **right**  5:18,21 6:7 | 68:11 69:17,24 | 140:14,17 142:8 | **rpr**  1:18 183:17 |
| 8:7 9:4,7,10,14,20 | 70:7,10,11 71:4,12 | 142:11,17 143:7 | **rude**  7:1 |
| 9:23 10:7,9,14,17 | 71:18 72:15,17,20 | 143:21,25 144:9 | **rule**  119:2 185:6 |
| 10:22 11:4,12,15 | 73:9,16 76:3,8,10 | 144:15 145:4,11 | **rules**  8:8,15 185:6 |
| 12:24 14:22 15:3 | 76:20 77:23 78:13 | 145:15,23,25 | **run**  12:8 23:17 |
| 15:18,22 16:9 | 78:17 79:5,13,22 | 146:12,22 147:8 | 112:13 |
| 17:14,18,22 19:9 | 79:25 80:3,6,18,22 | 147:12,18,20 | |

Jim Muth

Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[santa - speak]

Page 24

**s**

**santa** 20:23
**saved** 133:3,5,6,8
**saw** 96:18 97:4,11
  97:13,15 122:5
  137:21 138:4
  141:22
**saying** 8:13,23
  15:15 35:9,9
  51:16,21 63:22
  76:25 78:11 95:24
  95:25 119:5
**says** 6:20 74:13
  154:6 156:11
  157:9 173:22
**scott** 139:24 140:1
**scratch** 70:14
**screen** 6:12
**se** 2:16
**seal** 184:13
**search** 174:13
**searched** 175:5
**second** 122:6
  156:11,12,16
  161:1,4
**see** 15:15 42:9,16
  55:1 58:3 97:16
  103:4 128:23
  129:3 138:1 141:5
  145:5,7 151:1,4,10
  156:9,19,21,23
  159:2
**seeing** 103:2
**seen** 117:20
  168:10,13 170:22
  179:11 180:1,16
**send** 144:5,7 155:5
  155:21 184:13,18
**senior** 4:23 13:15
  13:18 14:23 15:5
  15:11 17:16 19:8

19:9,22 20:1,8,25
  21:7
**sense** 32:6
**sent** 155:14,23
**separate** 39:15,19
  39:20,23 41:15,17
  41:19,20 42:20,23
  102:7 174:9
**separated** 170:23
**separately** 41:8
**september** 143:9
  143:11 144:18
  170:21
**serve** 183:12
**services** 15:19,20
  182:23
**servicing** 48:10,14
  49:10,12,22 50:7
  50:15,18 51:8,17
  51:25 52:2,6,9,20
  52:22 53:5,8,14,23
  55:3,11,21 57:1,5
  57:9,25 58:10,19
  59:1,6,11,20,23
  60:15,19 61:8,9,9
  61:12,24 62:6,10
  64:4,20 65:1,17,23
  66:4,25 67:9,13,16
  67:21,25,25 68:1,2
  68:2,5,9 69:1,2
  70:2,8,25 71:6,9
  71:14,19,24 72:5
  72:15 73:1,3,5,7
  73:11,17
**set** 46:4 138:17
**share** 125:19
  143:22 144:2,4
  154:19
**sharing** 162:15
**shawn** 10:6

**sheet** 68:8 72:6
  173:21
**shift** 63:20
**shifted** 64:22
  66:24
**short** 52:24 53:4
  53:21 160:17
  163:15
**show** 47:8 54:20
  57:19,20 58:3,8
  75:9,11 89:14
  92:3 115:20 135:5
  136:14 164:5
  178:18
**showed** 92:10
  109:15,18,19
  115:23 121:3,25
  171:2
**showing** 29:14
  92:17 95:5
**shown** 93:15
  115:24 163:25
**shows** 136:14
  162:9 173:9
**side** 43:12,14
  46:23 138:17
**sign** 5:22 6:2 17:7
  184:6
**signature** 181:8
  183:15 184:2,16
  186:20
**signed** 184:10,12
  184:15
**silent** 120:12
**similar** 19:12
  87:11 100:19
**simplify** 51:1
  67:11
**simply** 30:20
  71:21 88:23

**single** 53:9
**sir** 180:25
**sit** 105:15 131:6
**six** 178:1
**socialize** 142:9
**software** 22:25
  23:1 28:18 148:14
**solely** 35:25 43:21
  46:7 183:11
**solutions** 1:7
  182:1
**somebody** 74:5
  79:14 94:16
  123:18
**sorry** 8:11 12:22
  18:9 25:11 26:22
  31:11 34:5 35:6
  63:24 69:2 107:14
  108:5 109:8,10
  114:19 116:16
  118:1 122:21
  127:25 128:19
  145:1 155:18
  167:8,14
**sort** 9:16 11:23
  12:16 37:12 78:7
  78:14 84:7
**source** 136:21
  137:6
**southeast** 2:11
  35:17,19 114:17
  114:21 115:6
  117:7 143:8
  161:24 163:7
  166:24 167:14,15
  167:17,25 169:24
  170:3,4,18 177:17
  177:19
**space** 64:14
**speak** 5:23 73:23
  74:20 79:17

**speaking** 25:19
32:23
**spearman** 1:4 5:8
84:10 89:18 116:5
116:14,21,25
162:18
**specific** 20:6
121:14 142:2
143:15 182:21
**specifically** 94:5
94:15,19 98:25
99:3 102:18
103:18 104:5
107:5 108:24
109:23 110:20
111:11 112:10
114:25 119:25
123:23 128:2
129:8 140:9
143:17 145:3
148:19 154:1,4
158:15 163:4,13
165:4 166:22
167:3,10,12
**speculating**
144:16
**speculation** 74:9
75:21 95:2 97:7
100:5 106:18
108:3,19 120:7
123:10 124:6
136:24 147:2
152:18
**spend** 80:9 169:23
**spending** 51:7
**spent** 50:15,17
51:17 52:2 60:24
72:14
**split** 36:21 39:2,6
42:1,3 61:25
68:25

**spoke** 141:22,24
**spread** 36:9
**spreadsheet** 2:18
2:19,22,23 3:4,5
23:18,20 26:18
30:2,3,6,10,15,21
30:24 40:20 45:6
55:1 89:9 148:2,5
150:19 155:1,5,14
**spreadsheets** 26:1
26:2,5 27:4,9
29:13 57:15 89:13
90:19 132:22,24
133:8 152:7
**stand** 180:25
**start** 41:22 65:25
70:13
**started** 48:4,4
70:17 84:20,24
**starting** 11:25
48:1
**state** 9:1,16 10:2
10:10,12,15 11:6
11:13 12:1 183:2
**stated** 7:3 183:4
**statement** 23:16
28:25 29:4,5
62:18 65:20
124:13 125:1
134:11 136:10
143:12 153:20,24
185:8
**statements** 28:16
29:17 31:16,25
32:11 33:9 63:12
88:17 92:2 101:11
111:6,10,16
115:15 116:7
124:21,24 125:6
133:19,23 135:13
135:18 137:8

151:6 152:5 153:2
153:12
**states** 1:1 5:10
**stay** 12:24 20:11
21:9
**stearns** 20:18,19
20:22,24 21:7,10
21:13,14,17,19
**step** 27:3 37:19
39:13 70:18
112:14 147:12
**stipulation** 5:14
**stomp** 6:14
**stop** 6:15 72:18,21
**stops** 74:19
**street** 4:16
**strike** 54:23
165:24
**studied** 11:7
**stuff** 145:19,20
**subcontractor**
183:11
**subdivisions** 39:3
39:5
**subject** 178:21
**submitted** 146:23
182:8,11
**subscribed** 186:21
**substance** 185:7
**substantially**
117:2
**subtracted** 63:3
**successor** 69:9,9
**sued** 36:4,6 78:18
78:19
**suite** 4:7,17 184:21
**summary** 2:13
165:1
**superior** 75:17
**supervise** 86:22

**supervising** 87:14
**supervisor** 22:19
22:21
**supplemental** 75:1
**supposed** 131:1
**sure** 5:17 7:2
14:13,16 23:8
25:20 26:24 31:13
33:22 34:6 38:4
48:25 53:12 59:18
60:4 94:12 97:2
99:5,8,9 102:2
108:7 109:5 115:5
116:18 122:12
124:20 131:16
132:1,7 134:5
135:17 137:12
138:24 149:10
153:19 168:25
169:11 172:10,24
178:2
**surmise** 110:22
**surprise** 92:9
122:15,24
**surprised** 96:15
163:20
**switch** 65:9 69:7
69:11
**switched** 65:6 67:6
**sworn** 5:2 186:21
**syllable** 122:6
**system** 23:12
34:15 43:15,16,17
44:10,24 45:20,23
46:4,7 47:3 60:8
90:1,2,7,9 91:5,11
91:13 133:4

| t |
|---|

**take** 5:12 7:11
8:22 14:18 23:15
28:10 34:10 39:13

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[take - understand]

Page 26

40:19 41:14 46:8
52:3,8 60:3 76:11
77:1 79:25 82:4
95:8 97:17 130:17
147:12 160:17,19
162:24 164:24
179:4 180:22,24
181:1
**taken** 1:17 10:18
10:21 46:9 61:23
183:4
**talk** 74:5,25 140:8
142:4 180:23
**talked** 59:18 62:2
81:10 113:14
124:8
**talking** 22:1 38:5
57:23 58:23 59:9
60:24 63:19,25
138:24
**tax** 62:19
**team** 91:4
**teams** 82:9,10,11
**technical** 6:16
**tell** 6:24 7:23 8:3
17:19 24:9,23,25
34:2,6 47:16
52:23 61:2 65:19
66:20 69:5,9
70:12,13,14 76:8
79:10 81:22 87:24
90:10 93:18,25
98:3 99:11 101:18
101:23 102:9
103:23 111:8,13
114:1 119:9,12
121:4,15 141:25
145:12 147:8
153:19 158:16
162:21 166:9
169:16 172:20

173:8 176:12
178:17
**telling** 62:9
**tells** 158:18
**templates** 91:6
**tenure** 29:20
31:21 113:3
**terminated** 141:18
**terms** 183:11
**testified** 5:3 27:5
62:4 64:21 92:10
122:1 133:22
135:9 137:7
149:10,22 171:19
**testify** 60:14 78:8
**testifying** 9:9
**testimony** 60:23
73:19 103:12
121:10 124:16
127:1,22 128:7
149:6,16,25 185:2
185:7
**testing** 23:7 37:12
**thank** 125:15
**thargrove** 4:9
**thefinleyfirm.com**
4:9,10,11
**theory** 59:22,23
**thereto** 80:24
**thing** 6:17 12:16
38:5 64:16
**things** 86:21
114:25 115:7
136:13 146:1,2,10
146:12
**think** 24:6,7 45:14
58:21 64:11 78:3
90:21 106:6 109:1
111:1 112:10
142:13 143:16
160:12 162:22

164:2 180:22
**thinking** 108:17
**thought** 25:19
101:1 176:15
**three** 42:17 94:2
**thumb** 119:2
**time** 7:5,11,14
8:23 13:4,25 14:3
17:11,11 19:2
28:15 47:12 49:4
49:5,9,20 50:15,17
51:7,16 52:2,24
53:4,19,21 63:22
64:11,19 66:22
72:13 80:25 84:14
100:16 106:12
115:8 137:21
138:1 140:3,13
141:22 163:16
164:19,24 178:24
181:4 182:22
184:15
**times** 35:19
**timing** 29:15,16
53:24,25
**title** 13:9,21 16:1
17:15 19:7,21
20:24 21:1 22:12
29:21,23
**today** 5:12 7:6,18
8:12,15 16:20,23
22:2 78:8,22 79:3
81:17 107:6 181:4
**told** 14:2 20:2 48:3
50:23 52:1 63:15
64:2 67:16 74:24
75:18 76:4,15
88:19 118:21
**top** 15:24 45:25
56:18 63:4 71:12
86:6 131:14 149:3

149:13 156:12
**total** 34:10 35:4,7
35:8,10 36:12,20
131:25
**totem** 87:2
**touch** 142:13
**training** 15:1
**transcript** 182:4,7
183:4,5 184:7,13
184:16 185:2
**transmitted** 97:1
**travis** 4:3 5:8,15
18:9 76:23 156:13
173:15
**trick** 7:18
**true** 182:6,10
183:5
**truthfully** 78:8
**try** 8:19,20 84:7
**trying** 7:1,18,19
17:6 178:18
**turned** 138:2
**tustin** 9:7,10 32:24
163:1 169:9
**two** 43:1 46:15,15
46:20,23 54:3
60:3 80:6
**typewriting** 183:5

**u**

**uh** 6:22 92:5 123:3
**uhs** 6:22
**ultimate** 33:14
**ultimately** 26:24
**unclear** 7:22
**undergraduate**
11:18
**underlying** 30:15
**undersigned** 185:2
**understand** 7:22
7:25 8:3 17:21
24:11 30:18 34:16

Jim Muth
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

**[understand - yeah]**

Page 27

38:17,20,22 39:13
57:8 66:2,19
68:10,11 69:17
72:1 106:2,14
115:14 138:23
153:16 164:19
175:2
**understanding** 8:4
30:12,17 31:25
32:3 38:13 48:5,9
48:16 74:12 92:16
92:18 103:4,6
104:24 109:6,12
122:1 138:24
152:10
**understood** 53:13
59:10 60:14 64:18
113:21 151:5
**unique** 6:11
**unit** 33:25 34:12
34:19,23 35:15,16
35:18 41:11,16,18
42:20 52:11 66:16
69:4 76:9,11 77:5
77:8,9,10,15
**united** 1:1 5:10
**units** 33:24 34:2,6
34:11,18,24 35:2
35:18,25 36:8
41:3,4,5,13 42:14
42:17,18 43:1
46:6,19,20,21,24
66:12,15 69:18
77:14
**upload** 30:15
125:16 147:18,19
147:20,24 148:4
154:10 157:16
160:15 161:11
164:6

**uploaded** 143:3
146:17 152:8
156:3
**uploading** 90:15
154:13
**upset** 141:5
163:18
**use** 23:15 32:10
42:16 44:4 53:10
65:21 161:14
185:9
**usual** 5:14
**utilized** 24:18
28:19 91:16

**v**

**v** 4:4
**vaguely** 164:22
166:8 172:19
176:6
**various** 12:8 33:18
33:20,23 88:1,2,4
89:14 93:16,20
101:22,25 102:11
102:14 109:20
134:7 177:14,15
178:24
**vendors** 44:21,22
**verbal** 6:21,24,25
**verification** 37:13
**veritext** 182:1,4,9
182:19 184:10,19
**veritext.com.**
182:17
**version** 156:13,14
**versus** 51:17 117:9
167:14
**vice** 84:22 87:7
**video** 1:17
**view** 30:7,8,9
**volume** 34:13
40:15,16 66:7,13

66:16 69:12,23
70:23 71:3 77:14
113:14 167:17,21
173:9
**volumes** 12:15
**vp** 87:10,21
**vs** 1:6

**w**

**waive** 5:23
**walk** 6:7,9 11:4,25
13:12 22:15 47:23
59:24 65:25 68:12
68:14,22 69:18
70:18 72:10 85:12
86:13 87:5
**walked** 88:8
**wall** 17:7
**want** 5:17 7:1
14:16 18:4 38:4
48:2,8 58:2 60:13
67:10 68:12,13
70:12,12 75:9
79:16 89:4 96:3
119:1 128:21
138:18 178:19
**wanted** 43:24
57:17,18 58:5
136:4,9
**way** 7:24 32:24
35:10 36:2 40:9
47:8,13,24 48:3
58:21 62:1 64:1
70:17 76:5 88:17
90:18 95:11
126:17 128:21
130:8 138:21
139:6,17,18
143:10 145:18
146:19 152:13,15
154:7 157:10
172:2 173:9

**we've** 57:23 59:9
165:21 174:7
**weekly** 86:20
**went** 11:6 13:15
20:16 25:25 57:1
57:4,7,11 61:7
63:17 67:17 73:5
90:10 96:25 113:5
139:12 141:18
175:4
**westle** 4:23
**whatsoever**
116:24
**whichever** 130:1
**withdraw** 122:23
**witness** 7:13 19:1
63:6 130:6 150:13
182:12
**word** 50:24 77:2
141:18
**work** 10:14 11:25
17:22,25 30:21
48:2,2 61:20
64:11 140:4 142:3
142:9 155:24
**worked** 84:13
106:11
**working** 12:3
19:23
**would've** 54:11
**write** 87:23
**writing** 51:21
55:17 69:8
**wrong** 65:19 67:23
75:4 149:13

**y**

**y'all** 79:20 96:24
102:21 142:8,8
**y'all's** 86:22
**yeah** 54:10 56:11
64:12,13 79:9

Jim Muth
March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[yeah - yesterday]**

Page 28

108:5
**year**   11:10 20:13
    21:11,11 22:4
    54:16,17 56:9,10
    56:11,13,19 77:13
    88:15,16 89:1
    92:1,8 95:12
    96:13 98:12 101:1
    101:2,12 103:8
    111:17 114:17
    117:13 133:3
    163:7,22 167:25
    168:1
**yearly**   29:16 47:18
**years**   13:1,10 54:3
    54:11,12 58:14
    65:12 88:23 94:3
    96:11 177:14,15
**yesterday**   80:2
    82:6 115:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.