Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

4    GINA SPEARMAN,

5           Plaintiff,

6     vs.                        Case No. 1:20-cv-04981-CAP

7

     BROKER SOLUTIONS, INC.,
8    d/b/a NEW AMERICAN FUNDING,

9           Defendant.

10

11

12

            REMOTE VIDEOCONFERENCE DEPOSITION

13

                           of

14

                        JON REED

15

                  January 28, 2022

16

                    2:15 p.m.

17

            Lucy C. Rateau, RPR, CCR

18

19

20

21

22

23

24

25

Jon Reed                                   January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 2

1                        INDEX OF EXHIBITS

2        Exhibit              Description              Page

3
                      (No exhibits marked)

4

5

6

7                    INDEX TO EXAMINATIONS          PAGE

8

    By Ms. Gibson                                      5

9

    By Mr. Perlowsi                                    59

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1      APPEARANCES OF COUNSEL (via Zoom videoconference):

2

3      On behalf of the Plaintiff:

4               TRAVIS C. HARGROVE, ESQ.

5               MARYBETH GIBSON, ESQ.

6               The Finley Firm, PC

7               3535 Piedmont Road, NE

8               Suite 230

9               Atlanta, GA  30305

10              thargrove@thefinleyfirm.com

11              mgibson@thefinleyfirm.com

12

13     On behalf of the Defendant:

14              HENRY M. PERLOWSKI, ESQ.

15              T. CHASE OGLETREE, ESQ.

16              Arnall Golden Gregory, LLP

17              171 17th Street, NW, Suite 2100

18              Atlanta, GA  30363

19              404.873.8500

20              henry.perlowski@ogg.com

21              chase.ogletree@ogg.com

22

23     Also Present Remotely:

24              Andrew Westle, Esq.

25              Gina Spearman

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 4

1                (All counsel stipulated to the remote

2        swearing in of the witness due to the COVID-19

3        pandemic.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                         JON REED

 2    having been first duly sworn, was examined and

 3    testified as follows:

 4                          EXAMINATION

 5    BY MS. GIBSON:

 6         Q.  Good morning, Mr. Reed.

 7         A.  Good morning.

 8         Q.  I'm MaryBeth Gibson, and I represent Gina

 9    Spearman in litigation against NAF over a contract

10    that she had with NAF.  Can you hear me okay?

11         A.  Yes, I can.  Can you hear me okay?

12         Q.  Yes.  I just have a message on my screen.

13    I didn't know what that was.

14              I want to go over some ground rules for the

15    deposition.  We are doing this by Zoom.  Did you

16    receive the subpoena that was sent to your

17    residence?

18         A.  I did.  Thank you.

19         Q.  The court reporter is going to take down

20    everything that we say today, so it's important that

21    you give verbal responses and not head nods.

22              I'm going to be asking some background

23    questions and I'm going to ask you some questions

24    about NAF and your employment and Ms. Spearman's

25    employment while you were there.
```

                                                    Page 6

```
 1              If at anytime you don't understand a

 2       question or you need me to repeat it, please just

 3       let me know and I'm happy to do that.

 4            A.  I'll do that.

 5            Q.  And I'll try not to speak over you so she

 6       can get complete responses on the record.

 7              And then you have the opportunity to read

 8       your transcript and sign it, make sure everything is

 9       correct.  Would you like to do that?

10            A.  Yes, please.

11            Q.  So we'll be sure and get your address to

12       the court reporter so she can send it to you.

13              If at anytime you need a break, just let me

14       know and we can take a break.  If there is a

15       question on the table I just ask that you answer it

16       and then we can take a break, okay?

17            A.  Sounds good.

18            Q.  Can you state your full name for the

19       record?

20            A.  Jon Reed, J-O-N, Reed, R-E-E-D.

21            Q.  And what is your current residence?

22            ████ ████████████ ████████████████████

23       ████████████████████████

24            Q.  Do you have any military experience?

25            A.  No.
```

Jon Reed                                          January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 7

1          Q.  Do you have any relatives that live in
2     Fulton County, Georgia?
3          A.  No.
4          Q.  Have you ever lived in the Atlanta area?
5          A.  Not for a permanent residence.  I had an
6     office there for a while.
7          Q.  When you had an office here what company
8     was that with?
9          A.  The company that I owned, CMP Mortgage.  I
10    had the office there probably back in 1994, '95,
11    somewhere in there.
12         Q.  But at that time you did not have a
13    residence in Atlanta?
14         A.  I did not.
15         Q.  Are you married?
16         A.  Yes.
17         Q.  And what is your wife's name?
18         A.  Katherine with a K, K-A-T-H-E-R-I-N-E, same
19    last name.
20         Q.  Do you have any children?
21         A.  I do.  Three.
22         Q.  What are their names?
23         A.  Angela, Kamie, K-A-M-I-E and Jon.
24         Q.  And do any of your children live in the
25    Atlanta area?

Jon Reed                                         January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 8

```
1        A.  No.
2        Q.  Are you a member of any civic
3   organizations?
4        A.  Not right now.
5        Q.  Have you ever given your deposition before?
6        A.  Yes.
7        Q.  And can you tell me the instances in which
8   you've done that?
9        A.  I gave depositions while employed at New
10  American Funding.  I gave depositions at times when
11  I owned my own mortgage brokerage company.  I think
12  those were the only two circumstances.
13       Q.  In this deposition if I refer to American
14  Funding as NAF, you'll know that I'm referring to
15  New American Funding, that's okay?
16       A.  That's okay, yes.
17       Q.  When you gave a deposition for NAF, what
18  was that litigation about?
19       A.  Employment.
20       Q.  And when you say "employment", what
21  specifically?
22       A.  They were being sued over employees that I
23  had hired in Colorado.  So the deposition really
24  wasn't -- wasn't accusing me of doing anything, it
25  was accusing the individuals within that I hired in
```

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 9 of 99
Jon Reed                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 9

```
 1    Colorado for -- what's the word I'm looking for...
 2    breaching their non-solicit agreement.
 3         Q.  So NAF had sued the individuals you had
 4    hired?
 5         A.  No.  NAF was being sued and the individuals
 6    were being sued.
 7         Q.  And do you know what the result of that
 8    litigation was?
 9         A.  I believe it settled.  It was for the most
10    part I would say that NAF -- NAF probably settled,
11    but I think we won the deal.
12         Q.  And when approximately was that deposition?
13         A.  Probably 2013.
14         Q.  And I need to ask you, are you on any
15    medications today that would affect your memory and
16    your ability to testify?
17         A.  No, I'm not.
18         Q.  When did you join NAF?
19         A.  October of 2012.
20         Q.  How did you come to join NAF?
21         A.  I actually answered an ad that they had in
22    a publication.  And the ad did not reference the
23    name of the company, just that a company in southern
24    Colorado was looking to fill some managerial
25    positions.  So I applied to the ad and did an
```

1     interview a couple of weeks after that and was

2     hired.

3          Q.  And you said it was advertised as a company

4     in southern Colorado?

5          A.  I'm sorry.  Southern California.

6          Q.  California, okay.  And did you travel to

7     California to interview for the position?

8          A.  I did.

9          Q.  Who did you meet with?

10         A.  Patty Arvielo.

11         Q.  Anyone else?

12         A.  I met with Christy Bunce as well.

13         Q.  And when you were hired what was your role

14    -- what was your title when you were hired?

15         A.  The original title was Regional Manager and

16    it was -- the job description was to begin to build

17    retail mortgage offices outside of California.

18         Q.  So when you were -- when approximately were

19    you hired by NAF?

20         A.  It was October of 2012.

21         Q.  And when you were hired did NAF not have a

22    presence outside of southern California?

23         A.  They did not.  The only -- I'll qualify

24    that.  They had business opportunities outside of

25    California through their Call Center.  But through

Spearman, Gina v. Broker Solutions, Inc. Et Al

1    their Retail offices, they didn't have any offices

2    outside of southern California.

3        Q.  And did you, after being hired by NAF, did

4    you move to southern California or did you move --

5        A.  I was actually living in southern

6    California when I interviewed with them.  I was

7    working for Bank of America at that time and living

8    in Santa Monica.

9        Q.  When you said when you were hired by NAF

10   your role was -- your title was Regional Manager; is

11   that correct?

12       A.  Correct.

13       Q.  And how has that changed during the time

14   you were employed with NAF?

15       A.  The fall of -- I believe it was 2014 it was

16   changed to Divisional Manager.  I had opened up --

17   hired and opened up several markets, so it was

18   changed to divisional.  It might have been changed

19   to Divisional Manager actually a little earlier.  I

20   was then later called to California to meet with

21   Christy and they changed my title to Executive --

22   Executive Manager position in charge of Business

23   Development.  So pretty much managing and running

24   Retail with the growth across the U.S.

25       Q.  And how had NAF grown after you were hired

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 12 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 12

1    by NAF?

2         A.   Quite a bit.  Most of it was all organic

3    growth.  We only had one acquisition that was a true

4    acquisition, and that was a group up in the

5    Minnesota area.  We acquired that company I believe

6    in either late 2018, early 2019.  The rest of it was

7    all organic growth, just -- I've been in the

8    business a long time, so hiring managers that had

9    worked for me either in previous companies or just

10   managers I came in contact with.  Probably the

11   largest group that we had added that was still

12   considered an organic add would have been Kelly and

13   Gina's group in the Southeast.

14        Q.   And I'm going to come back to that.  But

15   when did you leave NAF?

16        A.   Late January, early February of 2020.

17        Q.   And where are you employed now?

18        A.   Security National Mortgage Company.

19        Q.   And did you go to Security after leaving

20   NAF?

21        A.   Through an interview process.  I was

22   fortunate I had probably 10 or 12 companies that had

23   contacted me, interested in hiring me for a variety

24   of different roles.  I elected and accepted a

25   position with Security National on the 6th of April

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 13 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 13

1    in 2020.  I went to work for them on the 6th.

2         Q.  I believe you just were testifying about

3    hiring Kelly Allison and Gina Spearman.  Were you

4    involved in that process?

5         A.  Yes.

6         Q.  Tell me about that process.

7         A.  We had several meetings with their team and

8    a portion of their team.  Probably started in early

9    2017, probably late spring, I would say April, May.

10   Face-to-face meetings, phone meetings that continued

11   to transpire, a lot of different things to work

12   through, if it was going to work out between the two

13   entities.  I think a portion of their team started

14   to join late in the fourth quarter of 2017 with a

15   few more, and the entire team probably rolling in

16   very early in 2018.

17        Q.  So if Ms. Spearman actually signed her

18   contract with NAF in November of 2016, do you think

19   it would have been in the spring of 2016 that you

20   met with Ms. Allison and Ms. Spearman?

21        A.  That was probably correct.  I could be off

22   a year.

23        Q.  No problem.  So you were involved -- were

24   you involved in negotiating Ms. Spearman's and Ms.

25   Allison's compensation, or was that left to (audio

Page 14

```
 1   drop)?

 2       A.  I worked with them a lot on how the

 3   compensation would be broken down and how they pay

 4   their people.  The way the compensation laid out at

 5   that time, they received a total amount of

 6   commission that was given to the girls.  They would

 7   pay loan officers and branch managers down below

 8   them at different rates and then the spread

 9   difference between what they were paying to their

10   people and what their compensation was set at, that

11   spread or difference was paid to them in management

12   overrides.

13       Q.  And we'll come back to their contracts in a

14   bit.  But in your role, when you left NAF what was

15   your title when you left NAF?

16       A.  I was in charge of Retail lending.  Most

17   everything -- I divided up the -- the job title was

18   divided up pretty much between myself and a lady by

19   the name of Jan Preslo.  I probably dealt a lot more

20   with pricing, hiring, support to the different

21   regionals on down to some branch managers, but

22   mostly to regionals, really mostly on pricing, loan

23   structure, for whatever they would need in that

24   area, and recruiting services.  Jan handled more of

25   the actual working with legal on the contracts and
```

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 15 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

1    stuff like that.

2          Q.  Did Ms. Spearman and Ms Allison report to

3    you?

4          A.  To myself and to Jan.

5          Q.  And in your role as Executive Manager would

6    you review the P and Ls for NAF?

7          A.  Every month.

8          Q.  And would you have reviewed them in 2018?

9          A.  In 2018, yes.

10          Q.  And who prepared the P and Ls?

11          A.  Prepared by a team that worked under Jason

12    O'Bradovich.

13          Q.  And tell me the process, when you say you

14    reviewed them every month, the process of what you

15    would do when you reviewed them.

16          A.  Well, I would review the entire P and L for

17    corporate allocations, everything that would have to

18    do with revenue and expenses.

19          Q.  And was this the P and L for the entire

20    company or was it a P and L for the Retail Division?

21          A.  Just the Retail Division.

22          Q.  And so you testified that you reviewed the

23    P and Ls for 2018 for the Retail Division; is that

24    correct?

25          A.  That's correct.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 16 of 99
Jon Reed                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 16

1      Q.  And was the Retail Division in 2018

2  considered profitable based on your review of the

3  P and Ls?

4      A.  Based on the review and through the P and

5  Ls that were given to us up through the end of

6  December of 2018, yes.

7      Q.  And specifically was the southeastern

8  region profitable?

9      A.  Yes.

10     Q.  And did these P and Ls show the expenses

11  incurred by the southeast region?

12     A.  Yes.

13     Q.  Did you review P and Ls in early January

14  2019?

15     A.  Yes, I did.

16     Q.  What did those show?

17     A.  That 2018 had a loss.

18     Q.  And what was the amount of the loss?

19     A.  Somewhat from memory, but it was extensive.

20  We went from what we believed to be a 15 million

21  dollar profit to -- I think it was close to 25

22  million dollar loss.

23     Q.  And after you received this P and L in

24  January 2019, what did you do?

25     A.  Well, we had quite a few meetings.  There

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 17 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1    was a portion of the expense category for corporate

2    margins.  There were two categories for corporate

3    margin, what they called Corporate Margin 1 and

4    Corporate Margin 2.  And apparently what had

5    happened is Corporate Margin 2 never got included

6    into the P and Ls, so once it was added that created

7    a substantial loss.

8         Q.  When you say we had a number of meetings,

9    who attended those meetings?

10        A.  We had meetings with Jason O'Bradovich,

11   Rick Avielo, Patty Arvielo periodically, Christy

12   Bunce and Jan Preslo.

13        Q.  Were these meetings in January of 2019?

14        A.  Yes.

15        Q.  And so you discussed, if I understand your

16   testimony, that CM2, which was corporate expenses,

17   were not included in the P and Ls which resulted in

18   them changing to a 25 million dollar loss.  What did

19   you all discuss in this meeting how to move forward?

20             MR. PERLOWSKI:  Object to the form;

21        foundation.  You can answer, Mr. Reed.

22        A.  There was a lot of discussion on how the

23   P and Ls would be changed to make sure that we

24   accommodated the full expense.  So the corporate

25   allocation number was kind of a moving target which

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1    required a lot of different meetings, and that
2    number continued to evolve probably over four or
3    five meetings, but it was all centered around
4    getting to what they believe to be the correct
5    corporate allocation.
6        Q.  And tell me again who prepared the P and Ls
7    for Outside Retail?
8        A.  It reported under Jason O'Bradovich.  He
9    had a team that worked for him that was probably
10   three or four people on the team that worked to help
11   prepare the P and Ls.
12       Q.  What was Mr. O'Bradovich title?
13       A.  At that time he was head of Capital
14   Markets.
15       Q.  How is Capital Markets related to Outside
16   Retail?
17       A.  Capital Markets would really set the --
18   they're involved with setting price, they're
19   involved with hedging the loans, servicing.  They
20   wouldn't be directly managing servicing, but they
21   would be involved with everything that had to do
22   with the economics of the loan, different things
23   that create revenue inside the loan, fee income, and
24   the hedging of the files.  Everything comes through
25   Capital Markets.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 19 of 99
Jon Reed                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 19

1      Q.  Would it be unusual for Capital Markets to
2      be doing the P and L for Outside Retail?
3                  MR. PERLOWSKI:  Object to the form.
4      Q.  You may answer.  And I should have told you
5      Mr. Perlowski may object throughout the deposition,
6      but he's just protecting the record and you can
7      always respond.
8      A.  I understand.  It is unusual to have
9      somebody that is the head of Capital Markets also
10     being the CFO for the company.
11     Q.  Was Mr. O'Bradovich the CFO at that time?
12     A.  No.
13     Q.  He was just preparing the P and Ls for
14     Outside Retail at that time?
15     A.  Correct.  They did not have an actual CFO
16     at that time.
17     Q.  Were you surprised to see the loss reported
18     in the January 2019 P and L?
19                 MR. PERLOWSKI:  Object to the form.  You
20         can answer sir.
21     A.  Yes, very surprised.
22     Q.  Why?
23     A.  We reviewed P and Ls monthly throughout the
24     entire year just like we did every year.  So nothing
25     on any of the monthly P and Ls ever illustrated any

1      type of a loss or even a category for what became

2      the Margin 2.  So it's very surprising.  It wasn't

3      like we just got a P and L at the end of the year.

4      These were monthly reviews of the P and L, and you

5      could see the profitability or loss for all of the

6      regions that were within Retail and of course the

7      entire P and L for Retail.

8          Q.  And in your tenure at NAF did you review

9      the P and Ls on a monthly basis each year you were

10     there?

11         A.  Probably from 2015 on.

12         Q.  So do you have experience reading the P and

13     Ls?

14         A.  Oh, yes.  Yes, I do.

15         Q.  And when you would meet -- I believe you

16     said you would review them monthly.  Would you

17     review them with a team?

18         A.  I would review them and then I would review

19     with Jan Preslo.  And we would probably get -- I

20     normally get the P and Ls probably about a day or

21     two and then we would meet with the entire -- I

22     would meet with Christy and Jan and Jason, at least

23     one person from Jason's team and myself.  That would

24     be the general review.  Periodically Rick would join

25     the meetings, but most of the time it was with that

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 21 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 21

1    group.

2        Q.  So you would do that each month after

3    receiving a P and L throughout 2018?

4        A.  Correct.

5        Q.  And each month that you looked at those P

6    and Ls were the expenses for each of the regions in

7    Outside Retail included in those P and Ls?

8        A.  They were.

9        Q.  And I believe you explained that in January

10   of 2019 -- I may ask you to explain this again --

11   what is the CM bucket that changed the P and L to a

12   loss?

13              MR. PERLOWSKI:  Object to the form.  You

14         can answer, sir.

15       A.  It was just -- as I mentioned earlier,

16   there was Corporate Margin 1 and Corporate Margin 2

17   which encompassed a lot of different things with

18   expenses that would be attributed to running the

19   enterprise.  So I think as we moved into 2019 that

20   was consolidated into one corporate margin.  But for

21   some reason they had it divided in Corporate

22   Margin 1 and Corporate Margin 2, and Corporate

23   Margin 2 was never present as we reviewed any of the

24   P and Ls in 2018.

25       Q.  And after the group reviewed the 2019 --

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 22 of 99
Jon Reed                                      January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

```
 1    the January 2019 P and L which showed this loss,
 2    what was the general reaction?
 3              MR. PERLOWSKI:  Object to the form.
 4         Speculation.  You can answer, sir.
 5         A.  Well, there was a lot of concern and
 6    confusion for all of the regionals at that period of
 7    time because you think your region is profitable and
 8    then find out that it might not be profitable, that
 9    creates a lot of concern, a lot of concern for
10    everything you could imagine, the existence of the
11    company, the continuance of everything.  We worked
12    through a lot of that.  But there was general
13    concern with all of the regionals that reported to
14    me.
15         Q.  And was there -- when you met with Jan and
16    I think you said Jan, Patty, Jason O'Bradovich and
17    Christy in January 2019 after reviewing that new
18    P and L, what was their reaction to this
19    information?
20              MR. PERLOWSKI:  Object to the form;
21         mischaracterizes his testimony.  You can
22         answer, sir.
23         A.  There was a lot of concern.  I mean
24    obviously concern for all of us on how -- on getting
25    everything done correct, right sizing, figuring how
```

Page 23

1    we were going to move forward.  There was general

2    concern as to why the numbers weren't in there all

3    along.  That's the thing that was disturbing in

4    particular to Jan and I was we weren't preparing the

5    P and Ls so why was it not in there.

6         Q.  Did Jan express concern to you about that?

7         A.  Over and over again.

8         Q.  And did leadership come up with a solution

9    as how to move forward after reviewing those January

10   2019 P and Ls?

11        A.  Yes, they did.  The belief at that point in

12   time was that they really wanted to put the regions

13   on a regional P and L versus the structure that they

14   were currently on, which was a basis point plan.

15   And they did hire a CFO that came in from another

16   company, and it was his job to help create a P and L

17   and for the regionals to be able to manage their

18   region.  And there was two or three variations in

19   the beginning stages that the regionals could select

20   depending on how they wanted to manage their region,

21   either heavily centered on a pure P and L type

22   system or a heavily weighted P and L.  I guess I

23   shouldn't say purely P and L, but a heavily weighted

24   P and L to one that might be partial profit related

25   and some basis point component.  So all of that

Page 24

```
 1   continued to be reviewed as we went through the
 2   first quarter.
 3       Q.  Did you participate in a leadership meeting
 4   in February of 2019?
 5       A.  Yes.
 6       Q.  Who attended that meeting?
 7       A.  All the regionals, Christy, Jason
 8   O'Bradovich I believe was in there, Rick Arvielo of
 9   course, Patty Arvielo, Jan and I, and I believe Sam
10   was in that meeting.  That was probably about all of
11   it.
12       Q.  Who is Sam?
13       A.  Sam Elsworth is -- he was -- he worked
14   primarily for assisting in recruiting and support.
15   He wasn't really in the P and L review meetings, but
16   I believe he was a part of that management -- he
17   would always attend the regional management meetings
18   but didn't have direct review of the P and Ls.  I
19   would review them with him later, but he wasn't a
20   part of the review process.
21       Q.  What was the format of this leadership
22   meeting?
23       A.  Well, it was basically to let them know
24   that 2018 was not a profitable year, that there was
25   -- that there was loss involved.  I don't remember
```

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 25 of 99
Jon Reed                                     January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 25

1    if a clear number was given or not, but that the

2    company did not generate a profit.  I think they had

3    Jason kind of present some of the numbers that had

4    to do with the gain or loss of 2018, and that they

5    were going to introduce or begin to work on a plan

6    to switch to a more P and L plan.  I know that there

7    toward the very end of the meeting I can remember

8    sitting with one of the regionals, the regional out

9    of Missouri kind of made a flip comment, which was

10   not abnormal to him, but kind of made a flip

11   comment, that gee, then I guess we get to

12   participate in all the upside now.  And I know it

13   did aggravate Rick at that time because Rick turned

14   around as he was leaving the room and said, "I'm

15   assuming all of you are happy with what you made

16   last year.  I'm the only one that is not."

17        Q.   Did Rick speak at the meeting?

18        A.   Oh, yes.

19        Q.   What did he say?

20        A.   Just that -- he's always very articulate.

21   He did a good job.  He presented the fact that we

22   needed to make adjustments to the compensation plan,

23   that we needed to look more to a P and L.  And for a

24   lot of the regionals that were in the room, many of

25   them had worked under a P and L format with other

1      companies that they were with, so the idea of a

2      P and L wasn't necessarily considered negative.  It

3      would depend on how the P and L would be structured

4      for managing their expense, risk to them,

5      compensation benefits.  There's a lot of varieties

6      of profit and loss statements out there.

7           Q.  Did anyone announce a 25 million dollar

8      misallocation at the meeting?

9           A.  I don't remember.

10               MR. PERLOWSKI:  Object to the form;

11           foundation.  You can answer.

12           A.  I don't remember if the exact number came

13      out.  I know that it was mentioned that there was a

14      substantial loss.  And they may have.  I just don't

15      remember if it was -- if that was the actual number

16      that was given or not.  But it was -- there was --

17      it could have been.  But it was sizeable.  I just

18      don't remember if it was an exact number.

19           Q.  Who made the announcement that there was a

20      sizeable --

21               MR. PERLOWSKI:  Object to the form;

22           foundation; mischaracterizes testimony.  Mr.

23           Reed, you can answer.

24           A.  I believe Jason O'Bradovich went through

25      the numbers, and then Rick talked about the fact

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 27 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 27

1   that there was clearly loss in 2018 and we needed to

2   adjust things so that regionals managing these

3   regions -- the regions were fairly large at that

4   time -- that there was ownership and partnership in

5   the way that would be managed and change for all of

6   us.

7           Q.  Did he use the word "misallocation" ever?

8                MR. PERLOWSKI:  Object to the form.

9   BY MS. GIBSON:

10          Q.  You can answer.

11          A.  No.  It was never ever really determined

12   that -- nothing was really ever pushed out that it

13   was Jason's mistake or fault.  Rick took ownership

14   for the fact that the numbers were not correct, as

15   he should have done as the owner.  But, nonetheless,

16   the numbers proved to be a loss that none of us

17   understood or realized as we moved through 2018.

18          Q.  Did you believe 2018 to be a profitable

19   year?

20          A.  15 million profitable.

21          Q.  So you understood it to be 15 million

22   dollars profitable based on the P and Ls you

23   reviewed at the end of 2018?

24          A.  And throughout the year.  So there was

25   nothing about 2018 that would have shown that we

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 28 of 99
Jon Reed                                  January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 28

1      lost money on any of the P and L reviews.  I think
2      anybody that was in the industry at that time,
3      looking back on the industry, would understand and
4      agree that the last four months of 2018 was
5      problematic to the mortgage industry in general, but
6      2018 for the full year was a good year.
7           Q.  Did Patty Arvielo speak at the meeting?
8           A.  I don't remember if she did.  Normally she
9      weighs in and has some communication.  I don't
10     remember.  I don't remember exactly what her
11     comments would have been.
12          Q.  Was it apparent to you that Ms. Arvielo was
13     upset at the meeting?
14          A.  At the very end, absolutely.
15          Q.  Were others upset at the meeting?
16          A.  I think there was -- I think everybody was
17     somewhat upset and confused, because you go through
18     an entire year seeing numbers related to your
19     regional P and L or to, for Jan and I, to the
20     corporate P and L for Retail as being positive,
21     positive, positive, and all of a sudden you get to
22     the early weeks of 2019 and find out that that's --
23     not only did you not make any money, you lost money.
24          Q.  Were any announcements made in the meeting
25     regarding the marketing budget?

Jon Reed                          January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 29

1          A.   It could have been part of the expenses
2     that were talked about.  I don't really remember
3     much about the marketing budget.
4          Q.   Do you recall any announcements regarding
5     pricing exceptions and the tolerances regarding
6     pricing exceptions?
7          A.   Well, I think that was a great deal of the
8     communication around moving to a P and L, is that
9     when concessions were taken or people spent for
10    expenses within their region that they were just --
11    they were spending company money that they had no
12    accountability to.  So concessions that they took,
13    things that they took, there was no risk to them, it
14    was all just an expense to the company.
15         Q.   How long did this leadership meeting last?
16         A.   It was probably close to half a day I would
17    think.
18         Q.   Were there any smaller breakout meetings
19    held during the leadership meeting with individual
20    regional managers?
21         A.   I don't believe in that first meeting there
22    was.
23         Q.   Was there subsequently?
24         A.   I think they did have a lot of meetings as
25    they were preparing and working through how they

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 30 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 30

1    were going to roll out the profit and loss plan to

2    the regionals.  There were a lot of meetings with

3    individual regions.  Every region is a little bit

4    different depending on the profitability of that

5    region.  So there was a lot of discussion and debate

6    around how the P and L would be worked out for their

7    region, what kind of monies would be left in a bank,

8    if you will, to protect against loss, what

9    percentage of the profit they would earn.  There was

10   a lot of discussions on that.

11       Q.  Were you present at meetings with Ms.

12   Spearman and Ms. Preslo where Ms. Preslo expressed

13   that the changes would only last 90 days?

14                  MR. PERLOWSKI:  Object to the form;

15        foundation.  You can answer, sir.

16       A.  I don't know if I was in that particular

17   meeting or not.  I know I was in on a lot of the

18   meetings, so -- that one doesn't necessarily ring a

19   bell, but -- I was in most of them.

20       Q.  And I know I asked about Ms. Preslo.  What

21   about Ms. Arvielo, were you ever present in meetings

22   where she told Ms. Spearman these changes are only

23   going to last 90 days?

24                  MR. PERLOWSKI:  Objection, foundation.

25        You can answer, sir.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 31 of 99
Jon Reed                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 31

1        A.   A lot of times when Patty would meet with

2    some of the regionals, most of the time she would

3    meet with them independently -- not always but a lot

4    of times independently.  The thought of it lasting

5    for 90 days was certainly not something that was

6    being discussed at the top of the house.

7        Q.   In private meetings amongst you and Ms.

8    Preslo and Ms. Bunce and Ms. Arvielo?

9        A.   The thought process was we were going to

10   move towards a P and L format and that was going to

11   be an ongoing format that would last.

12       Q.   So you don't know what Ms. Preslo or Ms.

13   Arvielo might have told Gina outside of your

14   presence with respect to this only lasting for a

15   period of 90 days where the marketing budget was

16   taken away?

17            MR. PERLOWSKI:   Objection; foundation.

18       You can answer, sir.   And speculation.   Sorry.

19       You can answer.

20       A.   I don't remember...  not to be definite, I

21   don't remember that.  I mean not that it didn't; I

22   just don't -- I don't remember.

23       Q.   You don't remember being present when those

24   conversations were held?

25       A.   I don't.

Page 32

1        Q.  And did you testify earlier that Patty

2    would meet individually with the regional managers?

3        A.  She would at times, yes.

4        Q.  And do you know why she would do that?

5                MR. PERLOWSKI:  Object to the form;

6         speculation.  You can answer sir.

7        A.  Mostly to try to be a calming effect more

8    than anything else.  Patty was not confrontational

9    by nature, so it would have probably been more to

10   try to calm or comfort someone as they're going

11   through transition.

12       Q.  You say calming.  Was the reaction to these

13   announcements heated?

14               MR. PERLOWSKI:  Object to the form;

15        foundation; speculation.  You can answer, sir.

16       A.  Yes, some of them were.

17       Q.  You were present, so you saw reactions.

18   What were the reactions?

19       A.  A lot of reactions to how the P and L

20   format would roll out.  Once expenses were

21   accomplished, a lot of regionals wanted a higher

22   percentage of the profitability.  So just a lot of

23   debate and discussion over, okay, we've met the

24   expenses, now what percentage of the profit do we

25   get, how much money are we going to have to leave in

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

1     to account for risk.  There's always a lot of

2     discussion topics around how a P and L is going to

3     be laid out.

4          Q.  After the leadership meeting was over did

5     the regional managers fly out to Tustin to meet with

6     you and Christy and Jan to come up with a solution

7     to what was announced -- to the announcements made

8     at the leadership meeting?

9          A.  Yes.

10         Q.  Tell me about that meeting.

11         A.  A lot of it was just discussions on their

12    part, questioning again the loss.  That came up

13    several times.  And then just questions about if we

14    were going to move to a P and L format, and then a

15    lot of debate over the corporate allocation.  That

16    number continued to change frequently during that

17    next 45 days.

18         Q.  At that meeting did the regional managers

19    express concern to you and others present that their

20    marketing budget had been taken away?

21         A.  Not all of them used the same -- the

22    marketing budget the same as the southeast region

23    did.  But that marketing budget was a part of their

24    negotiation at the time of hire, so there was a lot

25    of concern at that point in time on why would that

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 34 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 34

1    be changing because it was a part of our hiring

2    agreement.

3        Q.  Was that a significant piece of their

4    compensation in their hiring?

5        A.  Yes.

6            MR. PERLOWSKI:  Object to the form;

7        foundation.

8        Q.  And at this meeting what was told to Ms.

9    Spearman and Ms. Allison about NAF taking away their

10   marketing budget?

11       A.  It was going to be, I think, suspended

12   until they got the P and L portion worked out.  And

13   I believe as the -- until the P and L was worked

14   out.

15       Q.  Did they say what period of time that would

16   be?

17       A.  That may have been the 90 days they were

18   talking about, thinking that the P and Ls would be

19   in place and ready to roll in that length of time.

20   I know that there was just some real pressure on the

21   new CFO to get those completed, rolled out, reviewed

22   and everybody's blessing on the direction of the

23   P and L for their particular region.  So there was

24   -- 90 days would have been probably a suitable

25   period that they were talking about to get that

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 35 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1    completed.

2         Q.  And so did Ms. Spearman stay on with NAF

3    during this time period?

4         A.  I believe Ms. Spearman was still a part of

5    NAF at the time I resigned.

6         Q.  Who was the CFO that was hired?

7         A.  I'm terrible with names.  It was Scott

8    Frommert.

9         Q.  And prior to hiring Scott Frommert there

10   was no -- was there a CFO at NAF?

11        A.  No.

12        Q.  Did you and Scott Frommert work together?

13        A.  Quite a bit.

14        Q.  Is Scott Frommert still employed at NAF?

15        A.  No, he's not.

16        Q.  Did he leave before you or after you?

17        A.  He left after I did.  And I really don't --

18   I don't know what the reason or terms of his

19   departure were because, like I said, he left several

20   months after I did.

21        Q.  Did he ever tell you while he was employed

22   and working with you that he was having problems

23   coming up with a P and L?

24        A.  I know he was having problems coming up

25   with a P and L.  We worked through -- we worked

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 36 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 36

1    together on a lot of that.  There was a lot of

2    debate early on on what would be fair, what would be

3    not fair.  In all fairness to Scott, he was coming

4    into a company that he had no experience with any of

5    the people.  I had worked with every regional --

6    every regional that was there was either directly

7    hired by me or I was involved with the hiring of

8    them.  So it was -- I don't think it was easy on

9    Scott because he's being hired and instructed by

10   ownership to create something.  And he did a good

11   job, but there was a lot of debate clearly from him

12   and I early on to come up with something that would

13   be fair.

14        Q.  Did Jason O'Bradovich participate in

15   putting together the P and L?

16        A.  I think he worked -- I think he was the

17   other side of the coin that worked with Scott and

18   Rick on things that were trying to get in place, and

19   then I was on the side probably working with Scott

20   on what was going to be distributed and given out to

21   the regionals.  So mine was probably more of a

22   position from sales and Rick and Jason was more of a

23   position of what was the right thing to do for the

24   company, neither one being wrong.  I just -- I

25   wasn't in most of the meetings with Jason, Rick and

Page 37

1    Scott.

2        Q.  Did Scott ever tell you he was having

3    trouble getting information he needed from Jason

4    O'Bradovich?

5        A.  Yeah, he would make comments on that.  As

6    time went on we had a good working relationship.

7    You don't always agree on how the math is adding up,

8    but we did have a good working relationship.  And so

9    he would share at times that he had difficulty in

10   getting clear direction on what would be acceptable

11   and not acceptable.

12       Q.  Clear direction from who?

13       A.  From Rick and from -- from ownership.  The

14   company is owned by Rick and Patty, so getting

15   direction from both of them and probably Jason's

16   commentary with it.  He needed answers to certain

17   questions that would be formulated on what

18   tolerances are we going to allow the regionals to

19   control, how were we going to manage marketing

20   budgets as an example, concessions, how would that

21   play out.  Because depending on the percentage of

22   the profit that was going to be generated and owned

23   by the regional versus the company, whatever portion

24   of that that's still owned by the company, what kind

25   of tolerances were they going to have in place for

Page 38

1    their 50 percent and what were they going to allow

2    -- so there was just a lot of discussion back and

3    forth to come down to something that could be

4    determined reasonable.  And a lot of what's

5    reasonable wasn't totally my call; it's what the

6    regionals were going to accept.

7           Q.  Did Scott ever tell you about conversations

8    he would have with Rick Arvielo regarding problems

9    he was having trying to get the numbers from Scott

10   Frommert?

11              MR. PERLOWSKI:  Object to the form;

12        foundation.  You can answer.

13          A.  I think that -- Scott and I had a good

14   working relationship, so if there was a particular

15   day where he felt he was having a hard time getting

16   answers to questions, he would probably comment on

17   it.  I don't know that it was anything more than

18   just general conversation between two people that

19   were trying to get to the end result so we could

20   move forward with what we were hired to do, which is

21   continue to grow and build a company.

22          Q.  When did the P and L model come into play?

23          A.  I think it rolled out pretty much right

24   about the late spring of 2019.

25          Q.  So that would have been a full year after

Page 39

1    the leadership meeting where the announcements were

2    made regarding the profitability and the P and Ls;

3    is that correct?

4              MR. PERLOWSKI:  Object to the form,

5         foundation.  You can answer.

6         A.  We still had a lot of meetings during that

7    first 75 days, first 90 days of 2019 because the

8    whole loss was realized early in 2019.  And then

9    they're working on the P and L.  So when I say it

10   rolled out probably late spring, that's probably

11   premature.  I think they began to roll out what the

12   P and Ls would look like to the regionals through

13   kind of the second and third quarter of 2019.  I

14   think there was test months on the P and L that

15   began probably in the fall of 2019, and I think they

16   all -- the P and Ls really went hard as they went

17   into 2020.  But, again, that's kind of my memory of

18   the dates.  My world continued to change through

19   that period of time, so -- I know that the P and Ls

20   were in full swing in 2020.  But, again, I left at

21   the end of January.

22        Q.  How did your world continue to change

23   during that time period?

24        A.  Well, my contract that I was under in

25   2018 -- so I started in 2019 with that contract.  It

1      changed.  They changed my contract in like March of

2      2019, and then changed it again in July of 2019, and

3      then changed it again in January of 2020.  Four

4      changes in a 12-month period was just more than I

5      was going to deal with.

6          Q.  And each time they changed your contract

7      did they present it to you and ask you to sign it?

8          A.  Yes, they presented it to me.  It was done

9      in writing.  They asked me to sign it.  Most of my

10     compensation was paid to some degree in arrears, so

11     if you don't sign it, then it would determine how

12     you're going to get paid on your stuff going

13     forward.  So even the very last one I received in

14     January I signed, but I still resigned even with the

15     signed contract.  It's all an at-will contract,

16     so...

17         Q.  Why was your contract changed so many

18     times?

19              MR. PERLOWSKI:  Object to the form,

20         foundation, speculation.  You can answer if you

21         can.

22         A.  That's really a good question.  I have my

23     personal feelings on it.  I don't know that that is

24     -- they could also argue with it.  But if you're

25     going to change somebody's compensation four times

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 41 of 99
Jon Reed                                     January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1    in a 12-month period, then I would assume that they

2    believed that I held some fault in the loss.  I'm

3    not preparing the financial statements, so if the

4    financial statements are prepared correctly you can

5    illustrate them correctly.  I can only assume that

6    they believed that there was some fault in that.

7           The original structure of the comp that was

8    put in place I had a big role in and laid that out

9    and it was -- it worked very well.  We grew very

10   rapidly.  I would probably venture to say that for

11   -- for mortgage companies that were growing around

12   that '13, '14, '15, '16 year periods, some grew

13   faster through acquisition.  But through pure

14   organic growth, I doubt if any -- I firmly believe

15   there was no company -- no mortgage company in

16   existence that grew faster organically than we did

17   during those years.

18           MR. PERLOWSKI:  MaryBeth, when you get

19        to a natural stopping point, let me know.  I

20        need to take a quick break.

21           MS.  GIBSON:  Now is fine.  We can take

22        a 10-minute break.  We'll go off the record,

23        Mr. Reed.

24           MR. PERLOWSKI:  Thank you.

25           (Recess 3:11 p.m. - 3:21 p.m.)

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 42 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 42

1      BY MS. GIBSON:

2          Q.  Mr. Reed, did you attend a meeting with

3      Scott Frommert in Atlanta in September of 2019?

4          A.  I did.

5          Q.  Who was present at that meeting?

6          A.  It was Scott and myself and Kelly Allison,

7      Gina Spearman, and I think that was it.  I don't

8      think Jan came on that trip.  I don't remember.  I

9      know Scott and I for sure.  I don't remember -- Jan

10     didn't normally travel, so I don't think she came on

11     the trip.  But she might have.

12         Q.  Did you do anything to prepare for that

13     meeting?

14         A.  Well, Scott was going to present the

15     P and L plan to Kelly and Gina for what he had come

16     up with for their P and L plan, which he did.  And I

17     think it got a little heated during some of the

18     discussion.  Anyway, I told them we needed to go

19     back and just work on it, kind of to diffuse the

20     deal.  But that was the purpose of the meeting, I

21     believe, was to present the format for how their

22     P and L would work.

23         Q.  Did you bring materials to the meeting to

24     give to Gina and Kelly?

25         A.  Scott did, yes.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 43 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 43

1          Q.  And was there a Power Point presented?

2          A.  I believe there was.

3          Q.  Did you receive a copy of that from Mr.

4     Frommert?

5          A.  I did.

6          Q.  Would you still have a copy of that?

7          A.  Probably not.  I got rid of most everything

8     I had.

9          Q.  When you resigned from NAF did you have a

10    company laptop that you turned back in?

11         A.  I did.

12         Q.  Is it possible it would have been on that

13    laptop?

14         A.  Oh, I'm sure it would have been.

15         Q.  Did you and Scott share various documents

16    related to the P and L model?

17         A.  We did.  Because the P and L model adjusted

18    and was -- there was a lot of variations and

19    differences for all of the different regions.

20         Q.  At this meeting with yourself and Mr.

21    Frommert and Kelly and Gina, were comparisons made

22    to their overrides and their compensation and their

23    2016 agreement to the new P and L model?

24         A.  I don't think Scott brought out anything

25    with -- well, let me think through that a minute.

Page 44

1    He may have referred, but I don't think he brought

2    out any particular documents to their original

3    agreement; however, I do believe that they had

4    copies of their original agreements to kind of

5    compare with what was being rolled out to them in

6    the P and L.  And I believe that there was kind of

7    ending discussion towards the end of the meetings

8    where Kelly and Gina would have their legal counsel

9    review -- and actually, thinking back on it, I think

10   they had representation there from their attorney in

11   that meeting.

12        Q.  So when the meeting ended was there any

13   resolution with respect to the P and L model?

14        A.  Not at that time.

15        Q.  And do you recall what was going to happen

16   next?

17        A.  Well, I think we went back to California

18   and presented at least the discussion points that

19   were important to Gina and Kelly.  Scott probably --

20   I'm assuming Scott had meetings with Rick and Patty,

21   probably Christy, on accommodations or things they

22   were going to do for the P and L for Kelly and Gina.

23   We had some very good regions.  And not to downplay

24   any of the regions, all of them did a good job with

25   profitability.  But the region -- the southeast

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 45 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45

1    region under Kelly and Gina was clearly the most

2    profitable region.

3         Q.  And how would you determine profitability

4    from looking at the P and L?

5         A.  Sure.  Expense minus revenue, they were the

6    best.

7         Q.  So ultimately NAF went to a P and L model

8    that was presented to Gina and Kelly.  Was it

9    presented to all regional managers?

10              MR. PERLOWSKI:  Object to the form;

11         foundation.  You can answer.

12         A.  It was clearly presented to all the

13    regionals.  It varied by region, but it was

14    presented to all of them.

15         Q.  Had you resigned before the March 1, 2020

16    amendment or Schedule 1 was presented to Ms.

17    Spearman?

18         A.  Yes.

19         Q.  Were you to be put on the same P and L

20    model as Ms. Spearman?

21         A.  No.  My deal changed dramatically in

22    January.  So the final contract I received was a

23    base of X amount of dollars and then I could receive

24    25 percent of that base and a bonus if profitability

25    was achieved.  And then I could get another 25

Jon Reed                                  January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 46

1      percent of that amount in a bonus if I increased the

2      sales force by 10 percent per month, which would

3      have been impossible for anyone on the planet to do.

4      It wasn't a question of the denomination; it was a

5      question of the stips that were absolutely

6      unattainable.  So it would be just as easy for

7      somebody to say, look, we don't want you anymore

8      than to put something that ridiculous in front of

9      somebody.

10         Q.  To your knowledge as the Executive VP that

11     Ms. Spearman reported to, was her contract ever

12     rewritten prior to the March 1, 2020 Schedule 1

13     P and L model?

14             MR. PERLOWSKI:  Objection; form;

15         foundation.

16     BY MS. GREEN:

17         Q.  You can answer.

18         A.  I don't remember if it was.  I don't

19     believe anything was altered to their original

20     contract until P and L deals started to roll out in

21     probably -- in reference to that March date you're

22     talking about.

23         Q.  Did Ms. Spearman ever speak to you about

24     the fact that she wasn't receiving overrides as she

25     thought she was entitled to receive under her

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 47 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 47

1    November 2016 agreement?

2         A.   I don't know that I had any -- I don't know

3    that she addressed that with me.  I know that she

4    did have some conversations with Jan in regards to

5    that.  We would all talk about different things.

6    Jan had a good relationship with the girls as well

7    as she did with most of the regionals.  It would

8    just depend on what the needs were of the regional

9    on whether those discussion topics were more

10   centered to her or me.

11        Q.   Did Jan ever tell you that Ms. Spearman

12   complained to her about not receiving all the

13   overrides she thought she should receive?

14        A.   Jan and I talked a lot, and so I can't

15   necessarily remember if she did or didn't.  But I'm

16   assuming she probably would have because we talked

17   through everything.

18        Q.   So you're aware of Ms. Spearman reporting

19   that she believed she was not being paid the

20   overrides that she thought she was entitled to under

21   her 2016 contract; is that correct?

22                 MR. PERLOWSKI:  Could you please read

23         that question back?

24                 (Reporter read requested portion.)

25                 MR. PERLOWSKI:  Objection; speculation.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 48 of 99
Jon Reed                            January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 48

1           You can answer, sir.

2           A.   Jan and I would have discussed it.  So I

3       would say, yes, I would have been aware that Gina

4       was not happy about her overrides.

5           Q.   What was Jan's response to Ms. Spearman?

6                MR. PERLOWSKI:  Object to the form;

7           speculation.

8           A.   I don't remember.

9           Q.   Did Jan ever speak to you about what she

10      was going to do about that?

11          A.   I think she talked to -- I think she was

12      going to have discussions with Christy on it.  I was

13      working a lot with Scott on the formatting of the

14      P and Ls and how that would really work and whether

15      certain parts were fair.  So that part there where

16      Gina might have been talking, I'm assuming to Jan,

17      Jan was probably taking it to Christy.  I would have

18      -- I would have known about the conversation.  I

19      wouldn't have been directly involved with it.

20          Q.   Did the Arvielos ever tell you that they

21      thought Gina and Kelly made too much money?

22          A.   I would say that was a general feeling,

23      that they felt that most of the regionals made too

24      much money.

25          Q.   Do you know whether Kelly and Gina's

Case 1:20-cv-04981-CAP Document 94 Filed 04/28/22 Page 49 of 99
Jon Reed                                        January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 49

1    marketing budget was removed from their P and L

2    model contract that was given to them in March of

3    2020?

4         A.  Like I said, I wasn't there in March of

5    2020, so -- unless the marketing budget would have

6    been formatted to be inside the P and L and

7    illustrated correctly with the change, all of that

8    should have been done in writing.  It was common for

9    any of these agreements, that when changes occurred

10   it was always done in writing.  It was with me and

11   to my knowledge with any of the changes with any of

12   the regionals it was always done in writing.

13        Q.  And when you say it was always done in

14   writing, does that mean it was presented and they

15   had to sign it?

16             MR. PERLOWSKI:  Object to the form.  You

17        can answer.

18        A.  It had a requirement for their signature.

19   It doesn't mean that -- I can speak for mine.

20   Whether I signed it or not, I had one of two

21   choices, accept the terms of the agreement, signed

22   or unsigned, or leave.

23        Q.  And so is that why you left after you were

24   presented with your January 2020 contract?

25        A.  Correct.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 50 of 99
Jon Reed                          January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 50

 1        Q.  And so I guess the options are to either

 2     accept the terms of the change or resign?

 3        A.  Right.

 4            MR. PERLOWSKI:  Object to the form,

 5         speculation.  You can answer.

 6     BY MS. GIBSON:

 7        Q.  Going back to the 2019 P and Ls, do you

 8     know who discovered the loss identified in the 2019

 9     P and L?

10            MR. PERLOWSKI:  Objection, foundation.

11          You can answer.

12        A.  Who discovered the loss?

13        Q.  Yes.

14            MR. PERLOWSKI:  Same objection.  You can

15          answer.

16        A.  Obviously the loss was presented that we

17     lost money by Rick.  So I'm assuming it was picked

18     up by Rick and Jason that there was a loss, not a

19     gain.

20        Q.  Going back to the meetings, the leadership

21     meetings and then the meetings afterwards when the

22     regional managers flew out to Tustin to meet with

23     you and other officers, was any resolution made at

24     those meetings with respect to cuts to Gina and

25     Kelly's marketing budget?

Page 51

```
1              MR. PERLOWSKI:  Object to the form;
2         foundation.  You can answer.
3         A.  Not to my knowledge, at that meeting.  That
4    meeting was centered around the fact that there was
5    -- that we did not make money in 2018 and that we
6    were going to move toward a P and L format for the
7    regionals instead of the basis point plan they were
8    on.
9         Q.  When the regionals flew out there to meet
10   with you all did they tell you why they were coming
11   out there to meet with everyone?
12        A.  It wasn't uncommon to bring the regionals
13   together for meetings, so I don't know if it was
14   illustrated to them as the specific reason other
15   than just a beginning-of-the-year meeting.
16        Q.  I'm speaking about after the February 2019
17   leadership meeting where the regional managers got
18   together and flew out to Tustin to discuss the
19   issues with you all that were raised at the
20   leadership meeting, before they all flew out there
21   did they tell you and Christy and Jan why they were
22   coming?
23        A.  Yeah.  They wanted --
24              MR. PERLOWSKI:  Object to the form;
25         speculation; foundation.  You can answer.
```

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 52 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 52

1       A.  They wanted to have a meeting with all of

2   us because they were concerned about impending

3   changes that were coming.  They were concerned about

4   the fact that why did we not know that there was

5   losses in 2018, why did we not know about that

6   earlier, why did we not react to the losses earlier,

7   why did we get through the entire year of 2018 and

8   the losses surfaced early in '19.  Why did we not

9   know about it earlier.

10      Q.  Did any of the regional managers that flew

11  out to meet with you all resign after that trip?

12      A.  No.

13      Q.  Were representations made by anyone at that

14  meeting to regional managers to keep them to stay?

15              MR. PERLOWSKI:  Object to the form;

16       foundation; speculation.

17              MS. GIBSON:  Well, he was there.  He can

18       testify to what he knows.  It's not

19       speculation.

20  BY MS. GIBSON:

21      Q.  Go ahead, Mr. Reed.

22              MR. PERLOWSKI:  Same objection.

23      A.  There was -- I don't know what commitments

24  or promises might have been made to the regionals

25  individually.  There was a common message that we

Jon Reed                                        January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 53

1    were going to work towards a fair P and L plan for

2    all of the regionals and that they were going to

3    take into account their earnings that they had been

4    achieving and try to stay consistent with that in

5    the plan that was being put together.

6           Q.   And was any time period expressed when this

7    new plan might be provided to the regional managers?

8           A.   I think the original deal was they were

9    going to try to have it done within 30 days, which

10   was not realistic.  I think the 90-day period was

11   more realistic for the time period it took to put it

12   all together, to have meetings with the different

13   regionals to review their plan.  Some of that was --

14   most of that was done via phone.  I do know that we

15   did fly out and meet with Gina and Kelly in person.

16          Q.   So it didn't happen within 30 days or 90

17   days, did it?

18                  MR. PERLOWSKI:  Object to the form.

19          A.   No, it did not.

20   BY MS. GIBSON:

21          Q.   Do you know when Ms. Spearman resigned?

22          A.   It was after I resigned.  So I think I

23   heard that she had resigned sometime around March or

24   April of 2020.

25          Q.   Was that after the P and L model was

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 54 of 99
Jon Reed                                           January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 54

 1    presented to her?

 2        A.  Well, the P and L model would have been

 3    presented in '19.  I think it actually rolled -- it

 4    might have rolled with some test months in '19, but

 5    I think it rolled fully the first of the year, in

 6    2020.

 7        Q.  I was actually referring to the written

 8    schedule that embodied the P and L model that was

 9    effective March 2020.

10        A.  They all were given kind of their plan in

11    '19.  Now there may have continued to be revisions

12    with some of the regionals.  If there were

13    revisions -- some of the regions -- you're talking

14    about regions that are pretty complex that were

15    doing a lot of volume.  There could have been

16    continual revisions to that P and L agreement well

17    into 2020.  But, again, I left really at the end of

18    January.  And kind of that last 30 days it was

19    pretty clear that I wasn't going to have a lot of

20    involvement in what was being rolled out.  So it was

21    -- I can't speak to a lot of things that were really

22    being offered to Gina and Kelly or any of the

23    regionals certainly as they got very deep into 2020.

24        Q.  So you went to the September 2019 meeting

25    in Atlanta with Kelly and Gina and Mr. Frommert,

1    correct?

2         A.   Yes, that is correct.

3         Q.   And the purpose of that was to come up with

4    an agreement to present to Ms. Spearman and Ms.

5    Allison; is that correct?

6         A.   Yes.  Scott had a plan put together.  So

7    when we flew out to meet with Gina and Kelly he flew

8    out there with the purpose of presenting their plan

9    to them.  And the plan that he presented was the

10   plan that he expected them to take.  So there was

11   options to the P and L plan, whether it favored a

12   higher percentage of the profit or a lower

13   percentage of the profit with a little bit higher

14   basis point component.  I think he believed that

15   they would clearly take the heavier profit

16   percentage of the P and L just because, again, they

17   were the most profitable region in New American.  So

18   that was what he presented.

19        Q.   Do you know when a formal contract

20   embodying that P and L model was presented to Ms.

21   Spearman?

22        A.   There were so many revisions at that time.

23   I would think --

24        Q.   If I tell you it was March 1, 2020, do you

25   have any reason to think that's incorrect?

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 56 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 56

1       A.  No, I would have no reason to think that's

2    incorrect.

3       Q.  Do you know why Ms. Spearman resigned?

4       A.  Well, I wasn't there and so I obviously

5    wasn't talking to Gina when she resigned.  But I do

6    know that there was -- I would be speculating at

7    that time.  I'm just assuming she resigned because

8    of terms within the agreement that she didn't agree

9    with.

10      Q.  After you resigned from NAF did you ever

11   speak with the Arvielos again?

12      A.  No.

13      Q.  Did you ever speak with Jason O'Bradovich?

14      A.  No.

15      Q.  Have you spoken with Scott Frommert?

16      A.  Yes.

17      Q.  When did you speak with him?

18      A.  I've talked to him periodically probably

19   every few months after he resigned just on where he

20   went to work, how things were going, general

21   conversations, nothing really related to New

22   American other than just -- we kind of became

23   friends and so we've stayed in communication after

24   that point.

25      Q.  Do you know if he was fired or if he

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 57 of 99
Jon Reed                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 57

1    resigned?

2         A.   I really don't know.  He was under -- at

3    least what he told me, he was under kind of a strict

4    NDA.  So I have no knowledge of why -- whether he

5    was either terminated or resigned or what the

6    reasoning for it was.

7              MS. GIBSON:  I just want to take a

8         five-minute break.  And I think we're almost

9         done, Mr. Reed.

10             MR. PERLOWSKI:  I'm going to have a few

11        questions for Mr. Reed.  Can we take 10 so I

12        can get my thoughts together as well?

13             MS. GIBSON:  Sure, we can take 10.

14             MR. PERLOWSKI:  And I'm not going to be

15        long.

16             (Recess 3:45 p.m. - 3:53 p.m.)

17   BY MS. GIBSON:

18        Q.   Mr. Reed, were you ever shown what losses

19   comprised the corporate margin that made the

20   P and Ls show a loss in 2019?

21        A.   Yes.  They had a breakdown -- there was a

22   breakdown of what made up Corporate Margin 1, so you

23   had all the different expense categories that made

24   up Corporate Margin 1.  And then when the losses

25   came in they had the different categories that were

Page 58

1    associated with Corporate Margin 2.  I didn't save

2    any of those P and L statements, so I couldn't by

3    memory go through it.  But they were itemized as to

4    what the different line items were that would have

5    made up those two allocations for corporate margin.

6         Q.  Do you have any recollection of what went

7    into those?  Do you know if they were related to

8    NAF's mortgage business?

9         A.  I don't believe so.

10        Q.  I just want to make sure I understood your

11   answer because I was a little distracted.  The

12   expenses in CM1 and CM2, I had asked you if they

13   were related to the mortgage business that NAF was

14   involved in.

15        A.  Just to the Retail side.  There was

16   certainly -- there's several different channels of

17   business for New American.  At that time the primary

18   channels were the Call Center group and then Retail.

19   They had some other things they were branching into.

20   But none of those other line items were really a

21   part of the corporate margin, although there were

22   some things they were doing with kind of a connect

23   lead deal that they were going to drive to the

24   Retail sales force.

25             So there was a lot of different things in

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 59 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 59

1    the line items, and that was part of the debate that

2    I was involved with in trying to get down to a

3    reasonable number that was going to be in this

4    corporate allocation.

5            I do remember as we rolled into starting to

6    formulate that, I was told that combining the two

7    corporate margins that we would be able to stay at

8    1.9 million on an annual basis.  And that went to

9    2.2 million and then 2.4 million and 2.6 million.

10   Just a moving target through the whole deal.  So to

11   try to make sense out of the changes to the

12   different line items, it's pretty hard to make sense

13   out of a lot of that stuff.  So it's just -- and

14   probably my debate on a lot of that stuff probably

15   just filtered to -- they decided it wasn't a good

16   time for me to stay around the company.

17        Q.  Were you ever shown any reports or

18   documents that supported the expenses identified

19   under CM1 or CM2?

20        A.  No.

21            MS. GIBSON:  I don't have any further

22        questions subject to your recross.  Thank you.

23                        EXAMINATION

24   BY MR. PERLOWSKI:

25        Q.  Mr. Reed, I have a few questions, sir.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 60 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 60

1    Nice to meet you.

2        A.  Nice to meet you, too.  Thank you.

3        Q.  Mr. Reed, understanding that you haven't

4    spoken directly with Ms. Spearman today, when was

5    the last time you talked to Ms. Spearman?

6        A.  We haven't had very many conversations.  I

7    think I spoke to Ms. Spearman probably the middle of

8    last year.  She called.  It was just a general call

9    to see how I liked the new company I was at.  She

10   told me she was very pleased with the place that she

11   was working, wanted to know how things were working

12   for me.  It was really nothing more than just kind

13   of a how-are-you-doing call.  Nothing centered

14   around anything other than that.

15       Q.  At anytime since you've left NAF, Mr. Reed,

16   has Ms. Spearman ever discussed her disputes with

17   NAF with you?

18       A.  No.

19       Q.  Prior to today, Mr. Reed, how many times

20   have you spoken with Ms. Spearman's counsel?

21       A.  I think twice.

22       Q.  Before I get into any specifics about those

23   discussions, Mr. Reed, can you tell me when those

24   conversations took place?

25       A.  The exact date and time I really don't

Page 61

```
 1   know.  I believe we've spoken twice, just general
 2   questions that they had.  But it was -- I couldn't
 3   tell you the exact date.
 4        Q.  And, Mr. Reed, look, I understand we're
 5   talking about things that happened some time ago.
 6   I'm not going to ask you about -- it's certainly
 7   fair you wouldn't remember an exact date.  Do you
 8   have an approximation as to when you -- let's just
 9   say there's two conversations.  When was the most
10   recent before today, approximately?
11        A.  Within the last 30 days.  Because I was
12   asked by Gina's legal counsel if I would be
13   available to depose, and I said I would be.
14        Q.  How long did that conversation take place,
15   the one you just talked about within the last 30
16   days?
17        A.  Ten minutes, 15 minutes maybe.
18        Q.  Did you talk at all about Ms. Spearman's
19   contentions in this litigation?
20             MS. GIBSON:  Objection.  Go ahead.
21        A.  I know in the first conversation that we
22   had I talked to MaryBeth, and she kind of outlined
23   the concerns of what Gina was suing over and some of
24   the things and general questions that at that time
25   was basically any contracts that ever went out to
```

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 62

1    any of the regionals, any contracts that -- any
2    changes to contracts, was that always done in
3    writing.  And the answer is, yes, those were always
4    done in writing.  And the contracts were very in
5    depth to cover all different things.  There was no
6    verbal contracts that were ever given to my
7    knowledge.
8         Q.  And you said that was the first
9    conversation that you had with Ms. Gibson?
10        A.  Yes.
11        Q.  Ms. Gibson knows I had to take this from
12   home today, and of course they're starting to cut
13   the grass outside, so sorry about that.
14        A.  No worries.
15        Q.  That first conversation, approximately when
16   did that conversation take place?
17        A.  I would say within the last six months.
18        Q.  And about how long did that conversation
19   last?
20        A.  Probably spent about 30 minutes, maybe 40
21   minutes on the call.
22        Q.  And the most -- the more recent
23   conversation, was that with Ms. Gibson or someone
24   else from Ms. Gibson's office?
25        A.  No.  The only person that I've talked to

Page 63

1    with her office is Ms. Gibson.

2         Q.   Thank you.  Mr. Reed, do you have any

3    accounting or finance educational background?

4         A.   Forty years in this business.

5         Q.   Certainly understood.  What is your

6    undergraduate degree?

7         A.   I didn't go to college.

8         Q.   Sorry about that.

9         A.   Hasn't been a problem for me.

10        Q.   I understood completely.  I didn't mean to

11   presume.  My apologies for presuming.

12        A.   That's all right.

13        Q.   Have you ever held a position with a

14   company in its finance department?

15        A.   Well, I owned a company for 11 years and it

16   was -- it would have been considered a mortgage

17   banker.  I have my own warehouse lines funded with

18   our own money, managed everything with investor

19   relations, secondary market.  We didn't service any

20   of our own loans but certainly managed all of the

21   details of the business with the exception of

22   servicing.

23        Q.   Do you have any formal accounting training

24   of any kind?

25        A.   I'm not an accountant.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 64 of 99
Jon Reed                              January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 64

1      Q.   Have you ever taken any kind of accounting

2      courses of any kind?

3      A.   No.   I've managed P and Ls for 40 years.   I

4      think when it comes to -- no, I'm not an accountant.

5      Q.   Mr. Reed, earlier when Ms. Gibson was

6      asking you questions you mentioned that you would

7      review the P and Ls typically every month.   If you

8      could just explain to me how did you go about doing

9      that.

10      A.   It came to me first on the P and L.   So as

11      I would review the numbers, looking at the P and Ls,

12      you look at the different line items.   It's pretty

13      simple when you're looking at the different line

14      items.   If two and two adds up to four, it's great.

15      If two and two adds up to eight, it doesn't make

16      sense.   So I am pretty good at math.   So when I go

17      through all of those different things I can pick out

18      and find areas in a P and L that just do not make

19      sense.   So that was -- those P and Ls normally came

20      to me first.   I would find what I would find in the

21      P and Ls that did not seem to make sense, and then

22      when we got together for our formal review of the

23      P and Ls with Christy and Jan and Jason and the

24      group, that's when I would introduce all that stuff.

25      Most of it I could do from memory.   They would go

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 65 of 99
Jon Reed                                          January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 65

1      back and make the changes that needed to be made,

2      understanding that there was flaws in the agreement

3      -- in the P and L, so those adjustments would be

4      made.  So I didn't take the review of the P and L

5      lightly.  I know you're not insinuating that.  But I

6      would have clearly known if there was any part of

7      the P and L that should have been in there and was

8      not being counted.  I would have known that.  But if

9      it's not a part of the P and L, then I would have no

10     knowledge and could not count what was not visible.

11          Q.  I totally understand your answer.  Let me

12     maybe try to ask a clarifying question.  I'm just

13     trying to understand what came to you.  So, in other

14     words, when you received something, you said you

15     received it first.  I'm trying to understand what it

16     was that you received.

17          A.  The full Retail P and L, the full P and L.

18          Q.  So you would receive the Retail P and L

19     only, not the P and L that involved non-Retail?

20          A.  Correct.  I wasn't involved with any -- my

21     exact title -- I think somebody asked it earlier --

22     was Executive Vice President of Retail Sales

23     nationwide.  So anything that had to do with Retail

24     I was involved with.

25          Q.  In what format did you typically, when you

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 66 of 99
Jon Reed
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 66

1    received the Retail P and L each month, how would

2    you receive it?

3         A.   It would come over electronically.

4         Q.   Was it an Excel spreadsheet?  Was it sort

5    of a link to access in Keblar?  I'm just trying to

6    understand what you might have received.

7         A.   A lot of that was put together in Keblar,

8    but it would come over in a P and L format that

9    would line out, like you would look at any P and L,

10   all of the expenses, all of the revenue, the volume

11   associated with that, units, fee income, everything

12   that was a part of it was in there.

13        Q.   Who would typically send you that first

14   pass of the P and L that you were asked to review?

15        A.   It would come from Jason or the lead person

16   on his team.

17        Q.   That P and L that you reviewed, earlier

18   there was -- we talked -- there was testimony or

19   discussion there was CM1, CM2, CM3 were discussed.

20   What you received, what was your understanding of

21   what bucket that came from, CM1, CM2 or CM3?

22             MS. GIBSON:  Objection; form and

23        foundation.

24   BY MR. PERLOWSKI:

25        Q.   You can answer.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 67 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 67

1          A.   The P and L that I was receiving, I was

2     under the understanding that that was inclusive of

3     everything that would have affected Retail.

4          Q.   So when you received it -- I'm just trying

5     to get your understanding, sir, no one else's, just

6     yours.

7          A.   Got it.

8          Q.   When you received the P and L, the Retail

9     P and L, did you have an understanding that certain

10    corporate expenses that might have been incurred on

11    behalf of Retail were embedded in that P and L that

12    you were receiving?

13         A.   Should have been.  The best way to answer

14    your question is the P and L that I was receiving I

15    was told was the actual P and L with all expenses

16    and all revenue associated for that month.

17         Q.   Going to my question, it was your

18    understanding that that P and L encompassed all

19    Retail-related expenses; is that fair?

20         A.   Correct.

21         Q.   I'm trying to understand what your

22    understanding was, and I think we got that down.

23              Did you ever receive the non-Retail

24    P and Ls?

25         A.   That would have dealt with other channels

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 68 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 68

1     within Broker Solutions?  No.

2          Q.  Other channels within NAF, so either

3     corporate or ILA instead of OLA?

4          A.  ILA was a different channel.  So there were

5     several channels of business inside Broker

6     Solutions, doing business as New American Funding.

7     I received everything associated with Retail.

8          Q.  And Retail only?

9          A.  Correct.

10         Q.  Did you ever ask to look at any of the

11    other P and Ls in connection with your review of the

12    Retail P and Ls?

13         A.  I wouldn't have asked that because it

14    didn't apply.

15         Q.  I'm just asking if you ever did.

16         A.  No.

17         Q.  Mr. Reed, in terms of the loss that was

18    reported in early 2019 with respect to Retail, did

19    that number -- could that number have been more like

20    5.5 million dollars and not 25 million dollars?

21              MS. GIBSON:  Objection, foundation.

22         A.  It depends on who you ask.

23    BY MR. PERLOWSKI:

24         Q.  Did you ever hear that number being a loss

25    of around 5.4 or 5.5 million dollars being reported

Page 69

1    for Retail?

2         A.  I heard two numbers, the one number was 25

3    million, the other number I said, well, we really

4    didn't make any money but we really didn't lose any

5    money.  So the short answer is that the truth lies

6    somewhere between a 15 million dollar gain, a 25

7    million dollar loss or break even.  Those were the

8    three numbers I was given.

9         Q.  Who gave you the 25 million dollar number?

10        A.  That came out of Rick and Jason.

11        Q.  Who gave you the break even number, the

12   approximately break even number?

13        A.  Christy.

14        Q.  Mr. Reed, were you at all involved in the

15   preparation of schedules for regional managers?

16        A.  You're going to have to qualify what you

17   mean.

18        Q.  Sure.  So are you familiar, just generally

19   speaking, with NAF's Regional Manager Agreement?

20        A.  Yes.

21        Q.  Are you aware that that Regional Manager

22   Agreement has certain schedules associated with it?

23        A.  Yes.

24        Q.  Were you typically involved in the

25   preparation of those schedules?

Page 70

1        A.  No.

2        Q.  Were you typically involved -- I'm just

3    going to ask you a few questions understanding,

4    based on your last answer, I probably know what the

5    answer is, but I'm trying to create a record.

6            Were you involved in the preparation of

7    Schedule 1s for regional managers?

8        A.  I wasn't involved in working -- Jan and

9    Legal worked on the preparation of the schedules.

10   Would I have had an understanding of them after I

11   read them, yes.  But I wasn't involved in the

12   preparation, no.

13       Q.  So is it fair to say that you were not

14   involved in the distribution of amended schedules

15   during a particular regional manager's employment?

16       A.  I wasn't involved in the preparation of the

17   agreements.  The review of the agreements I would

18   have had knowledge of.

19       Q.  Would you have been involved in the

20   distribution of any amended schedules to a regional

21   manager?  In other words, the amended schedule is

22   prepared.  It's been delivered.  Would you have been

23   involved in that process?

24       A.  I don't think it would have been sent by

25   me, no.

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 71 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 71

1          Q.  Ms. Gibson asked you some questions about

2     the September 2019 meeting in Atlanta that you and

3     Mr. Frommert attended on behalf of NAF.

4          A.  Yes.

5          Q.  What is your recollection, in terms of when

6     the meeting ended, what was your recollection as to

7     what you and/or Mr. Frommert told Ms. Spearman about

8     what would be happening next?

9          A.  Well, towards the end of the meeting it got

10    a little heated between Gina and Kelly and Scott.

11    And I think I had offered some comments that we

12    would take the information back, process the

13    information, talk to the people.  We diffused that

14    and went back.  But it got a little heated at the

15    end.  All I can give you is my honest assessment of

16    it.  I think it would have gotten heated on the side

17    of Gina and Kelly because there was a lot of changes

18    that were happening and a lot of things that were

19    clearly changing to their original agreements.  And

20    so that creates some anxiety.  And Scott, being new

21    to the organization, trained to do the right thing

22    for the people that hired him and trying to do a

23    really good job to put together a P and L plan that

24    was suitable to all sides, I think his intent was in

25    the right area.  But it did not come across well in

1    the meeting.  So we went back to work on the things

2    that needed to be polished up.

3        Q.  In terms of what -- as best as you can

4    remember, what message was delivered to Ms. Spearman

5    at the end of the meeting about what was going to

6    happen next?

7                MS. GIBSON:  Objection; form and

8          foundation.

9    BY MR. PERLOWSKI:

10       Q.  Let me revise that question.  What, if

11   anything, do you remember you saying to Ms. Spearman

12   and Ms. Allison about what was going to happen next

13   at the end of the September 19 meeting?

14       A.  Well, I clearly thanked them for the

15   opportunity to come out and meet with them.  I had a

16   great deal of respect for both of them, and still

17   do.  They ran a great shop.  And so my words to them

18   at that time would be let's go back, sit down with

19   obviously -- Rick and Patty own the company, so sit

20   down with the powers that be, look at what's being

21   presented, try to polish this up and come back with

22   something that's favorable or agreeable to all

23   sides.

24              So really, just thinking back, I remember

25   very clearly that it was -- it got a little heated

Page 73

```
 1    there at the end.  All I really wanted to do at the
 2    end is -- you can imagine at that particular time
 3    the last thing that would have ever occurred to me
 4    is that I wouldn't be working for New American
 5    Funding.  And I certainly didn't want to lose, in my
 6    opinion, arguably the best region in the company.
 7    So it was my sincere desire to try to figure out
 8    what we needed to put in place that was going to be
 9    something that was acceptable to ownership,
10    leadership and something that was going to be
11    acceptable to Kelly and Gina.
12            It's not healthy to watch any group -- and
13    I actually, to be honest with you, we did attend
14    like meetings with the St. Louis, the Midwest
15    manager.  I think we had a phone call with the
16    Colorado regional manager.  So I had the same
17    passion towards all of them.  I was very close to
18    them.  The Colorado manager worked for me.  We owned
19    a company together.  He's my brother -- I've known
20    him since he was 12 years old.
21            The gentleman that runs Nevada, I was
22    instrumental in hiring him.  I'm still very close to
23    him.  The guy that runs the Midwest worked for me at
24    Countrywide.  These weren't relationships that were
25    short term.  And so as we tried to put these things
```

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 74 of 99
Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 74

1    together, you want to do the right thing for the

2    company that you serve and you also want to do the

3    right thing for the people that you've worked so

4    hard to hire and retain.  I don't know how to say

5    that any different than that.

6         Q.  Thank you.  I appreciate it.  Do you

7    remember what Mr. Frommert may have -- in terms of

8    what message Mr. Frommert may have delivered, if

9    any, at the end of the September 19 meeting?

10        A.  The one out there in Atlanta?

11        Q.  Yes.

12        A.  He was pretty direct.  I know Scott had

13   worked really hard to try to put together what he

14   thought was a fair plan.  And probably in his

15   passion to the amount of work that he had put into

16   the plan, felt angered that it wasn't being received

17   more favorably.  And that wasn't the right position

18   to take at that time.  But I do think it centered

19   around the fact that he had worked hard on it and he

20   felt he had come up with something fair and it

21   wasn't being received very well.

22        Q.  From your impression of Mr. Frommert, do

23   you believe that he was working hard to put together

24   a plan that he thought was fair?

25        A.  I do.  It's obvious he had guidelines that

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 75 of 99
Jon Reed                                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 75

1    he was under that came directly from ownership.  I

2    wasn't a part of all the directives that he

3    received.  But I do know with a lot of the work I

4    did with him on everybody's P and L that he really

5    did want to work to something that was going to be

6    acceptable and fair to both sides.

7        Q.  I'm asking -- the next couple of questions

8    I'm just asking about your impression.  Was it your

9    impression that Ms. Allison was receptive to go to a

10   P and L model as opposed to a basis points model?

11       A.  I think Kelly -- I think Ms. Allison, she

12   had worked under a P and L model for years, so a

13   P and L was not foreign to her.  The idea of being

14   on a P and L plan would not have been unacceptable

15   to her.  The terms of the P and L plan was certainly

16   debatable.

17       Q.  Was it your impression as to whether Ms.

18   Spearman was receptive to going to a P and L model

19   from a basis points model?

20       A.  Gina and Kelly talked a great deal.  Gina

21   always -- she was always very polite, very reserved.

22   She didn't -- I don't want to say that she wouldn't

23   express her side.  She would.  But it wasn't as

24   direct often as Kelly would be.

25       Q.  Mr. Reed, have you given any -- I'm not

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 76 of 99
Jon Reed                                January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 76

1    talking about the deposition today, but have you

2    given any form of signed statement in this matter?

3         A.  I have not.

4              MR. PERLOWSKI:  I don't have any further

5         questions, MaryBeth.

6              MS. GIBSON:  Thank you for your time,

7         Mr. Reed.  I appreciate it.

8              THE WITNESS:  You're welcome.

9              MR. PERLOWSKI:  Mr. Reed, again, thank

10        you very much for your cooperation today.  We

11        certainly appreciate it.  Have a great weekend.

12             THE WITNESS:  You, too.  Thanks so much.

13             (Signature reserved.)

14             (Deposition concluded at 4:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 77

```
1                        CERTIFICATE
2       STATE OF GEORGIA:
3       COUNTY OF FULTON:
4           I hereby certify that the foregoing
5       transcript was taken down, as stated in the caption,
6       and the colloquies, questions and answers were
7       reduced to typewriting under my direction; that the
8       transcript is a true and correct record of the
9       evidence given upon said proceeding.
10          I further certify that I am not a relative or
11      employee or attorney of any party, nor am I
12      financially interested in the outcome of this action.
13          I have no relationship of interest in this
14      matter which would disqualify me from maintaining my
15      obligation of impartiality in compliance with the
16      Code of Professional Ethics.
17          I have no direct contract with any party in
18      this action and my compensation is based solely on
19      the terms of my subcontractor agreement.
20          Nothing in the arrangements made for this
21      proceeding impacts my absolute commitment to serve
22      all parties as an impartial officer of the court.
23      Th:                                    ?.
24
                        _____
25
                        Lucy C. Rateau, RPR, CCR 2766
```

Page 78

1    To:  Jon Reed

2    Re:  Signature of Deponent Jon Reed

3    Date Errata due back at our offices: 30 days

4

5    Greetings:

6    This deposition has been requested for read and sign

7    by the deponent.  It is the deponent's responsibility

8    to review the transcript, noting any changes or

9    corrections on the attached PDF Errata.

10   The deponent may fill out the Errata electronically

11   or print and fill out manually.  Once the Errata is

12   signed by the deponent and notarized, please mail it

13   to the offices of Veritext (below).

14   When the signed Errata is returned to us, we will

15   seal and forward to the taking attorney to file with

16   the original transcript.  We will also send copies

17   of the Errata to all ordering parties.

18   If the signed Errata is not returned within the time

19   above, the original transcript may be filed with the

20   court without the signature of the deponent.

21   Please send completed Errata to:

22   Veritext Production Facility

23   20 Mansell Court, Suite 300

24   Roswell, GA  30076

25   (770) 343-9696

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 79

1                    ERRATA for ASSIGNMENT #

2

3        I, the undersigned, do hereby certify that I have

4        read the transcript of my testimony, and that

5        ___ There are no changes noted.

6        ___ The following changes are noted:

7

8        Pursuant to Rule 30(7)(e) of the Federal Rules of

9        Civil Procedure and/or OCGA 9-11-30(e), any changes

10       in form or substance which you desire to make to

11       your testimony shall be entered upon the deposition

12       with a statement of the reasons given for making

13       them.  To assist you in making any such corrections,

14       please use the form below.  If additional pages are

15       necessary, please furnish same and attach.

16

17       Page _____ Line _____ Change _____

18       _____

19       Reason for change _____

20       Page _____ Line _____ Change _____

21       _____

22       Reason for change _____

23       Page _____ Line _____ Change _____

24       _____

25       Reason for change _____

Jon Reed                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 80

1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Reason for change _____

7    Page _____ Line _____ Change _____

8    _____

9    Reason for change _____

10   Page _____ Line _____ Change _____

11   _____

12   Reason for change _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16

17                          _____

18                          DEPONENT'S SIGNATURE

19   Sworn to and subscribed before me this ____ day of

20   _____, ____.

21

22   _____

23   NOTARY PUBLIC

24   My Commission Expires: _____

25

Jon Reed
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 28, 2022

**[04981 - adjustments]**

Page 1

**0**

**04981**   1:6

**1**

**1**   17:3 21:16,22
45:15,16 46:12,12
55:24 57:22,24
**1.9**   59:8
**10**   12:22 41:22
46:2 57:11,13
**11**   63:15
**12**   12:22 40:4 41:1
73:20
**13**   41:12
**14**   41:12
**14th**   77:23
**15**   16:20 27:20,21
41:12 61:17 69:6
**16**   41:12
**171**   3:17
**17th**   3:17
**19**   4:2 52:8 54:3,4
54:11 72:13 74:9
**19546**   77:24
**1994**   7:10
**1:20**   1:6
**1s**   70:7

**2**

**2**   17:4,5 20:2
21:16,22,23 58:1
**2.2**   59:9
**2.4**   59:9
**2.6**   59:9
**20**   78:23
**2012**   9:19 10:20
**2013**   9:13
**2014**   11:15
**2015**   20:11
**2016**   13:18,19
43:23 47:1,21

**2017**   13:9,14
**2018**   12:6 13:16
15:8,9,23 16:1,6
16:17 21:3,24
24:24 25:4 27:1
27:17,18,23,25
28:4,6 39:25 51:5
52:5,7
**2019**   12:6 16:14,24
17:13 19:18 21:10
21:19,25 22:1,17
23:10 24:4 28:22
38:24 39:7,8,13,15
39:25 40:2,2 42:3
50:7,8 51:16
54:24 57:20 68:18
71:2
**2020**   12:16 13:1
39:17,20 40:3
45:15 46:12 49:3
49:5,24 53:24
54:6,9,17,23 55:24
**2022**   1:15 77:23
**2100**   3:17
**230**   3:8
**25**   16:21 17:18
26:7 45:24,25
68:20 69:2,6,9
**2766**   77:25
**28**   1:15
**2:15**   1:16

**3**

**30**   53:9,16 54:18
61:11,15 62:20
78:3 79:8
**300**   78:23
**30076**   78:24
**30305**   3:9
**3035**   6:22
**30363**   3:18

**343-9696**   78:25
**3535**   3:7
**3:11**   41:25
**3:21**   41:25
**3:45**   57:16
**3:53**   57:16

**4**

**40**   62:20 64:3
**404.873.8500**   3:19
**45**   33:17
**4:25**   76:14

**5**

**5**   2:8
**5.4**   68:25
**5.5**   68:20,25
**50**   38:1
**59**   2:9

**6**

**6th**   12:25 13:1

**7**

**7**   79:8
**75**   39:7
**770**   78:25

**8**

**89044**   6:23

**9**

**9-11-30**   79:9
**90**   30:13,23 31:5
31:15 34:17,24
39:7 53:10,16
**95**   7:10

**a**

**ability**   9:16
**able**   23:17 59:7
**abnormal**   25:10
**absolute**   77:21
**absolutely**   28:14
46:5

**accept**   38:6 49:21
50:2
**acceptable**   37:10
37:11 73:9,11
75:6
**accepted**   12:24
**access**   66:5
**accommodated**
17:24
**accommodations**
44:21
**accomplished**
32:21
**account**   33:1 53:3
**accountability**
29:12
**accountant**   63:25
64:4
**accounting**   63:3
63:23 64:1
**accusing**   8:24,25
**achieved**   45:25
**achieving**   53:4
**acquired**   12:5
**acquisition**   12:3,4
41:13
**action**   77:12,18
**actual**   14:25 19:15
26:15 67:15
**ad**   9:21,22,25
**add**   12:12
**added**   12:11 17:6
**adding**   37:7
**additional**   79:14
**address**   6:11
**addressed**   47:3
**adds**   64:14,15
**adjust**   27:2
**adjusted**   43:17
**adjustments**   25:22
65:3

[advertised - belief]                                                              Page 2

advertised   10:3
affect   9:15
aggravate   25:13
ago   61:5
agree   28:4 37:7
  56:8
agreeable   72:22
agreement   9:2
  34:2 43:23 44:3
  47:1 49:21 54:16
  55:4 56:8 65:2
  69:19,22 77:19
agreements   44:4
  49:9 70:17,17
  71:19
ahead   52:21 61:20
allison   13:3,20
  15:2 34:9 42:6
  55:5 72:12 75:9
  75:11
allison's   13:25
allocation   17:25
  18:5 33:15 59:4
allocations   15:17
  58:5
allow   37:18 38:1
altered   46:19
amended   70:14,20
  70:21
amendment   45:16
america   11:7
american   1:8 8:10
  8:13,15 55:17
  56:22 58:17 68:6
  73:4
amount   14:5
  16:18 45:23 46:1
  74:15
andrew   3:24
angela   7:23

angered   74:16
announce   26:7
announced   33:7
announcement
  26:19
announcements
  28:24 29:4 32:13
  33:7 39:1
annual   59:8
answer   6:15 17:21
  19:4,20 21:14
  22:4,22 26:11,23
  27:10 30:15,25
  31:18,19 32:6,15
  38:12 39:5 40:20
  45:11 46:17 48:1
  49:17 50:5,11,15
  51:2,25 58:11
  62:3 65:11 66:25
  67:13 69:5 70:4,5
answered   9:21
answers   37:16
  38:16 77:6
anxiety   71:20
anybody   28:2
anymore   46:7
anytime   6:1,13
  60:15
anyway   42:18
apologies   63:11
apparent   28:12
apparently   17:4
appearances   3:1
applied   9:25
apply   68:14
appreciate   74:6
  76:7,11
approximately
  9:12 10:18 61:10
  62:15 69:12

approximation
  61:8
april   12:25 13:9
  53:24
area   7:4,25 12:5
  14:24 71:25
areas   64:18
arguably   73:6
argue   40:24
arnall   3:16
arrangements
  77:20
arrears   40:10
articulate   25:20
arvielo   10:10
  17:11 24:8,9 28:7
  28:12 30:21 31:8
  31:13 38:8
arvielos   48:20
  56:11
asked   30:20 40:9
  58:12 61:12 65:21
  66:14 68:13 71:1
asking   5:22 64:6
  68:15 75:7,8
assessment   71:15
assignment   79:1
assist   79:13
assisting   24:14
associated   58:1
  66:11 67:16 68:7
  69:22
assume   41:1,5
assuming   25:15
  44:20 47:16 48:16
  50:17 56:7
atlanta   1:2 3:9,18
  7:4,13,25 42:3
  54:25 71:2 74:10
attach   79:15

attached   78:9
attend   24:17 42:2
  73:13
attended   17:9 24:6
  71:3
attorney   44:10
  77:11 78:15
attributed   21:18
audio   13:25
available   61:13
avielo   17:11
aware   47:18 48:3
  69:21

b

b   1:8
back   7:10 12:14
  14:13 28:3 38:2
  42:19 43:10 44:9
  44:17 47:23 50:7
  50:20 65:1 71:12
  71:14 72:1,18,21
  72:24 78:3
background   5:22
  63:3
bank   11:7 30:7
banker   63:17
base   45:23,24
based   16:2,4 27:22
  70:4 77:18
basically   24:23
  61:25
basis   20:9 23:14
  23:25 51:7 55:14
  59:8 75:10,19
began   39:11,15
beginning   23:19
  51:15
behalf   3:3,13
  67:11 71:3
belief   23:11

Jon Reed

January 28, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[believe - commentary]

Page 3

**believe**  9:9 11:15
   12:5 13:2 18:4
   20:15 21:9 24:8,9
   24:16 26:24 27:18
   29:21 34:13 35:4
   41:14 42:21 43:2
   44:3,6 46:19 58:9
   61:1 74:23
**believed**  16:20
   41:2,6 47:19
   55:14
**bell**  30:19
**benefits**  26:5
**best**  45:6 67:13
   72:3 73:6
**big**  41:8
**bit**  12:2 14:14 30:3
   35:13 55:13
**blessing**  34:22
**bonus**  45:24 46:1
**branch**  14:7,21
**branching**  58:19
**breaching**  9:2
**break**  6:13,14,16
   41:20,22 57:8
   69:7,11,12
**breakdown**  57:21
   57:22
**breakout**  29:18
**bring**  42:23 51:12
**broken**  14:3
**broker**  1:7 68:1,5
**brokerage**  8:11
**brother**  73:19
**brought**  43:24
   44:1
**bucket**  21:11
   66:21
**budget**  28:25 29:3
   31:15 33:20,22,23
   34:10 49:1,5

   50:25
**budgets**  37:20
**build**  10:16 38:21
**bunce**  10:12 17:12
   31:8
**business**  10:24
   11:22 12:8 58:8
   58:13,17 63:4,21
   68:5,6

**c**

**c**  1:17 3:4 77:25
**california**  10:5,6,7
   10:17,22,25 11:2,4
   11:6,20 44:17
**call**  10:25 38:5
   58:18 60:8,13
   62:21 73:15
**called**  11:20 17:3
   60:8
**calm**  32:10
**calming**  32:7,12
**cap**  1:6
**capital**  18:13,15
   18:17,25 19:1,9
**caption**  77:5
**case**  1:6
**categories**  17:2
   57:23,25
**category**  17:1 20:1
**ccr**  1:17 77:25
**center**  10:25 58:18
**centered**  18:3
   23:21 47:10 51:4
   60:13 74:18
**certain**  37:16
   48:15 67:9 69:22
**certainly**  31:5
   54:23 58:16 61:6
   63:5,20 73:5
   75:15 76:11

**certificate**  77:1
**certify**  77:4,10
   79:3
**cfo**  19:10,11,15
   23:15 34:21 35:6
   35:10
**change**  27:5 33:16
   39:18,22 40:25
   49:7 50:2 79:17
   79:19,20,22,23,25
   80:1,3,4,6,7,9,10
   80:12,13,15
**changed**  11:13,16
   11:18,18,21 17:23
   21:11 40:1,1,2,3,6
   40:17 45:21
**changes**  30:13,22
   40:4 49:9,11 52:3
   59:11 62:2 65:1
   71:17 78:8 79:5,6
   79:9
**changing**  17:18
   34:1 71:19
**channel**  68:4
**channels**  58:16,18
   67:25 68:2,5
**charge**  11:22
   14:16
**chase**  3:15
**chase.ogletree**
   3:21
**children**  7:20,24
**choices**  49:21
**christy**  10:12
   11:21 17:11 20:22
   22:17 24:7 33:6
   44:21 48:12,17
   51:21 64:23 69:13
**circumstances**
   8:12

**civic**  8:2
**civil**  79:9
**clarifying**  65:12
**clear**  25:1 37:10
   37:12 54:19
**clearly**  27:1 36:11
   45:1,12 55:15
   65:6 71:19 72:14
   72:25
**close**  16:21 29:16
   73:17,22
**cm**  21:11
**cm1**  58:12 59:19
   66:19,21
**cm2**  17:16 58:12
   59:19 66:19,21
**cm3**  66:19,21
**cmp**  7:9
**code**  77:16
**coin**  36:17
**college**  63:7
**colloquies**  77:6
**colorado**  8:23 9:1
   9:24 10:4 73:16
   73:18
**combining**  59:6
**come**  9:20 12:14
   14:13 23:8 33:6
   36:12 38:3,22
   42:15 55:3 66:3,8
   66:15 71:25 72:15
   72:21 74:20
**comes**  18:24 64:4
**comfort**  32:10
**coming**  35:23,24
   36:3 51:10,22
   52:3
**comment**  25:9,11
   38:16
**commentary**
   37:16

Veritext Legal Solutions

**[comments - decided]**                                    Page 4

**comments** 28:11
  37:5 71:11
**commission** 14:6
  80:24
**commitment**
  77:21
**commitments**
  52:23
**common** 49:8
  52:25
**communication**
  28:9 29:8 56:23
**comp** 41:7
**companies** 12:9,22
  26:1 41:11
**company** 7:7,9
  8:11 9:23,23 10:3
  12:5,18 15:20
  19:10 22:11 23:16
  25:2 29:11,14
  36:4,24 37:14,23
  37:24 38:21 41:15
  41:15 43:10 59:16
  60:9 63:14,15
  72:19 73:6,19
  74:2
**compare** 44:5
**comparisons**
  43:21
**compensation**
  13:25 14:3,4,10
  25:22 26:5 34:4
  40:10,25 43:22
  77:18
**complained** 47:12
**complete** 6:6
**completed** 34:21
  35:1 78:21
**completely** 63:10
**complex** 54:14

**compliance** 77:15
**component** 23:25
  55:14
**comprised** 57:19
**concern** 22:5,9,9
  22:13,23,24 23:2,6
  33:19,25
**concerned** 52:2,3
**concerns** 61:23
**concessions** 29:9
  29:12 37:20
**concluded** 76:14
**confrontational**
  32:8
**confused** 28:17
**confusion** 22:6
**connect** 58:22
**connection** 68:11
**considered** 12:12
  16:2 26:2 63:16
**consistent** 53:4
**consolidated**
  21:20
**contact** 12:10
**contacted** 12:23
**contentions** 61:19
**continual** 54:16
**continuance** 22:11
**continue** 38:21
  39:22
**continued** 13:10
  18:2 24:1 33:16
  39:18 54:11
**contract** 5:9 13:18
  39:24,25 40:1,6,15
  40:15,17 45:22
  46:11,20 47:21
  49:2,24 55:19
  77:17
**contracts** 14:13,25
  61:25 62:1,2,4,6

**control** 37:19
**conversation**
  38:18 48:18 61:14
  61:21 62:9,15,16
  62:18,23
**conversations**
  31:24 38:7 47:4
  56:21 60:6,24
  61:9
**cooperation** 76:10
**copies** 44:4 78:16
**copy** 43:3,6
**corporate** 15:17
  17:1,2,3,4,5,16,24
  18:5 21:16,16,20
  21:21,22,22 28:20
  33:15 57:19,22,24
  58:1,5,21 59:4,7
  67:10 68:3
**correct** 6:9 11:11
  11:12 13:21 15:24
  15:25 18:4 19:15
  21:4 22:25 27:14
  39:3 47:21 49:25
  55:1,2,5 65:20
  67:20 68:9 77:8
**corrections** 78:9
  79:13
**correctly** 41:4,5
  49:7
**counsel** 3:1 4:1
  44:8 60:20 61:12
**count** 65:10
**counted** 65:8
**countrywide**
  73:24
**county** 7:2 77:3
**couple** 10:1 75:7
**course** 20:6 24:9
  62:12

**courses** 64:2
**court** 1:1 5:19
  6:12,22 77:22
  78:20,23
**cover** 62:5
**covid** 4:2
**create** 18:23 23:16
  36:10 70:5
**created** 17:6
**creates** 22:9 71:20
**current** 6:21
**currently** 23:14
**cut** 62:12
**cuts** 50:24
**cv** 1:6

**d**

**d** 1:8 6:20,22
**date** 46:21 60:25
  61:3,7 78:3
**dates** 39:18
**day** 20:20 29:16
  38:15 53:10 77:23
  80:19
**days** 30:13,23 31:5
  31:15 33:17 34:17
  34:24 39:7,7 53:9
  53:16,17 54:18
  61:11,16 78:3
**deal** 9:11 29:7
  40:5 42:20 45:21
  53:8 58:23 59:10
  72:16 75:20
**deals** 46:20
**dealt** 14:19 67:25
**debatable** 75:16
**debate** 30:5 32:23
  33:15 36:2,11
  59:1,14
**december** 16:6
**decided** 59:15

[deep - exact]                                                      Page 5

deep 54:23
defendant 1:9
  3:13
definite 31:20
degree 40:10 63:6
delivered 70:22
  72:4 74:8
denomination
  46:4
department 63:14
departure 35:19
depend 26:3 47:8
depending 23:20
  30:4 37:21
depends 68:22
deponent 78:2,7
  78:10,12,20
deponent's 78:7
  80:18
depose 61:13
deposition 1:12
  5:15 8:5,13,17,23
  9:12 19:5 76:1,14
  78:6 79:11
depositions 8:9,10
depth 62:5
description 2:2
  10:16
desire 73:7 79:10
details 63:21
determine 40:11
  45:3
determined 27:11
  38:4
development
  11:23
difference 14:9,11
differences 43:19
different 12:24
  13:11 14:8,20
  18:1,22 21:17

30:4 43:19 47:5
53:12 57:23,25
58:4,16,25 59:12
62:5 64:12,13,17
68:4 74:5
difficulty 37:9
diffuse 42:19
diffused 71:13
direct 24:18 74:12
  75:24 77:17
direction 34:22
  37:10,12,15 77:7
directives 75:2
directly 18:20
  36:6 48:19 60:4
  75:1
discovered 50:8
  50:12
discuss 17:19
  51:18
discussed 17:15
  31:6 48:2 60:16
  66:19
discussion 17:22
  30:5 32:23 33:2
  38:2 42:18 44:7
  44:18 47:9 66:19
discussions 30:10
  33:11 48:12 60:23
disputes 60:16
disqualify 77:14
distracted 58:11
distributed 36:20
distribution 70:14
  70:20
district 1:1,1
disturbing 23:3
divided 14:17,18
  21:21
division 1:2 15:20
  15:21,23 16:1

divisional 11:16
  11:18,19
documents 43:15
  44:2 59:18
doing 5:15 8:24
  19:2 54:15 58:22
  60:13 64:8 68:6
dollar 16:21,22
  17:18 26:7 69:6,7
  69:9
dollars 27:22
  45:23 68:20,20,25
doubt 41:14
downplay 44:23
dramatically
  45:21
drive 58:23
drop 14:1
due 4:2 78:3
duly 5:2

e

e 6:20,20,22,22
  7:18,18,23 79:8,9
earlier 11:19
  21:15 32:1 52:6,6
  52:9 64:5 65:21
  66:17
early 12:6,16 13:8
  13:16 16:13 28:22
  36:2,12 39:8 52:8
  68:18
earn 30:9
earnings 53:3
easy 36:8 46:6
economics 18:22
educational 63:3
effect 32:7
effective 54:9
eight 64:15
either 12:6,9 23:21
  36:6 50:1 57:5

68:2
elected 12:24
electronically 66:3
  78:10
else's 67:5
elsworth 24:13
embedded 67:11
embodied 54:8
embodying 55:20
employed 8:9
  11:14 12:17 35:14
  35:21
employee 77:11
employees 8:22
employment 5:24
  5:25 8:19,20
  70:15
encompassed
  21:17 67:18
ended 44:12 71:6
entered 79:11
enterprise 21:19
entire 13:15 15:16
  15:19 19:24 20:7
  20:21 28:18 52:7
entities 13:13
entitled 46:25
  47:20
errata 78:3,9,10
  78:11,14,17,18,21
  79:1
esq 3:4,5,14,15,24
ethics 77:16
everybody 28:16
everybody's 34:22
  75:4
evidence 77:9
evolve 18:2
exact 26:12,18
  60:25 61:3,7
  65:21

Case 1:20-cv-04981-CAP  Document 94  Filed 04/28/22  Page 86 of 99
Jon Reed
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[exactly - general]

Page 6

exactly 28:10
examination 5:4
  59:23
examinations 2:7
examined 5:2
example 37:20
excel 66:4
exception 63:21
exceptions 29:5,6
executive 11:21,22
  15:5 46:10 65:22
exhibit 2:2
exhibits 2:1,3
existence 22:10
  41:16
expected 55:10
expense 17:1,24
  26:4 29:14 45:5
  57:23
expenses 15:18
  16:10 17:16 21:6
  21:18 29:1,10
  32:20,24 58:12
  59:18 66:10 67:10
  67:15,19
experience 6:24
  20:12 36:4
expires 80:24
explain 21:10 64:8
explained 21:9
express 23:6 33:19
  75:23
expressed 30:12
  53:6
extensive 16:19

**f**

face 13:10,10
facility 78:22
fact 25:21 26:25
  27:14 46:24 51:4
  52:4 74:19

fair 36:2,3,13
  48:15 53:1 61:7
  67:19 70:13 74:14
  74:20,24 75:6
fairly 27:3
fairness 36:3
fall 11:15 39:15
familiar 69:18
faster 41:13,16
fault 27:13 41:2,6
favorable 72:22
favorably 74:17
favored 55:11
february 12:16
  24:4 51:16 77:23
federal 79:8
fee 18:23 66:11
feeling 48:22
feelings 40:23
felt 38:15 48:23
  74:16,20
figure 73:7
figuring 22:25
file 78:15
filed 78:19
files 18:24
fill 9:24 78:10,11
filtered 59:15
final 45:22
finance 63:3,14
financial 41:3,4
financially 77:12
find 22:8 28:22
  64:18,20,20
fine 41:21
finley 3:6
fired 56:25
firm 3:6
firmly 41:14
first 5:2 24:2
  29:21 39:7,7 54:5

61:21 62:8,15
  64:10,20 65:15
  66:13
five 18:3 57:8
flaws 65:2
flew 50:22 51:9,18
  51:20 52:10 55:7
  55:7
flip 25:9,10
fly 33:5 53:15
following 79:6
follows 5:3
force 46:2 58:24
foregoing 77:4
foreign 75:13
form 17:20 19:3
  19:19 21:13 22:3
  22:20 26:10,21
  27:8 30:14 32:5
  32:14 34:6 38:11
  39:4 40:19 45:10
  46:14 48:6 49:16
  50:4 51:1,24
  52:15 53:18 66:22
  72:7 76:2 79:10
  79:14
formal 55:19
  63:23 64:22
format 24:21
  25:25 31:10,11
  32:20 33:14 42:21
  51:6 65:25 66:8
formatted 49:6
formatting 48:13
formulate 59:6
formulated 37:17
forth 38:3
fortunate 12:22
forty 63:4
forward 17:19
  23:1,9 38:20

40:13 78:15
foundation 17:21
  26:11,22 30:15,24
  31:17 32:15 34:7
  38:12 39:5 40:20
  45:11 46:15 50:10
  51:2,25 52:16
  66:23 68:21 72:8
four 18:2,10 28:4
  40:3,25 64:14
fourth 13:14
frequently 33:16
friends 56:23
frommert 35:8,9
  35:12,14 38:10
  42:3 43:4,21
  54:25 56:15 71:3
  71:7 74:7,8,22
front 46:8
full 6:18 17:24
  28:6 38:25 39:20
  65:17,17
fully 54:5
fulton 7:2 77:3
funded 63:17
funding 1:8 8:10
  8:14,15 68:6 73:5
furnish 79:15
further 59:21 76:4
  77:10

**g**

g 6:22
ga 3:9,18 78:24
gain 25:4 50:19
  69:6
gee 6:22 25:11
general 20:24 22:2
  22:12 23:1 28:5
  38:18 48:22 56:20
  60:8 61:1,24

Jon Reed                                      January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[generally - income]                                      Page 7

**generally** 69:18
**generate** 25:2
**generated** 37:22
**gentleman** 73:21
**georgia** 1:1 7:2
  77:2
**getting** 18:4 22:24
  37:3,10,14 38:15
**gibson** 2:8 3:5 5:5
  5:8 27:9 41:21
  42:1 50:6 52:17
  52:20 53:20 57:7
  57:13,17 59:21
  61:20 62:9,11,23
  63:1 64:5 66:22
  68:21 71:1 72:7
  76:6
**gibson's** 62:24
**gina** 1:4 3:25 5:8
  13:3 31:13 42:7
  42:15,24 43:21
  44:8,19,22 45:1,8
  48:3,16,21 50:24
  53:15 54:22,25
  55:7 56:5 61:23
  71:10,17 73:11
  75:20,20
**gina's** 12:13 48:25
  61:12
**girls** 14:6 47:6
**give** 5:21 42:24
  71:15
**given** 8:5 14:6
  16:5 25:1 26:16
  36:20 49:2 54:10
  62:6 69:8 75:25
  76:2 77:9 79:12
**go** 5:14 12:19
  28:17 41:22 42:18
  52:21 58:3 61:20
  63:7 64:8,16,25

72:18 75:9
**going** 5:19,22,23
  12:14 13:12 23:1
  25:5 30:1,23 31:9
  31:10 32:10,25
  33:2,14 34:11
  36:20 37:18,19,22
  37:25 38:1,6 40:5
  40:12,12,25 42:14
  44:15,22 48:10,12
  50:7,20 51:6 53:1
  53:2,9 54:19
  56:20 57:10,14
  58:23 59:3 61:6
  67:17 69:16 70:3
  72:5,12 73:8,10
  75:5,18
**golden** 3:16
**good** 5:6,7 6:17
  25:21 28:6 36:10
  37:6,8 38:13
  40:22 44:23,24
  47:6 59:15 64:16
  71:23
**gotten** 71:16
**grass** 62:13
**great** 29:7 64:14
  72:16,17 75:20
  76:11
**green** 46:16
**greetings** 78:5
**gregory** 3:16
**grew** 41:9,12,16
**ground** 5:14
**group** 12:4,11,13
  21:1,25 58:18
  64:24 73:12
**grow** 38:21
**growing** 41:11
**grown** 11:25

**growth** 11:24 12:3
  12:7 41:14
**guess** 23:22 25:11
  50:1
**guidelines** 74:25
**guy** 73:23

**h**

**h** 7:18
**half** 29:16
**handled** 14:24
**happen** 44:15
  53:16 72:6,12
**happened** 17:5
  61:5
**happening** 71:8,18
**happy** 6:3 25:15
  48:4
**hard** 38:15 39:16
  59:12 74:4,13,19
  74:23
**hargrove** 3:4
**head** 5:21 18:13
  19:9
**healthy** 73:12
**hear** 5:10,11 68:24
**heard** 53:23 69:2
**heated** 32:13
  42:17 71:10,14,16
  72:25
**heavier** 55:15
**heavily** 23:21,22
  23:23
**hedging** 18:19,24
**held** 29:19 31:24
  41:2 63:13
**help** 18:10 23:16
**henderson** 6:23
**henry** 3:14
**henry.perlowski**
  3:20

**higher** 32:21
  55:12,13
**hire** 23:15 33:24
  74:4
**hired** 8:23,25 9:4
  10:2,13,14,19,21
  11:3,9,17,25 35:6
  36:7,9 38:20
  71:22
**hiring** 12:8,23
  13:3 14:20 34:1,4
  35:9 36:7 73:22
**home** 62:12
**honest** 71:15
  73:13
**house** 31:6

**i**

**idea** 26:1 75:13
**identified** 50:8
  59:18
**ila** 68:3,4
**illustrate** 41:5
**illustrated** 19:25
  49:7 51:14
**imagine** 22:10
  73:2
**impacts** 77:21
**impartial** 77:22
**impartiality** 77:15
**impending** 52:2
**important** 5:20
  44:19
**impossible** 46:3
**impression** 74:22
  75:8,9,17
**included** 17:5,17
  21:7
**inclusive** 67:2
**income** 18:23
  66:11

Case 1:20-cv-04981-CAP Document 94 Filed 04/28/22 Page 88 of 99
Jon Reed
January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[incorrect - leave]
Page 8

**incorrect** 55:25
56:2
**increased** 46:1
**incurred** 16:11
67:10
**independently**
31:3,4
**index** 2:1,7
**individual** 29:19
30:3
**individually** 32:2
52:25
**individuals** 8:25
9:3,5
**industry** 28:2,3,5
**information** 22:19
37:3 71:12,13
**inside** 18:23 49:6
68:5
**insinuating** 65:5
**instances** 8:7
**instructed** 36:9
**instrumental**
73:22
**intent** 71:24
**interest** 77:13
**interested** 12:23
77:12
**interview** 10:1,7
12:21
**interviewed** 11:6
**introduce** 25:5
64:24
**investor** 63:18
**involved** 13:4,23
13:24 18:18,19,21
24:25 36:7 48:19
58:14 59:2 65:19
65:20,24 69:14,24
70:2,6,8,11,14,16
70:19,23

**involvement** 54:20
**issues** 51:19
**itemized** 58:3
**items** 58:4,20 59:1
59:12 64:12,14

### j

**j** 6:20
**jan** 14:19,24 15:4
17:12 20:19,22
22:15,16 23:4,6
24:9 28:19 33:6
42:8,9 47:4,6,11
47:14 48:2,9,16,17
51:21 64:23 70:8
**jan's** 48:5
**january** 1:15
12:16 16:13,24
17:13 19:18 21:9
22:1,17 23:9
39:21 40:3,14
45:22 49:24 54:18
**jason** 15:11 17:10
18:8 20:22 22:16
24:7 25:3 26:24
36:14,22,25 37:3
50:18 56:13 64:23
66:15 69:10
**jason's** 20:23
27:13 37:15
**job** 10:16 14:17
23:16 25:21 36:11
44:24 71:23
**join** 9:18,20 13:14
20:24
**jon** 1:14 5:1 6:20
7:23 78:1,2
**july** 40:2

### k

**k** 7:18,18,23

**kamie** 7:23
**katherine** 7:18
**keblar** 66:5,7
**keep** 52:14
**kelly** 12:12 13:3
42:6,15,24 43:21
44:8,19,22 45:1,8
48:21,25 53:15
54:22,25 55:7
71:10,17 73:11
75:11,20,24
**kelly's** 50:25
**kind** 17:25 25:3,9
25:10 30:7 37:24
39:13,17 42:19
44:4,6 54:10,18
56:22 57:3 58:22
60:12 61:22 63:24
64:1,2
**know** 5:13 6:3,14
8:14 9:7 24:23
25:6,12 26:13
30:16,17,20 31:12
32:4 34:20 35:18
35:24 38:17 39:19
40:23 41:19 42:9
47:2,2,3 48:25
50:8 51:13 52:4,5
52:9,23 53:14,21
55:19 56:3,6,25
57:2 58:7 60:11
61:1,21 65:5 70:4
74:4,12 75:3
**knowledge** 46:10
49:11 51:3 57:4
62:7 65:10 70:18
**known** 48:18 65:6
65:8 73:19
**knows** 52:18 62:11

### l

**l** 15:16,19,20
16:23 19:2,18
20:3,4,7 21:3,11
22:1,18 23:13,16
23:21,22,23,24
24:15 25:6,23,25
26:2,3 28:1,19,20
29:8 30:6 31:10
32:19 33:2,14
34:12,13,23 35:23
35:25 36:15 38:22
39:9,14 42:15,16
42:22 43:16,17,23
44:6,13,22 45:4,7
45:19 46:13,20
49:1,6 50:9 51:6
53:1,25 54:2,8,16
55:11,16,20 58:2
64:10,18 65:3,4,7
65:9,17,17,18,19
66:1,8,9,14,17
67:1,8,9,11,14,15
67:18 71:23 75:4
75:10,12,13,14,15
75:18
**lady** 14:18
**laid** 14:4 33:3 41:8
**laptop** 43:10,13
**large** 27:3
**largest** 12:11
**lasting** 31:4,14
**late** 12:6,16 13:9
13:14 38:24 39:10
**lead** 58:23 66:15
**leadership** 23:8
24:3,21 29:15,19
33:4,8 39:1 50:20
51:17,20 73:10
**leave** 12:15 32:25
35:16 49:22

Jon Reed

Spearman, Gina v. Broker Solutions, Inc. Et Al

January 28, 2022

**[leaving - meetings]**

| | | | |
|---|---|---|---|
| **leaving** 12:19 25:14 | **lose** 69:4 73:5 | **m** | 50:25 |

**leaving** 12:19
25:14
**left** 13:25 14:14,15
30:7 35:17,19
39:20 49:23 54:17
60:15
**legal** 14:25 44:8
61:12 70:9
**lending** 14:16
**length** 34:19
**lies** 69:5
**lightly** 65:5
**liked** 60:9
**line** 58:4,20 59:1
59:12 64:12,13
66:9 79:17,20,23
80:1,4,7,10,13
**lines** 63:17
**link** 66:5
**litigation** 5:9 8:18
9:8 61:19
**little** 11:19 30:3
42:17 55:13 58:11
71:10,14 72:25
**live** 7:1,24
**lived** 7:4
**living** 11:5,7
**llp** 3:16
**loan** 14:7,22 18:22
18:23
**loans** 18:19 63:20
**long** 12:8 29:15
57:15 61:14 62:18
**look** 25:23 39:12
46:7 61:4 64:12
66:9 68:10 72:20
**looked** 21:5
**looking** 9:1,24
28:3 45:4 64:11
64:13

**lose** 69:4 73:5
**loss** 16:17,18,22
17:7,18 19:17
20:1,5 21:12 22:1
24:25 25:4 26:6
26:14 27:1,16
30:1,8 33:12 39:8
41:2 50:8,12,16,18
57:20 68:17,24
69:7
**losses** 52:5,6,8
57:18,24
**lost** 28:1,23 50:17
**lot** 13:11 14:2,19
17:22 18:1 21:17
22:5,9,9,12,23
25:24 26:5 29:24
30:2,5,10,17 31:1
31:3 32:19,21,22
33:1,11,15,24 36:1
36:1,11 38:2,4
39:6 43:18 47:14
48:13 54:15,19,21
58:25 59:13,14
66:7 71:17,18
75:3
**louis** 73:14
**lower** 55:12
**ls** 15:6,10,23 16:3
16:5,10,13 17:6,17
17:23 18:6,11
19:13,23,25 20:9
20:13,20 21:6,7,24
23:5,10 24:18
27:22 34:18 39:2
39:12,16,19 48:14
50:7 57:20 64:3,7
64:11,19,21,23
67:24 68:11,12
**lucy** 1:17 77:25

**m** 3:14 7:23
**mail** 78:12
**maintaining** 77:14
**making** 79:12,13
**manage** 23:17,20
37:19
**managed** 27:5
63:18,20 64:3
**management**
14:11 24:16,17
**manager** 10:15
11:10,16,19,22
15:5 69:19,21
70:21 73:15,16,18
**manager's** 70:15
**managerial** 9:24
**managers** 12:8,10
14:7,21 29:20
32:2 33:5,18 45:9
50:22 51:17 52:10
52:14 53:7 69:15
70:7
**managing** 11:23
18:20 26:4 27:2
**mansell** 78:23
**manually** 78:11
**march** 40:1 45:15
46:12,21 49:2,4
53:23 54:9 55:24
**margin** 17:3,3,4,5
20:2 21:16,16,20
21:22,22,23 57:19
57:22,24 58:1,5,21
**margins** 17:2 59:7
**marked** 2:3
**market** 63:19
**marketing** 28:25
29:3 31:15 33:20
33:22,23 34:10
37:19 49:1,5

50:25
**markets** 11:17
18:14,15,17,25
19:1,9
**married** 7:15
**marybeth** 3:5 5:8
41:18 61:22 76:5
**materials** 42:23
**math** 37:7 64:16
**matter** 76:2 77:14
**mean** 22:23 31:21
49:14,19 63:10
69:17
**medications** 9:15
**meet** 10:9 11:20
20:15,21,22 31:1,3
32:2 33:5 50:22
51:9,11 52:11
53:15 55:7 60:1,2
72:15
**meeting** 17:19
24:3,6,10,22 25:7
25:17 26:8 28:7
28:13,15,24 29:15
29:19,21 30:17
33:4,8,10,18 34:8
39:1 42:2,5,13,20
42:23 43:20 44:11
44:12 51:3,4,15,17
51:20 52:1,14
54:24 71:2,6,9
72:1,5,13 74:9
**meetings** 13:7,10
13:10 16:25 17:8
17:9,10,13 18:1,3
20:25 24:15,17
29:18,24 30:2,11
30:18,21 31:7
36:25 39:6 44:7
44:20 50:20,21,21
50:24 51:13 53:12

73:14
**member** 8:2
**memory** 9:15
16:19 39:17 58:3
64:25
**mentioned** 21:15
26:13 64:6
**message** 5:12
52:25 72:4 74:8
**met** 10:12 13:20
22:15 32:23
**mgibson** 3:11
**middle** 60:7
**midwest** 73:14,23
**military** 6:24
**million** 16:20,22
17:18 26:7 27:20
27:21 59:8,9,9,9
68:20,20,25 69:3,6
69:7,9
**mine** 36:21 49:19
**minnesota** 12:5
**minus** 45:5
**minute** 41:22
43:25 57:8
**minutes** 61:17,17
62:20,21
**misallocation** 26:8
27:7
**mischaracterizes**
22:21 26:22
**missouri** 25:9
**mistake** 27:13
**model** 38:22 43:16
43:17,23 44:13
45:7,20 46:13
49:2 53:25 54:2,8
55:20 75:10,10,12
75:18,19
**money** 28:1,23,23
29:11 32:25 48:21

48:24 50:17 51:5
63:18 69:4,5
**monica** 11:8
**monies** 30:7
**month** 15:7,14
21:2,5 40:4 41:1
46:2 64:7 66:1
67:16
**monthly** 19:23,25
20:4,9,16
**months** 28:4 35:20
39:14 54:4 56:19
62:17
**morning** 5:6,7
**mortgage** 7:9 8:11
10:17 12:18 28:5
41:11,15 58:8,13
63:16
**move** 11:4,4 17:19
23:1,9 31:10
33:14 38:20 51:6
**moved** 21:19
27:17
**moving** 17:25 29:8
59:10

**n**

**n** 6:20,22 7:18
**naf** 5:9,10,24 8:14
8:17 9:3,5,10,10
9:18,20 10:19,21
11:3,9,14,25 12:1
12:15,20 13:18
14:14,15 15:6
20:8 34:9 35:2,5
35:10,14 43:9
45:7 56:10 58:13
60:15,17 68:2
71:3
**naf's** 58:8 69:19
**name** 6:18 7:17,19
9:23 14:19

**names** 7:22 35:7
**national** 12:18,25
**nationwide** 65:23
**natural** 41:19
**nature** 32:9
**nda** 57:4
**ne** 3:7
**necessarily** 26:2
30:18 47:15
**necessary** 79:15
**need** 6:2,13 9:14
14:23 41:20
**needed** 25:22,23
27:1 37:3,16
42:18 65:1 72:2
73:8
**needs** 47:8
**negative** 26:2
**negotiating** 13:24
**negotiation** 33:24
**neither** 36:24
**nevada** 6:23 73:21
**never** 17:5 21:23
27:11
**new** 1:8 8:9,15
22:17 34:21 43:23
53:7 55:17 56:21
58:17 60:9 68:6
71:20 73:4
**nice** 60:1,2
**nods** 5:21
**non** 9:2 65:19
67:23
**normally** 20:20
28:8 42:10 64:19
**northern** 1:1
**notarized** 78:12
**notary** 80:23
**noted** 79:5,6
**noting** 78:8

**november** 13:18
47:1
**number** 17:8,25
18:2 25:1 26:12
26:15,18 33:16
59:3 68:19,19,24
69:2,3,9,11,12
**numbers** 23:2
25:3 26:25 27:14
27:16 28:18 38:9
64:11 69:2,8
**nw** 3:17

**o**

**o** 6:20
**o'bradovich** 15:12
17:10 18:8,12
19:11 22:16 24:8
26:24 36:14 37:4
56:13
**object** 17:20 19:3
19:5,19 21:13
22:3,20 26:10,21
27:8 30:14 32:5
32:14 34:6 38:11
39:4 40:19 45:10
48:6 49:16 50:4
51:1,24 52:15
53:18
**objection** 30:24
31:17 46:14 47:25
50:10,14 52:22
61:20 66:22 68:21
72:7
**obligation** 77:15
**obvious** 74:25
**obviously** 22:24
50:16 56:4 72:19
**occurred** 49:9
73:3
**ocga** 79:9

[october - personal]                                           Page 11

**october** 9:19 10:20
**offered** 54:22
71:11
**office** 7:6,7,10
62:24 63:1
**officer** 77:22
**officers** 14:7 50:23
**offices** 10:17 11:1
11:1 78:3,13
**ogg.com** 3:20,21
**ogletree** 3:15
**oh** 20:14 25:18
43:14
**okay** 5:10,11 6:16
8:15,16 10:6
32:23
**ola** 68:3
**old** 73:20
**once** 17:6 32:20
78:11
**ongoing** 31:11
**opened** 11:16,17
**opinion** 73:6
**opportunities**
10:24
**opportunity** 6:7
72:15
**opposed** 75:10
**options** 50:1 55:11
**ordering** 78:17
**organic** 12:2,7,12
41:14
**organically** 41:16
**organization**
71:21
**organizations** 8:3
**original** 10:15
41:7 44:2,4 46:19
53:8 71:19 78:16
78:19

**outcome** 77:12
**outlined** 61:22
**outside** 10:17,22
10:24 11:2 18:7
18:15 19:2,14
21:7 31:13 62:13
**overrides** 14:12
43:22 46:24 47:13
47:20 48:4
**owned** 7:9 8:11
37:14,22,24 63:15
73:18
**owner** 27:15
**ownership** 27:4,13
36:10 37:13 73:9
75:1

**p**

**p** 15:6,10,16,19,20
15:23 16:3,4,10,13
16:23 17:6,17,23
18:6,11 19:2,13,18
19:23,25 20:3,4,7
20:9,12,20 21:3,5
21:7,11,24 22:1,18
23:5,10,13,16,21
23:22,23,24 24:15
24:18 25:6,23,25
26:2,3 27:22 28:1
28:19,20 29:8
30:6 31:10 32:19
33:2,14 34:12,13
34:18,23 35:23,25
36:15 38:22 39:2
39:9,12,14,16,19
42:15,16,22 43:16
43:17,23 44:6,13
44:22 45:4,7,19
46:13,20 48:14
49:1,6 50:7,9 51:6
53:1,25 54:2,8,16
55:11,16,20 57:20

58:2 64:3,7,10,11
64:18,19,21,23
65:3,4,7,9,17,17
65:18,19 66:1,8,9
66:14,17 67:1,8,9
67:11,14,15,18,24
68:11,12 71:23
75:4,10,12,13,14
75:15,18
**p.m.** 1:16 41:25,25
57:16,16 76:14
**page** 2:2,7 79:17
79:20,23 80:1,4,7
80:10,13
**pages** 79:14
**paid** 14:11 40:10
40:12 47:19
**pandemic** 4:3
**part** 9:10 24:16,20
29:1 33:12,23
34:1 35:4 48:15
58:21 59:1 65:6,9
66:12 75:2
**partial** 23:24
**participate** 24:3
25:12 36:14
**particular** 23:4
30:16 34:23 38:14
44:2 70:15 73:2
**parties** 77:22
78:17
**partnership** 27:4
**parts** 48:15
**party** 77:11,17
**pass** 66:14
**passion** 73:17
74:15
**patty** 10:10 17:11
22:16 24:9 28:7
31:1 32:1,8 37:14
44:20 72:19

**pay** 14:3,7
**paying** 14:9
**pc** 3:6
**pdf** 78:9
**people** 14:4,10
18:10 29:9 36:5
38:18 71:13,22
74:3
**percent** 38:1 45:24
46:1,2
**percentage** 30:9
32:22,24 37:21
55:12,13,16
**period** 22:6 31:15
34:15,25 35:3
39:19,23 40:4
41:1 53:6,10,11
**periodically** 17:11
20:24 56:18
**periods** 41:12
**perlowsi** 2:9
**perlowski** 3:14
17:20 19:3,5,19
21:13 22:3,20
26:10,21 27:8
30:14,24 31:17
32:5,14 34:6
38:11 39:4 40:19
41:18,24 45:10
46:14 47:22,25
48:6 49:16 50:4
50:10,14 51:1,24
52:15,22 53:18
57:10,14 59:24
66:24 68:23 72:9
76:4,9
**permanent** 7:5
**person** 20:23
53:15 62:25 66:15
**personal** 40:23

Case 1:20-cv-04981-CAP Document 94 Filed 04/28/22 Page 92 of 99

Jon Reed

January 28, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[phone - quick]

Page 12

phone 13:10 53:14 73:15

pick 64:17

picked 50:17

piece 34:3

piedmont 3:7

place 34:19 36:18 37:25 41:8 60:10 60:24 61:14 62:16 73:8

plaintiff 1:5 3:3

plan 23:14 25:5,6 25:22 30:1 42:15 42:16 51:7 53:1,5 53:7,13 54:10 55:6,8,9,10,11 71:23 74:14,16,24 75:14,15

planet 46:3

play 37:21 38:22

please 6:2,10 47:22 78:12,14 79:14,15

pleased 60:10

point 23:11,14,25 33:25 41:19 43:1 51:7 55:14 56:24

points 44:18 75:10 75:19

polish 72:21

polished 72:2

polite 75:21

portion 13:8,13 17:1 34:12 37:23 47:24

position 10:7 11:22 12:25 36:22 36:23 63:13 74:17

positions 9:25

positive 28:20,21 28:21

possible 43:12

power 43:1

powers 72:20

premature 39:11

preparation 69:15 69:25 70:6,9,12,16

prepare 18:11 42:12

prepared 15:10,11 18:6 41:4 70:22

preparing 19:13 23:4 29:25 41:3

presence 10:22 31:14

present 3:23 21:23 25:3 30:11,21 31:23 32:17 33:19 40:7 42:5,14,21 55:4

presented 25:21 40:8 43:1 44:18 45:8,9,12,14,16 49:14,24 50:16 54:1,3 55:9,18,20 72:21

presenting 55:8

president 65:22

preslo 14:19 17:12 20:19 30:12,12,20 31:8,12

pressure 34:20

presume 63:11

presuming 63:11

pretty 11:23 14:18 38:23 54:14,19 59:12 64:12,16 74:12

previous 12:9

price 18:18

pricing 14:20,22 29:5,6

primarily 24:14

primary 58:17

print 78:11

prior 35:9 46:12 60:19

private 31:7

probably 7:10 9:10,13 12:10,22 13:8,9,15,21 14:19 18:2,9 20:11,19,20 24:10 29:16 32:9 34:24 36:19,21 37:15 38:16 39:10 39:10,15 41:10 43:7 44:19,21 46:21 47:16 48:17 56:18 59:14,14 60:7 62:20 70:4 74:14

problem 13:23 63:9

problematic 28:5

problems 35:22,24 38:8

procedure 79:9

proceeding 77:9 77:21

process 12:21 13:4 13:6 15:13,14 24:20 31:9 70:23 71:12

production 78:22

professional 77:16

profit 16:21 23:24 25:2 26:6 30:1,9 32:24 37:22 55:12 55:13,15

profitability 20:5 30:4 32:22 39:2 44:25 45:3,24

profitable 16:2,8 22:7,8 24:24 27:18,20,22 45:2 55:17

promises 52:24

protect 30:8

protecting 19:6

proved 27:16

provided 53:7

public 80:23

publication 9:22

pure 23:21 41:13

purely 23:23

purpose 42:20 55:3,8

pursuant 79:8

pushed 27:12

put 23:12 41:8 45:19 46:8 53:5 53:11 55:6 66:7 71:23 73:8,25 74:13,15,23

putting 36:15

**q**

qualify 10:23 69:16

quarter 13:14 24:2 39:13

question 6:2,15 40:22 46:4,5 47:23 65:12 67:14 67:17 72:10

questioning 33:12

questions 5:23,23 33:13 37:17 38:16 57:11 59:22,25 61:2,24 64:6 70:3 71:1 75:7 76:5 77:6

quick 41:20

**quite**  12:2 16:25
35:13

**r**

**r**  6:20,22 7:18
**raised**  51:19
**ran**  72:17
**rapidly**  41:10
**rateau**  1:17 77:25
**rates**  14:8
**react**  52:6
**reaction**  22:2,18
32:12
**reactions**  32:17,18
32:19
**read**  6:7 47:22,24
70:11 78:6 79:4
**reading**  20:12
**ready**  34:19
**real**  34:20
**realistic**  53:10,11
**realized**  27:17
39:8
**really**  8:23 14:22
18:17 23:12 24:15
27:11,12 29:2
35:17 39:16 40:22
48:14 54:17,21
56:21 57:2 58:20
60:12,25 69:3,4
71:23 72:24 73:1
74:13 75:4
**reason**  21:21
35:18 51:14 55:25
56:1 79:19,22,25
80:3,6,9,12,15
**reasonable**  38:4,5
59:3
**reasoning**  57:6
**reasons**  79:12
**recall**  29:4 44:15

**receive**  5:16 43:3
45:23 46:25 47:13
65:18 66:2 67:23
**received**  14:5
16:23 40:13 45:22
65:14,15,16 66:1,6
66:20 67:4,8 68:7
74:16,21 75:3
**receiving**  21:3
46:24 47:12 67:1
67:12,14
**receptive**  75:9,18
**recess**  41:25 57:16
**recollection**  58:6
71:5,6
**record**  6:6,19 19:6
41:22 70:5 77:8
**recross**  59:22
**recruiting**  14:24
24:14
**reduced**  77:7
**reed**  1:14 5:1,6
6:20,20 17:21
26:23 41:23 42:2
52:21 57:9,11,18
59:25 60:3,15,19
60:23 61:4 63:2
64:5 68:17 69:14
75:25 76:7,9 78:1
78:2
**refer**  8:13
**reference**  9:22
46:21
**referred**  44:1
**referring**  8:14
54:7
**regarding**  28:25
29:4,5 38:8 39:2
**regards**  47:4
**region**  16:8,11
22:7 23:18,20

29:10 30:3,5,7
33:22 34:23 44:25
45:1,2,13 55:17
73:6
**regional**  10:15
11:10 23:13 24:17
25:8 28:19 29:20
32:2 33:5,18 36:5
36:6 37:23 45:9
47:8 50:22 51:17
52:10,14 53:7
69:15,19,21 70:7
70:15,20 73:16
**regionals**  14:21,22
22:6,13 23:17,19
24:7 25:8,24 27:2
30:2 31:2 32:21
36:21 37:18 38:6
39:12 45:13 47:7
48:23 49:12 51:7
51:9,12 52:24
53:2,13 54:12,23
62:1
**regions**  20:6 21:6
23:12 27:3,3 30:3
43:19 44:23,24
54:13,14
**related**  18:15
23:24 28:18 43:16
56:21 58:7,13
67:19
**relations**  63:19
**relationship**  37:6
37:8 38:14 47:6
77:13
**relationships**
73:24
**relative**  77:10
**relatives**  7:1
**remember**  24:25
25:7 26:9,12,15,18

28:8,10,10 29:2
31:20,21,22,23
42:8,9 46:18
47:15 48:8 59:5
61:7 72:4,11,24
74:7
**remote**  1:12 4:1
**remotely**  3:23
**removed**  49:1
**repeat**  6:2
**report**  15:2
**reported**  18:8
19:17 22:13 46:11
68:18,25
**reporter**  5:19 6:12
47:24
**reporting**  47:18
**reports**  59:17
**represent**  5:8
**representation**
44:10
**representations**
52:13
**requested**  47:24
78:6
**required**  18:1
**requirement**
49:18
**reserved**  75:21
76:13
**residence**  5:17
6:21 7:5,13
**resign**  50:2 52:11
**resigned**  35:5
40:14 43:9 45:15
53:21,22,23 56:3,5
56:7,10,19 57:1,5
**resolution**  44:13
50:23
**respect**  31:14
44:13 50:24 68:18

72:16
**respond** 19:7
**response** 48:5
**responses** 5:21 6:6
**responsibility**
78:7
**rest** 12:6
**result** 9:7 38:19
**resulted** 17:17
**retail** 10:17 11:1
11:24 14:16 15:20
15:21,23 16:1
18:7,16 19:2,14
20:6,7 21:7 28:20
58:15,18,24 65:17
65:18,19,22,23
66:1 67:3,8,11,19
67:23 68:7,8,12,18
69:1
**retain** 74:4
**returned** 78:14,18
**revenue** 15:18
18:23 45:5 66:10
67:16
**review** 15:6,16
16:2,4,13 20:8,16
20:17,18,18,24
24:15,18,19,20
44:9 53:13 64:7
64:11,22 65:4
66:14 68:11 70:17
78:8
**reviewed** 15:8,14
15:15,22 19:23
21:23,25 24:1
27:23 34:21 66:17
**reviewing** 22:17
23:9
**reviews** 20:4 28:1
**revise** 72:10

**revisions** 54:11,13
54:16 55:22
**rewritten** 46:12
**rick** 17:11 20:24
24:8 25:13,13,17
26:25 27:13 36:18
36:22,25 37:13,14
38:8 44:20 50:17
50:18 69:10 72:19
**rid** 43:7
**ridiculous** 46:8
**right** 8:4 22:25
36:23 38:23 50:3
63:12 71:21,25
74:1,3,17
**ring** 30:18
**risk** 26:4 29:13
33:1
**road** 3:7
**role** 10:13 11:10
14:14 15:5 41:8
**roles** 12:24
**roll** 30:1 32:20
34:19 39:11 46:20
**rolled** 34:21 38:23
39:10 44:5 54:3,4
54:5,20 59:5
**rolling** 13:15
**room** 25:14,24
**roswell** 78:24
**rpr** 1:17 77:25
**rule** 79:8
**rules** 5:14 79:8
**running** 11:23
21:18
**runs** 73:21,23

**s**

**sales** 36:22 46:2
58:24 65:22
**sam** 24:9,12,13

**santa** 11:8
**save** 58:1
**saw** 32:17
**saying** 72:11
**schedule** 45:16
46:12 54:8 70:7
70:21
**schedules** 69:15
69:22,25 70:9,14
70:20
**scott** 35:7,9,12,14
36:3,9,17,19 37:1
37:2 38:7,9,13
42:3,6,9,14,25
43:15,24 44:19,20
48:13 55:6 56:15
71:10,20 74:12
**screen** 5:12
**seal** 78:15
**second** 39:13
**secondary** 63:19
**security** 12:18,19
12:25
**see** 19:17 20:5
60:9
**seeing** 28:18
**select** 23:19
**send** 6:12 66:13
78:16,21
**sense** 59:11,12
64:16,19,21
**sent** 5:16 70:24
**september** 42:3
54:24 71:2 72:13
74:9
**serve** 74:2 77:21
**service** 63:19
**services** 14:24
**servicing** 18:19,20
63:22

**set** 14:10 18:17
**setting** 18:18
**settled** 9:9,10
**share** 37:9 43:15
**shop** 72:17
**short** 69:5 73:25
**show** 16:10,16
57:20
**showed** 22:1
**shown** 27:25 57:18
59:17
**side** 36:17,19
58:15 71:16 75:23
**sides** 71:24 72:23
75:6
**sign** 6:8 40:7,9,11
49:15 78:6
**signature** 49:18
76:13 77:24 78:2
78:20 80:18
**signed** 13:17 40:14
40:15 49:20,21
76:2 78:12,14,18
**significant** 34:3
**simple** 64:13
**sincere** 73:7
**sir** 19:20 21:14
22:4,22 30:15,25
31:18 32:6,15
48:1 59:25 67:5
**sit** 72:18,19
**sitting** 25:8
**six** 62:17
**sizeable** 26:17,20
**sizing** 22:25
**smaller** 29:18
**solely** 77:18
**solicit** 9:2
**solution** 23:8 33:6
**solutions** 1:7 68:1
68:6

Case 1:20-cv-04981-CAP   Document 94   Filed 04/28/22   Page 95 of 99
Jon Reed                                                    January 28, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[somebody - thanks]                                              Page 15

**somebody** 19:9
46:7,9 65:21
**somebody's** 40:25
**somewhat** 16:19
28:17
**sorry** 10:5 31:18
62:13 63:8
**sort** 66:4
**sounds** 6:17
**southeast** 12:13
16:11 33:22 44:25
**southeastern** 16:7
**southern** 9:23
10:4,5,22 11:2,4,5
**speak** 6:5 25:17
28:7 46:23 48:9
49:19 54:21 56:11
56:13,17
**speaking** 51:16
69:19
**spearman** 1:4 3:25
5:9 13:3,17,20
15:2 30:12,22
34:9 35:2,4 42:7
45:17,20 46:11,23
47:11,18 48:5
53:21 55:4,21
56:3 60:4,5,7,16
71:7 72:4,11
75:18
**spearman's** 5:24
13:24 60:20 61:18
**specific** 51:14
**specifically** 8:21
16:7
**specifics** 60:22
**speculating** 56:6
**speculation** 22:4
31:18 32:6,15
40:20 47:25 48:7
50:5 51:25 52:16

52:19
**spending** 29:11
**spent** 29:9 62:20
**spoke** 60:7
**spoken** 56:15 60:4
60:20 61:1
**spread** 14:8,11
**spreadsheet** 66:4
**spring** 13:9,19
38:24 39:10
**st** 73:14
**stages** 23:19
**started** 13:8,13
39:25 46:20
**starting** 59:5
62:12
**state** 6:18 77:2
**stated** 77:5
**statement** 76:2
79:12
**statements** 26:6
41:3,4 58:2
**states** 1:1
**stay** 35:2 52:14
53:4 59:7,16
**stayed** 56:23
**stips** 46:5
**stipulated** 4:1
**stopping** 41:19
**street** 3:17
**strict** 57:3
**structure** 14:23
23:13 41:7
**structured** 26:3
**stuff** 15:1 40:12
59:13,14 64:24
**subcontractor**
77:19
**subject** 59:22
**subpoena** 5:16

**subscribed** 80:19
**subsequently**
29:23
**substance** 79:10
**substantial** 17:7
26:14
**sudden** 28:21
**sued** 8:22 9:3,5,6
**suing** 61:23
**suitable** 34:24
71:24
**suite** 3:8,17 78:23
**support** 14:20
24:14
**supported** 59:18
**sure** 6:8,11 17:23
42:9 43:14 45:5
57:13 58:10 69:18
**surfaced** 52:8
**surprised** 19:17
19:21
**surprising** 20:2
**suspended** 34:11
**swearing** 4:2
**swing** 39:20
**switch** 25:6
**sworn** 5:2 80:19
**system** 23:22

**t**

**t** 3:15 6:22 7:18
**table** 6:15
**take** 5:19 6:14,16
41:20,21 53:3
55:10,15 57:7,11
57:13 61:14 62:11
62:16 65:4 71:12
74:18
**taken** 29:9 31:16
33:20 64:1 77:5
**talk** 47:5 61:18
71:13

**talked** 26:25 29:2
47:14,16 48:11
56:18 60:5 61:15
61:22 62:25 66:18
75:20
**talking** 34:18,25
46:22 48:16 54:13
56:5 61:5 76:1
**tandra** 6:22
**target** 17:25 59:10
**team** 13:7,8,13,15
15:11 18:9,10
20:17,23 66:16
**tell** 8:7 13:6 15:13
18:6 33:10 35:21
37:2 38:7 47:11
48:20 51:10,21
55:24 60:23 61:3
**ten** 61:17
**tenure** 20:8
**term** 73:25
**terminated** 57:5
**terms** 35:18 49:21
50:2 56:8 68:17
71:5 72:3 74:7
75:15 77:19
**terrible** 35:7
**test** 39:14 54:4
**testified** 5:3 15:22
**testify** 9:16 32:1
52:18
**testifying** 13:2
**testimony** 17:16
22:21 26:22 66:18
79:4,11
**thank** 5:18 41:24
59:22 60:2 63:2
74:6 76:6,9
**thanked** 72:14
**thanks** 76:12

[thargrove - wanted]                                            Page 16

**thargrove** 3:10
**thefinleyfirm.com**
  3:10,11
**thing** 23:3 36:23
  71:21 73:3 74:1,3
**things** 13:11 18:22
  21:17 27:2 29:13
  36:18 44:21 47:5
  54:21 56:20 58:19
  58:22,25 60:11
  61:5,24 62:5
  64:17 71:18 72:1
  73:25
**think** 8:11 9:11
  13:13,18 16:21
  21:19 22:7,16
  25:2 28:1,16,16
  29:7,17,24 34:11
  36:8,16,16 38:13
  38:23 39:11,14,15
  42:7,8,10,17 43:24
  43:25 44:1,9,17
  48:11,11 53:8,10
  53:22 54:3,5
  55:14,23,25 56:1
  57:8 60:7,21 64:4
  65:21 67:22 70:24
  71:11,16,24 73:15
  74:18 75:11,11
**thinking** 34:18
  44:9 72:24
**third** 39:13
**thought** 31:4,9
  46:25 47:13,20
  48:21 74:14,24
**thoughts** 57:12
**three** 7:21 18:10
  23:18 69:8
**time** 7:12 11:7,13
  12:8 14:5 18:13
  19:11,14,16 20:25

22:7 23:12 25:13
  27:4 28:2 31:2
  33:24,25 34:15,19
  35:3,5 37:6 38:15
  39:19,23 40:6
  44:14 53:6,11
  55:22 56:7 58:17
  59:16 60:5,25
  61:5,24 72:18
  73:2 74:18 76:6
  78:18
**times** 8:10 31:1,4
  32:3 33:13 37:9
  40:18,25 60:19
**title** 10:14,15
  11:10,21 14:15,17
  18:12 65:21
**today** 5:20 9:15
  60:4,19 61:10
  62:12 76:1,10
**told** 19:4 30:22
  31:13 34:8 42:18
  57:3 59:6 60:10
  67:15 71:7
**tolerances** 29:5
  37:18,25
**top** 31:6
**topics** 33:2 47:9
**total** 14:5
**totally** 38:5 65:11
**trained** 71:21
**training** 63:23
**transcript** 6:8
  77:5,8 78:8,16,19
  79:4
**transition** 32:11
**transpire** 13:11
**travel** 10:6 42:10
**travis** 3:4
**tried** 73:25

**trip** 42:8,11 52:11
**trouble** 37:3
**true** 12:3 77:8
**truth** 69:5
**try** 6:5 32:7,10
  53:4,9 59:11
  65:12 72:21 73:7
  74:13
**trying** 36:18 38:9
  38:19 59:2 65:13
  65:15 66:5 67:4
  67:21 70:5 71:22
**turned** 25:13
  43:10
**tustin** 33:5 50:22
  51:18
**twice** 60:21 61:1
**two** 8:12 13:12
  17:2 20:21 23:18
  38:18 49:20 58:5
  59:6 61:9 64:14
  64:14,15,15 69:2
**type** 20:1 23:21
**typewriting** 77:7
**typically** 64:7
  65:25 66:13 69:24
  70:2

**u**

**u.s.** 11:24
**ultimately** 45:7
**unacceptable**
  75:14
**unattainable** 46:6
**uncommon** 51:12
**undergraduate**
  63:6
**undersigned** 79:3
**understand** 6:1
  17:15 19:8 28:3
  61:4 65:11,13,15
  66:6 67:21

**understanding**
  60:3 65:2 66:20
  67:2,5,9,18,22
  70:3,10
**understood** 27:17
  27:21 58:10 63:5
  63:10
**united** 1:1
**units** 66:11
**unsigned** 49:22
**unusual** 19:1,8
**upset** 28:13,15,17
**upside** 25:12
**use** 27:7 79:14

**v**

**variations** 23:18
  43:18
**varied** 45:13
**varieties** 26:5
**variety** 12:23
**various** 43:15
**venture** 41:10
**verbal** 5:21 62:6
**veritext** 78:13,22
**versus** 23:13 37:23
**vice** 65:22
**videoconference**
  1:12 3:1
**visible** 65:10
**volume** 54:15
  66:10
**vp** 46:10
**vs** 1:6

**w**

**want** 5:14 46:7
  57:7 58:10 73:5
  74:1,2 75:5,22
**wanted** 23:12,20
  32:21 51:23 52:1
  60:11 73:1

[warehouse - zoom]                                                    Page 17

**warehouse**   63:17
**watch**   73:12
**way**   14:4 27:5
  67:13
**we've**   32:23 56:23
  61:1
**weekend**   76:11
**weeks**   10:1 28:22
**weighs**   28:9
**weighted**   23:22,23
**welcome**   76:8
**went**   13:1 16:20
  24:1 26:24 37:6
  39:16,16 44:17
  45:7 54:24 56:20
  58:6 59:8 61:25
  71:14 72:1
**westle**   3:24
**wife's**   7:17
**witness**   4:2 76:8
  76:12
**won**   9:11
**word**   9:1 27:7
**words**   65:14 70:21
  72:17
**work**   13:1,11,12
  25:5 35:12 42:19
  42:22 48:14 53:1
  56:20 72:1 74:15
  75:3,5
**worked**   12:9 14:2
  15:11 18:9,10
  22:11 24:13 25:25
  30:6 34:12,13
  35:25,25 36:5,16
  36:17 41:9 70:9
  73:18,23 74:3,13
  74:19 75:12
**working**   11:7
  14:25 29:25 35:22
  36:19 37:6,8

38:14 39:9 48:13
  60:11,11 70:8
  73:4 74:23
**world**   39:18,22
**worries**   62:14
**writing**   40:9 49:8
  49:10,12,14 62:3,4
**written**   54:7
**wrong**   36:24

**x**

**x**   45:23

**y**

**yeah**   37:5 51:23
**year**   13:22 19:24
  19:24 20:3,9
  24:24 25:16 27:19
  27:24 28:6,6,18
  38:25 41:12 51:15
  52:7 54:5 60:8
**years**   41:17 63:4
  63:15 64:3 73:20
  75:12

**z**

**zoom**   3:1 5:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.