

Deposition of:

**Kelly Allison**

*November 18, 2021*

In the Matter of:

**Spearman, Gina  Vs. Broker Solutions, Inc. Et Al**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4    GINA SPEARMAN,
5          Plaintiff,

                              CIVIL ACTION FILE
6          vs.

                              NO. 1:20-cv-04981-CAP
7    BROKER SOLUTIONS, INC. d/b/a
     NEW AMERICAN FUNDING,

8

           Defendant.

9

10                  DEPOSITION OF
11                  KELLY ALLISON
12               November 18, 2021
13                    9:37 a.m.
14            Arnall, Golden & Gregory
15               171 17th Street
16                  Suite 2100
17               Atlanta, Georgia
18      Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
19

20

21

22

23

24

25

```
                                              Page 2

  1   For the Plaintiff(s):

  2   EXHIBIT              DESCRIPTION               PAGE

  3   Exhibit 1      Notice of Deposition              21

  4   Exhibit 2      String of e-mails, Subj:  Re:     64

  5                  Here is a text I got from

  6                  Michele this morning

  7   Exhibit 3      11/21/16 letter from New           91

  8                  American to Ms. Allison, Re:

  9                  Amended Offer of Employment

 10   Exhibit 4      String of e-mails, Subj:  FW:     128

 11                  Draft SVP Compensation

 12                  agreement for Gina and Kelly

 13   Exhibit 5      String of e-mails, Subj:  Re:     139

 14                  South East Division

 15   Exhibit 6      Schedule 1 to Regional Senior     184

 16                  Vice President Agreement

 17                  Compensation

 18   Exhibit 7      Schedule 1 to Divisional          188

 19                  Manager Agreement Compensation

 20

 21                  INDEX TO EXAMINATION             PAGE

 22   By Mr. Hargrove                                   4

 23

 24

 25
```

Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiff:

3              TRAVIS C. HARGROVE, ESQ.

4              MARYBETH V. GIBSON, ESQ.

5              N. NICKOLAS JACKSON, ESQ. (via Zoom)

6              The Finley Firm, P.C.

7              3535 Piedmont Road

8              Building 14, Suite 230

9              Atlanta, Georgia  30305

10

11   On behalf of the Defendant and the Deponent:

12             HENRY M. PERLOWSKI, ESQ.

13             Arnall Golden Gregory LLP

14             171 17th Street, N.W.

15             Suite 2100

16             Atlanta, Georgia  30363

17

18   Also Present:

19             Gina Spearman

20             Ken Block, Esq. (via Zoom)

21             Andrew Westle, Esq. (via Zoom)

22

23

24

25

```
                                                    Page  4

 1                    KELLY ALLISON,

 2   having been first duly sworn, was examined and

 3   testified as follows:

 4          MR. HARGROVE:  Henry, you good with the

 5   usual stipulation?

 6          MR. PERLOWSKI:  Yes.

 7          MR. HARGROVE:  Perfect.

 8                    EXAMINATION

 9   BY MR. HARGROVE:

10      Q    Ms. Allison, my name is Travis Hargrove.

11   I'm one of the attorneys for Ms. Spearman in this

12   case that she's filed against New American Funding

13   that's pending in the United States District Court

14   for the Northern District of Georgia, and I'm here

15   to take your deposition today in the case.

16          Have you ever been deposed before?

17      A    No, sir.

18      Q    Okay.  Well, some of this will probably be

19   a little bit repetitive because I'm sure your

20   counsel went over it, but I'm going to be asking you

21   questions.

22          Everything that I say, you say, or anyone

23   else says is going to be taken down by the court

24   reporter.  So in that regard, it's important that we

25   make sure we don't talk over each other.  Sometimes
```

Page 5

1   these things get conversational, you may anticipate

2   what I'm going to ask you, I may anticipate what

3   your answer is going to be, so let's both try to let

4   each other finish before we start speaking.  Fair

5   enough?

6        A    Fair enough.

7        Q    Great.

8             And if I cut you off because you start

9   answering a question before I'm done, I'm not trying

10  to be rude.  I just want to make sure that the

11  record accurately reflects what was said here today.

12  Fair enough?

13       A    Fair enough.

14       Q    Great.

15            You have the right to read and sign this

16  deposition or that's something that you can -- that

17  you can waive.  You have -- are you represented by

18  counsel today?

19       A    New American Funding's representation.

20       Q    Okay.  All right.

21            MR. PERLOWSKI:  She'll read and sign.

22            MR. HARGROVE:  Okay.  Got that one out of

23  the way.

24  BY MR. HARGROVE:

25       Q    Next, I'm going to need a verbal response

Page 6

1   on all the questions that I ask today.  Head nods or

2   uh-huhs or huh-uhs are difficult for the court

3   reporter to transcribe, so if I ask you a question

4   that's a yes-or-no question and you do one of those

5   things, I may say can I get a yes or no.  I'm not

6   trying to be rude; I just want to make sure that the

7   record is accurate.

8            And by all means, if there's something

9   after yes or no that you want to say in the way of

10  an explanation, you're entitled to do that.  Fair

11  enough?

12       A    Yes.

13       Q    If you need a break today, this is not an

14  exercise in endurance, so if you need a break at any

15  time for any reason, please just let me know.  The

16  only thing that I would ask is if there's a question

17  that is pending on the table at the time, that you

18  finish answering that question before we take the

19  break.  Fair enough?

20       A    Yes.

21       Q    The questions I ask you today, I'm not

22  trying to ask you trick questions, I'm not trying to

23  confuse you, I'm trying to ask you direct questions

24  so that I can learn what information you might have

25  about the case.

                                                    Page 7

1            So in that regard, if you don't understand

2    my question, if you would please tell me that you

3    don't understand it so that I can clarify it or ask

4    it in a different way so that you do understand it.

5    And if you don't tell me that and you answer the

6    question anyway, then the record's not going to

7    reflect your understanding.  Fair enough?

8        A    Yes.

9        Q    Great.

10            You got any questions about any of those

11   kind of guideposts about depositions?

12       A    Very clear.

13       Q    Perfect.

14            Could you state your full name for the

15   record?

16       A    Kelly Dean Morrison.

17       Q    And -- do you go -- do you go by any other

18   name?

19       A    I do.

20       Q    Okay.  And what name do you go by?

21       A    Kelly Allison.

22       Q    Okay.  And is Allison a maiden name or --

23       A    It was my married name.

24       Q    Okay.  Gotcha.

25            And I'm assuming because professionally

Page 8

1   people knew you as Kelly Allison, you just stuck

2   with that in the professional arena?

3        A    Correct.

4        Q    Great.

5             Are you currently married?

6        A    I am.

7        Q    Okay.  And for how long have you been

8   married to your current spouse?

9        A    For 19 years.

10       Q    Gotcha.

11            And what is your current address?

12   ████████████████████████████████████████████

13   ██████

14       Q    Okay.  And aside from your husband, who

15   resides with you at that address, if anyone?

16       A    My two dogs.

17       Q    Two dogs, gotcha.  Well, they can't be on

18   the jury, so I don't need to know the dogs' names.

19            Prior to -- and what is your current

20   husband's name?

21       A    Randy McCray.

22       Q    All right.  Prior to Mr. McCray, you had a

23   prior marriage?

24       A    I did.

25       Q    Okay.  And --

Page 9

1      A     I've had several.

2      Q     Okay.  Well -- and I'm -- when I'm asking

3   these questions, I'm not trying to embarrass or pry,

4   I'm trying to make sure that we don't end up with

5   someone who was related to you on the jury.

6            So do -- and let me just ask you:  Do any

7   of those former marriages reside in the Atlanta

8   metro area?

9      A     They do.

10      Q     Okay.  Could you give me their names?

11      A     Sure.  Chris Allison.

12      Q     Okay.

13      A     And Trey Greene.

14      Q     Do you have any relatives who are over the

15   age of 18 who live in the Atlanta metro area?

16      A     I do not.

17      Q     Okay.

18      A     Just ex-husbands.

19      Q     Just ex-husbands.  Understood.

20            And you are employed with New American

21   Funding, correct?

22      A     I am.

23      Q     And if I refer to New American Funding as

24   NAF today, is that the proper shortened term for it?

25      A     Sounds good to me.

Kelly Allison                           November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 10

```
 1      Q    Okay.  Well, then if I say NAF, then I'm
 2   referring to New American Funding today.
 3           Does your spouse work outside the home?
 4      A    Yes.
 5      Q    And where does he work?
 6      A    He is -- he owns restaurants.
 7      Q    Okay.  Is there a name of a company that
 8   owns several restaurants or is it individually or
 9   can you explain that to me?
10      A    Bella Partners.
11      Q    Okay.
12      A    McCray Ventures.
13      Q    What are the restaurants that those two
14   entities own?
15      A    The Mill Kitchen and Bar.
16      Q    Okay.
17      A    Mac's Chophouse.
18      Q    Gotcha.
19      A    And Mac's Coastal Market.
20      Q    Okay.
21      A    And there's another LLC called The Fab
22   Four.
23      Q    Do you have any ownership in any of those
24   entities that own the restaurants?
25      A    I do.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

                                                        Page 11

 1        Q     Okay.  Aside from your employment with NAF

 2   and an ownership entity [sic] in those entities --

 3   and I'm not talking about, like, a stock account,

 4   but any other business ventures or interests you're

 5   involved in?

 6        A     Yes, I do.

 7        Q     Okay.  What are those?

 8        A     A medicinal company --

 9        Q     Okay.

10        A     -- based out of California.

11        Q     And what's the name of the medicinal

12   company based out of California?

13        A     Brothers.

14        Q     Brothers?

15        A     LLC.

16        Q     What does Brothers LLC do in the medicinal

17   industry out of California?

18        A     CBD.

19        Q     Okay.  And my understanding -- I've had

20   some cases involving beverage companies is it, like,

21   CBD drinks or...

22        A     CBD oils.

23        Q     Okay.  Gotcha.

24              Any other business ventures that you're

25   involved with?

Kelly Allison                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 12

1        A     No.

2        Q     In Brothers, do you have an active role or

3   are you just an owner in the company?

4        A     Just a silent partner.

5        Q     Okay.  I assume same with the restaurant

6   ventures that your husband operates?

7        A     I'm a silent partner.

8        Q     Gotcha.

9              Are you a member of any -- member or

10  regular attender of any church in the metro area?

11       A     Passion City.

12       Q     Okay.  Is that located in Marietta?

13       A     Buckhead.

14       Q     Buckhead.  All right.

15             How about any civic organizations, country

16  clubs, anything like that?

17       A     Yes.  I am a member of Waterfalls Country

18  Club.

19       Q     Okay.

20       A     And I'm a member of the Marietta Country

21  Club.

22       Q     Gotcha.

23             Anything like Kiwanis, Lions Club, Rotary,

24  anything like that?

25       A     No.

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 13

1       Q     Are you a member of any, like,

2    professional associations in your industry?

3       A     Yes.

4       Q     Okay.  Tell me what those are.

5       A     Homebuilders Association, Professional

6    Women's Council, SMC, MBAG.

7       Q     What does SMC stand for?

8       A     SMC -- if you didn't ask me, I would have

9    been able to tell you.  Marketing Council.  I don't

10   know.

11      Q     What does it do?

12      A     It's just part of our industry.

13      Q     Okay.

14      A     It's part of the mortgage industry.

15      Q     Gotcha.

16            All right.  MBAG, what's that?

17      A     That's Mortgage Bankers Association.

18      Q     Gotcha.

19            Can you briefly walk me through your

20   educational background?

21      A     Yes.  I graduated from Alta Loma High and

22   went to Chaffey College.

23      Q     And where is Chaffey College located?

24      A     In California.

25      Q     California.

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 14

1              Did you get a degree?

2        A    I did not.

3        Q    How long did you attend?

4        A    Two and a half years.

5        Q    Gotcha.

6              So is California where you grew up then?

7        A    Yes.

8        Q    How long have you been in the Atlanta

9   metro area?

10       A    29 years.

11       Q    Did you come straight from California to

12  the metro area?

13       A    Sure did.

14       Q    Gotcha.

15             Can you walk me through -- walk me

16  through -- I guess it would be probably better to go

17  in order.  Let me go back.

18             When you ended your education at Chaffey

19  College in California, did you go right to work

20  then?  Did you enter the workforce at that point?

21       A    Yes.

22       Q    All right.  Can you walk me through your

23  work background from there up to the present?  And I

24  just need a 10,000-foot view at this point.

25       A    Yes.  I was with a company called

Kelly Allison                                        November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 15

1    Wilhelmina.

2         Q    Uh-huh.

3         A    It's a modeling agency.

4         Q    Okay.  What years was that approximately?

5         A    19- -- well, I was Wilhelmina since I was

6    17.

7         Q    Okay.

8         A    I ended that in 1992.

9         Q    All right.

10        A    And started in the mortgage industry in --

11   I went to the building industry, and then I started

12   my mortgage career in September of 2000.

13        Q    All right.  And Wilhelmina Modeling

14   Agency, was that out of California?

15        A    New York.

16        Q    New York.

17             And you said you were employed there from

18   the time you were 17 until 1992?

19        A    Yes.

20        Q    And then in 1992, you went into the

21   building industry?

22        A    Uh-huh.

23        Q    And where geographically did you go into

24   the building industry?

25        A    Atlanta.

Page 16

```
 1      Q     Atlanta.

 2            Did you go from -- to Atlanta from New

 3      York?

 4      A     No.  I didn't have to live in New York.

 5      Q     Okay.  Gotcha.  So the modeling agency was

 6      based in New York, but you were working for them in

 7      California?

 8      A     Uh-huh.

 9      Q     Okay.  How did you make a career change

10      from the modeling industry to the building industry?

11      A     I had a child.

12      Q     Okay.  Had you had any prior experience or

13      classes or something that piqued your interest in

14      the building industry or can you explain why the

15      building industry?

16      A     I was a single mom, needed a job.

17      Q     Gotcha.

18            Did you know someone who was hiring in the

19      building industry, did you respond to a want ad or

20      just --

21      A     Right out of the paper.

22      Q     Okay.  Cool.

23            And who did you go to work for in the

24      building industry first?

25      A     Torrey Homes.
```

Page 17

```
 1        Q     I'm sorry, could you repeat?

 2        A     Torrey, T-O-R-R-E-Y.

 3        Q     And what did you do there?

 4        A     I was the closing coordinator.

 5        Q     And as a closing coordinator -- the name

 6   seems pretty self-explanatory, but just to make sure

 7   I understand, you coordinated the closing for the

 8   person who had the house built when they purchased

 9   it?  Is that a fair description?

10        A     Correct.

11        Q     How long were you the closing coordinator

12   for Torrey?

13        A     Until September of 2000.

14        Q     And was it after that that you entered the

15   mortgage industry?

16        A     Yes.

17        Q     Okay.  We'll get into the mortgage

18   industry part in a little bit here.  I'll kind of

19   put a bookmark there.  Let me go back and ask a

20   couple other background questions.  And this is one

21   of those that I have to ask.

22              I can tell looking at you that it's not an

23   issue, but you aren't under the influence of any

24   medications or drugs of any sort that would affect

25   your ability to fully and truthfully testify today,
```

Page 18

1    correct?

2         A    No, I'm not.

3         Q    And you've never been diagnosed with any

4    sort of a memory issue, correct?

5         A    No.

6         Q    You'd be surprised.  I've had people

7    before who have answered that question yes, so it's

8    one of those -- one of those I have to ask.

9              Have you ever filed for bankruptcy before?

10        A    No, I have not.

11        Q    Have you ever been involved in a lawsuit

12   before either where you sued someone or where you

13   were sued?

14        A    Yes.

15        Q    Tell me about that.

16        A    I sued Caliber Home Loans.  Actually, it

17   wasn't a -- I mean, we didn't -- no, actually,

18   that's not true.  It wasn't a lawsuit.  They settled

19   before it became a lawsuit.

20        Q    All right.  Tell me the nature of the

21   legal dispute that you had with Caliber Home Loans.

22             MR. PERLOWSKI:  I'm going to caution you.

23   You can answer the question.  Don't reveal any

24   attorney-client privilege communications in doing

25   so, but you can answer the question subject to that

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 19

1    instruction.

2        A    They owed me money.

3    BY MR. HARGROVE:

4        Q    What did they owe you money for?

5        A    For P&L.

6        Q    And when you say P&L --

7        A    P&L profits.

8        Q    Okay.  How much -- how much money did they

9    owe you?

10       A    469,000.

11       Q    About what year was this dispute with

12   Caliber?

13       A    2016.

14       Q    And was Caliber your last employer before

15   NAF?

16       A    Yes.

17       Q    Okay.  Was there a written agreement with

18   Caliber?

19       A    Yes.

20       Q    And Caliber didn't follow the terms of

21   that agreement to the tune of $469,000?

22       A    Correct.

23       Q    Did you obtain counsel in that matter?

24       A    Yes, I did.

25       Q    And, again, yeah, I don't want you to tell

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 20

1   me what you discussed with the counsel, but who did

2   you retain for that matter?

3       A    I retained -- my gosh, his name just went

4   right out -- Lee Parks.

5       Q    Lee Parks.

6            When you retained Lee Parks, was this

7   before you left Caliber or after you left Caliber?

8       A    After.

9       Q    How long were you with Caliber?

10      A    I think right at maybe 16 months.  I'm not

11  sure.

12      Q    The moneys that you weren't paid by

13  Caliber, this is kind of a -- I got to think of the

14  best way to ask this.

15           When did they start not paying you

16  everything they were supposed to?

17      A    After they fired me.

18      Q    So Caliber let you go, and there was a

19  pending $469,000 you were supposed to be paid?

20      A    That's correct.

21      Q    And they -- I assume you asked them before

22  you retained Mr. Parks, and they ignored you or just

23  didn't pay you or what happened there?

24           MR. PERLOWSKI:  Object to the form.

25           You can answer.

Page 21

```
 1       A     No, I didn't -- I didn't even ask them for

 2   it.  I just retained Lee Parks and asked him to go

 3   get it for me, and he did.

 4   BY MR. HARGROVE:

 5       Q     Did you get the whole 469,000?

 6       A     I did.

 7       Q     Do you know whether my client was owed any

 8   money by Caliber?

 9       A     I have no idea.

10             MR. PERLOWSKI:  Object to the form.

11   BY MR. HARGROVE:

12       Q     Did you ever discuss the $469,000 you

13   weren't paid by Caliber with my client?

14       A     Possibly.

15       Q     "Possibly" meaning you might have, you

16   just don't recall it?

17       A     I don't recall.

18       Q     Any other lawsuits -- well, you said no

19   lawsuits.

20             Any other legal disputes where you

21   retained counsel to attempt to recover money?

22       A     No.

23             (Plaintiff's Exhibit 1 was marked for

24   identification.)

25   BY MR. HARGROVE:
```

Kelly Allison                                        November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 22

1      Q    I'm going to hand you a document that's
2    marked Exhibit 1.  And it's your notice of
3    deposition, and I just like to get these into the
4    record.
5           Do you recognize this document?
6      A    It's the first time I'm seeing this
7    document.
8      Q    Okay.  You understand you're here to
9    testify pursuant to a notice of deposition in the
10   case that's listed on Exhibit 1, correct?
11          MR. PERLOWSKI:  I'm just going to caution
12   you not to reveal any privileged communications that
13   we may have had.  Subject to that, you can answer
14   Mr. Hargrove's question.
15     A    Yes.
16   BY MR. HARGROVE:
17     Q    Okay.  And Mr. Perlowski is here as your
18   lawyer pursuant to that deposition notice, correct?
19     A    Correct.
20     Q    What did you do to prepare for your
21   deposition today?
22          MR. PERLOWSKI:  Same caution not to reveal
23   any communications we had, but you can otherwise
24   tell Mr. Hargrove what you did to prepare.
25     A    We had a pre-deposition meeting.

Page 23

1    BY MR. HARGROVE:

2         Q    And when you say "we," can you tell me --

3    don't tell me what you discussed, but who was in the

4    pre-deposition meeting?

5         A    Ken Block, Henry, Chase, and that's all I

6    remember.  I don't remember the other folks.  I

7    don't know their names.

8         Q    And Henry, you're referring to

9    Mr. Perlowski who's sitting across from you today,

10   correct?

11        A    Yes.  I'm sorry.  Mr. Perlowski.

12        Q    And Chase --

13             MR. PERLOWSKI:  Henry is fine.

14   BY MR. HARGROVE:

15        Q    And Chase is Mr. Ogletree, one of

16   Mr. Perlowski's associates in this office, correct?

17        A    Yes.

18        Q    And who is Ken Block?

19        A    He is New American Funding's legal

20   counsel.

21        Q    Okay.  He's an in-house lawyer employed by

22   New American Funding?

23        A    He would have to answer that question.  I

24   am not 100 percent sure how that works.

25        Q    Okay.  How long -- again, I don't want you

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 24

 1   to tell me what you discussed, but how long was your

 2   pre-deposition meeting?

 3       A    Maybe an hour.

 4       Q    Okay.  Other than that pre-deposition

 5   meeting you had with Mr. Block, Mr. Ogletree, and

 6   Mr. Perlowski, did you do anything else to prepare

 7   for your deposition?

 8       A    Mr. Perlowski and I met in my office a

 9   couple weeks ago.

10       Q    Okay.

11       A    Maybe even longer than that; I'm not sure.

12       Q    All right.  And was there anyone present

13   at that meeting other than you and Mr. Perlowski?

14       A    No.

15       Q    How long did that meeting last?

16       A    Maybe an hour, hour and a half.

17       Q    So we've got the meeting -- the one-hour

18   meeting, then the one a few weeks ago.

19            Anything else you did to prepare for your

20   deposition?

21       A    No.

22       Q    Did you look at any documents in

23   preparation for your deposition?

24       A    I was presented documents.

25       Q    Okay.  Can you -- did you look at those

Page 25

1    documents you were presented?

2         A    Yes.

3         Q    Can you tell me what those documents were?

4         A    No.

5         Q    No because you don't recall what they

6    were?

7         A    No because I don't really remember all the

8    documents.  It was mostly internal documents that

9    were preparing me for this deposition.

10        Q    When you say internal documents preparing

11   you for the deposition, were these communications

12   from your counsel?

13        A    Yes.

14        Q    Okay.  So aside from communications from

15   your counsel, did you review any documents in

16   preparing for the deposition?

17        A    Outside of counsel, no.

18        Q    So you didn't review any contracts by way

19   of example that you had with NAF, correct?

20        A    Not outside of counsel.

21        Q    Okay.  What I'm asking is what documents

22   did you review.  All I'm asking -- I'm not asking

23   you what your counsel told you about them.  I'm

24   asking you what documents you have seen in

25   preparation.

Page 26

```
 1      A    I reviewed internal communications that
 2  were in regards to Gina and I's compensation in two
 3  thousand -- early 2019.
 4      Q    Okay.
 5      A    I reviewed Gina's contractual agreement
 6  Schedule 1, I reviewed my employment agreement
 7  Schedule 1 and division president --
 8      Q    Okay.
 9      A    -- amendment, and that's all I can
10  remember reviewing.
11      Q    The communications regarding Gina and her
12  compensation from 2019, do you recall who those
13  communications were between?
14      A    Christy Bunce.
15      Q    Okay.
16      A    Jan Preslo.
17      Q    All right.
18      A    I did not look at who was all involved in
19  the -- I just read the body of the communication, so
20  I can't be 100 percent sure who was on those
21  e-mails.
22      Q    What do you recall was in the body of the
23  communications?
24      A    The body of the communication was e-mails
25  going back and forth with corporate as it related to
```

Page 27

1    the new structure of Gina and I's compensation early

2    '19.

3         Q    Were you copied on those e-mails that you

4    reviewed?

5         A    Yes, sir, I was.

6         Q    So that wasn't the first time you had seen

7    them?

8         A    No, sir.

9         Q    Recognizing that this is broad, but was

10   there -- aside from discussions about the potential

11   new structure for compensation in early 2019, were

12   any other compensation topics addressed in those

13   e-mails that you reviewed?

14        A    It was all compensation.

15        Q    Did you review any communications about

16   override bonuses?

17        A    Yes, all compensation.

18        Q    You said you reviewed Gina's Schedule 1,

19   and we'll look at that in a little bit, but I want

20   to ask did you -- when you reviewed Gina's

21   Schedule 1, are you talking about from the original

22   2016 Schedule 1?

23             MR. PERLOWSKI:  Object to the form.

24   BY MR. HARGROVE:

25        Q    Which Schedule 1 of Gina's did you review?

Page 28

1      A    I don't know because they were just

2  scrolling, so I don't have the dates.  They were --

3  they had them on the Zoom, and they were scrolling

4  through, so I don't have dates.

5      Q    Okay.  Well, we'll show you some

6  documents, and maybe we can nail it down.

7           How about your employment agreement and

8  Schedule 1, do you recall the date of that that you

9  reviewed?

10     A    Again, they were just showing me

11 highlights of things within our employment

12 agreements.  I didn't see dates.

13     Q    Are there any other documents other than

14 the ones you've told me about that you reviewed in

15 preparation for this deposition?

16     A    No.

17     Q    Anyone you spoke with other than

18 Mr. Block, Mr. Perlowski, and Mr. Ogletree about

19 this deposition?

20     A    My husband.

21     Q    Okay.

22     A    Randy McCray.

23     Q    You called Ms. Spearman yesterday and left

24 her a message, correct?

25     A    I did not.

Page 29

1      Q     You did not?

2      A     I did call Ms. Spearman yesterday, but I

3   did not leave her a message.

4      Q     Okay.  Gotcha.

5            What was the purpose of your call

6   yesterday?

7      A     Just to say this might be a little

8   awkward.

9      Q     And tell me why you think it "might be a

10  little awkward."  I assume you mean the deposition

11  today, correct?  When you said "this might be a

12  little awkward," you meant the deposition; is that

13  correct?

14     A     Yes.

15     Q     All right.  Tell me what you thought would

16  be a little awkward about the deposition.

17     A     Well, we were partners, and now we're

18  sitting on opposite ends of the table.

19     Q     Okay.  Do you believe -- you said

20  "opposite ends of the table," so do you believe your

21  position is adverse to Ms. Spearman's?

22     A     I do.

23           MR. PERLOWSKI:  Object to the form.

24  BY MR. HARGROVE:

25     Q     Why?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 30

 1       A    I don't care to share.

 2       Q    Well, it's -- it's a deposition.  This is

 3  my opportunity to ask you, so --

 4       A    It's personal feelings.  It has nothing to

 5  do with her lawsuit.

 6       Q    Okay.  Well, given that you're a witness

 7  in the case, and I understand it's personal

 8  feelings, but I need to know what those personal

 9  feelings are that you believe are adverse to my

10  client, Ms. Spearman.

11           THE WITNESS:  Am I required to answer this

12  question?

13           MR. PERLOWSKI:  He's entitled to ask the

14  question that's relevant to your status as a

15  witness, so you can -- if you can, please answer.

16       A    I think Ms. Spearman's betrayal to myself

17  and the team --

18  BY MR. HARGROVE:

19       Q    Okay.

20       A    -- is disappointing.

21       Q    Tell me about Ms. Spearman's betrayal to

22  herself and the team, what do you mean by that?

23       A    She put friendship -- she put a lawsuit

24  over friendship.  She put a lawsuit over loyalty,

25  commitment.

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 31

```
 1        Q     And when you say she put a lawsuit over
 2   friendship, is that the friendship with you?
 3        A     Yes.
 4        Q     Okay.  And tell me how her filing this
 5   lawsuit against NAF was put over your friendship.
 6              How does that affect your friendship?
 7        A     Again, this is -- has -- Gina has every
 8   right to sue NAF.  I have no issue with her suing
 9   New American Funding.
10        Q     So if you have no issue with her suing
11   NAF, then why would this lawsuit have any effect or
12   consideration on your friendship with her?
13              MR. PERLOWSKI:  Object to the form.
14   BY MR. HARGROVE:
15        Q     You can answer.  He's just putting an
16   objection on the record.
17              THE WITNESS:  Do I have to answer?
18              MR. PERLOWSKI:  Can you go ahead and
19   repeat the question, please?
20   BY MR. HARGROVE:
21        Q     Let me clarify.
22              You testified that Ms. Spearman put a
23   lawsuit over friendship, correct?
24        A     Mrs. Spearman did what she felt was best
25   for her and her family.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 32

1      Q     Okay.  And you considered the fact that --
2  you said you don't have a problem with her suing
3  NAF, correct?
4      A     No, I don't.
5      Q     So is -- is your issue that you've been
6  brought in for a deposition?  Is that why you
7  believe she chose a lawsuit over friendship?
8      A     No.
9      Q     Okay.  Why do you believe she chose a
10  lawsuit over friendship if you don't have a problem
11  with her suing NAF?
12      A     Clearly Ms. Spearman feels as though me
13  calling her yesterday needed to be a part of this
14  information for you, and clearly I did not leave her
15  a message, and clearly reaching out to her was a
16  mistake.
17      Q     So prior to me referencing the telephone
18  call to Ms. Spearman, you were not upset with
19  Ms. Spearman and didn't think that she had betrayed
20  you?
21            MR. PERLOWSKI:  Object to the form --
22      A     I'm not answering that question.
23            MR. PERLOWSKI:  -- mischaracterizes
24  testimony.
25  BY MR. HARGROVE:

Page 33

1       Q    Did you feel that -- you referenced a

2    betrayal to herself and the team.  Tell me what the

3    betrayal that you were referencing was.

4            MR. PERLOWSKI:  Objection, asked and

5    answered.

6    BY MR. HARGROVE:

7       Q    Go ahead and answer it again.

8       A    It's just a feeling.

9       Q    How did she betray you and the team?

10      A    It's just my feeling.

11      Q    What gave you that feeling?

12      A    Just a feeling.

13      Q    So you have no basis for the feeling.

14   There's no event that happened.  There's nothing

15   that was said.

16      A    It's just a feeling.

17      Q    All right.  You said that Ms. Spearman put

18   a lawsuit over friendship and over loyalty.  Tell me

19   about the loyalty that you believe Ms. Spearman put

20   this lawsuit over.

21      A    That's an opinion and another feeling.

22      Q    Loyalty to whom?

23      A    Ms. Spearman need -- put herself first,

24   and that's what she felt like she needed to do; my

25   feelings don't matter.

Kelly Allison                        November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 34

1      Q    What did she do to put herself first and

2  show you that your feelings don't matter?

3           MR. PERLOWSKI:  Object to the form --

4      A    That's just a feeling.

5           MR. PERLOWSKI:  -- mischaracterizes

6  testimony.

7      A    This has no relevance to the case.  It's

8  just my feeling.

9  BY MR. HARGROVE:

10     Q    Sure.

11          Well, I'm exploring what biases you might

12 have against my client, so that's why I'm asking

13 you.

14          So do you dislike my client?

15     A    No, I don't.

16     Q    Are you upset with my client?

17     A    No, I'm not.

18     Q    Have you had any discussions about this

19 lawsuit with my client?

20     A    Very -- just that we're -- that she's

21 suing New American Funding, and that, you know, she

22 did not know that I was going to be deposed, and

23 that if I didn't want to be deposed, that she would

24 have it called back.

25     Q    Did you tell her you didn't want to be

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 35

1    deposed?

2        A    No, I told her it was fine.

3        Q    Okay.  Have you had any discussions with

4    Sarah Laprade about this lawsuit?

5        A    Not anything other than the data that

6    Mr. Perlowski's team sent to Sarah and I that we

7    could not delete any communication that we had with

8    Mrs. Spearman.

9        Q    Okay.  How about Jon Reed, any discussions

10   with him about this lawsuit?

11       A    I don't -- no, I don't think I've talked

12   to Jon Reed about it.

13       Q    Scott Frommert?

14       A    No.

15       Q    When was your last conversation with

16   Ms. Spearman?

17       A    I think it's at least been a couple weeks.

18   I'm not a hundred percent sure.

19       Q    Was that conversation in person or by

20   telephone?

21       A    The last conversation?

22       Q    Uh-huh.

23       A    I think was telephone.

24       Q    And tell me what y'all discussed.

25       A    The kids.  I really don't remember.

Page 36

```
 1        Q     Okay.  Did you discuss anything about NAF
 2   in that conversation?
 3        A     I don't think so.  I don't remember.
 4        Q     Any conversations about this case?
 5        A     I don't think so.  We may have.  I don't
 6   remember that.
 7        Q     Anything about compensation issues with
 8   NAF?
 9        A     No.
10        Q     How often do you see Ms. Spearman?
11        A     Maybe -- I don't know, maybe once a
12   quarter.
13        Q     Do you remember the last time you
14   physically saw Ms. Spearman?
15              You told me about the phone conversation.
16   Do you remember the last time you saw Ms. Spearman
17   in person?
18        A     Yeah, we -- we went to dinner -- I don't
19   remember the date.  It's on my calendar.  But I feel
20   like it's been maybe a couple weeks.
21        Q     Okay.  At that dinner, did you discuss NAF
22   at all?
23        A     I think we discussed the industry as a
24   whole.
25        Q     Okay.  Did you discuss anything about the
```

Page 37

1   lawsuit -- this lawsuit we're here talking about

2   today?

3        A    I don't think that we did.  I mean, I

4   think we -- in general, it's still going on.  And I

5   have said on several occasions I don't know what's

6   going on with the lawsuit because I just get

7   documentation that says sign here that you're not

8   going to delete any information, and --

9             MR. PERLOWSKI:  Just want to caution you

10  not to reveal the substance of communications, but

11  you can go ahead and continue to answer.

12       A    Right.

13  BY MR. HARGROVE:

14       Q    Did you --

15       A    I haven't been abreast of what's going on

16  with the lawsuit from Henry or Ken Block.

17       Q    Have you been abreast of what's going on

18  with the lawsuit from any other source?

19       A    No.

20       Q    Did you have any discussion with

21  Ms. Spearman about this lawsuit being public

22  knowledge?

23       A    Yes.

24       Q    Tell me about that.

25       A    I had some phone calls that Gina was suing

Page 38

1    New American Funding, and I didn't know how that

2    information would get outside of Gina or myself or

3    New American Funding, especially to the people that

4    were calling me.  And then I found out that this was

5    a rumor going around.

6            And so I did call Gina, and I asked her, I

7    said, hey, do you know that people are talking about

8    this lawsuit.  And she said it was a matter of

9    public record.

10       Q     Okay.

11       A     And that was the first knowledge that I

12   had that this had gone public.

13       Q     Who were these phone calls with that you

14   had that people called you to tell you Gina was

15   suing NAF?

16       A     Eric Glick was the first phone call.

17       Q     And who is Mr. Glick?

18       A     He's a regional for our company.  He's

19   based out of Savannah, Georgia.

20       Q     Okay.  Tell me the contents of the

21   conversation with Mr. Glick about Ms. Spearman's

22   lawsuit.

23       A     That he had spoken to Doug Casbon at

24   Certainty, and that Doug told him that Gina was

25   suing New American Funding.

Page 39

```
 1       Q    Did you have any discussions about the
 2   allegations that Ms. Spearman made in the lawsuit
 3   with Mr. Glick?
 4       A    No, outside of what was already public
 5   knowledge.  We did read that.
 6       Q    All right.  Tell me what was public
 7   knowledge.
 8            MR. PERLOWSKI:  Object to the form.
 9   BY MR. HARGROVE:
10       Q    You testified that you didn't have any
11   discussions with Mr. Glick outside of what was
12   public knowledge, you did read that.  Tell me what
13   the "that" that you read you were referring to.
14       A    Just what was -- when we Googled -- after
15   Gina told me it was a matter of public record, I
16   Googled it, and it came up.
17       Q    Okay.  And when you say "it" came up --
18       A    The lawsuit.
19       Q    So the lawsuit came up on Google.
20            Did you read the lawsuit?
21       A    I did.
22       Q    All right.  And was that the first time
23   you've seen the lawsuit?
24       A    That was the first time I saw the lawsuit.
25       Q    Have you seen the lawsuit since then?
```

Kelly Allison                           November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 40

1        A     No.

2        Q     When you reviewed the lawsuit on Google,

3   did you read all of the allegations?

4        A     I did, and I didn't really understand a

5   lot of it.

6        Q     Okay.  Tell me, did you understand any of

7   it?

8        A     Yes, I did understand some of it.

9        Q     What did you understand?  Tell me the

10  parts you did understand.

11       A     To be honest, I really don't remember

12  the -- all the verbiage that I read online.

13       Q     Okay.

14       A     It wasn't until I met with Henry that I

15  had a full understanding of what Mrs. Spearman was

16  suing for.

17            MR. PERLOWSKI:  And please, again,

18  instruction not to reveal what we talked about.

19  Subject to that, you can answer Mr. Hargrove's

20  questions.

21  BY MR. HARGROVE:

22       Q     When you pulled the lawsuit offline, did

23  you have to enter a credit card or anything to

24  download the pleadings?

25       A     No.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 41

1      Q    Do you remember what website you were able

2   to pull a free copy of the lawsuit off of?

3      A    I didn't -- I didn't print the lawsuit.  I

4   didn't -- I just looked at what was online.  Other

5   than that, I didn't go to the trouble of buying it.

6      Q    Okay.  So online at no charge was a copy

7   of the actual lawsuit with a caption like what's on

8   Exhibit 1 and the allegations?

9      A    Yeah, whatever was online, that's what I

10  looked at.

11     Q    Okay.  Do you remember what website?

12     A    I just Googled it, and it came up.

13     Q    You just clicked a link, and up came the

14  lawsuit?

15     A    No.  I just put in "Gina Spearman versus

16  New American Funding," and it popped up.

17     Q    All right.  When you say "it popped up,"

18  the lawsuit popped up?

19     A    The lawsuit popped up.

20     Q    Okay.  And you pulled it up after you

21  received the call from Mr. Glick, correct?

22     A    No, I pulled it up while I was on the

23  phone with Mrs. Spearman.

24     Q    Okay.

25     A    She told me it was a matter of public

Page 42

1   record, and I went to my laptop, and I Googled her

2   name, and sure enough, it was a matter of public

3   record.

4        Q    Okay.  So just so I understand, Mr. Glick

5   called and said, hey, Doug Casbon from another

6   company told me about your lawsuit.  And then you

7   called Gina, and she said, yeah, it's a matter of

8   public record.  And then you entered her versus NAF

9   in Google, and the lawsuit popped up, correct?

10            MR. PERLOWSKI:  Object to the form.

11            You can answer.

12   BY MR. HARGROVE:

13        Q    Correct?

14        A    Yes.

15        Q    Okay.  Do you know if Mr. Glick had

16   reviewed the lawsuit before?

17        A    Oh, I have no idea.  I didn't speak to

18   Mr. Glick about that.  I hung up the phone because I

19   was, like, I don't know how this could have gotten

20   out.

21        Q    Uh-huh.

22        A    And then several people brought it to, you

23   know, different people's attention that Gina was

24   suing New American Funding.  All you had to do is

25   Google it.

Page 43

1        Q      Did you know that Gina had sued New

2   American Funding prior to the phone call from

3   Mr. Glick?

4              MR. PERLOWSKI:  And again, you can answer

5   that question with a yes or no, but don't reveal any

6   communications you may have had with lawyers about

7   the topic.

8        A      Yes.

9   BY MR. HARGROVE:

10       Q      How did you know that -- without divulging

11  anything from your lawyers, how did you know prior

12  to the call from Mr. Glick that Ms. Spearman had

13  sued New American Funding?

14       A      Because we got documentation to not delete

15  any information.

16       Q      Okay.  So you hadn't been told by

17  Ms. Spearman that she had filed a lawsuit, correct?

18       A      I don't -- no, I don't think she told us.

19       Q      And Doug Casbon, what company is he with?

20       A      He's -- I don't know the -- I think it's

21  Certainty Home Loans owned by Guaranteed Rate.

22  You'd have to look that up to be certain.

23       Q      And your understanding is he called

24  Mr. Glick and said, hey, did you know that Gina

25  Spearman is suing New American Funding?

Page 44

1      A    He used it as a recruiting tactic.

2      Q    Okay.  And did you -- after Mr. Glick

3   called you, you said you hung up.  I assume you

4   didn't hang up immediately; you finished the

5   conversation with Mr. Glick?

6      A    Yes, I did.  I just said, I don't know

7   anything about this; I'll have to get back to you.

8      Q    Did you then get back to Mr. Glick?

9      A    No, Mr. Glick got back to me that he had

10  Googled it and saw that Mrs. Spearman was suing New

11  American Funding.

12     Q    Okay.  Did he tell you whether he had

13  reviewed the lawsuit like you did?

14     A    No, we didn't talk about it.

15     Q    All right.  And did you opine to

16  Mr. Glick -- so let me go back.

17          Mr. Casbon was trying to recruit

18  Mr. Glick?

19     A    Uh-huh.

20     Q    And Mr. Glick was someone who's under you

21  at NAF, correct?

22     A    Yes.

23     Q    All right.  Did you opine to Mr. Glick on

24  the merits of Ms. Spearman's lawsuit?

25     A    Mr. -- I don't know what -- if he looked

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 45

1    at it or not.

2         Q    Okay.

3         A    It's not -- it wasn't very clear.  It's

4    not like it was super clear online --

5         Q    So --

6         A    -- what she is suing New American Funding

7    for.  It's just that she was suing New American

8    Funding.

9         Q    So Mr. Glick was being recruited.

10             Has he left the company?

11        A    No, he has not.

12        Q    Did you have to say or do anything to keep

13   Mr. Glick from leaving the company?

14        A    Absolutely not.

15        Q    Do you know Doug Casbon?

16        A    Uh-huh.

17        Q    Have you talked with Mr. Casbon about the

18   lawsuit?

19        A    I have not.

20        Q    You mentioned several other people had

21   referenced Ms. Spearman's lawsuit against NAF to

22   you.

23             Can you give me the identities of those

24   several people?

25        A    It was competitors in the marketplace,

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 46

1    mostly surrounded by Mr. Casbon's team, Jeff

2    Stodghill, John --

3         Q    John?

4         A    I don't -- I'm sorry, his name just went

5    right out of my head.

6         Q    That's okay.

7         A    Steele.

8         Q    Tell me about your conversations with Jeff

9    Stodghill about --

10        A    I did not have those conversations.

11   They're all hearsay of what they were calling, you

12   know, people within our company.  So I didn't have

13   conversations with any of those people.

14        Q    So who did Mr. Stodghill or Mr. Steele

15   call within your company that you became aware of

16   recognizing --

17        A    Just, they called it --

18             MR. PERLOWSKI:  Object to the form, calls

19   for speculation.

20        A    Yeah, I don't know.  I don't really know.

21   It's all hearsay of where all this information came

22   from, so I am not specific on who really talked to

23   who.

24   BY MR. HARGROVE:

25        Q    Okay.  Who told you this information?

Kelly Allison                                   November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 47

1        A     Eric Glick.

2        Q     All right.  I want to go back now and walk

3    you through -- we got to where you had the job as

4    the closing coordinator with the builder, and then

5    the mortgage industry is where you went.

6              So I want to walk you through your

7    background in the mortgage industry up to the

8    present if you could just start with your first job

9    after being the closing coordinator for the builder.

10       A     Can I ask why this is relative to the --

11   this case?

12       Q     So I'm -- I'm entitled when I take your

13   deposition to explore anything that's reasonably

14   calculated to lead to the discovery of admissible

15   evidence.  So your background in the mortgage

16   industry and the extent to which you were involved

17   with Ms. Spearman is all calculated to lead to the

18   discovery of evidence in this case, so...

19       A     Okay.

20             MR. PERLOWSKI:  He's entitled to get some

21   basic background about the witness.  That's all

22   within the parameters.

23       A     I started my career at Sunshine Mortgage.

24   BY MR. HARGROVE:

25       Q     Okay.  What year was that?

Page 48

1        A      That was in 1989.  I was with them for a

2   little over a year.  Then I went to -- then I went

3   into -- I was -- I set up files for them.  It was an

4   entry-level position.  And then I got an opportunity

5   to go work for Torrey Homes in 1991.  I was with

6   Torrey Homes from 1991 until September of 2000.

7             In September of 2000, I went to HomeBanc

8   Mortgage Corporation.  In 2001 I went to HomeBridge.

9   In 2005 I went to Market Street Mortgage.  In 2005 I

10  made a move to Countrywide Home Loans.  In 2008 I

11  was with Academy Mortgage.  In 2015 I was at Caliber

12  Home Loans.  In 2017 I joined New American Funding.

13       Q      You said your first job in 1989 at

14  Sunshine was an entry-level position that you were

15  at for over a year.

16            What was your position with Torrey Homes?

17       A      Closing coordinator.

18       Q      And is that -- that's the job you told me

19  about earlier because that was -- that was for the

20  builder, correct --

21       A      Uh-huh.

22       Q      -- as opposed to the mortgage industry?

23       A      That is my job history.

24       Q      All right.  And which of these -- and

25  we're going to talk a little bit more about these,

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 49

1   but tell me how you first came to meet Ms. Spearman.

2        A    Excuse me.  I met Ms. Spearman in -- I

3   believe it was 2001 --

4        Q    Okay.

5        A    -- at HomeBanc.

6        Q    All right.

7             MR. PERLOWSKI:  Do you need anything?

8             MR. HARGROVE:  Yeah.  And if you want to

9   take a break -- any time you need a break, let me

10  know.

11  BY MR. HARGROVE:

12       Q    So at HomeBanc where you went in -- when

13  you went to HomeBanc in 2000, what was your position

14  at HomeBanc?

15       A    What did they call me.  I think I was a

16  builder manager.

17       Q    All right.

18       A    I don't remember my title.

19       Q    And you were at HomeBanc for -- you said

20  you were there in September of 2000, and then

21  sometime in 2001, you went to HomeBridge?

22       A    Uh-huh.

23       Q    So that was -- you were there a few

24  months?

25       A    I think we were there maybe nine months.

Page 50

```
 1       Q    And when you say "we," are you referring
 2   to Ms. Spearman as well?
 3       A    No.  At the time, I was partnered with a
 4   gentleman by the name of Rick Floyd.
 5       Q    All right.  And Mr. Floyd, did he leave
 6   HomeBanc for HomeBridge with you, or was that the
 7   end of --
 8       A    He left HomeBanc for HomeBridge, and I
 9   went with him.
10       Q    Okay.  So when you left HomeBanc to go to
11   HomeBridge, how about Ms. Spearman, did she leave
12   HomeBanc for HomeBridge?
13       A    No.
14       Q    Were y'all -- when you first met at
15   HomeBanc, did you guys -- I know you worked at the
16   same place, but were you involved in working on
17   matters together?
18       A    Yes, we were.
19       Q    And did y'all become friends at that point
20   back in 2000 when you were at HomeBanc?
21       A    Yes.
22       Q    Did you guys visit socially or was it just
23   you were friends at work at that point?
24       A    I can't remember when we started visiting
25   socially.
```

Page 51

1        Q      Did you have any discussions with

2  Ms. Spearman when you left HomeBanc for HomeBridge

3  about Ms. Spearman potentially going with you to

4  HomeBridge?

5        A      Yeah, I think we did.  I'm sure we did.

6        Q      Okay.  But obviously she didn't go at that

7  point, correct?

8        A      No, she did not.

9        Q      Were you -- in the pecking order of

10  HomeBanc, were you at a -- a higher level employee,

11  the same, or a lower level employee than

12  Ms. Spearman was?

13        A      What do you mean by "higher level"?

14        Q      Responsibilities, compensation,

15  supervisory roles, et cetera.  I'm assuming there

16  was --

17        A      I don't know because I don't know what

18  Ms. Spearman's compensation was.

19        Q      Okay.  Did your -- from your view of what

20  she was doing, did you appear to have

21  responsibilities at a similar level to what she had

22  or did you appear to have greater or fewer

23  responsibilities?

24        A      I would say -- I don't really know how to

25  answer that question.  I mean, she had -- our

Page 52

1   responsibilities were very different.

2       Q    Okay.

3       A    But I wouldn't put one or the other in a

4   pecking order.

5       Q    Gotcha.

6            What caused you to leave HomeBanc for

7   HomeBridge in 2001?

8       A    My partner, Rick, decided to open a

9   company with his old partner, and I trusted them, so

10  I went with them.

11      Q    And did you remain partners with Mr. Floyd

12  when you went over to HomeBridge?

13      A    I -- well, yes, I had a very small, very

14  tiny, tiny, tiny percentage of my -- of the builder

15  division.

16      Q    Okay.

17      A    But technically Mr. Floyd was my boss.

18      Q    Who was the other partner who he went into

19  business with at HomeBridge?

20      A    Alex Koutouzis, and Greg Shumate, and

21  Peter Norden, and Marty Levine.

22      Q    Were these individuals that came from

23  HomeBanc or from other --

24      A    Other companies.

25      Q    Did you remain friends with Ms. Spearman

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 53

1   after you left HomeBanc?

2        A    I believe we did.

3        Q    Were y'all seeing each other socially

4   during the time that you were not working at the

5   same place?

6        A    I believe we did.

7        Q    At some point the two of you began working

8   together again, correct?

9        A    We did.

10       Q    All right.  Can you tell me how that came

11  to be?

12       A    At some point, Gina became unhappy at

13  Wells Fargo, and she joined HomeBridge.

14       Q    All right.  And that would have been

15  between 2001 and 2005, correct?

16       A    Yes.  I don't remember the date that she

17  joined.

18       Q    Did you have anything to do with her

19  leaving Wells Fargo and joining HomeBridge?

20       A    I am sure that myself and Rick Floyd

21  and -- did.  I truly can't remember the recruiting

22  process of that at that time.

23       Q    When Ms. Spearman went over to HomeBridge,

24  what was your role at HomeBridge at that point?

25       A    The builder -- I ran the builder division.

Kelly Allison                      November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 54

1      Q     Okay.  And what was Ms. Spearman hired to

2   do?

3      A     Loan origination.

4      Q     Was that loan origination outside of

5   builders or with builders?

6            Let me ask a better question.  Explain to

7   me what -- first what the builder division at

8   HomeBridge was.  What did it do?

9      A     I marketed builders to bring them into

10  HomeBridge and to support our sales staff with new

11  construction.

12     Q     And what was Ms. Spearman's role as a loan

13  originator at HomeBridge?

14     A     She originated loans.

15     Q     For individual consumers?

16     A     Yes, for consumers.

17     Q     Obviously it got to the point where you

18  and Ms. Spearman became partners and leaders in

19  various companies.

20           Can you walk me through during this

21  progression from HomeBridge up to the present how

22  you and Ms. Spearman came to be involved as partners

23  in the lending industry?

24     A     When we -- I left HomeBridge, Ms. Spearman

25  stayed with HomeBridge, and I went to Countrywide.

Page 55

1      Q    Okay.

2      A    I recruited Mrs. Spearman to Countrywide.

3  From Countrywide, we went -- when Countrywide had

4  the meltdown and was taken over by Bank of America,

5  Gina and I made a decision to go to Academy

6  Mortgage, and at that time, we decided to partner

7  up.

8            Ms. Spearman decided that her kids were

9  still young and that she didn't really want to be in

10  a role of leadership while her children were still

11  young, so we still worked together.  And then when

12  we went to Caliber, Mrs. Spearman's children were

13  getting older, and she took on the role of the

14  builder -- I think she was the builder manager at

15  Caliber.  She went into leadership.  And then when

16  we left Caliber to go to Academy, we decided to

17  partner.

18      Q    So -- and I've got -- so Academy was after

19  Caliber?

20      A    Academy was before Caliber.

21      Q    Okay.  And tell me what it means to

22  partner up.  You said you guys decided to partner

23  up.  Tell me what that means.

24      A    We split the income 70/30.  I was 70; she

25  was 30.

Page 56

1      Q     And this would be in a role of you guys
2   would be leading an office or region or walk me
3   through that.
4      A     Leading a division.
5      Q     And that was first at Academy, correct,
6   that you guys partnered up?
7      A     We tried partnering at Academy, and
8   Ms. Spearman decided that she didn't want to be in
9   leadership at that time.
10      Q     Okay.
11      A     So --
12      Q     But then by --
13      A     Our first partnership was at New American
14   Funding, and we -- we split our income 70/30.
15      Q     So you guys worked together at HomeBridge,
16   then you went back together at Countrywide, then
17   Countrywide melted down, and then y'all were with
18   Countrywide, Academy, Caliber, and then New American
19   Funding together, correct?
20      A     You got it.
21      Q     All right.  And you were not partners,
22   though, until you went to New American Funding,
23   correct?
24      A     Yes, correct.
25      Q     You referenced earlier that -- you

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 57

1    referenced Caliber firing you earlier in the

2    deposition.

3              Can you tell me the circumstances of that?

4         A    Yes.  Caliber fired myself and Ms. Gina

5    Spearman in October of 2017, I believe.

6         Q    Okay.  And can you tell me -- were you

7    fired because they knew you had found other jobs

8    or...

9         A    Yes, sir.

10        Q    Okay.  And I assume that's pretty standard

11   in that industry, if they learn you're going

12   somewhere else, you don't work out a notice, you --

13   you're gone?

14             MR. PERLOWSKI:  Object to the form.

15             You can answer.

16        A    Yes.

17   BY MR. HARGROVE:

18        Q    Fair enough?

19        A    Typically, yes.

20        Q    So while you said you were fired, you

21   weren't fired for something -- the only thing that

22   you did was have a different job already lined up,

23   and you were leaving anyway, correct?

24        A    We didn't have a job lined up.  They just

25   found out that we were talking to another company.

Page 58

1   So we had not secured a job.  They just found out

2   that we were talking to other companies.

3        Q    Was NAF the other company that you were

4   speaking with or were you talking to many?

5        A    Yeah, we had talked to quite a few, so I

6   don't know which one they -- I don't know which one.

7        Q    Sure.  Understood.

8             So you considered Ms. Spearman a friend

9   since y'all first met at HomeBridge in 2001,

10  correct?

11       A    Yes, we began a friendship in 2001.

12       Q    Do you still consider Ms. Spearman your

13  friend as we sit here today?

14       A    I love Ms. Spearman.

15       Q    Okay.  That wasn't exactly my question,

16  though.

17            Do you still consider her a friend?

18       A    Ms. Spearman is not my friend.

19       Q    Okay.  And why is she no longer your

20  friend?

21            MR. PERLOWSKI:  Object to the form.

22       A    I'm not answering that question.

23  BY MR. HARGROVE:

24       Q    It's -- I'm entitled to explore whatever

25  biases you might have against my client, so --

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 59

 1        A    I don't have any biases against your

 2   client.  I just told you I love her.

 3        Q    Okay.  Well, you told me she was your

 4   friend.

 5        A    I love Ms. Spearman.  She is not healthy

 6   for me, so I can love people that aren't healthy for

 7   me from afar.

 8        Q    All right.  But if she's not your friend

 9   anymore, I'm entitled to know why you do not

10   consider her a friend.

11             MR. PERLOWSKI:  And she's just told you,

12   and she's testified about that --

13        A    I just told you.

14             MR. PERLOWSKI:  -- earlier in the

15   deposition.

16   BY MR. HARGROVE:

17        Q    Well, go ahead and tell me again

18   because --

19        A    I love Ms. Spearman very much.

20             MR. PERLOWSKI:  Objection, asked and

21   answered.

22             Go ahead.

23        A    I love Ms. Spearman very much.

24   BY MR. HARGROVE:

25        Q    All right.  So she's --

Page 60

1      A     And I have made a decision to love her

2   from afar because she is not healthy for me.

3      Q     Okay.  Why is she not healthy for you?

4      A     I don't feel like she is someone that is

5   healthy for my life.

6      Q     And what is it about her that makes her

7   unhealthy for your life?

8      A     I think Ms. Spearman is about

9   Ms. Spearman, and I don't really like self-centered

10  people.

11     Q     What has led you to the conclusion that

12  Ms. Spearman is a self-centered person?

13     A     Well, a lot of things that aren't relative

14  to this case.

15     Q     Tell me about those things that aren't

16  relative to this case -- that you contend aren't

17  relative to this case.

18     A     Just the way that she -- Ms. Spearman is

19  going to put Ms. Spearman before anybody.  I think

20  she manipulates people, and I don't like people that

21  manipulate people and then turn around and tell them

22  that they love them.  That's not love.  Love -- she

23  works for a company.  She understands.  Love is a

24  verb.

25     Q     Now, who has Ms. Spearman manipulated and

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 61

1    then told that she loved them that you're aware of?

2        A    Several people.

3        Q    Tell me who those several people are.

4        A    Myself, my daughter.

5        Q    Okay.

6        A    That's personal.  That's a personal

7    opinion.  It has nothing to do with this case.

8        Q    Anyone other than yourself and your

9    daughter who she's manipulated and then told she

10   loved?

11       A    Not that I'm aware of.

12            MR. HARGROVE:  Why don't we take a

13   five-minute restroom break.  Y'all good with that?

14            MR. PERLOWSKI:  Yeah.

15            MR. HARGROVE:  Let's take five.

16            (Recess 10:47-11:01 a.m.)

17   BY MR. HARGROVE:

18       Q    You referenced earlier a gentleman named

19   Lee Parks that you retained to collect what you were

20   owed from Caliber, correct?

21       A    Uh-huh.

22       Q    All right.  Have you ever engaged Lee

23   Parks for any other matters?

24            MR. PERLOWSKI:  I want to just caution

25   you, don't reveal the substance of any

Page 62

1   communications with Mr. Parks.  That's your

2   privilege.  He's asking you on what matters you

3   engaged Mr. Parks.  You can answer that question.

4        A    I have engaged Lee Parks to redline my

5   employment agreement with New American Funding, and

6   I engaged Lee Parks to obtain the money that Caliber

7   Home Loans owed me.

8   BY MR. HARGROVE:

9        Q    Okay.  When you say redline the employment

10  agreement, are you talking about the employment

11  agreement that was ultimately executed in or about

12  March of 2020 with NAF or are you talking about a

13  different --

14       A    No, in 2017.

15       Q    2017.  You went to NAF in two thousand --

16       A    '16, I'm sorry.

17       Q    So when you went to NAF in 2016, you

18  retained Lee Parks to review your employment

19  agreement with NAF?

20       A    Yes, to redline it.

21       Q    Okay.  And were any of the changes in

22  your -- in the redline that he drafted incorporated

23  into your ultimate agreement in 2016 with NAF?

24       A    Yes, they were.

25       Q    Was Ms. Spearman involved at all in the

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 64 of 252
Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 63

1  retention of Mr. Parks?

2      A    I don't believe so.

3      Q    Okay.  Did you have any discussions with

4  Ms. Spearman at all about the fact you were having

5  Mr. Parks review your 2016 agreement with NAF?

6      A    I'm sure I did.  I don't remember the

7  conversation, but I shared most everything with

8  Gina.

9      Q    Did you have any -- after -- let me go

10  back.

11          After Mr. Parks reviewed and redlined your

12  2016 agreement with NAF, did you engage Mr. Parks on

13  any other matters related to NAF?

14      A    I don't believe that I did.

15      Q    Was 2016 the last time you had a

16  discussion about any legal matter with Mr. Parks?

17      A    I may have -- I may have spoken to Lee

18  about our -- when we were engaging -- going to a P&L

19  and new employment agreement to '19.  I'd have to go

20  back on records.  I mean, I don't have a bill from

21  him, but I may have reached out to him.  In the long

22  run, we ended up retaining Les Watson.

23      Q    Lex Watson?

24      A    Lex Watson, yeah.

25      Q    So although you might have reached out to

Page 64

1    Mr. Parks, the only matter that you recall him being

2    engaged to address that pertained to NAF was the

3    review of the 2016 agreement, correct?

4            MR. PERLOWSKI:  Object to the form.

5            You can answer.

6       A    I think so.  It's been a long time ago.  I

7    really don't know, but, I mean, I feel like -- I'm

8    trying to go back through the bills he sent me,

9    so --

10   BY MR. HARGROVE:

11      Q    Okay.

12      A    I'm not a hundred percent sure.

13      Q    I'm going to hand you a document that is

14   marked as Exhibit 2, which is a series of e-mails.

15           (Plaintiff's Exhibit 2 was marked for

16   identification.)

17   BY MR. HARGROVE:

18      Q    And I want you to go back to -- you can

19   review the whole document, but I want to start off

20   with, at the bottom right, NAF0000351, which looks

21   to be an e-mail you sent November 16, 2019.  And

22   I'll just ask you to take a glance at that.

23           Have you had a chance to look at it?

24      A    Yes.  The one from 7:25 a.m.?

25      Q    Yes.  Well, I was actually -- that was the

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 66 of 252
Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 65

1   response to your e-mail.  I wanted you to look at

2   your e-mail the next page.

3        A    On 352?

4        Q    Correct.

5        A    Okay.

6        Q    So the e-mail that begins on 351 and runs

7   to 352, what was the impetus behind you sending that

8   e-mail?

9             Had something happened that caused you to

10  send that e-mail?

11       A    I'm assuming this -- I'm assuming this is

12  around the time that corporate made the decision to

13  take Tennessee and Virginia out of Gina and I's

14  division.

15       Q    Okay.  And you reference in the e-mail a

16  conference call with Christy, Jan, and Jon where you

17  were informed the company made that decision,

18  correct?

19       A    Yes.

20       Q    And this e-mail, I notice that you sent it

21  to -- I assume "Jon" was Jon Reed, correct?

22       A    Uh-huh.

23       Q    And Christy that you referred to was

24  Christy Bunce, correct?

25       A    Uh-huh.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 66

1        Q     And Jan would be Jan Preslo, correct?

2        A     Uh-huh.

3        Q     You also sent the e-mail to Rick and Patty

4    Arvielo, correct?

5        A     Uh-huh.

6        Q     Can you tell me why you also sent the

7    e-mail to Rick and Patty Arvielo?

8        A     They are the president and CEO of the

9    company.

10        Q     Okay.  And why did you feel you should

11    send this e-mail about the individuals -- those

12    territories being removed also to Rick and Patty

13    Arvielo, who were executives in the company?

14        A     I felt as though they probably had

15    something to do with the decision.

16        Q     Why did you feel they had something to do

17    with the decision?

18        A     I mean, they're the CEO and the president.

19        Q     Okay.

20        A     I'm assuming that they're not going to

21    make that decision without referring to them.

22        Q     Have you witnessed Mr. and Mrs. Arvielo's

23    involvement in decisions within the company in the

24    past?

25              MR. PERLOWSKI:  Object to form.

Page 67

```
 1    BY MR. HARGROVE:

 2         Q    Let me strike -- let me go back.

 3              Are there facts on which you base your

 4    assumption that Mr. and Mrs. Arvielo would have been

 5    involved in a decision like this?

 6         A    Yes.

 7              MR. PERLOWSKI:  Object to the form.

 8              THE WITNESS:  Sorry.  You guys tell me

 9    what I'm supposed to do.

10              MR. PERLOWSKI:  No, it's fine.  I'm

11    preserving the record.  Unless I instruct you not to

12    answer, you can answer.

13    BY MR. HARGROVE:

14         Q    So what are the --

15              THE WITNESS:  What does it actually mean

16    when you say "object to the form"?

17              MR. PERLOWSKI:  I believe there's

18    something evidentially improper with the question,

19    and I'm reserving an object to the form.

20              THE WITNESS:  Okay.

21    BY MR. HARGROVE:

22         Q    So what are the facts or events that have

23    occurred that led you to believe that Mr. and

24    Mrs. Arvielo were involved in this decision?

25              MR. PERLOWSKI:  Object to form.
```

Kelly Allison                          November 18, 2021
Spearman, Gina Vs. Broker Solutions, Inc. Et Al

Page 68

1              You can answer.

2         A    They own the company.

3    BY MR. HARGROVE:

4         Q    Okay.  Are there actions you've seen them

5    take that they are -- strike that.

6              Have you witnessed the Arvielos be

7    involved in day-to-day decisions like changing

8    territories for folks?

9         A    I haven't been involved.  I would assume

10   that they are.

11        Q    Okay.  You reference on page 352, your

12   last paragraph, it says:  Rick, I know our last call

13   you stated, I just don't know what to show you girls

14   anymore to make you comfortable.

15             Do you see that?

16        A    I do.

17        Q    All right.  Do you recall that call with

18   Mr. Arvielo that you're referring to?

19        A    Yes, I do.

20        Q    Okay.  Tell me what you recall about that

21   call.

22        A    He was frustrated with some of the

23   questions that Gina and I were asking that were

24   probably super meaty, super detailed, and maybe

25   information that he didn't know, and he got super

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 69

1    frustrated.

2         Q    This call with Mr. Arvielo, you were on

3    the call and Mr. Arvielo was on the call, correct?

4         A    Yes.

5         Q    Was Ms. Spearman on the call?

6         A    Yes.

7         Q    Was anyone else on the call?

8         A    I think that Jason Obradovich was on the

9    call; I'm not a hundred percent sure.  And possibly

10   maybe -- I don't know.  I don't really remember

11   honestly who was all on that call.  It's been a

12   while.

13        Q    Have you had -- during the time you and

14   Ms. Spearman -- during this time where there were

15   discussions about pulling certain -- certain

16   territories from your region, was Mr. Arvielo

17   involved in more than one call or just one call?

18        A    I don't think that this call with Rick

19   Arvielo had anything to do with pulling the region.

20        Q    Okay.

21        A    This was simply -- I was referring to the

22   call that we had as it relates to the P&L.

23        Q    Okay.  How often did you and Ms. Spearman

24   have calls with either Mr. or Mrs. Arvielo during

25   your tenure at NAF?

Page 70

```
 1      A     Gosh, I don't -- I wouldn't be able to
 2   answer that.  I don't know.
 3      Q     Okay.  Would it be at least quarterly?
 4      A     Honestly, I don't -- I don't know.  Maybe
 5   if you wanted to say quarterly, that would probably
 6   be a good assessment.
 7      Q     Okay.  On these calls, recognize it's
 8   roughly-roughly quarterly, with you and Ms. Spearman
 9   that Mr. Arvielo was involved in, what kind of
10   topics were discussed?
11      A     A lot -- during this time, a lot was
12   around the pay structure.
13      Q     Okay.
14      A     Changing over to a P&L.  We were very
15   involved with Patty and Rick after the meltdown of
16   '18, and we changed compensation in '19.  And
17   they -- we were talking at the time of going to a
18   P&L.  They had never -- they had never put together
19   a P&L for the company on a divisional basis, so
20   they -- there was a lot -- we had a weekly call for
21   a while with Patty and Rick to discuss different P&L
22   models.
23      Q     Okay.
24      A     And they did ask all the SVPs to try to
25   obtain as many P&L models in the industry and submit
```

1    them to them so that they could review what they

2    thought -- the different models that were in the

3    industry so that they could review to decide what

4    was going to be the best model for us at New

5    American Funding moving forward.

6         Q    So on these weekly calls with Mr. and

7    Mrs. Arvielo, was there any discussion about the

8    current pay structure?

9         A    There were calls -- there were meetings

10   around the current pay structure and the change of

11   that pay structure.  The calls that we were

12   having -- and I think Rick may have been involved in

13   them, I'm not a hundred percent sure, but Patty was

14   definitely leading the weekly call in order for us

15   to gather different P&L models so that we could

16   discuss them amongst the SVPs.

17        Q    Were there discussions on these calls that

18   Patty was taking the lead on of the way the current

19   pay structure operated?

20        A    I don't remember that.

21        Q    Okay.  I want to talk about -- who is

22   Christy Bunce?

23        A    She is the COO for New American Funding.

24        Q    All right.  And is she someone who you

25   report to or someone who's -- explain -- let me go

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 72

1    back.

2           Explain her position as COO in relation to

3    your position with NAF, if any.

4       A    She's one of the executive -- obviously

5    she's the COO of the company.

6       Q    Okay.

7       A    And I think I used to report to her

8    directly.  I'm not sure that I do anymore.

9       Q    Ms. Bunce is one of the individuals, I

10   assume, that -- was she on these weekly calls?

11      A    I think she was.  I'm not a hundred

12   percent sure.

13      Q    If you look at the -- if you look at the

14   second sentence if we go to the e-mail, you see the

15   e-mail above yours that begins with "I honestly

16   think"?

17      A    Uh-huh.

18      Q    And that e-mail, obviously, you were not

19   copied on, correct?

20      A    Does not appear so.

21      Q    All right.  The second sentence, Ms. Bunce

22   says:  You can't reason or have a meaningful

23   relationship with a pathological liar.

24           Do you see that?

25      A    I do.

Kelly Allison                        November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 73

1      Q    Do you have any reason to know why
2  Ms. Bunce would be calling you a pathological liar?
3      A    I think you would have to ask Ms. Bunce
4  that.
5      Q    Okay.  Are you a pathological liar?
6      A    I do not believe I'm a pathological liar.
7      Q    Are you aware of anything you've said or
8  done that would lead Ms. Bunce to believe that you
9  were a pathological liar?
10     A    I think you're going to have to ask
11  Ms. Bunce that.
12     Q    Okay.  What is your relationship -- do you
13  have any relationship beyond she's the COO and you
14  are the Southeast regional manager -- is that your
15  title?
16     A    Yes.
17     Q    Okay.  Aside from that, do you have any
18  relationship of any sort with Ms. Bunce?
19     A    I have a professional relationship with
20  Mrs. Bunce.
21     Q    Okay.  Do you like Ms. Bunce?
22     A    Yeah, I like her.
23     Q    Okay.  Do you know -- does Ms. Bunce --
24  have you had any negative interactions with
25  Ms. Bunce in the past?

Page 74

1       A     Of course we have, yes.

2       Q     Tell me about the negative interactions

3    you've had with Ms. Bunce.

4       A     Well, clearly based on 352 and 353 when

5    they decided -- made the decision to take Tennessee

6    and Virginia from our region, clearly I expressed my

7    feelings about that.

8       Q     Okay.  Was there any expression of those

9    feelings other than this e-mail referenced on 352?

10      A     We had a prior -- I don't know what the

11   date was, but we did have a conference call with

12   Christy Bunce, Jon Reed, and Jan Preslo where they

13   informed Gina and I that we would no longer be --

14   that Tennessee and Virginia would no longer be under

15   our division.

16      Q     Okay.  Any other negative interactions

17   with Ms. Bunce?

18      A     I am sure we have disagreed throughout my

19   tenure at New American Funding, but off the top of

20   my head, no.

21      Q     Has Ms. Bunce ever called you a

22   pathological liar directly?

23      A     No.

24      Q     Does it surprise you that Ms. Bunce called

25   you a pathological liar in this e-mail to Mr. and

Page 75

 1   Mrs. Arvielo, Ms. Preslo, and Mr. Reed?

 2        A     Yes, it was very shocking.

 3        Q     Had you seen this e-mail before today?

 4        A     Yes, I saw --

 5              MR. PERLOWSKI:  You can answer if you've

 6   seen it before today.

 7        A     Yes.

 8   BY MR. HARGROVE:

 9        Q     Okay.  Is this one of the documents you

10   reviewed in preparation for your deposition?

11        A     It sure is.

12        Q     Were there other e-mails than this one

13   that you reviewed in preparation for your

14   deposition?

15        A     There was an e-mail that Gina had sent, I

16   think, to -- I don't remember.  Again, I didn't see

17   dates, just they were pointing things out that she

18   had sent to, I believe, maybe Christy on different

19   timelines, and then another one from Christy which

20   basically said this is what we're going to do as it

21   related to early 2019 compensation.

22        Q     Did you review any complete documents or

23   did you just review segments of documents in

24   preparation?

25        A     No, it was segments of documents that they

Page 76

```
 1   had on the Zoom screen.

 2        Q    Okay.  Have you had any discussion with

 3   Ms. Bunce since you learned that she had referred to

 4   you as a pathological liar about that?

 5        A    Yes, I have.

 6        Q    Okay.  Tell me about that conversation.

 7        A    Well, she wanted to let me know that this

 8   would probably be brought up in deposition and that

 9   it was a heated time and that she wanted me to know

10   that she was apologetic for ever saying it, and that

11   she doesn't mean it, and that she was just very

12   highly frustrated at the time, and that she regrets

13   it.

14        Q    Did she tell you what she referenced you

15   being a pathological liar about?

16        A    I didn't ask her.

17        Q    This was back in 2019, correct?

18             MR. PERLOWSKI:  Object to the form.

19   BY MR. HARGROVE:

20        Q    November 16, 2019, was the date of the

21   e-mail, correct?

22        A    Yes.

23        Q    All right.  And did she call you before

24   your deposition preparation to tell you she had

25   called you a pathological liar in an e-mail?
```

Page 77

```
 1       A    Yes, she did.

 2            MR. PERLOWSKI:  Object -- I was going to

 3   say object to the form.

 4   BY MR. HARGROVE:

 5       Q    Did she forward you the e-mail?

 6       A    No, sir.

 7       Q    The first time you saw the e-mail would

 8   have been during your deposition prep?

 9       A    Yes, sir.

10       Q    But you already knew about it at that

11   point because Ms. Bunce had told you that she had

12   sent an e-mail calling you a pathological liar,

13   correct?

14       A    Yes, sir.

15       Q    And her explanation was things were heated

16   and she was just angry?

17       A    She was highly --

18            MR. PERLOWSKI:  Object to the form, asked

19   and answered.

20   BY MR. HARGROVE:

21       Q    Go ahead.  You can answer.

22       A    She was frustrated, there was a lot of

23   pressure during that time, and that she regrets

24   saying that.

25       Q    Did she say that it wasn't true or just
```

Page 78

1    that she regretted saying it?

2         A    She said that she regretted saying that,

3    and that she respects me very much, and it was a

4    heated moment.  That's what she said.

5         Q    I want to change gears a little bit at

6    this point and have you walk me through your

7    recruitment and how you and Ms. Spearman ultimately

8    ended up at NAF.

9              Can you walk me through that?

10        A    Yes.  Mrs. Spearman and I were -- had made

11   the decision that we didn't think Caliber was going

12   to be a long-term home, so we started engaging with

13   several companies.

14             Mrs. Spearman had a call from New American

15   Funding's recruiter, Paul Pritchard.  And I actually

16   was in California with Caliber Home Loans at a

17   regional meeting, and Ms. Spearman said, well, hey,

18   since you're already in California, they're in

19   California, why don't I fly out, you're already

20   there, let's just see what this company is all

21   about.

22        Q    Okay.

23        A    So we did, and the rest is history.

24        Q    So who did you meet with when you flew out

25   to California?

Page 79

1        A    We met with Rick Arvielo, Patty Arvielo,

2    Jan Preslo, Jon Reed, Paul Pritchard, Christy Bunce.

3        Q    And the -- go ahead.

4        A    I believe Jason Obradovich.

5        Q    How involved was Rick Arvielo in the

6    discussions at that initial meeting?

7        A    I mean, I believe they attended most of --

8    from my recollection, I think they attended most of

9    the meetings that we had at their corporate office.

10        Q    And were they passive attenders or were

11    they actively involved in the communications?

12        A    They were actively involved in the

13    communications.

14        Q    At these meetings that you had with NAF

15    while you were being recruited, were there

16    discussions about compensation?

17        A    Of course.

18        Q    Were Rick and Patty Arvielo involved in

19    those discussions about compensation?

20        A    Not as much as Jon Reed led the

21    discussions on compensation.

22        Q    But when Jon Reed was leading these

23    discussions about compensation, the Arvielos were

24    part of the meeting, correct?

25        A    I really don't remember Patty and Rick

Page 80

1   being a part of the compensation meetings.  I'm sure

2   they ran it by them, but it was mostly Jan, Jon, and

3   Christy Bunce.

4        Q    Okay.  How many meetings did you have in

5   person before you and Ms. Spearman made the decision

6   to go to NAF?

7        A    I went to California 11 times.

8        Q    And of those 11 times you went, did you

9   meet with people from NAF every time?

10       A    Yes.

11       Q    And of those 11 meetings, how many were

12  Rick Arvielo in attendance at?

13       A    Rick Arvielo and Patty, the executive team

14  was, I would say, 80 percent of those meetings

15  because we were bringing team members out to

16  introduce them to New American Funding, so we made

17  the decision to go to New American Funding as a

18  group decision.  So we brought -- I think it was 42

19  of our teammates out to New American Funding over

20  a -- I think it was like a four- or five-month

21  period of time.

22       Q    So you had the two of you and then people

23  who worked for you who would also be moving to New

24  American Funding travel to California, correct?

25       A    Yes.

Page 81

1      Q    And those individuals also met with Rick

2   and Patty Arvielo in these in-person meetings,

3   correct?

4      A    Yes.

5      Q    You said there were 42 people on your team

6   who were talking --

7      A    I may -- that may not be an accurate

8   number, but I think that was one of the numbers I

9   heard them -- the corporate office throw out.

10     Q    The 42, roughly -- recognizing it's

11  rough -- people, what were their -- obviously you

12  and Ms. Spearman were at the top of the hierarchy on

13  your team.  Walk me through how far down the

14  hierarchy you got with these 42 employees.

15     A    We brought our leadership with operations,

16  and we brought loan officers that actually do rank

17  higher than Gina and I.  That's how we were able

18  to -- that's how we make our living is taking care

19  of loan officers --

20     Q    Okay.

21     A    -- supporting them.  So they rank higher

22  than we do.

23     Q    So tell me about your team.  You guys when

24  you went to NAF -- and I assume at Caliber -- were

25  the managers of the office, correct?

Page 82

1      A     Could you repeat the question?

2      Q     Let me just ask you this.  I think I can

3   clarify it.

4            Explain to me the hierarchy of employees

5   when you and Ms. Spearman were a team.  Walk me down

6   the org chart down to the bottom level.

7      A     At New American Funding?

8      Q     Start off with Caliber, and then we'll

9   talk, if it changed, about New American Funding.

10     A     Oh, gosh.  I don't remember my title.

11  Maybe it was regional manager, I think, maybe.  I

12  don't know.  I don't know what Gina's title was.

13  And we led the -- the Southeast division.  Gina

14  managed the builder division, from my recollection.

15           And -- I mean, like any -- like anything,

16  we're there to support our team.  So I don't --

17  that's all I -- I don't know what you mean by

18  "hierarchy."

19     Q     So if it was a basketball team, you'd have

20  guards, forwards, and maybe a center.  Obviously in

21  a mortgage team, you're going to have different

22  names of different positions and different duties.

23           So what I want to understand is of the

24  people who were taken to meet with NAF executives

25  including Rick and Patty Arvielo, what were the

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 83

1   positions of the folks that you took?

2       A    Originators, processors, underwriting

3   manager, loan originators, branch manager.  I can't

4   remember if we took our marketing director or not.

5   I think we took our closing manager as well.  If I

6   remember correctly, I think we did.

7       Q    Of those positions, what was the lowest

8   level position that was actually taken to

9   California?

10      A    You're going to have to define "lowest

11  level."

12      Q    All right.  Well, let's start with this:

13  What was the lowest compensation employee who you

14  took to California?

15      A    I'm going to guess the processing manager.

16      Q    All right.  How much did the processing

17  manager make?

18      A    About $120,000 a year.  I'm guessing.  I

19  don't know.

20      Q    Okay.  So all those other positions were

21  more than $120,000-a-year positions, recognizing it

22  was an estimate?

23      A    I don't know that.  I didn't pull their

24  W-2s prior to asking them to go to New American

25  Funding --

Page 84

1        Q    Okay.

2        A    -- for a visit.

3        Q    How many employees -- you said there were

4    roughly 42 who went.

5             How many employees were there on the team

6    at Caliber?

7        A    All 42.

8        Q    So every one of the Caliber employees that

9    was on the team was taken to California, correct?

10       A    Not every one.  You asked me how many of

11   the 42 were on the Caliber team.  All 42 were on the

12   Caliber team.

13       Q    All right.  How large was the entire

14   Caliber team regardless of whether they were taken

15   to California or not?

16       A    Oh, gosh.  I don't remember.  Couple

17   hundred.

18       Q    Couple hundred.

19            So roughly 20 percent of the Caliber team

20   was taken to California for these meetings, correct?

21       A    If that's -- if that's the correct math,

22   then that's correct.

23       Q    When you had these meetings with NAF, was

24   there a discussion about what your role would be

25   were you to go with your team to NAF?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 85

```
 1       A     We did -- I did not discuss roles or
 2   compensation with New American Funding until I knew
 3   that the team felt like it was a good fit.
 4       Q     And how did you surmise that the team felt
 5   like it was a good fit?
 6       A     I communicated.  I asked them -- after the
 7   presentation and after they had an opportunity to
 8   ask New American Funding questions, I asked them
 9   what they thought.
10       Q     So I'm assuming then you only asked the
11   ones who went to California, not the entire
12   200-person team, correct?
13       A     I had conversations with many of our
14   teammates that didn't have a chance to go to
15   California.
16       Q     Okay.
17       A     And of the ones that did go to California,
18   I asked them what they thought, and then they would
19   go back and tell other -- others what they thought.
20       Q     All right.  So you've got the team on
21   board, and then now was the time for you to have a
22   discussion with NAF about roles, responsibilities,
23   and compensation, correct?
24       A     That's right.
25       Q     When you had those discussions, did you
```

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 86

1    have those discussions alone or was Ms. Spearman

2    also involved in those discussions?

3         A    She was involved in some of them, not all

4    of them.

5         Q    Were those discussions in Georgia,

6    California, or by phone?

7         A    All -- mostly in California and some by

8    phone.

9         Q    And what were the discussions about what

10   your role would be?  Tell me about those

11   discussions.

12        A    We've changed titles.  I think I was --

13   the role was divisional -- I don't remember the

14   title that we came up with.

15        Q    So what were you going to be doing?

16   Regardless of the title, what was your job going to

17   be?  What was your job description?

18        A    Growing the Southeast for New American

19   Funding.

20        Q    Okay.  All right.  And do you know what

21   Ms. Spearman's role was going to be?

22        A    Growing the Southeast for New American

23   Funding.

24        Q    Were there any specific parameters as to

25   how you and Ms. Spearman were supposed to grow the

Kelly Allison                                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 87

1    Southeast for New American Funding?

2        A    No, they did not give us specific

3    parameters on how we were supposed to do that.

4        Q    Okay.  Were there discussions about the

5    methods you might employ to do that?

6        A    With who?

7        Q    With anyone at NAF?

8        A    I don't really remember.

9        Q    Okay.  Were there discussions with NAF in

10   addition to what the roles and duties would be about

11   what the compensation would be?

12       A    I don't think they gave us a job

13   description.  Maybe they did.  I don't know.  Don't

14   remember.

15       Q    What about discussions about compensation?

16       A    Yes, they -- they explained to us how we

17   were going to be compensated.

18       Q    Tell me what they explained to you about

19   how you were going to be compensated.

20       A    Oh, my gosh.  I got to go back.  We've

21   changed compensation quite a few times.

22            Basically there's a bucket of 140 basis

23   points, and -- I got to be honest with you, I don't

24   remember how we broke that down.  It's been a long

25   time ago.

Kelly Allison                            November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 88

1      Q    So you don't recall anything other than a
2   bucket of 140 basis points about the discussions
3   about what your compensation was going to be?
4      A    It was very -- it's very different -- when
5   we first came to New American Funding, it was very
6   different.  You have, like -- I mean, you get paid
7   on a -- we got paid on the branch.  We got paid
8   differently on branch manager's personal production.
9   I want to say there was, like, 140 basis points.
10  How that was broken down, I'll be honest with you, I
11  don't remember.
12     Q    Was the -- ultimately that compensation
13  was reduced to a writing, correct?
14     A    It was reduced to --
15     Q    Reduced to a writing, to a document,
16  correct?  And we'll look at a document.
17     A    Yes, yes, yes.  Of course it was.
18     Q    All right.  And you said -- you said your
19  compensation had changed quite a few times.
20          Were you referring to since that initial
21  document?
22     A    Since our initial -- yes, since 2016, yes.
23     Q    All right.  Tell me how your compensation
24  has changed since 2016.
25     A    We -- gosh, there's so many different

Page 89

1    little segments of it.  Again, I'd have to -- I'd

2    have to review the details of it.

3         Q    Okay.  When you were looking at the new

4    compensation system that ultimately was resulting

5    from the March 2020 document, you hired Lex Watson

6    to review your current agreement, correct?

7              MR. PERLOWSKI:  Object to form.

8         A    Yes, we hired -- yes.

9    BY MR. HARGROVE:

10        Q    Did you send Lex Watson all the documents

11   that you believed comprise your compensation at the

12   time as of the date -- let me go back.

13             Certain documents were forwarded to Lex

14   Watson, correct?

15        A    Yes.

16        Q    All right.  Those were all the documents

17   related to your compensation with NAF, correct?

18             MR. PERLOWSKI:  Object to the form.

19        A    I assume so.

20   BY MR. HARGROVE:

21        Q    You wouldn't have left anything out,

22   correct?

23        A    I would hope not.

24        Q    Tell me about marketing.  Did you have

25   discussions with NAF about marketing?

Page 90

1      A    Yes, I did have discussions with NAF about

2    marketing.

3      Q    Tell me about those discussions.

4      A    Could you be more specific?

5      Q    Sure.

6           NAF was talking to you, talking to your

7    team in these approximately 11 trips to California.

8           What was discussed during these

9    approximate 11 trips to California about marketing

10   and how that would work were you to come to NAF?

11     A    Well, they were -- they have a very robust

12   marketing team.  We do all of our own printing, so

13   we did a tour of the marketing department.  We

14   talked about, you know, the fact that a lot of the

15   marketing that New American Funding does for our

16   team post closing, you know, the co-branding on the

17   mortgage statement and the quarterly updates,

18   postcards to our clients, all of that is free, so

19   our loan officers would not have to contribute to

20   that.

21     Q    Okay.  Were there -- were there marketing

22   expenses discussed that NAF would not take care of?

23     A    I'm sure there was because, you know,

24   clearly they don't take care of all marketing.  I'm

25   sure, you know, loan officers have to invest in

Page 91

1    their yard signs and, you know, that type of thing.

2    So I'm sure there was; I just don't remember.

3        Q    Did you have a television show that you

4    used for marketing before you went over to NAF?

5        A    We did, yeah.

6        Q    Were there discussions about that

7    television show with NAF and who would pay for that?

8        A    Yes.

9        Q    Tell me about those discussions.

10       A    We let them know that we would love to

11   remain as the exclusive, you know, mortgage partner

12   for Atlanta's Best New Homes.  And they -- I don't

13   know that they wrote it into our contracts.  I think

14   we really just broke that down as we're going to do

15   7 and a half basis points per loan towards

16   marketing, and that should basically cover some of

17   those expenses or cover the expense of, you know,

18   obviously Atlanta's Best New Homes.

19       Q    I want to hand you a document that we'll

20   mark -- have marked Exhibit 3.

21           (Plaintiff's Exhibit 3 was marked for

22   identification.)

23   BY MR. HARGROVE:

24       Q    I'll ask you to take a look through this

25   and tell me if you --

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 92

1           MR. PERLOWSKI:  Travis, are the last two

2    pages intended to be included?  I'm just asking.

3           MR. HARGROVE:  They were in it the way we

4    got it.

5           MS. GIBSON:  Yes, they're intended.

6           MR. PERLOWSKI:  That's fine.  I'm just

7    asking.  Well, this is a Spearman Bates label.

8    That's the only -- I'm just asking.  It's fine.

9    BY MR. HARGROVE:

10       Q    Take a look and see if you recognize

11   Exhibit 3.

12       A    I'm a little confused.  This says "revised

13   3/4/2016."

14       Q    Okay.

15       A    We weren't with New American Funding in

16   March of 2016.

17       Q    So let me just ask you, do you contend

18   these aren't your initials and signature on the

19   documents 1243 through 1248?

20       A    No, they are.

21       Q    Okay.

22       A    But that doesn't -- those documents don't

23   say revised, only -- only the cover letter

24   through -- through the divisional manager agreement.

25   So I don't -- I don't know what this is.  It says --

Page 93

1    oh, wait.  That's revised 11/5 of '15.  I didn't

2    work there then.

3         Q    Is it possible that this is a New American

4    Funding form that was revised before the date you

5    signed it?

6         A    Oh, maybe that's it.  And then the second

7    is revised on 3/4/2016, and then the next one

8    revised 3/4/2016.  Okay.  I guess, yeah, possibly.

9         Q    So 1243 through 1248 you would agree is an

10   offer letter that you signed off on and accepted,

11   correct?

12        A    It appears I did.

13        Q    Before we go to the next one, I do want to

14   ask one question that popped in my mind afterwards

15   about the marketing.

16             That 7 and a half basis points for

17   marketing, was that a 70/30 split with you and

18   Ms. Spearman?

19        A    No.

20        Q    No?

21        A    That's marketing dollars that they were

22   going to -- that 7 and a half basis points per loan

23   would be contributed to New American Funding -- the

24   Southeast for New American Funding as a whole.

25        Q    Okay.  And so Gina was not a beneficiary

Page 94

1    of any of that; that was all you?

2          MR. PERLOWSKI:  Object to the form,

3    mischaracterizes testimony.

4      A    Could you repeat the question?

5    BY MR. HARGROVE:

6      Q    Sure.

7          Was Ms. Spearman to benefit from that

8    7 and a half basis points, or was that just for your

9    purposes?

10     A    The entire Southeast would benefit from

11   that.

12     Q    Okay.

13     A    We were using those dollars to brand and

14   grow the Southeast.  Everybody benefited from that.

15     Q    And that was 7 and a half basis points off

16   the top of all loans through -- generated through

17   the Southeast?

18     A    I'd have to --

19         MR. PERLOWSKI:  Object to the form.

20         You can answer.

21     A    I have to go back and look at the exact

22   verbiage.

23   BY MR. HARGROVE:

24     Q    Okay.

25     A    You want to reference the page?

Page 95

1      Q     Sure.  We can -- we'll get -- if we look

2   on page 1245, it says:  7.  Marketing Agreement.

3   Kelly is eligible to receive 7.5 basis points per

4   loan for the duration of her employment to be used

5   for approved marketing purposes on your eligible

6   banked funded volume.

7            Does that refresh your recollection?

8      A     Yes.

9      Q     All right.  So my question to you is out

10  of that 7 and a half basis points, was any of that

11  allocated towards Ms. Spearman or was it all

12  allocated towards you?

13     A     It was allocated for the whole Southeast.

14     Q     Okay.  All right.  So you agree with me

15  that the offer letter, Spearman 1243 through 1248,

16  is what it's referenced, that you have signed and

17  initialed -- those are your initials and those are

18  your signature on each of the pages -- your initials

19  are on pages 1243 through 1247, correct?

20     A     Uh-huh.  That would be correct.

21     Q     And you signed on page 1248, correct?

22     A     Looks like my signature.

23     Q     And you accepted the offer, correct?

24     A     I did accept the offer.

25     Q     Was this offer letter -- you referenced

Page 96

```
1    that you had had a redline version of your offer

2    from NAF by Lee Parks.

3              Did Lee Parks mark up the offer letter

4    that we've just talked about?

5              MR. PERLOWSKI:  Hold on a second.  Hold on

6    a second.  Don't -- instruct you again not to reveal

7    any privileged communications you may have had with

8    Mr. Parks.  To the extent that you can answer it

9    without revealing a privileged communication, you

10   can do so.

11        A    I would not have signed it if Mr. Parks

12   did not tell me that it was okay to.

13   BY MR. HARGROVE:

14        Q    Okay.  All right.  Let's look next at the

15   divisional manager agreement that starts at 1249 and

16   goes through 1256.

17        A    Okay.

18        Q    Is that your divisional manager agreement

19   signed by you, document Spearman 1249 through 1256?

20        A    That's my signature.

21        Q    All right.  And you agree it's a true and

22   correct copy, correct?

23        A    It looks like I signed it.  It doesn't

24   look like New American Funding signed it, but I did.

25        Q    And you wouldn't have signed this without
```

 1    your counsel, you said earlier, reviewing it for

 2    you, correct?

 3        A    I wouldn't have signed it unless he told

 4    me I was okay to sign it.

 5        Q    Okay.  Are you familiar with the term

 6    "override bonus"?

 7        A    Yes, I am.

 8        Q    What is an override bonus?

 9        A    It is a dollar figure broken down into BPs

10    that's agreed upon that you will receive after the

11    loan funds.

12        Q    Were you to be paid override bonuses

13    pursuant to the agreement that we've been looking

14    at?

15        A    Yes.

16        Q    Were you paid such bonuses pursuant to the

17    agreement?

18        A    Yes.

19        Q    Do you believe you were paid all the

20    moneys you were owed by NAF pursuant to this

21    agreement?

22        A    Yes.

23        Q    Let's flip to page Spearman 1262.  Let me

24    know -- are you there?

25        A    Yes, I am.

Page 98

1      Q    All right.  And would you agree with me

2    that this is a Schedule 1 that sets forth your

3    compensation details pursuant to your November 21,

4    2016, employment agreement divisional manager

5    agreement?

6      A    Yes.

7      Q    And if I flip to the page Spearman 1264 --

8    are you there?

9      A    Uh-huh.

10     Q    All right.  1.4B says:  No override bonus

11   will be paid on the following loans.

12          Are you following me?

13     A    Uh-huh.

14     Q    All right.  And if I look at the

15   following -- there are some items listed, and then

16   there's an X in the box for "no, not applicable to

17   this divisional vice president Schedule 1," correct?

18     A    Yes.

19     Q    All right.  So would you agree with me

20   that pursuant to your agreement of November 16,

21   2016, you were to be paid override bonuses on all of

22   the loans listed with the various bullet points

23   above the box checked "no"?

24          MR. PERLOWSKI:  Object to the form.

25     A    I think we were under -- we thought we

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 99

1   were supposed to be paid on those loans.

2   BY MR. HARGROVE:

3        Q     Okay.

4        A     But, you know, obviously our -- nobody was

5   paid on those loans, not even our branch managers.

6   So we were never paid on those loans after our

7   discussion with our corporate office, and they said

8   nobody gets paid on these loans, so no, we did not

9   get paid on those loans.

10       Q     Despite the fact that those loans are not

11  exempted from item 1.4B, you were not paid on those

12  loans?

13             MR. PERLOWSKI:  Object to the form.

14       A     No, I was not paid on those loans.

15  BY MR. HARGROVE:

16       Q     And the same goes for 1.4C, D, and E that

17  are marked "not applicable," correct?

18             MR. PERLOWSKI:  Object to the form.

19       A     No, I was -- no, I -- what are you asking

20  me?

21  BY MR. HARGROVE:

22       Q     What I'm asking you is each of these boxes

23  that are marked not -- let me just ask it

24  individually.

25             All right.  The following items will be

Page 100

1    deducted 1.4C from the override bonus calculation.

2    And it is checked "no, not applicable to this

3    divisional vice president."

4            Do you see that?

5        A    Uh-huh.

6        Q    Were those items deducted from your

7    override bonus calculation?

8            MR. PERLOWSKI:  Object to the form.

9        A    At some point, yes, the ASA decimals were

10   deducted from -- yes, they were.

11   BY MR. HARGROVE:

12       Q    Okay.  Despite the fact your agreement

13   states they would not be?

14           MR. PERLOWSKI:  Object to the form.

15       A    Clearly.

16   BY MR. HARGROVE:

17       Q    Well, let me go back to 1.4B.  You said

18   you were never paid on these loans.

19           Did you raise a concern with corporate or

20   with anyone that these loans were not exempted from

21   override bonuses pursuant to your agreement yet you

22   were not being paid the override bonuses?

23           MR. PERLOWSKI:  Object to the form.

24           You can answer.

25       A    We did, and they explained to us that

Page 101

1    nobody in the company, no SVPs, no branch managers,

2    nobody is paid on these particular loans.

3    BY MR. HARGROVE:

4         Q    Okay.  When you say "we did," who is we?

5         A    Gina and I.

6         Q    When did you and Gina Spearman reach out

7    to corporate to have this conversation?

8         A    Oh, goodness, sir, I couldn't -- I don't

9    remember.

10        Q    Well, you had a guarantee period, correct?

11        A    Yeah, we did.

12        Q    And you guys hit that and went past that

13   very quickly, right?

14        A    Uh-huh.

15        Q    So did you notice that you had not been

16   paid on the loans except for which the box is

17   checked "no" on Section 1.4B?

18        A    Yeah.

19        Q    Did Ms. Spearman notice that separately or

20   did y'all notice it together?

21        A    I don't remember.  I don't remember who

22   noticed it first.

23        Q    And your testimony is that then you

24   together called someone at corporate?

25        A    I don't remember if we called together or

Page 102

```
 1    if it was separate.  It was addressed.  Who, what

 2    time, what date, I don't remember.  It was

 3    addressed.  It was told to us that we would not be

 4    getting paid on those loans and that nobody gets

 5    paid on those loans.

 6         Q    And you accepted that explanation?

 7         A    Yeah, we did.

 8         Q    Ms. Spearman, you contend, also accepted

 9    that explanation?

10         A    Yeah.

11         Q    Were you given any document?  Did they

12    say, oh, oops, your agreement's wrong, we need to

13    send you a new one?

14         A    I -- my understanding is -- I don't know.

15    I don't know the answer to that.

16         Q    But your testimony is that Ms. Spearman

17    was just fine not being paid on these loans because

18    corporate said nobody gets paid on these loans?

19         A    I can't speak for Mrs. Spearman.

20         Q    So did she -- did you have any discussions

21    with her about either or both of you objecting to

22    not being paid override bonuses on these loans?

23              MR. PERLOWSKI:  Object to the form.

24         A    They said we weren't going to get paid on

25    them.
```

Page 103

1    BY MR. HARGROVE:

2        Q    Were you okay with not getting paid on

3    those?

4        A    I mean, yeah, at the time.  I mean, we

5    didn't, like, run to HR or, you know, go...

6        Q    Do you know Eric Fellows?

7        A    Yes, I do know Eric Fellows.

8        Q    Did you find out that Eric Fellows got

9    paid on these loans?

10           MR. PERLOWSKI:  Object to form.

11   BY MR. HARGROVE:

12       Q    Did you know that?

13       A    I don't know if he got paid on override

14   bonus during the guarantee period or if he got paid

15   on these loans.  Maybe it was both.  I don't

16   remember.  I have not been shown any documentation.

17   But I do know that it was brought up, and our

18   corporate office made the decision based on his

19   contractual agreement to pay him during the

20   guarantee period.  I don't know if they paid him on

21   the loans or if they just paid him on the guarantee

22   period.

23       Q    Okay.  Would it upset you if he got paid

24   on those loans and you didn't?

25       A    He -- oh.  Did he get paid on those loans?

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 104

```
 1      Q    Well, you said you didn't know whether he

 2  got paid on the loans.

 3      A    No, I'm asking you.

 4      Q    I'll represent to you that he said he got

 5  paid on those loans in his deposition, yes.

 6           MR. PERLOWSKI:  Object to the form.

 7  BY MR. HARGROVE:

 8      Q    Does that upset you that he got paid on

 9  those loans and you didn't?

10           MR. PERLOWSKI:  Object to the form,

11  mischaracterizes testimony.

12  BY MR. HARGROVE:

13      Q    You can answer.

14      A    I get so confused between him and you.

15           Well, it wouldn't seem fair, no, would it.

16      Q    Okay.

17      A    If that's the case.

18      Q    But your testimony is you just accepted a

19  verbal statement from corporate that, hey, no one

20  gets paid on these loans and didn't worry about it

21  beyond there?

22           MR. PERLOWSKI:  Object to the form of the

23  question --

24      A    They said no.

25           MR. PERLOWSKI:  -- asked and answered.
```

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 105

```
 1        A     We didn't --

 2              MR. PERLOWSKI:  Her testimony will speak

 3     for itself.

 4     BY MR. HARGROVE:

 5        Q     And Ms. Spearman and you didn't have any

 6     conversations subsequent to corporate telling you,

 7     oh, no one gets paid on those about not getting paid

 8     on these loans?

 9        A     No, we did have conversation about that

10     after Eric.  We did have conversation about that.

11     But, honestly, I did not know until just now that

12     Eric got paid on those loans.  I thought it was he

13     was getting paid on loan officers that he hired

14     during the guarantee period.

15        Q     Okay.

16        A     So if that -- I mean, that is the first

17     that I've known about that.  I guess I could have

18     gone back and looked if I really wanted to know, but

19     it wasn't important.

20        Q     Well, you, in fact, at least engaged in

21     discussions to potentially engage counsel to sue NAF

22     for not getting override bonuses on these loans,

23     correct?

24        A     With Les [sic]?

25              MR. PERLOWSKI:  Hold on a second.  You're
```

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 106

1    not to reveal any communications with Mr. Watson in

2    this deposition.  That's covered by attorney-client

3    privilege.  So I'm going to instruct you not to

4    answer that question.

5    BY MR. HARGROVE:

6         Q     You actually --

7              MR. PERLOWSKI:  You can answer it to the

8    extent that there were nonprivileged conversations

9    about the topic, but that's it.

10   BY MR. HARGROVE:

11        Q    You've talked to a lawyer other than Lex

12   Watson with Ms. Spearman about potentially suing NAF

13   for not paying you these --

14              MR. PERLOWSKI:  Same --

15   BY MR. HARGROVE:

16        Q    -- overrides, correct?

17              MR. PERLOWSKI:  Same instruction.  You're

18   not to answer the question.  That inherently reveals

19   privileged communications.  I'm instruct --

20   BY MR. HARGROVE:

21        Q    You spoke to Ms. Gibson about potentially

22   suing NAF, correct?

23              MR. PERLOWSKI:  Same instruction.

24   BY MR. HARGROVE:

25        Q    The privilege is yours.  You can --

Page 107

1          MR. PERLOWSKI:  Same instruction.

2    BY MR. HARGROVE:

3        Q    -- waive it or you can -- it's your

4    privilege, not his.  You can answer the question, or

5    you can stand on the privilege.

6          If you're not answering, just tell me

7    you're not answering.  That's fine.

8        A    Oh, I'm sorry.  I'm not answering the

9    question.

10        Q    You and Ms. Spearman have discussed suing

11    NAF over not being paid these override bonuses,

12    correct?

13          MR. PERLOWSKI:  You can answer

14    Mr. Hargrove's questions to the extent it does not

15    involve lawyers present.

16        A    We did -- I have never hired an attorney

17    to sue New American Funding.

18    BY MR. HARGROVE:

19        Q    Okay.

20        A    I have engaged legal counsel for their

21    opinion on our contractual agreement mostly for the

22    purpose of ensuring that we were protected when we

23    went into our new agreement with New American

24    Funding.  So I have never hired counsel to sue New

25    American Funding.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 108

1          I have hired counsel to review my

2   current -- my contract that I -- or agreement that

3   we have.  We did -- I did ask advice on the division

4   vice president or -- will be reduced 5 basis points

5   on candidates sourced internal and external

6   recruiters, it says, no, not applicable, and I was

7   deducted 5 basis points for that.

8          So yes, I asked counsel --

9          MR. PERLOWSKI:  Don't reveal

10  communications with counsel.

11     A    -- but I did not hire anyone to sue New

12  American Funding.

13  BY MR. HARGROVE:

14     Q    But you discussed with Ms. Spearman being

15  involved in a lawsuit for the exact same reasons

16  that she's suing over not being paid these

17  overrides, correct?

18     A    I did not -- I did not pursue suing New

19  American Funding.

20     Q    Okay.  But you agree you engaged in

21  discussions with Ms. Spearman about suing New

22  American Funding for not being paid on these loans,

23  correct?

24     A    I have had conversations with Gina about

25  how I think that this is interpreted because we have

Page 109

```
 1   had two legal -- I've had two legal, Lee Parks and

 2   Lex, and they have -- as they walked me through

 3   it --

 4           MR. PERLOWSKI:  Don't reveal your

 5   conversations with your counsel.

 6      A    -- that this is a very complicated

 7   agreement, that A doesn't equal -- 1 and 1 doesn't

 8   equal 2, that it can be interpreted in many

 9   different ways, and that it has a lot of provisions

10   in the agreement.

11   BY MR. HARGROVE:

12      Q    So --

13      A    That is the counsel that I was given.

14           MR. PERLOWSKI:  Again, don't reveal your

15   communications with your legal counsel.

16   BY MR. HARGROVE:

17      Q    I want to go back to the question I asked.

18           You discussed with Ms. Spearman, well

19   after that call with corporate, right after you

20   employed, the possibility of suing NAF over these

21   override bonuses, correct?

22      A    Would --

23           MR. PERLOWSKI:  Object to the form.

24      A    Would -- if we sued New American Funding,

25   would they have to pay us these dollars, that is a
```

Page 110

```
 1   discussion that we did have.  I did not pursue suing

 2   New American Funding.

 3   BY MR. HARGROVE:

 4       Q    That was a discussion you and Ms. Spearman

 5   had years after this call with corporate, correct?

 6            MR. PERLOWSKI:  Object to the form.

 7       A    Years after what conversation?

 8   BY MR. HARGROVE:

 9       Q    Your testimony earlier was that when you

10   weren't paid on these loans, you called corporate,

11   and they said, oh, nobody gets paid on those, and

12   you and Ms. Spearman were okay with that.

13            You recall that testimony?

14       A    Yes.

15       Q    Okay.  But a lengthy time after that, you

16   were having discussions with Ms. Spearman about

17   whether you would participate in this lawsuit,

18   correct?

19            MR. PERLOWSKI:  Objection, asked and

20   answered.

21       A    That I was having conversations with

22   Ms. Spearman about participating in this lawsuit?

23   BY MR. HARGROVE:

24       Q    Yes.

25       A    I did not have conversations with
```

Page 111

1    Ms. Spearman about participating in this lawsuit.

2         Q    Okay.  Did you have conversations with her

3    about whether you would pursue action to recover

4    moneys on these loans for which you were not paid

5    overrides?

6         A    We talked about it, but we never pursued

7    it.  We talked about in a court of law, would they

8    have to pay us after they paid Eric, but on what I

9    thought to be only during the guarantee period.  We

10   talked about it, but we did not pursue suing New

11   American Funding.

12        Q    Why?  Why didn't you pursue suing New

13   American Funding?

14             MR. PERLOWSKI:  And again, I don't want

15   you to reveal any privilege communications in that

16   regard.  To the extent you can answer without

17   revealing a privileged communication, you can do so.

18        A    I don't know.

19   BY MR. HARGROVE:

20        Q    How much money was at stake on these

21   overrides that you weren't paid on?

22        A    I don't know.

23        Q    So your testimony is as we sit here today,

24   you believe you were paid everything you were owed

25   pursuant to your November 21, 2016, agreement?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 112

1              MR. PERLOWSKI:  Object to the form.

2        A    Listen, I stayed out of the compensation

3   with New American Funding for the most part.  I left

4   that a lot up -- I would say probably 80 percent of

5   it to Sarah and Gina because it was a very

6   frustrating process that was very foreign to me.

7              I was outside of my comfort zone in the

8   way that New American Funding paid, so I really got

9   to the point where the level of frustration and the

10  time to break pay down became not worth it to me.

11  So I would tell Sarah just let me know what

12  you're -- just let me know what they're going to pay

13  me.

14  BY MR. HARGROVE:

15       Q    You would agree that it was a multiple six

16  figures amount that you would have been paid if you

17  received overrides on these loans that are

18  referenced in Section 1.4B, correct?

19             MR. PERLOWSKI:  Object to the form.

20       A    I would assume -- I don't know.  I'd have

21  to -- I don't even remember the calculation of which

22  we would have gotten paid on those loans, so I'm

23  sure it would be a nice -- it's probably a good sum

24  of money.

25  BY MR. HARGROVE:

Page 113

1      Q     All right.  And that just wasn't important

2  enough to you to dig into and make sure you were

3  being paid correctly?

4      A     Maybe to you that sounds a little crazy,

5  but at the time, I wanted to enjoy my job more than

6  I wanted to worry about money.  And so I found that

7  if I focused on doing my job versus how much money I

8  was going to get paid, I was a lot happier.

9      Q     Are you familiar with the term

10  "compensation differential"?

11      A     I am, but you're going to need to probably

12  give me a little overview because I forget a lot of

13  these terms.  It's been a long time ago.

14      Q     Well, if you don't know -- all I'm asking

15  is what your knowledge today.

16           So you don't know what that term means,

17  correct?

18      A     Compensation differential.  I'm sure I do.

19  I'm sure it had something to do with my pay.

20      Q     What are basis points?

21      A     As I stated before, basis points are BPs

22  that are usually tied either to pricing or

23  compensation, can be tied to a lot of things.  It

24  can be tied to P&Ls.  It can be tied to

25  profitability.  It can be tied to a lot of things.

Page 114

1          In the mortgage industry, we break most

2    things down based on basis points.

3          Q    Are you aware of any changes being made to

4    your agreement Exhibit Number 3?

5          A    You're going to have to direct me.

6          Q    Are you aware of any changes subsequent to

7    this agreement that we've been looking at?

8          Did NAF make any changes to the agreement

9    that you're aware of?

10         A    When?

11         Q    At any point.

12         A    Yes.

13         Q    Okay.  Tell me when they changed the

14   agreement.

15         A    In -- sometime in early '19.  I believe it

16   may have been --

17         Q    Early '19.

18         A    -- February.

19         Q    Okay.  What changed in February 2019?

20         A    In February 2019, NAF advised Gina and I

21   that we would no longer receive marketing dollars,

22   that if we wanted to participate in marketing

23   dollars -- or if we wanted to market, use marketing

24   dollars, it had to come from our own compensation.

25         Q    Okay.  All right.  And we'll get into --

Page 115

1   that was after the leadership meeting, correct?

2       A    I don't know which leadership meeting

3   you're referring to.

4       Q    Do you recall a leadership meeting in 2019

5   where there was discussion by the NAF leadership

6   team of a $30 million misallocation of funds?

7       A    Yeah, they met with us individually, they

8   didn't meet with us as a team, to review that

9   misallocation.

10      Q    Okay.  Tell me what they told you when

11  they reviewed the misallocation.

12      A    That they misallocated $30 million between

13  CM1 and CM2.

14      Q    All right.  Do you know what CM1 or CM2

15  are?

16      A    No.  I didn't -- no, I didn't know.

17      Q    Were there any documents you saw about

18  this $30 million misallocation?

19      A    No.

20      Q    Would it surprise you that NAF has denied

21  in pleadings that there ever was any such

22  misallocation in this case?

23      A    From my recollection, that's what we were

24  told.

25      Q    And that was the basis of y'all having to

Page 116

1    eat these marketing expenses, correct?

2            MR. PERLOWSKI:  Object to the form.

3        A    Yes.

4    BY MR. HARGROVE:

5        Q    The $30 million misallocation was why they

6    told you you would need to start paying marketing

7    expenses, correct?

8        A    Yes, sir.

9        Q    Okay.  We'll circle back to that a little

10   more in a minute, but I want to -- you said there

11   was the 2019 change.

12           Any other change to your agreement

13   Exhibit 3 other than the 2019 change after the

14   misallocation you were told occurred and you would

15   have to pay marketing expenses?

16           MR. PERLOWSKI:  Object to the form.

17       A    We were going to have to absorb all PEs

18   over 7/8 on conventional loans and I think it was 1

19   on government, but I'm not a hundred percent sure.

20   I just remember 7/8 on conventional.  I think 1 on

21   government, but I'm not a hundred percent sure.

22   BY MR. HARGROVE:

23       Q    And this was at the same time with that

24   marketing change, correct?

25       A    Yes, it was.

Page 117

1       Q     Any other changes to your agreement up to

2    the point that the March 2020 agreement was signed?

3              MR. PERLOWSKI:  Object to the form.

4              You can answer.

5       A     Could you repeat that for me?

6    BY MR. HARGROVE:

7       Q     Sure.

8              We talked about Exhibit 3, and I asked you

9    if there were changes, and you told me about the

10   changes after the leadership meeting that we'll get

11   into a little bit more -- a little bit more after

12   our next break.

13             Now, what I want to know is were there any

14   other changes to the agreement other than the ones

15   you just told me about prior to -- obviously there

16   was a March 2020 new agreement signed.  So I want to

17   make sure I understand the universe of changes up to

18   and including the one in March of 2020.

19      A     The changes that I remember are the

20   changes that New American Funding said that they're

21   no longer going to pay any marketing dollars and

22   that we would have to absorb PEs.  That's what -- if

23   there are more, I don't remember.

24      Q     Okay.

25             MR. HARGROVE:  I think now might be a good

Page 118

1    time to take a lunch break.

2              MR. PERLOWSKI:  That sounds good.

3              (Recess 12:21-1:07 p.m.)

4    BY MR. HARGROVE:

5         Q    Ms. Allison, we're back on the record, and

6    you actually still have in front of you Exhibit

7    Number -- which number is that one?

8         A    2.

9         Q    2.  Okay.

10             If you'll flip to page 352 on the bottom

11   right of Exhibit 2.  I wanted to ask you a couple

12   more questions about this document before we move

13   on.

14             So back in 2019, November 16, when you

15   sent this e-mail, the last full -- well, the last at

16   least partial sentence reads:  I know it feels like

17   everything is about money, and, yes, the money is

18   one component, but the bigger questions we have been

19   asking that seems to frustrate everyone is how does

20   the P&L working going forward.

21             Did I read that correctly?

22        A    I think you read it word for word.

23        Q    Okay.  Earlier in your deposition you

24   testified you were focused on job happiness and not

25   money.

Page 119

1              Was that the case when you sent this

2      e-mail back November 16 of 2019, still?

3         A     I think that we wanted -- I wanted to

4      understand the details of the new P&L platform that

5      we were going to.

6         Q     And the reason you wanted to understand

7      the details was because that's what your

8      compensation was based on, correct?

9         A     Well, it is what our compensation is based

10     on, but it's also kind of -- a P&L is kind of like

11     your report card, right.

12        Q     Uh-huh.

13        A     So it tells you how you're performing as

14     it relates to not only profitability but how you're

15     managing expenses, how you're managing your PE

16     behavior, how you're managing your production, how

17     you're managing your refis versus purchase, how

18     you're managing to, you know, your -- the complexity

19     of balancing your business, whether that be, you

20     know, conforming to government or, again, refi to

21     purchase, your LO behavior, your expense behavior.

22     It covers a lot of the data details in which we

23     place metrics on a lot of our leadership.  So it

24     goes deep -- a P&L goes much deeper than just

25     profitability.

Page 120

1      Q     And if those metrics are good, you're

2   going to make more money, right?

3      A     If those metrics are good, everybody makes

4   more money.

5      Q     Okay.

6      A     So this P&L model is not just around --

7   this P&L model was not just around Gina and I's

8   compensation, but it was around our entire

9   leadership team's compensation as well.  So we have

10   a fiduciary responsibility to look out for everyone

11   in the Southeast, not just ourselves.

12      Q     The loans that you were not paid override

13   bonuses that we looked at earlier on Exhibit --

14   Exhibit 3 --

15      A     Uh-huh.

16      Q     -- the category that you testified

17   overrides were not paid on, did those overrides not

18   being paid have anything to do with anyone's

19   compensation other than you and Ms. Spearman?

20      A     I don't -- no, it doesn't.  Once we dug in

21   to find out that, you know, our branch managers were

22   not getting paid on those loans as well, it really

23   wouldn't make sense for Gina and I to get paid on

24   them.

25      Q     So the branch managers -- so if you were

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 121

1    getting -- my question to you is if you had been

2    getting overrides on those loans from Section 1.4B,

3    would that have affected anyone's compensation other

4    than your own?

5              MR. PERLOWSKI:  Object to the form.

6       A     Well, absolutely it would have.  Then the

7    branch managers would have benefited from that as

8    well, right, so then they would have been paid on

9    those loans as well.

10   BY MR. HARGROVE:

11      Q     Okay.  So that fiduciary duty you

12   mentioned, did you fulfill that by digging into this

13   agreement and checking in to being paid on these

14   loans?

15             MR. PERLOWSKI:  Object to the form.

16      A     Say that --

17   BY MR. HARGROVE:

18      Q     Sure.

19      A     Try answering that -- try asking that a

20   different way.

21      Q     You testified earlier that with regard to

22   the P&L, since that affected everyone on your team's

23   compensation, you had a fiduciary duty to them to

24   make sure you had a good understanding of it,

25   correct?

Page 122

1        A     Absolutely.

2        Q     All right.  And these loans on 1.4B that

3     you were not paid on, you just testified had you

4     been paid on those, that would have benefited

5     everyone on the team's compensation, correct?

6        A     Not everyone on the team, only the branch

7     managers.

8        Q     Okay.  So it would have benefited the

9     branch managers had those loans been paid on,

10    correct?

11       A     If their agreements stated that they

12    should have been paid on them.

13       Q     Okay.  And --

14       A     But I think it's kind of a moot point.

15       Q     And why is it a moot point?

16       A     Because the -- they corrected our

17    agreement, so, I mean, it's a moot point.  It's not

18    even -- it's not even in relation to our agreements.

19       Q     You say "they corrected our agreements."

20    Who is "they"?

21       A     Corporate.

22       Q     And "our agreements," whose agreements are

23    you referring to?

24       A     Well, I shouldn't remember to Gina's

25    agreement.  I don't know.  On my agreement, it was

Page 123

1    corrected that I would not get paid on these loans.

2         Q    Okay.  When was it corrected?

3         A    I don't know.  Sometime early '17.

4    Sometime first/second quarter of '17.

5         Q    How was it corrected?

6         A    I think it's by Schedule 1.

7         Q    Didn't I ask you before the break about

8    any changes to your agreement, and all you told me

9    about was the 2019 changes after the leadership

10   meeting?

11            MR. PERLOWSKI:  Object to the form,

12   mischaracterizes testimony.

13            You can answer.

14       A    Yes, I -- we didn't ever get paid on those

15   loans.

16   BY MR. HARGROVE:

17       Q    Let me go back to my question.  Before the

18   break I asked you about the universe of changes to

19   your agreement.

20            Do you recall that?

21       A    Yes.

22       Q    Okay.  And do you recall telling me about

23   changes in 2019 related to marketing and pricing

24   exceptions?

25       A    Yes.  This was prior to '19.

Page 124

1      Q    But when I asked you earlier, I asked you

2    to tell me about every change in your agreement, and

3    you told me about none between the agreement and

4    2019 then, correct?

5              MR. PERLOWSKI:  Object to the form.

6      A    I don't remember all the changes that we

7    had to our agreements.  We got Schedule 1s all the

8    time.  Every time we hired a individual to the team,

9    we got a new Schedule 1.  It changed on every

10   Schedule 1 that we received.

11   BY MR. HARGROVE:

12     Q    You didn't tell me about any of that

13   before the lunch break, did you?

14     A    No, I didn't.

15             MR. PERLOWSKI:  Object to form.  Testimony

16   will speak for itself.

17   BY MR. HARGROVE:

18     Q    And the testimony that speaks for itself

19   was I asked you for the universe of changes, and you

20   didn't tell me anything about any Schedule 1s, you

21   only told me about --

22     A    I told you about --

23             MR. PERLOWSKI:  Hold on one second.

24             That's patently misleading.  That wasn't

25   the question you asked, and she specifically said

Page 125

1  she didn't recall all the changes before the lunch

2  break.  We can go back and read the transcript, but

3  we're not going to do this misleading what she said

4  stuff.

5  BY MR. HARGROVE:

6      Q    Now that you've had the opportunity to

7  have a lunch break and consult with your counsel,

8  now you remember Schedule -- Schedule 1s from 2017,

9  correct?

10     A    Well, I didn't spend much time with my

11 counsel because I do have a job outside of this

12 deposition, so I spent time working and returning

13 phone calls, but it's just a known fact that we all

14 had a lot of Schedule 1s.

15          Every -- I still get Schedule 1 -- or, you

16 know, Schedule 1s when we hire a new employee.  I

17 could not keep up -- I could not tell you every

18 possible change over the last five and a half years.

19     Q    When new employees are hired, is it a

20 Schedule 1 or Schedule 4?

21     A    Back then I don't know.

22     Q    Okay.

23     A    I think it was -- from my recollection, it

24 was a Schedule 1.

25     Q    Did you provide Lex Watson with all of

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 126

```
 1   those Schedule 1s that you now contend changed your
 2   agreement?
 3        A    I have --
 4             MR. PERLOWSKI:  Object -- hold on --
 5        A    No, I didn't.
 6             MR. PERLOWSKI:  -- one second.
 7             She's not going -- we're not going to talk
 8   about privileged communications here.  We keep on
 9   going down this road.  We're not doing it.  If we
10   keep on going down the road of invading privileged
11   communications, we're going to stop this.
12   BY MR. HARGROVE:
13        Q    Ms. Spearman was involved in the
14   communications and copied on all of them with
15   Mr. Watson, correct?
16             MR. PERLOWSKI:  Ms. Spearman can't waive a
17   privilege for Ms. Allison.
18             MR. HARGROVE:  She absolutely can.  She
19   waived it.
20             MR. PERLOWSKI:  No, she can't.
21             MR. HARGROVE:  It's waived for everybody.
22             MR. PERLOWSKI:  No, she can't.  No, she
23   cannot.
24             MR. HARGROVE:  She can absolutely waive --
25             MR. PERLOWSKI:  No, she cannot.  I suggest
```

Page 127

1    you look that up because we did last night.

2        A    Ms. Spearman's not afraid to waive

3    (inaudible).

4            MR. PERLOWSKI:  And we're not doing it.

5            MS. GIBSON:  I'm sorry, was that --

6    BY MR. HARGROVE:

7        Q    I'm sorry, what were you saying?  Can you

8    repeat what you said on the record?

9        A    I said it -- it appears that Ms. Spearman

10   has no issues waiving any confidentiality.

11       Q    And tell me what confidentiality you're

12   referring to.

13       A    I shouldn't have made the comment.

14       Q    Now you've made the comment, so tell me

15   what confidentiality you were referring to.

16       A    Well, I think Ms. Spearman is so fixated

17   on winning this case that just a mere phone call has

18   to get reported to her attorneys.

19       Q    So that phone call was supposed to be

20   confidential?  The fact you called her was supposed

21   to be confidential?

22       A    Within the realm of a friendship, you

23   actually would think that there's some respect to

24   the friendship.  But clearly throughout this

25   process, there's been zero.

Page 128

```
 1      Q    Have you talked -- is your employer aware
 2   that you're making calls to my client that you deem
 3   to be confidential communications?
 4      A    I'm not saying confidential about this
 5   situation.
 6           MR. PERLOWSKI:  Again, I'm going to
 7   instruct you --
 8           THE WITNESS:  Okay.
 9           MR. PERLOWSKI:  -- not to reveal any
10   privileged communications you may have had with NAF
11   because we keep on going down that road.
12   BY MR. HARGROVE:
13      Q    Sarah Laprade, she wasn't represented by
14   Mr. Watson, correct?
15      A    No.
16      Q    Let me hand you Exhibit 4.
17           (Plaintiff's Exhibit 4 was marked for
18   identification.)
19   BY MR. HARGROVE:
20      Q    And I'll ask you if you recognize
21   Exhibit 4.
22           MR. PERLOWSKI:  Has this been produced?
23           MR. HARGROVE:  It has.
24           MS. GIBSON:  It has been produced.
25           MR. PERLOWSKI:  When?
```

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 129

1          MR. HARGROVE:  Hang on.  I can find you a

2     Bates numbered version of it.

3          MS. GIBSON:  It was produced on --

4          MR. PERLOWSKI:  Yesterday?  One of the --

5          MS. GIBSON:  -- on the 11th.

6          MR. PERLOWSKI:  -- late surprises?

7          MS. GIBSON:  No.

8          MR. HARGROVE:  If you want us to take a

9     break and I'll get you a Bates-labeled copy of it.

10         MR. PERLOWSKI:  I want to understand if

11    it's been produced or not.

12         MS. GIBSON:  It has --

13         MR. HARGROVE:  It has.

14         MS. GIBSON:  -- been produced.

15         MR. PERLOWSKI:  Well, then I --

16         MS. GIBSON:  You've gotten two

17    productions.

18         MR. PERLOWSKI:  Do you think I'm going to

19    literally remember every document that's been

20    produced of the thousands of pages of documents?

21    You've given me a non-Bates page document --

22         MS. GIBSON:  We're representing to you --

23         MR. PERLOWSKI:  -- and you produced

24    documents as recently as, what, yesterday.

25         MS. GIBSON:  It was a duplicate production

Page 130

1  of a production that was made last week, so yes.

2          MR. PERLOWSKI:  Conveniently after

3  Ms. Spearman's deposition.

4          Take your time to look at it, Kelly.

5          For the purpose of the record, Exhibit 4

6  is an e-mail from Lex Watson to MaryBeth Gibson on

7  November 11th, 2021, at 11:41 a.m., forwarding

8  communication with Ms. Laprade to Ms. Watson [sic]

9  of the same date.

10          MS. GIBSON:  I'll find you the Bates.

11          MR. PERLOWSKI:  I'm also going to flag for

12  purposes of the record that we're going to be

13  seriously looking at whether lead counsel is a

14  witness in this matter based on the way this

15  testimony and the theories that are being pursued,

16  so I'm just going to put you on notice of that.

17          MR. HARGROVE:  Okay.

18  BY MR. HARGROVE:

19      Q    Let me know once you've had a chance to

20  look at that.

21          MR. HARGROVE:  Henry, just for the record,

22  my apologies for not having the Bates-stamp version.

23          MR. PERLOWSKI:  It's fine.

24          MR. HARGROVE:  It's Spearman 1464 and

25  thereafter.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 131

1           MR. PERLOWSKI:  Okay.

2      A    I've reviewed it.

3  BY MR. HARGROVE:

4      Q    You've reviewed Exhibit 4?  Okay.

5           And Sarah Laprade is -- at least -- I

6  don't know if she is now, but as of September 16,

7  2019, was your executive assistant, correct?

8      A    Correct.

9      Q    And you directed her to send the

10  attachment that is attached to Exhibit 4, correct?

11      A    Yes.

12      Q    All right.  And what is attached to this

13  e-mail is the exact same document that has already

14  been introduced in this deposition as Exhibit 3,

15  correct?

16      A    Yes.

17      Q    I want to make sure I got the number

18  right.

19      A    Yes, you're right.

20      Q    All right.  And there are no additional

21  documents other than what's in Exhibit 3, correct,

22  attached to this e-mail?

23      A    No.

24      Q    There are no other schedules attached to

25  this e-mail, correct?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 132

1      A    I don't know that this is everything that

2  she sent.

3      Q    Okay.

4      A    I have no way of knowing that.

5      Q    All right.  Well, if Ms. -- do you have

6  any reason to believe Mr. Watson would send an

7  e-mail to -- send this e-mail without everything

8  that was attached to it?

9           MR. PERLOWSKI:  Object to the form, calls

10  for speculation.

11      A    Maybe Sarah didn't understand that she was

12  supposed to send all the schedules or maybe Sarah

13  doesn't even have all the schedules.  They didn't go

14  to Sarah; they went to us.

15      Q    So --

16      A    And, I mean, she says:  Attached is

17  Kelly's original agreement with NAF.

18      Q    And the purpose of retaining Mr. Watson

19  was to have him compare the original agreement with

20  the proposed 2020 agreement, correct?

21      A    Correct.

22           MR. PERLOWSKI:  Again, you can answer

23  without revealing privileged communications.  That's

24  a standing instruction, but I'm going to keep on

25  reminding you because we keep on going down this

Page 133

1    road.

2         A    It appears that Jan actually forwarded

3    something to our attorney as well.

4    BY MR. HARGROVE:

5         Q    Are you aware of any communication where

6    you sent Mr. Watson any additional documents for his

7    consideration?

8         A    I didn't send Mr. Watson any

9    communication.  I relied on Sarah to do that.

10        Q    At your direction, correct?

11        A    Right.  Sarah -- if I asked Sarah to send

12   him my original agreement as stated, then Sarah did

13   exactly what I asked her to do, which is to send my

14   original agreement.

15        Q    So you didn't think it was important for

16   an attorney evaluating the agreement you had in

17   place versus what was being proposed to see these

18   additional schedules which you contend changed your

19   agreement?

20        A    Did Gina send schedules to Lex?

21             MR. HARGROVE:  Can you read back my

22   question?

23             (The record was read by the reporter as

24   follows:

25             "Q    So you didn't think it was important

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 134

1   for an attorney evaluating the agreement you had in

2   place versus what was being proposed to see these

3   additional schedules which you contend changed your

4   agreement?")

5       A    The purpose of us having Lex was -- my

6   purpose was to ensure that all my provisions that I

7   had worked with Lee Parks on my original agreement

8   stayed with the new agreement.  That was my

9   motivation.

10  BY MR. HARGROVE:

11      Q    So that would then include --

12      A    Schedule --

13      Q    -- Schedule 1, Section 1.4B, correct?

14      A    I don't recall that any of the Schedule 1s

15  covered any of my provisions.

16      Q    Well, you just testified that you wanted

17  Lex to make sure everything that was in your

18  original agreement carried over.

19           Was that the word you used?  I don't want

20  to put words --

21      A    Yes.  And this is my original agreement.

22      Q    Okay.  All right.

23      A    The provisions that I wanted him to

24  protect me on are in my original agreement, not my

25  Schedule 1.

Page 135

1      Q     So you don't consider the Schedule 1 to be

2  part of the agreement?

3      A     The Schedule 1s as we hired loan officers,

4  no, is not a part of my original agreement.  I get a

5  Schedule 1 every time I hire a loan officer.  The

6  Schedule 1s when I hire a loan officer has nothing

7  to do with the provisions that were in my original

8  contract.

9      Q     How about Schedule 4s, did you get any

10  Schedule 4s?

11      A     I don't -- I'd have to look to see what a

12  Schedule 4 is.  What is a Schedule 4?  There's no

13  Schedule 4 in here.

14      Q     When a new loan officer is hired, are you

15  sure it's a Schedule 1, not a Schedule 4?

16      A     Maybe it is a Schedule 4.

17      Q     Okay.

18      A     So if you know the answer, then you can

19  tell me what a Schedule 4 is.

20      Q     Well, this -- I get -- today I got to find

21  out what you know.  What I --

22      A     I don't know what a Schedule 4 is.

23      Q     So if you received Schedule 4s but not

24  Schedule 1s, do you contend those changed your

25  compensation?

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 136

```
 1      A     I don't know because I don't know what a
 2   Schedule 4 looks like.
 3      Q     No Schedule 4s were included in what Sarah
 4   sent to Lex, correct?
 5      A     I don't know what a Schedule 4 is.
 6            MR. HARGROVE:  And I have the Bates number
 7   wrong.  It's actually 1381 for this exhibit.  So my
 8   apologies.
 9            MR. PERLOWSKI:  For Exhibit 4?
10            MR. HARGROVE:  Yeah.
11            MR. PERLOWSKI:  1381?  Okay.
12            MR. HARGROVE:  1381.
13   BY MR. HARGROVE:
14      Q     Let's change gears a little bit.  I want
15   to go back to the February 2019 leadership meeting
16   and the discussion of the misallocation of funds.
17            Who all was involved in that discussion
18   you told me about earlier today?
19      A     I think we went through this; Christy
20   Bunce, Jon Reed, Jan --
21      Q     All right.
22      A     -- myself, Gina.
23      Q     Okay.
24      A     And I don't really remember who else was
25   there.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 137

1      Q     That was an in-person meeting --

2      A     Maybe Jim Muth.  I don't know.  I have no

3  idea.

4      Q     At that point that that discussion was

5  being had after this leadership meeting, was it your

6  understanding that the Southeast region was

7  profitable or unprofitable?

8      A     They told us that we were profitable.

9      Q     Okay.  And when were you told you were

10 profitable?

11     A     On several occasions.

12     Q     Who told you you were profitable?

13     A     Jan, Jon, Christy.

14     Q     Anybody else?

15     A     I don't remember.

16     Q     What about the Arvielos, you ever have any

17 discussion about profitability for the Southeast

18 region with either of them?

19     A     I don't remember.

20     Q     At some point, were you told later that

21 the Southeast region was, in fact, not profitable?

22     A     I feel like our C -- I don't know that we

23 weren't profitable.  I don't think our CM was where

24 they wanted it.  I don't remember.

25     Q     Can you tell me was CM is?

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 138

```
 1      A      Company margin.
 2             (Off-the-record discussion.)
 3   BY MR. HARGROVE:
 4      Q      So the point -- who was involved in the
 5   discussion about the company margin not being where
 6   NAF wanted it to be?
 7      A      From my recollection, that would be Jan,
 8   Jon, Christy.
 9      Q      Okay.  And was this a discussion that took
10   place at that same leadership meeting or was that
11   something that occurred before or after?
12      A      I don't remember.
13      Q      Do you remember the first time you were
14   told that the company margin was not what was
15   expected?
16      A      Exactly?  No, I don't remember.  I don't
17   remember what meeting that was in.
18      Q      Was that discussion about the company
19   margin not being what was expected in any way
20   related to the $30 million misallocation?
21      A      They never related the two.  The two were
22   two separate conversations.
23      Q      Did you ever get any understanding from
24   management of the details of the misallocation
25   beyond that it was something classified CM1 as
```

Page 139

1   opposed to CM2 I believe is what you told me

2   earlier?

3        A    No.

4        Q    Did you ask anyone?

5        A    I think we asked in the meeting, but I

6   don't really remember -- today I don't even remember

7   their response.

8        Q    Let me hand you a document that I'm

9   marking as Exhibit 5.

10            (Plaintiff's Exhibit 5 was marked for

11   identification.)

12   BY MR. HARGROVE:

13        Q    This one does have the Bates label on it.

14   I'll ask you to take a look.  It's a three-page

15   document.  Just let me know once you know whether

16   it's something you are familiar with or not.

17        A    Okay.

18        Q    And do you recognize these e-mails?

19        A    I do.

20        Q    There's initially an e-mail about a

21   conference call dated Monday, March 18, 2019,

22   correct, on the third page?

23        A    Yes.

24        Q    And it says, "Can you guys get on my

25   conference line," correct, from Christy Bunce?

Page 140

1      A     Uh-huh.

2      Q     Do you recall this conference call from

3  Monday, March 18th, of 2019?

4      A     I do not.

5      Q     This would have been after that February

6  leadership meeting, correct?

7      A     I don't remember the date of the

8  February -- I mean, I'm not even sure that the

9  meeting that we had at corporate was in February.

10      Q     Let's look at page 2 --

11      A     Okay.

12      Q     -- of this document, e-mail from you to

13  Christy Bunce, Jan Preslo, Jon Reed, Patty Arvielo,

14  Rick Arvielo, and Gina Spearman.

15            Do you see that?

16      A     Uh-huh.

17      Q     All right.  And it reads:  Good morning.

18  We jointed NAF two years ago.  In February it was

19  revealed to us --

20      A     Yeah.  Okay.  Perfect.

21      Q     So does that refresh your recollection as

22  to when the leadership meeting took place?

23      A     Yes.

24      Q     And that would be February, correct?

25      A     February.

Page 141

1       Q       So this e-mail then obviously took place

2   in March of 2019 because that was after the meeting,

3   correct?

4       A       Uh-huh.

5       Q       In reviewing -- in reviewing the e-mail,

6   do you recall what the reason you felt the need to

7   send this e-mail was?

8       A       Yes, after -- while Gina and I were at

9   corporate after the meeting in which they told us

10  that they were cutting all marketing and making some

11  changes, we met with Jon Reed at the corporate

12  office because we thought that versus managing to

13  individual loans as it related to PEs, that if we

14  just did a weighted average PE across the board, it

15  would just make it a lot simpler for everybody

16  involved.

17          And then Jon Reed thought that was a good

18  idea, and we -- my -- my opinion of our conversation

19  with Jon at corporate was that he actually really

20  liked that idea and that we were going to pursue

21  that idea.

22          And so we had several conversations with

23  Jon -- I shouldn't say several.  I remember one on

24  our way to Greenville or Charlotte, and it appeared

25  that we were going to go down a weighted average

Page 142

1    approach versus a per-loan approach to pricing.  And

2    then Jon informed us that we weren't going to do

3    that.

4            I felt as though it was going to be

5    extremely cumbersome to keep up with a per-loan

6    pricing exception versus a weighted average, so

7    that's what prompted this.

8        Q    All right.  Would you have to keep up with

9    the per-loan or is that something corporate would

10   keep up with?

11       A    It was something that we were all going to

12   have to keep up with.  It was a very manual process.

13   There wasn't a report that we could pull.  It was an

14   extremely manual process.

15       Q    And why would it have mattered whether you

16   kept up with the per-loan amount; what would that

17   have affected, if anything?

18       A    It's just a very manual process.  It's

19   very -- it's just -- it's a lot of work, and I felt

20   it was unnecessary work when we could just do a

21   weighted average.  And it's a very easy metric, you

22   meet once a month, and did you exceed this weighted

23   average, if you exceeded the weighted average, then

24   reduce that amount from our comp.

25            The per-loan when you're doing hundreds

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 143

1    and hundreds and hundreds of loans a month seemed

2    like more work than necessary.

3         Q    Would corporate have kept up with the

4    per-loan if it had gone the per-loan route?

5         A    It did go the per-loan route.

6         Q    Okay.  So was that something corporate was

7    going to keep up with?

8         A    We all kept up with it.  Again, a very,

9    very manual labor intensive process.

10        Q    What was the role of your office in

11   keeping up with it versus corporate's role in

12   keeping up with it?

13        A    Sarah kept up with it in an effort to

14   ensure that we lined up with corporate on the PEs in

15   which we were absorbing to ensure that our reports

16   lined up.

17        Q    So corporate was keeping up with it, and

18   Sarah was keeping up with it independently to verify

19   the accuracy of corporate's figures, correct?

20        A    I think she was actually working with

21   corporate to ensure that when they sent over the

22   report, that we had either got all the loans and

23   that maybe corporate didn't miss anything, right,

24   because we wanted to ensure that we kept the

25   integrity of the agreement.

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 144

1      Q    And if it was not kept up with, then
2  there's the potential your office would lose out on
3  compensation, correct?
4      A    Well, I think -- if we didn't keep up with
5  it?
6      Q    Let me go back.  Y'all weren't just going
7  to take corporate's word for it; you were tracking
8  your own to make sure the numbers lined up, correct?
9      A    Well, we tracked it because it's a very
10  large -- the way that we were paid is basically a
11  three-, four-page commission sheet that Sarah had to
12  go through on a monthly basis which was a very
13  manual process anyways.
14          The loans that we didn't get paid for were
15  on those, and Sarah would review those loans.
16  Sometimes corporate made a mistake and they were
17  overpaying us and she would say, hey, you're
18  overpaying us.  Sometimes they made a mistake and
19  weren't paying us correctly on a loan.
20          Again, because it was such a manual
21  process, it opened itself to a lot of mistakes on
22  both sides.
23      Q    In light of your earlier testimony that
24  the happiness of your job was more important than
25  the compensation, why did you have Sarah go through

Page 145

1    that exercise of verifying the accuracy of the

2    corporate records?

3         A    Because somebody had to do it, and I don't

4    like doing it.

5         Q    Why did somebody have to do it?

6         A    Because it's commission statements.  You

7    have to review the commission statements.

8         Q    Because you want to make sure that you're

9    compensated correctly, right?

10        A    Yes, or to make sure that we weren't

11   overpaid because sometimes that happened.

12        Q    Let me refer you -- let's look at the

13   second page of this.  I want to go to the second

14   full paragraph.

15             The first sentence says:  We made

16   commitments to them -- I'll read -- regardless of

17   the delayed resolve, we are obligated to our team.

18   We made commitments to them two years ago based on

19   the collective agreement with NAF corporate.

20   Although NAF corporate is retracting on the

21   employment agreement with myself and Gina, we cannot

22   condone doing the same to our team/family that have

23   aligned themselves with our leadership for many

24   years.

25             Did I read that correctly?

Page 146

1    A    Word for word.

2    Q    Can you tell me how was corporate

3  retracting on the employment agreement with yourself

4  and Gina as of March 19, 2019?

5    A    At the time, I felt that they were

6  retracting on their agreement to pay the marketing

7  dollars and then adding that we were going to cover

8  PEs over 1 percent for government and 7/8 for

9  conforming.  My feeling was that they were

10 retracting their agreement.  That's a feeling, not a

11 legal statement.

12   Q    But that's what you felt at that point,

13 that they were retracting on the agreement?

14   A    Clearly, that's what I wrote.

15   Q    That's what you told the executives,

16 including the Arvielos, correct?

17   A    Yes.  They are a part of the executive

18 team, the Arvielos.

19   Q    Tell me what you mean when you say

20 "they're a part of the executive team."

21   A    They're the CEO and the president.

22   Q    So just so I understand, what you contend

23 they were retracting was the marketing expenses and

24 the pricing exceptions from your agreement, correct?

25   A    Yes.

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 147

1      Q    Was there a discussion about a 90-day

2  period for these marketing expenses and pricing

3  exceptions after that leadership meeting?

4           Do you recall any discussion about these

5  were only going to be in effect for 90 days?

6      A    I feel like there was something said.  Who

7  said it, when it was said, I don't know.  I do feel

8  like it was, like, we'll revisit this.  I don't know

9  who said it and when it was said.

10     Q    How about any document, are you aware of

11  any document amending your agreement with regard to

12  the marketing costs and pricing exceptions?

13     A    No, I am not aware of any documentation.

14     Q    Did it ever revert back to the agreement

15  that your e-mail says NAF retracted?

16          MR. PERLOWSKI:  Object to the form.

17          You can answer.

18     A    I guess it did at some point.  I don't

19  really remember when it did.  And I wish I could

20  tell you, but it's been so many years.  I don't --

21  at some point, they said, okay, we're going to give

22  you guys -- all divisions get $10,000 a month for

23  marketing.

24  BY MR. HARGROVE:

25     Q    Okay.

Page 148

```
 1      A    Which was very helpful.
 2      Q    Was that while Ms. Spearman was still
 3  employed?
 4      A    Yes.
 5      Q    So tell me, what were the changes that
 6  ultimately were orally made by NAF to the marketing
 7  from your employment agreement?
 8           MR. PERLOWSKI:  Object to the form.
 9      A    Well, NAF, in my agreement, had agreed to
10  pay 7 and a half basis points per loan towards
11  marketing dollars.
12  BY MR. HARGROVE:
13      Q    Right.
14      A    And then they said they're not paying any
15  marketing dollars.
16      Q    Now, when you said they said, that was
17  orally, correct?
18      A    Well, I think --
19           MR. PERLOWSKI:  Object to the form.
20      A    I actually think they even put that in
21  writing.  I read somewhere that it included
22  Atlanta's Best New Homes.  I just read that
23  somewhere.
24  BY MR. HARGROVE:
25      Q    Was that in an e-mail?
```

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 149

```
 1            MR. PERLOWSKI:  Take your time if you need
 2      to.
 3            She's looking at other exhibits we marked
 4      today.
 5      BY MR. HARGROVE:
 6         Q    Look at the paragraph above the one we
 7      were going over.
 8            MR. PERLOWSKI:  Where are we, Travis?
 9            MR. HARGROVE:  Page 2.
10            MR. PERLOWSKI:  Of Exhibit 5?
11            MR. HARGROVE:  Yes.
12            MR. PERLOWSKI:  Okay.  Got it.
13         A    I read it somewhere too.  Let's see.  Yes:
14      You and Gina will be obligated to cover all
15      marketing costs including Atlanta's Best New Homes.
16      BY MR. HARGROVE:
17         Q    Okay.  That's on page 1 of the e-mail,
18      correct?
19         A    Yes.
20         Q    The reason I'm asking, I can see it, but
21      if it's not on the record then --
22         A    I understand.
23         Q    -- then we won't know.
24         A    I understand.
25         Q    All right.  And 7 and a half basis points
```

Kelly Allison                                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 150

1   that went away, how much in dollars was that on

2   average every month?

3        A    I'd have to go back and look at what we

4   were funding, but it's a really easy number, what

5   your funding times 7 and a half basis points.

6        Q    Would it have been a number close to

7   $10,000 or would it have been significantly higher?

8        A    Oh, significantly higher.

9        Q    Like 100,000?  200,000?

10       A    I would --

11            MR. PERLOWSKI:  Object to the form.

12            You can answer.

13       A    I would be remiss to throw a number out

14   there on a monthly basis, but probably, like, 5- to

15   $600,000 a year I'm guessing.

16   BY MR. HARGROVE:

17       Q    The other change was pricing exceptions,

18   correct?

19       A    Uh-huh.

20       Q    Can you walk me through what the changes

21   were to pricing exceptions?

22       A    When we came to New American Funding, they

23   gave us a 200 basis points threshold for PE

24   tolerances.  When they made the change in February

25   of 2019, we -- we had a hundred basis points on

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 151

1    government.  And anything that was approved over a

2    hundred basis points was taken out of our -- was

3    reduced from our comp on government.  And anything

4    over 7/8 on conventional was reduced from our comp.

5         Q    And was that a change that stayed in

6    effect permanently?

7         A    Gosh, how long did that stay in effect.  I

8    don't know the answer to that.

9         Q    Did you -- and I want to go -- with regard

10   to the marketing, did you sign any document about

11   the marketing policy being changed?

12        A    Unless it's a Schedule 1, I'm not aware of

13   it.

14        Q    How about the pricing exceptions, did you

15   sign any document about that?

16        A    I'm not aware that I did.

17        Q    Did you receive any written notification

18   about the pricing exceptions changing?

19        A    Yes, Wednesday, March 20th, 2019.

20        Q    The e-mail that we've been looking at,

21   Exhibit 5?

22        A    Uh-huh.

23        Q    Did you -- did you have any concerns about

24   the marketing expense change or the pricing

25   exceptions change?

Kelly Allison                     November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 152

1       A     Yes, I did have concern that Gina and I

2   wouldn't make enough money to cover it all, then

3   what would happen then.

4       Q     Did you have any discussions with

5   Ms. Spearman about those concerns?

6       A     I'm sure I did.

7       Q     Do you recall the details of any of those

8   discussions?

9       A     Ms. Spearman and I had a lot of

10  conversations.  I don't remember all the detail.

11      Q     While all this was going on, did you

12  explore leaving NAF for any other potential

13  employer?

14      A     While this was going on, we -- I did

15  entertain listening to what other companies were

16  doing as it related to P&L models.  That is what we

17  were told in early '19, that we would be going to a

18  P&L model.

19            Patty Arvielo, along with Christy Bunce,

20  asked us to gather P&Ls that -- different P&L

21  platforms and send them to corporate because at that

22  time, we had not -- we had not determined what type

23  of P&L model we were going to go on.

24            There's many P&L models within our

25  industry, so we -- we did gather and send.  And

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 153

1   during that time, I was interested to see what --

2   not only were we gathering information for

3   corporate, but I was also very interested to see how

4   other companies were creating P&L models, how long

5   they had been on them, if they originated that P&L

6   model and then found it -- that they needed to

7   change, was it net, was it split, how many P&L

8   models had they had.

9          A lot of times in this industry we start

10  down one path of a P&L model and we find out that it

11  doesn't work, and we change.

12     Q    So what did you do to gather information

13  on other companies' P&L models?

14     A    I talked to them, had them -- had several

15  companies send me P&L models.

16     Q    Okay.  Which companies did you talk to?

17     A    I talked to HomeBridge, I talked to

18  Cardinal, I spoke with Guild, and there was one

19  other.  I did send the Academy P&L model.

20     Q    Okay.  So --

21     A    I can't -- I think -- I don't know.

22  Maybe --

23     Q    So when you talk --

24     A    Maybe there were others; I don't know.

25     Q    When you talked with HomeBridge, was that

Page 154

1   in person or by telephone?

2        A    Oh, I'm sorry, HomeBridge.  Yeah.

3        Q    HomeBridge.

4        A    Rick Floyd, no, I talked to him in person.

5   We've been -- I've known Rick forever.

6        Q    Where is Rick Floyd located at HomeBridge?

7        A    He's not at HomeBridge any -- well, yeah,

8   it is HomeBridge.

9        Q    When he was with HomeBridge, where was he

10  physically located?

11       A    In Atlanta.

12       Q    In Atlanta?  Okay.

13            So did you drive to his office for that

14  meeting?

15       A    No, we met at a restaurant.

16       Q    Okay.  And did you tell -- what did you

17  tell him the purpose of the meeting with -- you said

18  Rick Floyd?

19            Did I get his name right?

20       A    You did.

21       Q    What did you tell Mr. Floyd the purpose of

22  the meeting was?

23       A    Exploring P&L models.

24       Q    Okay.  And was Mr. Floyd happy to share

25  HomeBridge's P&L models with you?

Page 155

1     A     Yeah.  He was very happy to do so.

2     Q     Okay.

3     A     Oh, Angel Oak was the other company.

4     Q     Angel Oak?

5     A     Angel Oak.

6     Q     Angel Oak.

7           So Mr. Floyd, how did he give you -- did

8     he give you documents of these P&L models?

9     A     Uh-huh.

10    Q     And what did you do with those documents?

11    A     I don't remember.

12    Q     Did you e-mail them to anyone at NAF?

13    A     I may have shared them with Patty or Tony

14    Blodgett.

15    Q     All right.  If --

16    A     We were all sharing a lot at that time.

17    Q     So you shared a lot of e-mails that had

18    P&L models from other companies with executives at

19    NAF?

20    A     I know we shared at least one or two.

21    Q     Okay.  Which one or two did you share with

22    them?

23    A     I don't know.

24    Q     How did you share those?  Was it by

25    e-mail, was it --

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 156

1          A     By e-mail.

2          Q     Okay.  When would those e-mails have been

3    sent?

4          A     I don't know.

5          Q     Were these PDFs of these models from these

6    other companies?

7          A     I mean, I don't know.

8          Q     How did you get the documents -- and we're

9    starting off with Rick Floyd.

10               How did he get the documents to you about

11   the P&L models?

12         A     He probably e-mailed them to me.

13         Q     Okay.  At your NAF e-mail address?

14         A     No, probably at my Builder Queen address.

15         Q     Is there a reason you would have been

16   using your Builder Queen e-mail address to receive

17   that information as opposed to your NAF e-mail

18   address?

19         A     Yes.

20         Q     What was that?

21         A     Well, Tony Blodgett almost got fired for

22   going out and getting P&L models, and I didn't want

23   to get fired.

24         Q     Well, you had been instructed to go and

25   get P&L models, though, by your superiors at NAF,

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 157

1    correct?

2        A    Yes, but it didn't turn out that way once

3    we started turning them in.

4        Q    Didn't turn out --

5        A    They thought that we were out looking to

6    leave the company, so I didn't feel comfortable

7    after what happened to Tony.

8        Q    So which person from NAF told you to go

9    gather P&L models?

10       A    Patty and Christy.

11       Q    So Patty and Christy told you go get P&L

12   models that you later e-mailed to them you said,

13   correct?

14       A    Uh-huh.

15       Q    All right.  So why were you uncomfortable

16   with your NAF e-mail address being used to receive

17   the documents that you had been asked to obtain?

18       A    Because Tony Blodgett got fired for

19   talking to other companies about P&L models, as I

20   stated before.

21       Q    Had he been instructed to obtain P&L

22   models from other companies like you had?

23       A    Yes, we all were instructed to gather P&L

24   models.  If we had P&L models or we knew people that

25   had P&L models, that they wanted to review them and

Page 158

1    figure out what was the best approach for New

2    American Funding.

3         Q    So did the executives then not stand up

4    and say, hang on, I asked this gentleman to go get

5    these P&L models, don't fire him?

6         A    We weren't involved in his firing.

7         Q    Okay.  Well, how did you come to have an

8    understanding that he was fired for obtaining P&L

9    models from other companies that he had been

10   instructed to obtain?

11        A    Because he called me and said that he was

12   fired and talked his way back into a job.

13        Q    Okay.  He said he was fired and then

14   talked his way back into a job before you obtained

15   P&L models from --

16        A    No, at the same time.

17        Q    Okay.  So how did he tell you he had

18   talked his way back into a job?

19        A    I don't remember.  He just told me he

20   talked his way back into his job.

21        Q    So despite the fact that he was able to

22   talk his way back into a job, you were still

23   concerned you would be fired if you had these P&L

24   models you had been asked to obtain sent to your NAF

25   e-mail address?

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 159

```
 1        A    Yes, I didn't...
 2        Q    So would Rick Floyd -- if we were to speak
 3   with Rick Floyd, he would not say you were
 4   interviewing for a job, correct?
 5             MR. PERLOWSKI:  Object to the form, calls
 6   for speculation.
 7   BY MR. HARGROVE:
 8        Q    You didn't tell Rick Floyd you were
 9   interviewing for a job, correct?
10        A    No, I didn't tell Rick Floyd I was
11   interviewing for a job.
12        Q    You didn't tell him --
13        A    I didn't know that Rick Floyd had a job
14   that I should be interviewing for.
15        Q    You didn't tell Rick Floyd you had any
16   interest in making a move from NAF, correct?
17        A    I talked to Rick Floyd about his P&L model
18   and what they were doing with their approach.  Rick
19   Floyd already had my position filled by a gentleman
20   by the name of Todd Greak.  He didn't have my
21   position available.
22             MR. HARGROVE:  Can you read my question
23   back?
24             (The record was read by the reporter as
25   follows:
```

Page 160

1          "Q     You didn't tell Rick Floyd you had

2     any interest in making a move from NAF, correct?")

3     BY MR. HARGROVE:

4          Q     So I appreciate the answer, but could you

5     answer my question?

6          A     I don't remember telling Rick Floyd that I

7     wanted to leave NAF and come to HomeBridge.

8          Q     Did you tell Rick Floyd you were looking

9     to leave NAF?

10         A     I don't remember if I told Rick Floyd I

11    was looking to leave NAF.  I did tell Rick Floyd I

12    was looking to go to a P&L model.

13         Q     So if we were to depose Rick Floyd, he

14    wouldn't tell us that you approached him under the

15    auspices of trying to make a move from NAF, correct?

16              MR. PERLOWSKI:  Object to the form, calls

17    for speculation.

18         A     I don't know what Rick Floyd would tell

19    you.

20    BY MR. HARGROVE:

21         Q     Let's talk about Cardinal.  What were your

22    discussions with Cardinal?

23         A     My discussion with Cardinal was what their

24    P&L model looked like.

25         Q     And who did you speak with at Cardinal?

Page 161

1      A     We spoke with -- I don't remember if his

2   name was Jared or Jason.

3      Q     All right.

4      A     Or if it even started with a J.

5      Q     When you met with Jared or Jason or

6   whatever the person's name was, you said "we."

7            So was Ms. Spearman at that meeting too?

8      A     She's already said that she was at that

9   meeting.

10     Q     How did you know she was already -- how

11   did you know she's already said she was at that

12   meeting?

13     A     Because I was told she said she was at

14   that meeting.

15     Q     And I don't want to go into

16   attorney-client privileged information, but where

17   did you learn that?

18     A     During my pre-deposition.

19           MR. PERLOWSKI:  I'm going to instruct you

20   again not to reveal privileged communications during

21   the deposition today.

22   BY MR. HARGROVE:

23     Q     So where was the meeting with Cardinal,

24   where did it take place?

25     A     In Greenville or Charlotte.

Kelly Allison                               November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 162

1       Q     Okay.  And you live in Marietta, correct?

2       A     Uh-huh.

3       Q     Did you drive or fly to Greenville or

4    Charlotte?

5       A     I think we drove.

6       Q     That's about a two-and-a-half-hour ride,

7    roughly?

8       A     I think it's further than that.

9       Q     Okay.  So the purpose of you driving to

10   Greenville or Charlotte to meet with Cardinal was to

11   obtain P&L information as per the instructions of

12   the NAF executives?

13      A     To explore other P&L models.

14      Q     You weren't trying to see whether Cardinal

15   had any opportunity for you to move over there,

16   correct?

17      A     I did not want to go to Cardinal.

18      Q     When you met with Cardinal, did you tell

19   whatever the individual's name was that you were

20   looking to make a move from NAF?

21      A     I don't remember what I told them.

22      Q     Did NAF provide you with any -- or did

23   Cardinal provide you with any P&L documents?

24      A     They did.

25      Q     How did they provide those to you?

Page 163

```
 1      A    I think they sent them to my Builder
 2   Queen.
 3      Q    And did you tell Cardinal that you wanted
 4   these because NAF was looking for P&L information to
 5   base your compensation on?
 6      A    No, I wasn't that blunt in taking up
 7   president, vice president's time to tell them that I
 8   was doing reconnaissance work for my current
 9   company, so I wasn't that honest with them.
10      Q    Okay.  So essentially what you were
11   instructed to do was to do reconnaissance on NAF's
12   competitors and what their pay models were?
13      A    No, we weren't instructed to do that.  If
14   we had them, to provide them.  I made a decision to
15   engage with other companies to see what their P&L
16   models looked like.  That was my decision alone.
17   Nobody at New American Funding instructed me to go
18   and do that.  If you have them, if you can get them,
19   send them to us.
20      Q    Did --
21      A    I made a decision to go out and seek
22   understanding of what other companies' P&L models
23   look like.
24      Q    Did you tell anyone other than
25   Ms. Spearman at NAF that you were going to meet with
```

Page 164

1   HomeBridge --

2          A    Who?

3          Q    -- Mr. Floyd?

4               Did you tell anyone other than

5   Ms. Spearman at NAF you were going to meet with

6   Mr. Floyd?

7          A    I don't think so.

8          Q    How about the meeting with Cardinal in

9   either Greenville or Charlotte, did anyone at NAF

10  other than Ms. Spearman know you were having that

11  meeting?

12         A    I don't think so.

13         Q    And, again, you communicated with Cardinal

14  through your Builder Queen e-mail address, correct?

15         A    Uh-huh.

16         Q    What is the Builder Queen e-mail address?

17  Can you give me that address?

18              THE WITNESS:  Do I have to give him my

19  personal e-mail address?

20              MR. PERLOWSKI:  He's -- unfortunately,

21  he's entitled to that.  And by the way, it's on

22  Exhibit 3.

23              MR. HARGROVE:  It's on Exhibit 3?

24              MR. PERLOWSKI:  It is.

25              MR. HARGROVE:  Okay.

Page 165

1              MR. PERLOWSKI:  I remember seeing it

2      today, so it's on Exhibit 3.

3      BY MR. HARGROVE:

4          Q    Go ahead and give it to me just so I've

5      got it on the record.

6          A    builderqueen1@gmail.com.

7          Q    And do you still maintain that Builder

8      Queen e-mail address?

9          A    I do.

10          Q    Is that -- is it just a regular Gmail

11      address or is it on some sort of server?

12          A    It's just a regular Gmail.

13          Q    Okay.  And all these communications you

14      had with HomeBridge, Cardinal, Guild, Academy, or

15      Angel Oak, were those all to the Builder Queen

16      e-mail address?

17          A    I think so.

18          Q    Tell me about Guild.  What -- did you do

19      reconnaissance work on Guild's P&L models?

20          A    I just had a conversation.

21          Q    Who did you have the conversation with at

22      Guild?

23          A    I don't really even remember.

24          Q    Where is Guild located?

25          A    I don't know.

Page 166

1      Q     How did you know -- so did you have a

2  phone conversation with Guild?

3      A     Uh-huh.

4      Q     How did you know what number to call?

5      A     I didn't call that number; they called me.

6      Q     Okay.  So was there only one call where

7  they called you and that was the extent of your

8  communications with Guild?

9      A     We all get a lot of recruiting calls, a

10 lot of recruiters call, and I like to ask a lot of

11 questions and find out how they do things.

12     Q     Did you have any communications with Guild

13 after the recruiter called you?

14     A     No.

15     Q     So Guild, the universe is one phone call

16 from a recruiter and that was it?

17     A     No, I just said the recruiter called a

18 couple times.

19     Q     Okay.  Was there any exchange of

20 information by e-mail with the representative from

21 Guild?

22     A     I don't remember.

23     Q     If there was, would it have been to the

24 builderqueen1@gmail.com e-mail address?

25     A     Yes.

Kelly Allison                                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 167

1           I mean, I can talk -- I'm an independent
2    agent.  I can talk to anyone that I so choose.
3       Q    I'm not saying you can't.  What I'm just
4    doing is finding out about these -- finding out
5    about these as part of the case.
6           Let's talk about Academy.  What were your
7    discussions with Academy?
8       A    I just forwarded Patty my old P&L from
9    Academy.
10      Q    Okay.  So there weren't any discussions
11   with Academy; it was just forwarding a P&L from when
12   you worked at Academy, correct?
13      A    That's what I said.
14      Q    All right.  You didn't approach anyone at
15   Academy or ask for any further information, correct?
16           Correct?
17      A    No, I did not.
18      Q    Okay.  Haven't had any discussions with
19   anyone at Academy about -- well, let me strike that.
20           Since you have been at NAF, have you had
21   any discussions with anyone at Academy?
22      A    Since I've been at NAF?
23      Q    Uh-huh.
24      A    Yes, catching up with people that I know
25   there.

Page 168

```
1        Q     And when was the last time you had a
2    conversation with -- catching up with someone that
3    you know at Academy?
4        A     I don't know.
5        Q     Did you have any conversations catching up
6    with anyone you know from Academy around the early
7    2019 time when you were doing this reconnaissance
8    work on P&Ls for other companies?
9        A     I don't know.
10       Q     Did you have any written communications
11   with anyone at Academy during the time you were
12   doing this reconnaissance work on P&Ls for other
13   companies?
14       A     I don't remember.
15       Q     If you did have any such communications,
16   would they have been to the builderqueen1@gmail.com
17   e-mail address?
18       A     I don't remember.
19       Q     So it could have been at your NAF e-mail
20   address?
21       A     I don't remember.
22       Q     Do you have any e-mail addresses other
23   than your NAF e-mail address and your
24   builderqueen1@gmail.com e-mail address?
25       A     I don't.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 169

1       Q    Have you ever had, since you've been at

2    NAF, any e-mail addresses other than your NAF e-mail

3    address and your builderqueen1@gmail.com e-mail

4    address?

5       A    I don't remember.

6       Q    You don't remember if you've had any other

7    e-mail addresses?

8       A    I don't remember.

9       Q    All right.  Tell me every other e-mail

10   address you remember that you might have had.

11      A    I don't remember.

12           MR. PERLOWSKI:  Since she started at NAF

13   or ever?  That question was unlimited in time.

14           MR. HARGROVE:  Yeah, well, she said she

15   doesn't remember whether she's had any other than

16   those two since she's been at NAF.

17           MR. PERLOWSKI:  I was just asking if the

18   other question was unlimited in time.

19           MR. HARGROVE:  Yeah, the other question's

20   unlimited because she said she didn't know.

21   BY MR. HARGROVE:

22      Q    So my question is what other e-mail

23   addresses have you had in the past since you don't

24   remember time-wise NAF --

25      A    Every company that I've been at, I've had

Kelly Allison                           November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 170

1    an e-mail address.

2         Q    How about e-mail addresses not -- that are

3    not company e-mail addresses?

4         A    Not that I remember.

5         Q    Okay.  Do you work on a laptop computer or

6    do you work on a desktop at the office?

7         A    Both.

8         Q    Both.  All right.

9              How long have you had the laptop computer

10   that you have at present?

11        A    Since early '19.  Or maybe -- no, August

12   of '19.

13        Q    August of '19.

14             How about the desktop that you have, how

15   long have you had that?

16        A    I don't know.

17        Q    The laptop you had prior to August of '19,

18   do you still have that laptop?

19        A    No.

20        Q    What happened to that laptop?

21        A    It went back to corporate.

22        Q    Did you use your laptop or desktop --

23   strike that.

24             You have -- the two computers you have are

25   a laptop issued by corporate and a desktop that I

Page 171

1    assume is also issued by corporate at your office,

2    correct?

3        A    Uh-huh.

4        Q    Do you have any personal computers?  Any

5    computers other than those two?

6        A    I don't.

7        Q    How about iPads or tablets, do you have

8    any of those?

9        A    I do.

10       Q    All right.  Do you use those to review

11   e-mails for the builderqueen1@gmail.com e-mail

12   address?

13       A    I do not.

14       Q    So do you use the laptop that you have

15   issued from corporate to view the

16   builderqueen1@gmail.com address?

17       A    I don't.  I use my husband's computer.

18       Q    Okay.  And your husband's computer is --

19   is that located at your house?

20       A    (Nods head affirmatively.)

21       Q    And is that laptop -- is that a laptop or

22   a desktop?

23       A    It's a laptop.

24       Q    What kind of laptop is it?

25       A    It's a Dell.

Page 172

```
 1      Q    Okay.  How long has he had that laptop?

 2      A    I don't know.

 3      Q    Is that the only computer that you use to

 4  view your builderqueen1@gmail.com e-mails?

 5      A    Uh-huh.  Sometimes I might go in from

 6  mine.  I don't really know.  I mean, I don't really

 7  look at it that often.

 8      Q    Okay.  Well, when you were doing this

 9  reconnaissance work and sending these P&Ls back and

10  forth to that address, were you using your husband's

11  computer?

12           MR. PERLOWSKI:  Object to the form.

13      A    I don't think so.

14  BY MR. HARGROVE:

15      Q    Okay.  What computer were you using?

16      A    I was using my computer, and then when

17  Tony got fired, I thought it was best to go to my

18  husband's computer.

19      Q    Angel Oak, who did you -- tell me about

20  your communications with Angel Oak.

21      A    Mike Fierman.

22      Q    All right.

23      A    Really, I don't know if I talked to Mike

24  Fierman during that time or prior to us going to New

25  American Funding.  I was just thinking about that.
```

Page 173

```
 1    I don't remember if that was -- I think that was
 2    prior to us going to New American Funding.  I don't
 3    remember.
 4        Q    All right.  If you corresponded with Mike
 5    Fierman while you were at NAF, would it have been
 6    from the Builder Queen e-mail address?
 7        A    I think so.
 8        Q    Let's change gears.  I want to talk now
 9    about Tennessee and Virginia.  One of your --
10             MR. PERLOWSKI:  We've been going for an
11    hour and 20 minutes.
12             MR. HARGROVE:  Yeah, let's take a break.
13             (Recess 2:19-2:34 p.m.)
14    BY MR. HARGROVE:
15        Q    I want to talk about -- now that we're
16    back into it -- the expansion.
17             One of your charges when you became
18    employed with NAF was to grow the southeastern
19    territory, correct?
20        A    Correct.
21        Q    And that was not only monetarily but also
22    geographically, correct?
23        A    Correct.
24        Q    And you expanded into multiple other
25    states from Georgia, correct?
```

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 174

1        A    Yes.

2        Q    All right.  Which states did you expand

3    NAF into under your watch?

4        A    North Carolina, South Carolina, Alabama,

5    Tennessee, Florida.

6        Q    And under your --

7        A    And Virginia.

8        Q    Under your leadership -- Tennessee and

9    Virginia were under your leadership initially but

10   are not now, correct?

11       A    Correct.

12       Q    Tell me about what went into starting up

13   the Tennessee and Virginia NAF territories.

14       A    We hired, business developed, branded our

15   names in those states.

16       Q    When you expanded into these other

17   territories, was there any sort of investment made

18   by you and Ms. Spearman?

19       A    Yes.

20       Q    All right.  Tell me about the investment

21   that was made.

22            MR. PERLOWSKI:  Object to the form.  I was

23   late to the last one as well.

24            But go ahead.

25       A    We participated in, you know, obviously

Page 175

1    all the marketing dollars.  We participated in some

2    of the hiring and the terms that maybe New American

3    Funding thought were too rich, so they asked us to

4    participate in the dollars.

5    BY MR. HARGROVE:

6        Q    Okay.  And in participating in the

7    dollars, and if you look at Exhibit 4, one of the --

8    and you can just look at this, one of the things you

9    said is:  I personally have had $93,000 deducted

10   from my personal pay for new hires that I agreed to

11   invest alongside NAF.

12            It's on page 352.

13       A    Of 4?

14       Q    Of Exhibit 4?

15            MR. PERLOWSKI:  That's not Exhibit 4.

16            MR. HARGROVE:  I'm sorry.

17            MR. PERLOWSKI:  I think it's 2.

18   BY MR. HARGROVE:

19       Q    2.  Exhibit 2.  Look at page 352,

20   second-to-last paragraph.

21       A    352?

22       Q    Uh-huh.  Second-to-last paragraph, second

23   sentence, I was just showing it to you, the sentence

24   that says:  I personally had $93,000 deducted from

25   my personal pay.

Page 176

```
 1        A     Uh-huh.

 2        Q     Is that part of what you're talking about

 3   in the dollars that were expended by you in growing

 4   the Virginia and Tennessee territories?

 5        A     Yes.

 6        Q     Was the -- was the investment limited to

 7   the $93,000 referenced in Exhibit 2 or were there

 8   other moneys expended by you and/or Ms. Spearman in

 9   growing those territories?

10              MR. PERLOWSKI:  Object to the form.

11        A     I don't know.  I mean, it appears that I

12   asked Sarah to send a complete breakdown of the

13   expenses.  I don't remember.

14   BY MR. HARGROVE:

15        Q     Okay.  Do you think there were more

16   expenses than the 93,000?

17        A     I'm sure there was.

18        Q     Okay.  When you and Ms. Spearman set out

19   to expand into Tennessee and Virginia, did you have

20   an expectation of earning those dollars back through

21   the business generated from growing it?

22        A     Everyone does.

23        Q     Everyone does meaning yes?

24        A     Yes, of course.

25        Q     And at some point, were those
```

Page 177

```
 1   territories -- were those territories profitable
 2   during the time they were still under your and
 3   Ms. Spearman's leadership?
 4        A    I don't know.  I'd have to go back and
 5   look at that.  I have no idea.
 6        Q    So you don't know whether you ever reaped
 7   any of the benefits of the moneys expended to expand
 8   into those territories?
 9        A    No.
10             MR. PERLOWSKI:  Object to the form.
11   BY MR. HARGROVE:
12        Q    Did any of -- my understanding is
13   Tennessee and Virginia were removed by NAF from your
14   territory, correct?
15        A    Yes, they were.
16        Q    Tell me the circumstances that led to --
17   we'll start off with Tennessee being removed from
18   the territory.
19        A    They were both removed at the same time.
20        Q    Okay.  Walk me through how they were both
21   removed then.
22        A    Again, we had a phone call with Christy
23   Bunce I do believe sometime in November, and she
24   stated that we would no longer be in charge of --
25   well, we would no longer -- Tennessee and Virginia
```

Page 178

1    would no longer fall under our division.

2         Q    Okay.  And did that upset you?

3         A    Of course it did.

4         Q    Why did it upset you?

5         A    Because I didn't understand why they were

6    doing it.

7         Q    Okay.  Did you come to an understanding of

8    what NAF's rationale for removing those two states

9    from your territory was?

10        A    They said that it had been requested by

11   Michelle, Eric, and Janet that they no longer wanted

12   to work under the Southeast.

13        Q    Was there any discussion about why they

14   never wanted to -- no longer wanted to work with the

15   Southeast?

16        A    No, I don't think they really went into

17   detail.  It was just that's the way it was.  I mean,

18   it was just matter of fact.  It was a matter-of-fact

19   conversation with no detail.

20        Q    All right.  Were those branches under your

21   direction long enough for you to recoup the moneys

22   that had been laid out to get them up and going?

23             MR. PERLOWSKI:  Object to the form.

24        A    No.  No.

25   BY MR. HARGROVE:

Page 179

1       Q    But for your and Ms. Spearman's work in
2   Tennessee and Virginia and the investments you made,
3   would those branches have been successful?
4            MR. PERLOWSKI:  Object to the form.
5       A    Say that again.
6   BY MR. HARGROVE:
7       Q    Sure.
8            In the absence of the time and monetary
9   investment in Tennessee and Virginia made by you and
10  Ms. Spearman, would those branches have been
11  possible?
12      A    I don't know.  I can't answer that
13  question.
14      Q    Would they have been as successful?
15      A    I don't know.  I really can't answer that
16  question.
17      Q    Well, do you think you and Ms. Spearman
18  did a good job getting those offices up and going?
19      A    Yeah, I think we did a fine job.
20      Q    And do you believe you had those offices
21  based on the investments of time and money you had
22  put in ready-to-be-profitable branches for NAF?
23      A    I feel like they would have followed suit.
24  I don't know -- I don't have the data, but I feel
25  like everything that we did was always a success and

Page 180

1  always returned a decent profit for the company.

2        Q    Do you feel like you are entitled to

3  recoup the monetary investments you made in getting

4  those states up and going?

5        A    We asked for it.  I mean, if you don't

6  ask, you don't, you know -- you know, nothing

7  ventured, nothing gained, but they didn't do

8  anything with that, so I moved on.

9        Q    But you did ask for it, correct?

10       A    Yes, we did ask for it.

11       Q    Do you know how much you asked for?

12       A    I don't remember.  I really don't.  I

13  don't remember.

14       Q    I want to go to March of 2020 and talk

15  about the -- this is around -- well, leading up to

16  March 2020 after the leadership meeting and the

17  reconnaissance work you did on the other mortgage

18  companies, did that lead ultimately to changing to a

19  profit and loss model?

20       A    It did.

21       Q    All right.  And can you tell me about the

22  discussions leading up to changing to a profit and

23  loss model?

24       A    My gosh, there were so many.  I mean,

25  there were so many conference calls and meetings

Page 181

1    and -- I mean, honestly, there were so many.  I

2    couldn't even tell you how many calls that we had,

3    how many reviews that we had.

4         Q    Who did you have the calls with, these

5    many, many calls?

6         A    Mostly -- I mean, Rick was -- Rick Arvielo

7    was on a few, mostly Scott Frommert --

8         Q    Okay.

9         A    -- and Jon Reed.  I don't remember Jan

10   Preslo being involved in many of them, but, again,

11   my recollection -- it's been a long time.  I felt

12   like most of it was around Jon Reed and Scott

13   Frommert.

14        Q    And --

15        A    And maybe Christy Bunce.  I really -- I

16   feel like most of it was with Scott and Jon.

17        Q    And ultimately leading up to, you were

18   provided with a draft document, correct?

19        A    A draft of the P&L model?

20        Q    Uh-huh.

21        A    Correct.

22        Q    And you and Ms. Spearman, in an effort to

23   continue your business relationship with NAF,

24   retained Lex Watson to review that, correct?

25             MR. PERLOWSKI:  Could you please read that

Page 182

1    question back?

2            (The record was read by the reporter as

3    follows:

4            "Q    And you and Ms. Spearman, in an

5    effort to continue your business relationship with

6    NAF, retained Lex Watson to review that, correct?")

7            MR. PERLOWSKI:  You can answer that --

8    again, don't reveal privileged communication, but

9    you can answer that question.

10       A    Correct.

11   BY MR. HARGROVE:

12       Q    Okay.  Did you have concerns going into

13   this P&L model about the transparency of NAF's

14   profit and loss figures?

15       A    Yes.

16       Q    What were those concerns?

17       A    The concerns were really based on the fact

18   that we had a P&L, but the questions that I had,

19   again, if you're going to manage to a P&L, I want to

20   be able to see the numbers that make up the P&L.  I

21   want to see behind the scenes on the numbers that

22   make up the P&L.

23           So a lot of our discussion -- the majority

24   of our discussion was around if you have operations

25   expense, I want to be able to click on, you know,

Page 183

1    that dollar figure or operations expense and see

2    what makes up those operations expenses or marketing

3    expenses or LO compensation expenses.  I wanted to

4    be able to see the numbers behind the P&L.

5         Q    Were you ever given the access to the

6    numbers behind the P&L?

7         A    No.  We as a company are working towards

8    that today, but during that time that you're

9    speaking of, no.

10        Q    You had a meeting with Lex Watson,

11   Ms. Spearman, Mr. Frommert, Mr. Reed, and a CPA in

12   September of 2019 to go over the P&L model document,

13   correct?

14        A    That's correct.

15        Q    And the reason Lex Watson was there at

16   that meeting was because you and Ms. Spearman wanted

17   to work to continue your business relationship with

18   NAF, correct?

19        A    That's correct.

20        Q    And prior to that meeting, you received a

21   proposed draft of a new Schedule 1, correct?

22        A    I think we did.  I'm sure you're going to

23   show it to me.

24        Q    Let me see here.

25             And after receipt of that -- I'm going to

Page 184

1    hand you Exhibit -- I'm going to hand you Exhibit 6

2    and ask if you recognize this as Mr. Watson's

3    redline of --

4              MS. GIBSON:  I'm going to give you the

5    Bates number.

6              MR. PERLOWSKI:  Okay.  I just wanted to

7    know where I was going.

8              MS. GIBSON:  I just know someone printed

9    those exhibits.

10             MR. HARGROVE:  Yeah, my fault.

11             MR. PERLOWSKI:  It's all right.  It's

12   fine.

13             (Plaintiff's Exhibit 6 was marked for

14   identification.)

15             MR. HARGROVE:  1216 is the Bates on that.

16             MR. PERLOWSKI:  Thank you.

17             (Off-the-record discussion.)

18   BY MR. HARGROVE:

19       Q    Do you recognize Exhibit 6 as the redline

20   version that Mr. Watson did of that initial

21   document?

22       A    Yes.

23       Q    And do you recall looking at this in the

24   redline what concerns, if any, you had about the --

25   about Exhibit 6?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 185

1           MR. PERLOWSKI:  Ms. Allison, again, I'm

2    going to caution you on the privilege instruction,

3    but you can go ahead and answer.  Mr. Hargrove asked

4    you about your concerns relative to Exhibit 6.

5         A    I think that Lex covered all of our

6    concerns.

7    BY MR. HARGROVE:

8         Q    The concerns that are shown in the

9    redline?

10        A    Or they were either our concerns or his

11   concerns.

12        Q    Okay.  Gotcha.

13             Was there a slide show shown at this

14   meeting about the new compensation model?

15        A    There was.

16        Q    Have you ever seen a copy of that slide

17   show since the meeting?

18        A    Not that I recall.

19        Q    Did you receive an electronic copy of that

20   slide show?

21        A    I don't remember.

22        Q    Okay.  Do you have any reason to know why

23   that slide show -- strike that.

24             Do you know if that slide show still

25   exists today?

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 186

1        A     I don't know.

2        Q     Do you know who prepared the slide show?

3        A     I assume Scott Frommert did, but I didn't

4    ask directly who created it.

5        Q     Was Mr. Frommert the person who was

6    operating the PowerPoint presentation?

7        A     I think so.

8        Q     That slide show showed a comparison of

9    your November 2016 agreement and the new proposed

10   Schedule 1, correct?

11       A     I think so.

12       Q     It did not show any other purported

13   schedules or changes to the November 2016 agreement,

14   did it?

15       A     I don't think so.  I honestly don't

16   remember what the slide show showed.  I don't

17   remember it.  I just remember we had three choices.

18       Q     No unsigned schedules were circulated at

19   that meeting or in the slide show, correct?

20       A     I don't remember if there were schedules

21   in the slide show.

22       Q     And you don't know whether you received a

23   copy of that slide show after the fact or before?

24       A     I definitely didn't before.  I don't think

25   I did after.  I'm not -- I'm not a hundred percent

Kelly Allison                                      November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 187

1    sure.

2        Q    There was a CPA at that meeting, correct?

3        A    Yes.

4        Q    Who was that CPA?

5        A    Oh, boy.  I don't remember.

6        Q    Did you retain --

7        A    It may have -- I don't know.  I really

8    don't know.

9        Q    Did you retain the CPA?

10       A    I'm sure I did.

11       Q    Would it have been the person who handles

12   your personal taxes?

13       A    It may have been.

14       Q    Does the same person handle your personal

15   taxes now as handled them back in 2019?

16       A    Yes.

17       Q    Who is that person?

18       A    We use a firm over in Roswell.  Mike -- I

19   wish I could tell you.  I don't remember.

20       Q    You don't know the name of the firm in

21   Roswell that handles your taxes?

22       A    I know.  You're just going to think,

23   right?  Mike.  Let me see if I have Mike's name on

24   here.

25            I don't know.  I have to tell you that my

Page 188

1    husband handles a lot of...

2        Q    You said -- where in Roswell is the office

3    located?

4        A    I don't know.  I have never been there.  I

5    don't get involved in the dollars and cents.  My

6    husband handles all of that.  I'm sorry.  I sign our

7    taxes every year, and I don't pay attention.

8        Q    Do you review the return before it's

9    submitted to the IRS?

10       A    You want -- no, I don't.

11       Q    Okay.  So ultimately after the meeting --

12   this one is Bates labeled.

13            I'm going to hand you Exhibit 7.

14            (Plaintiff's Exhibit 7 was marked for

15   identification.)

16   BY MR. HARGROVE:

17       Q    And I'll ask you if this is ultimately the

18   Schedule 1 that was agreed to.

19            (Off-the-record discussion.)

20   BY MR. HARGROVE:

21       Q    My question was:  Do you recognize this as

22   the final Schedule 1 that was ultimately agreed to?

23       A    Yes.

24       Q    Is there a version that is signed by you

25   or is this -- or do you know?

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 189

1      A     They told us that we didn't need to sign

2   it.

3      Q     Who's "they"?

4      A     Corporate.

5      Q     Who from corporate?

6      A     I think it was Scott and Jon said that our

7   signature wasn't necessary.

8      Q     Was it handed to you, e-mailed to you?

9   How did you receive it?

10     A     I believe it was e-mailed to us.

11     Q     Okay.  I want to change gears a little bit

12  and talk about -- you testified earlier after

13  discussion of the change to a profit model, you did

14  not explore changing employers, you just did some

15  reconnaissance work, correct?

16     A     No, I -- Gina and I clearly moved forward

17  with New American Funding's P&L model.

18     Q     And, ultimately, Ms. Spearman left New

19  American Funding, correct?

20     A     Yes.

21     Q     How did you find out that Ms. Spearman was

22  leaving New American Funding?

23     A     She called me.

24     Q     All right.  And when did she call you?

25     A     I don't remember if it was March or April.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 190

1    It was sometime in -- I think it was April.

2         Q    And how soon before her departure from NAF

3    did she call you?

4         A    The day before.

5         Q    All right.  And tell me about that

6    conversation.

7         A    She just said that she didn't want to work

8    with New American Funding anymore.

9         Q    Okay.

10        A    And that she really didn't know what she

11   wanted to do, but that she wanted to take some time

12   and explore what she wanted to do.

13        Q    And what did you tell her?

14        A    I need a break.

15        Q    Sure.  That's okay.

16             (Recess 3:03-3:06 p.m.)

17             MR. HARGROVE:  Can you read her back the

18   question?

19             (The record was read by the reporter as

20   follows:

21             "Q    And what did you tell her?")

22        A    I told her that I loved her and I wanted

23   her to be happy.

24   BY MR. HARGROVE:

25        Q    Okay.  Anything after that?

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 191

1      A    I don't know.

2      Q    Did she say anything else?

3      A    I don't know.  I don't remember.

4      Q    Did you have any discussion about whether

5  you might also leave NAF?

6      A    We had a discussion about the fact that I

7  would never -- I would not leave the team.  I would

8  not leave our team.

9      Q    Okay.  Did you have any discussion about

10  taking your team somewhere other than NAF?

11      A    At the time of Gina leaving, I did say

12  that I wanted to get -- I needed to get the team

13  through our -- I mean, obviously we were in the

14  middle of a -- beginning of a national pandemic.

15      Q    Uh-huh.

16      A    And I said that I couldn't -- couldn't

17  leave the team, and I wanted to -- I had to see it

18  through.

19      Q    Were you thinking about leaving the team

20  at that point?

21      A    Was I thinking about leaving the -- no, I

22  wasn't going to leave our team at that point.

23      Q    Were you trying to find a way to move the

24  team elsewhere from NAF at that point?

25      A    No, it was in the middle of a national

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 192

1   pandemic.

2       Q    Had you explored moving the team elsewhere

3   than NAF before --

4       A    I have never spoken to anyone on our team

5   about leaving New American Funding outside of Gina

6   Spearman.

7       Q    How about talk to anybody outside the team

8   of leaving New American Funding, including Gina

9   Spearman?

10      A    I talked to Gina.  I just said I talked to

11  Gina Spearman.

12      Q    About leaving NAF?

13      A    I didn't -- we didn't talk about leaving

14  NAF.  We talked about options that were out there

15  that were more suitable.  In the end, as Gina even

16  stated in an e-mail to corporate, that, you know, we

17  never intended on leaving New American Funding.

18      Q    Uh-huh.

19      A    That e-mail was sent from Gina and had

20  Eric and Michelle and Christy Bunce and Jan Preslo

21  and several other people on the e-mail that we never

22  had intentions of leaving New American Funding.

23      Q    Okay.  And you, in fact, didn't even

24  discuss leaving New American Funding, correct?

25      A    Gina and I of course discussed it.

Page 193

1     Q     Tell me about the discussions.

2     A     We did not discuss it with our team.

3     Q     Okay.

4     A     And as I stated, if Gina and I were

5  serious about leaving New American Funding, we would

6  have gathered our team together and spoke to them

7  just like we did when we were leaving Caliber to go

8  to New American Funding.

9           There were high levels of frustration,

10  some things happened that we didn't think were fair,

11  and it would create conversations between partners

12  that normal partners would have.

13     Q     Tell me --

14     A     And we made -- we had those conversations.

15     Q     Tell me about the conversations you had

16  with Ms. Spearman about potentially leaving NAF.

17     A     I told Gina that I don't agree with the

18  decisions that NAF has made, but I wasn't sure that

19  I -- I didn't know what I wanted to do with -- with

20  the -- my career.  I was very honest with that.  I

21  don't know if I want to continue doing mortgages.  I

22  don't know.

23           I was in the middle of a national

24  pandemic, and it makes you think your life through

25  very differently.  I didn't know if I even wanted to

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 194

1    entertain the mortgage business after the pandemic

2    was over.  I just know that I had to get our team

3    through it.

4            So we had lots of conversations about --

5    yeah, I mean, you know, you're not happy about

6    things that are going on.  You have conversations

7    that are between two partners and you think your

8    friend.  So yes, we had conversations.  Did we act

9    on those conversations?  No, we did not.

10       Q    Did you -- did you inform Ms. Spearman

11   that to the extent you were talking to any of the

12   other mortgage companies, that that was just

13   reconnaissance for NAF as opposed to efforts to look

14   for another --

15       A    I didn't say it was reconnaissance for

16   NAF.  NAF didn't require us to do that.  As I stated

17   before, it was reconnaissance for me to understand

18   what was out there and to get an idea of the

19   different platforms that were out there prior to us

20   going to what we finally determined to be this

21   compensation.

22       Q    Did you tell Ms. Spearman that any of

23   those visits made, for instance, to Greenville and

24   Charlotte, that the purpose of that for you was not

25   to explore other opportunities but was, in fact,

Kelly Allison                     November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 195

1    just reconnaissance?

2         A    To explore what was out there.  You can

3    call it reconnaissance.  You can call it whatever

4    you want.  We were exploring other platforms of P&L

5    agreements.  There are so many.

6         Q    But you definitely made it clear to

7    Ms. Spearman that in no way was speaking to any of

8    these folks an effort to potentially leave NAF,

9    correct?

10        A    I don't think Ms. Spearman and I went that

11   deep in conversation about that.  It's not like we

12   were having a formal conversation.  We were friends

13   and business partners.

14        Q    Did y'all ride together to either

15   Charlotte or Greenville?

16        A    Yeah, I'm sure we did.

17        Q    And during that ride up to Charlotte or

18   Greenville, it didn't come up at all what the actual

19   purpose of driving to Charlotte or Greenville was?

20        A    We knew what the purpose was, to look at

21   other platforms.

22        Q    But not for purposes of leaving NAF?

23        A    How do you know if you want to leave a

24   company if you don't -- if you're just looking at

25   what compensation plans are out there?  I'm not sure

Page 196

1    what you're so held up on that about.  We get

2    recruited and talk to companies all the time.  We

3    did not make a decision to leave New American

4    Funding.

5         Q    When you left -- who was your employer

6    prior to NAF?

7         A    Caliber Home Loans.

8         Q    When you were at Caliber, were you just

9    conducting reconnaissance when you talked to NAF to

10   learn --

11        A    No.  We --

12        Q    -- about other compensation models?

13        A    No.  We -- we had several of our clients

14   and our employees come to us and say that it was not

15   going to work.  We had had some of our -- we had

16   some of our employees that had been released from

17   Caliber.  We had a lot of very treacherous waters at

18   Caliber, and a lot of our clients and a lot of our

19   employees were very, very unhappy, and a lot of

20   changes happened with Caliber after we got there.

21             We went with -- the CFO within four

22   months, I think, they changed CFOs.  There were a

23   lot of changes at Caliber, and we made a decision

24   that Caliber was not going to be our forever home.

25             I -- that was my decision in most parts to

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 197

1    go to Caliber under a handshake agreement that I had

2    with Adam Kessler at Academy Mortgage.  So I had no

3    choice but to live out a one-year contract with

4    Caliber Home Loans.

5         Q    I want to set aside this reconnaissance

6    that you did while you were at NAF.

7              When you were at any of your other prior

8    employers, did you ever make visits to or contacts

9    with competitors of those employers for purposes of

10   reconnaissance on payment structures?

11        A    Oh, absolutely, all the time.

12        Q    All the time?

13        A    We all do it to each other.

14        Q    Okay.

15        A    People come and recruit with us, and

16   they're simply there to have a fishing expedition to

17   find out about technology, marketing, products,

18   pricing, philosophy, culture.  Happens every single

19   day in our business.

20        Q    Okay.

21        A    People do reconnaissance work on me and I

22   do reconnaissance work on them.

23        Q    Since you entered into the P&L model, what

24   reconnaissance work have you done for NAF, if any?

25              MR. PERLOWSKI:  Object to the form.

Kelly Allison                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 198

1            Go ahead, but to the extent that it

2     reveals privileged communications --

3         A     Yeah, I'm not answering that question.

4     BY MR. HARGROVE:

5         Q     Okay.  He's raised a privilege objection.

6               Have you visited any other mortgage

7     companies after you entered into the P&L model with

8     NAF?

9         A     No, I haven't visited any other mortgage

10    companies.

11        Q     Have you had any discussions with any

12    recruiters from other companies?

13        A     Of course.  We have -- people call us

14    every day.

15        Q     Okay.

16        A     Every single day.

17        Q     Have any of those gone beyond the first

18    phone call?

19        A     I get phone calls all the time.  I have

20    conversations with our competitors all the time.  I

21    try to stay very friendly with my competitors.  If

22    that means that they're recruiting me or I'm

23    recruiting them, so be it.

24        Q     The ones who have recruited you, have you

25    obtained any P&L documents or any other sort of

Page 199

1   documents from them since --

2       A    No, I have zero documents on my Builder

3   Queen Gmail account.  Zero documents from any other

4   companies.

5       Q    What did you do with the documents that

6   you had?

7       A    You just asked me if I've spoken to any

8   companies or gained any information since I signed

9   this Schedule 1.

10      Q    Correct.  Okay.

11      A    No, I have not.

12      Q    All right.  You had documents before that,

13  correct, on your Builder Queen e-mail address,

14  correct?

15      A    You mean prior to the Schedule 1?

16      Q    Yes.

17      A    Yes.

18      Q    Okay.  But since the Schedule 1, you

19  haven't gotten any, correct?

20      A    No.

21           MR. PERLOWSKI:  Object to the form.

22  BY MR. HARGROVE:

23      Q    Once you -- once Ms. Spearman left NAF,

24  did NAF offer you any incentive, monetary or

25  otherwise, to stay?

Kelly Allison                                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 200

```
1        A     Absolutely not.
2        Q     Has your compensation changed at all since
3   Ms. Spearman departed from NAF?
4        A     Absolutely not.
5        Q     Have you been given any bonuses outside of
6   that which is contained in the March 2020 Schedule 1
7   since Ms. Spearman's departure from NAF?
8        A     Absolutely not.
9              MR. PERLOWSKI:  Object to the form.
10  BY MR. HARGROVE:
11       Q     Have you executed any releases of NAF for
12  any claims of any sort since your -- since
13  Ms. Spearman departed NAF?
14       A     You have to repeat that question for me.
15       Q     Sure.
16             Settlement agreements or releases,
17  anything where you released any claims against NAF
18  since Ms. Spearman's departure?
19       A     No.  Nobody's asked me to.
20       Q     Have you signed any document that you
21  believe releases NAF from paying you override
22  bonuses pursuant to your agreement in effect prior
23  to March 2020?
24             MR. PERLOWSKI:  Object to the form.
25       A     Prior to March of 2020?
```

Page 201

```
 1    BY MR. HARGROVE:

 2        Q    Uh-huh.

 3        A    I don't know.  I mean, maybe I did when I

 4    signed those -- when I DocuSigned those Schedule 4s.

 5    I have no idea.

 6        Q    So you said Schedule 4, not Schedule 1

 7    that time.  Do you recall now that those were

 8    Schedule 4s, not Schedule 1s?

 9        A    I don't know, you said --

10             MR. PERLOWSKI:  Object to the -- object to

11    the form.

12        A    You said Schedule 4 earlier.  I assume

13    that you know something I don't.

14    BY MR. HARGROVE:

15        Q    Have you ever heard anyone at NAF express

16    that, "The girls made too much money"?

17        A    Did they say, "The girls make too much

18    money."  I think they said, "The girls make a lot of

19    money."  I don't know if anybody said we make too

20    much money.

21        Q    Okay.  Who's the "they" that you recall --

22    and when I say "the girls," you and Ms. Spearman

23    were referred to as "the girls" by NAF corporate

24    management, correct?

25             MR. PERLOWSKI:  Object to the form.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 202

1        A     Yes, we were.

2     BY MR. HARGROVE:

3        Q     Okay.  Who were the folks you heard say

4     that, "The girls made a lot of money"?

5        A     Well, I mean, Christy and Patty and Jan

6     and Scott and Jon.

7        Q     In what context were those statements

8     made?

9        A     That's a very good question.  I'd have

10    to -- I think it was more around -- going back and

11    actually pinpointing, I don't know when they said

12    it.  It was during, you know, a time when we were

13    going through the -- you know, the P&L.

14       Q     Okay.

15       A     And we were trying to understand, like,

16    what does that look like and trying to get a lot

17    more detail behind the P&L because it was very,

18    very, very different than the P&L that we had -- I

19    had previously been on.

20             And I think it was around the, like,

21    you're going to make more -- you guys make a lot of

22    money, you're going to make more money.

23       Q     Uh-huh.

24       A     Right.  I think that was more around the

25    comment of it.  I don't -- you know, can I tell you

Kelly Allison                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 203

1  I don't really remember a lot of the time and when

2  and who.

3       Q    Did Rick and Patty Arvielo think senior

4  regional vice presidents made too much money?

5            MR. PERLOWSKI:  Object to the form, calls

6  for speculation.

7       A    Rick made comments that we all made a lot

8  of money.

9  BY MR. HARGROVE:

10      Q    Did he ever say you made too much money?

11      A    He asked if -- he asked us if we thought

12  we made -- were we -- something about were we happy

13  with our income or we made a lot -- I don't really

14  remember how he asked it or how he stated it.  It

15  was something around basically everybody in the room

16  made money, and he lost money.

17      Q    So he said that he lost money,

18  Mr. Arvielo?

19      A    Uh-huh.

20      Q    Do you think that was true?

21      A    I don't know.

22      Q    So you think it's possible Mr. Arvielo was

23  actually losing money by working at NAF?

24           MR. PERLOWSKI:  Object to the form.

25      A    I don't know.  We didn't ever see their

Page 204

1    financials.  I don't know.  I have no idea.  I would

2    hope not.

3    BY MR. HARGROVE:

4        Q    What's a source code?

5        A    A source code is -- we have different

6    source codes, but a source code is what is a -- that

7    we create in order to capture specific loans so that

8    we can identify and measure loans that we're

9    catching under that source code.

10       Q    And can the source codes have -- codes

11   have an impact on loan officer compensation?

12       A    Yes, they can.

13       Q    Did you ever raise concerns about the use

14   of source codes within NAF and potential Dodd-Frank

15   issues?

16       A    Yes, we did.

17       Q    Tell me about that.

18       A    We had concern that -- we had concern that

19   in our agreements, that we were paying loan officers

20   a different compensation on jumbo and DPA loans than

21   what we were paying them on other products.

22       Q    Uh-huh.

23       A    And we did address that, and we were told

24   that that was run by legal and that that was

25   perfectly fine.

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 205

1              I think it was sometime in either -- I

2       think it was sometime in '19, I'm not sure -- I'm

3       sorry, I wish I had dates.  It was sometime in, I

4       think, '19 that they did decide to change that, and

5       we paid full comp on DPA loans and jumbo.

6              Q    So that changed at some point?

7              A    It did change.

8              Q    Prior -- go ahead.  Did you have something

9       else you wanted to say?

10             A    No.

11             Q    Prior to it changing, this discussion, did

12      you and Ms. Spearman have a phone call with NAF

13      about your concerns?

14             A    Yes, with Jan Preslo and Jon Reed.

15             Q    And you recorded that phone call, correct?

16             A    I don't -- maybe I did.  I think I

17      recorded one with Kristin.

18             Q    Okay.

19             A    I don't know if I recorded one with Jon

20      and -- I may have.

21             Q    Tell me about the phone call you recorded

22      with Kristin.

23             A    That was not -- so the source coding when

24      they -- when we went to standard comp on jumbo and

25      DPA, Jan Preslo had sent us all an e-mail that

Kelly Allison                                          November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 206

1    basically said you can run a DPA loan -- that she

2    had checked with legal and that we could source a

3    DPA loan or a jumbo under Connect or Corpgen,

4    meaning that as a Connect or as a Corpgen, under

5    those source codes, the loan officer would not --

6    they would make a reduced compensation.

7              So we questioned whether that was okay,

8    right, and we did ask if we were sure this was, you

9    know, okay to source a loan that was a self-source

10   loan as a Connect, and they assured us that it was

11   perfectly fine.

12        Q    Do you still have that recording?

13        A    Gosh, I don't -- I don't know.

14        Q    What device was it recorded on?

15        A    My iPhone.

16        Q    Your iPhone.

17             Do you still have the same iPhone?

18        A    Yes.

19        Q    Do your things you record from your phone

20   back up to the cloud?

21        A    I'm not very techie.

22        Q    Gotcha.

23             But you have the same phone today that you

24   had --

25        A    Yeah, well, I have a new phone, but I --

Kelly Allison                              November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 207

1    it all -- it usually transfers over.

2         Q    Okay.  So it was recorded on your phone,

3    and as far as you know, it's still saved within your

4    new phone, correct?

5         A    I think so, yes.

6         Q    Okay.

7              MR. HARGROVE:  Let us take a break.  We

8    may have a tad more, but we're very close to

9    finished.

10             THE WITNESS:  Okay.

11             MR. HARGROVE:  Thank you.

12             (Recess 3:29-3:33 p.m.)

13             MR. HARGROVE:  We don't have any further

14   questions.

15             MR. PERLOWSKI:  None on my end.

16             MR. HARGROVE:  Perfect.

17             MS. GIBSON:  Thank you for your time

18   today.

19             THE WITNESS:  Thank you.

20             MR. HARGROVE:  Thank you.

21             (Deposition concluded at 3:33 p.m.)

22             (Signature reserved.)

23

24

25

Kelly Allison                           November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 208

```
 1        The following reporter and firm disclosures
   were presented by me at this proceeding for review
 2  by counsel:
 3              REPORTER DISCLOSURES
 4        The following representations and disclosures
   are made in compliance with Georgia Law, more
 5  specifically:
           Article 10 (B) of the Rules and Regulations of
 6  the Board of Court Reporting (disclosure forms)
           OCGA Section 9-11-28 (c) (disqualification of
 7  reporter for financial interest)
           OCGA Sections 15-14-37 (a) and (b)
 8  (prohibitions against contracts except on a
   case-by-case basis).
 9
   - I am a certified court reporter in the State of
10  Georgia.
   - I am a subcontractor for Veritext.
11  - I have been assigned to make a complete and
   accurate record of these proceedings.
12  - I have no relationship of interest in the matter
   on which I am about to report which would disqualify
13  me from making a verbatim record or maintaining my
   obligation of impartiality in compliance with the
14  Code of Professional Ethics.
   - I have no direct contract with any party in this
15  action, and my compensation is determined solely by
   the terms of my subcontractor agreement.
16
17
18              FIRM DISCLOSURES
19  - Veritext was contacted to provide reporting
   services by the noticing or taking attorney in this
20  matter.
   - There is no agreement in place that is prohibited
21  by OCGA 15-14-37 (a) and (b).  Any case-specific
   discounts are automatically applied to all parties,
22  at such time as any party receives a discount.
   - Transcripts:  The transcript of this proceeding as
23  produced will be a true, correct, and complete
   record of the colloquies, questions, and answers as
24  submitted by the certified court reporter.
   - Exhibits:  No changes will be made to the exhibits
25  as submitted by the reporter, attorneys, or
   witnesses.
```

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 209

1    - Password-Protected Access:  Transcripts and
     exhibits relating to this proceeding will be
2    uploaded to a password-protected repository, to
     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kelly Allison                            November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 210

                         CERTIFICATE
1
2    STATE OF GEORGIA:
     COUNTY OF FULTON:
3
4        I hereby certify that the foregoing transcript
     was taken down, as stated in the caption, and the
5    colloquies, questions and answers were reduced to
     typewriting under my direction; that the transcript
6    is a true and correct record of the evidence given
     upon said proceeding.
7        I further certify that I am not a relative or
     employee or attorney of any party, nor am I
8    financially interested in the outcome of this
     action.
9        I have no relationship of interest in this
     matter which would disqualify me from maintaining my
10   obligation of impartiality in compliance with the
     Code of Professional Ethics.
11       I have no direct contract with any party in
     this action and my compensation is based solely on
12   the terms of my subcontractor agreement.
         Nothing in the arrangements made for this
13   proceeding impacts my absolute commitment to serve
     all parties as an impartial officer of the court.
14
15       This the 6th day of December, 2021.
16
17                   _Robyn Bosworth_
18
19           ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 211

1    To: Henry Perlowski, Esq.

2    Re: Signature of Deponent Kelly Allison

3    Date Errata due back at our offices: 30 Days

4

5    Greetings:

6    This deposition has been requested for read and sign
     by the deponent.  It is the deponent's

7    responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.

8    The deponent may fill out the Errata electronically
     or print and fill out manually.

9

     Once the Errata is signed by the deponent and

10   notarized, please mail it to the offices of Veritext
     (below).

11

     When the signed Errata is returned to us, we will

12   seal and forward to the taking attorney to file with
     the original transcript.  We will also send copies

13   of the Errata to all ordering parties.

14   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the

15   court without the signature of the deponent.

16

17   Please send completed Errata to:

18   Veritext Production Facility

19   20 Mansell Court, Suite 300

20   Roswell, GA 30076

21   (770) 343-9696

22

23

24

25

Kelly Allison                                November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 212

1    ERRATA for ASSIGNMENT #
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6
     Pursuant to Rule 30(7)(e) of the Federal Rules of
7    Civil Procedure and/or OCGA 9-11-30(e), any changes
     in form or substance which you desire to make to
8    your testimony shall be entered upon the deposition
     with a statement of the reasons given for making
9    them.  To assist you in making any such corrections,
     please use the form below.  If additional pages are
10   necessary, please furnish same and attach.
11   Page No._____Line No._____Change to_____
12   _____
13   Reason for change_____
14   Page No._____Line No._____Change to_____
15   _____
16   Reason for change_____
17   Page No._____Line No._____Change to_____
18   _____
19   Reason for change_____
20   Page No._____Line No._____Change to_____
21   _____
22   Reason for change_____
23   Page No._____Line No._____Change to_____
24   _____
25   Reason for change_____

Kelly Allison                                      November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

Page 213

1   Page No._____Line No._____Change to_____

2   _____

3   Reason for change_____

4   Page No._____Line No._____Change to_____

5   _____

6   Reason for change_____

7   Page No._____Line No._____Change to_____

8   _____

9   Reason for change_____

10  Page No._____Line No._____Change to_____

11  _____

12  Reason for change_____

13  Page No._____Line No._____Change to_____

14  _____

15  Reason for change_____

16  Page No._____Line No._____Change to_____

17  _____

18  Reason for change_____

19

            _____

20              DEPONENT'S SIGNATURE

21  Sworn to and subscribed before me this____day of

    _____, 20__.

22

23  _____

    NOTARY PUBLIC

24

25  My Commission Expires:_____

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**[& - 353]**                                                    Page 1

| & |
|---|
| **&**  1:14 |

| 0 |
|---|
| **04981**  1:6 |

| 1 |
|---|

**1**  2:3,15,18 21:23
  22:2,10 26:6,7
  27:18,21,22,25
  28:8 41:8 98:2,17
  109:7,7 116:18,20
  123:6 124:9,10
  125:15,20,24
  134:13,25 135:1,5
  135:15 146:8
  149:17 151:12
  183:21 186:10
  188:18,22 199:9
  199:15,18 200:6
  201:6
**1.4b**  98:10 99:11
  101:17 112:18
  121:2 122:2
  134:13
**1.4b.**  100:17
**1.4c**  99:16 100:1
**10**  208:5
**10,000**  14:24
  147:22 150:7
**100**  23:24 26:20
**100,000**  150:9
**10:47-11:01**  61:16
**11**  80:7,8,11 90:7,9
**11/21/16**  2:7
**11/5**  93:1
**11:41**  130:7
**11th**  129:5 130:7
**120,000**  83:18,21
**1216**  184:15
**1243**  92:19 93:9
  95:15,19

**1245**  95:2
**1247**  95:19
**1248**  92:19 93:9
  95:15,21
**1249**  96:15,19
**1256**  96:16,19
**1262**  97:23
**1264**  98:7
**128**  2:10
**12:21-1:07**  118:3
**13609**  210:18
**1381**  136:7,11,12
**139**  2:13
**14**  3:8
**140**  87:22 88:2,9
**1464**  130:24
**15**  93:1
**15-14-37**  208:7,21
**16**  20:10 62:16
  64:21 76:20 98:20
  118:14 119:2
  131:6
**17**  15:6,18 123:3,4
**171**  1:15 3:14
**17th**  1:15 3:14
**18**  1:12 9:15 70:16
  139:21
**184**  2:15
**188**  2:18
**18th**  140:3
**19**  8:9 15:5 27:2
  63:19 70:16
  114:15,17 123:25
  146:4 152:17
  170:11,12,13,17
  205:2,4
**1989**  48:1,13
**1991**  48:5,6
**1992**  15:8,18,20
**1:20**  1:6

**1s**  124:7,20 125:8
  125:14,16 126:1
  134:14 135:3,6,24
  201:8

| 2 |
|---|

**2**  2:4 64:14,15
  109:8 118:8,9,11
  140:10 149:9
  175:17,19,19
  176:7
**20**  84:19 173:11
  211:19 213:21
**200**  85:12 150:23
**200,000**  150:9
**2000**  15:12 17:13
  48:6,7 49:13,20
  50:20
**2001**  48:8 49:3,21
  52:7 53:15 58:9
  58:11
**2005**  48:9,9 53:15
**2008**  48:10
**2015**  48:11
**2016**  19:13 27:22
  62:17,23 63:5,12
  63:15 64:3 88:22
  88:24 92:16 98:4
  98:21 111:25
  186:9,13
**2017**  48:12 57:5
  62:14,15 125:8
**2019**  26:3,12 27:11
  64:21 75:21 76:17
  76:20 114:19,20
  115:4 116:11,13
  118:14 119:2
  123:9,23 124:4
  131:7 136:15
  139:21 140:3
  141:2 146:4
  150:25 151:19

**168:7 183:12
  187:15
2020**  62:12 89:5
  117:2,16,18
  132:20 180:14,16
  200:6,23,25
**2021**  1:12 130:7
  210:15
**20th**  151:19
**21**  2:3 98:3 111:25
**2100**  1:16 3:15
**2138**  1:18 210:19
**230**  3:8
**29**  14:10
**2:19-2:34**  173:13
**2s**  83:24

| 3 |
|---|

**3**  2:7 91:20,21
  92:11 114:4
  116:13 117:8
  120:14 131:14,21
  164:22,23 165:2
**3/4/2016**  92:13
  93:7,8
**30**  55:25 115:6,12
  115:18 116:5
  138:20 211:3
  212:6
**300**  211:19
**30064**  8:13
**30076**  211:20
**30305**  3:9
**30363**  3:16
**327**  8:12
**343-9696**  211:21
**351**  65:6
**352**  65:3,7 68:11
  74:4,9 118:10
  175:12,19,21
**353**  74:4

**3535**  3:7
**3:03-3:06**  190:16
**3:29-3:33**  207:12
**3:33**  207:21

**4**

**4**  2:10,22 125:20
128:16,17,21
130:5 131:4,10
135:12,12,13,15
135:16,19,22
136:2,5,9 175:7,13
175:14,15 201:6
201:12
**42**  80:18 81:5,10
81:14 84:4,7,11,11
**469,000**  19:10,21
20:19 21:5,12
**4s**  135:9,10,23
136:3 201:4,8

**5**

**5**  2:13 108:4,7
139:9,10 149:10
150:14 151:21

**6**

**6**  2:15 184:1,13,19
184:25 185:4
**600,000**  150:15
**64**  2:4
**6th**  210:15

**7**

**7**  2:18 91:15 93:16
93:22 94:8,15
95:2,10 148:10
149:25 150:5
188:13,14 212:6
**7.5**  95:3
**7/8**  116:18,20
146:8 151:4

**70**  55:24
**70/30**  55:24 56:14
93:17
**770**  211:21
**7:25**  64:24

**8**

**80**  80:14 112:4

**9**

**9-11-28**  208:6
**9-11-30**  212:7
**90**  147:1,5
**91**  2:7
**93,000**  175:9,24
176:7,16
**9:37**  1:13

**a**

**a.m.**  1:13 61:16
64:24 130:7
**ability**  17:25
**able**  13:9 41:1
70:1 81:17 158:21
182:20,25 183:4
**abreast**  37:15,17
**absence**  179:8
**absolute**  210:13
**absolutely**  45:14
121:6 122:1
126:18,24 197:11
200:1,4,8
**absorb**  116:17
117:22
**absorbing**  143:15
**academy**  48:11
55:5,16,18,20 56:5
56:7,18 153:19
165:14 167:6,7,9
167:11,12,15,19
167:21 168:3,6,11
197:2

**accept**  95:24
**accepted**  93:10
95:23 102:6,8
104:18
**access**  183:5 209:1
209:2
**account**  11:3
199:3
**accuracy**  143:19
145:1
**accurate**  6:7 81:7
208:11
**accurately**  5:11
**act**  194:8
**action**  1:5 111:3
208:15 210:8,11
**actions**  68:4
**active**  12:2
**actively**  79:11,12
**actual**  41:7 195:18
**ad**  16:19
**adam**  197:2
**adding**  146:7
**addition**  87:10
**additional**  131:20
133:6,18 134:3
212:9
**address**  8:11,15
64:2 156:13,14,16
156:18 157:16
158:25 164:14,16
164:17,19 165:8
165:11,16 166:24
168:17,20,23,24
169:3,4,10 170:1
171:12,16 172:10
173:6 199:13
204:23
**addressed**  27:12
102:1,3

**addresses**  168:22
169:2,7,23 170:2,3
**admissible**  47:14
**adverse**  29:21
30:9
**advice**  108:3
**advised**  114:20
**afar**  59:7 60:2
**affect**  17:24 31:6
**affirmatively**
171:20
**afraid**  127:2
**age**  9:15
**agency**  15:3,14
16:5
**agent**  167:2
**ago**  24:9,18 64:6
87:25 113:13
140:18 145:18
**agree**  93:9 95:14
96:21 98:1,19
108:20 112:15
193:17
**agreed**  97:10
148:9 175:10
188:18,22
**agreement**  2:12,16
2:19 19:17,21
26:5,6 28:7 62:5
62:10,11,19,23
63:5,12,19 64:3
89:6 92:24 95:2
96:15,18 97:13,17
97:21 98:4,5,20
100:12,21 103:19
107:21,23 108:2
109:7,10 111:25
114:4,7,8,14
116:12 117:1,2,14
117:16 121:13
122:17,25,25

Kelly Allison
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

November 18, 2021

123:8,19 124:2,3
126:2 132:17,19
132:20 133:12,14
133:16,19 134:1,4
134:7,8,18,21,24
135:2,4 143:25
145:19,21 146:3,6
146:10,13,24
147:11,14 148:7,9
186:9,13 197:1
200:22 208:15,20
210:12
**agreement's**
102:10
**agreements**  28:12
122:11,18,19,22
122:22 124:7
195:5 200:16
204:19
**ahead**  31:18 33:7
37:11 59:17,22
77:21 79:3 165:4
174:24 185:3
198:1 205:8
**alabama**  174:4
**alex**  52:20
**aligned**  145:23
**allegations**  39:2
40:3 41:8
**allison**  1:11 2:8
4:1,10 7:21,22 8:1
9:11 118:5 126:17
185:1 211:2
**allocated**  95:11,12
95:13
**alongside**  175:11
**alta**  13:21
**amended**  2:9
**amending**  147:11
**amendment**  26:9

**america**  55:4
**american**  1:7 2:8
4:12 5:19 9:20,23
10:2 23:19,22
31:9 34:21 38:1,3
38:25 41:16 42:24
43:2,13,25 44:11
45:6,7 48:12
56:13,18,22 62:5
71:5,23 74:19
78:14 80:16,17,19
80:24 82:7,9
83:24 85:2,8
86:18,22 87:1
88:5 90:15 92:15
93:3,23,24 96:24
107:17,23,25
108:12,19,22
109:24 110:2
111:11,13 112:3,8
117:20 150:22
158:2 163:17
172:25 173:2
175:2 189:17,19
189:22 190:8
192:5,8,17,22,24
193:5,8 196:3
**amount**  112:16
142:16,24
**andrew**  3:21
**angel**  155:3,4,5,6
165:15 172:19,20
**angry**  77:16
**answer**  5:3 7:5
18:23,25 20:25
22:13 23:23 30:11
30:15 31:15,17
33:7 37:11 40:19
42:11 43:4 51:25
57:15 62:3 64:5
67:12,12 68:1

70:2 75:5 77:21
94:20 96:8 100:24
102:15 104:13
106:4,7,18 107:4
107:13 111:16
117:4 123:13
132:22 135:18
147:17 150:12
151:8 160:4,5
179:12,15 182:7,9
185:3
**answered**  18:7
33:5 59:21 77:19
104:25 110:20
**answering**  5:9
6:18 32:22 58:22
107:6,7,8 121:19
198:3
**answers**  208:23
210:5
**anticipate**  5:1,2
**anybody**  60:19
137:14 192:7
201:19
**anymore**  59:9
68:14 72:8 190:8
**anyone's**  120:18
121:3
**anyway**  7:6 57:23
**anyways**  144:13
**apologetic**  76:10
**apologies**  130:22
136:8
**appear**  51:20,22
72:20
**appearances**  3:1
**appeared**  141:24
**appears**  93:12
127:9 133:2
176:11

**applicable**  98:16
99:17 100:2 108:6
**applied**  208:21
**appreciate**  160:4
**approach**  142:1,1
158:1 159:18
167:14
**approached**
160:14
**approved**  95:5
151:1
**approximate**  90:9
**approximately**
15:4 90:7
**april**  189:25 190:1
**area**  9:8,15 12:10
14:9,12
**arena**  8:2
**arnall**  1:14 3:13
**arrangements**
210:12
**article**  208:5
**arvielo**  66:4,7,13
67:4,24 68:18
69:2,3,16,19,24
70:9 71:7 75:1
79:1,1,5,18 80:12
80:13 81:2 82:25
140:13,14 152:19
181:6 203:3,18,22
**arvielo's**  66:22
**arvielos**  68:6
79:23 137:16
146:16,18
**asa**  100:9
**aside**  8:14 11:1
25:14 27:10 73:17
197:5
**asked**  20:21 21:2
33:4 38:6 59:20
77:18 84:10 85:6

[asked - benefit]

85:8,10,18 104:25
108:8 109:17
110:19 117:8
123:18 124:1,1,19
124:25 133:11,13
139:5 152:20
157:17 158:4,24
175:3 176:12
180:5,11 185:3
199:7 200:19
203:11,11,14
**asking**   4:20 9:2
25:21,22,22,24
34:12 62:2 68:23
83:24 92:2,7,8
99:19,22 104:3
113:14 118:19
121:19 149:20
169:17
**assessment**   70:6
**assigned**   208:11
**assignment**   212:1
**assist**   212:9
**assistant**   131:7
**associates**   23:16
**association**   13:5
13:17
**associations**   13:2
**assume**   12:5 20:21
29:10 44:3 57:10
65:21 68:9 72:10
81:24 89:19
112:20 171:1
186:3 201:12
**assuming**   7:25
51:15 65:11,11
66:20 85:10
**assumption**   67:4
**assured**   206:10
**atlanta**   1:2,17 3:9
3:16 9:7,15 14:8

15:25 16:1,2
154:11,12
**atlanta's**   91:12,18
148:22 149:15
**attach**   212:10
**attached**   131:10
131:12,22,24
132:8,16 211:7
**attachment**
131:10
**attempt**   21:21
**attend**   14:3
**attendance**   80:12
**attended**   79:7,8
**attender**   12:10
**attenders**   79:10
**attention**   42:23
188:7
**attorney**   18:24
106:2 107:16
133:3,16 134:1
161:16 208:19
210:7 211:12
**attorneys**   4:11
127:18 208:25
**august**   170:11,13
170:17
**auspices**   160:15
**automatically**
208:21
**available**   159:21
**average**   141:14,25
142:6,21,23,23
150:2
**aware**   46:15 61:1
61:11 73:7 114:3
114:6,9 128:1
133:5 147:10,13
151:12,16
**awkward**   29:8,10
29:12,16

**b**

**b**   1:7,18 208:5,7
208:21 210:19
**back**   14:17 17:19
26:25 34:24 44:7
44:8,9,16 47:2
50:20 56:16 63:10
63:20 64:8,18
67:2 72:1 76:17
85:19 87:20 89:12
94:21 100:17
105:18 109:17
116:9 118:5,14
119:2 123:17
125:2,21 133:21
136:15 144:6
147:14 150:3
158:12,14,18,20
158:22 159:23
170:21 172:9
173:16 176:20
177:4 182:1
187:15 190:17
202:10 206:20
211:3
**background**   13:20
14:23 17:20 47:7
47:15,21
**balancing**   119:19
**bank**   55:4
**banked**   95:6
**bankers**   13:17
**bankruptcy**   18:9
**bar**   10:15
**base**   67:3 163:5
**based**   11:10,12
16:6 38:19 74:4
103:18 114:2
119:8,9 130:14
145:18 179:21
182:17 210:11

**basic**   47:21
**basically**   75:20
87:22 91:16
144:10 203:15
206:1
**basis**   33:13 70:19
87:22 88:2,9
91:15 93:16,22
94:8,15 95:3,10
108:4,7 113:20,21
114:2 115:25
144:12 148:10
149:25 150:5,14
150:23,25 151:2
208:8
**basketball**   82:19
**bates**   92:7 129:2,9
129:21 130:10,22
136:6 139:13
184:5,15 188:12
**began**   53:7 58:11
**beginning**   191:14
**begins**   65:6 72:15
**behalf**   3:2,11
**behavior**   119:16
119:21,21
**believe**   29:19,20
30:9 32:7,9 33:19
49:3 53:2,6 57:5
63:2,14 67:17,23
73:6,8 75:18 79:4
79:7 97:19 111:24
114:15 132:6
139:1 177:23
179:20 189:10
200:21
**believed**   89:11
**bella**   10:10
**beneficiary**   93:25
**benefit**   94:7,10

**[benefited - call]**                                                                Page 5

benefited  94:14 121:7 122:4,8
benefits  177:7
best  20:14 31:24 71:4 91:12,18 148:22 149:15 158:1 172:17
betray  33:9
betrayal  30:16,21 33:2,3
betrayed  32:19
better  14:16 54:6
beverage  11:20
beyond  73:13 104:21 138:25 198:17
biases  34:11 58:25 59:1
bigger  118:18
bill  63:20
bills  64:8
bit  4:19 17:18 27:19 48:25 78:5 117:11,11 136:14 189:11
block  3:20 23:5,18 24:5 28:18 37:16
blodgett  155:14 156:21 157:18
blunt  163:6
board  85:21 141:14 208:6
body  26:19,22,24
bonus  97:6,8 98:10 100:1,7 103:14
bonuses  27:16 97:12,16 98:21 100:21,22 102:22 105:22 107:11 109:21 120:13

200:5,22
bookmark  17:19
boss  52:17
bosworth  1:18 210:19
bottom  64:20 82:6 118:10
box  98:16,23 101:16
boxes  99:22
boy  187:5
bps  97:9 113:21
branch  83:3 88:7 88:8 99:5 101:1 120:21,25 121:7 122:6,9
branches  178:20 179:3,10,22
brand  94:13
branded  174:14
branding  90:16
break  6:13,14,19 49:9,9 61:13 112:10 114:1 117:12 118:1 123:7,18 124:13 125:2,7 129:9 173:12 190:14 207:7
breakdown  176:12
briefly  13:19
bring  54:9
bringing  80:15
broad  27:9
broke  87:24 91:14
broken  88:10 97:9
broker  1:7
brothers  11:13,14 11:16 12:2

brought  32:6 42:22 76:8 80:18 81:15,16 103:17
bucket  87:22 88:2
buckhead  12:13 12:14
builder  47:4,9 48:20 49:16 52:14 53:25,25 54:7 55:14,14 82:14 156:14,16 163:1 164:14,16 165:7 165:15 173:6 199:2,13
builderqueen1  165:6 166:24 168:16,24 169:3 171:11,16 172:4
builders  54:5,5,9
building  3:8 15:11 15:21,24 16:10,14 16:15,19,24
built  17:8
bullet  98:22
bunce  26:14 65:24 71:22 72:9,21 73:2,3,8,11,18,20 73:21,23,25 74:3 74:12,17,21,24 76:3 77:11 79:2 80:3 136:20 139:25 140:13 152:19 177:23 181:15 192:20
business  11:4,24 52:19 119:19 174:14 176:21 181:23 182:5 183:17 194:1 195:13 197:19

buying  41:5

**c**

c  3:3 137:22 208:6
calculated  47:14 47:17
calculation  100:1 100:7 112:21
calendar  36:19
caliber  18:16,21 19:12,14,18,20 20:7,7,9,13,18 21:8,13 48:11 55:12,15,16,19,20 56:18 57:1,4 61:20 62:6 78:11 78:16 81:24 82:8 84:6,8,11,12,14,19 193:7 196:7,8,17 196:18,20,23,24 197:1,4
california  11:10 11:12,17 13:24,25 14:6,11,19 15:14 16:7 78:16,18,19 78:25 80:7,24 83:9,14 84:9,15,20 85:11,15,17 86:6,7 90:7,9
call  29:2,5 32:18 38:6,16 41:21 43:2,12 46:15 49:15 65:16 68:12 68:17,21 69:2,3,3 69:5,7,9,11,17,17 69:18,22 70:20 71:14 74:11 76:23 78:14 109:19 110:5 127:17,19 139:21 140:2 166:4,5,6,10,15 177:22 189:24

190:3 195:3,3
198:13,18 205:12
205:15,21
**called** 10:21 14:25
28:23 34:24 38:14
42:5,7 43:23 44:3
46:17 74:21,24
76:25 101:24,25
110:10 127:20
158:11 166:5,7,13
166:17 189:23
**calling** 32:13 38:4
46:11 73:2 77:12
**calls** 37:25 38:13
46:18 69:24 70:7
71:6,9,11,17 72:10
125:13 128:2
132:9 159:5
160:16 166:9
180:25 181:2,4,5
198:19 203:5
**candidates** 108:5
**cap** 1:6
**caption** 41:7 210:4
**capture** 204:7
**card** 40:23 119:11
**cardinal** 153:18
160:21,22,23,25
161:23 162:10,14
162:17,18,23
163:3 164:8,13
165:14
**care** 30:1 81:18
90:22,24
**career** 15:12 16:9
47:23 193:20
**carolina** 174:4,4
**carried** 134:18
**casbon** 38:23 42:5
43:19 44:17 45:15
45:17

**casbon's** 46:1
**case** 4:12,15 6:25
22:10 30:7 34:7
36:4 47:11,18
60:14,16,17 61:7
104:17 115:22
119:1 127:17
167:5 208:8,8,21
**cases** 11:20
**catching** 167:24
168:2,5 204:9
**category** 120:16
**caused** 52:6 65:9
**caution** 18:22
22:11,22 37:9
61:24 185:2
**cbd** 11:18,21,22
**ccr** 1:18 210:19
**center** 82:20
**centered** 60:9,12
**cents** 188:5
**ceo** 66:8,18 146:21
**certain** 43:22
69:15,15 89:13
**certainty** 38:24
43:21
**certificate** 210:1
**certified** 208:9,24
**certify** 210:4,7
212:2
**cetera** 51:15
**cfo** 196:21
**cfos** 196:22
**chaffey** 13:22,23
14:18
**chance** 64:23
85:14 130:19
**change** 16:9 71:10
78:5 116:11,12,13
116:24 124:2
125:18 136:14

150:17,24 151:5
151:24,25 153:7
153:11 173:8
189:11,13 205:4,7
212:11,13,14,16
212:17,19,20,22
212:23,25 213:1,3
213:4,6,7,9,10,12
213:13,15,16,18
**changed** 70:16
82:9 86:12 87:21
88:19,24 114:13
114:19 124:9
126:1 133:18
134:3 135:24
151:11 196:22
200:2 205:6
**changes** 62:21
114:3,6,8 117:1,9
117:10,14,17,19
117:20 123:8,9,18
123:23 124:6,19
125:1 141:11
148:5 150:20
186:13 196:20,23
208:24 211:7
212:4,5,7
**changing** 68:7
70:14 151:18
180:18,22 189:14
205:11
**charge** 41:6
177:24
**charges** 173:17
**charlotte** 141:24
161:25 162:4,10
164:9 194:24
195:15,17,19
**chart** 82:6
**chase** 23:5,12,15

**checked** 98:23
100:2 101:17
206:2
**checking** 121:13
**child** 16:11
**children** 55:10,12
**choice** 197:3
**choices** 186:17
**choose** 167:2
**chophouse** 10:17
**chose** 32:7,9
**chris** 9:11
**christy** 26:14
65:16,23,24 71:22
74:12 75:18,19
79:2 80:3 136:19
137:13 138:8
139:25 140:13
152:19 157:10,11
177:22 181:15
192:20 202:5
**church** 12:10
**circle** 116:9
**circulated** 186:18
**circumstances**
57:3 177:16
**city** 12:11
**civic** 12:15
**civil** 1:5 212:7
**claims** 200:12,17
**clarify** 7:3 31:21
82:3
**classes** 16:13
**classified** 138:25
**clear** 7:12 45:3,4
195:6
**clearly** 32:12,14
32:15 74:4,6
90:24 100:15
127:24 146:14
189:16

Case 1:20-cv-04981-CAP  Document 96  Filed 04/28/22  Page 221 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[click - confused]

Page 7

click 182:25
clicked 41:13
client 18:24 21:7
21:13 30:10 34:12
34:14,16,19 58:25
59:2 106:2 128:2
161:16
clients 90:18
196:13,18
close 150:6 207:8
closing 17:4,5,7,11
47:4,9 48:17 83:5
90:16
cloud 206:20
club 12:18,21,23
clubs 12:16
cm 137:23,25
cm1 115:13,14
138:25
cm2 115:13,14
139:1
coastal 10:19
code 204:4,5,6,9
208:14 210:10
codes 204:6,10,10
204:14 206:5
coding 205:23
collect 61:19
collective 145:19
college 13:22,23
14:19
colloquies 208:23
210:5
come 14:11 90:10
114:24 158:7
160:7 178:7
195:18 196:14
197:15
comfort 112:7
comfortable 68:14
157:6

comment 127:13
127:14 202:25
comments 203:7
commission
144:11 145:6,7
213:25
commitment
30:25 210:13
commitments
145:16,18
communicated
85:6 164:13
communication
26:19,24 35:7
96:9 111:17 130:8
133:5,9 182:8
communications
18:24 22:12,23
25:11,14 26:1,11
26:13,23 27:15
37:10 43:6 62:1
79:11,13 96:7
106:1,19 108:10
109:15 111:15
126:8,11,14 128:3
128:10 132:23
161:20 165:13
166:8,12 168:10
168:15 172:20
198:2
comp 142:24
151:3,4 205:5,24
companies 11:20
52:24 54:19 58:2
78:13 152:15
153:4,13,15,16
155:18 156:6
157:19,22 158:9
163:15,22 168:8
168:13 180:18
194:12 196:2

198:7,10,12 199:4
199:8
company 10:7
11:8,12 12:3
14:25 38:18 42:6
43:19 45:10,13
46:12,15 52:9
57:25 58:3 60:23
65:17 66:9,13,23
68:2 70:19 72:5
78:20 101:1 138:1
138:5,14,18 155:3
157:6 163:9
169:25 170:3
180:1 183:7
195:24
compare 132:19
comparison 186:8
compensated
87:17,19 145:9
compensation
2:11,17,19 26:2,12
27:1,11,12,14,17
36:7 51:14,18
70:16 75:21 79:16
79:19,21,23 80:1
83:13 85:2,23
87:11,15,21 88:3
88:12,19,23 89:4
89:11,17 98:3
112:2 113:10,18
113:23 114:24
119:8,9 120:8,9,19
121:3,23 122:5
135:25 144:3,25
163:5 183:3
185:14 194:21
195:25 196:12
200:2 204:11,20
206:6 208:15
210:11

competitors 45:25
163:12 197:9
198:20,21
complete 75:22
176:12 208:11,23
completed 211:17
complexity 119:18
compliance 208:4
208:13 210:10
complicated 109:6
component 118:18
comprise 89:11
computer 170:5,9
171:17,18 172:3
172:11,15,16,18
computers 170:24
171:4,5
concern 100:19
152:1 204:18,18
concerned 158:23
concerns 151:23
152:5 182:12,16
182:17 184:24
185:4,6,8,10,11
204:13 205:13
concluded 207:21
conclusion 60:11
condone 145:22
conducting 196:9
conference 65:16
74:11 139:21,25
140:2 180:25
confidential
127:20,21 128:3,4
confidentiality
127:10,11,15
conforming
119:20 146:9
confuse 6:23
confused 92:12
104:14

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**[connect - counsel]**

Page 8

**connect** 206:3,4,10
**consider** 58:12,17
  59:10 135:1
**consideration**
  31:12 133:7
**considered** 32:1
  58:8
**construction**
  54:11
**consult** 125:7
**consumers** 54:15
  54:16
**contacted** 208:19
**contacts** 197:8
**contained** 200:6
**contend** 60:16
  92:17 102:8 126:1
  133:18 134:3
  135:24 146:22
**contents** 38:20
**context** 202:7
**continue** 37:11
  181:23 182:5
  183:17 193:21
**contract** 108:2
  135:8 197:3
  208:14 210:11
**contracts** 25:18
  91:13 208:8
**contractual** 26:5
  103:19 107:21
**contribute** 90:19
**contributed** 93:23
**conveniently**
  130:2
**conventional**
  116:18,20 151:4
**conversation**
  35:15,19,21 36:2
  36:15 38:21 44:5
  63:7 76:6 101:7

105:9,10 110:7
141:18 165:20,21
166:2 168:2
178:19 190:6
195:11,12
**conversational** 5:1
**conversations**
  36:4 46:8,10,13
  85:13 105:6 106:8
  108:24 109:5
  110:21,25 111:2
  138:22 141:22
  152:10 168:5
  193:11,14,15
  194:4,6,8,9 198:20
**coo** 71:23 72:2,5
  73:13
**cool** 16:22
**coordinated** 17:7
**coordinator** 17:4
  17:5,11 47:4,9
  48:17
**copied** 27:3 72:19
  126:14
**copies** 211:12
**copy** 41:2,6 96:22
  129:9 185:16,19
  186:23
**corpgen** 206:3,4
**corporate** 26:25
  65:12 79:9 81:9
  99:7 100:19 101:7
  101:24 102:18
  103:18 104:19
  105:6 109:19
  110:5,10 122:21
  140:9 141:9,11,19
  142:9 143:3,6,14
  143:17,21,23
  144:16 145:2,19
  145:20 146:2

152:21 153:3
170:21,25 171:1
171:15 189:4,5
192:16 201:23
**corporate's**
  143:11,19 144:7
**corporation** 48:8
**correct** 8:3 9:21
  17:10 18:1,4
  19:22 20:20 22:10
  22:18,19 23:10,16
  25:19 28:24 29:11
  29:13 31:23 32:3
  41:21 42:9,13
  43:17 44:21 48:20
  51:7 53:8,15 56:5
  56:19,23,24 57:23
  58:10 61:20 64:3
  65:4,18,21,24 66:1
  66:4 69:3 72:19
  76:17,21 77:13
  79:24 80:24 81:3
  81:25 84:9,20,21
  84:22 85:12,23
  88:13,16 89:6,14
  89:17,22 93:11
  95:19,20,21,23
  96:22,22 97:2
  98:17 99:17
  101:10 105:23
  106:16,22 107:12
  108:17,23 109:21
  110:5,18 112:18
  113:17 115:1
  116:1,7,24 119:8
  121:25 122:5,10
  124:4 125:9
  126:15 128:14
  131:7,8,10,15,21
  131:25 132:20,21
  133:10 134:13

136:4 139:22,25
140:6,24 141:3
143:19 144:3,8
146:16,24 148:17
149:18 150:18
157:1,13 159:4,9
159:16 160:2,15
162:1,16 164:14
167:12,15,16
171:2 173:19,20
173:22,23,25
174:10,11 177:14
180:9 181:18,21
181:24 182:6,10
183:13,14,18,19
183:21 186:10,19
187:2 189:15,19
192:24 195:9
199:10,13,14,19
201:24 205:15
207:4 208:23
210:6
**corrected** 122:16
  122:19 123:1,2,5
**corrections** 211:7
  212:9
**correctly** 83:6
  113:3 118:21
  144:19 145:9,25
**corresponded**
  173:4
**costs** 147:12
  149:15
**council** 13:6,9
**counsel** 3:1 4:20
  5:18 19:23 20:1
  21:21 23:20 25:12
  25:15,17,20,23
  97:1 105:21
  107:20,24 108:1,8
  108:10 109:5,13

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 223 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[counsel - direction]

Page 9

109:15 125:7,11
130:13 208:2
**country** 12:15,17
12:20
**countrywide**
48:10 54:25 55:2
55:3,3 56:16,17,18
**county** 210:2
**couple** 17:20 24:9
35:17 36:20 84:16
84:18 118:11
166:18
**course** 74:1 79:17
88:17 176:24
178:3 192:25
198:13
**court** 1:1 4:13,23
6:2 111:7 208:6,9
208:24 210:13
211:15,19
**cover** 91:16,17
92:23 146:7
149:14 152:2
**covered** 106:2
134:15 185:5
**covers** 119:22
**cpa** 183:11 187:2,4
187:9
**crazy** 113:4
**crc** 1:18 210:19
**create** 193:11
204:7
**created** 186:4
**creating** 153:4
**credit** 40:23
**crr** 1:18 210:19
**culture** 197:18
**cumbersome**
142:5
**current** 8:8,11,19
71:8,10,18 89:6

108:2 163:8
**currently** 8:5
**cut** 5:8
**cutting** 141:10
**cv** 1:6

**d**

**d** 1:7 99:16
**data** 35:5 119:22
179:24
**date** 28:8 36:19
53:16 74:11 76:20
89:12 93:4 102:2
130:9 140:7 211:3
**dated** 139:21
**dates** 28:2,4,12
75:17 205:3
**daughter** 61:4,9
**day** 68:7,7 147:1
190:4 197:19
198:14,16 210:15
213:21
**days** 147:5 211:3
**dean** 7:16
**december** 210:15
**decent** 180:1
**decide** 71:3 205:4
**decided** 52:8 55:6
55:8,16,22 56:8
74:5
**decimals** 100:9
**decision** 55:5 60:1
65:12,17 66:15,17
66:21 67:5,24
74:5 78:11 80:5
80:17,18 103:18
163:14,16,21
196:3,23,25
**decisions** 66:23
68:7 193:18
**deducted** 100:1,6
100:10 108:7

175:9,24
**deem** 128:2
**deep** 119:24
195:11
**deeper** 119:24
**defendant** 1:8
3:11
**define** 83:10
**definitely** 71:14
186:24 195:6
**degree** 14:1
**delayed** 145:17
**delete** 35:7 37:8
43:14
**dell** 171:25
**denied** 115:20
**departed** 200:3,13
**department** 90:13
**departure** 190:2
200:7,18
**deponent** 3:11
211:2,6,8,9,15
**deponent's** 211:6
213:20
**depose** 160:13
**deposed** 4:16
34:22,23 35:1
**deposition** 1:10
2:3 4:15 5:16 22:3
22:9,18,21,25 23:4
24:2,4,7,20,23
25:9,11,16 28:15
28:19 29:10,12,16
30:2 32:6 47:13
57:2 59:15 75:10
75:14 76:8,24
77:8 104:5 106:2
118:23 125:12
130:3 131:14
161:18,21 207:21
211:6 212:8

**depositions** 7:11
**description** 2:2
17:9 86:17 87:13
**desire** 212:7
**desktop** 170:6,14
170:22,25 171:22
**despite** 99:10
100:12 158:21
**detail** 152:10
178:17,19 202:17
**detailed** 68:24
**details** 89:2 98:3
119:4,7,22 138:24
152:7
**determined**
152:22 194:20
208:15
**developed** 174:14
**device** 206:14
**diagnosed** 18:3
**different** 7:4 42:23
52:1 57:22 62:13
70:21 71:2,15
75:18 82:21,22,22
88:4,6,25 109:9
121:20 152:20
194:19 202:18
204:5,20
**differential** 113:10
113:18
**differently** 88:8
193:25
**difficult** 6:2
**dig** 113:2
**digging** 121:12
**dinner** 36:18,21
**direct** 6:23 114:5
208:14 210:11
**directed** 131:9
**direction** 133:10
178:21 210:5

**directly** 72:8
74:22 186:4
**director** 83:4
**disagreed** 74:18
**disappointing**
30:20
**disclosure** 208:6
**disclosures** 208:1
208:3,4,18
**discount** 208:22
**discounts** 208:21
**discovery** 47:14
47:18
**discuss** 21:12 36:1
36:21,25 70:21
71:16 85:1 192:24
193:2
**discussed** 20:1
23:3 24:1 35:24
36:23 70:10 90:8
90:22 107:10
108:14 109:18
192:25
**discussion** 37:20
63:16 71:7 76:2
84:24 85:22 99:7
110:1,4 115:5
136:16,17 137:4
137:17 138:2,5,9
138:18 147:1,4
160:23 178:13
182:23,24 184:17
188:19 189:13
191:4,6,9 205:11
**discussions** 27:10
34:18 35:3,9 39:1
39:11 51:1 63:3
69:15 71:17 79:6
79:16,19,21,23
85:25 86:1,2,5,9
86:11 87:4,9,15

88:2 89:25 90:1,3
91:6,9 102:20
105:21 108:21
110:16 152:4,8
160:22 167:7,10
167:18,21 180:22
193:1 198:11
**dislike** 34:14
**dispute** 18:21
19:11
**disputes** 21:20
**disqualification**
208:6
**disqualify** 208:12
210:9
**district** 1:1,1 4:13
4:14
**division** 1:2 2:14
26:7 52:15 53:25
54:7 56:4 65:14
74:15 82:13,14
108:3 178:1
**divisional** 2:18
70:19 86:13 92:24
96:15,18 98:4,17
100:3
**divisions** 147:22
**divulging** 43:10
**document** 22:1,5,7
64:13,19 88:15,16
88:21 89:5 91:19
96:19 102:11
118:12 129:19,21
131:13 139:8,15
140:12 147:10,11
151:10,15 181:18
183:12 184:21
200:20
**documentation**
37:7 43:14 103:16
147:13

**documents** 24:22
24:24 25:1,3,8,8
25:10,15,21,24
28:6,13 75:9,22,23
75:25 89:10,13,16
92:19,22 115:17
129:20,24 131:21
133:6 155:8,10
156:8,10 157:17
162:23 198:25
199:1,2,3,5,12
**docusigned** 201:4
**dodd** 204:14
**dogs** 8:16,17,18
**doing** 18:24 51:20
86:15 113:7 126:9
127:4 142:25
145:4,22 152:16
159:18 163:8
167:4 168:7,12
172:8 178:6
193:21
**dollar** 97:9 183:1
**dollars** 93:21
94:13 109:25
114:21,23,24
117:21 146:7
148:11,15 150:1
175:1,4,7 176:3,20
188:5
**doug** 38:23,24
42:5 43:19 45:15
**download** 40:24
**dpa** 204:20 205:5
205:25 206:1,3
**draft** 2:11 181:18
181:19 183:21
**drafted** 62:22
**drinks** 11:21
**drive** 154:13 162:3

**driving** 162:9
195:19
**drove** 162:5
**drugs** 17:24
**due** 211:3
**dug** 120:20
**duly** 4:2
**duplicate** 129:25
**duration** 95:4
**duties** 82:22 87:10
**duty** 121:11,23

**e**

**e** 2:4,10,13 17:2
26:21,24 27:3,13
64:14,21 65:1,2,6
65:8,10,15,20 66:3
66:7,11 72:14,15
72:18 74:9,25
75:3,12,15 76:21
76:25 77:5,7,12
99:16 118:15
119:2 130:6
131:13,22,25
132:7,7 139:18,20
140:12 141:1,5,7
147:15 148:25
149:17 151:20
155:12,17,25
156:1,2,12,13,16
156:17 157:12,16
158:25 164:14,16
164:19 165:8,16
166:20,24 168:17
168:19,22,23,24
169:2,2,3,7,9,22
170:1,2,3 171:11
171:11 172:4
173:6 189:8,10
192:16,19,21
199:13 205:25
212:6,7

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[earlier - exhibit]                                                    Page 11

earlier  48:19
  56:25 57:1 59:14
  61:18 97:1 110:9
  118:23 120:13
  121:21 124:1
  136:18 139:2
  144:23 189:12
  201:12
early  26:3 27:1,11
  75:21 114:15,17
  123:3 152:17
  168:6 170:11
earning  176:20
east  2:14
easy  142:21 150:4
eat  116:1
education  14:18
educational  13:20
effect  31:11 147:5
  151:6,7 200:22
effort  143:13
  181:22 182:5
  195:8
efforts  194:13
either  18:12 69:24
  102:21 113:22
  137:18 143:22
  164:9 185:10
  195:14 205:1
electronic  185:19
electronically
  211:8
eligible  95:3,5
embarrass  9:3
employ  87:5
employed  9:20
  15:17 23:21
  109:20 148:3
  173:18
employee  51:10,11
  83:13 125:16

employees  81:14
  82:4 84:3,5,8
  125:19 196:14,16
  196:19
employer  19:14
  128:1 152:13
  196:5
employers  189:14
  197:8,9
employment  2:9
  11:1 26:6 28:7,11
  62:5,9,10,18 63:19
  95:4 98:4 145:21
  146:3 148:7
ended  14:18 15:8
  63:22 78:8
ends  29:18,20
endurance  6:14
engage  63:12
  105:21 163:15
engaged  61:22
  62:3,4,6 64:2
  105:20 107:20
  108:20
engaging  63:18
  78:12
enjoy  113:5
ensure  134:6
  143:14,15,21,24
ensuring  107:22
enter  14:20 40:23
entered  17:14 42:8
  197:23 198:7
  212:8
entertain  152:15
  194:1
entire  84:13 85:11
  94:10 120:8
entities  10:14,24
  11:2

entitled  6:10 30:13
  47:12,20 58:24
  59:9 164:21 180:2
entity  11:2
entry  48:4,14
equal  109:7,8
eric  38:16 47:1
  103:6,7,8 105:10
  105:12 111:8
  178:11 192:20
errata  211:3,7,8,9
  211:11,13,14,17
  212:1
especially  38:3
esq  3:3,4,5,12,20
  3:21 211:1
essentially  163:10
estimate  83:22
et  51:15
ethics  208:14
  210:10
evaluating  133:16
  134:1
event  33:14
events  67:22
everybody  94:14
  120:3 126:21
  141:15 203:15
evidence  47:15,18
  210:6
evidentially  67:18
ex  9:18,19
exact  94:21 108:15
  131:13
exactly  58:15
  133:13 138:16
examination  2:21
  4:8
examined  4:2
example  25:19

exceed  142:22
exceeded  142:23
exception  142:6
exceptions  123:24
  146:24 147:3,12
  150:17,21 151:14
  151:18,25
exchange  166:19
exclusive  91:11
excuse  49:2
executed  62:11
  200:11
executive  72:4
  80:13 131:7
  146:17,20
executives  66:13
  82:24 146:15
  155:18 158:3
  162:12
exempted  99:11
  100:20
exercise  6:14
  145:1
exhibit  2:2,3,4,7
  2:10,13,15,18
  21:23 22:2,10
  41:8 64:14,15
  91:20,21 92:11
  114:4 116:13
  117:8 118:6,11
  120:13,14 128:16
  128:17,21 130:5
  131:4,10,14,21
  136:7,9 139:9,10
  149:10 151:21
  164:22,23 165:2
  175:7,14,15,19
  176:7 184:1,1,13
  184:19,25 185:4
  188:13,14

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**[exhibits - flew]**                                      Page 12

exhibits  149:3
  184:9 208:24,24
  209:1
exists  185:25
expand  174:2
  176:19 177:7
expanded  173:24
  174:16
expansion  173:16
expectation
  176:20
expected  138:15
  138:19
expedition  197:16
expended  176:3,8
  177:7
expense  91:17
  119:21 151:24
  182:25 183:1
expenses  90:22
  91:17 116:1,7,15
  119:15 146:23
  147:2 176:13,16
  183:2,3,3
experience  16:12
expires  213:25
explain  10:9 16:14
  54:6 71:25 72:2
  82:4
explained  87:16
  87:18 100:25
explanation  6:10
  77:15 102:6,9
explanatory  17:6
explore  47:13
  58:24 152:12
  162:13 189:14
  190:12 194:25
  195:2
explored  192:2

exploring  34:11
  154:23 195:4
express  201:15
expressed  74:6
expression  74:8
extent  47:16 96:8
  106:8 107:14
  111:16 166:7
  194:11 198:1
external  108:5
extremely  142:5
  142:14

f

fab  10:21
facility  211:18
fact  32:1 63:4
  90:14 99:10
  100:12 105:20
  125:13 127:20
  137:21 158:21
  178:18,18 182:17
  186:23 191:6
  192:23 194:25
facts  67:3,22
fair  5:4,6,12,13
  6:10,19 7:7 17:9
  57:18 104:15
  193:10
fall  178:1
familiar  97:5
  113:9 139:16
family  31:25
  145:22
far  81:13 207:3
fargo  53:13,19
fault  184:10
february  114:18
  114:19,20 136:15
  140:5,8,9,18,24,25
  150:24

federal  212:6
feel  33:1 36:19
  60:4 64:7 66:10
  66:16 137:22
  147:6,7 157:6
  179:23,24 180:2
  181:16
feeling  33:8,10,11
  33:12,13,16,21
  34:4,8 146:9,10
feelings  30:4,8,9
  33:25 34:2 74:7,9
feels  32:12 118:16
fellows  103:6,7,8
felt  31:24 33:24
  66:14 85:3,4
  141:6 142:4,19
  146:5,12 181:11
fewer  51:22
fiduciary  120:10
  121:11,23
fierman  172:21,24
  173:5
figure  97:9 158:1
  183:1
figures  112:16
  143:19 182:14
file  1:5 211:12
filed  4:12 18:9
  43:17 211:14
files  48:3
filing  31:4
fill  211:8,8
filled  159:19
final  188:22
finally  194:20
financial  208:7
financially  210:8
financials  204:1
find  103:8 120:21
  129:1 130:10

135:20 153:10
  166:11 189:21
  191:23 197:17
finding  167:4,4
fine  23:13 35:2
  67:10 92:6,8
  102:17 107:7
  130:23 179:10
  184:12 204:25
  206:11
finish  5:4 6:18
finished  44:4
  207:9
finley  3:6
fire  158:5
fired  20:17 57:4,7
  57:20,21 156:21
  156:23 157:18
  158:8,12,13,23
  172:17
firing  57:1 158:6
firm  3:6 187:18,20
  208:1,18
first  4:2 16:24
  22:6 27:6 33:23
  34:1 38:11,16
  39:22,24 47:8
  48:13 49:1 50:14
  54:7 56:5,13 58:9
  77:7 88:5 101:22
  105:16 123:4
  138:13 145:15
  198:17
fishing  197:16
fit  85:3,5
five  61:13,15
  80:20 125:18
fixated  127:16
flag  130:11
flew  78:24

Kelly Allison
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**[flip - getting]**                                               Page 13

**flip**  97:23 98:7
   118:10
**florida**  174:5
**floyd**  50:4,5 52:11
   52:17 53:20 154:4
   154:6,18,21,24
   155:7 156:9 159:2
   159:3,8,10,13,15
   159:17,19 160:1,6
   160:8,10,11,13,18
   164:3,6
**fly**  78:19 162:3
**focused**  113:7
   118:24
**folks**  23:6 68:8
   83:1 195:8 202:3
**follow**  19:20
**followed**  179:23
**following**  98:11,12
   98:15 99:25 208:1
   208:4 212:5
**follows**  4:3 133:24
   159:25 182:3
   190:20
**foot**  14:24
**foregoing**  210:4
**foreign**  112:6
**forever**  154:5
   196:24
**forget**  113:12
**form**  20:24 21:10
   27:23 29:23 31:13
   32:21 34:3 39:8
   42:10 46:18 57:14
   58:21 64:4 66:25
   67:7,16,19,25
   76:18 77:3,18
   89:7,18 93:4 94:2
   94:19 98:24 99:13
   99:18 100:8,14,23
   102:23 103:10

104:6,10,22
109:23 110:6
112:1,19 116:2,16
117:3 121:5,15
123:11 124:5,15
132:9 147:16
148:8,19 150:11
159:5 160:16
172:12 174:22
176:10 177:10
178:23 179:4
197:25 199:21
200:9,24 201:11
201:25 203:5,24
212:7,9
**formal**  195:12
**former**  9:7
**forms**  208:6
**forth**  26:25 98:2
   172:10
**forward**  71:5 77:5
   118:20 189:16
   211:12
**forwarded**  89:13
   133:2 167:8
**forwarding**  130:7
   167:11
**forwards**  82:20
**found**  38:4 57:7,25
   58:1 113:6 153:6
**four**  10:22 80:20
   144:11 196:21
**frank**  204:14
**free**  41:2 90:18
**friend**  58:8,13,17
   58:18,20 59:4,8,10
   194:8
**friendly**  198:21
**friends**  50:19,23
   52:25 195:12

**friendship**  30:23
   30:24 31:2,2,5,6
   31:12,23 32:7,10
   33:18 58:11
   127:22,24
**frommert**  35:13
   181:7,13 183:11
   186:3,5
**front**  118:6
**frustrate**  118:19
**frustrated**  68:22
   69:1 76:12 77:22
**frustrating**  112:6
**frustration**  112:9
   193:9
**fulfill**  121:12
**full**  7:14 40:15
   118:15 145:14
   205:5
**fully**  17:25
**fulton**  210:2
**funded**  95:6
**funding**  1:7 4:12
   9:21,23 10:2
   23:22 31:9 34:21
   38:1,3,25 41:16
   42:24 43:2,13,25
   44:11 45:6,8
   48:12 56:14,19,22
   62:5 71:5,23
   74:19 80:16,17,19
   80:24 82:7,9
   83:25 85:2,8
   86:19,23 87:1
   88:5 90:15 92:15
   93:4,23,24 96:24
   107:17,24,25
   108:12,19,22
   109:24 110:2
   111:11,13 112:3,8
   117:20 150:4,5,22

158:2 163:17
172:25 173:2
175:3 189:19,22
190:8 192:5,8,17
192:22,24 193:5,8
196:4
**funding's**  5:19
   23:19 78:15
   189:17
**funds**  97:11 115:6
   136:16
**furnish**  212:10
**further**  162:8
   167:15 207:13
   210:7
**fw**  2:10

**g**

**ga**  211:20
**gained**  180:7
   199:8
**gather**  71:15
   152:20,25 153:12
   157:9,23
**gathered**  193:6
**gathering**  153:2
**gears**  78:5 136:14
   173:8 189:11
**general**  37:4
**generated**  94:16
   176:21
**gentleman**  50:4
   61:18 158:4
   159:19
**geographically**
   15:23 173:22
**georgia**  1:1,17 3:9
   3:16 4:14 8:12
   38:19 86:5 173:25
   208:4,10 210:2
**getting**  55:13
   102:4 103:2 105:7

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

105:13,22 120:22
121:1,2 156:22
179:18 180:3
**gibson**  3:4 92:5
106:21 127:5
128:24 129:3,5,7
129:12,14,16,22
129:25 130:6,10
184:4,8 207:17
**gina**  1:4 2:12 3:19
26:2,11 27:1 31:7
37:25 38:2,6,14,24
39:15 41:15 42:7
42:23 43:1,24
53:12 55:5 57:4
63:8 65:13 68:23
74:13 75:15 81:17
82:13 93:25 101:5
101:6 108:24
112:5 114:20
120:7,23 133:20
136:22 140:14
141:8 145:21
146:4 149:14
152:1 189:16
191:11 192:5,8,10
192:11,15,19,25
193:4,17
**gina's**  26:5 27:18
27:20,25 82:12
122:24
**girls**  68:13 201:16
201:17,18,22,23
202:4
**give**  9:10 45:23
87:2 113:12
147:21 155:7,8
164:17,18 165:4
184:4
**given**  30:6 102:11
109:13 129:21

183:5 200:5 210:6
212:8
**glance**  64:22
**glick**  38:16,17,21
39:3,11 41:21
42:4,15,18 43:3,12
43:24 44:2,5,8,9
44:16,18,20,23
45:9,13 47:1
**gmail**  165:10,12
199:3
**gmail.com**  166:24
168:16,24 169:3
171:11,16 172:4
**gmail.com.**  165:6
**go**  7:17,17,20
14:16,17,19 15:23
16:2,23 17:19
20:18 21:2 31:18
33:7 37:11 41:5
44:16 47:2 48:5
50:10 51:6 55:5
55:16 59:17,22
63:9,19 64:8,18
67:2 71:25 72:14
77:21 79:3 80:6
80:17 83:24 84:25
85:14,17,19 87:20
89:12 93:13 94:21
100:17 103:5
109:17 123:17
125:2 132:13
136:15 141:25
143:5 144:6,12,25
145:13 150:3
151:9 152:23
156:24 157:8,11
158:4 160:12
161:15 162:17
163:17,21 165:4
172:5,17 174:24

177:4 180:14
183:12 185:3
193:7 197:1 198:1
205:8
**goes**  96:16 99:16
119:24,24
**going**  4:20,23 5:2
5:3,25 7:6 18:22
22:1,11 26:25
34:22 37:4,6,8,15
37:17 38:5 48:25
51:3 57:11 60:19
63:18 64:13 66:20
70:17 71:4 73:10
75:20 77:2 78:11
82:21 83:10,15
86:15,16,21 87:17
87:19 88:3 91:14
93:22 102:24
106:3 112:12
113:8,11 114:5
116:17 117:21
118:20 119:5
120:2 125:3 126:7
126:7,9,10,11
128:6,11 129:18
130:11,12,16
132:24,25 141:20
141:25 142:2,4,11
143:7 144:6 146:7
147:5,21 149:7
152:11,14,17,23
156:22 161:19
163:25 164:5
172:24 173:2,10
178:22 179:18
180:4 182:12,19
183:22,25 184:1,4
184:7 185:2
187:22 188:13
191:22 194:6,20

196:15,24 202:10
202:13,21,22
**golden**  1:14 3:13
**good**  4:4 9:25
61:13 70:6 85:3,5
112:23 117:25
118:2 120:1,3
121:24 140:17
141:17 179:18
202:9
**goodness**  101:8
**google**  39:19 40:2
42:9,25
**googled**  39:14,16
41:12 42:1 44:10
**gosh**  20:3 70:1
82:10 84:16 87:20
88:25 151:7
180:24 206:13
**gotcha**  7:24 8:10
8:17 10:18 11:23
12:8,22 13:15,18
14:5,14 16:5,17
29:4 52:5 185:12
206:22
**gotten**  42:19
112:22 129:16
199:19
**government**
116:19,21 119:20
146:8 151:1,3
**graduated**  13:21
**greak**  159:20
**great**  5:7,14 7:9
8:4
**greater**  51:22
**greene**  9:13
**greenville**  141:24
161:25 162:3,10
164:9 194:23
195:15,18,19

greetings  211:5
greg  52:20
gregory  1:14 3:13
grew  14:6
group  80:18
grow  86:25 94:14
  173:18
growing  86:18,22
  176:3,9,21
guarantee  101:10
  103:14,20,21
  105:14 111:9
guaranteed  43:21
guards  82:20
guess  14:16 83:15
  93:8 105:17
  147:18
guessing  83:18
  150:15
guideposts  7:11
guild  153:18
  165:14,18,22,24
  166:2,8,12,15,21
guild's  165:19
guys  50:15,22
  55:22 56:1,6,15
  67:8 81:23 101:12
  139:24 147:22
  202:21

**h**

half  14:4 24:16
  91:15 93:16,22
  94:8,15 95:10
  125:18 148:10
  149:25 150:5
  162:6
hand  22:1 64:13
  91:19 128:16
  139:8 184:1,1
  188:13

handed  189:8
handle  187:14
handled  187:15
handles  187:11,21
  188:1,6
handshake  197:1
hang  44:4 129:1
  158:4
happen  152:3
happened  20:23
  33:14 65:9 145:11
  157:7 170:20
  193:10 196:20
happens  197:18
happier  113:8
happiness  118:24
  144:24
happy  154:24
  155:1 190:23
  194:5 203:12
hargrove  2:22 3:3
  4:4,7,9,10 5:22,24
  19:3 21:4,11,25
  22:16,24 23:1,14
  27:24 29:24 30:18
  31:14,20 32:25
  33:6 34:9 37:13
  39:9 40:21 42:12
  43:9 46:24 47:24
  49:8,11 57:17
  58:23 59:16,24
  61:12,15,17 62:8
  64:10,17 67:1,13
  67:21 68:3 75:8
  76:19 77:4,20
  89:9,20 91:23
  92:3,9 94:5,23
  96:13 99:2,15,21
  100:11,16 101:3
  103:1,11 104:7,12
  105:4 106:5,10,15

106:20,24 107:2
107:18 108:13
109:11,16 110:3,8
110:23 111:19
112:14,25 116:4
116:22 117:6,25
118:4 121:10,17
123:16 124:11,17
125:5 126:12,18
126:21,24 127:6
128:12,19,23
129:1,8,13 130:17
130:18,21,24
131:3 133:4,21
134:10 136:6,10
136:12,13 138:3
139:12 147:24
148:12,24 149:5,9
149:11,16 150:16
159:7,22 160:3,20
161:22 164:23,25
165:3 169:14,19
169:21 172:14
173:12,14 175:5
175:16,18 176:14
177:11 178:25
179:6 182:11
184:10,15,18
185:3,7 188:16,20
190:17,24 198:4
199:22 200:10
201:1,14 202:2
203:9 204:3 207:7
207:11,13,16,20
hargrove's  22:14
  40:19 107:14
head  6:1 46:5
  74:20 171:20
healthy  59:5,6
  60:2,3,5

heard  81:9 201:15
  202:3
hearsay  46:11,21
heated  76:9 77:15
  78:4
held  196:1
helpful  148:1
henry  3:12 4:4
  23:5,8,13 37:16
  40:14 130:21
  211:1
hey  38:7 42:5
  43:24 78:17
  104:19 144:17
hierarchy  81:12
  81:14 82:4,18
high  13:21 193:9
higher  51:10,13
  81:17,21 150:7,8
highlights  28:11
highly  76:12 77:17
hire  108:11 125:16
  135:5,6
hired  54:1 89:5,8
  105:13 107:16,24
  108:1 124:8
  125:19 135:3,14
  174:14
hires  175:10
hiring  16:18 175:2
history  48:23
  78:23
hit  101:12
hold  96:5,5 105:25
  124:23 126:4
home  10:3 18:16
  18:21 43:21 48:10
  48:12 62:7 78:12
  78:16 196:7,24
  197:4

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

homebanc 48:7
49:5,12,13,14,19
50:6,8,10,12,15,20
51:2,10 52:6,23
53:1
homebridge 48:8
49:21 50:6,8,11,12
51:2,4 52:7,12,19
53:13,19,23,24
54:8,10,13,21,24
54:25 56:15 58:9
153:17,25 154:2,3
154:6,7,8,9 160:7
164:1 165:14
homebridge's
154:25
homebuilders
13:5
homes 16:25 48:5
48:6,16 91:12,18
148:22 149:15
honest 40:11
87:23 88:10 163:9
193:20
honestly 69:11
70:4 72:15 105:11
181:1 186:15
hope 89:23 204:2
hour 24:3,16,16
24:17 162:6
173:11
house 17:8 23:21
171:19
hr 103:5
huh 6:2 15:2,22
16:8 35:22 42:21
44:19 45:16 48:21
49:22 61:21 65:22
65:25 66:2,5
72:17 95:20 98:9
98:13 100:5

101:14 119:12
120:15 140:1,16
141:4 150:19
151:22 155:9
157:14 162:2
164:15 166:3
167:23 171:3
172:5 175:22
176:1 181:20
191:15 192:18
201:2 202:23
203:19 204:22
huhs 6:2
hundred 35:18
64:12 69:9 71:13
72:11 84:17,18
116:19,21 150:25
151:2 186:25
hundreds 142:25
143:1,1
hung 42:18 44:3
husband 8:14 12:6
28:20 188:1,6
husband's 8:20
171:17,18 172:10
172:18
husbands 9:18,19

i
idea 21:9 42:17
137:3 141:18,20
141:21 177:5
194:18 201:5
204:1
identification
21:24 64:16 91:22
128:18 139:11
184:14 188:15
identify 204:8
identities 45:23
ignored 20:22

immediately 44:4
impact 204:11
impacts 210:13
impartial 210:13
impartiality
208:13 210:10
impetus 65:7
important 4:24
105:19 113:1
133:15,25 144:24
improper 67:18
inaudible 127:3
incentive 199:24
include 134:11
included 92:2
136:3 148:21
including 82:25
117:18 146:16
149:15 192:8
income 55:24
56:14 203:13
incorporated
62:22
independent 167:1
independently
143:18
index 2:21
individual 54:15
124:8 141:13
individual's
162:19
individually 10:8
99:24 115:7
individuals 52:22
66:11 72:9 81:1
industry 11:17
13:2,12,14 15:10
15:11,21,24 16:10
16:10,14,15,19,24
17:15,18 36:23
47:5,7,16 48:22

54:23 57:11 70:25
71:3 114:1 152:25
153:9
influence 17:23
inform 194:10
information 6:24
32:14 37:8 38:2
43:15 46:21,25
68:25 153:2,12
156:17 161:16
162:11 163:4
166:20 167:15
199:8
informed 65:17
74:13 142:2
inherently 106:18
initial 79:6 88:20
88:22 184:20
initialed 95:17
initially 139:20
174:9
initials 92:18
95:17,18
instance 194:23
instruct 67:11
96:6 106:3,19
128:7 161:19
instructed 156:24
157:21,23 158:10
163:11,13,17
instruction 19:1
40:18 106:17,23
107:1 132:24
185:2
instructions
162:11
integrity 143:25
intended 92:2,5
192:17
intensive 143:9

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[intentions - know]

Page 17

**intentions** 192:22
**interactions** 73:24
74:2,16
**interest** 16:13
159:16 160:2
208:7,12 210:9
**interested** 153:1,3
210:8
**interests** 11:4
**internal** 25:8,10
26:1 108:5
**interpreted**
108:25 109:8
**interviewing**
159:4,9,11,14
**introduce** 80:16
**introduced** 131:14
**invading** 126:10
**invest** 90:25
175:11
**investment** 174:17
174:20 176:6
179:9
**investments** 179:2
179:21 180:3
**involve** 107:15
**involved** 11:5,25
18:11 26:18 47:16
50:16 54:22 62:25
67:5,24 68:7,9
69:17 70:9,15
71:12 79:5,11,12
79:18 86:2,3
108:15 126:13
136:17 138:4
141:16 158:6
181:10 188:5
**involvement** 66:23
**involving** 11:20
**ipads** 171:7

**iphone** 206:15,16
206:17
**irs** 188:9
**issue** 17:23 18:4
31:8,10 32:5
**issued** 170:25
171:1,15
**issues** 36:7 127:10
204:15
**item** 99:11
**items** 98:15 99:25
100:6

**j**

**j** 161:4
**jackson** 3:5
**jan** 26:16 65:16
66:1,1 74:12 79:2
80:2 133:2 136:20
137:13 138:7
140:13 181:9
192:20 202:5
205:14,25
**janet** 178:11
**jared** 161:2,5
**jason** 69:8 79:4
161:2,5
**jeff** 46:1,8
**jim** 137:2
**job** 16:16 47:3,8
48:13,18,23 57:22
57:24 58:1 86:16
86:17 87:12 113:5
113:7 118:24
125:11 144:24
158:12,14,18,20
158:22 159:4,9,11
159:13 179:18,19
**jobs** 57:7
**john** 46:2,3
**joined** 48:12 53:13
53:17

**joining** 53:19
**jointed** 140:18
**jon** 35:9,12 65:16
65:21,21 74:12
79:2,20,22 80:2
136:20 137:13
138:8 140:13
141:11,17,19,23
142:2 181:9,12,16
189:6 202:6
205:14,19
**jumbo** 204:20
205:5,24 206:3
**jury** 8:18 9:5

**k**

**keep** 45:12 125:17
126:8,10 128:11
132:24,25 142:5,8
142:10,12 143:7
144:4
**keeping** 143:11,12
143:17,18
**kelly** 1:11 2:12 4:1
7:16,21 8:1 95:3
130:4 211:2
**kelly's** 132:17
**ken** 3:20 23:5,18
37:16
**kept** 142:16 143:3
143:8,13,24 144:1
**kessler** 197:2
**kids** 35:25 55:8
**kind** 7:11 17:18
20:13 70:9 119:10
119:10 122:14
171:24
**kitchen** 10:15
**kiwanis** 12:23
**knew** 8:1 57:7
77:10 85:2 157:24
195:20

**know** 6:15 8:18
13:10 16:18 21:7
23:7 28:1 30:8
34:21,22 36:11
37:5 38:1,7 42:15
42:19,23 43:1,10
43:11,20,24 44:6
44:25 45:15 46:12
46:20,20 49:10
50:15 51:17,17,24
58:6,6 59:9 64:7
68:12,13,25 69:10
70:2,4 73:1,23
74:10 76:7,9
82:12,12,17 83:19
83:23 86:20 87:13
90:14,16,23,25
91:1,10,11,13,17
92:25 97:24 99:4
102:14,15 103:5,6
103:7,12,13,17,20
104:1 105:11,18
111:18,22 112:11
112:12,20 113:14
113:16 115:2,14
115:16 117:13
118:16 119:18,20
120:21 122:25
123:3 125:16,21
130:19 131:6
132:1 135:18,21
135:22 136:1,1,5
137:2,22 139:15
139:15 147:7,8
149:23 151:8
153:21,24 155:20
155:23 156:4,7
159:13 160:18
161:10,11 164:10
165:25 166:1,4
167:24 168:3,4,6,9

Case 1:20-cv-04981-CAP Document 96 Filed 04/28/22 Page 232 of 252

Kelly Allison
November 18, 2021
Spearman, Gina Vs. Broker Solutions, Inc. Et Al

[know - lo]
Page 18

169:20 170:16
172:2,6,23 174:25
176:11 177:4,6
179:12,15,24
180:6,6,11 182:25
184:7,8 185:22,24
186:1,2,22 187:7,8
187:20,22,25
188:4,25 190:10
191:1,3 192:16
193:19,21,22,25
194:2,5 195:23
201:3,9,13,19
202:11,12,13,25
203:21,25 204:1
205:19 206:9,13
207:3
**knowing** 132:4
**knowledge** 37:22
38:11 39:5,7,12
113:15
**known** 105:17
125:13 154:5
**koutouzis** 52:20
**kristin** 205:17,22

**l**

**label** 92:7 139:13
**labeled** 129:9
188:12
**labor** 143:9
**laid** 178:22
**laprade** 35:4
128:13 130:8
131:5
**laptop** 42:1 170:5
170:9,17,18,20,22
170:25 171:14,21
171:21,23,24
172:1
**large** 84:13 144:10

**late** 129:6 174:23
**law** 111:7 208:4
**lawsuit** 18:11,18
18:19 30:5,23,24
31:1,5,11,23 32:7
32:10 33:18,20
34:19 35:4,10
37:1,1,6,16,18,21
38:8,22 39:2,18,19
39:20,23,24,25
40:2,22 41:2,3,7
41:14,18,19 42:6,9
42:16 43:17 44:13
44:24 45:18,21
108:15 110:17,22
111:1
**lawsuits** 21:18,19
**lawyer** 22:18
23:21 106:11
**lawyers** 43:6,11
107:15
**lead** 47:14,17
71:18 73:8 130:13
180:18
**leaders** 54:18
**leadership** 55:10
55:15 56:9 81:15
115:1,2,4,5 117:10
119:23 120:9
123:9 136:15
137:5 138:10
140:6,22 145:23
147:3 174:8,9
177:3 180:16
**leading** 56:2,4
71:14 79:22
180:15,22 181:17
**learn** 6:24 57:11
161:17 196:10
**learned** 76:3

**leave** 29:3 32:14
50:5,11 52:6
157:6 160:7,9,11
191:5,7,8,17,22
195:8,23 196:3
**leaving** 45:13
53:19 57:23
152:12 189:22
191:11,19,21
192:5,8,12,13,17
192:22,24 193:5,7
193:16 195:22
**led** 60:11 67:23
79:20 82:13
177:16
**lee** 20:4,5,6 21:2
61:19,22 62:4,6,18
63:17 96:2,3
109:1 134:7
**left** 20:7,7 28:23
45:10 50:8,10
51:2 53:1 54:24
55:16 89:21 112:3
189:18 196:5
199:23
**legal** 18:21 21:20
23:19 63:16
107:20 109:1,1,15
146:11 204:24
206:2
**lending** 54:23
**lengthy** 110:15
**les** 63:22 105:24
**letter** 2:7 92:23
93:10 95:15,25
96:3
**level** 48:4,14 51:10
51:11,13,21 82:6
83:8,11 112:9
**levels** 193:9

**levine** 52:21
**lex** 63:23,24 89:5
89:10,13 106:11
109:2 125:25
130:6 133:20
134:5,17 136:4
181:24 182:6
183:10,15 185:5
**liar** 72:23 73:2,5,6
73:9 74:22,25
76:4,15,25 77:12
**life** 60:5,7 193:24
**light** 144:23
**liked** 141:20
**limited** 176:6
**line** 139:25 212:11
212:14,17,20,23
213:1,4,7,10,13,16
**lined** 57:22,24
143:14,16 144:8
**link** 41:13
**lions** 12:23
**listed** 22:10 98:15
98:22
**listen** 112:2
**listening** 152:15
**literally** 129:19
**little** 4:19 17:18
27:19 29:7,10,12
29:16 48:2,25
78:5 89:1 92:12
113:4,12 116:9
117:11,11 136:14
189:11
**live** 9:15 16:4
162:1 197:3
**living** 81:18
**llc** 10:21 11:15,16
**llp** 3:13
**lo** 119:21 183:3

**[loan - managers]**                                                    Page 19

**loan**   54:3,4,12
81:16,19 83:3
90:19,25 91:15
93:22 95:4 97:11
105:13 135:3,5,6
135:14 142:1,5,9
142:16,25 143:4,4
143:5 144:19
148:10 204:11,19
206:1,3,5,9,10
**loans**   18:16,21
43:21 48:10,12
54:14 62:7 78:16
94:16 98:11,22
99:1,5,6,8,9,10,12
99:14 100:18,20
101:2,16 102:4,5
102:17,18,22
103:9,15,21,24,25
104:2,5,9,20 105:8
105:12,22 108:22
110:10 111:4
112:17,22 116:18
120:12,22 121:2,9
121:14 122:2,9
123:1,15 141:13
143:1,22 144:14
144:15 196:7
197:4 204:7,8,20
205:5
**located**   12:12
13:23 154:6,10
165:24 171:19
188:3
**loma**   13:21
**long**   8:7 14:3,8
17:11 20:9 23:25
24:1,15 63:21
64:6 78:12 87:24
113:13 151:7
153:4 170:9,15

172:1 178:21
181:11
**longer**   24:11 58:19
74:13,14 114:21
117:21 177:24,25
178:1,11,14
**look**   24:22,25
26:18 27:19 43:22
64:23 65:1 72:13
72:13 88:16 91:24
92:10 94:21 95:1
96:14,24 98:14
120:10 127:1
130:4,20 135:11
139:14 140:10
145:12 149:6
150:3 163:23
172:7 175:7,8,19
177:5 194:13
195:20 202:16
**looked**   41:4,10
44:25 105:18
120:13 160:24
163:16
**looking**   17:22 89:3
97:13 114:7
130:13 149:3
151:20 157:5
160:8,11,12
162:20 163:4
184:23 195:24
**looks**   64:20 95:22
96:23 136:2
**lose**   144:2
**losing**   203:23
**loss**   180:19,23
182:14
**lost**   203:16,17
**lot**   40:5 60:13
70:11,11,20 77:22
90:14 109:9 112:4

113:8,12,23,25
119:22,23 125:14
141:15 142:19
144:21 152:9
153:9 155:16,17
166:9,10,10
182:23 188:1
196:17,18,18,19
196:23 201:18
202:4,16,21 203:1
203:7,13
**lots**   194:4
**love**   58:14 59:2,5,6
59:19,23 60:1,22
60:22,22,23 91:10
**loved**   61:1,10
190:22
**lower**   51:11
**lowest**   83:7,10,13
**loyalty**   30:24
33:18,19,22
**lunch**   118:1
124:13 125:1,7

|   m   |
| --- |

**m**   3:12
**mac's**   10:17,19
**maiden**   7:22
**mail**   64:21 65:1,2
65:6,8,10,15,20
66:3,7,11 72:14,15
72:18 74:9,25
75:3,15 76:21,25
77:5,7,12 118:15
119:2 130:6
131:13,22,25
132:7,7 139:20
140:12 141:1,5,7
147:15 148:25
149:17 151:20
155:12,25 156:1
156:13,16,17

157:16 158:25
164:14,16,19
165:8,16 166:20
166:24 168:17,19
168:22,23,24
169:2,2,3,7,9,22
170:1,2,3 171:11
173:6 192:16,19
192:21 199:13
205:25 211:10
**mailed**   156:12
157:12 189:8,10
**mails**   2:4,10,13
26:21,24 27:3,13
64:14 75:12
139:18 155:17
156:2 171:11
172:4
**maintain**   165:7
**maintaining**
208:13 210:9
**majority**   182:23
**making**   128:2
141:10 159:16
160:2 208:13
212:8,9
**manage**   182:19
**managed**   82:14
**management**
138:24 201:24
**manager**   2:19
49:16 55:14 73:14
82:11 83:3,3,5,15
83:17 92:24 96:15
96:18 98:4
**manager's**   88:8
**managers**   81:25
99:5 101:1 120:21
120:25 121:7
122:7,9

Kelly Allison                                    November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**[managing - misallocated]**                                    Page 20

**managing** 119:15
119:15,16,17,18
141:12
**manipulate** 60:21
**manipulated**
60:25 61:9
**manipulates** 60:20
**mansell** 211:19
**manual** 142:12,14
142:18 143:9
144:13,20
**manually** 211:8
**march** 62:12 89:5
92:16 117:2,16,18
139:21 140:3
141:2 146:4
151:19 180:14,16
189:25 200:6,23
200:25
**margin** 138:1,5,14
138:19
**marietta** 8:12
12:12,20 162:1
**mark** 91:20 96:3
**marked** 21:23
22:2 64:14,15
91:20,21 99:17,23
128:17 139:10
149:3 184:13
188:14
**market** 10:19 48:9
114:23
**marketed** 54:9
**marketing** 13:9
83:4 89:24,25
90:2,9,12,13,15,21
90:24 91:4,16
93:15,17,21 95:2,5
114:21,22,23
116:1,6,15,24
117:21 123:23

141:10 146:6,23
147:2,12,23 148:6
148:11,15 149:15
151:10,11,24
175:1 183:2
197:17
**marketplace**
45:25
**marking** 139:9
**marriage** 8:23
**marriages** 9:7
**married** 7:23 8:5,8
**marty** 52:21
**marybeth** 3:4
130:6
**math** 84:21
**matter** 19:23 20:2
33:25 34:2 38:8
39:15 41:25 42:2
42:7 63:16 64:1
130:14 178:18,18
208:12,20 210:9
**mattered** 142:15
**matters** 50:17
61:23 62:2 63:13
**mbag** 13:6,16
**mccray** 8:21,22
10:12 28:22
**mean** 18:17 29:10
30:22 37:3 51:13
51:25 63:20 64:7
66:18 67:15 76:11
79:7 82:15,17
88:6 103:4,4
105:16 122:17
132:16 140:8
146:19 156:7
167:1 172:6
176:11 178:17
180:5,24 181:1,6
191:13 194:5

199:15 201:3
202:5
**meaning** 21:15
176:23 206:4
**meaningful** 72:22
**means** 6:8 55:21
55:23 113:16
198:22
**meant** 29:12
**measure** 204:8
**meaty** 68:24
**medications** 17:24
**medicinal** 11:8,11
11:16
**meet** 49:1 78:24
80:9 82:24 115:8
142:22 162:10
163:25 164:5
**meeting** 22:25
23:4 24:2,5,13,15
24:17,18 78:17
79:6,24 115:1,2,4
117:10 123:10
136:15 137:1,5
138:10,17 139:5
140:6,9,22 141:2,9
147:3 154:14,17
154:22 161:7,9,12
161:14,23 164:8
164:11 180:16
183:10,16,20
185:14,17 186:19
187:2 188:11
**meetings** 71:9
79:9,14 80:1,4,11
80:14 81:2 84:20
84:23 180:25
**meltdown** 55:4
70:15
**melted** 56:17

**member** 12:9,9,17
12:20 13:1
**members** 80:15
**memory** 18:4
**mentioned** 45:20
121:12
**mere** 127:17
**merits** 44:24
**message** 28:24
29:3 32:15
**met** 24:8 40:14
49:2 50:14 58:9
79:1 81:1 115:7
141:11 154:15
161:5 162:18
**methods** 87:5
**metric** 142:21
**metrics** 119:23
120:1,3
**metro** 9:8,15
12:10 14:9,12
**michele** 2:6
**michelle** 178:11
192:20
**middle** 191:14,25
193:23
**mike** 172:21,23
173:4 187:18,23
**mike's** 187:23
**mill** 10:15
**million** 115:6,12
115:18 116:5
138:20
**mind** 93:14
**mine** 172:6
**minute** 61:13
116:10
**minutes** 173:11
**misallocated**
115:12

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 235 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[misallocation - needed]
Page 21

**misallocation**
115:6,9,11,18,22
116:5,14 136:16
138:20,24
**mischaracterizes**
32:23 34:5 94:3
104:11 123:12
**misleading**  124:24
125:3
**mistake**  32:16
144:16,18
**mistakes**  144:21
**model**  71:4 120:6
120:7 152:18,23
153:6,10,19
159:17 160:12,24
180:19,23 181:19
182:13 183:12
185:14 189:13,17
197:23 198:7
**modeling**  15:3,13
16:5,10
**models**  70:22,25
71:2,15 152:16,24
153:4,8,13,15
154:23,25 155:8
155:18 156:5,11
156:22,25 157:9
157:12,19,22,24
157:24,25 158:5,9
158:15,24 162:13
163:12,16,22
165:19 196:12
**mom**  16:16
**moment**  78:4
**monday**  139:21
140:3
**monetarily**  173:21
**monetary**  179:8
180:3 199:24

**money**  19:2,4,8
21:8,21 62:6
111:20 112:24
113:6,7 118:17,17
118:25 120:2,4
152:2 179:21
201:16,18,19,20
202:4,22,22 203:4
203:8,10,16,16,17
203:23
**moneys**  20:12
97:20 111:4 176:8
177:7 178:21
**month**  80:20
142:22 143:1
147:22 150:2
**monthly**  144:12
150:14
**months**  20:10
49:24,25 196:22
**moot**  122:14,15,17
**morning**  2:6
140:17
**morrison**  7:16
**mortgage**  13:14
13:17 15:10,12
17:15,17 47:5,7,15
47:23 48:8,9,11,22
55:6 82:21 90:17
91:11 114:1
180:17 194:1,12
197:2 198:6,9
**mortgages**  193:21
**motivation**  134:9
**move**  48:10
118:12 159:16
160:2,15 162:15
162:20 191:23
**moved**  180:8
189:16

**moving**  71:5 80:23
192:2
**multiple**  112:15
173:24
**muth**  137:2

**n**

**n**  3:5
**n.w.**  3:14
**naf**  9:24 10:1 11:1
19:15 25:19 31:5
31:8,11 32:3,11
36:1,8,21 38:15
42:8 44:21 45:21
58:3 62:12,15,17
62:19,23 63:5,12
63:13 64:2 69:25
72:3 78:8 79:14
80:6,9 81:24
82:24 84:23,25
85:22 87:7,9
89:17,25 90:1,6,10
90:22 91:4,7 96:2
97:20 105:21
106:12,22 107:11
109:20 114:8,20
115:5,20 128:10
132:17 138:6
140:18 145:19,20
147:15 148:6,9
152:12 155:12,19
156:13,17,25
157:8,16 158:24
159:16 160:2,7,9
160:11,15 162:12
162:20,22 163:4
163:25 164:5,9
167:20,22 168:19
168:23 169:2,2,12
169:16,24 173:5
173:18 174:3,13
175:11 177:13

179:22 181:23
182:6 183:18
190:2 191:5,10,24
192:3,12,14
193:16,18 194:13
194:16,16 195:8
195:22 196:6,9
197:6,24 198:8
199:23,24 200:3,7
200:11,13,17,21
201:15,23 203:23
204:14 205:12
**naf's**  163:11 178:8
182:13
**naf0000351**  64:20
**nail**  28:6
**name**  4:10 7:14,18
7:20,22,23 8:20
10:7 11:11 17:5
20:3 42:2 46:4
50:4 154:19
159:20 161:2,6
162:19 187:20,23
**named**  61:18
**names**  8:18 9:10
23:7 82:22 174:15
**national**  191:14,25
193:23
**nature**  18:20
**necessary**  143:2
189:7 212:10
**need**  5:25 6:13,14
8:18 14:24 30:8
33:23 49:7,9
102:12 113:11
116:6 141:6 149:1
189:1 190:14
**needed**  16:16
32:13 33:24 153:6
191:12

**[negative - offline]**                                    Page 22

**negative** 73:24
74:2,16
**nelson** 8:12
**net** 153:7
**never** 18:3 70:18
70:18 99:6 100:18
107:16,24 111:6
138:21 178:14
188:4 191:7 192:4
192:17,21
**new** 1:7 2:7 4:12
5:19 9:20,23 10:2
15:15,16 16:2,4,6
23:19,22 27:1,11
31:9 34:21 38:1,3
38:25 41:16 42:24
43:1,13,25 44:10
45:6,7 48:12
54:10 56:13,18,22
62:5 63:19 71:4
71:23 74:19 78:14
80:16,17,19,23
82:7,9 83:24 85:2
85:8 86:18,22
87:1 88:5 89:3
90:15 91:12,18
92:15 93:3,23,24
96:24 102:13
107:17,23,23,24
108:11,18,21
109:24 110:2
111:10,12 112:3,8
117:16,20 119:4
124:9 125:16,19
134:8 135:14
148:22 149:15
150:22 158:1
163:17 172:24
173:2 175:2,10
183:21 185:14
186:9 189:17,18

189:22 190:8
192:5,8,17,22,24
193:5,8 196:3
206:25 207:4
**nice** 112:23
**nickolas** 3:5
**night** 127:1
**nine** 49:25
**nobody's** 200:19
**nods** 6:1 171:20
**non** 129:21
**nonprivileged**
106:8
**norden** 52:21
**normal** 193:12
**north** 174:4
**northern** 1:1 4:14
**notarized** 211:10
**notary** 213:23
**noted** 212:4,5
**notice** 2:3 22:2,9
22:18 57:12 65:20
101:15,19,20
130:16
**noticed** 101:22
**noticing** 208:19
**notification**
151:17
**noting** 211:7
**november** 1:12
64:21 76:20 98:3
98:20 111:25
118:14 119:2
130:7 177:23
186:9,13
**number** 81:8
114:4 118:7,7
131:17 136:6
150:4,6,13 166:4,5
184:5

**numbered** 129:2
**numbers** 81:8
144:8 182:20,21
183:4,6

**o**

**o** 17:2
**oak** 155:3,4,5,6
165:15 172:19,20
**object** 20:24 21:10
27:23 29:23 31:13
32:21 34:3 39:8
42:10 46:18 57:14
58:21 64:4 66:25
67:7,16,19,25
76:18 77:2,3,18
89:7,18 94:2,19
98:24 99:13,18
100:8,14,23
102:23 103:10
104:6,10,22
109:23 110:6
112:1,19 116:2,16
117:3 121:5,15
123:11 124:5,15
126:4 132:9
147:16 148:8,19
150:11 159:5
160:16 172:12
174:22 176:10
177:10 178:23
179:4 197:25
199:21 200:9,24
201:10,10,25
203:5,24
**objecting** 102:21
**objection** 31:16
33:4 59:20 110:19
198:5
**obligated** 145:17
149:14

**obligation** 208:13
210:10
**obradovich** 69:8
79:4
**obtain** 19:23 62:6
70:25 157:17,21
158:10,24 162:11
**obtained** 158:14
198:25
**obtaining** 158:8
**obviously** 51:6
54:17 72:4,18
81:11 82:20 91:18
99:4 117:15 141:1
174:25 191:13
**occasions** 37:5
137:11
**occurred** 67:23
116:14 138:11
**ocga** 208:6,7,21
212:7
**october** 57:5
**offer** 2:9 93:10
95:15,23,24,25
96:1,3 199:24
**office** 23:16 24:8
56:2 79:9 81:9,25
99:7 103:18
141:12 143:10
144:2 154:13
170:6 171:1 188:2
**officer** 135:5,6,14
204:11 206:5
210:13
**officers** 81:16,19
90:19,25 105:13
135:3 204:19
**offices** 179:18,20
211:3,10
**offline** 40:22

**[ogletree - owed]**                                          Page 23

ogletree   23:15
  24:5 28:18
oh   42:17 82:10
  84:16 87:20 93:1
  93:6 101:8 102:12
  103:25 105:7
  107:8 110:11
  150:8 154:2 155:3
  187:5 197:11
oils   11:22
okay   4:18 5:20,22
  7:20,22,24 8:7,14
  8:25 9:2,10,12,17
  10:1,7,11,16,20
  11:1,7,9,19,23
  12:5,12,19 13:4,13
  15:4,7 16:5,9,12
  16:22 17:17 19:8
  19:17 22:8,17
  23:21,25 24:4,10
  24:25 25:14,21
  26:4,8,15 28:5,21
  29:4,19 30:6,19
  31:4 32:1,9 35:3,9
  36:1,21,25 38:10
  38:20 39:17 40:6
  40:13 41:6,11,20
  41:24 42:4,15
  43:16 44:2,12
  45:2 46:6,25
  47:19,25 49:4
  50:10 51:6,19
  52:2,16 54:1 55:1
  55:21 56:10 57:6
  57:10 58:15,19
  59:3 60:3 61:5
  62:9,21 63:3
  64:11 65:5,15
  66:10,19 67:20
  68:4,11,20 69:20
  69:23 70:3,7,13,23

71:21 72:6 73:5
73:12,17,21,23
74:8,16 75:9 76:2
76:6 78:22 80:4
81:20 83:20 84:1
85:16 86:20 87:4
87:9 89:3 90:21
92:14,21 93:8,25
94:12,24 95:14
96:12,14,17 97:4,5
99:3 100:12 101:4
103:2,23 104:16
105:15 107:19
108:20 110:12,15
111:2 114:13,19
114:25 115:10
116:9 117:24
118:9,23 120:5
121:11 122:8,13
123:2,22 125:22
128:8 130:17
131:1,4 132:3
134:22 135:17
136:11,23 137:9
138:9 139:17
140:11,20 143:6
147:21,25 149:12
149:17 153:16,20
154:12,16,24
155:2,21 156:2,13
158:7,13,17 162:1
162:9 163:10
164:25 165:13
166:6,19 167:10
167:18 170:5
171:18 172:1,8,15
175:6 176:15,18
177:20 178:2,7
181:8 182:12
184:6 185:12,22
188:11 189:11

190:9,15,25 191:9
192:23 193:3
197:14,20 198:5
198:15 199:10,18
201:21 202:3,14
205:18 206:7,9
207:2,6,10
old   52:9 167:8
older   55:13
once   36:11 120:20
  130:19 139:15
  142:22 157:2
  199:23,23 211:9
ones   28:14 85:11
  85:17 117:14
  198:24
online   40:12 41:4
  41:6,9 45:4
oops   102:12
open   52:8
opened   144:21
operated   71:19
operates   12:6
operating   186:6
operations   81:15
  182:24 183:1,2
opine   44:15,23
opinion   33:21 61:7
  107:21 141:18
opportunities
  194:25
opportunity   30:3
  48:4 85:7 125:6
  162:15
opposed   48:22
  139:1 156:17
  194:13
opposite   29:18,20
options   192:14
orally   148:6,17

order   14:17 51:9
  52:4 71:14 204:7
ordering   209:2
  211:13
org   82:6
organizations
  12:15
original   27:21
  132:17,19 133:12
  133:14 134:7,18
  134:21,24 135:4,7
  211:12,14
originated   54:14
  153:5
origination   54:3,4
originator   54:13
originators   83:2,3
outcome   210:8
outside   10:3 25:17
  25:20 38:2 39:4
  39:11 54:4 112:7
  125:11 192:5,7
  200:5
overpaid   145:11
overpaying
  144:17,18
override   27:16
  97:6,8,12 98:10,21
  100:1,7,21,22
  102:22 103:13
  105:22 107:11
  109:21 120:12
  200:21
overrides   106:16
  108:17 111:5,21
  112:17 120:17,17
  121:2
overview   113:12
owe   19:4,9
owed   19:2 21:7
  61:20 62:7 97:20

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 238 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[owed - people]

Page 24

111:24

**owned** 43:21

**owner** 12:3

**ownership** 10:23
11:2

**owns** 10:6,8

**p**

**p&l** 19:5,6,7 63:18
69:22 70:14,18,19
70:21,25 71:15
118:20 119:4,10
119:24 120:6,7
121:22 152:16,18
152:20,23,24
153:4,5,7,10,13,15
153:19 154:23,25
155:8,18 156:11
156:22,25 157:9
157:11,19,21,23
157:24,25 158:5,8
158:15,23 159:17
160:12,24 162:11
162:13,23 163:4
163:15,22 165:19
167:8,11 181:19
182:13,18,19,20
182:22 183:4,6,12
189:17 195:4
197:23 198:7,25
202:13,17,18

**p&ls** 113:24
152:20 168:8,12
172:9

**p.c.** 3:6

**p.m.** 118:3 173:13
190:16 207:12,21

**page** 2:2,21 65:2
68:11 94:25 95:2
95:21 97:23 98:7
118:10 129:21
139:14,22 140:10

144:11 145:13
149:9,17 175:12
175:19 212:11,14
212:17,20,23
213:1,4,7,10,13,16

**pages** 92:2 95:18
95:19 129:20
212:9

**paid** 20:12,19
21:13 88:6,7,7
97:12,16,19 98:11
98:21 99:1,5,6,8,9
99:11,14 100:18
100:22 101:2,16
102:4,5,17,18,22
102:24 103:2,9,13
103:14,20,21,23
103:25 104:2,5,8
104:20 105:7,7,12
105:13 107:11
108:16,22 110:10
110:11 111:4,8,21
111:24 112:8,16
112:22 113:3,8
120:12,17,18,22
120:23 121:8,13
122:3,4,9,12 123:1
123:14 144:10,14
205:5

**pandemic** 191:14
192:1 193:24
194:1

**paper** 16:21

**paragraph** 68:12
145:14 149:6
175:20,22

**parameters** 47:22
86:24 87:3

**parks** 20:4,5,6,22
21:2 61:19,23
62:1,3,4,6,18 63:1

63:5,11,12,16 64:1
96:2,3,8,11 109:1
134:7

**part** 13:12,14
17:18 32:13 79:24
80:1 112:3 135:2
135:4 146:17,20
167:5 176:2

**partial** 118:16

**participate** 110:17
114:22 175:4

**participated**
174:25 175:1

**participating**
110:22 111:1
175:6

**particular** 101:2

**parties** 208:21
209:2 210:13
211:13

**partner** 12:4,7
52:8,9,18 55:6,17
55:22,22 91:11

**partnered** 50:3
56:6

**partnering** 56:7

**partners** 10:10
29:17 52:11 54:18
54:22 56:21
193:11,12 194:7
195:13

**partnership** 56:13

**parts** 40:10 196:25

**party** 208:14,22
210:7,11

**passion** 12:11

**passive** 79:10

**password** 209:1,2

**patently** 124:24

**path** 153:10

**pathological** 72:23
73:2,5,6,9 74:22
74:25 76:4,15,25
77:12

**patty** 66:3,7,12
70:15,21 71:13,18
79:1,18,25 80:13
81:2 82:25 140:13
152:19 155:13
157:10,11 167:8
202:5 203:3

**paul** 78:15 79:2

**pay** 20:23 70:12
71:8,10,11,19 91:7
103:19 109:25
111:8 112:10,12
113:19 116:15
117:21 146:6
148:10 163:12
175:10,25 188:7

**paying** 20:15
106:13 116:6
144:19 148:14
200:21 204:19,21

**payment** 197:10

**pdf** 211:7

**pdfs** 156:5

**pe** 119:15 141:14
150:23

**pecking** 51:9 52:4

**pending** 4:13 6:17
20:19

**people** 8:1 18:6
38:3,7,14 42:22
45:20,24 46:12,13
59:6 60:10,20,20
60:21 61:2,3 80:9
80:22 81:5,11
82:24 157:24
167:24 192:21
197:15,21 198:13

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 239 of 252
Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[people's - possible]                                                                 Page 25

**people's** 42:23
**percent** 23:24
26:20 35:18 64:12
69:9 71:13 72:12
80:14 84:19 112:4
116:19,21 146:8
186:25
**percentage** 52:14
**perfect** 4:7 7:13
140:20 207:16
**perfectly** 204:25
206:11
**performing**
119:13
**period** 80:21
101:10 103:14,20
103:22 105:14
111:9 147:2
**perlowski** 3:12 4:6
5:21 18:22 20:24
21:10 22:11,17,22
23:9,11,13 24:6,8
24:13 27:23 28:18
29:23 30:13 31:13
31:18 32:21,23
33:4 34:3,5 37:9
39:8 40:17 42:10
43:4 46:18 47:20
49:7 57:14 58:21
59:11,14,20 61:14
61:24 64:4 66:25
67:7,10,17,25 75:5
76:18 77:2,18
89:7,18 92:1,6
94:2,19 96:5
98:24 99:13,18
100:8,14,23
102:23 103:10
104:6,10,22,25
105:2,25 106:7,14
106:17,23 107:1

107:13 108:9
109:4,14,23 110:6
110:19 111:14
112:1,19 116:2,16
117:3 118:2 121:5
121:15 123:11
124:5,15,23 126:4
126:6,16,20,22,25
127:4 128:6,9,22
128:25 129:4,6,10
129:15,18,23
130:2,11,23 131:1
132:9,22 136:9,11
147:16 148:8,19
149:1,8,10,12
150:11 159:5
160:16 161:19
164:20,24 165:1
169:12,17 172:12
173:10 174:22
175:15,17 176:10
177:10 178:23
179:4 181:25
182:7 184:6,11,16
185:1 197:25
199:21 200:9,24
201:10,25 203:5
203:24 207:15
211:1
**perlowski's** 23:16
35:6
**permanently**
151:6
**person** 17:8 35:19
36:17 60:12 80:5
81:2 85:12 137:1
154:1,4 157:8
186:5 187:11,14
187:17
**person's** 161:6

**personal** 30:4,7,8
61:6,6 88:8
164:19 171:4
175:10,25 187:12
187:14
**personally** 175:9
175:24
**pertained** 64:2
**pes** 116:17 117:22
141:13 143:14
146:8
**peter** 52:21
**philosophy** 197:18
**phone** 36:15 37:25
38:13,16 41:23
42:18 43:2 86:6,8
125:13 127:17,19
166:2,15 177:22
198:18,19 205:12
205:15,21 206:19
206:23,25 207:2,4
**physically** 36:14
154:10
**piedmont** 3:7
**pinpointing**
202:11
**piqued** 16:13
**place** 50:16 53:5
119:23 133:17
134:2 138:10
140:22 141:1
161:24 208:20
**plaintiff** 1:5 2:1
3:2
**plaintiff's** 21:23
64:15 91:21
128:17 139:10
184:13 188:14
**plans** 195:25
**platform** 119:4

**platforms** 152:21
194:19 195:4,21
**pleadings** 40:24
115:21
**please** 6:15 7:2
30:15 31:19 40:17
181:25 211:10,17
212:9,10
**point** 14:20,24
50:19,23 51:7
53:7,12,24 54:17
77:11 78:6 100:9
112:9 114:11
117:2 122:14,15
122:17 137:4,20
138:4 146:12
147:18,21 176:25
191:20,22,24
205:6
**pointing** 75:17
**points** 87:23 88:2
88:9 91:15 93:16
93:22 94:8,15
95:3,10 98:22
108:4,7 113:20,21
114:2 148:10
149:25 150:5,23
150:25 151:2
**policy** 151:11
**popped** 41:16,17
41:18,19 42:9
93:14
**position** 29:21
48:4,14,16 49:13
72:2,3 83:8
159:19,21
**positions** 82:22
83:1,7,20,21
**possibility** 109:20
**possible** 93:3
125:18 179:11

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

203:22
possibly  21:14,15
  69:9 93:8
post  90:16
postcards  90:18
potential  27:10
  144:2 152:12
  204:14
potentially  51:3
  105:21 106:12,21
  193:16 195:8
powerpoint  186:6
pre  22:25 23:4
  24:2,4 161:18
prep  77:8
preparation  24:23
  25:25 28:15 75:10
  75:13,24 76:24
prepare  22:20,24
  24:6,19
prepared  186:2
preparing  25:9,10
  25:16
present  3:18 14:23
  24:12 47:8 54:21
  107:15 170:10
presentation  85:7
  186:6
presented  24:24
  25:1 208:1
preserving  67:11
president  2:16
  26:7 66:8,18
  98:17 100:3 108:4
  146:21 163:7
president's  163:7
presidents  203:4
preslo  26:16 66:1
  74:12 75:1 79:2
  140:13 181:10
  192:20 205:14,25

pressure  77:23
pretty  17:6 57:10
previously  202:19
pricing  113:22
  123:23 142:1,6
  146:24 147:2,12
  150:17,21 151:14
  151:18,24 197:18
print  41:3 211:8
printed  184:8
printing  90:12
prior  8:19,22,23
  16:12 32:17 43:2
  43:11 74:10 83:24
  117:15 123:25
  170:17 172:24
  173:2 183:20
  194:19 196:6
  197:7 199:15
  200:22,25 205:8
  205:11
pritchard  78:15
  79:2
privilege  18:24
  62:2 106:3,25
  107:4,5 111:15
  126:17 185:2
  198:5
privileged  22:12
  96:7,9 106:19
  111:17 126:8,10
  128:10 132:23
  161:16,20 182:8
  198:2
probably  4:18
  14:16 66:14 68:24
  70:5 76:8 112:4
  112:23 113:11
  150:14 156:12,14
problem  32:2,10

procedure  212:7
proceeding  208:1
  208:22 209:1
  210:6,13
proceedings
  208:11
process  53:22
  112:6 127:25
  142:12,14,18
  143:9 144:13,21
processing  83:15
  83:16
processors  83:2
produced  128:22
  128:24 129:3,11
  129:14,20,23
  208:23
production  88:8
  119:16 129:25
  130:1 211:18
productions
  129:17
products  197:17
  204:21
professional  8:2
  13:2,5 73:19
  208:14 210:10
professionally
  7:25
profit  180:1,19,22
  182:14 189:13
profitability
  113:25 119:14,25
  137:17
profitable  137:7,8
  137:10,12,21,23
  177:1 179:22
profits  19:7
progression  54:21
prohibited  208:20

prohibitions  208:8
prompted  142:7
proper  9:24
proposed  132:20
  133:17 134:2
  183:21 186:9
protect  134:24
protected  107:22
  209:1,2
provide  125:25
  162:22,23,25
  163:14 208:19
provided  181:18
provisions  109:9
  134:6,15,23 135:7
pry  9:3
public  37:21 38:9
  38:12 39:4,6,12,15
  41:25 42:2,8
  213:23
pull  41:2 83:23
  142:13
pulled  40:22 41:20
  41:22
pulling  69:15,19
purchase  119:17
  119:21
purchased  17:8
purported  186:12
purpose  29:5
  107:22 130:5
  132:18 134:5,6
  154:17,21 162:9
  194:24 195:19,20
purposes  94:9
  95:5 130:12
  195:22 197:9
pursuant  22:9,18
  97:13,16,20 98:3
  98:20 100:21
  111:25 200:22

Kelly Allison
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

212:6
**pursue**  108:18
110:1 111:3,10,12
141:20
**pursued**  111:6
130:15
**put**  17:19 30:23,23
30:24 31:1,5,22
33:17,19,23 34:1
41:15 52:3 60:19
70:18 130:16
134:20 148:20
179:22
**putting**  31:15

**q**

**quarter**  36:12
123:4
**quarterly**  70:3,5,8
90:17
**queen**  156:14,16
163:2 164:14,16
165:8,15 173:6
199:3,13
**question**  5:9 6:3,4
6:16,18 7:2,6 18:7
18:23,25 22:14
23:23 30:12,14
31:19 32:22 43:5
51:25 54:6 58:15
58:22 62:3 67:18
82:1 93:14 94:4
95:9 104:23 106:4
106:18 107:4,9
109:17 121:1
123:17 124:25
133:22 159:22
160:5 169:13,18
169:22 179:13,16
182:1,9 188:21
190:18 198:3
200:14 202:9

**question's**  169:19
**questioned**  206:7
**questions**  4:21 6:1
6:21,22,23 7:10
9:3 17:20 40:20
68:23 85:8 107:14
118:12,18 166:11
182:18 207:14
208:23 210:5
**quickly**  101:13
**quite**  58:5 87:21
88:19

**r**

**r**  17:2,2
**raise**  100:19
204:13
**raised**  198:5
**ran**  53:25 80:2
**randy**  8:21 28:22
**rank**  81:16,21
**rate**  43:21
**rationale**  178:8
**reach**  101:6
**reached**  63:21,25
**reaching**  32:15
**read**  5:15,21 26:19
39:5,12,13,20 40:3
40:12 118:21,22
125:2 133:21,23
145:16,25 148:21
148:22 149:13
159:22,24 181:25
182:2 190:17,19
211:6 212:2
**reads**  118:16
140:17
**ready**  179:22
**really**  25:7 35:25
40:4,11 46:20,22
51:24 55:9 60:9
64:7 69:10 79:25

87:8 91:14 105:18
112:8 120:22
136:24 139:6
141:19 147:19
150:4 165:23
172:6,6,23 178:16
179:15 180:12
181:15 182:17
187:7 190:10
203:1,13
**realm**  127:22
**reaped**  177:6
**reason**  6:15 72:22
73:1 119:6 132:6
141:6 149:20
156:15 183:15
185:22 212:13,16
212:19,22,25
213:3,6,9,12,15,18
**reasonably**  47:13
**reasons**  108:15
212:8
**recall**  21:16,17
25:5 26:12,22
28:8 64:1 68:17
68:20 88:1 110:13
115:4 123:20,22
125:1 134:14
140:2 141:6 147:4
152:7 184:23
185:18 201:7,21
**receipt**  183:25
**receive**  95:3 97:10
114:21 151:17
156:16 157:16
185:19 189:9
**received**  41:21
112:17 124:10
135:23 183:20
186:22

**receives**  208:22
**recess**  61:16 118:3
173:13 190:16
207:12
**recognize**  22:5
70:7 92:10 128:20
139:18 184:2,19
188:21
**recognizing**  27:9
46:16 81:10 83:21
**recollection**  79:8
82:14 95:7 115:23
125:23 138:7
140:21 181:11
**reconnaissance**
163:8,11 165:19
168:7,12 172:9
180:17 189:15
194:13,15,17
195:1,3 196:9
197:5,10,21,22,24
**record**  5:11 6:7
7:15 22:4 31:16
38:9 39:15 42:1,3
42:8 67:11 118:5
127:8 130:5,12,21
133:23 138:2
149:21 159:24
165:5 182:2
184:17 188:19
190:19 206:19
208:11,13,23
210:6
**record's**  7:6
**recorded**  205:15
205:17,19,21
206:14 207:2
**recording**  206:12
**records**  63:20
145:2

**[recoup - represented]**                                    Page 28

**recoup**  178:21 180:3
**recover**  21:21 111:3
**recruit**  44:17 197:15
**recruited**  45:9 55:2 79:15 196:2 198:24
**recruiter**  78:15 166:13,16,17
**recruiters**  108:6 166:10 198:12
**recruiting**  44:1 53:21 166:9 198:22,23
**recruitment**  78:7
**redline**  62:4,9,20 62:22 96:1 184:3 184:19,24 185:9
**redlined**  63:11
**reduce**  142:24
**reduced**  88:13,14 88:15 108:4 151:3 151:4 206:6 210:5
**reed**  35:9,12 65:21 74:12 75:1 79:2 79:20,22 136:20 140:13 141:11,17 181:9,12 183:11 205:14
**refer**  9:23 145:12
**reference**  65:15 68:11 94:25
**referenced**  33:1 45:21 56:25 57:1 61:18 74:9 76:14 95:16,25 112:18 176:7
**referencing**  32:17 33:3

**referred**  65:23 76:3 201:23
**referring**  10:2 23:8 39:13 50:1 66:21 68:18 69:21 88:20 115:3 122:23 127:12,15
**refi**  119:20
**refis**  119:17
**reflect**  7:7
**reflects**  5:11
**refresh**  95:7 140:21
**regard**  4:24 7:1 111:16 121:21 147:11 151:9
**regarding**  26:11
**regardless**  84:14 86:16 145:16
**regards**  26:2
**region**  56:2 69:16 69:19 74:6 137:6 137:18,21
**regional**  2:15 38:18 73:14 78:17 82:11 203:4
**regrets**  76:12 77:23
**regretted**  78:1,2
**regular**  12:10 165:10,12
**regulations**  208:5
**related**  9:5 26:25 63:13 75:21 89:17 123:23 138:20,21 141:13 152:16
**relates**  69:22 119:14
**relating**  209:1
**relation**  72:2 122:18

**relationship**  72:23 73:12,13,18,19 181:23 182:5 183:17 208:12 210:9
**relative**  47:10 60:13,16,17 185:4 210:7
**relatives**  9:14
**released**  196:16 200:17
**releases**  200:11,16 200:21
**relevance**  34:7
**relevant**  30:14
**relied**  133:9
**remain**  52:11,25 91:11
**remember**  23:6,6 25:7 26:10 35:25 36:3,6,13,16,19 40:11 41:1,11 49:18 50:24 53:16 53:21 63:6 69:10 71:20 75:16 79:25 82:10 83:4,6 84:16 86:13 87:8 87:14,24 88:11 91:2 101:9,21,21 101:25 102:2 103:16 112:21 116:20 117:19,23 122:24 124:6 125:8 129:19 136:24 137:15,19 137:24 138:12,13 138:16,17 139:6,6 140:7 141:23 147:19 152:10 155:11 158:19 160:6,10 161:1

162:21 165:1,23 166:22 168:14,18 168:21 169:5,6,8 169:10,11,15,24 170:4 173:1,3 176:13 180:12,13 181:9 185:21 186:16,17,17,20 187:5,19 189:25 191:3 203:1,14
**reminding**  132:25
**remiss**  150:13
**removed**  66:12 177:13,17,19,21
**removing**  178:8
**repeat**  17:1 31:19 82:1 94:4 117:5 127:8 200:14
**repetitive**  4:19
**report**  71:25 72:7 119:11 142:13 143:22 208:12
**reported**  127:18
**reporter**  4:24 6:3 133:23 159:24 182:2 190:19 208:1,3,7,9,24,25
**reporting**  208:6 208:19
**reports**  143:15
**repository**  209:2
**represent**  104:4
**representation**  5:19
**representations**  208:4
**representative**  166:20
**represented**  5:17 128:13

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

**representing**
129:22
**requested**  178:10
211:6
**require**  194:16
**required**  30:11
**reserved**  207:22
**reserving**  67:19
**reside**  9:7
**resides**  8:15
**resolve**  145:17
**respect**  127:23
**respects**  78:3
**respond**  16:19
**response**  5:25 65:1
139:7
**responsibilities**
51:14,21,23 52:1
85:22
**responsibility**
120:10 211:7
**rest**  78:23
**restaurant**  12:5
154:15
**restaurants**  10:6,8
10:13,24
**restroom**  61:13
**resulting**  89:4
**retain**  20:2 187:6
187:9
**retained**  20:3,6,22
21:2,21 61:19
62:18 181:24
182:6
**retaining**  63:22
132:18
**retention**  63:1
**retracted**  147:15
**retracting**  145:20
146:3,6,10,13,23

**return**  188:8
**returned**  180:1
211:11,14
**returning**  125:12
**reveal**  18:23 22:12
22:22 37:10 40:18
43:5 61:25 96:6
106:1 108:9 109:4
109:14 111:15
128:9 161:20
182:8
**revealed**  140:19
**revealing**  96:9
111:17 132:23
**reveals**  106:18
198:2
**revert**  147:14
**review**  25:15,18
25:22 27:15,25
62:18 63:5 64:3
64:19 71:1,3
75:22,23 89:2,6
108:1 115:8
144:15 145:7
157:25 171:10
181:24 182:6
188:8 208:1 211:7
**reviewed**  26:1,5,6
27:4,13,18,20 28:9
28:14 40:2 42:16
44:13 63:11 75:10
75:13 115:11
131:2,4
**reviewing**  26:10
97:1 141:5,5
**reviews**  181:3
**revised**  92:12,23
93:1,4,7,8
**revisit**  147:8
**rich**  175:3

**rick**  50:4 52:8
53:20 66:3,7,12
68:12 69:18 70:15
70:21 71:12 79:1
79:5,18,25 80:12
80:13 81:1 82:25
140:14 154:4,5,6
154:18 156:9
159:2,3,8,10,13,15
159:17,18 160:1,6
160:8,10,11,13,18
181:6,6 203:3,7
**ride**  162:6 195:14
195:17
**right**  5:15,20 8:22
12:14 13:16 14:19
14:22 15:9,13
16:21 18:20 20:4
20:10 24:12 26:17
29:15 31:8 33:17
37:12 39:6,22
41:17 44:15,23
46:5 47:2 48:24
49:6,17 50:5
53:10,14 56:21
59:8,25 61:22
64:20 68:17 71:24
72:21 76:23 83:12
83:16 84:13 85:20
85:24 86:20 88:18
88:23 89:16 95:9
95:14 96:14,21
98:1,10,14,19
99:25 101:13
109:19 113:1
114:25 115:14
118:11 119:11
120:2 121:8 122:2
131:12,18,19,20
132:5 133:11
134:22 136:21

140:17 142:8
143:23 145:9
148:13 149:25
154:19 155:15
157:15 161:3
167:14 169:9
170:8 171:10
172:22 173:4
174:2,20 178:20
180:21 184:11
187:23 189:24
190:5 199:12
202:24 206:8
**road**  3:7 126:9,10
128:11 133:1
**robust**  90:11
**robyn**  1:18 210:19
**role**  12:2 53:24
54:12 55:10,13
56:1 84:24 86:10
86:13,21 143:10
143:11
**roles**  51:15 85:1
85:22 87:10
**room**  203:15
**roswell**  187:18,21
188:2 211:20
**rotary**  12:23
**rough**  81:11
**roughly**  70:8,8
81:10 84:4,19
162:7
**route**  143:4,5
**rpr**  1:18 210:19
**rude**  5:10 6:6
**rule**  212:6
**rules**  208:5 212:6
**rumor**  38:5
**run**  63:22 103:5
204:24 206:1

**[runs - signed]**                                                                 Page 30

runs   65:6

**s**

s   2:1
sales   54:10
sarah   35:4,6 112:5
  112:11 128:13
  131:5 132:11,12
  132:14 133:9,11
  133:11,12 136:3
  143:13,18 144:11
  144:15,25 176:12
savannah   38:19
saved   207:3
saw   36:14,16
  39:24 44:10 75:4
  77:7 115:17
saying   76:10 77:24
  78:1,2 127:7
  128:4 167:3
says   4:23 37:7
  68:12 72:22 92:12
  92:25 95:2 98:10
  108:6 132:16
  139:24 145:15
  147:15 175:24
scenes   182:21
schedule   2:15,18
  26:6,7 27:18,21,22
  27:25 28:8 98:2
  98:17 123:6 124:7
  124:9,10,20 125:8
  125:8,14,15,16,20
  125:20,24 126:1
  134:12,13,14,25
  135:1,3,5,6,9,10
  135:12,12,13,15
  135:15,16,19,22
  135:23,24 136:2,3
  136:5 151:12
  183:21 186:10
  188:18,22 199:9

  199:15,18 200:6
  201:4,6,6,8,8,12
schedules   131:24
  132:12,13 133:18
  133:20 134:3
  186:13,18,20
scott   35:13 181:7
  181:12,16 186:3
  189:6 202:6
screen   76:1
scrolling   28:2,3
seal   211:12
second   72:14,21
  93:6 96:5,6
  105:25 123:4
  124:23 126:6
  145:13,13 175:20
  175:22,22
section   101:17
  112:18 121:2
  134:13 208:6
sections   208:7
secured   58:1
see   28:12 36:10
  68:15 72:14,24
  75:16 78:20 92:10
  100:4 133:17
  134:2 135:11
  140:15 149:13,20
  153:1,3 162:14
  163:15 182:20,21
  183:1,4,24 187:23
  191:17 203:25
seeing   22:6 53:3
  165:1
seek   163:21
seen   25:24 27:6
  39:23,25 68:4
  75:3,6 185:16
segments   75:23,25
  89:1

self   17:6 60:9,12
  206:9
send   65:10 66:11
  89:10 102:13
  131:9 132:6,7,12
  133:8,11,13,20
  141:7 152:21,25
  153:15,19 163:19
  176:12 211:12,17
sending   65:7
  172:9
senior   2:15 203:3
sense   120:23
sent   35:6 64:8,21
  65:20 66:3,6
  75:15,18 77:12
  118:15 119:1
  132:2 133:6 136:4
  143:21 156:3
  158:24 163:1
  192:19 205:25
sentence   72:14,21
  118:16 145:15
  175:23,23
separate   102:1
  138:22
separately   101:19
september   15:12
  17:13 48:6,7
  49:20 131:6
  183:12
series   64:14
serious   193:5
seriously   130:13
serve   210:13
server   165:11
services   208:19
set   48:3 176:18
  197:5
sets   98:2

settled   18:18
settlement   200:16
share   30:1 154:24
  155:21,24
shared   63:7
  155:13,17,20
sharing   155:16
she'll   5:21
sheet   144:11
shocking   75:2
shortened   9:24
show   28:5 34:2
  68:13 91:3,7
  183:23 185:13,17
  185:20,23,24
  186:2,8,12,16,19
  186:21,23
showed   186:8,16
showing   28:10
  175:23
shown   103:16
  185:8,13
shumate   52:20
sic   11:2 105:24
  130:8
sides   144:22
sign   5:15,21 37:7
  97:4 151:10,15
  188:6 189:1 211:6
signature   92:18
  95:18,22 96:20
  189:7 207:22
  210:18 211:2,15
  213:20
signed   93:5,10
  95:16,21 96:11,19
  96:23,24,25 97:3
  117:2,16 188:24
  199:8 200:20
  201:4 211:9,11,14

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 245 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[significantly - states]
Page 31

significantly  150:7
  150:8
signs  91:1
silent  12:4,7
similar  51:21
simpler  141:15
simply  69:21
  197:16
single  16:16
  197:18 198:16
sir  4:17 27:5,8
  57:9 77:6,9,14
  101:8 116:8
sit  58:13 111:23
sitting  23:9 29:18
situation  128:5
six  112:15
slide  185:13,16,20
  185:23,24 186:2,8
  186:16,19,21,23
small  52:13
smc  13:6,7,8
socially  50:22,25
  53:3
solely  208:15
  210:11
solutions  1:7
somebody  145:3,5
soon  190:2
sorry  17:1 23:11
  46:4 62:16 67:8
  107:8 127:5,7
  154:2 175:16
  188:6 205:3
sort  17:24 18:4
  73:18 165:11
  174:17 198:25
  200:12
sounds  9:25 113:4
  118:2

source  37:18
  204:4,5,6,6,9,10
  204:14 205:23
  206:2,5,9,9
sourced  108:5
south  2:14 174:4
southeast  73:14
  82:13 86:18,22
  87:1 93:24 94:10
  94:14,17 95:13
  120:11 137:6,17
  137:21 178:12,15
southeastern
  173:18
speak  42:17
  102:19 105:2
  124:16 159:2
  160:25
speaking  5:4 58:4
  183:9 195:7
speaks  124:18
spearman  1:4 3:19
  4:11 28:23 29:2
  30:10 31:22,24
  32:12,18,19 33:17
  33:19,23 35:8,16
  36:10,14,16 37:21
  39:2 40:15 41:15
  41:23 43:12,17,25
  44:10 47:17 49:1
  49:2 50:2,11 51:2
  51:3,12 52:25
  53:23 54:1,18,22
  54:24 55:2,8 56:8
  57:5 58:8,12,14,18
  59:5,19,23 60:8,9
  60:12,18,19,25
  62:25 63:4 69:5
  69:14,23 70:8
  78:7,10,14,17 80:5
  81:12 82:5 86:1

86:25 92:7 93:18
  94:7 95:11,15
  96:19 97:23 98:7
  101:6,19 102:8,16
  102:19 105:5
  106:12 107:10
  108:14,21 109:18
  110:4,12,16,22
  111:1 120:19
  126:13,16 127:9
  127:16 130:24
  140:14 148:2
  152:5,9 161:7
  163:25 164:5,10
  174:18 176:8,18
  179:10,17 181:22
  182:4 183:11,16
  189:18,21 192:6,9
  192:11 193:16
  194:10,22 195:7
  195:10 199:23
  200:3,13 201:22
  205:12
spearman's  29:21
  30:16,21 38:21
  44:24 45:21 51:18
  54:12 55:12 86:21
  127:2 130:3 177:3
  179:1 200:7,18
specific  46:22
  86:24 87:2 90:4
  204:7 208:21
specifically  124:25
  208:5
speculation  46:19
  132:10 159:6
  160:17 203:6
spend  125:10
spent  125:12
split  55:24 56:14
  93:17 153:7

spoke  28:17
  106:21 153:18
  161:1 193:6
spoken  38:23
  63:17 192:4 199:7
spouse  8:8 10:3
staff  54:10
stake  111:20
stamp  130:22
stand  13:7 107:5
  158:3
standard  57:10
  205:24
standing  132:24
start  5:4,8 20:15
  47:8 64:19 82:8
  83:12 116:6 153:9
  177:17
started  15:10,11
  47:23 50:24 78:12
  157:3 161:4
  169:12
starting  156:9
  174:12
starts  96:15
state  7:14 208:9
  210:2
stated  68:13
  113:21 122:11
  133:12 157:20
  177:24 192:16
  193:4 194:16
  203:14 210:4
statement  90:17
  104:19 146:11
  212:8
statements  145:6
  145:7 202:7
states  1:1 4:13
  100:13 173:25
  174:2,15 178:8

Case 1:20-cv-04981-CAP   Document 96   Filed 04/28/22   Page 246 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[states - team]
Page 32

180:4
status  30:14
stay  151:7 198:21
    199:25
stayed  54:25 112:2
    134:8 151:5
steele  46:7,14
stipulation  4:5
stock  11:3
stodghill  46:2,9,14
stop  126:11
straight  14:11
street  1:15 3:14
    8:12 48:9
strike  67:2 68:5
    167:19 170:23
    185:23
string  2:4,10,13
structure  27:1,11
    70:12 71:8,10,11
    71:19
structures  197:10
stuck  8:1
stuff  125:4
subcontractor
    208:10,15 210:12
subj  2:4,10,13
subject  18:25
    22:13 40:19
submit  70:25
submitted  188:9
    208:24,25
subscribed  213:21
subsequent  105:6
    114:6
substance  37:10
    61:25 212:7
success  179:25
successful  179:3
    179:14

sue  31:8 105:21
    107:17,24 108:11
sued  18:12,13,16
    43:1,13 109:24
suggest  126:25
suing  31:8,10 32:2
    32:11 34:21 37:25
    38:15,25 40:16
    42:24 43:25 44:10
    45:6,7 106:12,22
    107:10 108:16,18
    108:21 109:20
    110:1 111:10,12
suit  179:23
suitable  192:15
suite  1:16 3:8,15
    211:19
sum  112:23
sunshine  47:23
    48:14
super  45:4 68:24
    68:24,25
superiors  156:25
supervisory  51:15
support  54:10
    82:16
supporting  81:21
supposed  20:16,19
    67:9 86:25 87:3
    99:1 127:19,20
    132:12
sure  4:19,25 5:10
    6:6 9:4,11 14:13
    17:6 20:11 23:24
    24:11 26:20 34:10
    35:18 42:2 51:5
    53:20 58:7 63:6
    64:12 69:9 71:13
    72:8,12 74:18
    75:11 80:1 90:5
    90:23,25 91:2

94:6 95:1 112:23
    113:2,18,19
    116:19,21 117:7
    117:17 121:18,24
    131:17 134:17
    135:15 140:8
    144:8 145:8,10
    152:6 176:17
    179:7 183:22
    187:1,10 190:15
    193:18 195:16,25
    200:15 205:2
    206:8
surmise  85:4
surprise  74:24
    115:20
surprised  18:6
surprises  129:6
surrounded  46:1
svp  2:11
svps  70:24 71:16
    101:1
sworn  4:2 213:21
system  89:4

**t**

t  17:2
table  6:17 29:18
    29:20
tablets  171:7
tactic  44:1
tad  207:8
take  4:15 6:18
    47:12 49:9 61:12
    61:15 64:22 65:13
    68:5 74:5 90:22
    90:24 91:24 92:10
    118:1 129:8 130:4
    139:14 144:7
    149:1 161:24
    173:12 190:11
    207:7

taken  4:23 55:4
    82:24 83:8 84:9
    84:14,20 151:2
    210:4
talk  4:25 44:14
    48:25 71:21 82:9
    126:7 153:16,23
    158:22 160:21
    167:1,2,6 173:8,15
    180:14 189:12
    192:7,13 196:2
talked  35:11 40:18
    45:17 46:22 58:5
    90:14 96:4 106:11
    111:6,7,10 117:8
    128:1 153:14,17
    153:17,25 154:4
    158:12,14,18,20
    159:17 172:23
    192:10,10,14
    196:9
talking  11:3 27:21
    37:1 38:7 57:25
    58:2,4 62:10,12
    70:17 81:6 90:6,6
    157:19 176:2
    194:11
taxes  187:12,15,21
    188:7
team  30:17,22
    33:2,9 35:6 46:1
    80:13,15 81:5,13
    81:23 82:5,16,19
    82:21 84:5,9,11,12
    84:14,19,25 85:3,4
    85:12,20 90:7,12
    90:16 115:6,8
    122:6 124:8
    145:17,22 146:18
    146:20 191:7,8,10
    191:12,17,19,22

191:24 192:2,4,7
193:2,6 194:2
**team's** 120:9
121:22 122:5
**teammates** 80:19
85:14
**techie** 206:21
**technically** 52:17
**technology** 197:17
**telephone** 32:17
35:20,23 154:1
**television** 91:3,7
**tell** 7:2,5 13:4,9
17:22 18:15,20
19:25 22:24 23:2
23:3 24:1 25:3
29:9,15 30:21
31:4 33:2,18
34:25 35:24 37:24
38:14,20 39:6,12
40:6,9 44:12 46:8
49:1 53:10 55:21
55:23 57:3,6
59:17 60:15,21
61:3 66:6 67:8
68:20 74:2 76:6
76:14,24 81:23
85:19 86:10 87:18
88:23 89:24 90:3
91:9,25 96:12
107:6 112:11
114:13 115:10
124:2,12,20
125:17 127:11,14
135:19 137:25
146:2,19 147:20
148:5 154:16,17
154:21 158:17
159:8,10,12,15
160:1,8,11,14,18
162:18 163:3,7,24

164:4 165:18
169:9 172:19
174:12,20 177:16
180:21 181:2
187:19,25 190:5
190:13,21 193:1
193:13,15 194:22
202:25 204:17
205:21
**telling** 105:6
123:22 160:6
**tells** 119:13
**tennessee** 65:13
74:5,14 173:9
174:5,8,13 176:4
176:19 177:13,17
177:25 179:2,9
**tenure** 69:25
74:19
**term** 9:24 78:12
97:5 113:9,16
**terms** 19:20
113:13 175:2
208:15 210:12
**territories** 66:12
68:8 69:16 174:13
174:17 176:4,9
177:1,1,8
**territory** 173:19
177:14,18 178:9
**testified** 4:3 31:22
39:10 59:12
118:24 120:16
121:21 122:3
134:16 189:12
**testify** 17:25 22:9
**testimony** 32:24
34:6 94:3 101:23
102:16 104:11,18
105:2 110:9,13
111:23 123:12

124:15,18 130:15
144:23 212:2,8
**text** 2:5
**thank** 184:16
207:11,17,19,20
**theories** 130:15
**thing** 6:16 57:21
91:1
**things** 5:1 6:5
28:11 60:13,15
75:17 77:15
113:23,25 114:2
166:11 175:8
193:10 194:6
206:19
**think** 20:10,13
29:9 30:16 32:19
35:11,17,23 36:3,5
36:23 37:3,4
43:18,20 49:15,25
51:5 55:14 60:8
60:19 64:6 69:8
69:18 71:12 72:7
72:11,16 73:3,10
75:16 78:11 79:8
80:18,20 81:8
82:2,11 83:5,6
86:12 87:12 91:13
98:25 108:25
116:18,20 117:25
118:22 119:3
122:14 123:6
125:23 127:16,23
129:18 133:15,25
136:19 137:23
139:5 143:20
144:4 148:18,20
153:21 162:5,8
163:1 164:7,12
165:17 172:13
173:1,7 175:17

176:15 178:16
179:17,19 183:22
185:5 186:7,11,15
186:24 187:22
189:6 190:1
193:10,24 194:7
195:10 196:22
201:18 202:10,20
202:24 203:3,20
203:22 205:1,2,4
205:16 207:5
**thinking** 172:25
191:19,21
**third** 139:22
**thought** 29:15
71:2 85:9,18,19
98:25 105:12
111:9 141:12,17
157:5 172:17
175:3 203:11
**thousand** 26:3
62:15
**thousands** 129:20
**three** 139:14
144:11 186:17
**threshold** 150:23
**throw** 81:9 150:13
**tied** 113:22,23,24
113:24,25
**time** 6:15,17 15:18
22:6 27:6 36:13
36:16 39:22,24
49:9 50:3 53:4,22
55:6 56:9 63:15
64:6 65:12 69:13
69:14 70:11,17
76:9,12 77:7,23
80:9,21 85:21
87:25 89:12 102:2
103:4 110:15
112:10 113:5,13

Case 1:20-cv-04981-CAP  Document 96  Filed 04/28/22  Page 248 of 252

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

[time - underwriting]
Page 34

116:23 118:1
124:8,8 125:10,12
130:4 135:5
138:13 146:5
149:1 152:22
153:1 155:16
158:16 163:7
168:1,7,11 169:13
169:18,24 172:24
177:2,19 179:8,21
181:11 183:8
190:11 191:11
196:2 197:11,12
198:19,20 201:7
202:12 203:1
207:17 208:22
211:14
**timelines** 75:19
**times** 80:7,8 87:21
88:19 150:5 153:9
166:18
**tiny** 52:14,14,14
**title** 49:18 73:15
82:10,12 86:14,16
**titles** 86:12
**today** 4:15 5:11,18
6:1,13,21 9:24
10:2 17:25 22:21
23:9 29:11 37:2
58:13 75:3,6
111:23 113:15
135:20 136:18
139:6 149:4
161:21 165:2
183:8 185:25
206:23 207:18
**todd** 159:20
**told** 25:23 28:14
35:2 36:15 38:24
39:15 41:25 42:6
43:16,18 46:25

48:18 59:2,3,11,13
61:1,9 77:11 97:3
102:3 115:10,24
116:6,14 117:9,15
123:8 124:3,21,22
136:18 137:8,9,12
137:20 138:14
139:1 141:9
146:15 152:17
157:8,11 158:19
160:10 161:13
162:21 189:1
190:22 193:17
204:23
**tolerances** 150:24
**tony** 155:13
156:21 157:7,18
172:17
**top** 74:19 81:12
94:16
**topic** 43:7 106:9
**topics** 27:12 70:10
**torrey** 16:25 17:2
17:12 48:5,6,16
**tour** 90:13
**tracked** 144:9
**tracking** 144:7
**transcribe** 6:3
**transcript** 125:2
208:22 210:4,5
211:7,12,14 212:2
**transcripts** 208:22
209:1
**transfers** 207:1
**transparency**
182:13
**travel** 80:24
**travis** 3:3 4:10
92:1 149:8
**treacherous**
196:17

**trey** 9:13
**trick** 6:22
**tried** 56:7
**trips** 90:7,9
**trouble** 41:5
**true** 18:18 77:25
96:21 203:20
208:23 210:6
**truly** 53:21
**trusted** 52:9
**truthfully** 17:25
**try** 5:3 70:24
121:19,19 198:21
**trying** 5:9 6:6,22
6:22,23 9:3,4
44:17 64:8 160:15
162:14 191:23
202:15,16
**tune** 19:21
**turn** 60:21 157:2,4
**turning** 157:3
**two** 8:16,17 10:13
14:4 26:2 53:7
62:15 80:22 92:1
109:1,1 129:16
138:21,21,22
140:18 145:18
155:20,21 162:6
169:16 170:24
171:5 178:8 194:7
**type** 91:1 152:22
**typewriting** 210:5
**typically** 57:19

**u**

**uh** 6:2 15:2,22
16:8 35:22 42:21
44:19 45:16 48:21
49:22 61:21 65:22
65:25 66:2,5
72:17 95:20 98:9
98:13 100:5

101:14 119:12
120:15 140:1,16
141:4 150:19
151:22 155:9
157:14 162:2
164:15 166:3
167:23 171:3
172:5 175:22
176:1 181:20
191:15 192:18
201:2 202:23
203:19 204:22
**uhs** 6:2
**ultimate** 62:23
**ultimately** 62:11
78:7 88:12 89:4
148:6 180:18
181:17 188:11,17
188:22 189:18
**uncomfortable**
157:15
**undersigned** 212:2
**understand** 7:1,3
7:4 17:7 22:8 30:7
40:4,6,8,9,10 42:4
82:23 117:17
119:4,6 129:10
132:11 146:22
149:22,24 178:5
194:17 202:15
**understanding** 7:7
11:19 40:15 43:23
102:14 121:24
137:6 138:23
158:8 163:22
177:12 178:7
**understands** 60:23
**understood** 9:19
58:7
**underwriting** 83:2

Kelly Allison
November 18, 2021
Spearman, Gina Vs. Broker Solutions, Inc. Et Al

**unfortunately** 164:20
**unhappy** 53:12 196:19
**unhealthy** 60:7
**united** 1:1 4:13
**universe** 117:17 123:18 124:19 166:15
**unlimited** 169:13 169:18,20
**unnecessary** 142:20
**unprofitable** 137:7
**unsigned** 186:18
**updates** 90:17
**uploaded** 209:2
**upset** 32:18 34:16 103:23 104:8 178:2,4
**use** 114:23 170:22 171:10,14,17 172:3 187:18 204:13 212:9
**usual** 4:5
**usually** 113:22 207:1

**v**

**v** 3:4
**various** 54:19 98:22
**ventured** 180:7
**ventures** 10:12 11:4,24 12:6
**verb** 60:24
**verbal** 5:25 104:19
**verbatim** 208:13
**verbiage** 40:12 94:22

**verify** 143:18
**verifying** 145:1
**veritext** 208:10,19 211:10,18
**version** 96:1 129:2 130:22 184:20 188:24
**versus** 41:15 42:8 113:7 119:17 133:17 134:2 141:12 142:1,6 143:11
**vice** 2:16 98:17 100:3 108:4 163:7 203:4
**view** 14:24 51:19 171:15 172:4
**virginia** 65:13 74:6,14 173:9 174:7,9,13 176:4 176:19 177:13,25 179:2,9
**visit** 50:22 84:2
**visited** 198:6,9
**visiting** 50:24
**visits** 194:23 197:8
**volume** 95:6
**vs** 1:6

**w**

**w** 83:24
**wait** 93:1
**waive** 5:17 107:3 126:16,24 127:2
**waived** 126:19,21
**waiving** 127:10
**walk** 13:19 14:15 14:15,22 47:2,6 54:20 56:2 78:6,9 81:13 82:5 150:20 177:20

**walked** 109:2
**want** 5:10 6:6,9 16:19 19:25 23:25 27:19 34:23,25 37:9 47:2,6 49:8 55:9 56:8 61:24 64:18,19 71:21 78:5 82:23 88:9 91:19 93:13 94:25 109:17 111:14 116:10 117:13,16 129:8,10 131:17 134:19 136:14 145:8,13 151:9 156:22 161:15 162:17 173:8,15 180:14 182:19,21 182:25 188:10 189:11 190:7 193:21 195:4,23 197:5
**wanted** 65:1 70:5 76:7,9 105:18 113:5,6 114:22,23 118:11 119:3,3,6 134:16,23 137:24 138:6 143:24 157:25 160:7 163:3 178:11,14 178:14 183:3,16 184:6 190:11,11 190:12,22 191:12 191:17 193:19,25 205:9
**watch** 174:3
**waterfalls** 12:17
**waters** 196:17
**watson** 63:22,23 63:24 89:5,10,14 106:1,12 125:25 126:15 128:14

130:6,8 132:6,18 133:6,8 181:24 182:6 183:10,15 184:20
**watson's** 184:2
**way** 5:23 6:9 7:4 20:14 25:18 60:18 71:18 92:3 112:8 121:20 130:14 132:4 138:19 141:24 144:10 157:2 158:12,14 158:18,20,22 164:21 178:17 191:23 195:7
**ways** 109:9
**we've** 24:17 86:12 87:20 96:4 97:13 114:7 151:20 154:5 173:10
**website** 41:1,11
**wednesday** 151:19
**week** 130:1
**weekly** 70:20 71:6 71:14 72:10
**weeks** 24:9,18 35:17 36:20
**weighted** 141:14 141:25 142:6,21 142:22,23
**wells** 53:13,19
**went** 4:20 13:22 15:11,20 20:3 36:18 42:1 46:4 47:5 48:2,2,7,8,9 49:12,13,21 50:9 52:10,12,18 53:23 54:25 55:3,12,15 56:16,22 62:15,17 80:7,8 81:24 84:4 85:11 91:4 101:12

Kelly Allison
November 18, 2021
Spearman, Gina  Vs. Broker Solutions, Inc. Et Al

107:23 132:14
136:19 150:1
170:21 174:12
178:16 195:10
196:21 205:24
**westle**  3:21
**wilhelmina**  15:1,5
15:13
**winning**  127:17
**wise**  169:24
**wish**  147:19
187:19 205:3
**witness**  30:6,11,15
31:7,11 47:21 67:8
67:15,20 128:8
130:14 164:18
207:10,19
**witnessed**  66:22
68:6
**witnesses**  208:25
**women's**  13:6
**word**  118:22,22
134:19 144:7
146:1,1
**words**  134:20
**work**  10:3,5 14:19
14:23 16:23 48:5
50:23 57:12 90:10
93:2 142:19,20
143:2 153:11
163:8 165:19
168:8,12 170:5,6
172:9 178:12,14
179:1 180:17
183:17 189:15
190:7 196:15
197:21,22,24
**worked**  50:15
55:11 56:15 80:23
134:7 167:12

**workforce**  14:20
**working**  16:6
50:16 53:4,7
118:20 125:12
143:20 183:7
203:23
**works**  23:24 60:23
**worry**  104:20
113:6
**worth**  112:10
**writing**  88:13,15
148:21
**written**  19:17
151:17 168:10
**wrong**  102:12
136:7
**wrote**  91:13
146:14

| x |
| --- |

**x**  98:16

| y |
| --- |

**y**  17:2
**y'all**  35:24 50:14
50:19 53:3 56:17
58:9 61:13 101:20
115:25 144:6
195:14
**yard**  91:1
**yeah**  19:25 36:18
41:9 42:7 46:20
49:8 51:5 58:5
61:14 63:24 73:22
91:5 93:8 101:11
101:18 102:7,10
103:4 115:7
136:10 140:20
154:2,7 155:1
169:14,19 173:12
179:19 184:10
194:5 195:16

198:3 206:25
**year**  19:11 47:25
48:2,15 83:18,21
150:15 188:7
197:3
**years**  8:9 14:4,10
15:4 110:5,7
125:18 140:18
145:18,24 147:20
**yesterday**  28:23
29:2,6 32:13
129:4,24
**york**  15:15,16
16:3,4,6
**young**  55:9,11

| z |
| --- |

**zero**  127:25 199:2
199:3
**zone**  112:7
**zoom**  3:5,20,21
28:3 76:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.