Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    GINA SPEARMAN,
                Plaintiff,
4
           vs.           CASE NO. 1:20-cv-04981-CAP
5
     BROKER SOLUTIONS, INC. d/b/a
6    NEW AMERICAN FUNDING,
                Defendant.
7
                        - - -
8
      30(b)(6) Deposition of Broker Solutions, Inc.
9            d/b/a New American Funding
                 through JAN PRESLO,
10
              and JAN PRESLO Individually,
11
           Taken by MaryBeth V. Gibson,
12
               Before Shannon E. Jordan,
13           Certified Court Reporter,
14      Via Veritext Virtual Videoconferencing,
15           On Friday, January 21, 2022,
     Beginning at 12:06 p.m. & ending at 4:07 p.m.
16
                        - - -
17
18
19
20
21
22
23
24
25

Page 2

```
 1    APPEARANCES OF COUNSEL
 2    For the Plaintiff:
 3              MARYBETH V. GIBSON
                TRAVIS C. HARGROVE
 4              The Finley Firm PC
                Building 14, Suite 230
 5              3535 Piedmont Road
                Atlanta, GA 30305
 6              404.320.9979
                mgibson@thefinleyfirm.com
 7              thargrove@thefinleyfirm.com
 8    For the Defendant:
 9              HENRY M. PERLOWSKI
                T. CHASE OGLETREE
10              Arnall Golden Gregory LLP
                Suite 2100
11              171 17th Street, NW
                Atlanta, GA 30363
12              404.873.8500
                henry.perlowski@agg.com
13              chase.ogletree@agg.com
14
      ALSO PRESENT:
15
                Gina Spearman
16              Ken Block, Esq., New American
                 Funding
17
18
19
20
21
22
23
24
25
```

30(b)(6) & Indv. Jan Preslo                      January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                          Page 3

1                    INDEX TO PROCEEDINGS
2                     EXAMINATION INDEX
3
    JAN PRESLO
4
    Examination by Ms. Gibson                          4
5
    Certificate Page                         158
6
    Errata Sheet                             160
7

8  _____

                      EXHIBIT INDEX
9
    Exhibit
10
     Exhibit 1     Plaintiff's Notice of taking           8
11                 Deposition of Broker Solutions, Inc.,
                   d/b/a New American Funding Pursuant
12                 to Fed. R. Civ. P. 30(b)(6)
13   Exhibit 2     (Exhibit not identified)
14   Exhibit 3     Offer of Employment Letter, 11-4-2016  19
15   Exhibit 4     Defendant Broker Solutions, Inc.,     106
                   d/b/a New American Funding's
16                 Responses and Objections to Plaintiff
                   Gina Spearman's First Requests for
17                 Admission
18   Exhibit 5     Email from P. Arvielo to J. Reed and  113
                   J. Preslo, 3-29-2019
19
     Exhibit 6     Email string ending 2-13-2019         117
20
     Exhibit 7     Email string ending 3-29-2019         127
21
     Exhibit 8     Email string ending 3-20-2019         134
22
     Exhibit 9     Email string ending 9-17-2019         142
23
     Exhibit 10    Email string ending 9-16-2019         144
24
25   (End of Index)

Page 4

1           January 21, 2022

2           12:06 p.m.

3      (Whereupon the reporter provided a written

4      disclosure to all counsel pursuant to

5      Article 10.B. of the Rules and Regulations

6      of the Board of Court Reporting.)

7           THE COURT REPORTER:  Due to this

8  deposition taking place remotely, the parties

9  will stipulate that the court reporter may swear

10  in the witness over Veritext virtual

11  videoconferencing and that the witness has

12  verified that she is, in fact, Jan Preslo.

13  JAN PRESLO,

14      being first duly sworn, was examined and

15      testified as follows:

16  EXAMINATION

17  BY MS. GIBSON:

18      Q      Good morning, Ms. Preslo.  How are

19  you?

20      A      I'm -- good morning or good afternoon

21  to you.

22      Q      Yes.  Good morning.

23      A      And I'm great.  Thank you.  Uh-huh

24  (affirmative).

25      Q      I just want to let you know I'm

Page 5

1    MaryBeth Gibson.  I'm counsel for Ms. Spearman.

2    And this is Travis Hargrove, who is also

3    representing Ms. Spearman.

4              I'm going to be asking you some

5    questions today, trying to understand some

6    documents that were exchanged and some issues

7    regarding Ms. Spearman's compensation that I

8    understand you have knowledge of.

9              I'm going to be asking you questions,

10   and the court reporter is taking everything down.

11   So I ask that you give verbal responses, not head

12   nods, because she needs to be able to transcribe

13   everything and write it down.

14             MS. GIBSON:  Henry, is the witness

15   going to read and sign?

16             MR. PERLOWSKI:  Yes.  And usual

17   stipulations, MaryBeth, is fine?

18             MS. GIBSON:  Yep.  That works.

19             MR. PERLOWSKI:  Thank you.

20   BY MS. GIBSON:

21        Q    So, Ms. Preslo, you'll have an

22   opportunity to read your deposition transcript

23   when we're -- when we're finished.  Henry has

24   told me I speak very fast, so I want you to know

25   I am not trying to rush you.

Page 6

1              So if you need me to slow down,

2     please let me know.  If you need me to repeat

3     anything, please let me know.  If you don't

4     understand a question, obviously, let me know,

5     and I'm happy to restate it.  Do you understand

6     all of that?

7          A     Yes, ma'am.

8          Q     Okay.  And are you on any medications

9     today that would affect your memory?

10         A     No.

11         Q     Are you on any medications that would

12    affect your ability to give truthful testimony?

13         A     No.

14         Q     And, also, if you have -- if you need

15    to take any breaks, that's perfectly fine.  Just

16    I would ask if you -- if there's a question up

17    there, answer the question and then let me know

18    you need a break.  I try to take one every hour

19    just for a couple of minutes just to let everyone

20    have a quick walk around.

21              And there are going to be times your

22    lawyer objects to some of my question.  Unless he

23    instructs you not to answer, you may answer the

24    question.  He's just perfecting the record.  Do

25    you understand that?

Page 7

1      A      Yes.

2      Q      Okay.  Also, you have been identified

3   as a 30(b)(6) witness with respect to certain

4   topics, which means that you represent NAF with

5   respect to your testimony and that that testimony

6   is binding on that.  Do you understand that?

7      A      Yes.

8      Q      And I'm also going to be asking you

9   specific questions with regard to your specific

10  knowledge regarding some documents or emails that

11  you may be on.  And I'll try and let you know

12  or -- it may be obvious, but I'll try and let you

13  know when I'm doing that.  Okay?

14     A      Okay.

15          MR. PERLOWSKI:  And, MaryBeth and

16  Travis, when we're accessing the exhibits, are we

17  going into the folder for Ms. Preslo with today's

18  date?

19          MS. GIBSON:  With today's date.

20  They're loaded in the correct folder, and you

21  just refresh it after --

22          MR. PERLOWSKI:  Got it.  Exactly.

23          MS. GIBSON:  It will appear.  Right

24  now we're loading Exhibit 1, which is the

25  30(b)(6) deposition notice.

Page 8

1               MR. PERLOWSKI:  So, Ms. Preslo, when

2     you go into the Exhibit Share folder, you can

3     look for the link with your name and today's

4     date, and that's where the exhibits will be

5     uploaded.  And they'll be uploaded sequentially

6     as they're presented to you.  We just all -- all

7     of us have to -- whenever there's a new exhibit,

8     we've got to refresh the browser.

9               THE WITNESS:  Okay.

10          (Whereupon a document was identified as

11          Exhibit 1.)

12     BY MS. GIBSON:

13          Q     Let me know when that's loaded.

14          A     I'm looking at Exhibit Share, and it

15     says Spearman, slash, comma, Gina.  Is that what

16     I'm supposed to be opening?

17          Q     Yes.  If you click on that, it's

18     going to have a marked folders exhibit underneath

19     it or it will have -- should have your -- your

20     deposition date of today.

21               MR. PERLOWSKI:  Yeah.  My

22     recollection is -- I'm in the exhibit.  It's

23     loading -- is that's on the left side of the

24     screen --

25               THE WITNESS:  Uh-huh (affirmative).

Page 9

```
 1                    MR. PERLOWSKI:  -- you'll have some

 2     options about -- there will be deponent names and

 3     dates.  There should be one for you with today's

 4     date.  If you will click on that link.

 5                    What happened for me when I just did

 6     that is the Exhibit 1 then just popped up in a

 7     window to the right.

 8                    THE WITNESS:  Okay.  Hold on.  It's

 9     saying -- oh, here we go.  I've got deposition --

10     there's three.  It looks like three folders.

11     BY MS. GIBSON:

12         Q     There should be a marked exhibit

13     folder under your name.

14         A     I have a deposition, Jan Preslo.

15     Hold on.

16                    MR. PERLOWSKI:  Ms. Jordan, also, I

17     believe Mr. Block is in the waiting room right

18     now.  If you could --

19                    THE WITNESS:  I have a deposition of

20     Jan Preslo, 1-21-22 folder.

21     BY MS. GIBSON:

22         Q     Yes, if you click on -- if you click

23     on that.

24         A     Okay.

25         Q     It's going to open a box below it,
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1    and it should be marked exhibit folder.

2          A      Okay.

3          Q      And then you click on that, and it

4    should open up the first exhibit.

5          A      Oh, okay.  Now I see.  And I -- I

6    should open that.  Okay.  Okay.

7          Q      So do you see Plaintiff's Notice of

8    Taking Deposition of Broker Solutions, doing

9    business as New American Funding, pursuant to

10   Federal Rule 30(b)(6)?

11         A      This is -- yes.

12         Q      Okay.  And you have been identified

13   as a witness who can testify about topics 4,

14   5, 6, 7, 8, 13, 17, and 18.

15         A      So 4, 5, 6 -- okay.

16         Q      7 and 8.

17         A      Hold on one sec.

18         Q      Uh-huh (affirmative).

19         A      Okay.  So 4, 5, 6, 7.  And what were

20   the other ones?

21         Q      8.

22         A      Okay.

23         Q      13.

24         A      13.  Okay.

25         Q      And then 17 and 18.

Page 11

```
 1        A        Okay.

 2        Q        So I'm going to be asking you

 3   questions about these topics today.  And you

 4   understand you're NAF's representative to provide

 5   responses to these topics?

 6        A        Yes.

 7        Q        Okay.  Also, prior to joining NAF --

 8   and when I say NAF, that's -- just so you know,

 9   I'm referring to New American Funding.  And is

10   that okay with you?

11        A        Yes.

12        Q        Okay.  Prior -- what -- when did you

13   join NAF?

14        A        In February -- February 1, 2012.

15        Q        Where did you work prior to NAF?

16        A        Prior to New American Funding, I

17   worked at MetLife Home Loans.

18        Q        And how long did you work for

19   MetLife?

20        A        One year.

21        Q        Where did you work prior to that?

22        A        I worked for Bank of America.

23        Q        How did you come to work at NAF?

24        A        MetLife Home Loans closed their

25   mortgage division, and I was recruited to New
```

Page 12

1    American Funding.

2         Q       Who recruited you?

3         A       That was Patty Arvielo and Bridgett

4    Attaya.

5         Q       What's Bridgett's last name?

6         A       Attaya.

7         Q       And when you started with NAF in

8    2012, what was your title?

9         A       Regional manager.

10        Q       And how long were you regional

11   manager?

12        A       For around nine months.

13        Q       And then what was your title?

14        A       I was promoted to EVP of retail

15   production.

16        Q       What is your current title?

17        A       EVP of production.

18        Q       Okay.  So since approximately 2000 --

19   late 2013, your title has not changed?

20        A       My title was recently changed.

21               MR. PERLOWSKI:  Object to the form.

22   Yeah, object to the form.  Mischaracterizes the

23   testimony.  You can answer, Ms. Preslo.

24               THE WITNESS:  My title of EVT -- EVP

25   retail production, I was promoted within the last

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 13

```
 1   couple of months to EVP of production.
 2   MS. GIBSON:
 3        Q     So you went from EVP of retail
 4   production to EVP of just production --
 5        A     Yes.
 6        Q     -- is that correct?
 7        A     Yes.
 8        Q     Okay.  And that's your current title?
 9        A     Yes.
10        Q     Okay.  Have you had any other titles
11   or roles while you were -- have been employed at
12   NAF?
13        A     No.
14        Q     Have you ever been COO?
15        A     No.
16        Q     CFO?
17        A     No.
18        Q     Have you ever worked in human
19   resources?
20        A     No.
21        Q     How are you paid as the SVP of
22   retail?
23        A     It's E -- EVP.
24        Q     EVP.  I'm sorry.
25        A     I'm paid a salary and a compensation
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 14

1    structure that's tied to the profitability of the

2    division.

3           Q       So is that based on a P&L model?

4           A       Yes.

5           Q       In your time at NAF, were you ever

6    paid override bonuses?

7           A       No.

8           Q       Tell me what you do as EVP.  And is

9    it now retail production or just production?

10          A       Just production.

11          Q       So what is -- what is your role as

12   EVP of production?

13          A       I oversee processes and procedures

14   for production, meaning loan production.

15          Q       How did that change when you went

16   from EVP of retail production to just production?

17          A       I'm now involved in our internal

18   division, our call center.

19          Q       Okay.  When did that change happen,

20   when you went from EVP of retail to just

21   production?

22          A       Just within October of last year.

23   October 2021.

24          Q       Is that -- does that include more job

25   responsibilities or less job responsibilities, or

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

1    is it just a different job entirely?

2         A      It's -- it is additional

3    responsibilities.

4         Q      Okay.  When you were EVP of retail

5    production, who reported to you?

6         A      The -- what we call the SVPs.

7         Q      And who were the SVPs?

8         A      Oh, you know what, I -- can I correct

9    that for a moment?

10        Q      Of course.

11        A      Okay.

12        Q      And at any time you need to correct

13   something, please feel free to do so.

14        A      Yeah.  So I had our -- my direct

15   reports were area -- the national area of

16   production manager and our onboarding and

17   training team, and various different admins

18   reported to me directly.

19        Q      Did the regional managers report to

20   you?

21        A      No.

22        Q      Who did they report to?

23        A      To Jon Reed.

24        Q      In your role as EVP of retail

25   production, were you involved in presenting

Page 16

1   contracts to new hires?

2       A       Not to all new hires, but I was

3   involved in reviewing offer letters with

4   employ -- with new hires but not all of them.

5       Q       Were you involved in reviewing the

6   offer letter to Ms. Spearman?

7       A       Yes.

8       Q       When did -- when did you -- did you

9   review the offer letter after it was emailed to

10  her or before it was emailed to her?

11      A       I would have reviewed it before it

12  was emailed to her.

13      Q       Okay.  So when you say you reviewed

14  the offer letter, you're talking about you just

15  reviewed it in your office, going through it.

16  You didn't review it with the regional manager

17  being hired?

18              MR. PERLOWSKI:  Object to the form.

19  You can answer.

20              THE WITNESS:  I know that I would

21  have reviewed it.  I mean, we -- there were

22  conversations with Gina Spearman and Kelly

23  Allison about, you know, the offer letter and

24  what to expect in regards to what they would

25  receive, you know, via email.

Page 17

```
1              So there were verbal conversations

2    prior to her receiving the offer letter.

3    BY MS. GIBSON:

4         Q     Okay.  Were you involved in a -- did

5    you participate in a meeting where Ms. Spearman

6    and Ms. Allison flew to Tustin to meet with

7    officers of NAF prior to her being offered a job

8    as regional manager?

9         A     I did participate in some of those

10   meetings, yes.

11        Q     Okay.  Tell me what happened at those

12   meetings.  What did you discuss?

13        A     My discussions that I recollect was

14   their transition, onboarding process, licensing

15   of the branches, because we did not have branches

16   in Georgia yet.  So my role was more around the

17   experience of the onboarding and the team joining

18   New American Funding.

19        Q     Did you discuss any terms of

20   Ms. Spearman's compensation with her when she

21   flew out to Tustin to meet with you?

22        A     I don't recall specifically

23   discussing those with Gina.  Kelly Allison was

24   out more than Gina and really drove those

25   conversations.
```

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 18 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1          Q       Do you know where they worked prior
2    to coming to work for NAF?
3          A       Yes.
4          Q       Where did they work?
5          A       Caliber Home Loans.
6          Q       Do you know how they were compensated
7    while they were at Caliber?
8          A       My recollection is Kelly Allison was
9    paid on a profit and loss with a salary, and it
10   was my understanding, I believe, that Gina was
11   paid a salary plus an override.
12         Q       Do you know what loans Ms. Spearman
13   was paid overrides on while she was at Caliber?
14         A       No.
15         Q       So at some point during that meeting,
16   while they were out in Tustin, did NAF make an
17   offer to them to come work for them?
18         A       There were -- Kelly supplied, from my
19   recollection, you know, her income documents.  I
20   recollect discussions around a guarantee for them
21   so they would not have a drop in income while
22   they were onboarding, you know, their team to a
23   new employer.  I don't remember specific dollar
24   amounts discussed.
25         Q       You don't remember specific dollar

Page 19

1    amounts discussed for their compensation?

2         A        Correct.

3         (Whereupon a document was identified as

4         Exhibit 3.)

5    BY MS. GIBSON:

6         Q     Okay.  Just so you know, we've loaded

7    Exhibit 2, but I'm going to come back to that.

8    And now we're loading Exhibit 3, so when that --

9    you can refresh your screen in a minute, and if

10   you can go to Exhibit 3, not Exhibit 2.

11              MR. PERLOWSKI:  You may have to

12   reload it twice, Ms. Preslo, because my --

13              THE WITNESS:  Do I have to -- when

14   you say reload it, do I just go back and click on

15   the shared or --

16              MR. PERLOWSKI:  Right-click and then

17   there's a reload button.  It should be a reload

18   button if you right-click your mouse or touch

19   pad.

20              THE WITNESS:  Yeah, I don't see a

21   reload.  Okay.  Do I go back to marked exhibits?

22   BY MS. GIBSON:

23        Q     If you just -- if you actually just

24   click on the -- your bar at the top, it should

25   refresh the folder entirely.

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 20

```
 1        A      Okay.  It's -- looks like it's
 2   reloading.  Does it take a while?
 3               MR. PERLOWSKI:  Yeah, it can.  Like,
 4   for example --
 5               THE WITNESS:  Okay.  Certainly.
 6               MR. PERLOWSKI:  -- my Exhibit 3, it
 7   took a while to reload.  I think it may depend on
 8   the size of the exhibit.
 9               THE WITNESS:  Okay.  So I go back to
10   Marked Exhibits folder.  So now I have loaded
11   Exhibit 30(b)(6) or is it Exhibit 2?
12   BY MS. GIBSON:
13        Q      No, it's Exhibit 3.
14               MR. PERLOWSKI:  Is there any --
15               THE WITNESS:  Exhibit 3.  Okay.  I
16   see it, so -- all right.  Okay.  The document is
17   on my screen.
18   BY MS. GIBSON:
19        Q      Okay.  And I'll represent to you that
20   this is a composite exhibit of Ms. Spearman's
21   offer -- letter offer of employment, the regional
22   manager agreement, and attached Schedule 1.  And,
23   you know, if you want to take a look at it, go
24   ahead.  I just want to know if you recognize
25   this.
```

Page 21

```
 1        A       I do.  Give me a moment.

 2        Q       Sure.

 3        A       Okay.

 4        Q       And earlier you testified that you

 5   reviewed the letter offer before it was sent to

 6   her.  Is this the letter offer that you reviewed?

 7        A       It would have been, yes.

 8        Q       And do you know who prepared this?

 9        A       It would have been prepared by human

10   resources.

11        Q       Okay.  And did human resources send

12   it to Ms. Spearman or did you send it to

13   Ms. Spearman after you reviewed it?

14        A       It would have been sent by human

15   resources.

16        Q       And did human resources also send the

17   regional manager agreement attached to it?

18        A       Yes.

19        Q       Did human resources also send the

20   Schedule 1 that's attached to the regional

21   manager agreement?

22        A       Yes.

23        Q       Did -- after human resources sent

24   this to Ms. Spearman, did you have any

25   discussions with Ms. Spearman about the offer of
```

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 22 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

1    employment or the regional manager agreement or

2    Schedule 1 before she came to work for NAF?

3         A     My recollection was mainly

4    conversations with -- with Kelly Allison.

5    Sometimes there were discussions with Kelly

6    Allison one on one or discussions with both of

7    them on the phone.  So I --

8         Q     Do you recall having a --

9         A     I do believe I would have reviewed --

10   would have -- we would have gone over, you know,

11   the offer letter.

12        Q     And I'm sorry.  I didn't hear the

13   beginning.  You would have gone over the offer

14   letter with --

15        A     Yeah, I do, but I don't -- you know

16   what, I don't specifically remember reviewing the

17   offer letter with Gina.

18        Q     Do you have a recollection of

19   reviewing the offer letter that you gave -- that

20   NAF gave to Ms. Allison?

21        A     So in the recruiting process, either

22   with both of them either out or with Kelly on the

23   phone, I'm sure I would have had conversations

24   with Gina, prior to her joining, about this offer

25   letter before she executed it.

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 23 of 192
30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 23

1      Q      Do you remember what the content of
2   those conversation were?
3      A      I don't recall.
4      Q      Okay.  And did NAF give a similar
5   letter offer to Ms. Allison?
6      A      What do you mean when you -- what do
7   you mean by similar?
8      Q      Did she receive a letter offer that
9   looked like Ms. Spearman's?
10     A      It would have been the same context.
11  I -- Kelly Allison's income was greater than Gina
12  Spearman's, so I'm sure her guarantee would have
13  been more.
14     Q      But otherwise, the -- I think you
15  said context.  But the contents were the -- were
16  the same?
17     A      The verbiage --
18            MR. PERLOWSKI:  Object to the form.
19  Mischaracterizes testimony.  You can answer.
20  BY MS. GIBSON:
21     Q      Go ahead.
22     A      So as far as Kelly Allison's offer
23  letter is concerned, from my -- from my memory,
24  she required a non -- or noncompete to be removed
25  for individuals that she was bringing to New

Page 24

1    American Funding.  And then she also negotiated a

2    marketing, you know, budget that she had at her

3    previous company.

4         Q       And so --

5         A       So those would have been differences,

6    from my memory, of Kelly's offer letter.  And her

7    guarantee was more.

8         Q       And if you look at each page of that

9    letter offer, did Ms. Spearman initial each page?

10        A       I just reviewed the document, and she

11   initialed each page where it indicates employee

12   initials.

13        Q       Uh-huh (affirmative).

14        A       And pages that -- that have a

15   signature, she signed the document.

16        Q       Okay.  So page 7 of the letter offer,

17   there's Ms. Spearman's signature?

18        A       Let me go back to that.  Page 7?

19        Q       Uh-huh (affirmative).

20        A       Yes.

21        Q       And it also is signed by Erika Del

22   Real.  And who is that?

23        A       I don't remember this -- that

24   employee, but it says her title is HR assistant,

25   so she would have been in the HR department.

Page 25

1        Q      Okay.  Is compensation a material

2    term of employment?

3                MR. PERLOWSKI:  Object to the form.

4    You can answer.

5                THE WITNESS:  I'm sorry.  Can you

6    repeat the question?

7    BY MS. GIBSON:

8        Q      Sure.  Is compensation a material

9    term of employment?

10               MR. PERLOWSKI:  Object to the form.

11   You can answer.

12               THE WITNESS:  I'm not an HR person.

13   I haven't worked in HR, so you'd have to give me

14   a better explanation of that question before I

15   answer.

16   MS. GIBSON:

17       Q      Okay.  Is -- so you understand what

18   material -- like, important material term would

19   be employed by NAF is.  Do you understand that?

20       A      Yes.

21               MR. PERLOWSKI:  Object to the form.

22   BY MS. GIBSON:

23       Q      And would compensation be a material

24   term of being employed by NAF or --

25               MR. PERLOWSKI:  Object -- sorry.

Page 26

1    Object to the form.

2                    THE WITNESS:  Repeat the question.

3    BY MS. GIBSON:

4         Q    Okay.  And you answered the first

5    part that you understood what a material term of

6    employment is to NAF.  My question is, is

7    compensation considered a material -- a material

8    term of employment -- of employment?

9                    MR. PERLOWSKI:  Object to the form.

10   You can answer.

11                   THE WITNESS:  I mean, yes.

12   BY MS. GIBSON:

13        Q    Can you turn to page 2 of the letter

14   offer and go to paragraph three.

15        A    Page 2?

16        Q    Yes, ma'am.

17        A    Paragraph -- this is of the offer

18   letter; correct?

19        Q    Yes, it is.

20        A    And you want -- okay.  The third

21   paragraph?

22        Q    Uh-huh (affirmative).

23        A    Okay.

24        Q    And that states, manager agreements,

25   Gina is eligible to receive a regional manager

Page 27

```
 1    override, it says, outlined in Schedule 1
 2    regional manager agreement.  Do you see that?
 3         A     Yes.
 4         Q     So the letter offer here is
 5    referencing Schedule 1 to the regional manager
 6    agreement; is that correct?
 7         A     Yes.
 8               MR. PERLOWSKI:  Object to the form.
 9    You can answer.
10    MS. GIBSON:
11         Q     And if you go -- I'll represent to
12    you, the regional manager agreement is at Bates
13    669.  And those are the numbers in the lower
14    left-hand corner of the page.  I'm sorry.  I
15    think I got that --
16         A     I don't see a 669.  What -- which
17    page are you?
18               MR. PERLOWSKI:  It's page -- page 9
19    of the exhibit.
20               THE WITNESS:  Page 9?
21               MR. PERLOWSKI:  Page 9 of the
22    exhibit.
23    BY MS. GIBSON:
24         Q     No, I'm sorry.  It's page -- so on
25    the bottom left, you see Spearman with numbers
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 28

1   after it?

2        A      Yes, ma'am.

3        Q      Okay.  So it says -- it will say

4   Spearman 669.

5        A      Okay.

6        Q      And that's titled Schedule 1 Regional

7   Manager Compensation Details.

8        A      Okay.  I have it.

9        Q      So this is the Schedule 1 that is

10  referenced in paragraph three of the loan

11  offer -- I'm sorry -- the letter offer; is that

12  correct?

13       A      Yes.

14              MR. PERLOWSKI:  Object to the form.

15  BY MS. GIBSON:

16       Q      And we're going to look at those in

17  more detail in a minute, but the Schedule 1

18  provides the details of Ms. Spearman's

19  compensation; is that correct?

20       A      Give me just a moment to look through

21  it.

22       Q      Sure.

23       A      Yes.

24       Q      And we're going to come back to it,

25  but it contains details on how her override

Page 29

1   bonuses are to be paid; is that correct?

2        A       Yes.

3        Q       Okay.  And if you go back to the

4   letter offer, I just want to look at one more

5   provision in there.  If you go to page 5 of the

6   letter offer.

7        A       Okay.

8        Q       And is that page -- her initials are

9   on the bottom?

10       A       Yes.

11       Q       Okay.  And at the top, there's a

12  block with -- it says Gina Spearman e-signed

13  2016-11-6, 11:53 a.m.  Are all contracts given to

14  employees of NAF DocuSigned like this?

15              MR. PERLOWSKI:  Object to the form.

16  You can answer.

17              THE WITNESS:  To my knowledge, yes.

18  BY MS. GIBSON:

19       Q       And if you look at the last paragraph

20  on that page --

21       A       On page -- are you --

22       Q       The same page.

23       A       Excuse me.  Are you referring back to

24  page 5?

25       Q       Yes, ma'am.

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 30

1          A       Okay.

2          Q       If you read the -- you can read the

3    entire paragraph, but I really want to ask you

4    about the last sentence.

5          A       Number four?

6          Q       And we're on page 5, and it's the

7    last --

8          A       Page --

9          Q       Page 5 of Spearman -- of the letter

10   offer.  It's Spearman 652.

11         A       Oh, I'm sorry.  I was looking at page

12   5 of the offer letter.  So we're back -- where is

13   it, 652?

14         Q       Yes.  And it actually is page 5 of

15   the offer letter.

16                 MR. PERLOWSKI:  And if it helps, it's

17   page 5 of the exhibit, as well.

18                 THE WITNESS:  So Spearman 0652,

19   that's the page you're referencing?

20   BY MS. GIBSON:

21         Q       Yes.

22         A       Okay.

23         Q       Do you see the last paragraph on that

24   page?

25         A       Yes, ma'am.

Page 31

```
1         Q      It begins, "This letter contains the
2    entire agreement."  I just want to make sure
3    we're in the right place.
4         A      Yes.
5         Q      Okay.  And you can read the -- if you
6    want, the entire paragraph, but I want you to
7    read the last sentence.
8                It states, "The material terms of
9    your employment as set out in this letter may not
10   be modified or amended by verbal agreement or
11   course of conduct, but only by a written
12   agreement presented by human resources COO,
13   presently Christy Bunce, or CEO, presently Rick
14   Arvielo."
15               Do you see that?
16        A      Yes.
17        Q      And so what did -- what did this mean
18   to you when you reviewed this before sending
19   it -- before it went to Ms. Spearman?
20        A      Exactly as it reads.  It's
21   referencing this specific offer letter that
22   outlines her title and her guarantee.  It's
23   specific to this letter.
24        Q      Is it specific --
25        A      Exactly as it reads.
```

30(b)(6) & Indv. Jan Preslo                      January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 32

1        Q        I'm sorry.  Okay.  And is it also

2    specific to Schedule 1 that is identified in

3    paragraph three?

4                 MR. PERLOWSKI:  Object to the form.

5    BY MS. GIBSON:

6        Q        You can answer.

7        A        No.

8        Q        Why not?

9        A        Because this is an offer letter

10   that's going over her guarantee and is going over

11   her title.  This sentence is specific to this

12   letter.

13       Q        And so your testimony is that it's

14   not specific to manager agreements.  Gina is

15   eligible to receive a regional manager override

16   outlined in Schedule 1 of the regional manager

17   agreement?

18                 MR. PERLOWSKI:  Object to the form.

19   BY MS. GIBSON:

20       Q        You may answer.

21       A        This letter -- this specific sentence

22   is referencing this offer letter specifically.

23       Q        And all of the -- and all the terms

24   contained in it?

25       A        No.  It's for this guarantee portion,

Veritext Legal Solutions

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 33 of 192
30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

1    her 12-month guarantee.

2          Q       Okay.  So that paragraph just applies

3    to some portions of this letter offer?

4          A       Correct.

5          Q       Is that what you're saying?

6          A       Yes.

7          Q       Okay.  And in your conversations with

8    Ms. Spearman about the letter offer, did you

9    explain to her that -- that this -- that the

10   material terms of your employment as set out in

11   this letter may not be modified or amended by

12   verbal agreement or course of conduct and only by

13   a written agreement?  Did you explain that that

14   only applies to a guarantee?

15         A       I did not get into that detail with

16   her, no.

17         Q       Did anyone from NAF explain that to

18   her?

19         A       I -- I can only testify to what I

20   reviewed with her.  I don't know if --

21         Q       And this --

22         A       -- she had conversations with our COO

23   and others, so I don't know.

24         Q       All right.  And this paragraph

25   doesn't say that, though, does it?

30(b)(6) & Indv. Jan Preslo                          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                      Page 34

 1                    MR. PERLOWSKI:  Object to the form.
 2      BY MS. GIBSON:
 3          Q       You may answer.
 4          A       I'm sorry.  Can you repeat the
 5      question?
 6          Q       Yeah.  You -- you said that this
 7      sentence only applies to the guarantee, but it
 8      doesn't say that in this sentence or the
 9      paragraph, does it?
10          A       The material terms of your employment
11      is set forth in this letter -- in this letter.
12          Q       Right.
13          A       Exactly what it says, which is
14      this -- this is her overview of her guarantee.
15          Q       And do you agree that Schedule 1 is
16      referenced in paragraph three?
17                    MR. PERLOWSKI:  Object to the form.
18      You can answer.
19                    THE WITNESS:  So just hang on a
20      second.  Let me refer back to that.  I was
21      looking through the -- we're on 6 -- we're on
22      065 -- excuse me.  I just want to make sure I'm
23      answering correctly.  We're on -- we're on 0652,
24      and then you are referencing -- I'm sorry.  Which
25      other paragraph?

Page 35

1    BY MS. GIBSON:

2          Q       Well, I'm just asking, you said that

3    this sentence only applies to this letter offer.

4          A       Yes.

5          Q       And I'm asking you, does the letter

6    offer of paragraph three contain the words,

7    Schedule 1 - Regional Manager Agreement --

8                  MR. PERLOWSKI:  Object to the form.

9    BY MS. GIBSON:

10         Q       -- right there on the bottom 0649?

11                 MR. PERLOWSKI:  Object to the form.

12   Mischaracterizes the document.  You can answer.

13   BY MS. GIBSON:

14         Q       You may answer.

15         A       Back to 0649?

16         Q       Yep.

17         A       Gina is eligible to receive a

18   regional manager override.  Yes, it's referencing

19   the Schedule 1, which is in a different document.

20         Q       And so this last sentence stating

21   that her employment -- the material terms may

22   only -- material terms of employment as set out

23   in this letter may only be modified or amended --

24   may not be modified or amended by verbal

25   agreement or course of conduct but only by a

Page 36

1   written agreement presented by HR or COO or CEO.

2               So does that mean a written agreement

3   had to be presented to change the terms of the

4   letter offer?

5               MR. PERLOWSKI:  Object to the form.

6   You can answer.

7               THE WITNESS:  So changing her terms

8   of her guarantee would have required that to be

9   given to her, you know, by Christy Bunce or Rick

10  Arvielo, as far as the terms of her guarantee.

11  BY MS. GIBSON:

12      Q      Does it say anywhere in here that

13  this -- that that applies only to her guarantee?

14      A      I'm going to go back to my statement

15  that it says it's material to this letter, which

16  is the offer of employment letter.

17      Q      And that's your testimony, but

18  that's -- is that stated anywhere in this letter

19  offer, is my question?

20      A      I believe when it -- as the sentence

21  reads, the material terms of your employment is

22  set out in this letter, this letter is

23  referencing the offer of employment letter.

24      Q      Right.  And her guarantee and

25  Schedule 1; correct?

Page 37

 1              MR. PERLOWSKI:  Object to the form.

 2              THE WITNESS:  The Schedule 1 is

 3    referenced in this offer letter, but it is not

 4    part of this sentence referenced in this offer

 5    letter.  If you read the -- if you read it, it

 6    states that there is an attachment.

 7    BY MS. GIBSON:

 8         Q      If you read it, it states what?

 9         A      And then if -- if you look at the --

10    hold on one sec.  Let me go back.

11         Q      Uh-huh (affirmative).

12         A      The Schedule 1 -- the offer letter

13    states that there is a regional manager override

14    schedule that outlines her compensation --

15         Q      Is that --

16         A      -- for her override.  Specifically to

17    her override.  Gina is eligible to receive a

18    regional manager override.

19         Q      Outlined in Schedule 1, that's

20    what --

21         A      Outlined in Schedule 1 Regional

22    Manager Agreement.

23         Q      Okay.  Let's go to Bates 6 -- in that

24    same document, Spearman 0669, and it is the

25    Schedule 1 Regional Manager Compensation Details.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 38

 1                 MR. PERLOWSKI:  I'm sorry.  MaryBeth,
 2    which page did you say?
 3                 MS. GIBSON:  Spearman 0669.
 4                 MR. PERLOWSKI:  Thank you.
 5                 MS. GIBSON:  Sure.
 6                 THE WITNESS:  Okay.
 7    BY MS. GIBSON:
 8         Q     You have that page?  And if you look
 9    at the top, it has that same DocuSign by
10    Ms. Spearman.  Do you see that?
11         A     Yes.
12         Q     So was the letter offer, the regional
13    manager agreement, and the Schedule 1 presented
14    by human resources to Ms. Spearman at the same
15    time?
16         A     Yes, it looks that it was sent at the
17    same time.
18         Q     And Ms. Spearman signed it, it
19    appears, at the same time, would you agree?
20         A     Yes.
21         Q     Okay.  And so this Schedule 1 is
22    what's referenced -- what we just looked at in
23    paragraph three of the offer letter?
24         A     Uh-huh (affirmative).
25         Q     Schedule 1 Regional Manager

Page 39

1    Compensation Details, do you see that title?

2          A     Yes.

3          Q     Okay.  And if we turn to the next

4    page, which is Spearman 0670.

5          A     Yes.

6          Q     And it has a paragraph 1.4, which is

7    titled, The Override Bonus Calculation Table.

8          A     Yes.

9          Q     Okay.  And that basically describes

10   how override bonuses are to be paid to

11   Ms. Spearman.  And if you look at the next page,

12   0671, it contains a table.

13         A     Is that a question?

14         Q     No, I'm just directing you to it.

15         A     Yes.  Okay.  I've got it.

16         Q     Are you there?

17         A     Uh-huh (affirmative).  Yes, ma'am.

18         Q     And -- and that override bonus

19   calculation table was how -- was that how

20   Ms. Spearman's compensation was to be computed?

21               MR. PERLOWSKI:  Object to the form.

22   You can answer.

23               THE WITNESS:  Yes.

24   BY MS. GIBSON:

25         Q     Okay.  And then there is a

Page 40

1    subparagraph 1.4.A.

2           A      Yes.

3           Q      And that provides, "The following

4    loan scenarios will not receive the override

5    bonus BPS shown in the above table, but will

6    instead receive the BPS shown as indicated

7    below."

8                  And it states, "Branch jumbo-funded

9    loans, excluding Kelly Morrison, max 20 BPS, 70

10   percent to Kelly, 30 to Gina."

11                 Do you see that, see the schedule set

12   up for bonus allocations?

13          A      Yes.

14          Q      So that's how jumbo-funded loans were

15   to be -- how overrides on jumbo-funded loans were

16   to be compensated?

17          A      Yes.

18          Q      Okay.  And then if you go to 1.4.B.

19          A      Yes.

20          Q      And it says, "No override bonuses to

21   be paid on the following loans."  And it lists

22   eight loans, do you see that?

23          A      Yes.

24          Q      It carries over to the next page.  It

25   has a yes and a no, and it's checked no, not

Page 41

1   applicable to this Area Manager Schedule.  Do you

2   see that?

3       A      Yes.

4       Q      Okay.  And this provision is actually

5   written in the double negative.  It says, "No

6   override bonus will be paid on the following

7   loans," lists eight loans, and then it says, "No,

8   not applicable to this Area Manager Schedule"; is

9   that correct?

10              MR. PERLOWSKI:  Object to the form.

11  Mischaracterizes the document, but you can

12  answer.

13              THE WITNESS:  No.  So the yes -- at

14  the time that this document was prepared, these

15  yes, noes apply to -- applies to these schedules,

16  to these loans.

17              So if you look at -- so it says a

18  yes, no, there can be amendments after the fact

19  with individuals who are hired where this

20  regional addendum can be modified.

21  BY MS. GIBSON:

22      Q      So right now, it's checked, no, not

23  applicable to this Area Manager Schedule.  We're

24  going to -- we're going to get to modifications

25  later, but I'm just asking about the original

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 42 of 192

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 42

1    contract dated -- or signed by Ms. Spearman

2    November 6th, 2016.

3                    This particular box, is it checked

4    no?

5          A        At the time that this document --

6                    MR. PERLOWSKI:  Object to the form.

7    BY MS. GIBSON:

8          Q        Go ahead --

9                    MR. PERLOWSKI:  Go ahead.

10   BY MS. GIBSON:

11         Q        -- Ms. Preslo, you can answer.

12         A        At the time that this document was

13   prepared, the "no" is checked.

14         Q        Okay.

15         A        Correct.

16         Q        And right above it, it says, "Yes,

17   see attached Schedule 4"; correct?

18         A        Correct.

19         Q        But it's not marked "yes"; is that

20   true?

21         A        It's not marked "yes."

22         Q        Okay.

23         A        Correct.

24         Q        So for -- so for Schedule 4 to be --

25   to be applicable, "yes" would have to be checked;

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 43

1    is that correct?

2         A       At the time that this document was

3    prepared, there was not a Schedule 4.

4         Q       Correct.

5         A       So that is why it's marked "no."

6         Q       Okay.  And for any Schedule 4 to be

7    applicable, "yes" would have to be checked?

8         A       At the -- yes.  When this document

9    was prepared, the "yes" was not applicable.

10        Q       I understand that.  But I'm just

11   asking you, not with respect to this document,

12   but for a Schedule 4 to be applicable, "yes" in

13   this box, not necessarily on this document, but

14   "yes" would have to be checked; is that true?

15               MR. PERLOWSKI:  Object to the form.

16   You can answer.

17        Q       You can answer.

18        A       Yes.

19        Q       Okay.  And so checking "no" here,

20   does that mean that all of these loans identified

21   above that line, Ms. Spearman should have

22   received an override bonus on?

23               MR. PERLOWSKI:  Object to the form.

24               THE WITNESS:  That is not correct.

25   BY MS. GIBSON:

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 44

1       Q       Okay.  Why not?

2       A       Because the -- the 1.4.B lists out --

3   lists out the loans.  And then this specific, see

4   attached Schedule 4 yes, no, is applicable to the

5   "no" override during the guarantee period.

6               At the time that she was hired, all

7   the loan officers were on guarantees, and she was

8   on a guarantee, and Kelly Allison was on a

9   guarantee for 12 months.

10              So it is -- this "no" is specific to

11  the Schedule 4 above, not to all of the loans

12  listed in the previous bullet points.

13      Q       Did you explain that to Ms. Spearman

14  when you spoke to her after she received her

15  letter offer and Schedule 1?

16      A       I know that during conversations with

17  Kelly and Gina, there were discussions on loans

18  that were paid or not paid.  I don't -- I don't

19  recall specifically going through these yes, no,

20  boxes with her.

21      Q       Right.  Because you -- the

22  discussions that you had with Ms. Spearman and

23  Kelly were well after they signed these

24  agreements, when they weren't being paid the

25  overrides on those loans; correct?

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 45 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45

1         A       No, that's not correct.

2                 MR. PERLOWSKI:   Object to the form.

3    Mischaracterizes testimony.  You can answer.

4    BY MS. GIBSON:

5         Q       When were the discussions held?

6         A       Discussions, when we're recruiting

7    individuals, you have conversations around your

8    compensation, loans excluded, not excluded.

9    Kelly Allison went back and forth on the split

10   that she was going to give Gina because that was

11   Kelly Allison's -- 100 percent her decision on

12   the compensation that Gina Spearman would be

13   paid.

14                And so when someone receives the

15   offer letter, we would have had discussions

16   around loans not receiving -- or not being

17   eligible to be paid an override.

18        Q       Do you recall those discussions?

19        A       I don't specifically recollect, but

20   I -- it would have been part of the process of

21   recruiting them, but those conversations would

22   have taken place either between myself or Christy

23   or Jon Reed.

24        Q       So if both Ms. Allison and

25   Ms. Spearman were surprised and expressed

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 46 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 46

1    surprise, after signing these agreements and

2    after the guarantee period was over, that they

3    weren't receiving these loans, why would that be

4    if you explained to them that they weren't

5    receiving overrides on those loans?

6              Why would that be if you had already

7    told them they wouldn't be if they -- before they

8    signed the contract?

9         A    I don't --

10             MR. PERLOWSKI:  Object to the form.

11   Calls for speculation.  Mischaracterizes

12   testimony.  You can answer.

13             THE WITNESS:  I don't recall them

14   being surprised.

15   BY MS. GIBSON:

16        Q    Do you recall them ever coming --

17   well, let me ask you this.

18             After -- on a monthly basis, do they

19   receive the BMA on override spreadsheets?

20        A    Part of the process of calculating

21   their monthly override, the commission team

22   prepared a manager override recap.  And that

23   document was sent to Gina, Kelly, their executive

24   assistant, for them to review and to have any

25   questions at that point.

Page 47

```
 1              If, you know, their -- their
 2   agreement with the compensation split was a
 3   little complex.  So they had the opportunity, you
 4   know, to review that recap every single month.
 5   They received it after the production month.
 6   When I say production month, I mean funded
 7   production month.
 8        Q     So when you say the agreement was
 9   complex, what are you referring to?
10        A     I meant their split.  Let me -- let
11   me clarify that.  Their -- their compensation
12   split of splitting comp was not common.
13        Q     Yeah, it was 70/30.  But that's not
14   complicated, is it?  70 percent versus 30 adds up
15   to 100.
16              MR. PERLOWSKI:  Object to the form.
17   Is that a question?
18   BY MS. GIBSON:
19        Q     Yeah.  I mean, tell me what was
20   complicated about that versus identifying the
21   overrides that were to be paid on these loans and
22   this contract.  I -- I don't understand.  Tell me
23   what you understood to be complicated about their
24   split.
25        A     They had a large territory.  They had
```

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 48 of 192
30(b)(6) & Indv. Jan Preslo                         January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 48

1   a lot of loans.  Their spreadsheet contained a

2   lot of -- it had a lot of -- a lot of details for

3   them to review, so --

4        Q      And so in the end, you took the --

5   the total, and they were just split 70/30; is

6   that correct?

7        A      There's a -- there was a recap form,

8   and it outlined loans eligible, not eligible.

9   Kelly received overrides on producing branch

10  managers that Gina did not.  Those had a

11  different calculation split.  So Gina was part of

12  reviewing that recap each month with Kelly.

13       Q      And did Ms. Spearman come to you and

14  ask you, after reviewing those spreadsheets, why

15  she wasn't being paid overrides on the loans

16  identified after 1.4.B?

17       A      I don't recall that, no.

18       Q      You don't recall any conversations

19  with Ms. Spearman when she came to you and asked

20  you that?

21       A      I do not.

22              MR. PERLOWSKI:  Object to the form.

23  Foundation.

24  BY MS. GIBSON:

25       Q      Do you have any recollection of

Page 49

1    conversations on the phone with Ms. Spearman --
2         A      No.
3         Q      -- regarding why she wasn't being
4    paid overrides on the loans under 1.4.B?
5         A      No.
6         Q      Let's go back to Exhibit 3, where we
7    were at the yes, no, line on Spearman 0672.
8         A      Okay.
9         Q      Okay.  And under 1.4.C, there are
10   several little points, and they say, "The
11   following notice will be deducted from the
12   override bonus calculation."  And then they're
13   marked, no, not applicable.
14              So did that mean they were not to be
15   deducted from Ms. Spearman's override bonus
16   calculation?
17        A      At the time that this --
18              MR. PERLOWSKI:  Object to the form.
19   You can answer.
20              THE WITNESS:  At the time that this
21   addendum was prepared in 2016, it's marked "no,"
22   because it did not apply.
23   BY MS. GIBSON:
24        Q      Okay.  And that's the same with 1.4.D
25   and E, they're both checked "no"; correct?

Page 50

1           MR. PERLOWSKI:  Take your time and

2    look at the document, Ms. Preslo.

3           THE WITNESS: 1.4.D is marked "no"

4    because at the time that this document was

5    prepared in 2016, it did not apply.

6    MS. GIBSON:

7      Q     And 1.4.E, is that the same response,

8    did not apply?

9      A     Correct.

10     Q     Okay.  So when NAF HR sent the letter

11   offer regional manager agreement with this

12   Schedule 1 over to Ms. Spearman, did it have any

13   intent on paying the loans identified in those

14   first seven bullet points under 1.4.B?

15     A     Can you repeat that, please.

16     Q     Sure.  So we talked about the

17   documents here being sent to Ms. Spearman by HR

18   and sometime before November 6th when she -- 16th

19   when she signed it.

20           And you testified that 1.4.B is

21   marked "no" and that it just applied to the --

22   and correct me if I'm wrong.  I don't want to

23   misstate your testimony -- that it just applied

24   to that last bullet point; is that correct?

25     A     1.4.B. outlines --

Page 51

1              MR. PERLOWSKI:  Object to the form.

2              THE WITNESS:  On 0671, 1.4.B outlines

3     the one, two, three, four, five, six, seven,

4     eight bullet points of loans.  No override bonus

5     will be paid on the following loans.

6              The yes, no, on page -- the next page

7     is no, specifically to the Schedule 4.  There was

8     no Schedule 4 applicable at the time.  Specific

9     to Schedule 4, because all of the loan

10    officers -- everyone that came was on guarantees.

11    BY MS. GIBSON:

12        Q     So at the time NAF sent this contract

13    to Ms. Spearman, did it have any intent to pay

14    the bonuses under 1.4.B in the first seven bullet

15    points?

16        A     No, there was no intention to pay her

17    on those loans.  However, please note that she

18    was on a 12-month guarantee.

19        Q     Why isn't there a yes, no, under each

20    of those seven bullet points?

21             MR. PERLOWSKI:  Object to the form.

22    BY MS. GIBSON:

23        Q     You may answer.

24             MR. PERLOWSKI:  Speculation.  Outside

25    the scope of any representative testimony, as

Page 52

1  well.

2              MS. GIBSON:  I think she was

3  testifying she's -- she testified about contracts

4  and compensation, and so to my --

5              MR. PERLOWSKI:  That's -- that's not

6  the topic, MaryBeth, and you know it.

7              MS. GIBSON:  Well --

8              MR. PERLOWSKI:  There's no topic that

9  says -- compensation, yes.  There's no topic that

10  says she's testifying about contracts.

11              MS. GIBSON:  Okay.  Well, this is

12  about compensation, Henry.  Henry, this is her

13  compensation, which you believe --

14              MR. PERLOWSKI:  You're asking her --

15  you're asking her why a document wasn't prepared

16  a certain way.  That's not a -- that's not a

17  question about --

18              MS. GIBSON:  You can answer the

19  question.  Your objection is noted.  You can

20  answer the question.

21              THE WITNESS:  Can you repeat the

22  question?

23  BY MS. GIBSON:

24       Q     Yes.  Do you know why there's not a

25  yes, no, after each bullet point in 1.4.B?

Page 53

```
 1        A        If we go to the last bullet point,
 2   that can change.  You can have an individual that
 3   might be -- a loan officer that is on a guarantee
 4   or not on a guarantee.  Number two, brokered
 5   loans, there would not be a yes, no, there
 6   because there was never -- that was -- every
 7   brokered loan that closed, no override was paid.
 8   So there's not a purpose for a -- a yes or no.
 9               If you want my opinion, I don't
10   prepare these documents.  They were prepared by
11   legal HR.  But brokered loans never get paid on a
12   brokered loan.
13        Q        Did you tell Ms. Spearman that?
14               MR. PERLOWSKI:  Object to the form.
15   BY MS. GIBSON:
16        Q        You can answer.
17               MR. PERLOWSKI:  You mean other than
18   in the contract?
19               THE WITNESS:  I don't remember a
20   specific conversation.  We had many
21   conversations, and I'm assuming that we would
22   have gone over that, but I don't specifically
23   remember the exact time frame of having the
24   conversation.
25   BY MS. GIBSON:
```

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 54 of 192
30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 54

 1          Q      Do you agree this -- these provisions
 2    under 1.4.B, C, and D are confusing?
 3                 MR. PERLOWSKI:  Object to the form.
 4                 THE WITNESS:  My opinion, are they
 5    confusing, no.
 6    BY MS. GIBSON:
 7          Q      Are all regional -- regional managers
 8    contracts with this Schedule 1, are they all
 9    checked "no" under 1.4.B?
10                 MR. PERLOWSKI:  Object to the form.
11                 THE WITNESS:  1.4.B outlines the
12    loans that are not eligible for an override, and
13    then the schedules that have the schedule -- yes,
14    no, for Schedule 4, 1.4.C, the bullet points
15    after that, yes, that the -- this document with a
16    yes or no is in every regional manager agreement.
17    BY MS. GIBSON:
18          Q      Thank you.  And is -- in every
19    regional manager agreement, is it checked "no" --
20                 MR. PERLOWSKI:  Object to the form.
21    BY MS. GIBSON:
22          Q      -- under these paragraphs?
23                 MR. PERLOWSKI:  Object to the form.
24                 THE WITNESS:  If a regional manager
25    was hired and not on a guarantee, no.  It -- it

Page 55

1    could be yes or no, depending upon guarantee

2    situations.  They may have hired loan officers

3    with guarantees or not guarantees.

4              When this document was prepared for

5    Gina Spearman, it is indicated "no," as they were

6    all on guarantees.

7    BY MS. GIBSON:

8         Q    Did NAF pay any regional managers or

9    branch managers overrides on any of the loans in

10   those seven bullet points under 1.4.B?

11        A    Regional managers -- branch managers

12   were not paid overrides on these loans -- well,

13   on the bullet-pointed loans under 1.4.B.

14        Q    Was Eric Fellows ever paid overrides

15   on those loans under 1.4.B?

16             MR. PERLOWSKI:  Objection.

17             THE WITNESS:  There was an incident

18   with Eric Fellows when he was hired that -- and I

19   was not involved in hiring him.  I had never met

20   Eric Fellows.

21             He received, I believe, his manager

22   recap outside of his -- once he was outside of

23   his guarantee period, there were deductions for

24   the guarantee period.

25             Kelly Allison had reached out to me

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 56

1    and had indicated that he was really upset about

2    it, didn't understand it, and she could not

3    recollect.  She said she had gone -- she wasn't

4    clear if she'd reviewed it with him or not

5    because Eric Fellows was going into -- you know,

6    new to the company.

7                   We did make an exception for an

8    initial group that he had recruited for him to be

9    paid overrides for that specific group.  So an

10   exception was made, from my recollection.

11   BY MS. GIBSON:

12        Q    So NAF -- it was checked "no," but

13   NAF paid Eric Fellows?

14                   MR. PERLOWSKI:  Object to the form.

15   Mischaracterizes testimony.  This is also outside

16   the scope, as Mr. Fellows was not a regional

17   manager.  So it's outside the scope of any topics

18   permissible --

19                   MS. GIBSON:  I just want to be sure I

20   understand that the --

21                   MR. PERLOWSKI:  -- that the Court

22   ordered with respect to topic six.  So I want to

23   assert that.  You can answer, Ms. Fellow --

24   Ms. Preslo.  Sorry.

25                   THE WITNESS:  I would have to look at

Case 1:20-cv-04981-CAP  Document 100  Filed 04/28/22  Page 57 of 192

30(b)(6) & Indv. Jan Preslo                January 21, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 57

1   his agreement.  I don't know if it -- that -- if

2   it had a yes or a no.  I don't know.  I'd have to

3   look at it, the exhibit.

4   BY MS. GIBSON:

5       Q       So topic 13 is any document from NAF

6   which NAF contends provided written notice to

7   Ms. Spearman regarding changes to her

8   compensation.

9              Are you aware of any documents that

10  NAF contends provided written notice to

11  Ms. Spearman regarding changes to her

12  compensation?

13      A       Are you referring to -- okay.  If you

14  can -- if I can ask a question.  Are you

15  referring to something on this exhibit, or is

16  this a separate question --

17      Q       It's a separate question.

18      A       -- not applicable to this exhibit?

19      Q       Yeah, no, it's a separate question.

20  So topic 13 of the 30(b)(6) Notice identified you

21  as a witness having knowledge of any document

22  from NAF that it contends provided written notice

23  to Ms. Spearman regarding changes to her

24  compensation.

25              So after this agreement and before

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 58 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 58

1    the -- there -- I understand there was a March 1,

2    2020, amendment, and we're going to talk about

3    that, are you aware of any documents that

4    provided written notice to Ms. Spearman regarding

5    changes to her compensation?

6         A      If there were changes, I don't

7    recollect off the top of my head.  But the

8    process would be to have a conversation with the

9    regional manager of the changes.  Not all changes

10   are bad.  Some changes are positive.  So a

11   conversation would be had about a compensation

12   change, and then HR would prepare that document

13   and send it to the employee.

14        Q      And that's what happened every time

15   there was a change to a, you said, employee's

16   compensation?

17        A      To -- you know, specific to an

18   override bonus, their manager compensation.  I

19   mean, yes.

20        Q      So specifically, then, with respect

21   to Ms. Spearman, are you aware of any documents

22   that NAF contends provided written notice to

23   Ms. Spearman regarding changes to her

24   compensation?

25        A      In regards to the override bonus?

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 59

1          Q       Yes.

2          A       Her split with Kelly Allison, if

3      there was changes to a split, that would have

4      been -- the process would have been to have that

5      discussion with her, and the document would have

6      been prepared and sent by HR.

7          Q       So was there any change to her

8      compensation before March 1, 2020?

9          A       There was a change in regards to --

10     we had a change in regards to they waived

11     overrides.  And written in their agreement is you

12     can waive overrides by written note -- with a

13     manager agreeing to that.  There was a change.

14     It was through the process of agreeing to waive

15     your override.  It's in the agreement that the

16     regional manager can agree to waive your override

17     on -- on a specific loan.

18              At the time prior to around March

19     2019, there was a favorable change that our --

20     our HR department, along with legal, said a

21     regional manager can waive a portion of their

22     override but not all of it.

23              So to give you an example, my

24     override could be $200.  Previously, our

25     requirement was that if a regional manager agreed

Page 60

1   to waive -- to my override, I would have to forgo

2   $200.  But regional manager overrides was deemed

3   to be able to be waived in increments, so it

4   was in a -- it was in a regional manager's favor.

5        Q      And you said in this document, this

6   contract with Ms. Spearman, it says that they can

7   waive their override?

8        A      Yes.

9        Q      Okay.  My question is a little

10  different.  Did NAF ever issue a written document

11  that changed the terms of Ms. Spearman's

12  compensation in Schedule 1?

13       A      Okay.  The Schedule 1 refers back to

14  the loans that they did not get paid an override

15  on and the yes, no, boxes that are applicable to

16  those loans.  So she would have received updates,

17  based on hiring loan officers within that

18  guarantee period.  So, yes, she would have

19  received updates to her compensation to the

20  Schedule 1 after her hire date.

21       Q      Can you explain to me what you mean

22  by an update?  Is that an email that says, we're

23  paying you this based on the people you hired?  I

24  don't understand what an update is.

25              MR. PERLOWSKI:  Yeah, hold on a

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 61

```
 1   second.  Object to the form.  I'm not sure if at
 2   all -- I don't know whether that was a
 3   declaratory sentence or a question.
 4               MS. GIBSON:  It was a question.  What
 5   is an update?
 6               MR. PERLOWSKI:  You said I -- you
 7   said you don't understand, with a question mark
 8   at the end.  I'm not sure that's --
 9               MS. GIBSON:  I said I don't
10   understand, can you explain to me what an update
11   is.
12               MR. PERLOWSKI:  Okay.  Fair enough.
13   That is a question.
14               MS. GIBSON:  Yes.  Thank you.
15   BY MS. GIBSON:
16        Q      Go ahead, Ms. Preslo.
17        A      A loan officer -- I just -- I want
18   to -- let me finish.
19        Q      You may answer.
20        A      Okay.
21        Q      If you can explain to me what you
22   meant by --
23        A      I'm trying to -- I'm trying to
24   explain it to you, so give me a moment.  So I
25   hire -- a loan officer is hired.  You hire Jan
```

Page 62

1    Preslo.  Jan Preslo was a $20,000-a-month

2    guarantee for two months.  I start on Monday.

3                   An update would be an amendment where

4    the Schedule 4 would be updated, including Jan

5    Preslo on that schedule, that I'm not going to

6    receive an override.  The manager is not going to

7    receive an override, because it's over $5,000,

8    during the guarantee period, unless that

9    guarantee is exceeded.

10                  So that's what I mean when I say an

11   -- you know, an update.

12        Q    So an update, by your example, just

13   so I understand -- this is a question.  An

14   update --

15        A    And I'm -- and I'm going to ask, when

16   we finish this, if we can take a break.

17        Q    No, of course.  No.

18        A    Because we've been going for almost

19   an hour a half.

20        Q    Yeah.

21        A    If that's okay with you.

22        Q    That's perfect.  Whenever you need a

23   break.

24                  So an update -- an example of an

25   update would be a Schedule 4; is that correct?

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 63

1        A        That is an example, yes, ma'am.

2        Q        And just one more question, before we

3    break, on this topic.  And would -- in Schedule

4    1, would that box under 1.4.B need to be checked

5    "yes" to allow NAF to issue updates?

6                 MR. PERLOWSKI:  Object to the form.

7    You can answer.

8                 THE WITNESS:  So going back to the

9    Schedule 1.  And your specific question is to

10   the -- hold on.

11   BY MS. GIBSON:

12       Q        Well, let me try and clarify it.  You

13   said Schedule 4 are examples of updates that you

14   would give --

15       A        Uh-huh (affirmative).

16       Q        -- to regional managers.  Well, to be

17   able to give those updates, would -- would 1.4.B

18   need to be checked "yes"?

19       A        The para- --

20                MR. PERLOWSKI:  Object to the form.

21                THE WITNESS:  Under 1.4.B for --

22   specific to the yes, no, question on Schedule 4,

23   the process for HR would be to amend the

24   agreement, update the agreement, for the "yes" to

25   be checked.

Page 64

1   BY MS. GIBSON:

2        Q      To allow NAF -- and that would be --

3   okay.  So I understood.

4              And that would then allow NAF to

5   issue the updates that you call Schedule 4s;

6   correct?

7        A      Yes, ma'am.

8        Q      Okay.  One more question.  Did NAF

9   amend the Schedule 1 and give it to Ms. Spearman

10  where Schedule 1 was checked "yes"?

11       A      I would -- I don't have the exhibit

12  in front of me, but I'm sure it would have -- or

13  I'm sure HR would have updated this to a "yes."

14       Q      Okay.  And would they -- so I guess

15  I'll have to ask someone in HR, but would --

16  maybe you can answer.  Would -- if -- you

17  testified the process is you have a conversation,

18  HR prepares the document, this -- this new

19  Schedule 1 checked "yes," and would send it to

20  Ms. Spearman.  Would she then DocuSign it and

21  send it back?

22       A      Signing of the document isn't

23  required.  The document -- the document is sent

24  by HR.  Most employees, by practice, typically

25  will execute it.

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 65 of 192
30(b)(6) & Indv. Jan Preslo                         January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 65

1     Q      Does HR sign it?  Like, Mr. --
2     A      I don't know.  I don't -- I'm not
3   involved in preparing the documents that HR
4   sends, so I -- I mean, that would really be a
5   question that would need to be presented to HR.
6     Q      Okay.
7     A      But it's coming from HR, being
8   DocuSigned.  So, to me, in my mind, okay, HR is
9   sending it via DocuSign, so HR would have had to
10  prepare it.  I don't think we require HR to
11  execute.  It would --
12    Q      So do you have HR send it so that you
13  have -- so that you know it's been sent to your
14  employee?
15    A      HR sends the document.  I don't --
16  I'm not understanding.  And I -- if we could take
17  a break?
18          MS. GIBSON:  Yeah.  Okay.  Let's take
19  a break.
20          THE WITNESS:  Okay.  Thank you.  I
21  really appreciate it.
22          MS. GIBSON:  We can go off the
23  record.
24      (Proceedings in recess, 1:23 p.m. to
25      1:40 p.m.)

Page 66

1   BY MS. GIBSON:

2        Q       Ms. Preslo, were you always paid on a

3   salary from profit model?

4               MR. PERLOWSKI:  Objection.  Asked and

5   answered.  Go ahead.

6               THE WITNESS:  So I need to correct

7   that.  I've been with the company for 10 years.

8   So I initially was paid a salary, plus a flat

9   override bonus that was not tied to

10  profitability.  And there was -- I don't remember

11  the exact time frame, but it was -- my

12  compensation was later amended to a salary, and

13  the -- a percentage of profitability.  So there

14  was a -- I was not always paid on profitability.

15  BY MS. GIBSON:

16       Q       When approximately did that happen?

17       A       I -- I should probably know, but I --

18  I'd have to go back and look through my own

19  contract to give an -- an exact date on that.

20       Q       Do you remember if it was before

21  Ms. Spearman was hired or after Ms. Spearman

22  was -- I'm just looking for a general time.

23       A       It was after.

24       Q       After she was hired that you went

25  to --

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 67

1          A       I -- yes, it would have been after.

2          Q       Okay.  And you said you'd have to go

3     look at your amended contract to know when that

4     was?

5          A       To -- to give you an exact.  To

6     answer an exact time frame.

7          Q       Okay.  So when they changed -- when

8     NAF changed your compensation, it amended your

9     contract to reflect that?

10         A       There was a conversation with me

11    about it, and I received, you know, update or an

12    amended agreement from human resources.

13         Q       Okay.  And so when you said you went

14    to a salary and a bonus -- I mean, I'm sorry --

15    and salary and profit model -- I don't want to

16    misstate testimony.  So would you -- if the

17    company was profitable, you did -- would you

18    receive a bonus?

19         A       My compensation -- my compensation

20    was specifically tied to the outside retail

21    division, not the company profit.

22         Q       Got you.  So if outside retail was

23    profitable, you would receive a bonus?

24         A       Yes.

25         Q       When was the last time you received a

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 68 of 192
30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 68

1    bonus based on outside retail's profitability?

2          A      In current time frame?

3          Q      Uh-huh (affirmative).

4          A      I have a -- in my position, I have a

5    compensation cap.  And then my last -- for

6    profitability, you know, the last profit bonus

7    that I received was in October of last year.

8          Q      Did you receive one -- so last year

9    is '21.  Did you receive one in, let's say -- did

10   you receive one in 2018?

11         A      In 2018, I'm going to -- I need to --

12   I'm hesitating on answering because I'm not --

13   I'm hesitating on answering because I don't

14   remember the exact year that I went to a profit

15   component, so I'm concerned I'm going to misspeak

16   and give an incorrect answer.

17         Q      So when you went to a profit

18   component, did you just receive the -- the bonus

19   once a year or was it quarterly or how -- or

20   monthly?  How was -- how was that paid?

21         A      My profit component was month -- it

22   was monthly, but it -- it followed -- it was

23   based off of the time frame of the P&L being

24   prepared.

25         Q      Okay.

Page 69

1      A      Meaning that it was typically two

2    months lagging.





30(b)(6) & Indv. Jan Preslo                     January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 72

1    ▰▰▰▰▰▰

2         ▰▰▰▰▰▰

3         Q      Okay.  What's your current residence

4    address?

5         A      405 Calle De Aragon, Redondo Beach,

6    California 90277.

7         Q      I love Redondo Beach.  Sorry.

8    Offtrack, off topic.

9                Do you have any military experience?

10        A      No.

11        Q      Have you ever been arrested?

12        A      No.

13        Q      Are you currently married?

14        A      Yes.

15        Q      And what is your spouse's name?

16        A      Kenneth Preslo.

17        Q      Have -- do you have any former

18   marriages?

19        A      No.

20        Q      And where is your husband employed?

21        A      He's self-employed.

22        Q      What does he do?

23        A      He is a developer.

24        Q      And do you have any children?

25        A      Yes.

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 73

1          Q          How many?

2          A          One.

3          Q          What is your child's age?

4          A          He is 11.

5          Q          Do you have any relatives in Fulton

6     County, Georgia?

7          A          I have relatives, yes.  I'm from

8     Georgia originally, so I do have relatives spread

9     out through Georgia.

10         Q          What are their names?

11         A          I have a lot.

12         Q          Can you tell me their last names?

13    This is for purposes of trial.

14         A          Okay.  My maiden name is Britt,

15    B-R-I-T-T.  And Wade.  Those are immediate family

16    names.

17         Q          Okay.  Any others?

18         A          Brooks, B-R-O-O-K-S.  Elliott.

19         Q          Elliott?

20         A          Yes.  Those are immediate aunt, uncle

21    names.

22         Q          Do any reside in Fulton County,

23    Georgia?

24         A          I had a cousin.  I believe, that he

25    is in Fulton County, Georgia, yes.

Page 74

1        Q       What is his name?

2        A       Ron Tuck.

3        Q       How do you spell that last name?

4        A       T-U-C-K.

5        Q       Any other relatives in Fulton County?

6        A       I have a cousin, I believe, that's in

7   Fulton County.  Another cousin, Dana Elliott.

8        Q       How do you spell that last name?

9        A       E-L-L-I-O -- I think it's a double T.

10       Q       Okay.  Elliott.  Sorry.

11       A       Elliott.  Sorry.

12       Q       Anyone else?

13       A       Off the top of my head, no.

14       Q       Okay.  You said you were born in

15   Georgia?

16       A       Yes, ma'am.

17       Q       Where were you born?

18       A       In Lawrenceville, Georgia.

19       Q       How long did you live in Georgia?

20       A       I lived in Georgia through -- through

21   1987.

22       Q       When you left Georgia, did you leave

23   to go to California?

24       A       Yes, ma'am.

25       Q       And was that to be employed by NAF?

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 75

1       A       No, it was -- I was employed by Chase

2  Bank.

3       Q       Okay.  Where did you go to college?

4       A       Georgia State University.

5       Q       And what -- did you obtain a degree

6  there?

7       A       No.  I got caught up in the mortgage

8  business as a junior in college.

9       Q       Okay.  And who was the -- who did you

10  go to work for when you left Georgia State?

11       A       Oh, my original job was with a

12  company called Reliance Trust Company and Credit

13  Union.  And from that, I worked for a Chase -- at

14  the time, it was called Chase Home Loans, which

15  was a division of Chase Bank.

16       Q       And where did you go after Chase Home

17  Loans?

18       A       Countrywide.

19       Q       I know you've told me some of your

20  former employers, but from Countrywide, where did

21  you go?

22       A       I went to a company called Guild

23  Mortgage for two years, and then I was recruited

24  back to Countrywide.

25       Q       And where did you go after that?

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 76

1          A      Bank of -- Countrywide was acquired

2     by Bank of America.

3          Q      Okay.

4          A      And that is when I became a Bank of

5     America employee.

6          Q      Got you.  And then from -- I think

7     you told me from Bank of America, you were

8     recruited to NAF?

9          A      No.  I went to MetLife home loans,

10    which was a division of the MetLife companies.

11         Q      Okay.  Are you a member of any civic

12    organizations in Tustin?

13         A      No.

14         Q      Are you a member of any church?

15         A      Presently, yes.

16         Q      What's the name of that church?

17         A      Riviera United Methodist Church.

18         Q      Okay.  Have you ever been a party to

19    a lawsuit?

20         A      Yes.

21         Q      Individually or as an employee of a

22    company?

23         A      Individually.

24         Q      And what was that about?

25         A      I was the plaintiff with my husband

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 77

1    over a development project.

2          Q      So that related to his employment?

3          A      He's self-employed.  It was related

4    to a land acquisition.

5          Q      Okay.  And did that go to trial?

6          A      It did go to trial.

7          Q      And how was that resolved?

8          A      We were -- we won the trial.

9          Q      Was there a jury or was it a bench

10   trial?

11         A      It was a bench trial.  It was bench.

12         Q      Is that the only lawsuit you've ever

13   been in?

14         A      That is the only lawsuit I've ever --

15   correct, yes.

16         Q      Okay.  Have you ever given your

17   deposition testimony before today?

18         A      Yes.

19         Q      When?

20         A      I have had one with New American

21   Funding, and I was deposed in the personal

22   lawsuit, and I was deposed at Countrywide Home

23   Loans.

24         Q      And what did the litigation at

25   Countrywide Home Loans involve?

Page 78

```
 1          A       It was involving a customer complaint

 2     over, from my memory, a expiration of a LOC and a

 3     dispute over damages that were deemed by the, you

 4     know, plaintiff on that LOC expiration.

 5          Q       And how was that resolved?

 6          A       I believe Countrywide --

 7                  MR. PERLOWSKI:  Ms. Preslo, let me --

 8     if the -- if the resolution is confidential, I

 9     ask that you not disclose that.

10                  THE WITNESS:  Oh.

11                  MR. PERLOWSKI:  If it's --

12                  THE WITNESS:  I don't remember.  It

13     was many, many years ago, so --

14     BY MS. GIBSON:

15          Q       Did it go to trial?

16          A       It did not go to trial.

17          Q       Was it settled?

18          A       You know, I was a witness to that, I

19     mean, at the depo.  I don't -- I do not remember

20     if it was settled.  I don't -- I don't remember

21     the outcome of it --

22          Q       Okay.

23          A       -- 100 percent because that was many,

24     many, many, many years ago.

25          Q       And how long ago was the litigation
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 79

```
 1    where you gave a deposition for NAF?
 2         A      I want to -- I -- more than five
 3    years ago.  I don't remember the exact date.
 4         Q      And what did that involve?
 5         A      That involved our regional manager of
 6    our Colorado region regarding violating a
 7    noncompete.
 8         Q      Did that go to trial?
 9         A      I -- I wasn't involved in attending
10    any kind of trial for that.  So I'm not -- I
11    don't know if it was settled or if it went to
12    trial.
13              MR. PERLOWSKI:  Same caution,
14    Ms. Preslo, about revealing any confidential
15    settlement terms, to the extent they are
16    confidential.
17    BY MS. GIBSON:
18         Q      How did you learn about this lawsuit?
19         A      This Spearman case?
20         Q      Ms. Spearman's, yes.
21              MR. PERLOWSKI:  And one second,
22    Ms. Preslo.  If you learned about -- if you
23    learned about the lawsuit from counsel, I would
24    just ask that you say that and not reveal any
25    communications that you had with counsel.
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 80

1    BY MS. GIBSON:

2        Q      And, Ms. Preslo, if I haven't made it

3    clear before, I'm not going to ask you anything

4    that you discussed with your lawyer.  So -- and

5    Henry will certainly object and tell you what

6    he's just told you.  But I'm not asking you for

7    the contents of any discussions with your

8    lawyers.

9        A      I was made aware of the lawsuit from

10   counsel.

11       Q      Okay.  What did you do to prepare for

12   your deposition today?

13       A      I've had Teams meetings, Zoom

14   meetings with counsel.

15       Q      Which counsel?

16       A      That would be counsel with New

17   American Funding and the law firm that Henry

18   works for.

19       Q      When did you have these meetings?

20       A      I don't know the exact, you know,

21   date of those meetings.

22       Q      How long did you meet with counsel to

23   prepare?

24       A      From an hour perspective?

25       Q      Uh-huh (affirmative).

Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 81

```
 1          A       Two hours, maybe three.

 2          Q       Two to three hours total to meeting

 3    with your lawyers to prepare for your deposition?

 4          A       Yes, ma'am.

 5          Q       Okay.  Did you have conversations

 6    with anyone else outside of your counsel?

 7          A       I have not.

 8          Q       Okay.  Have you read any transcripts

 9    of depositions of anyone in this litigation?

10          A       I have not.

11          Q       Did you review any documents with

12    your counsel to prepare for your deposition?

13          A       I have reviewed documents.

14          Q       What documents have you reviewed?

15          A       I've reviewed Gina Spearman's letter

16    of employment and her various different exhibits.

17          Q       Exhibits to --

18          A       I also have reviewed the manager --

19    one to two manager recaps.

20          Q       The manager -- I don't understand

21    what you just said.  You've reviewed the manager

22    recaps.  What are those?

23          A       The -- the override bonus.

24          Q       The BMAM --

25          A       Yes, ma'am.
```

Page 82

1          Q       -- spreadsheets that we were talking

2     about earlier?

3          A       Yes, ma'am.

4          Q       Okay.  Got you.  Did you attend the

5     leadership meeting in February of 2019?

6          A       Yes.

7          Q       Who else attended?

8          A       The attendees were the -- we call

9     them senior vice presidents, SVPs.  Gina Spearman

10    attended with Kelly Allison.  Christy Bunce,

11    Jason Obradovich, Jim Muth, and Rick and Patty

12    Arvielo.

13         Q       So you said SVPs.  Who were those

14    that attended?

15         A       Milton Karabites, Tony Blodgett,

16    Kelly Allison, Gina Spearman, Hamid Hamrah, Chris

17    Garza, and --

18         Q       Did Jon Reed attend?  Pardon?

19         A       Yes.  And Jon Reed --

20                 MR. PERLOWSKI:  Ms. Preslo, were you

21    finished with your answer?

22                 THE WITNESS:  And I believe Eli

23    Fairfield.

24    BY MS. GIBSON:

25         Q       What was the format of the meeting?

Page 83

1        A        The format of the meeting was to

2   bring -- the SVPs, as we have referred to them,

3   are higher leaders that run larger, you know,

4   territories.  And the purpose of the meeting was

5   to bring the SVPs in to have a conversation with

6   them about the 2018 P&L, the changes that were

7   made to that P&L in January of 2019, and to

8   review with them a plan to hire a CFO and to work

9   on -- all the SVPs had requested to be on P&Ls

10  and to have those conversations with the SVPs in

11  person.

12       Q        Did Ms. Spearman request to be on a

13  P&L?

14       A        I don't specifically remember Gina

15  requesting to be on a P&L, but it definitely had

16  been conversations with Kelly Allison on, you

17  know, moving to a P&L.

18       Q        Okay.  So not all SVPs requested to

19  be on a P&L?

20       A        I don't recollect every single one,

21  as far as if they wanted to be on a P&L or not.

22       Q        Okay.

23       A        The majority of the -- did from my

24  memory.  I can't remember specifically exactly

25  who.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 84

1        Q       And where was the meeting held?

2        A       It was held in our Tustin

3    headquarters.  Tustin, California.

4        Q       Okay.  Did you speak at the meeting

5    with everyone present?

6        A       The meeting was ran by Christy Bunce

7    and involved Jim Muth, as our finance department.

8    And -- and presenting, I didn't have a prepared

9    presentation, but we were all in the room

10   together having conversations.  So I'm -- did I

11   speak at the meeting, yes.

12       Q       Okay.  But you did not stand up and

13   do a presentation?

14       A       No.

15       Q       Okay.  Did Rick Arvielo speak at the

16   meeting?

17       A       Everyone that attended that meeting,

18   we all had conversations, and we were all

19   talking.  It wasn't a -- but I don't recollect

20   him doing any sort of presentation.

21       Q       Did he make any announcements

22   regarding changes to compensation at the meeting?

23       A       What was -- Rick Arvielo?  No.

24       Q       Did Patty Arvielo make any --

25       A       She --

30(b)(6) & Indv. Jan Preslo      January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 85

1        Q        -- announcements regarding changes to

2     compensation?

3        A        Patty did not make any comments

4     regarding changes to compensation.

5        Q        Who did make announcements regarding

6     changes to compensation?

7        A        What was changed was -- there

8     wasn't a change in compensation that was made.

9     It was a discussion around the expenses that

10    should be allocated to the outside retail

11    division, that marketing expenditures were not

12    going to be reimbursed.

13               And that's -- and that the plan was

14    to hire a CFO that would be tasked with working

15    with the SVPs on moving to a P&L platform for

16    compensation versus flat basis points override.

17       Q        So at the time of this meeting, NAF

18    did not have a CFO?

19       A        No.

20       Q        Who was preparing the P&Ls for 2018?

21       A        Those were prepared by our finance

22    department.

23       Q        Who was in the finance department?

24       A        I don't know names off of the top of

25    my head.  Our -- my main point of contact was a

Page 86

1    gentleman by the name of Jim Muth.

2         Q      Jim Muth?

3         A      M-U-T-H.



24   BY MS. GIBSON:

25         Q       Is a division something different

30(b)(6) & Indv. Jan Preslo                   January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 87

1    from outside retail, or are you --

2          A      No.

3          Q      -- using them interchangeably?

4          A      I'm using them interchangeable.  It

5    was outside retail.

6          Q      Okay.  I just wanted to be sure.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 88

1    ████████████████████████████████████

2    ███████████████████████████████████

3         ██████████████████████.

4    BY MS. GIBSON:

5         Q       Okay.  And these were prepared by the

6    finance department; is that correct?

7         A       Yes.

8         Q       Were they provided -- they were

9    provided to -- were they provided to you?

10        A       They were provided to me, yes.

11        Q       Were they provided to Ms. Bunce?

12        A       Yes.

13        Q       Were they provided to the Arvielos?

14        A       I can't answer that.  I --

15        Q       Okay.

16        A       I don't know what the Arvielos

17   reviewed.

18        Q       I'm sorry?

19        A       I do not know what they reviewed or

20   did not review.

21        Q       Okay.  Were they provided to

22   Obradovich?

23        A       Yes.

24        ██████████████████████████████████

25   ███████████████████████████████████

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 89



4    BY MS. GIBSON:

5         Q       And what was the point of the

6    leadership meeting in 2019 with these

7    individuals, the SVPs and the other people you

8    identified?

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 90



30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 91



30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 92



30(b)(6) & Indv. Jan Preslo                                                   January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 93



30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 94

1      ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2         A      Yes.

3                MR. PERLOWSKI:  Object to the form.

4    BY MS. GIBSON:

5         Q      Was that a slide show or was that a

6    handout?

7         A      My recollection, it was a handout.

8      ▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

9    ▨▨ ▨ ▨▨▨▨▨▨▨▨▨▨▨▨

10   ▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨

11      ▨ ▨▨▨▨▨▨▨▨▨▨▨

12   ▨▨▨▨▨▨▨▨ ▨▨▨

13   ▨▨▨

14     ▨▨▨▨▨▨▨▨▨

15   ▨▨▨▨▨

16     ▨▨▨▨▨▨▨▨▨

17   ▨▨▨▨▨▨▨▨▨▨▨▨

18   ▨▨▨

19        Q      Okay.  Have you spoken -- did you --

20   have you spoken to Jon Reed since he left NAF?

21        A      No.

22        Q      Did you do anything to prepare for

23   that 2019 leadership meeting before it was headed

24   off?

25        A      Repeat that question.

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 95

1        Q        Yeah.  Did you do anything to prepare

2    for the meeting, the 2019 leadership meeting?

3        A        The package that was presented at the

4    meeting was prepared by the finance department,

5    and I'm sure Jon and I reviewed that prior to the

6    meeting because it was being presented at the

7    meeting, and we had our SVPs coming into that.

8                 So I'm sure I would have reviewed

9    that prior to -- to that meeting.  I was not

10   involved in preparing the package.

11   ████████████████████████████████████████████

12   ██████████████████████████████████████████

13   ██████████████████████████████████████████████████

14   ██████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████

17   BY MS. GIBSON:

18       Q        What did that package -- do you

19   remember what the package -- you reviewed it.

20   What did it say?

21                MR. PERLOWSKI:  Object to the form.

22   ███  ██████████████████████████████████

23   ████████████  ████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 96



Page 97

1

2

3

4

5

6

7

8

9

10

11

12

13       Q       At this meeting, did NAF announce

14   that the marketing -- that Ms. Spearman and

15   Ms. Allison and other SVPs' marketing budgets

16   were eliminated?

17       A       Yes.

18       Q       Who made that announcement?

19       A       From my recollection, I believe it

20   was Christy Bunce.

21       Q       Do you remember what she said?

22       A       The discussion was around

23   eliminating, you know, marketing budgets and that

24   the company was pursuing interviewing, you know,

25   CFOs, a CF -- a CFO for the company, and that the

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 98 of 192

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 98

1   SVPs would be moving to a P&L plan eventually and

2   that there would be engagement with the SVPs on

3   that plan.  And there would be input on the plan

4   from the SVPs and that the goal was to -- at some

5   point in 2019, to -- there was not a specific

6   time frame.

7           Sometime in 2019, we'd be moving to a

8   P&L plan, and because of that, there would be

9   discussions around creating new marketing budgets

10  or establishing new marketing budgets.

11       Q   Did Ms. Bunce or anyone else say this

12  would be for a period of 90 days that the

13  marketing budget would be eliminated?

14       A   I have no recollection of there being

15  a 90-day time period mentioned.

16       Q   Were you present at any time when

17  Ms. Arvielo told Ms. Spearman that it was just

18  for a period of 90 days?

19       A   No.

20           MR. PERLOWSKI:  Objection.

21  Foundation.

22           THE WITNESS:  I mean --

23  BY MS. GIBSON:

24       Q   Did -- did NAF announce that it would

25  just be for a short period of time?

Page 99

1              MR. PERLOWSKI:  Object to the form.
2    You can answer.
3              THE WITNESS:  My recollection was
4    that the company was in a process of interviewing
5    a CFO and that the main objection or duty of that
6    CFO was to prepare P&L plans for the SVPs.  I
7    don't recollect there being any time frame of
8    saying 90 days or it's going to be coming soon.
9    The discussion was around, again, this particular
10   CFO -- the CFO being hired to move the SVPs to a
11   P&L platform.
12   BY MS. GIBSON:
13   
14   
15   
16   
17   
18   
19   
20   
21   
22   
23   
24   
25

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 100



20        Q        Is there a reason why the finance

21    department couldn't create the P&L plan?

22                  MR. PERLOWSKI:  Object to the form.

23    Speculation.  Answer if you can.

24                  THE WITNESS:  I mean, I've not worked

25    in finance department.  I don't have a finance

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 101

1   degree.  So I don't feel that I'm the best to

2   answer that.

3   BY MS. GIBSON:

4   ████████████████████████████████████

5   ████████████████████████████████████████

6   ██████████████████████████████

7        ████████████████████████████████████

8   ████████████

9       ████████████████████

10      ████████████████████████████

11  ██████████

12      ████████████████████████████████

13  ██████████████████████████████████████

14  ████████████████████████████

15  ██████████████████████████████████████

16  ██████

17  BY MS. GIBSON:

18       Q     Okay.  Did it come -- did the

19  announcements made at the leadership meeting come

20  as a surprise to the SVPs --

21            MR. PERLOWSKI:  Object to the form.

22  Speculation.

23  BY MS. GIBSON:

24       Q     -- removal of the marketing budget --

25            MS. GIBSON:  Henry, let me finish.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 102

1    BY MS. GIBSON:

2         Q       -- the removal of the marketing

3    budget?

4                 MR. PERLOWSKI:  Objection.

5    Speculation.  Answer if you can.  And my

6    apologies.  I thought you were finished.

7                 THE WITNESS:  Okay.  I'm -- I don't

8    think that I can speak on behalf of how someone

9    felt.

10   BY MS. GIBSON:

11        Q       What was their reaction?

12        A       When there is a change that a

13   human -- and since you're asking for my opinion,

14   it's human nature when you are advised that you

15   are no longer going to be able to receive

16   reimbursement for something that you were

17   reimbursed for, would anyone be happy to receive

18   that message?  I think that logical answer to

19   that is no.  Many -- but I will interject that

20   some of the SVPs did not spend as much as others

21   on marketing.

22        Q       Did some spend more because their

23   loan volume was so much higher?

24                MR. PERLOWSKI:  Object to the form.

25   Speculation.  Answer if you can.

Page 103

```
 1                 THE WITNESS:  Repeat the question.
 2      BY MS. GIBSON:
 3           Q      Did -- you said some SVPs spent more
 4      on marking than others; is that correct?
 5           A      Yes.
 6           Q      Was that related to their loan
 7      volume?
 8           A      Not entirely, no.
 9           Q      Okay.  Was Gina and Kelly's marketing
10      budget tied to their loan volume?
11                 MR. PERLOWSKI:  Object to the form.
12      Foundation.
13                 THE WITNESS:  When Kelly Allison
14      joined New American Funding, part of her
15      negotiation at the time was to include a
16      marketing budget.  And from my recollection, it
17      was tied to volume.
18      BY MS. GIBSON:
19           Q      So is high loan volume good?
20           A      So when you're asking a question is
21      high loan volume good, in the mortgage space, to
22      have a very easy answer, having good loan volume,
23      having a high volume, which can be -- vary from
24      company to company on what someone thinks is high
25      volume, but generally speaking, yes, having a
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 104

```
 1   higher dollar amount in volume is positive.

 2        Q      So did -- you commented or you

 3   testified that some SVP's marketing expenses were

 4   higher than others; correct?

 5        A      Yes.

 6        Q      Were Gina and Kelly's marketing

 7   expenses high -- higher than others?

 8        A      They were the highest in the outside

 9   retail division.

10        Q      And NAF gave Ms. Allison and

11   Ms. Spearman a marketing budget of 7.5 BPS or

12   .075 percent of their loan production; correct?

13               MR. PERLOWSKI:  Object to the form.

14   Foundation.

15               THE WITNESS:  That marketing budget

16   was negotiated by Kelly Allison --

17   BY MS. GIBSON:

18        Q      Right.

19        A      -- based on the loan volume of their

20   southeast team --

21        Q      Uh-huh (affirmative).

22        A      -- that they managed.

23        Q      Okay.  So you agree that NAF gave

24   them .075 percent of their loan production in

25   their marketing budget?
```

30(b)(6) & Indv. Jan Preslo                     January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 105

1                    MR. PERLOWSKI:  Object to the form.

2       Foundation.

3                    MS. GIBSON:  Well, we can introduce

4       the responses to the request to admit that state

5       and it's in Kelly's contract.  And I'm just

6       trying to confirm what their marketing budget

7       was.

8                    MR. PERLOWSKI:  You can introduce

9       anything you want.  I'm going to assert the same

10      foundation objection because you're

11      mischaracterizing documents over and over again

12      intentionally.

13                   MS. GIBSON:  Can you introduce the

14      responses?  If you want to refresh your screen,

15      it should be loaded.

16                   MR. PERLOWSKI:  I only have Exhibits

17      1, 2, and 3 when I reloaded.  Are we introducing

18      a fourth?

19                   MR. HARGROVE:  Yes.

20                   MR. PERLOWSKI:  Let me do it again.

21                   THE WITNESS:  I'm only seeing 1, 2,

22      and 3.

23                   MR. HARGROVE:  Do it now.

24                   MS. GIBSON:  Try now.

25                   MR. PERLOWSKI:  Yep.

```
 1              THE WITNESS:  I have -- there's an
 2   Exhibit 4.
 3         (Whereupon a document was identified as
 4         Exhibit 4.)
 5   BY MS. GIBSON:
 6         Q     And it should be titled Defendant
 7   Broker Solutions, doing business as New American
 8   Funding's Responses and Objections to Plaintiff
 9   Gina Spearman's First Requests for Admission.
10              Do you see that?
11         A     Yes.
12         Q     And you remember we looked at Exhibit
13   1, which are the deposition topics, and you were
14   designated to testify to the nature and scope of
15   NAF's practices for reimbursing marketing
16   expenses.  So I want to take you to page 4 of
17   Exhibit 4.
18         A     Are you asking a question or --
19         Q     No, I just want to know when you get
20   to page 4 of Exhibit 4.
21         A     Oh, I'm sorry.  Page 4?
22         Q     Uh-huh (affirmative).
23         A     I'm on page 4.  I'm sorry.
24         Q     Okay.  And if you look at request for
25   admission number 11.
```

Page 107

1          A       Uh-huh (affirmative).

2          Q       It says that --

3          A       Yes.

4          Q       -- that from November 2016 through

5    February 2019, Ms. Spearman's marketing budget

6    was 7.5 BPS or .075 percent of her loan

7    production, and the response by NAF is admitted.

8    Do you see that?

9          A       Response admitted?

10         Q       Uh-huh (affirmative).

11         A       Yes, ma'am.

12         Q       Okay.  So does that refresh your

13   memory or your recollection that Ms. Spearman's

14   marketing budget was .075 of her loan production?

15         A       The marketing budget --

16         Q       Uh-huh (affirmative).

17         A       -- was negotiated by Kelly Allison,

18   and it was seven and a half BPS of the total

19   production that both Kelly and Gina managed.

20         Q       Okay.  That's all I'm trying to get

21   at.

22         A       Okay.

23         Q       7.5 BPS.  Thank you.

24         A       Uh-huh (affirmative).

25         Q       And you testified earlier that they

1    had the highest marketing expenses of all SVPs?

2          A      From my recollection, yes.

3          Q      Okay.  And the marketing budget was

4    eliminated at this 20 -- February 2019 leadership

5    meeting; is that correct?

6          A      Yes.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 109

1   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2   ▨▨▨▨▨▨▨▨▨▨▨▨

3   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

4   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

5   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

6   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

8   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

9   BY MS. GIBSON:

10        Q     What was the other --

11        A     The company -- the company has the --

12   New American Funding has the right to make -- you

13   know, they could announce that this is what we're

14   changing, we're not going to be reimbursing for

15   marketing expenses.

16        Q     Did NAF ever rewrite the contract to

17   eliminate the 7.5 percent BPS from Kelly's

18   contract?

19        A     That seven and a half percent budget

20   was in her contract, in her -- in her contract or

21   offer letter.  I don't recollect if there was any

22   type of addendum that was sent to her.  I do know

23   it was communicated that it was being changed or

24   being eliminated.

25        Q     So in response to my question

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 110

1  earlier, you testified that the P&Ls were part of

2  the reason marketing budget was eliminated.  What

3  is the rest of the reason why it was eliminated?

4          A       I mean, the plan that the SVPs were

5  on at that time was based on flat basis points.

6  There was not a participation either favorable or

7  not, you know, in profitability.  And so the

8  company made a business decision to no longer,

9  you know, reimburse for marketing expenses.

10         Q       And you testified you don't recall

11  the time period for the marketing budget being

12  eliminated, that that -- that a time period was

13  announced; is that correct?

14         A       I think your question was, was it

15  announced when they would be brought back.  I

16  don't -- I -- I'm not understanding.

17         Q       Did Mrs. Arvielo --

18         A       I need to ask you to repeat because

19  I -- I'm not understanding the question.

20         Q       Yeah.  Was there a time period?

21  Was -- was it announced that we're just going to

22  take these away for a short period?

23         A       There was no announcement that there

24  were --

25                 MR. PERLOWSKI:  Object to the form.

Page 111

```
 1   Asked and answered.  I'm sorry, Ms. Preslo.  Go
 2   ahead.
 3                 THE WITNESS:  There was not any
 4   announcement of a time period indicated.
 5   BY MS. GIBSON:
 6        Q     Were you present for every -- strike
 7   that.
 8                 Is it possible it was announced when
 9   you weren't present?
10                 MR. PERLOWSKI:  Object to the form.
11   Speculation.  You can answer.
12                 THE WITNESS:  Repeat that question.
13   BY MS. GIBSON:
14        Q     Is it possible it was announced that
15   this was for a short time period when you were
16   not present?
17                 MR. PERLOWSKI:  Objection.
18   Speculation.  Foundation.  You can answer.
19                 THE WITNESS:  I'm not sure how to
20   answer a question that's asking me if something
21   could have been discussed when I wasn't present
22   when individuals are having conversations.
23   BY MS. GIBSON:
24        Q     So you weren't present in every
25   conversation with Ms. Spearman and Ms. Arvielo
```

Page 112

1   during that leadership meeting, were you?

2        A    I was present during the meeting.

3        Q    Uh-huh (affirmative).

4        A    There was a lunch break.  There was

5   breaks where I wasn't in the room.

6        Q    So you don't know that if Ms. Arvielo

7   told Ms. Spearman it was just for 90 days?

8             MR. PERLOWSKI:  Object to the form.

9   Foundation.

10  BY MS. GIBSON:

11       Q    That's fine.  You can answer.

12       A    I'm sorry.  Repeat the question.

13       Q    You do not know if Ms. Arvielo told

14  Ms. Spearman it was for a period of 90 days?

15            MR. PERLOWSKI:  Same objection.  You

16  can answer.

17            THE WITNESS:  I'm not aware of Patty

18  Arvielo making that comment to Gina Spearman.

19  BY MS. GIBSON:

20       Q    Did you ever ask her if she made that

21  comment to Ms. Spearman or Ms. Allison?

22       A    No.

23       Q    Was there an announcement made

24  regarding pricing tolerances for pricing

25  exceptions?

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 113

1          A       It was announced at the meeting that

2     pricing exception tolerances were going to be

3     reviewed by region.  And I believe in that

4     meeting, it was announced of those pricing --

5     those pricing exception tolerances when the SVPs

6     made the decision to -- and it's their decision

7     to exceed those pricing exceptions -- that they

8     would be able to approve those pricings

9     exceptions and -- over their specified tolerances

10    and would no longer have to waive an override at

11    100 percent.  It could be in dollar increments.

12         Q       You want to go ahead and refresh your

13    screen.  We added another Exhibit 5.

14             MR. PERLOWSKI:  MaryBeth, before we

15    go to the Exhibit 5, can we just take a short --

16    a very short break?

17             MS. GIBSON:  Yep.

18             MR. PERLOWSKI:  Thank you.

19         (Proceedings in recess, 2:47 p.m. to

20         3:04 p.m.)

21         Whereupon a document was identified as

22         Exhibit 5.)

23             THE WITNESS:  Exhibit 5?

24             MS. GIBSON:  Uh-huh (affirmative).

25             THE WITNESS:  Okay.  I --

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 114

1   BY MS. GIBSON:

2          Q      Do you have it up?

3          A      Yes, ma'am.

4          Q      Okay.  So this is an email dated

5   March 29, 2019, from Patty Arvielo to Jon Reed

6   and Jan Preslo, and it says see below.  And just

7   take -- if you'll just look at it, the very

8   bottom, Patty Arvielo is email -- onto the next

9   page, she says, "Hi, I wanted you to know we will

10  make zero exceptions to our PE roles.  They are

11  fair beyond what any other company would do.

12  Policy is policy.  I want zero exceptions."

13          And Jason responds, "We will enforce

14  it 100 percent."

15          And then Patty forwards that to you.

16  What were the new -- what were the PE roles?

17         A      So --

18                MR. PERLOWSKI:  Objection.  Go ahead.

19                THE WITNESS:  -- each region has

20  what's called pricing exception tolerance, and if

21  a pricing exception is needed over and above that

22  set tolerance, it's the regional's decision to

23  allow that exception to be processed or to grant

24  that exception.

25          And the difference between the

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 115 of 192

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 115

1    pricing exception tolerance and what the regional

2    chose to approve is -- which they've approved and

3    exchanged, you know, with our secondary

4    department.  It was deducted from the regional

5    manager's compensation on their monthly recap --

6    BY MS. GIBSON:

7           Q      And in this --

8           A      -- their manager override recap.

9           Q      Okay.  And this email is dated March

10   29, 2019, which is after the February 19 --

11   February of 2019 leadership meeting.  So was that

12   a new PE rule introduced at that leadership

13   meeting?

14          A      I wasn't a -- I wasn't -- Jon Reed's

15   position at the time was working with Jason

16   Obradovich, who is our secondary department, on

17   setting pricing exception, you know, tolerances

18   that the regional managers were involved in and

19   discussions of what those would be.  And as far

20   as, you know, going over, you know, that

21   threshold, were exceptions made on occasion?

22   Possibly.

23          Q      My question was, was the change to PE

24   tolerances announced at the February 2019

25   leadership meeting?

Page 116

```
 1      A      From my recollection, at the meeting,
 2   it was stated that PE tolerances were going to be
 3   reviewed at a later date with each regional,
 4   because all the regions were different.  When I
 5   say different, I mean different loan volume,
 6   different production.  To my knowledge, I don't
 7   recollect set PE tolerances being discussed at
 8   the meeting.
 9      Q      Okay.  I understand you don't recall
10   set tolerances for each region being discussed at
11   the meeting.  Was it --
12      A      Or changes to PE tolerances.
13      Q      So changes to PE tolerances were not
14   announced at the meeting, then.  Is that your
15   testimony?
16      A      My recollection was that there was a
17   discussion around Jon would be working with Jason
18   on reviewing the current pricing exception
19   tolerances and any, you know, changes would be
20   discussed at a later date with each regional.
21   That's my recollection of what was discussed.
22      Q      Do you recall Ms. Spearman's response
23   at the meeting?
24      A      I do not.
25   XXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 117



Page 118

1   BY MS. GIBSON:

2        Q     Okay.  We're loading an exhibit for

3   you to take a look at.  If you refresh your

4   screen, you should see an email, two pages from

5   Christy Bunce, dated February 13th, 2019.

6        A     This is Exhibit 6?

7              MR. HARGROVE:  6.

8              MR. PERLOWSKI:  It's just taking some

9   time on my end.  I'm not sure why.

10             MS. GIBSON:  Okay.

11             MR. PERLOWSKI:  Here we go.  I've got

12  it.  Thanks.

13             THE WITNESS:  The -- let me make sure

14  I have the right exhibit up.  This is an email

15  from Christy Bunce.  It's dated February 13,

16  2019?

17  BY MS. GIBSON:

18       Q     Yes.

19       A     Okay.

20       Q     And if you go to the bottom of the

21  email, so it will be on the next page.

22       A     The bottom of the email.  Yes, I have

23  it.

24       Q     And there's an email from

25  Ms. Spearman dated February 13th, 2019, at

Page 119

1    10:13 a.m. to Christy, Jon Reed, and Jan Preslo.

2    Do you see that?

3         A      Yes, ma'am.

4         Q      And is this the day after the

5    leadership meeting?

6         A      I don't remember the exact date of

7    the meeting, but based on Gina's email, I would

8    assume so.

9         Q      Okay.  And if you read her email, it

10   says, "We spent several hours yesterday and today

11   reviewing all the information you provided in our

12   meeting, along with the P&L info in Kevlar."

13           And she writes, "There are many

14   inconsistencies with the data that were causing

15   us serious concern.  If we use our actual

16   expenses, including current PEs, comp, marketing,

17   rents, salaries, and apply industry-accepted pro

18   forma ranges for corporate allocations, we should

19   be ▨▨▨▨▨▨▨ in profit to NAF."

20           Do you see that?

21        A      Yes, ma'am.

22        Q      Okay.  So did anyone -- did you

23   respond to Ms. Spearman about how her

24   calculations varied from what your P&L showed

25   about the southeastern region?

Case 1:20-cv-04981-CAP  Document 100  Filed 04/28/22  Page 120 of 192

30(b)(6) & Indv. Jan Preslo                    January 21, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 120

```
 1              MR. PERLOWSKI:  Object to the form.
 2    Foundation.  You can answer.
 3              THE WITNESS:  Give me a moment.
 4    BY MS. GIBSON:
 5         Q     Uh-huh (affirmative).
 6         A     I don't remember this email, but
 7    I'm -- just give me a moment to -- I don't
 8    remember if I responded to the email.  It could
 9    have been a response.  You know, Christine, being
10    the COO, may have made the decision that she
11    would respond to Gina's, you know, email
12    regarding her concerns.  I don't remember
13    responding to this email.
14         Q     Do you remember picking up the phone
15    and calling Gina and talking to her about this?
16         A     I do not.
17         Q     Okay.  Is there any reason why no one
18    would call her and explain how their calculations
19    are off from NAF's P&Ls?
20              MR. PERLOWSKI:  Object to the form.
21    Speculation.  Foundation.  You can answer if you
22    can.
23              THE WITNESS:  I can't answer that no
24    one responded to her.  I don't recollect
25    responding.  It could have been that Christy
```

Page 121

```
 1    Bunce may have responded or Jon at the time.

 2    If -- I can't speculate if they picked up the

 3    phone and had a conversation with her.

 4    BY MS. GIBSON:

 5          Q      In the top -- so you don't know how

 6    their calculations showing ████████ of profit

 7    could vary -- would vary so much from the P&Ls?

 8                 MR. PERLOWSKI:  Object to the form.

 9    Foundation.  You can answer.

10                 THE WITNESS:  So based on my years of

11    experience, the comment, we use our actual

12    expense, including current PEs, comp, marketing,

13    rents, salaries and apply industry-accepted pro

14    forma ranges --

15    BY MS. GIBSON:

16          Q      Uh-huh (affirmative).

17          A      -- for corporate allocations, there

18    is to -- there's not an industry-accepted pro

19    forma range.  I mean, it varies from company to

20    company.

21          Q      Uh-huh (affirmative).

22          A      And you -- and that's been evidenced

23    by, you know, independent structure company

24    documentation.  So that -- that comment and that

25    email, in my opinion, is inaccurate.
```

Page 122

1          Q       So that factor might alter why her
2     reading of profitability is different than NAF's
3     P&Ls regarding profitability?
4                  MR. PERLOWSKI:  Object to the form.
5     Foundation.  You can answer.
6                  THE WITNESS:  I don't know what Gina
7     used in her calculation when she makes the
8     comment "Our actual expenses, including PEs,
9     comp, marketing, rents, salaries."  I mean, I
10    don't -- I'd be speculating answering this.  I
11    don't know if she went to HR and got a giant
12    spreadsheet of salaries.  Did she do her own
13    calculation correct or not?  I don't -- I -- it's
14    hard to answer that question.
15    MS. GIBSON:
16         Q       Well, if she included current PEs,
17    comp, marketing, rents, salaries, what other
18    expenses do you know of that the southeast
19    division had?
20         A       In addition to that?
21         Q       Yes.
22         A       So back to the whole purpose of the
23    meeting, referring to the meeting where the SVPs
24    were brought into our corporate office, it was
25    discussed expenses that were not being mapped to

Page 123

1   the outside retail P&Ls that should be on a

2   go-forward basis.

3              So when I read this actual

4   expenses -- if we use our actual expenses,

5   including current PEs, comp, marketing, rents,

6   and salaries and applying industry, we should be

7   ▨▨▨▨▨▨▨▨ profit to NAF.

8              So I don't know if she took the 2018

9   P&L from December and then tried to apply.  I

10  don't know -- I don't have a recollection of what

11  she provided as far as attaching a spreadsheet or

12  any -- these are very general comments.

13      Q     And you never asked her?

14      A     I don't recall having a conversation

15  with her about this.

16  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

17  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

18  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

20  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

21  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

22  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23  ▨▨▨▨▨▨▨▨

24  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 124



30(b)(6) & Indv. Jan Preslo                     January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 125

1

2

3

4

5

6  BY MS. GIBSON:

7        Q      Okay.  Are you finished?

8        A      Yes.

9        Q      Okay.  So Ms. Spearman is emailing

10  you and others complaining, and you didn't

11  respond; is that correct?

12              MR. PERLOWSKI:  Objection.  Asked and

13  answered.

14              THE WITNESS:  I believe I answered

15  that I don't have a recollection of responding to

16  this email.

17  BY MS. GIBSON:

18        Q      Okay.  Okay.  That's fair.  And then

19  the top page -- and I'll say that you're not on

20  this email that's between Christy and Patty

21  Arvielo.

22              But Ms. Arvielo says, "What I don't

23  like is they are calling us liars.  I want a

24  total breakdown on the business they came with

25  and what has been built since they've been

30(b)(6) & Indv. Jan Preslo                        January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 126

1   here -- or gotten here.  They will be okay, but

2   we need to put them on a P&L.  Therefore, we need

3   to really work fast on getting an efficient

4   system so they can work off of it."

5                Do you see that?

6        A     Yes, ma'am.

7        Q     Did you ever have any conversations

8   with Ms. Arvielo or Ms. Bunce about this portion

9   of the email?

10       A     No, not that I recollect.

11       Q     Okay.  Was the purpose -- to your

12  knowledge, was the purpose of going to a P&L

13  system really fast -- wait -- going to a P&L

14  system so that you could decrease Ms. Spearman's

15  compensation?

16               MR. PERLOWSKI:  Objection.  Asked and

17  answered.  You can answer again.

18               MR. GIBSON:  I don't think you've

19  answered that.  Go ahead.

20               THE WITNESS:  There was not a

21  purpose -- can you repeat your -- repeat your

22  question.  I'm going to --

23  BY MS. GIBSON:

24       Q     Was the purpose of going to a P&L

25  system to reduce Ms. Spearman's compensation?

Page 127

1          A       No.

2                  MS. GIBSON:  We're loading another

3    exhibit, so if you can give us a minute.  You may

4    need to refresh your screen.  I'll tell you when

5    it's up there.

6                  MR. HARGROVE:  It's up there.

7                  MS. GIBSON:  It's up there.

8                  THE WITNESS:  Exhibit 7?

9                  MS. GIBSON:  Yes.

10                 MR. PERLOWSKI:  Give me a second.

11   Mine is still circling.

12                 THE WITNESS:  It's circling on my

13   end, as well.  It's up.

14        (Whereupon a document was identified as

15        Exhibit 7.)

16   BY MS. GIBSON:

17        Q       And if you look at that first page,

18   that email from Ms. Spearman dated March 29,

19   2019.

20        A       Yes.

21        Q       And it's to Rick, Kelly, Patty

22   Arvielo, Ms. Bunce, and Jon Reed.  So you're not

23   on this email chain, so I just want to recognize

24   that.  Have you seen this email before?

25        A       Just give me a moment.  I'm -- I

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 128

1    don't recall if I --

2          Q      Yeah, no problem.

3                 MR. PERLOWSKI:  Take your time.  Take

4    your time.

5                 THE WITNESS:  Okay.  So can you

6    repeat your question?

7    BY MS. GIBSON:

8          Q      I didn't have one yet.

9          A      Oh, okay.  Yeah, I -- I'm sorry.  I

10   wanted to take a moment to read it.

11         Q      Yeah.  And have you read that email

12   from Ms. Spearman?

13         A      Yes, ma'am.

14   ████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ██████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████

20                Do you recall that one-on-one meeting

21   with Ms. Spearman and Christy and Jon Reed?

22         A      I don't recollect a one-on-one

23   meeting.  I don't know if this was the same day

24   that they were in town, in Tustin, for the SVP

25   meeting.  I'm not sure of that exact date.  I

Page 129

1   don't specifically remember a one-on-one meeting.

2        Q    Okay.  And I'll represent to you from

3   other testimony, February 12th was the day of the

4   leadership meeting, if that helps you at all.

5        A    Okay.

6        Q    So you didn't meet as a smaller group

7   with Ms. Spearman, Christy, Jan?

8        A    I don't recollect meeting with her

9   one on one.

10       Q    Okay.  And then she goes on to write,

11  March 5th SVP/EVP meeting.  "After joint meeting,

12  Kelly and I met with Jon individually and

13  proposed a reduction in LO comp to 130 and

14  accountability to a weighted average of 75 BPS on

15  a monthly basis to include a claw back if

16  needed."

17            Do you see that?

18       A    Yes, ma'am.

19       Q    Do you recall Ms. Spearman and

20  Ms. Allison and other SVPs coming to Tustin to

21  meet with the EVPs on March 5th?

22            MR. PERLOWSKI:  Objection.

23  Foundation.  You can answer.

24            THE WITNESS:  I don't recollect a

25  March 5th meeting.

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 130 of 192

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 130

1   BY MS. GIBSON:

2          Q       Okay.  So you don't recall all of the

3   SVPs from NAF's retail division flying to Tustin

4   to meet with you and Jon Reed?

5                  MR. PERLOWSKI:  Objection.

6   Foundation.

7   MS. GIBSON:

8          Q       You can answer.

9          A       I don't have any recollection of them

10  flying in on March 5th.

11         Q       Okay.  On -- and then the bullet

12  point two down, March 20th, call with Jason,

13  Christy, Jon, Jan, and Kristin to discuss plan --

14  go forward plan.  Do you recall the March 20th

15  call with Ms. Spearman?

16         A       I don't specifically remember this

17  conversation, no.

18         Q       Okay.  And then the last paragraph

19  says, "In summary, as we have stated previously,

20  we are firmly committed to being part of the

21  solution to ensure NAF is profitable."

22                 Do you see that?  If you'll just read

23  the last paragraph.

24         A       I'm sorry.  Is that in the last

25  paragraph?

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 131

1          Q        In summary.

2          A        Oh, in summary.  Oh, okay.  Okay.

3          Q        And you see --

4          A        Yeah, right after -- uh-huh

5    (affirmative).

6          Q        Yeah.  Do you see it says, "We are

7    firmly committed to being part of the solution";

8    correct?

9          A        Yes, ma'am.

10         Q        So even after the announcements made

11   at the leadership meeting, Ms. Spearman remained

12   employed by NAF and committed to being a part of

13   the solution; is that correct?

14         A        Yes.  That's what's stated in the

15   email, and she -- yes.

16         Q        To your knowledge, did she stay

17   employed at NAF and work towards being part of

18   the solution?

19         A        Yes.

20                  MR. PERLOWSKI:  Object to the form.

21   BY MS. GIBSON:

22         Q        And the last sentence there says, "We

23   look forward to seeing you and Patty when you

24   visit Atlanta."

25                  Do you see that?

Page 132

```
 1        A      Yes, ma'am.
 2        Q      Are you aware of Rick and Patty
 3   Arvielo going to Atlanta to see Ms. Spearman and
 4   Ms. Allison?
 5        A      I don't recollect, you know --
 6        Q      Did you ever -- did you ever --
 7               MR. PERLOWSKI:  Hold on one second.
 8   Were you finished with your answer, Ms. Preslo?
 9   You said --
10               THE WITNESS:  I don't -- I don't
11   recall Patty and Rick making a visit to Atlanta.
12   They could have.  They travel.  So --
13   BY MS. GIBSON:
14        Q      Did they ever discuss going to --
15   discuss with you that they were going to go to
16   Atlanta to discuss the changes announced at the
17   leadership meeting with Ms. Spearman?
18        A      I have no recollection of having any
19   kind of conversation with Rick or Patty regarding
20   that.
21        Q      So the best person to ask about that
22   meeting would be either Ms. Spearman or Rick and
23   Patty?
24        A      I'm not aware of Patty and Rick
25   having any conversation with either Kelly or Gina
```

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 133

1    on compensation changes, and that's not in the

2    scope of what they would normally even have a

3    conversation with an SVP about.

4         Q     So you don't know if they even went

5    to Atlanta, then, to meet with Ms. Spearman?

6         A     I don't -- I don't recall.  They may

7    have had plans to be in that area and may have

8    made a -- you know, a visit with them.  I don't

9    know.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 134

1  ███████████████████████████████████

2  ████████████████████████████████

3  █████████

4      Q      Do you recall what you and Jon Reed

5  discussed?

6      A      I have no recollection of what we

7  discussed specifically.

8      Q      Okay.

9          MS. GIBSON:  We're going to load

10  another exhibit, and I'm close to finished.  So I

11  have one or two more exhibits.

12          MR. HARGROVE:  It should be up, guys.

13          MR. PERLOWSKI:  Thanks, Travis.

14      (Whereupon a document was identified as

15      Exhibit 8.)

16  BY MS. GIBSON:

17      Q      Go ahead and take a minute and review

18  that.  It's an email that's dated March 20 of

19  2019.

20      A      Is this Exhibit 8?

21      Q      Yes.

22          MR. PERLOWSKI:  Yeah.  Just give me a

23  moment, please.

24          THE WITNESS:  It's circling.

25          MR. PERLOWSKI:  Yep.

30(b)(6) & Indv. Jan Preslo                             January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

```
1              THE WITNESS:  Okay.  It's up.

2              MR. PERLOWSKI:  I've got it.  Thank

3      you.

4              THE WITNESS:  Uh-huh (affirmative).

5      I have it.

6      BY MS. GIBSON:

7          Q      Okay.  Have you reviewed it?

8          A      Give me a moment.

9          Q      Okay.

10         A      It's a long email.

11         Q      And you might want to start on the

12     second page with Ms. Allison's email --

13         A      Yep.

14         Q      -- to Christy Bunce, you, Jon Reed,

15     and the Arvielos.

16         A      Okay.  Okay.

17

18

19

20

21

22

23

24

25
```

Page 136

1     ▨▨▨▨▨▨▨▨▨▨▨▨

2     ▨▨▨▨▨▨▨▨▨▨▨▨

3     ▨▨▨▨▨▨▨▨▨▨▨▨

4     ▨▨▨

5     ▨▨▨▨▨▨▨▨▨▨▨▨

6     ▨▨▨▨▨▨▨▨▨▨▨▨

7     ▨▨▨▨▨▨▨▨▨▨▨▨

8     ▨▨▨▨▨▨▨▨▨▨▨▨

9     ▨▨▨▨▨▨▨▨▨▨▨▨

10     ▨▨▨▨▨▨▨▨▨▨

11     ▨▨▨▨▨▨▨

12     ▨▨▨

13     Q     And is the collective agreement with

14   NAF corporate two years ago, is that the -- is

15   that the contracts that Kelly and Gina signed

16   with NAF?

17         MR. PERLOWSKI:  Object to the form.

18   Speculation.  You can answer.

19   BY MS. GIBSON:

20     Q     Do you --

21     A     I can't interject and answer a

22   question of what -- Kelly Allison wrote an email,

23   what she was referring to.

24     Q     So you don't -- she writes this email

25   to you, but you don't know what --

Page 137

1        A       She does.

2        Q       But you don't know what she's

3   referring to?

4        A       Well, regardless of the delay of --

5   we made commitments to the team two years ago

6   based upon the collective agreement with NAF

7   corporate, I don't know what she's referring to.

8        Q       Go ahead and read the rest of the

9   sentence -- the paragraph.  It says, "Although

10  NAF is retracting on the employment agreement

11  with myself and Gina, we cannot condone doing the

12  same to our team and family that have aligned

13  themselves with our leadership for many years."

14              So Gina and Kelly agreed to stay on

15  at NAF, even after the February 2019 leadership

16  meeting; correct?

17       A       Yes, they continued to stay employed

18  at NAF after that meeting.

19       Q       And then if you go to the first page,

20  Christy Bunce responds.  Did you read her email?

21       A       Yes, I did.

22       Q       Okay.  And five lines down, she

23  writes, "We are looking to all of you to be a

24  part of the solution, hence the meetings we have

25  ████████████████████████████████████████████████

Page 138

1   ████████████████████████████████████

2   ████████████████████████████████

3   ██████████████████████████████████████████

4   ███████  ██████████████████████  ████████████

5           Do you see that?

6       A       Yes, ma'am.

7       Q       So do you recall receiving this

8   email?

9       A       I do not have a recollection of this

10  email.  I'm on the email chain, but I don't

11  specifically remember this email.

12      Q       Did you encourage Gina and Kelly to

13  stay at NAF even after you told them you were

14  cutting their marketing budget and pricing

15  exceptions?

16          MR. PERLOWSKI:  Object -- object to

17  the form.  Foundation.  You can answer.

18          THE WITNESS:  Gina and -- and Kelly

19  are good leaders.  They -- I mean, yes.  I mean,

20  if we did not want them to stay with the company,

21  I don't think Christy would have written an email

22  saying we want you to be part of the solution or

23  we want to work with you as part of the solution.

24  BY MS. GIBSON:

25      Q       Okay.  Did NAF eventually hire a CFO?

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 139

1        A       Yes.

2        Q       Okay.  When did they hire a CFO?

3        A       The CFO was hired in 2019.  I don't

4    remember the specific date of his employment.

5        Q       Okay.  And what was the CFO's name?

6        A       Scott Frommert.

7        Q       Is he still employed by NAF?

8        A       He is not.

9        Q       When did he leave?

10       A       I believe in 2020.  I do not have the

11   exact date.

12       Q       So he was hired after the leadership

13   meeting in 2019 and then left in 2020, so was he

14   there just approximately a year?

15       A       I would say approximately a year.

16       Q       Do you know why he left?

17       A       I do not.

18       Q       Was he fired?

19       A       I don't know the terms of his, you

20   know, exit from NAF.  He was a CFO.  He didn't

21   report to me.  I worked with him, but I don't

22   know why -- I don't have knowledge of that.

23       Q       Did he prepare the P&L model that was

24   being discussed after the 2019 leadership

25   meeting?

30(b)(6) & Indv. Jan Preslo        January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 140

1        A        Yes.  He was charged with working

2    through P&L models, specifically with the SVPs.

3        Q        Were you present at a meeting in

4    NAF's office in Atlanta with Scott Frommert and

5    Jon Reed and Christy -- I'm sorry -- Kelly

6    Allison, Ms. Spearman, and Lex Watson?

7        A        Was I at that meeting?

8        Q        Uh-huh (affirmative).

9        A        No, I did not travel to Atlanta.

10       Q        Did you speak to Jon Reed and Scott

11   Frommert before they attended that meeting with

12   them?

13       A        We had meetings with Kelly and Gina,

14   Scott Frommert and Jon Reed on various different

15   P&L pro formas.  And Jon was tasked with that

16   mostly with Scott, and the decision was made to

17   fly out to -- for them to meet with Gina and

18   Kelly in person versus everything being, you

19   know, over conference calls.

20       Q        Did -- were there any materials

21   prepared for that meeting with Ms. Allison and

22   Ms. Spearman?

23                MR. PERLOWSKI:  Object to the form.

24   Foundation.  Speculation.  You can answer.

25                THE WITNESS:  I don't recollect

Page 141

1   specifically.  No, I don't have a recollection of

2   any materials.

3   BY MS. GIBSON:

4        Q     So you don't recall Jon Reed showing

5   you any materials prepared for that meeting?

6        A     We -- as I stated, we had meetings.

7   Scott Frommert had prepared various different pro

8   formas for Kelly and Gina, with Jon Reed and

9   Scott flying to Atlanta to visit with them.

10             I'm sure they had those examples in

11  person to review with them versus it all being

12  over the phone, but I did not see a specific

13  packet prepared that I recollect that they were

14  presenting to them.

15       Q     Were you ever on any calls with Gina

16  Kelly, Scott, and Jon Reed?

17       A     Yes.

18       Q     Okay.  And if you load -- refresh

19  your screen and look at Exhibit 9.

20             MS. GIBSON:  Henry, let me know when

21  you have it up.

22             MR. PERLOWSKI:  Sure.

23             THE WITNESS:  Okay.

24             MR. PERLOWSKI:  Not yet on my end.

25  I'll let you know.

Page 142

1           MS. GIBSON:  Okay.

2           MR. PERLOWSKI:  It's circling.  Okay.

3    It's up.  Thank you.

4        (Whereupon a document was identified as

5        Exhibit 9.)

6    BY MS. GIBSON:

7        Q     And if you look halfway down that

8    first page, it's from Scott Frommert to Kelly and

9    Gina, you, Jon -- and Jon Reed.  And it says,

10   "please see below for our call."

11          And this is on September 12th at

12   12:03 p.m.  Do you see that?

13       A     Yes.

14       Q     Did you join that call?

15       A     I don't have a recollection.  We had

16   several calls over a period of time where I was

17   on those calls with Scott, Jon, Kelly, and Gina.

18   Jon had calls individually with them, I believe.

19   I don't remember the specific call.  We had many

20   calls going over -- going over the various

21   different plans that Scott Frommert was working

22   on for them.

23       Q     So there was a lot of back and forth

24   on this plan that Scott Frommert was preparing

25   for them; is that correct?

Page 143

1          A        Kelly and Gina were involved in the

2     discussions of the plan.

3          Q        Uh-huh (affirmative).

4          A        Which would include questions.  From

5     a back-and-forth-perspective, I don't know what

6     the definition of back and forth is.  There were

7     discussions, there were calls about the plans

8     that Scott was preparing to put the SVPs on a P&L

9     plan.

10              And the goal was to not cut anyone's

11     pay, but to actually work with the SVPs, to move

12     them to a P&L plan where their compensation would

13     be similar to what they were used to but would

14     have a -- could also have a benefit of making

15     additional money if they were profitable and were

16     able to manage their territory and grow their

17     territory.

18          Q        Okay.  I am loading another exhibit.

19     And other than what you've testified to, do you

20     remember anything else that was discussed on

21     these calls that you participated in?

22          A        The calls were always centered around

23     their plans, the various different pro formas

24     that Scott was working on, and feedback, but --

25     with Scott and Kelly and Gina on the plans.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                        Page 144

1        Q      Was there conversation comparing

2   their 2016 agreements to their -- to this

3   proposed P&L model?

4        A      I don't understand your question.  Or

5   can you repeat the question?

6        Q      Sure.  On these discussions that

7   you -- or on these calls that you were involved,

8   was there conversations where the members on the

9   call were comparing their compensation from their

10  2016 agreement to this new P&L model that was

11  embodied in the March 1, 2020 amendment, Schedule

12  1?

13       A      To my recollection, there was not a

14  comparison of a -- their 2016 agreement.  It was

15  comparing what they had earned in compensation

16  over the previous year.

17       (Whereupon a document was identified as

18       Exhibit 10.)

19  By MS. GIBSON:

20       Q      Okay.  Can you refresh your screen,

21  and there is going to be an Exhibit 10.

22       A      I have it.

23              MR. PERLOWSKI:  So do I.

24  BY MS. GIBSON:

25       Q      Okay.  And if you go down to the

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 145

1    bottom of the first page, you see an email from

2    you to Kelly and Gina, CC'ing Jon Reed and

3    yourself.  It's a draft SVP compensation

4    agreement for Gina and Kelly.  Do you see that?

5         A      Yes, ma'am.

6         Q      Okay.  And that's September 13, 2019.

7    And you say, "Attached is the draft document to

8    forward to your attorney today to start

9    reviewing."

10               Do you see that?

11        A      Yes, ma'am.

12        Q      Okay.  And you said, "I was given

13   permission to forward the attached to you.  Each

14   division will have its own P&P addendum."

15               What is the P&P addendum?

16        A      That would be that -- P&P references

17   policies and procedures.

18        Q      Got you.  And so this -- do you --

19   did you send this to Gina in advance of the

20   meeting that Scott Frommert and Jon Reed attended

21   for their attorney -- for Gina's attorney to

22   review?

23        A      Repeat the question.

24        Q      Did you send this to Gina in advance

25   of the meeting that Scott flew out to Atlanta to

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 146

1   attend?

2        A      I don't recollect the date that Scott

3   and Jon flew to Atlanta.

4        Q      Well, would you have sent the draft

5   document before their meeting?

6        A      If you read the email, "I attached

7   the draft document to forward to your attorney

8   today to start reviewing."

9        Q      Okay.  So you didn't --

10       A      I don't know if that was a request --

11  I don't recollect if that was a request from

12  Kelly to have her attorney to start to review a

13  draft document.  And I don't recollect if this

14  was sent in advance of a meeting.  I -- I don't

15  recollect the date that Scott and Jon flew out

16  there from a timing perspective.

17       Q      Why were you sending a draft of the

18  agreement to Ms. Spearman?

19       A      Kelly's typically had her attorney

20  review agreements.  I'm assuming she requested a

21  copy.  And I obtained approval.  It was -- it was

22  a draft document.  And my sentence says, "I was

23  given permission to forward the attached to you."

24  I'm assuming she must have requested it.

25       Q      Is there any reason why NAF was

Page 147

1    exchanging drafts of the proposed P&L agreement

2    with Ms. Spearman and Ms. Allison?

3                MR. PERLOWSKI:  Object to the form.

4    Asked and answered.  Go ahead.

5                THE WITNESS:  As I previously stated,

6    the SVPs were engaged with Scott Frommert and

7    calls I participated in with Jon Reed and Scott

8    regarding going on to a P&L plan.  The whole

9    purpose of that was for the SVPs to have

10   engagement in the process.

11               And I'm sure Kelly -- we discussed,

12   I'm sure, on those calls that we were working on

13   a draft document, and she must have -- I'm

14   assuming she probably requested it for me to

15   forward it to her, and I obtained permission to

16   do that.

17   BY MS. GIBSON:

18        Q     So NAF didn't just draft the new P&L

19   contract and said, here it is, sign it, this is

20   it?

21        A     No, it says draft document.

22        Q     Right.  So they -- so NAF was asking

23   for their input?

24        A     I don't recollect asking for Kelly's

25   input.  Kelly's typically always wanted to have

Page 148

1    her attorney review documentation.  She must have

2    requested it on a call with Jon and Scott or I

3    mean -- or I don't -- I don't remember her

4    requesting it for me to forward that to her.  And

5    for me to obtain approval from legal, she must

6    have requested it.

7              What we were working on was not a

8    secret.  It was shared with all the SVPs that we

9    were working -- as they were working with Scott

10   on their -- their plan.  Legal, at the same time,

11   was working on the agreement that would go in

12   conjunction with that P&L plan.

13        Q    Do you know if NAF had consulted

14   counsel of its own in September of 2019?

15              MR. PERLOWSKI:  And, Ms. Preslo, I

16   would just caution you to just answer that

17   question with a yes or no and not reveal any

18   communications --

19              MS. GIBSON:  That -- that's my

20   question.

21              MR. PERLOWSKI:  -- associated with

22   any potential answer.

23              THE WITNESS:  Can you repeat the

24   question?

25   BY MS. GIBSON:

30(b)(6) & Indv. Jan Preslo          January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 149

1          Q       Yes.  And all I want is a yes or no

2     answer.  Do you know if NAF had contacted counsel

3     in September of 2019?

4          A       No.

5          Q       No, you don't know or, no, they

6     hadn't?

7          A       No, I don't know.

8          Q       Okay.  So do you recall the date of

9     when the new P&L model, the contract for that was

10    signed by Ms. Spearman and Ms. Allison?

11         A       I don't recall if Gina executed that

12    contract.  We'd have to check with HR on when

13    that was sent.  I want to say I believe it was

14    the beginning of first quarter 2021.  I don't

15    recollect if Gina ever executed it.

16         Q       You don't recollect if she ever

17    signed it?

18         A       I don't -- I don't recall if she

19    signed it.

20         Q       Okay.  Do you recall when she

21    resigned?

22         A       She -- I don't have the exact date,

23    but she resigned in, I want to say, I think the

24    beginning of March 2020.

25         Q       And so from the leadership meeting

Page 150

1    February 19 of 2019 through March of '20, NAF was

2    negotiating -- or preparing this new P&L model

3    contract for the girls to sign; is that correct?

4               MR. PERLOWSKI:  Objection.

5    Mischaracterizes testimony.  Answer if you can.

6    BY MR. PERLOWSKI:

7         Q     I'm asking.

8         A     During that time frame --

9         Q     Uh-huh (affirmative).

10        A     -- Gina and Kelly was involved in the

11   P&L plan as far as discussing the various

12   different pro formas -- pro formas that would be

13   available for them.

14        Q     I'm curious why NAF involved Gina and

15   Kelly in preparing this March 2020 Schedule 1

16   based on the pro forma.  Can you tell me why it

17   involved them instead of just preparing it and

18   saying, here it is?

19        A     As I stated, there were many

20   conversations and meetings that were -- that was

21   had about the plan.

22        Q     Uh-huh (affirmative).

23        A     Kelly must have asked for it.  And

24   knowing that she would have an attorney review it

25   anyway, we -- I was given permission to forward

Page 151

1    it to her.

2         Q       And did NAF make changes to the March

3    2020 Schedule 1 based on comments from Kelly's

4    attorney?

5         A       On the agreement, I'm not aware.  I

6    wasn't involved in reviewing comments back from

7    Kelly's attorney.  I believe that went through

8    the legal department.

9         Q       Okay.  Do you refer to Gina and Kelly

10   as "the girls"?

11        A       I have referred to them that way,

12   yes.

13        Q       Okay.  Have you ever said the girls

14   make too much money?

15        A       I have never said that.

16        Q       Have the Arvielos ever said that?

17               MR. PERLOWSKI:  Objection.

18   Speculation.  Go ahead.  Have they --

19   BY MS. GIBSON:

20        Q       Have they ever said that to you?

21        A       They have not said that to me, no.

22        Q       Were you surprised that Gina

23   resigned?

24        A       Yes.

25        Q       Why?

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 152

1          A        Because she had worked with Kelly.

2    And for many years, my impression was that we

3    were moving forward, you know, with a P&L plan

4    for them.  Obviously, from the emails, you can

5    see there were questions on her end.  But I was

6    surprised, yes.

7          Q        There were questions on whose end?

8          A        Well, from Gina's emails.  You --

9    you've showed me exhibits, which I don't

10   recollect those emails, but she had questions.

11   My impression was we had resolved -- we were

12   working through moving them to a P&L.

13                  So, yes, I -- to answer your

14   question, yes, I was surprised.

15         Q        Did she ever -- did Gina ever express

16   to you that she felt misled by the statements

17   made at the February 2019 leadership meeting

18   about call productions and marketing costs and

19   PEs?

20         A        I don't recall her making those

21   specific allegations.

22         Q        You don't recall any conversations

23   with Ms. Spearman about that?

24         A        We had many conversations about what

25   had transpired, the expenses moving to the retail

Page 153

1   division P&L, discussions about moving to a P&L.

2   I don't -- specifically her -- remember

3   conversations where her saying she felt misled

4   with me.

5           Q       With you?

6           A       The question is for me, yes.

7           Q       Yeah, it's for you.  But do you

8   recall conversations with Ms. Spearman where --

9   where she told you she felt misled by NAF, not by

10  you, but by NAF?

11          A       No.

12          Q       You don't recall those conversations?

13          A       I don't recollect those

14  conversations, no.

15          Q       And you don't recall -- to your

16  recollection, do you -- you don't recall Gina

17  being -- expressing that she was unhappy to you

18  about the changes made?

19                  MR. PERLOWSKI:  Object to the form.

20  You can answer.

21                  THE WITNESS:  She was nervous about a

22  change.  A P&L can -- is a P&L.  And it's driven

23  by profitability.  It's driven by production.

24  It's not a set salary.  It's not a set amount

25  that you get every month.  So I do -- she did

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 154

1   express being nervous about it.  But misled, no,

2   I don't recollect any conversation about her

3   feeling misled.

4                MS. GIBSON:  Can we take a

5   five-minute break?

6                MR. PERLOWSKI:  Of course.

7        (Proceedings in recess, 4:02 p.m. to

8        4:06 p.m.)

9                MS. GIBSON:  I don't have any further

10  questions, subject to any redirect that

11  Mr. Perlowski does.

12               MR. PERLOWSKI:  I have none.

13               MS. GIBSON:  I'm sorry?

14               MR. PERLOWSKI:  I have none.

15               MS. GIBSON:  Okay.  And subject to

16  any documents that NAF may produce in response to

17  the order on the motion to compel that may fall

18  under her topics.

19               MR. PERLOWSKI:  Position understood.

20               MS. GIBSON:  All right.  Thank you,

21  Ms. Preslo, for your time.  I hope you have a

22  nice weekend.

23               THE COURT REPORTER:  Who wants a copy

24  of the transcript?

25               MR. PERLOWSKI:  Yes, please.

Page 155

1            MS. GIBSON:  I do.

2            THE COURT REPORTER:  Okay.  Thank

3    you.

4        (Proceedings adjourned, 4:07 p.m.)

5        (Signature reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 156

1          The following reporter and firm
    disclosures were presented by me at this
2   proceeding for review by counsel:
3              REPORTER DISCLOSURES
4          The following representations and
    disclosures are made in compliance with Georgia
5   Law, more specifically:
              Article 10 (B) of the Rules and
6   Regulations of the Board of Court Reporting
    (disclosure forms)
7              OCGA Section 9-11-28 (c)
    (disqualification of reporter for financial
8   interest)
              OCGA Section 15-14-37 (a) and (b)
9   (prohibitions against contracts except on a
    case-by-case basis).
10

    - I am a certified court reporter in the State of
11  Georgia.
    - I am a subcontractor for Veritext.
12  - I have been assigned to make a complete and
    accurate record of these proceedings.
13  - I have no relationship of interest in the
    matter on which I am about to report which would
14  disqualify me from making a verbatim record or
    maintaining my obligation of impartiality in
15  compliance with the Code of Professional Ethics.
    - I have no direct contract with any party in
16  this action, and my compensation is determined
    solely by the terms of my subcontractor
17  agreement.
18
                FIRM DISCLOSURES
19
    - Veritext was contacted to provide reporting
20  services by the noticing or taking attorney in
    this matter.
21  - There is no agreement in place that is
    prohibited by OCGA 15-14-37 (a) and (b).  Any
22  case-specific discounts are automatically applied
    to all parties at such time as any party receives
23  a discount.
    - Transcripts:  The transcript of this proceeding
24  as produced will be a true, correct, and complete
    record of the colloquies, and answers as
25  submitted by the certified court reporter.

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 157

1    - Exhibits:  No changes will be made to the
     exhibits as submitted by the reporter, attorneys,
2    or witnesses.
     - Password-Protected Access:  Transcripts and
3    exhibits relating to this proceeding will be
     uploaded to a password-protected repository, to
4    which all ordering parties will have access.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) & Indv. Jan Preslo                January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 158

```
 1                    CERTIFICATE
 2   STATE OF GEORGIA:
     COUNTY OF COBB:
 3
 4          I hereby certify that the foregoing
     deposition was taken down, as stated in the
 5   caption, and the colloquies, questions and
     answers were reduced to typewriting under my
 6   direction; that the transcript is a true and
     correct record of the evidence given upon said
 7   proceeding.
            That the witness's right to read and
 8   sign the deposition was reserved;
            I further certify that I am not a
 9   relative or employee or attorney of any party,
     nor am I financially interested in the outcome of
10   this action.
            I have no relationship of interest in
11   this matter which would disqualify me from
     maintaining my obligation of impartiality in
12   compliance with the Code of Professional Ethics.
            I have no direct contract with any party
13   in this action and my compensation is based
     solely on the terms of my subcontractor
14   agreement.
            Nothing in the arrangements made for
15   this proceeding impacts my absolute commitment to
     serve all parties as an impartial officer of the
16   court.
            Th
17
18
          _____
19          SHANNON E. JORDAN, RPR, CCR-B-2126
20
21
22
23
24
25
```

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 159 of 192

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 159

1    To:  Henry M. Perlowski

2    henry.perlowski@agg.com

3                 January 31, 2022

4    Re: Gina Spearman v. Broker Solutions, Inc. d/b/a
         New American Funding

5         January 21, 2022, Jan Preslo

6         The above-referenced transcript is available

7    for review.

8         Within the applicable time frame, the witness

9    should read the testimony to verify its accuracy.

10   If there are any changes, the witness should note

11   those with the reason, on the attached Errata

12   Sheet.

13        The witness should sign the Acknowledgement

14   of Deponent and Errata and return to the deposing

15   attorney.  Copies should be sent to all counsel,

16   and to Veritext at erratas-cs@veritext.com.

17        Return completed errata within 30 days from

18   receipt of testimony.

19        If the witness fails to do so within the time

20   allotted, the transcript may be used as if

21   signed.

22                      Yours,

23                      Veritext Legal Solutions

24

25

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 160

1    ERRATA for ASSIGNMENT # 5026286
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that

3    _____There are no changes noted.

4    _____The following changes are noted:

5

6    Pursuant to Rule 30(7)(e) of the Federal Rules of
     Civil Procedure and/or OCGA 9-11-30(e), any
7    changes in form or substance which you desire to
     make to your testimony shall be entered upon the
8    deposition with a statement of the reasons given
     for making them.  To assist you in making any
9    such corrections, please use the form below.  If
     additional pages are necessary, please furnish
10   same and attach.
11   Page No._____Line No._____Change to_____
12   _____
13   Reason for change_____
14   Page No._____Line No._____Change to_____
15   _____
16   Reason for change_____
17   Page No._____Line No._____Change to_____
18   _____
19   Reason for change_____
20   Page No._____Line No._____Change to_____
21   _____
22   Reason for change_____
23   Page No._____Line No._____Change to_____
24   _____
25

30(b)(6) & Indv. Jan Preslo                      January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 161

1   Reason for change_____

2   Page No.____Line No.____Change to_____

3   _____

4   Reason for change_____

5   Page No.____Line No.____Change to_____

6   _____

7   Reason for change_____

8   Page No.____Line No.____Change to_____

9   _____

10  Reason for change_____

11  Page No.____Line No.____Change to_____

12  _____

13  Reason for change_____

14  Page No.____Line No.____Change to_____

15  _____

16  Reason for change_____

17

                  _____

18                 DEPONENT'S SIGNATURE

19  Sworn to and subscribed before me this _____ day

    of _____, 20_____.

20

21  _____

    NOTARY PUBLIC

22

23  My Commission Expires:_____

24

25

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 162 of 192
30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[& - 3:04]                                                    Page 1

| & |
|---|
| **&**   1:15 |

| 0 |
|---|
| **04981**   1:4 |
| **0649**   35:10,15 |
| **065**   34:22 |
| **0652**   30:18 34:23 |
| **0669**   37:24 38:3 |
| **0670**   39:4 |
| **0671**   39:12 51:2 |
| **0672**   49:7 |
| **075**   104:12,24 |
| 107:6,14 |

| 1 |
|---|
| **1**   3:10 7:24 8:11 |
| 9:6 11:14 20:22 |
| 21:20 22:2 27:1,5 |
| 28:6,9,17 32:2,16 |
| 34:15 35:7,19 |
| 36:25 37:2,12,19 |
| 37:21,25 38:13,21 |
| 38:25 44:15 50:12 |
| 54:8 58:1 59:8 |
| 60:12,13,20 63:4,9 |
| 64:9,10,19 105:17 |
| 105:21 106:13 |
| 144:11,12 150:15 |
| 151:3 |
| **1-21-22**   9:20 |
| **1.4**   39:6 |
| **1.4.a.**   40:1 |
| **1.4.b**   44:2 48:16 |
| 49:4 50:14,20 |
| 51:2,14 52:25 |
| 54:2,9,11 55:10,15 |
| 63:4,17,21 |
| **1.4.b.**   40:18 50:25 |
| 55:13 |
| **1.4.c**   49:9 54:14 |

**1.4.d**   49:24 50:3
**1.4.e**   50:7
**10**   3:23 66:7
144:18,21 156:5
**10.b.**   4:5
**100**   45:11 47:15
78:23 113:11
114:14
**106**   3:15
**10:13**   119:1
**11**   73:4 106:25
**11-4-2016**   3:14
**113**   3:18
**117**   3:19
**11:53**   29:13
**12**   33:1 44:9 51:18
96:6 128:15
**127**   3:20
**12:03**   142:12
**12:06**   1:15 4:2
**12th**   129:3 142:11
**13**   10:14,23,24
57:5,20 118:15
145:6
**130**   129:13
**134**   3:21
**13th**   118:5,25
**14**   2:4
**142**   3:22
**144**   3:23
**15-14-37**   156:8,21
**158**   3:5
**160**   3:6
**16th**   50:18
**17**   10:14,25 96:10
**171**   2:11
**17th**   2:11
**18**   10:14,25
**19**   3:14 115:10
150:1

| 1987   74:21 |
|---|
| **1:20**   1:4 |
| **1:23**   65:24 |
| **1:40**   65:25 |

| 2 |
|---|
| **2**   3:13 19:7,10 |
| 20:11 26:13,15 |
| 105:17,21 |
| **2-13-2019**   3:19 |
| **20**   40:9 70:22 |
| 108:4 134:18 |
| 150:1 161:19 |
| **20,000**   62:1 |
| **200**   59:24 60:2 |
| **2000**   12:18 69:10 |
| 86:20 |
| **2012**   11:14 12:8 |
| **2013**   12:19 |
| **2016**   42:2 49:21 |
| 50:5 107:4 124:17 |
| 144:2,10,14 |
| **2016-11-6**   29:13 |
| **2018**   68:10,11 69:4 |
| 69:5,10,20,20 70:4 |
| 70:15,21 71:14,22 |
| 83:6 85:20 86:5,6 |
| 86:11,21 87:9,23 |
| 88:24 89:15,22 |
| 90:22 92:6,10 |
| 93:8,23 95:24,25 |
| 117:22 123:8 |
| **2019**   59:19 70:12 |
| 70:16 71:8 82:5 |
| 83:7 86:7,7 89:6 |
| 89:11,16 92:19 |
| 94:23 95:2 98:5,7 |
| 107:5 108:4 114:5 |
| 115:10,11,24 |
| 117:4 118:5,16,25 |
| 127:19 134:19 |
| 136:1 137:15 |

139:3,13,24 145:6
148:14 149:3
150:1 152:17
**2020**   58:2 59:8
139:10,13 144:11
149:24 150:15
151:3
**2021**   14:23 149:14
**2022**   1:15 4:1
158:16 159:3,5
**20th**   130:12,14
**21**   1:15 4:1 68:9
159:5
**2100**   2:10
**2126**   158:19
**230**   2:4
**24274**   158:17
**29**   114:5 115:10
127:18
**2:47**   113:19

| 3 |
|---|
| **3**   3:14 19:4,8,10 |
| 20:6,13,15 49:6 |
| 105:17,22 |
| **3-20-2019**   3:21 |
| **3-29-2019**   3:18,20 |
| **30**   1:8 3:12 7:3,25 |
| 10:10 20:11 40:10 |
| 47:14 57:20 94:10 |
| 94:12,17 95:12,15 |
| 96:8,15 128:17 |
| 159:17 160:6 |
| **30305**   2:5 |
| **30363**   2:11 |
| **31**   159:3 |
| **31st**   158:16 |
| **3535**   2:5 |
| **3:04**   113:20 |

30(b)(6) & Indv. Jan Preslo January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[4 - ahead] Page 2

| **4** | **7** | | |
| --- | --- | --- | --- |

**4** 3:4,15 10:13,15
10:19 42:17,24
43:3,6,12 44:4,11
51:7,8,9 54:14
62:4,25 63:13,22
106:2,4,16,17,20
106:20,21,23
**40** 119:19 121:6
123:7
**404.320.9979** 2:6
**404.873.8500** 2:12
**405** 72:5
**4:02** 154:7
**4:06** 154:8
**4:07** 1:15 155:4
**4s** 64:5

**5**

**5** 3:18 10:14,15,19
29:5,24 30:6,9,12
30:14,17 96:7
113:13,15,22,23
138:1
**5,000** 62:7
**50** 119:19 121:6
123:7
**5026286** 160:1
**5th** 129:11,21,25
130:10

**6**

**6** 1:8 3:12,19 7:3
7:25 10:10,14,15
10:19 20:11 34:21
37:23 57:20
117:25 118:6,7
**652** 30:10,13
**669** 27:13,16 28:4
**6th** 42:2 50:18

**7** 3:20 10:14,16,19
24:16,18 127:8,15
160:6
**7.5** 104:11 107:6
107:23 109:17
**70** 40:9 47:14
**70/30** 47:13 48:5
**75** 129:14

**8**

**8** 3:10,21 10:14,16
10:21 134:15,20

**9**

**9** 3:22 27:18,20,21
141:19 142:5
**9-11-28** 156:7
**9-11-30** 160:6
**9-16-2019** 3:23
**9-17-2019** 3:22
**90** 98:12,15,18
99:8 112:7,14
**90277** 72:6

**a**

**a.m.** 29:13 119:1
**ability** 6:12
**able** 5:12 60:3
63:17 102:15
113:8 143:16
**abolishment**
128:19
**absolute** 158:15
**accepted** 119:17
121:13,18
**access** 157:2,4
**accessing** 7:16
**accountability**
129:14
**accuracy** 159:9
**accurate** 156:12

**acknowledgement**
159:13
**acquired** 76:1
**acquisition** 77:4
**action** 156:16
158:10,13
**actively** 138:3
**actual** 119:15
121:11 122:8
123:3,4
**added** 93:22 95:25
97:3 113:13
**addendum** 41:20
49:21 109:22
145:14,15
**addition** 122:20
**additional** 15:2
143:15 160:9
**address** 72:4
**adds** 47:14
**adjourned** 155:4
**administered**
99:22 100:10
**admins** 15:17
**admission** 3:17
106:9,25
**admit** 105:4
**admitted** 107:7,9
**advance** 145:19,24
146:14
**advised** 102:14
**affect** 6:9,12
**affirmative** 4:24
8:25 10:18 24:13
24:19 26:22 37:11
38:24 39:17 63:15
68:3 80:25 93:2
93:20 104:21
106:22 107:1,10
107:16,24 112:3
113:24 117:13

120:5 121:16,21
131:5 135:4 136:2
140:8 143:3 150:9
150:22
**afternoon** 4:20
**age** 73:3
**agg.com** 2:12,13
159:2
**ago** 78:13,24,25
79:3 135:19 136:9
136:14 137:5
**agree** 34:15 38:19
54:1 59:16 104:23
**agreed** 59:25
137:14
**agreeing** 59:13,14
**agreement** 20:22
21:17,21 22:1
27:2,6,12 31:2,10
31:12 32:17 33:12
33:13 35:7,25
36:1,2 37:22
38:13 47:2,8
50:11 54:16,19
57:1,25 59:11,15
63:24,24 67:12
124:10,18,23
136:10,13 137:6
137:10 144:10,14
145:4 146:18
147:1 148:11
151:5 156:17,21
158:14
**agreements** 26:24
32:14 44:24 46:1
144:2 146:20
**ahead** 20:24 23:21
42:8,9 61:16 66:5
87:15 100:4 111:2
113:12 114:18
117:7 126:19

**[ahead - asking]**                                                    Page 3

133:15 134:17
137:8 147:4
151:18
**aligned** 137:12
**allegations** 152:21
**allison** 16:23 17:6
17:23 18:8 22:4,6
22:20 23:5 44:8
45:9,24 55:25
59:2 82:10,16
83:16 97:15
103:13 104:10,16
107:17 108:9
112:21 129:20
132:4 136:22
140:6,21 147:2
149:10
**allison's** 23:11,22
45:11 135:12,17
**allocated** 70:3
85:10 90:2,7
**allocations** 40:12
119:18 121:17
**allotted** 159:20
**allow** 63:5 64:2,4
114:23
**alter** 122:1
**amend** 63:23 64:9
**amended** 31:10
33:11 35:23,24
66:12 67:3,8,12
**amendment** 58:2
62:3 144:11
**amendments**
41:18
**america** 11:22
76:2,5,7
**american** 1:6,9
2:16 3:11,15 10:9
11:9,16 12:1
17:18 24:1 77:20

80:17 103:14
106:7 109:12
159:4
**amount** 71:21,25
96:3,20 97:12
104:1 153:24
**amounts** 18:24
19:1
**announce** 97:13
98:24 109:13
**announced** 96:21
100:8,8 109:7
110:13,15,21
111:8,14 113:1,4
115:24 116:14
132:16 133:12,21
**announcement**
94:8 97:18 110:23
111:4 112:23
**announcements**
84:21 85:1,5
101:19 131:10
**answer** 6:17,23,23
12:23 16:19 23:19
25:4,11,15 26:10
27:9 29:16 32:6
32:20 34:3,18
35:12,14 36:6
39:22 41:12 42:11
43:16,17 45:3
46:12 49:19 51:23
52:18,20 53:16
56:23 61:19 63:7
64:16 67:6 68:16
70:9 71:2,11
82:21 87:12 88:2
88:14 89:2,10
90:10 91:13 92:23
96:24 99:2,16,25
100:13,15,23
101:2 102:5,18,25

103:22 108:20
109:2 111:11,18
111:20 112:11,16
117:11 120:2,21
120:23 121:9
122:5,14 125:1
126:17 129:23
130:8 132:8
136:18,21 138:17
140:24 148:16,22
149:2 150:5
152:13 153:20
**answered** 26:4
66:5 71:11 89:9
96:18 111:1 117:8
125:13,14 126:17
126:19 133:22
147:4
**answering** 34:23
68:12,13 122:10
**answers** 156:24
158:5
**anyone's** 143:10
**anyway** 150:25
**apologies** 102:6
**apparent** 90:22
**appear** 7:23
**appearances** 2:1
**appears** 38:19
**applicable** 41:1,8
41:23 42:25 43:7
43:9,12 44:4
49:13 51:8 57:18
60:15 159:8
**applied** 50:21,23
156:22
**applies** 33:2,14
34:7 35:3 36:13
41:15
**apply** 41:15 49:22
50:5,8 119:17

121:13 123:9
**applying** 123:6
**appreciate** 65:21
**approval** 146:21
148:5
**approve** 113:8
115:2
**approved** 115:2
**approximately**
12:18 66:16
139:14,15
**aragon** 72:5
**area** 15:15,15 41:1
41:8,23 133:7
**arnall** 2:10
**arrangements**
158:14
**arrested** 72:11
**article** 4:5 156:5
**arvielo** 3:18 12:3
31:14 36:10 82:12
84:15,23,24 98:17
110:17 111:25
112:6,13,18 114:5
114:8 125:21,22
126:8 127:22
132:3
**arvielos** 87:8
88:13,16 135:15
151:16
**asked** 48:19 66:4
71:10 96:17 111:1
123:13 125:12
126:16 147:4
150:23
**asking** 5:4,9 7:8
11:2 35:2,5 41:25
43:11 52:14,15
69:19 80:6 87:13
102:13 103:20
106:18 111:20

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 165 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[asking - browser]

Page 4

123:25 124:20,21
147:22,24 150:7
**assert** 56:23 105:9
**assigned** 156:12
**assignment** 160:1
**assist** 160:8
**assistant** 24:24
46:24
**associated** 148:21
**assume** 119:8
**assuming** 53:21
146:20,24 147:14
**atlanta** 1:2 2:5,11
131:24 132:3,11
132:16 133:5
140:4,9 141:9
145:25 146:3
**attach** 160:10
**attached** 20:22
21:17,20 42:17
44:4 145:7,13
146:6,23 159:11
**attaching** 123:11
**attachment** 37:6
**attaya** 12:4,6
**attend** 82:4,18
146:1
**attended** 82:7,10
82:14 84:17
140:11 145:20
**attendees** 82:8
**attending** 79:9
**attorney** 145:8,21
145:21 146:7,12
146:19 148:1
150:24 151:4,7
156:20 158:9
159:15
**attorneys** 157:1
**attributable** 92:5

**aunt** 73:20
**automatically**
156:22
**available** 150:13
159:6
**average** 129:14
**aware** 57:9 58:3
58:21 80:9 112:17
132:2,24 151:5

**b**

**b** 1:5,8,9 3:11,12
3:15 7:3,25 10:10
20:11 57:20 73:15
73:18 156:5,8,21
158:19 159:4
**back** 19:7,14,21
20:9 24:18 28:24
29:3,23 30:12
34:20 35:15 36:14
37:10 45:9 49:6
60:13 63:8 64:21
66:18 69:24 71:4
75:24 93:22 95:25
97:3 110:15 117:1
122:22 129:15
142:23 143:5,6
151:6
**bad** 58:10
**bank** 11:22 75:2
75:15 76:1,2,4,7
**bar** 19:24
**based** 14:3 60:17
60:23 68:1,23
86:18 87:9,21
97:3 100:18
104:19 108:17,25
110:5 117:21,21
119:7 121:10
124:10 136:9
137:6 150:16
151:3 158:13

**basically** 39:9
**basis** 46:18 85:16
86:13 110:5 123:2
129:15 156:9
**bates** 27:12 37:23
**beach** 72:5,7
**beginning** 1:15
22:13 149:14,24
**begins** 31:1
**behalf** 102:8
**believe** 9:17 18:10
22:9 36:20 52:13
55:21 73:24 74:6
78:6 82:22 97:19
113:3 117:8
123:20 125:14
133:23 139:10
142:18 149:13
151:7
**bench** 77:9,11,11
**benefit** 143:14
**best** 101:1 132:21
**better** 25:14
**beyond** 114:11
**binding** 7:6
**block** 2:16 9:17
29:12
**blodgett** 82:15
**bma** 46:19
**bmam** 81:24
**board** 4:6 156:6
**bonus** 39:7,18
40:5,12 41:6
43:22 49:12,15
51:4 58:18,25
66:9 67:14,18,23
68:1,6,18 69:9,14
70:21,22 71:8,9,13
71:14,20 72:1
81:23

**bonuses** 14:6 29:1
39:10 40:20 51:14
**born** 74:14,17
**bottom** 27:25 29:9
35:10 92:10 114:8
118:20,22 145:1
**box** 9:25 42:3
43:13 63:4
**boxes** 44:20 60:15
**bps** 40:5,6,9
104:11 107:6,18
107:23 109:17
119:19 121:6
123:7 129:14
**branch** 40:8 48:9
55:9,11
**branches** 17:15,15
**break** 6:18 62:16
62:23 63:3 65:17
65:19 112:4
113:16 154:5
**breakdown** 95:23
125:24
**breakout** 93:18
**breaks** 6:15 112:5
**bridgett** 12:3
**bridgett's** 12:5
**bring** 83:2,5 89:16
**bringing** 23:25
**britt** 73:14
**broken** 97:6
**broker** 1:5,8 3:11
3:15 10:8 106:7
159:4
**brokered** 53:4,7
53:11,12
**brooks** 73:18
**brought** 110:15
122:24
**browser** 8:8

30(b)(6) & Indv. Jan Preslo                                              January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[budget - cm3]                                                                    Page 5

**budget** 24:2 98:13
  101:24 102:3
  103:10,16 104:11
  104:15,25 105:6
  107:5,14,15 108:3
  108:8,17,25
  109:19 110:2,11
  138:14
**budgets** 97:15,23
  98:9,10 128:19
**building** 2:4
**built** 125:25
**bullet** 44:12 50:14
  50:24 51:4,14,20
  52:25 53:1 54:14
  55:10,13 128:15
  130:11
**bunce** 31:13 36:9
  82:10 84:6 87:8
  88:11 97:20 98:11
  118:5,15 121:1
  126:8 127:22
  135:14 137:20
**business** 10:9 75:8
  106:7 109:6 110:8
  125:24
**button** 19:17,18

**c**

**c** 2:3 54:2 74:4
  156:7
**calculating** 46:20
**calculation** 39:7
  39:19 48:11 49:12
  49:16 122:7,13
**calculations**
  119:24 120:18
  121:6
**caliber** 18:5,7,13
**california** 72:6
  74:23 84:3

**call** 14:18 15:6
  64:5 82:8 120:18
  130:12,15 142:10
  142:14,19 144:9
  148:2 152:18
**calle** 72:5
**called** 75:12,14,22
  91:4,17 114:20
**calling** 120:15
  125:23
**calls** 46:11 140:19
  141:15 142:16,17
  142:18,20 143:7
  143:21,22 144:7
  147:7,12
**cap** 1:4 68:5 69:15
**capacity** 91:14
**caption** 158:5
**carries** 40:24
**case** 1:4 79:19
  156:9,9,22
**caught** 75:7
**causing** 119:14
**caution** 79:13
  148:16
**cc'ing** 145:2
**ccr** 158:19
**center** 14:18
**centered** 143:22
**ceo** 31:13 36:1
**certain** 7:3 52:16
**certainly** 20:5
  80:5
**certificate** 3:5
  158:1
**certified** 1:13
  156:10,25
**certify** 158:4,8
  160:2
**cf** 97:25

**cfo** 13:16 83:8
  85:14,18 97:25
  99:5,6,10,10,13,21
  100:9,16 138:3,25
  139:2,3,20
**cfo's** 139:5
**cfos** 97:25
**chain** 127:23
  138:10
**change** 14:15,19
  36:3 53:2 58:12
  58:15 59:7,9,10,13
  59:19 85:8 102:12
  115:23 117:15
  153:22 160:11,13
  160:14,16,17,19
  160:20,22,23
  161:1,2,4,5,7,8,10
  161:11,13,14,16
**changed** 12:19,20
  60:11 67:7,8
  71:18 85:7 109:6
  109:23
**changes** 57:7,11
  57:23 58:5,6,9,9
  58:10,23 59:3
  83:6 84:22 85:1,4
  85:6 86:19 116:12
  116:13,19 125:4
  132:16 133:1
  151:2 153:18
  157:1 159:10
  160:3,4,7
**changing** 36:7
  109:14 138:4
**charged** 140:1
**chart** 93:19
**chase** 2:9 75:1,13
  75:14,15,16
**chase.ogletree**
  2:13

**check** 149:12
**checked** 40:25
  41:22 42:3,13,25
  43:7,14 49:25
  54:9,19 56:12
  63:4,18,25 64:10
  64:19
**checking** 43:19
**child's** 73:3
**children** 72:24
**chose** 115:2
**chris** 82:16
**christine** 120:9
**christy** 31:13 36:9
  45:22 82:10 84:6
  97:20 118:5,15
  119:1 120:25
  125:20 128:16,21
  129:7 130:13
  135:14,18 137:20
  138:21 140:5
**church** 76:14,16
  76:17
**circling** 127:11,12
  134:24 142:2
**civ** 3:12
**civic** 76:11
**civil** 160:6
**clarify** 47:11
  63:12
**claw** 129:15
**clear** 56:4 80:3
**click** 8:17 9:4,22
  9:22 10:3 19:14
  19:16,18,24
**close** 134:10
**closed** 11:24 53:7
**cm1** 90:25 128:18
**cm2** 90:25
**cm3** 91:1

January 21, 2022

[cobb - corporate]

Page 6

cobb 158:2
code 156:15
  158:12
collective 136:9,13
  137:6
college 75:3,8
colloquies 156:24
  158:5
colorado 79:6
come 11:23 18:17
  19:7 28:24 48:13
  101:18,19
coming 18:2 46:16
  65:7 95:7 99:8
  129:20
comma 8:15
comment 112:18
  112:21 121:11,24
  122:8
commented 104:2
comments 85:3
  123:12 151:3,6
commission 46:21
  161:23
commitment
  158:15
commitments
  136:8 137:5
committed 130:20
  131:7,12
common 47:12
communicated
  108:13 109:23
communications
  79:25 148:18
comp 47:12
  119:16 121:12
  122:9,17 123:5
  129:13
companies 76:10

company 24:3
  56:6 66:7 67:17
  67:21 75:12,12,22
  76:22 97:24,25
  99:4 100:18
  103:24,24 109:11
  109:11 110:8
  114:11 121:19,20
  121:23 123:18,20
  124:5 138:20
comparing 144:1
  144:9,15
comparison
  144:14
compel 154:17
compensated 18:6
  40:16
compensation 5:7
  13:25 17:20 19:1
  25:1,8,23 26:7
  28:7,19 37:14,25
  39:1,20 45:8,12
  47:2,11 52:4,9,12
  52:13 57:8,12,24
  58:5,11,16,18,24
  59:8 60:12,19
  66:12 67:8,19,19
  68:5 69:15 84:22
  85:2,4,6,8,16
  115:5 126:15,25
  133:1 143:12
  144:9,15 145:3
  156:16 158:13
complaining
  125:10
complaint 78:1
complete 156:12
  156:24
completed 159:17
complex 47:3,9

compliance 156:4
  156:15 158:12
complicated 47:14
  47:20,23
component 68:15
  68:18,21 71:24
  109:6
composite 20:20
computed 39:20
concern 87:7
  101:12 119:15
concerned 23:23
  68:15 101:5,13,15
concerns 120:12
condition 86:19
condone 137:11
conduct 31:11
  33:12 35:25
conference 140:19
confidential 78:8
  79:14,16
confirm 105:6
confusing 54:2,5
conjunction
  148:12
considered 26:7
consulted 148:13
contact 85:25
contacted 149:2
  156:19
contain 35:6 92:4
contained 32:24
  48:1 93:5,18
contains 28:25
  31:1 39:12
contends 57:6,10
  57:22 58:22
content 23:1
contents 23:15
  80:7

context 23:10,15
continued 137:17
contract 42:1 46:8
  47:22 51:12 53:18
  60:6 66:19 67:3,9
  71:4 105:5 109:16
  109:18,20,20
  147:19 149:9,12
  150:3 156:15
  158:12
contracts 16:1
  29:13 52:3,10
  54:8 136:15 156:9
conversation 23:2
  53:20,24 58:8,11
  64:17 67:10 83:5
  111:25 121:3
  123:14 130:17
  132:19,25 133:3
  134:2 144:1 154:2
conversations
  16:22 17:1,25
  22:4,23 33:7,22
  44:16 45:7,21
  48:18 49:1 53:21
  81:5 83:10,16
  84:10,18 111:22
  126:7 144:8
  150:20 152:22,24
  153:3,8,12,14
coo 13:14 31:12
  33:22 36:1 120:10
copies 159:15
copy 146:21
  154:23
corner 27:14
corporate 70:2
  89:24 90:16,16,17
  91:4,17,18,19,19
  91:21,23 92:13,17
  93:3 97:4 99:19

30(b)(6) & Indv. Jan Preslo                    January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[corporate - disclose]                                                          Page 7

119:18 121:17
122:24 136:10,14
137:7 138:1,2
**correct** 7:20 13:6
15:8,12 19:2
26:18 27:6 28:12
28:19 29:1 33:4
36:25 41:9 42:15
42:17,18,23 43:1,4
43:24 44:25 45:1
48:6 49:25 50:9
50:22,24 62:25
64:6 66:6 70:24
77:15 86:9 87:10
87:25 88:6,25
90:8 92:14,15
103:4 104:4,12
108:5 110:13
117:5,17 122:13
125:11 131:8,13
136:4 137:16
142:25 150:3
156:24 158:6
**corrected** 95:25
96:7
**corrections** 160:9
**correctly** 34:23
86:5 90:15
**cost** 135:21
**costs** 152:18
**counsel** 2:1 4:4 5:1
79:23,25 80:10,14
80:15,16,22 81:6
81:12 148:14
149:2 156:2
159:15
**countrywide**
75:18,20,24 76:1
77:22,25 78:6
**county** 73:6,22,25
74:5,7 158:2

**couple** 6:19 13:1
**course** 15:10
31:11 33:12 35:25
62:17 154:6
**court** 1:1,13 4:6,7
4:9 5:10 56:21
154:23 155:2
156:6,10,25
158:16
**cousin** 73:24 74:6
74:7
**create** 100:21
**creating** 98:9
100:19
**credit** 75:12
**cs** 159:16
**curious** 150:14
**current** 12:16 13:8
68:2 72:3 116:18
119:16 121:12
122:16 123:5
**currently** 72:13
**customer** 78:1
**cut** 138:1 143:10
**cutting** 138:14
**cv** 1:4

**d**

**d** 1:5,9 3:11,15
54:2 159:4
**damages** 78:3
**dana** 74:7
**data** 119:14
**date** 7:18,19 8:4
8:20 9:4 60:20
66:19 79:3 80:21
100:10 116:3,20
119:6 128:25
139:4,11 146:2,15
149:8,22
**dated** 42:1 114:4
115:9 118:5,15,25

127:18 134:18
**dates** 9:3
**day** 98:15 119:4
128:23 129:3
158:16 161:19
**days** 98:12,18 99:8
112:7,14 159:17
**de** 72:5
**december** 86:21
123:9
**decision** 45:11
90:1 91:2 110:8
113:6,6 114:22
120:10 140:16
**declaratory** 61:3
**decrease** 126:14
**deducted** 49:11,15
115:4
**deductions** 55:23
**deemed** 60:2 78:3
**defendant** 1:6 2:8
3:15 106:6
**definitely** 83:15
**definition** 143:6
**degree** 75:5 101:1
**del** 24:21
**delay** 137:4
**delayed** 136:7
**deliver** 86:12
**department** 24:25
59:20 84:7 85:22
85:23 86:12 88:6
89:20 90:6 92:17
95:4 97:1,7 99:14
100:17,21,25
115:4,16 117:17
133:24 151:8
**departments** 97:4
**depend** 20:7
**depending** 55:1

**depo** 78:19
**deponent** 9:2
159:14
**deponent's** 161:18
**deposed** 77:21,22
**deposing** 159:14
**deposition** 1:8
3:11 4:8 5:22 7:25
8:20 9:9,14,19
10:8 77:17 79:1
80:12 81:3,12
106:13 158:4,8
160:8
**depositions** 81:9
**describes** 39:9
**designated** 106:14
**desire** 160:7
**detail** 28:17 33:15
**details** 28:7,18,25
37:25 39:1 48:2
**determined**
156:16
**developer** 72:23
**development** 77:1
**difference** 114:25
**differences** 24:5
**different** 15:1,17
35:19 48:11 60:10
69:17 81:16 86:25
91:17 116:4,5,5,6
122:2 140:14
141:7 142:21
143:23 150:12
**direct** 15:14
156:15 158:12
**directing** 39:14
**direction** 158:6
**directly** 15:18
89:12,25 93:9
**disclose** 78:9

**[disclosure - employment]**                                    Page 8

**disclosure** 4:4
  156:6
**disclosures** 156:1
  156:3,4,18
**discount** 156:23
**discounts** 156:22
**discovered** 117:4
**discuss** 17:12,19
  89:17 130:13
  132:14,15,16
**discussed** 18:24
  19:1 80:4 94:15
  111:21 116:7,10
  116:20,21 122:25
  133:25 134:5,7
  139:24 143:20
  147:11
**discussing** 17:23
  96:14 150:11
**discussion** 59:5
  85:9 94:12 97:22
  99:9 116:17
**discussions** 17:13
  18:20 21:25 22:5
  22:6 44:17,22
  45:5,6,15,18 80:7
  98:9 115:19 125:2
  133:11,19 143:2,7
  144:6 153:1
**dispute** 78:3
**disqualification**
  156:7
**disqualify** 156:14
  158:11
**district** 1:1,1
**division** 1:2 11:25
  14:2,18 67:21
  69:11,16,22,25
  70:4,5 75:15
  76:10 85:11 86:16
  86:17,22,25 89:13

89:15,25 90:4
  91:3,5,21 96:6
  97:5 104:9 117:3
  117:18,19,20
  122:19 123:16
  130:3 145:14
  153:1
**document** 8:10
  19:3 20:16 24:10
  24:15 35:12,19
  37:24 41:11,14
  42:5,12 43:2,8,11
  43:13 46:23 50:2
  50:4 52:15 54:15
  55:4 57:5,21
  58:12 59:5 60:5
  60:10 64:18,22,23
  64:23 65:15 106:3
  113:21 117:24
  127:14 134:14
  142:4 144:17
  145:7 146:5,7,13
  146:22 147:13,21
**documentation**
  121:24 148:1
**documents** 5:6
  7:10 18:19 50:17
  53:10 57:9 58:3
  58:21 65:3 81:11
  81:13,14 105:11
  154:16
**docusign** 38:9
  64:20 65:9
**docusigned** 29:14
  65:8
**doing** 7:13 10:8
  84:20 96:10 106:7
  137:11
**dollar** 18:23,25
  104:1 113:11

**double** 41:5 74:9
**draft** 145:3,7
  146:4,7,13,17,22
  147:13,18,21
**drafts** 147:1
**driven** 153:22,23
**drop** 18:21
**drove** 17:24
**due** 4:7 135:21
**duly** 4:14
**duty** 99:5

**e**

**e** 1:12 13:23 29:12
  49:25 74:9 158:19
  160:6,6
**earlier** 21:4 71:3
  82:2 107:25 110:1
  116:25 117:9
**earned** 144:15
**easy** 103:22
**efficient** 126:3
**eight** 40:22 41:7
  51:4
**either** 22:21,22
  45:22 110:6
  132:22,25
**eli** 82:22
**eligible** 26:25
  32:15 35:17 37:17
  45:17 48:8,8
  54:12
**eliminate** 109:4,17
**eliminated** 97:16
  98:13 108:4,15,16
  108:24 109:24
  110:2,3,12
**eliminating** 97:23
**elliott** 73:18,19
  74:7,10,11
**email** 3:18,19,20
  3:21,22,23 16:25

60:22 71:5 114:4
  114:8 115:9 118:4
  118:14,21,22,24
  119:7,9 120:6,8,11
  120:13 121:25
  123:24 125:16,20
  126:9 127:18,23
  127:24 128:11
  131:15 134:18
  135:10,12,17
  136:22,24 137:20
  138:8,10,10,11,21
  145:1 146:6
**emailed** 16:9,10
  16:12
**emailing** 125:9
  128:14
**emails** 7:10 152:4
  152:8,10
**embodied** 144:11
**employ** 16:4
**employed** 13:11
  25:19,24 72:20,21
  74:25 75:1 77:3
  131:12,17 137:17
  139:7
**employee** 24:11,24
  58:13 65:14 76:5
  76:21 158:9
**employee's** 58:15
**employees** 29:14
  64:24
**employer** 18:23
**employers** 75:20
**employment** 3:14
  20:21 22:1 25:2,9
  26:6,8,8 31:9
  33:10 34:10 35:21
  35:22 36:16,21,23
  77:2 81:16 137:10
  139:4

30(b)(6) & Indv. Jan Preslo                     January 21, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[encourage - federal]                                             Page 9

encourage 138:12
ended 86:21
enforce 114:13
engaged 147:6
engagement 98:2
  147:10
ensure 130:21
entered 160:7
entire 30:3 31:2,6
entirely 15:1
  19:25 103:8
eric 55:14,18,20
  56:5,13
erika 24:21
errata 3:6 159:11
  159:14,17 160:1
erratas 159:16
esq 2:16
establishing 98:10
ethics 156:15
  158:12
eventually 98:1
  138:25
evidence 158:6
evidenced 121:22
evp 12:14,17,24
  13:1,3,4,23,24
  14:8,12,16,20 15:4
  15:24 129:11
evps 129:21
evt 12:24
exact 53:23 66:11
  66:19 67:5,6
  68:14 71:5 79:3
  80:20 91:20 97:11
  119:6 128:25
  139:11 149:22
exactly 7:22 31:20
  31:25 34:13 83:24
examination 3:2,4
  4:16

examined 4:14
example 20:4
  59:23 62:12,24
  63:1
examples 63:13
  141:10
exceed 113:7
exceeded 62:9
  69:14
exception 56:7,10
  113:2,5 114:20,21
  114:23,24 115:1
  115:17 116:18
exceptions 112:25
  113:7,9 114:10,12
  115:21 138:15
exchanged 5:6
  115:3
exchanging 147:1
excluded 45:8,8
excluding 40:9
  87:23
excuse 29:23
  34:22
execute 64:25
  65:11
executed 22:25
  149:11,15
executive 46:23
exhibit 3:8,9,10,13
  3:13,14,15,18,19
  3:20,21,22,23 7:24
  8:2,7,11,14,18,22
  9:6,12 10:1,4 19:4
  19:7,8,10,10 20:6
  20:8,11,11,13,15
  20:20 27:19,22
  30:17 49:6 57:3
  57:15,18 64:11
  106:2,4,12,17,20
  113:13,15,22,23

117:25 118:2,6,14
  127:3,8,15 134:10
  134:15,20 141:19
  142:5 143:18
  144:18,21
exhibits 7:16 8:4
  19:21 20:10 81:16
  81:17 105:16
  134:11 152:9
  157:1,1,3
exit 139:20
expect 16:24
expenditures
  85:11
expense 92:9
  93:24 121:12
expenses 69:23,23
  70:2,7,17 85:9
  86:7 89:12,21,23
  89:24 90:1,3,5,15
  90:23 91:10 92:5
  92:7,11,17,25 93:6
  93:7,8,9,16,22
  94:1 95:24 96:4
  97:2 99:18 104:3
  104:7 106:16
  108:1 109:5,8,15
  110:9 119:16
  122:8,18,25 123:4
  123:4 125:4 138:1
  152:25
experience 17:17
  72:9 121:11
expiration 78:2,4
expires 161:23
explain 33:9,13,17
  44:13 60:21 61:10
  61:21,24 93:22
  120:18
explained 46:4
  90:19 93:12 97:6

97:9
explaining 124:16
  124:16,22
explanation 25:14
  97:2
express 152:15
  154:1
expressed 45:25
expressing 153:17
extent 79:15 87:12

                f

fact 4:12 41:18
factor 122:1
fail 101:15
fails 159:19
fair 61:12 114:11
  125:18
fairfield 82:23
fall 154:17
family 73:15
  137:12
far 23:22 36:10
  83:21 115:19
  123:11 150:11
fast 5:24 126:3,13
fatal 101:6
favor 60:4
favorable 59:19
  110:6
february 11:14,14
  82:5 107:5 108:4
  115:10,11,24
  117:3 118:5,15,25
  124:1 128:15
  129:3 135:19,24
  136:1 137:15
  150:1 152:17
fed 3:12
federal 10:10
  160:6

**[feedback - gibson]**                                                        Page 10

**feedback** 143:24
**feel** 15:13 101:1
**feeling** 154:3
**fellow** 56:23
**fellows** 55:14,18
  55:20 56:5,13,16
**felt** 102:9 152:16
  153:3,9
**figure** 70:6
**final** 93:23
**finance** 84:7 85:21
  85:23 86:12 88:6
  89:20 90:6 92:16
  95:4 97:1 99:14
  100:17,20,25,25
  133:23
**financial** 156:7
**financially** 158:9
**fine** 5:17 6:15
  112:11 124:2
**finish** 61:18 62:16
  101:25
**finished** 5:23
  82:21 102:6 125:7
  132:8 134:10
**finley** 2:4
**fired** 139:18
**firm** 2:4 80:17
  156:1,18
**firmly** 130:20
  131:7
**first** 3:16 4:14
  10:4 26:4 50:14
  51:14 70:7 106:9
  127:17 128:15
  137:19 142:8
  145:1 149:14
**five** 51:3 79:2
  137:22 154:5
**flat** 66:8 85:16
  110:5

**flawed** 123:21
**flaws** 101:6
**flew** 17:6,21
  145:25 146:3,15
**flows** 69:8
**fly** 140:17
**flying** 130:3,10
  133:25 141:9
**folder** 7:17,20 8:2
  9:13,20 10:1
  19:25 20:10
**folders** 8:18 9:10
**followed** 68:22
**following** 40:3,21
  41:6 49:11 51:5
  156:1,4 160:4
**follows** 4:15
**foregoing** 158:4
**forgo** 60:1
**form** 12:21,22
  16:18 23:18 25:3
  25:10,21 26:1,9
  27:8 28:14 29:15
  32:4,18 34:1,17
  35:8,11 36:5 37:1
  39:21 41:10 42:6
  43:15,23 45:2
  46:10 47:16 48:7
  48:22 49:18 51:1
  51:21 53:14 54:3
  54:10,20,23 56:14
  61:1 63:6,20 70:8
  71:1 86:15 87:11
  88:1,2 89:1 90:9
  91:7,12 92:22
  94:3 95:13,21
  96:23 99:1,15,24
  100:12,22 101:7
  101:21 102:24
  103:11 104:13
  105:1 108:19

110:25 111:10
112:8 117:6 120:1
120:20 121:8
122:4 124:25
131:20 133:14
136:17 138:17
140:23 147:3
153:19 160:7,9
**forma** 119:18
  121:14,19 150:16
**formas** 140:15
  141:8 143:23
  150:12,12
**format** 82:25 83:1
**former** 72:17
  75:20
**forms** 156:6
**forth** 34:11 45:9
  142:23 143:5,6
**forward** 93:24
  96:1 123:2 125:5
  130:14 131:23
  145:8,13 146:7,23
  147:15 148:4
  150:25 152:3
**forwards** 114:15
**foundation** 48:23
  98:21 99:16 100:3
  100:13 101:10
  103:12 104:14
  105:2,10 111:18
  112:9 120:2,21
  121:9 122:5
  129:23 130:6
  133:15 138:17
  140:24
**four** 30:5 51:3
**fourth** 105:18
**frame** 53:23 66:11
  67:6 68:2,23 71:5
  91:21 98:6 99:7

150:8 159:8
**free** 15:13
**friday** 1:15
**frommert** 139:6
  140:4,11,14 141:7
  142:8,21,24
  145:20 147:6
**front** 64:12
**fulton** 73:5,22,25
  74:5,7
**funded** 40:8,14,15
  47:6
**funding** 1:6,9 2:16
  3:11 10:9 11:9,16
  12:1 17:18 24:1
  77:21 80:17
  103:14 109:12
  159:4
**funding's** 3:15
  106:8
**furnish** 160:9
**further** 154:9
  158:8

**g**

**ga** 2:5,11
**garza** 82:17
**general** 66:22
  123:12
**generally** 103:25
**generated** 90:3
**gentleman** 86:1
**georgia** 1:1 17:16
  73:6,8,9,23,25
  74:15,18,19,20,22
  75:4,10 156:4,11
  158:2
**getting** 126:3
**giant** 122:11
**gibson** 1:11 2:3
  3:4 4:17 5:1,14,18
  5:20 7:19,23 8:12

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 172 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[gibson - hamid]                                                          Page 11

9:11,21 13:2 17:3
19:5,22 20:12,18
23:20 25:7,16,22
26:3,12 27:10,23
28:15 29:18 30:20
32:5,19 34:2 35:1
35:9,13 36:11
37:7 38:3,5,7
39:24 41:21 42:7
42:10 43:25 45:4
46:15 47:18 48:24
49:23 50:6 51:11
51:22 52:2,7,11,18
52:23 53:15,25
54:6,17,21 55:7
56:11,19 57:4
61:4,9,14,15 63:11
64:1 65:18,22
66:1,15 70:13
71:6,12 78:14
79:17 80:1 82:24
86:24 87:13,14,20
88:4 89:4 90:13
91:8 92:1 93:1
94:4 95:17 96:2
96:19 97:8 98:23
99:12,20 100:5,14
101:3,8,17,23,25
102:1,10 103:2,18
104:17 105:3,13
105:24 106:5
108:23 109:9
111:5,13,23
112:10,19 113:17
113:24 114:1
115:6 117:10
118:1,10,17 120:4
121:4,15 122:15
125:6,17 126:18
126:23 127:2,7,9
127:16 128:7

130:1,7 131:21
132:13 133:18
134:9,16 135:6
136:19 138:24
141:3,20 142:1,6
144:19,24 147:17
148:19,25 151:19
154:4,9,13,15,20
155:1
**gina** 1:3 2:15 3:16
8:15 16:22 17:23
17:24 18:10 22:17
22:24 23:11 26:25
29:12 32:14 35:17
37:17 40:10 44:17
45:10,12 46:23
48:10,11 55:5
81:15 82:9,16
83:14 103:9 104:6
106:9 107:19
108:14 112:18
120:15 122:6
132:25 136:15
137:11,14 138:12
138:18 140:13,17
141:8,15 142:9,17
143:1,25 145:2,4
145:19,24 149:11
149:15 150:10,14
151:9,22 152:15
153:16 159:4
**gina's** 119:7
120:11 145:21
152:8
**girls** 150:3 151:10
151:13
**give** 5:11 6:12 21:1
23:4 25:13 28:20
45:10 59:23 61:24
63:14,17 64:9
66:19 67:5 68:16

120:3,7 127:3,10
127:25 134:22
135:8
**given** 29:13 36:9
77:16 100:6
145:12 146:23
150:25 158:6
160:8
**go** 8:2 9:9 19:10
19:14,21 20:9,23
23:21 24:18 26:14
27:11 29:3,5
36:14 37:10,23
40:18 42:8,9 49:6
53:1 61:16 65:22
66:5,18 67:2 71:4
74:23 75:3,10,16
75:21,25 77:5,6
78:15,16 79:8
87:15 100:4 111:1
113:12,15 114:18
117:1,7 118:11,20
123:2 125:5
126:19 130:14
132:15 133:15
134:17 135:17
137:8,19 144:25
147:4 148:11
151:18
**goal** 98:4 143:10
**goes** 129:10
**going** 5:4,9,15
6:21 7:8,17 8:18
9:25 11:2 16:15
19:7 28:16,24
32:10,10 36:14
41:24,24 44:19
45:10 56:5 58:2
62:5,6,15,18 63:8
68:11,15 80:3
85:12 93:24 96:1

99:8 102:15 105:9
109:14 110:21
113:2 115:20
116:2 126:12,13
126:22,24 132:3
132:14,15 134:9
142:20,20 144:21
147:8
**golden** 2:10
**good** 4:18,20,20
4:22 103:19,21,22
138:19
**gotten** 126:1
**grant** 114:23
**graphic** 93:19
**great** 4:23
**greater** 23:11
**gregory** 2:10
**group** 56:8,9
129:6
**grow** 143:16
**guarantee** 18:20
23:12 24:7 31:22
32:10,25 33:1,14
34:7,14 36:8,10,13
36:24 44:5,8,9
46:2 51:18 53:3,4
54:25 55:1,23,24
60:18 62:2,8,9
**guarantees** 44:7
51:10 55:3,3,6
**guess** 64:14
**guild** 75:22
**guys** 134:12

**h**

**h** 86:3
**half** 62:19 107:18
109:19
**halfway** 142:7
**hamid** 82:16

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 173 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[hamrah - interchangeably]                                                    Page 12

**hamrah** 82:16
**hand** 27:14
**handout** 94:6,7
**hang** 34:19
**happen** 14:19
  66:16
**happened** 9:5
  17:11 58:14
**happy** 6:5 102:17
**hard** 122:14
**hargrove** 2:3 5:2
  105:19,23 118:7
  127:6 134:12
**head** 5:11 58:7
  71:15 74:13 85:25
**headed** 94:23
**headquarters** 84:3
**hear** 22:12
**held** 45:5 84:1,2
**help** 138:4
**helps** 30:16 129:4
**henry** 2:9 5:14,23
  52:12,12 80:5,17
  101:25 141:20
  159:1
**henry.perlowski**
  2:12 159:2
**hesitating** 68:12
  68:13
**hi** 114:9
**high** 103:19,21,23
  103:24 104:7
**higher** 83:3
  102:23 104:1,4,7
**highest** 104:8
  108:1
**hire** 60:20 61:25
  61:25 83:8 85:14
  138:25 139:2
**hired** 16:17 41:19
  44:6 54:25 55:2

55:18 60:23 61:25
66:21,24 99:10,13
99:22 100:9,9,16
139:3,12
**hires** 16:1,2,4
**hiring** 55:19 60:17
**hold** 9:8,15 10:17
  37:10 60:25 63:10
  132:7
**home** 11:17,24
  18:5 75:14,16
  76:9 77:22,25
**hope** 154:21
**hour** 6:18 62:19
  80:24
**hours** 81:1,2
  119:10
**hr** 24:24,25 25:12
  25:13 36:1 50:10
  50:17 53:11 58:12
  59:6,20 63:23
  64:13,15,18,24
  65:1,3,5,7,8,9,10
  65:12,15 71:5
  122:11 149:12
**huh** 4:23 8:25
  10:18 24:13,19
  26:22 37:11 38:24
  39:17 63:15 68:3
  80:25 93:2,20
  104:21 106:22
  107:1,10,16,24
  112:3 113:24
  117:13 120:5
  121:16,21 131:4
  135:4 136:2 140:8
  143:3 150:9,22
**human** 13:18 21:9
  21:11,14,16,19,23
  31:12 38:14 67:12
  102:13,14

**husband** 72:20
  76:25

**i**

**identified** 3:13 7:2
  8:10 10:12 19:3
  32:2 43:20 48:16
  50:13 57:20 89:8
  95:12 106:3
  113:21 117:24
  127:14 134:14
  142:4 144:17
**identify** 93:15
**identifying** 47:20
**immediate** 73:15
  73:20
**impacts** 158:15
**impartial** 158:15
**impartiality**
  156:14 158:11
**important** 25:18
**impression** 152:2
  152:11
**inaccurate** 121:25
**incident** 55:17
**include** 14:24 70:2
  103:15 129:15
  143:4
**included** 70:7,17
  86:8 89:13 90:23
  91:10 92:11 93:11
  95:23,24 96:1
  97:3 122:16
**including** 62:4
  89:21 119:16
  121:12 122:8
  123:5
**income** 18:19,21
  23:11
**inconsistencies**
  119:14

**inconsistent**
  124:11
**incorrect** 68:16
**increments** 60:3
  113:11
**independent**
  121:23
**index** 3:1,2,8,25
**indicated** 40:6
  55:5 56:1 71:3
  111:4
**indicates** 24:11
**individual** 53:2
  91:14
**individually** 1:10
  76:21,23 129:12
  142:18
**individuals** 23:25
  41:19 45:7 89:7
  111:22
**industry** 119:17
  121:13,18 123:6
**info** 119:12
**information**
  119:11 124:11
**initial** 24:9 56:8
**initialed** 24:11
**initially** 66:8
  70:14
**initials** 24:12 29:8
**input** 98:3 147:23
  147:25
**instructs** 6:23
**intent** 50:13 51:13
**intention** 51:16
**intentionally**
  105:12
**interchangeable**
  87:4
**interchangeably**
  87:3

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 174 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[interest - leaders]                                                    Page 13

**interest** 156:8,13 158:10
**interested** 158:9
**interject** 102:19 136:21
**internal** 14:17
**interviewing** 97:24 99:4
**introduce** 105:3,8 105:13
**introduced** 115:12
**introducing** 105:17
**involve** 77:25 79:4
**involved** 14:17 15:25 16:3,5 17:4 55:19 65:3 79:5,9 84:7 95:10 100:19 115:18 143:1 144:7 150:10,14 150:17 151:6
**involving** 78:1
**ish** 117:12
**issue** 60:10 63:5 64:5
**issues** 5:6
**item** 92:8,9

**j**

**j** 3:18,18
**jan** 1:9,10 3:3 4:12 4:13 9:14,20 61:25 62:1,4 114:6 119:1 128:16,17 129:7 130:13 159:5
**january** 1:15 4:1 70:11,12,16 83:7 86:7 89:11 92:18 117:12,14 138:2 158:16 159:3,5

**jason** 82:11 114:13 115:15 116:17 130:12
**jim** 82:11 84:7 86:1,2 93:17,25 94:9,17
**job** 14:24,25 15:1 17:7 75:11
**join** 11:13 142:14
**joined** 103:14 135:19
**joining** 11:7 17:17 22:24
**joint** 129:11
**jon** 15:23 45:23 82:18,19 94:20 95:5 114:5 115:14 116:17 119:1 121:1 127:22 128:16,16,21 129:12 130:4,13 133:11,17,20,24 134:4 135:14,18 140:5,10,14,15 141:4,8,16 142:9,9 142:17,18 145:2 145:20 146:3,15 147:7 148:2
**jordan** 1:12 9:16 158:19
**jumbo** 40:8,14,15
**junior** 75:8
**jury** 77:9

**k**

**k** 73:18 74:4
**karabites** 82:15
**kelly** 16:22 17:23 18:8,18 22:4,5,22 23:11,22 40:9,10 44:8,17,23 45:9,11 46:23 48:9,12

55:25 59:2 82:10 82:16 83:16 103:13 104:16 107:17,19 108:13 127:21 129:12 132:25 136:15,22 137:14 138:12,18 140:5,13,18 141:8 141:16 142:8,17 143:1,25 145:2,4 146:12 147:11 150:10,15,23 151:9 152:1
**kelly's** 24:6 103:9 104:6 105:5 109:17 146:19 147:24,25 151:3,7
**ken** 2:16
**kenneth** 72:16
**kevlar** 119:12
**kind** 79:10 132:19
**know** 4:25 5:24 6:2,3,4,17 7:11,13 8:13 11:8 15:8 16:20,23,25 18:1,6 18:12,19,22 19:6 20:23,24 21:8 22:10,15 24:2 33:20,23 36:9 44:16 47:1,4 52:6 52:24 56:5 57:1,2 58:17 61:2 62:11 65:2,13 66:17 67:3,11 68:6 69:14 71:5,9,13,19 75:19 78:4,18 79:11 80:20,20 83:3,17 85:24 88:16,19 90:4 91:22 92:16,20,21 92:24 96:3 97:23

97:24 100:17 106:19 108:12 109:8,13,22 110:7 110:9 112:6,13 114:9 115:3,17,20 115:20 116:19 120:9,11 121:5,23 122:6,11,18 123:8 123:10,22,25 128:23 132:5 133:4,8,9 136:25 137:2,7 139:16,19 139:20,22 140:19 141:20,25 143:5 146:10 148:13 149:2,5,7 152:3
**knowing** 150:24
**knowledge** 5:8 7:10 29:17 57:21 89:23 116:6 126:12 131:16 139:22
**kristin** 130:13

**l**

**l** 74:9,9
**lagging** 69:2
**land** 77:4
**landscape** 138:4
**large** 47:25
**larger** 83:3
**late** 12:19
**law** 80:17 156:5
**lawrenceville** 74:18
**lawsuit** 76:19 77:12,14,22 79:18 79:23 80:9
**lawyer** 6:22 80:4
**lawyers** 80:8 81:3
**leaders** 83:3 138:19

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 175 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[leadership - managers]                                          Page 14

**leadership** 82:5
89:6 93:13,16
94:9,23 95:2
101:19 108:4
112:1 115:11,12
115:25 119:5
124:1,6,8 129:4
131:11 132:17
133:13,21 136:1
137:13,15 139:12
139:24 149:25
152:17
**learn** 79:18
**learned** 79:22,23
**leave** 74:22 139:9
**left** 8:23 27:14,25
74:22 75:10 94:20
139:13,16
**legal** 53:11 59:20
148:5,10 151:8
159:23
**letter** 3:14 16:6,9
16:14,23 17:2
20:21 21:5,6
22:11,14,17,19,25
23:5,8,23 24:6,9
24:16 26:13,18
27:4 28:11 29:4,6
30:9,12,15 31:1,9
31:21,23 32:9,12
32:21,22 33:3,8,11
34:11,11 35:3,5,23
36:4,15,16,18,22
36:22,23 37:3,5,12
38:12,23 44:15
45:15 50:10 81:15
109:21
**letters** 16:3
**level** 69:15
**lex** 140:6

**liars** 125:23
**licensing** 17:14
**line** 43:21 49:7
91:4 92:8,9,10
160:11,14,17,20
160:23 161:2,5,8
161:11,14
**lines** 137:22
**link** 8:3 9:4
**listed** 44:12
**lists** 40:21 41:7
44:2,3
**litigation** 77:24
78:25 81:9
**little** 47:3 49:10
60:9
**live** 74:19
**lived** 74:20
**llp** 2:10
**lo** 129:13
**load** 134:9 141:18
**loaded** 7:20 8:13
19:6 20:10 105:15
**loading** 7:24 8:23
19:8 118:2 127:2
143:18
**loan** 14:14 28:10
40:4 44:7 51:9
53:3,7,12 55:2
59:17 60:17 61:17
61:25 102:23
103:6,10,19,21,22
104:12,19,24
107:6,14 116:5
**loans** 11:17,24
18:5,12 40:9,14,15
40:21,22 41:7,7,16
43:20 44:3,11,17
44:25 45:8,16
46:3,5 47:21 48:1
48:8,15 49:4

50:13 51:4,5,17
53:5,11 54:12
55:9,12,13,15
60:14,16 75:14,17
76:9 77:23,25
**loc** 78:2,4
**logical** 102:18
**long** 11:18 12:10
74:19 78:25 80:22
135:10
**longer** 102:15
110:8 113:10
**look** 8:3 20:23
24:8 28:16,20
29:4,19 37:9 38:8
39:11 41:17 50:2
56:25 57:3 66:18
67:3 69:23 71:4
92:8 106:24 114:7
118:3 127:17
131:23 138:3
141:19 142:7
**looked** 23:9 38:22
106:12
**looking** 8:14 30:11
34:21 66:22 108:7
137:23
**looks** 9:10 20:1
38:16
**loss** 18:9 89:14
96:7
**lot** 48:1,2,2,2
73:11 100:7
142:23
**love** 72:7
**lower** 27:13
**lunch** 112:4

**m**

**m** 2:9 86:3 159:1
**ma'am** 6:7 26:16
28:2 29:25 30:25

39:17 63:1 64:7
70:19 74:16,24
81:4,25 82:3
96:12 107:11
114:3 119:3,21
124:14 126:6
128:13 129:18
131:9 132:1
135:23 138:6
145:5,11
**maiden** 73:14
**main** 85:25 99:5
**maintaining**
156:14 158:11
**majority** 83:23
**making** 112:18
124:19 132:11
143:14 152:20
156:14 160:8,8
**manage** 143:16
**managed** 104:22
107:19
**manager** 12:9,11
15:16 16:16 17:8
20:22 21:17,21
22:1 26:24,25
27:2,5,12 28:7
32:14,15,16 35:7
35:18 37:13,18,22
37:25 38:13,25
41:1,8,23 46:22
50:11 54:16,19,24
55:21 56:17 58:9
58:18 59:13,16,21
59:25 60:2 62:6
79:5 81:18,19,20
81:21 115:8
**manager's** 60:4
115:5
**managers** 15:19
48:10 54:7 55:8,9

[managers - modified]

55:11,11 63:16
115:18
**mapped** 122:25
**march** 58:1 59:8
59:18 114:5 115:9
127:18 129:11,21
129:25 130:10,12
130:14 134:18
144:11 149:24
150:1,15 151:2
**margin** 91:4,18,18
91:19,19,22 92:13
92:18
**mark** 61:7
**marked** 8:18 9:12
10:1 19:21 20:10
42:19,21 43:5
49:13,21 50:3,21
**market** 86:18
**marketing** 24:2
85:11 97:14,15,23
98:9,10,13 101:24
102:2,21 103:9,16
104:3,6,11,15,25
105:6 106:15
107:5,14,15 108:1
108:3,8,14,14,16
108:24 109:5,7,15
110:2,9,11 119:16
121:12 122:9,17
123:5 128:19
138:14 152:18
**marking** 103:4
**marriages** 72:18
**married** 72:13
**marybeth** 1:11 2:3
5:1,17 7:15 38:1
52:6 113:14
**material** 25:1,8,18
25:18,23 26:5,7,7
31:8 33:10 34:10

35:21,22 36:15,21
**materials** 140:20
141:2,5
**math** 96:8,11
**matter** 156:13,20
158:11
**max** 40:9
**mean** 16:21 23:6,7
26:11 31:17 36:2
43:20 47:6,19
49:14 53:17 58:19
60:21 62:10 65:4
67:14 78:19 91:6
91:10 98:22
100:24 101:14
109:6 110:4 116:5
121:19 122:9
138:19,19 148:3
**meaning** 14:14
69:1
**means** 7:4 123:23
**meant** 47:10 61:22
**medications** 6:8
6:11
**meet** 17:6,21
80:22 129:6,21
130:4 133:5
140:17
**meeting** 17:5
18:15 81:2 82:5
82:25 83:1,4 84:1
84:4,6,11,16,17,22
85:17 89:6,10,16
93:13,16,17 94:10
94:23 95:2,2,4,6,7
95:9 96:14,21
97:13 100:8
101:19 108:5
112:1,2 113:1,4
115:11,13,25
116:1,8,11,14,23

119:5,7,12 122:23
122:23 124:1,2,6,8
128:16,20,23,25
129:1,4,8,11,11,25
131:11 132:17,22
133:13,21 134:2
136:1,5 137:16,18
139:13,25 140:3,7
140:11,21 141:5
145:20,25 146:5
146:14 149:25
152:17
**meetings** 17:10,12
80:13,14,19,21
133:16 137:24
140:13 141:6
150:20
**member** 76:11,14
**members** 144:8
**memory** 6:9 23:23
24:6 78:2 83:24
107:13 117:21
**mentioned** 89:17
98:15 108:18,25
**mentioning** 95:15
**message** 102:18
**met** 55:19 69:24
129:12 133:25
**methodist** 76:17
**metlife** 11:17,19
11:24 76:9,10
**mgibson** 2:6
**micromanage**
138:4
**middle** 70:11
117:14
**military** 72:9
**million** 94:10,12
94:17 95:12,15
96:6,7,9,10,15
128:18 138:2

**milton** 82:15
**mind** 65:8
**mine** 127:11
**minute** 19:9 28:17
127:3 134:17
154:5
**minutes** 6:19
**misallocated**
94:10
**misallocation**
94:13,18 95:12,16
96:15,20 97:10
128:17 133:11,12
133:20
**misallocations**
135:21
**mischaracterizes**
12:22 23:19 35:12
41:11 45:3 46:11
56:15 150:5
**mischaracterizing**
105:11
**mishandled** 99:14
99:18
**misled** 152:16
153:3,9 154:1,3
**misspeak** 68:15
**misstate** 50:23
67:16
**mix** 123:17
**model** 14:3 66:3
67:15 69:7 137:25
139:23 144:3,10
149:9 150:2
**models** 140:2
**modifications**
41:24
**modified** 31:10
33:11 35:23,24
41:20

**[moment - object]**                                                    Page 16

**moment** 15:9 21:1
28:20 61:24 120:3
120:7 127:25
128:10 134:23
135:8
**monday** 62:2
**money** 143:15
151:14
**month** 33:1 47:4,5
47:6,7 48:12
51:18 62:1 68:21
153:25
**monthly** 46:18,21
68:20,22 86:12
115:5 129:15
**months** 12:12 13:1
44:9 62:2 69:2
86:23
**morning** 4:18,20
4:22
**morrison** 40:9
**mortgage** 11:25
75:7,23 103:21
**motion** 154:17
**mouse** 19:18
**move** 99:10
143:11
**moved** 92:17,25
**moving** 83:17
85:15 98:1,7
137:25 152:3,12
152:25 153:1
**muth** 82:11 84:7
86:1,2 93:17,25
94:9,17

**n**

**naf** 7:4 11:7,8,13
11:15,23 12:7
13:12 14:5 17:7
18:2,16 22:2,20
23:4 25:19,24

26:6 29:14 33:17
50:10 51:12 55:8
56:12,13 57:5,6,10
57:22 58:22 60:10
63:5 64:2,4,8 67:8
74:25 76:8 79:1
85:17 86:13 88:25
94:10,20 96:14
97:13 98:24
104:10,23 107:7
108:7,16,24
109:16 119:19
123:7 124:10,12
124:17,22 130:21
131:12,17 135:19
135:20 136:10,14
136:16 137:6,10
137:15,18 138:13
138:25 139:7,20
146:25 147:18,22
148:13 149:2
150:1,14 151:2
153:9,10 154:16
**naf's** 11:4 106:15
120:19 122:2
130:3 140:4
**name** 8:3 9:13
12:5 72:15 73:14
74:1,3,8 76:16
86:1 139:5
**names** 9:2 73:10
73:12,16,21 85:24
89:17
**national** 15:15
**nature** 102:14
106:14
**necessarily** 43:13
**necessary** 160:9
**need** 6:1,2,14,18
15:12 62:22 63:4
63:18 65:5 66:6

68:11 71:4 110:18
123:19 126:2,2
127:4
**needed** 114:21
129:16
**needs** 5:12
**negative** 41:5
89:14
**negotiated** 24:1
104:16 107:17
**negotiating** 150:2
**negotiation** 103:15
**nervous** 153:21
154:1
**never** 53:6,11
55:19 90:17
123:13 151:15
**new** 1:6,9 2:16
3:11,15 8:7 10:9
11:9,16,25 16:1,2
16:4 17:18 18:23
23:25 56:6 64:18
77:20 80:16 98:9
98:10 103:14
106:7 108:10
109:12 114:16
115:12 117:22
128:18 144:10
147:18 149:9
150:2 159:4
**nice** 154:22
**nine** 12:12
**nods** 5:12
**noes** 41:15
**non** 23:24
**noncompete** 23:24
79:7
**normal** 134:1
**normally** 133:2
**northern** 1:1

**notary** 161:21
**note** 51:17 59:12
159:10
**noted** 52:19 160:3
160:4
**notice** 3:10 7:25
10:7 49:11 57:6
57:10,20,22 58:4
58:22
**noticing** 156:20
**notified** 128:17
**november** 42:2
50:18 107:4
**number** 30:5 53:4
106:25
**numbers** 27:13,25
123:21
**nw** 2:11

**o**

**o** 73:18,18 74:9
**object** 12:21,22
16:18 23:18 25:3
25:10,21,25 26:1,9
27:8 28:14 29:15
32:4,18 34:1,17
35:8,11 36:5 37:1
39:21 41:10 42:6
43:15,23 45:2
46:10 47:16 48:22
49:18 51:1,21
53:14 54:3,10,20
54:23 56:14 61:1
63:6,20 70:8 71:1
80:5 86:15 87:11
88:1,2 89:1 90:9
91:7,12 92:22
94:3 95:13,21
96:23 99:1,15,24
100:12,22 101:7
101:21 102:24
103:11 104:13

105:1 108:19
110:25 111:10
112:8 117:6 120:1
120:20 121:8
122:4 124:25
131:20 133:14
136:17 138:16,16
140:23 147:3
153:19
objection 52:19
55:16 66:4 71:10
87:17 96:17 98:20
99:5 102:4 105:10
109:2 111:17
112:15 114:18
125:12 126:16
129:22 130:5
150:4 151:17
objections 3:16
106:8
objects 6:22
obligated 136:8
obligation 156:14
158:11
obradovich 82:11
87:8 88:22 115:16
obtain 75:5 148:5
obtained 146:21
147:15
obvious 7:12
obviously 6:4
152:4
occasion 115:21
ocga 156:7,8,21
160:6
october 14:22,23
68:7 86:18,21
87:24
offer 3:14 16:3,6,9
16:14,23 17:2
18:17 20:21,21

21:5,6,25 22:11,13
22:17,19,24 23:5,8
23:22 24:6,9,16
26:14,17 27:4
28:11,11 29:4,6
30:10,12,15 31:21
32:9,22 33:3,8
35:3,6 36:4,16,19
36:23 37:3,4,12
38:12,23 44:15
45:15 50:11
109:21
offered 17:7
office 16:15
122:24 140:4
officer 53:3 61:17
61:25 158:15
officers 17:7 44:7
51:10 55:2 60:17
offtrack 72:8
ogletree 2:9
oh 9:9 10:5 15:8
30:11 75:11 78:10
106:21 128:9
131:2,2
okay 6:8 7:2,13,14
8:9 9:8,24 10:2,5
10:6,6,12,15,19,22
10:24 11:1,7,10,12
12:18 13:8,10
14:19 15:4,11
16:13 17:4,11
19:6,21 20:1,5,9
20:15,16,19 21:3
21:11 23:4 24:16
25:1,17 26:4,20,23
28:3,5,8 29:3,7,11
30:1,22 31:5 32:1
33:2,7 37:23 38:6
38:21 39:3,9,15,25
40:18 41:4 42:14

42:22 43:6,19
44:1 49:8,9,24
50:10 52:11 57:13
60:9,13 61:12,20
62:21 64:3,8,14
65:6,8,18,20 67:2
67:7,13 68:25
69:3 70:14,20,23
71:7,25 72:3
73:14,17 74:10,14
75:3,9 76:3,11,18
77:5,16 78:22
80:11 81:5,8 82:4
83:18,22 84:4,12
84:15 86:11 87:6
87:7 88:5,15,21
90:21 91:6 92:24
94:19 99:21
101:18 102:7
103:9 104:23
106:24 107:12,20
107:22 108:3
113:25 114:4
115:9 116:9,25
118:2,10,19 119:9
119:22 120:17
123:16 124:4,15
125:7,9,18,18
126:1,11 128:5,9
128:14 129:2,5,10
130:2,11,18 131:2
131:2 134:8 135:1
135:7,9,16,16
137:22 138:25
139:2,5 141:18,23
142:1,2 143:18
144:20,25 145:6
145:12 146:9
149:8,20 151:9,13
154:15 155:2

onboarding 15:16
17:14,17 18:22
once 55:22 68:19
ones 10:20 92:6
open 9:25 10:4,6
opening 8:16
openly 137:25
opinion 53:9 54:4
99:17 102:13
121:25
opportunity 5:22
47:3
options 9:2
order 154:17
ordered 56:22
ordering 157:4
organizations
76:12
original 41:25
69:20,21 75:11
originally 73:8
96:5
outcome 78:21
158:9
outline 93:18
outlined 27:1
32:16 37:19,21
48:8
outlines 31:22
37:14 50:25 51:2
54:11
outside 51:24
55:22,22 56:15,17
67:20,22 68:1
69:4,5,17,24 70:15
70:18 81:6 85:10
86:6,13 87:1,5
89:14,25 90:7,22
91:13 92:4,5,18
93:10 96:6 97:5
104:8 117:3,4

[outside - perlowski]                                         Page 18

123:1
**overall** 117:16,19
**overhead** 138:3
**override** 14:6
  18:11 27:1 28:25
  32:15 35:18 37:13
  37:16,17,18 39:7
  39:10,18 40:4,20
  41:6 43:22 44:5
  45:17 46:19,21,22
  49:12,15 51:4
  53:7 54:12 58:18
  58:25 59:15,16,22
  59:24 60:1,7,14
  62:6,7 66:9 71:23
  81:23 85:16
  113:10 115:8
**overrides** 18:13
  40:15 44:25 46:5
  47:21 48:9,15
  49:4 55:9,12,14
  56:9 59:11,12
  60:2
**oversee** 14:13
  100:17
**overview** 34:14

**p**

**p** 3:12,18
**p&l** 14:3 68:23
  69:11,21,21 70:3,4
  70:7 83:6,7,13,15
  83:17,19,21 85:15
  86:22 89:11,24
  90:7,16,18,24
  91:23 92:8 93:3,4
  93:8,23,23 95:24
  96:1,5,7 98:1,8
  99:6,11,19 100:19
  100:21 108:10
  117:15 119:12,24
  123:9 126:2,12,13

126:24 137:25
139:23 140:2,15
143:8,12 144:3,10
147:1,8,18 148:12
149:9 150:2,11
152:3,12 153:1,1
153:22,22
**p&ls** 70:14 83:9
  85:20 86:5,12,19
  87:10,22 88:24
  89:20,21 90:21,25
  91:1,15 92:3,4,11
  92:14,18,18 99:14
  99:17,22 100:7,10
  101:6 108:10,17
  108:25 110:1
  117:1,2 120:19
  121:7 122:3 123:1
  125:4
**p&p** 145:14,15,16
**p.m.** 1:15,15 4:2
  65:24,25 113:19
  113:20 142:12
  154:7,8 155:4
**package** 93:18,25
  95:3,10,11,15,18
  95:19,23 96:25
  97:7 133:24
**packet** 141:13
**pad** 19:19
**page** 3:5 24:8,9,11
  24:16,18 26:13,15
  27:14,17,18,18,20
  27:21,24 29:5,8,20
  29:21,22,24 30:6,8
  30:9,11,14,17,19
  30:24 38:2,8 39:4
  39:11 40:24 51:6
  51:6 106:16,20,21
  106:23 114:9
  118:21 125:19

127:17 135:12
137:19 142:8
145:1 160:11,14
160:17,20,23
161:2,5,8,11,14
**pages** 24:14 118:4
  160:9
**paid** 13:21,25 14:6
  18:9,11,13 29:1
  39:10 40:21 41:6
  44:18,18,24 45:13
  45:17 47:21 48:15
  49:4 51:5 53:7,11
  55:12,14 56:9,13
  60:14 66:2,8,14
  68:20 69:12 108:8
**para** 63:19
**paragraph** 26:14
  26:17,21 28:10
  29:19 30:3,23
  31:6 32:3 33:2,24
  34:9,16,25 35:6
  38:23 39:6 130:18
  130:23,25 136:6
  137:9
**paragraphs** 54:22
**pardon** 82:18
**part** 26:5 37:4
  45:20 46:20 48:11
  91:1 103:14
  108:21 109:3,4
  110:1 130:20
  131:7,12,17
  137:24 138:22,23
**participate** 17:5,9
**participated**
  143:21 147:7
**participation**
  110:6
**particular** 42:3
  99:9

**parties** 4:8 156:22
  157:4 158:15
**party** 76:18
  156:15,22 158:9
  158:12
**password** 157:2,3
**patty** 12:3 82:11
  84:24 85:3 112:17
  114:5,8,15 125:20
  127:21 131:23
  132:2,11,19,23,24
**pay** 51:13,16 55:8
  143:11
**paying** 50:13
  60:23 108:8
**pc** 2:4
**pe** 114:10,16
  115:12,23 116:2,7
  116:12,13 128:18
**people** 60:23 89:7
**percent** 40:10
  45:11 47:14 78:23
  104:12,24 107:6
  109:17,19 113:11
  114:14
**percentage** 66:13
**perfect** 62:22
  124:4
**perfecting** 6:24
**perfectly** 6:15
**period** 44:5 46:2
  55:23,24 60:18
  62:8 98:12,15,18
  98:25 110:11,12
  110:20,22 111:4
  111:15 112:14
  142:16
**perlowski** 2:9 5:16
  5:19 7:15,22 8:1
  8:21 9:1,16 12:21
  16:18 19:11,16

20:3,6,14 23:18
25:3,10,21,25 26:9
27:8,18,21 28:14
29:15 30:16 32:4
32:18 34:1,17
35:8,11 36:5 37:1
38:1,4 39:21
41:10 42:6,9
43:15,23 45:2
46:10 47:16 48:22
49:18 50:1 51:1
51:21,24 52:5,8,14
53:14,17 54:3,10
54:20,23 55:16
56:14,21 60:25
61:6,12 63:6,20
66:4 70:8 71:1,10
78:7,11 79:13,21
82:20 86:15 87:11
87:17 88:1 89:1
90:9 91:7,12
92:22 94:3 95:13
95:21 96:17,23
98:20 99:1,15,24
100:3,12,22 101:7
101:10,21 102:4
102:24 103:11
104:13 105:1,8,16
105:20,25 108:19
109:1 110:25
111:10,17 112:8
112:15 113:14,18
114:18 117:6
118:8,11 120:1,20
121:8 122:4
124:25 125:12
126:16 127:10
128:3 129:22
130:5 131:20
132:7 133:14
134:13,22,25

135:2 136:17
138:16 140:23
141:22,24 142:2
144:23 147:3
148:15,21 150:4,6
151:17 153:19
154:6,11,12,14,19
154:25 159:1
**permissible** 56:18
**permission** 145:13
146:23 147:15
150:25
**person** 25:12
83:11 132:21
140:18 141:11
**personal** 77:21
**personally** 101:4,5
101:9
**perspective** 80:24
143:5 146:16
**pes** 119:16 121:12
122:8,16 123:5
152:19
**phone** 22:7,23
49:1 120:14 121:3
141:12
**picked** 121:2
**picking** 120:14
**pie** 93:19
**piedmont** 2:5
**place** 4:8 31:3
45:22 156:21
**plaintiff** 1:3 2:2
3:16 76:25 78:4
106:8
**plaintiff's** 3:10
10:7
**plan** 70:24 71:19
83:8 85:13 98:1,3
98:3,8 100:21
110:4 130:13,14

142:24 143:2,9,12
147:8 148:10,12
150:11,21 152:3
**plans** 99:6 100:19
133:7 142:21
143:7,23,25
**platform** 85:15
99:11
**please** 6:2,3 15:13
50:15 51:17
134:23 142:10
154:25 160:9,9
**plus** 18:11 66:8
**point** 18:15 46:25
50:24 52:25 53:1
85:25 89:5,10
98:5 128:15
130:12
**pointed** 55:13
**points** 44:12 49:10
50:14 51:4,15,20
54:14 55:10 85:16
110:5
**policies** 145:17
**policy** 114:12,12
128:18
**popped** 9:6
**portion** 32:25
59:21 126:8
**portions** 33:3
**position** 68:4
115:15 154:19
**positive** 58:10
104:1
**possible** 111:8,14
**possibly** 115:22
**posted** 125:4
**potential** 148:22
**practice** 64:24
**practices** 106:15

**prepare** 53:10
58:12 65:10 80:11
80:23 81:3,12
94:22 95:1 99:6
139:23
**prepared** 21:8,9
41:14 42:13 43:3
43:9 46:22 49:21
50:5 52:15 53:10
55:4 59:6 68:24
69:12 84:8 85:21
86:5 88:5 95:4
97:1 133:24
140:21 141:5,7,13
**prepares** 64:18
**preparing** 65:3
85:20 95:10
142:24 143:8
150:2,15,17
**present** 2:14 84:5
98:16 111:6,9,16
111:21,24 112:2
136:3,5 140:3
**presentation** 84:9
84:13,20 94:1
**presented** 8:6
31:12 36:1,3
38:13 65:5 93:21
95:3,6 97:12
108:11 156:1
**presenting** 15:25
84:8 141:14
**presently** 31:13,13
76:15
**presidents** 82:9
**preslo** 1:9,10 3:3
3:18 4:12,13,18
5:21 7:17 8:1 9:14
9:20 12:23 19:12
42:11 50:2 56:24
61:16 62:1,1,5

66:2 72:16 78:7
79:14,22 80:2
82:20 91:14 111:1
114:6 119:1 132:8
148:15 154:21
159:5
**previous** 24:3
44:12 86:23
144:16
**previously** 59:24
89:17 91:16
130:19 133:23
147:5
**pricing** 112:24,24
113:2,4,5,7 114:20
114:21 115:1,17
116:18 138:14
**pricings** 113:8
**prior** 11:7,12,15
11:16,21 17:2,7
18:1 22:24 59:18
95:5,9
**pro** 119:17 121:13
121:18 140:15
141:7 143:23
150:12,12,16
**probably** 66:17
147:14
**problem** 128:2
**procedure** 160:6
**procedures** 14:13
145:17
**proceeding** 156:2
156:23 157:3
158:7,15
**proceedings** 3:1
65:24 113:19
154:7 155:4
156:12
**process** 17:14
22:21 45:20 46:20

58:8 59:4,14
63:23 64:17 99:4
147:10
**processed** 99:19
114:23
**processes** 14:13
**produce** 154:16
**produced** 156:24
**producing** 48:9
**product** 123:17
**production** 12:15
12:17,25 13:1,4,4
14:9,9,10,12,14,14
14:16,16,21 15:5
15:16,25 47:5,6,7
101:13 104:12,24
107:7,14,19 116:6
123:17 153:23
**productions**
152:18
**professional**
156:15 158:12
**profit** 18:9 66:3
67:15,21 68:6,14
68:17,21 69:7,13
70:23 71:16,19
86:6,8,13,22 96:6
119:19 121:6
123:7
**profitability** 14:1
66:10,13,14 68:1,6
87:9,24 108:12
109:5 110:7 122:2
122:3 153:23
**profitable** 67:17
67:23 69:4,11,17
69:22 70:5,15,18
86:14,17,19,23
88:25 117:5,20
123:18 130:21
143:15

**prohibited** 156:21
**prohibitions** 156:9
**project** 77:1
**promoted** 12:14
12:25
**properly** 99:23
100:11
**proposed** 129:13
144:3 147:1
**protected** 157:2,3
**provide** 11:4
156:19
**provided** 4:3 57:6
57:10,22 58:4,22
88:8,9,9,10,11,13
88:21 119:11
123:11
**provides** 28:18
40:3
**provision** 29:5
41:4
**provisions** 54:1
**prudent** 124:11
**public** 161:21
**purpose** 53:8 83:4
89:15 100:16
122:22 126:11,12
126:21,24 147:9
**purposes** 73:13
**pursuant** 3:11 4:4
10:9 160:6
**pursuing** 97:24
**put** 126:2 143:8

**q**

**quarter** 149:14
**quarterly** 68:19
**question** 6:4,16,17
6:22,24 25:6,14
26:2,6 34:5 36:19
39:13 47:17 52:17
52:19,20,22 57:14

57:16,17,19 60:9
61:3,4,7,13 62:13
63:2,9,22 64:8
65:5 69:19 87:19
89:9 90:12 92:2
94:25 100:2 103:1
103:20 106:18
108:22 109:25
110:14,19 111:12
111:20 112:12
115:23 122:14
124:15,20 126:22
128:6 136:22
144:4,5 145:23
148:17,20,24
152:14 153:6
**questions** 5:5,9 7:9
11:3 46:25 117:2
143:4 152:5,7,10
154:10 158:5
**quick** 6:20
**quotes** 123:20,21

**r**

**r** 3:12 73:15,18
**ran** 84:6
**range** 121:19
**ranges** 119:18
121:14
**reached** 55:25
**reaction** 102:11
**read** 5:15,22 30:2
30:2 31:5,7 37:5,5
37:8 81:8 119:9
123:3 128:10,11
130:22 137:8,20
146:6 158:7 159:9
160:2
**reading** 122:2
**reads** 31:20,25
36:21

**[real - regulations]**                                    Page 21

**real** 24:22
**really** 17:24 30:3
  56:1 65:4,21
  126:3,13
**reason** 100:20
  109:4 110:2,3
  120:17 146:25
  159:11 160:13,16
  160:19,22 161:1,4
  161:7,10,13,16
**reasons** 160:8
**recalculation** 70:1
**recall** 17:22 22:8
  23:3 44:19 45:18
  46:13,16 48:17,18
  70:20 95:11,14
  96:13 110:10
  116:9,22 123:14
  124:5,7 128:1,20
  129:19 130:2,14
  132:11 133:6
  134:4 138:7 141:4
  149:8,11,18,20
  152:20,22 153:8
  153:12,15,16
**recap** 46:22 47:4
  48:7,12 55:22
  115:5,8
**recaps** 81:19,22
**receipt** 159:18
**receive** 16:25 23:8
  26:25 32:15 35:17
  37:17 40:4,6
  46:19 62:6,7
  67:18,23 68:8,9,10
  68:18 70:22 71:8
  102:15,17
**received** 43:22
  44:14 47:5 48:9
  55:21 60:16,19
  67:11,25 68:7

69:8,13 70:21
  71:9,13,14,19
  89:19
**receives** 45:14
  156:22
**receiving** 17:2
  45:16 46:3,5
  138:7
**recess** 65:24
  113:19 154:7
**recognize** 20:24
  127:23
**recollect** 17:13
  18:20 45:19 56:3
  58:7 71:15 83:20
  84:19 99:7 109:21
  116:7 120:24
  126:10 128:22
  129:8,24 132:5
  140:25 141:13
  146:2,11,13,15
  147:24 149:15,16
  152:10 153:13
  154:2
**recollection** 8:22
  18:8,19 22:3,18
  48:25 56:10 70:11
  94:7,11,16 97:19
  98:14 99:3 103:16
  107:13 108:2
  116:1,16,21
  117:23 123:10
  125:15 130:9
  132:18 134:6
  138:9 141:1
  142:15 144:13
  153:16
**record** 6:24 65:23
  156:12,14,24
  158:6

**recruited** 11:25
  12:2 56:8 75:23
  76:8
**recruiting** 22:21
  45:6,21
**redirect** 154:10
**redondo** 72:5,7
**reduce** 126:25
**reduced** 158:5
**reduction** 108:11
  129:13 135:21
**reed** 3:18 15:23
  45:23 82:18,19
  94:20 114:5 119:1
  127:22 128:21
  130:4 133:11,20
  134:4 135:14,18
  140:5,10,14 141:4
  141:8,16 142:9
  145:2,20 147:7
**reed's** 115:14
**refer** 34:20 151:9
**referenced** 28:10
  34:16 37:3,4
  38:22 159:6
**references** 145:16
**referencing** 27:5
  30:19 31:21 32:22
  34:24 35:18 36:23
**referred** 83:2
  151:11
**referring** 11:9
  29:23 47:9 57:13
  57:15 122:23
  135:25 136:23
  137:3,7
**refers** 60:13
**reflect** 67:9 91:3
**reflected** 89:14
  108:11

**reflecting** 86:22
**refresh** 7:21 8:8
  19:9,25 105:14
  107:12 113:12
  118:3 127:4
  141:18 144:20
**regard** 7:9
**regarding** 5:7 7:10
  49:3 57:7,11,23
  58:4,23 79:6
  84:22 85:1,4,5
  87:9 112:24
  120:12 122:3
  125:3 132:19
  147:8
**regardless** 136:7
  137:4
**regards** 16:24
  58:25 59:9,10
**region** 79:6 113:3
  114:19 116:10
  119:25
**regional** 12:9,10
  15:19 16:16 17:8
  20:21 21:17,20
  22:1 26:25 27:2,5
  27:12 28:6 32:15
  32:16 35:7,18
  37:13,18,21,25
  38:12,25 41:20
  50:11 54:7,7,16,19
  54:24 55:8,11
  56:16 58:9 59:16
  59:21,25 60:2,4
  63:16 79:5 115:1
  115:4,18 116:3,20
**regional's** 114:22
**regions** 116:4
  125:3
**regulations** 4:5
  156:6

**[reimburse - reviewed]**                                                  Page 22

reimburse  110:9
reimbursed  85:12
  102:17 109:8
reimbursement
  102:16
reimbursements
  108:15
reimbursing
  106:15 109:14
related  77:2,3
  89:12,25 93:10
  103:6
relating  157:3
relationship
  156:13 158:10
relative  158:9
relatives  73:5,7,8
  74:5
reliance  75:12
reload  19:12,14,17
  19:17,21 20:7
reloaded  105:17
reloading  20:2
remained  131:11
remember  18:23
  18:25 22:16 23:1
  24:23 53:19,23
  66:10,20 68:14
  71:18,25 78:12,19
  78:20 79:3 83:14
  83:24 91:20 94:14
  95:19 97:9,11,21
  106:12 119:6
  120:6,8,12,14
  129:1 130:16
  138:11 139:4
  142:19 143:20
  148:3 153:2
remotely  4:8
removal  101:24
  102:2

removed  23:24
renegotiate  124:17
  124:22
renegotiating
  124:9
rents  119:17
  121:13 122:9,17
  123:5
repeat  6:2 25:6
  26:2 34:4 50:15
  52:21 87:19 90:11
  90:12 94:25 100:1
  103:1 108:22
  110:18 111:12
  112:12 126:21,21
  128:6 144:5
  145:23 148:23
report  15:19,22
  139:21 156:13
reported  15:5,18
reporter  1:13 4:3
  4:7,9 5:10 154:23
  155:2 156:1,3,7,10
  156:25 157:1
reporting  4:6
  156:6,19
reports  15:15
repository  157:3
represent  7:4
  20:19 27:11 129:2
representations
  156:4
representative
  11:4 51:25
representing  5:3
request  83:12
  105:4 106:24
  146:10,11
requested  83:9,18
  146:20,24 147:14
  148:2,6

requesting  83:15
  148:4
requests  3:16
  106:9
require  65:10
required  23:24
  36:8 64:23
requirement
  59:25
requiring  135:20
reserved  155:5
  158:8
reside  73:22
residence  72:3
resigned  149:21
  149:23 151:23
resolution  78:8
resolve  136:7
resolved  77:7 78:5
  152:11
resources  13:19
  21:10,11,15,16,19
  21:23 31:12 38:14
  67:12
respect  7:3,5
  43:11 56:22 58:20
  123:19,19
respond  119:23
  120:11 124:21
  125:11
responded  120:8
  120:24 121:1
  124:16
responding  120:13
  120:25 125:15
responds  114:13
  137:20
response  50:7
  107:7,9 109:25
  116:22 120:9
  154:16

responses  3:16
  5:11 11:5 105:4
  105:14 106:8
responsibilities
  14:25,25 15:3
rest  110:3 137:8
restate  6:5
retail  12:14,25
  13:3,22 14:9,16,20
  15:4,24 67:20,22
  69:4,5,18,21,25
  70:4,4,15,18 85:10
  86:6,14 87:1,5
  89:13,14,25 90:4,7
  90:22 91:3,4,21
  92:4,5,18 93:4,10
  96:6 97:5 104:9
  117:3,4,16,18,19
  123:1 130:3
  152:25
retail's  68:1
retracting  137:10
return  159:14,17
reveal  79:24
  148:17
revealed  135:20
  135:25
revealing  79:14
revenue  92:8
review  16:9,16
  46:24 47:4 48:3
  81:11 83:8 88:20
  91:25 92:3,13
  134:17 141:11
  145:22 146:12,20
  148:1 150:24
  156:2 159:7
reviewed  16:11,13
  16:15,21 21:5,6,13
  22:9 24:10 31:18
  33:20 56:4 81:13

81:14,15,18,21
88:17,19 90:21
91:2,16 92:6,11
95:5,8,19 113:3
116:3 135:7
**reviewing** 16:3,5
22:16,19 48:12,14
116:18 119:11
145:9 146:8 151:6
**rewrite** 109:16
**rick** 31:13 36:9
82:11 84:15,23
127:21 128:14
132:2,11,19,22,24
**ridiculous** 101:11
**right** 7:23 9:7,17
19:16,18 20:16
31:3 33:24 34:12
35:10 36:24 41:22
42:16 44:21 71:17
93:5 96:11 104:18
109:12 118:14
123:19,22 124:4
131:4 147:22
154:20 158:7
**riviera** 76:17
**road** 2:5
**role** 14:11 15:24
17:16
**roles** 13:11 114:10
114:16
**ron** 74:2
**room** 9:17 84:9
112:5
**rpr** 158:19
**rule** 10:10 115:12
160:6
**rules** 4:5 156:5
160:6
**run** 83:3

**rush** 5:25

**s**

**s** 73:18
**salaries** 119:17
121:13 122:9,12
122:17 123:6
**salary** 13:25 18:9
18:11 66:3,8,12
67:14,15 153:24
**saying** 9:9 33:5
94:17 96:14 99:8
138:22 150:18
153:3
**says** 8:15 24:24
27:1 28:3 29:12
34:13 36:15 40:20
41:5,7,17 42:16
52:9,10 60:6,22
107:2 114:6,9
119:10 123:16
124:9 125:22
128:15 130:19
131:6,22 136:7
137:9 142:9
146:22 147:21
**scenarios** 40:4
**schedule** 20:22
21:20 22:2 27:1,5
28:6,9,17 32:2,16
34:15 35:7,19
36:25 37:2,12,14
37:19,21,25 38:13
38:21,25 40:11
41:1,8,23 42:17,24
43:3,6,12 44:4,11
44:15 50:12 51:7
51:8,9 54:8,13,14
60:12,13,20 62:4,5
62:25 63:3,9,13,22
64:5,9,10,19
144:11 150:15

151:3
**schedules** 41:15
54:13
**scope** 51:25 56:16
56:17 91:13
106:14 133:2
**scott** 139:6 140:4
140:10,14,16
141:7,9,16 142:8
142:17,21,24
143:8,24,25
145:20,25 146:2
146:15 147:6,7
148:2,9
**screen** 8:24 19:9
20:17 105:14
113:13 118:4
127:4 141:19
144:20
**sec** 10:17 37:10
**second** 34:20 61:1
79:21 127:10
132:7 135:12
136:6
**secondary** 115:3
115:16
**secret** 148:8
**section** 156:7,8
**see** 10:5,7 19:20
20:16 27:2,16,25
30:23 31:15 38:10
39:1 40:11,11,22
41:2 42:17 44:3
106:10 107:8
114:6 118:4 119:2
119:20 124:13
126:5 129:17
130:22 131:3,6,25
132:3 135:22
136:11 138:5
141:12 142:10,12

145:1,4,10 152:5
**seeing** 105:21
131:23
**seen** 90:17 127:24
**self** 72:21 77:3
**send** 21:11,12,16
21:19 58:13 64:19
64:21 65:12
145:19,24
**sending** 31:18
65:9 146:17
**sends** 65:4,15
**senior** 82:9
**sent** 21:5,14,23
38:16 46:23 50:10
50:17 51:12 59:6
64:23 65:13
109:22 146:4,14
149:13 159:15
**sentence** 30:4 31:7
32:11,21 34:7,8
35:3,20 36:20
37:4 61:3 131:22
137:9 146:22
**separate** 57:16,17
57:19 133:10
**september** 86:18
86:20,20 87:24
142:11 145:6
148:14 149:3
**sequentially** 8:5
**serious** 119:15
**serve** 158:15
**services** 156:20
**set** 31:9 33:10
34:11 35:22 36:22
40:11 114:22
116:7,10 153:24
153:24
**setting** 115:17

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 185 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al

[settled - spreadsheets]                                            Page 24

**settled** 78:17,20
79:11
**settlement** 79:15
**seven** 50:14 51:3
51:14,20 55:10
107:18 109:19
**shannon** 1:12
158:19
**share** 8:2,14
**shared** 19:15
148:8
**she'd** 56:4
**sheet** 3:6 159:12
**short** 98:25 110:22
111:15 113:15,16
**shortfall** 133:12
**show** 94:5
**showed** 70:15,17
86:6,13 87:24
88:25 96:7 119:24
152:9
**showing** 69:22
121:6 141:4
**shown** 40:5,6
**side** 8:23
**sign** 5:15 65:1
147:19 150:3
158:8 159:13
**signature** 24:15,17
155:5 158:17
161:18
**signed** 24:15,21
29:12 38:18 42:1
44:23 46:8 50:19
136:15 149:10,17
149:19 159:21
**signing** 46:1 64:22
**similar** 23:4,7
143:13
**single** 47:4 83:20

**situations** 55:2
**six** 51:3 56:22
**size** 20:8 100:18
123:17,19,23
124:5
**slash** 8:15
**slide** 94:5
**slow** 6:1
**smaller** 129:6
**solely** 156:16
158:13
**solution** 130:21
131:7,13,18
137:24 138:22,23
**solutions** 1:5,8
3:11,15 10:8
106:7 159:4,23
**soon** 99:8
**sorry** 13:24 22:12
25:5,25 27:14,24
28:11 30:11 32:1
34:4,24 38:1
56:24 67:14 72:7
74:10,11 88:18
90:12 106:21,23
108:22 111:1
112:12 128:9
130:24 140:5
154:13
**sort** 84:20
**southeast** 104:20
117:20 122:18
**southeastern**
119:25
**space** 103:21
**speak** 5:24 84:4,11
84:15 102:8
140:10
**speaking** 103:25
**spearman** 1:3 2:15
5:1,3 8:15 16:6,22

17:5 18:12 21:12
21:13,24,25 24:9
27:25 28:4 29:12
30:9,10,18 31:19
33:8 37:24 38:3
38:10,14,18 39:4
39:11 42:1 43:21
44:13,22 45:12,25
48:13,19 49:1,7
50:12,17 51:13
53:13 55:5 57:7
57:11,23 58:4,21
58:23 60:6 64:9
64:20 66:21,21
79:19 82:9,16
83:12 97:14 98:17
104:11 108:9
111:25 112:7,14
112:18,21 118:25
119:23 125:9
127:18 128:12,21
129:7,19 130:15
131:11 132:3,17
132:22 133:5
140:6,22 146:18
147:2 149:10
152:23 153:8
159:4
**spearman's** 3:16
5:7 17:20 20:20
23:9,12 24:17
28:18 39:20 49:15
60:11 79:20 81:15
106:9 107:5,13
116:22 126:14,25
**specific** 7:9,9
18:23,25 31:21,23
31:24 32:2,11,14
32:21 44:3,10
51:8 53:20 56:9
58:17 59:17 63:9

63:22 69:10 90:3
98:5 139:4 141:12
142:19 152:21
156:22
**specifically** 17:22
22:16 32:22 37:16
44:19 45:19 51:7
53:22 58:20 67:20
69:20 83:14,24
129:1 130:16
134:7 138:11
140:2 141:1 153:2
156:5
**specified** 113:9
**speculate** 121:2
**speculating**
122:10
**speculation** 46:11
51:24 87:12 99:25
100:13,23 101:22
102:5,25 111:11
111:18 120:21
136:18 140:24
151:18
**spell** 74:3,8
**spend** 102:20,22
**spent** 103:3
119:10
**split** 45:9 47:2,10
47:12,24 48:5,11
59:2,3
**splitting** 47:12
**spoke** 44:14
**spoken** 94:19,20
**spouse's** 72:15
**spread** 73:8
**spreadsheet** 48:1
90:16,18 122:12
123:11
**spreadsheets**
46:19 48:14 82:1

Case 1:20-cv-04981-CAP Document 100 Filed 04/28/22 Page 186 of 192
30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 21, 2022

[stand - third]                                                                 Page 25

**stand** 84:12
**start** 62:2 135:11 145:8 146:8,12
**started** 12:7
**state** 75:4,10 105:4 156:10 158:2
**stated** 36:18 116:2 130:19 131:14 141:6 147:5 150:19 158:4
**statement** 36:14 124:19 160:8
**statements** 152:16
**states** 1:1 26:24 31:8 37:6,8,13 40:8
**stating** 35:20
**stay** 131:16 137:14 137:17 138:13,20
**stipulate** 4:9
**stipulations** 5:17
**street** 2:11
**strike** 111:6
**string** 3:19,20,21 3:22,23
**structure** 14:1 121:23
**subcontractor** 156:11,16 158:13
**subject** 154:10,15
**submitted** 156:25 157:1
**subparagraph** 40:1
**subscribed** 161:19
**subsequent** 89:11
**substance** 160:7
**substantial** 135:20
**suite** 2:4,10
**summary** 130:19 131:1,2

**supplied** 18:18
**supported** 97:4
**supposed** 8:16
**sure** 21:2 22:23 23:12 25:8 28:22 31:2 34:22 38:5 50:16 56:19 61:1 61:8 64:12,13 87:6 95:5,8 111:19 118:9,13 128:25 133:24 141:10,22 144:6 147:11,12
**surprise** 46:1 101:20
**surprised** 45:25 46:14 151:22 152:6,14
**svp** 13:21 128:24 129:11 133:3 145:3
**svp's** 104:3
**svps** 15:6,7 82:9 82:13 83:2,5,9,10 83:18 85:15 89:7 89:16 93:21 95:7 97:15 98:1,2,4 99:6,10 100:19 101:13,20 102:20 103:3 108:1,13 110:4 113:5 122:23 125:3 129:20 130:3 133:25 140:2 143:8,11 147:6,9 148:8
**swear** 4:9
**sworn** 4:14 161:19
**system** 126:4,13 126:14,25

**t**

**t** 2:9 73:15,15 74:4 74:9 86:3
**table** 39:7,12,19 40:5
**take** 6:15,18 20:2 20:23 50:1 62:16 65:16,18 106:16 110:22 113:15 114:7 118:3 128:3 128:3,10 134:17 154:4
**taken** 1:11 45:22 158:4
**talk** 58:2
**talked** 50:16 100:6
**talking** 16:14 82:1 84:19 116:25 117:2 120:15 137:25
**tasked** 85:14 140:15
**team** 15:17 17:17 18:22 46:21 104:20 136:8 137:5,12
**teams** 80:13
**tell** 14:8 17:11 47:19,22 53:13 73:12 80:5 127:4 150:16
**term** 25:2,9,18,24 26:5,8 97:10,11 101:15 123:22 124:4
**terms** 17:19 31:8 32:23 33:10 34:10 35:21,22 36:3,7,10 36:21 60:11 79:15 139:19 156:16 158:13

**territories** 83:4
**territory** 47:25 143:16,17
**testified** 4:15 21:4 50:20 52:3 64:17 71:7 104:3 107:25 110:1,10 143:19
**testify** 10:13 33:19 106:14
**testifying** 52:3,10
**testimony** 6:12 7:5 7:5 12:23 23:19 32:13 36:17 45:3 46:12 50:23 51:25 56:15 67:16 70:16 77:17 86:4 87:22 90:15 92:12 100:7 116:15 129:3 150:5 159:9,18 160:2,7
**thank** 4:23 5:19 38:4 54:18 61:14 65:20 107:23 113:18 135:2 142:3 154:20 155:2
**thanks** 118:12 134:13
**thargrove** 2:7
**thefinleyfirm.com** 2:6,7
**think** 20:7 23:14 27:15 52:2 65:10 74:9 76:6 87:23 89:9 102:8,18 110:14 126:18 133:22 138:21 149:23
**thinks** 103:24
**third** 26:20

Case 1:20-cv-04981-CAP   Document 100   Filed 04/28/22   Page 187 of 192

30(b)(6) & Indv. Jan Preslo
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 21, 2022

[thought - updates]                                                    Page 26

thought   102:6

three   9:10,10
26:14 28:10 32:3
34:16 35:6 38:23
51:3 81:1,2 91:19
91:22 96:18

threshold   115:21
128:18

tied   14:1 66:9
67:20 69:15 71:16
71:16 103:10,17

time   14:5 15:12
38:15,17,19 41:14
42:5,12 43:2 44:6
49:17,20 50:1,4
51:8,12 53:23
58:14 59:18 66:11
66:22 67:6,25
68:2,23 69:11,13
69:23 70:24 71:5
75:14 85:17 91:20
98:6,15,16,25 99:7
103:15 110:5,11
110:12,20 111:4
111:15 115:15
118:9 121:1 128:3
128:4 142:16
148:10 150:8
154:21 156:22
159:8,19

times   6:21 96:18

timing   146:16

title   12:8,13,16,19
12:20,24 13:8
24:24 31:22 32:11
39:1

titled   28:6 39:7
106:6

titles   13:10

today   5:5 6:9 8:20
11:3 77:17 80:12

119:10 145:8
146:8

today's   7:17,19
8:3 9:3

told   5:24 46:7
75:19 76:7 80:6
98:17 112:7,13
138:13 153:9

tolerance   114:20
114:22 115:1

tolerances   112:24
113:2,5,9 115:17
115:24 116:2,7,10
116:12,13,19

tony   82:15

top   19:24 29:11
38:9 58:7 71:15
74:13 85:24 121:5
125:19

topic   52:6,8,9
56:22 57:5,20
63:3 72:8

topics   7:4 10:13
11:3,5 56:17
106:13 154:18

total   48:5 81:2
96:3 107:18
125:24

touch   19:18

town   128:24

training   15:17

transcribe   5:12

transcript   5:22
154:24 156:23
158:6 159:6,20
160:2

transcripts   81:8
156:23 157:2

transition   17:14

transpired   89:18
152:25

travel   132:12
140:9

travis   2:3 5:2 7:16
134:13

trial   73:13 77:5,6
77:8,10,11 78:15
78:16 79:8,10,12

tried   123:9

true   42:20 43:14
69:9 156:24 158:6

truly   123:20

trust   75:12

truthful   6:12

try   6:18 7:11,12
63:12 105:24

trying   5:5,25
61:23,23 91:9
105:6 107:20

tuck   74:2

turn   26:13 39:3

tustin   17:6,21
18:16 76:12 84:2
84:3 128:24
129:20 130:3

twice   19:12

two   51:3 53:4 62:2
69:1 75:23 81:1,2
81:19 91:19,22
96:18 118:4
124:10 130:12
134:11 135:19
136:9,14 137:5

type   109:22

typewriting   158:5

typically   64:24
69:1 146:19
147:25

**u**

u   74:4 86:3

uh   4:23 8:25 10:18
24:13,19 26:22

37:11 38:24 39:17
63:15 68:3 80:25
93:2,20 104:21
106:22 107:1,10
107:16,24 112:3
113:24 117:13
120:5 121:16,21
131:4 135:4 136:2
140:8 143:3 150:9
150:22

uncle   73:20

underneath   8:18

undersigned   160:2

understand   5:5,8
6:4,5,25 7:6 11:4
25:17,19 43:10
47:22 56:2,20
58:1 60:24 61:7
61:10 62:13 70:16
81:20 86:4 87:21
91:9 92:2,12,20
116:9 144:4

understanding
18:10 65:16 90:19
91:23 110:16,19

understood   26:5
47:23 64:3 69:3
90:14 154:19

unhappy   153:17

union   75:13

united   1:1 76:17

university   75:4

upcoming   134:3

update   60:22,24
61:5,10 62:3,11,12
62:14,24,25 63:24
67:11

updated   62:4
64:13 117:15,22

updates   60:16,19
63:5,13,17 64:5

[uploaded - yeah]                                                    Page 27

uploaded   8:5,5
  157:3
upset   56:1
use   101:15 119:15
  121:11 123:4
  160:9
usual   5:16

**v**

v   1:11 2:3 159:4
varied   119:24
varies   121:19
various   15:17
  81:16 140:14
  141:7 142:20
  143:23 150:11
vary   103:23 121:7
  121:7
verbal   5:11 17:1
  31:10 33:12 35:24
verbatim   156:14
verbiage   23:17
verified   4:12
verify   159:9
veritext   1:14 4:10
  156:11,19 159:16
  159:23
veritext.com.
  159:16
versus   47:14,20
  85:16 140:18
  141:11
vice   82:9
videoconferenci...
  1:14 4:11
violating   79:6
virtual   1:14 4:10
visit   131:24
  132:11 133:8
  141:9
volume   102:23
  103:7,10,17,19,21

103:22,23,25
104:1,19 116:5
vs   1:4

**w**

wade   73:15
wait   126:13
waiting   9:17
waive   59:12,14,16
  59:21 60:1,7
  113:10
waived   59:10 60:3
walk   6:20
want   4:25 5:24
  20:23,24 26:20
  29:4 30:3 31:2,6,6
  34:22 50:22 53:9
  56:19,22 61:17
  67:15 79:2 105:9
  105:14 106:16,19
  113:12 114:12
  117:1 125:23
  127:23 135:11
  138:20,22,23
  149:1,13,23
wanted   83:21 87:6
  114:9 124:17,22
  128:10 147:25
wants   154:23
watson   140:6
way   52:16 108:7
  151:11
we've   8:8 19:6
  62:18 100:6 138:1
weekend   154:22
weighted   129:14
went   13:3 14:15
  14:20 31:19 45:9
  66:24 67:13 68:14
  68:17 75:22 76:9
  79:11 122:11
  133:4 151:7

window   9:7
witness   4:10,11
  5:14 7:3 8:9,25
  9:8,19 10:13
  12:24 16:20 19:13
  19:20 20:5,9,15
  25:5,12 26:2,11
  27:20 29:17 30:18
  34:19 36:7 37:2
  38:6 39:23 41:13
  43:24 46:13 49:20
  50:3 51:2 52:21
  53:19 54:4,11,24
  55:17 56:25 57:21
  63:8,21 65:20
  66:6 70:10 71:3
  78:10,12,18 82:22
  86:16 87:18 88:3
  89:3 90:11 91:15
  92:24 95:14,22
  96:25 98:22 99:3
  99:17 100:1,24
  101:12 102:7
  103:1,13 104:15
  105:21 106:1
  108:21 109:3
  111:3,12,19
  112:17 113:23,25
  114:19 117:8
  118:13 120:3,23
  121:10 122:6
  125:2,14 126:20
  127:8,12 128:5
  129:24 132:10
  133:16 134:24
  135:1,4 138:18
  140:25 141:23
  147:5 148:23
  153:21 159:8,10
  159:13,19

witness's   158:7
witnesses   157:2
won   77:8
words   35:6
work   11:15,18,21
  11:23 18:2,4,17
  22:2 75:10 83:8
  126:3,4 131:17
  138:23 143:11
worked   11:17,22
  13:18 18:1 25:13
  75:13 100:24
  139:21 152:1
working   85:14
  115:15 116:17
  140:1 142:21
  143:24 147:12
  148:7,9,9,11
  152:12
works   5:18 80:18
write   5:13 123:24
  129:10
writes   119:13
  135:18 136:24
  137:23
written   4:3 31:11
  33:13 36:1,2 41:5
  57:6,10,22 58:4,22
  59:11,12 60:10
  138:21
wrong   50:22
wrote   136:22

**y**

yeah   8:21 12:22
  15:14 19:20 20:3
  22:15 34:6 47:13
  47:19 57:19 60:25
  62:20 65:18 95:1
  100:6 110:20
  117:11 128:2,9,11
  131:4,6 134:22

153:7
**year**   11:20 14:22
    68:7,8,14,19 86:17
    86:21 117:22
    138:2 139:14,15
    144:16
**years**   66:7 75:23
    78:13,24 79:3
    91:16 121:10
    124:10 135:19
    136:9,14 137:5,13
    152:2
**yep**   5:18 35:16
    105:25 113:17
    134:25 135:13
**yesterday**   119:10

**z**

**zero**   114:10,12
**zoom**   80:13

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.