

Deposition of:
## **Jason M Obradovich**

*January 11, 2022*

In the Matter of:

# **Spearman, Gina v. Broker Solutions, Inc. Et Al**

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4   GINA SPEARMAN,

5        Plaintiff,              CIVIL ACTION FILE

6   vs.                         NO. 1:20-cv-04981-CAP

7   BROKER SOLUTIONS, INC.
    d/b/a NEW AMERICAN FUNDING,

8

         Defendant.

9

10

11         DEPOSITION OF JASON M. OBRADOVICH

12               APPEARING REMOTE FROM

13                TUSTIN, CALIFORNIA

14

15               JANUARY 11, 2022

16                1:02 P.M. EST

17

18

19

20  Reported By:

21  Judith L. Leitz Moran

22  RPR, RSA, CCR-B-2312

23  APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

Page 2

1          REMOTE APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4         TRAVIS C. HARGROVE, ESQUIRE

5         MARYBETH V. GIBSON, ESQUIRE

6         N. NICKOLAS JACKSON, ESQUIRE

7         THE FINLEY FIRM, P.C.

8         3535 Piedmont Road

9         Building 14, Suite 230

10        Atlanta, Georgia  30305

11

12   On behalf of the Defendant:

13        HENRY M. PERLOWSKI, ESQUIRE

14        ARNALL GOLDEN GREGORY, LLP

15        171 17th Street, N.W

16        Suite 2100

17        Atlanta, Georgia  30363

18

19   ALSO PRESENT:

20        * ANDREW WESTLE, ESQUIRE, NEW AMERICAN FUNDING

21        * KEN BLOCK, ESQUIRE, NEW AMERICAN FUNDING

22        * GINA SPEARMAN, PLAINTIFF

23

24

25

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                          Page 3

1                          I N D E X

2    EXAMINATION                                            PAGE

3        BY MR. HARGROVE .......................    4

4

5

6                        E X H I B I T S

7            (EXHIBITS SUBMITTED ELECTRONICALLY)

8    EXHIBIT NO.                                            PAGE

9    Exhibit 1      11/4/2016 Offer of Employ-       75

10                  ment, Pages 1 through 29

11   Exhibit 2      Schedule 1 to Regional          107

12                  Manager Agreement

13                  Compensation, Effective

14                  Date: March 1, 2020

15                  Pages 1 through 6

16   Exhibit 3      Rolling P&L Statement           107

17                  (10/18 - 12/18) Southeast

18                  (NAF 0000743 - Native)

19   Exhibit 4      3/26/2019 email                 129

20                  (NAF 0000549 - 553)

21

22   (EXHIBIT 4 - referenced only and not submitted to

23   the court reporter.)

24

25

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 4

1     WITNESS APPEARED REMOTELY FROM TUSTIN, CALIFORNIA

2  2              JANUARY 11, 2022 - 1:02 P.M.

3  3

4  4              MR. HARGROVE:  Well, I am ready.  If you

5  5  want to go ahead and swear the witness in and we'll

6  6  get rocking.  I don't have experience with this

7  7  exhibit platform so if I'm a little slow at the

8  8  beginning bringing up exhibits, my apologies, but

9  9  we'll all get through it.

10 10             MR. PERLOWSKI:  No problem.

11 11             THE COURT REPORTER:  Jason, please raise

12 12  your right hand.

13 13                  JASON M. OBRADOVICH,

14 14  being first duly sworn, was examined as follows:

15 15             MR. OBRADOVICH:  I do.

16 16                  EXAMINATION

17 17  BY MR. HARGROVE:

18 18      Q    And Mr. Obradovich, have I pronounced it

19 19  correctly?

20 20      A    Yeah, Obradovich, Obradovich, it's kind

21 21  of the same.  That's fine.

22 22      Q    Okay.  Gotcha.  I just want to make

23 23  sure --

24 24      A    I've heard 90 iterations, so, that's

25 25  pretty close.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 5

 1      Q    Understood.  Can you hear me okay on the

 2   Zoom right now?

 3      A    Yep.

 4      Q    If at any point you can't hear me, wave,

 5   raise your hands, whatever, so that we can get it

 6   fixed, because I don't want to go through and us

 7   not hear each other.  And I'll do the same if I

 8   don't hear you.  Fair enough?

 9      A    Yeah, that's great.

10          MR. HARGROVE:  Is everyone fine with the

11   usual stipulation, reserve objections except as to

12   the form of the question and responsiveness of the

13   answer until further use at trial?

14          MR. PERLOWSKI:  Yes.

15          MR. HARGROVE:  Great.  All right.

16   BY MR. HARGROVE:

17      Q    Mr. Obradovich, this is going to be your

18   deposition taken on behalf of the Plaintiff in the

19   case of Gina Spearman versus New American Funding

20   that's pending in the United States District Court

21   for the Middle District of Georgia.

22          You have the right to either read and

23   sign this deposition or you can waive that right.

24   And that's just a right that I always advise people

25   of.  You can discuss that with your counsel and

Page 6

1   then let the court reporter know what your

2   preference is.  Fair enough?

3        A    Okay.

4             MR. PERLOWSKI:  We'll read and sign.

5             MR. HARGROVE:  Okay.

6   BY MR. HARGROVE:

7        Q    Have you ever been deposed before?

8        A    I have not.

9        Q    All right.  Well, I want to go over some

10  ground rules and you probably heard most of them

11  from your counsel already.

12            But everything that you're saying and I'm

13  saying or anyone else says today is going to be

14  transcribed by the court reporter.  So in that

15  regard it's very important that we make sure to

16  give a verbal response today.

17            And by that I mean, uh-huhs or uh-uhs or

18  head nods, you and I can see them even though we're

19  on a screen, but those are difficult for the court

20  reporter to take down.

21            So if I ask you a question and it's a yes

22  or no question if you could -- and I say I need a

23  verbal response -- if you could give me a yes or no

24  and then you can give whatever explanation of the

25  answer you wish to give thereafter.

Page 7

```
 1          But if I tell you I need a verbal --
 2   verbal response, I'm not trying to be rude, just
 3   want to make sure everything ends up on the
 4   transcript as it's said today.  Fair enough?
 5       A    That makes sense.  Got it.
 6       Q    Okay.  Next, if you need a break today
 7   and we're in unique -- you know, unique being
 8   you're over in California, were here in Georgia,
 9   but if you need a break today at any time for any
10   reason just let me know.  This isn't intended to be
11   an exercise in endurance.
12          The only thing that I would ask is if
13   there's a question on the table or a series of
14   questions that we're in the middle of, if you
15   would -- we wait to take the break until that is
16   finished.  Fair enough?
17       A    Okay.
18       Q    All right.  And then finally, the
19   questions I'm asking you today, and I referenced
20   earlier you being able to hear me because of the
21   technology sometimes creates an obstacle as well,
22   but the questions I'm asking you today I'm not
23   trying to ask you trick questions, I'm not trying
24   to trip you up, I'm trying to ask you direct
25   questions so I can find out what information you
```

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 8

1    may know or not know about the case that you're

2    here to testify today.

3              So if you do not understand my question,

4    if you would please tell me "I don't understand

5    your question" and then I will rephrase it or

6    clarify it until I ask it in a way that you do

7    understand it.  Fair enough?

8        A    Okay, that's fair.

9        Q    And if you answer a question and you

10   didn't understand it and you didn't let me know so

11   I could clarify it, then the record is not going to

12   be reflect your lack of understanding of the

13   question.  Fair enough?

14       A    Yes.

15       Q    All right.  Did you understand those

16   general ground rules that we kind of went through?

17       A    Yes, I do.

18       Q    Are you fine with abiding by them?

19       A    Yes.

20       Q    All right.  Well, if you could go ahead

21   and state your name, your full name for the record,

22   please.

23       A    Yeah.  Jason Michael Obradovich.

24       Q    Okay.  And where do you currently live,

25   sir?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 9

```
 1        A    I live in Coto de Caza, California.
 2   That's in Orange County.
 3        Q    All right.  And do you have any relatives
 4   in -- we'll start off with the state of Georgia?
 5        A    To my knowledge, I don't have any -- I
 6   don't know anyone that's related to me that lives
 7   in the state of Georgia.
 8        Q    All right.  Gotcha.  Who lives with you
 9   at home over in California?
10        A    I live -- I live with my wife.
11        Q    Okay.  Does she have any ties at all to
12   the state of Georgia?
13        A    To my knowledge, zero ties to the state
14   of Georgia.
15        Q    Have you even ever been to the state of
16   Georgia?
17        A    I had been one time.  I went to the 2019
18   Masters Tournament.
19        Q    Okay.  Gotcha.
20             Are you a member of any churches, civic
21   organizations, anything like that?
22        A    I am -- I would consider a membership to
23   the Saddleback Church that's in Orange County.
24        Q    Okay.  How about any -- since we're in
25   Georgia and you're in California -- any national
```

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 11 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1    sort of clubs, groups, associations, et cetera,

2    that you might be involved in?

3         A    The only one I can think of would just be

4    the MAA, which is the Mortgage Action Alliance.

5    It's just a mortgage banking PAC.

6         Q    All right.  Mortgage Action Alliance,

7    when you say it's a PAC, like a Political Action

8    Committee that --

9         A    Yeah, I think it's the -- I believe, I

10   could be wrong, I think it's the fund raising arm

11   for like -- for the Mortgage, you know, Political

12   Action Committee.  I think it's called MORPAC.

13             I don't know if that's con- -- I don't

14   know if that's under what you're considering, but

15   that's all I can think of.

16        Q    Sure.  Sure.  So -- so MORPAC.  Do you

17   have any sort of officership or board member,

18   anything like that?

19        A    No, no, I've just -- I just, you know,

20   donated, you know, smaller amounts of money each

21   year as requested.

22        Q    Okay.  Gotcha.

23             Question I have to ask everyone, and I

24   can tell looking at you that this is a question

25   that I know what the answer is going to be.

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 12 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 11

1          You're not under the influence of any

2    prescription drugs or medications or anything else

3    that would affect your ability to fully and

4    truthfully testify today, correct?

5          A    I'm not under the influence of anything.

6    I couldn't tell if the way you phrased that I --

7    yes is an agreement that I'm not under the

8    influence of anything.

9          Q    Okay.  That was a good example of a

10   question that needed clarification.

11         A    Yeah.

12         Q    So --

13         A    Yeah.

14         Q    So I understand that you are not under

15   the influence of anything that would affect --

16         A    Correct.

17         Q    -- your ability to remember --

18         A    Correct.

19         Q    -- today, correct?

20         A    Correct.

21         Q    And one other ground rule that I failed

22   to go over.  Sometimes you may anticipate my

23   question, I may anticipate your answer.  Let's both

24   try not to step on each other because it's very

25   hard for the court reporter to take down what both

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 12

1    of us are saying at the same time.  Fair enough?

2         A    Understood.

3         Q    Great.  Great.

4              All right.  Have you, aside from minor

5    traffic violations, ever been convicted of any

6    crime?

7         A    No.

8         Q    Ever filed for bankruptcy before?

9         A    No.

10        Q    Can you walk me through your educational

11   background.

12        A    Yes.  My, you know, highest education was

13   a bachelor of art in economics at the University of

14   California at San Diego.

15        Q    And what year did you obtain that?

16        A    I graduated in '96.

17        Q    And so, that's the farthest you have of

18   higher education.  Any other courses, pursuit of

19   any other degrees?

20        A    You know, I have taken some online

21   courses at the same university through their

22   extension program courses in accounting.

23        Q    Okay.  So as part of your econ degree,

24   and I was an econ major, too, so I have a pretty

25   good idea of what you did, was there much emphasis

Jason M Obradovich                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 13

1    on accounting when you were obtaining that degree

2    at UCSD?

3         A    For the courses that I selected there

4    wasn't a ton of emphasis on accounting.  A lot of

5    it was micro and macro economics.

6         Q    Okay.  Did you have to take any

7    accounting courses for your econ degree?

8         A    No accounting courses were required at

9    all.

10        Q    Okay.  Same with mine, so.

11             Did you actually take any while you were

12   pursuing your undergraduate degree?  Did you take

13   any accounting courses?

14        A    I did not take any accounting courses at

15   all.

16        Q    Okay.  But after you graduated you've

17   done some online accounting courses at University

18   of California, San Diego?

19        A    That is correct.

20        Q    All right.  What accounting courses did

21   you take?

22        A    You know, I don't recall the exact names

23   of the courses.  You know, they were I think more

24   than four or five years ago that I had taken them,

25   but they were basically, you know, intro to

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 14

1   accounting and some basic accounting and basic tax.

2        Q    All right.  Do you remember how many

3   courses it was that you took in accounting --

4        A    Yeah.

5        Q    -- on line?

6        A    Sorry, I interrupted.

7        Q    Sure.

8        A    I don't recall the exact number, but I

9   believe I took four courses total.

10       Q    Okay.  Were they graded courses?

11       A    Yes, you had the option of pass, fail or,

12   you know, credit, noncredit or a grade.  I believe

13   I took them all as credit or noncredit which is

14   pass or fail.

15       Q    Okay.  Okay.  And I assume you passed all

16   four of them?

17       A    That is correct.

18       Q    Okay.  What was the impetus behind you

19   deciding to take these four accounting courses

20   roughly four to five years ago?

21       A    You know, I was trying to decide on

22   career direction and I was not certain at the time

23   whether or not I wanted to pursue CFO positions.

24            And so I, you know, especially after

25   Sarbanes-Oxley, felt that you need to have an

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 16 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

1  accounting degree and accounting experience if you

2  ever wanted to be a CFO.  And having never taken an

3  accounting course felt I should at least start by

4  taking an accounting course.

5      Q    Okay.  And I'm going to walk you through

6  your career path in a little while here, but were

7  you with New American Funding at the time you took

8  these courses?

9      A    Yes, I was.

10     Q    And if I call it NAF, is that appropriate

11  shorthand today or do y'all call it something else?

12     A    NAF would be the preferred nomenclature

13  that we all use.

14     Q    Great.  So if I say NAF today you'll

15  understand that I'm referring to New American

16  Funding?

17     A    Yes.

18     Q    Great.  All right.  So you took these

19  courses four to five years ago because you were

20  trying to decide whether you wanted to pursue CFO

21  positions.

22          Were you looking at that potential

23  internal at NAF or external somewhere else?

24     A    At the time, no, NAF did not have a CFO

25  and so I was looking at my career ascension in --

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 17 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 16

1    you know, within NAF.  And so that was one

2    possibility.

3         Q    Okay.  Does NAF have a CFO now?

4         A    As of today, no.  There was a time period

5    where they did.

6         Q    All right.  And who was it -- who was the

7    CFO at NAF?

8         A    His name was Scott Frommert.

9         Q    Okay.  So during your tenure at NAF, the

10   only time there's been a CFO was Scott Frommert,

11   and there's not one presently, correct?

12        A    That is correct.

13             MR. PERLOWSKI:  Sorry.  Object to the

14   form.

15             You can answer.

16   BY MR. HARGROVE:

17        Q    So we've got University of California,

18   San Diego, econ degree, four online courses in

19   accounting four to five years ago.

20             Any other post secondary education?

21        A    None that I can recall.

22        Q    Okay.  Is there anything in your field,

23   continuing education credits to keep your licensure

24   up, anything like that that you have to take?

25        A    You know, I don't have any licensure.  I

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 18 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1    don't have to take any of those courses or any

2    continuing education courses.

3         Q    So you don't have any sort of

4    professional licensure associated with the mortgage

5    industry, correct?

6         A    Correct, I do not have one.

7         Q    Have you ever had any such licensure?

8         A    No, I have not.

9         Q    Have you ever been involved in a lawsuit

10   either where you sued someone or you were sued?

11        A    Never.

12        Q    Okay.  And you never testified in a

13   deposition you said earlier, correct?

14        A    That is correct, I have never testified.

15        Q    Have you ever given testimony in a court

16   proceeding before?

17        A    I have never given a testimony either.

18        Q    What did you do to prepare for your

19   deposition today?

20             MR. PERLOWSKI:  And Mr. Obradovich, I

21   just want -- in response to that question, please

22   don't reveal any attorney/client privileged

23   communications.  You can answer without revealing

24   what we discussed.

25             THE WITNESS:  Okay.

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1        A    To prepare for this I had one, you know,
2    preparatory call with the attorneys that are on --
3    I believe that are on the call.  I think it was
4    just one instance that we had contact and discussed
5    the case.
6    BY MR. HARGROVE:
7        Q    So you had a call with Mr. Perlowski and
8    perhaps the in-house lawyers.  I don't want to know
9    what you discussed on that call.  But I just want
10   to make sure we're clear there was just the one
11   call before today?
12       A    That is correct.  There was email traffic
13   about that the deposition was going to exist and
14   trying to schedule it, but in terms of preparing
15   for it we just had the one call.
16       Q    How long was y'all's call?  Again, don't
17   tell me what y'all said on the call, but how long
18   was the call?
19       A    I would venture to say, I didn't -- I
20   didn't, you know, note the time, I would say it was
21   20 minutes, it might have been a few minutes more,
22   but I don't know exactly.
23       Q    Gotcha.
24            Did you look at any documents to prepare
25   for your deposition today?

Jason M Obradovich                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 19

1      A      They had sent me two documents that I had

2    -- had looked at.

3      Q      Okay.  Do you recall what documents you

4    looked at in preparation for your deposition?

5      A      Both documents were emails.

6      Q      Okay.  Were they emails -- and I want to

7    -- I know they were forwarded to you, but were the

8    emails that you actually reviewed the body of, were

9    they emails from your lawyer or were they emails

10   between other parties?

11     A      They were emails where I was either the

12   sender or the subject of the email.

13     Q      All right.  And what was the content of

14   those emails?

15     A      One email was one that I had sent to Gina

16   and Kelly.  And then one email was an email that

17   was sent to me by Patty.

18     Q      Okay.

19     A      If I can use everyone's first name, is

20   that okay?

21     Q      That's fine.

22     A      Okay.

23     Q      All right.  And what was the subject of

24   the one sent to Gina and Kelly?

25     A      You know, it was an email -- I actually

Page 20

1    printed it out -- it's here next to me.  It was an

2    email that I had sent in early 2019 about, you

3    know, price exceptions, you know, and expectations

4    around them.

5         Q    Okay.  You said you had that email with

6    you.

7              MR. HARGROVE:  Is that something --

8              MS. GIBSON:  Can we get a copy of that?

9              MR. HARGROVE:  Yeah, is there a way?

10             MR. PERLOWSKI:  Let me -- Mr. Obradovich,

11   is -- on the bottom right-hand corner of the email

12   is there a -- it's called Bates numbers, where

13   lawyers put numbers or it may say NAF and have a

14   number after it or it may say Spearman and a number

15   after it or Plaintiff.  Is there a number on the

16   bottom?

17             THE WITNESS:  I printed out whatever the

18   attachment was that -- I believe was sent to me.  I

19   don't see a number at least on what I had printed

20   out.

21             MR. PERLOWSKI:  Okay.

22   BY MR. HARGROVE:

23        Q    What's the date of the email?

24        A    The date of the email that I had sent --

25   sorry -- it was on March 26th, 2019.

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 22 of 175
Jason M Obradovich                January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 21

1          MR. PERLOWSKI:  Travis, I know the

2     email's been produced.  I just was asking if there

3     was a Bates number associated with it.

4          MR. HARGROVE:  Yeah.  If you happen to

5     know the Bates label of it then maybe -- yeah, let

6     us know.  And same thing with the second one

7     because it will probably go faster if I look at it

8     and ask him questions about the emails looking at

9     them instead of speculating.

10    BY MR. HARGROVE:

11        Q    What was the second email?

12             So the first one's about pricing

13    exceptions.

14             The second one sent to you by Patty, what

15    was the date of that email?

16        A    I don't have that one printed out.  It

17    was so short I did not print it out.

18        Q    All right.  Do you recall the contents of

19    that email?

20        A    I do recall the contents, not word for

21    word, but I do recall the contents.

22        Q    Can you give me the -- a synopsis of what

23    the contents were?

24        A    Yeah, she had sent me an email affirming

25    that we would stick to our, you know, PE policies

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

1    and thresholds a hundred percent and no exceptions.

2         Q    Okay.  And why was she -- and I recognize

3    you're not in her head -- but what caused her to

4    send you the email saying you would stick to your

5    PE policies and procedures a hundred percent?

6              MR. PERLOWSKI:  Object to the form.

7              You can answer to the extent you can.

8              THE WITNESS:  Okay.

9         A    You know, I -- like I said, I don't know,

10   you know, what was inside of her head at the time

11   but, you know, my knowledge of Patty I would just

12   say she's just, you know, wanting to make sure

13   things are a hundred percent clear.

14             That there is no cloud over, you know,

15   that we are to follow all the policies and

16   procedures that were laid out.

17   BY MR. HARGROVE:

18        Q    Had you had a discussion with her in

19   advance of that email being sent or was that just a

20   blanket email that went to everyone?

21        A    It was a total, you know, out of the blue

22   random email.  You know, I wasn't surprised, you

23   know, she is just someone who would send something

24   like that random with one sentence.

25        Q    Were you the only recipient or were there

Jason M Obradovich                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 23

1    others on that email?

2        A    I believe Kristin, who works for me was

3    on it, but I don't have it in front of me to

4    confirm that.

5        Q    Did this issue about sticking to the PE

6    policy relate in any way to my client Ms. Spearman

7    or her former partner?

8        A    To my knowledge --

9             MR. PERLOWSKI:  Object to the form.

10            THE WITNESS:  Sorry to interrupt.

11   BY MR. HARGROVE:

12       Q    He objected to the form, you can answer.

13       A    Oh.  To my knowledge, I don't think it

14   was in reference to anyone in particular.

15            The way I interpret it was to continue to

16   do my job, you know, it wasn't -- I don't -- I

17   think it was just a reaffirmation.

18            MR. PERLOWSKI:  Travis, I believe the

19   first of the two emails that we've been discussing

20   is a chain that is NAF 549 through 553.

21            MR. HARGROVE:  Okay.

22            MR. PERLOWSKI:  Give me one second and

23   I'll give the second.

24            MR. HARGROVE:  Sure.

25            MR. PERLOWSKI:  The second is NAF 558

Jason M Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 11, 2022

Page 24

1    through 559.

2              MR. HARGROVE:  Okay.  Thank you.  Well,

3    what we'll do is we'll print those off during a

4    break.  And then, once I look at them, make it

5    definitely go faster, but we'll go ahead and come

6    back to that.

7    BY MR. HARGROVE:

8         Q    Did you have any discussions with anyone

9    other than counsel about this deposition?

10        A    No.

11        Q    So nobody at NAF outside of your legal

12   counsel or in-house counsel, correct?

13        A    Not about any of the contents of the

14   deposition.  I did have to inform our COO that I

15   was leaving a prior call to get on it, this call

16   for the deposition.

17        Q    And who is that COO you you had to advise

18   that you had to leave?

19        A    Christy Bunce.  She's the one who was

20   scheduling the meeting so if she needed to schedule

21   around this.

22        Q    Okay.  So aside from meetings with

23   counsel and one discussion with Ms. Bunce just of

24   the existence of the deposition, there's not been

25   any discussion with anyone about the deposition by

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 26 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 25

1   you, correct?

2       A    That is correct.  I have not had any

3   other discussions around the deposition.

4       Q    How about discussions with anyone at NAF

5   other than legal counsel about this case that we're

6   here to talk about today, have you had any of

7   those?

8       A    Not that I can recall having -- having

9   any.

10      Q    Okay.  How did you become aware of this

11  litigation?

12      A    I was sent an email I believe from one of

13  our internal counsels that it was requested that I

14  be deposed.

15      Q    Okay.  So until you were -- until you

16  understood there was a request to depose you, you

17  did not know that there was a lawsuit between

18  Ms. Spearman and NAF?

19      A    I can't say for a hundred percent.  I --

20  you know, I've heard Ms. Spearman's name in

21  passing, but I can't say exactly that there was a

22  lawsuit that was involved.  But not specifically

23  like any details of anything.

24      Q    So aside from a lawsuit, did you have any

25  knowledge there was a dispute between Ms. Spearman

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 26

1    and NAF prior to being asked about a deposition?

2        A    What I know or at least what I had heard

3    was there was a dispute in terms of, you know, she

4    was no longer employed at NAF, but I didn't have

5    any details on what the dispute was.

6        Q    Okay.  From whom did you learn that there

7    was a dispute, the nature of which you weren't made

8    aware?

9            MR. PERLOWSKI:  And Mr. Obradovich, if

10   the source of that information is counsel just

11   state that without elaboration.

12           THE WITNESS:  Okay.

13       A    I honestly don't recall.  You know, I'm

14   not intimately involved in what happened within the

15   sales division so I don't know where I heard it.  I

16   would only be speculating if I did state someone.

17   BY MR. HARGROVE:

18       Q    Have you ever talked with Kelly Allison

19   about this case?

20       A    No.

21       Q    When was the last time you spoke with

22   Ms. Allison?

23       A    Well, like directly -- like, let me give

24   an example.  The call I was on before this call was

25   a regional meeting with all the regional managers

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 27

1    and so she asked a question during my presentation.

2    And so, she and I had an exchange during that

3    presentation.

4        Q    Okay.  Let's say aside from calls of that

5    nature, have you ever had any discussions with

6    Ms. Allison?

7             MR. PERLOWSKI:  Object to the form.

8             You can answer.

9             THE WITNESS:  Okay.

10       A    The only time I would have a call

11   scheduled would be something related to the

12   business where it would not be a one-on-one call,

13   it would be, you know, her superior arranging a

14   call for the three of us to get on to discuss a

15   particular topic.

16            So if I were to venture, I mean, I'm

17   presuming, in the last six months maybe once or

18   twice.

19   BY MR. HARGROVE:

20       Q    In those discussions with Ms. Allison,

21   was there any discussion at all about Ms. Spearman?

22       A    No.

23       Q    And you didn't read Ms. Allison's

24   deposition prior to this deposition, correct?

25       A    Correct, I have not read any -- anything

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 29 of 175
Jason M Obradovich                January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 28

1   related to the case from Kelly whatsoever.

2        Q    Okay.  And you haven't read anybody's

3   deposition that's been taken in this case, correct?

4        A    Correct.

5        Q    Have you ever seen the complaint, the

6   actual lawsuit that was filed?

7        A    I have not.

8        Q    What is your understanding of the

9   allegations of the lawsuit?

10            MR. PERLOWSKI:  Again, if the source of

11  your information or understanding is from legal

12  counsel, I'm going to instruct you not to answer.

13            If you have an understanding otherwise

14  you are able to answer it.

15            THE WITNESS:  Okay.

16       A    Everything was from legal counsel.

17  BY MR. HARGROVE:

18       Q    Okay.  Can walk me through your

19  employment history starting -- I'm assuming --

20  well, before I ask the question let me clarify.

21            Did you go directly from high school to

22  college or was there a gap in between?

23       A    I went directly from high school to

24  college.

25       Q    Okay.  When you finished college, can you

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 30 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 29

1   walk me through your career path up to where it's

2   lead you today?

3        A    Sure.  I -- as I stated I graduated, I

4   believe, it was September 1996.

5            At the end of that month, I believe

6   September 30th, 1996, I started with a company

7   called Countrywide.  So that was my first foray

8   into mortgage banking.

9            And I worked in their secondary or

10  capital markets department for approximately 10

11  years, might be nine years.

12           I stayed at Countrywide, but switched to

13  two different divisions.  I worked within

14  Countrywide's bank for six months and I worked

15  within their correspondent lending division for

16  approximately three years.

17           My employment ended, I believe, was the

18  end of October of 2008.

19       Q    Okay.  Before we move on past

20  Countrywide.  Secondary -- you said secondary and

21  corporate markets department, did I get that

22  correct?

23       A    Secondary marketing and capital markets

24  for a lot of people are synonymous, they're kind of

25  used intermittently.

Jason M Obradovich                         January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 30

1          Typically you call it secondary

2     marketing, but most people outside of mortgage

3     banking call it capital markets.

4          Q    Okay.  For someone not in the mortgage

5     banking industry, can you explain, kind of define

6     capital markets for me?

7          A    Yes.  The capital markets department, the

8     ultimate function of the department is to, you

9     know, send out pricing.  So that is the pricing

10    that is on the rate sheet.

11         Taking in locks of loans in terms of

12    making sure they're committed into the system of

13    record.

14         Hedging those loans depending on the

15    structure of the organization.  And ultimately

16    selling those loans to investors.

17         Q    And in those 10 years I assume there was

18    a -- was there a hierarchy within that department

19    at Countrywide?

20         A    Yes.  Yes, there is a hierarchy.

21         Q    And I assume you advanced up that

22    hierarchy during those 10 years?

23         A    I did.

24         Q    Can you walk me through the advancement

25    during those 10 years that you had?

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 32 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 31

1      A     Sure.  I started as a financial analyst,

2   which was the first role out of college.

3             I ascended to, you know, many different

4   titles.  I believe the progression was senior

5   financial analyst, vice president, first vice

6   president, senior vice president and executive vice

7   president.

8      Q     In any of those roles were you preparing

9   financial statements for Countrywide?

10     A     No.

11     Q     As those titles advanced, were your roles

12  changing or were you supervising more people or can

13  you kind of give me a break down of what the title

14  changes meant as far as what you did at Countrywide

15  during those 10 years?

16     A     It was a long time ago, but my

17  recollection is, you know, sometimes the title

18  increase would be added responsibility and

19  sometimes the title increase would be based on, you

20  know, added experience.

21     Q     Okay.  And after 10 years in that

22  department, you moved to the banking department at

23  Countrywide, correct?

24     A     Countrywide had a subsidary bank and so

25  I worked for that bank.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 32

```
 1      Q     All right.  And I know Countrywide ended
 2   up shutting down eventually, correct?
 3      A     Yes, I believe they were purchased by
 4   Bank of America in July -- I think July 1st, 2008.
 5      Q     Okay.
 6      A     I think I have the date right.
 7      Q     All right.  Gotcha.
 8            So before we get there, what was the
 9   impetus behind your move from the department that
10   you'd been 10 years to the subsidiary bank?
11      A     You know, ultimately it was based on, you
12   know, wanting more knowledge around mortgage
13   banking.  And working within a silo of 10 years of
14   a large, you know, company it was time to, you
15   know, learn other things about the company and
16   other roles.
17      Q     So was that a promotion when you moved to
18   that banking job that you were in for six months?
19      A     It was considered lateral.
20      Q     Lateral, okay.
21            And then after those 10 months you moved
22   into the lending department?
23      A     Correspondent lending department.
24      Q     All right.  What is --
25      A     Correspondent lending division, I think
```

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 34 of 175
Jason M Obradovich                      January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

1   it's known as.

2        Q    What is correspondent lending?

3        A    Correspondent lending is where within,

4   you know, within Countrywide they would buy closed

5   loans from other mortgage companies.

6        Q    What's a closed loan?

7        A    So once a loan funds, the borrowers

8   receive the money, the house is purchased, that

9   other entity would basically fund that loan on

10  their own balance sheet or through a warehouse

11  facility and then now you are purchasing that loan

12  from them.

13       Q    Okay.  So kind of the opposite of some of

14  your duties on the front end of brokering out the

15  loans that Countrywide closed, now you were on the

16  buying end of the loans; is that accurate?

17       A    You know, my prior role was to sell the

18  loans once they were already funded by Countrywide

19  and so I'm moving closer to -- like, what I would

20  -- what I would consider the front of the

21  transaction is a borrower working with a loan

22  officer to originate a loan.

23            And the very back end would be capital

24  markets where the loans are being sold to the

25  investor.  This is kind of one step closer from the

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 34

1    back end to the front end.

2        Q    Okay.  So October of 2008 you left the

3    Countrywide umbrella.  Were you actually a Bank of

4    America employee at that time?

5        A    I was.

6        Q    Okay.  So you had three months after the

7    -- after the purchase of Countrywide by Bank of

8    America where you were actually employed by Bank of

9    America?

10       A    That is correct.

11       Q    All right.  What was your role with Bank

12   of America?

13       A    My role had not changed.  There was a

14   transition period where Bank of America employees

15   -- or I'm sorry, Countrywide employees became Bank

16   of America employees.  And so, during that

17   transition I was still doing the exact same thing.

18       Q    Okay.  And then pretty shortly thereafter

19   you departed from Bank of America.  What was the

20   cause of that?

21       A    It was a decision.  I was offered an

22   option to stay or an option to leave based on the

23   changing control package that existed under the

24   Countrywide umbrella.  And so, I opted to take the

25   package to leave.

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 36 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1       Q     And when you took that package where did

2    you go next?

3       A     I -- I believe it was January of 2009 I

4    started at Kinecta Federal Credit Union.  It's

5    based in Los Angeles.

6       Q     And how long did you stay at Kinecta

7    Federal Credit Union?

8       A     Until May of 2013 when I joined NAF?

9       Q     While you were at Kinecta, tell me about

10   what your duties were at that job?

11      A     Yeah, it is a credit union so very

12   different than just a mortgage lender like

13   Countrywide.  They did want to start their own

14   wholesale lending division and also grow their

15   retail lending division.

16            And so, my responsibilities initially

17   were to manage the secondary marketing or capital

18   markets.

19      Q     Did you have any role in preparing

20   financial statements for the credit union while you

21   were employed there?

22      A     No.

23      Q     And you hadn't had those four accounting

24   classes yet, you said those were around 2014 once

25   you were at NAF, correct?

Page 36

1       A      Correct.

2       Q      All right.  And what caused you to leave

3    in or about May of 2013 from Kinecta Federal Credit

4    Union?

5       A      You know, I was referred by at the time

6    New American's counsel who was an ex-Countrywide --

7    I think he was a Countrywide Bank employee, might

8    have been just a Countrywide employee, that they

9    were looking for a head of capital markets.

10      Q      And who was that?

11      A      His name was Jerry Hager.

12      Q      Jerry Hager.

13             So did Mr. Hager just -- was that a

14   relationship that you maintained from your time at

15   Countrywide?

16      A      I only knew him very -- like, I knew him

17   almost by name.  We had a mutual friend that kind

18   of reconnected us, I guess, is the best way to say

19   it.

20      Q      Okay.  And he told you about the opening.

21   And how did you go about applying with NAF?

22      A      I don't recall the exact specifics.  He

23   had asked me for my resume.  I believe, that's how

24   it went.  And then I believe I was contacted by NAF

25   to come and meet with them.

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 38 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 37

1       Q    Aside from Mr. Hager, did you know anyone
2    at NAF at the time that you sent that resume?
3       A    At the time, I don't believe I knew
4    anyone at NAF.  I had heard names of people, but I
5    had never met them before.
6       Q    Okay.  Who was it who first reached out
7    to you after you sent that resume to NAF from NAF?
8       A    I don't recall if it was Christy or Rick
9    or HR to be honest.
10      Q    That would be Christy Bunce, correct?
11      A    Correct.
12      Q    Or Rick Arvielo, correct?
13      A    Correct.
14      Q    All right.  And then you said or someone
15   at HR?
16      A    I don't recall -- I don't recall how I
17   was first contacted and then how I came to actually
18   come in and meet with -- with New American.
19      Q    Okay.  When you went -- when you did
20   ultimately go in to meet with NAF, who did you meet
21   with?
22      A    The first meeting was with Rick Arvielo.
23      Q    Okay.  And what's Mr. Arvielo's position
24   with NAF?
25      A    He is the CEO.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 38

1      Q     And he was the only person in that first
2   meeting?
3      A     I believe so.
4      Q     All right.  Were you offered the job
5   after that first meeting?
6      A     No.
7      Q     Okay.  Was there a subsequent meeting?
8      A     Yes, I was requested to come back and
9   meet with Rick again.
10     Q     Okay.
11     A     I -- at that point I did meet Patty,
12  although, for probably less than 60 seconds, it was
13  a chance to say hello.  She informed me that she
14  was familiar -- she was -- knew my wife.  And then
15  I met with Christy Bunce.
16     Q     So when Patty informed you that she knew
17  your wife, did you know that ahead of time going
18  in?
19     A     Yes.  When I alluded to -- that I had
20  heard about Rick and Patty it was because my wife
21  knew them from a -- you know, a prior professional
22  life.
23     Q     And where did your wife know them from
24  before?
25     A     My wife worked for Countrywide and

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 40 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 39

1   covered Rick and Patty, their -- the company during

2   her time as the salesperson.

3        Q    So she was a salesperson for Countrywide

4   and Countrywide -- and in that role called upon NAF

5   to make sales?

6        A    She -- yeah, she would call upon -- yeah,

7   exactly, she would contact NAF about purchasing

8   loans from New American.

9        Q    And was she merely a business

10  acquaintance of the Arvielos or did they have a

11  friendship beyond business?

12       A    To my knowledge, she only knew them

13  through this precise professional relationship and

14  I don't believe they've ever had a relationship

15  outside of that.

16       Q    Were they her primary contacts who she

17  called upon at NAF, Mr. and Mrs. Arvielo?

18       A    I believe so.  I'm not a hundred percent

19  certain but I believe so.

20       Q    Are Mr. and Mrs. Arvielo still involved

21  in the day-to-day such as having vendors call on

22  them now like they were when your wife was at

23  Countrywide?

24            MR. PERLOWSKI:  Object to the form.

25  BY MR. HARGROVE:

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 41 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 40

1        Q    He just objected to the form, you can

2    answer, if you can.

3        A    Okay.  I don't believe they are operating

4    in the same capacity they were when I met them.

5        Q    Okay.  When you met them, what capacity

6    were they operating in, when you first met them?

7        A    I don't know at the -- when I met them I

8    didn't know exactly Patty's role.  To my knowledge,

9    at the time Rick's role was that he ran capital

10   markets, marketing, accounting.  I don't know what

11   else.  I think technology.

12       Q    And what does Rick do now?

13       A    A lot of those same departments report to

14   him.  Some of them now report to me who reports to

15   him.  But he doesn't have the same direct

16   involvement as he did prior.

17       Q    Gotcha.

18            And what about Patty, what was her role

19   then versus now?

20       A    To my knowledge, at the time sales and

21   operations reported to her.  I believe that is

22   still her role today.

23       Q    After that second meeting, were you

24   offered the job at NAF?

25       A    When you say after that meeting.  I mean,

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1    obviously, I was offered the role, but I think it

2    was more of a -- I think my question is more around

3    the time.

4          Q     Sure.

5                Did you have any other meetings before

6    the job was offered to you then the two you've told

7    me about?

8          A     No, that is the -- that is the last two

9    meetings, when I met with Rick and Christy that

10   second time, was the last two meetings I had with

11   them.

12         Q     Okay.  And what were you hired as, what

13   was your position at NAF when you were hired after

14   that meeting with Rick and Christy you just told me

15   about?

16         A     I believe that the exact title of the

17   role was vice president of capital markets, is what

18   the role was offered to me as.

19         Q     All right.  And this would have been in

20   or about May of 2013?

21         A     I believe my start date was May 28th, but

22   I could be wrong.  But it was around -- around the

23   end of May of 2013.

24         Q     And what were your duties as the VP of

25   capital markets once you were hired?

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 43 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 42

1      A    I was responsible for all pricing, all

2   trading and our lock desk.

3      Q    Trading, and I'm sorry, I didn't hear the

4   last word.  Trading and what?

5      A    Yeah.  Pricing, trading, and the lock

6   desk, which is how loan officers are able to lock

7   loans in the system.

8      Q    Okay.  Lock in the rate for the loan; is

9   that right?

10      A    Correct.  The terms of -- yeah, locking

11   in the terms of the loan.

12      Q    Were you involved at all in the

13   preparation of financial statements for NAF at the

14   time that -- that you were initially employed?

15      A    No.

16      Q    How about preparing profit and loss

17   statements, are you involved with that at that

18   point?

19      A    No.

20      Q    Did your career progress at NAF beyond

21   the position of VP of capital markets?

22      A    It did.

23      Q    All right.  Tell me about that

24   progression.

25      A    So I was -- I don't -- don't remember the

Jason M Obradovich                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 43

1    month or year at all.  I was promoted to the EVP of

2    capital markets.

3         Q    Okay.  How did your duties change when

4    you were promoted to EVP of capital markets?

5         A    My -- my duties did not change.  I

6    believe the reason for the title change was the

7    title was commensurate with my experience.

8         Q    Approximately how long did it take you to

9    receive that new title of EVP of capital markets?

10        A    I don't -- you know, I don't recall the

11   exact year.  It might have been one year after I

12   started would be my best guess.

13        Q    Okay.  Do you know whether you were

14   already EVP of capital markets when you pursued the

15   accounting classes you told me about earlier?

16        A    I believe so.

17        Q    Once you were EVP of capital markets were

18   you involved at all in preparing P&Ls for NAF?

19        A    At the time I was promoted I do not

20   believe I was.

21        Q    Okay.  How about financial statements?

22        A    No.

23        Q    After you were promoted, while you were

24   EVP of capital markets, did you have a role in

25   preparation of P&Ls or financial statements?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 44

1      A     Yes, I don't recall the exact time --

2    timeline, but at one point myself and my team

3    started preparing P&L statements for the production

4    divisions.

5      Q     All right.  And prior to you and your

6    team taking over the P&Ls for the production

7    division, do you know who was handling that duty?

8      A     To my -- to my knowledge, the accounting

9    system of record for NAF is a software system

10   called AMB, which I think stands for Accounting for

11   Mortgage Banking, and there is a portal -- maybe

12   portal is the wrong word -- but within there's a

13   functionality that produces P&Ls for the production

14   divisions.

15   ████████████████████████████████████████

16   ████████████

17   ████████████████████████  ████████████████

18   █████████████████████████

19   █████████████████████████  ██████████

20   ████

21   ███████████

22   ████████████████████████████

23   ██████████████████████████████████████

24   ██████████████

25   ███████████████████

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45



Jason M Obradovich                          January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 46



11        A    Yeah, Part 2 is it did not have the

12   functionality that I was looking for for a P&L

13   system.

14        Q    Okay.  And why did you -- well, so had

15   you taken these four accounting classes when you

16   came to the belief that the AMB system did not

17   properly account for revenue, did expenses very

18   well, and did not have the functionality you would

19   like to see in a P&L system?

20        A    I don't recall the timing of which

21   happened first.

22        Q    So you don't know whether you and your

23   team took those duties on before or after you had

24   taken the four accounting courses?

25        A    Yeah, off the top -- off the top of my

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 47

1    head I don't know the exact sequence.

2        Q    Did taking over these profit and loss

3    statements by your team have anything to do with

4    you taking the accounting courses?

5        A    No.

Jason M Obradovich                                                January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 48

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 49



20        Q     Were the statements that you prepared

21   used in the preparation of tax returns for NAF?

22        A     No.

23        Q     To whom were those statements

24   transmitted?

25        A     Those statements were produced and

Jason M Obradovich                                      January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 50

1   distributed to all of the affected regions or the

2   managers of those regions including senior

3   management within NAF.



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 51

1      XXX

2          Q    Okay.  So when this user interface was

3      being built who told the programmers what sort of

4      functionality was needed?

5          A    The person who directly communicated was

6      a person named Kristin, Kristin Ankeny, that was

7      her name prior to marriage.

8          Q    And what was Kristin's role in the

9      company?

10         A    Her, you know, primary responsibilities

11     were pricing on the rate sheet and the systems to

12     program that pricing as well as these P&Ls.

13         Q    So did Kristin have any sort of

14     accounting background?

15         A    No, she did not.

16         Q    Did she have more or less of an

17     accounting background then you did after four

18     courses?

19         A    I believe similar, but I can't speak to

20     what her exact education background was.

21         Q    So Kristin communicated the functionality

22     to the programmers, who then created a program that

23     was used and sent to the executives and regional

24     managers, correct?

25         A    Correct.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 52

1       Q    Was there any person with an accounting

2   background who was involved in the preparation of

3   this new software that would replace the AMB

4   program?

5       A    What do you mean by accounting

6   background?

7       Q    By way of an example, a CPA, someone who

8   -- well, let's start with this.

9            Was there anyone who had taken more than

10  the four accounting classes you had taken who was

11  involved in the preparation of this software?

12           MR. PERLOWSKI:  Object to the form, calls

13  for speculation.

14  BY MR. HARGROVE:

15      Q    Do you know everyone who was involved in

16  the preparation of this software?

17      A    Yes.

18      Q    Okay.  Do you know -- how many people

19  were there?

20      A    Including myself, I would say five

21  individuals.

22      Q    Okay.  So we've got you, we know what

23  your background is.  We have -- you said Kristin

24  was the next person?

25      A    Correct.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 53

1        Q     All right.  And Kristin, what was her

2    title?

3        A     I believe at the time it was vice

4    president of secondary marketing.  I could be

5    wrong.

6        Q     VP of secondary marketing.

7              All right.  Who were the other three

8    people?

9        A     At the time it would -- I would just have

10   to go and double-check all three of their names

11   that they were employed at the time, like, I'm

12   speculating on that it was five individuals.

13       Q     All right.  Were the people other than

14   you and Kristin the programmers?

15       A     Yes.

16       Q     Okay.  And do you know whether those

17   programmers had any accounting background?

18       A     I don't know if they do or don't.

19       Q     All right.  And as we sit here today, you

20   don't know their names, correct?

21       A     I can't say the exact names of the people

22   that were there at the time that we had designed

23   and built it out.

24       Q     Were these folks NAF employees or were

25   they people who were subbed out?

Jason M Obradovich                        January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 54

1        A     They were NAF employees.

2        Q     All right.  Within NAF's IT department?

3        A     They were hired directly by Kristin to my

4     knowledge.

5        Q     Okay.  They were hired by Kristin for the

6     purposes of creating this accounting software?

7        A     Creating the P&L system, correct.

8        Q     All right.  You said that the AMB

9     accounting system did expenses very well.

10             Was there anything that was changed in

11     the platform that you and Kristin had built as to

12     how expenses were accounted for for the P&Ls?

13        A     Expenses.  There are, you know, different

14     layers of expenses so I think we just have to be

15     more specific about that.

16        Q     What are the different layers of

17     expenses?

18        A     There are, you know, branch expenses and

19     corporate allocations.

20        Q     What are branch expenses?

21        A     Branches expenses would be, you know, to

22     paint an example, you know, within a branch, let's

23     say, we're talking about the Southeast in Atlanta,

24     so any expenses that the branch would submit to

25     accounting for payment.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 55

1      Q     Okay.  What are corporate expenses?

2      A     Corporate expenses are corporate

3  allocations, are the costs that are outside of the

4  production division that the company, you know, has

5  to pay, I guess.

6      Q     Can you give me an example of the

7  corporate allocation -- of a corporate allocation?

8      A     You know, the rent of the building that

9  I'm in.  I work in the corporate office.  Would be

10  an example.

11      Q     All right.  When you said the AMB program

12  did expenses very well, were you referring to all

13  expenses or a specific type of expense?

14      A     You know, the AMB system is the, you

15  know, system of record for the organization.  So

16  all expenses.

17      Q     Were there any changes made in the

18  software you had created as to how expenses were

19  accounted for from the AMB system?

20      A     For branch expenses, no.

21      Q     So there were no changes made to the

22  branch expenses for the AMB system.

23            How about for corporate allocations, was

24  that changed from the AMB system to the new system

25  that you and Kristin had built?

Jason M Obradovich                        January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 56

1      A     The corporate expenses don't -- are not

2   put into the P&L system.

3      Q     So they are not -- the corporate expenses

4   are not part of this new software that you and

5   Kristin had built by programmers, correct?

6      A     I want to kind of give you more

7   information around that.

8      Q     Sure.

9      A     So as not to be confusing.  They are

10  called corporate allocations.

11         So to dig into that further and to

12  explain further, the corporate expenses from AMB

13  are the corporate expenses system of record.

14         How they are allocated to different

15  production divisions is determined by the company

16  and then those are applied within the P&L system.

17         So we do not take, like, for example, we

18  do not take the rent bill from Tustin and plug the

19  rent bill into the P&L system.  We apply the

20  aggregation of all the expenses into the P&L

21  system.

22      Q     All right.  And when the new system was

23  created -- I just want to make sure I understand --

24  I want to make sure I understand.

25         The new system that you and Kristin

Jason M Obradovich

Spearman, Gina v. Broker Solutions, Inc. Et Al

January 11, 2022

Page 57

1    commissioned these programmers to build produced

2    P&Ls that did not take corporate allocations into

3    account, correct?

4              MR. PERLOWSKI:  Object to the form.

5         A    It takes corporate allocations into

6    affect.  It does not take the individual expense.

7    It takes the aggregation of all of them and then

8    based on the agreement of how they are to be

9    allocated to different production divisions, it is

10   applied in that system.

11   BY MR. HARGROVE:

12        Q    So the P&Ls produced by your -- the P&Ls

13   produced by your team using the software you and

14   Kristin commissioned would account for the revenue

15   differently in the way you told me then the AMB

16   system with the hedges taken into account, correct?

17        A    Correct.

18        Q    All right.  And then it would account for

19   the branch expenses the same as the AMB system,

20   correct?

21        A    It would account for the -- can you say

22   that one more time, please?

23        Q    It would account for the branch expenses

24   the same or differently than the AMB system?

25        A    The same as the AMB system.

Jason M Obradovich                          January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 58

1      Q     Okay.  The corporate allocations were

2    accounted for differently in the new system from

3    the AMB system, correct?

4      A     How they are applied is not based on the

5    individual expense.  I don't -- it's hard for me to

6    answer that as a kind of yes or no.  It's the same

7    dollar amount but applied differently.

8      Q     All right.  So let's take by way of an

9    example the rent in Tustin in the building you're

10   in.  How was that taken into account under the AMB

11   system?

12     A     In the AMB system there would be an entry

13   that is the rent that is paid in that particular

14   month.

15     Q     Okay.  How about in the system that you

16   and your team built?

17     A     It would look at the rent charges for

18   whatever time period, let's say, an entire year and

19   say we need to charge each loan a certain dollar

20   amount to cover that expense.

21           The AMB system is a receipt level system,

22   the P&L system is a loan level system.

23     Q     All right.  So the aggregate numbers

24   would ultimately be the same from your team's

25   system as the AMB system then?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 59

1      A    As it pertains to those expenses,

2   correct.

3      Q    Okay.  When you say as it pertains to

4   those expenses, which expenses are you talking

5   about?

6      A    The branch and the corporate expenses.

7      Q    All right.  So the system your team built

8   would produce branch level P&Ls, correct?

9      A    Correct.

10     Q    And those were transmitted to certain

11  executives within the company, correct?

12     A    Correct.

13     Q    And those accounted for revenue in the

14  manner that you told me, correct?

15     A    Correct.

16     Q    And as far as expenses, they split up the

17  corporate allocations amongst each branch on a loan

18  level, correct?

19     A    Correct.

20     Q    All right.  So in the system that your

21  team built, all the revenues were accounted for,

22  correct?

23     A    Correct.

24     Q    And all the expenses including the

25  corporate allocations were accounted for, correct?

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 61 of 175
Jason M Obradovich                 January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 60

1       A     Correct.  I want to qualify in the

2    revenue that that is the, you know, net revenue

3    from all the hedging activity.

4       Q     Okay.

5       A     When people say revenue sometimes they

6    are thinking about the revenue but not any hedging

7    expenses or other expenses to protect that revenue.

8       Q     All right.  Was there an aggregate P&L

9    and branch level P&Ls that you transmitted to the

10   other executives within the company?

11      A     Correct.

12      Q     All right.  And that aggregate P&L would

13   match what would be in the AMB system, correct?

14      A     Not entirely.

15      Q     Okay.  Why would it not match what was in

16   the AMB system?

17      A     New American Funding has, you know, two

18   different businesses.  The AMB system has the

19   servicing operations as well as the MSR asset.  And

20   so those will cause income and fluctuations or

21   potentially losses.

22            And then New American has origination

23   business which is the intention of these P&Ls to

24   replicate as the origination business.

25      Q     So the origination business -- well, let

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 61

1    me go back.
2           When NAF prepares its global financial
3    statement the part you're working on is only one
4    division of NAF that goes in --
5         A    It's only one portion of the P&L,
6    correct.
7         Q    All right.  Did you have anything to do
8    with the P&Ls for the other division of NAF?
9         A    Yes, the methodology that we implore or
10   employ with the -- all the channels what we refer
11   to also applied to the call center which is known
12   as ILA.
13        Q    So that same platform you had built was
14   being used for the other division of NAF as well?
15        A    Correct, the other production division.
16   I just want to make sure we separate out the
17   servicing operation.
18        Q    All right.  So walk me through again each
19   division of NAF and to which of these a platform
20   you had built apply?
21        A    Okay.  NAF had two production divisions.
22   The retail ILA division which is the call center.
23   The distributor retail division which is known as
24   OLA.  And servicing operations.
25        Q    All right.  So the three total divisions,

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 62

1    correct?

2         A    Yeah.  I don't typically refer to

3    servicing as a division but a -- you could say --

4    we could call it a division to purposes of this

5    conversation.

6         Q    All right.  So NAF, the call center and

7    the retail division both of those used the

8    accounting system that you and your team built,

9    correct?

10        A    Correct.

11        Q    All right.  The servicing center did not,

12   correct?

13        A    Correct.

14        Q    All right.  So whatever the AMB system

15   put out for the call center and the retail, would

16   match what your system, the ultimate aggregate

17   result would be, correct?

18        A    Correct.

19        Q    All right.  So as far as NAF's global

20   profit and loss as a company, the only portion of

21   the company not factored into your P&L system that

22   you and your team built would be the servicing

23   operations department, correct?

24        A    To the best of my knowledge, yes.

25        Q    Okay.  In your role with NAF, do you have

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 63

1   anything to do with the servicing operations
2   department?
3        A    I'm aware of their activity in my role,
4   but I am not directly involved in the management or
5   operations of that division.
6        Q    Does the servicing operations profit or
7   loss affect the retail call center and the retail
8   division of NAF?
9        A    No, the design of the P&Ls would be such
10  that they would be insulated from things like the
11  servicing operation or the hedging, you know,
12  portion of our business.
13       Q    Were you involved at all in the
14  preparation of NAF's tax returns during this time?
15       A    No.
16            MR. PERLOWSKI:  Object to the form.
17  BY MR. HARGROVE:
18       Q    Were you asked by anyone at NAF to submit
19  the P&Ls prepared by the system that you and your
20  team created to an accountant, CPA, anyone like
21  that?
22       A    No.
23       Q    Do you know whether those were submitted?
24       A    I don't know if they were submitted.  I
25  do not believe that they were.

Page 64

1      Q    Do you know whether there was any tax

2  consequence to NAF, positive or negative, by the

3  figures generated by the system that you and your

4  team created?

5      A    Can you say that one more time, I'm

6  sorry.

7      Q    Sure.

8          Do you know whether there was any tax

9  consequence to NAF, positive or negative, meaning,

10 paying more or less taxes as a result of the

11 figures generated by the software that you and your

12 team built?

13     A    I believe you used the word "was" in the

14 tax implication.  I'm aware of the tax implications

15 of the P&L.

16     Q    Uh-huh.

17     A    I just want to make sure I'm clear when I

18 answer what exactly what you mean.

19     Q    Okay.  And let me -- are you -- is that

20 software still being used to generate the P&Ls as

21 we sit here today?

22     A    Yes.

23     Q    Okay.  So since that software has been

24 used versus the AMB system, has NAF either paid

25 more or less taxes based on that system then it

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 66 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 65

1   would have using AMB?

2           MR. PERLOWSKI:  Object to the form.

3       A    You know, the P&L system -- oh, I'm

4   sorry.

5           MR. PERLOWSKI:  You can answer.

6           THE WITNESS:  Okay.

7       A    The P&L system is not used as a system of

8   record for taxes.

9   BY MR. HARGROVE:

10      Q    Okay.  What is used as a system of record

11  for taxes?

12      A    AMB is.

13      Q    All right.  And as you said earlier, your

14  system as far as the -- everything but the

15  servicing operation division -- would be exactly

16  the same as what's in AMB, correct?

17      A    Ask me that one more time, I'm sorry --

18      Q    Sure.

19      A    -- there was some noise outside my

20  office.

21      Q    The aggregate combination from what you

22  generate from the system your team developed would

23  be the -- would be for the -- for every division

24  except the servicing operation the same as what AMB

25  generates, correct?

Jason M Obradovich                       January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 66

1      A    The servicing as well as any hedging

2    activity.

3      Q    Okay.  So the hedging activity is taken

4    into account in your team's system, but not AMB

5    system, correct?

6      A    The hedging activity is taken into

7    consideration in the AMB system because that is the

8    system of record.  The intention of the P&L system,

9    which maybe we should just give it a name, the name

10   we refer to internally is Kevlar.

11     Q    Okay.

12     A    The intention of the Kevlar system is to

13   insulate the divisions from any hedging activity

14   that may impact their P&Ls that they had no control

15   over.

16     Q    Okay.  We'll probably come back to some

17   of that, but let me get you back to where I was.

18          In 2014 you had received a title change

19   to more accurately reflect your experience of

20   executive vice president.  And as part of that role

21   you and your team built this system, correct?

22     A    Correct.

23     Q    All right.

24          MR. PERLOWSKI:  Travis, can we take a

25   short rest room break just when you get to a

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 67

 1    breaking point.

 2              MR. HARGROVE:  Right now is as good a

 3    time as any.

 4              MR. PERLOWSKI:  I just need a couple of

 5    minutes.  Thank you.

 6              MR. HARGROVE:  Okay.

 7              (Recess taken 2:18 - 2:32 P.M. EST)

 8              MR. HARGROVE:  Let's go back on the

 9    record.

10    BY MR. HARGROVE:

11        Q    Mr. Obradovich, we were going through

12    your progression at NAF and then we took a break.

13              So take me to your next progression

14    beyond executive vice president, if any.

15        A    Yes.  I believe in -- oh, gosh, I think

16    it's 2020.  After COVID everything is kind of like

17    drawing blanks.  But I was promoted to chief

18    investment officer.

19        Q    Okay.  And did your role change when you

20    were promoted to chief investment officer?

21        A    It did.

22        Q    Tell me how it changed.

23        A    I assumed the finance and accounting

24    departments in addition to my, you know, capital

25    markets departments and also some business

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 69 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 68

1    intelligence individuals.

2        Q    And was this -- did this promotion occur

3    while Scott Frommert was still employed as CFO or

4    afterwards?

5        A    I believe it occurred while he was still

6    at NAF after he was hired.

7        Q    Okay.  Were you then promoted again after

8    that at some point?

9        A    No.

10       Q    So your current -- again, give me your

11   current title again?

12       A    Chief investment officer.

13       Q    And you were promoted to chief investment

14   officer -- you were promoted to chief investment

15   officer, you said, you think 2019 or '20?

16       A    I think it's 2020, I believe.  Like I

17   said, a lot's happened during that exact time

18   period.

19       Q    Gotcha.

20            And that's the role that you have as we

21   sit here today, correct?

22       A    Correct, yes.

23       Q    Did you have any role in the recruitment

24   of my client or Kelly Allison to NAF?

25       A    What do you mean by role in the

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 69

1   recruitment?

2        Q     Sure.

3              Ultimately, you know they both came to

4   work for NAF, correct?

5        A     Correct.

6        Q     What, if any, involvement did you have in

7   the process leading up to them becoming employed by

8   NAF?

9        A     To my knowledge and what I can recall, I

10  looked at some of the financial statements they had

11  provided from their prior employer.

12       Q     All right.  And did they provide those

13  directly to you or did someone else provide them to

14  you?

15       A     I don't believe they provided it.  I did

16  not have -- I don't believe I had much direct

17  contact during the recruiting of them.

18       Q     And when you looked at those financial

19  statements, what was the purpose of you looking at

20  those financial statements?

21       A     The purpose of reviewing those financial

22  statements were to be determined based on the terms

23  of which they were hired, you know, to estimate the

24  economics we would expect out of bringing them on

25  board.

Page 70

1      Q    So your role was to help assist with the

2   process of figuring out their compensation

3   structure and how they could be profitable

4   employees for NAF?

5                MR. PERLOWSKI:  Object to the form.

6                You can answer.

7      A    I would -- I would say not their

8   compensation.  I was given the -- and I don't know

9   if it was the final, but I was given the terms of

10  what the expected compensation was going to be

11  along with other details to try to generate a

12  projection of what the financials would look like

13  of them once they came on to NAF.

14  BY MR. HARGROVE:

15     Q    Okay.  When you say you were given the

16  terms of what the expected compensation would be,

17  how were those terms delivered to you?

18     A    You know, I don't recall off -- to be

19  honest off the top of my head.  I don't know if it

20  was in person or via email.

21     Q    All right.  Were you ever transmitted the

22  contract that they had, their employment contract?

23     A    I don't recall ever seeing their

24  employment contract.

25     Q    So when you got the terms, you don't know

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 71

1   if it was by email or you said in person, so that

2   would be, like, on a printout piece of paper or --

3       A    What I would -- what I need to run a

4   projection would be prior to them even receiving an

5   offer.

6            So, like I said, I don't know if it was

7   the final terms that they were agreed upon.  It

8   was, we are recruiting these individuals, we need

9   to understand the economics of -- if they join NAF

10  under the NAF cost structure versus the cost

11  structure of the prior employer to determine, you

12  know, estimated profitability.

13      Q    Did the NAF cost structure take into

14  account compensation for the potential new

15  employee?

16      A    Yeah.  The information I was given was

17  all of the compensation for Ms. Spearman,

18  Ms. Allison, their LOs, their branch employees, the

19  only major difference would be our corporate cost

20  versus what was being shown on their P&L.

21      Q    All right.  And just so I'm clear, you're

22  talking about -- let me just -- were you given the

23  terms of what their compensation would be at NAF or

24  what their compensation was at the prior employer?

25      A    You know, I don't remember exactly what

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 72

1    was communicated, but what I would be told if I

2    were to run a projection would be the compensation

3    terms being at NAF.

4        Q    Okay.  And how did you learn what the

5    compensation terms at NAF are for a person at

6    either of their level?

7        A    Like I said, I don't recall if I was

8    emailed, you know, run this projection with these

9    assumptions or someone was in my office saying run

10   these projections with these numbers.

11       Q    All right.  So regardless of which you

12   were told, you would have run some projections,

13   correct?

14       A    Correct.

15       Q    All right.  Were those projections

16   something that was run on your computer?

17       A    Yes.

18       Q    All right.  Are those projections

19   something that you deleted off of your computer?

20       A    You know, I don't remember.  I don't -- I

21   don't know if it's deleted off my computer or not.

22       Q    All right.  Did you email the projections

23   to anyone?

24       A    I don't recall how I communicated back,

25   whether it was email or in person with a printed

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 74 of 175
Jason M Obradovich  January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 73

 1    copy.

 2         Q    But if there was a printed copy there

 3    would have had to have been an electronic copy on

 4    your computer at some point, correct?

 5         A    At some point, yes.

 6         Q    When you made those projections, is that

 7    something you would have done in Excel or what

 8    program would you have used?

 9         A    Yeah, 99 percent certain that it would

10    have been in Excel.

11         Q    And you either would have been given a

12    document printed out with what the terms for Gina

13    and Kelly would be or you would have been emailed

14    what the terms were going to be compensation-wise,

15    correct?

16         A    Yeah, whether it was --

17              MR. PERLOWSKI:  Object to the form.

18         A    -- told to me while I was at my computer

19    or was emailed to me I'm -- you know, I'm not sure.

20    Or if it was even handed to me, you know,

21    physically, I don't know.

22    BY MR. HARGROVE:

23         Q    When you make projections like those that

24    we're discussing now, is that something that you

25    save in a particular area of your computer or is it

Jason M Obradovich

Spearman, Gina v. Broker Solutions, Inc. Et Al

January 11, 2022

Page 74

```
 1   something that you have a folder for potential

 2   employees, where would you save such a document?

 3        A    Hard to say.  I try to categorize

 4   anything that I do into different folders.  It

 5   might be under a temporary folder knowing that I --

 6   you know, it might be something I don't need to

 7   keep versus something that needs to be permanent

 8   that I would save in a different folder.

 9        Q    Have you searched for any of those

10   documents or been asked to search for any of those

11   documents?

12        A    No.

13             MR. PERLOWSKI:  Object.  Go ahead.

14   BY MR. HARGROVE:

15        Q    Would you search for those documents and

16   if you find them provide them to your counsel?

17             MR. PERLOWSKI:  He's not going to make a

18   commitment on discovery issues until we review what

19   you actually requested again.

20             MR. HARGROVE:  Okay.  And I -- we'll look

21   at our request.  I think it would have been

22   encompassed.

23             I'll let you know which one and I'll just

24   touch base with you at this point or once we -- and

25   I'm talking to Henry, sorry, I'm looking at you,
```

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 75

1  but if you can't tell what I'm looking at on the

2  camera.  So I'll touch base with him.

3  BY MR. HARGROVE:

4      Q    But I would ask that you not delete any

5  such documents or alter any such documents if

6  they're on your computer still.  Fair enough?

7      A    Yes.

8      Q    All right.  Were you involved, aside from

9  doing these computations at all, in the negotiation

10 of the ultimate contract between NAF and Gina?

11     A    No.

12     Q    I'm going to pull up if I can figure out

13 how to -- yeah, perhaps, MaryBeth can do it.

14          MS. GIBSON:  Does he have Exhibit Share?

15          MR. HARGROVE:  I don't know.

16          (Deposition Exhibit 1 marked.)

17 BY MR. HARGROVE:

18     Q    Mr. Obradovich, can you see that?

19     A    Yes, it looks like I can see what you

20 have on the screen shared.

21     Q    Okay.  And I just want to ask you:  Have

22 you ever seen this document before, the offer of

23 employment and agreement with Ms. Spearman?

24          MR. PERLOWSKI:  Mr. Obradovich, if you

25 need Mr. Hargrove to sort of scroll through the

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 76

1    document to be able to answer the question, please

2    feel free to ask him to do that.

3            If you don't, certainly that's fine as

4    well, but I just want to make sure that you --

5    because given that we're not doing this with paper,

6    like it's been handed to you, I want to make sure

7    you understand what you've been asked.

8            THE WITNESS:  Okay.

9        A    I don't believe I've ever seen that

10   document before.

11   BY MR. HARGROVE:

12       Q    And I want to specifically ask you about

13   this Schedule 1 that I'll slowly go through here.

14           Are you familiar -- have you ever seen

15   the Schedule 1 for Ms. Spearman?

16       A    I've never seen a Schedule 1 for

17   Ms. Spearman.

18       Q    Have you ever seen a Schedule 1 at all in

19   your time at NAF?

20       A    Probably less than five times total, but

21   I have seen them before.

22       Q    Okay.  Do you see where I am on Page 3,

23   1.4.B that says "No Override Bonus will be paid on

24   the following loans"?

25       A    Yes.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 77

1        Q     And then it has certain loans listed?

2        A     Yes.

3        Q     And it has checked off "No, not

4   applicable to this Area Manager Schedule 1."  Do

5   you see that?

6        A     "No, not applicable to this Area Manager

7   Schedule 1."  Okay.

8        Q     Have you ever seen a Schedule 1 where

9   "no" was checked off with regard to Section 1.4.B?

10       A     I have --

11             MR. PERLOWSKI:  Object to the form.

12       A     I have not reviewed very many Schedule 1s

13   or that specific section to say that I've ever even

14   seen that exact section before or if one was

15   checked off or not.

16   BY MR. HARGROVE:

17       Q     So do you have any knowledge as to

18   whether Ms. Spearman was to be paid override

19   bonuses on any of the types of loans listed in

20   Section 1.4.B?

21       A     Yeah, I would have --

22             MR. PERLOWSKI:  Object to the form.

23       A     -- no knowledge of that.

24   BY MR. HARGROVE:

25       Q     You have no knowledge whatsoever of that,

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 78

1    correct?

2         A    Of her specifically, no, not at all.

3         Q    Okay.  How about generally for NAF

4    employees of a similar stature as Ms. Spearman.  Do

5    you have any knowledge as to whether those types of

6    loans are paid overrides or not?

7         A    I have not seen --

8              MR. PERLOWSKI:  Object to the form.

9         A    -- that schedule for any other

10   individuals like Ms. Spearman or in their position.

11   BY MR. HARGROVE:

12        Q    Okay.  So just so -- just so I'm clear.

13   One of the -- at the beginning of this deposition I

14   said to find out what you know and what you don't

15   know.

16             So you're not in a position to give any

17   opinion or testimony about whether or which types

18   of loans Ms. Spearman was to be paid override

19   bonuses or not on, correct?

20        A    That is correct, I have no knowledge and

21   I had zero involvement in what she should or should

22   not have been paid on.

23        Q    Okay.  Fair enough.

24             Are you familiar with the general

25   policies about employment contracts at NAF?

Case 1:20-cv-04981-CAP Document 102 Filed 04/28/22 Page 80 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 79

1          MR. PERLOWSKI:  Object to the form.

2          You can answer, if you can.

3     A    It would depend on the question.  I'm

4    vaguely familiar of different pieces.

5    BY MR. HARGROVE:

6     Q    Well, let's talk about compensation

7    changes at NAF.  Do you know how NAF generally

8    addresses compensation changes with its employees?

9          MR. PERLOWSKI:  Object to the form.

10    A    Do you mean specific to loan officers or

11    employees in general?

12    BY MR. HARGROVE:

13    Q    Well, let's talk about regional managers

14    such as Ms. Spearman.  Do you know how those

15    changes are done?

16    A    I don't know exactly how those changes

17    are done.  I know there is a procedure with how

18    they are done.

19    Q    All right.  Tell me --

20    A    But I don't know the exact details of the

21    procedure.

22    Q    Okay.  Tell me what you know about the

23    procedure.

24    A    I know generally, whether it be loan

25    officers or individuals in management, that there

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 81 of 175
Jason M Obradovich                January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 80

1   is a procedure for compensation and communication.

2   I don't know the exact procedure, but I know it

3   exists.

4        Q    Okay.  Do you know whether documents

5   regarding changes in compensation are presented to

6   employees?

7             MR. PERLOWSKI:  Object to the form.

8   BY MR. HARGROVE:

9        Q    You don't know?

10       A    I'm generally familiar that it exists,

11  but how it actually happens I do not know.

12       Q    All right.  Do you know whether employees

13  sign documents when they have compensation changes

14  at NAF?

15            MR. PERLOWSKI:  Object to the form.

16       A    I've never verified that they have signed

17  them, but I am aware that there are signatures that

18  happen when compensation changes.

19  BY MR. HARGROVE:

20       Q    How are you aware that there are

21  signatures -- I'm sorry, could you repeat what you

22  just said?

23       A    I'm aware -- I'll give you an example.

24  When my -- when compensation changes with one of my

25  employees I have to sign a form to have it changed

Jason M Obradovich                         January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 81

1    and they have to sign it.  So I'm aware that NAF

2    has signatures that exist.

3         Q    Okay.

4         A    But I can't state, you know, in all cases

5    how it's handled, I'm just aware in my particular

6    cases.

7         Q    All right.  And how many employees are

8    under you?

9         A    Present, I would be guessing, but I would

10   say somewhere around 60 employees.

11        Q    Okay.  Of those 60 employees how many of

12   them have had compensation changes?

13        A    I would assume --

14             MR. PERLOWSKI:  Object to the form.

15        A    -- most of them at some point during

16   their tenure at NAF.

17   BY MR. HARGROVE:

18        Q    And whenever they have you sign off on a

19   document, presented it to them and they signed off

20   on it as well?

21        A    At my direct -- I have, you know,

22   probably five or six direct employees.  And in

23   those cases, yes, I've been the one to sign.  On

24   the others that don't report directly to me that

25   does not come to me for signature.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 82

1      Q      Have you had discussion with anyone at

2  NAF about why the signatures are obtained of the

3  employee when there's a compensation change?

4      A      Never had a conversation about it.

5      Q      During the time that Ms. Spearman was

6  employed at NAF, did you ever hear any of the

7  company executives say that regionals made too much

8  money?

9      A      Did I hear any executive say regionals

10  make too much money?

11      Q      Uh-huh.

12      A      I've heard them say they make a lot of

13  money.  I don't know about the word "too much" --

14  the phrase "too much money."

15      Q      Who said they made a lot of money?

16      A      I can't, you know, say a particular

17  person or particular time, but I've -- but I've

18  heard it in passing it come up in conversation.

19      Q      And in what context?

20      A      I think in the context of just generally

21  compensation.  The conversation was people at NAF

22  -- NAF make a lot of money and, you know, regional

23  managers were something that was also mentioned.

24      Q      And who was having this conversation

25  about people at NAF making a lot of money?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 83

1        A    I can't remember the exact individuals

2   that were there or the -- even what year we were

3   even, you know, having -- I'm only -- I would only

4   be speculating if I said exact names or exact time

5   period.

6        Q    But you remember there was a discussion

7   where you and other executives were talking about

8   how people at NAF made a lot of money and regional

9   managers were some of those people?

10       A    Correct.

11            MR. PERLOWSKI:  Object to the form.

12  BY MR. HARGROVE:

13       Q    You don't remember what brought up that

14  topic of conversation?

15       A    I don't.  Like I said, it was so long

16  ago.  It could have been four, five years ago.  I

17  don't even know the exact time period.  But it was

18  more than -- more than three years ago.

19       Q    I want to shift gears a little bit and

20  talk about, do you recall a leadership meeting in

21  or about February 2019 for NAF?

22       A    I was aware that there were leadership

23  meetings happening after 2018, yes.  But if it was

24  in February, I couldn't say.

25       Q ██████████████████████████████████████

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 84



Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 85



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 86



Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 87



Jason M Obradovich                         January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 88



Jason M Obradovich                                  January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 89

Jason M Obradovich                                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 90



Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 91



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 92



Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 93



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 94

1        Q     Were Kevlar reports sent quarterly,

2    yearly, monthly, can you tell me about that?

3        A     I --

4              MR. PERLOWSKI:  Object to the form.

5              THE WITNESS:  What did you say, Henry?

6              MR. PERLOWSKI:  I said I objected to the

7    form of the question.

8              You can answer.

9        A     Okay.  I'm not the one who sends out the

10   individual reports from Kevlar.  So from what I

11   recall reports were generated and sent out monthly.

12   BY MR. HARGROVE:

13       Q     Okay.  Who generated the reports from

14   Kevlar?

15       A     Kevlar is a system where you update the

16   database with all the information and then it is a

17   user interface so then the reports are then --

18   become available once the database has been

19   updated.

20             So it's not a, you have to basically

21   click a button to generate a report, it's already

22   in Kevlar.

23   ▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟

24   ▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟

25   ▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 95

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 96



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 97



Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 98

Jason M Obradovich                           January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 99



20      Q     All right.  So you have -- did you have a

21   discussion with someone about they wanted someone

22   to take the lead with the P&Ls?

23      A     It was -- you know, my role was to manage

24   capital markets and to produce the P&Ls.  My, you

25   know, duties stopped at that.

Jason M Obradovich                      January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 100

1          My duties were not to communicate with

2      the regional managers their P&Ls, to have

3      conversation with them about their P&Ls.

4          It was really to, you know, stop at that

5      point and I believe that the CFO was hired because

6      they wanted someone directly communicating with the

7      production divisions.

8      Q    When the CFO was hired, did you continue

9      to prepare the P&Ls through Kevlar?

10     A    Yes.

11     Q    Was the CFO privy to the information that

12     went into Kevlar?

13     A    Yes.

14     Q    All right.  And how was the information

15     -- well, strike that.

16          Was the information input by the CFO into

17     Kevlar or by you into Kevlar?

18     A    My team was --

19          MR. PERLOWSKI:  Object to the form.

20     A    My team was the one that entered the

21     information to Kevlar not the CFO.

22     BY MR. HARGROVE:

23     Q    Okay.  Was the CFO given the back-up

24     information that was -- to what was entered into

25     Kevlar?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 101

1       A     Can you say that again, I just want to

2    make sure I heard that?

3       Q     Sure.

4             Was the CFO given the back-up information

5    to support what was entered into Kevlar?

6       A     Was he -- was he given, I don't know what

7    you mean by given it, I guess.

8       Q     All right.  Well, presumably when the --

9    your team -- well, your team entered information

10   into Kevlar, correct?

11      A     Correct.

12      Q     That information had to come from some

13   document or source, correct?

14      A     Multiple sources, correct.

15      Q     Okay.  So those multiple sources that

16   that information was derived from, were those

17   sources of information shared with the CFO?

18            MR. PERLOWSKI:  Object to the form.

19      A     Yeah, he had access to all that same

20   information.

21   BY MR. HARGROVE:

22      Q     Okay.  So he had access to everything

23   financial for the company that went into the

24   statements, correct?

25      A     I believe -- I believe he had access to

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 102

1   everything, yes.  I'm not in IT so I can't tell you

2   his access level of information, but to my

3   knowledge he had access to that information.

4       Q    Where was that information stored?

5       A    So as we mentioned earlier a lot of the

6   expenses come from AMB which our accounting system

7   record which now reported under him.

8       Q    Okay.

9       A    And then all of the revenue information

10  is with -- built in with Encompass which I believe

11  he had access to be able to get that information

12  from Encompass.

13      Q    So the CFO was hired, but your team still

14  input all the information, correct?

15      A    Correct.

16      Q    And Kevlar still -- still is what the

17  information was produced in, correct?

18      A    Correct.

19      Q    Was Mr. Frommert in the same building as

20  you with the other executives?

21      A    Yes, he was in the office next to me.

22      Q    All right.  And with him being in the

23  office next to you, do you have an idea of what he

24  did other than review the final product from Kevlar

25  that your team prepared each month?

Page 103

1           MR. PERLOWSKI:  Objection, foundation,

2    speculation.

3           You can answer to the extent you can.

4           THE WITNESS:  Okay.

5      A    To my knowledge, you know, he was heavily

6    involved and managed the piece where it was

7    distributed out to the regional managers.

8           As well as, you know, he had the

9    accounting team that he managed.

10          Just based on the office next to me

11   that's -- I could see that's what he was doing.

12   BY MR. HARGROVE:

13     Q    So there was an accounting team separate

14   from your team that entered everything into Kevlar?

15     A    There is an accounting team that entered

16   information into AMB not into Kevlar.

17     Q    Okay.  So the accounting team that

18   entered into AMB was not the same accounting team

19   that entered into Kevlar?

20     A    The finance team would take the

21   information from AMB and deliver that information

22   so it could be entered into Kevlar.

23     Q    Is there a reason that the accounting

24   team didn't just go ahead and enter it into Kevlar

25   on its own instead of having a second step?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 104

1        A     The design of Kevlar was to copy that

2   information from AMB on the expenses so it would

3   not have to be double entered into both systems.

4        Q     We're going to pull up a document real

5   quick.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 105



Jason M Obradovich                        January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 106



19    BY MR. HARGROVE:

20         Q     Have you talked to Scott Frommert since

21    his departure from NAF?

22         A     No.

23         Q     Did you know Mr. Frommert before he came

24    to NAF?

25         A     I did not.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 107

1        Q     Did you interact, I know he was in the

2    office next to you, did you interact with

3    Mr. Frommert regularly while he was employed at

4    NAF?

5        A     Yes, to the extent he was in, you know,

6    the office next to me.

7        Q     Okay.  Did you all have a cordial

8    relationship?

9        A     Yes.

10       Q     Did you guys ever have any disagreements

11   about the way, by way of example, expenses were

12   accounted for?

13       A     None to my knowledge.

14       Q     All right.  Did Mr. Frommert ever ask you

15   for any financial information while he was

16   employed?

17       A     None that I can think of.

18       Q     Are you aware of him asking for

19   information from anyone else and it not being

20   provided to him?

21       A     No, not to my knowledge.

22             (Deposition Exhibit 2 and 3 marked.)

23   BY MR. HARGROVE:

24       Q     Before we talk a little bit more about

25   Mr. Frommert, do you have -- can you see on the

Jason M Obradovich                 January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 108

1   screen the document that's labeled Exhibit 3 that

2   looks to be a Kevlar reporting P&L statement?

3        A    Yes.

4             MR. PERLOWSKI:  Travis, could you please

5   just give a Bates range for the document so that we

6   have it?

7             MR. HARGROVE:  Yeah.  It is -- let's see

8   -- it's NAF 0000743 through --

9             MS. GIBSON:  Well, it's a native file.

10  So it's just marked on the first page.

11            MR. PERLOWSKI:  Okay, thank you.

12            MS. GIBSON:  You're welcome.

13            MR. PERLOWSKI:  And what is the -- if you

14  can just make that slightly bigger -- I'm sorry,

15  I'm just trying to see what is that.  Okay, 10/18

16  to 12/18 Rolling P&L.  Okay, thank you.

17  BY MR. HARGROVE:

18       Q    Is this an example of a Kevlar report

19  prepared out of the Kevlar system?

20       A    It appears to be.

21       Q    All right.  And do you know why this is

22  the only Kevlar report that's been produced in this

23  case to us to date?

24       A    I have no idea.

25       Q    Were you involved in gathering the Kevlar

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 110 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 109

```
 1   reports for this case?

 2        A    I was not.

 3        Q    When you talked about -- it looks like

 4   this is for the -- it looks like for October 18 to

 5   December 18 of 2018?

 6        A    That's what it looks like, yes.

 7        Q    All right.  Were you involved in the

 8   preparation of this Kevlar report?

 9        A    What do you mean by preparation?  Like,

10   the design of the system or the one that you have

11   physically here on the screen?

12        Q    The one I have physically in front of me.

13        A    No.

14        Q    Did you have anything to do with it being

15   generated?

16        A    No.

17        Q    Who would have generated -- who would be

18   the one to generate reports like this or such as

19   this?

20        A    I could only think of two other people

21   that would have.  There are other people that would

22   have access that could.  But Jim Muth or Kristin

23   Ankeny might be one of the two individuals.  I

24   don't know.

25        Q    Have you ever generated Kevlar reports?
```

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 110

1      A    Yes.

2      Q    All right.  And what would be the reasons

3   you would generate a Kevlar report?

4      A    I would want to look at the profitability

5   of the regions, branches, or there are other

6   reports, you know, it has.

7      Q    Okay.  And if I scroll to the bottom --

8   to the bottom of this document.  You said bottom

9   line profit is on the Kevlar report.

10          Is that -- at the bottom I see branch

11  expenses, corporate allocation, corporate regional

12  expenses.

13          Where would I see the profit on this

14  document?

15     A    Generally, it would be all the way at the

16  bottom.

17     Q    All the way at the bottom.

18     A    Now, if it says -- it looks like

19  corporate margins is kind of -- it's very hard to

20  read.

21     Q    I see that at the bottom, yes.  So

22  corporate margin, okay.  I see what you mean.

23          So where it says Corporate Margin at the

24  bottom, that would be -- and I've got -- that would

25  be profit or loss in that parenthesis there.  I'm

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 111

1   not sure why it isn't showing up on the ones that I

2   printed off it.

3             MS. GIBSON:  It does have it?

4             MR. HARGROVE:  It should have.

5   BY MR. HARGROVE:

6        Q    All right.  Yeah.

7             So corporate margin and I realize it's

8   difficult to see there on my copy.  Corporate

9   margin is the profit, correct?

10       A    Yes, that is the general nomenclature we

11  use.

12       Q    And if it's got a parenthesis around it,

13  that means it's a loss, correct?

14       A    Yes.

15       Q    All right.  And this also has branch

16  margin on hit because this was a report for the

17  Southeast, correct?

18       A    It has branch margin on it, yes.  And it

19  was the Southeast, yes.

20       Q    All right.  And all of the reports that

21  would be generated from Kevlar and so now it would

22  have had this corporate margin on them, correct?

23       A    Yes.  If you were to pull -- if you go to

24  the top it has the name of the report from Kevlar.

25       Q    Uh-huh.

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 113 of 175
Jason M Obradovich                   January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 112

1       A     And if you pull that report it will

2   always have the corporate margin.

3       Q     All right.  And so here that report is

4   called Rolling P&L Statement, correct?

5       A     Correct.

6       Q     Is there any type of P&L statement that

7   you can generate off Kevlar that does not have the

8   ultimate profit or loss contained on them?

9       A     I don't believe anything that has the

10  word "P&L Statement" you could view without seeing

11  the corporate margin.

12      Q     All right.  And anyone who -- and the

13  titles, if you're pulling those statements up to

14  generate it, the title would include the words

15  "P&L" on it, correct?

16      A     Correct.

17      Q     Okay.  Does this statement show that the

18  Southeast branch was profitable for October 2018 to

19  December 2018?

20      A     You know, I'll be honest, I can't -- I

21  can't see the numbers.

22      Q     Okay.

23      A     I don't know if it's just the scan.

24            MR. PERLOWSKI:  And by the way, Travis,

25  likewise, again, I can't really read the corporate

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 113

1   margin number because of the shading.

2            But, I mean, if you'll -- look, I'm going

3   to -- I'm confident that if you have a better

4   version of it and can read it, just read what the

5   number --

6            MR. HARGROVE:  Yeah.

7            MR. PERLOWSKI:  -- read what it says you

8   can -- Mr. Obradovich can answer that question.

9            It's just that it's difficult to see it

10  on the screen of this document.

11           MR. HARGROVE:  Sure.  And we've got the

12  Bates label, but I'll read you -- all right, the

13  first number in the left -- in the far left column

14  which is the October 2018 --

15           MR. PERLOWSKI:  So like the third --

16  sorry, the third -- it would be the third column to

17  the left as we're looking at it?

18  BY MR. HARGROVE:

19       Q    At corporate margin there's several --

20  there's an October, dollar, and basis points

21  column.

22           MR. PERLOWSKI:  Okay.

23  ▨▨▨▨▨ ▨▨▨▨▨▨▨

24       ▨    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨ i▨▨▨▨▨▨▨▨▨▨▨▨▨

25  ▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Jason M Obradovich                      January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 114



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 115

1    ▨▨▨▨▨

2    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3    ▨▨▨▨▨▨▨▨▨▨▨

4    ▨▨▨▨▨▨

5    ▨▨▨▨▨

6    ▨▨▨▨▨▨▨

7    ▨▨▨▨▨▨   ▨▨▨▨▨▨

8    ▨▨▨▨▨▨▨▨▨▨▨   ▨▨▨▨▨▨

9    ▨▨▨▨▨▨

10   ▨   ▨▨▨

11   ▨   ▨▨▨   ▨▨▨▨▨▨

12   ▨▨▨   ▨▨▨

13   ▨   ▨▨

14        Q    Can you tell when this document was

15   generated?

16        A    I can't -- I don't see it anymore.  But I

17   don't believe when these documents are created in

18   Kevlar has a creation date.

19        Q    Okay.  I didn't see -- I didn't see a

20   created date.

21        A    Yeah.

22        Q    Do you know if this information was

23   provided to Mr. Reed?

24        A    If that report was provided to Mr. Reed?

25   He had access to that report, but I don't know if

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 116

1    it was like sent to him.

2         Q    Okay.  So you don't know if he got these

3    reports in the normal course of business?

4         A    Correct.  He has access to the system

5    where he can -- he can generate those reports

6    himself.  So I don't know if someone specifically

7    sent them.

8              Typically he would be sent those reports

9    in Excel not in Kevlar.

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████████

13   ████████████████████████████████████████

14   ██████████████████

15        A    Yeah, there -- there are two sets of

16   reports.  There's Excel reports and then there are

17   other reports directly from Kevlar.

18        Q    What's an Excel report?

19        A    So the P&L process, just to give you the

20   complete information, the P&L process is to

21   generate everything in Excel.

22        Q    Uh-huh.

23        A    It is then reviewed and approved.  Once

24   it's approved it's uploaded into Kevlar and then it

25   becomes permanent record in Kevlar.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 117

1        Q     I want to go back to Mr. Frommert.

2              Do you have any idea -- well, you --

3     Mr. Frommert departed while you were still working

4     for NAF, correct?

5        A     Correct.

6        Q     Do you have any information about

7     Mr. Frommert's departure from NAF?

8        A     What do you mean by any information?

9              Sorry, my screen minimized so I can't --

10    okay, there we go.  Okay.  Sorry.

11       Q     Do you know, did Mr. Frommert leave NAF

12    or was he fired?

13       A     I don't know.  I believe he resigned.

14       Q     Okay.  What knowledge -- tell me what you

15    know about the circumstances of his resignation?

16       A     To my knowledge, post COVID, so after

17    March of 2020, his engagement with the organization

18    began to diminish.

19       Q     It began to what?

20       A     Diminish.

21       Q     Tell me how the -- tell me how his

22    engagement with the organization began to diminish?

23       A     You know, it's -- you know, he did not

24    report to me and I'm not -- I'm not watching his

25    every -- every move and how he did his job or

Page 118

1    whether or not he did his job.

2              But I believe that he just was not as

3    engaged in the organization and doing the full

4    amount of his duties.

5         Q    Who did he --

6         A    That is my general knowledge.  I'm --

7    there's some speculation there.

8         Q    Who did he report to?

9         A    I believe he reported to Rick.

10        Q    Okay.  So the only person who would have

11   knowledge really about the reason Mr. Frommert

12   departed would be Mr. Arvielo, correct?

13        A    I would believe so.  And, yeah,

14   potentially HR.  You know, like I said, I don't

15   know.

16        Q    Okay.  But he didn't communicate to you

17   why he was leaving, correct?

18        A    No, he did not.

19        Q    All right.  Do you know when he resigned,

20   did he have another job lined up?

21        A    I do not know.

22        Q    Okay.  You said that his engagement -- he

23   was pretty disengaged.  Are you sure he wasn't

24   terminated?

25        A    I don't know.  I don't get involved in HR

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 119

1    matters or if someone was fired or if someone quit,

2    I don't know.

3         Q    Who assumed his duties when he departed?

4         A    His duties were split back out between

5    myself and Rick Arvielo.

6         Q    Which duties of his did you assume?

7         A    The accounting team that reported to him

8    and the commissions team that reported to him moved

9    under me.

10        Q    And were you able to absorb that work

11   load without much issue?

12        A    Generally, yes.

13        Q    Okay.  What did Rick take on?

14        A    He -- Rick is the CEO so he assumed the

15   signing of the financial statements as the CFO

16   would normally do.

17        Q    Okay.

18        A    I don't know if Scott was signing the

19   financials when he was CFO or not, but that --

20   that's what I'd be referencing on what he took

21   over.

22        Q    Do you have any knowledge about marketing

23   expenses and how those were allocated or not

24   allocated to regional managers?

25        A    Very limited knowledge.

Page 120

```
 1           MR. PERLOWSKI:  Object to the form.
 2    BY MR. HARGROVE:
 3        Q    Very little?
 4        A    Very -- very limited knowledge.
 5        Q    All right.  So you wouldn't -- if you
 6    were to testify in court you wouldn't have any
 7    knowledge about marketing expenses and how they
 8    were allocated to Ms. Spearman or not allocated to
 9    her, correct?
10        A    Yeah, I would know very, very little.
11        Q    All right.  What about pricing
12    exceptions, do you have any knowledge as to the --
13    the standards for pricing exceptions as they
14    applied to Ms. Spearman while she was employed with
15    NAF?
16        A    Her exact -- I mean, pricing exceptions,
17    you know, are under my purview as head of capital
18    markets.  So I have to be aware or my team has to
19    be aware of what authorities they have.
20        Q    So do you have any knowledge about what
21    authority Ms. Spearman had for pricing exceptions
22    during her employment with NAF?
23        A    Not off the top of my head.  The person
24    that works for me manages all of that.  So the
25    exact details of her exact authority I wouldn't
```

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 121

1    know especially off the top of my head.

2         Q    All right.  Who is the person who works

3    under you who would have that knowledge?

4         A    Kristin Ankeny.

5         Q    And that is the same employee who helped

6    you create the Kevlar program, correct?

7         A    Correct.

8         Q    Okay.  Do you have any knowledge about

9    Ms. Spearman and Ms. Allison's expansion into the

10   Tennessee and Virginia territory at all?

11        A    No, I have no -- no or limited to next to

12   no knowledge of that.

13        Q    Okay.  Let's talk about Ms. Spearman and

14   Ms. Allison as far as their compensation.

15             Were you involved at all in effort to

16   change them to a profit and loss model for their

17   compensation?

18        A    I was not.

19        Q    Okay.  Do you have any knowledge about

20   any such change or attempted change?

21        A    I have some knowledge around the effort

22   to move people into a P&L structure.

23        Q    Is that knowledge general to the company

24   or specific as to Ms. Spearman and the Southeast

25   region?

Page 122

1      A     Generally for the -- for that entire

2   division, not specific to Ms. Spearman and

3   Ms. Allison.

4      Q     Okay.  Were you involved at all in the

5   creation of that model?

6      A     I was not.

7      Q     Who was involved in the creation of that

8   model?

9      A     To my knowledge, Mr. Frommert.  And I

10  don't know how much Mr. Reed was involved.

11     Q     Did Mr. Frommert share any information

12  with you about that model?

13     A     He needed to convey certain information

14  based on the terms of it to myself or my team so

15  then the P&Ls that are generated would reflect

16  that -- those changes.

17     Q     Do you know whether Mr. Frommert prepared

18  any PowerPoint presentations related to shifting

19  employees to a P&L model?

20     A     A PowerPoint presentation?  I don't

21  recall it off the top of my head, no.

22     Q     So is that something we would have to ask

23  him about to know whether he created PowerPoints,

24  you got no independent knowledge of that?

25     A     PowerPoints is very generic.  I don't

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 123

1    know, I don't recall any PowerPoints that he

2    created or not, I really don't remember.

3         Q    Do you recall any information that he

4    created at all to present to employees, PowerPoint

5    or otherwise, about the change to a P&L model?

6         A    I'm generally aware being in the office

7    next to him that he put information together, but I

8    don't recall seeing the information or not.

9         Q    Do you know if that information would be

10   stored anywhere on NAF's computers?

11               MR. PERLOWSKI:  Object to the form.

12        A    I don't know.

13   BY MR. HARGROVE:

14        Q    Do you have knowledge about source codes

15   used by NAF to categorize loans?

16        A    You know, I have a general understanding

17   of them but not necessarily all the specifics.

18        Q    Okay.  Do you know anything about the --

19   any of the Dodd-Frank considerations that go into

20   source codes?

21               MR. PERLOWSKI:  Object to the form and

22   foundation.

23        A    I have general information.

24   BY MR. HARGROVE:

25        Q    Have you been privy to any conversations

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 124

1    with anyone at NAF about concerns regarding source

2    codes and any Dodd-Frank implications resulting

3    there from?

4              MR. PERLOWSKI:  Mr. Obradovich, I want to

5    caution you, if the substance of this -- of the

6    response would be a communication with NAF's

7    counsel, I'm going to instruct you not to answer as

8    to the substance of the response.

9              If it's not with counsel, you can answer,

10   period.  But if it's with counsel I think the

11   answer to the question is a yes or no.

12       A    I have had conversation with counsel

13   about this.

14   BY MR. HARGROVE:

15       Q    Only with counsel?

16       A    To my recollection, yes.

17       Q    So until -- until you spoke with counsel

18   you had no knowledge, that had never come up in

19   your employment with NAF, correct?

20       A    I can't -- I can't recall if I had

21   conversations with someone where counsel was not

22   present.

23       Q    So if there was a conversation, it's

24   possible there was without counsel, you just don't

25   recall whether there was or not?

Jason M Obradovich                   January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 125

1        A     I can't -- I can't recall an instance.

2        Q     Are you aware of -- you didn't read

3   Ms. Allison's deposition, you testified earlier,

4   correct?

5        A     That's correct.

6        Q     All right.  Are you aware of NAF ever

7   commissioning employees to do reconnaissance work

8   on other mortgage companies or competitors?

9        A     Commission them to do what, I'm sorry?

10        Q     Do it reconnaissance work to find out

11   what the competition's doing?

12        A     I don't know of anyone being commissioned

13   to do something like that, no.

14        Q     Are you aware of anyone at NAF ever doing

15   that uncommissioned or voluntarily?

16        A     I'm aware of people knowing information

17   about our competitors, but being commissioned or

18   doing something where it was official, no.

19        Q     Okay.  Are you aware of a lawsuit that

20   NAF has filed against Movement Mortgage?

21        A     I'm aware that a suit was launched

22   against Movement Mortgage, yes.

23        Q     Okay.  Do you know where that suit's

24   pending?

25        A     No.

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 126

1          Q    Do you know what -- does it involve four

2     employees of NAF?

3               MR. PERLOWSKI:  Mr. Obradovich, again, if

4     your awareness comes from a conversation with

5     counsel, please don't reveal the substance of that

6     communication, otherwise you can answer.

7          A    I don't know specifics of the lawsuit or

8     anything about the lawsuit.  I just know the

9     general existence of the lawsuit and it may or may

10    not be related to former employees.

11              I don't know.  Like I said, I don't know

12    the specifics of the lawsuit.

13    BY MR. HARGROVE:

14         Q    Okay.  Yeah, what generalities do you

15    know about the lawsuit?

16         A    I know that there is a lawsuit.  I know

17    that the inception of the lawsuit was after certain

18    individuals had departed NAF for Movement.  Aside

19    from that, I don't know the specifics.

20         Q    Do you know who the individuals are?

21         A    That left NAF --

22         Q    Yeah.

23         A    -- or for Movement?

24         Q    Yes.

25         A    I know individuals that left NAF for

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 127

1   Movement, but I don't know if they're involved in
2   the lawsuit or not.
3        Q    Okay.  Tell me who left NAF for Movement.
4        A    I know Ely Fairfield.
5        Q    Okay.
6        A    I know Brian Keranen.  I know Anna Benz.
7        Q    Okay.
8        A    I believe there are people that work for
9   those individuals that also left, but I -- I might
10  know a couple other names, but a couple others I
11  might guess.
12       Q    Okay.
13            MR. HARGROVE:  Let's take a short break
14  and then I want to ask about the emails and I'll
15  probably have a little bit more, but I think we're
16  getting fairly close to being finished.
17            MR. PERLOWSKI:  How long do you want,
18  Travis?
19            MR. HARGROVE:  Let's take 10 minutes.
20            MR. PERLOWSKI:  Sounds good.  See you in
21  10.
22            (Recess taken 3:44 - 3:58 P.M. EST)
23            MR. HARGROVE:  Let's go back on the
24  record.
25  BY MR. HARGROVE:

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 129

1   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

2   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

3   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

4   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

5   ✕✕✕✕✕✕✕✕✕✕

6   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

7   ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

8   ✕✕✕✕✕✕✕✕✕✕✕✕✕

9   ✕✕✕✕✕✕✕✕

10          (Deposition Exhibit 4 referenced.)

11  BY MR. HARGROVE:

12      Q    All right.  I've heard the terms CM1, and

13  if you pull up the email NAF 0000549 that you

14  referenced you brought with you.  Let me know when

15  you've got that in front of you.

16          MR. PERLOWSKI:  Which Bates number,

17  Travis?

18          MR. HARGROVE:  0000549.

19          MR. PERLOWSKI:  Thank you.

20  BY MR. HARGROVE:

21      Q    Let me know when -- it's the one you

22  brought with you paper-wise, do you have it in

23  front of you?

24      A    I have -- was it the one I was

25  referencing earlier?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 130

1       Q     Yes.  The one you referenced from March

2    of 2019.

3       A     Yes.  Okay.  I have it on paper here in

4    front of me.  Okay.

5    ████████████████████████████████████████████

6    ██████████████████████████████████████████████

7    ██████████████████████████████████████████████

8    █████████████████████████████████████████████

9    ██████████████████████████████████████████████

10   ████████

11          ██████████████████

12      ████████

13      Q     All right.  Can you tell me, do you know

14   what CM1 is?

15      A     What they're referencing is one layer of

16   profitability.  So when I was talking about the

17   water fall, the CM1 is one of the water falls.

18      Q     Okay.  That bottom line number in your

19   Kevlar reports, it takes into account CM1, doesn't

20   it?

21      A     Yes, CM -- CM in Kevlar is synonymous

22   with CM3.  So you have kind of branch margin, then

23   CM1, 2, and 3.  In Kevlar it's -- it just says CM.

24      Q     All right.  So Kevlar encompasses CM, you

25   said 1, 2 and 3?

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 131

1        A     Yeah, there are different layers of

2   corporate allocations so they could see each

3   individual layer.

4        Q     Okay.

5        A     And so, there was -- it was broken into

6   three layers and in Kevlar it just -- it shows the

7   bottom line, the CM.

8        Q     Okay.  So what all the management would

9   see in Kevlar, it would encompass CM1, as well as 2

10  and 3 then, correct?

11       A     Correct.

12  ████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ██████████

15  █████████████████████████████████████████████████

16  ███████████

17  ██████████████████████████████████████████

18  ████████████████████

19  ███████████████████████████

20  ██████████████████████

21  ████████████████████████████████████

22  █████████████████

23  █████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████

25  ████████████

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Jason M Obradovich                           January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al



Page 133

7    BY MR. HARGROVE:

8        Q     Well, what role -- at what point does

9    your role end?

10       A     In generate --

11             MR. PERLOWSKI:  Object to the form.

12             THE WITNESS:  Sorry.

13       A     Generating the P&Ls is kind of where my

14   role stops.

15   BY MR. HARGROVE:

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 134



Jason M Obradovich                      January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                              Page 135

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2        A    How would they be able to?

3             MR. PERLOWSKI:  Object to the form.

4   BY MR. HARGROVE:

5        Q    Yes.

6        A    As I mentioned earlier, there are Excel

7   P&Ls and then the final version which is published

8   in Kevlar.

9             In Kevlar you really can't.  You can

10  download it into Excel, and I would presume you

11  could modify the Excel, or you have the Excel

12  version and did something similar.  That's the only

13  way I think you could do it.

14       Q    But it wouldn't be possible out of

15  Kevlar, correct?

16       A    Kevlar -- so Kevlar is an interface.  So

17  it's a web UI so you could not modify that.  But

18  you could download it into Excel.  When something's

19  in Excel you can -- you know, you can modify it, it

20  becomes an editable document.

21       ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24  ▓▓▓▓▓▓▓

25       ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Jason M Obradovich                                          January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 136

1   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

4   ▨▨▨▨▨▨

5   BY MR. HARGROVE:

6       Q    Okay.  And just so I'm very clear, you

7   weren't involved in the production of that Kevlar

8   report, correct?

9       A    I did not -- I don't -- I did not produce

10  that report.  And if it's from four years ago then

11  I don't remember if I produced that report.  To be

12  honest, I don't recall.

13           But I definitely don't have any

14  recollection of producing it for the purpose of

15  this lawsuit.

16      Q    Okay.  And we received it on Tuesday, so

17  I'm assuming it was -- reason you weren't involved

18  in the production of it to us on Tuesday, correct?

19      A    Correct.  She may -- whoever requested

20  may have asked to have it produced by my team, but

21  I was not involved in the creation of it.

22      Q    Okay.  And don't you have any knowledge

23  as to why that's the only Kevlar document that's

24  been produced in this case, correct?

25      A    I have no idea.

Page 137



Jason M Obradovich                January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 138



```
22      Q    Okay.  Do you socialize with the Arvielos
23 outside of work?
24      A    Can you define what you mean by socialize
25 with them outside of work?
```

Page 139

1      Q      Sure.

2             Do you go out to eat with them, watch a

3      ball game with them, get together, you and your

4      wife with the two of them?

5      A      Okay.  I believe in the eight and a half

6      years that I have been here I've had maybe one

7      dinner and one lunch with them outside of the

8      office.

9      Q      Okay.

10            MR. HARGROVE:  Give us two minutes this

11     time.  I think we're done, but let me --

12            MR. PERLOWSKI:  You got it.  We'll stay

13     on.

14            MR. HARGROVE:  We're not leaving the

15     room.

16            MR. PERLOWSKI:  Okay.  Yeah, we'll stay

17     on.

18            (Off the record 4:11 - 4:12 P.M. EST)

19            MR. HARGROVE:  At this point we're

20     finished today.  The only thing I want to do is

21     keep the deposition open to the extent something in

22     the production after the motion to compel comes up.

23            Obviously, we would want to keep it open

24     for purposes of asking any questions that

25     reasonably, you know, come from whatever documents

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 140

1    are produced in a supplementary production.

2              MR. PERLOWSKI:  I'm not saying we're

3    going to agree to that, but I understand your

4    position.

5              MR. HARGROVE:  Okay.  As long as -- I'm

6    not asking you to agree to it, just putting it on

7    the record so that --

8              MR. PERLOWSKI:  Understood.

9              MR. HARGROVE:  Perfect.  All right.

10             Well, that will be it for today then.

11             MR. PERLOWSKI:  No questions.

12             (Deposition concluded at 4:13 p.m.)

13             (Signature reserved.)

14

15                  *    *    *    *    *

16

17

18

19

20

21

22

23

24

25

Case 1:20-cv-04981-CAP  Document 102  Filed 04/28/22  Page 142 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 141

```
 1          The following reporter and firm
    disclosures were presented by me at this proceeding
 2  for review by counsel:
                REPORTER DISCLOSURES
 3          The following representations and
    disclosures are made in compliance with Georgia
 4  Law, more specifically:
                Article 10 (B) of the Rules and
 5  Regulations of the Board of Court Reporting
    (disclosure forms).
 6          OCGA Sections 9-11-28 (c)
    (disqualification of reporter for financial
 7  interest).
                OCGA Sections 15-14-37 (a) and (b)
 8  (prohibitions against contracts except on a
    case-by-case basis).
 9  - I am a certified court reporter in the state of
    Georgia.
10  - I am a subcontractor for Veritext.
    - I have been assigned to make a complete and
11  accurate record of these proceedings.
    - I have no relationship of interest in the matter
12  on which I am about to report which would
    disqualify me from making a verbatim record or
13  maintaining my obligation of impartiality in
    compliance with the Code of Professional Ethics.
14  - I have no direct contract with any party in this
    action, and my compensation is determined solely by
15  the terms of my subcontractor agreement.
                FIRM DISCLOSURES
16  - Veritext was contacted to provide reporting
    services by the noticing or taking attorney in this
17  matter.
    - There is no agreement in place that is prohibited
18  by OCGA 15-14-37(a) and (b).  Any case-specific
    discounts are automatically applied to all parties,
19  at such time as any party receives a discount.
    - Transcripts:  The transcript of this proceeding
20  as produced will be a true, correct, and complete
    record of the colloquies, questions, and answers as
21  submitted by the certified court reporter.
    - Exhibits:  No changes will be made to the
22  exhibits as submitted by the reporter, attorneys,
    or witnesses.
23  - Password-Protected Access:  Transcripts and
    exhibits relating to this proceeding will be
24  uploaded to a password-protected repository, to
    which all ordering parties will have access.

25
```

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 142

1              C E R T I F I C A T E
2         Deposition of: JASON M. OBRADOVICH
          Date of Deposition: JANUARY 11, 2022
3
4    STATE OF GEORGIA:
     COUNTY OF DEKALB:
5
6              I hereby certify that the foregoing
7    transcript was stenographically recorded by me
8    via Zoom as stated in the caption.  The deponent
9    was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16             I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21             This. the 19th dav of January 2022.
22
23
     _____
24   Judith L. Leitz Moran, CCR-B-2312
     Registered Professional Reporter
25

Veritext Legal Solutions
800.808.4958                                  770.343.9696

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 143

1              FIRM CERTIFICATE AND DISCLOSURE
2
3    Veritext represents that the foregoing transcript
     as produced by our Production Coordinators, Georgia
4    Certified Notaries, is a true, correct and complete
     transcript of the colloquies, questions and answers
5    as submitted by the certified court reporter in
     this case.  Veritext further represents that the
6    attached exhibits, if any, are a true, correct and
     complete copy as submitted by the certified
7    reporter, attorneys or witness in this case; and
     that the exhibits were handled and produced
8    exclusively through our Production Coordinators,
     Georgia Certified Notaries.  Copies of notarized
9    production certificates related to this proceeding
     are available upon request to
10   production@veritext.com
11   Veritext is not taking this deposition under any
     relationship that is prohibited by OCGA 15-14-37
12   (a) and (b).  Case-specific discounts are
     automatically applied to all parties, at such time
13   as any party receives a discount.  Ancillary
     services such as calendar and financial reports are
14   available to all parties upon request.
15
16
17
18
19
20
21
22
23
24
25

Page 144

1   TO:  Henry Perlowski, Esq., Arnall Golden Gregory
2   Re:  Signature of Deponent JASON M. OBRADOVICH
3   Date Errata due back at our offices: 30 Days
4
5   Greetings:
6   The Deponent has reserved the right to read and
    sign.  Please have the deponent review the attached
7   PDF transcript, noting any changes or corrections
    on the attached PDF Errata.  The deponent may fill
8   out the Errata electronically or print and fill out
    manually.
9
    Once the Errata is signed by the Deponent and
10  notarized, please mail it to the offices of
    Veritext (below).
11
    When the signed Errata is returned to us, we will
12  seal and forward to the taking attorney to file
    with the original transcript.  We will also send
13  copies of the Errata to all ordering parties.
14  If the signed Errata is not returned within the
    time above, the original transcript may be filed
15  with the court without the signature of the
    Deponent.
16
17  Please send completed Errata to:
    Veritext Production Facility
18  20 Mansell Court E, Suite 300
    Roswell, Georgia  30076
19  (770) 343-9696
20
21
22
23
24
25

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 145

1   ERRATA FOR ASSIGNMENT NO. 5022778

2   I, the undersigned, do hereby certify that I have

3   read the transcript of my testimony, and that

4

5   _____ There are no changes noted.

6   _____ The following changes are noted:

7

8   Pursuant to Rule 30(7)(e) of the Federal Rules of

9   Civil Procedure and/or OCGA 9-11-30(e), any changes

10  in form or substance which you desire to make to

11  your deposition testimony shall be entered upon the

12  deposition with a statement of the reasons given

13  for making them.  To assist you in making any such

14  corrections, please use the form below.  If

15  supplemental or additional pages are necessary,

16  please finish same and attach them to this errata

17  sheet.

18

19  Page/Line/    Change    /   Reason

20  ____/____/_____/_____

21  ____/____/_____/_____

22  ____/____/_____/_____

23  ____/____/_____/_____

24  ____/____/_____/_____

25  ____/____/_____/_____

Jason M Obradovich                           January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 146

1    Page/Line/      Change    /    Reason

2    ____/____/_____/_____

3    ____/____/_____/_____

4    ____/____/_____/_____

5    ____/____/_____/_____

6    ____/____/_____/_____

7    ____/____/_____/_____

8    ____/____/_____/_____

9    ____/____/_____/_____

10   ____/____/_____/_____

11   ____/____/_____/_____

12   ____/____/_____/_____

13   ____/____/_____/_____

14   ____/____/_____/_____

15   ____/____/_____/_____

16

17

18                        _____

19                        JASON M. OBRADOVICH

20

21   Sworn to and subscribed before me

     this _____ day of _____, 20__.

22

23   _____

     Notary Public.

24   My Commission Expires _____.

25

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[0.087 - able]**

Page 1

## 0

**0.087**   115:12
**0.095.**   114:7
**0.186**   114:19,20
**0000549**   3:20
129:13,18
**0000743**   3:18
108:8
**006**   115:3
**04981**   1:6
**095**   114:7

## 1

**1**   3:9,10,11,14,15
46:7 75:16 76:13
76:15,16,18 77:4,7
77:8 130:25
**1.4.b**   76:23 77:9
77:20
**10**   4:10 29:10
30:17,22,25 31:15
31:21 32:10,13,21
127:19,21 141:4
**10/18**   3:17 108:15
**107**   3:11,16
**11**   1:15 4:2,11
142:2
**11/4/2016**   3:9
**12**   4:12 130:6
**12/18**   3:17 108:16
**1278**   142:23
**129**   3:19
**13**   4:13
**14**   2:9 4:14
**15**   4:15 137:19
**15-14-37**   141:7,18
143:11
**150**   114:13
**150,953**   114:10,15
**16**   4:16 45:7

**17**   4:17 45:7,18
**171**   2:15
**17th**   2:15
**18**   4:18 109:4,5
115:8,8
**19**   4:19
**1996**   29:4,6
**19th**   142:21
**1:02**   1:16 4:2
**1:20**   1:6
**1s**   77:12
**1st**   32:4

## 2

**2**   3:11 4:2 46:11
107:22 130:23,25
131:9
**20**   4:20 18:21
68:15 144:18
146:21
**2000**   91:21
**2008**   29:18 32:4
34:2
**2009**   35:3
**2013**   35:8 36:3
41:20,23
**2014**   35:24 66:18
**2015**   45:14
**2016**   45:4,17
**2017**   45:3,4
**2018**   45:1,20 83:23
86:6,9 89:7,15,19
90:4,8,20 91:1,6
91:11,17 93:18,21
96:14 99:10 104:8
104:18 105:3,17
106:4,8,14 109:5
112:18,19 113:14
114:10,16 129:1
132:16 135:1,23
137:1,2,5,14,17,18
138:15

**2018's**   137:21
**2019**   9:17 20:2,25
68:15 83:21 84:3
84:9 91:21 92:3
96:20 129:5 130:2
137:6
**2020**   3:14 67:16
68:16 117:17
**2022**   1:15 4:2
142:2,21
**21**   4:21
**2100**   2:16
**22**   4:22
**221,453**   115:7,9
**23**   4:23
**230**   2:9
**2312**   1:22 142:24
**24**   4:24
**25**   4:25 137:3,5,15
**26th**   20:25
**28th**   41:21
**29**   3:10
**2:18**   67:7
**2:32**   67:7

## 3

**3**   3:16 4:3 76:22
107:22 108:1
130:23,25 131:10
**3/26/2019**   3:19
**30**   130:8 144:3
145:8
**300**   144:18
**30076**   144:18
**30305**   2:10
**30363**   2:17
**30th**   29:6
**343-9696**   144:19
**3535**   2:8
**3:44**   127:22
**3:58**   127:22

## 4

**4**   3:3,19,22 4:4
129:10
**4:11**   139:18
**4:12**   139:18
**4:13**   140:12

## 5

**5**   4:5
**5,870**   114:23,25
**5022778**   145:1
**549**   23:20
**553**   3:20 23:20
**558**   23:25
**559**   24:1

## 6

**6**   3:15 4:6
**60**   38:12 81:10,11

## 7

**7**   4:7 145:8
**75**   3:9
**76,369**   114:4
**76,379**   113:25
**770**   144:19

## 8

**8**   4:8

## 9

**9**   4:9
**9-11-28**   141:6
**9-11-30**   145:9
**90**   4:24
**96**   12:16
**99**   73:9

## a

**abiding**   8:18
**ability**   11:3,17
142:14
**able**   7:20 28:14
42:6 50:19 76:1

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 149 of 175

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[able - appeared]

Page 2

102:11 119:10
135:2
**abolishment** 130:9
**absorb** 119:10
**access** 101:19,22
101:25 102:2,3,11
109:22 115:25
116:4 141:23,24
**account** 46:17
47:7,24 48:15,15
57:3,14,16,18,21
57:23 58:10 66:4
71:14 130:19
**accountant** 63:20
**accounted** 46:3
54:12 55:19 58:2
59:13,21,25 94:24
107:12
**accounting** 12:22
13:1,4,7,8,13,14
13:17,20 14:1,1,3
14:19 15:1,1,3,4
16:19 35:23 40:10
43:15 44:8,10
46:15,24 47:4
48:19 49:12 51:14
51:17 52:1,5,10
53:17 54:6,9,25
62:8 67:23 84:7
84:17 102:6 103:9
103:13,15,17,18
103:23 119:7
**accurate** 33:16
45:11 49:15 99:18
141:11
**accurately** 45:10
45:23 49:9 66:19
96:14
**accuse** 97:19
**accused** 98:2

**acquaintance**
39:10
**action** 1:5 10:4,6,7
10:12 141:14
142:20
**activity** 60:3 63:3
66:2,3,6,13
**actual** 28:6
**added** 31:18,20
**addition** 67:24
**additional** 145:15
**addresses** 79:8
**adequately** 48:12
**advance** 22:19
**advanced** 30:21
31:11
**advancement**
30:24
**advise** 5:24 24:17
**affect** 11:3,15 57:6
63:7
**affirming** 21:24
**aggregate** 58:23
60:8,12 62:16
65:21
**aggregation** 56:20
57:7
**ago** 13:24 14:20
15:19 16:19 31:16
83:16,16,18
136:10
**agree** 140:3,6
**agreed** 71:7
**agreement** 3:12
11:7 57:8 75:23
141:15,17
**ahead** 4:5 8:20
24:5 38:17 46:9
74:13 86:18 89:25
103:24 105:1
128:8

**alarm** 91:5,8
**alarmed** 91:9
**allegations** 28:9
**alliance** 10:4,6
**allison** 26:18,22
27:6,20 68:24
71:18 121:14
122:3
**allison's** 27:23
121:9 125:3
**allocated** 56:14
57:9 119:23,24
120:8,8
**allocation** 55:7,7
110:11
**allocations** 54:19
55:3,23 56:10
57:2,5 58:1 59:17
59:25 95:10,13,22
131:2
**alluded** 38:19
**alter** 75:5
**altered** 128:3
**amb** 44:10,19 45:9
45:23 46:16 47:6
47:9,17 48:5,16,19
48:22 49:10 50:4
52:3 54:8 55:11
55:14,19,22,24
56:12 57:15,19,24
57:25 58:3,10,12
58:21,25 60:13,16
60:18 62:14 64:24
65:1,12,16,24 66:4
66:7 102:6 103:16
103:18,21 104:2
**amended** 106:3
**america** 32:4 34:4
34:8,9,12,14,16,19
**american** 1:7 2:20
2:21 5:19 15:7,15

37:18 39:8 60:17
60:22
**american's** 36:6
**amount** 58:7,20
96:15 118:4
**amounts** 10:20
**analyst** 31:1,5
**analyze** 48:14
**ancillary** 143:13
**andrew** 2:20
**angeles** 35:5
**ankeny** 51:6
109:23 121:4
**anna** 127:6
**answer** 5:13 6:25
8:9 10:25 11:23
16:15 17:23 22:7
23:12 27:8 28:12
28:14 40:2 58:6
64:18 65:5 70:6
76:1 79:2 84:15
85:20 86:18,21
87:12 88:10 94:8
95:3 98:6,8,16,18
99:3 103:3 104:12
104:24 105:22
106:17 113:8
124:7,9,11 126:6
128:8,20
**answered** 86:17
98:15 128:7
**answers** 141:20
142:11 143:4
**anticipate** 11:22
11:23
**anybody's** 28:2
**anymore** 115:16
**apologies** 4:8
**appearances** 2:1
**appeared** 4:1

**[appearing - believe]**

**appearing** 1:12,23
**appears** 108:20
**applicable** 77:4,6
**applied** 56:16
57:10 58:4,7
61:11 120:14
141:18 143:12
**apply** 47:10,14,17
56:19 61:20
**applying** 36:21
**appropriate** 15:10
**approved** 116:23
116:24
**approximate**
137:19
**approximately**
29:10,16 43:8
**area** 73:25 77:4,6
**areas** 128:14
**arm** 10:10
**arnall** 2:14 144:1
**arranging** 27:13
**art** 12:13
**article** 141:4
**arvielo** 37:12,22
39:17,20 87:3
97:5,6 118:12
119:5
**arvielo's** 37:23
**arvielos** 39:10
138:22
**ascended** 31:3
**ascension** 15:25
**aside** 12:4 24:22
25:24 27:4 37:1
75:8 106:10
126:18
**asked** 26:1 27:1
36:23 45:8 63:18
74:10 76:7 86:17
88:1,3,10,11,12,15

98:14 128:6
136:20 137:9
**asking** 7:19,22
21:2 107:18
139:24 140:6
**asset** 60:19
**assigned** 44:15
134:2 141:10
**assignment** 145:1
**assist** 70:1 145:13
**associated** 17:4
21:3 49:18 88:8
88:13
**associations** 10:1
**assume** 14:15
30:17,21 81:13
119:6
**assumed** 67:23
119:3,14
**assuming** 28:19
136:17
**assumptions** 72:9
**atlanta** 1:2,23 2:10
2:17 54:23
**attach** 145:16
**attached** 143:6
144:6,7
**attachment** 20:18
**attempted** 121:20
**attorney** 17:22
141:16 142:17,19
144:12
**attorneys** 18:2
141:22 143:7
**attribute** 133:16
133:21
**authorities** 120:19
**authority** 120:21
120:25
**automatically**
141:18 143:12

**available** 94:18
143:9,14
**avoid** 48:19
**aware** 25:10 26:8
63:3 64:14 80:17
80:20,23 81:1,5
83:22 84:17 87:15
90:5 93:12 104:7
107:18 120:18,19
123:6 125:2,6,14
125:16,19,21
**awareness** 126:4

**b**

**b** 1:7,22 3:6 141:4
141:7,18 142:24
143:12
**bachelor** 12:13
**back** 24:6 33:23
34:1 38:8 50:12
61:1 66:16,17
67:8 72:24 100:23
101:4 117:1 119:4
127:23 134:3
144:3
**background** 12:11
51:14,17,20 52:2,6
52:23 53:17
**balance** 33:10
**ball** 139:3
**bank** 29:14 31:24
31:25 32:4,10
34:3,7,8,11,14,15
34:19 36:7
**banking** 10:5 29:8
30:3,5 31:22
32:13,18 44:11
**bankruptcy** 12:8
**base** 74:24 75:2
**based** 31:19 32:11
34:22 35:5 47:18
57:8 58:4 64:25

69:22 95:7 103:10
122:14 129:1
136:2
**basic** 14:1,1
**basically** 13:25
33:9 94:20
**basis** 113:20 114:6
114:8,19,19,22
115:2,3,11 141:8
**bates** 20:12 21:3,5
108:5 113:12
129:16
**becoming** 69:7
**began** 117:18,19
117:22
**beginning** 4:8
78:13
**behalf** 2:3,12 5:18
**belief** 46:16 48:13
89:15
**believe** 10:9 14:9
14:12 18:3 20:18
23:2,18 25:12
29:4,5,17 31:4
32:3 35:3 36:23
36:24 37:3 38:3
39:14,18,19 40:3
40:21 41:16,21
43:6,16,20 44:18
45:2,9,25 46:2
47:6 51:19 53:3
63:25 64:13 67:15
68:5,16 69:15,16
76:9 84:18,23
87:25 89:3,23
90:5 99:14 100:5
101:25,25 102:10
112:9 115:17
117:13 118:2,9,13
127:8 129:1 139:5

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[believed - change]                                                      Page 4

**believed** 89:9
**benz** 127:6
**best** 36:18 43:12
  62:24 142:14
**better** 48:18 113:3
**beyond** 39:11
  42:20 67:14
**bigger** 108:14
**bill** 56:18,19
**bit** 83:19 107:24
  127:15
**blame** 97:6 98:10
  134:2
**blamed** 97:10
  98:12
**blaming** 98:19,22
**blanket** 22:20
**blanks** 67:17
**block** 2:21
**blue** 22:21
**board** 10:17 69:25
  141:5
**body** 19:8
**bonus** 76:23
**bonuses** 77:19
  78:19
**borrower** 33:21
**borrowers** 33:7
**bottom** 20:11,16
  85:10,13,23,25
  87:7,8 88:5 92:15
  93:2,6,13,25 95:8
  95:24 96:2,4,5,9
  96:10,14 105:13
  105:19 106:13
  110:7,8,8,10,16,17
  110:21,24 130:18
  131:7
**bracket** 114:12
**branch** 54:18,20
  54:22,24 55:20,22

57:19,23 59:6,8,17
  60:9 71:18 110:10
  111:15,18 112:18
  114:4 116:11
  130:22
**branches** 54:21
  110:5
**break** 7:6,9,15
  24:4 31:13 66:25
  67:12 127:13
**breaking** 67:1
**brian** 127:6
**bringing** 4:8 69:24
**broken** 131:5
**broker** 1:7
**brokering** 33:14
**brought** 83:13
  105:11 129:14,22
**budget** 130:10
**build** 50:24,24
  57:1
**building** 2:9 55:8
  58:9 102:19
**built** 50:15,17 51:3
  53:23 54:11 55:25
  56:5 58:16 59:7
  59:21 61:13,20
  62:8,22 64:12
  66:21 93:24
  102:10
**bullet** 130:6
**bunce** 24:19,23
  37:10 38:15 87:2
**business** 27:12
  39:9,11 60:23,24
  60:25 63:12 67:25
  91:9 116:3 138:4
  138:17
**businesses** 60:18
**button** 94:21

**buy** 33:4
**buying** 33:16

**c**

**c** 2:4 141:6 142:1,1
**calculation** 84:7
**calendar** 143:13
**california** 1:13 4:1
  7:8 9:1,9,25 12:14
  13:18 16:17
**call** 15:10,11 18:2
  18:3,7,9,11,15,16
  18:17,18 24:15,15
  26:24,24 27:10,12
  27:14 30:1,3 39:6
  39:21 61:11,22
  62:4,6,15 63:7
**called** 10:12 20:12
  29:7 39:4,17
  44:10 56:10 112:4
  131:21
**calls** 27:4 52:12
  85:18 86:16 95:1
**camera** 75:2
**cap** 1:6
**capacity** 40:4,5
**capital** 29:10,23
  30:3,6,7 33:23
  35:17 36:9 40:9
  41:17,25 42:21
  43:2,4,9,14,17,24
  47:12,23 49:4,5,18
  67:24 99:24
  120:17
**caption** 142:8
**career** 14:22 15:6
  15:25 29:1 42:20
**case** 5:19 8:1 18:5
  25:5 26:19 28:1,3
  108:23 109:1
  136:24 141:8,8,18
  142:18 143:5,7,12

**cases** 81:4,6,23
**cash** 47:20
**categorize** 74:3
  123:15
**cause** 34:20 60:20
  138:13
**caused** 22:3 36:2
**caution** 124:5
**caza** 9:1
**ccr** 1:22 142:24
**center** 61:11,22
  62:6,11,15 63:7
**ceo** 37:25 87:3
  97:5 119:14
**certain** 14:22
  39:19 58:19 59:10
  73:9 77:1 106:12
  122:13 126:17
  133:5
**certainly** 76:3
**certificate** 143:1
**certificates** 143:9
**certified** 141:9,21
  143:4,5,6,8
**certify** 142:6,16
  145:2
**cetera** 10:1
**cfo** 14:23 15:2,20
  15:24 16:3,7,10
  68:3 99:8 100:5,8
  100:11,16,21,23
  101:4,17 102:13
  106:11 119:15,19
**chain** 23:20
**chance** 38:13
**change** 43:3,5,6
  66:18 67:19 82:3
  121:16,20,20
  123:5 132:14
  145:19 146:1

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**changed**  34:13
54:10 55:24 67:22
80:25 128:10
**changes**  31:14
55:17,21 79:7,8,15
79:16 80:5,13,18
80:24 81:12
106:11 122:16
128:12,14 129:3
141:21 144:7
145:5,6,9
**changing**  31:12
34:23
**channel**  138:18
**channels**  61:10
138:19
**charge**  58:19
**charges**  58:17
**check**  53:10
**checked**  77:3,9,15
**chief**  67:17,20
68:12,13,14
**christy**  24:19 37:8
37:10 38:15 41:9
41:14 87:2 88:19
90:1 130:7
**church**  9:23
**churches**  9:20
**circumstances**
117:15
**civic**  9:20
**civil**  1:5 145:9
**clarification**  11:10
**clarify**  8:6,11
28:20
**classes**  35:24
43:15 46:15 52:10
**clear**  18:10 22:13
64:17 71:21 78:12
96:25 97:3,16
116:13 136:6

**click**  94:21
**client**  17:22 23:6
68:24
**close**  4:25 127:16
**closed**  33:4,6,15
**closer**  33:19,25
**cloud**  22:14
**clubs**  10:1
**cm**  130:21,21,23
130:24 131:7
**cm1**  129:12 130:8
130:14,17,19,23
131:9,13
**cm3**  130:22
**code**  141:13
**codes**  123:14,20
124:2
**college**  28:22,24
28:25 31:2
**colloquies**  141:20
142:10 143:4
**column**  113:13,16
113:21
**combination**
65:21
**come**  24:5 36:25
37:18 38:8 66:16
81:25 82:18 90:14
93:7,8 101:12
102:6 124:18
139:25
**comes**  126:4
139:22
**commensurate**
43:7
**commission**  125:9
146:24
**commissioned**
57:1,14 125:12,17
**commissioning**
125:7

**commissions**
119:8
**commitment**
74:18
**committed**  30:12
**committee**  10:8,12
**communicate**
100:1 118:16
**communicated**
51:5,21 72:1,24
91:22 92:8 116:10
**communicating**
97:18 100:6
**communication**
80:1 91:15 96:22
105:3,8 124:6
126:6 133:6
**communications**
17:23 87:11
104:17
**companies**  33:5
125:8
**company**  29:6
32:14,15 39:1
49:13 51:9 55:4
56:15 59:11 60:10
62:20,21 82:7
86:5,9 88:6,9
101:23 121:23
**compel**  139:22
**compensation**
3:13 70:2,8,10,16
71:14,17,23,24
72:2,5 73:14 79:6
79:8 80:1,5,13,18
80:24 81:12 82:3
82:21 121:14,17
128:2,10 132:14
132:22 141:14
**competition's**
125:11

**competitors**  125:8
125:17
**complaint**  28:5
**complete**  116:20
141:10,20 143:4,6
**completed**  144:17
**compliance**  141:3
141:13
**components**  138:3
**compound**  128:19
**compress**  45:21
**computations**  75:9
**computer**  72:16
72:19,21 73:4,18
73:25 75:6
**computers**  123:10
**con**  10:13
**concerns**  124:1
**concluded**  140:12
**conclusion**  91:6
**confident**  113:3
**confirm**  23:4
90:24
**confused**  96:3,5
**confusing**  56:9
**consequence**  64:2
64:9 105:20
**consider**  9:22
33:20 48:12
**consideration**  66:7
**considerations**
123:19
**considered**  32:19
50:9
**considering**  10:14
95:22
**construct**  48:17
**contact**  18:4 39:7
69:17
**contacted**  36:24
37:17 141:16

[contacts - current]

Page 6

**contacts** 39:16
**contain** 93:13
**contained** 112:8
**content** 19:13
**contents** 21:18,20
  21:21,23 24:13
**context** 82:19,20
**continue** 23:15
  100:8
**continuing** 16:23
  17:2
**contract** 70:22,22
  70:24 75:10
  141:14
**contracts** 78:25
  141:8
**control** 34:23
  66:14
**conversation** 62:5
  82:4,18,21,24
  83:14 89:18 91:17
  95:19 96:23 100:3
  124:12,23 126:4
  132:20
**conversations**
  86:13 87:14 88:1
  97:12,24 123:25
  124:21
**converting** 114:21
**convey** 122:13
**conveyed** 92:5
**convicted** 12:5
**coo** 24:14,17 87:2
**coordinators**
  143:3,8
**copies** 143:8
  144:13
**copy** 20:8 73:1,2,3
  104:1 111:8 143:6
**cordial** 107:7

**corner** 20:11
**corporate** 29:21
  54:19 55:1,2,2,7,7
  55:9,23 56:1,3,10
  56:12,13 57:2,5
  58:1 59:6,17,25
  71:19 95:9,13,22
  110:11,11,19,22
  110:23 111:7,8,22
  112:2,11,25
  113:19,25 131:2
**correct** 11:4,16,18
  11:19,20 13:19
  14:17 16:11,12
  17:5,6,13,14 18:12
  24:12 25:1,2
  27:24,25 28:3,4
  29:22 31:23 32:2
  34:10 35:25 36:1
  37:10,11,12,13
  42:10 51:24,25
  52:25 53:20 54:7
  56:5 57:3,16,17,20
  58:3 59:2,8,9,11
  59:12,14,15,18,19
  59:22,23,25 60:1
  60:11,13 61:6,15
  62:1,9,10,12,13,17
  62:18,23 65:16,25
  66:5,21,22 68:21
  68:22 69:4,5
  72:13,14 73:4,15
  78:1,19,20 83:10
  90:11,23 92:16,17
  92:20 95:23 96:6
  96:7,10,16 97:15
  99:18 101:10,11
  101:13,14,24
  102:14,15,17,18
  105:7 111:9,13,17
  111:22 112:4,5,15

  112:16 114:5,20
  114:21,25 115:1,4
  115:5,9,10,12
  116:4,13 117:4,5
  118:12,17 120:9
  121:6,7 124:19
  125:4,5 129:8,9
  131:10,11 132:8
  133:18 135:15
  136:8,18,19,24
  137:24 138:9,14
  138:20,21 141:20
  142:14 143:4,6
**corrections** 144:7
  145:14
**correctly** 4:19
**correspondent**
  29:15 32:23,25
  33:2,3
**cost** 48:2,4 71:10
  71:10,13,19
**costs** 47:25 55:3
  88:8,11,13,16,20
**coto** 9:1
**counsel** 2:1 5:25
  6:11 24:9,12,12,23
  25:5 26:10 28:12
  28:16 36:6 74:16
  124:7,9,10,12,15
  124:17,21,24
  126:5 134:4 141:2
  142:17,19
**counsels** 25:13
**countrywide** 29:7
  29:12,20 30:19
  31:9,14,23,24 32:1
  33:4,15,18 34:3,7
  34:15,24 35:13
  36:6,7,8,15 38:25
  39:3,4,23

**countrywide's**
  29:14
**county** 9:2,23
  142:4
**couple** 67:4
  127:10,10
**course** 15:3,4
  116:3
**courses** 12:18,21
  12:22 13:3,7,8,13
  13:14,17,20,23
  14:3,9,10,19 15:8
  15:19 16:18 17:1
  17:2 46:24 47:4
  51:18
**court** 1:1 3:23
  4:11 5:20 6:1,14
  6:19 11:25 17:15
  120:6 141:5,9,21
  143:5 144:15,18
**cover** 58:20
**covered** 39:1
**covid** 67:16
  117:16
**cpa** 52:7 63:20
**create** 121:6
**created** 51:22
  55:18 56:23 63:20
  64:4 115:17,20
  122:23 123:2,4
**creates** 7:21
**creating** 54:6,7
**creation** 48:24
  115:18 122:5,7
  136:21
**credit** 14:12,13
  35:4,7,11,20 36:3
**credits** 16:23
**crime** 12:6
**current** 68:10,11

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[currently - division]

Page 7

| | | | |
|---|---|---|---|
| **currently** 8:24 | **department** 29:10 | **determined** 56:15 | **discount** 141:19 |
| **cursory** 47:9 | 29:21 30:7,8,18 | 69:22 141:14 | 143:13 |
| **cv** 1:6 | 31:22,22 32:9,22 | **developed** 65:22 | **discounts** 141:18 |
| | 32:23 47:23 54:2 | 96:13 | 143:12 |
| **d** | 62:23 63:2 | **diego** 12:14 13:18 | **discovery** 74:18 |
| **d** 1:7 3:1 | **departments** | 16:18 | **discuss** 5:25 27:14 |
| **database** 50:25 | 40:13 67:24,25 | **difference** 71:19 | **discussed** 17:24 |
| 94:16,18 | 138:12 | **different** 29:13 | 18:4,9 84:1 85:6 |
| **date** 3:14 20:23,24 | **departure** 106:21 | 31:3 35:12 50:10 | 132:1 |
| 21:15 32:6 41:21 | 117:7 | 54:13,16 56:14 | **discussing** 23:19 |
| 108:23 115:18,20 | **depend** 79:3 | 57:9 60:18 74:4,8 | 73:24 |
| 142:2 144:3 | **depending** 30:14 | 79:4 93:22 131:1 | **discussion** 22:18 |
| **day** 39:21,21 | **depends** 93:9 | **differently** 48:22 | 24:23,25 27:21 |
| 142:21 146:21 | **deponent** 142:8,15 | 57:15,24 58:2,7 | 82:1 83:6 84:24 |
| **days** 144:3 | 144:2,6,6,7,9,15 | **difficult** 6:19 | 89:21 90:2 99:21 |
| **de** 9:1 | **depose** 25:16 | 111:8 113:9 | **discussions** 24:8 |
| **december** 109:5 | **deposed** 6:7 25:14 | **difficulties** 48:20 | 25:3,4 27:5,20 |
| 112:19 114:15,15 | **deposition** 1:11 | **dig** 56:11 | 87:6 89:7,14 |
| 114:23 115:8 | 5:18,23 17:13,19 | **diminish** 117:18 | 91:11 96:18 |
| 136:4 | 18:13,25 19:4 | 117:20,22 | 138:16 |
| **decide** 14:21 15:20 | 24:9,14,16,24,25 | **dinner** 139:7 | **disengaged** 118:23 |
| **decided** 50:9 | 25:3 26:1 27:24 | **direct** 7:24 40:15 | **dispute** 25:25 26:3 |
| **deciding** 14:19 | 27:24 28:3 75:16 | 69:16 81:21,22 | 26:5,7 |
| **decision** 34:21 | 78:13 107:22 | 90:16 141:14 | **disqualification** |
| **defendant** 1:8 | 125:3 129:10 | **direction** 14:22 | 141:6 |
| 2:12 | 139:21 140:12 | 142:12 | **disqualify** 141:12 |
| **define** 30:5 138:24 | 142:2,2,13 143:11 | **directions** 48:7 | **distributed** 50:1 |
| **definitely** 24:5 | 145:11,12 | **directly** 26:23 | 103:7 |
| 136:13 | **derived** 101:16 | 28:21,23 51:5 | **distributor** 61:23 |
| **degree** 12:23 13:1 | **design** 63:9 104:1 | 54:3 63:4 69:13 | **district** 1:1,1 5:20 |
| 13:7,12 15:1 | 109:10 | 81:24 90:17,25 | 5:21 |
| 16:18 | **designed** 48:25 | 100:6 116:17 | **division** 1:2 26:15 |
| **degrees** 12:19 | 49:11 53:22 93:5 | **disagreements** | 29:15 32:25 35:14 |
| **dekalb** 142:4 | **desire** 145:10 | 107:10 | 35:15 44:7 55:4 |
| **delete** 75:4 | **desired** 50:20 | **disbelief** 86:4,8 | 61:4,8,14,15,19,22 |
| **deleted** 72:19,21 | **desk** 42:2,6 | 88:5 | 61:23 62:3,4,7 |
| **deliver** 103:21 | **details** 25:23 26:5 | **disclosure** 141:5 | 63:5,8 65:15,23 |
| **delivered** 70:17 | 70:11 79:20 85:16 | 143:1 | 90:3,7,23 91:6,13 |
| **departed** 34:19 | 120:25 | **disclosures** 141:1 | 91:23 92:3 93:14 |
| 117:3 118:12 | **determine** 71:11 | 141:2,3,15 | 122:2 129:2 |
| 119:3 126:18 | 88:15 | | |

Jason M Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 11, 2022

**[divisions - exact]**

Page 8

**divisions** 29:13
44:4,14 49:16
56:15 57:9 61:21
61:25 66:13 89:20
91:18 100:7
**document** 73:12
74:2 75:22 76:1
76:10 81:19
101:13 104:4
108:1,5 110:8,14
113:10 115:14
135:20 136:23
**documentation**
91:3
**documents** 18:24
19:1,3,5 74:10,11
74:15 75:5,5 80:4
80:13 90:10,21,25
91:4 93:2,11,12,19
104:7,13,14
115:17 129:6
139:25
**dodd** 123:19 124:2
**doing** 34:17 75:9
76:5 103:11 118:3
125:11,14,18
**dollar** 58:7,19
113:20,24
**donated** 10:20
**double** 53:10
104:3
**download** 135:10
135:18
**drawing** 67:17
**drugs** 11:2
**due** 144:3
**duly** 4:14 142:9
**duties** 33:14 35:10
41:24 43:3,5
44:15 46:23 99:25
100:1 118:4 119:3

119:4,6
**duty** 44:7 45:8

**e**

**e** 3:1,6 142:1,1
144:18 145:8,9
**earlier** 7:20 17:13
43:15 65:13 88:18
102:5 104:19
125:3 128:5
129:25 133:4
135:6
**early** 20:2
**earnings** 132:23
**eat** 139:2
**econ** 12:23,24 13:7
16:18
**economics** 12:13
13:5 69:24 71:9
**editable** 135:20
**education** 12:12
12:18 16:20,23
17:2 51:20
**educational** 12:10
**effective** 3:13
**effort** 121:15,21
**eight** 139:5
**either** 5:22 17:10
17:17 19:11 45:7
64:24 72:6 73:11
**elaboration** 26:11
**electronic** 73:3
**electronically** 3:7
144:8
**ely** 127:4
**email** 3:19 18:12
19:12,15,16,16,25
20:2,5,11,23,24
21:11,15,19,24
22:4,19,20,22 23:1
25:12 70:20 71:1
72:22,25 104:17

105:8 129:13
131:25 132:3,5
134:3,5
**email's** 21:2
**emailed** 72:8
73:13,19 91:1
**emails** 19:5,6,8,9,9
19:11,14 21:8
23:19 93:18
105:13,15 127:14
134:15,21
**emphasis** 12:25
13:4
**employ** 3:9 61:10
**employed** 26:4
34:8 35:21 42:14
53:11 68:3 69:7
82:6 88:24 107:3
107:16 120:14
**employee** 34:4
36:7,8 71:15 82:3
121:5 142:17,19
**employees** 34:14
34:15,16 53:24
54:1 70:4 71:18
74:2 78:4 79:8,11
80:6,12,25 81:7,10
81:11,22 122:19
123:4 125:7 126:2
126:10
**employer** 69:11
71:11,24
**employment** 28:19
29:17 70:22,24
75:23 78:25
120:22 124:19
**encompass** 102:10
102:12 131:9
**encompassed**
74:22

**encompasses**
130:24
**ended** 29:17 32:1
**ends** 7:3
**endurance** 7:11
**engaged** 118:3
**engagement**
117:17,22 118:22
**enter** 103:24
**entered** 100:20,24
101:5,9 103:14,15
103:18,19,22
104:3 145:11
**entire** 58:18 122:1
**entirely** 60:14
**entity** 33:9
**entry** 58:12
**errata** 144:3,7,8,9
144:11,13,14,17
145:1,16
**error** 84:7,8,17
**especially** 14:24
121:1
**esq** 144:1
**esquire** 2:4,5,6,13
2:20,21
**est** 1:16 67:7
127:22 139:18
**estimate** 69:23
**estimated** 71:12
**estimation** 47:8
**et** 10:1
**ethics** 141:13
**eventually** 32:2
**everyone's** 19:19
**evidence** 142:15
**evp** 43:1,4,9,14,17
43:24
**ex** 36:6
**exact** 13:22 14:8
34:17 36:22 41:16

43:11 44:1 45:18
47:1 51:20 53:21
68:17 77:14 79:20
80:2 83:1,4,4,17
93:8 120:16,25,25
137:22
**exactly** 18:22
25:21 39:7 40:8
64:18 65:15 71:25
79:16 86:2
**examination** 3:2
4:16
**examined** 4:14
**example** 11:9
26:24 47:13 52:7
54:22 55:6,10
56:17 58:9 80:23
107:11 108:18
**excel** 73:7,10
116:9,16,18,21
135:6,10,11,11,18
135:19
**exceptions** 20:3
21:13 22:1 120:12
120:13,16,21
128:13,22,25
129:4
**exchange** 27:2
**exclusively** 143:8
**excuse** 137:6
**executive** 31:6
66:20 67:14 82:9
90:21 132:21
**executives** 51:23
59:11 60:10 82:7
83:7 90:11,13,19
93:13 96:15
102:20 106:12
128:2 132:14
**exercise** 7:11

**exhibit** 3:8,9,11,16
3:19,22 4:7 75:14
75:16 107:22
108:1 129:10
**exhibits** 3:7 4:8
141:21,22,23
143:6,7
**exist** 18:13 81:2
**existed** 34:23
44:22 97:25
**existence** 24:24
126:9
**exists** 80:3,10
**expansion** 121:9
**expect** 69:24
**expectations** 20:3
**expected** 70:10,16
**expense** 46:3 50:4
55:13 57:6 58:5
58:20
**expenses** 46:17
54:9,12,13,14,17
54:18,20,21,24
55:1,2,12,13,16,18
55:20,22 56:1,3,12
56:13,20 57:19,23
59:1,4,4,6,16,24
60:7,7 94:24
102:6 104:2
107:11 110:11,12
119:23 120:7
128:12
**experience** 4:6
15:1 31:20 43:7
66:19
**expires** 146:24
**explain** 30:5 56:12
131:13
**explanation** 6:24
**express** 92:2

**extension** 12:22
**extent** 22:7 103:3
104:12 106:17
107:5 139:21
**external** 15:23

**f**

**f** 142:1
**face** 98:20
**facility** 33:11
144:17
**fact** 47:24 89:9,16
91:12,17 92:3,15
132:7 138:16
**factored** 62:21
**fail** 14:11,14
**failed** 11:21
**fair** 5:8 6:2 7:4,16
8:7,8,13 12:1 75:6
78:23
**fairfield** 127:4
**fairly** 127:16
**fall** 130:17
**falls** 130:17
**familiar** 38:14
76:14 78:24 79:4
80:10
**far** 31:14 59:16
62:19 65:14
113:13 121:14
**farthest** 12:17
**faster** 21:7 24:5
**fault** 98:3 132:24
133:17,22
**february** 83:21,24
84:2,9 91:21
96:20 130:6
**federal** 35:4,7 36:3
145:8
**feel** 45:22 76:2
**felt** 14:25 15:3

**field** 16:22
**figure** 75:12
**figures** 48:14 64:3
64:11
**figuring** 70:2
**file** 1:5 108:9
144:12
**filed** 12:8 28:6
125:20 144:14
**fill** 144:7,8
**final** 70:9 71:7
102:24 135:7
**finally** 7:18 91:22
**finance** 67:23 89:4
89:6 103:20
**financial** 31:1,5,9
35:20 42:13 43:21
43:25 61:2 69:10
69:18,20,21
101:23 107:15
119:15 128:4
137:1,14,17,18
138:13 141:6
143:13
**financially** 142:20
**financials** 70:12
99:10 104:9
119:19
**find** 7:25 74:16
78:14 125:10
**fine** 4:21 5:10 8:18
19:21 76:3
**finish** 145:16
**finished** 7:16
28:25 127:16
139:20
**finley** 2:7
**fired** 117:12 119:1
**firm** 2:7 141:1,15
143:1

Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[first - go]**                                                    Page 10

**first** 4:14 19:19
  21:12 23:19 29:7
  31:2,5 37:6,17,22
  38:1,5 40:6 46:21
  93:23 108:10
  113:13 130:5
  134:4
**five** 13:24 14:20
  15:19 16:19 52:20
  53:12 76:20 81:22
  83:16
**fixed** 5:6
**fluctuations** 49:17
  60:20
**folder** 74:1,5,8
**folders** 74:4
**folks** 50:21 53:24
**follow** 22:15
**following** 76:24
  141:1,3 145:6
**follows** 4:14
**foray** 29:7
**foregoing** 142:6
  143:3
**form** 5:12 16:14
  22:6 23:9,12 27:7
  39:24 40:1 45:13
  46:1 52:12 57:4
  63:16 65:2 70:5
  73:17 77:11,22
  78:8 79:1,9 80:7
  80:15,25 81:14
  83:11 84:10,14
  85:15,17 86:3,16
  87:16 90:14 91:24
  92:21 94:4,7 95:1
  95:15 96:21 97:8
  98:4,14 99:1,11
  100:19 101:18
  104:10,22 105:21
  120:1 123:11,21

**128:18 131:17**
  132:10 133:1,11
  133:19 134:12
  135:3 137:7
  145:10,14
**former** 23:7
  126:10
**forms** 141:5
**forward** 144:12
**forwarded** 19:7
**foundation** 97:9
  98:5,15 99:2,12
  103:1 104:11,23
  123:22 128:7,19
  131:18 133:2,20
  134:13 135:25
**four** 13:24 14:9,16
  14:19,20 15:19
  16:18,19 35:23
  46:15,24 51:17
  52:10 83:16 126:1
  136:10
**frank** 123:19
  124:2
**free** 76:2
**friend** 36:17
**friendship** 39:11
**frommert** 16:8,10
  68:3 99:8 102:19
  106:10,20,23
  107:3,14,25 117:1
  117:3,11 118:11
  122:9,11,17
**frommert's** 117:7
**front** 23:3 33:14
  33:20 34:1 109:12
  129:15,23 130:4
**frustrated** 92:10
**frustration** 92:7,8
**full** 8:21 118:3

**fully** 11:3
**function** 30:8
  50:24
**functionality**
  44:13,19 46:12,18
  50:20 51:4,21
  93:23
**fund** 10:10 33:9
**funded** 33:18
**funding** 1:7 2:20
  2:21 5:19 15:7,16
  60:17
**funds** 33:7 84:1,5
**further** 5:13 56:11
  56:12 142:16
  143:5

## g

**game** 139:3
**gap** 28:22
**gathering** 108:25
**gears** 83:19
**general** 8:16 78:24
  79:11 105:11
  111:10 118:6
  121:23 123:16,23
  126:9 128:16,21
  138:15
**generalities**
  126:14
**generally** 78:3
  79:7,24 80:10
  82:20 110:15
  119:12 122:1
  123:6
**generate** 64:20
  65:22 70:11 94:21
  109:18 110:3
  112:7,14 116:5,21
  133:10 134:25
**generated** 50:15
  64:3,11 90:6

**94:11,13 109:15**
  109:17,25 111:21
  115:15 122:15
**generates** 65:25
**generating** 133:13
**generic** 122:25
**gentleman** 88:21
**georgia** 1:1,23
  2:10,17 5:21 7:8
  9:4,7,12,14,16,25
  141:3,9 142:4
  143:3,8 144:18
**getting** 127:16
**gibson** 2:5 20:8
  75:14 108:9,12
  111:3
**gina** 1:4 2:22 5:19
  19:15,24 73:12
  75:10
**give** 6:16,23,24,25
  21:22 23:22,23
  26:23 31:13 46:9
  46:9 47:13 50:19
  55:6 56:6 66:9
  68:10 78:16 80:23
  108:5 116:19
  139:10
**given** 17:15,17
  70:8,9,15 71:16,22
  73:11 76:5 99:4
  100:23 101:4,6,7
  142:15 145:12
**global** 61:2 62:19
**go** 4:5 5:6 6:9 8:20
  11:22 21:7 24:5,5
  28:21 35:2 36:21
  37:20 46:9 48:7
  48:13 53:10 61:1
  67:8 74:13 76:13
  86:18 89:25 93:1
  103:24 105:1

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[go - impartiality]**                                              Page 11

111:23 117:1,10
123:19 127:23
128:8 137:17
139:2
**goes** 61:4 133:4
**going** 5:17 6:13
8:11 10:25 15:5
18:13 28:12 38:17
47:10 67:11 70:10
73:14 74:17 75:12
87:10 104:4 113:2
124:7 140:3
**golden** 2:14 144:1
**good** 11:9 12:25
67:2 127:20
**gosh** 67:15
**gotcha** 4:22 9:8,19
10:22 18:23 32:7
40:17 68:19
**grade** 14:12
**graded** 14:10
**graduated** 12:16
13:16 29:3
**great** 5:9,15 12:3,3
15:14,18 49:3
**greetings** 144:5
**gregory** 2:14
144:1
**ground** 6:10 8:16
11:21
**groups** 10:1
**grow** 35:14
**guess** 36:18 43:12
48:18 55:5 101:7
127:11
**guessing** 81:9
**guys** 107:10

**h**

**h** 3:6 88:23
**hager** 36:11,12,13
37:1

**half** 139:5
**hand** 4:12 20:11
**handed** 73:20 76:6
**handled** 81:5
143:7
**handling** 44:7
**hands** 5:5
**happen** 21:4 80:18
**happened** 26:14
46:21 68:17 93:16
95:6,17 98:13
**happening** 83:23
**happens** 80:11
**hard** 11:25 58:5
74:3 110:19
**hargrove** 2:4 3:3
4:4,17 5:10,15,16
6:5,6 16:16 18:6
20:7,9,22 21:4,10
22:17 23:11,21,24
24:2,7 26:17
27:19 28:17 39:25
45:15 46:5 52:14
57:11 63:17 65:9
67:2,6,8,10 70:14
73:22 74:14,20
75:3,15,17,25
76:11 77:16,24
78:11 79:5,12
80:8,19 81:17
83:12 84:20 85:21
87:4,19 92:1,24
94:12 95:11,20
97:2,13 98:7,17
99:7,16 100:22
101:21 103:12
104:16,25 106:2
106:19 107:23
108:7,17 111:4,5
113:6,11,18,23
114:2 120:2

123:13,24 124:14
126:13 127:13,19
127:23,25 128:11
128:23 129:11,18
129:20 131:20
132:12 133:7,15
133:23 134:17
135:4 136:5
137:11 139:10,14
139:19 140:5,9
**harm** 49:6
**hate** 45:17
**head** 6:18 22:3,10
36:9 47:1 49:4,5
70:19 87:1 120:17
120:23 121:1
122:21 137:16
**hear** 5:1,4,7,8 7:20
42:3 82:6,9 86:19
**heard** 4:24 6:10
25:20 26:2,15
37:4 38:20 82:12
82:18 84:4,6,11
86:3,4,7 89:12
98:21 101:2
129:12 131:12,15
131:16,21,23,23
**heavily** 103:5
**hedge** 47:23 48:9
48:10
**hedges** 48:14
57:16
**hedging** 30:14
48:11 49:4,5 60:3
60:6 63:11 66:1,3
66:6,13 138:5,7,11
**hello** 38:13
**help** 70:1
**helped** 121:5
**henry** 2:13 74:25
86:19 94:5 144:1

**hierarchy** 30:18
30:20,22
**high** 28:21,23
**higher** 12:18 48:6
**highest** 12:12
**highly** 135:22
138:11
**hired** 41:12,13,25
50:23 54:3,5 68:6
69:23 99:8 100:5
100:8 102:13
106:10
**history** 28:19
**hit** 111:16
**hold** 50:11 104:21
128:17
**home** 9:9
**honest** 37:9 70:19
112:20 136:12
**honestly** 26:13
**hopefully** 129:4
**house** 18:8 24:12
33:8
**hr** 37:9,15 118:14
118:25
**huh** 47:19 64:16
82:11 97:22
111:25 116:22
132:19
**huhs** 6:17
**hundred** 22:1,5,13
25:19 39:18

**i**

**idea** 12:25 102:23
108:24 117:2
136:25
**ila** 61:12,22
**immaterial** 105:25
**impact** 66:14
**impartiality**
141:13

Veritext Legal Solutions

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 159 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[impetus - kind]                                                    Page 12

**impetus** 14:18 32:9
**implication** 64:14 106:1
**implications** 64:14 124:2
**implore** 61:9
**important** 6:15
**inception** 126:17
**include** 112:14
**included** 138:8
**including** 50:2 52:20 59:24
**income** 60:20
**incorrect** 135:23 136:1
**increase** 31:18,19
**independent** 122:24
**indicate** 114:17
**individual** 57:6 58:5 86:11 93:1 94:10 131:3
**individuals** 50:23 52:21 53:12 68:1 71:8 78:10 79:25 83:1 85:9,22,24 86:25 87:18 88:18 89:24 92:10,22 109:23 126:18,20 126:25 127:9
**industry** 17:5 30:5
**influence** 11:1,5,8 11:15
**inform** 24:14
**information** 7:25 26:10 28:11 56:7 71:16 88:2 94:16 96:12 100:11,14 100:16,21,24 101:4,9,12,16,17

101:20 102:2,3,4,9 102:11,14,17 103:16,21,21 104:2 106:7 107:15,19 115:22 116:20 117:6,8 122:11,13 123:3,7 123:8,9,23 125:16
**informed** 38:13,16
**initial** 89:15
**initially** 35:16 42:14
**input** 100:16 102:14
**inside** 22:10
**instance** 18:4 125:1
**instruct** 28:12 87:10 124:7
**insulate** 66:13
**insulated** 63:10
**intelligence** 68:1
**intended** 7:10 49:12,14
**intention** 49:15 60:23 66:8,12
**interact** 107:1,2
**interest** 141:7,11
**interested** 142:20
**interface** 50:25 51:2 94:17 135:16
**intermediary** 96:1
**intermittently** 29:25
**internal** 15:23 25:13
**internally** 66:10
**interpret** 23:15
**interrupt** 23:10
**interrupted** 14:6

**intimately** 26:14
**intricacies** 47:11 47:14
**intro** 13:25
**investment** 67:18 67:20 68:12,13,14
**investor** 33:25
**investors** 30:16
**involve** 126:1
**involved** 10:2 17:9 25:22 26:14 39:20 42:12,17 43:18 52:2,11,15 63:4,13 75:8 87:20,22 95:18 103:6 104:18 106:6 108:25 109:7 118:25 121:15 122:4,7,10 127:1 136:7,17,21
**involvement** 40:16 69:6 78:21
**issue** 23:5 87:6 105:11,18 119:11 131:14
**issues** 74:18
**item** 47:18 93:9 96:3
**iterations** 4:24

**j**

**jackson** 2:6
**jan** 130:7
**january** 1:15 4:2 35:3 142:2,21
**jason** 1:11 4:11,13 8:23 142:2 144:2 146:19
**jerry** 36:11,12
**jim** 88:21,22 109:22

**job** 23:16 32:18 35:10 38:4 40:24 41:6 49:3,4 117:25 118:1,20
**join** 71:9
**joined** 35:8
**jon** 86:25 88:19 90:1 130:7 135:21
**judith** 1:21 142:24
**july** 32:4,4

**k**

**keep** 16:23 74:7 139:21,23
**kelly** 19:16,24 26:18 28:1 68:24 73:13
**ken** 2:21
**keranen** 127:6
**kevlar** 66:10,12 90:7,10,14,17 91:5 92:14,16 93:4,14 93:19,24 94:1,10 94:14,15,22 96:13 100:9,12,17,17,21 100:25 101:5,10 102:16,24 103:14 103:16,19,22,24 104:1 105:8,11,23 108:2,18,19,22,25 109:8,25 110:3,9 111:21,24 112:7 115:18 116:9,17 116:24,25 121:6 129:7 130:19,21 130:23,24 131:6,9 135:8,9,15,16,16 136:7,23 137:23 138:2,8,20
**kind** 4:20 8:16 29:24 30:5 31:13 33:13,25 36:17

Jason M Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 11, 2022

45:20 56:6 58:6
67:16 105:25
110:19 114:12
130:22 133:13
**kinecta** 35:4,6,9
36:3
**knew** 36:16,16
37:3 38:14,16,21
39:12
**know** 6:1 7:7,10
8:1,1,10 9:6 10:11
10:13,14,19,20,25
12:12,20 13:22,23
13:25 14:12,21,24
16:1,25 18:1,8,20
18:22 19:7,25
20:3,3 21:1,5,6,25
22:9,9,10,11,12,14
22:21,22,23 23:16
25:17,20 26:2,3,13
26:15 27:13 30:9
31:3,17,20 32:1,11
32:12,14,15 33:4
33:17 36:5 37:1
38:17,21,23 40:7,8
40:10 43:10,13
44:7 46:8,22 47:1
47:9 50:25 51:10
52:15,18,22 53:16
53:18,20 54:13,18
54:21,22 55:4,8,14
55:15 60:2,17
63:11,23,24 64:1,8
65:3 67:24 69:3
69:23 70:8,18,19
70:25 71:6,12,25
72:8,20,21 73:19
73:20,21 74:6,23
75:15 78:14,15
79:7,14,16,17,20
79:22,24 80:2,2,4

80:9,11,12 81:4,21
82:13,16,22 83:3
83:17 84:18 85:5
85:7,16 86:2,3,7
86:12,24 87:1,16
90:3 91:14,25
92:5,25 95:5,5,7
95:16 97:10 98:9
98:20 99:13,23,25
100:4 101:6 103:5
103:8 105:7,15,19
106:3,23 107:1,5
108:21 109:24
110:6 112:20,23
115:22,25 116:2,6
117:11,13,15,23
117:23 118:14,15
118:19,21,25
119:2,18 120:10
120:17 121:1
122:10,17,23
123:1,9,12,16,18
125:12,23 126:1,7
126:8,11,11,15,16
126:16,19,20,25
127:1,4,6,6,10
128:1,9 129:14,21
130:13 132:17
133:4,5,25 134:9
134:14,16,22,24
135:19 137:1,15
137:18 139:25
**knowing** 74:5
125:16
**knowledge** 9:5,13
22:11 23:8,13
25:25 32:12 39:12
40:8,20 44:8 47:9
47:16 54:4 62:24
69:9 77:17,23,25
78:5,20 85:9 90:9

91:20 94:23 96:11
96:17 99:4 102:3
103:5 104:14
106:5,18 107:13
107:21 117:14,16
118:6,11 119:22
119:25 120:4,7,12
120:20 121:3,8,12
121:19,21,23
122:9,24 123:14
124:18 128:13,21
128:22,24 132:9
136:22
**known** 33:1 61:11
61:23
**kristin** 23:2 51:6,6
51:13,21 52:23
53:1,14 54:3,5,11
55:25 56:5,25
57:14 109:22
121:4
**kristin's** 51:8

## l

**l** 1:21 142:24
**label** 21:5 113:12
**labeled** 108:1
**lack** 8:12 129:7
132:16
**laid** 22:16
**large** 32:14
**lateral** 32:19,20
**launched** 125:21
**law** 141:4
**lawsuit** 17:9 25:17
25:22,24 28:6,9
105:6,9 125:19
126:7,8,9,12,15,16
126:17 127:2
136:15
**lawyer** 19:9

**lawyers** 18:8
20:13
**layer** 130:15 131:3
**layers** 54:14,16
131:1,6
**lead** 29:2 99:22
**leadership** 83:20
83:22 84:2,8
91:22 96:20 97:17
99:14
**leading** 69:7
**learn** 26:6 32:15
72:4 85:24
**leave** 24:18 34:22
34:25 36:2 117:11
**leaving** 24:15
118:17 139:14
**left** 34:2 113:13,13
113:17 126:21,25
127:3,9
**legal** 24:11 25:5
28:11,16
**leitz** 1:21 142:24
**lender** 35:12
**lending** 29:15
32:22,23,25 33:2,3
35:14,15
**level** 47:11,14 48:3
58:21,22 59:8,18
60:9 72:6 102:2
**levels** 93:24
**licensure** 16:23,25
17:4,7
**life** 38:22
**likewise** 112:25
**limited** 47:9
119:25 120:4
121:11 128:22
**line** 14:5 47:17
85:10,10,12,13,23
85:23,25,25 87:7,7

[line - meeting]

87:8 88:5 92:14
92:15,20 93:2,3,5
93:6,9,13,20,25
94:25 95:7,8,24
96:2,3,4,6,9,9,10
96:15 105:12,13
105:18,19,24
106:13,13 110:9
130:18 131:7
145:19 146:1
**lined** 118:20
**lines** 96:1
**listed** 77:1,19
**litigation** 25:11
**little** 4:7 15:6
83:19 89:19 90:3
90:8,22 91:7,13
92:4 107:24 120:3
120:10 127:15
**live** 8:24 9:1,10,10
**lives** 9:6,8
**llp** 2:14
**load** 119:11
**loan** 33:6,7,9,11
33:21,22 42:6,8,11
47:10,14,18,21,24
48:2,8,9 49:1
58:19,22 59:17
79:10,24
**loans** 30:11,14,16
33:5,15,16,18,24
39:8 42:7 76:24
77:1,19 78:6,18
123:15
**lock** 42:2,5,6,8
48:25 49:2
**locking** 42:10
**locks** 30:11
**long** 18:16,17
31:16 35:6 43:8
83:15 127:17

140:5
**longer** 26:4
**look** 18:24 21:7
24:4 50:18 58:17
70:12 74:20 93:1
95:25 110:4 113:2
130:5 137:17
**looked** 19:2,4
69:10,18
**looking** 10:24
15:22,25 21:8
36:9 46:12 69:19
74:25 75:1 85:9
85:12,22,25 92:20
93:9,10 94:25
95:8,9,12,21,24
96:1,3 105:17
113:17 134:3
**looks** 75:19 108:2
109:3,4,6 110:18
**los** 35:5 71:18
**lose** 48:8,10
**loss** 42:16 45:24
47:2 62:20 63:7
89:10,17,20
110:25 111:13
112:8 114:8,14,20
114:21 115:7,11
121:16 137:2,3,6
137:15 138:12,18
**losses** 60:21
**lost** 114:4
**lot** 13:4 29:24
40:13 45:20 82:12
82:15,22,25 83:8
97:25 102:5
**lot's** 68:17
**lunch** 139:7

**m**

**m** 1:11 2:13 4:13
88:23 142:2 144:2
146:19
**maa** 10:4
**macro** 13:5
**mail** 144:10
**maintained** 36:14
**maintaining**
141:13
**major** 12:24 71:19
**making** 30:12
82:25 91:7,9,13,18
141:12 145:13,13
**manage** 35:17
47:22 49:17 99:23
**managed** 103:6,9
**management** 50:3
63:4 79:25 131:8
**manager** 3:12
77:4,6
**managers** 26:25
50:2 51:24 79:13
82:23 83:9 100:2
103:7 119:24
128:2 132:15,22
**manages** 120:24
**managing** 49:6
**manner** 59:14
**mansell** 144:18
**manually** 144:8
**march** 3:14 20:25
117:17 130:1
**margin** 48:25
110:22,23 111:7,9
111:16,18,22
112:2,11 113:1,19
113:25 130:22
**margins** 110:19
**marked** 75:16
107:22 108:10

**marketing** 29:23
30:2 35:17 40:10
53:4,6 119:22
120:7 128:12,22
130:9
**markets** 29:10,21
29:23 30:3,6,7
33:24 35:18 36:9
40:10 41:17,25
42:21 43:2,4,9,14
43:17,24 47:12,23
49:4,5,18 67:25
99:24 120:18
**marriage** 51:7
**marybeth** 2:5
75:13
**masters** 9:18
**match** 60:13,15
62:16
**matter** 104:20
105:2,6 141:11,17
**matters** 119:1
**mean** 6:17 27:16
40:25 52:5 64:18
68:25 79:10 85:4
95:25 101:7 105:6
109:9 110:22
113:2 114:3,7,14
114:24 115:7
117:8 120:16
138:24
**meaning** 64:9
**means** 111:13
**meant** 31:14
**medications** 11:2
**meet** 36:25 37:18
37:20,20 38:9,11
**meeting** 24:20
26:25 37:22 38:2
38:5,7 40:23,25
41:14 83:20 84:2

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 162 of 175
Jason M Obradovich                          January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[meeting - negotiation]                                                Page 15

84:8 96:20 130:7
**meetings** 24:22
41:5,9,10 83:23
85:6 91:15 96:23
**member** 9:20
10:17
**membership** 9:22
**ment** 3:10
**mentioned** 82:23
102:5 135:6
**merely** 39:9
**met** 37:5 38:15
40:4,5,6,7 41:9
**methodology** 61:9
**michael** 8:23
**micro** 13:5
**middle** 5:21 7:14
85:10,12,23,25
87:7 92:14,20
93:2 94:25 96:9
105:12,18 106:13
**million** 130:8
137:3,5,15,19
**mind** 137:13
**mine** 13:10
**minimized** 117:9
**minor** 12:4
**minutes** 18:21,21
67:5 127:19
139:10
**misallocation** 84:1
84:5 130:8 131:13
131:22,24 132:3,7
**misbelief** 97:24
**mischaracterizes**
104:22 106:16
128:18
**miscommunicate**
96:8
**miscommunicati...**
97:7,20

**miscommunicati...**
84:25 85:2,7,8
87:16,17,21,23
95:17 96:19 97:1
97:4,15,18 98:1,3
98:24 99:9 128:4
128:15 132:7,25
133:17
**misreading** 105:12
105:18
**mistake** 96:19
104:8,18
**misunderstanding**
84:25 85:3 95:6
**model** 121:16
122:5,8,12,19
123:5 128:9
**modify** 135:11,17
135:19
**money** 10:20 33:8
48:8,9,9,10 82:8
82:10,13,14,15,22
82:25 83:8 89:19
90:4,8,22 91:7,10
91:13,19 92:4
**month** 29:5 43:1
58:14 102:25
**monthly** 94:2,11
**months** 27:17
29:14 32:18,21
34:6
**moran** 1:21
142:24
**morpac** 10:12,16
**mortgage** 10:4,5,6
10:11 17:4 29:8
30:2,4 32:12 33:5
35:12 44:11 125:8
125:20,22
**motion** 139:22

**move** 29:19 32:9
50:9 117:25
121:22
**moved** 31:22
32:17,21 119:8
128:9
**movement** 125:20
125:22 126:18,23
127:1,3
**moving** 33:19
**msr** 60:19
**multiple** 101:14
101:15
**muth** 88:21,24
109:22
**mutual** 36:17

**n**

**n** 2:6 3:1
**n.w** 2:15
**naf** 3:18,20 15:10
15:12,14,23,24
16:1,3,7,9 20:13
23:20,25 24:11
25:4,18 26:1,4
35:8,25 36:21,24
37:2,4,7,7,20,24
39:4,7,17 40:24
41:13 42:13,20
43:18 44:9 45:24
49:9,21 50:3
53:24 54:1 61:2,4
61:8,14,19,21 62:6
62:25 63:8,18
64:2,9,24 67:12
68:6,24 69:4,8
70:4,13 71:9,10,13
71:23 72:3,5
75:10 76:19 78:3
78:25 79:7,7
80:14 81:1,16
82:2,6,21,22,25

83:8,21 87:6
88:25 89:8,15
91:12 96:16 98:2
104:8 105:20
106:3,8,11,21,24
107:4 108:8 117:4
117:7,11 120:15
120:22 123:15
124:1,19 125:6,14
125:20 126:2,18
126:21,25 127:3
129:13 132:2,5
134:25 137:3,14
**naf's** 54:2 62:19
63:14 123:10
124:6
**name** 8:21,21 16:8
19:19 25:20 36:11
36:17 51:7 66:9,9
88:22 111:24
**named** 51:6 88:21
**names** 13:22 37:4
53:10,20,21 83:4
127:10
**national** 9:25
**native** 3:18 108:9
**nature** 26:7 27:5
**near** 99:5
**necessarily** 123:17
**necessary** 145:15
**need** 6:22 7:1,6,9
14:25 58:19 67:4
71:3,8 74:6 75:25
105:3 129:3
**needed** 11:10
24:20 51:4 122:13
**needs** 74:7
**negative** 64:2,9
138:14
**negotiation** 75:9

net  60:2
never  15:2 17:11
  17:12,14,17 37:5
  76:16 80:16 82:4
  84:4 96:25 97:3
  97:14,18 124:18
new  1:7 2:20,21
  5:19 15:7,15 36:6
  37:18 39:8 43:9
  50:13,16 52:3
  55:24 56:4,22,25
  58:2 60:17,22
  71:14 130:8
nickolas  2:6
nine  29:11
nods  6:18
noise  65:19
nomenclature
  15:12 111:10
noncredit  14:12
  14:13
normal  116:3
normally  119:16
northern  1:1
notaries  143:4,8
notarized  143:8
  144:10
notary  146:23
note  18:20
noted  145:5,6
noticing  141:16
notified  130:7
noting  144:7
november  114:9
  114:16
number  14:8
  20:14,14,15,19
  21:3 113:1,5,13
  114:10 129:16
  130:18 137:22,24
  138:14

numbers  20:12,13
  58:23 72:10 85:10
  92:19 112:21

**o**

object  16:13 22:6
  23:9 27:7 39:24
  45:13 46:1 52:12
  57:4 63:16 65:2
  70:5 73:17 74:13
  77:11,22 78:8
  79:1,9 80:7,15
  81:14 83:11 84:10
  85:15,17 86:16
  91:24 92:21 94:4
  95:1,15 96:21
  97:8 98:4,14 99:1
  99:11 100:19
  101:18 104:10,22
  105:21 120:1
  123:11,21 128:17
  131:17 132:10
  133:1,11,19
  134:12 135:3
  137:7
objected  23:12
  40:1 84:13 94:6
objection  103:1
  106:15 128:6
  135:25
objections  5:11
obligation  141:13
obradovich  1:11
  4:13,15,18,20,20
  5:17 8:23 17:20
  20:10 26:9 67:11
  75:18,24 87:9
  113:8 124:4 126:3
  128:1 142:2 144:2
  146:19
obstacle  7:21

obtain  12:15
obtained  82:2
obtaining  13:1
obviously  41:1
  139:23
occur  68:2
occurred  45:5
  68:5 98:25
ocga  141:6,7,18
  143:11 145:9
october  29:18 34:2
  109:4 112:18
  113:14,20,24
  114:3 115:8 136:3
offer  3:9 71:5
  75:22
offered  34:21 38:4
  40:24 41:1,6,18
office  55:9 65:20
  72:9 102:21,23
  103:10 107:2,6
  123:6 139:8
officer  33:22
  67:18,20 68:12,14
  68:15
officers  42:6 79:10
  79:25
officership  10:17
offices  144:3,10
official  125:18
offset  47:25 48:10
  48:20
oh  23:13 65:3
  67:15
okay  4:22 5:1 6:3
  6:5 7:6,17 8:8,24
  9:11,19,24 10:22
  11:9 12:23 13:6
  13:10,16 14:10,15
  14:15,18 15:5
  16:3,9,22 17:12,25

19:3,6,18,20,22
  20:5,21 22:2,8
  23:21 24:2,22
  25:10,15 26:6,12
  27:4,9 28:2,15,18
  28:25 29:19 30:4
  31:21 32:5,20
  33:13 34:2,6,18
  36:20 37:6,19,23
  38:7,10 40:3,5
  41:12 42:8 43:3
  43:13,21 44:15,21
  45:7,16,22 46:6,14
  51:2 52:18,22
  53:16 54:5 55:1
  58:1,15 59:3 60:4
  60:15 61:21 62:25
  64:19,23 65:6,10
  66:3,11,16 67:6,19
  68:7 70:15 72:4
  74:20 75:21 76:8
  76:22 77:7 78:3
  78:12,23 79:22
  80:4 81:3,11 84:6
  84:16,21,23 85:2
  86:14,23 87:13,20
  88:3,7,22 89:21
  91:20 92:2 94:9
  94:13,23 95:4
  96:18 97:6 99:17
  100:23 101:15,22
  102:8 103:4,17
  106:18 107:7
  108:11,15,16
  110:7,22 112:17
  112:22 113:22
  114:1,9,23 115:19
  116:2,10 117:10
  117:10,14 118:10
  118:16,22 119:13
  119:17 121:8,13

121:19 122:4
123:18 125:19,23
126:14 127:3,5,7
127:12 128:24
130:3,4,18 131:4,8
132:1,19,24
133:16,24 134:18
136:6,16,22 138:7
138:22 139:5,9,16
140:5
**ola** 61:24
**once** 24:4 27:17
33:7,18 35:24
41:25 43:17 49:8
70:13 74:24 94:18
116:23 144:9
**one's** 21:12
**ones** 90:11 111:1
**ongoing** 132:20
**online** 12:20 13:17
16:18
**open** 139:21,23
**opening** 36:20
**operated** 89:20
**operating** 40:3,6
**operation** 61:17
63:11 65:15,24
**operations** 40:21
60:19 61:24 62:23
63:1,5,6
**opinion** 78:17
**opposite** 33:13
**opted** 34:24
**option** 14:11 34:22
34:22
**orange** 9:2,23
**order** 129:4
**ordering** 141:24
144:13
**organization**
30:15 55:15 87:15

88:14,16 89:8,19
95:25 105:24
106:1,12 117:17
117:22 118:3
132:23
**organizations** 9:21
**original** 144:12,14
**originate** 33:22
**origination** 60:22
60:24,25 138:4,18
138:19
**outside** 24:11 30:2
39:15 55:3 65:19
138:23,25 139:7
**outweigh** 138:12
**overall** 138:13
**override** 76:23
77:18 78:18
**overrides** 78:6
**oxley** 14:25

## p

**p&l** 3:16 44:3
45:10 46:12,19
48:24 49:7,16
54:7 56:2,16,19,20
58:22 60:8,12
61:5 62:21 64:15
65:3,7 66:8 71:20
108:2,16 112:4,6
112:10,15 116:19
116:20 121:22
122:19 123:5
128:9 134:25
137:5 138:3
**p&ls** 43:18,25
44:6,13,18,24 49:8
49:11 50:7,15
51:12 54:12 57:2
57:12,12 59:8
60:9,23 61:8 63:9
63:19 64:20 66:14

93:4 97:25 99:15
99:17,22,24 100:2
100:3,9 122:15
133:13 134:9,18
134:22 135:7
**p.c.** 2:7
**p.m.** 1:16 4:2 67:7
127:22 139:18
140:12
**pac** 10:5,7
**package** 34:23,25
35:1
**page** 3:2,8 76:22
108:10 145:19
146:1
**pages** 3:10,15
145:15
**paid** 58:13 64:24
76:23 77:18 78:6
78:18,22
**paint** 54:22
**paper** 71:2 76:5
129:22 130:3
**paragraph** 130:5
**parenthesis**
110:25 111:12
113:24 114:7,10
114:18,24 115:2,7
**part** 12:23 46:7,7
46:10,11 50:21
56:4 61:3 66:20
91:9 95:16,18
**particular** 23:14
27:15 58:13 73:25
81:5 82:16,17
105:9
**parties** 19:10
141:18,24 142:18
143:12,14 144:13
**partition** 48:2,4

**partner** 23:7
**parts** 46:8
**party** 105:14,16
141:14,19 143:13
**pass** 14:11,14
**passed** 14:15
**passing** 25:21
82:18
**password** 141:23
141:24
**path** 15:6 29:1
**patty** 19:17 21:14
22:11 38:11,16,20
39:1 40:18
**patty's** 40:8
**pay** 55:5
**paying** 64:10
**payment** 54:25
**pdf** 144:7,7
**pe** 21:25 22:5 23:5
130:9
**pending** 5:20
125:24
**people** 5:24 29:24
30:2 31:12 37:4
52:18 53:8,13,21
53:25 60:5 82:21
82:25 83:8,9
91:17 109:20,21
121:22 125:16
127:8
**percent** 22:1,5,13
25:19 39:18 73:9
114:20
**percentage** 115:4
**perfect** 140:9
**performance** 86:5
86:8
**period** 16:4 34:14
58:18 68:18 83:5
83:17 96:24 115:8

[period - printed]                                                   Page 18

124:10
**perlowski**  2:13
  4:10 5:14 6:4
  16:13 17:20 18:7
  20:10,21 21:1
  22:6 23:9,18,22,25
  26:9 27:7 28:10
  39:24 45:13 46:1
  52:12 57:4 63:16
  65:2,5 66:24 67:4
  70:5 73:17 74:13
  74:17 75:24 77:11
  77:22 78:8 79:1,9
  80:7,15 81:14
  83:11 84:10,13
  85:15,17,20 86:16
  86:21 87:9 91:24
  92:21 94:4,6 95:1
  95:15 96:21 97:8
  98:4,14 99:1,11
  100:19 101:18
  103:1 104:10,21
  105:21 106:15
  108:4,11,13
  112:24 113:7,15
  113:22 114:1
  120:1 123:11,21
  124:4 126:3
  127:17,20 128:6
  128:17 129:16,19
  131:17 132:10
  133:1,11,19
  134:12 135:3,25
  137:7,9 139:12,16
  140:2,8,11 144:1
**permanent**  74:7
  116:25
**person**  38:1 51:5,6
  52:1,24 70:20
  71:1 72:5,25
  82:17 86:2 88:14

118:10 120:23
  121:2
**personality**
  133:25
**pertaining**  84:7
**pertains**  59:1,3
  104:20 105:2,3,5,6
**phrase**  82:14 84:4
  84:6,19,22
**phrased**  11:6
**physically**  73:21
  109:11,12
**piece**  71:2 103:6
**pieces**  48:20 79:4
  138:5,8,11
**piedmont**  2:8
**place**  141:17
**plaintiff**  1:5 2:3,22
  5:18 20:15
**platform**  4:7
  54:11 61:13,19
**please**  4:11 8:4,22
  17:21 57:22 76:1
  108:4 126:5 144:6
  144:10,17 145:14
  145:16
**plug**  56:18
**point**  5:4 38:11
  42:18 44:2 67:1
  68:8 73:4,5 74:24
  81:15 84:2 100:5
  106:4 114:19
  115:3,11 133:5,8
  139:19
**points**  113:20
  114:6,8,19,22
  115:2
**policies**  21:25 22:5
  22:15 78:25
**policy**  23:6 130:9

**political**  10:7,11
**portal**  44:11,12
  45:23 47:6
**portion**  46:3 48:1
  61:5 62:20 63:12
**portrayed**  96:14
**portraying**  45:10
**position**  37:23
  41:13 42:21 78:10
  78:16 89:2 140:4
**positions**  14:23
  15:21
**positive**  64:2,9
**possibility**  16:2
**possible**  98:11
  124:24 135:14
**post**  16:20 117:16
**potential**  15:22
  71:14 74:1
**potentially**  60:21
  118:14
**powerpoint**
  122:18,20 123:4
**powerpoints**
  122:23,25 123:1
**precise**  39:13
**preference**  6:2
**preferred**  15:12
**preparation**  19:4
  42:13 43:25 49:21
  50:6 52:2,11,16
  63:14 106:7 109:8
  109:9
**preparatory**  18:2
**prepare**  17:18
  18:1,24 93:19
  100:9
**prepared**  49:20
  63:19 102:25
  104:7,13,15
  108:19 122:17

**prepares**  61:2
**preparing**  18:14
  31:8 35:19 42:16
  43:18 44:3 91:4
  129:6
**prescription**  11:2
**present**  2:19 81:9
  85:5 123:4 124:22
**presentation**  27:1
  27:3 122:20
**presentations**
  122:18
**presented**  80:5
  81:19 141:1
**presenting**  92:1
  92:16,19
**presently**  16:11
**president**  31:5,6,6
  31:7 41:17 53:4
  66:20 67:14 89:4
  89:5,5
**presumably**  101:8
**presume**  134:21
  135:10
**presuming**  27:17
**pretty**  4:25 12:24
  34:18 116:13
  118:23
**price**  20:3 128:21
**pricing**  21:12 30:9
  30:9 42:1,5 48:25
  51:11,12 120:11
  120:13,16,21
  128:13,25 129:4
**primary**  39:16
  51:10
**print**  21:17 24:3
  144:8
**printed**  20:1,17,19
  21:16 72:25 73:2
  73:12 111:2

Jason M Obradovich

Spearman, Gina v. Broker Solutions, Inc. Et Al

January 11, 2022

**[printout - raising]**                                    Page 19

**printout** 71:2
**prior** 24:15 26:1
27:24 33:17 38:21
40:16 44:5 45:20
51:7 69:11 71:4
71:11,24 131:12
131:24,24
**privileged** 17:22
87:10
**privy** 87:25 97:11
100:11 123:25
134:14,23
**probably** 6:10
21:7 38:12 66:16
76:20 81:22 93:7
116:13 127:15
**problem** 4:10
47:22 99:17
**procedure** 79:17
79:21,23 80:1,2
145:9
**procedures** 22:5
22:16
**proceeding** 17:16
141:1,19,23 143:9
**proceedings**
141:11
**process** 69:7 70:2
116:19,20
**produce** 44:19,24
49:15 59:8 88:2,3
88:10,11,13 99:24
136:9
**produced** 21:2
49:25 57:1,12,13
102:17 108:22
136:11,20,24
140:1 141:20
143:3,7
**produces** 44:13

**producing** 44:17
136:14
**product** 102:24
**production** 44:3,6
44:13 49:16 55:4
56:15 57:9 61:15
61:21 89:20 90:3
90:7,23 91:5,13,18
91:23 92:3 93:14
100:7 136:7,18
138:3 139:22
140:1 143:3,8,9,10
144:17
**professional** 17:4
38:21 39:13
141:13 142:24
**profit** 42:16 45:24
47:2 62:20 63:6
85:11,13,23 86:1
87:8,15 88:5
92:15 93:3,6,14,25
96:4,6,10,15
105:13,19 106:14
110:9,13,25 111:9
112:8 114:24
115:3 121:16
132:16 137:2,20
138:17
**profitability** 71:12
85:1,3 110:4
129:8 130:16
135:1
**profitable** 70:3
89:9,16 112:18
116:11 129:2,5
134:11,20 135:22
136:2 138:11
**program** 12:22
51:12,22 52:4
55:11 73:8 121:6

**programmers**
51:3,22 53:14,17
56:5 57:1
**progress** 42:20
**progression** 31:4
42:24 67:12,13
**prohibited** 141:17
143:11
**prohibitions** 141:8
**projection** 70:12
71:4 72:2,8
**projections** 72:10
72:12,15,18,22
73:6,23
**promoted** 43:1,4
43:19,23 67:17,20
68:7,13,14 98:23
99:5
**promotion** 32:17
68:2
**pronounced** 4:18
**properly** 46:2,17
47:7
**protect** 60:7
**protected** 141:23
141:24
**provide** 69:12,13
74:16 141:16
**provided** 69:11,15
107:20 115:23,24
**public** 146:23
**published** 135:7
**pull** 75:12 104:4
111:23 112:1
129:13
**pulling** 104:6
112:13
**purchase** 34:7
50:11,13
**purchased** 32:3
33:8

**purchasing** 33:11
39:7 50:18
**purpose** 69:19,21
136:14
**purposes** 54:6
62:4 139:24
**pursuant** 145:8
**pursue** 14:23
15:20
**pursued** 43:14
**pursuing** 13:12
**pursuit** 12:18
**purview** 120:17
**put** 20:13 56:2
62:15 96:12 123:7
**putting** 140:6

| q |
| --- |

**qualify** 60:1
**quarterly** 94:1
**question** 5:12 6:21
6:22 7:13 8:3,5,9
8:13 10:23,24
11:10,23 17:21
27:1 28:20 41:2
76:1 79:3 88:11
94:7 105:4 113:8
124:11 128:18
**questions** 7:14,19
7:22,23,25 21:8
139:24 140:11
141:20 142:11
143:4
**quick** 104:5
**quit** 119:1

| r |
| --- |

**r** 142:1
**raise** 4:11 5:5
98:23 99:5
**raising** 10:10

Jason M Obradovich                                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[ran - reporting]**                                            Page 20

**ran**  40:9
**random**  22:22,24
**range**  108:5
**rate**  30:10 42:8
  51:11
**reached**  37:6
**read**  5:22 6:4
  27:23,25 28:2
  110:20 112:25
  113:4,4,7,12 125:2
  144:6 145:3
**ready**  4:4
**reaffirmation**
  23:17
**real**  104:4
**realize**  111:7
**realized**  48:6 50:5
**really**  93:18 100:4
  112:25 118:11
  123:2 135:9
**reason**  7:10 43:6
  103:23 118:11
  136:17 145:19
  146:1
**reasonably**  139:25
**reasons**  110:2
  145:12
**recall**  13:22 14:8
  16:21 19:3 21:18
  21:20,21 25:8
  26:13 36:22 37:8
  37:16,16 43:10
  44:1 45:18 46:20
  69:9 70:18,23
  72:7,24 83:20,25
  88:4,17 90:12
  91:1,14 92:6,11
  93:15,16,17,18,21
  94:11 97:23
  122:21 123:1,3,8
  124:20,25 125:1

**receipt**  58:21
**receive**  33:8 43:9
  47:21 49:1
**received**  66:18
  91:2 136:16
**receives**  141:19
  143:13
**receiving**  71:4
  90:21,25
**recess**  67:7 127:22
**recipient**  22:25
**recognize**  22:2
**recognizing**  45:7
**recollection**  31:17
  124:16 136:14
**reconnaissance**
  125:7,10
**reconnected**  36:18
**record**  8:11,21
  30:13 44:9 49:12
  50:10 55:15 56:13
  65:8,10 66:8 67:9
  102:7 105:23
  116:25 127:24
  139:18 140:7
  141:11,12,20
  142:14
**recorded**  142:7
**recruiting**  69:17
  71:8
**recruitment**  68:23
  69:1
**reduced**  142:12
**reed**  86:25 115:23
  115:24 122:10
  135:21
**refer**  61:10 62:2
  66:10
**reference**  23:14

**referenced**  3:22
  7:19 88:18 129:10
  129:14 130:1
**referencing**  84:18
  84:22 119:20
  129:25 130:15
**referred**  36:5
  47:15 85:22
  104:19 128:5,15
**referring**  15:15
  55:12
**reflect**  8:12 66:19
  122:15
**reflecting**  45:23
**regard**  6:15 77:9
**regarding**  80:5
  124:1
**regardless**  72:11
**region**  49:1 121:25
  134:11,20 135:1
  135:22
**region's**  49:6
**regional**  3:11
  26:25,25 51:23
  79:13 82:22 83:8
  100:2 103:7
  110:11 119:24
  128:2 132:15,22
**regionals**  82:7,9
  134:10
**regions**  50:1,2
  85:1,3 86:5 110:5
  129:2
**registered**  142:24
**regularly**  107:3
**regulations**  141:5
**relate**  23:6
**related**  9:6 27:11
  28:1 104:8 105:16
  122:18 126:10
  143:9

**relating**  141:23
**relation**  132:22
**relationship**  36:14
  39:13,14 107:8
  141:11 143:11
**relative**  142:17,19
**relatives**  9:3
**remember**  11:17
  14:2 42:25 44:23
  44:25 71:25 72:20
  83:1,6,13 98:12
  123:2 136:11
**remote**  1:12 2:1
**remotely**  1:23 4:1
**removed**  49:17
**rent**  55:8 56:18,19
  58:9,13,17
**repeat**  80:21
**repeating**  137:13
**rephrase**  8:5
**replace**  52:3
**replicate**  60:24
**report**  40:13,14
  81:24 93:23 94:21
  108:18,22 109:8
  110:3,9 111:16,24
  112:1,3 115:24,25
  116:12,18 117:24
  118:8 136:8,10,11
  141:12
**reported**  1:20
  40:21 50:17 88:14
  90:18 102:7 118:9
  119:7,8
**reporter**  3:23 4:11
  6:1,14,20 11:25
  141:1,2,6,9,21,22
  142:24 143:5,7
**reporting**  108:2
  132:15 141:5,16

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**reports**  40:14 90:6
93:22 94:1,10,11
94:13,17 105:9
109:1,18,25 110:6
111:20 116:3,5,8
116:16,16,17
130:19 143:13
**repository**  141:24
**representations**
141:3
**represents**  143:3,5
**reproduce**  88:20
**request**  25:16
74:21 143:9,14
**requested**  10:21
25:13 38:8 44:17
44:23 74:19
136:19
**required**  13:8
**reserve**  5:11
**reserved**  140:13
144:6
**resignation**  117:15
**resigned**  117:13
118:19
**respect**  129:3
**response**  6:16,23
7:2 17:21 124:6,8
**responsibilities**
35:16 51:10
**responsibility**
31:18
**responsible**  42:1
133:6
**responsiveness**
5:12
**rest**  66:25
**result**  48:5 62:17
64:10 105:20
106:12 128:3

**resulting**  124:2
128:14
**resume**  36:23 37:2
37:7
**retail**  35:15 61:22
61:23 62:7,15
63:7,7
**return**  106:8
**returned**  144:11
144:14
**returns**  49:21
63:14 106:4,4
**reveal**  17:22 87:10
126:5
**revealing**  17:23
**revenue**  46:3,17
47:7,10,17,25 48:1
48:6 49:9 57:14
59:13 60:2,2,5,6,7
85:10,12,23,25
87:7 92:15,20
93:2,5,20 94:25
96:6,9,10 102:9
105:12,18 106:13
**revenues**  59:21
**review**  74:18
102:24 141:2
144:6
**reviewed**  19:8
77:12 116:23
**reviewing**  69:21
**rick**  37:8,12,22
38:9,20 39:1
40:12 41:9,14
87:3 88:19 90:1
97:5 118:9 119:5
119:13,14
**rick's**  40:9
**right**  4:12 5:2,15
5:22,23,24 6:9
7:18 8:15,20 9:3,8

10:6 12:4 13:20
14:2 15:18 16:6
19:13,23 20:11
21:18 32:1,6,7,24
34:11 36:2 37:14
38:4 41:19 42:9
42:23 44:5 45:19
50:11 53:1,7,13,19
54:2,8 55:11
56:22 57:18 58:8
58:23 59:7,20
60:8,12 61:7,18,25
62:6,11,14,19
65:13 66:23 67:2
69:12 70:21 71:21
72:11,15,18,22
75:8 79:19 80:12
81:7 83:25 87:5
88:24 89:12 92:18
92:25 97:19 99:20
100:14 101:8
102:22 105:10
106:6 107:14
108:21 109:7
110:2 111:6,15,20
112:3,12 113:12
114:6,9,18 115:11
116:14 118:19
120:5,11 121:2
125:6 129:12
130:13,24 131:12
140:9 144:6
**road**  2:8
**rocking**  4:6
**role**  31:2 33:17
34:11,13 35:19
39:4 40:8,9,18,22
41:1,17,18 43:24
51:8 62:25 63:3
66:20 67:19 68:20
68:23,25 70:1

99:15,23 133:4,8,9
133:14
**roles**  31:8,11
32:16
**rolling**  3:16
108:16 112:4
**room**  66:25
139:15
**roswell**  144:18
**rough**  45:8
**roughly**  14:20
**rpr**  1:22
**rsa**  1:22
**rude**  7:2
**rule**  11:21 145:8
**rules**  6:10 8:16
141:4 145:8
**run**  71:3 72:2,8,9
72:12,16
**running**  88:9,13
88:16

**s**

**s**  3:6
**saddleback**  9:23
**sales**  26:15 39:5
40:20 87:1
**salesperson**  39:2,3
**san**  12:14 13:18
16:18
**sarbanes**  14:25
**save**  73:25 74:2,8
**saying**  6:12,13
12:1 22:4 72:9
140:2
**says**  6:13 76:23
110:18,23 113:7
130:6,23
**scan**  112:23
**schedule**  3:11
18:14 24:20 76:13
76:15,16,18 77:4,7

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 169 of 175
Jason M Obradovich                    January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[schedule - southeast]                                    Page 22

77:8,12 78:9
**scheduled** 27:11
**scheduling** 24:20
**school** 28:21,23
**scott** 16:8,10 68:3
99:8 106:20
119:18
**scratch** 50:18
**screen** 6:19 75:20
108:1 109:11
113:10 117:9
**scroll** 75:25 110:7
**seal** 144:12
**search** 74:10,15
**searched** 74:9
**second** 21:6,11,14
23:22,23,25 40:23
41:10 46:10
103:25 104:21
128:17
**secondary** 16:20
29:9,20,20,23 30:1
35:17 53:4,6
**seconds** 38:12
**section** 77:9,13,14
77:20
**sections** 141:6,7
**see** 6:18 20:19
46:19 75:18,19
76:22 77:5 103:11
107:25 108:7,15
110:10,13,21,22
111:8 112:21
113:9 114:11,11
114:12 115:16,19
115:19 127:20
130:11 131:2,9
**seeing** 70:23
112:10 123:8
131:24

**seen** 28:5 75:22
76:9,14,16,18,21
77:8,14 78:7
116:12 134:5
**sees** 48:1
**selected** 13:3
**sell** 33:17
**selling** 30:16
**send** 22:4,23 30:9
93:11 144:12,17
**sender** 19:12
**sending** 93:12
**sends** 94:9
**senior** 31:4,6 50:2
**sense** 7:5 128:10
**sent** 19:1,15,17,24
20:2,18,24 21:14
21:24 22:19 25:12
37:2,7 51:23
90:11,13,18 93:17
94:1,11 116:1,7,8
134:9,15,19,21
**sentence** 22:24
**separate** 61:16
103:13
**september** 29:4,6
**sequence** 47:1
**series** 7:13
**services** 141:16
143:13
**servicing** 60:19
61:17,24 62:3,11
62:22 63:1,6,11
65:15,24 66:1
138:5,7,10,17
**sets** 116:15
**shading** 113:1
**share** 75:14
122:11
**shared** 75:20
101:17

**sheet** 30:10 33:10
51:11 145:17
**shift** 83:19
**shifting** 122:18
**short** 21:17 66:25
127:13
**shorthand** 15:11
**shortly** 34:18
**show** 90:7 93:20
93:24 112:17
138:14
**showed** 129:7
134:10,19,22
136:3,3 137:2,5,15
137:19 138:17,18
**showing** 90:21
111:1
**shown** 71:20
134:25
**shows** 131:6
**shutting** 32:2
**side** 85:7
**sides** 48:12
**sign** 5:23 6:4 80:13
80:25 81:1,18,23
144:6
**signature** 81:25
140:13 142:23
144:2,15
**signatures** 80:17
80:21 81:2 82:2
**signed** 80:16 81:19
144:9,11,14
**signing** 119:15,18
**silo** 32:13
**similar** 51:19 78:4
135:12
**sir** 8:25
**sit** 53:19 64:21
68:21 98:11

**six** 27:17 29:14
32:18 81:22
**slightly** 108:14
**slow** 4:7
**slowly** 76:13
**smaller** 10:20
**socialize** 138:22
138:24
**software** 44:9
50:13 52:3,11,16
54:6 55:18 56:4
57:13 64:11,20,23
**sold** 33:24 47:18
47:21
**solely** 141:14
**solutions** 1:7
**something's**
135:18
**sorry** 14:6 16:13
20:25 23:10 34:15
42:3 64:6 65:4,17
74:25 80:21 84:12
86:19 108:14
113:16 117:9,10
125:9 131:19
132:11 133:12
137:4
**sort** 10:1,17 17:3
51:3,13 75:25
84:8
**sounds** 127:20
**source** 26:10
28:10 101:13
123:14,20 124:1
**sources** 101:14,15
101:17
**southeast** 3:17
54:23 111:17,19
112:18 114:3
116:11 121:24
134:11,19 135:1

Case 1:20-cv-04981-CAP   Document 102   Filed 04/28/22   Page 170 of 175
Jason M Obradovich                     January 11, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[southeast - system]                                    Page 23

135:22

**speak** 51:19

**spearman** 1:4 2:22
5:19 20:14 23:6
25:18,25 27:21
71:17 75:23 76:15
76:17 77:18 78:4
78:10,18 79:14
82:5 120:8,14,21
121:9,13,24 122:2
132:2 134:6,19

**spearman's** 25:20

**specific** 54:15
55:13 77:13 79:10
105:4 121:24
122:2 141:18
143:12

**specifically** 25:22
45:6 76:12 78:2
95:6 99:13 116:6
141:4

**specifics** 36:22
92:12 123:17
126:7,12,19

**speculate** 91:16

**speculating** 21:9
26:16 53:12 83:4
86:10 91:2 92:23
133:3

**speculation** 52:13
85:18 86:17 95:2
98:15 103:2 118:7

**spell** 88:22

**split** 59:16 119:4

**spoke** 26:21
124:17

**spoken** 132:4

**stair** 93:6

**standards** 120:13

**stands** 44:10

**start** 9:4 15:3
35:13 41:21 52:8
137:8,9

**started** 29:6 31:1
35:4 43:12 44:3

**starting** 28:19

**starts** 93:5

**state** 8:21 9:4,7,12
9:13,15 26:11,16
81:4 141:9 142:4

**stated** 29:3 49:9
133:4 142:8

**statement** 3:16
61:3 108:2 112:4
112:6,10,17
135:24 136:2
137:2,2,4,14,17,19
138:14 145:12

**statements** 31:9
35:20 42:13,17
43:21,25 44:3
47:3 49:20,23,25
69:10,19,20,22
101:24 112:13
119:15 128:4
142:11

**states** 1:1 5:20

**stating** 48:5

**stature** 78:4

**stay** 34:22 35:6
139:12,16

**stayed** 29:12

**stenographically**
142:7

**step** 11:24 33:25
50:12 103:25

**steps** 93:6

**stick** 21:25 22:4

**sticking** 23:5

**stipulation** 5:11

**stop** 100:4

**stopped** 99:25

**stops** 133:14

**stored** 102:4
123:10

**street** 2:15

**strike** 100:15

**structure** 30:15
70:3 71:10,11,13
121:22

**subbed** 53:25

**subcontractor**
141:10,15

**subject** 19:12,23
87:12

**submission** 106:7

**submit** 54:24
63:18

**submitted** 3:7,22
63:23,24 141:21
141:22 143:5,6

**subscribed** 146:21

**subsequent** 38:7

**subsidiary** 31:24
32:10

**substance** 124:5,8
126:5 145:10

**subtotal** 93:10

**sued** 17:10,10

**suit** 125:21

**suit's** 125:23

**suite** 2:9,16 144:18

**superior** 27:13

**supervising** 31:12

**supervision**
142:13

**supplemental**
145:15

**supplementary**
140:1

**support** 101:5

**sure** 4:23 6:15 7:3
10:16,16 14:7
18:10 22:12 23:24
29:3 30:12 31:1
41:4 46:9 56:8,23
56:24 61:16 64:7
64:17 65:18 69:2
73:19 76:4,6
89:12,13 101:2,3
111:1 113:11
118:23 137:12
139:1

**surprise** 92:2,5

**surprised** 22:22
132:13,18

**swear** 4:5

**switched** 29:12

**sworn** 4:14 142:9
146:21

**synonymous**
29:24 130:21

**synopsis** 21:22

**system** 30:12 42:7
44:9,9 45:9,23
46:13,16,19 47:6
47:10,17 48:5,16
48:19,22,24 49:10
49:12 50:4,10,14
50:16 54:7,9
55:14,15,19,22,24
55:24 56:2,13,16
56:19,21,22,25
57:10,16,19,24,25
58:2,3,11,12,15,21
58:21,22,22,25,25
59:7,20 60:13,16
60:18 62:8,14,16
62:21 63:19 64:3
64:24,25 65:3,7,7
65:10,14,22 66:4,5

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[system - told]**

Page 24

66:7,8,8,12,21
93:4,8 94:15
96:13 102:6
105:23 108:19
109:10 116:4
**systems**  50:19
51:11 104:3

**t**

**t**  3:6 88:23 142:1,1
**table**  7:13
**take**  6:20 7:15
11:25 13:6,11,12
13:14,21 14:19
16:24 17:1 34:24
43:8 45:8 48:14
50:12 56:17,18
57:2,6 58:8 66:24
67:13 71:13 99:14
99:22 103:20
119:13 127:13,19
**taken**  5:18 12:20
13:24 15:2 28:3
46:15,24 48:15
52:9,10 57:16
58:10 66:3,6 67:7
127:22
**takes**  57:5,7
130:19
**talk**  25:6 79:6,13
83:20 107:24
121:13
**talked**  26:18
106:20 109:3
**talking**  54:23 59:4
71:22 74:25 83:7
130:16
**tax**  14:1 49:21
63:14 64:1,8,14,14
105:20 106:3,4,8
**taxes**  64:10,25
65:8,11 105:25

**team**  44:2,6,16
46:23 47:3 48:21
50:6,14,17,22
57:13 58:16 59:7
59:21 62:8,22
63:20 64:4,12
65:22 66:21 90:21
96:13 97:17
100:18,20 101:9,9
102:13,25 103:9
103:13,14,15,17
103:18,20,24
119:7,8 120:18
122:14 132:21
136:20
**team's**  58:24 66:4
**technology**  7:21
40:11
**tell**  7:1 8:4 10:24
11:6 18:17 35:9
42:23 67:22 75:1
79:19,22 84:21
85:4 94:2 102:1
115:14 117:14,21
117:21 127:3
128:24 130:13
142:9
**tells**  47:20
**temporary**  74:5
**tennessee**  121:10
**tenure**  16:9 81:16
**term**  131:13,23
132:3
**terminated**  118:24
**terms**  18:14 26:3
30:11 42:10,11
69:22 70:9,16,17
70:25 71:7,23
72:3,5 73:12,14
122:14 129:12
141:15

**terrible**  49:4
**territory**  121:10
**testified**  17:12,14
125:3
**testify**  8:2 11:4
120:6 135:21
**testimony**  17:15
17:17 78:17
104:22 106:16
128:19 142:15
145:3,11
**thank**  24:2 67:5
108:11,16 129:19
**thereto**  142:11
**thing**  7:12 21:6
34:17 92:6 139:20
**things**  22:13 32:15
63:10
**think**  10:3,9,10,12
10:15 13:23 18:3
23:13,17 32:4,6,25
36:7 40:11 41:1,2
44:10 54:14 67:15
68:15,16 74:21
82:20 84:21 92:6
92:9 98:19 105:4
107:17 109:20
124:10 127:15
132:20 134:14
135:13 139:11
**thinking**  60:6
**third**  113:15,16,16
**three**  27:14 29:16
34:6 53:7,10
61:25 83:18 86:24
87:18 88:18 89:23
92:9 131:6
**threshold**  130:9
**thresholds**  22:1
**ties**  9:11,13

**time**  7:9 9:17 12:1
14:22 15:7,24
16:4,10 18:20
22:10 26:21 27:10
31:16 32:14 34:4
36:5,14 37:2,3
38:17 39:2 40:9
40:20 41:3,10
42:14 43:19 44:1
49:1 53:3,9,11,22
57:22 58:18 63:14
64:5 65:17 67:3
68:17 76:19 82:5
82:17 83:4,17
86:11,12 87:1
88:4 89:11 96:24
115:8 134:4
139:11 141:19
143:12 144:14
**timeline**  44:2
**times**  76:20
**timing**  46:20
**title**  31:13,17,19
41:16 43:6,7,9
53:2 66:18 68:11
89:3 112:14
**titles**  31:4,11
112:13
**today**  6:13,16 7:4
7:6,9,19,22 8:2
11:4,19 15:11,14
16:4 17:19 18:11
18:25 25:6 29:2
40:22 53:19 64:21
68:21 131:12,24
139:20 140:10
**told**  36:20 41:6,14
43:15 51:3 57:15
59:14 72:1,12
73:18 86:11,15
97:14

Veritext Legal Solutions

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[ton - want]**

Page 25

ton   13:4
top   46:25,25 70:19
   93:5,20 111:24
   120:23 121:1
   122:21 137:16
topic   27:15 83:14
   87:11
total   14:9 22:21
   61:25 76:20 93:10
   115:6
touch   74:24 75:2
tournament   9:18
trades   47:12
trading   42:2,3,4,5
traffic   12:5 18:12
   105:8
transaction   33:21
transcribed   6:14
transcript   7:4
   141:19 142:7
   143:3,4 144:7,12
   144:14 145:3
transcripts   141:19
   141:23
transition   34:14
   34:17 45:5
transmitted   49:24
   59:10 60:9 70:21
travis   2:4 21:1
   23:18 66:24 108:4
   112:24 127:18
   129:17
trial   5:13
trick   7:23
trip   7:24
true   141:20
   142:13 143:4,6
truth   142:9,9,10
truthfully   11:4
try   11:24 70:11
   74:3

trying   7:2,23,23
   7:24 14:21 15:20
   18:14 48:20
   108:15
tuesday   136:16,18
tustin   1:13 4:1
   56:18 58:9
twice   27:18
two   19:1 23:19
   29:13 41:6,8,10
   46:8 48:20 60:17
   61:21 109:20,23
   116:15 128:14
   139:4,10
type   50:24 55:13
   91:3 112:6
types   77:19 78:5
   78:17
typewriting
   142:12
typically   30:1 62:2
   116:8

**u**

u   88:23
ucsd   13:2
uh   6:17,17 47:19
   64:16 82:11 97:22
   111:25 116:22
   132:19
uhs   6:17
ui   135:17
ultimate   30:8
   62:16 75:10 112:8
ultimately   30:15
   32:11 37:20 58:24
   69:3
umbrella   34:3,24
uncommissioned
   125:15
undergraduate
   13:12

undersigned   145:2
understand   8:3,4
   8:7,10,15 11:14
   15:15 56:23,24
   71:9 76:7 134:18
   140:3
understanding
   8:12 28:8,11,13
   123:16 132:6
   138:15
understands   48:1
understood   5:1
   12:2 25:16 140:8
union   35:4,7,11,20
   36:4
unique   7:7,7
united   1:1 5:20
university   12:13
   12:21 13:17 16:17
update   94:15
updated   94:19
uploaded   116:24
   141:24
use   5:13 15:13
   19:19 45:17 48:18
   111:11 132:17
   145:14
user   50:25 51:2
   94:17
usual   5:11

**v**

v   2:5
vaguely   79:4
vendors   39:21
venture   18:19
   27:16 45:4
verbal   6:16,23 7:1
   7:2
verbatim   141:12
verified   80:16

veritext   141:10,16
   143:3,5,11 144:10
   144:17
veritext.com
   143:10
version   113:4
   135:7,12
versus   5:19 40:19
   64:24 71:10,20
   74:7 87:8 93:2
   95:8 96:6,9,10
   105:18
vice   31:5,5,6,6
   41:17 53:3 66:20
   67:14 89:3,4,5
view   112:10
viewing   106:13
violations   12:5
virginia   121:10
volatility   49:18
voluntarily   125:15
vp   41:24 42:21
   53:6
vs   1:6

**w**

wait   7:15
waive   5:23
walk   12:10 15:5
   28:18 29:1 30:24
   61:18
want   4:5,22 5:6
   6:9 7:3 17:21 18:8
   18:9 19:6 35:13
   56:6,23,24 60:1
   61:16 64:17 75:21
   76:4,6,12 83:19
   89:11 101:1 110:4
   117:1 124:4
   127:14,17 139:20
   139:23

Jason M Obradovich

January 11, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**wanted** 14:23 15:2
15:20 99:14,21
100:6
**wanting** 22:12
32:12
**warehouse** 33:10
**watch** 139:2
**watching** 117:24
**water** 130:17,17
**wave** 5:4
**way** 8:6 11:6 20:9
23:6,15 36:18
47:16 48:2,17,18
52:7 57:15 58:8
93:4,6,25 107:11
107:11 110:15,17
112:24 128:3
134:24 135:13
**we've** 16:17 23:19
52:22 113:11
**web** 135:17
**welcome** 108:12
**went** 8:16 9:17
22:20 28:23 36:24
37:19 100:12
101:23
**westle** 2:20
**whatever's** 137:23
138:2
**whatsoever** 28:1
77:25
**wholesale** 35:14
**wife** 9:10 38:14,17
38:20,23,25 39:22
139:4
**wise** 73:14 129:22
133:25
**wish** 6:25
**witness** 4:1,5
17:25 20:17 22:8
23:10 26:12 27:9

28:15 65:6 76:8
84:12,16 85:19
86:19,23 87:13
94:5 95:4 103:4
131:19 132:11
133:12 143:7
**witnesses** 141:22
**word** 21:20,21
42:4 44:12 45:17
64:13 82:13
112:10 132:17
**words** 112:14
**work** 50:23 55:9
69:4 119:10 125:7
125:10 127:8
138:23,25
**worked** 29:9,13,14
31:25 38:25
**working** 32:13
33:21 61:3 117:3
**works** 23:2 47:17
88:12 120:24
121:2
**wrong** 10:10 41:22
44:12 53:5 89:4

**x**

**x** 3:1,6

**y**

**y'all** 15:11 18:17
48:22
**y'all's** 18:16
**yeah** 4:20 5:9 8:23
10:9 11:11,13
14:4 20:9 21:4,5
21:24 35:11 39:6
39:6 42:5,10 46:2
46:11,25 47:16
50:8,17 62:2
71:16 73:9,16
75:13 77:21 85:14

85:19 86:10 91:8
95:24 97:10,16
101:19 104:13
108:7 111:6 113:6
114:12 115:21
116:15 118:13
120:10 126:14,22
131:1,15 133:3
134:8 138:15
139:16
**year** 10:21 12:15
43:1,11,11 45:18
58:18 83:2 89:9
89:16,17 90:20
132:16
**yearly** 94:2
**years** 13:24 14:20
15:19 16:19 29:11
29:11,16 30:17,22
30:25 31:15,21
32:10,13 45:20
83:16,18 136:10
139:6
**yep** 5:3

**z**

**zero** 9:13 78:21
**zoom** 5:2 142:8

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreging transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.