Page 147

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                        ATLANTA DIVISION

4      GINA SPEARMAN,

5              Plaintiff,          Case No:

6      vs.                          1:20-cv-04981-CAP

7      BROKER SOLUTIONS, INC.,

8      d/b/a NEW AMERICAN FUNDING,

9              Defendant.

10

11

12                      DEPOSITION OF

13                    JASON OBRADOVICH

14                        Volume 2

15                     March 29, 2022

16                     11:03 a.m. EST

17            TAKEN BY REMOTE VIDEO CONFERENCE

18            LaRita J. Cormier, RPR, CCR-2578

19

20

21

22

23

24

25

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 148

1                      INDEX OF EXHIBITS

2     Exhibit No.        Description                    Page

3     Plaintiff's

4        Exhibit 5   NAF_0000743, Kevlar, Rolling P&L   179

5                    10/18-12/18

6        Exhibit 6   NAF_0000733, Complete OLA P&L,     187

7                    Jan-Nov '18

8        Exhibit 7   NAF_0000734, Southeast             194

9        Exhibit 8   NAF_0000735, 2018 Regional         198

10                   Summary

11       Exhibit 9   NAF_0000736, Q3-Q4 2018            201

12       Exhibit 10  2018 Post Lock Concessions         203

13       Exhibit 11  NAF_0000738, SE Discretionary      206

14                   and Marketing Expenses

15       Exhibit 12  NAF_0000739, OLA Division CM       212

16                   breakdown 2018 (bps)

17       Exhibit 13  NAF_0000774, spreadsheet           216

18       Exhibit 14  NAF_0000781, Rolling P&L, 01/18    218

19                   to 09/18

20       Exhibit 15  NAF_0000782, 2017                  221

21       Exhibit 16  NAF_0000783, Confidential          222

22                   spreadsheet

23       Exhibit 17  NAF_0000784 Spreadsheet            224

24       Exhibit 18  NAF_0000789 Spreadsheet            225

25       Exhibit 19  NAF_0000795 Spreadsheet            226

Page 149

1   APPEARANCES OF COUNSEL:

2   On behalf of the Plaintiff:

3           TRAVIS C. HARGROVE, ESQUIRE

4           MARYBETH V. GIBSON, ESQUIRE

5           N. NICKOLAS JACKSON, ESQUIRE

6           THE FINLEY FIRM, P.C.

7           3535 Piedmont Road

8           Building 14, Suite 230

9           Atlanta, Georgia  30305

10          Thargrove@thefinleyfirm.com

11          Mgibson@thefinleyfirm.com

12          Njackson@thefinleyfirm.com

13

14  On behalf of the Defendant:

15          HENRY M. PERLOWSKI, ESQUIRE

16          Arnall Golden Gregory LLP

17          171 17th Street, NW

18          Suite 2100

19          Atlanta, Georgia  30363

20          Hperlowski@agg.com

21

22  Also present:

23          Ken Block, NAF General Counsel

24          Andrew Westle, NAF Senior Counsel

25

Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 150

1                      JASON OBRADOVICH,

2       having been first duly sworn, was examined and

3       testified as follows:

4                        EXAMINATION

5       BY MR. HARGROVE:

6            Q.   Good morning, Mr. Obradovich.  I'm Travis

7       Hargrove.  We met before via Zoom.  I just want to

8       make sure before we get going that you can see and

9       hear me okay.

10           A.   Yeah, it's pretty clear.

11           Q.   Great.  So if there's a technology issue,

12      just raise your hand and let me know.  We're going

13      to be looking at several documents today, and you're

14      familiar with how to use the Exhibit Share from last

15      time?

16           A.   I don't know.  I don't remember, to be

17      honest.  I don't remember if it was working right or

18      how it works, so I might have to just double-check.

19           Q.   Okay.  We'll upload, and I'll make sure you

20      can see the exhibit before I ask you questions about

21      it, obviously.

22                So this is a continuation of your

23      deposition.  Are you still familiar with all the

24      ground rules that we went over the first time, or do

25      we need to refresh any of those?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 151

1         A.   I think I'm pretty familiar.

2         Q.   All right.  Perfect.  And let's just try to

3    remember to make sure that if one of us is speaking,

4    if we wait until the other one is finished speaking

5    so that the court reporter can take down everything

6    that's said.  Fair enough?

7         A.   Yes, absolutely.

8         Q.   All right.  So after we initially began

9    your deposition, there were some documents that were

10   produced with this case in the way of spreadsheets

11   and different documents, and what I would like to do

12   is just go through those documents and find out what

13   you may or may not know about those documents.  But

14   first I want to ask you, were you involved in a

15   document production on behalf of NAF subsequent to

16   your deposition in this case?

17        A.   Do you mean in terms of was I seeing or

18   part of the production of those documents?

19        Q.   Correct.

20        A.   No, I was not.

21        MR. PERLOWSKI:  Mr. Obradovich, I want to

22   instruct you not to reveal any privileged

23   communications in that regard.  Subject to that, you

24   may answer.  I think you just did.

25        A.   Yeah.  Just to repeat, I was not involved

Page 152

1   in the production of them.

2   BY MR. HARGROVE:

3       Q.  Okay.  Did you see the documents that were

4   produced before they were produced?

5       A.  Did I see the documents produced before

6   they were produced?  No.  I don't know exactly what

7   you mean by that.  Would you mind just clarifying?

8       Q.  All right.  Well, you know, I'll show you

9   and go through each of the documents, and we can

10  confirm that.  That would be a better way to do

11  that.

12          Did you do anything to prepare for the

13  continuation of your deposition today?

14      A.  Yes.

15      Q.  And if you could tell me what it is that

16  you did.

17      A.  I had a brief phone call with our counsel,

18  who's on the line, yesterday.

19      Q.  Okay.  And I don't want to know the context

20  of that call.  You said brief.  Less than 15

21  minutes?

22      A.  Yeah, approximately.

23      Q.  All right.  Did you look at any documents

24  to prepare for the continuation of your deposition

25  today?

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 153

1        A.   I did.

2        Q.   All right.  Can you tell me what the

3   documents you looked at, to the best of your

4   recollection, to prepare for this deposition were?

5        A.   It appeared to show, you know, the P&Ls for

6   specific regions, you know, the Southeast.  I

7   believe there was another document related to the

8   P&L for all the regions for a particular time

9   period.  And then I believe there was another

10  document that was related to the costs that the

11  company had incurred during a certain time period.

12       Q.   All right.  Do you remember what that time

13  period was that you were looking at documents from?

14            MR. PERLOWSKI:  Object to the form.

15  BY MR. HARGROVE:

16       Q.   You can answer.

17       A.   There was documents related to 2018, '19.

18  I believe one of the documents might have had

19  information from 2017, maybe even late 2016.

20       Q.   All right.  The P&Ls for southeast region

21  that you looked at, were those -- do you recall what

22  year those were for?

23       A.   I believe it was for the time period

24  stated, late 2016 and 2019.

25       Q.   Okay.  Do you know whether those P&Ls that

Jason  Obradovich                         March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 154

1    you looked at were produced in this litigation?

2         A.   I do not.

3         Q.   Okay.  The P&Ls that you reviewed for all

4    of the regions -- well, let me go back.  First, the

5    P&L from the Southeast Region, was that a Kevlar

6    document or was that from some other software?

7         A.   I would need to look again to refresh my

8    memory.  I believe some were directly from Kevlar,

9    and there may be a derivation but not directly from

10   Kevlar.

11        Q.   Okay.  How would a document be a derivation

12   from Kevlar?  Can you help me understand that?

13             MR. PERLOWSKI:  Object to the form.

14        A.   Yeah.  The document that might be a

15   derivation of Kevlar may be -- you know, I did not

16   produce it, but it looked like it was produced prior

17   to being uploaded into Kevlar, so in my mind they're

18   probably the exact same numbers, it's just one did

19   not come directly from Kevlar.

20   BY MR. HARGROVE:

21        Q.   Okay.  And my understanding from the first

22   part of your deposition was that the Kevlar numbers

23   were actually input from the AMB system?  Was that a

24   correct understanding?

25        A.   AMB generates the data.

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 155

1          Q.   Uh-huh.

2          A.   But it's not just copied and pasted

3      directly into Kevlar.

4          Q.   Okay.  How does the information get into

5      Kevlar?

6          A.   The information is prepared and then

7      reviewed, approved; and then once approved, then

8      it's uploaded into Kevlar.

9          Q.   And the documents that you were looking at

10     might have been documents that were before they were

11     loaded into Kevlar or something that was pulled out

12     of Kevlar?

13             MR. PERLOWSKI:  Object to the form.

14         A.   I would need to look at the documents again

15     to be a hundred percent certain, but I would

16     presume, based on at least from my recollection,

17     that they were the same documents that were uploaded

18     to Kevlar with the same information.

19     BY MR. HARGROVE:

20         Q.   All right.  Once a document is uploaded

21     into Kevlar, is it -- you said it wasn't a copy and

22     paste into Kevlar, so I want to understand, does

23     Kevlar do some computations based on the data that's

24     put into it?

25         A.   There's no calculations within Kevlar, so

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 156

1   once the information is put into Kevlar, Kevlar is a

2   display of that information.

3        Q.  So Kevlar is just more of a repository for

4   information that comes from other sources that

5   presents it in a readable fashion?

6        A.  Yes.  I would consider it to be called the

7   user interface.

8        Q.  All right.  And what is the utility, if you

9   have the information and Kevlar doesn't do any

10  calculations, what is the utility of having Kevlar

11  as opposed to just the data input into Kevlar?

12       A.  There are certain security features within

13  Kevlar, so it would look at your user ID and what

14  authorities you have to view what information.

15       Q.  Okay.

16       A.  Another document would just be all the

17  information available to any user that, you know,

18  could be e-mailed it.

19       Q.  So the document from which the information

20  was put into Kevlar, in what software program is

21  that document?

22       A.  That's in Microsoft Excel.

23       Q.  Okay.  And who prepares that Microsoft

24  Excel document?

25       A.  The calculation portion is done by a woman

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 157

1    by the name of Kristin Ankeny.

2         Q.   Okay.   And where does Ms. Ankeny get the

3    numbers that she makes those computations with?

4         A.   The information comes from many different

5    sources, so AMB would be one source.

6         Q.   Okay.

7         A.   Our origination system would be another

8    source.

9         Q.   And tell me about that origination system?

10        A.   So Encompass is the origination system, our

11   system of record.

12        Q.   And what data goes into Encompass?   From

13   where does it come?

14        A.   Encompass information is originally

15   entered, so all of the loan information, for

16   example, would be entered by a loan officer.   So

17   that's how they originate loans.

18        Q.   All right.   So there's Encompass, there's

19   AMB.   Are there other sources that Kristin would put

20   into this Excel document that gets uploaded into

21   Kevlar?

22        A.   Correct.

23        Q.   What are the other sources?

24        A.   Those are the two sources.

25        Q.   Okay.   Got you.   All right.   The Excel

Jason Obradovich                               March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 158

1    document, other than this Ms. Ankeny, who's

2    inputting the information, who has access to that

3    Excel document before it goes into Kevlar?

4         A.   I would be speculating, but I believe

5    herself, myself, and a gentleman named Jim Muth.

6         Q.   And what is -- we're talking to Mr. Muth

7    later today, but tell me what Mr. Muth's role is in

8    getting the information from -- between -- role, if

9    any, in information from Encompass and AMB going

10   into the spreadsheet that then goes into Kevlar?

11        A.   Mr. Muth pulls the information from AMB so

12   it can be put into Kevlar.

13        Q.   Okay.  And then he gives that information

14   to Ms. Ankeny, who inputs it; correct?

15        A.   Correct.

16        Q.   And then -- and that spreadsheet, you know,

17   Mr. Muth and Ms. Ankeny, is that a spreadsheet that

18   you have access to before it goes into Kevlar?

19        A.   I have access to it, yes.

20        Q.   Okay.  Is it a password-protected

21   spreadsheet?

22        A.   Yes.

23        Q.   And who's in charge, who's the gatekeeper

24   of that password?

25        A.   Ms. Ankeny is.

Jason Obradovich                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 159

1        Q.   Okay.  And has she been given instructions,

2    that you're aware of, as to who can have that

3    password?

4        A.   I believe I gave her instructions that only

5    certain individuals are to have a password to that

6    spreadsheet.

7        Q.   Who did you instruct her should have the

8    password to that spreadsheet?

9             MR. PERLOWSKI:  Object to --

10       A.   The same individuals -- myself, herself, as

11   well as Jim Muth.

12   BY MR. HARGROVE:

13       Q.   When Mr. Frommert was employed as CFO, did

14   he have a password to access the spreadsheet before

15   it went into Kevlar?

16       A.   I can't say a hundred percent that he

17   wasn't given the password, but to my knowledge, he

18   did not have a password.

19       Q.   Did he ever ask you for the password?

20       A.   He did not.

21       Q.   Are you aware of him asking anyone else for

22   the password?

23       A.   I am not aware of him asking anyone else

24   for the password.

25       Q.   Okay.  What about the Arvielos, did they

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 160

1   not have the password for the Excel spreadsheet that

2   got uploaded into Kevlar?

3        A.   They did not.

4        Q.   And did you ever discuss with them, as the

5   top executives in the company, why they would not

6   have the password to those spreadsheets?

7        A.   I did not discuss that with them, no.

8        Q.   Did -- did you ever have any discussions

9   with them where they would even know the existence

10  of those spreadsheets?

11       A.   I don't believe we've ever had a discussion

12  around these spreadsheets that prepared the P&Ls.

13       Q.   Okay.  Aside from being uploaded into

14  Kevlar, is there any other use for those

15  spreadsheets?

16       A.   Not to say for certain.  Excel is a very

17  different utility than Kevlar, so there are uses for

18  it that might be something our department uses but

19  not necessarily production.

20       Q.   And are the spreadsheets maintained before

21  they're uploaded -- the spreadsheet that gets

22  uploaded into Kevlar, is that something that's

23  maintained on NAF's computer system?

24       A.   I believe the spreadsheet is on a network

25  drive.

Jason  Obradovich                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 161

1      Q.  Okay.  And that's not deleted once the

2   information is uploaded into Kevlar, is it?

3      A.  I don't believe the spreadsheet is ever

4   deleted.

5      Q.  All right.  And we're referring to "the

6   spreadsheet."  Is there literally only one

7   spreadsheet, or is it an Excel file with multiple

8   sheets in it?

9      A.  It is an Excel file with multiple sheets on

10  it.

11     Q.  Is that information manually entered into

12  Kevlar, or does Kevlar somehow interface with Excel

13  to upload the information to its appropriate area?

14     A.  Encompass is a system where you can pull

15  data into a spreadsheet, and so then it is copied

16  over.

17     Q.  Okay.  Are these spreadsheets that upload

18  into -- are those spreadsheets that are uploaded

19  into Kevlar, are those quarterly, monthly, yearly?

20  What's the time increments for those spreadsheets?

21     A.  The upload time period is monthly.

22     Q.  Monthly?  Okay.  So each month there's a

23  series of spreadsheets in an Excel file.  Ms. Ankeny

24  uploads that information from Excel into Kevlar.

25  And Kevlar is the document of record from which

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 162

1    people access the P&Ls; is that accurate?

2         A.   That's correct.

3         Q.   And are the -- were the Arvielos shown the

4    spreadsheets, or are they only shown the Kevlar

5    information?

6         A.   I don't believe they've ever been shown the

7    spreadsheets.

8         Q.   And when did Kevlar come to be?

9         A.   I'd only be guessing, but I believe 2015 or

10   2016.  I can't recollect the exact year.

11        Q.   And as I recall from the first part of your

12   deposition, you were involved in the creation of

13   Kevlar; correct?

14        A.   Correct.

15        Q.   All right.  Obviously you're not a software

16   programmer, but you told the software programmers

17   the functionality you were looking for?

18        A.   Correct.

19        Q.   All right.  The Kevlar -- and this is very

20   helpful because we're going to look at these

21   documents.  I'm going to understand better what

22   we're talking about.  So the Kevlar reports, is that

23   just a reporting, or is there functionality within

24   Kevlar like there is in Excel?

25        A.   Kevlar does not have the same functionality

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 163

1   as Excel.

2        Q.  Did it have any functionality, or is it

3   literally just information dumped, for lack of a

4   better word?

5            MR. PERLOWSKI:  Object to form.

6        A.  It has some functionality, but not to the

7   limit that Excel does.

8   BY MR. HARGROVE:

9        Q.  Describe for me some of the functionalities

10  that Kevlar has.

11       A.  As it pertains to P&Ls, you can select a

12  particular division or a particular region or a

13  particular branch.

14       Q.  So Kevlar has the ability -- for instance,

15  we used the Southeast as an example.  You can go

16  into Kevlar and say, okay, profitability for the

17  southeast region in a certain month in 2018, that

18  would be something you could pull off of Kevlar?

19  Correct?

20       A.  Correct.

21       Q.  All right.  In these reports in Kevlar

22  about profitability, are all of the corporate

23  margins -- let me go back before we get to that

24  because I want to make sure this is -- that I've put

25  the information out there first.

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 164

1          My understanding is there were different
2     types of corporate margin that factored into the
3     profitability of NAF; is that correct?
4          A.   There are different layers of corporate
5     expenses that go into the calculation and
6     profitability.
7          Q.   All right.  And those are referred to as
8     CM1, CM2, and CM3; correct?
9          A.   Correct.
10         Q.   All right.  And refresh my recollection
11    what the -- what each of those encompassed, to the
12    best of your knowledge.
13         A.   I don't recall the exact definition of each
14    at this point, because that was so long ago.  But
15    generally speaking, corporate costs were broken into
16    payroll and non-payroll type expenses.
17         Q.   Uh-huh.
18         A.   I don't recall each piece and how it was
19    individually defined.
20         Q.   All right.  With regard to all -- is one of
21    those CMs an all-encompassing CM, or do you need all
22    three of them put together to get to the total
23    expense?
24              MR. PERLOWSKI:  Object to the form.  You
25    can answer.

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 165

1      A.  If you were to look at CM3 profitability,
2   you would see the bottom-line profit.
3   BY MR. HARGROVE:
4      Q.  And did you ever have any discussions with
5   Rick Arvielo about CM3 being the bottom-line profit
6   figure?
7      A.  I think we have.  I don't recollect an
8   exact time or example when I did.
9      Q.  We talked in your prior deposition about
10   the fact that Rick had been looking at top-line
11   revenue as opposed to bottom-line profit in 2018.
12   Do you recall that discussion that we had?
13         MR. PERLOWSKI:  Object to the form.  You
14   can answer.
15      A.  I don't recall discussing if Rick looked at
16   CM1 versus CM3 or not.  I have to go back and look
17   at my deposition.
18   BY MR. HARGROVE:
19      Q.  Okay.  If -- well, as we sit here today --
20   your prior testimony will stand on its own; but as
21   you sit here today, do you -- well, let me ask you
22   this:  Do you recall discussing there was a mistake
23   made about 2018 profitability based on someone
24   looking at top-line revenue as opposed to
25   bottom-line profit?

Jason Obradovich                                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 166

1           A.   Yeah.

2                MR. PERLOWSKI:  Object to form.

3           A.   I recollect discussing miscommunication

4      around certain individuals looking at CM1 versus CM3

5      profitability.

6      BY MR. HARGROVE:

7           Q.   All right.  And you told me that the bottom

8      line always, the CM3 profitability is on every

9      Kevlar report; correct?

10          A.   Correct.

11          Q.   Okay.  It's not possible to produce a

12     Kevlar profitability report that doesn't have that

13     bottom line CM3 figure; correct?

14          A.   For the relevant --

15               MR. PERLOWSKI:  Object to form.

16          A.   -- period, correct.

17     BY MR. HARGROVE:

18          Q.   There was an objection being made, so I

19     didn't hear your answer.

20          A.   For that time period, that is correct.

21          Q.   And you say "for that time period."  Which

22     time period is that?

23          A.   Up until 2018, if you are -- through the

24     end of 2018, if you were to produce something out of

25     Kevlar, you could not produce something without CM3

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 167

1    profitability being displayed.
2         Q.  Okay.  So the information from Kevlar for
3    2018 that would have been disseminated to company
4    executives always had the CM3 bottom line; correct?
5         A.  At that time, yes.
6         Q.  All right.  When did that change?
7         A.  I don't recall the exact time period, but
8    as a follow-up discussion from 2018, to eliminate
9    confusion over whether or not individuals should
10   look at CM1, CM2, or CM3, it would determine that we
11   should only display one CM and not have each of the
12   individual components of CM1, CM2, and CM3.  So
13   Kevlar was programmed to only show bottom-line CM.
14        Q.  So before, in 2018, you could see CM1, 2,
15   and 3, but 3 was always the bottom line; correct?
16        A.  Correct.
17        Q.  All right.  And after 2018, there isn't --
18   now it's only CM3 on there; correct?
19        A.  It says CM.  It does not say CM3.
20        Q.  Okay.  Were you involved in the decision to
21   have CM1, 2, and 3 in the Kevlar system?
22        A.  I was.
23        Q.  All right.  And what was the -- were there
24   discussions with others about CM1, CM2, and CM3
25   before that was input into the Kevlar system?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 168

1        A.   Yes.

2        Q.   With whom were those discussions had?

3        A.   I believe the discussions were had with

4    myself, Kristin Ankeny, Jon Reed, Jan Preslo, and I

5    don't recall or not, but I believe Christy Bunce.

6        Q.   All right.  Were either of the Arvielos

7    involved in those discussions?

8        A.   Not to my knowledge.

9        Q.   When you had those discussions with the

10   individuals you identified, did you explain to them

11   what CM1, 2, and 3 would encompass?

12       A.   Yes.

13       Q.   All right.  And although you didn't recall

14   those exact definitions today, in your discussions,

15   did you make it clear that CM3 was the only

16   all-encompassing of the three?

17       A.   Yes.

18       Q.   And what was the reasoning that you

19   explained to them as to why there would be each of

20   these different CMs listed in Kevlar on P&Ls?

21       A.   In my mind, the necessity of having each

22   individual was to understand where each corporate

23   cost was coming from, whether it be through hiring

24   other people or costs that the company had to bear

25   that were beyond, you know, the normal hiring

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 169

1    practices.  And so I believed it to be necessary to

2    be able to differentiate those costs when looking at

3    a P&L.

4        Q.  Okay.  And those are reports that came off

5    of Kevlar that had -- let me go back.

6            Did they agree with the decision, the folks

7    you had the discussion with you identified earlier,

8    did they agree with the decision to have each of the

9    CMs listed on the Kevlar reports?

10       A.  I believe there was general consensus that

11   it was acceptable.  I don't know necessarily their,

12   you know, percent of agreement.

13       Q.  While all three CMs were on there, did

14   anyone express to you confusion about why there were

15   three different profitability levels?

16           MR. PERLOWSKI:  Object to the form.

17       A.  I don't -- I can't recall if there was.

18   BY MR. HARGROVE:

19       Q.  After you had the discussion and explained

20   what those different levels of corporate margin

21   were, did any of the individuals you discussed it

22   with express confusion or ask you questions further

23   about what those terms meant?

24           MR. PERLOWSKI:  Object to the form.

25       A.  You know, the definitions were determined

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 170

1   back probably in 2015, so I don't recall the exact
2   specifics around that.
3   BY MR. HARGROVE:
4       Q.  Did anyone that you had the discussion
5   about the various levels of CM express confusion to
6   you about what the actual bottom-line profit on a
7   Kevlar statement was?
8       A.  I don't think there was any confusion
9   around CM3 profitability and what that meant.
10      Q.  Okay.
11          MR. PERLOWSKI:  Travis, I'm getting a bit
12  of an echo.  It's like when you're asking questions,
13  it's kind of breaking up a bit.  I don't know what
14  your audio is connected to.
15          MR. HARGROVE:  Hang on.
16          (Off-the-record discussion.)
17  BY MR. HARGROVE:
18      Q.  Kevlar.  So going back to Kevlar, the
19  division that my client, Ms. Spearman, was involved
20  with was the retail division of NAF; correct?
21      A.  Correct.
22      Q.  Did Kevlar address only the retail
23  division, or did it address other divisions as well?
24      A.  We had two divisions within NAF that are
25  both retail.  One is the call center, and one is the

Jason  Obradovich                         March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 171

1   distributed, and Kevlar, you know, handled both of

2   them.

3        Q.   So the call center and the distributing are

4   the divisions of retail, and the distributing would

5   be the division of retail that Ms. Spearman was

6   involved in; correct?

7        A.   She was involved in the distributed retail.

8        Q.   Distributed, I'm sorry.  All right.  So any

9   Kevlar report that encompasses what Ms. Spearman was

10  involved with, would that be a separate report for

11  the distributed division, or did those figures also

12  include the call center?

13       A.   Any reporting related to her region would

14  be specific to that region, and Kevlar would report

15  that region specifically.

16       Q.   And the corporate margin allocations, how

17  is it determined what part of the corporate

18  expenses -- I think you gave an example of, you

19  know, the building that you were sitting in during

20  the first part of your deposition, there's an

21  expense associated with that.  How is it determined

22  what portion of those expenses are attributed to, by

23  way of example, the southeast region?

24       A.   All corporate expenses, once they're

25  determined which corporate expenses are to be

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 172

1  allocated, I believe we divide them by total units.
2      Q.  And what is a unit?
3      A.  A unit would be a one unit of funding, but
4  I believe, and I would have to double-check for that
5  time period, I don't know off the top of my head, we
6  will exclude certain units, like second liens or
7  brokered loans that, you know, were not -- wasn't
8  necessary to hit them with a corporate expense.
9      Q.  So the larger -- I just want to make sure I
10  understand this.  The southeast region has -- and
11  I'm using small numbers here, bear with my example
12  because I know it's a lot more.  But if the
13  southeast has ten loans and the northeast has three
14  loans, then the southeast is going to be allocated
15  more corporate margin because it was more productive
16  and had ten loans as opposed to the northeast having
17  four?
18      A.  Correct.  I would use the terminology
19  "corporate expense," but yes.
20      Q.  All right.  So expense -- so the more --
21  the more volume a region has, the larger percentage
22  of corporate margin is going to be attributed to
23  that region; is that accurate?
24      A.  That's correct.
25      Q.  All right.  Was there ever any change in

Jason Obradovich                         March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 173

1  the way that these corporate margin expenses were

2  allocated from the time Kevlar was introduced in

3  2016, roughly?

4       A.  I do not believe there was any changes.

5  However, I believe for 2019, when Mr. Frommert

6  engaged with the regionals, they created a new

7  agreement on what those corporate expense

8  allocations would be.

9       Q.  All right.  And was that new agreement

10 different than the per-unit allocation?

11      A.  I don't recall the exact numbers, but I

12 believe Mr. Frommert had discussions with each

13 regional manager and decided to go as a percentage

14 of volume, in terms of a percentage, times the total

15 loan amount, as opposed to a dollar allocation per

16 loan funded.

17      Q.  So in figuring out the corporate margin,

18 and figuring out the corporate margin prior to 2019,

19 was any factor other than the number of units

20 considered in determining how that was allocated?

21      A.  I don't believe so.

22      Q.  Okay.  Did other divisions of NAF -- by way

23 of example the call center, did it take some of the

24 corporate margin, or was it all put on the

25 distributed department?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 174

1      A.   The allocations for the call center was

2   nearly identical to the distributed retail.

3      Q.   And how was it calculated for the call

4   center?

5      A.   Just like distributed retail, the call

6   center was divided by total number of units.

7      Q.   Okay.  And there's the retail division, add

8   those two, and then my understanding is NAF had a

9   servicing division as well; am I correct?

10      A.   That's correct.

11      Q.   The servicing division, is any of the

12   corporate margin allocated to the servicing

13   division?

14      A.   For corporate expenses, all those servicing

15   personnel or people related to the servicing

16   operation are expensed to the servicing operation.

17      Q.   So the servicing operation does not absorb

18   any of the corporate margin that the call center and

19   distributed division pay; correct?

20      A.   If it is not a servicing-related expense,

21   that is correct.

22      Q.   So the servicing department, is it -- does

23   it benefit at all from the corporate -- from the

24   items that are paid for our corporate margin such as

25   the building where you're sitting, et cetera?

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 175

1      A.   The servicing expense pays for rent for the

2   facilities that they utilize but not for facilities

3   that they do not utilize.

4      Q.   All right.  But the distributed division

5   does contribute money towards, for instance, the

6   corporate office; correct?

7      A.   Correct.

8      Q.   Why doesn't the servicing division also

9   distribute -- or contribute money towards, by way of

10  example, the corporate office?

11     A.   The P&Ls are designed to cost allocate

12  based on originated loans, and the servicing

13  department does not originate loans.

14     Q.   Okay.  Does the servicing department, are

15  there costs to corporate associated with the

16  servicing department?

17     A.   I can't say for certain, but the general

18  belief and the understanding is any direct servicing

19  expenses would be costed to the servicing operation.

20     Q.   So Mr. Arvielo is the CEO of the company;

21  correct?

22     A.   Correct.

23     Q.   All right.  And in his role as CEO, does he

24  oversee only the retail division, or does he also

25  oversee the servicing division?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 176

1          A.   I don't know how to answer that.

2          Q.   Well, all right, let me go back to this.

3      Are they all under one company?  Is NAF one company

4      that has two divisions, or is there an entirely

5      separate entity that operates the servicing

6      division?

7          A.   I believe everything rolls up under Broker

8      Solutions.

9          Q.   All right.  So Broker Solutions has

10     executive employees, amongst them yourself; correct?

11         A.   Correct.

12         Q.   Do any of those executive employees perform

13     any work related to the servicing division?

14              MS. GIBSON:  Travis, you froze.  You need

15     to repeat that question.

16              MR. HARGROVE:  All right.

17     BY MR. HARGROVE:

18         Q.   Do any of the executives for NAF perform

19     work for the benefit of the servicing division?

20         A.   I can't say what work they perform or don't

21     perform, but I would presume some level of work.  I

22     just couldn't state the percentages.

23         Q.   But none of the salaries of those executive

24     employees are allocated towards the servicing

25     division; correct?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 177

1        A.   Correct.

2        Q.   And in preparing the P&Ls, were there any

3   discussions when you were creating Kevlar about

4   whether some of the corporate costs should be

5   allocated to the servicing division?

6        A.   The only discussion I recollect is that the

7   servicing division should cover all direct servicing

8   expenses.

9        Q.   All right.  And the retail division would

10  cover its expenses and then a pro rata share of the

11  corporate expenses based on loan volume; correct?

12       A.   Correct.

13       Q.   As far as revenue of NAF, percentage wise,

14  how much of the revenue comes from the servicing

15  division as opposed to the retail division?

16       A.   I couldn't say for certain.  I don't have

17  any of those numbers in front of me, so I would only

18  be guessing.

19       Q.   All right.  Do you know a ballpark figure,

20  recognizing -- recognizing it's a guess?

21          MR. PERLOWSKI:  Objection.  Asked and

22  answered.

23       A.   Yeah.  I just -- I wouldn't know off the

24  top of my head.  Every year is very different.

25  BY MR. HARGROVE:

Jason  Obradovich                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 178

1        Q.   Well, what's the last year that you know

2   of?

3        A.   I never have looked at our revenue as a

4   servicing versus origination in terms of

5   percentages, so I really would only be guessing.

6        Q.   Okay.  Let's --

7            MR. HARGROVE:  MaryBeth, can you upload

8   0000743, which I think was an exhibit to his prior,

9   the first part of his deposition?

10           MS. GIBSON:  Because these are

11  spreadsheets, I cannot put a label on them.  So

12  we'll just note that 743 is Exhibit -- do you want

13  to start over, or do you want to resume from where

14  we were?  Let me look at where we left off with

15  Jason's.  This will be Exhibit 5.

16           MR. HARGROVE:  We can just start over then

17  with 1 for today and note for the record that any

18  pleadings would have to be clear.

19  BY MR. HARGROVE:

20       Q.   So this was not part of the new production.

21  I'm just putting this in, Mr. Obradovich, for

22  reference because we talked about it before and to

23  refresh your recollection.

24           This is a Kevlar P&L statement for October

25  to December of 2018; correct?

Page 179

1        A.   I don't see anything on my screen.

2             MR. PERLOWSKI:  Let's go off the record for

3    a second.

4             (Off-the-record discussion.)

5             (Recess 11:47 to 11:58 a.m.)

6    BY MR. HARGROVE:

7        Q.   So do you have Exhibit 1 up in front of you

8    now, NAF_0000743?

9        A.   Yes.

10       Q.   And again, I put this in just to refresh

11   your recollection.  This is one of the Kevlar --

12   this is an example of a Kevlar report; correct?

13       A.   All right.  It opened right away to the

14   exhibits from the last deposition.

15            (Off-the-record discussion.)

16            MS. GIBSON:  I moved it to the January 11th

17   folder, Exhibit 5.

18            (Plaintiff's Exhibit 5 marked)

19       A.   Okay.  I can see it now.

20   BY MR. HARGROVE:

21       Q.   And so this, we looked at it in your

22   prior -- the beginning part of your deposition back

23   in January, this is one of the Kevlar -- this is an

24   example of a Kevlar report; correct?

25       A.   Correct.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 180

1        Q.  All right.  And this is from the southeast
2    region, October of 2018 to December 2018; correct?
3        A.  Correct.
4        Q.  And in order to access this, someone would
5    have to log on; is that correct?
6        A.  Yes, they would have to have permissions in
7    Kevlar to have access.
8        Q.  All right.  And if whoever it was involved
9    in the Kevlar and had access, would there be a
10   record made of that within Kevlar?
11       A.  I believe the record -- I have some
12   feedback.  I don't know --
13       Q.  I heard feedback as well.
14           (Off-the-record discussion.)
15       A.  I believe a record is made when someone
16   logs in.
17   BY MR. HARGROVE:
18       Q.  And you referred to -- so when a record, is
19   there an admin log that shows when someone logs in
20   or when they generate Kevlar reports?
21       A.  I can't say for certain when they log in.
22   I believe when they log in there is a record.
23       Q.  Is a record made within Kevlar of when
24   reports are created?
25       A.  I believe there is -- and, you know, it's

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 181

1   only partial speculation.  I believe there's a

2   record on the user ID and the report name that

3   they're accessing.

4        Q.   Okay.  How about when the report is

5   actually created?  Is there a record made of when

6   the report is created?

7        A.   I don't know if it's when the report is

8   created or when they access the page to create the

9   report.  I don't know.

10        Q.   All right.  Are edits -- once reports are

11   created, are there ever any edits made to any of the

12   reports?

13        A.   Are you referring to -- I'm not sure.

14        Q.   Well, let me be clear.  So once a Kevlar

15   report is generated, can that -- can it be altered

16   within Kevlar or would the underlying Excel data

17   have to be altered and then a new report generated

18   by Kevlar?

19        A.   You could not edit a report in Kevlar.  You

20   would need to put it into Excel and then edit it.

21        Q.   All right.  So is there any -- if there are

22   any changes made, a new Kevlar report would have to

23   be generated for a time period using changed Excel

24   values that you uploaded in; correct?

25        A.   Correct.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 182

1      Q.  It is not possible to, within Kevlar

2  itself -- for instance, if you realized there was an

3  error in data entry, to change it in Kevlar, there

4  would have to be an Excel file; correct?

5      A.  Correct.

6      Q.  And any spreadsheets that are entered, any

7  spreadsheets that go into Kevlar, is there a record

8  kept of what spreadsheets were used to generate a

9  report within Kevlar?

10     A.  I can't say for certain, but I believe so.

11     Q.  All right.  Tell me what the process --

12 describe for me, if you have those spreadsheets and

13 you want to create a Kevlar report, what --

14 mechanically, what do you do?

15     A.  The, you know, kind of the high level

16 synopsis of -- or creating the data that goes into

17 Kevlar is to pull all of the origination information

18 from Encompass, as well as all the expense

19 information from AMB.

20     Q.  Okay.

21     A.  There's calculations that are done within

22 that spreadsheet.

23     Q.  Uh-huh.

24     A.  And then once that information is

25 completed, there is a review process and approval

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 183

1  process and then upload process.

2       Q.  And the upload is simple as you click on

3  the Excel file and then it populates Kevlar?

4       A.  I believe, and I'm not involved in this

5  part of the process, is that the spreadsheet that

6  generates all the information creates -- creates a

7  separate spreadsheet that is uploadable into Kevlar,

8  but there are programmers that do that upload

9  process.

10      Q.  Are the underlying spreadsheets ever

11  altered or amended after a Kevlar report is

12  generated?

13      A.  I can't recollect an example where that was

14  the case.

15      Q.  The spreadsheets uploaded into Kevlar,

16  would they remain password-protected?

17      A.  To my knowledge, yes.  I'm just not

18  involved in that process.

19      Q.  And that's Ms. Ankeny and Mr. Muth involved

20  in that process?

21      A.  Yes.  I believe Ms. Ankeny oversees it.  I

22  don't know if Mr. Muth is involved in that portion

23  of it.

24      Q.  All right.  Going back to the issue of the

25  corporate margin, why is none of it allocated to

Page 184

1    servicing?

2              MR. PERLOWSKI:  Object to the form.  Asked

3    and answered.

4         A.   In my estimation, it's common practice for

5    servicing expenses to be always direct expenses.

6    And to give you further clarification of what I mean

7    by that is NAF does not have to service its own

8    loans.  NAF can choose to use a subservicer.  And so

9    if you were to compare a subservicer's costs versus

10   NAF's costs, you would want to, for apples-to-apples

11   comparison, look at the NAF servicing expenses,

12   direct servicing expenses versus a subservicer's

13   direct servicing expenses.  So if NAF were to use a

14   subservicer, you would not be allocating NAF's costs

15   to the subservicing costs, you would only look at

16   the subservicing costs.

17   BY MR. HARGROVE:

18        Q.   And that's -- so that is the reason that --

19   you said "common."  That's the common industry

20   practice to not allocate any corporate expenses to

21   the servicing division?

22             MR. PERLOWSKI:  Objection to the form.

23   Speculation.

24             THE WITNESS:  Sorry.

25             MR. PERLOWSKI:  Go ahead.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 185

1        A.   It is my understanding that common industry

2   practice is to look at the servicing operation on

3   its direct servicing expenses.

4   BY MR. HARGROVE:

5        Q.   What other companies are you aware of that

6   did it that way?

7        A.   I can't say specific names.  It's done

8   general observations and conversations around the

9   servicing industry and how they expense and how they

10  report their expenses.

11       Q.   The spreadsheets that go into Kevlar, you

12  said Scott Frommert didn't have access to those;

13  correct?

14       A.   To my knowledge, he did not.

15            MR. PERLOWSKI:  Object to form.  Asked and

16  answered.

17  BY MR. HARGROVE:

18       Q.   Did he have access to the revenue figures

19  for NAF?

20       A.   Did he have access to the revenue figures

21  for NAF?

22       Q.   Yes.

23       A.   I believe Mr. Frommert had access to AMB,

24  which would contain the revenue numbers for NAF.

25       Q.   All right.  Did he have access to the

Jason Obradovich                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 186

1    underlying data that would go into AMB?

2         A.   I can't say for certain what his access was

3    for the numbers that went into AMB, and I would say

4    it would depend if he had access to, or log-ins for

5    Encompass.

6         Q.   Do you know whether he asked for the

7    underlying revenue data from Rick Arvielo?

8              MR. PERLOWSKI:   Object to the form.

9         A.   Can you rephrase or repeat the question?

10   I'm sorry.

11   BY MR. HARGROVE:

12        Q.   Sure.   Do you know whether Mr. Frommert

13   asked Mr. Arvielo for the underlying revenue data?

14        A.   I don't know if he had asked Mr. Arvielo

15   that question.

16        Q.   Did he ask you for the underlying revenue

17   data?

18        A.   I don't recall him asking for that

19   information.

20        Q.   Did he ever ask for any information from

21   you that you would not give him?

22        A.   No.

23             MR. PERLOWSKI:   Travis, you left the

24   deposition open to address new discovery matters and

25   that's it.   We're not rehashing everything that you

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 187

1    could have asked him back in January.  If you want

2    to ask him questions about the new productions and

3    new information, you can do that.

4              MR. HARGROVE:  Are you instructing him not

5    to answer the question?

6              MR. PERLOWSKI:  He already answered the

7    question, but I'm telling you our willingness to

8    make him available will cease if the questions are

9    not focused on what the deposition was left open

10   for.

11             MR. HARGROVE:  Part of what I'm doing in

12   pulling these -- anyway, I'm asking him questions

13   related to data.  We're about to go over a bunch of

14   documents, so I'm just trying to figure out the

15   universe and who had access to the data.

16   BY MR. HARGROVE:

17       Q.  All right.  Let's go ahead and look at

18   Exhibit -- these are now in the January 11th folder.

19             MR. HARGROVE:  Can you upload NAF 733,

20   MaryBeth?

21             (Plaintiff's Exhibit 6 marked)

22       A.  I see Exhibit 6 in the folder.

23   BY MR. HARGROVE:

24       Q.  Let me know when you've got that up.

25       A.  Yes, I have it up.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 188

1        Q.   This is one of the subsequently produced

2    documents, and my question for you is, what is this

3    document?

4        A.   This appears to be a P&L for -- is it --

5    well, it's not produced in Kevlar, it looks like, so

6    it looks like it's a P&L for the OLA division from

7    January to November 2018.

8        Q.   All right.  So if it's not in Kevlar, where

9    did it come from?

10       A.   I can't say where this report came from.

11   I -- my presumption would be it came from Excel.

12       Q.   Do you know who created this report?

13       A.   I do not.

14       Q.   Is there a way that I could go in that

15   system and find out when this report was created?

16       A.   Not to my knowledge.

17       Q.   Do you know, is this one of the reports

18   that would be uploaded into Kevlar?

19       A.   Kevlar doesn't -- you don't upload reports

20   into Kevlar, you upload data.

21       Q.   All right.  So data from Excel goes into

22   Kevlar; correct?

23       A.   Correct.

24       Q.   All right.  And if this is a -- if this is

25   a spreadsheet from Excel that didn't get uploaded

Jason Obradovich                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 189

1    into Kevlar -- let me go back.

2           Have you ever seen this document before

3    today, Exhibit No. 6?

4       A.   I don't recall if I saw this yesterday

5    during our document review; but prior to that, I

6    don't recall if I've seen this document before or

7    not.  It's from 2018.

8       Q.   Have you ever seen this type of document

9    with similar information to Exhibit 6?

10      A.   I'm very familiar with all the line items

11   on this report.  I have not -- it's the format of

12   the report I just don't recall.  So I don't recall

13   if this was created in Excel or this was a download

14   from Kevlar and they changed a couple line items or

15   formatting.  It's hard to say.

16      Q.   So if it's a download from Kevlar, how

17   would lines be changed, since Kevlar doesn't allow

18   changes to it?

19      A.   Once items are put into Excel, Excel

20   doesn't have any security features to prevent any

21   type of manipulation, whether it be formatting or

22   numbers changing.

23      Q.   Okay.  So this -- this is not a Kevlar

24   document, then; correct?

25      A.   It does not appear to be, but it may be the

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 190

1   same information that is in Kevlar.  I can't say for

2   certain.

3       Q.  So if the information is not in Kevlar, if

4   it's on Excel, information can be changed, you

5   testified earlier, but the only way to change a

6   Kevlar report is to actually change the underlying

7   Excel doc; correct?

8       A.  Correct.

9           MR. PERLOWSKI:  Object to the form.

10  Mischaracterizes testimony.  You can answer.

11  BY MR. HARGROVE:

12      Q.  Is this the format, is the Excel

13  spreadsheet -- so this document, Exhibit 6, is not

14  something that would be uploaded into Kevlar;

15  correct?

16      A.  Can you repeat that question?

17      Q.  Sure.  Exhibit 6 would not have been

18  uploaded into Kevlar from Excel; correct?

19      A.  You would not upload a report into Kevlar.

20      Q.  All right.  So this -- you don't know who

21  created this or where these numbers came from;

22  correct?

23      A.  I don't recall.

24      Q.  Have you ever been involved in creating

25  reports like this, like Exhibit 6?

Jason  Obradovich                 March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 191

1        A.   I've been involved in creating reports that

2    look very similar to this report.

3        Q.   All right.  Do you create those reports in

4    Kevlar or in Excel?

5        A.   For reports that I create?  I more

6    oftentimes than not use Excel.

7        Q.   And why do you choose to use Excel rather

8    than Kevlar for the reports that you create?

9        A.   For my purposes, I like the functionality

10   of Excel better than the functionality within

11   Kevlar.

12       Q.   In creating reports, what functionalities

13   do you need in creating reports as opposed to using

14   what's already been reported in Kevlar?

15       A.   When I look at reports, it might be for

16   very different reasons.  I may choose to compare

17   branches that are in different regions or compare

18   only two regions versus each other.  Kevlar is

19   designed for the regional managers to be able to

20   look at their region and their branches.

21       Q.   So if you're comparing the regions in

22   Kevlar, do you have to actually enter raw data into

23   Excel to generate a report, or is that already in

24   someplace?

25            MR. PERLOWSKI:  Object to the form.

Page 192

1        A.   The data that's in Kevlar is the same data

2   that's in Excel, but Excel has what's -- you know,

3   the functionality in Excel is called a pivot table

4   where it's much faster to manipulate data than you

5   can do in Kevlar.

6   BY MR. HARGROVE:

7        Q.   So if you've seen reports like this in

8   Exhibit 6, have you ever created a report like

9   Exhibit 6?

10       A.   Similar to it, possibly.

11       Q.   Okay.  Walk me through how you would create

12   such report.

13       A.   If I were to create this report, just based

14   on some of the line items on here, the fastest way

15   would be to download it from Kevlar.

16       Q.   So you download the information from Kevlar

17   into Excel, and then you can change data?  Is that

18   correct?

19       A.   I'm not -- I would download it into Excel

20   and change the formatting potentially.  It just

21   depends on what purpose you were downloading the

22   report.  I can't say for certain why someone

23   downloaded it and what their purpose was for

24   downloading it.

25       Q.   So what I'm trying to understand, this

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 193

1    report, these numbers came from somewhere.  Is it --

2    can I download the report from Kevlar and then just

3    change that report to an Excel spreadsheet where I

4    can change the numbers, et cetera?

5         A.  Once you download a report --

6             MR. PERLOWSKI:  Objection.  Form.

7    Speculation.  Go ahead.  Sorry.

8         A.  Once you download a report into Excel,

9    Excel gives you the ability to make any

10   manipulations you want, whether it be color, size of

11   columns, the numeric values, the names that are in

12   each line item, you can -- you know, that is the

13   function of Excel.

14   BY MR. HARGROVE:

15        Q.  All right.  And when this document was

16   produced, you don't have any idea why this document

17   Exhibit 6 was produced in this litigation; correct?

18        A.  No, I don't.  I would only be speculating

19   on why it was produced.

20        Q.  You don't know what this document is

21   intended to show us; correct?

22        A.  Correct.

23        Q.  Okay.

24            MR. HARGROVE:  MaryBeth, if you want to go

25   ahead and upload 734.

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                              Page 194

1              (Plaintiff's Exhibit 7 marked)

2       A.   Okay.  I have the document open.

3    BY MR. HARGROVE:

4       Q.   And we've marked that as Exhibit 7.  And I

5    will ask you if you recognize Exhibit 7.

6       A.   I have a vague recollection of this report,

7    or this NAF, whatever you want to call it.

8       Q.   And what is Exhibit 7?

9       A.   It appears to show the total pricing margin

10   in the southeast, although I don't know for what

11   time period, and compares it to all of the expenses.

12      Q.   Were you involved in the production of this

13   document in this case at all?

14      A.   I have familiar -- it's obviously been a

15   long time since I've seen this document, but I have

16   vague familiarity of its creation.

17      Q.   Tell me what the familiarity you have with

18   its creation is.

19      A.   I believe the intent of this document was

20   to show the total revenue for this particular region

21   versus all the expenses, to show all the different

22   components and to -- I think to create or to be part

23   of the dialogue of the differences between the

24   revenue and expenses.

25      Q.   And when was this document created, to your

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 195

1  knowledge?
2      A.  I would only be speculating, but I presume
3  early 2019 is just my vague recollection of that
4  time period.
5      Q.  Do you know who created this document?
6      A.  I don't recall.  I would presume it would
7  be one of two individuals, if -- if it wasn't
8  myself, which I don't think I was the one to produce
9  it.
10     Q.  Who were the two who you believe it would
11  be other than yourself?
12     A.  It would either be Kristin Ankeny or Jim
13  Muth.
14     Q.  Were you involved in -- this is for the
15  southeast region, it appears, but you don't know the
16  time frame of the document; correct?
17     A.  I don't recall, no.
18     Q.  Okay.  And do you know whether this was
19  shared with my client, Ms. Spearman?
20     A.  I believe the intention to create this
21  document was to share it, but I can't say for
22  certain if it was shared.
23     Q.  Did you have discussions with other ones
24  within NAF about this document?
25         MR. PERLOWSKI:  Could you please repeat

Jason  Obradovich                           March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 196

1    that question?

2              MR. HARGROVE:  Sure.

3    BY MR. HARGROVE:

4         Q.  Did you have discussions with others within

5    NAF about this document that has been labeled

6    Exhibit 7?

7         A.  I believe there were conversations around

8    the want to create a document like this one for

9    conversation with Ms. Spearman or other regionals,

10   but I don't recall which -- which other regions, if

11   it was just for them or not.

12        Q.  Recognizing we don't know the time frame,

13   can you explain to me what this document shows?

14             MR. PERLOWSKI:  Objection.  Asked and

15   answered.

16             You can answer.

17             THE WITNESS:  Okay.

18        A.  Like I said, on the left-hand column, that

19   is the total pricing margin or revenue for the time

20   period and this population of loans.

21   BY MR. HARGROVE:

22        Q.  So the left part, GPM 515 basis points?

23        A.  Correct.

24        Q.  That's what you're talking about?  Okay.

25   All right.  And then walk me through the column to

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 197

1    the left of the bar on the right.

2         A.   Yes.   The intention of the bar on the right

3    is to address all the expense items in relation to

4    that revenue in a, you know, easier-to-view format

5    than typical, you know, numeric values on a

6    spreadsheet.   And so the different columns on there

7    have price exception, sales compensation, branch

8    manager, area manager, region manager compensation,

9    the LM costs.   I believe it says branch salaries,

10   branch expenses, and the corporate margin or

11   corporate costs.

12        Q.   What are LM costs?

13        A.   LM costs are -- LM stands for loan margin,

14   and so LM costs are direct origination expenses,

15   which would include operation expenses.   There are

16   other items on there like Encompass fees, early

17   payoff costs.   I think there are a couple other

18   items that are in there that are smaller.

19        Q.   And what -- where it says two basis points

20   with an arrow, what is that intending to show?

21        A.   I believe it appears, although it's hard to

22   see because this is in black and white and it's

23   small on my screen, but it looks like the difference

24   between the gross profit margin and all the expenses

25   is two basis points.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 198

1        Q.   Meaning a loss of two basis points?

2        A.   Correct.

3        Q.   All right.  And that includes the 63 basis

4    points for corporate margin; correct?

5        A.   Correct.

6        Q.   All right.  And was there ever a change in

7    the way -- was corporate margin never allocated to

8    the servicing division, or was there a change at

9    some point in your time with NAF?

10       A.   It's never been allocated to the servicing

11   division.

12       Q.   Okay.

13            MR. HARGROVE:  Let's go to, MaryBeth, let's

14   look at 735.  Should be Exhibit 8.

15            (Plaintiff's Exhibit 8 marked)

16       A.   Okay.  I have 735 up on my screen.

17   BY MR. HARGROVE:

18       Q.   And can you tell me what is Exhibit 8?

19       A.   I have a vague recollection of this report.

20   It appears to be a summary of all the southeast

21   branches, it states for 2018.  I don't know if that

22   is for the entire year or not.  And it shows all of

23   the different revenue line items.

24       Q.   Do you know when it was created?

25       A.   I do not.  I would presume, given if it is

Page 199

1    for the entire year of 2018, it would have to be

2    February or March of 2019, just as a guess.

3         Q.  So -- but you don't know, it could have

4    been created for this litigation for all you know;

5    correct?

6         A.  I don't think it was created for this

7    litigation.  I believe it was probably created back

8    in 2019.  I recall -- but, you know, we're talking

9    about, you know, 10 percent, like, familiarity with

10   the report.  Just looking at the report itself, it

11   looks like something we might have put together back

12   then, but it's something that, you know, is not like

13   a regular report.  It looks like something that was

14   created for a specific purpose.

15        Q.  All right.  Is this a Kevlar report?

16        A.  It looks like it takes information from

17   Kevlar, but this is not a Kevlar report.

18        Q.  Is it an Excel report?

19        A.  I would presume this was done in Excel just

20   by looking at a couple of the line items on here.

21        Q.  And which line items make you believe that

22   it was an Excel report?

23        A.  The last column says "2019 projected," so

24   that is not something that Kevlar would project.

25   And there are totals at the bottom that state

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 200

1    adjusted volume with 2019 CM target, and then

2    concession tolerances below that.  Those are all --

3    none of that information is written like that or in

4    Kevlar, so that would be -- most likely have been

5    done in Excel.

6         Q.  And you didn't prepare this report;

7    correct?

8         A.  I don't recall if I did or did not.  I --

9    to be honest, for this type of projection, I would

10   think I would be involved, but I just -- I don't

11   recall.

12        Q.  Do you know what the purpose of the

13   preparation of this report was?

14        A.  I don't.  I would only be speculating.

15        Q.  Do you know why this report was produced in

16   this litigation?

17        A.  I do not.  It's the concession tolerances

18   that have me scratching my head.  To put that in a

19   report would mean there was some conversation around

20   them.

21        Q.  Is this a password-protected document?

22        A.  I do not know.

23        Q.  And you don't know if this document, since

24   it was originally prepared, has been altered by

25   anybody; correct?

Jason  Obradovich                          March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 201

```
 1        A.  I do not.

 2        Q.  And my apologies if I asked this already.

 3   Do you know who prepared this document?

 4        A.  I do not know if I was the one that created

 5   this document or not.  I just really do not recall.

 6             MR. HARGROVE:  Let's take a look at 736, if

 7   you can upload that.

 8   BY MR. HARGROVE:

 9        Q.  While we're getting the next document up,

10   were you involved in any meetings where

11   spreadsheets -- these spreadsheets we've looked at

12   or similar documents were shared with my client?

13        A.  Was I involved with what?  I'm sorry.

14        Q.  Were you involved in any meetings where the

15   spreadsheets that we've already looked at, like

16   Exhibit 8, the document Exhibit 7 and the one that

17   may be up there by now, were shown to my client,

18   Ms. Spearman?

19        A.  I was not involved in any conversations

20   around these documents being discussed with your

21   client.  That's not part of my role with NAF.

22        Q.  Okay.

23             (Plaintiff's Exhibit 9 marked)

24   BY MR. HARGROVE:

25        Q.  Exhibit 9 looks like it's up now, and I'll
```

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 202

1    just ask if you recognize Exhibit 9.

2         A.   I'm familiar with the majority of the line

3    items on Exhibit 9.  I don't recall this exact

4    report, but a lot of the data items look familiar.

5         Q.   Is this a Kevlar report?

6         A.   This does not appear to be a Kevlar report.

7         Q.   All right.  And is it an Excel report?

8         A.   It looks like an Excel report.

9         Q.   Do you know where the data came from to go

10   into this Excel report?

11        A.   I do not.  I would be speculating.

12        Q.   Did you prepare this report?

13        A.   I don't believe that I did, although I may

14   have produced portions of it.  I do not recall, very

15   similar to the prior report.

16        Q.   Were you involved in the production of this

17   report to your counsel?

18        A.   No.

19        Q.   All right.  Do you know what this report is

20   intended to show?

21        A.   I would be speculating.  There are

22   certain -- there's one column, which I don't have --

23   I don't know if I can't read it or I just don't have

24   familiarity with it, so I can't say for certain.

25        Q.   Which column is that?

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 203

1        A.   To the far right, I can't tell what that

2   says.  It's like a percent sign, and there may be an

3   "at" sign and an F and a Q.  I can't read that.

4        Q.   That's what it appears to me.  Do you know

5   what percent sign, "at" symbol, FQ means?

6        A.   I would be speculating, and I don't know,

7   but it appears to say that -- like I said, I'm

8   speculating percent that where the loan officer or

9   the branch was earning full compensation.  I'm not

10  sure.

11       Q.   Do you know where this document is

12  contained on NAF's computer server?

13       A.   I do not.

14       Q.   Do you know whether this is a

15  password-protected document?

16       A.   I do not.

17       Q.   Do you know whether it's been altered in

18  any way since it was originally prepared?

19       A.   I do not.

20            MR. HARGROVE:  MaryBeth, if you can upload

21  737, which will be Exhibit 10.

22            (Plaintiff's Exhibit 10 marked)

23  BY MR. HARGROVE:

24       Q.   Do you know what this document is?

25       A.   I have some familiarity with what this is,

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 204

1    or what's on here.

2         Q.   Tell me what -- tell me what that

3    familiarity is.

4         A.   It appears to show all of the post lock

5    concessions for all of OLA versus southeast region

6    for, it states, 2018.

7         Q.   And what is a post lock concession?

8         A.   Once a loan has been locked and confirmed

9    and the borrower has agreed to proceed, there is

10   some amount of price concession that is then given

11   to the borrower after the fact, and this report is

12   showing the amount of that price concession in terms

13   of total loan amount that -- I'm sorry, in total

14   costs in terms of dollars and costs in terms of

15   basis points.

16        Q.   And did you prepare this document?

17        A.   I do not believe that I did.

18        Q.   Do you know who prepared it?

19        A.   I have a strong guess, and that would be

20   Ms. Ankeny.

21        Q.   All right.  And was this -- is this a

22   Kevlar document?

23        A.   This appears to be, based on the data that

24   is on here as something that had come from

25   Encompass, our loan origination system.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 205

1        Q.   Okay.   And so Encompass, are you able to
2    just track reports?
3        A.   Encompass, you are -- there is a reporting
4    functionality where you can pick certain fields and
5    certain time periods and run a report that is then
6    dropped into Excel.
7        Q.   Does Encompass keep a log of when the
8    reports are printed?
9        A.   I do not know if that is the case.
10        Q.   Is Encompass password-protected?
11        A.   Yes.
12        Q.   All right.   So if someone wanted to
13    generate this report in Encompass, they would have
14    had to log on using their password and then click
15    "print" on the -- on a document?
16        A.   You would -- yeah, you would have to select
17    the fields that you wanted and the time period you
18    wanted.
19        Q.   All right.   And you don't know when this
20    document was prepared or when it was printed;
21    correct?
22        A.   Correct.
23        Q.   And you don't know if data has been changed
24    after this report was printed; correct?
25        A.   Yes, I do not know that.

Jason  Obradovich                  March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 206

1          MR. HARGROVE:   738, MaryBeth if you can put

2     that one up.  And that should show up as Exhibit 11.

3          (Plaintiff's Exhibit 11 marked)

4     BY MR. HARGROVE:

5          Q.  And do you know what this document is?

6          A.  It appears to show all of the expenditures,

7     or it says discretionary expenditures for the

8     southeast in 2018.

9          Q.  Is this a Kevlar document?

10         A.  I -- it's not a pre-canned Kevlar report,

11    if that is what you are asking.

12         Q.  It's not a Kevlar report?

13         A.  It's not a pre-canned Kevlar report.  A lot

14    of items on here are from Kevlar.  I cannot state

15    for certain if they came from Kevlar or from another

16    source.

17         Q.  With regard to each of the documents that

18    were prepared that we've gone through, and we can

19    take them one by one before we come back to this, do

20    you know why -- and I'll ask you broadly, do you

21    know why any of these documents were prepared?

22         MR. PERLOWSKI:  Objection.

23         A.  Why they were, is that what you're asking?

24    BY MR. HARGROVE:

25         Q.  So, let's start with Exhibit 11.  Do you

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 207

1    know why Exhibit 11 was prepared?

2         A.   I'm sorry, is that the one that's on the

3    screen right now?

4         Q.   Correct.

5         A.   I speculate that this document was created

6    to show your client and her business partner the

7    discretionary expenditures within their territory

8    that could be managed.

9    ████████████████████████████████████████████

10   ████████████████████████████████████████

11   ██████████████████████████████████████████████████

12   ██████████████████████████████████████

13   ██████████████████████████

14        Q.   And we looked at -- and you can go back and

15   look at them, 7, 8, 9, and 10 prior to this, and

16   feel free to go back and look, and my question on

17   each of those is going to be is that the same reason

18   you believe 7, 8, 9, and 10 were created?

19             MR. PERLOWSKI:  Objection.  Compound.

20   Asked and answered.  Jason, pull up each, one by

21   one.

22   BY MR. HARGROVE:

23        Q.   Start with 6, actually.

24        A.   Okay.

25        Q.   Pull up 6.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 208



13      Q.   And how could the regional managers manage

14   the corporate margins, if at all?

15      A.   At the time this was created, the dialogue

16   was that NAF had corporate expenses of 63 basis

17   points.

18      Q.   Okay.

19      A.   And all of the other components were under

20   the direct control of the regional manager.   I

21   believe that was the reason for the creation of this

22   was to facilitate that dialogue.

23      Q.   Okay.  Same question with Exhibit 8.

24      A.   8 is more difficult, or at least I don't

25   recollect, but because there is a 2019 projection on

Jason  Obradovich                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 209

1    here, I would just make a presumption that the

2    dialogue was around projecting profit for the

3    following year, based on what happened in the

4    current year, or the year that just happened, 2018.

5         Q.  And Exhibit 10, what was the specific

6    purpose of it, if you know?

7         A.  For Exhibit 10, the -- at least my belief

8    on what the intention was to show was that there

9    were price concessions being given by the southeast

10   region that were greater than the other channels

11   when you look at them in aggregate.

12        Q.  And that was to show my client and

13   Ms. Allison; correct?

14        A.  I believe the intention was to show your

15   client and Ms. Allison that they were granting price

16   exceptions beyond what other regions were doing.

17   ████████████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ███████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ██████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████

Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 210

1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ███████████████████████████████████

4       MR. PERLOWSKI:  Object to the form.

5       A.  I believe it would be one of two

6  individuals that were primarily responsible for

7  communicating that type of information.

8  BY MR. HARGROVE:

9       Q.  Okay.  And who were those two individuals?

10      A.  I believe those individuals to be Jon Reed

11  and Jan Preslo.

12  ██████████████████████████████████████

13  ████████████████████████████████████████

14  █████████

15  ████████████████████████████████

16  ██████████████████████████████████████

17  ███████████████████████████████████████

18  ████████████████

19  ███████████████████████████████████████

20  ████████████████████████████████████

21  ████████████████████████████████████████

22  ███████████████████████████████████████

23  ███████████

24      Q.  And those are the P&Ls that come from

25  Kevlar; correct?

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 211

1     A.   Yes.   Part of their review process before

2     they're uploaded into Kevlar is review and approval

3     process, including those two individuals.

4     Q.   And that would just be reviewing the Kevlar

5     report as the bottom-line CM3 figure, not reviewing

6     these documents we've looked at thus far; correct?

7          MR. PERLOWSKI:   Object to form.

8     A.   It would be reviewing information before it

9     goes into Kevlar, specifically with the Kevlar

10    information and not some of these documents that

11    we've just discussed.

12    BY MR. HARGROVE:

13    Q.   Were there discussions throughout 2018

14    between you and those two individuals about these

15    costs and losses reflected in the documents that

16    we've gone through thus far?

17    A.   I don't recall specific in 2018 with this

18    particular division these particular expenditures or

19    not.

20    Q.   All right.   How about any expenditures, not

21    just the ones listed on the documents we've looked

22    at thus far?

23    A.   The conversations that I recollect were

24    conversations around any branches that ever lost

25    money on any individual month and trying to

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 212

1   understand why.

2      Q.  Did the Kevlar reports that were generated

3   break down by the region when the three of y'all

4   met, or did you just have one Kevlar report for the

5   whole division?

6      A.  When we review the information, we review

7   it prior to it being uploaded into Kevlar, there

8   would be information at the region and branch level

9   prior to it being uploaded.

10      Q.  Okay.

11         MR. HARGROVE:  MaryBeth, if you can just go

12   put 739 in, which will be Exhibit 12.

13         (Plaintiff's Exhibit 12 marked)

14      A.  I have it up on my screen.

15   BY MR. HARGROVE:

16      Q.  All right.  And do you know what this

17   document is?

18      A.  This appears to show a breakdown of all of

19   the corporate costs for 2018 broken out by

20   department.

21      Q.  So the CM3 number, is this a breakdown of

22   all of CM3 for 2018?

23      A.  This appears to show all of the corporate

24   costs that were allocated to the OLA division for

25   2018.

Jason  Obradovich                         March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 213

1          Q.   All right.  And so did you prepare this
2     document?
3          A.   I do not believe I did.
4          Q.   All right.  Do you know who prepared it?
5          A.   I believe it was prepared by Jim Muth.
6          Q.   Okay.  Do you know why the document was
7     prepared?
8          A.   To my recollection, I believe there were
9     conversations around the regional managers not
10    understanding or maybe surprised by the amount of
11    costs it takes to run a mortgage originator.
12    ████████████████████████████████████████
13    ████████████████████████████████████████
14    ████████
15         Q.   So did the southeast region in 2018 have
16    any lawsuits, to your knowledge?
17         A.   I do not recall if there were lawsuits in
18    the southeast in 2018.
19    ████████████████████████████████
20    ████████████████████████████████████████
21    ██████████████████████████████
22    ████████████████
23    ████████████████████████████
24    ██████████████████████████████████
25    ████████████████████████████████████

Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 214

1   ⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯

2   ⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯

3   ⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯

4        A.   I believe so, but I am not a hundred

5   percent certain if it's not specifically to a

6   lawsuit.  That column says legal counsel and

7   lawsuits.  I don't know if any of that in there is

8   lawsuits; and if there was, would it be allocated to

9   their division or their region or not.

10       Q.   So just so I'm clear, it's possible that

11  there were lawsuits against another division that

12  aren't reflected on here that got allocated to that

13  division?

14            MR. PERLOWSKI:  Object to the form.

15       A.   I don't believe there are any lawsuits

16  related to another division that would be allocated

17  to a separate division.

18  BY MR. HARGROVE:

19       Q.   Okay.  So legal counsel/lawsuits, what all

20  legal counsel and lawsuits does that encompass?  Is

21  it all legal counsel and lawsuits from anyone in

22  NAF?

23       A.   I don't recall; and I, you know, did not

24  prepare this report.  I don't know if that is

25  specific to just the legal department or if they

Jason  Obradovich                March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 215

1  employed outside counsel, there's expenditures

2  there, or if there's any lawsuits in these

3  underlying expenses or not.

4     Q.  But Mr. Muth is the one who prepared this,

5  so he would be the most knowledgeable about what

6  that legal counsel/lawsuits is; correct?

7     A.  I believe so.

8  ████████████████████████████████████████

9  ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████

14    Q.  All right.  And so -- and whoever has the

15 most volume is going to pay more of that money

16 towards the marketing department; correct?

17    A.  In terms of unit count, that is correct.

18    Q.  Okay.  That's going to be the case for any

19 of these items on this OLA division corporate margin

20 breakdown; correct?

21    A.  To the best of my knowledge, yes.

22    Q.  All right.  Let's take a look at 743.  Hang

23 on.  We might have already looked at 743.

24       MR. HARGROVE:  Yeah, let's skip that one,

25 MaryBeth.  We already covered that one.  Let me look

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 216

1    at 774, and that will be Exhibit No. 13.

2            (Plaintiff's Exhibit 13 marked)

3    BY MR. HARGROVE:

4        Q.   Let me know when you've got that up.

5        A.   Okay.  I have it up.

6        Q.   Can you tell me what Exhibit 13 is?

7        A.   It appears to show profitability and other

8    components by region, although it does not state the

9    time period.

10       Q.   Okay.  Did you prepare Exhibit 13?

11       A.   I do not know if I did or not.

12       Q.   Do you know if this is a Kevlar document?

13       A.   It does not appear to be.

14       Q.   All right.  You don't know when it was

15   created; correct?

16       A.   Correct.

17       Q.   Do you know where the numbers that were

18   used in this document came from?

19       A.   It appears the numbers came from the Excel

20   that creates all of the data that goes into Kevlar.

21   I can't say for certain.

22       Q.   All right.  And that Excel that uses all

23   the numbers that go into Kevlar, is there some way

24   to extrapolate those numbers into a document like

25   Exhibit 13?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 217

1        A.   Repeat again?  I'm sorry, I got lost in the
2    question.
3        Q.   Yeah.  So is this something that would have
4    to be manually entered, or is there a way to pull
5    data from that Excel spreadsheet that goes into
6    Kevlar to generate a document like Exhibit 13?
7        A.   This appears to come from the pivot table
8    that references all the data that goes into Kevlar.
9        Q.   What's a pivot table?
10       A.   A pivot table is a functionality within
11   Excel that allows you to sum all the information in
12   a large data set, from a large data set.
13       Q.   Okay.  And do you know why Exhibit 13 was
14   prepared?
15       A.   I don't know why it was prepared.  I would
16   only be speculating.
17       Q.   What would be the use for Exhibit 13?
18       A.   You know, just given -- if this is from
19   2018 and was produced from this lawsuit, I presume
20   it is to show which regions were profitable and
21   which ones were not for that particular time period,
22   but it's speculation on the time period and the
23   region.
24       Q.   All right.  Let's go ahead and upload 781.
25       A.   I have it open.

Jason  Obradovich                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 218

1      Q.   And tell me what -- this will be Exhibit

2  No. 14.

3           (Plaintiff's Exhibit 14 marked)

4  BY MR. HARGROVE:

5      Q.   Can you tell me what Exhibit 14 is?

6      A.   This appears to show the P&L for the

7  southeast from January to September 2018, and it

8  appears to have come from Kevlar.

9      Q.   Okay.  Do you know why we didn't get this

10  document at the same time we got the 2018 P&L that

11  had October, November, December, which was the only

12  Kevlar report we've been produced until the

13  production that contained 781, Exhibit 14?

14           MR. PERLOWSKI:  Object to the form.

15  BY MR. HARGROVE:

16      Q.   You can answer.

17      A.   I already answered.  My apologies.  I said

18  I do not.

19      Q.   Okay.  And this is -- this would be a

20  report that was printed off of Kevlar, so you can do

21  Kevlar by the month; correct?

22      A.   Correct.

23      Q.   And does this report show that the

24  southeast region was profitable or unprofitable?

25      A.   I will need to total out the columns; and

Jason Obradovich                   March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 219

1    in the viewer, it does not allow me to.

2         Q.   I notice we had October, November, December

3    that we looked at earlier.  Is there a Kevlar report

4    that totals up the entire year?

5         A.   There should be.

6         Q.   And do you know why this one that was

7    produced, Exhibit 14, only goes up to September?

8         A.   I do not.

9         Q.   Let's go ahead and see, do we have -- we

10   had 743.  Give me one second.  Earlier we put in

11   Exhibit 5, which was 743, and that's the one that

12   had October, November, and December, and you can

13   feel free to pull that up on your screen.

14        A.   Okay.

15        Q.   And what I'm trying to figure out from

16   there is why did we get one report for January to

17   September and then one from October to December as

18   opposed to one for the whole year?

19        A.   I do not know.

20        Q.   Do you know whether any of the data that

21   went to Kevlar that generated these reports was

22   altered or changed in any way after initially being

23   entered?

24        A.   Can you repeat again?

25        Q.   Sure.  So each month data was entered into

Jason  Obradovich                     March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 220

1    Kevlar from Excel; correct?

2          A.   Correct.

3          Q.   On any of these months, was the Excel data

4    upon which the month was based changed at some point

5    thereafter and re-uploaded into Kevlar?

6          A.   Not to my knowledge.

7          Q.   And if that had happened, would there be

8    any record that NAF has that would show that?

9          A.   Not to my knowledge.

10         Q.   Were you involved in producing Exhibit 14

11   in this litigation?

12         A.   Exhibit 14 you said?

13         Q.   Yes.

14         A.   I don't believe I was involved.

15         MR. HARGROVE:  MaryBeth, if you can go

16   ahead and put the next one in, 782, and that will be

17   Exhibit No. 15.

18   BY MR. HARGROVE:

19         Q.   While we're waiting for that one to upload,

20   I do have one more question about 14.

21         Is there a document that tells us what the

22   corporate regional expenses were on the corporate

23   margins?  Is there a document somewhere that would

24   tell us what those expenses were?

25         A.   You mean the individual expenses?

800.808.4958                                      770.343.9696

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 221

1          Q.   Yes.

2          A.   Corporate expenses, is there a document?

3     Not to my knowledge.

4          Q.   Is there a series of documents that would

5     show what the expenses were?

6          A.   Not -- is there -- I don't know.

7          Q.   If my client was still at NAF and wanted to

8     verify that indeed these corporate expenses

9     occurred, where would they look to find that out?

10         A.   I don't know how to answer that question.

11    I believe that information is generally not shared

12    at the expense level.

13         Q.   Okay.  Do you have 15 up?

14         A.   Let me go back out of 14 and open up 15.

15         Q.   Sure.

16              (Plaintiff's Exhibit 15 marked)

17         A.   Okay.  I have 15 open.

18    BY MR. HARGROVE:

19         Q.   All right.  And what is Exhibit 15?

20         A.   It appears to show profitability for 2017

21    by month, with all the components of the revenue.

22         Q.   Did you create this document?

23         A.   I do not think that I did.

24         Q.   Do you know who did?

25         A.   I do not.

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 222

1        Q.   Were you involved in the production of this
2    document in this litigation?
3        A.   Not the production of this document, no.
4        Q.   Were you involved in the production of
5    other documents in this litigation?
6        A.   I do not believe I was.
7        Q.   Okay.
8             MR. HARGROVE:  MaryBeth, if you want to
9    pull up 783.  That will be Exhibit 16.
10            (Plaintiff's Exhibit 16 marked)
11       A.   All right.  I have it up on my screen.
12   BY MR. HARGROVE:
13       Q.   And can you tell me what Exhibit 16 is?
14       A.   It appears to show profitability by month
15   in basis points from 2016 to 2020, or late 2016 to
16   early 2020.
17       Q.   And was this for the southeast region?
18       A.   I presume it to be the case.
19       Q.   Why do you presume it to be the case?
20       A.   That attorneys yesterday had shared with me
21   this document, so I'm --
22            MR. PERLOWSKI:  Don't share any
23   communications that we may have had.
24            THE WITNESS:  Okay.
25   BY MR. HARGROVE:

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 223

1      Q.  So all the documents I've shown you today,

2   have you looked at those in preparation for this

3   deposition?

4      A.  Yes.

5      Q.  All right.  Exhibit No. 16, looks like it

6   has '17, '18, and '19, so you believe that to be

7   profitability for the southeast region for those

8   three years?

9      A.  Correct.

10     Q.  Is this a Kevlar document?

11     A.  No, I do not believe it is.

12     Q.  Do you know where this document came from?

13     A.  It appears to be created in Excel.

14     Q.  You don't know when it was created?

15     A.  I do not.

16     Q.  Do you know whether it has been changed in

17  any way since it was initially created?

18     A.  Not to my knowledge.

19     Q.  The next couple documents --

20         MR. HARGROVE:  And MaryBeth, you know these

21  are three big ones.  Maybe we ought to take a quick

22  break while we upload those because they're rather

23  large documents; and probably after we go over

24  those, there's not too much left to go over.  Does

25  that make sense?  Everyone in agreement?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 224

 1              MR. PERLOWSKI:  That's fine.

 2              (Recess 1:09 to 1:19 p.m.)

 3    BY MR. HARGROVE:

 4        Q.  It should be in the Marked Exhibits folder

 5    now, Exhibit No. 17.

 6              (Plaintiff's Exhibit 17 marked)

 7        A.  I'm just downloading right now.

 8    BY MR. HARGROVE:

 9        Q.  All right.

10        A.  Okay.

11        Q.  Mr. Obradovich, can you tell me what is

12    Exhibit 17?

13        A.  I've never seen this document before.

14        Q.  So having never seen this, you don't know

15    anything about the document; correct?

16        A.  Correct.  Never seen it.

17        Q.  Don't know who prepared it?  Don't know

18    what it's for?  Literally, this is the first time

19    you've seen it; correct?

20        A.  Yeah.  Today is the first time I've ever

21    seen this document.

22        Q.  Okay.  Have you ever prepared a similar

23    document to Exhibit 17?  It looks like it has three

24    different sheets.  Make sure you look at all three

25    of them.

Jason Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 225

1        A.  I have looked at all three sheets, and I
2    have never seen a document like this, nor have I
3    prepared anything that looks like this.
4        Q.  Do you know if this is something that came
5    from Kevlar?
6        A.  I don't believe this came from Kevlar.
7    I've never seen anything like this in Kevlar.
8        Q.  All right.  Let's take a look next at
9    Exhibit 18.  I'll wait to hear from both you and
10   Henry that you've got yours downloaded.
11          (Plaintiff's Exhibit 18 marked)
12       A.  Mine is now open.
13   BY MR. HARGROVE:
14       Q.  So I'm showing you Exhibit 18, which also
15   appears to be three sheets; and I'll ask if you
16   recognize Exhibit No. 18.
17       A.  I do not recognize that at all.
18       Q.  All right.  And so with regard to all three
19   sheets, you have never seen Exhibit 18 before today?
20       A.  Have not seen anything like any of these
21   three tabs on Exhibit 18 before today.
22       Q.  So you didn't prepare it, then; correct?
23       A.  Correct.
24       Q.  And you don't know what it's intended to
25   show; correct?

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 226

```
 1        A.  Correct.
 2        Q.  All right.  Let's then go to Exhibit
 3   No. 19.
 4            (Plaintiff's Exhibit 19 marked)
 5   BY MR. HARGROVE:
 6        Q.  If you can tell me, do you recognize
 7   Exhibit No. 19?
 8        A.  I do not recognize Exhibit 19.
 9        Q.  Never seen it before today?
10        A.  I have never seen Exhibit 19 before today.
11        Q.  Didn't prepare it; correct?
12        A.  Correct.
13        Q.  Don't know what it's intended to show us;
14   correct?
15        A.  Correct.
16        Q.  All right.  I want to go back and talk a
17   little bit about the corporate margin expenses that
18   we've -- that we looked at in the prior exhibits and
19   just ask you in general, did something change, did
20   anything change about the way the corporate margin
21   expenses were allocated between 2016 and 2019?
22        A.  To my knowledge, the only change to the
23   allocation of corporate expenses was 2019, when
24   Mr. Frommert engaged in conversation with the
25   regionals and came to the agreement on how it was to
```

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 227

1    be allocated.

2         Q.   Okay.  And was there some sort of increase

3    in the corporate expenses that occurred in 2018 over

4    2017?

5         A.   Was there a -- something about the increase

6    in the expenses that were allocated?

7         Q.   Yes.  Did those go up substantially?

8         A.   I don't recall if they went up

9    substantially.  I believe whatever the expenses were

10   in 2018 versus '17, if they were higher, then they

11   would have gone up; if they were lower, they would

12   have gone down.

13        Q.   Okay.  And what I'm -- so all those Kevlar

14   reports have this corporate margin in that would

15   have shown the loss throughout the year.  And you

16   testified earlier you had meetings with Ms. -- was

17   it Ms. Bunce and Ms. Preslo and Mr. Reed for each

18   P&L?

19        A.   Yes.  Every month there was an approval

20   process, before it could be uploaded into Kevlar,

21   that had to be agreed on by all individuals.

22        Q.   All right.  And that upload included all of

23   this corporate margin that we've looked at documents

24   about today; correct?

25        A.   Correct.  There were reports reviewed in

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 228

1    those conversations where the corporate margin fully

2    loaded, I guess, is probably the easiest way to say

3    it.

4         Q.  Is there a lot of corporate margin maybe --

5    strike that.

6             Is the corporate margin commensurately

7    loaded as it occurred, or were there certain

8    expenses that all arise in the fourth quarter?

9         A.  Can you either rephrase or restate the

10   question?

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████

14   ████████████████████████████████████████████████

15   ███████████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████

19   ███████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ███████████████████████████████████

23   ██████████████████████████

24        Q.  You said general.  Are there exceptions

25   that are not treated on a monthly basis?

Page 229

```
 1        A.  I can't think of an example -- I'll give
 2   you an example just for conversation.  If we pay a
 3   software bill, like Microsoft Office, I don't know
 4   if that's paid monthly or annually, so if the bill
 5   came in June, I wouldn't know if it was paid
 6   annually or monthly at that time.
 7        Q.  Okay.
 8        A.  But generally the design is to expense it
 9   when the bill is received.
10        Q.  Let me take a quick break and consult with
11   my co-counsel.  If we have anything more for you,
12   it's not going to be much, so let me talk to her
13   real quick.  Let's take five minutes.
14             And then Henry, my suggestion would be
15   after we finish with him, we take about 15 minutes;
16   that way we can cycle in Mr. Muth and we can take a
17   quick pause on our end and jump right back into it.
18   Does that work?
19             MR. PERLOWSKI:  That's fine.
20             (Recess 1:28 to 1:30 p.m.)
21             MR. HARGROVE:  Mr. Obradovich, I don't have
22   any questions for you.  Appreciate you appearing for
23   the deposition.
24             MR. PERLOWSKI:  No questions on our end.
25   Appreciate it.
```

Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 230

1            THE WITNESS:   Thanks.

2            (Deposition concluded at 1:31 p.m.)

3            (Signature reserved.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 231

```
 1              VERITEXT LEGAL SOLUTIONS

 2           FIRM CERTIFICATE AND DISCLOSURE

 3

 4    Veritext represents that the foregoing transcript as

 5    produced by our Production Coordinators, Georgia

 6    Certified Notaries, is a true, correct and complete

 7    transcript of the colloquies, questions and answers

 8    as submitted by the certified court reporter in this

 9    case.  Veritext further represents that the attached

10    exhibits, if any, are a true, correct and complete

11    copy as submitted by the certified reporter,

12    attorneys or witness in this case; and that the

13    exhibits were handled and produced exclusively

14    through our Production Coordinators, Georgia

15    Certified Notaries.  Copies of notarized production

16    certificates related to this proceeding are

17    available upon request to litsup-ga@veritext.com.

18

19    Veritext is not taking this deposition under any

20    relationship that is prohibited by OCGA 15-14-37(a)

21    and (b).  Case-specific discounts are automatically

22    applied to all parties, at such time as any party

23    receives a discount.  Ancillary services such as

24    calendar and financial reports are available to all

25    parties upon request.
```

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 232

1                        CERTIFICATE
2    STATE OF GEORGIA:
     COUNTY OF FULTON:
3
            I hereby certify that the foregoing
4    transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
5    reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
6    evidence given upon said proceeding.
            I further certify that I am not a relative
7    or employee or attorney of any party, nor am I
     financially interested in the outcome of this
8    action.
            I have no relationship of interest in this
9    matter which would disqualify me from maintaining my
     obligation of impartiality in compliance with the
10   Code of Professional Ethics.
            I have no direct contract with any party in
11   this action and my compensation is based solely on
     the terms of my subcontractor agreement.
12          Nothing in the arrangements made for this
     proceeding impacts my absolute commitment to serve
13   all parties as an impartial officer of the court.
14   ─                                         )22.
15
            _____
16
17          LaRita J. Cormier, RPR, CCR No. 2578
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                   770.343.9696

Page 233

1   To:  Henry M. Perlowski, ESQUIRE
2   Re:  Signature of Deponent Jason Obradovich
3   Date Errata due back at our offices: 30 DAYS
4
5   Greetings:
6   The deponent has reserved the right to read and
    sign.  Please have the deponent review the attached
7   PDF transcript, noting any changes or corrections on
    the attached PDF Errata.  The deponent may fill out
8   the Errata electronically or print and fill out
    manually.
9
10  Once the Errata is signed by the deponent and
    notarized, please mail it to the office of Veritext
11  (below).
12
    When the signed Errata is returned to us, we will
13  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies
14  of the Errata to all ordering parties.
15
    If the signed Errata is not returned within the time
16  above, the original transcript may be filed with the
    court without the signature of the deponent.
17
18
    Please send completed Errata to:
19
    Veritext Production Facility
20
    20 Mansell Court
21
    Suite 300
22
    Roswell, GA  30076
23
    (770) 343-9696
24
25

Jason  Obradovich                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page  234

1    ERRATA
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony and that
3
     ____ There are no changes noted.
4
     ____ The following changes are noted:
5
6    Pursuant to Rule 30(7)(e) of the Federal Rules of
     Civil Procedure and/or OCGA 9-11-30(e), any changes
7    in form or substance which you desire to make to
     your testimony shall be entered upon the deposition
8    with a statement of the reasons given for making
     them.  To assist you in making any such corrections,
9    please use the form below.  If additional pages are
     necessary, please furnish same and attach.
10
11   Page ____ Line ____ Change _____
12   _____
13   Reason for change _____
14   Page ____ Line ____ Change _____
15   _____
16   Reason for change _____
17   Page ____ Line ____ Change _____
18   _____
19   Reason for change _____
20   Page ____ Line ____ Change _____
21   _____
22   Reason for change _____
23   Page ____ Line ____ Change _____
24   _____
25   Reason for change _____

Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 235

1    Page ____ Line ____ Change _____

2    _____

3    Reason for change _____

4    Page ____ Line ____ Change _____

5    _____

6    Reason for change _____

7    Page ____ Line ____ Change _____

8    _____

9    Reason for change _____

10   Page ____ Line ____ Change _____

11   _____

12   Reason for change _____

13   Page ____ Line ____ Change _____

14   _____

15   Reason for change _____

     Page ____ Line ____ Change _____

16

     _____

17

     Reason for change _____

18

19

                         _____

20                       DEPONENT'S SIGNATURE

21   Sworn to and subscribed before me this ____ day of

     _____, _____.

22

23   _____

     NOTARY PUBLIC

24

25   My Commission Expires: _____

Jason Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[0000733 - 737]                                                    Page 1

| 0 | | |
|---|---|---|
| **0000733**  148:6 | | |
| **0000734**  148:8 | | |
| **0000735**  148:9 | | |
| **0000736**  148:11 | | |
| **0000738**  148:13 | | |
| **0000739**  148:15 | | |
| **0000743**  148:4 | | |
| 178:8 179:8 | | |
| **0000774**  148:17 | | |
| **0000781**  148:18 | | |
| **0000782**  148:20 | | |
| **0000783**  148:21 | | |
| **0000784**  148:23 | | |
| **0000789**  148:24 | | |
| **0000795**  148:25 | | |
| **01/18**  148:18 | | |
| **04981**  147:6 | | |
| **09/18**  148:19 | | |

| 1 |
|---|
| **1**  178:17 179:7 |
| 209:21 |
| **1/12th**  228:15 |
| **10**  148:12 199:9 |
| 203:21,22 207:15 |
| 207:18 209:5,7 |
| **10/18-12/18**  148:5 |
| **11**  148:13 206:2,3 |
| 206:25 207:1 |
| 209:17,19 |
| **11:03**  147:16 |
| **11:47**  179:5 |
| **11:58**  179:5 |
| **11th**  179:16 |
| 187:18 |
| **12**  148:15 212:12 |
| 212:13 228:12 |
| **12th**  232:14 |
| **13**  148:17 216:1,2 |
| 216:6,10,25 217:6 |

217:13,17
**13621**  232:15
**14**  148:18 149:8
218:2,3,5,13 219:7
220:10,12,20
221:14
**15**  148:20 152:20
220:17 221:13,14
221:16,17,19
229:15
**15-14-37**  231:20
**16**  148:21 222:9,10
222:13 223:5
**17**  148:23 223:6
224:5,6,12,23
227:10
**171**  149:17
**179**  148:4
**17th**  149:17
**18**  148:7,24 223:6
225:9,11,14,16,19
225:21
**187**  148:6
**19**  148:25 153:17
223:6 226:3,4,7,8
226:10
**194**  148:8
**198**  148:9
**1:09**  224:2
**1:19**  224:2
**1:20**  147:6
**1:28**  229:20
**1:30**  229:20
**1:31**  230:2

| 2 |
|---|
| **2**  147:14 167:14,21 |
| 168:11 |
| **2,045,000**  228:14 |
| **2,407,170**  215:8 |
| **20**  233:20 |

**201**  148:11
**2015**  162:9 170:1
**2016**  153:19,24
162:10 173:3
222:15,15 226:21
**2017**  148:20
153:19 221:20
227:4
**2018**  148:9,11,12
148:16 153:17
163:17 165:11,23
166:23,24 167:3,8
167:14,17 178:25
180:2,2 188:7
189:7 198:21
199:1 204:6 206:8
207:11 208:4
209:4,25 210:13
211:13,17 212:19
212:22,25 213:15
213:18,25 217:19
218:7,10 227:3,10
**2019**  153:24 173:5
173:18 195:3
199:2,8,23 200:1
208:25 226:21,23
**2020**  222:15,16
**2022**  147:15
232:14
**203**  148:12
**206**  148:13
**2100**  149:18
**212**  148:15
**216**  148:17
**218**  148:18
**221**  148:20
**222**  148:21
**224**  148:23
**225**  148:24
**226**  148:25

**230**  149:8
**2578**  147:18
232:17
**29**  147:15

| 3 |
|---|
| **3**  167:15,15,21 |
| 168:11 |
| **30**  233:3 234:6 |
| **300**  233:21 |
| **30076**  233:22 |
| **30305**  149:9 |
| **30363**  149:19 |
| **343-9696**  233:23 |
| **3535**  149:7 |

| 4 |
|---|
| **4,097,231**  213:13 |
| 213:21 214:2 |

| 5 |
|---|
| **5**  148:4 178:15 |
| 179:17,18 219:11 |
| **515**  196:22 |

| 6 |
|---|
| **6**  148:6 187:21,22 |
| 189:3,9 190:13,17 |
| 190:25 192:8,9 |
| 193:17 207:23,25 |
| 208:1 |
| **63**  198:3 208:16 |

| 7 |
|---|
| **7**  148:8 194:1,4,5,8 |
| 196:6 201:16 |
| 207:15,18 208:7,8 |
| 234:6 |
| **733**  187:19 |
| **734**  193:25 |
| **735**  198:14,16 |
| **736**  201:6 |
| **737**  203:21 |

Jason Obradovich
March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[738 - aside]**
Page 2

| | | | |
|---|---|---|---|
| **738** 206:1 | **add** 174:7 | **allows** 217:11 | **appearances** |
| **739** 212:12 | **additional** 234:9 | **altered** 181:15,17 | 149:1 |
| **743** 178:12 215:22 | **address** 170:22,23 | 183:11 200:24 | **appeared** 153:5 |
| 215:23 219:10,11 | 186:24 197:3 | 203:17 219:22 | **appearing** 229:22 |
| **770** 233:23 | **adjusted** 200:1 | **amb** 154:23,25 | **appears** 188:4 |
| **774** 216:1 | **admin** 180:19 | 157:5,19 158:9,11 | 194:9 195:15 |
| **781** 217:24 218:13 | **administration** | 182:19 185:23 | 197:21 198:20 |
| **782** 220:16 | 228:14,14 | 186:1,3 228:22 | 203:4,7 204:4,23 |
| **783** 222:9 | **advised** 209:25 | **amended** 183:11 | 206:6 208:2,6,8 |

**8**

| | | | |
|---|---|---|---|
| **8** 148:9 198:14,15 | **agg.com** 149:20 | **american** 147:8 | 212:18,23 216:7 |
| 198:18 201:16 | **aggregate** 209:11 | **amount** 173:15 | 216:19 217:7 |
| 207:15,18 208:23 | **ago** 164:14 | 204:10,12,13 | 218:6,8 221:20 |
| 208:24 | **agree** 169:6,8 | 213:10 | 222:14 223:13 |

**9**

| | | | |
|---|---|---|---|
| **9** 148:11 201:23,25 | **agreed** 204:9 | **ancillary** 231:23 | 225:15 |
| 202:1,3 207:15,18 | 227:21 | **andrew** 149:24 | **apples** 184:10,10 |
| **9-11-30** 234:6 | **agreement** 169:12 | **ankeny** 157:1,2 | **applied** 231:22 |
| | 173:7,9 223:25 | 158:1,14,17,25 | **appreciate** 229:22 |

**a**

| | | | |
|---|---|---|---|
| | 226:25 232:11 | 161:23 168:4 | 229:25 |
| **a.m.** 147:16 179:5 | **ahead** 184:25 | 183:19,21 195:12 | **appropriate** |
| **ability** 163:14 | 187:17 193:7,25 | 204:20 | 161:13 |
| 193:9 | 217:24 219:9 | **annually** 229:4,6 | **approval** 182:25 |
| **able** 169:2 191:19 | 220:16 | **answer** 151:24 | 211:2 227:19 |
| 205:1 | **allison** 209:13,15 | 153:16 164:25 | **approve** 210:20 |
| **absolute** 232:12 | 209:24 | 165:14 166:19 | **approved** 155:7,7 |
| **absolutely** 151:7 | **allocate** 175:11 | 176:1 187:5 | 210:21 |
| **absorb** 174:17 | 184:20 | 190:10 196:16 | **approximately** |
| **acceptable** 169:11 | **allocated** 172:1,14 | 210:1 218:16 | 152:22 |
| **access** 158:2,18,19 | 173:2,20 174:12 | 221:10 | **april** 232:14 |
| 159:14 162:1 | 176:24 177:5 | **answered** 177:22 | **area** 161:13 197:8 |
| 180:4,7,9 181:8 | 183:25 198:7,10 | 184:3 185:16 | **areas** 228:12 |
| 185:12,18,20,23 | 212:24 213:20,25 | 187:6 196:15 | **arnall** 149:16 |
| 185:25 186:2,4 | 214:8,12,16 215:9 | 207:20 218:17 | **arrangements** |
| 187:15 | 226:21 227:1,6 | **answers** 231:7 | 232:12 |
| **accessing** 181:3 | **allocating** 184:14 | 232:4 | **arrow** 197:20 |
| **accurate** 162:1 | **allocation** 173:10 | **anybody** 200:25 | **arvielo** 165:5 |
| 172:23 | 173:15 226:23 | **anyway** 187:12 | 175:20 186:7,13 |
| **action** 232:8,11 | **allocations** 171:16 | **apologies** 201:2 | 186:14 |
| **actual** 170:6 | 173:8 174:1 | 213:23 218:17 | **arvielos** 159:25 |
| | **allow** 189:17 | **appear** 189:25 | 162:3 168:6 |
| | 219:1 | 202:6 216:13 | **aside** 160:13 |

Jason Obradovich March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[asked - ceo]** Page 3

**asked** 177:21 184:2 185:15 186:6,13,14 187:1 196:14 201:2 207:20
**asking** 159:21,23 170:12 186:18 187:12 206:11,23
**assist** 234:8
**associated** 171:21 175:15
**atlanta** 147:3 149:9,19
**attach** 234:9
**attached** 231:9 233:6,7
**attorney** 232:7 233:13
**attorneys** 222:20 231:12
**attributed** 171:22 172:22
**audio** 170:14
**authorities** 156:14
**automatically** 231:21
**available** 156:17 187:8 231:17,24
**aware** 159:2,21,23 185:5

**b**

**b** 147:8 231:21
**back** 154:4 163:23 165:16 169:5 170:1,18 176:2 179:22 183:24 187:1 189:1 199:7 199:11 206:19 207:14,16 209:17 221:14 226:16 228:16 229:17

233:3
**ballpark** 177:19
**bar** 197:1,2
**based** 155:16,23 165:23 175:12 177:11 192:13 204:23 207:9 208:2 209:3 213:20 214:1 215:9,10 220:4 232:11
**basis** 196:22 197:19,25 198:1,3 204:15 208:16 222:15 228:25
**bear** 168:24 172:11
**began** 151:8
**beginning** 179:22
**behalf** 149:2,14 151:15
**belief** 175:18 209:7
**believe** 153:7,9,18 153:23 154:8 158:4 159:4 160:11,24 161:3 162:6,9 168:3,5 169:10 172:1,4 173:4,5,12,21 176:7 180:11,15 180:22,25 181:1 182:10 183:4,21 185:23 194:19 195:10,20 196:7 197:9,21 199:7,21 202:13 204:17 207:10,12,18 208:21 209:14,18 209:20 210:5,10 213:3,5,8 214:4,15

215:7,11 220:14 221:11 222:6 223:6,11 225:6 227:9
**believed** 169:1
**benefit** 174:23 176:19
**best** 153:3 164:12 215:21
**better** 152:10 162:21 163:4 191:10
**beyond** 168:25 208:11 209:16
**big** 223:21
**bill** 229:3,4,9
**bit** 170:11,13 226:17
**black** 197:22
**block** 149:23
**borrower** 204:9 204:11
**bottom** 165:2,5,11 165:25 166:7,13 167:4,13,15 170:6 199:25 211:5
**bps** 148:16
**branch** 163:13 197:7,9,10 203:9 212:8
**branches** 191:17 191:20 198:21 211:24
**break** 212:3 223:22 229:10
**breakdown** 148:16 212:18,21 215:20
**breaking** 170:13
**brief** 152:17,20

**broadly** 206:20
**broken** 164:15 212:19
**broker** 147:7 176:7,9
**brokered** 172:7
**building** 149:8 171:19 174:25
**bunce** 168:5 227:17
**bunch** 187:13
**business** 207:6

**c**

**c** 149:3
**calculated** 174:3
**calculation** 156:25 164:5
**calculations** 155:25 156:10 182:21
**calendar** 231:24
**call** 152:17,20 170:25 171:3,12 173:23 174:1,3,5 174:18 194:7
**called** 156:6 192:3
**canned** 206:10,13
**cap** 147:6
**caption** 232:4
**case** 147:5 151:10 151:16 183:14 194:13 205:9 215:18 222:18,19 231:9,12,21
**ccr** 147:18 232:17
**cease** 187:8
**center** 170:25 171:3,12 173:23 174:1,4,6,18
**ceo** 175:20,23

Jason  Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al
March 29, 2022

**[certain - contract]**

Page 4

**certain** 153:11
155:15 156:12
159:5 160:16
163:17 166:4
172:6 175:17
177:16 180:21
182:10 186:2
190:2 192:22
195:22 202:22,24
205:4,5 206:15
214:5 216:21
228:7
**certificate** 231:2
232:1
**certificates** 231:16
**certified** 231:6,8
231:11,15
**certify** 232:3,6
234:2
**cetera** 174:25
193:4
**cfo** 159:13
**change** 167:6
172:25 182:3
190:5,6 192:17,20
193:3,4 198:6,8
226:19,20,22
234:11,13,14,16
234:17,19,20,22
234:23,25 235:1,3
235:4,6,7,9,10,12
235:13,15,15,17
**changed** 181:23
189:14,17 190:4
205:23 219:22
220:4 223:16
**changes** 173:4
181:22 189:18
233:7 234:3,4,6
**changing** 189:22

**channels** 209:10
**charge** 158:23
**chart** 228:11
**check** 150:18
172:4
**choose** 184:8
191:7,16
**christy** 168:5
**civil** 234:6
**clarification** 184:6
**clarifying** 152:7
**clear** 150:10
168:15 178:18
181:14 214:10
**click** 183:2 205:14
**client** 170:19
195:19 201:12,17
201:21 207:6
209:12,15 221:7
**cm** 148:15 164:21
167:11,13,19
170:5 200:1
**cm1** 164:8 165:16
166:4 167:10,12
167:14,21,24
168:11
**cm2** 164:8 167:10
167:12,24
**cm3** 164:8 165:1,5
165:16 166:4,8,13
166:25 167:4,10
167:12,18,19,24
168:15 170:9
211:5 212:21,22
**cms** 164:21 168:20
169:9,13
**code** 232:10
**colloquies** 231:7
232:4
**color** 193:10

**column** 196:18,25
199:23 202:22,25
214:6
**columns** 193:11
197:6 218:25
**come** 154:19
157:13 162:8
188:9 204:24
206:19 210:24
217:7 218:8
**comes** 156:4 157:4
177:14
**coming** 168:23
**commensurately**
228:6
**commission**
235:25
**commitment**
232:12
**common** 184:4,19
184:19 185:1
**communicate**
208:3 210:12
**communicating**
210:7
**communications**
151:23 222:23
**companies** 185:5
**company** 153:11
160:5 167:3
168:24 175:20
176:3,3
**compare** 184:9
191:16,17
**compares** 194:11
**comparing** 191:21
**comparison**
184:11
**compensation**
197:7,8 203:9
232:11

**complete** 148:6
231:6,10
**completed** 182:25
233:18
**compliance** 232:9
**components**
167:12 194:22
208:19 216:8
221:21
**compound** 207:19
**computations**
155:23 157:3
**computer** 160:23
203:12
**concession** 200:2
200:17 204:7,10
204:12
**concessions**
148:12 204:5
209:9
**concluded** 230:2
**conference** 147:17
**confidential**
148:21
**confirm** 152:10
**confirmed** 204:8
**confusion** 167:9
169:14,22 170:5,8
**connected** 170:14
**consensus** 169:10
**consider** 156:6
**considered** 173:20
**consult** 229:10
**contain** 185:24
**contained** 203:12
218:13
**context** 152:19
**continuation**
150:22 152:13,24
**contract** 232:10

Jason Obradovich

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[contribute - department]

Page 5

contribute 175:5,9
contributing
209:22
control 208:11,12
208:20
conversation
196:9 200:19
210:16 226:24
229:2
conversations
185:8 196:7
201:19 207:10
211:23,24 213:9
228:1
coordinators
231:5,14
copied 155:2
161:15
copies 231:15
233:13
copy 155:21
231:11
cormier 147:18
232:17
corporate 163:22
164:2,4,15 168:22
169:20 171:16,17
171:24,25 172:8
172:15,19,22
173:1,7,17,18,24
174:12,14,18,23
174:24 175:6,10
175:15 177:4,11
183:25 184:20
197:10,11 198:4,7
208:14,16 212:19
212:23 215:19
220:22,22 221:2,8
226:17,20,23
227:3,14,23 228:1
228:4,6,12,22

correct 151:19
154:24 157:22
158:14,15 162:2
162:13,14,18
163:19,20 164:3,8
164:9 166:9,10,13
166:16,20 167:4
167:15,16,18
170:20,21 171:6
172:18,24 174:9
174:10,19,21
175:6,7,21,22
176:10,11,25
177:1,11,12
178:25 179:12,24
179:25 180:2,3,5
181:24,25 182:4,5
185:13 188:22,23
189:24 190:7,8,15
190:18,22 192:18
193:17,21,22
195:16 196:23
198:2,4,5 199:5
200:7,25 205:21
205:22,24 207:4
209:13 210:25
211:6 213:22
214:3 215:6,10,16
215:17,20 216:15
216:16 218:21,22
220:1,2 223:9
224:15,16,19
225:22,23,25
226:1,11,12,14,15
227:24,25 231:6
231:10 232:5
corrections 233:7
234:8
cost 168:23 175:11
costed 175:19

costs 153:10
164:15 168:24
169:2 175:15
177:4 184:9,10,14
184:15,16 197:9
197:11,12,13,14
197:17 204:14,14
211:15 212:19,24
213:11
counsel 149:1,23
149:24 152:17
202:17 213:13,22
214:3,6,19,20,21
215:1,6 229:11
count 215:17
county 232:2
couple 189:14
197:17 199:20
223:19
court 147:1 151:5
231:8 232:13
233:16,20
cover 177:7,10
covered 215:25
create 181:8
182:13 191:3,5,8
192:11,13 194:22
195:20 196:8
221:22
created 173:6
180:24 181:5,6,8
181:11 188:12,15
189:13 190:21
192:8 194:25
195:5 198:24
199:4,6,7,14 201:4
207:5,18 208:2,5,6
208:15 216:15
223:13,14,17
creates 183:6,6
216:20

creating 177:3
182:16 190:24
191:1,12,13
creation 162:12
194:16,18 208:21
current 209:4
cv 147:6
cycle 229:16

d

d 147:8
data 154:25
155:23 156:11
157:12 161:15
181:16 182:3,16
186:1,7,13,17
187:13,15 188:20
188:21 191:22
192:1,1,4,17 202:4
202:9 204:23
205:23 216:20
217:5,8,12,12
219:20,25 220:3
date 233:3
day 232:14 235:21
days 233:3
december 178:25
180:2 218:11
219:2,12,17
decided 173:13
decision 167:20
169:6,8
defendant 147:9
149:14
defined 164:19
definition 164:13
definitions 168:14
169:25
deleted 161:1,4
department
160:18 173:25
174:22 175:13,14

Jason  Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

[department - dropped]

Page 6

175:16 212:20
214:25 215:12,13
215:16
**depend** 186:4
**depends** 192:21
**deponent** 233:2,6
233:6,7,10,16
**deponent's** 235:20
**deposition** 147:12
150:23 151:9,16
152:13,24 153:4
154:22 162:12
165:9,17 171:20
178:9 179:14,22
186:24 187:9
223:3 229:23
230:2 231:19
234:7
**derivation** 154:9
154:11,15
**describe** 163:9
182:12
**description** 148:2
**design** 229:8
**designed** 175:11
191:19
**desire** 234:7
**determine** 167:10
**determined**
169:25 171:17,21
171:25
**determining**
173:20
**dialogue** 194:23
208:15,22 209:2
210:22
**difference** 197:23
**differences** 194:23
**different** 151:11
157:4 160:17
164:1,4 168:20

169:15,20 173:10
177:24 191:16,17
194:21 197:6
198:23 224:24
228:12
**differentiate** 169:2
**difficult** 208:24
**direct** 175:18
177:7 184:5,12,13
185:3 197:14
208:20 232:10
**direction** 232:5
**directly** 154:8,9
154:19 155:3
**disclosure** 231:2
**discount** 231:23
**discounts** 231:21
**discovery** 186:24
**discretionary**
148:13 206:7
207:7,13 209:22
**discuss** 160:4,7
**discussed** 169:21
201:20 211:11
**discussing** 165:15
165:22 166:3
**discussion** 160:11
165:12 167:8
169:7,19 170:4,16
177:6 179:4,15
180:14 207:12
**discussions** 160:8
165:4 167:24
168:2,3,7,9,14
173:12 177:3
195:23 196:4
210:17 211:13
**display** 156:2
167:11
**displayed** 167:1

**disqualify** 232:9
**disseminated**
167:3
**distribute** 175:9
**distributed** 171:1
171:7,8,11 173:25
174:2,5,19 175:4
**distributing** 171:3
171:4
**district** 147:1,2
**divide** 172:1
**divided** 174:6
**division** 147:3
148:15 163:12
170:19,20,23
171:5,11 174:7,9
174:11,13,19
175:4,8,24,25
176:6,13,19,25
177:5,7,9,15,15
184:21 188:6
198:8,11 208:4
210:13,18 211:18
212:5,24 214:9,11
214:13,16,17
215:19
**divisions** 170:23
170:24 171:4
173:22 176:4
**doc** 190:7
**document** 151:15
153:7,10 154:6,11
154:14 155:20
156:16,19,21,24
157:20 158:1,3
161:25 188:3
189:2,5,6,8,24
190:13 193:15,16
193:20 194:2,13
194:15,19,25
195:5,16,21,24

196:5,8,13 200:21
200:23 201:3,5,9
201:16 203:11,15
203:24 204:16,22
205:15,20 206:5,9
207:5 208:1
212:17 213:2,6
216:12,18,24
217:6 218:10
220:21,23 221:2
221:22 222:2,3,21
223:10,12 224:13
224:15,21,23
225:2
**documents** 150:13
151:9,11,12,13,18
152:3,5,9,23 153:3
153:13,17,18
155:9,10,14,17
162:21 187:14
188:2 201:12,20
206:17,21 211:6
211:10,15,21
221:4 222:5 223:1
223:19,23 227:23
**doing** 187:11
209:16
**dollar** 173:15
**dollars** 204:14
**double** 150:18
172:4
**download** 189:13
189:16 192:15,16
192:19 193:2,5,8
**downloaded**
192:23 225:10
**downloading**
192:21,24 224:7
**drive** 160:25
**dropped** 205:6

Jason  Obradovich

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**due** 233:3
**duly** 150:2
**dumped** 163:3

**e**

**e** 156:18 234:6,6
**earlier** 169:7
  190:5 219:3,10
  227:16
**early** 195:3 197:16
  222:16
**earning** 203:9
**easier** 197:4
**easiest** 228:2
**echo** 170:12
**edit** 181:19,20
**edits** 181:10,11
**either** 168:6
  195:12 228:9
**electronically**
  233:8
**eliminate** 167:8
**employed** 159:13
  215:1
**employee** 232:7
**employees** 176:10
  176:12,24
**encompass** 157:10
  157:12,14,18
  158:9 161:14
  168:11 182:18
  186:5 197:16
  204:25 205:1,3,7
  205:10,13 214:20
**encompassed**
  164:11
**encompasses**
  171:9
**encompassing**
  164:21 168:16
**engaged** 173:6
  226:24

**enter** 191:22
**entered** 157:15,16
  161:11 182:6
  217:4 219:23,25
  234:7
**entire** 198:22
  199:1 219:4
**entirely** 176:4
**entity** 176:5
**entry** 182:3
**errata** 233:3,7,8
  233:10,12,14,15
  233:18 234:1
**error** 182:3
**esquire** 149:3,4,5
  149:15 233:1
**est** 147:16
**estimation** 184:4
**et** 174:25 193:4
**ethics** 232:10
**evidence** 232:6
**exact** 154:18
  162:10 164:13
  165:8 167:7
  168:14 170:1
  173:11 202:3
**exactly** 152:6
**examination** 150:4
**examined** 150:2
**example** 157:16
  163:15 165:8
  171:18,23 172:11
  173:23 175:10
  179:12,24 183:13
  228:13 229:1,2
**excel** 156:22,24
  157:20,25 158:3
  160:1,16 161:7,9
  161:12,23,24
  162:24 163:1,7
  181:16,20,23

182:4 183:3
188:11,21,25
189:13,19,19
190:4,7,12,18
191:4,6,7,10,23
192:2,2,3,17,19
193:3,8,9,13
199:18,19,22
200:5 202:7,8,10
205:6 216:19,22
217:5,11 220:1,3
223:13
**exception** 197:7
**exceptions** 209:16
  228:24
**exclude** 172:6
**exclusively** 231:13
**executive** 176:10
  176:12,23
**executives** 160:5
  167:4 176:18
**exhibit** 148:2,4,6,8
  148:9,11,12,13,15
  148:17,18,20,21
  148:23,24,25
  150:14,20 178:8
  178:12,15 179:7
  179:17,18 187:18
  187:21,22 189:3,9
  190:13,17,25
  192:8,9 193:17
  194:1,4,5,8 196:6
  198:14,15,18
  201:16,16,23,25
  202:1,3 203:21,22
  206:2,3,25 207:1
  208:8,23 209:5,7
  209:17,19 212:12
  212:13 216:1,2,6
  216:10,25 217:6
  217:13,17 218:1,3

218:5,13 219:7,11
220:10,12,17
221:16,19 222:9
222:10,13 223:5
224:5,6,12,23
225:9,11,14,16,19
225:21 226:2,4,7,8
226:10 228:11
**exhibits** 148:1
  179:14 224:4
  226:18 231:10,13
**existence** 160:9
**expenditures**
  206:6,7 207:7
  209:22 211:18,20
  215:1
**expense** 164:23
  171:21 172:8,19
  172:20 173:7
  174:20 175:1
  182:18 185:9
  197:3 208:9,10
  221:12 228:20,20
  228:23 229:8
**expensed** 174:16
**expenses** 148:14
  164:5,16 171:18
  171:22,24,25
  173:1 174:14
  175:19 177:8,10
  177:11 184:5,5,11
  184:12,13,20
  185:3,10 194:11
  194:21,24 197:10
  197:14,15,24
  208:16 215:3
  220:22,24,25
  221:2,5,8 226:17
  226:21,23 227:3,6
  227:9 228:8

Jason  Obradovich                                        March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[expires - go]**                                                  Page 8

| | | | |
|---|---|---|---|
| expires 235:25 | 187:14 211:5 | 184:22 185:15 | **g** |
| explain 168:10 | 219:15 | 186:8 190:9 | ga 231:17 233:22 |
| 196:13 | figures 171:11 | 191:25 193:6 | gatekeeper 158:23 |
| explained 168:19 | 185:18,20 | 210:4 211:7 | general 149:23 |
| 169:19 | figuring 173:17,18 | 214:14 218:14 | 169:10 175:17 |
| express 169:14,22 | file 161:7,9,23 | 234:7,9 | 185:8 210:17 |
| 170:5 | 182:4 183:3 | format 189:11 | 226:19 228:24 |
| extrapolate | 233:13 | 190:12 197:4 | generally 164:15 |
| 216:24 | filed 233:16 | formatting 189:15 | 221:11 228:19 |
| | fill 233:7,8 | 189:21 192:20 | 229:8 |
| **f** | financial 231:24 | forward 233:13 | generate 180:20 |
| f 203:3 | financially 232:7 | four 172:17 | 182:8 191:23 |
| facilitate 208:22 | find 151:12 188:15 | fourth 228:8 | 205:13 217:6 |
| facilities 175:2,2 | 221:9 | fq 205:5 | generated 181:15 |
| facility 233:19 | fine 224:1 229:19 | frame 195:16 | 181:17,23 183:12 |
| fact 165:10 204:11 | finish 229:15 | 196:12 | 212:2 219:21 |
| factor 173:19 | finished 151:4 | free 207:16 219:13 | generates 154:25 |
| factored 164:2 | finley 149:6 | frommert 159:13 | 183:6 |
| fair 151:6 | firm 149:6 231:2 | 173:5,12 185:12 | gentleman 158:5 |
| familiar 150:14,23 | first 150:2,24 | 185:23 186:12 | georgia 147:2 |
| 151:1 189:10 | 151:14 154:4,21 | 226:24 | 149:9,19 231:5,14 |
| 194:14 202:2,4 | 162:11 163:25 | front 177:17 179:7 | 232:2 |
| familiarity 194:16 | 171:20 178:9 | froze 176:14 | getting 158:8 |
| 194:17 199:9 | 224:18,20 | full 203:9 | 170:11 201:9 |
| 202:24 203:25 | five 229:13 | fully 228:1 | gibson 149:4 |
| 204:3 | flip 208:7 | fulton 232:2 | 176:14 178:10 |
| far 177:13 203:1 | focused 187:9 | function 193:13 | 179:16 |
| 211:6,16,22 | folder 179:17 | functionalities | gina 147:4 |
| fashion 156:5 | 187:18,22 224:4 | 163:9 191:12 | give 184:6 186:21 |
| faster 192:4 | folks 169:6 | functionality | 219:10 229:1 |
| fastest 192:14 | follow 167:8 | 162:17,23,25 | given 159:1,17 |
| features 156:12 | following 209:3 | 163:2,6 191:9,10 | 198:25 204:10 |
| 189:20 | 234:4 | 192:3 205:4 | 209:9 217:18 |
| february 199:2 | follows 150:3 | 217:10 | 232:6 234:8 |
| federal 234:6 | foregoing 231:4 | funded 173:16 | gives 158:13 193:9 |
| feedback 180:12 | 232:3 | funding 147:8 | go 151:12 152:9 |
| 180:13 | form 153:14 | 172:3 | 154:4 163:15,23 |
| feel 207:16 219:13 | 154:13 155:13 | furnish 234:9 | 164:5 165:16 |
| fees 197:16 | 163:5 164:24 | further 169:22 | 169:5 173:13 |
| fields 205:4,17 | 165:13 166:2,15 | 184:6 231:9 232:6 | 176:2 179:2 182:7 |
| figure 165:6 | 169:16,24 184:2 | | 184:25 185:11 |
| 166:13 177:19 | | | |

Jason Obradovich

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[go - intending]

Page 9

186:1 187:13,17
188:14 189:1
193:7,24 198:13
202:9 207:14,16
212:11 216:23
217:24 219:9
220:15 221:14
223:23,24 226:2
226:16 227:7
**goes** 157:12 158:3
158:10,18 182:16
188:21 211:9
216:20 217:5,8
219:7 228:23
**going** 150:8,12
158:9 162:20,21
170:18 172:14,22
183:24 207:17
213:12 215:15,18
229:12
**golden** 149:16
**good** 150:6
**gpm** 196:22
**granting** 209:15
**great** 150:11
**greater** 208:9
209:10
**greetings** 233:5
**gregory** 149:16
**gross** 197:24
**ground** 150:24
**guess** 177:20
199:2 204:19
228:2
**guessing** 162:9
177:18 178:5

**h**

**hand** 150:12
196:18
**handled** 171:1
231:13

**hang** 170:15
215:22
**happened** 209:3,4
220:7
**hard** 189:15
197:21
**hargrove** 149:3
150:5,7 152:2
153:15 154:20
155:19 159:12
163:8 165:3,18
166:6,17 169:18
170:3,15,17
176:16,17 177:25
178:7,16,19 179:6
179:20 180:17
184:17 185:4,17
186:11 187:4,11
187:16,19,23
190:11 192:6
193:14,24 194:3
196:2,3,21 198:13
198:17 201:6,8,24
203:20,23 206:1,4
206:24 207:22
210:8 211:12
212:11,15 214:18
215:24 216:3
218:4,15 220:15
220:18 221:18
222:8,12,25
223:20 224:3,8
225:13 226:5
229:21
**head** 172:5 177:24
200:18
**hear** 150:9 166:19
225:9
**heard** 180:13
**help** 154:12

**helpful** 162:20
**henry** 149:15
225:10 229:14
233:1
**high** 182:15
**higher** 227:10
**hiring** 168:23,25
**hit** 172:8
**honest** 150:17
200:9
**hperlowski** 149:20
**huh** 155:1 164:17
182:23
**hundred** 155:15
159:16 214:4

**i**

**idea** 193:16
**identical** 174:2
**identified** 168:10
169:7 228:22
**impacts** 232:12
**impartial** 232:13
**impartiality** 232:9
**include** 171:12
197:15
**included** 227:22
**includes** 198:3
215:12
**including** 211:3
**increase** 227:2,5
**increments** 161:20
**incurred** 153:11
228:15
**index** 148:1
**individual** 167:12
168:22 211:25
220:25
**individually**
164:19
**individuals** 159:5
159:10 166:4

167:9 168:10
169:21 195:7
210:6,9,10,21
211:3,14 227:21
**industry** 184:19
185:1,9
**information**
153:19 155:4,6,18
156:1,2,4,9,14,17
156:19 157:4,14
157:15 158:2,8,9
158:11,13 161:2
161:11,13,24
162:5 163:3,25
167:2 182:17,19
182:24 183:6
186:19,20 187:3
189:9 190:1,3,4
192:16 199:16
200:3 210:7 211:8
211:10 212:6,8
217:11 221:11
**initially** 151:8
219:22 223:17
**input** 154:23
156:11 167:25
**inputs** 158:14
**inputting** 158:2
**ins** 186:4
**instance** 163:14
175:5 182:2
**instruct** 151:22
159:7
**instructing** 187:4
**instructions** 159:1
159:4
**intended** 193:21
202:20 225:24
226:13
**intending** 197:20

Jason  Obradovich

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[intent - lawsuits]

Page 10

**intent**  194:19
**intention**  195:20
197:2 209:8,14
**interest**  232:8
**interested**  232:7
**interface**  156:7
161:10
**introduced**  173:2
**involved**  151:14
151:25 162:12
167:20 168:7
170:19 171:6,7,10
180:8 183:4,18,19
183:22 190:24
191:1 194:12
195:14 200:10
201:10,13,14,19
202:16 220:10,14
222:1,4
**issue**  150:11
183:24
**item**  193:12
208:10
**items**  174:24
189:10,14,19
192:14 197:3,16
197:18 198:23
199:20,21 202:3,4
206:14 207:12
208:9,10 215:19

**j**

**j**  147:18 232:17
**jackson**  149:5
**jan**  148:7 168:4
210:11,12
**january**  179:16,23
187:1,18 188:7
218:7 219:16
**jason**  147:13
150:1 207:20
233:2

**jason's**  178:15
**jim**  158:5 159:11
195:12 213:5
**jon**  168:4 210:10
210:12
**jump**  229:17
**june**  229:5

**k**

**keep**  205:7
**ken**  149:23
**kept**  182:8
**kevlar**  148:4 154:5
154:8,10,12,15,17
154:19,22 155:3,5
155:8,11,12,18,21
155:22,23,25
156:1,1,3,9,10,11
156:13,20 157:21
158:3,10,12,18
159:15 160:2,14
160:17,22 161:2
161:12,12,19,24
161:25 162:4,8,13
162:19,22,24,25
163:10,14,16,18
163:21 166:9,12
166:25 167:2,13
167:21,25 168:20
169:5,9 170:7,18
170:18,22 171:1,9
171:14 173:2
177:3 178:24
179:11,12,23,24
180:7,9,10,20,23
181:14,16,18,19
181:22 182:1,3,7,9
182:13,17 183:3,7
183:11,15 185:11
188:5,8,18,19,20
188:22 189:1,14
189:16,17,23

190:1,3,6,14,18,19
191:4,8,11,14,18
191:22 192:1,5,15
192:16 193:2
199:15,17,17,24
200:4 202:5,6
204:22 206:9,10
206:12,13,14,15
210:25 211:2,4,9,9
212:2,4,7 216:12
216:20,23 217:6,8
218:8,12,20,21
219:3,21 220:1,5
223:10 225:5,6,7
227:13,20
**kind**  170:13
182:15
**know**  150:12,16
151:13 152:6,8,19
153:5,6,25 154:15
156:17 158:16
160:9 168:25
169:11,12,25
170:13 171:1,19
172:5,7,12 176:1
177:19,23 178:1
180:12,25 181:7,9
182:15 183:22
186:6,12,14
187:24 188:12,17
190:20 192:2
193:12,20 194:10
195:5,15,18
196:12 197:4,5
198:21,24 199:3,4
199:8,9,12 200:12
200:15,22,23
201:3,4 202:9,19
202:23 203:4,6,11
203:14,17,24
204:18 205:9,19

205:23,25 206:5
206:20,21 207:1
208:4,9 209:6
210:1,2 212:16
213:4,6 214:7,23
214:24 216:4,11
216:12,14,17
217:13,15,18
218:9 219:6,19,20
221:6,10,24
223:12,14,16,20
224:14,17,17
225:4,24 226:13
228:21 229:3,5
**knowledge**  159:17
164:12 168:8
183:17 185:14
188:16 195:1
210:19 213:16
215:21 220:6,9
221:3 223:18
226:22
**knowledgeable**
215:5
**kristin**  157:1,19
168:4 195:12

**l**

**label**  178:11
**labeled**  196:5
**lack**  163:3 207:11
**large**  217:12,12
223:23
**larger**  172:9,21
**larita**  147:18
232:17
**late**  153:19,24
222:15
**lawsuit**  214:6
217:19
**lawsuits**  213:13,16
213:17,20,22,25

Jason  Obradovich                                      March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[lawsuits - mean]**                                                    Page 11

214:3,7,8,11,15,19
214:20,21 215:2,6
**layers**  164:4
**left**  178:14 186:23
187:9 196:18,22
197:1 223:24
**legal**  213:12,21
214:2,6,19,20,21
214:25 215:6
231:1
**level**  176:21
182:15 212:8
221:12
**levels**  169:15,20
170:5
**liens**  172:6
**limit**  163:7
**line**  152:18 165:2
165:5,10,11,24,25
166:8,13 167:4,13
167:15 170:6
189:10,14 192:14
193:12 198:23
199:20,21 202:2
211:5 213:12
234:11,14,17,20
234:23 235:1,4,7
235:10,13,15
**lines**  189:17
**listed**  168:20
169:9 211:21
**literally**  161:6
163:3 224:18
**litigation**  154:1
193:17 199:4,7
200:16 220:11
222:2,5
**litsup**  231:17
**little**  209:21
226:17

**llp**  149:16
**lm**  197:9,12,13,13
197:14
**loaded**  155:11
228:2,7,16
**loan**  157:15,16
173:15,16 177:11
197:13 203:8
204:8,13,25
213:21 214:1,1
215:9
**loans**  157:17 172:7
172:13,14,16
175:12,13 184:8
196:20
**lock**  148:12 204:4
204:7
**locked**  204:8
**log**  180:5,19,21,22
186:4 205:7,14
**logs**  180:16,19
**long**  164:14
194:15
**look**  152:23 154:7
155:14 156:13
162:20 165:1,16
167:10 178:14
184:11,15 185:2
187:17 191:2,15
191:20 198:14
201:6 202:4
207:15,16 209:11
215:22,25 221:9
224:24 225:8
**looked**  153:3,21
154:1,16 165:15
178:3 179:21
201:11,15 207:14
211:6,21 215:23
219:3 223:2 225:1
226:18 227:23

**looking**  150:13
153:13 155:9
162:17 165:10,24
166:4 169:2
199:10,20
**looks**  188:5,6
197:23 199:11,13
199:16 201:25
202:8 223:5
224:23 225:3
**losing**  209:25
210:3,14,18
**loss**  198:1 227:15
**losses**  209:23
211:15
**lost**  208:4 211:24
217:1
**lot**  172:12 202:4
206:13 228:4
**lower**  227:11

**m**

**m**  149:15 233:1
**mail**  233:10
**mailed**  156:18
**maintained**
160:20,23
**maintaining**  232:9
**majority**  202:2
208:10
**making**  234:8,8
**manage**  208:13
**managed**  207:8
**manager**  173:13
197:8,8,8 208:20
**managers**  191:19
208:12,13 213:9
**manipulate**  192:4
**manipulation**
189:21
**manipulations**
193:10

**mansell**  233:20
**manually**  161:11
217:4 233:8
**march**  147:15
199:2
**margin**  164:2
169:20 171:16
172:15,22 173:1
173:17,18,24
174:12,18,24
183:25 194:9
196:19 197:10,13
197:24 198:4,7
215:19 226:17,20
227:14,23 228:1,4
228:6,13
**margins**  163:23
208:14 220:23
**marked**  179:18
187:21 194:1,4
198:15 201:23
203:22 206:3
212:13 216:2
218:3 221:16
222:10 224:4,6
225:11 226:4
**marketing**  148:14
215:8,10,11,12,13
215:16
**marybeth**  149:4
178:7 187:20
193:24 198:13
203:20 206:1
212:11 215:25
220:15 222:8
223:20
**matter**  232:9
**matters**  186:24
**mean**  151:17
152:7 184:6
200:19 220:25

228:17
**meaning** 198:1
**means** 203:5
**meant** 169:23
170:9
**mechanically**
182:14
**meetings** 201:10
201:14 227:16
**memory** 154:8
**met** 150:7 212:4
**mgibson** 149:11
**microsoft** 156:22
156:23 229:3
**million** 209:21
**mind** 152:7 154:17
168:21
**mine** 225:12
**minutes** 152:21
229:13,15
**mischaracterizes**
190:10
**miscommunicati...**
166:3
**mistake** 165:22
**money** 175:5,9
208:4 209:25
210:3,14,18
211:25 215:15
**month** 161:22
163:17 210:20,23
211:25 218:21
219:25 220:4
221:21 222:14
227:19 228:15
**monthly** 161:19
161:21,22 228:20
228:25 229:4,6
**months** 220:3
**morning** 150:6

**mortgage** 213:11
**moved** 179:16
**multiple** 161:7,9
**muth** 158:5,6,11
158:17 159:11
183:19,22 195:13
213:5 215:4
229:16
**muth's** 158:7

**n**

**n** 149:5
**naf** 148:4,6,8,9,11
148:13,15,17,18
148:20,21,23,24
148:25 149:23,24
151:15 164:3
170:20,24 173:22
174:8 176:3,18
177:13 179:8
184:7,8,11,13
185:19,21,24
187:19 194:7
195:24 196:5
198:9 201:21
208:16 210:2
214:22 220:8
221:7
**naf's** 160:23
184:10,14 203:12
208:11
**name** 157:1 181:2
**named** 158:5
**names** 185:7
193:11
**nearly** 174:2
**necessarily** 160:19
169:11
**necessary** 169:1
172:8 234:9
**necessity** 168:21

**need** 150:25 154:7
155:14 164:21
176:14 181:20
191:13 218:25
**network** 160:24
**never** 178:3 198:7
198:10 224:13,14
224:16 225:2,7,19
226:9,10
**new** 147:8 173:6,9
178:20 181:17,22
186:24 187:2,3
**nickolas** 149:5
**njackson** 149:12
**non** 164:16
**normal** 168:25
**northeast** 172:13
172:16
**northern** 147:2
**notaries** 231:6,15
**notarized** 231:15
233:10
**notary** 235:23
**note** 178:12,17
**noted** 234:3,4
**notice** 219:2
**noting** 233:7
**nov** 148:7
**november** 188:7
218:11 219:2,12
**number** 173:19
174:6 212:21
**numbers** 154:18
154:22 157:3
172:11 173:11
177:17 185:24
186:3 189:22
190:21 193:1,4
216:17,19,23,24
**numeric** 193:11
197:5

**nw** 149:17

**o**

**object** 153:14
154:13 155:13
159:9 163:5
164:24 165:13
166:2,15 169:16
169:24 184:2
185:15 186:8
190:9 191:25
210:4 211:7
214:14 218:14
**objection** 166:18
177:21 184:22
193:6 196:14
206:22 207:19
**obligation** 232:9
**obradovich**
147:13 150:1,6
151:21 178:21
224:11 229:21
233:2
**observations**
185:8
**obviously** 150:21
162:15 194:14
**occurred** 215:10
221:9 227:3 228:7
**ocga** 231:20 234:6
**october** 178:24
180:2 218:11
219:2,12,17
**office** 175:6,10
229:3 233:10
**officer** 157:16
203:8 232:13
**offices** 233:3
**oftentimes** 191:6
**okay** 150:9,19
152:3,19 153:25
154:3,11,21 155:4

Case 1:20-cv-04981-CAP   Document 104   Filed 04/28/22   Page 102 of 110
Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[okay - person]                                              Page 13

156:15,23 157:2,6
157:25 158:13,20
159:1,25 160:13
161:1,17,22
163:16 165:19
166:11 167:2,20
169:4 170:10
173:22 174:7
175:14 178:6
179:19 181:4
182:20 189:23
192:11 193:23
194:2 195:18
196:17,24 198:12
198:16 201:22
205:1 207:24
208:8,18,23
209:24 210:9
212:10 213:6
214:19 215:18
216:5,10 217:13
218:9,19 219:14
221:13,17 222:7
222:24 224:10,22
227:2,13 229:7
ola   148:6,15 188:6
204:5 208:4
212:24 215:19
once   155:7,20
156:1 161:1
171:24 181:10,14
182:24 189:19
193:5,8 204:8
233:10
ones   195:23
211:21 217:21
223:21
open   186:24 187:9
194:2 217:25
221:14,17 225:12

opened   179:13
operates   176:5
operation   174:16
174:16,17 175:19
185:2 197:15
opposed   156:11
165:11,24 172:16
173:15 177:15
191:13 219:18
order   180:4
ordering   233:14
original   233:13,16
originally   157:14
200:24 203:18
originate   157:17
175:13
originated   175:12
origination   157:7
157:9,10 178:4
182:17 197:14
204:25
originator   213:11
ought   223:21
outcome   232:7
outside   215:1
oversee   175:24,25
oversees   183:21

**p**

p&l   148:4,6,18
153:8 154:5 169:3
178:24 188:4,6
218:6,10 227:18
p&ls   153:5,20,25
154:3 160:12
162:1 163:11
168:20 175:11
177:2 210:21,21
210:22,24 228:23
p.c.   149:6
p.m.   224:2 229:20
230:2

page   148:2 181:8
234:11,14,17,20
234:23 235:1,4,7
235:10,13,15
pages   234:9
paid   174:24
228:21 229:4,5
part   151:18
154:22 162:11
171:17,20 178:9
178:20 179:22
183:5 187:11
194:22 196:22
201:21 211:1
partial   181:1
particular   153:8
163:12,12,13
194:20 211:18,18
217:21
parties   231:22,25
232:13 233:14
partner   207:6
party   231:22
232:7,10
password   158:20
158:24 159:3,5,8
159:14,17,18,19
159:22,24 160:1,6
183:16 200:21
203:15 205:10,14
paste   155:22
pasted   155:2
pause   229:17
pay   174:19 215:15
229:2
payoff   197:17
payroll   164:16,16
pays   175:1
pdf   233:7,7
people   162:1
168:24 174:15

percent   155:15
159:16 169:12
199:9 203:2,5,8
214:5
percentage   172:21
173:13,14 177:13
percentages
176:22 178:5
perfect   151:2
perform   176:12
176:18,20,21
period   153:9,11,13
153:23 161:21
166:16,20,21,22
167:7 172:5
181:23 194:11
195:4 196:20
205:17 208:3
216:9 217:21,22
periods   205:5
perlowski   149:15
151:21 153:14
154:13 155:13
159:9 163:5
164:24 165:13
166:2,15 169:16
169:24 170:11
177:21 179:2
184:2,22,25
185:15 186:8,23
187:6 190:9
191:25 193:6
195:25 196:14
206:22 207:19
210:4 211:7
214:14 218:14
222:22 224:1
229:19,24 233:1
permissions   180:6
person   210:3

Jason Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

**personnel** 174:15 215:13
**pertains** 163:11
**phone** 152:17
**pick** 205:4 213:12
**pie** 228:11
**piece** 164:18
**piedmont** 149:7
**pivot** 192:3 217:7 217:9,10
**plaintiff** 147:5 149:2
**plaintiff's** 148:3 179:18 187:21 194:1 198:15 201:23 203:22 206:3 212:13 216:2 218:3 221:16 222:10 224:6 225:11 226:4
**pleadings** 178:18
**please** 195:25 233:6,10,18 234:9 234:9
**point** 164:14 198:9 220:4
**points** 196:22 197:19,25 198:1,4 204:15 208:17 222:15
**populates** 183:3
**population** 196:20
**portion** 156:25 171:22 183:22
**portions** 202:14
**possible** 166:11 182:1 214:10
**possibly** 192:10
**post** 148:12 204:4 204:7

**potentially** 192:20
**practice** 184:4,20 185:2
**practices** 169:1
**pre** 206:10,13
**preparation** 200:13 223:2
**prepare** 152:12,24 153:4 200:6 202:12 204:16 213:1 214:24 216:10 225:22 226:11
**prepared** 155:6 160:12 200:24 201:3 203:18 204:18 205:20 206:18,21 207:1 213:4,5,7 215:4 217:14,15 224:17 224:22 225:3
**prepares** 156:23
**preparing** 177:2
**present** 149:22
**presents** 156:5
**preslo** 168:4 210:11,13 227:17
**presume** 155:16 176:21 195:2,6 198:25 199:19 217:19 222:18,19
**presumption** 188:11 209:1
**pretty** 150:10 151:1
**prevent** 189:20
**price** 197:7 204:10 204:12 209:9,15
**pricing** 194:9 196:19

**primarily** 210:6
**print** 205:15 233:8
**printed** 205:8,20 205:24 218:20
**prior** 154:16 165:9 165:20 173:18 178:8 179:22 189:5 202:15 207:15 212:7,9 226:18
**privileged** 151:22
**pro** 177:10
**probably** 154:18 170:1 199:7 223:23 228:2
**procedure** 234:6
**proceed** 204:9
**proceeding** 231:16 232:6,12
**process** 182:11,25 183:1,1,5,9,18,20 210:19 211:1,3 227:20
**produce** 154:16 166:11,24,25 195:8
**produced** 151:10 152:4,4,5,6 154:1 154:16 188:1,5 193:16,17,19 200:15 202:14 217:19 218:12 219:7 231:5,13
**producing** 220:10
**production** 151:15 151:18 152:1 160:19 178:20 194:12 202:16 218:13 222:1,3,4 231:5,14,15 233:19

**productions** 187:2
**productive** 172:15
**professional** 232:10
**profit** 165:2,5,11 165:25 170:6 197:24 209:2
**profitability** 163:16,22 164:3,6 165:1,23 166:5,8 166:12 167:1 169:15 170:9 207:11 216:7 221:20 222:14 223:7
**profitable** 217:20 218:24
**program** 156:20
**programmed** 167:13
**programmer** 162:16
**programmers** 162:16 183:8
**prohibited** 231:20
**project** 199:24
**projected** 199:23
**projecting** 209:2
**projection** 200:9 208:25
**protected** 158:20 183:16 200:21 203:15 205:10
**public** 235:23
**pull** 161:14 163:18 182:17 207:20,25 217:4 219:13 222:9
**pulled** 155:11
**pulling** 187:12

Jason  Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al
March 29, 2022

**[pulls - report]**

Page 15

**pulls**  158:11
**purpose**  192:21,23
  199:14 200:12
  209:6,18,20
**purposes**  191:9
**pursuant**  234:6
**put**  155:24 156:1
  156:20 157:19
  158:12 163:24
  164:22 173:24
  178:11 179:10
  181:20 189:19
  199:11 200:18
  206:1 212:12
  219:10 220:16
  228:21
**putting**  178:21

**q**

**q3**  148:11
**q4**  148:11
**quarter**  228:8
**quarterly**  161:19
  228:16
**question**  176:15
  186:9,15 187:5,7
  188:2 190:16
  196:1 207:16
  208:7,23 210:1
  217:2 220:20
  221:10 228:10
**questions**  150:20
  169:22 170:12
  187:2,8,12 229:22
  229:24 231:7
  232:4
**quick**  223:21
  229:10,13,17

**r**

**raise**  150:12

**rata**  177:10
**raw**  191:22
**read**  202:23 203:3
  233:6 234:2
**readable**  156:5
**real**  229:13
**realized**  182:2
**really**  178:5 201:5
**reason**  184:18
  207:17 208:1,21
  234:13,16,19,22
  234:25 235:3,6,9
  235:12,15,17
**reasoning**  168:18
**reasons**  191:16
  234:8
**recall**  153:21
  162:11 164:13,18
  165:12,15,22
  167:7 168:5,13
  169:17 170:1
  173:11 186:18
  189:4,6,12,12
  190:23 195:6,17
  196:10 199:8
  200:8,11 201:5
  202:3,14 210:15
  211:17 213:17
  214:23 227:8
**received**  229:9
**receives**  231:23
**recess**  179:5 224:2
  229:20
**recognize**  194:5
  202:1 225:16,17
  226:6,8
**recognizing**
  177:20,20 196:12
**recollect**  162:10
  165:7 166:3 177:6
  183:13 208:25

211:23
**recollection**  153:4
  155:16 164:10
  178:23 179:11
  194:6 195:3
  198:19 213:8
**record**  157:11
  161:25 170:16
  178:17 179:2,4,15
  180:10,11,14,15
  180:18,22,23
  181:2,5 182:7
  220:8 232:5
**reduced**  232:5
**reed**  168:4 210:10
  210:12 227:17
**reference**  178:22
**references**  217:8
**referred**  164:7
  180:18
**referring**  161:5
  181:13
**reflected**  211:15
  214:12
**refresh**  150:25
  154:7 164:10
  178:23 179:10
**regard**  151:23
  164:20 206:17
  225:18
**region**  153:20
  154:5 163:12,17
  171:13,14,15,23
  172:10,21,23
  180:2 191:20
  194:20 195:15
  197:8 204:5
  209:10,23 212:3,8
  213:15,24 214:9
  216:8 217:23
  218:24 222:17

223:7
**regional**  148:9
  173:13 191:19
  208:12,13,20
  213:9 220:22
**regionals**  173:6
  196:9 226:25
**regions**  153:6,8
  154:4 191:17,18
  191:21 196:10
  209:16 217:20
**regular**  199:13
**rehashing**  186:25
**related**  153:7,10
  153:17 171:13
  174:15,20 176:13
  187:13 214:16
  231:16
**relation**  197:3
**relationship**
  231:20 232:8
**relative**  232:6
**relevant**  166:14
**remain**  183:16
**remember**  150:16
  150:17 151:3
  153:12
**remote**  147:17
**rent**  175:1
**repeat**  151:25
  176:15 186:9
  190:16 195:25
  213:23 217:1
  219:24
**rephrase**  186:9
  228:9
**report**  166:9,12
  171:9,10,14
  179:12,24 181:2,4
  181:6,7,9,15,17,19
  181:22 182:9,13

Jason  Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[report - servicing]**

Page 16

183:11 185:10
188:10,12,15
189:11,12 190:6
190:19 191:2,23
192:8,12,13,22
193:1,2,3,5,8
194:6 198:19
199:10,10,13,15
199:17,18,22
200:6,13,15,19
202:4,5,6,7,8,10
202:12,15,17,19
204:11 205:5,13
205:24 206:10,12
206:13 209:20
211:5 212:4
214:24 218:12,20
218:23 219:3,16
**reported** 191:14
**reporter** 151:5
231:8,11
**reporting** 162:23
171:13 205:3
**reports** 162:22
163:21 169:4,9
180:20,24 181:10
181:12 188:17,19
190:25 191:1,3,5,8
191:12,13,15
192:7 205:2,8
212:2 219:21
227:14,25 231:24
**repository** 156:3
**represents** 231:4,9
**request** 231:17,25
**reserved** 230:3
233:6
**responsible** 210:6
**restate** 228:9
**resume** 178:13

**retail** 170:20,22,25
171:4,5,7 174:2,5
174:7 175:24
177:9,15 210:18
**returned** 233:12
233:15
**reveal** 151:22
**revenue** 165:11,24
177:13,14 178:3
185:18,20,24
186:7,13,16
194:20,24 196:19
197:4 198:23
208:10 221:21
**review** 182:25
189:5 210:19,20
211:1,2 212:6,6
233:6
**reviewed** 154:3
155:7 227:25
**reviewing** 211:4,5
211:8
**rick** 165:5,10,15
186:7
**right** 150:17 151:2
151:8 152:8,23
153:2,12,20
155:20 156:8
157:18,25 161:5
162:15,19 163:21
164:7,10,20 166:7
167:6,17,23 168:6
168:13 171:8
172:20,25 173:9
175:4,23 176:2,9
176:16 177:9,19
179:13,13 180:1,8
181:10,21 182:11
183:24 185:25
187:17 188:8,21
188:24 190:20

191:3 193:15
196:25 197:1,2
198:3,6 199:15
202:7,19 203:1
204:21 205:12,19
207:3 208:7
211:20 212:16
213:1,4 215:14,22
216:14,22 217:24
221:19 222:11
223:5 224:7,9
225:8,18 226:2,16
227:22 229:17
233:6
**road** 149:7
**role** 158:7,8
175:23 201:21
**rolling** 148:4,18
**rolls** 176:7
**roswell** 233:22
**roughly** 173:3
**rpr** 147:18 232:17
**rule** 234:6
**rules** 150:24 234:6
**run** 205:5 213:11

**s**

**salaries** 176:23
197:9
**sales** 197:7
**saw** 189:4 228:11
**saying** 228:18
**says** 167:19 197:9
197:19 199:23
203:2 206:7 214:6
215:11
**scott** 185:12
**scratching** 200:18
**screen** 179:1
197:23 198:16
207:3 212:14
219:13 222:11

**se** 148:13
**seal** 233:13
**second** 172:6
179:3 219:10
**security** 156:12
189:20
**see** 150:8,20 152:3
152:5 165:2
167:14 179:1,19
187:22 197:22
213:13 219:9
**seeing** 151:17
**seen** 189:2,6,8
192:7 194:15
224:13,14,16,19
224:21 225:2,7,19
225:20 226:9,10
**segments** 228:15
**select** 163:11
205:16
**send** 233:13,18
**senior** 149:24
**sense** 223:25
**separate** 171:10
176:5 183:7
214:17
**september** 218:7
219:7,17
**series** 161:23
221:4
**serve** 232:12
**server** 203:12
**service** 184:7
**services** 231:23
**servicing** 174:9,11
174:12,14,15,16
174:17,20,22
175:1,8,12,14,16
175:18,19,25
176:5,13,19,24
177:5,7,7,14 178:4

Case 1:20-cv-04981-CAP   Document 104   Filed 04/28/22   Page 106 of 110
Jason  Obradovich                                    March 29, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[servicing - sum]                                                  Page 17

184:1,5,11,12,13
184:21 185:2,3,9
198:8,10
set  217:12,12
share  150:14
177:10 195:21
222:22
shared  195:19,22
201:12 221:11
222:20
sheets  161:8,9
224:24 225:1,15
225:19
show  152:8 153:5
167:13 193:21
194:9,20,21
197:20 202:20
204:4 206:2,6
207:6 208:8 209:8
209:12,14,21
212:18,23 216:7
217:20 218:6,23
220:8 221:5,20
222:14 225:25
226:13
showed  228:12
showing  204:12
225:14
shown  162:3,4,6
201:17 223:1
227:15
shows  180:19
196:13 198:22
sign  203:2,3,5
233:6
signature  230:3
232:15 233:2,16
235:20
signed  233:10,12
233:15

similar  189:9
191:2 192:10
201:12 202:15
224:22
simple  183:2
single  210:20,23
228:19
sit  165:19,21
sitting  171:19
174:25
size  193:10
skip  215:24
small  172:11
197:23
smaller  197:18
software  154:6
156:20 162:15,16
229:3
solely  232:11
solutions  147:7
176:8,9 231:1
someplace  191:24
sorry  171:8
184:24 186:10
193:7 201:13
204:13 207:2
217:1
sort  227:2
source  157:5,8
206:16
sources  156:4
157:5,19,23,24
southeast  148:8
153:6,20 154:5
163:15,17 171:23
172:10,13,14
180:1 194:10
195:15 198:20
204:5 206:8 209:9
210:13,16 213:15
213:18,19,24

218:7,24 222:17
223:7
speaking  151:3,4
164:15
spearman  147:4
170:19 171:5,9
195:19 196:9
201:18 209:24
specific  153:6
171:14 185:7
199:14 209:5
210:15,16 211:17
214:25 231:21
specifically  171:15
211:9 214:5
specifics  170:2
speculate  207:5
speculating  158:4
193:18 195:2
200:14 202:11,21
203:6,8 217:16
speculation  181:1
184:23 193:7
207:9 217:22
spending  207:13
spreadsheet
148:17,22,23,24
148:25 158:10,16
158:17,21 159:6,8
159:14 160:1,21
160:24 161:3,6,7
161:15 182:22
183:5,7 188:25
190:13 193:3
197:6 217:5
spreadsheets
151:10 160:6,10
160:12,15,20
161:17,18,20,23
162:4,7 178:11
182:6,7,8,12

183:10,15 185:11
201:11,11,15
stand  165:20
stands  197:13
start  178:13,16
206:25 207:23
state  176:22
199:25 206:10
216:8 232:2
stated  153:24
232:4
statement  170:7
178:24 234:8
states  147:1
198:21 204:6
street  149:17
strike  228:5
strong  204:19
subcontractor
232:11
subject  151:23
submitted  228:21
231:8,11
subscribed  235:21
subsequent  151:15
subsequently
188:1
subservicer  184:8
184:14
subservicer's
184:9,12
subservicing
184:15,16
substance  234:7
substantially
227:7,9
suggestion  229:14
suite  149:8,18
233:21
sum  217:11

Case 1:20-cv-04981-CAP   Document 104   Filed 04/28/22   Page 107 of 110

Jason  Obradovich

March 29, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[summary - unit]

Page 18

summary  148:10
  198:20
sure  150:8,19
  151:3 163:24
  172:9 181:13
  186:12 190:17
  196:2 203:10
  213:24 219:25
  221:15 224:24
  228:11
surprised  213:10
surrounding
  207:11
sworn  150:2
  235:21
symbol  203:5
synopsis  182:16
system  154:23
  157:7,9,10,11
  160:23 161:14
  167:21,25 188:15
  204:25

**t**

table  192:3 217:7
  217:9,10
tabs  225:21
take  151:5 173:23
  201:6 206:19
  215:22 223:21
  225:8 229:10,13
  229:15,16
taken  147:17
  232:4
takes  199:16
  213:11
talk  226:16 229:12
talked  165:9
  178:22
talking  158:6
  162:22 196:24
  199:8

target  200:1
technology  150:11
tell  152:15 153:2
  157:9 158:7
  182:11 194:17
  198:18 203:1
  204:2,2 210:3
  216:6 218:1,5
  220:24 222:13
  224:11 226:6
telling  187:7
tells  220:21
ten  172:13,16
terminology
  172:18
terms  151:17
  169:23 173:14
  178:4 204:12,14
  204:14 215:17
  232:11
territory  207:7
testified  150:3
  190:5 227:16
testimony  165:20
  190:10 234:2,7
thanks  230:1
thargrove  149:10
thefinleyfirm.com
  149:10,11,12
thing  215:8
think  151:1,24
  165:7 170:8
  171:18 178:8
  194:22 195:8
  197:17 199:6
  200:10 221:23
  229:1
three  164:22
  168:16 169:13,15
  172:13 212:3
  223:8,21 224:23

224:24 225:1,15
  225:18,21
throw  228:13
time  150:15,24
  153:8,11,12,23
  161:20,21 165:8
  166:20,21,22
  167:5,7 172:5
  173:2 181:23
  194:11,15 195:4
  195:16 196:12,19
  198:9 205:5,17
  208:2,15 216:9
  217:21,22 218:10
  224:18,20 229:6
  231:22 233:15
times  173:14
today  150:13
  152:13,25 158:7
  165:19,21 168:14
  178:17 189:3
  223:1 224:20
  225:19,21 226:9
  226:10 227:24
told  162:16 166:7
tolerances  200:2
  200:17
top  160:5 165:10
  165:24 172:5
  177:24
total  164:22 172:1
  173:14 174:6
  194:9,20 196:19
  204:13,13 218:25
totals  199:25
  219:4
track  205:2
transcript  231:4,7
  232:4,5 233:7,13
  233:16 234:2

travis  149:3 150:6
  170:11 176:14
  186:23
treated  228:25
true  231:6,10
  232:5
try  151:2
trying  187:14
  192:25 211:25
  219:15
two  157:24 170:24
  174:8 176:4
  191:18 195:7,10
  197:19,25 198:1
  210:5,9,21 211:3
  211:14
type  164:16 189:8
  189:21 200:9
  210:7
types  164:2
typewriting  232:5
typical  197:5

**u**

uh  155:1 164:17
  182:23
underlying  181:16
  183:10 186:1,7,13
  186:16 190:6
  215:3
undersigned  234:2
understand
  154:12 155:22
  162:21 168:22
  172:10 192:25
  212:1 228:17,18
understanding
  154:21,24 164:1
  174:8 175:18
  185:1 213:10
unit  172:2,3,3
  173:10 215:17

Jason Obradovich
Spearman, Gina v. Broker Solutions, Inc. Et Al

March 29, 2022

**[united - zoom]**

Page 19

united 147:1
units 172:1,6
 173:19 174:6
universe 187:15
unprofitable
 218:24
upload 150:19
 161:13,17,21
 178:7 183:1,2,8
 187:19 188:19,20
 190:19 193:25
 201:7 203:20
 217:24 220:19
 223:22 227:22
uploadable 183:7
uploaded 154:17
 155:8,17,20
 157:20 160:2,13
 160:21,22 161:2
 161:18 181:24
 183:15 188:18,25
 190:14,18 211:2
 212:7,9 220:5
 227:20
uploads 161:24
use 150:14 160:14
 172:18 184:8,13
 191:6,7 217:17
 234:9
user 156:7,13,17
 181:2
uses 160:17,18
 216:22
utility 156:8,10
 160:17
utilize 175:2,3

**v**

v 149:4
vague 194:6,16
 195:3 198:19

values 181:24
 193:11 197:5
various 170:5
verify 221:8
veritext 231:1,4,9
 231:19 233:10,19
veritext.com.
 231:17
versus 165:16
 166:4 178:4 184:9
 184:12 191:18
 194:21 204:5
 227:10
video 147:17
view 156:14 197:4
viewer 219:1
volume 147:14
 172:21 173:14
 177:11 200:1
 213:21 214:1,1
 215:9,15
vs 147:6

**w**

wait 151:4 225:9
waiting 220:19
walk 192:11
 196:25
want 150:7 151:14
 151:21 152:19
 155:22 163:24
 172:9 178:12,13
 182:13 184:10
 187:1 193:10,24
 194:7 196:8 222:8
 226:16
wanted 205:12,17
 205:18 221:7
way 151:10 152:10
 171:23 173:1,22
 175:9 185:6
 188:14 190:5

192:14 198:7
 203:18 216:23
 217:4 219:22
 223:17 226:20
 228:2 229:16
we've 160:11
 194:4 201:11,15
 206:18 211:6,11
 211:16,21 218:12
 226:18 227:23
went 150:24
 159:15 186:3
 219:21 227:8
westle 149:24
white 197:22
willingness 187:7
wise 177:13
witness 184:24
 196:17 222:24
 230:1 231:12
woman 156:25
word 163:4
work 176:13,19,20
 176:21 229:18
working 150:17
works 150:18
written 200:3

**y**

y'all 212:3
yeah 150:10
 151:25 152:22
 154:14 166:1
 177:23 205:16
 215:24 217:3
 224:20
year 153:22
 162:10 177:24
 178:1 198:22
 199:1 209:3,4,4
 219:4,18 227:15
 228:17

yearly 161:19
years 223:8
yesterday 152:18
 189:4 222:20

**z**

zero 213:25
zoom 150:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.