

Deposition of:
## Christy Bunce

*January 12, 2022*

In the Matter of:

# Spearman, Gina v. Broker Solutions, Inc. Et Al

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4    GINA SPEARMAN,

5        Plaintiff,              CIVIL ACTION FILE

6    vs.                        NO. 1:20-cv-04981-CAP

7    BROKER SOLUTIONS, INC.
     d/b/a NEW AMERICAN FUNDING,

8

         Defendant.

9

10

11              DEPOSITION OF CHRISTY BUNCE

12                 APPEARING REMOTE FROM

13                 TUSTIN, CALIFORNIA

14

15                 JANUARY 12, 2022

16                 11:07 A.M. EST

17

18

19

20   Reported By:

21   Judith L. Leitz Moran

22   RPR, RSA, CCR-B-2312

23   APPEARING REMOTELY FROM ATLANTA, GEORGIA

24

25

Page 2

1        REMOTE APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4         MARYBETH V. GIBSON, ESQUIRE

5         TRAVIS C. HARGROVE, ESQUIRE

6         N. NICKOLAS JACKSON, ESQUIRE

7         THE FINLEY FIRM, P.C.

8         3535 Piedmont Road

9         Building 14, Suite 230

10        Atlanta, Georgia  30305

11

12   On behalf of the Defendant:

13        HENRY M. PERLOWSKI, ESQUIRE

14        T. CHASE OGLETREE, ESQUIRE

15        ARNALL GOLDEN GREGORY, LLP

16        171 17th Street, N.W

17        Suite 2100

18        Atlanta, Georgia  30363

19

20   ALSO PRESENT:

21        * ANDREW WESTLE, ESQUIRE, NEW AMERICAN FUNDING

22        * KEN BLOCK, ESQUIRE, NEW AMERICAN FUNDING

23        * GINA SPEARMAN, PLAINTIFF

24

25

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 3

1                    I N D E X

2  EXAMINATION                                    PAGE

3       BY MS. GIBSON ........................     7

4

5

6                    E X H I B I T S

7          (EXHIBITS SUBMITTED ELECTRONICALLY)

8  EXHIBIT NO.                                    PAGE

9  Exhibit 1      Plaintiff's Notice of Taking     24

10                 Deposition of NAF Pursuant to

11                 Fed. R. Civ. P. 30(b)(6)

12 Exhibit 2      11/4/2016 Offer of Employment    44

13                 (SPEARMAN0648 – 0676)

14 Exhibit 3      Defendant's Initial              90

15                 Disclosures

16 Exhibit 4      2/28/2020 emails                 94

17                 (SPEARMAN0687 – 0690)

18 Exhibit 5      2/28/2020 emails                 97

19                 (SPEARMAN0709)

20 Exhibit 6      Schedule 1 to Regional           97

21                 Manager Agreement

22                 Compensation, Effective

23                 Date: March 1, 2020

24                 (SPEARMAN0697 – 0702)

25

Page 4

1                   E X H I B I T S   (CONT.)

2              (EXHIBITS SUBMITTED ELECTRONICALLY)

3    EXHIBIT NO.                                   PAGE

4    Exhibit 7      3/9/202 email                   103

5                   (SPEARMAN0710)

6    Exhibit 8      Schedule 1 to Regional          103

7                   Manager Agreement

8                   Compensation, Effective

9                   Date: March 1, 2020

10                  (SPEARMAN0703 - 0708)

11   Exhibit 9      Schedule 1, Regional            126

12                  Manager Compensation

13                  Details, GFE/LE Applica-

14                  tion, Effective Date:

15                  3/1/2017

16                  (NAF_0000274 - 0000279)

17   Exhibit 10     Amendment to Schedule 1,        126

18                  Regional Manager Compensa-

19                  tion, Effective 1/1/2018

20                  NAF_0000256 - 000260)

21   Exhibit 11     Schedule 1, Regional            126

22                  Manager Compensation Details,

23                  GFE/LE Application Effective

24                  Date: 3/1/2018

25                  (NAF_0000280 - 0000285)

Christy Bunce                      January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 5

1              E X H I B I T S   (CONT.)

2         (EXHIBITS SUBMITTED ELECTRONICALLY)

3    EXHIBIT NO.                                      PAGE

4    Exhibit 12    8/24/2018 email, Subject:     142

5                  You

6                  (SPEARMAN0643)

7    Exhibit 13    Defendant Broker Solutions,    165

8                  Inc. d/b/a New American Fund-

9                  Ing's Responses and Objections

10                 to Plaintiff Gina Spearman's

11                 First Requests for Admission

12   Exhibit 14    3/29/2019 email, Subject:      184

13                 Southeast PE's

14                 (NAF_0000549 - 0000553)

15   Exhibit 15    3/20/2019 email, Subject:      192

16                 South East Division

17                 (SPEARMAN0645 - 0647)

18   Exhibit 16    11/26/2019 email, Subject:     197

19                 Re: The Southeast Division

20                 (NAF_0000350 - 0000353)

21   Exhibit 17    Defendant Broker Solutions,    240

22                 Inc. d/b/a New American Fund-

23                 ing's Answer and Affirmative

24                 Defenses to Plaintiff's First

25                 Amended Complaint

Page 6

1                  E X H I B I T S   (CONT.)

2              (EXHIBITS SUBMITTED ELECTRONICALLY)

3     EXHIBIT NO.                                  PAGE

4     Exhibit 18       Defendant Broker Solutions,     251

5                      Inc. d/b/a New American Fund-

6                      ing's Responses and Objections

7                      to Plaintiff Gina Spearman'

8                      First Interrogatories

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 7

1    WITNESS APPEARED REMOTELY FROM TUSTIN, CALIFORNIA

2              JANUARY 12, 2022 - 11:07 A.M. EST

3

4              THE COURT REPORTER:  Christy, please

5    raise your right hand.

6                    CHRISTY BUNCE

7    being first duly sworn, was examined as follows:

8              MS. BUNCE:  I do.

9                    EXAMINATION

10   BY MS. GIBSON:

11        Q    Good morning, Ms. Bunce.

12        A    Good morning.

13        Q    My name is MaryBeth Gibson.  How are you

14   today?

15        A    Good.  How are you?

16        Q    I'm fine.  Thank you for appearing today.

17             As you know, I'm Mary Beth Gibson and I'm

18   a lawyer and I represent Ms. Spearman in the

19   litigation against NAF.

20             And I'm going to refer to New American

21   Funding as NAF if that's okay with you.

22        A    Of course.

23        Q    Okay.  And I'm just going to give you

24   some ground rules about the deposition today.

25             Your lawyer probably already went over

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 8

1    these, but I just want to remind you, you need to
2    give verbal responses.
3            The court reporter is recording
4    everything today and she needs a yes or no or full
5    responses to record in the transcript.
6            You're going to receive a copy of the
7    transcript.
8            MS. GIBSON:  Henry, do you want to read
9    and sign?
10           MR. PERLOWSKI:  Yes.
11           MS. GIBSON:  Okay.
12   BY MS. GIBSON:
13       Q    So you'll have the opportunity to review
14   the transcript after your deposition is concluded.
15           I just ask you if you will wait until I
16   finish my questions so you have the complete
17   question and then you can answer.
18           And if there's anything you don't
19   understand, feel free to ask me any questions or
20   ask me to repeat the question.  I don't have no
21   problem with that.
22           Let's try not to talk over each other.
23   You may anticipate what I'm going to ask, but let
24   me complete my question so that the court reporter
25   has a clean transcript of what we're discussing

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                            Page 9

1    today; is that okay?

2         A    Yes.

3         Q    Okay.  And the court reporter gave you an

4    oath where you attested that you will tell the

5    truth under penalty of perjury, and do you

6    understand what that means?

7         A    I do.

8         Q    Okay.  Are you on any medications today

9    that might affect your memory?

10        A    No.

11        Q    Are you on any medications that might

12   affect your ability to testify truthful?

13        A    No.

14        Q    Also, if you -- if at any time you need a

15   break, we're going to be going for a while today,

16   just let me know, I'm happy for us to take a break

17   whenever you need one.

18             If there's a question pending, I'll just

19   ask that you answer the question before we take a

20   break.

21        A    No problem.

22        Q    Okay.

23        A    Uh-huh.

24        Q    Okay.  And also, we're doing this a

25   little differently.  We're doing it by Zoom.  So as

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 10

1    you know, we are going to be uploading exhibits and

2    I am going to be referring to Bates numbers which

3    are numbers on the bottom corner of those documents

4    that will help you get to the page I might be

5    asking you questions about.

6              So those are the -- the tiny numbers at

7    the bottom and that's how we identify the

8    documents.  So if I say Bates No. 457, we'll upload

9    the exhibit and you can scroll through and find

10   that page.

11             And if you have any trouble, just let me

12   know.

13        A    Okay.

14        Q    Okay?

15        A    Yes.

16        Q    Are you on any -- under any time

17   constraints today that you need to finish by?

18        A    No.

19        Q    Just so I know.

20        A    No.

21        Q    Okay.  All right.  Can you state your

22   full name for the record?

23        A    Christy Lane Bunce.

24        Q    And what is your current residence?

25        A    ████████████████████████████████

Page 11

1   ░░░░░░░░░░░░░░░

2        Q    Have you ever served in the military?

3        A    No.

4        Q    Have you ever been arrested?

5        A    Yes.

6        Q    What were you arrested for?

7        A    A bar fight when I was 21 years old.

8        Q    Okay.  Are you married?

9        A    I am.

10       Q    And what is your spouse's name?

11       A    Patrick Joseph Bunce.

12       Q    And does he live in the same residence?

13       A    He does.

14       Q    Okay.  Have you ever been married before?

15       A    No.

16       Q    Do you have any children?

17       A    I do.

18       Q    And what are their names and ages?

19       A    Riley Joseph Bunce, 22; Kaitlyn Rose

20  Bunce, 17.

21       Q    And where do they live?

22       A    With me.

23       Q    Do you have any relatives that live in

24  Atlanta, Georgia?

25       A    I do not.

Christy Bunce                  January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 12

1        Q      Are you a member of any civic

2    organizations?

3        A      Clarify "civic."

4        Q      Organizations in the community?

5        A      No.

6        Q      Any organizations related to your

7    employment?

8        A      Yes, the MBA.

9        Q      And what does that stand for?

10        A      Mortgage Bankers Association.

11        Q      Okay.  And what about -- are you a member

12    of a church?

13        A      I am not.

14        Q      Okay.  And have you ever filed

15    bankruptcy?

16        A      No.

17        Q      And what is your date of birth?

18        A      3/30/72.

19        Q      Ms. Bunce, were you born in California?

20        A      I was.

21        Q      Where did you go to high school?

22        A      El Dorado High School in Placentia,

23    California.

24        Q      And did you go to college after that?

25        A      I did.

Christy Bunce                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 13

1       Q       Where did you go to college?

2       A       Cal State Fullerton.

3       Q       And did you go to any postgraduate

4    school?

5       A       I did not.

6       Q       And what was your degree that you

7    acquired when you graduated from college?

8       A       Communications.

9       Q       Okay.  Have you ever been a party to a

10   lawsuit?

11      A       I have not.

12      Q       Have you ever given your deposition

13   before?

14      A       I have.

15      Q       And when did -- tell me the circum --

16   tell me how many times you've done that.

17      A       I've been in three depositions.

18      Q       Okay.  And what were they related to?

19   Were they related to work or something personal?

20      A       Work.

21      Q       Work.

22              And tell me when they were.

23      A       Oh, gosh.  October 2020.  The one before

24   that was, goodness, probably sometime in 2018.  One

25   before that was probably 2015.

Christy Bunce                                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 14

1        Q      Okay.  Let's take the one in 2020.  What
2    were you giving your deposition in when you gave
3    that deposition?
4        A      It was for a qui tam.
5        Q      Was it filed against -- a qui tam action
6    filed against NAF?
7        A      Correct.
8        Q      And what was the basis of the qui tam?
9    What were the general allegations?
10       A      It's a false --
11              MR. PERLOWSKI:  Object to the form.
12              You can answer.
13       A      It's a false claims proceeding.
14   BY MS. GIBSON:
15       Q      Is that litigation still pending?
16       A      It is not.
17       Q      And where was that filed?
18       A      I don't know.
19       Q      Was it in California?
20       A      I don't know.  I'm sorry, what?
21       Q      Was it in California?
22       A      I think that's where the filing was, yes.
23       Q      Okay.  And did it go to trial?
24       A      It did not.
25       Q      Did NAF settle?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 15

```
 1       A    We did.
 2       Q    Was NAF -- did NAF have to pay a fine?
 3            MR. PERLOWSKI:  Ms. Bunce, I want to
 4    caution you, and again, understanding I wasn't
 5    counsel for that, but if the terms of the
 6    settlement were confidential, do not reveal those.
 7       A    As far as I know, it was confidential.
 8    BY MS. GIBSON:
 9       Q    It was confidential.  I'm not asking the
10    amount of the fine, but whether NAF had to pay a
11    fine was confidential?
12       A    As far as I know, that was confidential.
13       Q    Okay.  And then in the 2018 -- and I
14    should have explained this as well.
15            Your lawyer will object throughout the
16    course of the deposition.  Most of the time it's
17    going to be --
18            MS. GIBSON:  And Henry, I didn't even ask
19    you, do we want to have the normal stipulation
20    regarding the reservation of objections?
21            MR. PERLOWSKI:  Yes.
22    BY MS. GIBSON:
23       Q    Okay.  So he'll object and if it's to
24    form, you may go ahead and answer.  If he instructs
25    you not to answer based on attorney/client
```

Page 16

1    privilege, then you would not answer.  And I just

2    want to make sure you understand that.

3              And I'm not going to try and ask you

4    anything that you and your lawyers discussed, so

5    hopefully that won't arise, but I just wanted to

6    let you know.

7         A    I understand.

8         Q    Okay.  So the 2018 litigation that you

9    gave your deposition, what was that about?

10        A    It was an employment lawsuit.

11        Q    And did an employee sue NAF?

12        A    No, a former employer of one of our

13   employees.

14        Q    What was the basis of that litigation?

15        A    That he -- that our employer had -- our

16   employee had violated his nonsolicit noncompete.

17        Q    Okay.  And did that go to trial?

18        A    It did not.

19        Q    Was that settled?

20        A    It was.

21        Q    Do you remember what year that settled?

22        A    I'm guessing, but I think it was 2018 but

23   I'm -- I'm really not sure.

24        Q    Okay.  And do you remember when the qui

25   tam litigation settled?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 17

1        A     It settled in 2021.

2        Q     And then the 2015 litigation, what was

3    that about?

4        A     That was a loan officer that was suing

5    New American.

6        Q     And did that go to trial?

7        A     It did not.

8        Q     Did NAF settle with the loan officer?

9        A     As far as I remember, no.  We actually

10   won.

11       Q     Do you know how you won if it didn't go

12   to trial?

13       A     I think that it was -- I think it was

14   dropped, if I remember correctly, but honestly, it

15   was so long ago.

16       Q     And why did the loan officer sue NAF?

17             MR. PERLOWSKI:  Object to the form.

18       A     I can't even remember what it was.

19   BY MS. GIBSON:

20       Q     Okay.  Was it about the terms of his or

21   her employment contract?

22       A     I don't think so.  I think -- if I

23   remember correctly, and this is a while ago, I

24   think it was wrongful termination.

25       Q     Okay.  Have you ever been involved in an

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 18

1   arbitration?

2        A    Not that I recall.

3        Q    What about a mediation?

4        A    Not that I recall.

5        Q    Okay.  When did you first come to work

6   for NAF?

7        A    13 years ago.

8        Q    When did you graduate from college?

9        A    Oh, gosh, let me think.

10       Q    Approximately?

11       A    1992.

12       Q    Okay.  So you've been working for NAF for

13  approximately 13 years, and if my math is correct,

14  that's approximately 2009 --

15       A    Yes.

16       Q    -- that you began?

17            Okay.  Well, where did you work before

18  NAF?

19       A    Before New American, I worked at

20  Greenlight Financial.

21       Q    And what did you do for -- can you say

22  that again, Green Link?

23       A    Greenlight.

24       Q    Greenlight, okay.  What did you do for

25  them?

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

Page 19

```
 1        A     I was VP of operations.

 2        Q     And how long did you work for them?

 3        A     Well, I worked for them twice, so I

 4   worked for them for about a year before coming to

 5   New American.

 6              I'll just give you a quick.  And then

 7   before that --

 8        Q     Okay.

 9        A     -- I worked for Countrywide as an account

10   executive for a couple of years.  And before that,

11   I had worked at Greenlight for about four years.

12        Q     Was that your first job out of college?

13        A     No.  No, no, no.

14        Q     Okay.  And so tell me where before that

15   did you work.

16        A     So starting back from college?

17        Q     Sure.  That would be great.

18        A     Okay.  So my first job out of college was

19   at Long Beach Mortgage.  That was my first mortgage

20   job.  And then I went to Ditech.

21        Q     How long were you at Long Beach?

22        A     Oh, gosh, I don't even remember.  I'm

23   going to guess I think maybe four years.

24        Q     Okay.

25        A     And then Ditech, probably three years.
```

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 20

1    Greenlight, about four years.  Countrywide, one to
2    two years, back to Greenlight and then to New
3    American.
4         Q    So, in approximately 2009, you started at
5    New American, correct?
6         A    Correct.
7         Q    And how did you come to be hired by NAF?
8         A    I had met the owners when I was working
9    at Countrywide, so I was their subprime account
10   executive.
11        Q    Okay.  And when you were hired by NAF,
12   what was your title when you were hired?
13        A    I was hired as operations manager.
14        Q    And what did you do as operations
15   manager?
16        A    I ran operations.  So processing,
17   funding, underwriting, all reported up to me.
18        Q    All the -- I didn't hear the last thing
19   you said.  All the corporate, what?
20        A    Processing, funding and underwriting, all
21   those departments.
22        Q    Okay.
23        A    That's what I managed.
24        Q    And how long were you the operations
25   manager?

1       A     Well, I'm still the operations manager,

2    I'm just a COO now.  So, I mean, the job just grew

3    as we grew, so.

4       Q     So when you -- when you began in 2009,

5    how big was NAF when you started with them?

6       A     50 employees, 5-0.

7       Q     When did you become COO?

8       A     Oh, gosh, probably five years ago.

9       Q     So approximately 2016-'17?

10      A     Yeah, that's -- that's probably right.

11      Q     Were you COO when NAF hired Ms. Spearman?

12      A     I was, yes.

13      Q     So, in addition to being operations

14   manager and COO, have you ever had any other title

15   or role at NAF?

16            MR. PERLOWSKI:  Object to the form.

17      A     I think I went from operations manager to

18   VP of operations, probably SVP and then COO.

19   BY MS. GIBSON:

20      Q     And how did your job responsibilities

21   change when you went from operations manager to VP

22   of operations?

23      A     They really didn't change.  It was just a

24   function of us, you know, growing and getting

25   bigger and needing to bring management underneath

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 22

1   me to help manage as we -- as we -- as we grew.

2       Q    Okay.  And how did your job duties change

3   when you became SVP?

4       A    Kind of the same.  Kind of the same

5   thing.  The job just got bigger, I was managing

6   more departments, more people, bringing in --

7   training out more people underneath us for better

8   management and accountability.

9       Q    Did your compensation change when you

10  went from VP of operations to SVP?

11      A    Not that I recall.

12      Q    Did your compensation change when you

13  went from operations manager to VP of operations?

14      A    Not that I recall.

15      Q    And did your compensation change when you

16  went from SVP to COO?

17      A    Not that I recall.

18      Q    Has it changed at all since you were

19  hired in 2009.

20      A    I think I had one compensation change

21  probably a year or two after I started.

22      Q    So how -- tell me how your compensation

23  -- did you receive a salary?

24      A    I do.

25      Q    I'm sorry, I didn't hear you.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 23

1     A    I do.

2     Q    And do you receive bonuses?

3     A    I do.

4     Q    And how are your bonuses calculated?

5     A    My bonus is based on funded production.

6     Q    Funded production of all of the regions?

7     A    Yes, of the entire company.

8     Q    Do you have a written agreement with NAF?

9     A    I do.

10    Q    And does that agreement identify how your

11   bonuses are calculated?

12    A    Honestly, I'm -- I'm not sure.  I've been

13   here for a very long time, so I don't know.

14    Q    Okay.  I'm going to show you what's in

15   your Exhibit Share.  Give me a second.

16         MR. PERLOWSKI:  So, sorry, MaryBeth, you

17   mentioned earlier that the exhibits are going to be

18   in the 1/11?

19         MS. GIBSON:  Yes.

20         MR. PERLOWSKI:  Okay.

21         MS. GIBSON:  I'm moving the first one

22   over now.

23         MR. PERLOWSKI:  Okay, thank you.

24         MS. GIBSON:  So if you go to your Marked

25   Exhibits, you should see the deposition notice.

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 24

1          MR. PERLOWSKI:  Got it.  Thank you.

2          MS. GIBSON:  Yeah, sure.  No problem.

3          (Deposition Exhibit 1 marked.)

4     BY MS. GIBSON:

5          Q    Ms. Bunce, are you able to refresh your

6     screen and see the deposition notice?

7          A    I am, yes.

8          Q    Okay.  Have you seen this before?

9          A    I have.

10         Q    And when did you see this?

11         A    I'm assuming back when we received it as

12    a company, so I think it was back in October.

13         Q    In October of '21?

14         A    Yeah.

15         Q    Okay.  How did you learn about the

16    lawsuit filed by Ms. Spearman?

17         MR. PERLOWSKI:  Ms. Bunce, I just want to

18    caution you not to reveal the content of any

19    privileged communications, but you -- subject to

20    not revealing the content of those communications,

21    you can answer.

22         A    Yes, so --

23    BY MS. GIBSON:

24         Q    And, Ms. Bunce, like I said earlier, I'm

25    never going to ask you the contents of your

Page 25

1    conversation with your lawyer.  So I just am asking

2    you, when did you learn about the lawsuit?

3         A    I don't recall the date, but I was

4    notified by general counsel, Ken Block.

5         Q    Okay.  And have you been shown any

6    documents relating to the lawsuit?

7         A    I have.

8         Q    Okay.  Did you review any deposition

9    transcripts to prepare for your deposition today?

10        A    Can you clarify deposition transcripts?

11   Of previous.

12        Q    Yes.

13        A    -- depositions or...

14        Q    Yes.

15        A    Oh, no, uh-uh.

16        Q    Okay.  Have you reviewed any transcripts

17   to prepare for your deposition?

18        A    No, I've not reviewed any deposition

19   transcripts.

20        Q    Okay.  Have you reviewed any documents to

21   prepare for your deposition?

22        A    Yes, I have.

23        Q    Did you meet with your lawyer to prepare

24   for the deposition?

25        A    I did.

Page 26

1      Q     And when did you do that?

2      A     We've met a few times over the last month

3   or so.  Probably three times.

4      Q     Okay.  And how long total would you say

5   you met to prepare for the deposition?

6      A     Oh, gosh, maybe three, four hours total.

7   Maybe five.

8      Q     And you said you reviewed documents in

9   preparing for your deposition.  What documents did

10  you review?

11     A     Just various documents that were

12  presented to me.

13     Q     Do you remember what documents were

14  presented to you?

15     A     Gina's employment contract, some emails,

16  a profit and loss statement.  I think that's

17  probably about it.

18     Q     Okay.  What employment contract were you

19  shown?

20     A     The contract that was in her human

21  resources file.

22     Q     And is that the contract dated

23  November 2016?

24     A     As far as I remember, yes.

25     Q     Okay.  Do you remember specifically what

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 27

1    emails you reviewed?

2         A    Not off the top of my head, no.

3         Q    Okay.  Do you remember what P&L statement

4    you reviewed?

5         A    The 2018.

6         Q    Do you know if that's the October to

7    December 2018 that was produced to Plaintiff this

8    week?

9         A    I don't know if I reviewed that one.  I

10   looked at the January through November 2018.

11        Q    And do you know if that's been produced

12   in this litigation?

13        A    As far as I know, yes.

14        Q    Okay.  Did you have any conversations

15   with anyone about the litigation outside the

16   presence of your lawyer?

17        A    Not that I can recall.

18        Q    Have you discussed the lawsuit with

19   anyone at NAF?

20        A    Yes.

21        Q    Who?

22        A    Well, obviously, my general counsel.

23   He's an employer -- employee of NAF.  And then when

24   we were reviewing with our counsel, Jan Preslo was

25   on that call as well who is also an employee of

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 28

1    NAF.

2         Q    Did you discuss any -- the litigation
3    with the Arvielos?

4         A    Not any specifics, no.

5         Q    Have you discussed the litigation with
6    Kelly Allison?

7         A    We did have a call with Kelly and our
8    counsel was on that call as well.

9         Q    Okay.  Were you asked to help provide
10   responses to interrogatories that were served on
11   NAF?

12        A    I was, yes.

13        Q    Were you asked to help gather documents
14   in response to requests for production of
15   documents?

16        A    I was asked for direction on who to get
17   those documents from, and I -- and I let our
18   counsel know who they could get those documents
19   from.

20        Q    Okay.  So I want to go back to Exhibit 1,
21   the 30(b)(6) notice.  And --

22        A    I've got it on my other screen just so
23   you know, so I'm --

24        Q    No problem.

25             And while you're pulling that up, you

Page 29

1    said you told counsel who they could get the
2    responsive documents from.
3              Who did you tell them they could get the
4    responsive documents from?
5         A    Most of the documents were able to be
6    gotten from Jim Muth in our finance department and
7    from our human resources department.
8         Q    Does NAF have a central repository where
9    it stores all of its documents related to the
10   business?
11        A    Well, not one central repository.  So if
12   you're talking about like employee files, yes,
13   that's one -- one depository.  That's our ADP
14   system.
15        Q    And where else are documents stored at
16   NAF?
17        A    On our share drives for some departments.
18        Q    Okay.  Have you seen -- okay, we talked
19   about you saw this probably back in October; is
20   that correct?
21        A    Yes.
22        Q    Okay.  And your counsel identified you as
23   the 30(b)(6) witness to testify to topics in this
24   notice.  Are you aware of that?
25        A    I am, yes.

Page 30

```
 1            MR. PERLOWSKI:  And -- I'm sorry, let me

 2    be specific.  Ms. Bunce has been designated for

 3    Topics 1, 2, 3.

 4            MS. GIBSON:  Henry, I was just going to

 5    go through this with her.

 6            MR. PERLOWSKI:  Okay, go ahead.

 7            MS. GIBSON:  Thank you.  Yeah, no

 8    problem.

 9    BY MS. GIBSON:

10        Q    So as your counsel was just about to say,

11    you've looked at this notice, correct, and he's

12    identified that you can testify to Topics 1, 2 and

13    3, 9, 10, 11, 12, 14, 15, 16, 19, 20, 22, 23, 24,

14    25, 26, 27, 28 and 29.

15            Are you able to testify to those topics

16    today?

17        A    I'll let Henry review that real quick

18    because you rattled them off really quickly and I

19    know that we were --

20        Q    I'm sorry.

21        A    That's okay.

22        Q    Probably would have been easier to state

23    the ones you were not testifying to.

24            MS. GIBSON:  But go ahead, Henry, if you

25    want to review that.
```

Christy Bunce                                        January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 31

1           MR. PERLOWSKI:  No, I believe that --

2    MaryBeth, I believe that you accurately recited the

3    topics that were -- we emailed about this on

4    Friday, and you accurately recited the topics that

5    were allocated to Ms. Bunce.

6           MS. GIBSON:  All right.

7    BY MS. GIBSON:

8       Q    Okay.  And Ms. Bunce, you understand that

9    you're testifying as New American Funding and

10   information known to the company --

11      A    Yes.

12      Q    -- is that right?

13      A    Yes.

14      Q    Okay.  Are there any topics that you do

15   not believe you can testify to in a manner that

16   will bind the company?

17      A    I believe I can testify to all of them.

18      Q    Okay.  Okay.  And your individual

19   testimony has also been requested in this

20   litigation, and so I may be asking you questions

21   today with respect to your personal knowledge about

22   certain topics.  And I will try and identify that

23   when I am speaking to you in an individual

24   capacity.

25           Your counsel and I spoke and we just

Christy Bunce                         January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 32

1    thought it would be better to do your deposition in

2    one entire day as opposed to as a 30(b)(6) witness

3    and then as an individual, as the COO.  Do you

4    understand that?

5         A    I do.

6         Q    Okay.  Before NAF hired Ms. Spearman --

7    and sometimes I may refer to Ms. Spearman and

8    Ms. Allison as Kelly and Gina.  Do you know who I'm

9    referring to?

10        A    Yes.

11        Q    So before NAF hired Ms. Spearman, did it

12   have any offices in the Southeast?

13        A    We did not.

14        Q    Why did NAF hire Ms. Spearman?

15        A    Gina was partner to Kelly Allison, and

16   they had been brought to us by a recruiter that was

17   employed by New American Funding.

18             And they were a perfect fit for New

19   American.  We didn't have any offices in the

20   Southeast, as I just stated.  And they have a great

21   book of business and seemed to be, you know, just

22   the right type of people that would, you know, grow

23   and flourish here at New American.

24        Q    And who was the recruiter that you

25   referenced?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 33

```
 1      A      Paul Pritchard.

 2      Q      And is he employed by NAF?

 3      A      He is.

 4      Q      Do you know how he came to learn about

 5   Ms. Spearman and Ms. Allison?

 6      A      Well, as far as I know, he was -- he was

 7   cold calling anybody and everybody that was a big

 8   producer in the mortgage industry, so I think that

 9   is how he came to know Kelly and Gina.

10      Q      Okay.  Were you involved in the meetings

11   that -- in which Ms. Spearman and Ms. Allison were

12   hired?

13      A      I was.

14      Q      Okay.  So tell me about those meetings

15   and when they occurred.

16      A      Oh, my goodness.  I don't know the exact

17   dates.  There were quite a few meetings.  We had

18   meetings by phone.  I wasn't involved in all of

19   them.

20             Kelly flew out, I think, a handful of

21   times.  Gina came out one or two times before they

22   were actually officially hired.

23             And when I say came out, I mean, flying

24   out from Georgia to So Cal.

25             So we had quite a few meetings.
```

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 34

1      Q    And was there -- do you recall a two-day

2  meeting where Kelly and Gina came out in the fall

3  of 2016 to meet with y'all with NAF?

4      A    I do, yeah.

5      Q    And were you present at that two-day

6  meeting?

7      A    I was.  I don't think I was in every

8  single meeting.  They were meeting with a lot of

9  people at New American so that they could get a

10  good feel for what we do and how we do it.  But I

11  was -- I was involved in those two-day meetings.

12      Q    Do you recall who else was involved in

13  those two-day meetings?

14      A    I'll assume at this point that it was our

15  marketing managers.  I'm assuming Jason Obradovich

16  at one point, the RBLOs, Jan Preslo, Jon Reed.

17  Probably our tech team.  They usually met with our

18  big recruits.  Maybe human resources.

19      Q    And do you know where Ms. Spearman and

20  Ms. Allison worked prior to joining NAF?

21      A    Yes, I do.

22      Q    Where did -- where did they work?

23      A    Caliber.

24      Q    So what was discussed during the time you

25  were present at these two -- during these two days?

Christy Bunce                     January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 35

1      A      A lot of what we did when we were

2   recruiting Kelly and Gina was very in the weeds,

3   talking about everything that they did from soup to

4   nuts when it came to loans.

5              So in the mortgage industry, and I'm

6   assuming Gina explained this to you, but you know

7   -- and especially with what the business they did

8   with builder business -- it is imperative that you

9   close loans on time and you close them in a certain

10  way and you have very distinct communication with

11  the builder partners that they were bringing on to

12  the Southeast.

13             So a lot of our meetings were very, very

14  detailed and in the weeds about how they did things

15  to make sure that we could emulate the way they

16  were doing them at their current employer.

17     Q      And so I presume NAF was happy with the

18  way they were doing things since they hired them;

19  is that correct?

20     A      Correct.

21     Q      Did you discuss compensation at these

22  two-day meetings?

23     A      I'm sure we did.

24     Q      Do you remember what you discussed?

25     A      Most of the compensation conversations

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 36

1    were directed at Kelly.  Kelly was the person that

2    was kind of dictating the overall compensation

3    package.

4            And then her and Gina were working out

5    their own kind of split, we called it a split back

6    then, of, you know, here's the whole -- here's the

7    whole package of what we are negotiating with New

8    American.  And then Kelly was figuring out with

9    Gina what the split would be.

10           So there was just a lot of conversation

11   about, you know, how we paid high level managers,

12   what LO compensation would be for their LOs that

13   they were bringing over, all of their operation

14   staff.

15           Kelly was pretty focused on a P&L model

16   because that is something that she had been

17   accustomed to.  We didn't have a P&L model at that

18   time.

19           So there was a lot of conversations about

20   the BPS override model that they were being

21   recruited into.

22       Q    Do you remember specific conversations

23   about the BPS override model that was being offered

24   to them?

25       A    Not like specific conversations like a

Page 37

```
 1   date and time.  There was a lot of conversation
 2   about compensation.  And there always is when we're
 3   recruiting big teams that are coming over with a
 4   lot of moving parts.
 5            And, you know, they've got a lot of skin
 6   in the game.  They're bringing their relationships.
 7   So it's a big part of their recruiting meetings.
 8       Q    Sure.
 9            Did you discuss various types of loans
10   that NAF would pay override bonuses on?
11       A    We did, yes.
12       Q    Do you remember what loans were
13   identified?
14       A    It's mostly --
15            MR. PERLOWSKI:  Object to the form.
16            You can answer.
17            THE WITNESS:  Oh, sorry, Henry.
18       A    So it's most of -- it's most of the
19   business that everybody does.
20            So it's -- it's the bulk of the business
21   is all paid to override.  And then there's the
22   brokered business, bond and DPA business that
23   profits are very, very low on.
24            So then we discussed, you know, whether
25   we're going to pay overrides on those or not.
```

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 38

1    BY MS. GIBSON:

2        Q    Okay.  And what was discussed with

3    respect to whether you were going to pay overrides

4    on those?

5        A    If I remember correctly, bond, DPA and

6    broker was not going to receive override bonus.

7        Q    And so, you said you had discussions

8    about that.  Did Kelly and Gina asked to be paid

9    overrides on broker, bond, and DPA loans?

10       A    I don't think they specifically asked.  I

11   think we were going through the economics of the

12   loans.  And they're smart business people, they

13   know coming in, we've all been doing this a long

14   time, that the -- there just isn't room sometimes

15   to pay management overrides if you want to pay your

16   loan officers a certain amount of comp.

17       Q    Did you discuss with Kelly and Gina what

18   kinds of loans that Caliber paid them overrides on?

19       A    We didn't because they were on a P&L at

20   Caliber.  So I don't know -- I don't know all the

21   interworkings of --

22       Q    Was Ms. Spearman on a P&L at Caliber?

23       A    I don't know.  I don't --

24            MR. PERLOWSKI:  Object to the form.

25            THE WITNESS:  Sorry.

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 39

```
 1        A    I don't actually know.
 2             MR. PERLOWSKI:  I was going to say object
 3   to the form.  Answer to the extent you can.
 4             THE WITNESS:  Yeah.
 5   BY MS. GIBSON:
 6        Q    So you don't know if Ms. Spearman was
 7   being paid overrides on brokered loans, bond loans
 8   and down payment assistance loans at Caliber; is
 9   that correct?
10        A    Correct.
11        Q    Okay.  And I know you just said they're
12   smart business women or something to that effect.
13   I don't want to misquote you.
14             But do you think she would leave Caliber
15   and be paid overrides on fewer types of loans at
16   NAF?
17             MR. PERLOWSKI:  Object to the form.
18   BY MS. GIBSON:
19        Q    You can answer.
20        A    Yeah, I -- I can't -- I can't put myself
21   in Gina's shoes.
22             So Kelly -- you know, Kelly was -- is the
23   one that kind of leads that group.  So Kelly was
24   interested in looking at New American Funding.
25             Gina was kind of the person that I
```

1    called, the one that kept the wheels on the bus.

2    Kind of like how I am at New American Funding.

3              So Kelly, I think, was really driving the

4    decisions to move, to look at other options.  And

5    Gina was the person that was kind of keeping

6    everything together.

7              And so, I think it was -- my impression

8    of the whole situation was Kelly was driving the

9    decisions and Gina was a good partner to Kelly and

10   they were working out what made sense for them.

11        Q    Okay.  Do you -- during this two-day

12   meeting, do you remember anyone, yourself or anyone

13   present telling Gina that she'd be paid overrides

14   on fewer kinds of loans than she received at

15   Caliber?

16        A    I don't think we talked in those types of

17   specifics at all, no.

18        Q    Okay.  In this two-day meeting with

19   potential recruits with NAF officers, is that a

20   normal process in hiring new hires, regional

21   managers?

22        A    It was before COVID.  Yeah, it was

23   something that we did.  A lot of people would fly

24   in and we'd run them through so that they could

25   meet everybody that was important that they'd be

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 41

1    dealing with on a day-to-day basis.

2        Q    Did you discuss at that two-day meeting

3    what states that NAF wanted Kelly and Gina to

4    develop?

5        A    It really wasn't our decision, it was

6    Kelly's decision.  So she was coming with business

7    in all the states that were in their contract

8    initially.

9        Q    And I think you said, you were talking a

10   little bit earlier, that when they came, they bring

11   loan officers and there's loan officer comp to

12   consider.

13           Who hired the loan officers for each

14   state?

15       A    Well, they're all employees of New

16   American Funding.

17       Q    Okay.  So who would offer the loan

18   officers contracts?

19       A    New American Funding.

20       Q    All right.  So tell me how that worked.

21   Would Kelly and Gina recruit a loan officer and

22   then say it's a good fit and turn them over to NAF?

23       A    Yeah.  So the way it works and still does

24   to this day is the loan officer is recruited into

25   the south division.

Page 42

```
 1          Paul Pritchard takes over, puts an offer
 2   together at the direction of Kelly as far as what
 3   the compensation package needs to be.
 4          And then the New American Funding human
 5   resources team puts together the contract and sends
 6   it out.
 7      Q    Okay.  So HR puts together a contract for
 8   a loan officer and you said sends it out.  Who does
 9   HR send it to?
10      A    Directly to the candidate with a cc to
11   the managers.
12      Q    And what happens after that?
13      A    Well, we wait for the candidate to sign
14   the agreement.  And usually there's back and forth
15   between the manager and the candidate.
16      Q    So the loan officer has to sign the
17   contract and then do they return it to human
18   resources?
19      A    That's all through Adobe Sign now.  I
20   don't know if it was that way when we first were
21   hiring Kelly and Gina, but that is the way it is
22   now.
23      Q    And does NAF sign the contract as well --
24      A    We do, yeah.
25      Q    -- as a loan officer?
```

Page 43

1          Are Kelly and/or Gina required to sign

2    the loan officer contract?

3          A    As far as I recall, no.

4          Q    Is there anything they're required to

5    sign when a loan officer is hired?

6               MR. PERLOWSKI:  Object to the form.

7    BY MS. GIBSON:

8          Q    You can answer.

9          A    As far as signing anything on the loan

10   officer, the specific person they're hiring, no,

11   they are not required to sign.

12         Q    So they're not required to sign anything

13   on their contract, the loan officer's contract; is

14   that correct?  Is that what you said?  I'm just

15   trying to confirm.

16         A    That's correct.

17         Q    Okay.  Did NAF ever change a loan

18   officer's compensation after they were hired?

19         A    We have in the past, yes.

20         Q    And what -- tell me about that process.

21   How does that happen?

22         A    Well, our common practice is that we try

23   to give a 30-day notice if compensation is going to

24   change and we do that in writing.  And then a new

25   contract is sent so that they do have the amended

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 44

1    contract that they can view.

2         Q     And are they required to sign it?

3         A     They aren't required to sign it.

4               MR. PERLOWSKI:  Object to the form.

5    BY MS. GIBSON:

6         Q     You can answer.

7         A     They aren't required to sign it.  So all

8    of our new hires are required to sign their initial

9    contracts because that is really what starts in

10   motion ordering equipment, doing branch rentals,

11   all of those kind of things.

12              But subsequent contracts, our practice

13   is, is that we -- like I said, we notify them at

14   least -- we try to within 30 days of the change,

15   and then we send the contracts out for signature,

16   but it is not required that they sign.

17        Q     Okay.  So you put their comp change in a

18   written contract and send it to the loan officer

19   asking for their signature, but it's not required?

20        A     Correct.

21              (Deposition Exhibit 2 marked.)

22   BY MS. GIBSON:

23        Q     Okay.  I want to show you a loan.  It's

24   loading.  I think if you refresh your screen,

25   you'll see Exhibit 2 which is a composite exhibit

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 45

1    of the Offer of Employment made to Ms. Spearman, a

2    Regional Manager Agreement, and Schedule 1.

3              And it's Bates No. SPEARMAN0648.  You'll

4    see that down in the left-hand corner.

5              Do you see that?

6        A    I'm not seeing it and it's spinning, so

7    give me a minute.

8              MR. PERLOWSKI:  Yeah, same for me.  I can

9    see that it's loading and it's spinning.

10             Oh, by the way, Mr. Ogletree joined me.

11   He's in the room right now, but he's off screen,

12   but I just wanted to point that out for the record.

13             MS. GIBSON:  Okay.

14       A    Okay.  I've got it up here.

15   BY MS. GIBSON:

16       Q    Okay.  Do you recognize this document?

17       A    I do.

18       Q    And you see in the bottom left-hand

19   corner the Bates No. SPEARMAN0648?

20       A    I do not see that.  Hold on.

21       Q    It's in tiny print on the bottom left.

22       A    Oh, yeah, I got it, okay.

23       Q    So each page is going to have a number

24   like that, and I just want to identify that because

25   that will help you find pages I want to ask you

Page 46

1    questions about.

2            Who prepared this document -- this offer

3    of employment?

4        A    Our human resources department.

5        Q    Any specific person in human resources,

6    do you know?

7        A    I don't know.

8        Q    Okay.  And how is this given to Gina,

9    Ms. Spearman?

10       A    I don't recall if we were using Adobe

11   back then or not.  That is what we use now.  It

12   could have simply been in an email format, I really

13   don't know.

14       Q    Okay.  And after -- so that -- you'll see

15   at the top this is dated November 4th, 2016?

16       A    Yes.

17       Q    Do you know how long after your two-day

18   meetings this -- this was or this was presented to

19   Ms. Spearman?

20       A    I think it was pretty soon after because

21   I'm pretty sure that two-day meeting was in the

22   fall, and then this was November.  So I'm assuming

23   it was pretty close to when they were out here.

24       Q    Okay.  And after -- let me ask you this:

25   Do you have any role in preparing this offer of

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 47

1   employment?

2        A    I don't.  I don't prepare the agreements.

3        Q    Did you review it before it went out?

4        A    I -- I do review -- I do review the

5   numbers, so that was -- that's something that I --

6   Jan Preslo and myself do.  So we make sure that the

7   numbers are correct.

8             And when I say "numbers," I mean the

9   compensation.

10       Q    Okay.  So you review the compensation in

11  the offer of employment --

12       A    Yeah.

13       Q    -- and the agreement?

14       A    Yeah.

15       Q    So after this was sent to Ms. Spearman,

16  did you have any phone calls with her explaining

17  any portion of this document?

18       A    Not that I can recall.

19       Q    Okay.  Do you know if anyone at NAF had

20  any discussions with her about the contents of this

21  document?

22       A    Specific to this document, I don't know.

23       Q    Are you aware of other conversations?

24       A    Well, like I had said before, we had lots

25  of conversations about compensation, the

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 48

1    compensation model at New American, specifically

2    Kelly and Gina's compensation.

3              I was involved in sitting in meetings

4    where Kelly and Gina were talking about the

5    compensation split.  So many, many conversations

6    about compensation, but I don't know specific to

7    once this agreement was sent.

8         Q    Okay.  But you don't remember a

9    conversation after the agreement?

10        A    I -- I can't recall.

11        Q    Okay.  So if you, you know, want to take

12   a look at the document, you see at the bottom of

13   Page 1 -- or the bottom of every page, do you see

14   Ms. Spearman's initials?

15        A    I do.

16        Q    Okay.  And do you see at the top of Page

17   1, it says, E-signed 2016 November 6th at

18   11:53 a.m.?

19        A    Yes.

20        Q    Okay.

21        A    So at that time we were using Adobe, I'm

22   assuming, if it was e-signed.

23        Q    Okay.  Gotcha.

24              And if you go to Page 7 of that offer

25   letter which is Bates No. SPEARMAN0654.

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 49

1        A     Yep, I've got it.

2        Q     And do you see Ms. Spearman signed that?

3        A     I do.

4        Q     And did NAF also sign that?

5        A     Yes, it looks like a human resources

6   assistant signed it, Erica Del Real.

7        Q     And is she still employed at NAF?

8        A     I don't think so.

9        Q     Okay.  So NAF sent this to Ms. Spearman

10  and required that she sign it; is that correct?

11       A     That's correct.

12       Q     Did NAF require all contracts to be

13  signed?

14             MR. PERLOWSKI:  Object to the form.

15  BY MS. GIBSON:

16       Q     You can answer.

17       A     All initial contracts would have to be

18  signed.  As I stated before, we would not order

19  equipment, start branch leases, things like that

20  until these offers were signed.

21       Q     Okay.  How is this returned to NAF after

22  it was e-signed?

23       A     Well, when it's e-signed, it goes back

24  into the signer --

25       Q     Adobe?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 50

1        A    Right, correct.

2        Q    So it's through NAF; is that correct?

3        A    As far as I -- yeah.

4        Q    Okay.  So NAF is -- when Ms. Spearman

5    signed this, NAF received the copy back?

6        A    I would assume, yes.

7        Q    Okay.  And if you go a few more pages

8    after the signature page on the letter offer to the

9    Regional Manager Agreement, and it's SPEARMAN0656.

10   Do you see that?

11       A    I do.

12       Q    Okay.  Do you know who prepared this

13   document?

14       A    They're all prepared in human resources.

15       Q    Okay.  Is it -- is the regional manager

16   agreement the same for all regional managers?

17       A    It's -- yeah, they're boilerplate.

18       Q    Okay.  If Ms. Spearman wanted to change

19   any provision of the document, would she be able

20   to?

21       A    Yeah.  Yes.  We're pretty flexible when

22   it comes to hiring these higher level managers.  If

23   they had an -- if they had an issue with the

24   language, then we would absolutely sit down and

25   discuss it and make amendments if we felt like we

Page 51

1  could after reviewing it with our human resources

2  team and legal counsel.

3      Q    Is that with respect to the compensation

4  or all provisions in the contract, like, for

5  example, the at-will employment agreement?

6      A    Yeah.  So anything is up for

7  conversation.  So, you know, not to say that we

8  would agree to every single thing that somebody was

9  asking for, but yes, everything is up for

10  conversation.

11     Q    If Ms. Spearman wanted to remove the

12  at-will provision, would NAF be agreeable to that?

13          MR. PERLOWSKI:  Object to the form.

14  BY MS. GIBSON:

15     Q    You can answer.

16     A    We've never been asked to remove that.  I

17  don't think I would be okay with removing that.

18     Q    Okay.  If you go to -- I want to go back

19  to the offer of employment, the first page -- the

20  second page of the document that you have there.

21     A    Okay.

22     Q    And on Page 2 which is SPEARMAN0649,

23  there is a Paragraph 3 at the bottom.  And it says

24  Manager Agreements.  And it says:  Gina is eligible

25  to receive a Regional Manager Override.  (Outlined

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 52

1    in Schedule 1 - Regional Manager Agreement).

2            Do you see that?

3        A    I do.

4        Q    So did Schedule 1 outline the overrides

5    that Ms. Spearman was eligible to receive?

6            MR. PERLOWSKI:  Object to the form.

7            You can answer.

8        A    As far as I know, yeah, I think it's in

9    this document, so we could review it.

10   BY MS. GIBSON:

11       Q    Okay.  And it says -- that Paragraph 3

12   says:  Kelly and Gina are eligible to receive a

13   compensation differential of up to 140 BPS maximum

14   comp on all self-generated loans and house accounts

15   as well as 75 BPS max compensation on brokered

16   loans, compensation on all their direct reports.

17   Kelly and Gina will split the compensation with 70

18   to Kelly and 30 to Gina.  Kelly will be responsible

19   for notifying accounting on the 70/30 split for

20   each pay period.

21           Do you see that?

22       A    I do.

23       Q    And when was this provision discussed

24   with NAF?

25       A    Oh, they would have been discussed when

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 53

1    we were recruiting them.  So this is the original

2    agreement.  So this was all decided upon before we

3    did the initial agreement.

4         Q    Okay.  And tell me what it means that

5    Kelly and Gina are eligible to receive a comp

6    differential up to 140 BPS on all self-generated

7    loans.

8         A    Yeah, so their loan officers, if I recall

9    right in conversation, some of their loan officers

10   were paid up to 140 basis points for their

11   originations.

12            So on the LOs that they brought over that

13   were on lower comp, they would receive the

14   difference between, like, if they brought in Joe

15   Smith at a hundred basis points in comp, Kelly and

16   Gina would split the 40 basis points differential.

17        Q    Okay.  So the offer has this Paragraph 3

18   regarding compensation, and then it outlines in

19   Schedule 1, the regional manager agreement, the

20   overrides that Ms. Spearman is entitled to receive;

21   is that correct?

22        A    Do you want to go to the Schedule 1?

23        Q    Yeah, I do in a minute, but I wanted to

24   make sure I understand that's your understanding of

25   Schedule 1?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 54

```
 1      A     Yeah, that is my understanding.  I'm just

 2   saying we could review it because I don't memorize

 3   these things.

 4      Q     I understand.

 5            Can you go to the -- so there's an entire

 6   schedule that discusses compensation; is that

 7   correct?

 8            MR. PERLOWSKI:  Object to the form.

 9   BY MS. GIBSON:

10      Q     Go ahead.  You can answer.

11      A     That's correct.

12      Q     Okay.  So this Paragraph 3 is not the

13   only paragraph discussing compensation?

14      A     Correct, it references Schedule 1.

15      Q     Okay.  And if you can go to Page 5 of

16   this document which is Bates 0652.

17      A     Yep, I've got it here.

18      Q     Okay.  And if you can read the last

19   paragraph or just go to the last paragraph.  It

20   states:  This letter contains the entire agreement

21   with respect to your employment.  It supersedes any

22   and all other representations or statements that

23   may have been made, either verbally or in writing,

24   with respect to the terms and conditions begin

25   offered by the company.
```

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 55

1              I think that's a typo.

2              And then the last sentence of that

3    paragraph says -- well, let me finish that.

4              "When signed by you, this offer letter

5    will be considered a written agreement with respect

6    to the subject matter contained in this letter.  By

7    your signature below, you acknowledge and agree

8    that no other offers, representations, inducements

9    or promises have been made by the company that are

10   not included in this letter, and that you

11   understand no other offer, representations,

12   inducements or promises not included in this letter

13   are valid and binding.  The material terms of your

14   employment as set out in this letter may not be

15   modified or amended by verbal agreement or course

16   of conduct, but only by a written agreement

17   presented by Human Resources, COO (presently

18   Christy Bunce) or CEO (presently Rick Arvielo)."

19             Do you see that paragraph?

20        A    I do.

21        Q    Okay.  So this paragraph required that

22   Ms. Spearman sign this document; is that correct?

23        A    Let's see.  I don't think it requires the

24   -- I don't think there's anything in writing here

25   that says that it requires a signature.

Page 56

1        Q     So it says "When signed by you, this

2    offer letter" --

3        A     "When signed by you."  It doesn't say

4    that it has to be signed, so I don't know.

5        Q     Understood.

6              "So by your signature below, you

7    acknowledge and agree."  So if she didn't sign it,

8    then this would not be a binding agreement; is that

9    correct?

10       A     No, our -- I've said -- I'll say it

11   again.  So our practice is, is that for the initial

12   contract everybody has to sign because it shows us

13   that they are making a commitment to New American.

14             And we have a lot of things to do to

15   hire, especially a group the size of Kelly and

16   Gina.  So branches have to be -- leases have to be

17   signed.  Mass amounts of equipment have to be

18   provisioned and ready to send out.

19             So they do or are required to sign their

20   initial agreement in order for us to start the

21   process of onboarding a region.

22       Q     Okay.  So you agree with me then that she

23   had to sign this initial agreement?

24       A     She did.  Yes, she did.

25             MR. PERLOWSKI:  Object to the form.

Christy Bunce                        January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 57

1    BY MS. GIBSON:

2        Q    So the last -- what does the last

3    sentence mean, the material terms may not be

4    modified or amended by verbal agreement or course

5    of conduct, but only by a written agreement

6    presented by HR, you, or Rick Arvielo?

7                MR. PERLOWSKI:  Object to the form.

8                You can answer.

9        A    Okay.  I mean, I think it's pretty clear

10   what it means.  So we can't change your

11   compensation verbally.

12   BY MS. GIBSON:

13       Q    Okay.  Okay.  Is compensation -- you

14   would consider then a compensation a material term

15   of employment?

16       A    I would, yes.  I think everybody would.

17       Q    All right.  Let's turn to the Schedule 1

18   which is Bates No. SPEARMAN669, which is the

19   schedule that was referenced in Paragraph 3 that we

20   just discussed.

21       A    Okay, I got it up.

22       Q    Okay.  And you just testified that that

23   last sentence meant you can't change compensation

24   by verbal agreement.

25                How does NAF, if not by verbal agreement

1   or course of conduct, how does NAF change

2   compensation?

3        A    So common practice is, is that we let the

4   people know that are having a compensation change,

5   we try to do that within 30 days of the

6   compensation change.  And then we sign -- we send

7   an amended agreement through our e-sign system.

8        Q    Okay.  And when they receive the amended

9   agreement through the e-sign system, what happens

10  next?

11       A    That -- that really is it.  So we expect

12  them to review it, we would like for them to sign

13  it, but we don't require for them to sign it.

14       Q    When you send it to them through the

15  e-sign system, is there a record of the document

16  being sent?

17       A    Yes.  Oh, as far as I know, yes.  I'm

18  99 percent sure.

19       Q    When a document is sent via the e-sign

20  system, is it already signed by NAF?

21       A    No.  As far as I know, they're

22  countersigned once they're back in the employees'

23  files.

24       Q    Okay.  Okay.  So we are at SPEARMAN0669

25  which is the Schedule 1, Regional Manager

Page 59

1    Compensation Details.  Do you see that?

2         A    Yes.

3         Q    And this has Regional Manager Name: Gina

4    Spearman, Southeast Division.

5              So this is the Schedule 1 that was

6    attached to her regional manager agreement; is that

7    correct?

8         A    Yes.

9         Q    And if you go to the next, Page 2 of the

10   schedule which is SPEARMAN0670.

11        A    Yep.

12        Q    And if you look at that page, she

13   e-signed at the top and signed her initials at the

14   bottom; is that correct?

15        A    Yep.

16        Q    Okay.  And 1.4 is titled Override Bonus

17   Calculation Table, correct?

18        A    Yes.

19        Q    Okay.  And if we read that, it says:  The

20   Override Bonus to Regional Manager shall be

21   calculated per the Override Bonus Calculation Table

22   below.  Loan Volume and Units funded by managed

23   territory branches during calendar month will

24   receive the BPS shown in the Override Bonus

25   Calculation Table unless specified otherwise as

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 60

1  follows.

2          Do you see that?

3      A    I do.

4      Q    And then it has one, two, three, four,

5  bullet points.  It says:  Loan scenarios listed in

6  1.4.A will earn the BPS indicated in 1.4.A.

7          No Override Bonus is paid on loan

8  scenarios listed in 1.4.B.

9          Override Bonus to RM will be reduced by

10 the amounts shown in 1.4.C.

11         And then, The Override Bonus to Regional

12 Manager will include the Override Bonus Add-on

13 shown in 1.4.D, if indicated by 1.4.D.

14         Do you see that?

15     A    I do.

16     Q    Okay.  And then if you go to the next

17 page, it has an Override Bonus Calculation Table

18 and that's SPEARMAN0671.

19     A    Uh-huh, yep.

20     Q    Okay.  And it says:  Loan Volume and

21 Units Originated by Territory to be split

22 70 percent to Kelly, 30 to Gina: (see 1.4.B for

23 loans excluded from the override payout).

24         Do you see that?

25     A    I do.

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 62 of 321
Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 61

1       Q    And is this excluding these type of loans

2    from the loans excluded from the override payout on

3    the previous page?

4            So you have those four buckets on the

5    previous -- the four bullet points on the previous

6    page.  Do you see that?

7       A    Let's see.  It looks like...

8            Yeah, so if you look at that last

9    paragraph on SPEARMAN670, those -- that list.

10   Piggyback Junior Lien Loans, closed end second lien

11   loans, Secondary Market Issue loans.

12           It looks like it repeats that in the

13   little parenthesis there on the schedule.

14      Q    Okay.  And if you look at the first

15   paragraph, it says under 1.4, the Override Bonus

16   Calculation Table says the Units funded by managed

17   branches during a calendar month will receive the

18   BPS shown in the table unless otherwise specified

19   -- unless specified otherwise, correct?

20      A    Correct.

21      Q    If you go to 671 -- and we just looked at

22   the override calculation table.  And then it does

23   say, excluding Piggyback, Jumbo, Junior Lien Loans

24   and Secondary Market Issue Loans, correct?

25      A    Correct.

Case 1:20-cv-04981-CAP  Document 106  Filed 04/28/22  Page 63 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 62

1    Q    Okay.  If you go to 1.4.A, the following

2   loan scenarios will not receive the Override Bonus

3   shown in the above table but will instead receive

4   the BPS shown as indicated below.

5           And it says:  Branch Jumbo Funded Loans

6   (excluding Kelly): Max 20 BPS (70 percent to Kelly,

7   30 percent to Gina Spearman).

8           So based on this, was Gina to be paid on

9   jumbo loans at 20 BPS?

10   A    Yeah, so the way I read that, so if you

11  -- the first part of the contract is the top.  So

12  the Override Bonus Calculation Table, which,

13  remember, this is boilerplate.  So it's saying that

14  your jumbo loans are excluded.

15          And then we've got a carve-out here in

16  1.4.A that says, okay, we are going to pay jumbo

17  funded loans up to a max of 20 BPS.  And then

18  they're doing -- Kelly and Gina are doing their

19  split.

20          That's the way I read that.

21   Q    Okay.  Okay.  So you have a carve-out on

22  the jumbo loans --

23   A    Yes.

24   Q    -- where Ms. Spearman was supposed to

25  receive overrides on BPS?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 63

1       A    Yeah, according to this contract, that's

2    the way I read it.

3       Q    Okay.  Now, if you go to 1.4.B, it says:

4    No Override Bonus will be paid on the following

5    loans.

6            Do you see that?

7       A    I do.

8       Q    And it's got eight bullet points.

9            The first one says, none will be paid on

10   a Regional Manager Personal Loan Production,

11   Brokered Loans, Down Payment Assistance Loans,

12   Secondary Market Issue Loans.

13           And I asked you earlier on these four

14   categories, you didn't -- you testified you didn't

15   know if Ms. Spearman was being paid overrides at

16   Caliber for these type loans?

17      A    Yeah, I do not know.

18      Q    Okay.  And then it also says, Piggyback

19   Junior Lien Loans and Loans that have a GFE/LE

20   Application date that precedes the effective date

21   of a schedule.  And then Loan Applications taken

22   during the Monetary Guaranty Period.

23           Do you see those bullet points?

24      A    I do.

25      Q    And if you go to the next page,

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 64

1    SPEARMAN0672, it has a line that says "Yes" and a

2    line that says "No, not applicable to this Area

3    Manager Schedule."

4              Do you see that?

5        A    I do.

6        Q    Okay.  And "No, not applicable to this

7    Area Manager schedule 1" is marked, correct?

8        A    That is correct.

9        Q    Okay.  Did NAF ever pay overrides on any

10   of the loans in these buckets -- in these bullet

11   points?

12       A    So are you -- can you clarify your

13   question?  Are you asking specifically?

14       Q    Yes.  So the box "no" is checked,

15   correct?

16       A    Correct.

17       Q    Do you agree that by checking, "No, not

18   applicable to this Area Manager Schedule" means

19   that these overrides are payable on the loans

20   listed?

21       A    Yes.

22       Q    Okay.  Because it -- at the beginning of

23   Paragraph 1.4.B says "No Override Bonus will be

24   paid."  And then it's marked, "No, not applicable."

25              So it's a double negative meaning

Page 65

```
 1   overrides will be paid; is that correct?
 2        A    Yeah, I mean, I can't testify to how this
 3   contract was written, but it's -- the box is
 4   checked, "No, not applicable to this Area Manager
 5   Schedule 1."
 6        Q    So Ms. Spearman should have been paid on
 7   -- based on the contract, Ms. Spearman was to be
 8   paid overrides on these bullet points of loans
 9   listed, correct?
10             MR. PERLOWSKI:  Object to the form.
11        A    Yeah, that's what it looks like.
12   BY MS. GIBSON:
13        Q    Do you know if she was paid overrides on
14   these types of loans listed under 1.4.B?
15        A    I don't -- I don't know if she was or
16   not.  I -- I wasn't part of the commissions
17   calculations group every month.
18        Q    So who would know if she was paid
19   overrides on these type loans?
20        A    Jan Preslo.
21        Q    Okay.  And then if you look at 1.4.C, it
22   says:  The following items will be deducted from
23   the Override Bonus Calculation.
24             And it says:  Any portion of the RM's
25   biweekly salary if not already deducted from the
```

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 67 of 321
Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 66

1    commissions.

2              And then has another bullet point that

3    says:  ASA/Desk Rental Allocation.

4              Do you see that?

5         A    I do.

6         Q    And then there's a "Yes" and a "No, not

7    applicable to this area -- this Regional Manager

8    Schedule 1."  And do you see that "no" is checked?

9         A    I do.

10        Q    So, again, it's a double negative.  It

11   says, these items will be deducted from her

12   override but it's marked, "no, not applicable,"

13   correct?

14        A    That's correct, it's marked "no."

15        Q    Do you know if NAF deducted ASA/rentals

16   from Gina's pay?

17        A    I do not know.

18        Q    But based on this, it should not have; is

19   that correct?

20             MR. PERLOWSKI:  Object to the form.

21        A    Yes.

22   BY MS. GIBSON:

23        Q    Based on the provision 1.4.C being marked

24   "no," NAF should not have deducted ASA/rentals; is

25   that correct?

Page 67

1       A      Yes, that's the way it reads.

2              MR. PERLOWSKI:  Object to the form.

3    BY MS. GIBSON:

4       Q      Okay.  And then 1.4.C has another loan --

5    another bullet point right there.  It says:

6    Regional manager will be reduced 5 BPS on

7    candidates sourced by internal or external

8    recruiters.

9              And it has a "Yes" and a "No, not

10   applicable to this Regional Manager Schedule."

11             Do you see that?

12      A      I do.

13      Q      And it's checked "no," correct?

14      A      That's correct.

15      Q      Okay.  So again, it says her comp will be

16   reduced by BPS but says it's not applicable, so it

17   should not -- her comp should not have been reduced

18   5 BPS; is that correct?

19             MR. PERLOWSKI:  Object to the form.

20      A      That's correct.

21   BY MS. GIBSON:

22      Q      Do you know if NAF reduced Gina's pay by

23   5 BPS on candidates sourced by recruiters?

24      A      As far as I know, no.  And I think the

25   reason, if I remember correctly, why we didn't do

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 68

1    that is because everybody was coming over together.

2            So, as I said, Paul Pritchard was

3    recruiting Kelly and Gina.  And then they were in

4    turn recruiting all of their team.

5            So it didn't really make sense to deduct

6    overrides from them when they were all on a

7    guaranty anyway.

8        Q    And what about subsequent hires?  This

9    would apply to subsequent hires, correct?

10       A    Correct.

11       Q    Okay.  And then 1.4.C has another bucket

12   -- another bullet point that says:  Overrides to

13   Authorized Personnel that are identified on the

14   Overrides to Authorized Personnel if indicated

15   below.

16           And it says, "No, not applicable to this

17   Regional Manager Schedule," correct?

18       A    Yes, it's checked "no."

19       Q    So were these items deducted from Gina's

20   compensation, do you know?

21       A    I do not know.

22       Q    And who would know that?

23       A    Jan Preslo should know that.

24       Q    And then there is a subparagraph 1.4.D,

25   do you see that?

Page 69

1      A    I do.

2      Q    And it says:  Where applicable, the

3   Regional Manager will be paid an Override Bonus

4   Add-on as shown on the Comp Differential indicated

5   below.

6           And it's got a "yes" and a "no" and it's

7   marked, "No, not applicable to this period -- to

8   this Regional Manager's Schedule 1."

9           Do you see that?

10     A    I do.

11     Q    And so what does this mean?  What are the

12   override bonus add-ons?

13     A    I'd have to go to the compensation

14   differential schedule to clarify.  I don't know off

15   the top of my head.

16     Q    Okay.  But it's marked, "no, not

17   applicable," correct?

18     A    That's correct.

19     Q    So each of these -- this Page 0672 has a

20   "yes" and "no" line after each category?  Correct,

21   NAF -- NAF put a "yes" and "no" line after each

22   item?

23     A    Yep.

24     Q    Okay.  And now the previous page for

25   1.4.B, there's just a yes-and-no line at the end of

Page 70

```
 1    the list, correct?
 2         A    Correct, this is the same form all the
 3    way down.
 4         Q    Yeah.  And it's marked, "no, not
 5    applicable" to this area manager's schedule,
 6    correct?
 7         A    Yes.
 8         Q    And so, I understood your testimony
 9    earlier is that, "no, not applicable," meant that
10    Ms. Spearman should have been paid overrides on
11    those bullet points listing those loans; is that
12    correct?
13              MR. PERLOWSKI:  Object to the form.
14    BY MS. GIBSON:
15         Q    You can answer.
16         A    Yes, according to this.  Although,
17    there's -- up on top where the override bonus
18    calculation table and then the 1.4.A, there's
19    things that carved that out as well.
20         Q    Right.  So the calculation table states
21    it excludes jumbo loans, but then 1.4.A carved out
22    jumbo loans and said she'd actually be paid an
23    override on jumbo loans, correct?
24         A    Correct.
25         Q    Okay.  And NAF drafted this document; is
```

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 71

 1    that correct?

 2         A    That's correct.

 3         Q    Okay.  Okay.  Can you turn to Page 5 of

 4    this Schedule 1, and it's SPEARMAN0673.

 5         A    Yep, I'm there.

 6         Q    Okay.  And if you read that, that's

 7    Paragraph -- I want you to go to Paragraph 4, the

 8    last paragraph.  And again, this page is e-signed

 9    by Ms. Spearman and her initials are on there; is

10    that correct?

11         A    Yes.

12         Q    And it says:  Modification of

13    Compensation.  Regional Manager's Compensation

14    including but not limited to: Commissions and

15    Override Bonus may be restructured and/or adjusted

16    up or down by the Company, in its sole discretion.

17    Regional manager shall be provided notice of any

18    adjustments as required by law.

19              Do you know what that means?

20              MR. PERLOWSKI:  Object to the form.

21              You can answer.

22    BY MS. GIBSON:

23         Q    You can answer.

24         A    I think it means exactly what we do at

25    New American.  So we send them their agreement so

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 73 of 321
Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 72

1   that they can see it in writing, and our common

2   practice is to also notify people that -- within 30

3   days of the compensation change.

4         Q    And that's you -- when you said you send

5   them the agreement, you send them the agreement via

6   the, I think you called it, Adobe e-sign --

7         A    Yes.

8         Q    -- system?

9         A    I don't know if we were using Adobe back

10  in 2016 when Gina was signing this agreement, but

11  it's obvious that we were using some sort of e-sign

12  system.  We do currently use Adobe.  My guess is we

13  were using it back then.

14        Q    Okay.  Did NAF provide notification of

15  changes to Ms. Spearman's compensation in writing?

16        A    Yes.

17        Q    When?

18        A    I don't know the dates off the top of my

19  head.

20        Q    Are you aware of a March 1, 2020

21  amendment that -- to Schedule 1 that changed the

22  compensation?

23        A    I'd have to review the dates and the

24  compensation agreement.  I don't -- I don't know

25  the specifics of the dates or the date -- or of the

Page 73

1   specifics of the contract or the date.

2       Q    Okay.

3           MS. GIBSON:  We've been going about an

4   hour and a half.  Do you want to take a short

5   break, Henry?

6           MR. PERLOWSKI:  Yeah, that would be

7   great.  Thank you.

8           (Recess taken 12:27 - 12:42 p.m. EST)

9           MS. GIBSON:  We can go back on the

10  record.

11  BY MS. GIBSON:

12      Q    Ms. Bunce, earlier when I was asking you

13  what documents you reviewed, you testified you

14  looked at a January through November P&L.  Was that

15  P&L in Kevlar?

16      A    No, it was a P&L that Jim Muth had sent

17  me.

18      Q    I'm sorry, can you repeat that?

19      A    It was a P&L that Jim Muth had sent me.

20      ▨    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

21  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

22      ▨    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23  ▨▨▨▨▨  ▨▨▨▨▨▨▨

24      ▨    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25      ▨    ▨▨▨▨▨▨▨▨▨▨▨▨

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 74

1       Q     And it was for -- it was the P&L for just
2   the outside retail?
3       A     Correct.
4       Q     Is that the same as capital markets?
5       A     No, outside retail and capital markets
6   are not the same thing.
7       Q     Okay.  What is outside retail?
8       A     Outside retail is the division that Kelly
9   and Gina worked for.  It's our true retail line.
10      Q     True retail.  And what is capital
11  markets?
12      A     Capital markets is a department at New
13  American Funding.
14      Q     And what do they do?
15      A     They manage all of the pricing and
16  finance.
17      Q     Okay.  When was that P&L created?
18      A     That was a P&L that he had pulled up from
19  2018 as far as I know.
20      Q     So he pulled it up from 2018.  Was the
21  data input into it in 2018 or was that created more
22  recently?
23            MR. PERLOWSKI:  Object to the form.
24  BY MS. GIBSON:
25      Q     You can answer.

Page 75

1      A    So it was back from 2018.

2      Q    So it would have been generated in 2018

3  contemporaneously with the data from that time

4  period?

5      A    I don't know exactly when he put together

6  that P&L, but I know it was in 2018.

7      Q    Okay.  And why did he send you the 2018

8  P&L for outside retail for that -- for just that

9  time period?

10     A    It would --

11         MR. PERLOWSKI:  Ms. Bunce, I caution you

12  to the extent that your answer would reveal a

13  privileged communication.

14  BY MS. GIBSON:

15     Q    You can answer.

16         MR. PERLOWSKI:  You can answer subject to

17  that.

18     A    Okay.  So, yes, it was asked of me to

19  review from legal counsel.

20  BY MS. GIBSON:

21     ■    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

22  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24     ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25  ▨▨▨▨▨▨▨▨▨▨▨

Case 1:20-cv-04981-CAP  Document 106  Filed 04/28/22  Page 77 of 321
Christy Bunce                        January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 76

1      Q     And was this for the entire United

2    States?

3      A     It was.

4      Q     And what did it show for the Southeast

5    region?

6      A     I don't have it in front of me.  I don't

7    know exactly what it was.  I was just looking at

8    the bottom line.  I don't even think it was -- I

9    don't think it was even broken up by region

10   actually.

11     Q     Do you have spreadsheets, if not P&Ls,

12   that break it out by region so you can determine

13   what regions are profitable?

14     A     Yes, we do that.

15           MR. PERLOWSKI:  Objection.

16   BY MS. GIBSON:

17     Q     Okay.

18           MS. GIBSON:  Henry, has that P&L been

19   produced?

20           MR. PERLOWSKI:  Excuse me?

21           MS. GIBSON:  Has the January-November

22   2018 P&L that she's testifying about, has that been

23   produced?

24           MR. PERLOWSKI:  I'm not -- Mr. Ogletree

25   stepped out.  I'm not specifically sure, but I'll

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 77

1    ask him once he gets back into the room.  He just

2    stepped out for a minute.

3            MS. GIBSON:  Okay.  Thank you.

4            MR. PERLOWSKI:  But that was the subject

5    of the Court's -- I mean, that's -- the topic we're

6    talking about now is the subject of an order that

7    came out two days ago, so.

8            Where your motion to compel on her loan,

9    P&Ls was denied, and the Court said if you have

10   regional P&Ls, go ahead and produce them.

11   BY MS. GIBSON:

12       ▨        ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

13   ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

14   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

15   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

16   ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

17           ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

18       ▨   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19   ▨▨▨   ▨▨▨▨▨▨▨▨▨▨

20   ▨▨▨ ▨▨▨▨

21       ▨   ▨▨▨

22           ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24   ▨▨▨▨▨▨▨▨▨▨▨▨▨

25       ▨▨▨▨▨▨▨▨▨▨

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 78

1        Q     Okay.  And so, I understood from

2   testimony from Mr. Obradovich there's a difference

3   in looking at revenue and bottom line.

4            ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

5   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

6   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7   ▨▨▨▨▨▨▨▨▨

8            MR. PERLOWSKI:  Object to the form.  I'm

9   not even sure there's a question in there, but I'm

10  going to object to the form.

11           ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

12  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

13       A     Yeah.  So --

14           MR. PERLOWSKI:  Objection, asked and

15  answered.

16           Go ahead.

17       A     So every profit and loss that I know has

18  revenue and has expenses and then has a bottom

19  line.  So you look at the bottom line to determine

20  if something is profitable or not.

21  BY MS. GIBSON:

22       Q     Mr. Obradovich also testified that he had

23  60 employees report to him and all changes to comp

24  to employees that report to him are in writing and

25  are signed by the employee and NAF.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 79

1              Is there any reason that his department

2       has a different policy regarding changes to

3       compensation versus other departments?

4              MR. PERLOWSKI:  Object to the form,

5       mischaracterizes testimony.

6              You can answer.

7       A     So the policy is that we present the

8       compensation changes to every employee.  Whether we

9       get them signed or not isn't -- isn't a policy that

10      we have to have the employee sign.  Most managers

11      are able to get their employees to sign their

12      agreements.

13             He has a much smaller department than a

14      lot of departments, so it's easier to manage that

15      also.

16      BY MS. GIBSON:

17      Q     Okay.  So 60 employees is a smaller

18      department than other departments?

19      A     Yes.

20      Q     Okay.  Okay.  After Ms. Spearman came to

21      work for NAF, was she happy?

22             MR. PERLOWSKI:  Object to the form.

23      A     Do you want me to answer that?  She's

24      sitting right there.  Probably ask her.

25             No, I think that she was happy.  You

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 81 of 321
Christy Bunce                                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 80

1   know, we had a lot -- Gina and I had a lot of

2   interaction.  We talked a lot about the region as a

3   whole and how they were getting things done and how

4   we were working together and transition is very

5   hard.  So Gina and I had a lot of conversations.

6            And that is something that is important

7   to New American, is that employees are happy, as I

8   think most of us especially in the mortgage

9   industry spend more time working than with our

10  families.

11  BY MS. GIBSON:

12      Q    Okay.  Did Ms. Spearman communicate to

13  satisfaction to you regarding how she was paid

14  under her contract?

15      A    As far as I remember early on, yes.  I

16  think Gina was happy with her compensation package.

17           I do remember and I do not recall what

18  year it was that Kelly had mentioned that Gina had

19  gone to her questioning whether she should have a

20  bigger split of the override BPS.  And I know Kelly

21  was a little bit upset with the request, but I

22  think they did end up working that out.

23           But that really doesn't have anything to

24  do with NAF because Kelly controlled the

25  compensation that was paid to Gina.

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 81

1      Q     Did Ms. Spearman express dissatisfaction

2   to you regarding the fact she wasn't being paid

3   overrides on the bullet points under 1.4.B that we

4   just discussed?

5      A     Not that I recall.

6      Q     Okay.  So I want to introduce -- so, to

7   your recollection, she never expressed

8   dissatisfaction or concern that she wasn't being

9   paid according to her contract and the override

10  bonuses identified in her contract?

11     A     Not that I recall.  The big bone of

12  contention with Kelly and Gina on that initial

13  contract was the override bonuses on the employees

14  that were on the guaranty.

15           I don't know if you look at that

16  schedule, that's why that box is marked "no," so

17  that they would get -- be -- they would be being

18  paid their override bonuses when all of those loan

19  officers that they brought over were on their

20  guaranty, which is not typical for New American.

21     Q     Right.  And you actually testified

22  earlier that "no" applied to all of those loans

23  identified under 1.4.B that she should have been

24  paid overrides on.

25           And so I wanted to know, because then

Page 82

1   I'll introduce some discovery responses that NAF

2   provided to us where she -- where NAF has admitted

3   that she expressed dissatisfaction.

4           So I was wondering what you know about

5   Ms. Spearman expressing dissatisfaction about not

6   being paid?

7           MR. PERLOWSKI:  Objection,

8   mischaracterizes testimony, asked and answered.

9           Subject to that, go ahead, Ms. Bunce.

10      A    Yeah, as far as I can remember it and

11  it's -- you know, it's been quite a few years, but

12  the big bone of contention, like I said, was when

13  they were first coming over that they wanted to get

14  paid their overrides on their loan officers that

15  were under guaranty.

16          So that's why we marked that box no on

17  1.4 -- I can look at it -- 1.4.B.

18  BY MS. GIBSON:

19      Q    Right.

20      A    So that they would get paid their

21  overrides.  So I don't think that was a bone of

22  contention with Gina.

23          And then -- and then --

24      Q    What was the bone of contention?

25          MR. PERLOWSKI:  Will you please continue

Christy Bunce                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 83

1    your answer, Ms. Bunce.

2    BY MS. GIBSON:

3         Q    Go ahead.

4         A    Yeah.  So, I mean, if -- if you want me

5    to stop answering, but I --

6              MR. PERLOWSKI:  Please continue your

7    answer, Ms. Bunce.

8         A    So the real -- the bone of contention

9    that I remember with Gina was in 2019, so I don't

10   think you've gotten to that point yet.

11   BY MS. GIBSON:

12        Q    Okay.  So you don't remember any

13   complaints she made to you about not being paid the

14   overrides on the loans you testified to that she

15   should have received under 1.4.B?

16        A    I do not --

17             MR. PERLOWSKI:  Object to the form,

18   mischaracterizes testimony.

19             Go ahead.

20        A    Yeah, I don't -- I do not.  As I said

21   before, the big contention was the guaranty period,

22   and we marked that box "no" so that she would get

23   paid the overrides on the -- on the LOs that were

24   under their guaranty.

25   BY MS. GIBSON:

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 84

1       Q     Okay.  Let's go back to that exhibit

2    because I want to make sure I have your testimony

3    clear and what I understood your testimony before.

4       A     Okay.

5       Q     And I understood we took a break and I

6    don't want to know what you talked about with your

7    counsel, but I just want to make sure you're not

8    changing your testimony.

9             So if we go back to Bates No. 0648 and it

10   was Exhibit 2.  And if you can turn to

11   SPEARMAN0671.

12      A     Okay.

13      Q     And 672.  We went through both of those

14   pages and discussed the fact that "no" was checked

15   with respect to those subparagraphs, correct?

16            MR. PERLOWSKI:  Object to the form.

17      A     That is --

18   BY MS. GIBSON:

19      Q     You can answer.

20      A     That is correct.  So I think maybe where

21   I misspoke was that that "no" on 1.4.B, that does

22   apply to that bullet point about the loan

23   applications taken during monetary guaranty period.

24      Q     Okay.

25      A     And I think you will, when you review

Christy Bunce                     January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 85

1    Gina's pay statements, you will see she was paid on

2    all of those loan officers that were under

3    guaranty.

4            That is my impression.  Like I said, I

5    don't review the pay statements, but that is my

6    understanding.

7        Q    Okay.  And earlier -- I understand that.

8    We talked about 1.4.B and it said "No Override

9    Bonus will be paid on the following loans."  And

10   there are one, two, three, four, five, six, seven,

11   eight bullet points.

12           And you testified -- and we looked at

13   "Yes"; "No, not applicable to this Area Manager

14   Schedule."

15           And you testified that Ms. Spearman

16   should have been paid overrides on each of those

17   loans identified under 1.4.B.  Do you recall that?

18       A    Yes.  And I think I misspoke there

19   because I did also state before that, that we don't

20   pay management overrides on brokered loans or down

21   payment assistance and bond loans.

22       Q    Okay.  Did you do anything during the

23   break that refreshed your memory about that?

24       A    I did review this agreement when we went

25   off line.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 86

1        Q      Okay.  And who did review it with?

2        A      I -- I reviewed it myself.

3        Q      Okay.  And what -- what about that when

4    we specifically read through the bullet points,

5    when you and I were reviewing it, what was

6    different that made you change your testimony about

7    the overrides that were supposed to be paid on

8    these loans?

9        A      Yeah, it was --

10              MR. PERLOWSKI:  Object to the form.

11              THE WITNESS:  Sorry.

12              MR. PERLOWSKI:  Ms. Bunce, give me a

13   moment after a question to potentially assert an

14   objection --

15              THE WITNESS:  Sorry.

16              MR. PERLOWSKI:  -- because Ms. Gibson is

17   admittedly rushing.  She's rushing.  So just --

18              MS. GIBSON:  Henry, I'm not rushing.  I

19   do --

20              MR. PERLOWSKI:  -- give me a moment to --

21              MS. GIBSON:  I tend to talk fast, Henry,

22   and I apologize.  I am from New York so I have a

23   faster pace.

24              MR. PERLOWSKI:  So am I.  So am I.

25   BY MS. GIBSON:

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 87

1        Q    Ms. Bunce, you are welcome to take as

2   much time --

3             MR. PERLOWSKI:  You're rushing and we're

4   going to slow it down.

5   BY MS. GIBSON:

6        Q    You are welcome to take as much time as

7   you need to answer the questions, Ms. Bunce.

8        A    So when you were questioning me before we

9   took the break, it was sticking in my head as I was

10  reading through this, and I should have read

11  through it more thoroughly to refresh my memory on

12  these agreements, because I didn't see that bullet

13  lines that says Brokered Loans and DPA Loans.

14            I know that none of our managers are paid

15  on brokered loans and DPA loans.

16            So then I had to reread through the whole

17  agreement again, that section, to refresh my

18  memory, so.

19            And then I did recall that we had a lot

20  of conversation about the LOs that were on

21  guaranty.  So it was a big bone of contention with

22  Kelly and Gina.

23            And honestly, I agreed with them because

24  it was a huge group of people that were coming over

25  that they would be excluded from getting overrides

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 88

1   because they were -- if I remember right, those

2   loan officers were on an extended guaranty period.

3   Mostly because they do builder business and they

4   were -- they had month -- year-end closings.  I

5   think it was in March.

6           So there was quite a bit of time where

7   there would be a lot of application activity, but

8   not a lot of funding activity.

9           So we had come to the agreement with them

10  that we wouldn't pay them their override bonuses

11  even though their loan officers were under

12  guaranty.

13      Q    And that's what this bullet point says,

14  correct?

15      A    Right, loan applications taken during

16  monetary guaranty period.

17      Q    Right.

18          And so earlier when we read through the

19  bullet points and I read Regional Manager Personnel

20  Loan Production, Brokered Loans, Down Payment

21  Assistance Loans, Secondary Market Issue Loans,

22  Loans where the Regional Manager elects in writing

23  to waive all override comp, Piggyback Junior Loans,

24  Loans that the application date was previously --

25  precedes the effective date of this Schedule.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 89

1        So when I read those earlier, you didn't

2   -- you didn't -- I'm just trying to understand, you

3   didn't know that NAF never pays on those loans?

4        A    No, no, no, I did know.

5             MR. PERLOWSKI:  Wait, wait, wait.  Object

6   to the form, mischaracterizes testimony.

7             You can answer.

8        A    Yeah.  So I did know and I should have

9   stopped right then and there and said that I needed

10  a minute to reread this because it was sticking in

11  my head that I wasn't interpreting it correctly to

12  you.

13            So when we took the break and I ran to

14  the restroom, I came back and looked at this

15  thing -- this agreement again and that's when it

16  refreshed my memory of exactly what had happened

17  when we were negotiating Kelly and Gina's contract.

18  BY MS. GIBSON:

19       Q    Did you speak with anyone during the

20  break?

21       A    I did not.

22       Q    Okay.  I wanted to introduce the initial

23  disclosures.

24       A    Are you uploading a new document?

25       Q    Yes, I am.  Just give us a minute.

Page 90

1           MR. PERLOWSKI:  Sure.

2           (Deposition Exhibit 3 marked.)

3    BY MS. GIBSON:

4       Q    If you refresh your screen, you should be

5    able to pull it up.

6           MR. HARGROVE:  And I'm sorry, do we need

7    to refresh it each time?  That's a stupid question

8    on my -- yes?  Okay, got it.  Thanks.  I see Judi

9    nodding yes.  Just that it takes -- the reload

10   takes 16 or 20 seconds or so at least.

11      A    Okay, I got it.  It's still thinking.

12   BY MS. GIBSON:

13      Q    Before we went back to the contract, I

14   was asking you about communications you had with

15   Ms. Spearman regarding her dissatisfaction with her

16   compensation.  Do you remember that?

17      A    Yes.

18      Q    Okay.  So if you go to Page 12 of the

19   initial disclosures, you're identified as a

20   witness.

21          Do you see that in the third bullet

22   point, identifies "Communications with Plaintiff

23   regarding her compensation"?

24      A    Yes.

25      Q    But you don't recall conversations with

Case 1:20-cv-04981-CAP  Document 106  Filed 04/28/22  Page 92 of 321
Christy Bunce                              January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 91

1    Ms. Spearman about -- that she had with you

2    regarding her dissatisfaction regarding payment of

3    override bonuses?

4         A    I don't think --

5              MR. PERLOWSKI:  Object to the form --

6    object to the form, mischaracterizes testimony.

7              You can answer.

8         A    Yeah.  So when I said that I was the

9    correct person to talk about compensation, I think

10   that I am the correct person to talk about

11   compensation.

12             I was involved in a lot of conversations

13   with Kelly and Gina about their compensation when

14   they came on.

15             I was also involved in conversations with

16   Kelly and Gina after we made the changes in

17   compensation that we did in 2019.

18             The screen just changed.  Are you guys

19   still there?

20   BY MS. GIBSON:

21        Q    Yeah, we're here.  Do you see us?

22        A    Yeah.  You went blank there for a minute.

23             MR. PERLOWSKI:  Oh, it looks like someone

24   else has joined from your firm.  I think that may

25   be it.  I see them in the upper right-hand corner

Page 92

1   -- in my view, I see them in the upper right-hand

2   corner, but then there's another -- The Finley Firm

3   that's just dark, at least video.  So someone else

4   has probably joined from your firm, from

5   Ms. Spearman's counsel's firm.

6           MR. JACKSON:  It's Nick Jackson.  Sorry,

7   I'm logging back in.

8           MR. PERLOWSKI:  Welcome, Nick.

9           MS. GIBSON:  Can the court reporter read

10  back the last question.  I think, Ms. Bunce, you

11  were testifying.

12          THE WITNESS:  Do you want her to read it

13  back or do you want to restate your question?

14          MS. GIBSON:  Let's let her read it back.

15          (Whereupon, the requested portion of

16          the record was read by the reporter.)

17          THE COURT REPORTER:  Okay.  So the

18  question is:

19          "But you don't recall conversations with

20      Ms. Spearman about -- that she had with you

21      regarding her dissatisfaction regarding

22      payment of override bonuses?"

23          And then there was an objection and then

24  you gave a big answer which I can read if you want.

25          THE WITNESS:  I don't need you to read

Page 93

1   it.

2            THE COURT REPORTER:  Okay.  Do you need

3   me to read it, MaryBeth?

4            MS. GIBSON:  No, I don't need you to read

5   it.

6   BY MS. GIBSON:

7        Q    I understood your answer to be you had

8   conversations with her about her compensation.

9            My question is, do you recall any

10  conversations where she complained to you that she

11  wasn't being paid properly?

12       A    I don't recall conversations that we had

13  about that.

14       Q    If she -- do you know who would -- who

15  she would have complained to about compensation, if

16  not you?

17       A    Well, if not -- well, if it wasn't me, it

18  was probably Kelly, and I'm assuming Jan Preslo

19  because Jan was the one that was involved in the

20  commission override bonus schedules.

21            It could have been Jon Reed as well who

22  is no longer with the company.

23       Q    Okay.  And this Exhibit 3 states that you

24  also have information of "NAF notices to Plaintiff

25  regarding her compensation and changes thereto,

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 94

1   including NAF's efforts to inform plaintiff of each

2   compensation change in real-time."

3              Do you see that?

4       A    Yes.  And I think I've covered that

5   today, but I can definitely state our practices

6   again.

7       Q    No, I understand your practices and how

8   you go about changes.  When was the first time you

9   changed Ms. Spearman's compensation?

10      A    As I stated before, I'd have to go

11  through her agreements which I'm assuming are a

12  part of the exhibits to give you the actual dates.

13      Q    Okay.  Are you familiar with the March 1,

14  2020 amendment to Schedule 1?

15      A    I'd have to read it to look at the

16  details.

17      Q    Okay.  Well, let's look at SPEARMAN687.

18             MR. PERLOWSKI:  Sorry, is this a new

19  exhibit?

20             MS. GIBSON:  It is, Henry.

21             (Deposition Exhibit 4 marked.)

22             MR. PERLOWSKI:  Thank you.

23      A    Just let us know when we should refresh.

24             MR. PERLOWSKI:  I do think we do need to

25  reload.  That's why I asked if it was a new

Case 1:20-cv-04981-CAP  Document 106  Filed 04/28/22  Page 96 of 321
Christy Bunce                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 95

1    exhibit.

2            Ms. Bunce, so go ahead and reload.

3        A    Okay, I can see it.

4    BY MS. GIBSON:

5        Q    Okay.  And we're getting the actual

6    schedule loaded, too, but this is Exhibit 4.

7            Again, do you recognize this as Exhibit

8    -- I'm sorry, an email from you to Ms. Spearman,

9    Mr. Frommert, Kelly Allison, Michael Bartyczak, Jan

10   Preslo and Patty Arvielo?

11       A    Yeah.

12       Q    And you can take a minute and look at the

13   email if you like.

14       A    Yeah, let me read it real quick.

15       Q    Sure.

16       A    (Witness reviews document.)

17            Okay.

18       Q    And so this is -- it says -- the Subject

19   line is "SVP Schedule 1: Kelly and Gina."

20            Do you see that?

21       A    I do.

22       Q    Does this refresh your recollection about

23   a March 1, 2020 amendment to Schedule 1?

24       A    Yes, yes.

25       Q    Were you involved in drafting that

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 96

1    amendment?

2        A    I did not draft the amendment.  Those

3    were also done in our human resources department on

4    the direction of Scott Frommert, who was our CFO at

5    the time.  And this is pertaining to when we were

6    moving all of our SVPs over to a P&L model.

7        Q    Is this the first time NAF amended

8    Ms. Spearman's compensation by a written agreement?

9            MR. PERLOWSKI:  Object to the form.

10   BY MS. GIBSON:

11       Q    You may answer.

12       A    As I recall, no.  I think there was

13   another amendment earlier on.

14       Q    Do you recall when that amendment was?

15       A    No.

16       Q    Do you recall how it -- as NAF's 30(b)(6)

17   witness, do you recall how it changed her

18   compensation?

19            MR. PERLOWSKI:  Object to the form.

20       A    Yeah, as far as I remember, it -- I think

21   it amended some of the override language, but I'd

22   have to look at it again.

23   BY MS. GIBSON:

24       Q    Okay.  Okay.  Well, we've loaded and you

25   should be able to refresh your screen, SPEARMAN709

Page 97

1   and 697.

2            (Deposition Exhibit 5 and Exhibit 6

3   marked.)

4            MR. PERLOWSKI:  So Exhibits 5 and 6 have

5   been reloaded.  Which exhibit would you like

6   Ms. Bunce to pull up?

7            MS. GIBSON:  Bates number ending in 709,

8   Exhibit 5.

9            MR. PERLOWSKI:  Thank you.

10       A    Okay, I've got it.

11   BY MS. GIBSON:

12       Q    Okay.  And so this is an email from Scott

13   Frommert to Gina Spearman and it cc's you and Jan.

14   And it has an attachment.

15            And it says:  With our updated terms and

16   signature line.  I have signed the PDF and would

17   like for you to print and sign that and return that

18   to me.  I know it is later in the day, but am

19   hoping to get this back today.

20            Do you see that?

21       A    I do.

22       Q    And he wrote this email a little after --

23   later in the day after Exhibit 4, your email, on

24   the same day which was earlier that morning,

25   correct?

Christy Bunce                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 98

1        A      I would have to go back and look at the
2    time of the email, but I can assume that's correct.
3        Q      Yeah.  And I represent to you it says
4    11:37 a.m.
5        A      Yeah, yeah, yeah.
6        Q      It was regarding Schedule 1.
7               And then if you open -- and he's
8    requesting that Gina sign it, print it, sign it and
9    return it, correct?
10       A      Yes, that's what it says.
11       Q      Were you always cc'd on communications
12   with regional managers about their contracts?
13       A      I can't say if I always was.  I
14   definitely was probably more often than not.
15       Q      So as COO, is that -- does that fall
16   under your bucket of job responsibilities?
17       A      You know, I think COOs at different
18   companies have different jobs, but because we were
19   definitely a bottom-up company and we've grown a
20   lot over the years, I -- I am cc'd on a lot of
21   different things.  So I try to be in the loop on
22   most everything that goes on.
23       Q      Do regional managers report to you?
24       A      They do not.
25       Q      Okay.  And so, do branch managers or area

Page 99

1   managers?

2        A    They do not.

3        Q    Okay.  But you just testified you're

4   generally cc'd on emails about their contracts --

5   about regional manager contracts; is that correct?

6        A    Yeah, I would say that I probably am cc'd

7   on most of them.  I mean, I don't know what I don't

8   know.  So if things are going out without me being

9   cc'd, then you know.

10       Q    In March of 2020, how many regional

11  managers did NAF employ?

12       A    Well, not very many.  So we kind of

13  lumped Gina into the SVP category.  It was that

14  high level sales leadership group.  And I think at

15  that time there was seven or eight.

16       Q    And so have you -- can you open

17  Exhibit 6?

18       A    Yep, I got it open.

19       Q    And this is the written agreement --

20  written amendment to Schedule 1.

21            Is this the written amendment to Schedule

22  1 that changed Ms. Spearman's compensation in March

23  of 2020?

24       A    Yeah.  Let me just look through it real

25  quick.

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 100

1      Q     Sure.

2      A     Yes, this is.

3      Q     Okay.  And if you go to the last page,

4    702, you see that Scott Frommert signed it,

5    correct?

6      A     Correct.

7      Q     And this -- so this amendment was sent to

8    Ms. Spearman by Scott Frommert and cc'd you.  How

9    did this amendment change her compensation?

10     A     This amendment was when we changed the

11   whole outside retail model from a straight BPS

12   override compensation model to a P&L compensation

13   model.  Kelly and Gina had negotiated a small BPS

14   as well, but it was mostly P&L.

15     Q     And was a similar schedule, amended

16   Schedule 1, given to Ms. Allison?

17     A     Yes.

18     Q     Was it also given to the other SVPs that

19   you said were in the region at the time?

20     A     Correct, yes.  All of outside retail was

21   changed at the same time.

22     Q     Okay.  Did -- did it change branch

23   managers and area manager compensation as well?

24     A     That was really dictated by the regional

25   managers, the SVPs.  It was really dictated by them

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 101

1    of how they were going to change or not change the
2    compensation underneath them as far as their
3    managers go.

4         Q    Do you know who Eric Fellows is?

5         A    I do.

6         Q    Okay.  Would he have been required -- did
7    his compensation change by the March 1, 2020
8    amendment?

9         A    Not that I recall.  His -- he was -- he
10   didn't have a big enough region to go on to a P&L
11   model.

12        Q    So only regions that were -- when you say
13   big enough, what do you mean?

14        A    Well, we didn't -- we didn't look at Eric
15   and Michelle as the same group as Kelly and Gina
16   and our other SVPs.

17             So they were running prolific regions
18   that had grown quite a bit.  They had been at New
19   American for quite some time.

20             And most of them actually were -- were
21   kind of forcing our hand to move to a P&L model.
22   It was something that they wanted to do.  So that's
23   kind of how we determined.

24        Q    All right.  Go ahead.  Sorry.

25        A    Oh, I was going to say that's how we --

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 102

 1    you know, we determined what the right course of

 2    business was for those regions.

 3         Q    So you say most of them wanted to go to a

 4    P&L.  Did Ms. Spearman want to go to a P&L?

 5         A    It really wasn't up to Gina, it was up to

 6    Kelly, and Kelly was one of the ones that actually

 7    -- she was actually from the very beginning, from

 8    the time we met her, asking us to develop a P&L

 9    model.

10         Q    Okay.  And you said you didn't put Eric

11    Fellow's region on a P&L model, just the really big

12    regions?  That's what I understood your testimony,

13    correct me if I'm wrong.

14              When you say big regions, what do you

15    mean, the highly profitable ones?

16         A    No, no, no, it was -- it was the regions

17    that had been with New American for quite some

18    time.  They had a lot of salespeople underneath

19    them.  They had a good established region.

20         Q    So when you say you changed the big

21    regions, you mean by -- the regions that had a

22    number of employees?

23         A    It wasn't determined by a number of

24    employees, it was just -- it was all the SVPs.  So

25    we don't have that many SVPs.  And so, it was

Page 103

1   everybody that was -- an SVP title.  They -- they

2   were the ones that were switched to a P&L.

3        Q    Okay.  And it's your testimony that

4   Ms. Allison wanted to go to a P&L model?

5        A    Yes.

6        Q    Okay.

7             MR. PERLOWSKI:  Ms. Bunce, I don't know

8   if you reloaded, but I think that's what we need to

9   be doing right now.

10            THE WITNESS:  Oh.

11            (Deposition Exhibit 7 and Exhibit 8 were

12   marked.)

13   BY MS. GIBSON:

14        Q    If you refresh your screen, you should be

15   able to pull up 710 and 703.

16            MR. PERLOWSKI:  Open Exhibit 7 first?

17            MS. GIBSON:  710.

18            MR. PERLOWSKI:  That's Exhibit 7,

19   Ms. Bunce.

20        A    I'm still opening it.  It's spinning.

21            Okay, I got Exhibit 7 up.

22   BY MS. GIBSON:

23        Q    Okay.  And so, we just looked at

24   Exhibit 5 and 6 which was an email from Scott

25   Frommert dated February 28th with the attached

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 104

1    Schedule 1.

2                And we've got Exhibit 7 which is an email

3    from Scott Frommert to Ms. Spearman cc-ing you with

4    the attached March 1, 2020 schedule.  Do you see

5    that email?

6        A    I do.

7        Q    He says:  Hope things are well.  I'm sure

8    you are busy with rates as low as they are.  I

9    wanted to follow up on our exchange regarding the

10   compensation discussions and documents.

11               Just to make certain there's no confusion

12   about the terms of your bonus compensation

13   arrangement, Christy and I have each placed our

14   initials on your attached Schedule 1 document that

15   we delivered to you last week.

16               This document is being placed in your

17   Employment file with HR to reflect the terms of

18   your bonus comp that are in place and effective

19   March 1, 2020.

20               Do you see that?

21       A    I do.

22       Q    What discussions did you have with Scott

23   about sending this email?

24       A    I recall that we discussed that, you

25   know, we were making a move to this bonus plan

Page 105

1  starting March 1st.  Everybody had signed their

2  agreements, as far as I recall, except for Gina.

3          So we had talked to our general counsel

4  and just decided that we would put this email

5  together to make sure that she was notified that we

6  were putting this in her file.  It was in effect.

7  And just to kind of move on because we were kicking

8  off this new pay plan.

9      Q    Did you do this with any other proposed

10  amendment to Ms. Spearman's compensation?  When I

11  say "this," did you resend to her an initial other

12  versions of changes to compensation?

13          MR. PERLOWSKI:  Object to the form.

14      A    Not -- not that I recall.

15  BY MS. GIBSON:

16      Q    So can you tell me why it was so

17  important to do it with this version, this change

18  to compensation?

19      A    This was a wholesale change for all of

20  our SVPs on how they were compensated.  It was a

21  very involved process.  One that Scott had worked

22  very, very hard on with the SVPs, including Gina,

23  and gone over with them.

24          And we really had put a lot of time and

25  effort into this because it was a completely

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 106

1    different compensation model for New American

2    Funding.

3              So we had put a lot of effort into making

4    sure that our SVPs and everybody that was getting

5    moved to this model would not be taking any sort of

6    pay cut from what they had been earning before.

7              There was a lot of math, a lot of

8    conversations.  So it was very important to us that

9    everybody understood it.

10       Q    Was NAF affirming the written contract by

11   resending this and not a course of conduct or a

12   verbal agreement?

13             MR. PERLOWSKI:  Object to the form.

14       A    I don't -- I don't understand the

15   question.

16   BY MS. GIBSON:

17       Q    Well, you're resending the written

18   contract.  And then we testified earlier a little

19   bit about modifications to material terms of

20   employment.

21             So my question is, I want to know why you

22   resent this written contract twice?

23       A    I think it was resent twice because Gina

24   wasn't signing it.  We wanted to make sure that she

25   had reviewed it and that she understood that her

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

Page 107

1  compensation changes were taking place.

2      Q    Do you agree that NAF could not have

3  changed her compensation to this model by just a

4  course of conduct or a verbal agreement?

5          MR. PERLOWSKI:  Object to the form.

6          You can answer.

7      A    Yeah, our policy has not changed since

8  way before we did a P&L model.  So we always felt

9  the correct thing to do is to notify the people

10 that are getting a compensation change and then to

11 send them their amended contract so that they can

12 review it.

13 BY MS. GIBSON:

14     Q    And just to confirm, NAF would have

15 something in its system that confirmed that the

16 documents were sent via Adobe; is that correct?

17     A    I'm almost a hundred percent sure that

18 Adobe can show those records.

19     Q    Who is Scott Frommert?

20     A    He was our CFO.

21     Q    When was he hired?

22     A    Spring 2019, if I remember correctly.

23     Q    Who was your CFO before Mr. Frommert?

24     A    We did not have a CFO.

25     Q    Why was -- why was he hired?

Page 108

1      A    We felt that we needed somebody in that

2    capacity to help with just managing the finances.

3    Our owner of our company and Jason Obradovich, who

4    you met yesterday, really does act in that capacity

5    for the most part.

6            But with moving to a P&L model for the

7    biggest regions that we have, we felt that it was a

8    good step for us to have a CFO.

9      Q    Is he still your CFO?

10     A    He is not.

11     Q    And when did he leave?

12     A    I think it was March 2020.  Maybe April.

13   Right around that time.

14     Q    Why did he leave?

15     A    We decided that Scott wasn't a good fit

16   for New American Funding.

17     Q    Why wasn't he a good fit?

18     A    I don't know if I can answer that

19   actually because it's confidential as to why we

20   part ways with employees.

21           THE WITNESS:  I mean, Henry, you can tell

22   me if I can answer that or not.

23           MR. PERLOWSKI:  If it's confidential

24   subject to an agreement, then it's confidential.

25   BY MS. GIBSON:

Page 109

1      Q     So is it confidential --

2            MR. PERLOWSKI:  So if it was a separation

3      agreement between NAF and Mr. Frommert as

4      confidentiality as to what can be said, then that

5      agreement would apply.

6      A     Yes.

7   BY MS. GIBSON:

8      Q     Was he fired?

9      A     We had an agreement with Scott that it

10     just wasn't a good fit for New American Funding and

11     we were going to part ways.

12     Q     Okay.  Was he fired?

13     A     He was terminated, yes.

14     Q     Was he paid money when he was terminated?

15     A     Not that I recall.

16     Q     Was he unhappy at NAF?

17           MR. PERLOWSKI:  Object to the form.

18           You can answer.

19     A     No, I don't think he was.  I think he was

20     happy here.

21   BY MS. GIBSON:

22     Q     Who is your CFO now?

23     A     We don't have anybody that holds that

24     title.  It reverted back really to Jason Obradovich

25     after Scott Frommert was no longer with the

Christy Bunce                        January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 110

1   company.

2       Q    Okay.  Have you spoken to Mr. Frommert

3   since being notified of this litigation?

4       A    No.

5       Q    And he prepared the P&L -- or, I'm sorry,

6   he prepared -- he did all the work that went into

7   preparing the March 1, 20 -- did he do all the work

8   that went into preparing the March 1, 2020

9   amendment?

10      A    He didn't prepare the actual amendment

11  that was sent.  That was prepared by human

12  resources.  But he did all the work providing the

13  structure for the P&L.

14      Q    Okay.  And did -- were you involved in

15  drafting the separation agreement with

16  Mr. Frommert?

17      A    I was involved in it, in the -- in the

18  separation, yeah.

19      Q    Were you involved in writing the

20  separation agreement?

21      A    I didn't write the separation agreement,

22  human resources did, and I would have to refresh my

23  memory as to what the terms of that were.

24      Q    Have you read it?

25      A    When -- when we parted ways, yes.

Page 111

1      Q     And you testified that was March or April

2   of 2020?

3      A     Yeah.

4      Q     Okay.  And I think I just asked you, and

5   I don't remember your answer, have you spoken to

6   Mr. Frommert after being -- after you've learned of

7   this litigation?

8      A     No, I have not spoken to Scott since we

9   parted ways.

10      Q     Okay.  Are you aware of a meeting that

11   Mr. Frommert and Mr. Reed attended with

12   Ms. Spearman, Ms. Allison and her CPA and a lawyer

13   named Lex Watson?

14      A     I do recall that, yes.

15      Q     Okay.  Did Mr. Frommert communicate with

16   you about that meeting?

17      A     He did.

18      Q     What did he tell you about that meeting?

19      A     He -- he told me that he thought it went

20   well and that he answered a lot of questions and he

21   thought that everybody was under a good

22   understanding of what the agreement was.

23            And he walked away from that thinking

24   that, you know, everybody was happy with where we

25   were going.

Christy Bunce January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 112

1     Q   And Ms. Allison brought her CPA to that

2  meeting?

3     A   I'm assuming it was hers.  I -- I don't

4  know for sure.  I didn't -- I didn't know the

5  person.

6     Q   Okay.  But you just -- did you just

7  testify that he walked away understanding that

8  everyone was happy?

9     A   That was what the messaging back from

10  Scott was.

11     Q   And did you at some point learn that

12  Ms. Spearman and Ms. Allison weren't happy?

13     A   No, I think that there was some back and

14  forth after that about questions on the P&L and

15  things like that.

16         But that really was -- Scott was kind of

17  taking point with those -- with the questions and

18  the back and forth.

19     Q   Is there any reason why NAF hasn't

20  identified Mr. Frommert as a witness who would know

21  information about Ms. Spearman's employment

22  agreement since he was -- conducted this meeting

23  with Kelly and Gina?

24         MR. PERLOWSKI:  Object to the form.

25     A   No.

Christy Bunce                              January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 113

1    BY MS. GIBSON:

2        Q    Would he have the best knowledge of what

3    happened at that meeting?

4        A    Yeah, I -- I mean, yes, he was there, so

5    yes.

6        Q    Yeah.  I understood he prepared a slide

7    show to present at that meeting.  Did you receive a

8    copy of that slide show?

9        A    I do not recall seeing any slide show.

10       Q    Did he meet with you before he went to

11   meet with them in Atlanta to discuss what he was

12   going to present?

13       A    We -- we -- Scott and I met all the time,

14   but he did -- he did talk to me about going to the

15   meeting and what he was going to talk to Kelly and

16   Gina about, but I don't remember reviewing material

17   or anything like that.

18       Q    What did he tell you he was going to talk

19   to them about?

20       A    We really -- I think really we were kind

21   of in the dark as to what -- what the questions

22   were going to be.

23            He -- he was feeling very confident about

24   the model that he had built and that he was going

25   to go and explain that model and make sure that

Page 114

1    everybody had their questions answered.

2         And I know it was important for -- I'm

3    assuming it was Kelly's CPA, I don't think it was

4    Gina's.  Or maybe they shared the same person, I

5    don't know.  They had questions as well and Scott

6    felt like he could handle all of those questions.

7         Q    Do you -- did you understand or do you

8    know what their -- what Kelly and Gina's concerns

9    were with respect to the P&L model and leaving

10   their compensation under their 2016 agreement?

11        A    I think -- I think it would be the same

12   concerns that everybody had.  It's a wholesale

13   change of the way that they were compensated.  And

14   a P&L model is a very different model to manage.

15        I think Kelly had a lot of experience

16   managing a P&L, but there's a lot of skin in the

17   game when you move from a straight BPS model to a

18   P&L.

19        So they wanted to make sure that they had

20   a good firm understanding of the way we were

21   accounting for all the P and all the L, and make

22   sure that they could be profitable and make the

23   money that they wanted to make.

24        Q    Did you review any materials that they

25   went over at that meeting?

Page 115

1          A     Not that I recall.

2          Q     Does NAF have those materials that they

3     went over at that meeting?

4          A     I did not --

5                MR. PERLOWSKI:  Object to the form,

6     foundation.

7                THE WITNESS:  Sorry.

8     BY MS. GIBSON:

9          Q     You can answer.

10         A     I did not -- I did not have any slide

11    show that has been noticed in this lawsuit.  I know

12    it's come up.  I -- I do not recall ever seeing any

13    sort of slide show.

14         Q     Has anyone from NAF asked Mr. Frommert

15    for the slide show?

16         A     Not that I know of.

17         Q     Does NAF -- anyone at NAF know what the

18    contents of the slide show is?

19               MR. PERLOWSKI:  Object to the form,

20    foundation.

21    BY MS. GIBSON:

22         Q     You can answer.

23         A     Yeah, like I said, I -- I never saw any

24    sort of slide show.

25         Q     I understand.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 116

1           I'm asking you, like, as the NAF 30(b)(6)

2    rep, if NAF has any knowledge of anyone at NAF that

3    knows what the contents of that slide show is?

4        A    No.

5              MR. PERLOWSKI:  Object to the form.

6              MS. GIBSON:  Sorry.  Go ahead, Henry.

7              MR. PERLOWSKI:  I asserted my objection.

8              MS. GIBSON:  What did he say?

9              MR. HARGROVE:  He asserted his objection.

10             MR. PERLOWSKI:  I said I asserted my

11   objection.

12   BY MS. GIBSON:

13       Q    So no one at NAF --

14             MR. PERLOWSKI:  One second.  I'm also

15   going to assert an objection because I don't

16   believe that's a noticed 30(b)(6) topic that I can

17   see.  I'm skimming through it, but...

18             I'm looking at the notice right now.  I

19   don't believe there is a notice for anything about

20   a slide show.

21             MS. GIBSON:  It's probably not that

22   specific, but it's about the March 1, 2020

23   amendment.  And I believe the order said I could

24   ask about that.

25             But I'm asking -- I can ask in her

Page 117

1    personal --

2              MR. PERLOWSKI:  You certainly can, but I

3    know that you phrased a question of her in her

4    capacity as a 30(b)(6) witness.

5              MS. GIBSON:  Absolutely.

6              MR. PERLOWSKI:  I just wanted to raise a

7    point that that's not a designated -- that's not a

8    noticed topic, but you can certainly ask her

9    individually certainly, and please do.

10             MS. GIBSON:  Okay, yeah.  Thank you.

11             One of the notice topics, though, is

12   communications about Ms. Spearman's contracts, and

13   I'm trying to find it for you.

14             Here.

15             Financial decisions made by NAF regarding

16   changes to compensation.  And documents and

17   materials relied upon by NAF in deciding whether to

18   alter her compensation.  The nature and scope of

19   contractual negotiations for Ms. Spearman's

20   employment.  The nature and scope of Ms. Spearman's

21   compensation.

22   BY MS. GIBSON:

23        Q    So I just want to know if anyone at NAF

24   knows whether that slide show compared

25   Ms. Spearman's -- the buckets in Ms. Spearman's

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 118

1   2016 Schedule 1 to the amended Schedule 1 dated

2   March 1, 2020?

3          MR. PERLOWSKI:  Object to the form,

4   foundation.

5   BY MS. GIBSON:

6      Q    You can answer.

7      A    Like I said, I have not seen any sort of

8   slide show.  I don't know anything that was -- I

9   don't even know if it exists to be honest.

10     Q    Well, if we have testimony from

11  individuals that said they were showed a slide

12  show, do you have any reason to disagree with them?

13         MR. PERLOWSKI:  Object to the form,

14  foundation.

15     A    Yeah, all I can -- all I can testify to

16  is, do I know of a slide show, I do not know of a

17  slide show.

18  BY MS. GIBSON:

19     Q    And does NAF know of a slide show?

20     A    No.

21     Q    Okay.  Has anyone spoken to Mr. Reed

22  since about -- since you received notice of the

23  litigation?

24     A    Not that I know of.

25     Q    Do you know if anyone at NAF has asked

Page 119

1    Mr. Reed about the slide show?

2         A    Not that I know of.

3         Q    Did anyone ask Mr. Reed what was

4    discussed at the -- this meeting in the fall of

5    2019?

6         A    Are you asking if we had conversations

7    about the meeting like after the meeting or since

8    we've been served the lawsuit?

9         Q    Since you've been served the lawsuit?

10        A    No.

11        Q    So did you have conversations with

12   Mr. Reed after the meeting?

13        A    Yes.  So I got the same messaging from

14   Jon that I got from Scott, was that the meeting

15   went well.  He walked away thinking that everybody

16   was -- understood the agreement.  And I think there

17   were a few takeaways and nothing more than that.

18             MS. GIBSON:  It's 1:45.  So it's almost

19   11 your time.  Do you want to take a 10-minute

20   break or do you want to break for 30 minutes for

21   lunch, Henry and Ms. Bunce?

22             THE WITNESS:  It's really early for lunch

23   for me.

24             MS. GIBSON:  No, that's fine.

25             MR. PERLOWSKI:  Let's do a short break,

Page 120

```
1    and then maybe we can do a 30-minute break, you

2    know, in another hour or so.

3              MS. GIBSON:  Sure.

4              MR. PERLOWSKI:  If that works for

5    everybody.

6              MS. GIBSON:  That's fine.  We'll speak

7    in -- we'll resume at 1:55.

8              MR. PERLOWSKI:  Sounds good.  Thank you.

9              (Recess taken 1:45 - 2:03 p.m. EST.)

10             MS. GIBSON:  We can go back on the

11   record.

12   BY MS. GIBSON:

13        Q    What was Jon Reed's title?

14        A    I think it was EVP of retail sales.

15        Q    Did Ms. Spearman and Ms. Allison report

16   to him?

17        A    They did.

18        Q    Okay.  When was he hired?

19        A    Oh, my gosh.  Maybe in 2000 -- let me

20   think real quick -- 2012.

21        Q    Is he still with the company?

22        A    He is not.

23        Q    When did he leave?

24        A    2020, early spring.

25        Q    Was it before or after the March 1, 2020
```

Page 121

1    amendment?

2         A    I think it was right after that.

3         Q    Was he required to sign the amendment or

4    was -- did the amendment apply to his compensation?

5         A    No, he doesn't -- he didn't manage a

6    region or anything like that.  He didn't have

7    production reporting up to him.

8         Q    And you said he was EVP?

9         A    EVP.

10        Q    So in his role as EVP, does he review

11   P&Ls?

12        A    He did.

13        Q    Would he have reviewed the same P&Ls that

14   you looked at?

15             MR. PERLOWSKI:  Object to the form.

16        A    Specific to outside retail, yes.

17   BY MS. GIBSON:

18        Q    There would be no reason that they would

19   be different, is there?

20        A    What do you mean?

21             MR. PERLOWSKI:  Object to the form.

22   Yeah, I --

23   BY MS. GIBSON:

24        Q    Is there any reason why a P&L for

25   December -- I'm sorry, a P&L from January to -- to

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 122

1    November 2018 would be different from the P&L that

2    you looked at?

3                MR. PERLOWSKI:  Object to the form.

4    BY MS. GIBSON:

5        Q    You can answer.

6        A    Yeah.  So as the COO, I'm looking at

7    different P&Ls.  I'm looking at an P&L for the

8    entire company, I'm looking at our internal call

9    center P&L, and then outside retail P&L.  So Jon

10   was specific EVP to outside retail.

11       Q    So you said the P&L that you looked at in

12   preparing for the deposition was the P&L for

13   outside retail; is that correct?

14       A    That's correct.

15       Q    Okay.  And so that's the same P&Ls that

16   he would look at?

17       A    Correct.

18   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

19   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

20   ▨▨▨▨▨▨▨▨▨

21   ▨▨▨▨▨▨▨▨▨

22   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24   ▨▨▨▨▨▨▨▨▨▨▨

25   ▨▨▨▨▨▨▨▨▨

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 123



Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 124

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 125

1  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

3  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

4  ▨▨▨

5  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

6  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7  ▨▨▨▨▨▨▨▨▨▨▨▨▨

8       Q     And he would be able to see CM3 fully

9  loaded?

10      A     He would, yeah.

11      Q     And is he -- would he be looking at the

12  P&L for the entire United States or is there a P&L

13  for just the Southeast region?

14      A     So it would --

15            MR. PERLOWSKI:  Object to the form.

16            Subject to that, you can answer.

17            THE WITNESS:  Sorry, Henry.

18      A     So, yeah, the P&L was -- would cover the

19  entire United States, but you could also see it by

20  region.

21  BY MS. GIBSON:

22      Q     Okay.  Did you look at a P&L for the

23  Southeast region for that time period of January

24  through November 2018?

25      A     I did.

Page 126

1       Q    And was the Southeast region profitable?

2       A    As far as I remember on CM1, they were

3  profitable.  I don't recall what their profit level

4  was at CM3.

5       Q    And what would you look at today to learn

6  what their -- Southeast's region profit was at CM3?

7       A    We can pull those P&Ls back up.

8            (Deposition Exhibit 9, Exhibit 10 and

9  Exhibit 11 were marked.)

10  BY MS. GIBSON:

11      Q    Okay.  We loaded a couple of exhibits for

12  you to look at.  It's 9, 10, and 11.  And you can

13  pull up 9 first.

14      A    Okay, Regional Manager Schedule 1 dated

15  March 1st, 2017.

16           MR. PERLOWSKI:  Just one second,

17  Ms. Bunce.  Mine's still reloading.  You said

18  Exhibit 9 first?

19           MS. GIBSON:  Yes.

20           MR. PERLOWSKI:  Thank you.

21           MS. GIBSON:  You're welcome.

22           MR. PERLOWSKI:  Thank you.  Okay.

23           MS. GIBSON:  Uh-huh.

24           MR. PERLOWSKI:  And just -- I'm sorry to

25  interrupt, but did we ever actually introduce or

Christy Bunce                            January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 127

1    talk about Exhibit 8?

2              MS. GIBSON:  No, not yet.

3              MR. PERLOWSKI:  Okay, thank you.

4    BY MS. GIBSON:

5        Q    Ms. Bunce, are you taking a look at that?

6        A    Yeah, I said I already had it up.

7        Q    Okay.  Just let me know when you had a

8    minute to review it.

9        A    (Witness reviews document.)

10             Okay, I reviewed it.

11       Q    Okay.  And was this the same amend --

12   same Schedule 1 that was attached to Ms. Spearman's

13   November 2016 regional manager agreement?

14       A    No, this one is dated March 1st, 2017.

15       Q    All right.  And you did say before, I

16   think your word was, form documents, but my

17   question is, is it the same -- I know it's got a

18   different date.  Is it the same contents?

19       A    I'd have to do a side by side.  Like I

20   said, we have a boilerplate agreement, but we --

21       Q    Boilerplate.

22       A    -- do amend them if we need to.

23             So I'd have to do a side by side to say

24   they're exactly the same verbiage.

25       Q    Okay.  And prior I asked you if the

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 128

1    March 1, 2020 amendment was the first written

2    amendment to Ms. Spearman's compensation.  Do you

3    remember that?

4         A    I do.

5         Q    And was that the first written amendment

6    amended -- amendment to her compensation?

7         A    No.  What I said was I thought that there

8    had been a previous amendment.  So I'm assuming

9    this is it.

10        Q    Well, I want to show you what was

11   introduced at Ms. Spearman's deposition by your

12   counsel, and this was presented to her and

13   represented to be a Schedule 1 dated March 1, 2017.

14   And if you go to the second page, and it's got the

15   Bates page on the right, NAF_275.

16        A    Yes.

17        Q    And it has the same provision as November

18   2016, Schedule 1, titled 1.4, Override Bonus

19   Calculation Table.  Do you see that?

20        A    I do.

21        Q    And it states:  Override Bonus payable to

22   Regional Manager shall be calculated per the

23   Override Bonus Calculation Table below.  Loan

24   Volume and Units funded by managed territory

25   branches during a calendar month will receive the

Christy Bunce                                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 129

```
 1    BPS shown in the Override Bonus Calculation Table

 2    unless specified otherwise as follows.

 3              Do you see that?

 4        A    I do.

 5        Q    You do?

 6        A    Yeah.

 7        Q    And then if you go to the next page, do

 8    those appear to be the same table as in her 2016

 9    Schedule 1?

10              MR. PERLOWSKI:  Could you please repeat

11    that question?

12    BY MS. GIBSON:

13        Q    Sure.

14              If you go to the next page, Bates

15    No. 276, there is a table.  Does that appear to be

16    the same table as in Ms. Spearman's 2016 Schedule

17    1?

18        A    The form looks the same.  I just -- I

19    don't -- I'd have to do a side by side on the

20    language and the tables to tell you for sure if it

21    was exactly the same.  But the form looks the same.

22        Q    Okay.  Do you know if this document was

23    an amendment to Ms. Spearman's compensation?

24              MR. PERLOWSKI:  Object to the form.

25              You can answer.
```

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 130

1      A     It was.  It is an amendment because we

2   wouldn't have produced -- we wouldn't have sent

3   anything to Gina unless there was an amendment to

4   the contract that she initially signed in 2016.

5   BY MS. GIBSON:

6      Q     Was this sent to Ms. Spearman?

7      A     I'm assuming it was since it was

8   addressed to her.

9      Q     What do you mean it's addressed to her?

10     A     Well, we wouldn't have -- we wouldn't

11  have produced a contract.  This is in Gina's name

12  dated March 1st, 2017, unless we were amending

13  something.  So if we were amending something, then

14  we would have presented it to her.

15     Q     Well, do you agree with me that NAF --

16  would you agree with me that NAF prepared many

17  versions of the March 1, 2020 amendment?

18     A     I don't know how many versions were

19  produced.

20     Q     Do you have any evidence that this

21  Exhibit 9 was provided to Ms. Spearman?

22     A     I don't see any Adobe Sign on the top

23  like the other one did have.

24           So let me look.

25           No, in what you produced here, I don't

Christy Bunce                                                  January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 131

```
 1   see anything.
 2        Q    Okay.  And if you go to Page Bates
 3   No. 277.
 4        A    Yes.
 5        Q    Do you see that the bucket, 1.4.B, where
 6   it has "yes" and "no," and then in the 2016
 7   agreement, it was marked "no," and you see here it
 8   was marked "yes"?
 9        A    I do see that.
10        Q    Okay.  And in 2016, original agreement,
11   all of these buckets were marked "no," correct,
12   when we were reviewed them earlier?
13             MR. PERLOWSKI:  Object to the form.
14             You can answer.
15        A    Yes.  So as I discussed before, the box
16   that's marked "yes" or "no" applies to that
17   override bonus which I had talked to you about was
18   a big bone of contention with Kelly and Gina.
19   BY MS. GIBSON:
20        Q    Right.  You testified after your break
21   that the "no" applied to the loan applications
22   taken during the monetary guaranty period.  And
23   before the break you testified it applied to all
24   bullets.
25             But my question was, in the original 2016
```

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 132

1   agreement, all of these lines with the "yes" and

2   "no" were marked "no," under 1.4.B and we see D and

3   E, correct?

4           MR. PERLOWSKI:  Object to the form.

5       A    Yeah.  I want to make sure that we're

6   clear on this because when I clarified, that box

7   "yes" or "no" is specific to the loan application.

8   So I feel like you're trying to lead me down that

9   path, so --

10  BY MS. GIBSON:

11      Q    No, I don't want to misinterpret that.

12          So you are -- are you telling me now that

13  the yes -- that that "no" when it was checked not

14  applicable to this area manager schedule only

15  applied to the bullet point immediately preceding

16  it?

17      A    That's correct.

18      Q    So you've changed your testimony; is that

19  correct?

20          MR. PERLOWSKI:  Object to the form.

21      A    So --

22  BY MS. GIBSON:

23      Q    You can answer.

24      A    -- we've already gone through this.  So I

25  told you that the -- we know that the brokered,

Page 133

1    down payment assistance, nobody was getting paid

2    overrides on those.

3            So when you had initially questioned me

4    and then I had a break to actually look at it

5    because it wasn't ringing right with me, then

6    that's when I realized that those boxes are

7    specific for the override bonus because it was a

8    big bone of contention with Kelly and Gina because

9    they were bringing over, I think it was, upwards of

10   30 originators that were all on an extended

11   guaranty that they wouldn't be receiving overrides

12   on.

13       Q    So that would --

14       A    So we changed --

15       Q    So, go ahead.

16       A    So we checked that box "no" that it would

17   not apply so that they would receive their

18   overrides.

19           This agreement, the box is checked "yes,"

20   which is standard for New American, that if you do

21   hire a loan officer over $5,000 guaranty a month,

22   then you don't earn override while they're still on

23   that guaranty period.

24           They had gotten past that initial big

25   glut of loan officers coming on and they had

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 134

1    started doing fresh recruiting with high producing

2    LOs that were earning high guaranties, so we went

3    back to what our standard is.  And that's what this

4    is.

5         Q    Okay.  So that meant that they would be

6    receiving lower compensation because they wouldn't

7    be receiving an override on the new loan officers

8    that came in, correct?

9         A    Yes, correct, only for -- and there's

10   language in here that spells it out, but it's only

11   for originators that were earning over a $5,000

12   guaranty and didn't outearn their guaranty in the

13   month that the bonus override was paid.

14             It's a complicated process but...

15        Q    All right.  So before the break when I --

16   when we together read through the contract and I

17   said regional manager, personal loan production,

18   brokered loans, down payment assisted loans, those

19   -- at that time it didn't ring a bell or sound

20   unusual to you that that was marked "no, not

21   applicable"?

22        A    Yes, so what I --

23             MR. PERLOWSKI:  Hold on.  Hold on.

24   Objection, mischaracterizes testimony, form.

25             You can answer.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 135

1        A     Yes, so what I -- what I said was I

2     should have taken a minute -- because it wasn't

3     ringing right with me -- I should have taken a

4     minute and gathered myself and reread the contract.

5              Because once I was given a break and

6     reread it, then I recalled why exactly we had

7     marked that box "no" and what it applied to.

8     BY MS. GIBSON:

9        Q     Okay.  And at any time if you need a

10    minute to read it more in depth, absolutely let me

11    know.

12       A     I will.

13       Q     I thought we had done that.

14              So if you go to the last page, Page 279.

15    You see that?

16       A     I do.

17       Q     And whose signature is that?

18              Jan Preslo; is that correct?

19       A     That is correct.

20       Q     Okay.  Did the letter offer require that

21    written agreements -- that material terms,

22    compensation billing be changed by a written

23    agreement signed by HR, you or Rick?

24              MR. PERLOWSKI:  Object to the form.

25       A     I'm sorry, where are you reading that on

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 136

1    this agreement?

2    BY MS. GIBSON:

3         Q    Okay.  If you want to go back to Exhibit

4    2, the letter offer we -- you testified earlier

5    about.

6         A    Yeah, can you restate your question?

7         Q    Sure.

8              So earlier I asked you have we discussed

9    the letter offer, and we read through the paragraph

10   that stated:  The material terms of your employment

11   as set out in this letter may not be modified or

12   amended by verbal agreement or course of conduct,

13   but only by a written agreement presented by HR,

14   the COO or the CEO.

15        A    Oh, yeah, yep.  Yep.

16        Q    So this agreement -- this proposed

17   amendment is signed by Ms. Preslo, correct?

18        A    That's correct.

19        Q    So she's not the CEO or the COO, correct?

20        A    Correct, she's EVP of production for

21   outside retail.

22        Q    And is she authorized under the letter

23   agree- -- under the letter offer to sign -- to make

24   a change to Ms. Spearman's employment compensation?

25             MR. PERLOWSKI:  Object to the form.

Page 137

1          You can answer.

2     A    Yeah.  No, she's not -- well, yeah, she's

3    not authorized according to the contract.

4    BY MS. GIBSON:

5     Q    And just so I'm clear, there's no Adobe

6    Sign that's on this document that you're looking at

7    that shows Ms. Spearman received it?

8     A    I do not see that.

9     Q    Okay.  Can you open -- refresh your

10   screen and open Exhibit 10.

11    A    I've got Exhibit 10 up.

12    Q    Okay.  And this is another Amendment to

13   Schedule 1, Regional Manager Compensation dated

14   January 1, 2018.

15          And it was previously introduced by your

16   counsel at Ms. Spearman's deposition as Defendant's

17   Exhibit 8, so you'll see that at the bottom.  And

18   it's Bate No. 256.

19          Do you see that?

20    A    I do see that.

21    Q    And go ahead and, you know, take as much

22   time as you need to look at these pages.

23    A    (Witness reviews document.)

24          Okay, I've read it.  I've read some of

25   it.  Most of it.

Christy Bunce                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 138

1      Q      Okay.  Was 2017 profitable for outside

2  retail?

3      A      As far as I recall, yes.

4      Q      Was it crazy profitable or was it just,

5  eh?

6             MR. PERLOWSKI:  Object to the form.

7      A      I don't -- I don't remember.  I don't

8  think it was crazy profitable, no, to use your

9  term.

10  BY MS. GIBSON:

11     Q      So if this agreement -- this Exhibit 10,

12  do you know if it was ever given to Ms. Spearman?

13     A      I don't know if it was or not.  I would

14  assume if it was drawn up that it was given to her.

15     Q      Is there any DocuSign or any evidence

16  that this was presented to Ms. Spearman?

17     A      Well, if this --

18     Q      I'm sorry, go ahead.

19     A      If this is maybe part of a whole

20  contract, I don't know.  So this is just the

21  amendment to Schedule 1.  There's nobody's name on

22  this contract.

23     Q      Right.

24             So I'll represent this was produced by

25  NAF in litigation as pertaining to Ms. Spearman, so

Christy Bunce                      January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 139

1   that's why I'm asking you.

2           Is there a contract that this would have

3   gone with?

4       A    I would assume so.  I mean, I know it

5   pertains to the Southeast region because of all the

6   branch lists in Exhibit A.  Those are Kelly and

7   Gina's branches.

8           But without seeing the full context of

9   what was sent out, I can't -- I can't for surely

10  answer your question.

11      Q    How would we know what was sent out?  How

12  would we find out what was sent to Ms. Spearman?

13      A    We would have to go through the emails or

14  Adobe Sign or however it was sent.  I'd have --

15  we'd have to review that with human resources.

16      Q    Okay.  Is there any reason why that would

17  not have been produced by NAF to date?

18          MR. PERLOWSKI:  It was.  You're just not

19  showing it to her.

20          MS. GIBSON:  I don't have any Adobe

21  DocuSign.

22          MR. PERLOWSKI:  You have an email that

23  shows the distribution of this document, you're

24  just not showing it to her.

25          MS. GIBSON:  I'm asking for the Adobe

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 140

1    records that show, Henry.

2    BY MS. GIBSON:

3        Q    And back to this -- this document, this

4    is not in any way similar to the format of the

5    Schedule 1 in Exhibit 9 or attached to

6    Ms. Spearman's 2016 contract, is it?

7        A    No, this looks like a different schedule.

8        Q    Okay.  Does this schedule purport to

9    change her compensation?

10       A    It does.

11       Q    Can I get you to look at -- and you had

12   already testified it's not signed by anyone and it

13   doesn't have anyone's name on it, correct?

14       A    Correct.

15       Q    Can you open Exhibit 11.

16       A    Okay.

17       Q    And go ahead and take a few minutes and

18   look at this.

19            You know, I'll go ahead and ask:  Does

20   this appear to look like the Exhibit 9 and the

21   Schedule 1 attached to Ms. Spearman's 2016 regional

22   manager agreement?

23       A    The schedule looks a little different,

24   but the form looks to be the same.

25       Q    How does the -- is it different in that

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 141

1    the boxes under 1.4.B are checked -- is checked

2    "yes" and 1.4.D is checked "yes"?

3         A    No, no, I was talking about the

4    override bonus --

5              MR. PERLOWSKI:  Object to the form.

6              Go ahead.

7              THE WITNESS:  Sorry.

8         A    I was --

9    BY MS. GIBSON:

10        Q    I'm sorry.  Okay.  This is different how?

11             THE WITNESS:  Oh, my god.

12             MR. PERLOWSKI:  So you're break -- so

13   you're breaking up a little bit.

14             MS. GIBSON:  How come you're freezing?

15        A    Am I freezing or are you?

16   BY MS. GIBSON:

17        Q    Yes, you are.

18             Ms. Bunce, how did you say it's

19   different?

20        A    So I'm looking at the Bonus Override

21   Calculation Table and that looks different from the

22   other ones that I've reviewed.  It looks like

23   there's an additional box.

24        Q    And if you go to the last page, Bates

25   No. 285.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 142

1        A    Yep, I'm there.

2        Q    There's a signature line for you, but you

3   haven't signed it, have you?

4        A    No.

5        Q    Has anyone signed it?

6        A    No.

7        Q    Is there any DocuSign evidence that this

8   was given to Ms. Spearman?

9        A    Not that I can see.

10       Q    And can you load -- so we were just

11  talking about purported amendments that NAF has in

12  its files dated March 1, '18, March 1 of 2017 and

13  January 2018.  So these are all 2017 to March 2018,

14  would you agree?

15       A    Yes.

16            MR. PERLOWSKI:  Hold on.  Just give me a

17  second.  My Exhibit Share just froze.

18            MS. GIBSON:  Sure.  I wasn't looking at

19  an exhibit.

20            MR. PERLOWSKI:  I thought you had asked

21  her to reload, but maybe I'm...

22            (Deposition Exhibit 12 marked.)

23            MS. GIBSON:  Can you reload now and look

24  at Exhibit 12.  It is Bates number SPEARMAN643.

25  And I apologize, you're going to have to rotate it.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 143

1          MR. PERLOWSKI:  Give me one second,

2     please.

3          MS. GIBSON:  Sure.

4          MR. PERLOWSKI:  Thank you.  Okay, I got

5     it.  Thank you.

6     BY MS. GIBSON:

7          Q    Ms. Bunce, do you have it?

8          A    Yeah, let me rotate it real quick.  Okay.

9          Q    Just let me know when you're ready.

10         A    (Witness reviews document.)

11              Okay, I've read it.

12         Q    Okay.  And so just -- these amendments --

13    these proposed amendments that we just went over,

14    Exhibits 9, 10, 11 were dated from March 2017 to

15    March 2018, correct?

16         A    Correct.

17         Q    Okay.  And Exhibit 12 is an email from

18    you, Christy Bunce, dated August 24th, 2018, to

19    Ms. Spearman and Ms. Allison, Subject You.  Do you

20    see that?

21         A    I do.

22         Q    And your email says:  Hi Kelly and Gina,

23    I just wanted to put in writing how much we value

24    our partnership with you guys and that we have

25    never discussed your deal changing.  Patty, Rick

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 144

1    and I think you two are one of the best things that

2    has ever happened to NAF and you have pushed us to

3    be better in every way.  I absolutely love working

4    with you and you will forever be Our girls.

5            Do you see that?

6       A    I do.

7       Q    And you specifically say "we have never

8    discussed your deal changing."

9            So up until August 24th, 2018, NAF had

10   never changed the compensation identified in

11   Ms. Spearman's 2016 contract; is that true?

12           MR. PERLOWSKI:  Object to the form.

13   BY MS. GIBSON:

14      Q    You may answer.

15      A    Yeah, I think you're taking that email

16   definitely out of context.  So I'm assuming that

17   there was some back and forth about a deal changing

18   with them after amendments and things like that

19   somewhere around August, and that's why I sent that

20   email.

21      Q    So tell me how this is out of context if

22   there is unsigned amendments that we just looked at

23   and shortly thereafter you're saying we never

24   talked about your deal changing?

25      A    I can't -- I can't -- ...

Page 145

```
 1            MR. PERLOWSKI:  Hold on --

 2       A    ... -- that we were having previous to

 3    this email.  So I'm sure that if you look in

 4    emails, Kelly and Gina did receive those contract

 5    changes.

 6            They weren't just produced and then just

 7    put into a file.  That they were -- that they were

 8    presented to them.  Whether they signed them or not

 9    is beside the point.

10    BY MS. GIBSON:

11       Q    Are you texting or chatting with anyone

12    during the deposition?

13       A    No.

14       Q    Okay.  But you testified earlier there's

15    no DocuSign evidence that these were ever presented

16    to Ms. Spearman, correct?

17       A    Yeah, like I --

18            MR. PERLOWSKI:  Object.  Hold on.  Object

19    to the form, mischaracterizes testimony.

20    BY MS. GIBSON:

21       Q    Go ahead.  You can answer.

22       A    No, what I said in the beginning was, at

23    that time we were doing Adobe Sign and we were

24    doing other -- I think we were doing other DocuSign

25    and we were doing emails.
```

Page 146

1          So I can't -- unless I can go through all

2     of the emails and say whether this is emailed to

3     them, whether it was sent through Adobe, I don't

4     know.

5          But it is obvious on these that you have

6     presented to me that they weren't time stamped as

7     -- as an e-sign.

8     Q    Well, you're the 30(b)(6) witness on

9     behalf of NAF that I'm asking you what your

10    procedures are with respect to presenting

11    amendments to contracts to employees.

12         So I'm asking you to tell me what -- you

13    know, what evidence is there?

14    A    And I stated --

15         MR. PERLOWSKI:  Hold on a second.  Object

16    to the form.  Her testimony -- you said she is

17    NAF's representative about NAF's practices --

18         MS. GIBSON:  You can object to form.

19         MR. PERLOWSKI:  -- with respect to

20    changing compensation.

21         MS. GIBSON:  No speaking objections.

22         MR. PERLOWSKI:  And then you --

23    BY MS. GIBSON:

24    Q    Go ahead, Ms. Bunce.

25         MR. PERLOWSKI:  Object to the form.

Page 147

1    Fundamentally misleading the witness.

2    BY MS. GIBSON:

3        Q    So tell me what you are referencing in

4    this email because I don't have anything preceding

5    this other than these agreements.

6        A    Yes.  So this email is from August 2018.

7    So I don't recall what conversations I was having

8    with Kelly and Gina at that time, but I would

9    assume because of the email content that they were

10   asking me if we were having changes, that I knew of

11   looming changes to their contracts that were coming

12   forward.  And my statement is true at that time.

13       Q    So your statement that we have never

14   discussed your deal changing as of August 24th,

15   2018, is true?

16       A    Yeah, for that period in time.

17       Q    What period in time?

18       A    August 24th, 2018.  Obviously, there was

19   conversations between Kelly and Gina and I that I

20   do not recall that they were asking me about a

21   pending change.  That's the way I read my response

22   back to them.  And I --

23       Q    So you don't recall -- I'm sorry, go

24   ahead.

25       A    No, that's fine.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 148

1      Q     You don't recall any communications with
2   them where they were dissatisfied with the fact
3   they weren't being paid overrides pursuant to
4   Schedule 1 in their 2016 agreements?
5              MR. PERLOWSKI:   Object to the form,
6   mischaracterizes testimony.
7   BY MS. GIBSON:
8      Q     I'm asking, do you recall?
9      A     No.
10             MR. PERLOWSKI:   Objection, asked and
11  answered.
12  BY MS. GIBSON:
13     Q     No, you don't, okay.
14             What did you mean that they would
15  "forever be our girls"?
16     A     They were our girls.  Gina knows this
17  very well.  We were very proud to have Kelly and
18  Gina at New American Funding.
19             I told them numerous times that I was
20  very excited that we had people of their level that
21  were women leaders in mortgage, so.
22             And I think that was a big reason why
23  Kelly and Gina chose New American is because New
24  American is run a lot at the top by women.  And we
25  had that in common.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 149

1          So we started early on calling them our

2     girls.  That's the way we called them.  We didn't

3     have teams of salespeople in those positions.

4     Kelly and Gina were the only ones.  And that's why

5     we said -- that's why we called them what we did.

6          And Gina knows for sure, without a shadow

7     of a doubt, that we were very proud to have her and

8     Kelly as part of New American Funding.

9          Q    Did anyone at New American Funding ever

10    say that our girls made too much money?

11         A    Not that I recall.

12         Q    Did NAF believe that they made too much

13    money based on their 2016 agreements and the

14    compensation they received under those agreements?

15         A    We felt that they were fairly paid until

16    the compensation agreement that they had didn't --

17    didn't work because New American as a whole as

18    outside retail was not making money on outside

19    retail.  So it just wasn't a sustainable model.

20         Q    And so is that what led to the change to

21    the P&L model embodied in the March 1, 2020

22    amendment?

23         A    Yes.

24              MS. GIBSON:  I think I'm at a good

25    stopping point for lunch.  We can go off the

Page 150

1    record.

2            MR. PERLOWSKI:  What time would you like

3    to come back?

4            MS. GIBSON:  3:15 -- how about 3:20?

5            MR. PERLOWSKI:  Sounds good.  See you

6    then.

7            MS. GIBSON:  Let's say 3:30 just to

8    be safe.

9            MR. PERLOWSKI:  Okay, sounds good.  See

10   you then.

11           (Lunch recess 2:44 - 3:34 p.m. EST)

12

13                   *   *   *   *   *

14

15           MS. GIBSON:  We can go back on the

16   record.

17   BY MS. GIBSON:

18       Q    Ms. Bunce, I want to ask you about the

19   February 2019 leadership meeting.  Do you recall

20   that taking place?

21       A    I do.

22       Q    Okay.  Did you attend that meeting?

23       A    I did.

24       Q    And who else attended that meeting?

25       A    It was all the SVPs, Jim Muth, Jan

Page 151

1    Preslo, Jon Reed.  I'm pretty sure Jason Obradovich

2    was in there.  And Patty and Rick Arvielo attended

3    some of it.  I don't think they were in all the

4    meeting.

5         Q    Can you tell me about the format of the

6    meeting?

7         A    It was informal.  It was -- everybody

8    came into the Tustin office in corporate to discuss

9    going into 2019 what the override comp model was

10   going to be moving to a P&L, and then the

11   profitability of the OLA region as a whole.

12        Q    What was discussed about the

13   profitability of the region as a whole?

14             MR. PERLOWSKI:  Object to the form.

15             You can answer.

16        A    Okay.  The discussion was about the fact

17   that we did not make a profit for outside retail in

18   2018.

19   BY MS. GIBSON:

20        Q    What specifically was discussed?  And let

21   me go back -- strike that.  Let me go back.

22             So how many days did this -- did the

23   meeting take place over?

24        A    Two days.

25        Q    Two days.  And this was in February of

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 152

1   2019?

2        A    Correct.

3        Q    Okay.  And was everyone present at one

4   time during the meeting?

5        A    Yes.

6        Q    Okay.  Were -- did anyone make a

7   presentation?

8        A    Actually, you know what, I think Chris

9   Garza who is our SVP over Nevada, northern

10  California and Arizona, I think he was on the

11  phone.  I think he didn't attend for some reason.

12  I don't know if that's important but...

13       Q    No, thank you.

14            So was -- did any of the officers speak

15  to the group as a whole?

16       A    I'm sorry, what was that?

17       Q    Did any of the officers of NAF speak to

18  the group as a whole?

19       A    Yes.

20       Q    Okay.  Who spoke?

21       A    We all did.

22       Q    When you say "we," who is that?  You?

23       A    Yes, me, Rick, Patty, Jason, Jan, Jon.

24  And then it was a -- it was free form meeting, so

25  the SVPs were talking as well.

Christy Bunce                       January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 153

1      Q     Okay.  And what was your presentation

2   about?

3      A     It was -- like I said, it was definitely

4   casual.  It wasn't structured.  So it was just we

5   were all having an open discussion about 2018, what

6   had occurred, the fact that the straight BPS

7   override model wasn't working going into 2019 and

8   we needed to come together as a group and figure

9   out, you know, what had made sense.

10          And we had already had conversations with

11  some of the SVPs.  We had phone calls.  We had

12  decided that we should all get together as a group

13  because it's a lot easier to communicate when

14  you're all in one room.

15          Because quite a few of the SVPs had

16  already weighed in earlier in 2018 that they wanted

17  to go to a P&L model.

18          So this was really to discuss, you know,

19  moving to that model, what it would take as an

20  organization to move to that model.  Hiring a CFO

21  was one of those things that we would have to do to

22  move to that model.

23          So it was just a free form conversation

24  about doing all of those things.  Talking about the

25  expenses that we were looking at that we had

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 154

1    incurred in 2018.  And how we had evaluated those

2    expenses and allocated them through the sales

3    regions.

4        Q    Was the meeting held at the headquarters

5    in Tustin?

6        A    Yes.

7        Q    Is the headquarters still in Tustin?

8        A    It is.

9        Q    What did Rick Arvielo talk about to the

10   group?

11       A    I can't -- I can't recall specifics.  We

12   were all kind of talking about the same thing.  So

13   the same subjects.

14            Just the overall profitability of the --

15   of the regions, what we needed to do going into

16   2019 to make sure that the company was profitable,

17   that the SVPs were profitable in their regions,

18   that they were making an acceptable amount of

19   income, that our salespeople were able to get the

20   pricing that they needed to be successful.

21            So it was just a -- it was a conversation

22   around all of that and equal parts from everybody

23   that was discussing.

24       Q    Did the officers, Rick, Patty, you, tell

25   the SVPs -- or strike that.

Page 155



BY MS. GIBSON:

    Q    What was the tenor of the meeting?

    A    I would say it was a little contentious for sure.  Everybody was nervous about what was going to happen and what we were going to decide.

        And I think the SVP group -- and when I say SVP group, please know that I'm lumping Gina into that group.

        The SVP group, they -- I had heard that they were having side conversations because a few weren't real excited by going on a P&L model and most were.

        So most -- you know, most of these people are, you know, kind of mini business owners and they really felt like if they could control their P

Page 156

1   and their L and kind of be the masters of their

2   domain, that they could actually make more money

3   than what they had been making.

4       Q    Did Rick or Patty Arvielo announce any

5   changes to the SVP's compensation at this meeting?

6       A    I think most of the conversation -- I

7   mean, I talk the most at these meetings, so I think

8   most of it was presented by me.

9            So we were talking about marketing

10  budgets and pricing authority and things like that.

11           Jason Obradovich was there.  He was

12  talking because everything pricing bubbles up to

13  him.  He was talking about those things.

14           Jon Reed really was kind of the person

15  that was the go-to for profit and loss.  So he was

16  talking a lot about just the expense of OLA.

17           So like I said, it was -- it was a -- it

18  was a group discussion.

19      Q    Did you say Jon Reed was the person you'd

20  go to for P&Ls?

21      A    Yeah, so he was -- he was kind of the

22  person that the SVPs would talk to the most about

23  the P&Ls.  So he was -- he was -- had a lot to say

24  about that as well, discussing new structure and

25  things like that.

Page 157

1     Q     Was he in favor of the P&L model, moving

2   to compensation on a P&L model?

3     A     I think so.

4     Q     And then did you -- and I may have

5   misunderstood you, so -- you know, tell me if I'm

6   wrong.

7           Did you say Mr. Obradovich spoke about

8   pricing exceptions or he was the person to go to

9   for pricing exceptions?

10    A     Yeah, so Jason heads up all of capital

11  markets.  So he was discussing just, you know,

12  where he thought we needed to go as far as loan

13  officer flexibility with pricing and rate sheets

14  per region and things like that.

15  ████████████████████████████████████████

16  ██████████████████████████████████████████████

17  ███████████████████████████

18  ███████████████████████████████████████

19  ███████████████████████████████████████████

20  ███████████████████████████████████

21  ██████████████████████████████████████████████████

22  ████████████████████████

23    A     Yeah, so the discussion more was -- and I

24  had talked about it before -- kind of that CM, CM1,

25  CM2, CM3, I guess you would call tiers on the

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 158

1   profitability.

2          So what the SVPs saw was CM1.  So we

3   didn't -- it wasn't -- I mean, to make it simple,

4   it wasn't a fully loaded P&L.

5          So there's -- there's hedge cost, there's

6   servicing revenue and losses and all those types of

7   things that we weren't putting into the P&L that

8   the SVPs were looking at.  All of those numbers

9   were in the P&L that we were viewing.

10         So it was just a decision on the business

11  side when we were developing this profit and loss

12  for the outside retail people that we weren't going

13  to hit them with some of those costs, corporate

14  allocations.

15         You know, we were a growing company, we

16  -- we probably had a little bit of an immature kind

17  of look at corporate allocations and the way we

18  allocated them to the outside retail division,

19  compared to the internal call center division,

20  compared to what we were just basically eating as a

21  corporation.

22         So once 2018 kind of rounded out and we

23  sat down and looked at the economics and where we

24  were with margins and just the state of the

25  mortgage industry, you know, we really had to come

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 159

1   together and talk about the fact that it -- it

2   needed to be a wholly loaded P&L.

3          So all costs had to be allocated to one

4   department or another.

5      Q    Was Jason Obradovich responsible for

6   inputting the numbers that went into make --

7   creating the P&Ls?

8      A    His department was the team that would

9   produce the P&Ls.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1    Henry?

2           MR. PERLOWSKI:  No.  I think we have a

3    double negative issue there, but it's your

4    deposition.

5           MS. GIBSON:  Thank you.

6    BY MS. GIBSON:

7        Q    You can answer.

8        A    Oh, I did.  I said no.

9        Q    So you never heard anyone make an

10   announcement about a misallocation or a shortfall

11   in the amount of $30 million?

12       A    I did not.

13       Q    Or in the amount of any amount of money?

14       A    No, there's no terminology that we use of

15   a shortfall or a misallocation.

16       Q    Okay.  So if other employees or SVPs who

17   were present at that February 2019 leadership

18   meeting testify -- have said they heard an

19   announcement -- they were present when it was

20   announced a $30 million misallocation, would that

21   be inaccurate?

22       A    That would be inaccurate.

23           MR. PERLOWSKI:  Objection.  Objection,

24   foundation.

25           Go ahead.

Page 161

1    BY MS. GIBSON:

2        Q    Were you present at the entire meeting?

3        A    I was.

4        Q    Okay.  So you would have heard everyone's

5    presentation including Mr. and Mrs. Arvielo?

6        A    Correct.

7        Q    Okay.  And was it ever announced at this

8    meeting or discussed at the -- and maybe announced

9    isn't the right meaning since you said it was more

10   of a give and take.

11            Was it ever discussed that the SVPs would

12   have to start paying their marketing costs?

13       A    That was discussed.

14       Q    Tell me what was discussed.

15       A    Exactly that.  So we were discussing the

16   fact that the -- the SVPs were making a lion's

17   share of the profit, and that we would be moving to

18   a P&L model, but that would take time.

19            So in the meantime they would take on the

20   marketing expenses in their regions since they were

21   the ones that were deciding whether to spend those

22   dollars or not.

23       Q    Okay.  And what -- were there any changes

24   announced or discussed at this meeting regarding

25   pricing exception tolerances?

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 162

```
 1        A    Yes.

 2        Q    And what were those?

 3        A    I think they were different for each

 4   region, but I think it was just a matter of Jason

 5   discussing with the SVPs pricing tolerance

 6   guidelines and when the managers would be leaning

 7   in for pricing exceptions and things like that.

 8             But I do think it was specific to each

 9   region.

10        Q    And who was leading the discussion on the

11   change to compensation with respect to the

12   marketing costs?

13             MR. PERLOWSKI:  Object to the form.

14        A    Can I answer?

15   BY MS. GIBSON:

16        Q    I'm just asking --

17             MR. PERLOWSKI:  Yes.

18   BY MS. GIBSON:

19        Q    -- who had the discussion?

20        A    I think -- I think it was a roundtable

21   discussion.  So I think we were all discussing it.

22   But most likely it was me that started the

23   conversation.  I know Jon and Jan had input as well

24   into that conversation.

25        Q    And did you -- did the discussion include
```

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 163

1   an announcement that the changes to PEs and

2   marketing costs would be for a short period of

3   time?

4        A    Yes, that is correct.  So the -- the

5   overall messaging was, listen, we need to make some

6   changes right away out of the gate.  We understand

7   most everybody wants to go on a P&L model.

8            We want to do that as well.  It makes

9   more -- most sense for the company as a whole and

10  for these SVPs running their regions, but we can't

11  do that overnight.  And we knew it was a big job.

12           So we were making these changes in the

13  interim, and then quickly hiring a CFO, and then

14  developing a good P&L model that everybody, you

15  know, could abide by.

16       Q    So when did NAF change its policy back on

17  the marketing costs and policy exceptions?

18           MR. PERLOWSKI:  Objection, foundation.

19           Go ahead.

20       A    So as far as I recall, we didn't change

21  it back.  So once the P&L model was rolled out,

22  then we had a new policy as far as P&L expenses and

23  where they were hitting the P&L and those kind of

24  things.  So it was never changed back to the way it

25  was before.

Page 164

1   BY MS. GIBSON:

2       Q    So the -- but the P&L model that was

3   amended -- that you -- that you changed the

4   compensation to the P&L model March 1, 2020; is

5   that correct?

6       A    Yes.  That's when it took effect, yes.

7       Q    Okay.  So the discussion at the

8   leadership meeting was that this would -- the

9   change to marketing costs and PEs would be for a

10  short period of time.

11          Was that -- what was contemplated by that

12  short period of time?  What amount of time?

13      A    I don't think there was any -- I know for

14  sure there was no end date to that.  It was -- it

15  was like this -- the progression of what needed to

16  happen.  We were making the changes we needed to

17  make that we thought were fair for the company and

18  for the regions.

19          And then we promised everybody that we

20  would actively put all of our efforts into finding

21  a CFO to build the P&Ls, to put everybody on a P&L.

22          So we couldn't give a time frame.  So it

23  was just, you know, our commitment to everybody

24  that we would put all of our efforts into that,

25  which is exactly what we did.

Page 165

1        Q    Did Patty Arvielo tell the SVPs that it

2    would only be for a 90-day period of time?

3        A    Not that I recall.  I think what we did

4    talk about was that our hopes would be that we can

5    find a CFO within 90 days of the meetings we had in

6    February.  We felt like we could accomplish that.

7             (Deposition Exhibit 13 marked.)

8    BY MS. GIBSON:

9        Q    Okay.  And if you can look at the next

10   exhibit that was uploaded.  13.

11       A    I've got it open in front of me.

12       Q    Okay.

13            MR. PERLOWSKI:  One second.  One second,

14   please.  I'm sorry, it took me a second to be able

15   to reload.  One second.

16            Okay, thank you.

17            MS. GIBSON:  Sure.

18   BY MS. GIBSON:

19       Q    If you go to Page 5.  And actually, the

20   bottom of Page 4, it asks:  Admit that at the

21   February 2019 Leadership Meeting, NAF verbally

22   informed Ms. Allison that she no longer had a

23   marketing budget and all Marketing Expenses would

24   be deducted from her compensation.

25            NAF's response is:  Denied as stated.

Christy Bunce

January 12, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 166

1   NAF admits that, on February 12 it notified

2   Ms. Spearman and Ms. Allison that it would

3   eliminate their marketing budget prospectively for

4   a period of time to ensure profitability.

5          Do you see that?

6   A    I do.

7   Q    Is February 12, 2019 the date of that

8   leadership meeting?

9   A    As far as I recall, yes.

10  Q    And what is the period of time that NAF

11  contemplated to ensure that the marketing budget

12  would be eliminated prospectively?

13  A    I -- I just answered that.  So the -- we

14  did not put a date on when that marketing budget

15  would change.

16  Q    I'm not asking for a date, I'm just

17  asking if you expressed when you told them all

18  their marketing budget is being taken away, and you

19  said it's for a period of time, did anyone ask what

20  that period of time is?

21  A    No.  I mean, the conversation flowed into

22  exactly what I just said.  So I said this is what

23  the changes we're going to make now.  We're going

24  -- the order of things that have to happen is we

25  absolutely have to hire a CFO.

Page 167

1          We're going to find somebody that has P&L

2    experience so that -- we're hoping that we can

3    build those P&Ls and get them presented to the SVPs

4    as quickly as possible.

5          So there was no -- that was kind of it.

6    I mean, we left those meetings knowing that Patty

7    and Rick and I and Jason were going to find a CFO

8    in very short order and that we were going to set

9    this, you know, whole P&L plan in place.

10         But there was no way for me or anybody

11   else to say I know for sure we're going to have a

12   P&L model by this date because we just -- I

13   personally had never done that.

14         And we didn't have anybody at New

15   American that had built P&L models before.  We had

16   never worked under those models.

17     Q    I'm not asking when NAF told the SVPs the

18   P&L model would be in place.  I'm asking what was

19   told to Ms. Spearman, Ms. Allison, the other SVPs,

20   about the period of time that the marketing budget

21   was removed?

22     A    Yeah, I think that's maybe where we're

23   not seeing eye to eye.  So there was -- the

24   marketing budgets weren't coming back.

25         So the whole point was -- sorry.

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 168

1        Q     No, take your time.

2        A     So the whole point was that we were going

3    to do those changes that we needed to do as far as

4    marketing budgets, PE authorities, guardrails,

5    things like that, and that we were going to move to

6    a P&L model.  Period, end of story.

7              So there wasn't any sort of timeline that

8    I remember saying that we're going to only do this

9    for 90 days.  It really doesn't even make sense

10   because we knew that we had to go to this new

11   model.

12       Q     So you just stated that the marketing

13   budgets were not coming back, correct?

14       A     Correct.  Not -- they would not revert

15   back to what they were before.

16       Q     Understood.  Did you tell the SVPs at

17   this meeting that the marketing budgets were not

18   coming back?

19       A     No.  I think the conversation was that we

20   were moving to a whole new model and what that

21   looked like and what that entailed as far as, you

22   know, expenses and marketing and all of those kind

23   of things.  We really didn't know until we had

24   somebody that was under the New American umbrella

25   that could help direct us on that model.

January 12, 2022

Page 169

```
 1       Q    Were you present at meetings that Gina
 2   was in with Ms. Arvielo?
 3       A    I -- I'm sure I was in meetings over the
 4   last -- the years that Gina was here with Patty.
 5       Q    I'm sorry.  I meant at the 2019
 6   leadership meeting when you had smaller group
 7   meetings, were you present at the meetings with
 8   Gina and Ms. Arvielo?
 9       A    I would assume so.  I don't -- I don't
10   recall that Gina had a one-off meeting with Patty.
11       Q    What about with Patty, Gina, Jon Reed,
12   Jan Preslo, you and Kelly Allison?
13       A    What's the question, I'm sorry?
14       Q    You break out into smaller meetings later
15   in the day?
16       A    We did have a subsequent meeting the -- I
17   think it was the second day.  And it was Kelly,
18   Gina, myself, Jim Muth, Jan and Jon, and I think
19   that was it.
20       Q    Patty wasn't present at that meeting?
21       A    Not that I recall.
22       Q    So did you ever hear Patty Arvielo tell
23   Ms. Spearman that the removal of marketing budget
24   and the change in pricing exceptions was for a
25   period of 90 days?
```

Page 170

1          MR. PERLOWSKI:  Object to the form,

2     foundation.

3          THE WITNESS:  Sorry.

4          MR. PERLOWSKI:  That's okay.

5      A    I did not hear that she said it was 90

6     days.  The whole gist of the meeting was that we

7     were going to move as quickly as we could to this

8     new model.

9     BY MS. GIBSON:

10     Q    But you weren't present with Ms. Spearman

11    when -- the entire time when she might have been

12    talking to Ms. Arvielo; is that true?

13         MR. PERLOWSKI:  Object to the form,

14    foundation.

15         You can answer.

16     A    Yeah, I don't even know how to answer

17    that.  I don't follow Patty around.  So they could

18    have definitely had a one-off conversation, I...

19    BY MS. GIBSON:

20     Q    And did you -- before this February 2019

21    leadership meeting, did -- so they could have had a

22    one-off conversation.  Strike that.

23         They could have had a one-off

24    conversation.  So you don't know if Patty told Gina

25    it was for a period of 90 days; is that correct?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 171

1      A    I don't -- I do not see why Patty would

2   say that because we were all very aligned in the

3   steps that had to take place to get this new

4   compensation model rolled out.  And we were all --

5   we all knew it was not going -- it was going to

6   take more than 90 days.

7      Q    Was Ms. Spearman aligned with going to

8   the P&L model?

9      A    Honestly, I don't think she was.

10     Q    Okay.  So if she was told it was only

11  going to be for a period of 90 days, would that

12  have placated her?

13          MR. PERLOWSKI:  Object to the form,

14  foundation, speculation.

15     A    So my theory on this whole thing with

16  Kelly and Gina was that Kelly was very excited to

17  go on to a P&L model.

18          Like I said early on today, Kelly wanted

19  a P&L even coming into NAF, and I think she was

20  even questioning whether to come to NAF because we

21  didn't have a P&L model and we were on a straight

22  BPS model.

23          Kelly felt very confident in managing a

24  P&L.  She had done it for years and made very good

25  money.  And I think Gina had profited off of that

Page 172

1    as well and the two of them together made a good

2    working team when it came to running a P&L.

3              They chose to join NAF on a straight BPS

4    model and it worked out very, very well.  Because

5    profits in the mortgage industry started to

6    diminish in the years that they were here and

7    margins got very, very tight and because they were

8    on a straight BPS model, their pay didn't really

9    fluctuate a lot.

10             Where if you were on a P&L model in 2018,

11   we had many, many stories of many people in the

12   Kelly and Gina positions that made zero money or

13   actually owed money to companies because P&Ls were

14   let to go negative.

15             So I think that when we presented the P&L

16   models Kelly was all for it.  I think she was one

17   of the people that was excited about it because she

18   had done it for years and done it very well.

19             And honestly, I felt like Gina wasn't.  I

20   think that she liked the stability of an override

21   BPS model and I -- I could see why she would.  And

22   I think that's where, you know, there was some

23   contention between Kelly and Gina.

24        Q    So my question was, would telling Gina

25   that it was just for a period of 90 days entice her

Page 173

1   to stay on with NAF?

2           MR. PERLOWSKI:  Object to the form,

3   mischaracterizes testimony, foundation.

4           MS. GIBSON:  I'm not mischaracterizing

5   testimony, I'm asking a question.

6           MR. PERLOWSKI:  Mischaracterizes the

7   question that you said you asked.

8   BY MS. GIBSON:

9       Q    You can answer the question.

10      A    Yeah, I can't answer that question

11  because I don't think that was ever said.

12      Q    Okay.  So you understood that

13  Ms. Spearman wasn't happy with going to the P&L

14  model; is that correct?

15      A    Well, that's my perception, I'll say

16  that.

17      Q    That's what I'm asking.  Okay.  And you

18  don't know if Ms. Arvielo told her it was just for

19  90 days to keep her on; is that true?

20      A    Yeah, listen, we -- we had -- there would

21  be no false promises to keep Gina on.  So Kelly and

22  Gina were a team.  Kelly was the one that really

23  directed how everything went.

24          So, you know, Kelly was the one that was

25  the leader, Kelly was the one that we had to talk

Christy Bunce

Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

Page 174

1   to about comp changes or anything like that for her

2   region.  So --

3       Q    Did Ms. Spearman have a separate contract

4   from Kelly?

5           MR. PERLOWSKI:  One second.  Were you

6   done with your answer, Ms. Bunce?

7           THE WITNESS:  Yeah, I'm done.

8           MR. PERLOWSKI:  I mean, she was --

9           MS. GIBSON:  Okay.  I would like

10  Ms. Bunce to answer the question, and she's welcome

11  to explain it, but I'm asking very focused

12  questions.

13          MR. PERLOWSKI:  Well --

14          MS. GIBSON:  And I don't want to waste

15  the day.  We can get out of here a lot sooner is

16  all I'm saying.

17          MR. PERLOWSKI:  Well, again, she was in

18  the middle of an answer and you cut her off, so

19  please let her finish.

20  BY MS. GIBSON:

21      Q    Do you have anything else on that,

22  Ms. Bunce?  I didn't mean to cut you off.

23      A    No, I'm done.

24      Q    Okay.  So did Kelly and Gina have

25  separate contracts?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 175

1        A    They did.

2        Q    Okay.  When Kelly resigned -- I mean, I'm

3   sorry, when Gina resigned, did Kelly resign?

4        A    She did not.

5        Q    Okay.  Is Ms. Allison still employed by

6   NAF?

7        A    She is.

8        Q    Okay.  So they did their own thing?  I

9   understand you're testifying their compensation was

10  tied, but you did testify that -- or let me ask you

11  this:  Ms. Allison was happy with going to the P&L

12  model; is that correct?

13       A    That was my impression, yes.

14       Q    And your impression is that Ms. Spearman

15  was not?

16       A    Correct.

17       Q    And you had -- do you know if Ms. Arvielo

18  ever told her it was just for a period of 90 days?

19            MR. PERLOWSKI:  Objection, asked and

20  answered.

21            You can answer again.

22       A    Yes, she did not say that as far as I

23  know.

24  BY MS. GIBSON:

25       Q    And if Ms. Spearman said she said that,

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 176

1    who would be the best person to ask other than

2    Ms. Spearman whether Ms. Arvielo said that at this

3    leadership meeting?

4        A    Like I said, I don't think she said that.

5    There would be no reason to say that.

6        Q    I understand there would be no reason

7    because you're going to a P&L model, but would

8    there be a reason to tell her that to keep her on?

9        A    No.

10       Q    Why not?

11       A    Because at that point we did not feel at

12   all that we were going to lose Gina or Kelly over

13   this subject.  We knew that Kelly was actually very

14   for a P&L model.

15            And Gina is tied to Kelly.  So, you know,

16   did we foresee Gina leaving Kelly?  No, they're

17   best friends, they've been working partners for

18   years and years and years.

19            I did see a little bit of some cracks in

20   the relationship, but I figured they could get

21   through it.

22       Q    Were any slide shows or PowerPoints

23   presented at this meeting?

24       A    We did have a handout that we gave to

25   everybody.  It wasn't a slide show.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 177

1      Q     And what was in the handout?

2      A     It showed the corporate expenses.  It had

3  a pie chart sort of diagram.

4      Q     Do you know if that's been produced in

5  the litigation?

6            MR. PERLOWSKI:  It has.

7            MS. GIBSON:  Okay, Henry, can you or

8  Chase give us the Bates number at your convenience.

9  BY MS. GIBSON:

10     Q     Any other documents handed out other than

11 the one you just discussed?

12     A     If I remember correctly, the P&Ls for

13 2018 were also produced.

14     Q     Anything else?

15     A     Not that I can remember.

16     Q     Okay.  Did -- were meetings held amongst

17 officers of NAF before the leadership meeting to

18 prepare for it?

19     A     Yeah.

20     Q     And who attended those meetings?

21     A     From what I remember, it was mostly

22 Jason, Jan, Jon and I.  Jim Muth was in a lot of

23 those meetings just because he is the person that

24 puts together the P&Ls and does a lot of the

25 finance reporting for us and things like that.

Page 178

1        Q      And what's Jim Muth's title?

2        A      VP of finance.

3        Q      And is he still with NAF?

4        A      He is.

5        Q      And so at this meeting -- so the Arvielos

6    didn't attend this pre-leadership meeting with you?

7        A      Not that I recall.

8        Q      Okay.  And what was discussed with

9    respect to compensation at this meeting?

10       A      It was really just a precursor to the

11   meeting that we had with the SVPs.  So we were

12   talking about 2018 and what had happened and what

13   we thought was going to happen in 2019 with

14   compressing margins and just the -- you know, the

15   purchase and REFI markets and things like that.  So

16   we were talking about those things.

17              And then just talking about the steps

18   that we would need to take to be able to present a

19   P&L model to this group.

20       Q      Did you say Jon Reed was involved in the

21   pre-leadership meetings?

22       A      Yes.

23       Q      Was Scott Frommert -- no, he wasn't hired

24   yet.  Was Jason Obradovich?

25       A      He was involved in those meetings as

Christy Bunce                                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 179

1   well.

2       Q    So you -- the second day of the

3   leadership meeting, were there smaller group

4   meetings held with various SVPs?

5       A    As far as I remember, we met with every

6   SVP.  So we did have one-on-ones with the SVP, Jon,

7   Jan.  I'm almost sure Jason was in there.  I know

8   Jim was in there.

9           Of course, I was in there.  Just to

10  discuss, you know, PE authority and things like

11  that per region because those vary per region.

12      Q    So you, Jon, Jan, Jim, Jason met with

13  Kelly and Gina?

14      A    And like I said, I'm not a hundred

15  percent sure if Jason was in those meetings, but I

16  know Jim was and then Jan, Jon and I were in there.

17      Q    Okay.  And that was separate from the

18  larger group meeting with the other SVPs?

19      A    Yeah.  So we did the large group meeting

20  all day the first day, we went to dinner, and then

21  the next day we had the breakouts.

22      Q    So what was discussed at this smaller

23  group meeting with just Gina and Kelly?

24      A    It was just the specifics to the region.

25  So we were talking about the marketing budgets, how

Christy Bunce                                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 180

1   much they had spent in 2018, what they were

2   projecting for 2019, the PE authority, pricing

3   exceptions in general, mix of business, things like

4   that.

5        Q    Well, if -- so Jon Reed was present for

6   the leadership meeting the day before and then at

7   the smaller group meeting with the girls; is that

8   correct?

9        A    That's correct.

10       Q    Were the Arvielos present in this smaller

11  group meeting?

12       A    Not that I remember.

13       Q    Was Jon present the entire time the

14  Arvielos were present at the larger group meeting?

15       A    As far as I remember, yes, we were all in

16  that room together.

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████████

21  █████████████████████████████████████████

22  ████████████

23  ████████████████████████████████

24  ██████████████████

25  █████████████████████████████████

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 181

1   ████████████████████████████████████████

2   ████████████

3            ██████████████████████████████

4   ████████

5        ████████████████████████████████

6   ██████████████████████████████████████

7   ████████████████████

8   ██████████

9        ██████████████████████████████████

10       ██████

11       Q    Okay.  And so tell me how the leadership

12  meeting ended.

13       A    What's the question?  What do you mean

14  how it ended?  The first day, the big leadership

15  meeting when everybody was together?

16       Q    Uh-huh.

17       A    Yeah, so --

18       Q    You had that, you said you had dinner and

19  then the second day you had individual meetings

20  with the SVPs.

21            And when the meeting was over with Kelly

22  and Gina, how did they depart?  Were they unhappy

23  with what you had told them?

24       A    I don't --

25            MR. PERLOWSKI:  Objection, speculation.

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 182

1          You can answer.

2     A    Okay.  Yeah, I don't -- I don't think

3     they were particularly happy, no.

4     BY MS. GIBSON:

5     Q    And what was resolved at the meeting

6     about how things were going to go forward with

7     respect to the compensation?

8     A    I mean, it was very up in the air at that

9     point because that's when we presented to them that

10    we need to hire a CFO and then we would have to go

11    down the road of building out a P&L model which is

12    not an easy undertaking.

13    Q    Okay.  So at some point after the -- were

14    Kelly and Gina the only ones -- the only SVPs that

15    were unhappy with the changes that were being

16    announced at the leadership meeting?

17         MR. PERLOWSKI:  Objection, speculation.

18         You can answer.

19    A    Yeah, I think it was just -- I don't -- I

20    don't know if everybody was unhappy or happy.

21         I think some people that had been wanting

22    a P&L model were excited at the premise that we

23    were actually going to take on this endeavor.

24         But most mortgage people coming out of

25    2018 were not in a great mood going into 2019.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 183

1        So the year had been tough, companies

2   were posting lots and lots of losses, there were

3   lots of consolidations, companies going out of

4   business, companies merging.

5        So, you know, it wasn't -- it wasn't that

6   uplifting of a meeting and a quarter for 2019.

7   BY MS. GIBSON:

8        Q    Did NAF develop a new office in Las

9   Vegas?

10       A    When?

11       Q    I'm asking you.

12       A    A new office, no.  We've had Vegas

13  offices for years.

14       Q    Dating back to when?

15       A    Oh, I wouldn't be able to pick a date.  I

16  mean, Chris Garza has run Nevada for us for years.

17  Probably 8, 9 years.  So we've had our Vegas

18  offices that long.

19       Q    At some point after the February 2019

20  leadership meeting, did SVPs travel back to Tustin

21  to meet with you, Jan, Rick and Patty?

22       A    I don't recall having another SVP

23  roundtable that year.

24       Q    Was there an informal meeting where they

25  came back to meet with you to try to figure out how

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 184

1    to help the company financially?

2            MR. PERLOWSKI:  Object to the form.

3            You can answer.

4       A    All right.  Yeah, I don't -- I don't

5    remember having another meeting around those

6    subjects all together with everybody.

7            MS. GIBSON:  Okay.  Can you introduce

8    549?

9            MR. HARGROVE:  Yes.

10           (Deposition Exhibit 14 marked.)

11           MR. PERLOWSKI:  Are you uploading a new

12   document because I just did a reload and there

13   isn't a new one.

14           MR. HARGROVE:  It just got loaded.  It

15   showed up in the Exhibit Share.

16           MR. PERLOWSKI:  Okay.  Thanks.

17           THE WITNESS:  Is it Exhibit 13?

18           MR. PERLOWSKI:  Yeah, 13 is the Response

19   to Request for Admissions.

20           MR. HARGROVE:  Exhibit 14.

21           MR. PERLOWSKI:  Let me do it again.

22   BY MS. GIBSON:

23      Q    Let me know, Ms. Bunce, when you've got

24   it loaded.

25      A    I've got it.

Page 185

1        Q    Okay.  And this is an email marked
2    Exhibit 14.  On the bottom it says NAF Bates
3    No. 549.  Do you see that?
4        A    I do.
5        Q    Okay.  And if you go ahead and take a
6    minute to look at it, I'm going to ask you a few
7    short questions.
8             But it's an email exchange between Jason
9    Obradovich to Kelly Allison and Gina Spearman and
10   you're cc'd.
11            And then Rick Arvielo emails Kelly
12   Allison and Gina and you.  And then Gina -- the top
13   page is Gina's email to Rick, Patty, you and Jon
14   Reed dated March 29th, 2019.  Do you see that?
15       A    I do.
16       Q    Okay.  You can take a minute to look at
17   it.
18       A    (Witness reviews document.)
19            Okay.
20       Q    Okay.  So my question -- my first
21   question is, if you look at the first bullet point
22   under Ms. Spearman's email to you, Rick, Patty and
23   Jon Reed, it says -- she says:  Good afternoon
24   Rick, Thank you for reaching out to clarify the
25   overall objective.  We would like the opportunity

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 186

1   to review the facts in the chronology of our
2   discussions over the last 2 months so we are all
3   synchronized to move forward in the best interest
4   of all parties.
5            And the first bullet point is dated
6   February 12th.  And is that the date you said was
7   the date of the leadership meeting?
8       A    Well, I might be wrong.  It sounds like
9   from Gina's email that was the one-on-one meeting
10  that we had.
11      Q    Was that part of the leadership meeting
12  -- the two-day leadership meeting?
13      A    I think so.  Now I'm questioning my
14  dates.
15  ████ ██████████████████████████████████████
16  ████████████████████████████████████████
17  ██████████████████████████████████████████████
18  ████████████████████████████████████████████
19  ██████████████████
20      ████████████████████████████████████
21  ████████████████████████████████████
22      ████████████████████
23      Q    Okay.  But a new policy on PE thresholds
24  was announced and abolishment of marketing budgets
25  was announced; is that correct?

Page 187

1      A      That's correct.

2      ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

3      ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

4      ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

5      ✗✗✗✗✗✗✗✗✗✗✗✗✗✗

6      Q      Okay.  And so was there any explanation

7      given to the SVPs about the new policy on PE

8      thresholds and abolishment of marketing budgets

9      other than you just want to go to a P&L?

10     A      Yeah, so that was -- I think we've

11     already talked about it, but in the meeting --

12     Q      You have, and I don't want to talk over

13     you, but I don't want you to get back into the

14     explanation of the P&L.

15             I understand you wanted to move to a P&L,

16     but there was no -- at this meeting was there any

17     urgency to announcing or abolishing your marketing

18     budget and changing your PE thresholds?

19     A      Yeah, there was absolutely an urgency.

20     So, you know, we presented to them that when you

21     look at CM1, the profitability looked different

22     than when you looked at CM3, which was the fully

23     loaded P&L.  And that we had to allocate all

24     expenses out to the sales regions.

25             So in -- because we had to do that, then

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 188

1   we had to make some changes on the way these

2   regions were managed.  And to make sure that we

3   were all profitable, the marketing expense would be

4   borne on to the sales leaders.

5        Q    So there was a difference between CM1 and

6   CM3 in what was reflected as expenses in those two;

7   is that correct?

8        A    Yep, and I already explained that if you

9   want me to do it again.

10       Q    No, I don't.

11       ████ ██████████████████████████

12   ████████████ ███████████████

13       ██████████

14       ██████████ █████████████████████████████

15   ████████████

16       ██ ███████████████

17            MR. PERLOWSKI:  Object to the form.

18   BY MS. GIBSON:

19       Q    What was the difference?

20       A    I don't --

21            MR. PERLOWSKI:  Object to the form.

22            THE WITNESS:  Sorry.

23       A    I don't know the exact -- sorry.

24   BY MS. GIBSON:

25       Q    Okay.  What was the difference between

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                        Page 189

1    CM1 and CM3?

2         A    Yeah, I don't know --

3              MR. PERLOWSKI:  Object to the form.

4              THE WITNESS:  My god.

5    BY MS. GIBSON:

6         Q    Go ahead.

7         A    Okay.  Can I go?

8         Q    Yes, you can.

9    ▨    ▨▨▨   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

10   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

11   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

12   ▨▨▨▨▨▨▨

13        Q    And her next bullet point is "March 5th

14   SVP/EVP meeting."  And were you present at that

15   meeting?

16        A    It sounds like it was a meeting -- well,

17   she's referencing a meeting with Jon individually,

18   so I wasn't in that meeting.

19        Q    Okay.  Okay.  To your knowledge, is that

20   when the SVPs flew out to Tustin to meet with Jon

21   again?

22        A    My recollection is, no, I don't -- I

23   think that must have been a phone call.  I do not

24   remember having the SVPs here twice in a month.  So

25   I -- I don't think that it -- that was an in-person

Page 190

1   meeting.

2       Q    Was it possible that you did not attend

3   that meeting?  If Jon Reed says that happened, is

4   it possible it happened and you just weren't there?

5       A    I would know about it.  So if I wasn't

6   sitting there, I would absolutely know about it.

7       Q    Okay.  And then in the last paragraph,

8   Ms. Spearman says:  In summary, as we stated

9   previously, we're firmly committed to being a part

10  of the solution to ensure NAF is profitable.

11          So this is still part of a back and forth

12  between the SVPs and NAF trying to figure out a

13  solution?

14      A    That's correct.

15      Q    And did the solution ultimately reveal

16  itself in the March 1, 2020 Amendment to Schedule

17  1?

18          MR. PERLOWSKI:  Object to the form.

19          You can answer.

20      A    Thank you.

21          No, I mean, this -- this is all back and

22  forth coming off of the meetings that we had with

23  the SVPs about making some changes in the interim

24  until we moved into the P&L.  So these changes were

25  to take place right away while we moved to a P&L

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 191

1    model.

2          I think this back and forth, if you read

3    the whole trail, it's just kind of figuring out

4    what makes sense for their region.  If they're

5    going to lower LO comp, what their tolerances were

6    going to be for PEs.

7          And so they were going back and forth

8    with Jason, and Jason was just saying that the math

9    works if everything kind of stays constant.  So I

10   think there was just a back and forth on what would

11   make sense for them for their salespeople.

12      Q    So like a back and forth negotiating what

13   was going to work for the P&L model?

14      A    No, no, no.  This was not for the P&L

15   model.  This was for right that day going, you

16   know, into the second quarter of 2019, the changes

17   that we were going to make for PEs.

18          I don't think -- I don't think there was

19   any back and forth about marketing budgets on this

20   email.  I think it was specific to LO comp and

21   pricing exceptions.

22      Q    Okay.  I understand.

23          And after the February 19 leadership

24   meeting, you said NAF hired Mr. Frommert?

25      A    That's correct.

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 192

```
 1      Q    Okay.  And was Mr. Frommert responsible
 2  for preparing the P&L model?
 3      A    He was.
 4  ████████   ████████████████████████████
 5  ███████████████████████████████████
 6       ████████████████████████████████████
 7      ████████
 8       ████████████████████████████████████
 9     ██████████████████████████
10           MS. GIBSON:  Okay.  Can you introduce
11  SPEARMAN645.
12           (Deposition Exhibit 15 marked.)
13  BY MS. GIBSON:
14      Q    I think if you'll refresh your screen,
15  you'll see Exhibit 15.  And you can -- it's Bates
16  No. SPEARMAN645.
17           And it -- the first page is an email from
18  Christy Bunce to Kelly Allison, Jan Preslo, Jon
19  Reed, cc-ing the Arvielos and Ms. Spearman.
20           And the next page, Bates 646, is a March
21  19th email from Ms. Allison to you, Jan, Jon, the
22  Arvielos and Gina.
23           Go ahead and take a minute and review
24  that.
25      A    (Witness reviews document.)
```

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 193

1              Okay.

2        Q    Okay.  And if you look at the second page

3   where Ms. Allison emails on March 19th to Christy

4   Bunce and others.  She said:  Good morning.  We

5   joined NAF two years ago.  In February, it was

6   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

8        ▨▨▨▨▨▨▨▨▨▨▨▨

9      ▨▨▨▨▨▨▨

10    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

11    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

12  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

13  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

14  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

15        Q    So, in February, she's talking about the

16   February 2019 leadership meeting we were just

17   discussing?

18        A    Correct.

19    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

20  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

21  ▨▨▨▨▨▨▨▨▨

22        ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23  ▨▨▨  ▨▨▨▨▨▨▨▨▨▨▨

24    ▨▨▨▨▨▨

25    ▨▨▨▨▨▨▨▨▨▨▨▨

Christy Bunce                   January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 194

1    &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

2    &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

3    &#9608;&#9608;&#9608;

4    &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

5    &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

6    &#9608;&#9608;

7    &#9608;&#9608;&#9608;&#9608;&#9608;

8          MR. PERLOWSKI:  Objection to the form and

9    foundation.

10          You can answer.

11   BY MS. GIBSON:

12      Q    And then "On March 5th" -- if you read

13   on, she says:  The first option presented to us in

14   February was not conducive to long-term sustainable

15   growth and retention.  We formulated a plan that

16   would achieve the corporate mandate and have the

17   least negative impact on production.  On March 5th,

18   we presented a business plan we believed to be

19   amicable and sustainable for NAF as a whole.

20          So she's referencing the same March 5th

21   that I just showed you in the email in Exhibit 14

22   that Ms. Spearman wrote, correct?

23      A    Yes.

24      Q    But are you aware -- does this help you

25   remember a March 5th meeting where they presented a

Page 195

```
1    business plan?
2         A    Yeah, I think we -- I don't -- I don't
3    think it was an in-person meeting.  It might have
4    been, but I do not remember it being in person.
5             But it -- I mean, in reading this email,
6    I remember that they were coming up with a plan as
7    to what they wanted to do around LO comp and PE
8    authority and those kind of things, so they had
9    presented that to us.
10        Q    And you respond:  As you know, we've
11   discussed on quite a few occasions since the
12   beginning of the year, the mortgage landscape has
13   changed drastically since mid 2018.
14   ████████████████████████████████████████
15   ████████████████████████████████████████████████
16   ████████████████████████████
17       ████████████████████████
18        Q    Okay.
19             MS. GIBSON:  Can you upload Exhibit 15
20   (sic) which is NAF 350.
21   BY MS. GIBSON:
22       ████████████████████████████████████
23   ████████████████████████████████████████████████
24   ████
25             MR. PERLOWSKI:  Object to the form and
```

Page 196

1    foundation.

2           You can answer.

3      A    Yeah, I didn't think it -- I mean, in my

4    response, I didn't think it needed to be addressed.

5    I was addressing what had to be done and what we

6    had done to help the effort of making sure that we

7    were profitable.

8    BY MS. GIBSON:

9      Q    Okay.  And is it still your testimony

10   that Ms. Allison was happy about going to the P&L

11   model after reading this email?

12     A    Yes.  I do know that Kelly was always

13   wanting a P&L model.

14          MS. GIBSON:  If y'all want to refresh

15   your screen and let me know when you have

16   Exhibit 15 (sic) up.

17          MR. PERLOWSKI:  MaryBeth, can we take a

18   very, very short restroom break.

19          MS. GIBSON:  Can we go -- sure, that's

20   fine.

21          MR. PERLOWSKI:  I mean, short.

22          MS. GIBSON:  Sure.  Give you five

23   minutes.  Go ahead.

24          MR. PERLOWSKI:  Thanks.

25          (Recess taken 4:37 - 4:42 p.m. EST)

Page 197

1            MS. GIBSON:  Everybody ready?  We can go

2     back on the record.

3            And if you want to refresh your screen,

4     Exhibit 15 (sic) should be loaded which is NAF 350

5     Bates number.

6            MR. PERLOWSKI:  Exhibit 16.

7            MS. GIBSON:  Exhibit 16.

8            MR. PERLOWSKI:  Thank you.

9            MS. GIBSON:  Yep.

10           (Deposition Exhibit 16 marked.)

11    BY MS. GIBSON:

12       Q    And if you look at the first page, it's

13    Bates No. 350.  And it's -- the first email is from

14    -- or the last email in the chain is from Jan

15    Preslo to you, Patty Arvielo, Rick Arvielo and Jon

16    Reed, and it's dated 11/16/2019.  Do you see that?

17       A    Yes.

18       Q    And in the first part of the email, the

19    Bates is 352.  And it is Ms. Allison emailing Reed,

20    you, the Arvielos and Jan Preslo.

21           And if you want to take a look at what

22    she, you know, wrote in the email to you and

23    refresh your memory, that's fine.

24           But I want to ask you some questions

25    about your response which is at NAF 351 in the

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 198

1    second page of the email.

2         A    Yeah.

3         Q    Okay.  And so the second paragraph of

4    your email says:  On the P&L stuff, we are just

5    about there from what I have seen.  The goal is to

6    have this buttoned up by year-end, but I think it

7    will be sooner for them.  Kristin said the dropdown

8    expense stuff is being developed now.

9              So what do mean by, "on the P&L stuff, we

10   are just about there"?

11        A    So that's during the time that we were

12   building out the P&L models.

13        Q    So when you say building -- I'm sorry, go

14   ahead.

15        A    So that's what that was referencing was

16   the actual P&L model.

17             And then the dropdown on the expense

18   stuff is that the SVPs were asking -- because

19   please know that we were in -- talking to the SVPs

20   the whole time we were building these models out as

21   to what they needed to be able to manage the P&L

22   correctly.

23             So the request was that they wanted to be

24   able to see the expenses, expense by expense of

25   hitting into their P&L.  So that took some --

Page 199

1   definitely took some programming effort which

2   Kristin Ankeny was working on for us.

3       Q   And then if you go to the next page,

4   Patty -- at the bottom, Patty Arvielo responds to

5   you:  Ugh, I'm going to reply.  I understand her

6   being upset about the Tennessee group.  That's

7   natural, but let's be real sometimes it just

8   doesn't work out.

9           And -- yeah.  So what does she mean, it

10   just doesn't work out?

11      A   Well, just the fact that not everybody

12   gets along all the time.  So, you know, we've got

13   relationships that happen in business and sometimes

14   things just don't work out.  Eric and Michelle were

15   not happy under the leadership of Kelly and Gina

16   and they wanted to break off.

17       Q   And she says -- she goes on saying:  She

18   needs to realize that (and we all know she doesn't)

19   in parentheticals, I'm also going to remind her

20   that her growth is our growth our platform that we

21   all built is the groundwork for success and that I

22   just can't handle the distrust and am just going to

23   try to work together the best I can making everyone

24   in the Southeast know that corporate cares.

25          Whose distrust was she talking about in

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 200

1  this email to you?

2       A    Kelly and --

3            MR. PERLOWSKI:  Object to the form.

4            THE WITNESS:  Sorry.

5       A    Kelly and Gina's mistrust.

6  BY MS. GIBSON:

7       Q    So they distrusted you or NAF?

8       A    NAF, yes.

9       Q    And then Jan replies in the top:  Jon and

10  I have spent hours and hours on the phone with Gina

11  and Kelly...

12           Let me go back to that, why did they

13  distrust you?

14           MR. PERLOWSKI:  Object to the form,

15  speculation.

16           You can answer.

17      A    I don't really know.  I mean, I've got my

18  -- my thoughts on it.  But I mean, I don't -- I

19  don't know.  I don't have any facts.

20  BY MS. GIBSON:

21      Q    What would be the reason they would

22  distrust you?  Is there anything you were

23  misrepresenting to them?

24      A    No, I don't think --

25           MR. PERLOWSKI:  Object to the form,

Christy Bunce                                     January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 201

1    speculation.

2            You can answer.

3        A    We were running the outside retail

4    division the best that we could and the best that

5    we knew how.

6            We tried to do everything that we

7    possibly could do to make all of our SVPs happy,

8    including Kelly and Gina.

9            So I think that they didn't love the way

10   we ran it.  We were a newer outside retail model.

11   We hadn't been around doing this for 20 some odd

12   years like some of the companies that they had

13   worked for.

14           So I think that they were frustrated that

15   we were a little bit of an immature model when it

16   came to outside retail.

17   BY MS. GIBSON:

18       Q    And this is dated November 2019, right?

19   So this is like seven months after the leadership

20   meeting?

21       A    Correct.

22   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

23   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

24   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

25   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Christy Bunce                                      January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 202

1    ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

2    ✕✕✕✕✕✕✕✕✕

3       ✕✕✕✕✕✕✕✕✕✕✕✕

4     ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

5   ✕✕✕✕✕✕✕✕✕✕✕✕

6    BY MS. GIBSON:

7        Q    Well, did you and Patty and Jan have any

8    discussions about their distrust and how to assuage

9    them and make them feel better about what NAF was

10   doing?

11       A    Yeah, it was something that we discussed

12   quite often.  Because like you read in that email,

13   when I said we were very, very excited to have the

14   girls as part of the team and felt honored and was

15   very excited that we had two women at the top of

16   the sales division, I meant it.  And we all felt

17   the same way.

18            So it was disheartening that we felt like

19   we're doing everything that we possibly could to

20   make them happy and to run a good division and they

21   were distrustful of it.

22       Q    Did Kelly explain her distrust and where

23   it stemmed from?

24       A    I didn't read that in the email.  I could

25   read the email again, though.

Page 203

1      Q     I'm just asking if you recall if she

2   explained her distrust to you?  You know, I know

3   you were happy with the girls and you wanted to

4   keep them happy, so I was just wondering if you

5   were curious about where their distrust stemmed

6   from?

7      A     Yeah, I think the distrust for them was

8   that they didn't feel like our P&L model was what

9   they had been used to in the past.

10           The profit and the loss and the way we

11  accounted for loan margin and things like that were

12  always up for debate.

13     Q     So then Jan emailed -- replies -- well,

14  you reply with a thumbs up emoji.  And then Jan

15  Preslo responds:  Patty, your message was great.

16  Just so you know, Rick -- just so you and Rick

17  know, Jon and I spent hours and hours on the phone

18  with Kelly and Gina going over and over where we

19  are on the P&L, reviewing and re-reviewing what

20  Scott has put together for them.  Making tweaks

21  along the way.

22           Do you see that?

23     A     I do.

24     Q     Okay.  And she says what -- "reviewing

25  what Scott has put together for them."  And is that

Page 204

1    the compensation based on the P&L model that's

2    reflected in the March 1, 2020 Amendment to

3    Schedule 1?

4          A     That's correct.

5          Q     Okay.  And Jan says, "We're making tweaks

6    along the way."  What does that mean?

7          A     What we were -- what the goal of the

8    model was, was it would not be disruptive to the

9    SVPs.  So what we were trying to do was back into

10   the assumptions of the P&L to make sure that

11   nobody, not just Kelly and Gina, were taking a pay

12   cut.

13             So we wanted it to be as benign as

14   possible as we went into this model because we knew

15   it was new for everybody and it was a very new

16   model for us.  So we knew that, you know, we would

17   probably have to make adjustments along the way as

18   far as the way we were managing it.

19             So, you know, to our credit, we were

20   trying to make sure that no matter what the market

21   was, everybody would not take any sort of pay cut

22   and that would hopefully only be upside with this

23   new model.

24         Q     So this is the P&L comp plan that NAF is

25   negotiating with Gina and Kelly; is that right?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 205

1          A     Yes.

2          Q     Okay.  So why didn't NAF just say we're

3     going to this P&L model, here it is, I'm sending

4     you the contract, done?

5          A     It's really just not -- it's not what we

6     do here at New American.  So, you know, we do try

7     to be inclusive of the leaders.  These leaders,

8     these sales leaders, they're -- like I said,

9     they're like little mini businesses.

10               So, you know, we do try to keep everybody

11    as happy as possible.  We try to keep things as

12    smooth as possible because they all have a lot of

13    stress and strain managing the salespeople that

14    they do.

15         Q     So from the date of the leadership

16    meeting through at least this email, November 16,

17    2019, NAF is working on a P&L model of

18    compensation; is that correct?

19         A     That is correct.

20         Q     And NAF never just presented it to them

21    and said take it or leave it?

22         A     No, we -- we just don't -- wouldn't do

23    that.

24         Q     Even though NAF can make any changes to

25    compensation it wants, right?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 206

1      A    That's correct.

2      Q    Did the Arvielos fly to Atlanta to meet

3   with the girls --

4      A    Yes.

5      Q    -- sometime in -- I'm sorry?

6      A    They -- they did.  I don't know what date

7   it was, but they did fly out there to meet with

8   Kelly and Gina.

9      Q    Do you remember roughly when it was?

10      A    I want to say it was early fall.

11      Q    And what was the point of that, of them

12   going to Atlanta to meet with them?

13      A    Well, I think it was to see if they

14   could, you know, solidify the relationship.  There

15   was distrust there.

16          They wanted to make sure that, you know,

17   Kelly and Gina were firmly on board with New

18   American and that there was a good, you know,

19   steady -- I'm not going to say friendship -- but

20   good working relationship.

21          And I think that Rick was going to review

22   the financials with Kelly and Gina.

23      Q    Did anyone go with the Arvielos or was it

24   just them?

25      A    I think it was just them.

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 207

1       Q    If you can go back to Exhibit 16 and look

2   at Bates 351, the second page of the email.

3       A    Yep.

4       Q    And you write:  I honestly think we

5   should read her the legal statements that Ken have

6   from Eric and Michelle, but I don't think anything

7   we say or explain will do any good.  You can't

8   reason or have a meaningful relationship with a

9   pathological liar.

10           Do you see that?

11      A    I do.

12      Q    Why did Eric and Michelle give a legal

13  statement to Ken?

14      A    Because they had been told that Kelly and

15  Gina were planning to leave New American, and Kelly

16  and Gina were going to try to recruit Eric and

17  Michelle to the company that they were leaving,

18  which violates their employment agreement with NAF.

19      Q    Did that happen?

20      A    Matters who you ask.

21      Q    Well, I'm asking you.

22      A    Well, I wasn't privy to those meetings,

23  but I was told they did happen from Eric and

24  Michelle, and I was told that they didn't happen

25   from Kelly.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 208

1       Q     You were told -- say that again, I'm

2    sorry.

3       A     I was told that they did happen by Eric

4    and Michelle, and I was told that they didn't

5    happen -- happen from Kelly.

6       Q     Okay.  And when you say they did happen,

7    what are you talking about?

8       A     A meeting with Eric and Michelle --

9    between Eric and Michelle and Kelly and Gina to

10   recruit them to a different company and a different

11   model.

12      Q     Gotcha.  Okay.  Okay.

13            And so you don't believe her -- you

14   believe Kelly that it didn't happen because you

15   said she's a pathological liar; is that correct?

16            MR. PERLOWSKI:  Object to the form.

17            You can answer.

18            THE WITNESS:  Thank you.

19      A     At that time, yes, that was my

20   impression.

21   BY MR. HARGROVE:

22      Q     Do you still have that impression of

23   Kelly?

24      A     No, I do not.

25      Q     So, what she was lying about then is the

Christy Bunce                                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 209

1   fact -- is what you just told me, that they, Eric

2   and Michelle, said Kelly and Gina recruited them to

3   leave; is that correct?

4        A    Restate the question.  I don't understand

5   the question.

6        Q    Well, I want to understand what you say

7   she's lying about in this email.

8        A    Yeah.  Yeah, so my impression was that

9   she was lying, that she wasn't trying to recruit

10  Eric and Michelle to a different company.

11       Q    And have you had any conversations with

12  Kelly since you wrote this email where you changed

13  your mind that she was not recruiting them?

14       A    We never really talked about it after

15  that conversation.  So, you know, things happen in

16  business and you've got to move on and patch up the

17  relationships, and that's what we did.

18       Q    What changed your perception of Kelly

19  from not -- that she's no longer a pathological

20  liar?

21       A    I think that this email was, you know,

22  when I was heated and I was getting told a lot of

23  different things that Kelly and Gina were doing

24  behind our back.

25            And at the end of the day, after trying

Page 210

1   to prove what was right and wrong, I decided that,

2   you know, everybody does things for a reason and

3   people can be unhappy with the company and they can

4   look elsewhere and it doesn't mean that they're

5   trying to stage a coup or trying to take a whole

6   bunch of people with them.  It's just people

7   exploring what opportunities are out there.

8           And after talking to Kelly and her

9   telling me that she is dedicated to New American

10  and that she plans to stay and she wants to work

11  through everything, then it was just -- it was just

12  a meeting of the minds.  It was just -- we moved

13  on.

14      Q    Okay.  So you called her a pathological

15  liar which implies more than one lie.  Was there

16  other things that you believe she lied about?

17      A    Not that I recall.  It was all stemming

18  around this -- these rumors that were swirling that

19  they were, you know, going to recruit all of their

20  people and go to a different company.

21      Q    And in fact, they did not; is that

22  correct?

23      A    Correct, Kelly did not.

24           MR. PERLOWSKI:  Object to the form,

25  foundation, speculation.

Christy Bunce                            January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 211

1    BY MS. GIBSON:

2         Q    Can you repeat your answer?

3         A    Correct, Kelly did not.

4         Q    Well, at this time neither of them were

5    trying to -- neither Kelly nor Gina were trying to

6    leave because weren't they, in fact, trying to

7    negotiate their amendment to their contract with

8    NAF?

9         A    Yes, correct, we were working through the

10   P&L model at that time.

11        Q    Okay.  Are you aware of a meeting in

12   September 2019 with Scott Frommert, Jon Reed, Gina

13   and Kelly, Lex Watson and Kelly's CPA?

14        A    Yes.  I think we already talked about

15   that meeting.

16        Q    We did talk about it.

17             And so, at that meeting they brought a

18   lawyer to that meeting to help them understand the

19   changes to the P&L model and to the contract; is

20   that correct?

21        A    As far as I know, yes.  I was not part of

22   that meeting, but that was my impression.

23        Q    Had NAF consulted a lawyer at that time

24   about the compensation model and Gina and Kelly?

25        A    Yes, we -- we consult with our general

Christy Bunce                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 212

1    counsel on pretty much anything that we do that

2    impacts contracts or anything like that.

3         Q    Was NAF expecting litigation at that

4    point or were you just consulting with him in the

5    normal course of business?

6         A    Yeah, normal course of business.

7              MR. PERLOWSKI:  Object to the form.

8              THE WITNESS:  Sorry.

9    BY MS. GIBSON:

10        Q    You can answer.

11        A    Yeah, normal course of business.

12        Q    So you didn't have any reason to

13   anticipate that Kelly or Gina were going to sue NAF

14   as of September 2019?

15        A    No.

16        Q    So -- and did in-house counsel attend

17   this meeting in September 2019?

18        A    Are you talking about the meeting that

19   Scott and Jon flew out to Atlanta for?

20        Q    Yes, I am.

21        A    Yeah.  No, Ken Block did not attend that

22   meeting.

23        Q    Was NAF aware that Kelly and Gina were

24   bringing a lawyer to the meeting?

25        A    I don't recall them discussing it.  I

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 213

1    think we knew that a CPA was going to be there.

2            And actually, I do think Kelly had told

3    us that she was bringing an attorney, her attorney

4    that she consulted with, and she had used that

5    attorney before even when we were first hiring her.

6    She had him review her contract and things, so.

7        Q    And we did talk about this a little bit

8    before, but I just want to confirm that I asked you

9    about the slide show.

10           Did you -- have you or anyone at NAF

11   reached out to Mr. Frommert to ask him if he still

12   has a copy of this slide show?

13           MR. PERLOWSKI:  Objection, asked and

14   answered, foundation.

15           MS. GIBSON:  I don't think so.

16   BY MS. GIBSON:

17       Q    Go ahead.  You can answer.

18       A    Yeah, like I said, I haven't talked to

19   Scott since we parted ways.

20       Q    Okay.  And to your knowledge, no one from

21   NAF has contacted him to ask for the slide show?

22       A    Correct.

23           MR. PERLOWSKI:  Same objection.

24   BY MS. GIBSON:

25       Q    Why not call him and ask for it?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 214

1     A    Well, no employee that leaves New

2    American is allowed to bring New American

3    documents.  So I would sure hope that he doesn't

4    have anything if he had put together some sort of

5    slide show, so.

6        Q    But you didn't even call him to ask him

7    about the contents of it?  Is there any reason why

8    no one from NAF called to ask him about the

9    contents?

10            MR. PERLOWSKI:  Objection, foundation,

11   asked and answered five times.

12   BY MS. GIBSON:

13       Q    You can answer.

14       A    What was the question?  Why I didn't call

15   Scott?

16       Q    Why anyone from NAF didn't call Scott and

17   say, hey, what was in this slide show that

18   everyone's talking about?

19            MR. PERLOWSKI:  Objection, foundation,

20   mischaracterizes repeated testimony, asked and

21   answered five times.

22            Please answer.

23            MS. GIBSON:  I'm not repeating testimony,

24   I'm just proffering a question.

25            MR. PERLOWSKI:  No, you're

Page 215

1   mischaracterizing testimony deliberately.

2           MS. GIBSON:  No.

3   BY MS. GIBSON:

4       Q    Go ahead.  You can answer.

5       A    I don't think -- as far as I know, that

6   slide show does not exist.

7       Q    Was it destroyed?

8       A    No, I don't --

9           MR. PERLOWSKI:  Objection, foundation,

10  asked and answered.

11          THE WITNESS:  Okay.

12  BY MS. GIBSON:

13      Q    How did NAF decide which territories to

14  assign regional managers?

15      A    Well, it really was predicated on the

16  business that they were bringing in.  So if they --

17  you know, and Kelly and Gina specifically in their

18  point, they were bringing in loan officers that

19  were in states that we directed were their -- what

20  we call their dirt, so.

21      Q    So when you hire them for the Southeast

22  region, you just -- they were granted authority to

23  develop all the states they wanted in the

24  Southeast; is that correct?

25      A    I don't think it was a free-for-all for

Page 216

1  all the states in the Southeast.  I think that
2  Kelly was specific in the states that she had
3  salespeople already in that she was bringing over
4  to NAF and then opportunity in.
5      Q    What factors does NAF consider when
6  removing territories from regional managers'
7  territories?
8      A    It really just is kind of a circumstance
9  of if we're hiring somebody else, they can come in
10  and build dirt that the regional manager had under
11  their jurisdiction and hadn't built.
12           Or if we could have people play nice in
13  the sandbox and share a territory.
14           It really isn't -- there isn't like a
15  formula for that.
16      Q    Okay.  What states were in Kelly and
17  Gina's territory in 2019?
18      A    I'd have to look at their agreement to
19  rattle off the states.
20      Q    Were Tennessee and Virginia part of their
21  territories?
22      A    Yes.
23      Q    Are you aware of any investments that
24  they made in developing those territories?
25           MR. PERLOWSKI:  Object to the form.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 217

```
 1      A    Can you be more specific as far as what

 2   you mean by "investments"?

 3   BY MS. GIBSON:

 4      Q    Sure.

 5           So by -- I guess it was by February 2019,

 6   you took away their marketing budget; is that

 7   correct?

 8      A    I think it was -- I think it took --

 9   actually took place in March, but yeah.

10      Q    So by March you took away their marketing

11   budget.

12           So after March, anything they had to do

13   to develop the territories, the Tennessee and

14   Virginia territories, was from their own personal

15   investment; is that correct?

16      A    It was taken out of their commissions,

17   yes.

18      Q    And did NAF keep a record of the

19   marketing costs that were taken out of their

20   commissions?

21      A    Yes.

22      Q    Are you aware of any personal investments

23   that they made in the Tennessee/Virginia

24   territories?

25           MR. PERLOWSKI:  Object to the form.
```

Page 218

1      A      What do you -- I'm sorry, you'll have to

2      clarify.  What do you mean "personal investments"?

3      BY MS. GIBSON:

4      Q      Well, any funds they invested personally

5      that was not removed from their commissions but

6      that they couldn't submit to NAF that they just had

7      to eat?

8      A      I mean, if you're talking about marketing

9      -- I'm assuming you're talking about marketing

10     costs.  Is that what you're talking about?

11     Q      Uh-huh.

12     A      Yeah, so I don't have an accounting of

13     the marketing costs that were spent for that

14     region, but I can assume, yes, that there was

15     marketing costs that Kelly and Gina absorbed when

16     we took away the marketing budgets.

17     Q      Do you know how the relationship with

18     Chattanooga Real Estate Partners came into

19     existence?

20     A      Not off the top of my head.

21     Q      Did Kelly and Gina develop the

22     relationship with Chattanooga Real Estate Partners?

23             MR. PERLOWSKI:  Objection, speculation.

24     A      I can answer to the best of my --

25             MS. GIBSON:  I'm asking her what she's

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 219

1    aware of as --

2         A     Yeah, I can answer to the best of my

3    ability.  So my impression is Kelly and Gina

4    recruited a branch manager in Chattanooga that had

5    the relationship with that real estate firm.

6    BY MS. GIBSON:

7         Q     Okay.  And then did they invest more

8    marketing costs in developing that relationship

9    with Chattanooga Real Estate Partners?

10                MR. PERLOWSKI:  Object to the form.

11   BY MS. GIBSON:

12        Q     You may answer.

13        A     So I don't have the -- I don't -- I don't

14   know what the marketing costs were that they did

15   absorb, so I can't answer that question.

16        Q     But you're not aware of what their

17   dollars invested into that relationship is?

18        A     I do not know.

19                MR. PERLOWSKI:  Object to the form.

20   BY MS. GIBSON:

21        Q     Why did NAF remove Tennessee and Virginia

22   from Ms. Spearman's territory?

23        A     It was on the request of Eric and

24   Michelle who were regional sales managers.

25        Q     So they just requested that you remove

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 220

1    these two territories from your girls, and you did?

2         A    No, it was a lot of long conversations

3    about the fact that they didn't feel like they were

4    getting supported by Kelly and Gina.

5              Kelly was continually complaining that

6    she didn't know if Eric and Michelle were a good

7    fit for New American.  But Kelly and Gina weren't

8    making much money on Tennessee and Virginia and

9    they weren't growing as fast as they thought that

10   they should.

11             So it was a lot of just contention

12   between the two groups.  And then Eric came to me

13   actually when I was at the MBA.  We met and he

14   basically said that, you know, they're going to

15   have to find another place to work because the

16   relationship between that -- Michelle and Eric and

17   Kelly and Gina had just gotten to a point where it

18   was just really causing him a lot of angst, and

19   Michelle.

20             So I went back, I talked to Jan and Jon.

21   I talked to Patty and Rick.  And we just decided

22   that at the end of the day it's the best thing for

23   everybody.

24             We didn't want to lose Eric and Michelle.

25   They didn't have the most prolific region, but they

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                        Page 221

1    were doing a good job.  And they were good people

2    and we liked them as people.

3              And we knew that Kelly was not thrilled

4    with them either.  So we just felt like it was --

5    it was a good business decision just to break them

6    off.

7        Q    So you talked to Jan and Jon and Patty

8    and Rick about taking away the territory.

9              Did you ever talk to Gina about taking

10   this territory away from her before NAF did it?

11             MR. PERLOWSKI:  Object to the form.

12   BY MS. GIBSON:

13       Q    You can answer.

14       A    Sorry.  I don't think we specifically

15   talked to Gina about it, no.

16       Q    So you didn't give her an opportunity to

17   try and explain to you why she should keep the

18   region after she's invested so much of her

19   marketing dollars in the region?

20             MR. PERLOWSKI:  Object to the form.

21   BY MS. GIBSON:

22       Q    You can answer.

23       A    No, it was a business decision.

24       Q    Okay.  So even though you were proud of

25   these girls and you wanted to help them, you liked

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 222

1   what they were doing, you removed these states from

2   Ms. Spearman's territory without speaking to her

3   about it?

4        A    Well, we spoke to them about it.  We let

5   them know what we were doing.  But, yes, it just

6   was a bad relationship between the four of them.

7        Q    So what I was asking was, you just took

8   it away before giving Ms. Spearman an opportunity

9   to address the concerns you had?

10       A    No, we hadn't been talking about, you

11  know, their concerns about Tennessee and Virginia

12  in that region.  We had had many conversations

13  about just kind of where this region was going,

14  their profitability, their lack of growth, all

15  those types of things.

16            So it was made -- a decision was made at

17  the corporate level that it was just time to break

18  it off.

19       Q    And when corporate made that decision,

20  had it talked to Gina before taking those --

21  Tennessee and Virginia away from them?

22       A    No.

23       Q    Did you talk to Gina about leaving

24  Chattanooga Real Estate Partners with her?

25       A    When we talked to both Kelly and Gina

Page 223

1    together about that, it really was up to -- I think

2    the branch manager is Janet, if I remember

3    correctly.  It was really up to her whether she

4    wanted to stay under the Kelly and Gina umbrella or

5    if she wanted to move under the Eric and Michelle

6    umbrella.

7              MS. GIBSON:  Can I take a five-minute

8    break?

9              MR. PERLOWSKI:  Of course.

10             MS. GIBSON:  We'll be back in five

11   minutes.

12             (Recess taken 5:13 - 5:19 p.m. EST)

13             MS. GIBSON:  Ms. Bunce, are you ready?

14             THE WITNESS:  I'm ready.

15             MS. GIBSON:  We can go back on the

16   record.

17   BY MS. GIBSON:

18        Q    Ms. Bunce, can you pull up Exhibit 1, the

19   30(b)(6) deposition notice?

20        A    Okay, I have it up.

21        Q    And we've discussed a lot of these topics

22   without specifically referring to this exhibit, but

23   I just want to go through a few that I want to be

24   sure we've covered.  If you can go to Page 4, Topic

25   14.

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 224

1        A     Okay.

2        Q     Are there any oral communications that

3    NAF made to Ms. Spearman that NAF contends changed

4    her compensation?

5        A     So like --

6        Q     Other than what we've talked about at the

7    February 2019 leadership meeting with respect to

8    marketing costs and PEs?

9        A     Yeah, our policy is that we do

10   communicate verbally compensation changes.  And

11   then we -- normal course of business is to send an

12   agreement showing those changes.

13       Q     So any oral communication regarding a

14   change to compensation would be followed up with a

15   written agreement, is that your testimony?

16       A     That is correct.

17       Q     Okay.  And if an oral communication was

18   made that's not followed up with a written

19   agreement, then would that change not take effect?

20       A     That's correct.

21             MR. PERLOWSKI:  Object to the form.

22             You can answer.

23             THE WITNESS:  Sorry, Henry.

24       A     That is correct.

25   BY MS. GIBSON:

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 225

1        Q      Okay.  Can you turn to Page 5 and go to
2    Topic 16.
3        A      Yep.
4        Q      Were you shown charts that Ms. Spearman
5    prepared that calculates the amount of overrides
6    she believes she is owed?
7        A      I did see the letter that she had sent.
8        Q      And did you look at the chart that was
9    attached to that letter that showed how she
10   calculated those amounts of overrides?
11       A      I did look at the chart.  I didn't do any
12   math on the chart or anything to that extent.
13       Q      And you understand -- or do you
14   understand that those amounts are for overrides
15   that NAF did not pay her for loans identified in
16   Schedule 1 of the November 2016 agreement?
17              MR. PERLOWSKI:  Objection, foundation,
18   mischaracterizes evidence.
19              You can answer.
20              And again, don't reveal any privileged
21   communications regarding this topic which
22   Ms. Gibson said earlier on.
23              MS. GIBSON:  I'm just asking a simple
24   question.
25              MR. PERLOWSKI:  Go ahead.

Page 226

```
 1            THE WITNESS:  Sorry, you cut out there
 2   for a second.  Am I to answer that question?
 3            MR. PERLOWSKI:  Yes.
 4   BY MS. GIBSON:
 5       Q    Yes.
 6            MR. PERLOWSKI:  Subject to the
 7   instruction.
 8       A    Yeah.  So like I said, I didn't go in
 9   depth into that part that Gina had sent over, so I
10   don't know if I can answer the question to what you
11   want me to, so.
12   BY MS. GIBSON:
13       Q    So NAF has denied that -- or refused to
14   pay her the amounts she's requested in those
15   charts; is that correct?
16       A    We feel that Gina was paid according to
17   her contracts.
18       Q    Okay.  That doesn't really answer my
19   question.
20            My question was, you've looked at that
21   chart and she's identified buckets of loans, and
22   has NAF denied that she's entitled to be paid those
23   amounts?
24       A    Yes.
25       Q    How would NAF go about calculating the
```

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 227

1    overrides on those buckets of loans?  I understand

2    you contend they're not owed, but how would you --

3    what documents would you rely upon to calculate

4    those?

5            MR. PERLOWSKI:  Object to the form.

6    BY MS. GIBSON:

7        Q    You can answer.

8        A    I'm not really understanding your

9    question.

10       Q    So if you were to calculate the override

11   bonus on the loans that were identified, for

12   example, in 1.4.B, is there -- would you look at

13   the BM/AM spreadsheet to determine the overrides on

14   those loans?

15       A    Yes, we would look at all of the

16   commission spreadsheets.

17       Q    Okay.  So, NAF could calculate the amount

18   of overrides from spreadsheets maintained in the

19   normal course of business; is that correct?

20       A    That is correct.

21           MR. PERLOWSKI:  Object to the form.

22           You can answer.

23   BY MS. GIBSON:

24       Q    And were the BM/AM spreadsheets produced

25   provided to Gina on a routine basis during her

Page 228

1    employment at NAF?

2         A    As far as I know, yes.  I wasn't involved

3    in the actual production in sending out of those

4    commission spreadsheets.

5         Q    So if she calculated those amounts of

6    override she believes is owed to her from those

7    spreadsheets, those BM/AM spreadsheets that NAF

8    provided her -- and I understand you're contending

9    she's not owed them -- but if she calculated them

10   from those spreadsheets, those spreadsheets are

11   accurate and the amounts she came up would be

12   accurate as well; is that correct?

13            MR. PERLOWSKI:  Object to the form,

14   foundation, speculation.

15            You can answer if you can.

16   BY MS. GIBSON:

17        Q    You can answer.

18        A    Yeah.  So, my understanding is that these

19   managers approve the spreadsheets.  So if she was

20   thinking that she wasn't paid correctly on a

21   certain month or a certain override, then she would

22   bring up to the commissions team when that was

23   happening.

24        Q    Did she ever -- that wasn't my question

25   but good point.  Did she ever bring that up to you

Page 229

1    when that was happening?

2        A    I don't recall getting emails saying that

3    she felt like she was due money on certain loans.

4        Q    Did she ever speak to you, pick up the

5    phone and call you and say, hey, I'm not getting

6    paid what my contract says I should be paid?

7        A    Not that I recall.

8        Q    You don't recall, okay.

9            But those spreadsheets -- from those

10   spreadsheets, you could calculate the amount of

11   overrides on those loans, was my question?

12       A    Yes.

13           MR. PERLOWSKI:  Object to the form.

14           You can answer.

15   BY MS. GIBSON:

16       Q    Can you go back to Page 3 and let's look

17   at Topic 3.

18           And Topic 3 is "The nature and scope of

19   Ms. Spearman's productivity, including her loan

20   productivity, and the productivity of states and

21   branches in her territory."

22           How did NAF determine Ms. Spearman's

23   productivity?

24       A    Well, the question really doesn't make

25   sense.  So if you're asking us how we looked at

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 230

1    Gina and Kelly's region as a whole and their

2    productivity as a whole, we just looked at overall

3    volume and overall profitability and a mix of

4    business and PEs and all of those types of things.

5    So it's a myriad of different things that we were

6    looking at.

7        Q    Did NAF ever have any complaints

8    regarding their overall productivity, the volume

9    and the profitability?

10            MR. PERLOWSKI:  Object to the form.

11            You can answer.

12       A    No, Kelly and Gina's region always had

13   very, very good funding volume.  The profitability

14   kind of fluctuated.  Their book of business was

15   changing a lot.  They used to do a lot of

16   government and they were doing more conventional

17   loans and things like that, so -- but no.

18   BY MS. GIBSON:

19       Q    Does high volume correlate to high

20   profitability?

21       A    No, not always.

22       Q    And can you look at Topic 7.

23            Going back to Topic 3, did NAF maintain

24   -- or in what -- let me ask it this way:  Obviously

25   you kept records on their volume profitability,

Christy Bunce                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 231

1    loans made states, correct?

2         A    Correct.

3         Q    Where were those records stored?  And is

4    that the information that is kept in the BM/AM

5    spreadsheets?

6         A    Yeah.  So it would be on the BM/AM

7    spreadsheets.  It would be on our P&Ls that are

8    stored on a share drive.

9              Kevlar, which I know was -- is a system

10   that we talked about.  Overall production numbers

11   and profitability and all of that is in that system

12   as well.

13        Q    Okay.  Who compiled the BM/AM

14   spreadsheets?

15        A    Our commissions team.

16        Q    Who is on the commissions team?

17        A    Well, I don't know all the members of our

18   payroll department, but Jean Chen is the person

19   that heads up our commissions team presently at

20   NAF.

21        Q    And who does she report to?

22        A    She reports directly to Jason Obradovich.

23        Q    Does Jason Obradovich have to approve the

24   BM/AM spreadsheets before they go out?

25        A    He does not.

Christy Bunce                                              January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 232

1     Q     So does the commissions team just send

2   them directly to Gina and Kelly?

3     A     Yes.

4     Q     And from those spreadsheets is that how

5   their override compensation is determined?

6     A     That is correct.

7     Q     We talked about this topic quite a bit,

8   but if you can go to No. 24.

9     A     Yep.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 233

1    ████████████████████████████████████████

2    And then...

3         Q    What is a source code?

4              MR. PERLOWSKI:  One second.  Were you

5    finished with your answer, Ms. Bunce?

6              THE WITNESS:  Yeah, I'm done.

7              MR. PERLOWSKI:  Okay.

8    BY MS. GIBSON:

9         Q    If you weren't finished, I thought you

10   were, you can go ahead if you have more to say.

11        A    No.

12        Q    What is a source code?

13        A    Source code is the way that we track what

14   loans are coming in through what lead source.

15        Q    What loans are coming in from what lead

16   source?

17        A    Correct.

18        Q    Why does that matter?

19        A    It matters because we -- we compile

20   reports on it, we pay different compensation.

21             Like in Kelly and Gina's region

22   specifically, they have builder comp in their LO

23   agreement.  So like the people that are attached to

24   a builder relationship will change that source code

25   so that it reflects what builder it's coming from.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 234

1    Things to that effect.
2         Q    In January or February of 2019, did you
3    announce a new policy giving loan officers
4    discretion to use different source codes?
5         A    We did.
6         Q    And what was that policy?
7         A    That they could choose to go down in
8    compensation if there was an outside market
9    movement of some sort, they needed to take a PE
10   because loan extension or something happened with a
11   loan not closing on time or just to be more
12   competitive with the market because the market was
13   moving pretty quickly.
14        Q    So a loan officer would have to take a
15   cut on his comp to lower the interest rate?
16        A    If they chose to do that at origination.
17        Q    So before January or February of 2019,
18   that was -- the company did not allow that?
19        A    No.
20        Q    Okay.  So does that tie a loan officer's
21   compensation to interest rates?
22        A    I don't -- I'm not understanding your
23   question.
24        Q    Well, if the loan officer is going to
25   take a lower comp to offer a lower interest rate to

Page 235

1    win a loan, isn't that tying his compensation to

2    the interest rate?

3                MR. PERLOWSKI:  Object to the form.

4    BY MS. GIBSON:

5        Q    You may answer.

6        A    It gave them the lever to compete with

7    their competition.

8        Q    Well, does that incentivize a loan

9    officer to not make concessions on interest rates?

10               MR. PERLOWSKI:  Object to the form.

11               THE WITNESS:  I'm sorry.  Go ahead,

12   Henry.

13               MR. PERLOWSKI:  Object to the form.

14               You can answer.

15       A    Yeah, so it was -- it was a lever for the

16   loan officers to be able to compete when they were

17   going up against lenders that were being able to

18   offer lower rates because they had lower loan

19   officer comp.

20   BY MS. GIBSON:

21       Q    So would a loan officer willingly take a

22   lower comp to offer a lower interest rate?

23               Isn't that incentivizing the officer to

24   charge higher interest rates so he gets higher

25   comp?

Christy Bunce                January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 236

1        A     No.  So our --

2              MR. PERLOWSKI:  Object.  Object to the

3     form, compound.

4              Go ahead.

5     BY MS. GIBSON:

6        Q     You can answer.

7        A     So our interest rate is -- our rate

8     sheets in the region are tied to the comp that the

9     loan officer sits at.  So this lever was a -- was

10    enabling them to compete when they needed to offer

11    a lower rate to a borrower.

12             So it was their choice to do that or they

13    could decide that they wanted -- that they could

14    let the borrower go to a different competitor.  It

15    was really up to them.

16       Q     Is that complying with Dodd-Frank?

17       A     It is.

18             MR. PERLOWSKI:  Object to the form.

19             THE WITNESS:  Sorry.

20       A     It is.

21    BY MS. GIBSON:

22       Q     Did Gina ever raise concerns with you

23    about this being compliant?

24       A     We had discussions about it when we

25    changed our policy and it had been reviewed by

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 237

1    general counsel and outside counsel and we felt

2    that it was compliant.

3         Q    Are loan officers still allowed

4    discretion to use these source codes this way?

5         A    They are.

6         Q    Has NAF ever been sued for violating

7    Dodd-Frank?

8         A    We have not.

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022



Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 239

1   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

2   ▨▨▨▨

3   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

4   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

5   ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

6   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

7   ▨▨▨▨ ▨▨▨▨▨

8            MS. GIBSON:  Okay.  We'll take that up.

9            MR. PERLOWSKI:  Please do.  Please do.

10           MS. GIBSON:  Yeah.

11   BY MS. GIBSON:

12       Q    Are you -- so you have been working for

13   NAF, I think you told me, since -- was it -- and I

14   may get this wrong.  Was it 2009 you decided?

15       A    Yes.  13 years.

16       Q    Do you socialize with the Arvielos?

17       A    What do you mean "socialize"?

18       Q    Do you go out with them, have dinner with

19   them, see them outside of work?

20       A    Not on a regular basis, no.

21       Q    How often do you do that?

22       A    I've probably been to dinner with the

23   Arvielos, when it didn't have anything to do with

24   work, maybe three times in the last 13 years.

25       Q    Okay.  Have you been to visit them at

Christy Bunce                                      January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 240

1    their house in Las Vegas?

2         A    Yes, but that was in conjunction with

3    meetings that we were having in Vegas.

4         Q    So how often have you been to their house

5    in Vegas in conjunction with meetings?

6         A    Twice.

7         Q    Okay.  How about their house in Montana,

8    have you ever been to their house in Montana in

9    conjunction with meetings?

10        A    No.

11             MS. GIBSON:  Can you introduce the

12   answer.

13             (Deposition Exhibit 17 marked.)

14   BY MS. GIBSON:

15        Q    And we are introducing what's going to be

16   Exhibit 17.  And if you refresh your screens, the

17   next exhibit, 17, will appear.

18        A    I just refreshed.  It's not there.  I'll

19   try it again.

20        Q    That's okay.

21        A    It's still not there.

22             MR. HARGROVE:  It should be now.  You can

23   hit refresh now.

24   BY MS. GIBSON:

25        Q    Has it appeared on your screens?

Page 241

1      A     Nope.

2            Okay.  It's up here.

3      Q     Okay.  And so, Document 17 does not have

4    a Bates number, but it is stamped at the top.  And

5    it is Defendant Broker Solutions doing business as

6    New American Funding's Answer and Affirmative

7    Defenses to Plaintiff's First Amended Complaint.

8            Have you seen this before?

9      A     I have.

10     Q     Okay.  Can you go to Page 23, please.

11     A     Okay.

12     Q     And NAF's Third Defense states:

13   Plaintiff's claims fail, in whole or in part,

14   because Plaintiff was given ample notice, in

15   writing, of any compensation changes made by NAF,

16   including changes permissibly made in NAF's

17   discretion.

18           Do you see that?

19     A     I do.

20     Q     And my question is, I just want to make

21   sure we've discussed all of these notices that NAF

22   contends is made and that we haven't missed any.

23   There are no others?

24           MR. PERLOWSKI:  Object to the form.

25   BY MS. GIBSON:

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 242

1       Q     You can answer.

2       A     I don't even know what you're asking.

3       Q     I'm asking -- today we discussed the

4   changes that NAF contends it presented to

5   Ms. Spearman in writing.

6             I want to know if there's any others or I

7   want to be sure that NAF isn't going to allege

8   other changes that have been made in writing.

9             I'm just confirming that we discussed

10  everything today in your 30(b)(6) deposition?

11            MR. PERLOWSKI:  Object to the form.  That

12  is patently misleading and you know it.

13            MS. GIBSON:  No, I don't, Henry.  I'm

14  explaining my question.

15            MR. PERLOWSKI:  Sure you do.  You know

16  all the schedules you have that you haven't shown.

17  Sure you do.

18            MS. GIBSON:  Henry, I want her to

19  testify, not you.  If she contends there's other

20  things, let the 30(b)(6) witness tell me.

21            MR. PERLOWSKI:  Okay, we'll play a memory

22  game.

23            Go ahead.

24      A     Yeah, so I have not memorized every

25  schedule that we've ever given to Gina.  So we

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 243

1    reviewed, I think, three schedules today, but I
2    don't know if there are others.  So I cannot --
3    BY MS. GIBSON:
4        Q    I'm asking -- oh, I'm sorry, go ahead.
5        A    I could go into her HR file and pull them
6    all up.  I'm assuming you have them.  But I don't
7    know off the top of my head if there's other
8    schedules there or not.
9        Q    Okay.  And I apologize, my question might
10   not have been quite clear.  I understand there are
11   other schedules to the agreement that are not
12   Schedule 1 Regional Manager Compensation.
13           I want to make sure we're discussing
14   Schedule 1 regarding the compensation of the
15   regional manager.
16       A    Same answer.
17       Q    And we talked about Schedule 1 with the
18   1.4.A, B, C, D, those buckets.  And we did talk
19   about several of those versions today.
20           And I apologize if my question was
21   unclear, but I just want to be sure, to your
22   knowledge, those are all I'm aware of, are you
23   aware of any more?
24       A    So still the same answer.  So I think
25   we've reviewed all of the amendments here today,

Page 244

1  but I'd have to go into Gina's file to make sure

2  that there weren't any other amendment.

3      Q    Okay.  Okay.  Can you go to Page 24.  And

4  the Eighth Defense states:  Plaintiff's claims

5  fail, in whole or in part, and any performance of

6  NAF was excused, by virtue of Plaintiff's own

7  failure to perform under her agreement.

8           Can you tell me what facts there are that

9  NAF knows of that she failed to perform under her

10 agreement?

11     A    So I think this goes back to what I said

12 before.  So if Gina was contesting her compensation

13 override, she had the opportunity to do that every

14 single month with the commissions team.

15          So if she thought that she was missing

16 commissions on certain loans, then she should have

17 brought it up then.

18     Q    Okay.  And you testified that you don't

19 recall her ever bringing that up to you, but that

20 doesn't mean she never did, correct?

21     A    That's correct.

22     Q    Okay.  And but this -- this really speaks

23 more to her performance under the contract, not her

24 dissatisfaction with how NAF paid.

25          Is there anything that she failed to do

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 245

1    with respect to her job duties under her agreement?

2         A    No.

3         Q    Okay.  And then if you can look at the

4    next defense.  Plaintiff's claims are barred, in

5    whole or in part, by the doctrine of unclean hands.

6              What do you mean by that?  What did she

7    do wrong?

8              MR. PERLOWSKI:  Object to the form.

9              You can answer.

10   BY MS. GIBSON:

11        Q    You can answer.

12        A    It's back to the same -- to the same

13   answer I just gave you.  So I -- my -- what I'm

14   trying to say is, if she felt like she wasn't paid

15   correctly, she should have let the commission's

16   team know.

17        Q    Okay.

18        A    On specific loans that she was given a

19   spreadsheet every single month on.

20        Q    Right.

21             And her testimony is she brought that to

22   your attention, but you've testified that you don't

23   recall.

24             So that's -- I'm not -- that's what

25   you're referencing in this defense is her unclean

Page 246

1    hands?  That's what she did wrong?

2         A    Yes.

3         Q    Okay.  If you can go to the next defense,

4    the Tenth Defense.  Plaintiff's claims are barred,

5    in whole or in part, by the doctrine of in pari

6    delicto, which I will tell you, and you may know,

7    is Latin for in equal fault.

8              So what did she -- what did Ms. Spearman

9    do, other than what you've already told me, she

10   should have talked to the commissions team,

11   anything else she did that was in pari delicto?

12        A    Nothing that I can recall, no.

13        Q    Okay.  What about the Eleventh Defense,

14   Plaintiff's claims are barred, in whole or in part,

15   by the doctrine of laches?

16             MR. PERLOWSKI:  Object to the form.

17        A    I'll say this, I mean, Gina wasn't

18   terminated.  We wanted her to be part of NAF.  So

19   she didn't do anything to cause her to leave New

20   American Funding.  She chose to leave.

21             She's suing us because she's saying that

22   we didn't pay her according to her contract.  All

23   of this goes back to the fact that we think we did

24   pay her according to her contract.

25             And if she didn't, she was able to raise

Page 247

1  her hand every single month and highlight the loans

2  that she thought she wasn't getting paid on

3  correctly.

4  BY MS. GIBSON:

5       Q    Okay.  Thank you for that.

6            So that's the basis of the Eleventh

7  Defense, that she should have raised her hand and

8  said, I'm not getting paid correctly?

9            And you don't recall her ever doing that;

10  is that correct?

11       A    Yes.

12            MR. PERLOWSKI:  Object to the form.

13            You can answer.

14       A    Yes.

15  BY MS. GIBSON:

16       Q    Okay.  The next one, the Twelfth Defense

17  states:  Plaintiff's claims are barred, in whole or

18  in part, by the employment at-will doctrine.

19            So what facts support the employment

20  at-will barring Ms. Spearman's claims to the

21  override compensation?

22            MR. PERLOWSKI:  Object to the form.

23       A    Yeah, I'm not an attorney, so I don't

24  know how to answer that question.

25  BY MS. GIBSON:

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 248

1      Q    Yeah, I understand you're not an

2   attorney, but this is a topic in the 30(b)(6)

3   deposition, so Plaintiff is entitled to know the

4   basis of NAF's defense of this.

5           So I'm just trying to get at the facts

6   that support these defenses.

7      A    And again, the basis of our defense is

8   that we feel Gina was paid according to her

9   contract.

10     Q    Okay.  So other than your feeling that

11  you thought she was paid according to her contract,

12  there are no other facts that you have that support

13  the defense of employment at-will barring her

14  claims for overrides?

15     A    Well, the fact that she earned those

16  commissions every single month and didn't let the

17  commission's team know that she thought she was due

18  commissions on certain loans that she didn't get

19  paid on.

20     Q    Do you know whether she let other

21  officers know she wasn't getting paid on those

22  overrides?

23     A    Not that I know of.

24     Q    Okay.  Do you recall her ever telling you

25  that she wasn't getting paid on those overrides?

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 249

```
 1      A     No.

 2            MR. PERLOWSKI:  Object to the form.

 3            You can answer.

 4   BY MS. GIBSON:

 5      Q     Can you turn to Page 25, and the

 6   Fourteenth Defense states:  To the extent Plaintiff

 7   has failed to mitigate her alleged damages, her

 8   recovery, if any, must be reduced accordingly.

 9            What facts -- and if we've already

10   discussed everything, that's fine.  But what facts

11   does NAF rely upon that Plaintiff has not -- has

12   failed to mitigate her damages?

13            MR. PERLOWSKI:  Object to the form.

14            You can answer.

15      A     It's the same answer.

16   BY MS. GIBSON:

17      Q     Same answer, that she didn't bring it to

18   the commission's team attention?

19      A     Yeah.

20      Q     And had she brought -- I'm sorry.

21      A     Real quick.  I thought this was going to

22   be over at 3 Pacific Time, so if it's not, I've got

23   to be able to send a text to say I'm not going to

24   attend a meeting.

25      Q     Well, that's why I asked you if you had
```

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 250

1   any time constraints.  I have probably about five

2   more questions, but your attorney may have some

3   questions also.  Just five more minutes.

4        A    You're going to have to give me a break.

5        Q    You're welcome to send a text.

6        A    Okay.

7             MS. GIBSON:  Do you want to take a minute

8   break and go off the record?  We can stay on

9   screen, but we can go off the record for a second.

10            MR. PERLOWSKI:  It's entirely up to you.

11            THE WITNESS:  Yeah, that's fine.  I just

12   have to call the meeting coordinator.

13            (Off the record 5:55 - 5:56 p.m. EST)

14            THE WITNESS:  Okay.

15            MS. GIBSON:  Can we go back on the

16   record?

17   BY MS. GIBSON:

18        Q    And if you look at the Fifteenth Defense,

19   Plaintiff's claims are barred, in whole or in part,

20   or her recovery is reduced, by the doctrine of

21   setoff, including by any overpayments made to

22   Plaintiff.

23            What overpayments were made to Plaintiff?

24        A    Oh, I'm not aware of overpayments.

25        Q    Okay.

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 251

1              MR. PERLOWSKI:  I'm sorry, did you ask us

2     to reload?

3              MS. GIBSON:  I asked Travis and I'll ask

4     you here in a minute.

5              MR. PERLOWSKI:  Okay.

6              (Deposition Exhibit 18 marked.)

7              MS. GIBSON:  If you refresh your screen,

8     it should be available.

9         A    Okay.

10    BY MS. GIBSON:

11        Q    Okay.

12             MR. PERLOWSKI:  Not up yet for me.  Just

13    give me one second.  Seems to be a lag with

14    Ms. Bunce a little bit of the documents coming up.

15             Okay, I'm there, thank you.

16             MS. GIBSON:  Yeah, sure.

17    BY MS. GIBSON:

18        Q    So this is Exhibit 18 and it does not

19    have a Bates stamp, but it is Defendant Broker

20    Solutions d/b/a New American Funding's Responses

21    and Objections to Plaintiff Gina Spearman's First

22    Interrogatories.

23             Do you see that?

24        A    I do.

25        Q    And if you go to the last page, do you

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 252

1    see a verification that says:  I, Christy Bunce,

2    state that I have read Defendant Broker Solutions

3    d/b/a New American Funding's Objections and

4    Responses to Plaintiff's First Set of

5    Interrogatories, and that the facts stated therein

6    are true to the best of my knowledge, information,

7    and belief.  I declare under penalty of perjury

8    that the foregoing is true and correct.

9            Do you see that?

10    A    I do.

11    Q    And is that your signature?

12    A    It is.

13    Q    And you signed this on August 16th, 2021?

14    A    Yes.

15    Q    Okay.  And did you review these responses

16    before you signed it?

17    A    I did.

18    Q    Okay.  Did you assist in the preparation

19    of this document?

20    A    To a certain extent, yes.

21    Q    Well, what extent was that?

22    A    Our legal team asked me some questions on

23    some of the items and things like that.

24    Q    Okay.  And you reviewed each of the

25    responses for accuracy?

Page 253

1      A     Yes.

2      Q     Okay.  And if you look at Interrogatory

3   No. 1, it asks to "Describe with specificity each

4   component of compensation discussed in negotiations

5   between NAF and Ms. Spearman, specifically

6   identifying each individual who participated in

7   said negotiations and the date of said

8   negotiations, leading up to the November 4th Letter

9   Offer made by NAF."

10           If you go to the next page, there's a

11   response.  The first paragraph is objections.  And

12   then it says in the second paragraph:  Subject to

13   the foregoing objections, NAF responds that Jan

14   Preslo engaged in pre-contract discussions

15   predominantly with Kelly Allison over the phone.

16   These discussions largely concerned the employment

17   opportunity, as opposed to negotiating specific

18   forms of comp.  The foregoing discussions took

19   place in the period preceding the signing of the

20   Letter Offer, the RMA, the contents of which are

21   the best evidence of the agreements between the

22   parties regarding the compensation offered to

23   Plaintiff.

24           Is there any reason why the two-day

25   meeting that Kelly and Gina flew out to Tustin to

Christy Bunce                     January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 254

1   meet with you and others is not identified in this

2   discovery response?

3        A     No.

4        Q     So this is not a complete discovery

5   response?

6        A     Well, I think --

7              MR. PERLOWSKI:  Object to the form.

8        A     -- most of the conversations did happen

9   over the phone, but obviously we had a face-to-face

10  as well.

11  BY MS. GIBSON:

12       Q     You had a two-day face-to-face, didn't

13  you?

14       A     I don't know if it carried over into the

15  second day.  It might have.

16       Q     The record will speak for itself.

17              If you can go to Interrogatory No. 4 on

18  Page 3.

19       A     I'm there.

20       Q     And you can read that to yourself.  NAF's

21  response on the next page says:  Subject to the

22  foregoing objections, NAF will produce business

23  records identifying the loans originating from

24  Plaintiff's territories from November 2016 through

25  March 2020 that NAF contends were excluded under

Christy Bunce                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 255

1    Paragraph 1.4.B.

2              And I just want to confirm that NAF has

3    produced all of these business records?

4         A    To the best of my knowledge, yes.

5         Q    Okay.  And from these records you contend

6    show the amounts excluded, correct?

7         A    That is correct.

8         Q    So those are the overrides on loans that

9    NAF contends were excluded under the contract?

10             MR. PERLOWSKI:  Object to the form.

11        A    To the best of my knowledge, yes.

12   BY MS. GIBSON:

13        Q    And so, those are also the loans that

14   Ms. Spearman contends were included under the

15   contract.  So could we use those same documents to

16   calculate her damages?

17             MR. PERLOWSKI:  Object to the form.

18   BY MS. GIBSON:

19        Q    You can answer.

20        A    Yes, I -- as far as I know, those

21   commission sheets show all of that information.

22        Q    Okay.  And if you go to Page 5, we'll

23   read Interrogatory No. 6.  And then the response

24   says:  Subject to -- and take your time -- without

25   waiving the foregoing, NAF will produce business

Page 256

1    records that identify the changes to Ms. Spearman's

2    compensation from November 2016 to November '20.

3              And I just want to confirm that NAF has

4    produced all of these documents that it contends

5    change Ms. Spearman's compensation?

6         A    To the best of my knowledge, yes.

7         Q    Okay.  And then if you go to

8    Interrogatory No. 7:  Describe with specificity why

9    NAF amended Schedule 1 to the Regional Manager

10   Agreement effective March 1, 2020 and who

11   participated in the decision.

12             Can you tell me why NAF amended Schedule

13   1 with the March 2020 amendment?

14        A    Are we going to go over the whole P&L

15   move again?

16        Q    I'm just asking a really short, quick

17   question.  Why did they amend the March 2020

18   amendment?  Was it for the purpose of eliminating

19   override bonuses?

20        A    Yes, it was for the purpose of going to

21   the P&L model.

22        Q    Did the Arvielos participate in that

23   decision?

24        A    Well, it goes back to the meeting that we

25   had with all of the SVPs and all of management for

Page 257

1    outside retail.  So we had all decided together

2    that we were moving to a P&L model.

3        Q    So it's your testimony that it was a

4    group effort, everyone, SVPs, officers, everyone

5    said we're going to move to a P&L model.  Is that

6    my understanding of your testimony?

7            MR. PERLOWSKI:  Object to the form,

8    speculation, mischaracterizes testimony.

9            You can answer.

10           MS. GIBSON:  I'm trying to understand her

11   answer.

12   ████████████████████████████████████████████████

13   ███████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ███████████████████████████████████

16           We knew that the SVPs, most of them, were

17   in favor of a P&L model.  That's why we brought

18   them in in February to discuss going to a P&L

19   model.  Most were all for it.

20           So then we discussed the plan of moving

21   to the P&L model.  And then that agreement for

22   March 2020 was to move to the P&L model.

23   BY MS. GIBSON:

24       Q    And so, no one person came up with this

25   idea, this was just a great big group decision?

Page 258

1          MR. PERLOWSKI:  Object to the form.

2          You can answer.

3     A     That's correct.

4  BY MS. GIBSON:

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████

8          ████████████████████████████████████

9          ██████████████████████████

10     ████████████████████████████████████

11  ██████████████████████████

12          I'll restate my statement again.  2018

13  was a bad year for all mortgage.  We realized that

14  a pure override model was not going to work.  So we

15  pulled everybody in in 2019 and said that we were

16  going to move to a P&L model which most SVPs wanted

17  to go to from a -- for quite some time.

18  BY MS. GIBSON:

19     Q     And I'm going to represent to you that in

20  these interrogatory responses, 11, 14 and 15 --

21  I'll take that back.

22          11 -- Interrogatory 11, if you read the

23  request and the response, I just want to know if

24  NAF has produced all the business records it

25  contends are notifications to Plaintiff of her comp

Page 259

1    changes?

2         A    To the best of my knowledge, yes.

3         Q    Okay.  And Interrogatory 14 states that

4    "NAF will produce business records showing its

5    Pricing Exception compensation as to Plaintiff from

6    2016 to 2020."

7              Have all of those business records been

8    produced?

9         A    To the best of my knowledge, yes.

10        Q    Okay.  And we did discuss this a little

11   bit before, but I have a follow-up question.

12             Interrogatory 15 just asked for the

13   criteria used by NAF to assign territories and to

14   reassign territories.

15             And the response states on Page 12, "NAF

16   has no set policy regarding territory assignments.

17   Rather, such assignments are made at NAF's

18   discretion and based on its business needs from

19   time to time."

20             What are examples of business needs that

21   made NAF reassign the Tennessee and Virginia

22   territories?

23        A    Well, I'll restate what happened with the

24   reassigning of the Tennessee and Virginia

25   territories.  It was a conflict between the two

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 260

1   managers.  So Michelle and Eric were --

2       Q    I'm sorry, I didn't hear that.  A

3   conflict between what?

4       A    The two managers.  So it was a conflict

5   between Eric and Michelle versus Gina and Kelly.

6   BY MS. GIBSON:

7       Q    And what was the criteria as described in

8   Paragraph 15?

9            MR. PERLOWSKI:  Object to the form.

10      A    O speak further, to talk about the

11  business needs, it's the same exact reason why we

12  put Florida region underneath Kelly and Gina,

13  because they had good builder experience and that

14  region wanted to build out their builder business,

15  so they also inherited a region as well.

16  BY MS. GIBSON:

17      Q    Did you ever amend Kelly's agreement with

18  NAF to remove the 7.5 BPS marketing budget that was

19  in her 2016 agreement?

20           MR. PERLOWSKI:  Object to the form,

21  mischaracterizes documentation.

22           Please answer.

23      A    Yes.  So it was removed when we changed

24  the compensation agreements having the SVPs take on

25  their marketing expenses.

Page 261

1    BY MS. GIBSON:

2        Q    So when you changed the compensation

3    agreements, is that the March 1, 2020 agreement?

4        A    I'd have to go through Kelly's file.  I

5    haven't reviewed Kelly's agreements to see when

6    that was removed.

7        Q    Okay.  So NAF removed the 7.5 BPS

8    marketing budget from her 2016 agreement.  You just

9    don't know when?

10            MR. PERLOWSKI:  Object to the form.

11            Again, mischaracterizes testimony and

12   documentation.

13            Please answer.

14       A    Yeah, I don't know what --

15   BY MS. GIBSON:

16       Q    You can answer.

17       A    I don't know what agreement it was.  I'd

18   have to go back and look at the date.

19       Q    Okay.  I'm just asking that -- if there

20   was an agreement that removed the 7.5 BPS?

21       A    Yes.  To the best of my knowledge, there

22   was.

23       Q    Okay.

24            MS. GIBSON:  Okay.  If we can take a

25   five-minute break, I might be done with questions

Christy Bunce                      January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 262

1    for today.

2              MR. PERLOWSKI:  Okay.  Come back in five?

3              MS. GIBSON:  Yep.

4              (Recess taken 6:12 - 6:19 p.m. EST)

5              MS. GIBSON:  All right.  We can go back

6    on the record.

7              All right, Ms. Bunce, I don't have any

8    more questions today from you.

9              Henry, I do want to suspend the

10   deposition pending any follow-up questions we may

11   have regarding the document production as a result

12   of the motion to compel and the Court's order, and

13   if Ms. Bunce is designated as the witness to

14   testify about those documents.

15             MR. PERLOWSKI:  We can take that up

16   later.  She's not the designee for the additional

17   topic that the court ordered testimony on.  We've

18   already emailed about that.

19             I understood that you're suspending.

20             MS. GIBSON:  Okay.  Yeah, I'm suspending

21   any follow-up questions on that.

22             MR. PERLOWSKI:  And we have 5 hours and

23   37 minutes on the record per the court reporter.

24             MS. GIBSON:  Perfect.  So if we need to

25   come back, we've got an hour or so.

Christy Bunce                                           January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

                                                    Page 263

1            Thank you for your time today,

2    Mrs. Bunce.

3            THE WITNESS:  Okay.

4            MS. GIBSON:  Thank you, Judi.

5            MR. PERLOWSKI:  Thank you, Judi.

6            THE WITNESS:  You're welcome.

7            MS. GIBSON:  Thanks, Henry.

8            MR. PERLOWSKI:  Thank you, MaryBeth.

9            (Deposition concluded at 6:20 P.M. EST)

10           (Signature reserved.)

11

12                *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

Christy Bunce                          January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 264

```
 1          The following reporter and firm
    disclosures were presented by me at this proceeding
 2  for review by counsel:
                REPORTER DISCLOSURES
 3          The following representations and
    disclosures are made in compliance with Georgia
 4  Law, more specifically:
                Article 10 (B) of the Rules and
 5  Regulations of the Board of Court Reporting
    (disclosure forms).
 6          OCGA Sections 9-11-28 (c)
    (disqualification of reporter for financial
 7  interest).
                OCGA Sections 15-14-37 (a) and (b)
 8  (prohibitions against contracts except on a
    case-by-case basis).
 9  - I am a certified court reporter in the state of
    Georgia.
10  - I am a subcontractor for Veritext.
    - I have been assigned to make a complete and
11  accurate record of these proceedings.
    - I have no relationship of interest in the matter
12  on which I am about to report which would
    disqualify me from making a verbatim record or
13  maintaining my obligation of impartiality in
    compliance with the Code of Professional Ethics.
14  - I have no direct contract with any party in this
    action, and my compensation is determined solely by
15  the terms of my subcontractor agreement.
                FIRM DISCLOSURES
16  - Veritext was contacted to provide reporting
    services by the noticing or taking attorney in this
17  matter.
    - There is no agreement in place that is prohibited
18  by OCGA 15-14-37(a) and (b).  Any case-specific
    discounts are automatically applied to all parties,
19  at such time as any party receives a discount.
    - Transcripts:  The transcript of this proceeding
20  as produced will be a true, correct, and complete
    record of the colloquies, questions, and answers as
21  submitted by the certified court reporter.
    - Exhibits:  No changes will be made to the
22  exhibits as submitted by the reporter, attorneys,
    or witnesses.
23  - Password-Protected Access:  Transcripts and
    exhibits relating to this proceeding will be
24  uploaded to a password-protected repository, to
    which all ordering parties will have access.

25
```

Page 265

```
 1              C E R T I F I C A T E
 2          Deposition of: CHRISTY BUNCE
        Date of Deposition: JANUARY 12, 2022
 3
 4   STATE OF GEORGIA:
     COUNTY OF DEKALB:
 5
 6              I hereby certify that the foregoing
 7   transcript was stenographically recorded by me
 8   via Zoom as stated in the caption.  The deponent
 9   was duly sworn to tell the truth, the whole truth,
10   and nothing but the truth.  And the colloquies,
11   statements, questions and answers thereto were
12   reduced to typewriting under my direction and
13   supervision and the deposition is a true and
14   correct record, to the best of my ability, of
15   the testimony/evidence given by the deponent.
16              I further certify that I am not a
17   relative or employee or attorney or counsel to
18   any of the parties in the case, nor am I a
19   relative or employee of such attorney or counsel,
20   nor am I financially interested in the action.
21              This, the 29th day of January 2022.
22
23
24   _____
     Judith L. Leitz Moran, CCR-B-2312
     Registered Professional Reporter
25
```

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 266

1              FIRM CERTIFICATE AND DISCLOSURE
2
3   Veritext represents that the foregoing transcript
    as produced by our Production Coordinators, Georgia
4   Certified Notaries, is a true, correct and complete
    transcript of the colloquies, questions and answers
5   as submitted by the certified court reporter in
    this case.  Veritext further represents that the
6   attached exhibits, if any, are a true, correct and
    complete copy as submitted by the certified
7   reporter, attorneys or witness in this case; and
    that the exhibits were handled and produced
8   exclusively through our Production Coordinators,
    Georgia Certified Notaries.  Copies of notarized
9   production certificates related to this proceeding
    are available upon request to
10  production@veritext.com
11  Veritext is not taking this deposition under any
    relationship that is prohibited by OCGA 15-14-37
12  (a) and (b).  Case-specific discounts are
    automatically applied to all parties, at such time
13  as any party receives a discount.  Ancillary
    services such as calendar and financial reports are
14  available to all parties upon request.
15
16
17
18
19
20
21
22
23
24
25

Page 267

1    TO:  Henry Perlowski, Esq., Arnall Golden Gregory
2    Re:  Signature of Deponent CHRISTY BUNCE
3    Date Errata due back at our offices: 30 DAYS

4

5    Greetings:
6    The Deponent has reserved the right to read and
     sign.  Please have the deponent review the attached
7    PDF transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill
8    out the Errata electronically or print and fill out
     manually.

9

     Once the Errata is signed by the Deponent and
10   notarized, please mail it to the offices of
     Veritext (below).

11

     When the signed Errata is returned to us, we will
12   seal and forward to the taking attorney to file
     with the original transcript.  We will also send
13   copies of the Errata to all ordering parties.
14   If the signed Errata is not returned within the
     time above, the original transcript may be filed
15   with the court without the signature of the
     Deponent.

16

17   Please send completed Errata to:
     Veritext Production Facility
18   20 Mansell Court E, Suite 300
     Roswell, Georgia  30076
19   (770) 343-9696
20
21
22
23
24
25

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

Page 268

1   ERRATA FOR ASSIGNMENT NO. 5022785

2   I, the undersigned, do hereby certify that I have

3   read the transcript of my testimony, and that

4

5   _____ There are no changes noted.

6   _____ The following changes are noted:

7

8   Pursuant to Rule 30(7)(e) of the Federal Rules of

9   Civil Procedure and/or OCGA 9-11-30(e), any changes

10  in form or substance which you desire to make to

11  your deposition testimony shall be entered upon the

12  deposition with a statement of the reasons given

13  for making them.  To assist you in making any such

14  corrections, please use the form below.  If

15  supplemental or additional pages are necessary,

16  please finish same and attach them to this errata

17  sheet.

18

19  Page/Line/     Change    /   Reason

20  ____/____/_____/_____

21  ____/____/_____/_____

22  ____/____/_____/_____

23  ____/____/_____/_____

24  ____/____/_____/_____

25  ____/____/_____/_____

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

Page 269

```
1   Page/Line/      Change    /    Reason
2   ____/____/_____/_____
3   ____/____/_____/_____
4   ____/____/_____/_____
5   ____/____/_____/_____
6   ____/____/_____/_____
7   ____/____/_____/_____
8   ____/____/_____/_____
9   ____/____/_____/_____
10  ____/____/_____/_____
11  ____/____/_____/_____
12  ____/____/_____/_____
13  ____/____/_____/_____
14  ____/____/_____/_____
15  ____/____/_____/_____
16
17
18                  _____
19                      CHRISTY BUNCE
20
21  Sworn to and subscribed before me
    this _____ day of _____, 20__.
22
23  _____
    Notary Public.
24  My Commission Expires _____.
25
```

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[0000256 - 2016]**

Page 1

| **0** |
| --- |

**0000256**   4:20
**0000274**   4:16
**0000279**   4:16
**0000280**   4:25
**0000285**   4:25
**0000350**   5:20
**0000353**   5:20
**0000549**   5:14
**0000553**   5:14
**000260**   4:20
**04981**   1:6
**0647**   5:17
**0648**   84:9
**0652**   54:16
**0672**   69:19
**0676**   3:13
**0690**   3:17
**0702**   3:24
**0708**   4:10

| **1** |
| --- |

**1**   3:9,20,23 4:6,9
4:11,17,21 24:3
28:20 30:3,12
45:2 48:13,17
52:1,4 53:19,22,25
54:14 57:17 58:25
59:5 64:7 65:5
66:8 69:8 71:4
72:20,21 94:13,14
95:19,23,23 98:6
99:20,22 100:16
101:7 104:1,4,14
104:19 110:7,8
116:22 118:1,1,2
120:25 126:14
127:12 128:1,13
128:13,18 129:9
129:17 130:17
137:13,14 138:21

140:5,21 142:12
142:12 148:4
149:21 164:4
190:16,17 204:2,3
223:18 225:16
243:12,14,17
253:3 256:9,10,13
261:3
**1.4**   59:16 61:15
82:17 128:18
**1.4.a**   60:6 62:1,16
70:18,21 243:18
**1.4.a.**   60:6
**1.4.b**   60:22 63:3
64:23 65:14 69:25
81:3,23 83:15
84:21 85:8 131:5
132:2 141:1
227:12
**1.4.b.**   60:8 82:17
85:17 255:1
**1.4.c**   65:21 66:23
67:4 68:11
**1.4.c.**   60:10
**1.4.d**   60:13 68:24
141:2
**1.4.d.**   60:13
**1/1/2018**   4:19
**1/11**   23:18
**10**   4:17 30:13
119:19 126:8,12
137:10,11 138:11
143:14 264:4
**103**   4:4,6
**11**   4:21 30:13
119:19 126:9,12
140:15 143:14
258:20,22,22
**11/16/2019**   197:16
**11/26/2019**   5:18

**11/4/2016**   3:12
**11:07**   1:16 7:2
**11:37**   98:4
**11:53**   48:18
**12**   1:15 5:4 7:2
30:13 90:18
142:22,24 143:17
166:1,7 259:15
265:2
**126**   4:11,17,21
**1278**   265:22
**12:27**   73:8
**12:42**   73:8
**12th**   186:6
**13**   5:7 18:7,13
165:7,10 184:17
184:18 239:15,24
**14**   2:9 5:12 30:13
184:10,20 185:2
194:21 223:25
258:20 259:3
**140**   52:13 53:6,10
**142**   5:4
**15**   5:15 30:13
192:12,15 195:19
196:16 197:4
258:20 259:12
260:8
**15-14-37**   264:7,18
266:11
**16**   5:18 30:13
90:10 197:6,7,10
205:16 207:1
225:2
**165**   5:7
**16th**   252:13
**17**   5:21 11:20 21:9
240:13,16,17
241:3
**171**   2:16

**17th**   2:16
**18**   6:4 142:12
251:6,18
**184**   5:12
**19**   30:13 191:23
**192**   5:15
**197**   5:18
**1992**   18:11
**19th**   192:21 193:3
**1:20**   1:6
**1:45**   119:18 120:9
**1:55**   120:7
**1st**   105:1 126:15
127:14 130:12

| **2** |
| --- |

**2**   3:12 30:3,12
44:21,25 51:22
59:9 84:10 136:4
186:2 193:14
**2/28/2020**   3:16,18
**20**   30:13 62:6,9,17
90:10 110:7
201:11 256:2
267:18 269:21
**2000**   120:19
**2009**   18:14 20:4
21:4 22:19 239:14
**2012**   120:20
**2015**   13:25 17:2
**2016**   21:9 26:23
34:3 46:15 48:17
72:10 114:10
118:1 127:13
128:18 129:8,16
130:4 131:6,10,25
140:6,21 144:11
148:4 149:13
225:16 254:24
256:2 259:6
260:19 261:8

Case 1:20-cv-04981-CAP  Document 106  Filed 04/28/22  Page 272 of 321

Christy Bunce

January 12, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[20160 - 6]

Page 2

**20160** 10:25
**2017** 126:15
127:14 128:13
130:12 138:1
142:12,13 143:14
**2018** 13:24 15:13
16:8,22 27:5,7,10
74:19,20,21 75:1,2
75:6,7,23 76:22
122:1,23 123:1,22
124:9,9 125:7,24
137:14 142:13,13
143:15,18 144:9
147:6,15,18
151:18 153:5,16
154:1 158:22
172:10 177:13
178:12 180:1
182:25 195:13
232:11 257:13
258:12
**2019** 83:9 91:17
107:22 119:5
150:19 151:9
152:1 153:7
154:16 160:17
165:21 166:7
169:5 170:20
178:13 180:2
182:25 183:6,19
185:14 191:16
193:16 201:18
205:17 211:12
212:14,17 216:17
217:5 224:7 234:2
234:17 258:15
**2020** 3:23 4:9
13:23 14:1 72:20
94:14 95:23 99:10
99:23 101:7 104:4
104:19 108:12

110:8 111:2
116:22 118:2
120:24,25 128:1
130:17 149:21
164:4 190:16
204:2 254:25
256:10,13,17
257:22 259:6
261:3
**2021** 17:1 252:13
**2022** 1:15 7:2
265:2,21
**21** 11:7 24:13
**2100** 2:17
**22** 11:19 30:13
**23** 30:13 241:10
**230** 2:9
**2312** 1:22 265:24
**24** 3:9 30:13 232:8
244:3
**240** 5:21
**24th** 143:18 144:9
147:14,18
**25** 30:14 249:5
**251** 6:4
**256** 137:18
**26** 30:14
**27** 30:14
**275** 128:15
**276** 129:15
**277** 131:3
**279** 135:14
**28** 30:14
**285** 141:25
**28th** 103:25
**29** 30:14
**29th** 185:14
265:21
**2:03** 120:9
**2:44** 150:11

**3**

**3** 3:14 30:3,13
51:23 52:11 53:17
54:12 57:19 90:2
93:23 193:14
229:16,17,18
230:23 249:22
254:18
**3/1/2017** 4:15
**3/1/2018** 4:24
**3/20/2019** 5:15
**3/29/2019** 5:12
**3/30/72** 12:18
**3/9/202** 4:4
**30** 3:11 28:21
29:23 32:2 43:23
44:14 52:18 58:5
60:22 62:7 72:2
96:16 116:1,16
117:4 119:20
120:1 133:10
146:8 157:15
159:12,23 160:11
160:20 186:17
187:4 188:12,15
192:5 194:2
223:19 242:10,20
248:2 258:7,11
267:3 268:8
**300** 267:18
**30076** 267:18
**30305** 2:10
**30363** 2:18
**343-9696** 267:19
**350** 195:20 197:4
197:13
**351** 197:25 207:2
**352** 197:19
**3535** 2:8
**37** 262:23

**3:15** 150:4
**3:20** 150:4
**3:30** 150:7
**3:34** 150:11

**4**

**4** 3:16 71:7 94:21
95:6 97:23 165:20
223:24 254:17
**40** 53:16
**44** 3:12
**457** 10:8
**4:37** 196:25
**4:42** 196:25
**4th** 46:15 253:8

**5**

**5** 3:18 54:15 67:6
67:18,23 71:3
97:2,4,8 103:24
165:19 189:12
225:1 255:22
262:22
**5,000** 133:21
134:11
**5-0** 21:6
**50** 21:6
**5022785** 268:1
**549** 184:8 185:3
**5:13** 223:12
**5:19** 223:12
**5:55** 250:13
**5:56** 250:13
**5th** 189:13 194:12
194:17,20,25

**6**

**6** 3:11,20 28:21
29:23 32:2 96:16
97:2,4 99:17
103:24 116:1,16
117:4 146:8
223:19 242:10,20

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 273 of 321

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[6 - agreement]

Page 3

248:2 255:23
**60**   78:23 79:17
**646**   192:20
**671**   61:21
**672**   84:13
**697**   97:1
**6:12**   262:4
**6:19**   262:4
**6:20**   263:9
**6th**   48:17

**7**

**7**   3:3 4:4 48:24
   103:11,16,18,21
   104:2 230:22
   256:8 268:8
**7.5**   260:18 261:7
   261:20
**70**   52:17 60:22
   62:6
**70/30**   52:19
**702**   100:4
**703**   103:15
**709**   97:7
**710**   103:15,17
**75**   52:15
**770**   267:19

**8**

**8**   4:6 103:11 127:1
   137:17 183:17
**8/24/2018**   5:4

**9**

**9**   4:11 30:13 126:8
   126:12,13,18
   130:21 140:5,20
   143:14 183:17
**9-11-28**   264:6
**9-11-30**   268:9
**90**   3:14 165:2,5
   168:9 169:25
   170:5,25 171:6,11

172:25 173:19
   175:18
**92886**   11:1
**94**   3:16
**97**   3:18,20
**99**   58:18

**a**

**a.m.**   1:16 7:2
   48:18 98:4
**abide**   163:15
**ability**   9:12 219:3
   265:14
**able**   24:5 29:5
   30:15 50:19 79:11
   90:5 96:25 103:15
   125:8 154:19
   165:14 178:18
   183:15 198:21,24
   235:16,17 246:25
   249:23
**abolishing**   187:17
**abolishment**
   186:18,24 187:8
**absolutely**   50:24
   117:5 135:10
   144:3 166:25
   187:19 190:6
**absorb**   219:15
**absorbed**   218:15
**acceptable**   154:18
**access**   264:23,24
**accomplish**   165:6
**account**   19:9 20:9
**accountability**
   22:8
**accounted**   203:11
**accounting**   52:19
   114:21 218:12
**accounts**   52:14
**accuracy**   252:25

**accurate**   228:11
   228:12 264:11
**accurately**   31:2,4
**accustomed**   36:17
**achieve**   194:16
**acknowledge**   55:7
   56:7
**acquired**   13:7
**act**   108:4
**action**   1:5 14:5
   264:14 265:20
**actively**   164:20
**activity**   88:7,8
**actual**   94:12 95:5
   110:10 198:16
   228:3
**add**   60:12 69:4,12
**addition**   21:13
**additional**   141:23
   262:16 268:15
**address**   222:9
**addressed**   130:8,9
   196:4
**addressing**   196:5
**adjusted**   71:15
**adjustments**   71:18
   204:17
**admission**   5:11
**admissions**   184:19
**admit**   165:20
**admits**   166:1
**admitted**   82:2
**admittedly**   86:17
**adobe**   42:19 46:10
   48:21 49:25 72:6
   72:9,12 107:16,18
   130:22 137:5
   139:14,20,25
   145:23 146:3
**adp**   29:13

**affect**   9:9,12
**affirmative**   5:23
   241:6
**affirming**   106:10
**afternoon**   185:23
**ages**   11:18
**ago**   17:15,23 18:7
   21:8 77:7 193:5
**agree**   51:8 55:7
   56:7,22 64:17
   107:2 130:15,16
   136:23 142:14
**agreeable**   51:12
**agreed**   87:23
**agreement**   3:21
   4:7 23:8,10 42:14
   45:2 47:13 48:7,9
   50:9,16 51:5 52:1
   53:2,3,19 54:20
   55:5,15,16 56:8,20
   56:23 57:4,5,24,25
   58:7,9 59:6 71:25
   72:5,5,10,24 85:24
   87:17 88:9 89:15
   96:8 99:19 106:12
   107:4 108:24
   109:3,5,9 110:15
   110:20,21 111:22
   112:22 114:10
   119:16 127:13,20
   131:7,10 132:1
   133:19 135:23
   136:1,12,13,16
   138:11 140:22
   149:16 207:18
   216:18 224:12,15
   224:19 225:16
   233:23 243:11
   244:7,10 245:1
   256:10 257:21
   260:17,19 261:3,8

Case 1:20-cv-04981-CAP Document 106 Filed 04/28/22 Page 274 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[agreement - answer]                                                    Page 4

261:17,20 264:15
264:17
**agreements** 47:2
51:24 79:12 87:12
94:11 105:2
135:21 147:5
148:4 149:13,14
253:21 260:24
261:3,5
**ahead** 15:24 30:6
30:24 54:10 77:10
78:16 82:9 83:3
83:19 95:2 101:24
116:6 124:21
133:15 137:21
138:18 140:17,19
141:6 145:21
146:24 147:24
155:6 160:25
163:19 185:5
189:6 192:23
196:23 198:14
213:17 215:4
225:25 233:10
235:11 236:4
242:23 243:4
258:9
**air** 182:8
**aligned** 171:2,7
**allegations** 14:9
**allege** 242:7
**alleged** 249:7
**allison** 28:6 32:8
32:15 33:5,11
34:20 95:9 100:16
103:4 111:12
112:1,21 120:15
143:19 165:22
166:2 167:19
169:12 175:5,11
185:9,12 192:18

192:21 193:3
194:4 196:10
197:19 253:15
**allocate** 187:23
**allocated** 31:5
154:2 158:18
159:3
**allocation** 66:3
**allocations** 158:14
158:17
**allow** 234:18
**allowed** 214:2
237:3
**alter** 117:18
**amend** 127:11,22
256:17 260:17
**amended** 5:25
43:25 55:15 57:4
58:7,8 96:7,21
100:15 107:11
118:1 128:6
136:12 164:3
241:7 256:9,12
**amending** 130:12
130:13
**amendment** 4:17
72:21 94:14 95:23
96:1,2,13,14 99:20
99:21 100:7,9,10
101:8 105:10
110:9,10 116:23
121:1,3,4 128:1,2
128:5,6,8 129:23
130:1,3,17 136:17
137:12 138:21
149:22 190:16
204:2 211:7 244:2
256:13,18
**amendments**
50:25 142:11
143:12,13 144:18

144:22 146:11
243:25
**american** 1:7 2:21
2:22 5:8,22 6:5
7:20 17:5 18:19
19:5 20:3,5 31:9
32:17,19,23 34:9
36:8 39:24 40:2
41:16,19 42:4
48:1 56:13 71:25
74:13 80:7 81:20
101:19 102:17
106:1 108:16
109:10 133:20
148:18,23,24
149:8,9,17 167:15
168:24 205:6
206:18 207:15
210:9 214:2,2
220:7 241:6
246:20 251:20
252:3
**amicable** 194:19
**amount** 15:10
38:16 154:18
160:11,13,13
164:12 225:5
227:17 229:10
**amounts** 56:17
60:10 225:10,14
226:14,23 228:5
228:11 255:6
**ample** 241:14
**ancillary** 266:13
**andrew** 2:21
**angst** 220:18
**ankeny** 199:2
**announce** 156:4
234:3
**announced** 157:16
160:20 161:7,8,24

180:18 181:1
182:16 186:21,24
186:25 201:24
**announcement**
157:18 159:11,22
160:10,19 163:1
**announcing**
187:17
**answer** 5:23 8:17
9:19 14:12 15:24
15:25 16:1 24:21
37:16 39:3,19
43:8 44:6 49:16
51:15 52:7 54:10
57:8 70:15 71:21
71:23 74:25 75:12
75:15,16 79:6,23
83:1,7 84:19 87:7
89:7 91:7 92:24
93:7 96:11 107:6
108:18,22 109:18
111:5 115:9,22
118:6 122:5
123:16 125:16
129:25 131:14
132:23 134:25
137:1 139:10
144:14 145:21
151:15 160:7
162:14 170:15,16
173:9,10 174:6,10
174:18 175:21
182:1,18 184:3
190:19 194:10
196:2 200:16
201:2 202:3
208:17 211:2
212:10 213:17
214:13,22 215:4
218:24 219:2,12
219:15 221:13,22

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[answer - attached]

Page 5

224:22 225:19
226:2,10,18 227:7
227:22 228:15,17
229:14 230:11
232:17 233:5
235:5,14 236:6
239:4,7 240:12
241:6 242:1
243:16,24 245:9
245:11,13 247:13
247:24 249:3,14
249:15,17 255:19
257:9,11 258:2,9
260:22 261:13,16
**answered** 78:15
82:8 111:20 114:1
148:11 166:13
175:20 213:14
214:11,21 215:10
**answering** 83:5
237:14,19
**answers** 264:20
265:11 266:4
**anticipate** 8:23
212:13
**anybody** 33:7
109:23 167:10,14
**anybody's** 123:5
**anyone's** 140:13
**anyway** 68:7
**apologize** 86:22
142:25 243:9,20
**apparent** 123:8
**appear** 129:8,15
140:20 240:17
**appearances** 2:1
**appeared** 7:1
240:25
**appearing** 1:12,23
7:16

**applica** 4:13
**applicable** 64:2,6
64:18,24 65:4
66:7,12 67:10,16
68:16 69:2,7,11
70:5,9 85:13
132:14 134:21
**application** 4:23
63:20 88:7,24
132:7
**applications** 63:21
84:23 88:15
131:21
**applied** 81:22
131:21,23 132:15
135:7 264:18
266:12
**applies** 131:16
**apply** 68:9 84:22
109:5 121:4
133:17
**approve** 228:19
231:23
**approximately**
18:10,13,14 20:4
21:9
**april** 108:12 111:1
**arbitration** 18:1
**area** 64:2,7,18
65:4 66:7 70:5
85:13 98:25
100:23 132:14
**arizona** 152:10
**arnall** 2:15 267:1
**arrangement**
104:13
**arrested** 11:4,6
**article** 264:4
**arvielo** 55:18 57:6
95:10 151:2 154:9
156:4 157:16

161:5 165:1 169:2
169:8,22 170:12
173:18 175:17
176:2 185:11
197:15,15 199:4
232:14
**arvielos** 28:3
178:5 180:10,14
192:19,22 197:20
206:2,23 239:16
239:23 256:22
**asa** 66:3,15,24
**asked** 28:9,13,16
38:8,10 51:16
63:13 75:18 78:14
82:8 94:25 111:4
115:14 118:25
127:25 136:8
142:20 148:10
173:7 175:19
213:8,13 214:11
214:20 215:10
238:11,14,14
249:25 251:3
252:22 259:12
**asking** 10:5 15:9
25:1 31:20 44:19
51:9 64:13 73:12
78:11 90:14 102:8
116:1,25 119:6
139:1,25 146:9,12
147:10,20 148:8
162:16 166:16,17
167:17,18 173:5
173:17 174:11
183:11 198:18
203:1 207:21
218:25 222:7
225:23 229:25
238:25 239:3,5
242:2,3 243:4

256:16 261:19
**asks** 165:20 253:3
**assert** 86:13
116:15
**asserted** 116:7,9
116:10
**assign** 215:14
259:13
**assigned** 264:10
**assignment** 268:1
**assignments**
259:16,17
**assist** 252:18
268:13
**assistance** 39:8
63:11 85:21 88:21
133:1
**assistant** 49:6
**assisted** 134:18
**association** 12:10
**assuage** 202:8
**assume** 34:14 50:6
98:2 138:14 139:4
147:9 169:9
218:14
**assuming** 24:11
34:15 35:6 46:22
48:22 93:18 94:11
112:3 114:3 128:8
130:7 144:16
218:9 237:17
243:6
**assumptions**
204:10
**atlanta** 1:2,23 2:10
2:18 11:24 113:11
206:2,12 212:19
**attach** 268:16
**attached** 59:6
103:25 104:4,14
127:12 140:5,21

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[attached - bind]**

Page 6

225:9 233:23
266:6 267:6,7
**attachment** 97:14
**attend** 150:22
152:11 178:6
190:2 212:16,21
249:24
**attended** 111:11
150:24 151:2
177:20
**attention** 245:22
249:18
**attested** 9:4
**attorney** 15:25
213:3,3,5 247:23
248:2 250:2
264:16 265:17,19
267:12
**attorneys** 264:22
266:7
**attribute** 232:21
**audio** 180:21
**august** 143:18
144:9,19 147:6,14
147:18 252:13
**authorities** 168:4
**authority** 156:10
179:10 180:2
195:8 215:22
**authorized** 68:13
68:14 136:22
137:3
**automatically**
264:18 266:12
**available** 251:8
266:9,14
**aware** 29:24 47:23
72:20 111:10
194:24 211:11
212:23 216:23
217:22 219:1,16

243:22,23 250:24

**b**

**b** 1:7,22 3:6,11 4:1
5:1,8,22 6:1,5
28:21 29:23 32:2
96:16 116:1,16
117:4 146:8
223:19 242:10,20
243:18 248:2
251:20 252:3
264:4,7,18 265:24
266:12
**back** 19:16 20:2
24:11,12 28:20
29:19 36:5 42:14
46:11 49:23 50:5
51:18 58:22 72:9
72:13 73:9 75:1
77:1 84:1,9 89:14
90:13 92:7,10,13
92:14 97:19 98:1
109:24 112:9,13
112:18 120:10
122:23 126:7
134:3 136:3 140:3
144:17 147:22
150:3,15 151:21
151:21 159:16
163:16,21,24
167:24 168:13,15
168:18 183:14,20
183:25 187:13
190:11,21 191:2,7
191:10,12,19
197:2 200:12
204:9 207:1
209:24 220:20
223:10,15 229:16
230:23 244:11
245:12 246:23
250:15 256:24

258:21 261:18
262:2,5,25 267:3
**bad** 222:6 258:13
**bankers** 12:10
**bankruptcy** 12:15
**bar** 11:7
**barred** 245:4
246:4,14 247:17
250:19
**barring** 247:20
248:13
**bartyczak** 95:9
**based** 15:25 23:5
62:8 65:7 66:18
66:23 75:22
149:13 204:1
259:18
**basically** 158:20
220:14
**basis** 14:8 16:14
41:1 53:10,15,16
227:25 239:20
247:6 248:4,7
264:8
**bate** 137:18
**bates** 10:2,8 45:3
45:19 48:25 54:16
57:18 84:9 97:7
128:15 129:14
131:2 141:24
142:24 177:8
185:2 192:15,20
197:5,13,19 207:2
241:4 251:19
**beach** 19:19,21
**bearing** 237:21
**began** 18:16 21:4
**beginning** 64:22
102:7 145:22
195:12

**behalf** 2:3,12
146:9
**belief** 252:7
**believe** 31:1,2,15
31:17 116:16,19
116:23 123:1
149:12 208:13,14
210:16
**believed** 194:18
**believes** 225:6
228:6
**bell** 134:19
**benign** 204:13
**best** 113:2 144:1
176:1,17 186:3
199:23 201:4,4
218:24 219:2
220:22 252:6
253:21 255:4,11
256:6 259:2,9
261:21 265:14
**beth** 7:17
**better** 22:7 32:1
144:3 202:9
**big** 21:5 33:7
34:18 37:3,7
81:11 82:12 83:21
87:21 92:24
101:10,13 102:11
102:14,20 123:10
131:18 133:8,24
148:22 163:11
181:14 257:25
258:5
**bigger** 21:25 22:5
80:20
**biggest** 108:7
232:24
**billing** 135:22
**bind** 31:16

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[binding - bunce]**

Page 7

**binding** 55:13
56:8
**birth** 12:17
**bit** 41:10 80:21
88:6 101:18
106:19 141:13
158:16 176:19
201:15 213:7
232:7 251:14
259:11
**biweekly** 65:25
**blank** 91:22
**block** 2:22 25:4
212:21
**bm** 227:13,24
228:7 231:4,6,13
231:24
**board** 206:17
264:5
**boilerplate** 50:17
62:13 127:20,21
**bond** 37:22 38:5,9
39:7 85:21
**bone** 81:11 82:12
82:21,24 83:8
87:21 131:18
133:8
**bonus** 23:5 38:6
59:16,20,21,24
60:7,9,11,12,17
61:15 62:2,12
63:4 64:23 65:23
69:3,12 70:17
71:15 85:9 93:20
104:12,18,25
128:18,21,23
129:1 131:17
133:7 134:13
141:4,20 227:11
**bonuses** 23:2,4,11
37:10 81:10,13,18

88:10 91:3 92:22
256:19
**book** 32:21 230:14
**born** 12:19
**borne** 188:4
**borrower** 236:11
236:14
**bottom** 10:3,7
45:18,21 48:12,13
51:23 59:14 76:8
77:16 78:3,18,19
98:19 137:17
165:20 185:2
199:4
**box** 64:14 65:3
81:16 82:16 83:22
131:15 132:6
133:16,19 135:7
141:23
**boxes** 133:6 141:1
**bps** 36:20,23 52:13
52:15 53:6 59:24
60:6 61:18 62:4,6
62:9,17,25 67:6,16
67:18,23 80:20
100:11,13 114:17
129:1 153:6
171:22 172:3,8,21
260:18 261:7,20
**branch** 44:10
49:19 62:5 98:25
100:22 139:6
219:4 223:2
**branches** 56:16
59:23 61:17
128:25 139:7
229:21
**break** 9:15,16,20
73:5 76:12 84:5
85:23 87:9 89:13
89:20 119:20,20

119:25 120:1
131:20,23 133:4
134:15 135:5
141:12 169:14
196:18 199:16
221:5 222:17
223:8 250:4,8
261:25
**breaking** 141:13
**breakouts** 179:21
**breath** 238:24
**bring** 21:25 41:10
155:9 214:2
228:22,25 249:17
**bringing** 22:6
35:11 36:13 37:6
133:9 212:24
213:3 215:16,18
216:3 244:19
**broken** 76:9
**broker** 1:7 5:7,21
6:4 38:6,9 241:5
251:19 252:2
**brokered** 37:22
39:7 52:15 63:11
85:20 87:13,15
88:20 132:25
134:18
**brought** 32:16
53:12,14 81:19
112:1 211:17
244:17 245:21
249:20 257:17
**bubbles** 156:12
**bucket** 68:11
98:16 131:5
**buckets** 61:4
64:10 117:25
131:11 226:21
227:1 243:18

**budget** 165:23
166:3,11,14,18
167:20 169:23
187:18 201:25
217:6,11 260:18
261:8
**budgets** 156:10
167:24 168:4,13
168:17 179:25
186:19,24 187:8
191:19 218:16
**build** 164:21 167:3
216:10 260:14
**builder** 35:8,11
88:3 233:22,24,25
260:13,14
**building** 2:9
182:11 198:12,13
198:20
**built** 113:24
167:15 199:21
216:11
**bulk** 37:20
**bullet** 60:5 61:5
63:8,23 64:10
65:8 66:2 67:5
68:12 70:11 81:3
84:22 85:11 86:4
87:12 88:13,19
90:21 132:15
185:21 186:5
189:13
**bullets** 131:24
**bunce** 1:11 7:6,8
7:11 10:23 11:11
11:19,20 12:19
15:3 24:5,17,24
30:2 31:5,8 55:18
73:12 75:11 77:13
82:9 83:1,7 86:12
87:1,7 92:10 95:2

97:6 103:7,19
119:21 126:17
127:5 141:18
143:7,18 146:24
150:18 174:6,10
174:22 180:23
184:23 192:18
193:4 223:13,18
233:5 239:3
251:14 252:1
262:7,13 263:2
265:2 267:2
269:19
**bunch** 210:6
**bus** 40:1
**business** 29:10
32:21 35:7,8
37:19,20,22,22
38:12 39:12 41:6
88:3 102:2 155:24
158:10 180:3
183:4 194:18
195:1 199:13
209:16 212:5,6,11
215:16 221:5,23
224:11 227:19
230:4,14 241:5
254:22 255:3,25
258:24 259:4,7,18
259:20 260:11,14
**businesses** 205:9
**busy** 104:8
**buttoned** 198:6

**c**

**c** 2:5 243:18 264:6
265:1,1
**cal** 13:2 33:24
**calculate** 227:3,10
227:17 229:10
255:16

**calculated** 23:4,11
59:21 128:22
225:10 228:5,9
**calculates** 225:5
**calculating** 226:25
**calculation** 59:17
59:21,25 60:17
61:16,22 62:12
65:23 70:18,20
128:19,23 129:1
141:21
**calculations** 65:17
**calendar** 59:23
61:17 128:25
266:13
**caliber** 34:23
38:18,20,22 39:8
39:14 40:15 63:16
**california** 1:13 7:1
11:1 12:19,23
14:19,21 152:10
237:17,18
**call** 27:25 28:7,8
122:8 157:25
158:19 189:23
213:25 214:6,14
214:16 215:20
229:5 250:12
**called** 36:5 40:1
72:6 124:25 149:2
149:5 210:14
214:8
**calling** 33:7 149:1
**calls** 47:16 153:11
**candidate** 42:10
42:13,15
**candidates** 67:7
67:23
**cap** 1:6
**capacity** 31:24
108:2,4 117:4

**capital** 74:4,5,10
74:12 77:23
157:10
**caption** 265:8
**cares** 199:24
**carried** 254:14
**carve** 62:15,21
**carved** 70:19,21
**case** 124:14 264:8
264:8,18 265:18
266:5,7,12
**casual** 153:4
**categories** 63:14
**category** 69:20
99:13
**cause** 246:19
**causing** 220:18
**caution** 15:4 24:18
75:11
**cc** 42:10 104:3
192:19
**cc'd** 98:11,20 99:4
99:6,9 100:8
185:10
**cc's** 97:13
**ccr** 1:22 265:24
**center** 122:9
158:19
**central** 29:8,11
**ceo** 55:18 136:14
136:19
**certain** 31:22 35:9
38:16 104:11
124:24 228:21,21
229:3 244:16
248:18 252:20
**certainly** 117:2,8
117:9 238:19
**certificate** 266:1
**certificates** 266:9

**certified** 264:9,21
266:4,5,6,8
**certify** 265:6,16
268:2
**cfo** 96:4 107:20,23
107:24 108:8,9
109:22 153:20
163:13 164:21
165:5 166:25
167:7 182:10
**chain** 197:14
**change** 21:21,23
22:2,9,12,15,20
43:17,24 44:14,17
50:18 57:10,23
58:1,4,6 72:3 86:6
94:2 100:9,22
101:1,1,7 105:17
105:19 107:10
114:13 136:24
140:9 147:21
149:20 162:11
163:16,20 164:9
166:15 169:24
224:14,19 233:24
256:5 268:19
269:1
**changed** 22:18
72:21 91:18 94:9
96:17 99:22
100:10,21 102:20
107:3,7 132:18
133:14 135:22
144:10 163:24
164:3 195:13
209:12,18 224:3
236:25 260:23
261:2
**changes** 72:15
78:23 79:2,8
91:16 93:25 94:8

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[changes - company]                                                    Page 9

| | | | |
|---|---|---|---|
| 105:12 107:1 | 246:20 | **cm2** 125:1,5 | 217:16,20 218:5 |
| 117:16 145:5 | **chris** 152:8 183:16 | 157:25 | 228:22 231:15,16 |
| 147:10,11 156:5 | **christy** 1:11 7:4,6 | **cm3** 125:1,5,6,8 | 231:19 232:1 |
| 161:23 163:1,6,12 | 10:23 55:18 | 126:4,6 157:25 | 244:14,16 246:10 |
| 164:16 166:23 | 104:13 143:18 | 187:22 188:6,14 | 248:16,18 |
| 168:3 174:1 | 186:16 192:18 | 189:1,10 | **commitment** |
| 182:15 188:1 | 193:3 252:1 265:2 | **code** 233:3,12,13 | 56:13 164:23 |
| 190:23,24 191:16 | 267:2 269:19 | 233:24 264:13 | **committed** 190:9 |
| 205:24 211:19 | **chronology** 186:1 | **codes** 234:4 237:4 | **common** 43:22 |
| 224:10,12 241:15 | **church** 12:12 | **cold** 33:7 | 58:3 72:1 148:25 |
| 241:16 242:4,8 | **circum** 13:15 | **college** 12:24 13:1 | **communicate** |
| 256:1 259:1 | **circumstance** | 13:7 18:8 19:12 | 80:12 111:15 |
| 264:21 267:7 | 216:8 | 19:16,18 | 153:13 224:10 |
| 268:5,6,9 | **civ** 3:11 | **colloquies** 264:20 | **communication** |
| **changing** 84:8 | **civic** 12:1,3 | 265:10 266:4 | 35:10 75:13 |
| 123:7 143:25 | **civil** 1:5 268:9 | **come** 18:5 20:7 | 224:13,17 |
| 144:8,17,24 | **claims** 14:13 | 88:9 115:12 | **communications** |
| 146:20 147:14 | 241:13 244:4 | 141:14 150:3 | 13:8 24:19,20 |
| 187:18 230:15 | 245:4 246:4,14 | 153:8 158:25 | 90:14,22 98:11 |
| **charge** 235:24 | 247:17,20 248:14 | 171:20 216:9 | 117:12 148:1 |
| **chart** 177:3 225:8 | 250:19 | 262:2,25 | 224:2 225:21 |
| 225:11,12 226:21 | **clarified** 132:6 | **comes** 50:22 | **community** 12:4 |
| **charts** 225:4 | **clarify** 12:3 25:10 | **comfortable** | **comp** 38:16 41:11 |
| 226:15 | 64:12 69:14 | 237:13,19,24 | 44:17 52:14 53:5 |
| **chase** 2:14 177:8 | 185:24 218:2 | **coming** 19:4 37:3 | 53:13,15 67:15,17 |
| **chattanooga** | **clean** 8:25 | 38:13 41:6 68:1 | 69:4 78:23 88:23 |
| 218:18,22 219:4,9 | **clear** 57:9 84:3 | 82:13 87:24 | 104:18 151:9 |
| 222:24 | 132:6 137:5 | 133:25 147:11 | 174:1 191:5,20 |
| **chatting** 145:11 | 243:10 | 167:24 168:13,18 | 195:7 204:24 |
| **checked** 64:14 | **client** 15:25 | 171:19 182:24 | 233:22 234:15,25 |
| 65:4 66:8 67:13 | **close** 35:9,9 46:23 | 190:22 195:6 | 235:19,22,25 |
| 68:18 84:14 | **closed** 61:10 | 233:14,15,25 | 236:8 253:18 |
| 132:13 133:16,19 | **closing** 234:11 | 251:14 | 258:25 |
| 141:1,1,2 | **closings** 88:4 | **commission** 93:20 | **companies** 98:18 |
| **checking** 64:17 | **cm** 157:24 | 227:16 228:4 | 172:13 183:1,3,4 |
| **chen** 231:18 | **cm1** 125:1,2,5 | 255:21 269:24 | 201:12 |
| **children** 11:16 | 126:2 157:24 | **commission's** | **company** 23:7 |
| **choice** 236:12 | 158:2 186:17 | 245:15 248:17 | 24:12 31:10,16 |
| **choose** 234:7 | 187:21 188:5,14 | 249:18 | 54:25 55:9 71:16 |
| **chose** 148:23 | 189:1 193:14 | **commissions** | 93:22 98:19 108:3 |
| 172:3 234:16 | | 65:16 66:1 71:14 | 110:1 120:21 |

122:8 154:16
158:15 163:9
164:17 184:1
207:17 208:10
209:10 210:3,20
234:18 237:23
**compared**  117:24
158:19,20
**compel**  77:8
262:12
**compensa**  4:18
**compensated**
105:20 114:13
**compensation**
3:22 4:8,12,22
22:9,12,15,20,22
35:21,25 36:2,12
37:2 42:3 43:18
43:23 47:9,10,25
48:1,2,5,6 51:3
52:13,15,16,17
53:18 54:6,13
57:11,13,14,23
58:2,4,6 59:1
68:20 69:13 71:13
71:13 72:3,15,22
72:24 79:3,8
80:16,25 90:16,23
91:9,11,13,17 93:8
93:15,25 94:2,9
96:8,18 99:22
100:9,12,12,23
101:2,7 104:10,12
105:10,12,18
106:1 107:1,3,10
114:10 117:16,18
117:21 121:4
128:2,6 129:23
134:6 135:22
136:24 137:13
140:9 144:10

146:20 149:14,16
156:5 157:2
162:11 164:4
165:24 171:4
175:9 178:9 182:7
204:1 205:18,25
211:24 224:4,10
224:14 232:5
233:20 234:8,21
235:1 241:15
243:12,14 244:12
247:21 253:4,22
256:2,5 259:5
260:24 261:2
264:14
**compete**  235:6,16
236:10
**competition**  235:7
**competitive**
234:12
**competitor**  236:14
**compile**  233:19
**compiled**  231:13
**complained**  93:10
93:15
**complaining**  220:5
**complaint**  5:25
241:7
**complaints**  83:13
230:7
**complete**  8:16,24
254:4 264:10,20
266:4,6
**completed**  267:17
**completely**  105:25
**compliance**  264:3
264:13
**compliant**  236:23
237:2
**complicated**
134:14

**complying**  236:16
**component**  253:4
**composite**  44:25
**compound**  236:3
**compressing**
178:14
**concern**  81:8
**concerned**  253:16
**concerns**  114:8,12
222:9,11 236:22
**concessions**  235:9
**concluded**  8:14
263:9
**conclusion**  75:22
**conditions**  54:24
**conducive**  194:14
**conduct**  55:16
57:5 58:1 106:11
107:4 136:12
**conducted**  112:22
**confident**  113:23
171:23
**confidential**  15:6
15:7,9,11,12
108:19,23,24
109:1
**confidentiality**
109:4
**confirm**  43:15
107:14 213:8
255:2 256:3
**confirmed**  107:15
**confirming**  242:9
**conflict**  259:25
260:3,4
**confusing**  125:1
**confusion**  104:11
**conjunction**  240:2
240:5,9
**consider**  41:12
57:14 216:5

**considered**  55:5
**consolidations**
183:3
**constant**  191:9
**constraints**  10:17
250:1
**consult**  211:25
**consulted**  211:23
213:4
**consulting**  212:4
**cont**  4:1 5:1 6:1
**contacted**  213:21
264:16
**contained**  55:6
**contains**  54:20
**contemplated**
164:11 166:11
**contemporaneou...**
75:3
**contend**  227:2
255:5
**contending**  228:8
**contends**  224:3
241:22 242:4,19
254:25 255:9,14
256:4 258:25
**content**  24:18,20
147:9
**contention**  81:12
82:12,22,24 83:8
83:21 87:21
131:18 133:8
172:23 220:11
**contentious**
155:13
**contents**  24:25
47:20 115:18
116:3 127:18
214:7,9 253:20
**contesting**  244:12

**context** 139:8
144:16,21
**continually** 220:5
**continue** 82:25
83:6
**contract** 17:21
26:15,18,20,22
41:7 42:5,7,17,23
43:2,13,13,25 44:1
44:18 51:4 56:12
62:11 63:1 65:3,7
73:1 80:14 81:9
81:10,13 89:17
90:13 106:10,18
106:22 107:11
130:4,11 134:16
135:4 137:3
138:20,22 139:2
140:6 144:11
145:4 174:3 205:4
211:7,19 213:6
229:6 244:23
246:22,24 248:9
248:11 253:14
255:9,15 264:14
**contracts** 41:18
44:9,12,15 49:12
49:17 98:12 99:4
99:5 117:12
146:11 147:11
174:25 212:2
226:17 264:8
**contractual**
117:19
**contributing**
232:24
**control** 155:25
**controlled** 80:24
**convenience** 177:8
**conventional**
230:16

**conversation** 25:1
36:10 37:1 48:9
51:7,10 53:9
87:20 153:23
154:21 156:6
162:23,24 166:21
168:19 170:18,22
170:24 209:15
**conversations**
27:14 35:25 36:19
36:22,25 47:23,25
48:5 80:5 90:25
91:12,15 92:19
93:8,10,12 106:8
119:6,11 147:7,19
153:10 155:20
209:11 220:2
222:12 254:8
**coo** 21:2,7,11,14
21:18 22:16 32:3
55:17 98:15 122:6
136:14,19
**coordinator**
250:12
**coordinators**
266:3,8
**coos** 98:17
**copies** 266:8
267:13
**copy** 8:6 50:5
113:8 213:12
266:6
**corner** 10:3 45:4
45:19 91:25 92:2
**corporate** 20:19
151:8 158:13,17
177:2 194:16
199:24 222:17,19
**corporation**
158:21 237:18

**correct** 14:7 18:13
20:5,6 29:20
30:11 35:19,20
39:9,10 43:14,16
44:20 47:7 49:10
49:11 50:1,2
53:21 54:7,11,14
55:22 56:9 59:7
59:14,17 61:19,20
61:24,25 64:7,8,15
64:16 65:1,9
66:13,14,19,25
67:13,14,18,20
68:9,10,17 69:17
69:18,20 70:1,2,6
70:12,23,24 71:1,2
71:10 73:25 74:3
84:15,20 88:14
91:9,10 97:25
98:2,9 99:5 100:5
100:6,20 102:13
107:9,16 122:13
122:14,17,20,21
131:11 132:3,17
132:19 134:8,9
135:18,19 136:17
136:18,19,20
140:13,14 143:15
143:16 145:16
152:2 161:6 163:4
164:5 168:13,14
170:25 173:14
175:12,16 180:8,9
186:22,25 187:1,3
187:5 188:7
190:14 191:25
193:18,24 194:6,7
194:22 195:15,23
201:21 204:4
205:18,19 206:1
208:15 209:3

210:22,23 211:3,9
211:20 213:22
215:24 217:7,15
224:16,20,24
226:15 227:19,20
228:12 231:1,2
232:6 233:17
244:20,21 247:10
252:8 255:6,7
258:3 264:20
265:14 266:4,6
**corrections** 267:7
268:14
**correctly** 17:14,23
38:5 67:25 89:11
107:22 177:12
198:22 223:3
228:20 245:15
247:3,8
**correlate** 230:19
**cost** 158:5 193:7
193:21
**costs** 158:13 159:3
161:12 162:12
163:2,17 164:9
193:23 217:19
218:10,13,15
219:8,14 224:8
**counsel** 2:1 15:5
25:4 27:22,24
28:8,18 29:1,22
30:10 31:25 51:2
75:19 84:7 105:3
128:12 137:16
212:1,16 237:1,1
238:16,25 264:2
265:17,19
**counsel's** 92:5
**countersigned**
58:22

**countrywide** 19:9 20:1,9

**county** 265:4

**coup** 210:5

**couple** 19:10 126:11

**course** 7:22 15:16 55:15 57:4 58:1 102:1 106:11 107:4 136:12 179:9 212:5,6,11 223:9 224:11 227:19

**court** 1:1 7:4 8:3 8:24 9:3 77:9 92:9 92:17 93:2 159:17 159:20 238:4 262:17,23 264:5,9 264:21 266:5 267:15,18

**court's** 77:5 262:12

**cover** 125:18

**covered** 94:4 223:24

**covid** 40:22

**cpa** 111:12 112:1 114:3 211:13 213:1

**cracks** 176:19

**crazy** 138:4,8 232:25

**created** 74:17,21

**creating** 159:7

**credit** 204:19

**criteria** 259:13 260:7

**curious** 203:5

**current** 10:24 35:16

**currently** 72:12

**cut** 106:6 174:18 174:22 204:12,21 226:1 234:15

**cv** 1:6

**d**

**d** 1:7 3:1 5:8,22 6:5 132:2 243:18 251:20 252:3

**damages** 249:7,12 255:16

**dark** 92:3 113:21

**data** 74:21 75:3

**date** 3:23 4:9,14 4:24 12:17 25:3 37:1 63:20,20 72:25 73:1 88:24 88:25 127:18 139:17 164:14 166:7,14,16 167:12 183:15 186:6,7 205:15 206:6 253:7 261:18 265:2 267:3

**dated** 26:22 46:15 103:25 118:1 126:14 127:14 128:13 130:12 137:13 142:12 143:14,18 185:14 186:5 197:16 201:18

**dates** 33:17 72:18 72:23,25 94:12 186:14

**dating** 183:14

**day** 32:2 34:1,5,11 34:13 35:22 40:11 40:18 41:1,1,2,24 43:23 46:17,21

97:18,23,24 165:2 169:15,17 174:15 179:2,20,20,21 180:6 181:14,19 186:12 189:10 191:15 209:25 220:22 253:24 254:12,15 265:21 269:21

**days** 34:25 44:14 58:5 72:3 77:7 151:22,24,25 165:5 168:9 169:25 170:6,25 171:6,11 172:25 173:19 175:18 267:3

**deal** 143:25 144:8 144:17,24 147:14

**dealing** 41:1

**debate** 203:12

**december** 27:7 121:25

**decide** 77:22 155:15 215:13 236:13

**decided** 53:2 105:4 108:15 153:12 210:1 220:21 239:14 257:1

**deciding** 117:17 161:21

**decision** 41:5,6 77:16 158:10 221:5,23 222:16 222:19 256:11,23 257:25 258:5,6

**decisions** 40:4,9 117:15

**declare** 252:7

**dedicated** 210:9

**deduct** 68:5

**deducted** 65:22,25 66:11,15,24 68:19 165:24

**defendant** 1:8 2:12 5:7,21 6:4 241:5 251:19 252:2

**defendant's** 3:14 137:16

**defense** 241:12 244:4 245:4,25 246:3,4,13 247:7 247:16 248:4,7,13 249:6 250:18

**defenses** 5:24 241:7 248:6

**definitely** 94:5 98:14,19 144:16 153:3 170:18 199:1 232:23

**degree** 13:6

**dekalb** 265:4

**del** 49:6

**deliberately** 215:1

**delicto** 246:6,11

**delivered** 104:15

**denied** 77:9 165:25 226:13,22

**depart** 181:22

**department** 29:6,7 46:4 74:12 79:1 79:13,18 96:3 159:4,8 231:18

**departments** 20:21 22:6 29:17 79:3,14,18

**depend** 123:17

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 283 of 321

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[deponent - distrust]

Page 13

**deponent** 265:8,15
267:2,6,6,7,9,15
**deposition** 1:11
3:10 7:24 8:14
13:12 14:2,3
15:16 16:9 23:25
24:3,6 25:8,9,10
25:17,18,21,24
26:5,9 32:1 44:21
90:2 94:21 97:2
103:11 122:12
126:8 128:11
137:16 142:22
145:12 160:4
165:7 184:10
192:12 197:10
223:19 238:1
240:13 242:10
248:3 251:6
262:10 263:9
265:2,2,13 266:11
268:11,12
**depositions** 13:17
25:13
**depository** 29:13
**depth** 135:10
226:9
**describe** 253:3
256:8
**described** 260:7
**designated** 30:2
117:7 262:13
**designee** 262:16
**desire** 268:10
**desk** 66:3
**destroyed** 215:7
**detailed** 35:14
**details** 4:13,22
59:1 94:16
**determine** 76:12
78:19 227:13

229:22
**determined** 78:5
78:12 101:23
102:1,23 232:5
264:14
**determines** 78:6
**determining** 77:23
**develop** 41:4
102:8 183:8
215:23 217:13
218:21
**developed** 198:8
**developing** 158:11
163:14 216:24
219:8
**diagram** 177:3
**dictated** 100:24,25
**dictating** 36:2
**difference** 53:14
77:15 78:2 188:5
188:14,19,25
189:10
**different** 79:2 86:6
98:17,18,21 106:1
114:14 121:19
122:1,7 124:1,16
124:19 127:18
140:7,23,25
141:10,19,21
162:3 187:21
208:10,10 209:10
209:23 210:20
230:5 233:20
234:4 236:14
**differential** 52:13
53:6,16 69:4,14
**differently** 9:25
**diminish** 172:6
**dinner** 179:20
181:18 239:18,22

**direct** 52:16
168:25 264:14
**directed** 36:1
173:23 215:19
**direction** 28:16
42:2 96:4 265:12
**directly** 42:10
231:22 232:2
**dirt** 215:20 216:10
**disagree** 118:12
**disclosure** 264:5
266:1
**disclosures** 3:15
89:23 90:19 264:1
264:2,3,15
**discount** 264:19
266:13
**discounts** 264:18
266:12
**discover** 192:4
**discovery** 82:1
238:1,22 254:2,4
**discretion** 71:16
234:4 237:4
241:17 259:18
**discuss** 28:2 35:21
37:9 38:17 41:2
50:25 113:11
151:8 153:18
179:10 257:18
259:10
**discussed** 16:4
27:18 28:5 34:24
35:24 37:24 38:2
52:23,25 57:20
81:4 84:14 104:24
119:4 131:15
136:8 143:25
144:8 147:14
151:12,20 161:8
161:11,13,14,24

177:11 178:8
179:22 193:23
195:11 202:11
223:21 241:21
242:3,9 249:10
253:4 257:14,20
**discusses** 54:6
**discussing** 8:25
54:13 154:23
156:24 157:11
161:15 162:5,21
193:17 212:25
243:13
**discussion** 151:16
153:5 156:18
157:23 162:10,19
162:21,25 164:7
194:2 258:10
**discussions** 38:7
47:20 104:10,22
155:7 186:2 202:8
236:24 238:16
253:14,16,18
**disheartening**
202:18
**disqualification**
264:6
**disqualify** 264:12
**disruptive** 204:8
**dissatisfaction**
81:1,8 82:3,5
90:15 91:2 92:21
244:24
**dissatisfied** 148:2
**distinct** 35:10
**distribution**
139:23
**district** 1:1,1
**distrust** 199:22,25
200:13,22 201:22
202:5,8,22 203:2,5

203:7 206:15
**distrusted** 200:7
**distrustful** 202:21
**ditech** 19:20,25
**division** 1:2 5:16
5:19 41:25 59:4
73:22 74:8 158:18
158:19 201:4
202:16,20
**doctrine** 245:5
246:5,15 247:18
250:20
**document** 45:16
46:2 47:17,21,22
48:12 50:13,19
51:20 52:9 54:16
55:22 58:15,19
70:25 89:24 95:16
104:14,16 127:9
129:22 137:6,23
139:23 140:3
143:10 184:12
185:18 192:25
241:3 252:19
262:11
**documentation**
260:21 261:12
**documents** 10:3,8
25:6,20 26:8,9,11
26:13 28:13,15,17
28:18 29:2,4,5,9
29:15 73:13
104:10 107:16
117:16 127:16
177:10 214:3
227:3 251:14
255:15 256:4
262:14
**docusign** 138:15
139:21 142:7
145:15,24

**dodd** 236:16 237:7
**doing** 9:24,25
35:16,18 38:13
44:10 62:18,18
103:9 134:1
145:23,24,24,25
153:24 201:11
202:10,19 209:23
221:1 222:1,5
230:16 241:5
247:9
**dollars** 161:22
219:17 221:19
**domain** 156:2
**dorado** 12:22
**double** 64:25
66:10 160:3
**doubt** 149:7
**dpa** 37:22 38:5,9
87:13,15
**draft** 96:2
**drafted** 70:25
**drafting** 95:25
110:15
**drastically** 195:13
**drawn** 138:14
**drive** 231:8
**drives** 29:17
**driving** 40:3,8
**dropdown** 198:7
198:17
**dropped** 17:14
**due** 193:7,25
229:3 248:17
267:3
**duly** 7:7 265:9
**duties** 22:2 245:1

**e**

**e** 3:1,6 4:1 5:1 6:1
48:17,22 49:22,23
58:7,9,15,19 59:13

71:8 72:6,11
132:3 146:7 265:1
265:1 267:18
268:8,9
**earlier** 23:17
24:24 41:10 63:13
70:9 73:12 81:22
85:7 88:18 89:1
96:13 97:24
106:18 131:12
136:4,8 145:14
153:16 225:22
**early** 80:15 119:22
120:24 149:1
171:18 206:10
**earn** 60:6 133:22
**earned** 248:15
**earning** 106:6
134:2,11
**easier** 30:22 79:14
153:13
**east** 5:16
**easy** 182:12
**eat** 218:7
**eating** 158:20
**economics** 38:11
158:23
**effect** 39:12 105:6
164:6 224:19
234:1
**effective** 3:22 4:8
4:14,19,23 63:20
88:25 104:18
256:10
**effort** 105:25
106:3 196:6 199:1
257:4
**efforts** 94:1
164:20,24
**eh** 138:5

**eight** 63:8 85:11
99:15
**eighth** 244:4
**either** 54:23 221:4
**el** 12:22
**electronically** 3:7
4:2 5:2 6:2 267:8
**elects** 88:22
**eleventh** 246:13
247:6
**eligible** 51:24 52:5
52:12 53:5
**eliminate** 166:3
**eliminated** 166:12
**eliminating**
256:18
**email** 4:4 5:4,12
5:15,18 46:12
95:8,13 97:12,22
97:23 98:2 103:24
104:2,5,23 105:4
139:22 143:17,22
144:15,20 145:3
147:4,6,9 185:1,8
185:13,22 186:9
191:20 192:17,21
194:21 195:5,14
196:11 197:13,14
197:18,22 198:1,4
200:1 202:12,24
202:25 205:16
207:2 209:7,12,21
**emailed** 31:3
146:2 194:5
203:13 262:18
**emailing** 197:19
**emails** 3:16,18
26:15 27:1 99:4
139:13 145:4,25
146:2 185:11
193:3 229:2

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[embodied - exhibit]**

Page 15

| | | | |
|---|---|---|---|
| **embodied** 149:21 | 77:14 122:8 | 57:16 68:1 103:1 | 191:21 |
| **emoji** 203:14 | 125:12,19 161:2 | 105:1 106:4,9 | **exchange** 104:9 |
| **employ** 99:11 | 170:11 180:13 | 111:21,24 114:1 | 185:8 |
| **employed** 32:17 | 181:5 195:14 | 114:12 119:15 | **excited** 148:20 |
| 33:2 49:7 175:5 | **entirely** 250:10 | 120:5 125:2 151:7 | 155:21 171:16 |
| **employee** 16:11,16 | **entitled** 53:20 | 154:22 155:9,14 | 172:17 182:22 |
| 27:23,25 29:12 | 226:22 238:18 | 163:7,14 164:19 | 202:13,15 |
| 78:25 79:8,10 | 248:3 | 164:21,23 176:25 | **excluded** 60:23 |
| 214:1 265:17,19 | **equal** 154:22 | 181:15 182:20 | 61:2 62:14 87:25 |
| **employees** 16:13 | 246:7 | 184:6 197:1 | 254:25 255:6,9 |
| 21:6 41:15 58:22 | **equipment** 44:10 | 199:11 204:15,21 | **excludes** 70:21 |
| 78:23,24 79:11,17 | 49:19 56:17 | 205:10 210:2 | **excluding** 61:1,23 |
| 80:7 81:13 102:22 | **eric** 101:4,14 | 220:23 258:15 | 62:6 |
| 102:24 108:20 | 102:10 199:14 | **everyone's** 161:4 | **exclusively** 266:8 |
| 146:11 160:16 | 207:6,12,16,23 | 214:18 | **excuse** 76:20 |
| **employer** 16:12,15 | 208:3,8,9 209:1,10 | **evidence** 130:20 | **excused** 244:6 |
| 27:23 35:16 | 219:23 220:6,12 | 138:15 142:7 | **executive** 19:10 |
| **employment** 3:12 | 220:16,24 223:5 | 145:15 146:13 | 20:10 238:8 |
| 12:7 16:10 17:21 | 260:1,5 | 225:18 253:21 | **exhibit** 3:8,9,12,14 |
| 26:15,18 45:1 | **erica** 49:6 | 265:15 | 3:16,18,20 4:3,4,6 |
| 46:3 47:1,11 51:5 | **eroding** 232:25 | **evp** 120:14 121:8,9 | 4:11,17,21 5:3,4,7 |
| 51:19 54:21 55:14 | **errata** 267:3,7,8,9 | 121:10 122:10 | 5:12,15,18,21 6:3 |
| 57:15 104:17 | 267:11,13,14,17 | 136:20 189:14 | 6:4 10:9 23:15 |
| 106:20 112:21 | 268:1,16 | **exact** 33:16 188:23 | 24:3 28:20 44:21 |
| 117:20 136:10,24 | **especially** 35:7 | 189:9 260:11 | 44:25,25 84:1,10 |
| 207:18 228:1 | 56:15 80:8 | **exactly** 71:24 75:5 | 90:2 93:23 94:19 |
| 247:18,19 248:13 | **esq** 267:1 | 76:7 89:16 127:24 | 94:21 95:1,6,7 |
| 253:16 | **esquire** 2:4,5,6,13 | 129:21 135:6 | 97:2,2,5,8,23 |
| **emulate** 35:15 | 2:14,21,22 | 161:15 164:25 | 99:17 103:11,11 |
| **enabling** 236:10 | **est** 1:16 7:2 73:8 | 166:22 | 103:16,18,21,24 |
| **endeavor** 182:23 | 120:9 150:11 | **examination** 3:2 | 104:2 126:8,8,9,18 |
| **ended** 181:12,14 | 196:25 223:12 | 7:9 | 127:1 130:21 |
| **ends** 233:1 | 250:13 262:4 | **examined** 7:7 | 136:3 137:10,11 |
| **engaged** 253:14 | 263:9 | **example** 51:5 | 137:17 138:11 |
| **ensure** 166:4,11 | **established** 102:19 | 227:12 | 139:6 140:5,15,20 |
| 190:10 | **estate** 218:18,22 | **examples** 259:20 | 142:17,19,22,24 |
| **entailed** 168:21 | 219:5,9 222:24 | **exception** 161:25 | 143:17 165:7,10 |
| **entered** 268:11 | **ethics** 264:13 | 259:5 | 184:10,15,17,20 |
| **entice** 172:25 | **evaluated** 154:1 | **exceptions** 157:8,9 | 185:2 192:12,15 |
| **entire** 23:7 32:2 | **everybody** 33:7 | 162:7 163:17 | 194:21 195:19 |
| 54:5,20 76:1 | 37:19 40:25 56:12 | 169:24 180:3 | 196:16 197:4,6,7 |

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 286 of 321
Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

[exhibit - find]                                                                 Page 16

197:10 207:1
223:18,22 240:13
240:16,17 251:6
251:18
**exhibits** 3:7 4:2
5:2 6:2 10:1 23:17
23:25 94:12 97:4
126:11 143:14
264:21,22,23
266:6,7
**exist** 215:6
**existence** 218:19
**exists** 118:9
**expect** 58:11
**expecting** 212:3
**expense** 124:24
156:16 188:3
198:8,17,24,24
**expenses** 78:18
124:2 153:25
154:2 161:20
163:22 165:23
168:22 177:2
187:24 188:6
198:24 260:25
**experience** 114:15
167:2 260:13
**expires** 269:24
**explain** 78:12
113:25 174:11
202:22 207:7
221:17
**explained** 15:14
35:6 188:8,11
193:13 203:2
**explaining** 47:16
242:14
**explanation** 187:6
187:14
**exploring** 210:7

**express** 81:1
**expressed** 81:7
82:3 166:17
**expressing** 82:5
**extended** 88:2
133:10
**extension** 234:10
**extent** 39:3 75:12
225:12 249:6
252:20,21
**external** 67:7
**eye** 167:23,23

**f**

**f** 265:1
**face** 254:9,9,12,12
**facility** 267:17
**fact** 81:2 84:14
148:2 151:16
153:6 159:1
161:16 199:11
209:1 210:21
211:6 220:3
246:23 248:15
**factor** 232:24
**factors** 216:5
232:20
**facts** 186:1 200:19
244:8 247:19
248:5,12 249:9,10
252:5
**faded** 180:20
**fail** 241:13 244:5
**failed** 244:9,25
249:7,12
**failure** 244:7
**fair** 164:17
**fairly** 149:15
**fall** 34:2 46:22
98:15 119:4
206:10

**false** 14:10,13
173:21
**familiar** 94:13
**families** 80:10
**far** 15:7,12 17:9
26:24 27:13 33:6
42:2 43:3,9 50:3
52:8 58:17,21
67:24 74:19 80:15
82:10 96:20 101:2
105:2 124:5 126:2
138:3 157:12
163:20,22 166:9
168:3,21 175:22
179:5 180:15
204:18 211:21
215:5 217:1 228:2
255:20
**fast** 86:21 220:9
**faster** 86:23
**fault** 246:7
**favor** 157:1
257:17
**february** 103:25
150:19 151:25
160:17 165:6,21
166:1,7 170:20
183:19 186:6
191:23 193:5,15
193:16 194:14
217:5 224:7 234:2
234:17 257:18
**fed** 3:11
**federal** 268:8
**feel** 8:19 34:10
132:8 176:11
202:9 203:8 220:3
226:16 237:13,19
237:21,23 248:8
**feeling** 113:23
248:10

**fellow's** 102:11
**fellows** 101:4
**felt** 50:25 107:8
108:1,7 114:6
149:15 155:25
165:6 171:23
172:19 202:14,16
202:18 221:4
229:3 237:1
245:14
**fewer** 39:15 40:14
**fifteenth** 250:18
**fight** 11:7
**figure** 153:8
183:25 190:12
**figured** 176:20
**figuring** 36:8
191:3
**file** 1:5 26:21
104:17 105:6
145:7 243:5 244:1
261:4 267:12
**filed** 12:14 14:5,6
14:17 24:16
237:16,17 267:14
**files** 29:12 58:23
142:12
**filing** 14:22
**fill** 267:7,8
**finance** 29:6 74:16
177:25 178:2
**finances** 108:2
**financial** 18:20
117:15 264:6
266:13
**financially** 184:1
265:20
**financials** 206:22
**find** 10:9 45:25
117:13 139:12
157:22 165:5

Christy Bunce

January 12, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

**[find - fresh]**

Page 17

167:1,7 220:15
**finding** 164:20
**fine** 7:16 15:2,10
15:11 119:24
120:6 147:25
196:20 197:23
239:4 249:10
250:11
**finish** 8:16 10:17
55:3 174:19
268:16
**finished** 233:5,9
**finley** 2:7 92:2
**fired** 109:8,12
**firm** 2:7 91:24
92:2,4,5 114:20
219:5 264:1,15
266:1
**firmly** 190:9
206:17
**first** 5:11,24 6:8
7:7 18:5 19:12,18
19:19 23:21 42:20
51:19 61:14 62:11
63:9 82:13 94:8
96:7 103:16
126:13,18 128:1,5
155:1 179:20
181:14 185:20,21
186:5 192:17
194:13 197:12,13
197:18 213:5
241:7 251:21
252:4 253:11
**fit** 32:18 41:22
108:15,17 109:10
220:7
**five** 21:8 26:7
85:10 196:22
214:11,21 223:7
223:10 250:1,3

261:25 262:2
**flew** 33:20 189:20
212:19 253:25
**flexibility** 157:13
**flexible** 50:21
**florida** 260:12
**flourish** 32:23
**flowed** 166:21
**fluctuate** 172:9
**fluctuated** 230:14
**fly** 40:23 206:2,7
**flying** 33:23
**focused** 36:15
174:11
**follow** 104:9
170:17 259:11
262:10,21
**followed** 224:14
224:18
**following** 62:1
63:4 65:22 85:9
264:1,3 268:6
**follows** 7:7 60:1
129:2
**forcing** 101:21
**foregoing** 252:8
253:13,18 254:22
255:25 265:6
266:3
**foresee** 176:16
**forever** 144:4
148:15
**form** 14:11 15:24
17:17 21:16 37:15
38:24 39:3,17
43:6 44:4 49:14
51:13 52:6 54:8
56:25 57:7 65:10
66:20 67:2,19
70:2,13 71:20
74:23 77:17 78:8

78:10 79:4,22
83:17 84:16 86:10
89:6 91:5,6 96:9
96:19 105:13
106:13 107:5
109:17 112:24
115:5,19 116:5
118:3,13 121:15
121:21 122:3
123:24 124:17
125:15 127:16
129:18,21,24
131:13 132:4,20
134:24 135:24
136:25 138:6
140:24 141:5
144:12 145:19
146:16,18,25
148:5 151:14
152:24 153:23
155:5 162:13
170:1,13 171:13
173:2 180:19
181:3 184:2
188:17,21 189:3
190:18 192:6,8
194:8 195:25
200:3,14,25
208:16 210:24
212:7 216:25
217:25 219:10,19
221:11,20 224:21
227:5,21 228:13
229:13 230:10
232:16 235:3,10
235:13 236:3,18
241:24 242:11
245:8 246:16
247:12,22 249:2
249:13 254:7
255:10,17 257:7

258:1,8 260:9,20
261:10 268:10,14
**format** 46:12
140:4 151:5
**former** 16:12
**forms** 253:18
264:5
**formula** 216:15
**formulated** 194:15
**forth** 42:14 112:14
112:18 144:17
190:11,22 191:2,7
191:10,12,19
**forward** 147:12
182:6 186:3
267:12
**foundation** 115:6
115:20 118:4,14
123:14 160:24
163:18 170:2,14
171:14 173:3
181:4 192:8 194:9
196:1 202:2
210:25 213:14
214:10,19 215:9
225:17 228:14
**four** 19:11,23 20:1
26:6 60:4 61:4,5
63:13 85:10 222:6
**fourteenth** 249:6
**fourth** 123:9,21
232:10,25 233:1
**frame** 164:22
**frank** 236:16
237:7
**free** 8:19 152:24
153:23 215:25
238:21,22
**freezing** 141:14,15
**fresh** 134:1

Case 1:20-cv-04981-CAP Document 106 Filed 04/28/22 Page 288 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[friday - gina]
Page 18

**friday** 31:4
**friends** 176:17
**friendship** 206:19
**frommert** 95:9
  96:4 97:13 100:4
  100:8 103:25
  104:3 107:19,23
  109:3,25 110:2,16
  111:6,11,15
  112:20 115:14
  178:23 191:24
  192:1,4 211:12
  213:11
**front** 76:6 165:11
**froze** 142:17
**frustrated** 201:14
**full** 8:4 10:22
  139:8
**fullerton** 13:2
**fully** 124:3 125:6,8
  158:4 187:22
**function** 21:24
**fund** 5:8,22 6:5
**fundamentally**
  147:1
**funded** 23:5,6
  59:22 61:16 62:5
  62:17 128:24
**funding** 1:7 2:21
  2:22 7:21 20:17
  20:20 31:9 32:17
  39:24 40:2 41:16
  41:19 42:4 74:13
  88:8 106:2 108:16
  109:10 148:18
  149:8,9 230:13
  246:20
**funding's** 241:6
  251:20 252:3
**funds** 218:4

**further** 260:10
  265:16 266:5

**g**

**game** 37:6 114:17
  242:22
**garza** 152:9
  183:16
**gate** 163:6
**gather** 28:13
**gathered** 135:4
**general** 14:9 25:4
  27:22 105:3 180:3
  211:25 237:1
**generally** 99:4
**generated** 52:14
  53:6 75:2
**georgia** 1:1,23
  2:10,18 11:24
  33:24 264:3,9
  265:4 266:3,8
  267:18
**getting** 21:24 80:3
  87:25 95:5 106:4
  107:10 133:1
  209:22 220:4
  229:2,5 238:22
  247:2,8 248:21,25
**gfe** 4:13,23 63:19
**gibson** 2:4 3:3
  7:10,13,17 8:8,11
  8:12 14:14 15:8
  15:18,22 17:19
  21:19 23:19,21,24
  24:2,4,23 30:4,7,9
  30:24 31:6,7 38:1
  39:5,18 43:7 44:5
  44:22 45:13,15
  49:15 51:14 52:10
  54:9 57:1,12
  65:12 66:22 67:3
  67:21 70:14 71:22

73:3,9,11 74:24
75:14,20 76:16,18
76:21 77:3,11,20
78:11,21 79:16
80:11 82:18 83:2
83:11,25 84:18
86:16,18,21,25
87:5 89:18 90:3
90:12 91:20 92:9
92:14 93:4,6
94:20 95:4 96:10
96:23 97:7,11
103:13,17,22
105:15 106:16
107:13 108:25
109:7,21 113:1
115:8,21 116:6,8
116:12,21 117:5
117:10,22 118:5
118:18 119:18,24
120:3,6,10,12
121:17,23 122:4
123:20 124:7,20
125:21 126:10,19
126:21,23 127:2,4
129:12 130:5
131:19 132:10,22
135:8 136:2 137:4
138:10 139:20,25
140:2 141:9,14,16
142:18,23 143:3,6
144:13 145:10,20
146:18,21,23
147:2 148:7,12
149:24 150:4,7,15
150:17 151:19
155:11 159:25
160:5,6 161:1
162:15,18 164:1
165:8,17,18 170:9
170:19 173:4,8

174:9,14,20
175:24 177:7,9
180:22 181:8
182:4 183:7 184:7
184:22 188:18,24
189:5 192:10,13
194:11 195:19,21
196:8,14,19,22
197:1,7,9,11 200:6
200:20 201:17
202:6 211:1 212:9
213:15,16,24
214:12,23 215:2,3
215:12 217:3
218:3,25 219:6,11
219:20 221:12,21
223:7,10,13,15,17
224:25 225:22,23
226:4,12 227:6,23
228:16 229:15
230:18 232:19
233:8 235:4,20
236:5,21 238:10
238:24 239:8,10
239:11 240:11,14
240:24 241:25
242:13,18 243:3
245:10 247:4,15
247:25 249:4,16
250:7,15,17 251:3
251:7,10,16,17
254:11 255:12,18
257:10,23 258:4
258:18 260:6,16
261:1,15,24 262:3
262:5,20,24 263:4
263:7
**gina** 1:4 2:23 5:10
  6:7 32:8,15 33:9
  33:21 34:2 35:2,6
  36:4,9 38:8,17

Case 1:20-cv-04981-CAP Document 106 Filed 04/28/22 Page 289 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[gina - going]
Page 19

39:25 40:5,9,13
41:3,21 42:21
43:1 46:8 48:4
51:24 52:12,17,18
53:5,16 56:16
59:3 60:22 62:7,8
62:18 68:3 72:10
74:9 80:1,5,16,18
80:25 81:12 82:22
83:9 87:22 91:13
91:16 95:19 97:13
98:8 99:13 100:13
101:15 102:5
105:2,22 106:23
112:23 113:16
123:12,18 124:6
124:11 130:3
131:18 133:8
143:22 145:4
147:8,19 148:16
148:18,23 149:4,6
155:17 169:1,4,8
169:10,11,18
170:24 171:16,25
172:12,19,23,24
173:21,22 174:24
175:3 176:12,15
176:16 179:13,23
181:22 182:14
185:9,12,12
192:22 199:15
200:10 201:8
203:18 204:11,25
206:8,17,22
207:15,16 208:9
209:2,23 211:5,12
211:24 212:13,23
215:17 218:15,21
219:13 220:4,7,17
221:9,15 222:20
222:23,25 223:4

226:9,16 227:25
230:1 232:2
236:22 237:14
242:25 244:12
246:17 248:8
251:21 253:25
260:5,12
**gina's** 26:15 39:21
48:2 66:16 67:22
68:19 85:1 89:17
114:4,8 130:11
139:7 185:13
186:9 200:5
216:17 230:12
233:21 244:1
**girls** 144:4 148:15
148:16 149:2,10
180:7 202:14
203:3 206:3 220:1
221:25
**gist** 170:6
**give** 7:23 8:2 19:6
23:15 43:23 45:7
86:12,20 89:25
94:12 142:16
143:1 161:10
164:22 177:8
196:22 207:12
221:16 250:4
251:13
**given** 13:12 46:8
100:16,18 135:5
138:12,14 142:8
187:7 241:14
242:25 245:18
265:15 268:12
**giving** 14:2 222:8
234:3
**glut** 133:25
**go** 12:21,24 13:1,3
14:23 15:24 16:17

17:6,11 23:24
28:20 30:5,6,24
48:24 50:7 51:18
51:18 53:22 54:5
54:10,15,19 59:9
60:16 61:21 62:1
63:3,25 69:13
71:7 73:9 77:10
78:16 82:9 83:3
83:19 84:1,9
90:18 94:8,10
95:2 98:1 100:3
101:3,10,24 102:3
102:4 103:4
113:25 116:6
120:10 124:21
128:14 129:7,14
131:2 133:15
135:14 136:3
137:21 138:18
139:13 140:17,19
141:6,24 145:21
146:1,24 147:23
149:25 150:15
151:21,21 153:17
155:6 156:15,20
157:8,12 160:25
163:7,19 165:19
168:10 171:17
172:14 182:6,10
185:5 187:9 189:6
189:7 192:23
196:19,23 197:1
198:13 199:3
200:12 206:23
207:1 210:20
213:17 215:4
223:15,23,24
225:1,25 226:8,25
229:16 231:24
232:8 233:10

234:7 235:11
236:4,14 239:18
241:10 242:23
243:4,5 244:1,3
246:3 250:8,9,15
251:25 253:10
254:17 255:22
256:7,14 257:15
258:5,6,9,17 261:4
261:18 262:5
**goal** 198:5 204:7
**god** 141:11 189:4
**goes** 49:23 98:22
199:17 244:11
246:23 256:24
**going** 7:20,23 8:6
8:23 9:15,15 10:1
10:2 15:17 16:3
19:23 23:14,17
24:25 30:4 37:25
38:3,6,11 39:2
43:23 45:23 62:16
73:3 78:10 87:4
99:8 101:1,25
109:11 111:25
113:12,14,15,18
113:22,24 116:15
123:9 124:25
142:25 151:9,10
153:7 154:15
155:15,15,21
158:12 166:23,23
167:1,7,8,11 168:2
168:5,8 170:7
171:5,5,7,11
173:13 175:11
176:7,12 178:13
182:6,23,25 183:3
185:6 191:5,6,7,13
191:15,17 196:10
199:5,19,22

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[going - henry]**

Page 20

203:18 205:3
206:12,19,21
207:16 210:19
212:13 213:1
220:14 222:13
230:23 232:22
234:24 235:17
238:6 239:3
240:15 242:7
249:21,23 250:4
256:14,20 257:5
257:14,18 258:14
258:16,19
**golden** 2:15 267:1
**good** 7:11,12,15
34:10 40:9 41:22
102:19 108:8,15
108:17 109:10
111:21 114:20
120:8 149:24
150:5,9 163:14
171:24 172:1
185:23 193:4
202:20 206:18,20
207:7 220:6 221:1
221:1,5 228:25
230:13 260:13
**goodness** 13:24
33:16
**gosh** 13:23 18:9
19:22 21:8 26:6
120:19
**gotcha** 48:23
208:12
**gotten** 29:6 83:10
133:24 220:17
**government**
230:16
**graduate** 18:8
**graduated** 13:7

**granted** 215:22
**great** 19:17 32:20
73:7 182:25
203:15 257:25
**green** 18:22
**greenlight** 18:20
18:23,24 19:11
20:1,2
**greetings** 267:5
**gregory** 2:15
267:1
**grew** 21:2,3 22:1
**ground** 7:24
**groundwork**
199:21
**group** 39:23 56:15
65:17 87:24 99:14
101:15 152:15,18
153:8,12 154:10
155:10,16,17,18
155:19 156:18
169:6 178:19
179:3,18,19,23
180:7,11,14 199:6
257:4,25 258:6
**groups** 220:12
**grow** 32:22
**growing** 21:24
158:15 220:9
**grown** 98:19
101:18
**growth** 194:15
199:20,20 222:14
**guaranties** 134:2
**guaranty** 63:22
68:7 81:14,20
82:15 83:21,24
84:23 85:3 87:21
88:2,12,16 131:22
133:11,21,23
134:12,12

**guardrails** 168:4
**guess** 19:23 72:12
157:25 217:5
**guessing** 16:22
**guidelines** 162:6
**guys** 91:18 143:24

**h**

**h** 3:6 4:1 5:1 6:1
**half** 73:4
**hand** 7:5 45:4,18
91:25 92:1 101:21
247:1,7
**handed** 177:10
**handful** 33:20
**handle** 114:6
199:22
**handled** 266:7
**handout** 176:24
177:1
**hands** 245:5 246:1
**happen** 43:21
155:15 164:16
166:24 178:13
199:13 207:19,23
207:24 208:3,5,5,6
208:14 209:15
254:8
**happened** 89:16
113:3 144:2
178:12 190:3,4
234:10 259:23
**happening** 228:23
229:1
**happens** 42:12
58:9
**happy** 9:16 35:17
79:21,25 80:7,16
109:20 111:24
112:8,12 173:13
175:11 182:3,20
196:10 199:15

201:7 202:20
203:3,4 205:11
**hard** 80:5 105:22
**hargrove** 2:5 90:6
116:9 184:9,14,20
208:21 240:22
**he'll** 15:23
**head** 27:2 69:15
72:19 87:9 89:11
218:20 243:7
**headquarters**
154:4,7
**heads** 157:10
231:19
**hear** 20:18 22:25
169:22 170:5
180:23 260:2
**heard** 155:19
159:11,21 160:9
160:18 161:4
**heated** 209:22
**hedge** 158:5
**held** 154:4 177:16
179:4
**help** 10:4 22:1
28:9,13 45:25
108:2 168:25
184:1 194:24
196:6 211:18
221:25
**henry** 2:13 8:8
15:18 30:4,17,24
37:17 73:5 76:18
86:18,21 94:20
108:21 116:6
119:21 125:17
140:1 160:1 177:7
224:23 235:12
238:10,24 242:13
242:18 262:9
263:7 267:1

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[hey - interim]

Page 21

**hey** 214:17 229:5
238:10
**hi** 143:22
**high** 12:21,22
36:11 99:14 134:1
134:2 230:19,19
**higher** 50:22
235:24,24
**highlight** 247:1
**highly** 102:15
**hire** 32:14 56:15
133:21 166:25
182:10 215:21
**hired** 20:7,11,12
20:13 21:11 22:19
32:6,11 33:12,22
35:18 41:13 43:5
43:18 107:21,25
120:18 178:23
191:24
**hires** 40:20 44:8
68:8,9
**hiring** 40:20 42:21
43:10 50:22
153:20 163:13
213:5 216:9
**hit** 158:13 240:23
**hitting** 163:23
198:25
**hold** 45:20 134:23
134:23 142:16
145:1,18 146:15
**holds** 109:23
**honest** 118:9
**honestly** 17:14
23:12 87:23 171:9
172:19 207:4
**honored** 202:14
**hope** 104:7 214:3
**hopefully** 16:5
204:22

**hopes** 165:4
**hoping** 97:19
167:2
**hour** 73:4 120:2
257:13 262:25
**hours** 26:6 200:10
200:10 203:17,17
262:22
**house** 52:14
212:16 240:1,4,7,8
**hr** 42:7,9 57:6
104:17 135:23
136:13 243:5
**huge** 87:24
**huh** 9:23 60:19
126:23 181:16
218:11
**human** 26:20 29:7
34:18 42:4,17
46:4,5 49:5 50:14
51:1 55:17 96:3
110:11,22 139:15
**hundred** 53:15
107:17 179:14

**i**

**idea** 257:25
**identified** 29:22
30:12 37:13 68:13
81:10,23 85:17
90:19 112:20
144:10 225:15
226:21 227:11
254:1
**identifies** 90:22
**identify** 10:7
23:10 31:22 45:24
256:1
**identifying** 253:6
254:23
**immature** 158:16
201:15

**immediately**
132:15
**impact** 194:17
**impacts** 212:2
**impartiality**
264:13
**imperative** 35:8
**implies** 210:15
**important** 40:25
80:6 105:17 106:8
114:2 152:12
**impression** 40:7
85:4 175:13,14
208:20,22 209:8
211:22 219:3
**inaccurate** 160:21
160:22
**incentivize** 235:8
**incentivizing**
235:23
**include** 60:12
162:25
**included** 55:10,12
255:14
**including** 71:14
94:1 105:22 161:5
201:8 229:19
241:16 250:21
**inclusive** 205:7
**income** 154:19
**incorrect** 181:2
**incorrectly** 193:12
**incurred** 154:1
**indicated** 60:6,13
62:4 68:14 69:4
**individual** 31:18
31:23 32:3 181:19
253:6
**individually** 117:9
189:17 238:25

**individuals** 118:11
**inducements** 55:8
55:12
**industry** 33:8 35:5
80:9 158:25 172:5
**inform** 94:1
**informal** 151:7
183:24
**information** 31:10
93:24 112:21
231:4 252:6
255:21
**informed** 165:22
**ing** 104:3 192:19
**ing's** 5:9,23 6:6
**inherited** 260:15
**initial** 3:14 44:8
49:17 53:3 56:11
56:20,23 81:12
89:22 90:19
105:11 133:24
**initially** 41:8
130:4 133:3
**initials** 48:14
59:13 71:9 104:14
**input** 74:21
162:23
**inputting** 159:6
**instruct** 239:4,6
**instruction** 226:7
**instructs** 15:24
**interaction** 80:2
**interest** 186:3
234:15,21,25
235:2,9,22,24
236:7 264:7,11
**interested** 39:24
265:20
**interim** 163:13
190:23

Case 1:20-cv-04981-CAP Document 106 Filed 04/28/22 Page 292 of 321

Christy Bunce

January 12, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[internal - kelly]

Page 22

**internal** 67:7
122:8 158:19
**interpreting** 89:11
**interrogatories**
6:8 28:10 251:22
252:5
**interrogatory**
253:2 254:17
255:23 256:8
258:20,22 259:3
259:12
**interrupt** 126:25
**interworkings**
38:21
**introduce** 81:6
82:1 89:22 126:25
184:7 192:10
240:11
**introduced** 128:11
137:15
**introducing**
240:15
**invest** 219:7
**invested** 218:4
219:17 221:18
**investment** 217:15
**investments**
216:23 217:2,22
218:2
**involved** 17:25
33:10,18 34:11,12
48:3 91:12,15
93:19 95:25
105:21 110:14,17
110:19 178:20,25
228:2
**issue** 50:23 61:11
61:24 63:12 88:21
160:3 238:3
**item** 69:22

**items** 65:22 66:11
68:19 252:23

**j**

**jackson** 2:6 92:6,6
**jan** 27:24 34:16
47:6 65:20 68:23
93:18,19 95:9
97:13 125:2
135:18 150:25
152:23 162:23
169:12,18 177:22
179:7,12,16
183:21 186:16
192:18,21 197:14
197:20 200:9
202:7 203:13,14
204:5 220:20
221:7 253:13
**janet** 223:2
**january** 1:15 7:2
27:10 73:14 75:23
76:21 121:25
125:23 137:14
142:13 157:21
234:2,17 265:2,21
**jason** 34:15 108:3
109:24 151:1
152:23 156:11
157:10,19 159:5
162:4 167:7
177:22 178:24
179:7,12,15 185:8
191:8,8 231:22,23
**jean** 231:18
**jim** 29:6 73:16,19
150:25 169:18
177:22 178:1
179:8,12,16
**job** 19:12,18,20
21:2,20 22:2,5
98:16 163:11

221:1 245:1
**jobs** 98:18
**joe** 53:14
**join** 172:3
**joined** 45:10 91:24
92:4 193:5
**joining** 34:20
**jon** 34:16 93:21
119:14 120:13
122:9 123:11
124:2,11 125:2
151:1 152:23
156:14,19 162:23
169:11,18 177:22
178:20 179:6,12
179:16 180:5,13
185:13,23 186:16
189:17,20 190:3
192:18,21 197:15
200:9 203:17
211:12 212:19
220:20 221:7
**joseph** 11:11,19
**judi** 90:8 263:4,5
**judith** 1:21 265:24
**jumbo** 61:23 62:5
62:9,14,16,22
70:21,22,23
**junior** 61:10,23
63:19 88:23
**jurisdiction**
216:11

**k**

**kaitlyn** 11:19
**keep** 173:19,21
176:8 203:4
205:10,11 217:18
221:17
**keeping** 40:5
**kelly** 28:6,7 32:8
32:15 33:9,20

34:2 35:2 36:1,1,8
36:15 38:8,17
39:22,22,23 40:3,8
40:9 41:3,21 42:2
42:21 43:1 48:2,4
52:12,17,18,18
53:5,15 56:15
60:22 62:6,6,18
68:3 74:8 80:18
80:20,24 81:12
87:22 89:17 91:13
91:16 93:18 95:9
95:19 100:13
101:15 102:6,6
112:23 113:15
114:8,15 131:18
133:8 139:6
143:22 145:4
147:8,19 148:17
148:23 149:4,8
169:12,17 171:16
171:16,18,23
172:12,16,23
173:21,22,24,25
174:4,24 175:2,3
176:12,13,15,16
179:13,23 181:21
182:14 185:9,11
192:18 196:12
199:15 200:2,5,19
201:8 202:22
203:18 204:11,25
206:8,17,22
207:14,15,25
208:5,9,14,23
209:2,12,18,23
210:8,23 211:3,5
211:13,24 212:13
212:23 213:2
215:17 216:2,16
218:15,21 219:3

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[kelly - leadership]

Page 23

220:4,5,7,17 221:3
222:25 223:4
230:12 232:2
233:21 253:15,25
260:5,12
**kelly's** 41:6 114:3
211:13 230:1
260:17 261:4,5
**ken** 2:22 25:4
207:5,13 212:21
**kept** 40:1 230:25
231:4
**kevlar** 73:15 231:9
**kicking** 105:7
**kind** 22:4,4 36:2,5
39:23,25 40:2,5
44:11 99:12
101:21,23 105:7
112:16 113:20
124:1 154:12
155:24 156:1,14
156:21 157:24
158:16,22 163:23
167:5 168:22
191:3,9 195:8
216:8 222:13
230:14
**kinds** 38:18 40:14
**knew** 147:10
163:11 168:10
171:5 176:13
201:5 204:14,16
213:1 221:3
257:16
**know** 7:17 9:16
10:1,12,19 14:18
14:20 15:7,12
16:6 17:11 21:24
23:13 27:6,9,11,13
28:18,23 30:19
32:8,21,22 33:4,6

33:9,16 34:19
35:6 36:6,11 37:5
37:24 38:13,20,20
38:23 39:1,6,11,22
42:20 46:6,7,13,17
47:19,22 48:6,11
50:12 51:7 52:8
56:4 58:4,17,21
63:15,17 65:13,15
65:18 66:15,17
67:22,24 68:20,21
68:22,23 69:14
71:19 72:9,18,24
74:19 75:5,6 76:7
78:17 80:1,20
81:15,25 82:4,11
84:6 87:14 89:3,4
89:8 93:14 94:23
97:18 98:17 99:7
99:8,9 101:4
102:1 103:7
104:25 106:21
108:18 111:24
112:4,4,20 114:2,5
114:8 115:11,16
115:17 117:3,23
118:8,9,16,16,19
118:24,25 119:2
120:2 124:5,5,25
127:7,17 129:22
130:18 132:25
135:11 137:21
138:12,13,20
139:4,11 140:19
143:9 146:4,13
152:8,12 153:9,18
155:17,23,24
157:5,11 158:15
158:25 162:23
163:15 164:13,23
167:9,11 168:22

168:23 170:16,24
172:22 173:18,24
175:17,23 176:15
177:4 178:14
179:7,10,16
182:20 183:5
184:23 187:20
188:23 189:2,9
190:5,6 191:16
193:10,12 195:10
196:12,15 197:22
198:19 199:12,18
199:24 200:17,19
203:2,2,16,17
204:16,19 205:6
205:10 206:6,14
206:16,18 209:15
209:21 210:2,19
211:21 215:5,17
218:17 219:14,18
220:6,14 222:5,11
226:10 228:2
231:9,17 237:13
237:16 238:18
239:2 242:2,6,12
242:15 243:2,7
245:16 246:6
247:24 248:3,17
248:20,21,23
254:14 255:20
258:23 261:9,14
261:17
**knowing** 167:6
**knowledge** 31:21
113:2 116:2
189:19 213:20
243:22 252:6
255:4,11 256:6
259:2,9 261:21
**known** 31:10

**knows** 116:3
117:24 148:16
149:6 244:9
**kristin** 198:7
199:2

**l**

**l** 1:21 114:21
156:1 265:24
**laches** 246:15
**lack** 222:14
**lag** 251:13
**landscape** 195:12
**lane** 10:23,25
**language** 50:24
96:21 129:20
134:10
**large** 179:19
**largely** 253:16
**larger** 179:18
180:14
**las** 183:8 240:1
**latin** 246:7
**law** 71:18 264:4
**lawsuit** 13:10
16:10 24:16 25:2
25:6 27:18 115:11
119:8,9 237:10,12
238:4,20,21,22,23
**lawyer** 7:18,25
15:15 25:1,23
27:16 111:12
211:18,23 212:24
**lawyers** 16:4
**le** 4:13,23 63:19
**lead** 132:8 233:14
233:15
**leader** 173:25
**leaders** 148:21
188:4 205:7,7,8
**leadership** 99:14
150:19 160:17

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[leadership - look]**

Page 24

164:8 165:21
166:8 169:6
170:21 176:3
177:17 178:6,21
179:3 180:6
181:11,14 182:16
183:20 186:7,11
186:12 191:23
193:16 199:15
201:19 205:15
224:7
**leading** 162:10
253:8
**leads** 39:23
**leaning** 162:6
**learn** 24:15 25:2
33:4 112:11 126:5
**learned** 111:6
**leases** 49:19 56:16
**leave** 39:14 108:11
108:14 120:23
205:21 207:15
209:3 211:6
246:19,20
**leaves** 214:1
**leaving** 114:9
176:16 207:17
222:23
**led** 149:20
**left** 45:4,18,21
167:6
**legal** 51:2 75:19
207:5,12 252:22
**leitz** 1:21 265:24
**lenders** 235:17
**letter** 48:25 50:8
54:20 55:4,6,10,12
55:14 56:2 135:20
136:4,9,11,22,23
225:7,9 253:8,20

**level** 36:11 50:22
99:14 124:23,24
126:3 148:20
222:17
**levels** 124:1 125:4
193:14
**lever** 235:6,15
236:9
**lex** 111:13 211:13
**liar** 207:9 208:15
209:20 210:15
**lie** 210:15
**lied** 210:16
**lien** 61:10,10,23
63:19
**liked** 172:20 221:2
221:25
**limited** 71:14
**linda** 10:25
**line** 64:1,2 69:20
69:21,25 74:9
76:8 77:16 78:3
78:19,19 85:25
95:19 97:16 125:3
142:2 268:19
269:1
**lines** 87:13 132:1
**link** 18:22
**lion's** 161:16
**list** 61:9 70:1
**listed** 60:5,8 64:20
65:9,14
**listen** 163:5
173:20
**listing** 70:11
**lists** 139:6
**litigation** 7:19
14:15 16:8,14,25
17:2 27:12,15
28:2,5 31:20
110:3 111:7

118:23 138:25
177:5 212:3 238:8
**little** 9:25 41:10
61:13 80:21 97:22
106:18 140:23
141:13 155:13
158:16 176:19
189:11 201:15
205:9 213:7
251:14 259:10
**live** 11:12,21,23
**llp** 2:15
**lo** 36:12 191:5,20
195:7 233:22
**load** 142:10
**loaded** 95:6 96:24
124:3,24 125:6,9
126:11 158:4
159:2 184:14,24
187:23 197:4
**loading** 44:24 45:9
**loan** 17:4,8,16
38:16 41:11,11,13
41:17,21,24 42:8
42:16,25 43:2,5,9
43:13,17 44:18,23
53:8,9 59:22 60:5
60:7,20 62:2
63:10,21 67:4
77:8 81:18 82:14
84:22 85:2 88:2
88:11,15,20
128:23 131:21
132:7 133:21,25
134:7,17 157:12
203:11 215:18
229:19 234:3,10
234:11,14,20,24
235:1,8,16,18,21
236:9 237:3

**loans** 35:4,9 37:9
37:12 38:9,12,18
39:7,7,8,15 40:14
52:14,16 53:7
60:23 61:1,2,10,11
61:11,23,24 62:5,9
62:14,17,22 63:5
63:11,11,12,16,19
63:19 64:10,19
65:8,14,19 70:11
70:21,22,23 81:22
83:14 85:9,17,20
85:21 86:8 87:13
87:13,15,15 88:20
88:21,21,22,23,24
89:3 134:18,18
225:15 226:21
227:1,11,14 229:3
229:11 230:17
231:1 233:14,15
244:16 245:18
247:1 248:18
254:23 255:8,13
**logging** 92:7
**long** 17:15 19:2,19
19:21,21 20:24
23:13 26:4 38:13
46:17 183:18
194:14 220:2
**longer** 93:22
109:25 165:22
209:19
**look** 40:4 48:12
59:12 61:8,14
65:21 77:22,25
78:19 81:15 82:17
94:15,17 95:12
96:22 98:1 99:24
101:14 122:16
125:3,22 126:5,12
127:5 130:24

Veritext Legal Solutions

133:4 137:22
140:11,18,20
142:23 145:3
158:17 165:9
185:6,16,21
187:21 193:2
197:12,21 207:1
210:4 216:18
225:8,11 227:12
227:15 229:16
230:22 245:3
250:18 253:2
261:18
**looked**   27:10
30:11 61:21 73:14
77:13 85:12 89:14
103:23 121:14
122:2,11,22
123:11,21 144:22
158:23 168:21
187:21,22 226:20
229:25 230:2
**looking**   39:24 76:7
77:15 78:3 116:18
122:6,7,8 123:19
124:15,18 125:11
137:6 141:20
142:18 153:25
158:8 230:6
**looks**   49:5 61:7,12
65:11 91:23
129:18,21 140:7
140:23,24 141:21
141:22
**looming**   147:11
**loop**   98:21
**los**   36:12 53:12
83:23 87:20 134:2
**lose**   176:12 220:24
**loss**   26:16 78:17
122:19,23 123:10

156:15 158:11
189:11 203:10
**losses**   158:6 183:2
**lot**   34:8 35:1,13
36:10,19 37:1,4,5
40:23 56:14 79:14
80:1,1,2,5 87:19
88:7,8 91:12
98:20,20 102:18
105:24 106:3,7,7
111:20 114:15,16
148:24 153:13
156:16,23 172:9
174:15 177:22,24
205:12 209:22
220:2,11,18
223:21 230:15,15
**lots**   47:24 183:2,2
183:3
**love**   144:3 201:9
**low**   37:23 104:8
232:21
**lower**   53:13 134:6
191:5 234:15,25
234:25 235:18,18
235:22,22 236:11
**lumped**   99:13
**lumping**   155:17
**lunch**   119:21,22
149:25 150:11
**lying**   208:25 209:7
209:9

| m |
| --- |

**m**   2:13
**mail**   267:10
**maintain**   230:23
**maintained**
227:18
**maintaining**
264:13

**making**   56:13
77:16 104:25
106:3 149:18
154:18 156:3
161:16 163:12
164:16 190:23
196:6 199:23
203:20 204:5
220:8 264:12
268:13,13
**manage**   22:1
74:15 79:14
114:14 121:5
198:21
**managed**   20:23
59:22 61:16
128:24 188:2
193:13
**management**
21:25 22:8 38:15
85:20 256:25
**manager**   3:21 4:7
4:12,18,22 20:13
20:15,25 21:1,14
21:17,21 22:13
42:15 45:2 50:9
50:15 51:24,25
52:1 53:19 58:25
59:3,6,20 60:12
63:10 64:3,7,18
65:4 66:7 67:6,10
68:17 69:3 71:17
85:13 88:19,22
99:5 100:23
126:14 127:13
128:22 132:14
134:17 137:13
140:22 216:10
219:4 223:2
243:12,15 256:9

**manager's**   69:8
70:5 71:13
**managers**   34:15
36:11 40:21 42:11
50:16,22 79:10
87:14 98:12,23,25
99:1,11 100:23,25
101:3 124:23
162:6 215:14
216:6 219:24
228:19 260:1,4
**managing**   22:5
108:2 114:16
171:23 204:18
205:13
**mandate**   194:16
**manner**   31:15
**mansell**   267:18
**manually**   267:8
**march**   3:23 4:9
72:20 88:5 94:13
95:23 99:10,22
101:7 104:4,19
105:1 108:12
110:7,8 111:1
116:22 118:2
120:25 126:15
127:14 128:1,13
130:12,17 142:12
142:12,13 143:14
143:15 149:21
164:4 185:14
189:13 190:16
192:20 193:3
194:12,17,20,25
204:2 217:9,10,12
254:25 256:10,13
256:17 257:22
261:3
**margin**   203:11

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**margins** 158:24
172:7 178:14
232:24
**marked** 23:24
24:3 44:21 64:7
64:24 66:12,14,23
69:7,16 70:4
81:16 82:16 83:22
90:2 94:21 97:3
103:12 126:9
131:7,8,11,16
132:2 134:20
135:7 142:22
165:7 184:10
185:1 192:12
197:10 240:13
251:6
**market** 61:11,24
63:12 88:21 123:6
204:20 232:22,23
234:8,12,12
**marketing** 34:15
156:9 161:12,20
162:12 163:2,17
164:9 165:23,23
166:3,11,14,18
167:20,24 168:4
168:12,17,22
169:23 179:25
186:19,24 187:8
187:17 188:3
191:19 193:23
201:25 217:6,10
217:19 218:8,9,13
218:15,16 219:8
219:14 221:19
224:8 260:18,25
261:8
**markets** 74:4,5,11
74:12 157:11
178:15

**married** 11:8,14
**mary** 7:17
**marybeth** 2:4 7:13
23:16 31:2 93:3
196:17 263:8
**mass** 56:17
**masters** 156:1
**material** 55:13
57:3,14 106:19
113:16 135:21
136:10
**materials** 114:24
115:2 117:17
**math** 18:13 106:7
191:8 225:12
**matter** 55:6 162:4
204:20 233:18
237:25 264:11,17
**matters** 207:20
233:19
**max** 52:15 62:6,17
**maximum** 52:13
**mba** 12:8 220:13
**mean** 21:2 33:23
47:8 57:3,9 65:2
69:11 77:5 83:4
99:7 101:13
102:15,21 108:21
113:4 121:20
130:9 139:4
148:14 156:7
158:3 166:21
167:6 174:8,22
175:2 181:13
182:8 183:16
190:21 195:5
196:3,21 198:9
199:9 200:17,18
204:6 210:4 217:2
218:2,8 238:12
239:17 244:20

245:6 246:17
**meaning** 64:25
161:9
**meaningful** 207:8
**means** 9:6 53:4
57:10 64:18 71:19
71:24
**meant** 57:23 70:9
134:5 169:5
202:16
**mediation** 18:3
**medications** 9:8
9:11
**meet** 25:23 34:3
40:25 113:10,11
183:21,25 189:20
206:2,7,12 254:1
**meeting** 34:2,6,8,8
40:12,18 41:2
46:21 111:10,16
111:18 112:2,22
113:3,7,15 114:25
115:3 119:4,7,7,12
119:14 150:19,22
150:24 151:4,6,23
152:4,24 154:4
155:1,12 156:5
159:11,14,22
160:18 161:2,8,24
164:8 165:21
166:8 168:17
169:6,10,16,20
170:6,21 176:3,23
177:17 178:5,6,9
178:11 179:3,18
179:19,23 180:6,7
180:11,14 181:1
181:12,15,21
182:5,16 183:6,20
183:24 184:5
186:7,9,11,12,16

187:11,16 189:14
189:15,16,17,18
190:1,3 191:24
193:16 194:25
195:3 201:20
205:16 208:8
210:12 211:11,15
211:17,18,22
212:17,18,22,24
224:7 249:24
250:12 253:25
256:24
**meetings** 33:10,14
33:17,18,25 34:11
34:13 35:13,22
37:7 46:18 48:3
156:7 165:5 167:6
169:1,3,7,7,14
177:16,20,23
178:21,25 179:4
179:15 181:6,19
190:22 207:22
240:3,5,9
**member** 12:1,11
**members** 231:17
**memorize** 54:2
**memorized** 242:24
**memory** 9:9 85:23
87:11,18 89:16
110:23 197:23
242:21
**mentioned** 23:17
80:18
**merging** 183:4
**message** 203:15
**messaging** 112:9
119:13 163:5
**met** 20:8 26:2,5
34:17 102:8 108:4
113:13 179:5,12
220:13

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

michael  95:9
michelle  101:15
  199:14 207:6,12
  207:17,24 208:4,8
  208:9 209:2,10
  219:24 220:6,16
  220:19,24 223:5
  260:1,5
mid  195:13
middle  174:18
military  11:2
million  157:15
  159:12,23 160:11
  160:20 186:17
  187:4 188:12,15
  189:12 192:5
  194:2 258:7,11
mind  209:13
minds  210:12
mine's  126:17
mini  155:24 205:9
minute  45:7 53:23
  77:2 89:10,25
  91:22 95:12
  119:19 120:1
  127:8 135:2,4,10
  185:6,16 192:23
  223:7 250:7 251:4
  261:25
minutes  119:20
  140:17 196:23
  223:11 250:3
  262:23
misallocation
  157:15 159:12,23
  160:10,15,20
  180:17 181:1,7
  186:17,21 187:4
  188:12 192:5
  194:2,5 195:16,23
  201:23 258:7,11

misallocations
  193:7,12 194:1
mischaracterizes
  79:5 82:8 83:18
  89:6 91:6 134:24
  145:19 148:6
  173:3,6 214:20
  225:18 257:8
  260:21 261:11
mischaracterizing
  173:4 215:1
misinterpret
  132:11
misleading  147:1
  242:12
misquote  39:13
misrepresenting
  200:23
missed  241:22
missing  244:15
misspoke  84:21
  85:18
mistrust  200:5
misunderstood
  157:5
mitigate  249:7,12
mix  180:3 230:3
model  36:15,17,20
  36:23 48:1 96:6
  100:11,12,13
  101:11,21 102:9
  102:11 103:4
  106:1,5 107:3,8
  108:6 113:24,25
  114:9,14,14,17
  149:19,21 151:9
  153:7,17,19,20,22
  155:21 157:1,2
  161:18 163:7,14
  163:21 164:2,4
  167:12,18 168:6

  168:11,20,25
  170:8 171:4,8,17
  171:21,22 172:4,8
  172:10,21 173:14
  175:12 176:7,14
  178:19 182:11,22
  191:1,13,15 192:2
  196:11,13 198:16
  201:10,15 203:8
  204:1,8,14,16,23
  205:3,17 208:11
  211:10,19,24
  256:21 257:2,5,15
  257:17,19,21,22
  258:6,14,16
models  167:15,16
  172:16 198:12,20
modification
  71:12
modifications
  106:19
modified  55:15
  57:4 136:11
moment  86:13,20
monetary  63:22
  84:23 88:16
  131:22
money  109:14
  114:23 149:10,13
  149:18 156:2
  160:13 171:25
  172:12,13 220:8
  229:3
montana  240:7,8
month  26:2 59:23
  61:17 65:17 88:4
  123:18 128:25
  133:21 134:13
  189:24 228:21
  244:14 245:19
  247:1 248:16

months  186:2
  201:19
mood  182:25
moran  1:21
  265:24
morning  7:11,12
  97:24 193:4
mortgage  12:10
  19:19,19 33:8
  35:5 80:8 123:6
  148:21 158:25
  172:5 182:24
  195:12 237:9,11
  237:15 238:4,9,14
  238:16,17,18
  258:13
motion  44:10 77:8
  262:12
move  40:4 101:21
  104:25 105:7
  114:17 153:20,22
  168:5 170:7 186:3
  187:15 209:16
  223:5 256:15
  257:5,22 258:16
moved  106:5
  190:24,25 210:12
movement  234:9
  237:9,11,14 238:4
  238:9,12,14,18,20
  239:1,5
moving  23:21 37:4
  96:6 108:6 151:10
  153:19 157:1
  161:17 168:20
  234:13 257:2,20
multiple  238:15
muth  29:6 73:16
  73:19 150:25
  169:18 177:22

Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

**muth's** 178:1
**myriad** 230:5

**n**

**n** 2:6 3:1
**n.w** 2:16
**naf** 3:10 4:16,20
  4:25 5:14,20 7:19
  7:21 14:6,25 15:2
  15:2,10 16:11
  17:8,16 18:6,12,18
  20:7,11 21:5,11,15
  23:8 27:19,23
  28:1,11 29:8,16
  32:6,11,14 33:2
  34:3,20 35:17
  37:10 39:16 40:19
  41:3,22 42:23
  43:17 47:19 49:4
  49:7,9,12,21 50:2
  50:4,5 51:12
  52:24 57:25 58:1
  58:20 64:9 66:15
  66:24 67:22 69:21
  69:21 70:25 72:14
  73:20 78:6,25
  79:21 80:24 82:1
  82:2 89:3 93:24
  96:7 99:11 106:10
  107:2,14 109:3,16
  112:19 115:2,14
  115:17,17 116:1,2
  116:2,13 117:15
  117:17,23 118:19
  118:25 128:15
  130:15,16 138:25
  139:17 142:11
  144:2,9 146:9
  149:12 152:17
  163:16 165:21
  166:1,10 167:17
  171:19,20 172:3

173:1 175:6
177:17 178:3
183:8 185:2
190:10,12 191:24
193:5,6,20 194:19
195:20 197:4,25
200:7,8 202:9
204:24 205:2,17
205:20,24 207:18
211:8,23 212:3,13
212:23 213:10,21
214:8,16 215:13
216:4,5 217:18
218:6 219:21
221:10 224:3,3
225:15 226:13,22
226:25 227:17
228:1,7 229:22
230:7,23 231:20
237:6,9 238:12,19
239:13 241:15,21
242:4,7 244:6,9,24
246:18 249:11
253:5,9,13 254:22
254:25 255:2,9,25
256:3,9,12 258:24
259:4,13,15,21
260:18 261:7
**naf's** 94:1 96:16
  146:17,17 165:25
  238:6,7 241:12,16
  248:4 254:20
  259:17
**name** 7:13 10:22
  11:10 59:3 130:11
  138:21 140:13
**named** 111:13
**names** 11:18
**natural** 199:7
**nature** 117:18,20
  229:18

**necessary** 268:15
**need** 8:1 9:14,17
  10:17 87:7 90:6
  92:25 93:2,4
  94:24 103:8
  127:22 135:9
  137:22 163:5
  178:18 182:10
  262:24
**needed** 89:9 108:1
  153:8 154:15,20
  157:12 159:2
  164:15,16 168:3
  196:4 198:21
  234:9 236:10
**needing** 21:25
**needs** 8:4 42:3
  199:18 259:18,20
  260:11
**negative** 64:25
  66:10 75:25 160:3
  172:14 194:17
**negotiate** 211:7
**negotiated** 100:13
**negotiating** 36:7
  89:17 191:12
  204:25 253:17
**negotiations**
  117:19 253:4,7,8
**neither** 211:4,5
**nervous** 155:14
**nevada** 152:9
  183:16
**never** 24:25 51:16
  81:7 89:3 115:23
  143:25 144:7,10
  144:23 147:13
  159:11,21 160:9
  163:24 167:13,16
  205:20 209:14
  244:20 258:10

**new** 1:7 2:21,22
  5:8,22 6:5 7:20
  17:5 18:19 19:5
  20:2,5 31:9 32:17
  32:18,23 34:9
  36:7 39:24 40:2
  40:20 41:15,19
  42:4 43:24 44:8
  48:1 56:13 71:25
  74:12 80:7 81:20
  86:22 89:24 94:18
  94:25 101:18
  102:17 105:8
  106:1 108:16
  109:10 133:20
  134:7 148:18,23
  148:23 149:8,9,17
  156:24 163:22
  167:14 168:10,20
  168:24 170:8
  171:3 183:8,12
  184:11,13 186:18
  186:23 187:7
  204:15,15,23
  205:6 206:17
  207:15 210:9
  214:1,2 220:7
  234:3 241:6
  246:19 251:20
  252:3
**newer** 201:10
**nice** 216:12
**nick** 92:6,8
**nickolas** 2:6
**nobody's** 138:21
**nodding** 90:9
**noncompete** 16:16
**nonsolicit** 16:16
**nope** 241:1
**normal** 15:19
  40:20 212:5,6,11

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[normal - officers]**

Page 29

224:11 227:19
**northern** 1:1
152:9
**notaries** 266:4,8
**notarized** 266:8
267:10
**notary** 269:23
**noted** 268:5,6
**notice** 3:9 23:25
24:6 28:21 29:24
30:11 43:23 71:17
116:18,19 117:11
118:22 223:19
241:14
**noticed** 115:11
116:16 117:8
**notices** 93:24
241:21
**noticing** 264:16
**notification** 72:14
**notifications**
258:25
**notified** 25:4
105:5 110:3 166:1
186:17
**notify** 44:13 72:2
107:9
**notifying** 52:19
**noting** 267:7
**november** 26:23
27:10 46:15,22
48:17 73:14 75:23
76:21 122:1
125:24 127:13
128:17 201:18
205:16 225:16
253:8 254:24
256:2,2
**number** 45:23
97:7 102:22,23
142:24 177:8

197:5 241:4
**numbers** 10:2,3,6
47:5,7,8 158:8
159:6 231:10
**numerous** 148:19
**nuts** 35:4

**o**

**o** 260:10
**oath** 9:4
**object** 14:11 15:15
15:23 17:17 21:16
37:15 38:24 39:2
39:17 43:6 44:4
49:14 51:13 52:6
54:8 56:25 57:7
65:10 66:20 67:2
67:19 70:13 71:20
74:23 77:17 78:8
78:10 79:4,22
83:17 84:16 86:10
89:5 91:5,6 96:9
96:19 105:13
106:13 107:5
109:17 112:24
115:5,19 116:5
118:3,13 121:15
121:21 122:3
123:24 124:17
125:15 129:24
131:13 132:4,20
135:24 136:25
138:6 141:5
144:12 145:18,18
146:15,18,25
148:5 151:14
155:5 162:13
170:1,13 171:13
173:2 180:19
181:3 184:2
188:17,21 189:3
190:18 192:6

195:25 200:3,14
200:25 208:16
210:24 212:7
216:25 217:25
219:10,19 221:11
221:20 224:21
227:5,21 228:13
229:13 230:10
232:16 235:3,10
235:13 236:2,2,18
241:24 242:11
245:8 246:16
247:12,22 249:2
249:13 254:7
255:10,17 257:7
258:1,8 260:9,20
261:10
**objection** 76:15
78:14 82:7 86:14
92:23 116:7,9,11
116:15 123:14
134:24 148:10
159:25 160:23,23
163:18 175:19
181:25 182:17
194:8 202:1
213:13,23 214:10
214:19 215:9
218:23 225:17
**objections** 5:9 6:6
15:20 146:21
251:21 252:3
253:11,13 254:22
**objective** 185:25
**obligation** 264:13
**obradovich** 34:15
78:2,22 108:3
109:24 151:1
156:11 157:7,19
159:5 178:24
185:9 231:22,23

**obvious** 72:11
146:5
**obviously** 27:22
147:18 230:24
254:9
**occasions** 195:11
**occurred** 33:15
153:6
**ocga** 264:6,7,18
266:11 268:9
**october** 13:23
24:12,13 27:6
29:19
**odd** 201:11
**offer** 3:12 41:17
42:1 45:1 46:2,25
47:11 48:24 50:8
51:19 53:17 55:4
55:11 56:2 135:20
136:4,9,23 234:25
235:18,22 236:10
253:9,20
**offered** 36:23
54:25 253:22
**offers** 49:20 55:8
**office** 151:8 183:8
183:12
**officer** 17:4,8,16
41:11,21,24 42:8
42:16,25 43:2,5,10
44:18 133:21
157:13,19 234:14
234:24 235:9,19
235:21,23 236:9
238:8
**officer's** 43:13,18
234:20
**officers** 38:16
40:19 41:11,13,18
53:8,9 81:19
82:14 85:2 88:2

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 300 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[officers - options]                                                   Page 30

88:11 133:25
134:7 152:14,17
154:24 177:17
215:18 234:3
235:16 237:3
248:21 257:4
**offices** 32:12,19
183:13,18 267:3
267:10
**officially** 33:22
**ogletree** 2:14
45:10 76:24
**oh** 13:23 18:9
19:22 21:8 25:15
26:6 33:16 37:17
45:10,22 52:25
58:17 91:23
101:25 103:10
120:19 124:22
136:15 141:11
160:8 183:15
243:4 250:24
**okay** 7:21,23 8:11
9:1,3,8,22,24
10:13,14,21 11:8
11:14 12:11,14
13:9,18 14:1,23
15:13,23 16:8,17
16:24 17:20,25
18:5,12,17,24 19:8
19:14,18,24 20:11
20:22 22:2 23:14
23:20,23 24:8,15
25:5,8,16,20 26:4
26:18,25 27:3,14
28:9,20 29:18,18
29:22 30:6,21
31:8,14,18,18 32:6
33:10,14 38:2
39:11 40:11,18
41:17 42:7 43:17

44:17,23 45:13,14
45:16,22 46:8,14
46:24 47:10,19
48:8,11,16,20,23
49:9,21 50:4,7,12
50:15,18 51:17,18
51:21 52:11 53:4
53:17 54:12,15,18
55:21 56:22 57:9
57:13,13,21,22
58:8,24,24 59:16
59:19 60:16,20
61:14 62:1,16,21
62:21 63:3,18
64:6,9,22 65:21
67:4,15 68:11
69:16,24 70:25
71:3,3,6 72:14
73:2,20 74:7,17
75:7,18,21 76:17
77:3 78:1 79:17
79:20,20 80:12
81:6 83:12 84:1,4
84:12,24 85:7,22
86:1,3 89:22 90:8
90:11,18 92:17
93:2,23 94:13,17
95:3,5,17 96:24,24
97:10,12 98:25
99:3 100:3,22
101:6 102:10
103:3,6,21,23
109:12 110:2,14
111:4,10,15 112:6
117:10 118:21
120:18 122:15,18
122:22 123:1
125:22 126:11,14
126:22 127:3,7,10
127:11,25 129:22
131:2,10 134:5

135:9,20 136:3
137:9,12,24 138:1
139:16 140:8,16
141:10 143:4,8,11
143:12,17 145:14
148:13 150:9,22
151:16 152:3,6,20
153:1 159:10,24
160:16 161:4,7,23
164:7 165:9,12,16
170:4 171:10
173:12,17 174:9
174:24 175:2,5,8
177:7,16 178:8
179:17 180:25
181:11 182:2,13
184:7,16 185:1,5
185:16,19,20
186:15,23 187:2,6
188:25 189:7,9,19
189:19 190:7
191:22 192:1,10
193:1,2,19,25
195:18 196:9
198:3 203:24
204:5 205:2 208:6
208:12,12 210:14
211:11 213:20
215:11 216:16
219:7 221:24
223:20 224:1,17
225:1 226:18
227:17 229:8
231:13 232:14
233:7 234:20
237:25 239:6,8,25
240:7,20 241:2,3
241:10,11 242:21
243:9 244:3,3,18
244:22 245:3,17
246:3,13 247:5,16

248:10,24 250:6
250:14,25 251:5,9
251:11,15 252:15
252:18,24 253:2
255:5,22 256:7
259:3,10 261:7,19
261:23,24 262:2
262:20 263:3
**ola** 151:11 156:16
**old** 11:7
**onboarding** 56:21
**once** 48:7 58:22
77:1 135:5 158:22
163:21 267:9
**ones** 30:23 102:6
102:15 103:2
141:22 149:4
161:21 179:6
182:14
**ons** 69:12
**open** 98:7 99:16
99:18 103:16
137:9,10 140:15
153:5 165:11
**opening** 103:20
**operation** 36:13
**operations** 19:1
20:13,14,16,24
21:1,13,17,18,21
21:22 22:10,13,13
**opportunities**
210:7
**opportunity** 8:13
185:25 216:4
221:16 222:8
244:13 253:17
**opposed** 32:2
253:17
**option** 194:13
**options** 40:4

oral 224:2,13,17
order 49:18 56:20
  77:6 116:23
  166:24 167:8
  262:12
ordered 262:17
ordering 44:10
  264:24 267:13
organization
  153:20
organizations 12:2
  12:4,6
original 53:1
  131:10,25 267:12
  267:14
originated 60:21
originating 254:23
origination 234:16
originations 53:11
originators 133:10
  134:11
outearn 134:12
outline 52:4
outlined 51:25
outlines 53:18
outside 27:15
  73:22 74:2,5,7,8
  75:8,24 77:14,24
  78:6 100:11,20
  121:16 122:9,10
  122:13,19,23
  123:2,5,10,12,22
  124:9,12 125:6
  136:21 138:1
  149:18,18 151:17
  155:2 158:12,18
  189:11 201:3,10
  201:16 232:12
  234:8 237:1
  239:19 257:1

overall 36:2
  154:14 163:5
  185:25 230:2,3,8
  231:10
overnight 163:11
overpayments
  250:21,23,24
override 36:20,23
  37:10,21 38:6
  51:25 59:16,20,21
  59:24 60:7,9,11,12
  60:17,23 61:2,15
  61:22 62:2,12
  63:4 64:23 65:23
  66:12 69:3,12
  70:17,23 71:15
  80:20 81:9,13,18
  85:8 88:10,23
  91:3 92:22 93:20
  96:21 100:12
  128:18,21,23
  129:1 131:17
  133:7,22 134:7,13
  141:4,20 151:9
  153:7 172:20
  227:10 228:6,21
  232:5 244:13
  247:21 256:19
  258:14
overrides 37:25
  38:3,9,15,18 39:7
  39:15 40:13 52:4
  53:20 62:25 63:15
  64:9,19 65:1,8,13
  65:19 68:6,12,14
  70:10 81:3,24
  82:14,21 83:14,23
  85:16,20 86:7
  87:25 133:2,11,18
  148:3 225:5,10,14
  227:1,13,18

229:11 248:14,22
  248:25 255:8
owed 172:13 225:6
  227:2 228:6,9
owner 108:3
owners 20:8
  155:24

**p**

p 3:11 114:21
  155:25
p&l 27:3 36:15,17
  38:19,22 73:14,15
  73:16,19,20 74:1
  74:17,18 75:6,8,22
  76:18,22 77:12,25
  96:6 100:12,14
  101:10,21 102:4,4
  102:8,11 103:2,4
  107:8 108:6 110:5
  110:13 112:14
  114:9,14,16,18
  121:24,25 122:1,7
  122:9,9,11,12,18
  123:18 124:1,2,3
  124:16,19,22,23
  125:3,6,12,12,18
  125:22 149:21
  151:10 153:17
  155:21 157:1,2
  158:4,7,9 159:2
  161:18 163:7,14
  163:21,22,23
  164:2,4,21 167:1,9
  167:12,15,18
  168:6 171:8,17,19
  171:21,24 172:2
  172:10,15 173:13
  175:11 176:7,14
  178:19 182:11,22
  187:9,14,15,23
  190:24,25 191:13

191:14 192:2
  196:10,13 198:4,9
  198:12,16,21,25
  203:8,19 204:1,10
  204:24 205:3,17
  211:10,19 256:14
  256:21 257:2,5,15
  257:17,18,21,22
  258:6,16
p&ls 76:11 77:9
  77:10 78:5 121:11
  121:13 122:7,15
  123:12 126:7
  156:20,23 157:20
  159:7,9 164:21
  167:3 172:13
  177:12,24 193:14
  231:7 232:10
p.c. 2:7
p.m. 73:8 120:9
  150:11 196:25
  223:12 250:13
  262:4 263:9
pace 86:23
pacific 249:22
package 36:3,7
  42:3 80:16
page 3:2,8 4:3 5:3
  6:3 10:4,10 45:23
  48:13,13,16,24
  50:8 51:19,20,22
  54:15 59:9,12
  60:17 61:3,6
  63:25 69:19,24
  71:3,8 90:18
  100:3 128:14,15
  129:7,14 131:2
  135:14,14 141:24
  165:19,20 185:13
  192:17,20 193:2
  197:12 198:1

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[page - perlowski]**

Page 32

199:3 207:2
223:24 225:1
229:16 241:10
244:3 249:5
251:25 253:10
254:18,21 255:22
259:15 268:19
269:1
**pages** 45:25 50:7
84:14 137:22
268:15
**paid** 36:11 37:21
38:8,18 39:7,15
40:13 53:10 60:7
62:8 63:4,9,15
64:24 65:1,6,8,13
65:18 69:3 70:10
70:22 80:13,25
81:2,9,18,24 82:6
82:14,20 83:13,23
85:1,9,16 86:7
87:14 93:11
109:14 133:1
134:13 148:3
149:15 226:16,22
228:20 229:6,6
244:24 245:14
247:2,8 248:8,11
248:19,21,25
**paragraph** 51:23
52:11 53:17 54:12
54:13,19,19 55:3
55:19,21 57:19
61:9,15 64:23
71:7,7,8 136:9
190:7 198:3
253:11,12 255:1
260:8
**parenthesis** 61:13
**parentheticals**
199:19

**pari** 246:5,11
**part** 37:7 62:11
65:16 94:12 108:5
108:20 109:11
138:19 149:8
186:11 190:9,11
197:18 202:14
211:21 216:20
226:9 241:13
244:5 245:5 246:5
246:14,18 247:18
250:19
**parted** 110:25
111:9 213:19
**participate** 256:22
**participated** 253:6
256:11
**particularly** 182:3
**parties** 186:4
253:22 264:18,24
265:18 266:12,14
267:13
**partner** 32:15
40:9
**partners** 35:11
176:17 218:18,22
219:9 222:24
**partnership**
143:24
**parts** 37:4 154:22
**party** 13:9 264:14
264:19 266:13
**password** 264:23
264:24
**patch** 209:16
**patently** 242:12
**path** 132:9
**pathological** 207:9
208:15 209:19
210:14

**patrick** 11:11
**patty** 95:10 143:25
151:2 152:23
154:24 156:4
157:16 165:1
167:6 169:4,10,11
169:20,22 170:17
170:24 171:1
183:21 185:13,22
197:15 199:4,4
202:7 203:15
220:21 221:7
232:14
**paul** 33:1 42:1
68:2
**pay** 15:2,10 37:10
37:25 38:3,15,15
52:20 62:16 64:9
66:16 67:22 85:1
85:5,20 88:10
105:8 106:6 172:8
204:11,21 225:15
226:14 233:20
246:22,24
**payable** 64:19
128:21
**paying** 161:12
**payment** 39:8
63:11 85:21 88:20
91:2 92:22 133:1
134:18
**payout** 60:23 61:2
**payroll** 231:18
**pays** 89:3
**pdf** 97:16 267:7,7
**pe** 168:4 179:10
180:2 186:18,23
187:7,18 195:7
234:9
**pe's** 5:13

**penalty** 9:5 252:7
**pending** 9:18
14:15 147:21
262:10
**people** 22:6,7
32:22 34:9 38:12
40:23 58:4 72:2
87:24 107:9
148:20 155:23
158:12 172:11,17
182:21,24 210:3,6
210:6,20 216:12
221:1,2 233:23
**perceived** 201:23
**percent** 58:18
60:22 62:6,7
107:17 179:15
**perception** 173:15
209:18
**perfect** 32:18
262:24
**perform** 244:7,9
**performance**
244:5,23
**period** 52:20
63:22 69:7 73:21
75:4,9 83:21
84:23 88:2,16
125:23 131:22
133:23 147:16,17
163:2 164:10,12
165:2 166:4,10,19
166:20 167:20
168:6 169:25
170:25 171:11
172:25 175:18
253:19
**perjury** 9:5 252:7
**perlowski** 2:13
8:10 14:11 15:3
15:21 17:17 21:16

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 303 of 321

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[perlowski - point]

Page 33

23:16,20,23 24:1
24:17 30:1,6 31:1
37:15 38:24 39:2
39:17 43:6 44:4
45:8 49:14 51:13
52:6 54:8 56:25
57:7 65:10 66:20
67:2,19 70:13
71:20 73:6 74:23
75:11,16 76:15,20
76:24 77:4,17
78:8,14 79:4,22
82:7,25 83:6,17
84:16 86:10,12,16
86:20,24 87:3
89:5 90:1 91:5,23
92:8 94:18,22,24
96:9,19 97:4,9
103:7,16,18
105:13 106:13
107:5 108:23
109:2,17 112:24
115:5,19 116:5,7
116:10,14 117:2,6
118:3,13 119:25
120:4,8 121:15,21
122:3 123:14,24
124:17 125:15
126:16,20,22,24
127:3 129:10,24
131:13 132:4,20
134:23 135:24
136:25 138:6
139:18,22 141:5
141:12 142:16,20
143:1,4 144:12
145:1,18 146:15
146:19,22,25
148:5,10 150:2,5,9
151:14 155:5
159:15,24 160:2

160:23 162:13,17
163:18 165:13
170:1,4,13 171:13
173:2,6 174:5,8,13
174:17 175:19
177:6 180:19
181:3,25 182:17
184:2,11,16,18,21
188:17,21 189:3
190:18 192:6,8
194:8 195:25
196:17,21,24
197:6,8 200:3,14
200:25 202:1
208:16 210:24
212:7 213:13,23
214:10,19,25
215:9 216:25
217:25 218:23
219:10,19 221:11
221:20 223:9
224:21 225:17,25
226:3,6 227:5,21
228:13 229:13
230:10 232:16
233:4,7 235:3,10
235:13 236:2,18
238:2,13 239:6,9
241:24 242:11,15
242:21 245:8
246:16 247:12,22
249:2,13 250:10
251:1,5,12 254:7
255:10,17 257:7
258:1,8 260:9,20
261:10 262:2,15
262:22 263:5,8
267:1

**permissibly**
241:16

**person** 36:1 39:25
40:5 43:10 46:5
91:9,10 112:5
114:4 156:14,19
156:22 157:8
176:1 177:23
189:25 195:3,4
231:18 257:24
**personal** 13:19
31:21 63:10 117:1
134:17 217:14,22
218:2
**personally** 167:13
218:4
**personnel** 68:13
68:14 88:19
**pertaining** 96:5
138:25
**pertains** 139:5
**pes** 163:1 164:9
191:6,17 193:22
224:8 230:4
**phone** 33:18 47:16
152:11 153:11
155:8 189:23
200:10 203:17
229:5 253:15
254:9
**phrased** 117:3
**pick** 183:15 229:4
**pie** 177:3
**piedmont** 2:8
**piggyback** 61:10
61:23 63:18 88:23
**placated** 171:12
**place** 104:18 107:1
150:20 151:23
167:9,18 171:3
190:25 217:9
220:15 253:19
264:17

**placed** 104:13,16
**placentia** 12:22
**plaintiff** 1:5 2:3,23
5:10 6:7 27:7
90:22 93:24 94:1
241:14 248:3
249:6,11 250:22
250:23 251:21
253:23 258:25
259:5
**plaintiff's** 3:9 5:24
241:7,13 244:4,6
245:4 246:4,14
247:17 250:19
252:4 254:24
**plan** 104:25 105:8
167:9 194:15,18
195:1,6 204:24
257:20
**planning** 207:15
**plans** 210:10
**platform** 199:20
**play** 216:12
242:21
**please** 7:4 82:25
83:6 117:9 129:10
143:2 155:17
165:14 174:19
195:15 198:19
214:22 239:9,9
241:10 260:22
261:13 267:6,10
267:17 268:14,16
**point** 34:14,16
45:12 66:2 67:5
68:12 83:10 84:22
88:13 90:22
112:11,17 117:7
132:15 145:9
149:25 167:25
168:2 176:11

**[point - production]**                                          Page 34

182:9,13 183:19
185:21 186:5
189:13 206:11
212:4 215:18
220:17 228:25
**points** 53:10,15,16
60:5 61:5 63:8,23
64:11 65:8 70:11
81:3 85:11 86:4
88:19
**policy** 79:2,7,9
107:7 163:16,17
163:22 186:18,23
187:7 224:9 234:3
234:6 236:25
259:16
**portion** 47:17
65:24 92:15
159:18
**positions** 149:3
172:12
**possible** 167:4
190:2,4 204:14
205:11,12
**possibly** 201:7
202:19
**postgraduate** 13:3
**posting** 183:2
**potential** 40:19
**potentially** 86:13
**powerpoints**
176:22
**practice** 43:22
44:12 56:11 58:3
72:2
**practices** 94:5,7
146:17
**pre** 178:6,21
253:14
**precedes** 63:20
88:25

**preceding** 132:15
147:4 253:19
**precursor** 178:10
**predicated** 215:15
**predominantly**
253:15
**premise** 182:22
**preparation**
252:18
**prepare** 25:9,17
25:21,23 26:5
47:2 110:10
177:18
**prepared** 46:2
50:12,14 110:5,6
110:11 113:6
130:16 225:5
**preparing** 26:9
46:25 110:7,8
122:12 192:2
**presence** 27:16
**present** 2:20 34:5
34:25 40:13 79:7
113:7,12 152:3
159:14 160:17,19
161:2 169:1,7,20
170:10 178:18
180:5,10,13,14
189:14
**presentation**
152:7 153:1 161:5
**presented** 26:12
26:14 46:18 55:17
57:6 128:12
130:14 136:13
138:16 145:8,15
146:6 156:8 167:3
172:15 176:23
182:9 187:20
194:13,18,25
195:9 205:20

242:4 264:1
**presenting** 146:10
**presently** 55:17,18
231:19 237:10
**president** 237:23
**preslo** 27:24 34:16
47:6 65:20 68:23
93:18 95:10
135:18 136:17
151:1 169:12
192:18 197:15,20
203:15 253:14
**presume** 35:17
**pretty** 36:15 46:20
46:21,23 50:21
57:9 123:9 151:1
212:1 234:13
**previous** 25:11
61:3,5,5 69:24
128:8 145:2
**previously** 88:24
137:15 190:9
**pricing** 74:15
154:20 156:10,12
157:8,9,13 161:25
162:5,7 169:24
180:2 191:21
259:5
**print** 45:21 97:17
98:8 267:8
**prior** 34:20 127:25
**pritchard** 33:1
42:1 68:2
**privilege** 16:1
**privileged** 24:19
75:13 225:20
**privy** 207:22
**probably** 7:25
13:24,25 19:25
21:8,10,18 22:21
26:3,17 29:19

30:22 34:17 79:24
92:4 93:18 98:14
99:6 116:21
158:16 183:17
204:17 239:22
250:1
**problem** 8:21 9:21
24:2 28:24 30:8
**procedure** 268:9
**procedures** 146:10
**proceeding** 14:13
264:1,19,23 266:9
**proceedings**
264:11
**process** 40:20
43:20 56:21
105:21 134:14
**processes** 238:7,11
**processing** 20:16
20:20
**produce** 77:10
159:9 254:22
255:25 259:4
**produced** 27:7,11
76:19,23 124:23
130:2,11,19,25
138:24 139:17
145:6 177:4,13
227:24 255:3
256:4 258:24
259:8 264:20
266:3,7
**producer** 33:8
**producing** 134:1
**production** 23:5,6
28:14 63:10 88:20
121:7 134:17
136:20 194:17
228:3 231:10
262:11 266:3,8,9
266:10 267:17

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**productivity**
229:19,20,20,23
230:2,8
**professional**
264:13 265:24
**proffering** 214:24
**profit** 26:16 75:25
78:17 125:5,7
126:3,6 151:17
156:15 158:11
161:17 203:10
**profitability** 123:4
151:11,13 154:14
157:21 158:1
166:4 187:21
222:14 230:3,9,13
230:20,25 231:11
232:21
**profitable** 73:21
73:24 76:13 77:14
77:24 78:7,12,20
102:15 114:22
123:2,13,23
124:10,12 126:1,3
138:1,4,8 154:16
154:17 155:3
188:3 190:10
196:7 232:12
257:13
**profited** 171:25
**profits** 37:23
172:5
**programming**
199:1
**progression**
164:15
**prohibited** 264:17
266:11
**prohibitions** 264:8
**projecting** 180:2

**prolific** 101:17
220:25
**promised** 164:19
**promises** 55:9,12
173:21
**properly** 93:11
**proposed** 105:9
136:16 143:13
**prospectively**
166:3,12
**protected** 264:23
264:24
**proud** 148:17
149:7 221:24
**prove** 210:1
**provide** 28:9
72:14 264:16
**provided** 71:17
82:2 130:21
227:25 228:8
**providing** 110:12
**provision** 50:19
51:12 52:23 66:23
128:17
**provisioned** 56:18
**provisions** 51:4
**public** 269:23
**pull** 90:5 97:6
103:15 126:7,13
223:18 243:5
**pulled** 74:18,20
258:15
**pulling** 28:25
**purchase** 178:15
**pure** 258:14
**purport** 140:8
**purported** 142:11
**purpose** 256:18,20
**pursuant** 3:10
148:3 268:8

**pushed** 144:2
**put** 39:20 44:17
69:21 75:5 102:10
105:4,24 106:3
124:2 143:23
145:7 164:20,21
164:24 166:14
203:20,25 214:4
260:12
**puts** 42:1,5,7
177:24
**putting** 105:6
158:7

**q**

**quarter** 123:9,22
183:6 191:16
232:11 233:1,1
**question** 8:17,20
8:24 9:18,19
64:13 77:18 78:9
86:13 90:7 92:10
92:13,18 93:9
106:15,21 117:3
127:17 129:11
131:25 136:6
139:10 159:16,20
169:13 172:24
173:5,7,9,10
174:10 181:13
185:20,21 209:4,5
214:14,24 219:15
225:24 226:2,10
226:19,20 227:9
228:24 229:11,24
234:23 238:20
241:20 242:14
243:9,20 247:24
256:17 259:11
**questioned** 133:3
**questioning** 80:19
87:8 171:20

186:13
**questions** 8:16,19
10:5 31:20 46:1
87:7 111:20
112:14,17 113:21
114:1,5,6 174:12
185:7 197:24
250:2,3 252:22
261:25 262:8,10
262:21 264:20
265:11 266:4
**qui** 14:4,5,8 16:24
**quick** 19:6 30:17
95:14 99:25
120:20 143:8
249:21 256:16
**quickly** 30:18
163:13 167:4
170:7 234:13
**quite** 33:17,25
82:11 88:6 101:18
101:19 102:17
153:15 195:11
202:12 232:7
243:10 258:17

**r**

**r** 3:11 265:1
**raise** 7:5 117:6
236:22 246:25
**raised** 247:7
**ran** 20:16 89:13
201:10
**rate** 157:13 234:15
234:25 235:2,22
236:7,7,11
**rates** 104:8 234:21
235:9,18,24
**rattle** 216:19
**rattled** 30:18
**rblos** 34:16

**reached** 213:11
**reaching** 185:24
**read** 8:8 54:18
  59:19 62:10,20
  63:2 71:6 78:5
  86:4 87:10 88:18
  88:19 89:1 92:9
  92:12,14,16,24,25
  93:3,4 94:15
  95:14 110:24
  134:16 135:10
  136:9 137:24,24
  143:11 147:21
  159:16,19 191:2
  194:12 195:14
  202:12,24,25
  207:5 252:2
  254:20 255:23
  258:22 267:6
  268:3
**reading** 77:13
  87:10 123:23,25
  124:4 135:25
  195:5 196:11
**reads** 67:1
**ready** 56:18 143:9
  197:1 223:13,14
**real** 30:17 49:6
  83:8 94:2 95:14
  99:24 120:20
  143:8 155:21
  199:7 218:18,22
  219:5,9 222:24
  249:21
**realize** 199:18
**realized** 133:6
  258:13
**really** 16:23 21:23
  30:18 40:3 41:5
  44:9 46:12 58:11
  68:5 77:18 80:23

100:24,25 102:5
102:11 105:24
108:4 109:24
112:16 113:20,20
119:22 123:3
153:18 155:25
156:14 158:25
168:9,23 172:8
173:22 178:10
200:17 205:5
209:14 215:15
216:8,14 220:18
223:1,3 226:18
227:8 229:24
236:15 237:25
244:22 256:16
**reason** 67:25 79:1
  112:19 118:12
  121:18,24 139:16
  148:22 152:11
  176:5,6,8 195:22
  200:21 207:8
  210:2 212:12
  214:7 253:24
  260:11 268:19
  269:1
**reasons** 238:15
  268:12
**reassign** 259:14,21
**reassigning**
  259:24
**recall** 18:2,4 22:11
  22:14,17 25:3
  27:17 34:1,12
  43:3 46:10 47:18
  48:10 53:8 80:17
  81:5,11 85:17
  87:19 90:25 92:19
  93:9,12 96:12,14
  96:16,17 101:9
  104:24 105:2,14

109:15 111:14
113:9 115:1,12
126:3 138:3 147:7
147:20,23 148:1,8
149:11 150:19
154:11 157:17
163:20 165:3
166:9 169:10,21
178:7 183:22
203:1 210:17
212:25 229:2,7,8
244:19 245:23
246:12 247:9
248:24
**recalled** 135:6
**receive** 8:6 22:23
  23:2 38:6 51:25
  52:5,12 53:5,13,20
  58:8 59:24 61:17
  62:2,3,25 113:7
  128:25 133:17
  145:4
**received** 24:11
  40:14 50:5 83:15
  118:22 137:7
  149:14
**receives** 264:19
  266:13
**receiving** 133:11
  134:6,7
**recess** 73:8 120:9
  150:11 196:25
  223:12 262:4
**recited** 31:2,4
**recognize** 45:16
  95:7
**recollection** 81:7
  95:22 189:22
**record** 8:5 10:22
  45:12 58:15 73:10
  92:16 120:11

150:1,16 159:19
197:2 217:18
223:16 250:8,9,13
250:16 254:16
262:6,23 264:11
264:12,20 265:14
**recorded** 265:7
**recording** 8:3
**records** 107:18
  140:1 230:25
  231:3 254:23
  255:3,5 256:1
  258:24 259:4,7
**recovery** 249:8
  250:20
**recruit** 41:21
  207:16 208:10
  209:9 210:19
**recruited** 36:21
  41:24 209:2 219:4
**recruiter** 32:16,24
**recruiters** 67:8,23
**recruiting** 35:2
  37:3,7 53:1 68:3,4
  134:1 209:13
**recruits** 34:18
  40:19
**reduced** 60:9 67:6
  67:16,17,22 249:8
  250:20 265:12
**reductions** 193:7
  193:21
**reed** 34:16 93:21
  111:11 118:21
  119:1,3,12 123:11
  151:1 156:14,19
  169:11 178:20
  180:5,17,25
  185:14,23 190:3
  192:19 197:16,19
  211:12

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 307 of 321
Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[reed's - represent]                                                  Page 37

**reed's** 120:13
**refer** 7:20 32:7
**referenced** 32:25
  57:19
**references** 54:14
**referencing** 147:3
  189:17 194:20
  198:15 245:25
**referring** 10:2
  32:9 223:22
**refi** 178:15
**reflect** 104:17
**reflected** 188:6
  204:2
**reflects** 233:25
**refresh** 24:5 44:24
  87:11,17 90:4,7
  94:23 95:22 96:25
  103:14 110:22
  137:9 192:14
  196:14 197:3,23
  240:16,23 251:7
**refreshed** 85:23
  89:16 240:18
**refused** 226:13
**regarding** 15:20
  53:18 79:2 80:13
  81:2 90:15,23
  91:2,2 92:21,21
  93:25 98:6 104:9
  117:15 157:19,20
  161:24 224:13
  225:21 230:8
  243:14 253:22
  259:16 262:11
**region** 56:21 76:5
  76:9,12 77:23
  80:2 100:19
  101:10 102:11,19
  121:6 125:13,20
  125:23 126:1,6

139:5 151:11,13
157:14 162:4,9
174:2 179:11,11
179:24 191:4
215:22 218:14
220:25 221:18,19
222:12,13 230:1
230:12 233:21
236:8 260:12,14
260:15
**regional** 3:20 4:6
  4:11,18,21 40:20
  45:2 50:9,15,16
  51:25 52:1 53:19
  58:25 59:3,6,20
  60:11 63:10 66:7
  67:6,10 68:17
  69:3,8 71:13,17
  77:10 88:19,22
  98:12,23 99:5,10
  100:24 126:14
  127:13 128:22
  134:17 137:13
  140:21 215:14
  216:6,10 219:24
  243:12,15 256:9
**regions** 23:6 76:13
  101:12,17 102:2
  102:12,14,16,21
  102:21 108:7
  154:3,15,17
  161:20 163:10
  164:18 187:24
  188:2
**registered** 265:24
**regular** 239:20
**regulations** 264:5
**related** 12:6 13:18
  13:19 29:9 266:9
**relating** 25:6
  264:23

**relationship**
  176:20 206:14,20
  207:8 218:17,22
  219:5,8,17 220:16
  222:6 233:24
  264:11 266:11
**relationships** 37:6
  199:13 209:17
**relative** 265:17,19
**relatives** 11:23
**relevant** 238:5
**relied** 117:17
**reload** 90:9 94:25
  95:2 142:21,23
  165:15 184:12
  251:2
**reloaded** 97:5
  103:8
**reloading** 126:17
**rely** 227:3 249:11
**remember** 16:21
  16:24 17:9,14,18
  17:23 19:22 26:13
  26:24,25 27:3
  35:24 36:22 37:12
  38:5 40:12 48:8
  62:13 67:25 80:15
  80:17 82:10 83:9
  83:12 88:1 90:16
  96:20 107:22
  111:5 113:16
  126:2 128:3 138:7
  168:8 177:12,15
  177:21 179:5
  180:12,15 184:5
  189:24 194:1,25
  195:4,6 206:9
  223:2
**remind** 8:1 199:19
**remote** 1:12 2:1

**remotely** 1:23 7:1
**removal** 169:23
**remove** 51:11,16
  219:21,25 260:18
**removed** 167:21
  218:5 222:1
  260:23 261:6,7,20
**removing** 51:17
  216:6
**rental** 66:3
**rentals** 44:10
  66:15,24
**rep** 116:2
**repeat** 8:20 73:18
  129:10 211:2
**repeated** 214:20
**repeating** 214:23
**repeats** 61:12
**replies** 200:9
  203:13
**reply** 199:5 203:14
**report** 78:23,24
  98:23 120:15
  231:21 264:12
**reported** 1:20
  20:17
**reporter** 7:4 8:3
  8:24 9:3 92:9,16
  92:17 93:2 159:17
  159:19,20 262:23
  264:1,2,6,9,21,22
  265:24 266:5,7
**reporting** 121:7
  177:25 264:5,16
**reports** 52:16
  231:22 233:20
  266:13
**repository** 29:8,11
  264:24
**represent** 7:18
  98:3 138:24

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 308 of 321
Christy Bunce                                    January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[represent - right]                                             Page 38

258:19

**representations**
54:22 55:8,11
264:3

**representative**
146:17

**represented**
128:13

**represents** 266:3,5

**request** 80:21
184:19 198:23
219:23 258:23
266:9,14

**requested** 31:19
92:15 159:18
219:25 226:14

**requesting** 98:8

**requests** 5:11
28:14

**require** 49:12
58:13 135:20

**required** 43:1,4,11
43:12 44:2,3,7,8
44:16,19 49:10
55:21 56:19 71:18
101:6 121:3

**requires** 55:23,25

**requiring** 193:6
193:20

**reread** 87:16
89:10 135:4,6

**resend** 105:11

**resending** 106:11
106:17

**resent** 106:22,23

**reservation** 15:20

**reserved** 263:10
267:6

**residence** 10:24
11:12

**resign** 175:3

**resigned** 175:2,3

**resolved** 182:5

**resources** 26:21
29:7 34:18 42:5
42:18 46:4,5 49:5
50:14 51:1 55:17
96:3 110:12,22
139:15

**respect** 31:21 38:3
51:3 54:21,24
55:5 77:12 84:15
114:9 146:10,19
162:11 178:9
182:7 224:7 238:1
245:1

**respond** 195:10

**responds** 199:4
203:15 253:13

**response** 28:14
147:21 165:25
184:18 196:4
197:25 253:11
254:2,5,21 255:23
258:23 259:15

**responses** 5:9 6:6
8:2,5 28:10 82:1
251:20 252:4,15
252:25 258:20

**responsibilities**
21:20 98:16

**responsible** 52:18
159:5 192:1

**responsive** 29:2,4

**restate** 77:19
92:13 136:6 209:4
258:12 259:23

**restroom** 89:14
196:18

**restructured**
71:15

**result** 262:11

**resulted** 201:24

**resume** 120:7

**retail** 73:22 74:2,5
74:7,8,9,10 75:8
75:24 77:14,24
78:6 100:11,20
120:14 121:16
122:9,10,13,20,24
123:2,5,10,12,22
124:9,12 125:6
136:21 138:2
149:18,19 151:17
155:2 158:12,18
189:11 201:3,10
201:16 232:12
257:1

**retention** 194:15

**return** 42:17
97:17 98:9

**returned** 49:21
267:11,14

**reveal** 15:6 24:18
75:12 190:15
225:20 238:6,11

**revealed** 193:6,20

**revealing** 24:20

**revenue** 77:15
78:3,18 158:6

**revert** 168:14

**reverted** 109:24

**review** 8:13 25:8
26:10 30:17,25
47:3,4,4,10 52:9
54:2 58:12 72:23
75:19,22 84:25
85:5,24 86:1
107:12 114:24
121:10 127:8
139:15 186:1
192:23 206:21

213:6 252:15
264:2 267:6

**reviewed** 25:16,18
25:20 26:8 27:1,4
27:9 73:13 75:21
86:2 106:25
121:13 122:19
127:10 131:12
141:22 236:25
243:1,25 252:24
261:5

**reviewing** 27:24
51:1 86:5 113:16
203:19,19,24

**reviews** 95:16
127:9 137:23
143:10 185:18
192:25

**rick** 55:18 57:6
135:23 143:25
151:2 152:23
154:9,24 156:4
157:16 167:7
183:21 185:11,13
185:22,24 197:15
203:16,16 206:21
220:21 221:8
232:14

**right** 7:5 10:21
21:10 31:6,12
32:22 41:20 45:11
50:1 53:9 57:17
67:5 70:20 79:24
81:21 82:19 88:1
88:15,17 89:9
91:25 92:1 101:24
102:1 103:9
108:13 116:18
121:2 127:15
128:15 131:20
133:5 134:15

Case 1:20-cv-04981-CAP   Document 106   Filed 04/28/22   Page 309 of 321

Christy Bunce

January 12, 2022

Spearman, Gina v. Broker Solutions, Inc. Et Al

[right - see]

Page 39

135:3 138:23
161:9 163:6 184:4
190:25 191:15
201:18 204:25
205:25 210:1
245:20 262:5,7
267:6
**riley** 11:19
**ring** 134:19
**ringing** 133:5
135:3
**rm** 60:9
**rm's** 65:24
**rma** 253:20
**road** 2:8 182:11
**role** 21:15 46:25
121:10
**rolled** 163:21
171:4
**room** 38:14 45:11
77:1 153:14
180:16 238:9
**rose** 11:19
**roswell** 267:18
**rotate** 142:25
143:8
**roughly** 206:9
**rounded** 158:22
**roundtable** 162:20
183:23
**routine** 227:25
**rpr** 1:22
**rsa** 1:22
**rule** 268:8
**rules** 7:24 264:4
268:8
**rumors** 210:18
**run** 40:24 148:24
183:16 202:20
**running** 101:17
163:10 172:2

201:3
**rushing** 86:17,17
86:18 87:3

**s**

**s** 3:6 4:1 5:1 6:1
**safe** 150:8
**salary** 22:23 65:25
**sales** 99:14 120:14
154:2 187:24
188:4 202:16
205:8 219:24
**salespeople** 102:18
149:3 154:19
191:11 205:13
216:3
**sandbox** 216:13
**sat** 158:23 181:5
**satisfaction** 80:13
**saw** 29:19 115:23
123:22 125:1
158:2 232:10
**saying** 54:2 62:13
124:11 144:23
168:8 174:16
191:8 199:17
229:2 246:21
**says** 48:17 51:23
51:24 52:11,12
55:3,25 56:1
59:19 60:5,20
61:15,16 62:5,16
63:3,9,18 64:1,2
64:23 65:22,24
66:3,11 67:5,15,16
68:12,16 69:2
71:12 87:13 88:13
95:18 97:15 98:3
98:10 104:7
143:22 185:2,23
185:23 186:15
190:3,8 193:19,25

194:13 198:4
199:17 203:24
204:5 229:6 252:1
253:12 254:21
255:24
**scenarios** 60:5,8
62:2
**schedule** 3:20 4:6
4:11,17,21 45:2
52:1,4 53:19,22,25
54:6,14 57:17,19
58:25 59:5,10
61:13 63:21 64:3
64:7,18 65:5 66:8
67:10 68:17 69:8
69:14 70:5 71:4
72:21 81:16 85:14
88:25 94:14 95:6
95:19,23 98:6
99:20,21 100:15
100:16 104:1,4,14
118:1,1 126:14
127:12 128:13,18
129:9,16 132:14
137:13 138:21
140:5,7,8,21,23
148:4 190:16
204:3 225:16
242:25 243:12,14
243:17 256:9,12
**schedules** 93:20
242:16 243:1,8,11
**school** 12:21,22
13:4
**scope** 117:18,20
229:18
**scott** 96:4 97:12
100:4,8 103:24
104:3,22 105:21
107:19 108:15
109:9,25 111:8

112:10,16 113:13
114:5 119:14
178:23 203:20,25
211:12 212:19
213:19 214:15,16
**screen** 24:6 28:22
44:24 45:11 90:4
91:18 96:25
103:14 137:10
192:14 196:15
197:3 250:9 251:7
**screens** 240:16,25
**scroll** 10:9
**seal** 267:12
**second** 23:15
51:20 61:10
116:14 126:16
128:14 142:17
143:1 146:15
159:15 165:13,13
165:14,15 169:17
174:5 179:2
181:19 191:16
193:2 198:1,3
207:2 226:2 233:4
250:9 251:13
253:12 254:15
**secondary** 61:11
61:24 63:12 88:21
**seconds** 90:10
**section** 87:17
**sections** 264:6,7
**see** 23:25 24:6,10
44:25 45:4,5,9,18
45:20 46:14 48:12
48:13,16 49:2
50:10 52:2,21
55:19,23 59:1
60:2,14,22,24 61:6
61:7 63:6,23 64:4
66:4,8 67:11

Christy Bunce
January 12, 2022
Spearman, Gina v. Broker Solutions, Inc. Et Al

[see - simple]
Page 40

68:25 69:9 72:1
85:1 87:12 90:8
90:21 91:21,25
92:1 94:3 95:3,20
97:20 100:4 104:4
104:20 116:17
123:4 124:3 125:8
125:19 128:19
129:3 130:22
131:1,5,7,9 132:2
135:15 137:8,17
137:19,20 142:9
143:20 144:5
150:5,9 166:5
171:1 172:21
176:19 185:3,14
192:15 193:8
197:16 198:24
203:22 206:13
207:10 225:7
239:19 241:18
251:23 252:1,9
261:5
**seeing** 45:6 113:9
115:12 139:8
167:23
**seen** 24:8 29:18
118:7 198:5 241:8
**self** 52:14 53:6
**send** 42:9 44:15,18
56:18 58:6,14
71:25 72:4,5 75:7
107:11 224:11
232:1 249:23
250:5 267:12,17
**sending** 104:23
205:3 228:3
**sends** 42:5,8
**sense** 40:10 68:5
77:18 153:9 163:9
168:9 191:4,11

229:25
**sent** 43:25 47:15
48:7 49:9 58:16
58:19 73:16,19
100:7 107:16
110:11 130:2,6
139:9,11,12,14
144:19 146:3
225:7 226:9
**sentence** 55:2 57:3
57:23
**separate** 174:3,25
179:17
**separation** 109:2
110:15,18,20,21
**september** 211:12
212:14,17
**served** 11:2 28:10
119:8,9
**services** 264:16
266:13
**servicing** 158:6
**set** 55:14 136:11
167:8 252:4
259:16
**setoff** 250:21
**settle** 14:25 17:8
**settled** 16:19,21,25
17:1
**settlement** 15:6
**seven** 85:10 99:15
201:19
**shadow** 149:6
**share** 23:15 29:17
142:17 161:17
184:15 216:13
231:8
**shared** 114:4
**she'd** 40:13 70:22
**sheet** 268:17

**sheets** 157:13
236:8 255:21
**shocking** 123:6
**shoes** 39:21
**short** 73:4 119:25
163:2 164:10,12
167:8 185:7
196:18,21 256:16
**shortfall** 157:16
159:12,23 160:10
160:15 181:9
**shortly** 144:23
**show** 23:14 44:23
73:20,24 76:4
107:18 113:7,8,9
115:11,13,15,18
115:24 116:3,20
117:24 118:8,12
118:16,17,19
119:1 122:23
128:10 140:1
176:25 213:9,12
213:21 214:5,17
215:6 255:6,21
**showed** 118:11
122:19 157:20
177:2 184:15
194:21 225:9
**showing** 139:19,24
224:12 232:12
259:4
**shown** 25:5 26:19
59:24 60:10,13
61:18 62:3,4 69:4
75:24 129:1 225:4
242:16
**shows** 56:12 137:7
139:23 176:22
**sic** 195:20 196:16
197:4

**side** 127:19,19,23
127:23 129:19,19
155:20 158:11
**sign** 8:9 42:13,16
42:19,23 43:1,5,11
43:12 44:2,3,7,8
44:16 49:4,10
55:22 56:7,12,19
56:23 58:6,7,9,12
58:13,15,19 72:6
72:11 79:10,11
97:17 98:8,8
121:3 130:22
136:23 137:6
139:14 145:23
146:7 267:6
**signature** 44:15,19
50:8 55:7,25 56:6
97:16 135:17
142:2 252:11
263:10 265:22
267:2,15
**signed** 48:17,22
49:2,6,13,18,20,22
49:23 50:5 55:4
56:1,3,4,17 58:20
59:13,13 71:8
78:25 79:9 97:16
100:4 105:1 130:4
135:23 136:17
140:12 142:3,5
145:8 252:13,16
267:9,11,14
**signer** 49:24
**signing** 43:9 72:10
106:24 253:19
**similar** 100:15
140:4
**simple** 158:3
225:23

**[simply - spearman0673]**                                                    Page 41

**simply** 46:12

**single** 34:8 51:8
  244:14 245:19
  247:1 248:16

**sit** 50:24

**sits** 236:9

**sitting** 48:3 79:24
  190:6 238:9

**situation** 40:8

**six** 85:10

**size** 56:15

**skimming** 116:17

**skin** 37:5 114:16

**slide** 113:6,8,9
  115:10,13,15,18
  115:24 116:3,20
  117:24 118:8,11
  118:16,17,19
  119:1 176:22,25
  213:9,12,21 214:5
  214:17 215:6

**slipping** 123:5

**slow** 87:4

**small** 100:13

**smaller** 79:13,17
  169:6,14 179:3,22
  180:7,10

**smart** 38:12 39:12

**smith** 53:15

**smooth** 205:12

**socialize** 239:16
  239:17

**sole** 71:16

**solely** 264:14

**solidify** 206:14

**solution** 190:10,13
  190:15

**solutions** 1:7 5:7
  5:21 6:4 241:5
  251:20 252:2

**somebody** 51:8
  108:1 167:1
  168:24 216:9

**soon** 46:20

**sooner** 174:15
  198:7

**sorry** 14:20 22:25
  23:16 30:1,20
  37:17 38:25 73:18
  86:11,15 90:6
  92:6 94:18 95:8
  101:24 110:5
  115:7 116:6
  121:25 125:17
  126:24 135:25
  138:18 141:7,10
  147:23 152:16
  155:7 159:15
  165:14 167:25
  169:5,13 170:3
  175:3 188:22,23
  192:9 198:13
  200:4 206:5 208:2
  212:8 218:1
  221:14 224:23
  226:1 235:11
  236:19 243:4
  249:20 251:1
  260:2

**sort** 72:11 106:5
  115:13,24 118:7
  157:18 168:7
  177:3 204:21
  214:4 234:9

**sound** 134:19

**sounds** 120:8
  150:5,9 186:8
  189:16

**soup** 35:3

**source** 233:3,12,13
  233:14,16,24

234:4 237:4

**sourced** 67:7,23

**south** 5:16 41:25

**southeast** 5:13,19
  32:12,20 35:12
  59:4 76:4 125:13
  125:23 126:1
  139:5 199:24
  215:21,24 216:1

**southeast's** 126:6

**speak** 89:19 120:6
  152:14,17 229:4
  254:16 260:10

**speaking** 31:23
  146:21 222:2

**speaks** 244:22

**spearman** 1:4 2:23
  6:7 7:18 21:11
  24:16 32:6,7,11,14
  33:5,11 34:19
  38:22 39:6 45:1
  46:9,19 47:15
  49:2,9 50:4,18
  51:11 52:5 53:20
  55:22 59:4 62:7
  62:24 63:15 65:6
  65:7 70:10 71:9
  79:20 80:12 81:1
  82:5 85:15 90:15
  91:1 92:20 95:8
  97:13 100:8 102:4
  104:3 111:12
  112:12 120:15
  130:6,21 137:7
  138:12,16,25
  139:12 142:8
  143:19 145:16
  166:2 167:19
  169:23 170:10
  171:7 173:13
  174:3 175:14,25

176:2 185:9
  186:21 190:8
  192:19 194:4,22
  222:8 224:3 225:4
  238:25 242:5
  246:8 253:5
  255:14

**spearman's** 5:10
  48:14 72:15 92:5
  94:9 96:8 99:22
  105:10 112:21
  117:12,19,20,25
  117:25 127:12
  128:2,11 129:16
  129:23 136:24
  137:16 140:6,21
  144:11 185:22
  219:22 222:2
  229:19,22 247:20
  251:21 256:1,5

**spearman0643** 5:6

**spearman0645**
  5:17

**spearman0648**
  3:13 45:3,19

**spearman0649**
  51:22

**spearman0654**
  48:25

**spearman0656**
  50:9

**spearman0669**
  58:24

**spearman0670**
  59:10

**spearman0671**
  60:18 84:11

**spearman0672**
  64:1

**spearman0673**
  71:4

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

[spearman0687 - subject]

Page 42

**spearman0687**
3:17
**spearman0697**
3:24
**spearman0703**
4:10
**spearman0709**
3:19
**spearman0710** 4:5
**spearman643**
142:24
**spearman645**
192:11,16
**spearman669**
57:18
**spearman670** 61:9
**spearman687**
94:17
**spearman709**
96:25
**specific** 30:2 36:22
36:25 43:10 46:5
47:22 48:6 116:22
121:16 122:10
132:7 133:7 162:8
191:20 216:2
217:1 232:20
245:18 253:17
264:18 266:12
**specifically** 26:25
38:10 48:1 64:13
76:25 86:4 144:7
151:20 215:17
221:14 223:22
233:22 253:5
264:4
**specificity** 253:3
256:8
**specifics** 28:4
40:17 72:25 73:1
154:11 179:24

**specified** 59:25
61:18,19 129:2
**speculation**
123:15 171:14
181:25 182:17
200:15 201:1
202:1 210:25
218:23 228:14
257:8
**spells** 134:10
**spend** 80:9 161:21
**spent** 180:1
200:10 203:17
218:13
**spinning** 45:6,9
103:20
**split** 36:5,5,9 48:5
52:17,19 53:16
60:21 62:19 80:20
**spoke** 31:25
152:20 157:7
222:4
**spoken** 110:2
111:5,8 118:21
**spouse's** 11:10
**spreadsheet**
227:13 245:19
**spreadsheets**
76:11 227:16,18
227:24 228:4,7,7
228:10,10,19
229:9,10 231:5,7
231:14,24 232:4
**spring** 107:22
120:24
**stability** 172:20
**staff** 36:14
**stage** 210:5
**stamp** 251:19
**stamped** 146:6
241:4

**stand** 12:9
**standard** 133:20
134:3
**start** 49:19 56:20
161:12
**started** 20:4 21:5
22:21 134:1 149:1
162:22 172:5
202:5
**starting** 19:16
105:1
**starts** 44:9
**state** 10:21 13:2
30:22 41:14 85:19
94:5 158:24 252:2
264:9 265:4
**stated** 32:20 49:18
94:10 136:10
146:14 165:25
168:12 190:8
252:5 265:8
**statement** 26:16
27:3 147:12,13
187:3 207:13
258:12 268:12
**statements** 54:22
85:1,5 207:5
265:11
**states** 1:1 41:3,7
54:20 70:20 76:2
93:23 125:12,19
128:21 215:19,23
216:1,2,16,19
222:1 229:20
231:1 241:12
244:4 247:17
249:6 259:3,15
**stay** 173:1 210:10
223:4 250:8
**stays** 191:9

**steady** 206:19
**stem** 201:22
**stemmed** 202:23
203:5
**stemming** 210:17
**stenographically**
265:7
**step** 108:8
**stepped** 76:25
77:2
**steps** 171:3 178:17
**sticking** 87:9
89:10
**stipulation** 15:19
**stop** 83:5
**stopped** 89:9
**stopping** 149:25
**stored** 29:15 231:3
231:8
**stores** 29:9
**stories** 172:11
**story** 168:6
**straight** 100:11
114:17 153:6
171:21 172:3,8
**strain** 205:13
**street** 2:16
**stress** 205:13
**strike** 151:21
154:25 170:22
**structure** 110:13
156:24
**structured** 153:4
**stuff** 198:4,8,9,18
**stupid** 90:7
**subcontractor**
264:10,15
**subject** 5:4,12,15
5:18 24:19 55:6
75:16 77:4,6 82:9
95:18 108:24

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

125:16 143:19
176:13 226:6
253:12 254:21
255:24
**subjects** 154:13
184:6
**submit** 218:6
**submitted** 3:7 4:2
5:2 6:2 264:21,22
266:5,6
**subparagraph**
68:24
**subparagraphs**
84:15
**subprime** 20:9
**subscribed** 269:21
**subsequent** 44:12
68:8,9 169:16
**substance** 268:10
**substantial** 193:6
193:20
**success** 199:21
**successful** 154:20
**suddenly** 157:21
**sue** 16:11 17:16
212:13
**sued** 237:6,9
238:12,12,14,15
238:17 239:5
**suing** 17:4 246:21
**suite** 2:9,17 267:18
**summary** 190:8
**super** 125:1
**supersedes** 54:21
**supervision**
265:13
**supplemental**
268:15
**support** 247:19
248:6,12

**supported** 220:4
**supposed** 62:24
86:7
**sure** 16:2,23 19:17
23:12 24:2 35:15
35:23 37:8 46:21
47:6 53:24 58:18
76:25 77:21 78:9
84:2,7 90:1 95:15
100:1 104:7 105:5
106:4,24 107:17
112:4 113:25
114:19,22 120:3
129:13,20 132:5
136:7 142:18
143:3 145:3 149:6
151:1 154:16
155:14 159:17
164:14 165:17
167:11 169:3
179:7,15 188:2
196:6,19,22
204:10,20 206:16
214:3 217:4
223:24 238:2
241:21 242:7,15
242:17 243:13,21
244:1 251:16
**surely** 139:9
**surprise** 123:6
**surprised** 232:11
232:13,15,18
**suspend** 262:9
**suspending** 262:19
262:20
**sustainable** 149:19
194:14,19
**svp** 21:18 22:3,10
22:16 95:19 99:13
103:1 124:23
152:9 155:16,17

155:19 179:6,6
183:22 189:14
**svp's** 156:5
**svps** 96:6 100:18
100:25 101:16
102:24,25 105:20
105:22 106:4
125:1 150:25
152:25 153:11,15
154:17,25 155:1,8
156:22 158:2,8
160:16 161:11,16
162:5 163:10
165:1 167:3,17,19
168:16 178:11
179:4,18 181:20
182:14 183:20
187:7 188:11
189:20,24 190:12
190:23 198:18,19
201:7 204:9
256:25 257:4,16
258:16 260:24
**swirling** 210:18
**switched** 103:2
**sworn** 7:7 265:9
269:21
**synchronized**
186:3
**system** 29:14 58:7
58:9,15,20 72:8,12
107:15 231:9,11

| t |
| --- |

**t** 2:14 3:6 4:1 5:1
6:1 265:1,1
**table** 59:17,21,25
60:17 61:16,18,22
62:3,12 70:18,20
128:19,23 129:1,8
129:15,16 141:21

**tables** 129:20
**take** 9:16,19 14:1
48:11 73:4 87:1,6
95:12 119:19
123:9 137:21
140:17 151:23
153:19 161:10,18
161:19 168:1
171:3,6 178:18
182:23 185:5,16
190:25 192:23
195:15 196:17
197:21 204:21
205:21 210:5
223:7 224:19
234:9,14,25
235:21 238:3,24
239:8 250:7
255:24 258:21
260:24 261:24
262:15
**takeaways** 119:17
**taken** 63:21 73:8
84:23 88:15 120:9
131:22 135:2,3
166:18 196:25
201:25 217:16,19
223:12 262:4
**takes** 42:1 90:9,10
**talk** 8:22 86:21
91:9,10 113:14,15
113:18 127:1
154:9 155:9 156:7
156:22 159:1
165:4 173:25
187:12 211:16
213:7 221:9
222:23 243:18
260:10
**talked** 29:18 40:16
80:2 84:6 85:8

Case 1:20-cv-04981-CAP Document 106 Filed 04/28/22 Page 314 of 321
Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

[talked - think]

Page 44

105:3 131:17
144:24 157:24
187:11 209:14
211:14 213:18
220:20,21 221:7
221:15 222:20,25
224:6 231:10
232:7 243:17
246:10 257:12
**talking** 29:12 35:3
41:9 48:4 77:6
123:18 141:3
142:11 152:25
153:24 154:12
156:9,12,13,16
170:12 178:12,16
178:17 179:25
193:10,15 198:19
199:25 208:7
210:8 212:18
214:18 218:8,9,10
222:10 237:22,24
**tam** 14:4,5,8 16:25
**team** 34:17 42:5
51:2 68:4 159:8
172:2 173:22
202:14 228:22
231:15,16,19
232:1 244:14
245:16 246:10
248:17 249:18
252:22
**teams** 37:3 149:3
**tech** 34:17
**tell** 9:4 13:15,16
13:22 19:14 22:22
29:3 33:14 41:20
43:20 53:4 105:16
108:21 111:18
113:18 129:20
144:21 146:12

147:3 151:5
154:24 157:5
161:14 165:1
168:16 169:22
176:8 181:11
242:20 244:8
246:6 256:12
265:9
**telling** 40:13 124:5
132:12 172:24
210:9 248:24
**tend** 86:21
**tennessee** 199:6
216:20 217:13,23
219:21 220:8
222:11,21 259:21
259:24
**tenor** 155:12
**tenth** 246:4
**term** 57:14 138:9
193:11 194:14
**terminated** 109:13
109:14 246:18
**termination** 17:24
**terminology**
160:14
**terms** 15:5 17:20
54:24 55:13 57:3
97:15 104:12,17
106:19 110:23
135:21 136:10
264:15
**territories** 215:13
216:6,7,21,24
217:13,14,24
220:1 254:24
259:13,14,22,25
**territory** 59:23
60:21 128:24
216:13,17 219:22
221:8,10 222:2

229:21 259:16
**testified** 57:22
63:14 73:13 78:22
81:21 83:14 85:12
85:15 99:3 106:18
111:1 122:18
131:20,23 136:4
140:12 145:14
244:18 245:22
**testify** 9:12 29:23
30:12,15 31:15,17
65:2 112:7 118:15
160:18 175:10
242:19 262:14
**testifying** 30:23
31:9 76:22 92:11
175:9
**testimony** 31:19
70:8 78:2 79:5
82:8 83:18 84:2,3
84:8 86:6 89:6
91:6 102:12 103:3
118:10 132:18
134:24 145:19
146:16 148:6
159:10,21 173:3,5
186:20 196:9
214:20,23 215:1
224:15 245:21
257:3,6,8 261:11
262:17 265:15
268:3,11
**text** 249:23 250:5
**texting** 145:11
**thank** 7:16 23:23
24:1 30:7 73:7
77:3 94:22 97:9
117:10 120:8
126:20,22 127:3
143:4,5 152:13
160:5 165:16

185:24 190:20
197:8 208:18
247:5 251:15
263:1,4,5,8
**thanks** 90:8
184:16 196:24
263:7
**theory** 171:15
**thereto** 93:25
265:11
**thing** 20:18 22:5
51:8 74:6 89:15
107:9 154:12
171:15 175:8
187:2 220:22
**things** 35:14,18
44:11 49:19 54:3
56:14 70:19 80:3
98:21 99:8 104:7
112:15 144:1,18
153:21,24 156:10
156:13,25 157:14
158:7 162:7
163:24 166:24
168:5,23 177:25
178:15,16 179:10
180:3 182:6 195:8
199:14 203:11
205:11 209:15,23
210:2,16 213:6
222:15 230:4,5,17
234:1 242:20
252:23
**think** 14:22 16:22
17:13,13,22,22,24
18:9 19:23 21:17
22:20 24:12 26:16
33:8,20 34:7
38:10,11 39:14
40:3,7,16 41:9
44:24 46:20 49:8

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

[think - transcript]

Page 45

51:17 52:8 55:1
55:23,24 57:9,16
67:24 71:24 72:6
76:8,9 79:25 80:8
80:16,22 82:21
83:10 84:20,25
85:18 88:5 91:4,9
91:24 92:10 94:4
94:24 96:12,20
98:17 99:14 103:8
106:23 108:12
109:19,19 111:4
112:13 113:20
114:3,11,11,15
119:16 120:14,20
121:2 124:22
127:16 133:9
138:8 144:1,15
145:24 148:22
149:24 151:3
152:8,10,11
155:16 156:6,7
157:3 160:2 162:3
162:4,8,20,20,21
164:13 165:3
167:22 168:19
169:17,18 171:9
171:19,25 172:15
172:16,20,22
173:11 176:4
181:6 182:2,19,21
186:13 187:10
189:23,25 191:2
191:10,18,18,20
192:14 193:11
195:2,3 196:3,4
198:6 200:24
201:9,14 203:7
206:13,21,25
207:4,6 209:21
211:14 213:1,2,15

215:5,25 216:1
217:8,8 221:14
223:1 232:18
239:13 243:1,24
244:11 246:23
254:6
**thinking**   90:11
111:23 119:15
228:20 238:7
**third**   90:21 233:1
241:12
**thoroughly**   87:11
**thought**   32:1
111:19,21 128:7
135:13 142:20
157:12 164:17
178:13 220:9
233:9 238:7,11
244:15 247:2
248:11,17 249:21
**thoughts**   200:18
**three**   13:17 19:25
26:3,6 60:4 85:10
239:24 243:1
**thresholds**   186:18
186:23 187:8,18
**thrilled**   221:3
**thumbs**   203:14
**tie**   234:20
**tied**   175:10 176:15
236:8
**tiers**   157:25
**tight**   172:7
**time**   9:14 10:16
15:16 23:13 34:24
35:9 36:18 37:1
38:14 48:21 75:3
75:9 80:9 87:2,6
88:6 90:7 94:2,8
96:5,7 98:2 99:15
100:19,21 101:19

102:8,18 105:24
108:13 113:13
119:19 122:24
124:8 125:23
134:19 135:9
137:22 145:23
146:6 147:8,12,16
147:17 150:2
152:4 155:1
161:18 163:3
164:10,12,12,22
165:2 166:4,10,19
166:20 167:20
168:1 170:11
180:13 195:15
198:11,20 199:12
208:19 211:4,10
211:23 222:17
234:11 249:22
250:1 255:24
258:17 259:19,19
263:1 264:19
266:12 267:14
**timeline**   168:7
**times**   13:16 26:2,3
33:21,21 148:19
214:11,21 239:24
**tiny**   10:6 45:21
**tion**   4:14,19
**title**   20:12 21:14
103:1 109:24
120:13 178:1
**titled**   59:16 128:18
**today**   7:14,16,24
8:4 9:1,8,15 10:17
25:9 30:16 31:21
94:5 97:19 126:5
159:10,21 171:18
237:22 242:3,10
243:1,19,25 262:1
262:8 263:1

**told**   29:1 111:19
123:12 124:8,11
132:25 148:19
155:2 166:17
167:17,19 170:24
171:10 173:18
175:18 181:23
207:14,23,24
208:1,3,4 209:1,22
213:2 239:13
246:9
**tolerance**   162:5
**tolerances**   161:25
191:5
**top**   27:2 46:15
48:16 59:13 62:11
69:15 70:17 72:18
130:22 148:24
185:12 200:9
202:15 218:20
241:4 243:7
**topic**   77:5 116:16
117:8 223:24
225:2,21 229:17
229:18 230:22,23
232:7 248:2
262:17
**topics**   29:23 30:3
30:12,15 31:3,4,14
31:22 117:11
223:21
**total**   26:4,6 189:11
**tough**   183:1
**track**   233:13
**trail**   191:3
**training**   22:7
**transcript**   8:5,7,14
8:25 264:19 265:7
266:3,4 267:7,12
267:14 268:3

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

January 12, 2022

**[transcripts - veritext.com]**

Page 46

**transcripts** 25:9
25:10,16,19
264:19,23
**transition** 80:4
**travel** 183:20
**travis** 2:5 251:3
**trial** 14:23 16:17
17:6,12
**tried** 201:6
**trouble** 10:11
180:21
**true** 74:9,10
144:11 147:12,15
170:12 173:19
252:6,8 264:20
265:13 266:4,6
**truth** 9:5 265:9,9
265:10
**truthful** 9:12
**try** 8:22 16:3
31:22 43:22 44:14
58:5 98:21 183:25
199:23 205:6,10
205:11 207:16
221:17 240:19
**trying** 43:15 78:4
89:2 117:13 132:8
157:22 190:12
204:9,20 209:9,25
210:5,5 211:5,5,6
245:14 248:5
257:10
**turn** 41:22 57:17
68:4 71:3 84:10
225:1 249:5
**tustin** 1:13 7:1
151:8 154:5,7
183:20 189:20
253:25
**tweaks** 203:20
204:5

**twelfth** 247:16
**twice** 19:3 106:22
106:23 189:24
240:6
**two** 20:2 22:21
33:21 34:1,5,11,13
34:25,25 35:22
40:11,18 41:2
46:17,21 60:4
77:7 85:10 144:1
151:24,25 172:1
186:12 188:6
193:5 202:15
220:1,12 253:24
254:12 259:25
260:4
**tying** 235:1
**type** 32:22 61:1
63:16 65:19
**types** 37:9 39:15
40:16 65:14 158:6
222:15 230:4
**typewriting**
265:12
**typical** 81:20
**typo** 55:1

**u**

**ugh** 199:5
**uh** 9:23 25:15,15
60:19 126:23
181:16 218:11
**ultimately** 190:15
**umbrella** 168:24
223:4,6
**unclean** 245:5,25
**unclear** 243:21
**underneath** 21:25
22:7 101:2 102:18
260:12
**undersigned** 268:2

**understand** 8:19
9:6 16:2,7 31:8
32:4 53:24 54:4
55:11 78:4 85:7
89:2 94:7 106:14
114:7 115:25
163:6 175:9 176:6
187:15 191:22
199:5 209:4,6
211:18 225:13,14
227:1 228:8
243:10 248:1
257:10
**understanding**
15:4 53:24 54:1
85:6 111:22 112:7
114:20 227:8
228:18 234:22
257:6
**understood** 56:5
70:8 78:1 84:3,5
93:7 102:12 106:9
106:25 113:6
119:16 168:16
173:12 262:19
**undertaking**
182:12
**underwriting**
20:17,20
**unhappy** 109:16
181:22 182:15,20
210:3
**united** 1:1 76:1
125:12,19
**units** 59:22 60:21
61:16 128:24
**unsigned** 144:22
**unusual** 134:20
**updated** 97:15
**uplifting** 183:6

**upload** 10:8
195:19
**uploaded** 165:10
264:24
**uploading** 10:1
89:24 184:11
**upper** 91:25 92:1
**upset** 80:21 199:6
**upside** 204:22
**upwards** 133:9
**urgency** 187:17,19
**use** 46:11 72:12
138:8 160:14
234:4 237:4
255:15 268:14
**usually** 34:17
42:14
**uttered** 181:7,9

**v**

**v** 2:4
**valid** 55:13
**value** 143:23
**various** 26:11 37:9
179:4
**vary** 179:11
**vegas** 183:9,12,17
240:1,3,5
**verbal** 8:2 55:15
57:4,24,25 106:12
107:4 136:12
**verbally** 54:23
57:11 165:21
224:10
**verbatim** 264:12
**verbiage** 127:24
**verification** 252:1
**veritext** 264:10,16
266:3,5,11 267:10
267:17
**veritext.com**
266:10

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al

**[version - work]**                                                                 Page 47

| | | | |
|---|---|---|---|
| **version** 105:17 | 119:19,20 128:10 | 107:8 114:13,20 | **westle** 2:21 |
| **versions** 105:12 | 132:5,11 136:3 | 140:4 144:3 | **wheels** 40:1 |
| 130:17,18 243:19 | 150:18 163:8 | 147:21 149:2 | **wholesale** 105:19 |
| **versus** 77:16 79:3 | 174:14 187:9,12 | 158:17 163:24 | 114:12 |
| 260:5 | 187:13 188:9 | 167:10 188:1 | **wholly** 159:2 |
| **vice** 237:22 | 196:14 197:3,21 | 193:13 201:9 | **willingly** 235:21 |
| **video** 92:3 | 197:24 206:10 | 202:17 203:10,21 | **win** 235:1 |
| **view** 44:1 92:1 | 209:6 213:8 | 204:6,17,18 | **witness** 7:1 29:23 |
| **viewing** 158:9 | 220:24 223:23,23 | 230:24 233:13 | 32:2 37:17 38:25 |
| **violated** 16:16 | 226:11 238:3 | 237:4 | 39:4 86:11,15 |
| **violates** 207:18 | 241:20 242:6,7,18 | **ways** 108:20 | 90:20 92:12,25 |
| **violating** 237:6 | 243:13,21 250:7 | 109:11 110:25 | 95:16 96:17 |
| **virginia** 216:20 | 255:2 256:3 | 111:9 213:19 | 103:10 108:21 |
| 217:14,23 219:21 | 258:23 262:9 | **we've** 26:2 38:13 | 112:20 115:7 |
| 220:8 222:11,21 | **wanted** 16:5 41:3 | 51:16 62:15 73:3 | 117:4 119:22 |
| 259:21,24 | 45:12 50:18 51:11 | 96:24 98:19 104:2 | 125:17 127:9 |
| **virtue** 244:6 | 53:23 81:25 82:13 | 119:8 132:24 | 137:23 141:7,11 |
| **visit** 239:25 | 89:22 101:22 | 183:12,17 187:10 | 143:10 146:8 |
| **volterra** 10:25 | 102:3 103:4 104:9 | 195:10 199:12 | 147:1 170:3 174:7 |
| **volume** 59:22 | 106:24 114:19,23 | 223:21,24 224:6 | 184:17 185:18 |
| 60:20 128:24 | 117:6 143:23 | 241:21 242:25 | 188:22 189:4 |
| 230:3,8,13,19,25 | 153:16 171:18 | 243:25 249:9 | 192:25 200:4 |
| **vp** 19:1 21:18,21 | 187:15 195:7 | 257:12 262:17,25 | 208:18 212:8 |
| 22:10,13 178:2 | 198:23 199:16 | **weeds** 35:2,14 | 215:11 223:14 |
| **vs** 1:6 | 203:3 204:13 | **week** 27:8 104:15 | 224:23 226:1 |
| | 206:16 215:23 | **weighed** 153:16 | 233:6 235:11 |
| **w** | 221:25 223:4,5 | **welcome** 87:1,6 | 236:19 242:20 |
| | 236:13 246:18 | 92:8 126:21 | 250:11,14 262:13 |
| **wait** 8:15 42:13 | 258:16 260:14 | 174:10 250:5 | 263:3,6 266:7 |
| 89:5,5,5 | **wanting** 182:21 | 263:6 | **witnesses** 264:22 |
| **waive** 88:23 | 196:13 | **went** 7:25 19:20 | **women** 39:12 |
| **waiving** 255:25 | **wants** 163:7 | 21:17,21 22:10,13 | 148:21,24 202:15 |
| **walked** 111:23 | 205:25 210:10 | 22:16 47:3 84:13 | **won** 17:10,11 |
| 112:7 119:15 | 238:20 239:1 | 85:24 90:13 91:22 | **wondering** 82:4 |
| **want** 8:1,8 15:3,19 | **waste** 174:14 | 110:6,8 111:19 | 203:4 |
| 16:2 24:17 28:20 | **watson** 111:13 | 113:10 114:25 | **word** 127:16 181:7 |
| 30:25 38:15 39:13 | 211:13 | 115:3 119:15 | 181:9 |
| 44:23 45:24,25 | **way** 35:10,15,18 | 134:2 143:13 | **wore** 123:3 |
| 48:11 51:18 53:22 | 41:23 42:20,21 | 157:22 159:6 | **work** 13:19,20,21 |
| 71:7 73:4 79:23 | 45:10 62:10,20 | 173:23 179:20 | 18:5,17 19:2,15 |
| 81:6 83:4 84:2,6,7 | 63:2 67:1 70:3 | 204:14 220:20 | 34:22 79:21 110:6 |
| 92:12,13,24 102:4 | | | |
| 106:21 117:23 | | | |

800.808.4958                                                                    770.343.9696

Christy Bunce
Spearman, Gina v. Broker Solutions, Inc. Et Al
January 12, 2022

[work - zoom]                                                              Page 48

110:7,12 149:17
191:13 199:8,10
199:14,23 210:10
220:15 239:19,24
258:14
**worked**   18:19 19:3
19:4,9,11 34:20
41:20 74:9 105:21
167:16 172:4
201:13
**working**   18:12
20:8 36:4 40:10
80:4,9,22 144:3
153:7 172:2
176:17 199:2
205:17 206:20
211:9 239:12
**works**   41:23 120:4
191:9 237:14,20
**write**   110:21 207:4
**writing**   43:24
54:23 55:24 72:1
72:15 78:24 88:22
110:19 143:23
241:15 242:5,8
**written**   23:8 44:18
55:5,16 57:5 65:3
96:8 99:19,20,21
106:10,17,22
128:1,5 135:21,22
136:13 224:15,18
**wrong**   102:13
123:11,23 124:1,4
124:10 157:6
180:18 186:8
210:1 239:14
245:7 246:1
**wrongful**   17:24
**wrote**   97:22
194:22 197:22
209:12

**x**

**x**   3:1,6 4:1 5:1 6:1

**y**

**y'all**   34:3 196:14
**yeah**   21:10 24:2
24:14 30:7 34:4
39:4,20 40:22
41:23 42:24 45:8
45:22 47:12,14
50:3,17,21 51:6
52:8 53:8,23 54:1
61:8 62:10 63:1
63:17 65:2,11
70:4 73:6 78:11
78:13 82:10 83:4
83:20 86:9 89:8
91:8,21,22 95:11
95:14 96:20 98:3
98:5,5,5 99:6,24
107:7 110:18
111:3 113:4,6
115:23 117:10
118:15 121:22
122:6 123:17,25
125:10,18 127:6
129:6 132:5 136:6
136:15 137:2,2
143:8 144:15
145:17 147:16
156:21 157:10,23
167:22 170:16
173:10,20 174:7
177:19 179:19
181:5,17 182:2,19
184:4,18 187:10
187:19 189:2
193:11 195:2
196:3 198:2 199:9
202:11 203:7
209:8,8 212:6,11

212:21 213:18
217:9 218:12
219:2 224:9 226:8
228:18 231:6
233:6 235:15
239:10 242:24
247:23 248:1
249:19 250:11
251:16 261:14
262:20
**year**   16:21 19:4
22:21 80:18 88:4
123:3 183:1,23
195:12 198:6
258:13
**years**   11:7 18:7,13
19:10,11,23,25
20:1,2 21:8 82:11
98:20 169:4
171:24 172:6,18
176:18,18,18
183:13,16,17
193:5 201:12
239:15,24
**yep**   49:1 54:17
59:11,15 60:19
69:23 71:5 99:18
136:15,15 142:1
188:8 197:9 207:3
225:3 232:9 262:3
**yesterday**   108:4
**yorba**   10:25
**york**   86:22

**z**

**zero**   172:12
**zoom**   9:25 265:8

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.